```
              THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF TEXAS
                    MARSHALL DIVISION

                      *  *  *  *  *

G+ COMMUNICATIONS, LLC.,     *   CAUSE NO. 2:22-CV-078-JRG
                             *
         Plaintiff,          *
                             *
VS.                          *   MARSHALL, TEXAS
                             *   8:00 A.M. - 3:26 P.M.
SAMSUNG ELECTRONICS CO.,     *
LTD., et al.,                *
                             *
         Defendants.         *   JANUARY 26, 2024

                      *  *  *  *  *
```

**TRIAL ON THE MERITS**

BEFORE JUDGE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

*  *  *  *  *

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*EDWARD L. REED*
EdReedCR@aol.com
409-330-1605

**APPEARANCES:**

For the Plaintiff:

    **MR. JASON SHEASBY**        **(Los Angeles Office)**
    **MR. BENJAMIN MANZIN-MONNIN (Los Angeles Office)**
    **MS. LISA GLASSER**        **(Newport Beach Office)**
    IRELL & MANELLA, LLP
    1800 AVENUE OF THE STARS, SUITE 900
    LOS ANGELES, CA 90067-4276

    **MS. JENNIFER TRULOVE**
    **MR. SAM BAXTER**
    McKOOL SMITH, P.C.
    104 EAST HOUSTON
    SUITE 300
    MARSHALL, TX 75670

For the Defendants:

    **MR. RUFFIN CORDELL (Washington Office)**
    **MR. MICHAEL McKEON (Washington Office)**
    **MS. LAUREN DEGNAN  (Washington Office)**
    **MR. THOMAS REGER    (Dallas Office)**
    FISH & RICHARDSON, P.C.,
    1000 MAIN AVENUE, SW
    SUITE 1000
    WASHINGTON, DC 20024

    **MS. MELISSA SMITH**
    GILLAM & SMITH, LLP
    303 SOUTH WASHINGTON AVENUE
    MARSHALL, TX 75670

Courtroom Deputy:  ANDREA L. BRUNSON, CP

Court Reporter:  EDWARD L. REED

*EDWARD L. REED*
EdReedCR@aol.com
409-330-1605

**P R O C E E D I N G S**

**8:00 A.M. - JANUARY 26, 2024**

THE COURT:  As counsel are aware, we completed the presentation of evidence yesterday in the early part of the afternoon.  I released the jury for the remainder of the date.  We spent more than an hour where the parties presented and the Court heard and considered Motions for Relief under Rule 50(a) of the Federal Rules of Civil Procedure.  Having heard and ruled on those motions, the Court then conducted an informal Charge Conference with counsel for the parties in Chambers off the record and had a lively and fulsome discussion of the working draft of the Final Jury Instructions and Verdict Form.  The Court completed that informal Charge Conference after some length of time and then spent additional time last evening taking into account the input from each of the parties with regard to the Final Jury Instructions and Verdict Form.

Over this evening, last evening, into this morning, the Court produced what it believes to be the appropriate and proper Final Jury Instruction and Verdict Form for use in this case.  The Court has delivered that to counsel with an opportunity to review it, and the Court now intends to conduct a formal Charge Conference on the record where the parties may,

4

if they believe it necessary and proper to protect the interest of their clients, offer formal objections as to both the Final Jury Instructions and Verdict Form.

The Court's typical practice in this regard, counsel, is to ask a single spokesperson for each side to go to the podium, and my practice is to begin with the Final Jury Instructions and then review them on a page-by-page basis. Starting with the cover page and working page by page all the way to the end, in my view, ensures the greatest likelihood that nothing will be missing or overlooked. And as we turn to each page, I will ask if there are objections from either party. If you believe something improper has been included or something proper and necessary has been omitted, then you certainly may make those objections at that juncture as we go through this document from page to page.

So, with that, we'll proceed with the formal Charge Conference at this time. Whoever is going to speak for G+ and Samsung, please go to the podium and we'll proceed beginning with the Final Jury Instructions.

*[Pause]*

Somehow I knew it would be you two ladies.

All right, turning to the Final Jury Instructions, is there any objection from either G+ or Samsung to anything on the front cover page?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 2, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 3, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 4, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Next is page 5.  Are there objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning next to page 6, are there objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  Yes, Your Honor.

6

THE COURT:  State your objection.

MS. DEGNAN:  On line, 6, where it says "and", the sentence says, "Samsung must prove by a preponderance of the evidence that G+ failed to offer a license to patents in this lawsuit on fair, reasonable and non-discriminatory, or 'FRAND' terms," and it reads currently "and that G+ failed to negotiate toward a FRAND license in good faith."  We object to "and".  We would say "or".  This comes up later when Your Honor uses "or", and we have a similar objection to the form.

THE COURT:  I'm sure your objections will be consistent throughout.

MS. DEGNAN:  Okay.

THE COURT:  That objection is overruled.

MS. DEGNAN:  If I could be heard later to use "or" instead of "and".

THE COURT:  We'll take it one instance at a time, counsel.  Is there anything else by way of an objection from Defendant on page 6?

MS. DEGNAN:  No, Your Honor.

THE COURT:  Then let's turn to page 7.  Any objection here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  All right, turning to page 8 of

the Final Jury Instructions.  Are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 9, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 10, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  And then to page 11 of the Final Jury Instructions, are there any objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 12, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  Your Honor, I'll state for the record those objections we previously made with the Court.

THE COURT:  But you're not offering a new objection here, you're just preserving your prior

objection; correct?

MS. DEGNAN:  Yes, Your Honor.

THE COURT:  Okay.  Then unless there is something further on page 12, we'll turn to page 13 of the Final Jury Instructions and I'll ask if there is objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  Yes, Your Honor, we object to this section because it does not include the following sentence, which we would insert at the bottom of the full paragraph.  After "Interchangeability at the present time is not sufficient," we would insert:

"However, G+ must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the Accused Device, or with respect to the function, way, result, and it must be on a claim limitation-by-limitation basis to support a finding of infringement under the doctrine of equivalents. Generalized testimony as to the overall similarity between the claims and the Accused Products is not sufficient to support a finding of infringement under the doctrine of equivalents."

THE COURT:  All right, that objection is overruled.  Anything else on page 13?

MS. DEGNAN:  No, Your Honor.

THE COURT:  Then we'll turn to page 14.  Are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning then to page 15, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 16, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 17, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 18, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 19, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 20, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 21, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 22, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  Yes, Your Honor.

THE COURT:  State your objection.

MS. DEGNAN:  In the second paragraph, before the sentence that currently reads, "The issue of written description is decided on a claim-by-claim basis, not as to the entire patent or groups of claims," before that sentence we would insert, "It is not sufficient that the specification discloses only enough to make the claimed invention obvious to a person having ordinary skill."

THE COURT:  All right, that objection is overruled.  Anything further from the Defendants on page 22?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Then turn to page 23.  Are there any objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 24, are there any objections?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 25, are there any objections?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  Yes, Your Honor.

THE COURT:  State your objection.

MS. DEGNAN:  In the paragraph that begins, "If you find that the Patents-in-Suit are indeed essential," in the second sentence after the clause that ends in "a FRAND royalty in this case," with the current reading of "only if you find that the Patents-in-Suit are standard essential, based on the totality of the circumstances," we would strike "only if" and add "whether or not".

So the sentence would read, "You should determine a FRAND royalty in this case, whether or not you find that the Patents-in-Suit are standard essential, based on the totality of the circumstances."

And the reason for this, Your Honor, is

the evidence in the law is that the FRAND obligation attaches due to the declaration and it never goes away. If they are not proven to be essential, there is still the obligation to offer a license on FRAND terms because the obligation attaches, that the declaration alone requires it.

THE COURT:  Does Plaintiff have a response here?

MS. GLASSER:  I'm sorry, I'm not sure exactly what sentence.  Can you show it to me, the one you want to add?

MS. DEGNAN:  It starts with "You should determine," and then where it says "only if", replace that with "whether or not".

MS. GLASSER:  I disagree with that.  I think we could strike the sentence and get rid of it.  Maybe that would resolve the objection.  But the sentence, as it is, is correct.  As Your Honor states elsewhere in the instructions, if somebody is negotiating in bad faith, there is no FRAND obligation during that point in time.  So, if the jury were to find that due process was suspended and Samsung never came back to the table in good faith, then this would be true, that there would not have to be a FRAND royalty.  But again, I think you could strike the sentence, which could

probably resolve her objection as well.

THE COURT: Would striking the sentence resolve the objection, Ms. Degman?

MS. DEGNAN: No, Your Honor, we want to have the sentence as I said it.

MS. GLASSER: The sentence as read is incorrect.

THE COURT: All right, thank you for your input, counsel.

I'm going to grant this objection. I agree that the FRAND obligation attaches at the time the patents are contributed to the standard and is irrevocable, and I think that's consistent with my ruling under Federal Rule of Civil Procedure 44.1, which I've entered in this case earlier. So I'm going to take out "only if" and I'll change that to "whether or not".

MS. DEGNAN: Thank you, Your Honor.

THE COURT: Is there anything further from either party on page 25?

MS. GLASSER: There is an objection to the part starting at the bottom of the page, but primarily to the portion that carries over on page 26. The portion at the bottom of page talks about "patent holdout" and I don't think there was evidence on that

term in this case.  But the primary objection we have is to "patent holdup" on the following page, we're primarily focused on the prejudicial statement on page 26 regarding "patent holdup".

THE COURT:  Well, since your focus is on 26, let's turn to page 26.  And let me ask for the record if either party has an objection to anything regarding page 26?

MS. GLASSER:  Just the portion regarding "patent holdup", Your Honor.

MS. DEGNAN:  Your Honor, if I can respond, we object to having both paragraphs.  However, if the Court were to take out the second paragraph related to "patent holdup," we would then have an objection to the paragraph about "patent holdout" remaining that starts on page 25.

THE COURT:  All right.  I'm going to overrule the Plaintiff's objection.  I'm going to leave both provisions in as they currently stand.

Is there anything further from either party with regard to page 26 of the Final Jury Instructions?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Then we'll turn to page 27.  Are

there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 28, are there any objections here?

MS. GLASSER:  Yes, Your Honor.  The first seven lines incorrectly states that G+ has a burden to show that non-infringement alternatives were available at the time of the hypothetical negotiation.  It's not an exact statement of the law; and moreover, it's prejudicial here because the argument G+ is making is almost the opposite.  The argument is that Samsung did not have available alternatives and that the jury should consider the next best option as a part of calculating damages.

THE COURT:  All right, that objection is overruled.  Anything further from either party on page 28?

MS. GLASSER:  Yes, just a small typographical error in the middle paragraph, "'443 Patent."

THE COURT:  It's '442.

MS. GLASSER:  And then additionally, the large paragraph at the bottom stating, "The parties dispute the date that the damages period began," and to all of the other instructions regarding marking and notice.

There is no issue of marking in this case.  It was not pled or disclosed, nor was evidence produced at trial by the Defendant that there was any unmarked products.  So [??] wasn't satisfied at any point during the case, nor were the pleadings amended, and therefore it is improper and prejudicial.

THE COURT:  All right.  Well, in the third line of the middle paragraph, which begins "In calculating damages," where the patent number is erroneously listed as '442, I will change that typographical error to '443.  With regard to the remainder of the objection raised by Plaintiff on page 28, that is overruled.

Anything further before going to page 29?

MS. DEGNAN:  Yes, Your Honor, for the Defendant on page 28, on the fifth line --

THE COURT:  From the top?

MS. DEGNAN:  From the top, yes, Your Honor, that line, "that a proposed non-infringing alternative was available," we would ask the Court to insert "for available acceptable," and we preserve our objection in that regard.

THE COURT:  All right, that's overruled.  We'll turn next to page 29.  Is there any objection here from either party?

MS. GLASSER: Yes, Your Honor. G+ preserves its objection to the statement "you may consider that a party filed one or more lawsuits, even if the lawsuits were allowed to be filed, when you assess the totality of the circumstances," first, because that is not an act of bad faith and because it improperly emphasizes the just one of the factors.

THE COURT: All right, that objection is overruled. Anything further on page 29 from either party?

MS. GLASSER: No, Your Honor.

THE COURT: Then we turn to page 30. Are there any objections here from either party?

MS. GLASSER: Yes, Your Honor, and this is not an objection. Just for the record, I think there actually appears to be something that was omitted from it. Your Honor's 44.1 order provided the proper standard under French law for a case like this where there's competing claims by both sides. This is on page 5 of Document 575, where it says, "The party who fails to act in good faith is liable to the other parties for any reasonable damages that arise from such breach, including but not limited to attorneys' fees." The current version of the jury instructions addresses only the Defendant's Counterclaim. It doesn't address

the G+ claim.  And so we respectfully submit that this was an omission perhaps by the Court in that paragraph, and that it should be replaced with the Court's language from Document 575.

THE COURT:  Ms. Glasser, it identifies parties to a negotiation and which one breached and which one was the non-breaching party.  It doesn't specifically identify Plaintiff or Defendant or patent holder or implementer.

MS. GLASSER:  It should have the language from Your Honor's prior order at Document 575, and not this language just about the patent holder.

THE COURT:  Beginning portion of that paragraph refers to negotiating parties and non-breaching parties, but it does get down to patent holder in the fourth line of that paragraph.  I was focusing on the earlier part of the proposed paragraph.

MS. GLASSER:  Samsung actually hasn't objected to this either.  It was included in the parties' submitted joint instructions, the exact language from Your Honor's Document 575 at page 5.

MS. DEGNAN:  So, Your Honor, if I can respond?

THE COURT:  Please do.

MS. DEGNAN:  So, in this sentence our objection assumes to have them both considered in the

revision. Our objection to this paragraph is two-fold: One is it says "or." When a party's negotiation violates its duty to negotiate in good faith towards a license, "or" -- and we would insert, before the word "violates", "the patent holder," because it says "violates the duty to offer a FRAND license," where it is the patent holder's obligation, not ours. We don't have a duty.

So I think the rest of the sentence would be and is accurate if you insert "the patent holder violates its duty to offer the FRAND license." And given the rest of the sentence, we think it was the patent holder's omission, which may be inadvertent, and so that's how we would edit in the sentence.

And with respect to adding any more language, we think that what you have here is sufficient.

MS. GLASSER: Your Honor, the document would actually address her objection as well. If you don't have it handy, I could hand it up. Would that be helpful?

THE COURT: I do not have it. You may approach. Hand it to the Courtroom Deputy.

*[Pause]*

Let me ask Samsung's counsel what its

position would be with regard to the suggestion that the Court's determination of French Law in Document 557, which is the Court's Order and opinion under Rule 44.1 of the Federal Rules of Civil Procedure, why that would or would not be appropriate here or adequate here?

MS. DEGNAN:  So, Your Honor, I'm getting a copy of it.  If you bear with me, when I read this this morning, I thought Your Honor had captured the essence and put it in simpler language.  And so I would just like to reread the language you would add --

THE COURT:  That's fine, take a moment.

MS. DEGNAN:  And, Your Honor, which portion?

THE COURT:  The middle of page 5, counsel.

MS. DEGNAN:  Is it the one that starts "In a negotiation for a license"?

THE COURT:  Yes, it is.

MS. DEGNAN:  Thank you.

THE COURT:  The indented language.

*[Pause]*

MS. DEGNAN:  That would be fine, Your Honor. We would have no objection.

THE COURT:  Then that's what we will do.  I'll insert that language in place of the first paragraph on the top of page 30.

21

MS. DEGNAN:  However, I would then object to the removal of that paragraph.  The reasons are already stated.  We would like before access of that maintained and we think "the patent holder" language should be in front of "violates its duty".

THE COURT:  That's overruled.

MS. DEGNAN:  Thank you, Your Honor.

THE COURT:  All right.  There is only one other sentence on page 30.  Just for completeness, I'll ask if there are any other objections on page 30?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Then we'll turn to page 31 of the Final Jury Instructions.  Are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turn again to page 32, which is thankfully the last page of the Final Jury Instructions.  Are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Okay, counsel, I'll make those changes with regard to the Final Jury Instructions. Let me ask you to turn your attention to the verdict

form.

MS. DEGNAN:  Before you do that, Your Honor, I have a question, a clarification question.  I did not read in the entire original paragraph on paragraph 30 before you struck it.  And do you think the record is clear that the entire paragraph -- the colloquy, they objected to part of it, but the whole thing was not read into the record and I think it would be helpful if we read what you originally had -- to modify into the record.

THE COURT:  If you think it's necessary for preservation purposes, you can read the entirety of paragraph 30 -- excuse me, the top paragraph on page 30, if you think it's necessary.

MS. DEGNAN:  Thank you, Your Honor.

THE COURT:  Please do so, but don't go so fast that the court reporter can't take it down.

MS. DEGNAN:  Yes, Your Honor.

The paragraph we would insert was, "When a party to the negotiation violates its duty to negotiate in good faith towards a license, or the patent holder violates its duty to offer a FRAND license, the non-breaching party is entitled to damages covering all its losses caused by the FRAND holder's bad faith, including the costs of defending itself against the

suit brought by the patent owner in violation of its duty to act in good faith."

Thank you, Your Honor.

THE COURT:  All right, let's move to the verdict form.  We'll follow the same approach.  Is there objection from either party with regard to the cover page or page 1 of the verdict form?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 2, are there any objections to anything on this page?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 3, where there are some instructions set forth, are there objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 4, where the infringement questions are listed, are there objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to question 2, where the Step 2 question under 101 is listed, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to question 3 on page 6, is there any objection here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page --

MS. GLASSER:  Oh, I apologize, Your Honor, there is an objection here from us because the question implies --

THE COURT:  Just a minute, let me turn to the page.  Okay, question 3, page 6.  What's your objection?

MS. GLASSER:  The question implies that all three of the defenses apply to each of the listed claims, whereas, in fact, where that '130 Patent, there was only a written description, and the others only in some instances anticipation and sometimes obviousness.

THE COURT:  Well, I tried to write that.  So some of these claims, all three defenses apply; some of these claims, less than all three defenses apply to.  I tried to write it so that if any of these defenses apply.  They would answer it yes, but not to exclude the possibility they could find that all three defenses apply.  That's why it's written that way.

MS. GLASSER:  And that is our concern, that will be the impression, but for the '130 Patent, for example, they only are arguing written description.

MS. DEGNAN:  So, Your Honor, I would respond --

MS. GLASSER:  And --

THE COURT:  No, ladies, not at the same time. Come on.  Go ahead, Ms. Degnan.

MS. DEGNAN:  So the jury instructions are, we think, completely clear as to what theory is with respect to this patent.  And we think that the way Your Honor has it in question 3 is elegant and easy for the jury to understand and we would ask that you keep it.

THE COURT:  All right, what else from you, Ms. Glasser?

MS. GLASSER:  Nothing else, Your Honor.

THE COURT:  Okay.  Plaintiff's objection to question 3 on page 6 of the verdict form is overruled.

We'll turn then to page 7 of the verdict form.  Are there objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 8 of the verdict form, are there objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 9 of the verdict form, are there objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  Yes, Your Honor.

THE COURT:  State your objection.

MS. DEGNAN:  In question 5 there is a word in the third line that's bolded "and".  We would have that be "or".  So the question would read, "Did Samsung prove by a preponderance of the evidence that G+ breached its FRAND obligation by failing to offer a license to the Asserted Patents to Samsung that was fair, reasonable, and non-discriminatory," and we would say, **"or** by failing to act in good faith regarding negotiations with Samsung as to a FRAND license covering the Asserted Patents."

THE COURT:  I'm going to deny that objection.  However, I am going to remove the bolding from the word "and" just not to call undue attention to it.  But I'm not going to change the question as it's presented.

Any other objection from page 9?

MS. DEGNAN:  No, Your Honor.

MS. GLASSER:  Your Honor, in view of that, on page 5 could we suggest, as well, removing the bolding on **"well understood, routine, and conventional**?"  It seems like that's unduly emphasizing that part.

THE COURT:  That is the crux of the Step 2 analysis, counsel.  That's why it's bolded there.  I've tried to bold things where I wanted to make sure the jury was clear.  In the competing breach of FRAND sections I tried to bold the word FRAND.  To focus the jury's attention, I tried to bold the parties' identification so they don't confuse who is in which posture on each question.  I'm not going to go through and change the bolding.  I will take it out on question 5 because, quite honestly, I reconsidered whether I should have bolded "and" there in the first part, but I'm not going to change it otherwise.

All right, anything further on page 9 or page 10?

MS. GLASSER:  No, Your Honor.

THE COURT:  All right, we'll turn to page --

MS. DEGNAN:  I'm sorry, you said 9 or 10?

THE COURT:  Yes, I thought we had covered that.

MS. DEGNAN:  Okay, so there is nothing else on 9.  I have not yet spoken on 10.

THE COURT:  All right, I'll give you an opportunity to speak on 10, then.  Do you have an objection here?

MS. DEGNAN:  Yes, Your Honor.

THE COURT:  State your objection on page 10.

28

MS. DEGNAN:  On page 10 we have an objection to having question 8 in the verdict form at all.  We would strike it.

THE COURT:  All right, that objection is overruled.

Anything on page 11 from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Page 11 is the final page of the verdict form.  That completes the formal Charge Conference.  I will make these changes.  As I've indicated earlier, I'm going to prepare eight printed hard copies of the Final Jury Instructions so that the Members of the Jury can have those for their benefit in the jury room when they enter into their deliberations.  That will take me just a minute.  Other than that, I'm prepared to return to the bench, bring in the jury, and proceed with these Final Jury Instructions, followed by closing arguments from the parties.

Is there anything that either side, not just the two counsel at the podium, but is there anything from either side, either trial team, that needs to be raised before we go forward?

MR. SHEASBY:  There is, Your Honor.  We discussed the fact at the end of the entry of evidence

29

we would specify particularized papers of the source code binders that were actually used in front of the jury so that the subsets could go to the jury.  We have those specific pages and they are agreed to, and I think that they now need to heard.

THE COURT:  All right, well, I do need to also inquire if there are any items in the list of pre-admitted exhibits that were used for the first time during the portion of the trial yesterday so that we can get those in the record, if there are any.  And that's when I would intend to take up this other issue as well.  And I'll do that when I return before I bring the jury in.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  Also, based on communications last evening, I understand the parties have agreed and I have satisfied myself with the Court staff that we can facilitate this.  We will allow publishing of any confidential information electronically during closing, without leaving the courtroom, in a manner that disables the monitors in the gallery, and counsel have agreed to adjust the position of the monitors on counsel tables so they wouldn't be visible to anybody that is behind the bar, and only people subject to the Protective Order will be permitted within the bar, and

30

that should avoid the unintended disclosure of confidential information.  That proposal as proposed by the parties is acceptable to the Court and we'll follow that process during closing.

Anything further?

MR. SHEASBY:  Nothing from Plaintiff, Your Honor.  Thank you.

MR. CORDELL:  Nothing from Samsung, no, Your Honor.

THE COURT:  All right, we'll stand in recess.

*[Recess]*

All right, counsel, are the parties prepared to read into the record those items in the list of pre-admitted exhibits used in yesterday's portion of the trial?

MR. SHEASBY:  Plaintiffs are, Your Honor.

THE COURT:  All right, let's proceed to do that.

MR. SHEASBY:  Your Honor, beginning on day two of the trial we used [??] files from two exhibits, which was JTX-13 and JTX-14.  Those are thousands and thousands of pages long.

On the morning of Wednesday an agreement was reached between the parties on the record that at the end of the close of evidence we would extract the

pages that had the code that was shown to the jury.

THE COURT:  I remember that.

MR. SHEASBY:  We have not done that.  We've given them the page numbers.  In clarification this morning, Mr. Freeman, who's from Samsung, said, "Samsung will seek to admit the full files in which the below page ranges are contained."  We have only included in our [??] the pages that contain portions of the code that was actually shown to the jury.

Samsung has now changed 180 degrees from what they told us this morning and is now claiming that it's not enough to just extract the pages; we must then redact everything on the page except for the specific line that was called out to the jury.

There's two problems with it.  We don't do that with regular documents.  It is not required with a fail-safe Protective Order, and it would take us weeks to go through and redact so that there would be one or two random lines on a page of source code.

So what we have done is the only thing included in these binders are the specific pages that contain source code that was shown to the jury without objection.

THE COURT:  Let me hear from Samsung in regard to this issue.

32

MR. FREEMAN:  Good morning, Your Honor,

THE COURT:  Good morning.  As you may recall from the earlier discussion about the source code technician pages, it was indicated it would provide the pages that were cited plus perhaps a page on each side for additional context.  To clarify, if I may read in the specific pages into the record.

For JTX-013, the pages that were discussed are pages Samsung GCSC0112.

THE COURT:  Let me stop you, counsel.  Are those the same pages that are in the binder Mr. Sheasby has held up?

MR. FREEMAN:  I understand that is the source code that GComm seeks to admit, not the code that we seek to admit.

MR. SHEASBY:  I've also included your code as well.  So this is both yours, as well as ours.

THE COURT:  All right, so we have one binder that has in it source code that either party has published to the jury during the course of the trial; correct?

MR. FREEMAN:  Your Honor, we received the identification of pages that GComm intended to include, that binder, at approximately 7 a.m. this morning that we simply have not had time to evaluate it because they

have the copies.  Their source code exists in hard copies back in our war room.  We just received this identification this morning as we were coming to court --

THE COURT:  Let me ask this question:  The source code as issue -- well, let me ask it this way.  During the Pretrial process, certain pre-admitted exhibits were taken up and considered by the Court and the Court pre-admitted certain exhibits.  Some of those exhibits, I'm assuming, related to this source code and there were more pages in the pre-admitted exhibits than were actually exhibited to the jury during the course of the trial.

My understanding is this effort which we talked about early into the trial as an ongoing effort would be not to have those exhibits available, if the jury should ask for them, with every page of source code that have those exhibits, if the jury should ask for them, limited to the page of the source code that were actually published to the jury.  And there was the statement for a page on either side for context.  And my understanding was the parties were going to jointly work through that over the course of the trial so that we can have those exhibits winnowed down to just the exhibited source code pages and perhaps a page or so

for context rather than multiple additional pages of source code that, (A), are highly confidential, and (B), were never exhibited to the jury.

What I need to know is, has that happened and do we have that by individual exhibit, or have you taken source code across the board and put it in one binder?  Because we're going to need to be able to track it by exhibit because the jury is going to have to ask for any exhibits that they want.  And if they ask for an exhibit number that has source code as a part of it, I don't intend to send them a binder with every piece of source code that was exhibited during the trial.

But I guess my question is:  Has this been accomplished or has this not been accomplished?  Where are we?  I gather what you're telling me it may be that you haven't had time to prove it or check it.

MR. FREEMAN:  That's correct, Your Honor.

THE COURT:  Here's what we're going to do.  I need to start my Final Instructions to the jury, which, based on the way I will probably read them, will take at least an hour.  There's 32 pages of Final Jury Instructions.  And then we've got an hour of closing statements -- or more than an hour of closing statements between the two parties.

I'm going to direct that counsel for the competing parties not involved in the final argument, excluding your two lead counsel on either side, that you work through this issue.  From the Samsung side, you need to check what's been given to you earlier this morning.  Hopefully, at the end of the process and before the jury would ask for any exhibits, you'll have this worked out and can put some agreement on the record.

If, in the worse possible case we don't have that worked out -- or you all don't have that worked out and there is no agreement to put on the record, at least then I will have time to get in the middle of it and try to resolve it for you.  I can't do that now without holding up the whole procession.

So, basically, what I'm going to end up telling you both is I'm carrying this.  I want both sides to continue to work on it.  I will see where you are on this after the case is delivered to the jury and they retire to the jury room to deliberate.  At that point there will be time to focus on this.  I can't take the amount of time this is going to require now and do it.  Understood?

MR. FREEMAN:  Understood, Your Honor.

THE COURT:  All right.  Mr. Sheasby,

obviously, you're going to present closing arguments for Plaintiff.  Who is going to be working on this issue from your side?

MR. SHEASBY:  Mr. Manzin-Monnin.

THE COURT:  All right.  And you'll continue to work on it from the Defendant's side, Mr. Freeman?

MR. FREEMAN:  I will, with some of my colleagues to assist, Your Honor.

THE COURT:  Well, whoever is going to participate, continue to do that while the rest of us go forward, and then after the jury retires, I'll see where we are.

I gather, counsel, in addition to this source code issue, there are not other discrete exhibits that were only used for the first time during yesterday's portion of the trial, or were there?

MR. FREEMAN:  There were three from Defendants, Your Honor, and there's also one request for clarification.

THE COURT:  Well, read the three into the record that you used for the first time during yesterday's portion of the trial.

MR. FREEMAN:  DTX-052, JTX-024, and JTX-025.

THE COURT:  Okay.  Does Plaintiff object to that rendition by Defendants?

MR. SHEASBY:  No, Your Honor.

THE COURT:  Okay.  Does Plaintiff have any exhibits that were used for the first time during the portion of the trial yesterday?

MR. SHEASBY:  Source code, no, Your Honor.

THE COURT:  All right.  Now, you mentioned some clarification, Mr. Freeman.  What is that?

MR. FREEMAN:  I did, Your Honor.  On Monday, during the cross-examination of Dr. Akl, DTX-190 was used.  On the record there was an objection made and discussion that this was not a pre-admitted exhibit and thus could be used for demonstrate purposes only.  We went back and looked at the record.  It turns out that document was actually a pre-admitted exhibit.  And since it was a pre-admitted exhibit and was discussed on the record, we would request that DTX-190, which was discussed on Monday, also be read in as evidence.

MR. SHEASBY:  Your Honor, DTX-190 is a page from Dr. Wicker's report that the Court has repeatedly forbade to be displayed to the jury as a demonstrative and was not pre-admitted as an exhibit.  It has no role in front of the jury in closing because it was not used as a demonstrative nor as an exhibit.

THE COURT:  So you all do not agree factually whether this was a pre-admitted exhibit or not during

the pretrial process?

MS. GLASSER:  DTX-190, which is Dr. Wicker's report, was not a pre-admitted exhibit, Your Honor.

THE COURT:  And you contend that it was, Mr. Freeman?

MR. FREEMAN:  I do.  I have highlighted documents that shows it was.

THE COURT:  All right, the two groups from each side will continue to work on that issue and I will take that up at the same time we take up the source code issue after the jury retires.  I'll carry both of those issues.

MR. SHEASBY:  Thanks, Your Honor.

THE COURT:  Anything further?

MR. FREEMAN:  Nothing from Defendants, Your Honor.

THE COURT:  All right.  Anything else from anyone else before I bring in the jury?

MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

MR. FREEMAN:  Nothing from Defendant.

THE COURT:  All right.  Let me ask, do we have everything arranged in the courtroom with regard to the monitors, so that when we get to closing arguments, they'll be ready to go?

MS. TRUELOVE:  That's our understanding, Your Honor.

THE COURT:  Okay.  Now, I want to say this very briefly and then we'll bring in the jury.  The Court considers this Final Jury Instructions to the jury and counsel's closing arguments the most serious part of a very serious process.  I don't want any distractions or interruptions during either of those.  If you need to do something that might be disruptive or distracting, do it now before I bring in the jury.  I don't want paralegals wheeling boxes of documents into the room.  I certainly don't want cell phones or other devices emitting noises alarms or sounds.  If there is anything you need to arrange to avoid that, I'm speaking to everyone in the courtroom, do it now.  I will not be so easy-going if we're interrupted during this portion of the trial as I have been during the evidence.

All right.  Let's bring in the jury, please.

*[Jury in]*

Good morning, members of the jury.  Welcome back.  Please have a seat.

Ladies and gentlemen of the jury, you have now heard all the evidence in this case.  And I will

40

now instruct you on the law that you must apply.

I want you each to understand that when you retire to the jury room to deliberate, I'm going to send back and each of you will then have your own hard copy, printed version of these final injury instructions that I am about to give you orally now. My request would be that you focus on what I am saying to you, listen carefully, and you should not feel compelled to make notes at this point because you are going to have your own printed copy of these to review when you get back to the jury room.  So please listen carefully as I go through these instructions with you orally.

It is your duty to follow the law as I give it to you.  On the other hand, and as I said, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or make in the course of these instructions as an indication that I have any opinion about the facts in this case.  You are about to hear closing arguments from the attorneys for both sides.  Statements and lawyers of the attorneys, ladies and gentlemen, are not evidence, and they are not instructions on the law.  They are intended only to assist the jury in understanding the evidence and the

parties' contentions.

A verdict form has been prepared for you. And you will take the verdict form with you to the jury room when you deliberate. And when you have reached a unanimous agreement as to the answers to the questions in that verdict form, you will have your foreperson complete those questions to reflect your unanimous answers, sign it, date it an then advise the Court Security Officer you've reached a verdict. Answer the questions in the verdict form from the facts as you find them to be. Do not decide who you think should win this case and then answer the questions to reach that result. Your answers and your verdict in this case, let me remind you, must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all of the witnesses, regardless of who may have called them. You may consider the stipulations of any of the parties, and you may consider all the exhibits that have been received and admitted into evidence, regardless of who may have introduced or used them.

You, the jurors, are the sole judges of the credibility of all the witnesses and the weight and effect, if any, to give to all of the evidence. Now,

in deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone are to determine the questions of credibility or truthfulness of the witnesses.  In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest that witness may have in the case or its outcome, any prejudice or bias about the case that the witness might have, and you may consider the consistency or inconsistency of their testimony, considered in the light of the circumstances.  Has the witness been contradicted by other evidence?  Has he or she made statements at other times and in other places contrary to what they said on the witness stand?  You, the jury, must give the testimony of each witness the amount of credibility and believability that you think it deserves.

You must also keep in mind, ladies and gentlemen, that a simple mistake does not mean that a witness is not telling the truth.  You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory, and what significance should be attached to that testimony.

As I told you previously, the attorneys

in this case are advocates for their competing clients, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court. When the Court sustained an objection to a question addressed to a witness, you must disregard the question entirely, and you may draw no inference from its wording or speculate about what the witness would have said if the Court had allowed them to answer the question. However, if the objection was overruled, then you must treat the answer to the question just as you would the answer to any other question as if the objection had not been made. Now, by allowing the testimony or other evidence to be introduced over the objection of attorney, the Court in doing so did not indicate to you any opinion about the weight or the effect of that evidence.

Now, at various times during the course of the trial it's been necessary for the Court to talk with the attorneys outside of your hearing, either by talking to them here at the bench or by calling a recess and talking to them when you were outside of the courtroom. This happens because during trials such as this, things arise that do not involve the jury. You should not guess or speculate about what was said during such discussions between the Court and counsel

44

that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or it's called sometimes circumstantial evidence. That is the proof of the chain of circumstances that indicates the existence or the non-existence of certain other facts. As a general rule, you should understand that the law makes no distinction between direct or circumstantial evidence, but simply requires that you find the facts based on the evidence presented, both direct and circumstantial.

Now, certain testimony over the course of the trial has been presented to you through depositions. A deposition is the sworn, recorded answers to questions as to a witness in advance of the trial. In general, if a witness cannot be present to testify in person, then the witness's testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the parties questioned these deposition witnesses under oath. At that time a court reporter was present and recorded the sworn testimony that was given. Deposition testimony, ladies and gentlemen, is

45

entitled to the same consideration by you as testimony given by a witness in person from the witness stand in open court.  And you should judge the credibility and the importance of deposition testimony to the best of your ability just as if the witness had testified in open court before you.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and the exhibits as you feel are justified in the light of common experience.  Said another way, you may make deductions and you may reach conclusions that reason and common sense lead you to draw from the facts that have been established through the testimony and evidence in this case.  However, you should not base your decisions on any evidence not presented by the parties during the trial, including your own personal experiences with any of the products that might be at issue or that are at issue in this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the evidence, you believe that single witness.

Also, when knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field -- we call them an "expert witness" -- is permitted to state his or her opinions on those technical matters to the jury.  However, you are not required to accept those opinions.  As with any other witness, it is solely up to you to decide whether to accept and rely on what's presented or not.

Now, certain exhibits have been shown to you over the course of the trial that were simply illustrations.  We call these types of exhibits "demonstrative exhibits" or simply demonstratives." Demonstrative exhibits, ladies and gentlemen, are a party's depiction, picture, or model to describe something involved in the trial.  If your recollection of the evidence differs from these demonstratives, then you should rely on your recollection.  Demonstrative exhibits are sometimes referred to as "jury aides." And these demonstrative exhibits themselves are not evidence, but a witness's testimony concerning a demonstrative is evidence.  Let me be clear, demonstrative exhibits will not be available for you to review or consider during your deliberations.

Now, in any legal action, facts must be

proven by a required amount of evidence known as the "burden of proof." The burden of proof in this case is on the Plaintiff for some issues and on the Defendants for other issues. There are two burdens of proof that you will apply in this case. They are the "preponderance of the evidence" and "clear and convincing evidence."

The Plaintiff in this case, G+ Communications, LLC, which you have heard referred to throughout the trial as either the "Plaintiff," "G+" or "GComm," has the burden of proving patent infringement by a preponderance of the evidence. G+ also has the burden of proving damages for any patent infringement by a preponderance of the evidence. A preponderance of the evidence means evidence that persuades you that the claim is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Defendants in this case, Samsung Electronics Company, Ltd., and Samsung Electronics America, Inc., which you have heard referred to throughout the trial collectively as the "Defendants" or simply as "Samsung," they bear the burden of proving invalidity of G+'s patent claims by clear and convincing evidence. Clear and convincing evidence

means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable. Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard. If proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, G+ and Samsung both allege that the other has failed to comply with what are known as FRAND obligations during their negotiations. Each party must prove its claim by a preponderance of the evidence. For Samsung to succeed on its claim, Samsung must prove, by a preponderance of the evidence, that G+ failed to offer a license to the parties in this lawsuit on fair, reasonable, and non-discriminatory, as you've heard them referred to "FRAND" terms, and that G+ failed to negotiate toward a FRAND license in good faith. For G+ to succeed on its claim, G+ must prove, by a preponderance of the evidence, that Samsung has failed to negotiate toward a FRAND license in good faith.

Now, as I've previously told you, ladies

and gentlemen, these two burdens of proof that I've described to you are not to be confused with a separate, different, and all together unrelated burden of proof known as "beyond a reasonable doubt," which is the burden of proof applied in a criminal case, and which has absolutely no application at all in a civil case such as this.  Beyond a reasonable doubt is a higher burden of proof or standard than the preponderance of the evidence standard, and it is a higher burden of proof or standard than the clear and convincing evidence standard.

Now, as I did at the beginning of the case, I will give you a summary of each side's contentions in the case, and then I'll provide you with detailed instructions on what each side must prove to win on each of its contentions.  As I have previously advised you, this is an action for patent infringement. The Plaintiff, G+, contends that the Samsung Defendants infringed certain claims of three United States patents.  They are U.S. Patent Number 8,761,776, which you've heard referred to throughout the trial as the '776 Patent, U.S. Patent Number 10,736,130, which you have heard referred to as the '130 or the 130 Patent throughout the trial, and U.S. Patent Number 10,594,443, which you heard referred to during the

trial as the '443 or the 443 Patent.  Together, these three patents have been referred to, and are noted to be the "Asserted Patents," or they are also referred to as the "Patents-in-Suit" in this case.

Now, G+ contends that Samsung infringes the following claims of these asserted patents: Claims 1 and 2 of the '776 Patent, Claim 20 of the '130 Patent, and Claim 10 of the '443 Patent.  And these are referred to as the "Asserted Claims."  G+ contends that the Asserted Patents are essential to the ETSI 5G standard and that Samsung has infringed the Asserted Claims by making, using, selling, importing, or offering for sale smartphones and tablets that comply with the 5G standard.  These are the "Accused Products."  Separately, G+ contends that the Accused Products infringed the Asserted Claims whether or not the Asserted Patents are essential to the ETSI 5G standard.  G+ contends that it is entitled to money damages in the form of a reasonable royalty for Samsung's infringement, and G+ has the burden to prove these issues by a preponderance of the evidence.

Samsung denies that the Asserted Patents are essential to the 5G standard.  Samsung also denies that it infringes any of the Asserted Claims.  Samsung denies that it makes, uses, offers for sale, sells, or

imports any Accused Product that infringes any of the Asserted Claims.  Samsung also denies that it owes G+ any money damages.

Samsung also contends that certain of the Asserted Claims are invalid for claiming ineligible subject matter, because they are not new, because they are obvious, and/or because they lack an adequate written description.  Samsung has the burden to prove invalidity on these various bases by clear and convincing evidence.

invalidity and infringement, ladies and gentlemen, are separate and distinct issues.  Your job is to decide whether Samsung has infringed the Asserted Claims and whether those claims are invalid.  If you decide that any asserted claim has been infringed and is not invalid, you will then need to decide the amount of money damages, if any, to be awarded to G+ to compensate it for that infringement.

Now, the parties agree that the Asserted Patents are subject to certain commitments to ETSI.  Samsung alleges that G+ breached its obligation to negotiate in good faith.  Samsung also asserts that G+ breached its obligation to offer a license to the Patents-in-Suit on fair, reasonable, and non-discriminatory terms.  Samsung asserts that it is

entitled to damages as a result of G+'s breach.  G+ denies that it has breached any obligations.  Additionally, G+ contends affirmatively that Samsung breached its duty to negotiate in good faith.  Samsung denies that it breached any obligation to negotiate in good faith.  Now, if you find any breach by either party, any resulting damages must be proven by a preponderance of the evidence.  Both parties deny that the other is entitled to any damages in that circumstance.

Now, before you can decide many of the issues of this case, you will need to understand the role of the patent "claims."  The patent claims, ladies and gentlemen, are those numbered sentences at the end of each patent.  The claims are important because it is the words of the claims that define what the patent covers.  The figure and the text in the rest of the patent provide the description and/or examples of the invention and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's protection and coverage.  Each claim effectively is treated as if it were a separate patent, and each claim may cover more or may cover less than any other claim.  Accordingly, what a patent covers depends in turn upon what each of its claims covers.

Now, you will first need to understand what each claim covers in order to decide whether or not there has been infringement of the claim and to decide whether or not the claim is invalid.  The law says that it is my role as the Judge to define the terms of the claims and it is your role as the jury to apply my definitions to the issues that you are asked to decide in this case.  Therefore, as I have explained to you at the beginning of the case, I've already determined the meanings of certain language from the claims and I have provided those definitions, sometimes they are called constructions, to you regarding those certain claim terms.  These definitions or constructions are set forth and can be found in your juror notebooks.  And you must accept the Court's definition and constructions of these words in the claims as being correct.  It's your job to take these definitions that I have provided and apply them to the issues that you are deciding, including the issues of infringement and invalidity.

Now, you should disregard any evidence presented during the trial that contradicts or is inconsistent with these constructions or definitions that the Court has given you.  Now, for claim language or limitations that I have not construed -- that is,

language or limitations that I have not interpreted or defined for you -- you are to use and apply the plain and ordinary meaning of that language or limitation as understood by a person of ordinary skill in the art, which is to say in the field of the technology of the patent at the time of the alleged invention.  The meaning of the words of the patent claims must be the same when deciding any issue, including both infringement and invalidity.  And you have been provided, as I noted, copies of the asserted patents themselves, as well as the Court's definitions or constructions in your juror notebooks, and you may use them and refer to them during your deliberations.

Now, several times in these instructions I have and I will refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art.  In deciding the level of ordinary skill in a field, you should consider all the evidence introduced at trial, including but not limited to:  the levels of education and experience of the inventor or other persons actively working in the field; the types of problems encountered in the field; previous solutions to those problems; the rapidity with which innovations are made; and the sophistication of the technology.

Now, the claims, ladies and gentlemen, are intended to define, in words, the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description, nor the drawings of the patent can be infringed.  Each claim must be considered by you individually.

I will now explain to you how a claim defines what it covers.

A claim sets forth, in words, a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a product satisfies each of these requirements, then it is covered by that claim.  There can be several claims in a patent.  Each claim may be narrower or broader than another claim by setting forth more or fewer requirements.  The coverage of a patent is assessed on a claim-by-claim basis.  And in patent law, the requirements of a claim are often referred to as the "claim elements," and they are often referred to also as the "claim limitations."  And when a product meets all of these requirements of a claim, the claim is said to "cover" that product, and that product is said to "fall" within the scope of that claim.  In other words, a claim covers a product where each of the claim elements or limitations is present in that product.  If a product is missing even one

56

limitation or element of a claim, the product is not covered by that claim, unless an equivalent of the limitation is present.  If the product is not covered by the claim, the product cannot infringe that claim.

Now, the beginning portion, or preamble, of a claim often uses the word "comprising."  The word "comprising" when used in such a preamble, means "including but not limited to," or "containing but not limited to."  When "comprising" is used in the preamble, if you decide that an accused product includes all of the requirements of that claim, that claim is infringed.  And this is true even if the Accused Product contains additional elements.

Let me give you a quick example.  A claim covering a table comprising a tabletop, legs, and glue would be infringed by a claim that includes a tabletop legs, and glue, even if the table also contains other structures, such as leaves that would expand the size of the tabletop or wheels that might go on the ends of the legs.

Now, this case involves only one type of a patent claim:  independent claims.  All of the Asserted Claims in this case are independent patent claims.

An "independent claim," ladies and

57

gentlemen, sets forth all of the requirements that must be met in order to be covered by that claim. And it is not necessary to look to any other claim within the patent to determine what an independent claim covers.

Now, if a person or corporation makes, uses, sells, or offers to sell within the United States or imports into the United States what is covered by a patent claim without the patent holder's permission, that person or corporation is said to directly infringe the patent.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed. And you must compare the Asserted Claims, as I have construed each of them for you with my definitions, to the Accused Products or a relevant standard, and determine whether or not there is infringement. These are the only correct comparisons.

And you should not compare the Accused Product to any standards with any specific examples set out in the patent, or the prior art, or G+'s own products, if any, in reaching your decision on infringement. In deciding infringement, let me be clear, the only correct comparison is between the Accused Products or the standards, and the limitations of the Asserted Claims as the Court has construed them.

58

You must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by both parties over the course of the trial.

I will now instruct you on the specific rules you must follow to determine whether G+ has proven that Samsung has directly infringed one or more of the patent claims involved in this case.

A patent can be directly infringed even if the alleged direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringement of a claim. A patent may also be directly infringed even though the accused direct infringer believed in good faith that what it did was not infringement of the patent. Infringement does not require proof that a party copied its product from the Asserted Claims.

In this case, ladies and gentlemen, the Plaintiff, G+ contends that the Asserted Patents are essential to certain ETSI 5G standards. And you may rely on an industry standard in analyzing infringement. Now, just because the Asserted Patents were declared essential to practicing the 5G standard, does not mean that they are actually essential to practicing that

standard. A patent is essential if it is not possible on technical grounds, taking into account normal technical practice and the state of the art generally to operate equipment or methods which comply with the 5G standard without infringing that patent. If an industry standard does not provide the level of specificity required to establish that practicing that standard would always result in infringement, or if the relevant section of a technical standard is optional, it is not sufficient for the Plaintiff, G+, to establish infringement solely by arguing that the product practices the standard. Only in the situation where the standard essential patent covers a mandatory section of a standard, or the party accused of infringement implements an optional section of the standard covered by the patent, will it be enough to prove infringement by showing standard compliance.

Now, if you find that the reach of the claims includes any Accused Product that practices a standard, then this can be sufficient for a fining of infringement. Accordingly, while claims should be compared to an Accused Product to determine infringement, if an Accused Product operates in accordance with a standard, then comparing the claims to the standard is the same as comparing the claims to

60

the Accused Product.

You must determine, separately for each of the Asserted Claims, whether or not there is infringement.  And in order to prove direct infringement of a patent claim, G+, the Plaintiff, must show by a preponderance of the evidence that an Accused Product includes each and every limitation of a claim. In determining whether an Accused Product directly infringes a patent claim in this case, you must compare the Accused Product with each and every one of the requirements or limitations of that claim to determine whether the Accused Product contains each and every requirement or limitation recited in that claim.

A claim requirement is literally present if it exists in an Accused Product just as it is described in the claim language, either as I have explained that language to you or, if I did not explain it, as it would be understood by its plain and ordinary meaning to one of ordinary skill in the art.  If an Accused Product omits any element recited in a claim, then you must find the product in question does not literally infringe that claim.

So long as an Accused Product has each and every one of the claim requirements, infringement of that claim is shown even if the product contains

additional features or elements not required by the claim.

If you do not find that each limitation of a claim is literally met, then you may still find infringement, ladies and gentlemen, if you find each element is met under the Doctrine of Equivalents.  If a person makes, uses, sells, or offers to sell within the United States, or imports into the United States a product that does not meet all of the elements or limitations of a claim and thus does not literally infringe that claim, there can still be direct infringement if that product or method satisfies that claim under the "Doctrine of Equivalents."  Under the Doctrine of Equivalents, the Accused Product infringes a claim if it contains elements or limitations corresponding to each and every limitation or element of the claim that is equivalent to, even though not literally met by the Accused Product.  You may find that an Accused Product is equivalent to an element or limitation of a claim that is not met literally, if a person having ordinary skill in the field of the technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the Accused Product:  performs substantially the same function; in substantially the

same way; to achieve substantially the same result as the element or limitation of the claim that may not be literally present. In order for a structure or action to be considered interchangeable, the structure or action must have been known at the time of the alleged infringement to a person having ordinary skill in the field of the technology of the patent. Interchangeability, ladies and gentlemen, at the present time today is not sufficient.

Now, in order to prove direct infringement under the Doctrine of equivalents," G+ must prove by a preponderance of the evidence that for each claim element or limitation that is not literally present, in an Accused Product, the equivalent of that claim element or limitation is present.

The "first reselection module" and the "second reselection module" terms in Claim 2 of the '776 patent are so-called means-plus-function claim limitations.

Means plus function claims have a special meaning in patent law. These claims do not cover all the structures that could perform the function set forth in the claim. Instead, they cover a structure or set of structures that performs that function and that is either identical or equivalent to the structures

63

described in the patent for performing the function. The issue of whether two structures are identical or equivalent is for you to decide.

To demonstrate that these limitations are literally met, G+ must prove by a preponderance of the evidence that Samsung's products contain a structure that performs the recited function; and is identical or equivalent to the structure that is disclosed in the patent specification and drawings for performing the recited function. I have set forth in my claim construction process both the recited function that is to be performed by the structure, and the structure that is disclosed in the patent specification that performs the recited function. These constructions are also set forth in your juror notebooks.

Now, whether the structure of the Accused Product is equivalent to a structure disclosed in the patent specification and drawings is decided from the perspective of an ordinary person in -- or a person of ordinary skill in the art. The structure in the Accused Product and that disclosed in the patent are equivalent if a person of ordinary skill in the art would consider the differences between them to be insubstantial. One way to show this is to demonstrate that the structure in the Accused Product performs the

identical function in substantially the same way to receive substantially the same result as would be achieved by the element that was disclosed in the patent specification.

In deciding whether the differences would be insubstantial, you may consider whether people of ordinary skill in the art would have known that the accused structure and the structure identified in the claim construction were interchangeable at the time the patent issued.

That the structure in the Accused Products may perform additional functions not disclosed in the patent specification does not mean the structure is not identical or equivalent to the structure that I identified in my claim construction rulings.  This is the case even if the accused structure achieves better performance than that is disclosed in the patent specification.  Further, even when two structures would not have been considered equivalent structures in other contexts, if performing functions other than the claimed function, they may nevertheless be equivalent for the means-plus-function term when performing the same function.

I will now instruct you on the rules that you must follow in deciding whether or not Samsung has

proven that any Asserted Claims of the Asserted Patents are invalid.  An issued United States patent, ladies and gentlemen, is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to as either the "PTO" or the "Patent Office," acted correctly in issuing the patent.  This presumption of validity extends to all issued United States patents.

In order to overcome this presumption, Samsung must establish by clear and convincing evidence that a claim is invalid.  Like infringement, invalidity is determined on a claim-by-claim basis.  You must determine separately for each claim whether that claim is invalid.  If one claim of the patent is invalid, this does not mean that any other claim is necessarily invalid.

Claims are construed in the same way for determining infringement as for determining invalidity. And you must apply the claim language consistently and in the same manner for the issues of infringement as for the issues of invalidity.  In making your determination  as to invalidity, you should consider each claim separately.

I will now instruct you on the rules that you must follow in deciding whether or not Samsung has

66

proven that any of the Asserted Claims of the Patents-in-Suit are ineligible for patent protection. Samsung contends that the asserted claims of the '776 and the '443 patents are ineligible for patent protection.

To succeed on its claim for patent ineligibility, Samsung must establish two things.  The first is whether the claims are directed to an abstract idea.  And this is an issue for the Court to decide, not the jury to decide.  And I will make this determination after the trial is over.  It is not something that you will decide.  However, you, the jury, will decide the second question that's related to patent eligibility.  Specifically, and in that regard, Samsung must show that the claims involved nothing more than the performance of activities which a person of ordinary skill in the art would have considered well-understood, routine, and conventional at the time the patent application was filed.  To meet its burden on this issue, Samsung must show by clear and convincing evidence that the Asserted Claims involve only technology which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional as of the priority date.  The mere fact that something was known in the art at the

time does not necessarily mean that it was well-understood, routine, and conventional. Rather, the test is whether, in view of all the evidence, a person of ordinary skill in the art would have considered the claim to involve only technology that was well-understood, routine, and conventional as of its priority date. You should consider all the evidence presented during the trial, including the testimony of the witnesses, as well as the exhibits introduced, including the specifications within the Patents-in-Suit. If the evidence shows by clear and convincing evidence that the elements of the Asserted Claims, when taken individually and as an ordered combination, involve only technology which a person of ordinary skill in the art would have considered are well-understood, routine, and conventional, then this element of patent ineligibility has been established.

Now, a previous device, system, method, publication, or patent that predates the priority date of a an Asserted Patent is generally called "prior art," and may include items that were publicly known or that had been used or offered for sale, or references, such as publications or patents, that disclose the claim invention or elements of the claimed invention. In evaluating the prior art to determine whether an

68

invalidity defense has been proven by clear and convincing evidence, you may consider whether that prior art was or was not before the PTO.

I'll now instruct you on how to determine whether any of the Asserted Claims of any of the Asserted Patents are invalid as being anticipated. In order for someone to be entitled to a patent, ladies and gentlemen, the invention must actually be "new," and the inventor must not have lost his or her rights by delaying the filing of an application claiming the invention. In general, inventions are not "new" when the identical product, method, or process has been made, used, or disclosed before.

Samsung contends that the Asserted Claims of the '776 and the '443 Patents are invalid because the claimed inventions are not "new." In other words, Samsung contends that these patents are "anticipated" by the prior art. Anticipation requires that all of the requirements of a patent claim be disclosed in a single prior art reference. Also, the single prior art reference must disclose each and all of the elements of the claim arranged or combined in the same way as in the claim -- as the claim has been construed or interpreted by the Court. Samsung must prove by clear and convincing evidence that an Asserted Patent claim

was anticipated by the prior art reference.  The anticipation must be determined on a claim-by-claim basis.

To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the requirements of the claim must have been disclosed, either expressly or implied, to a person having ordinary skill in the art in the technology of the invention, so that looking at that one reference, that one prior art reference, that person could make and use the claimed invention.  Keep in mind, ladies and gentlemen, that Samsung may not establish anticipation by arguing that the Accused Product practice the prior art, or by comparing the Accused Products to a prior art reference.  An item of prior art may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.

Samsung contends that all the Asserted Claims of the '776 Patent are invalid as being obvious.

I'll now instruct you how to determine whether any of the Asserted Claims are invalid as obvious.

Even though an invention may have not

have been identically disclosed or identically described in a single prior art reference before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary  skill in the field of the technology of the patent at the time the invention was made.

Samsung has the burden of establishing obviousness by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the at the time the invention was made in the field of the technology of the patent.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.  Keep in mind, ladies and gentlemen, that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.  The skill of the actual inventor is not necessarily relevant because inventors may possess something that distinguishes them from persons having

ordinary skill in the art.

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.  The scope and content of the prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Further, teachings, suggestions, and motivations may also be found within the knowledge of a person of ordinary skill in the art, including references and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together like the pieces of a jigsaw puzzle.  The person of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the pertinent art.

In considering whether a claimed invention is obvious, you may but you are not required to find obviousness if you find that at the time of the

claimed invention, there was a reason that would have prompted a person of ordinary skill in the field to combine the known elements in a way the claimed invention does, taking into account such factors as:

1.   Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.   Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.   Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.   Whether the prior art teaches away from the combining elements in the claimed invention;

5.   Whether it would have obvious to try the combination of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified predictable solutions; and

6.   Whether the change resulted more from design incentives or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of

success.  Obvious to try is not sufficient in unpredictable technologies.

Now, prior art is not limited to the patents and published materials, but includes the general knowledge of a person of ordinary skill in the field of the invention.  Also, Samsung does not need to show that one of ordinary skill would actually have combined the physical structures of the references.  A person of ordinary skill in the art need only be motivated to combine these teachings.

In determining whether the claimed invention was obvious, consider each claim separately. Do not use hindsight; consider only what was known at the time of the invention.  In other words, you should not consider what a person of ordinary skill in the art would know today or what has been learned from the teachings of the Asserted Patent.

Now, in making these assessments, you should take into account any objective evidence, sometimes called "secondary considerations," that may have existed at the time of the invention, and afterwards, that may shed light on the obviousness or not of the claimed invention.  Now, the following are possible secondary considerations, but it is up to you, ladies and gentlemen, to decide whether secondary

considerations of non-obviousness exist at all.  These are:

1.  Whether the invention was commercially successful as the result of the merits of the claimed inventions, rather than the result of the design needs or market pressure, advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether the inventor proceeded contrary to accepted wisdom in the field;

4.  Whether others tried, but failed to solve the problem solved by the claimed invention;

5.  Whether others invented the invention at roughly the same time;

6.  Whether others copies the claimed invention;

7.  Whether others accepted the licenses under the Patents-in-Suit because of the merits of the claimed invention;

8.  Whether the claimed invention achieved unexpected results;

9.  Whether others in the field praised the claimed invention;

10.  Whether there were changes or

related technologies or market needs contemporaneous with the invention ; and

11.  Whether persons having ordinary skill in the art at the time of the invention expressed surprise or disbelief regarding the invention.

These factors are relevant only if there is a connection, or "nexus," between the factors and the patented features of the invention.  G+ has the burden of establishing this connection or "nexus."  Moreover, even if you conclude that some of the above indicators of objective evidence has been established, those factors should be considered along with all of the other evidence in the case in determining whether Samsung has proven that the claimed invention would have been obvious.  In support of obviousness, you may also consider whether others independently invented the claimed invention at roughly the same time as the date of the invention.

Now, Samsung also contends that the Asserted Claim of the '130 Patent is invalid for failure to satisfy the written description requirement.  As I have previously explained, to obtain a patent, one must first file an application with the United States Patent and Trademark Office.  And the process of obtaining a patent is called "patent prosecution."  The

application submitted to the Patent Office includes within it what is called a "specification." The specification is required to contain a written description of the claimed invention telling what the invention is, how it works, how to make it, and how to use it. The written description requirement is designed to ensure that the inventor was in possession of the full scope of the claimed invention as of the patent's priority date.

To succeed on its claim of a lack of adequate written description as to the '130 Patent, Samsung must show by clear and convincing evidence that a person having ordinary skill in the field reading the patent specification as of the priority date of the patent would not have understood that the specification describes the full scope of the invention as it is claimed. If a patent claim lacks adequate written description, it is invalid.

Now, in deciding whether the '130 Patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent as of the priority date of the Patent-in-Suit. The specification must describe the full scope of the claimed invention, including each

77

element thereof, either expressly or inherently.  A claimed element is disclosed inherently if a person having ordinary skill in the field as of the priority date would have understood that the element is necessarily present in what the specification discloses.

The written description does not have to be in the exact words of the claim.  The requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, et cetera, contained in the patent specification.  Adequate written description does not require either examples or an actual reduction to practice of the claimed invention.  However, a mere wish or plan for obtaining the claimed invention is not adequate written description.  Rather, the level of disclosure required depends on a variety of factors, such as the existing knowledge in the particular field, the scope and content of the prior art, the maturity of the science or technology, and other considerations appropriate to the subject matter.  The issue of written description, ladies and gentlemen, is decided on a claim-by-claim basis, not as to the entire patent or groups of claims.

If you find that Samsung has infringed any valid claim as to the Asserted Patent, you must

then consider what amount of damages, if any, should be awarded to G+.

Now, during this case the parties introduced licensing offers that G+ made to Samsung to license the G+ patents. You are to consider these offers only for the purpose of determining whether either party breached its commitment to negotiate in good faith. You are not to consider these licensing offers to determine the amount of damages to be awarded if you find that the patents have been infringed and are valid.

I'm now going to instruct you about the measure of damages. And by instructing you on damages, ladies and gentlemen, I am not suggesting which party should win this case, on any issue. If you find that Samsung has not infringed any valid claim of the Patents-in-Suit, then G+ is not entitled to any patent damages. Also, if you do not find that Samsung infringes any claims of a particular patent, G+ is not entitled to damages for that patent.

G+ has the burden of establishing the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that G+ establishes that it more likely than not suffered as a result of Samsung's infringement.

While G+ is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty, and G+ is not entitled to damages that are remote or that are only speculative.

The damages that you award, if any, must adequate to compensate G+ for any infringement you may find.  You must not award G+ more damages than are adequate to compensate it for the infringement.  You also must not include any additional amount for the purpose of punishing Samsung or setting an example.

I'll now instruct you on how to calculate reasonable royalty damages.

A royalty, ladies and gentlemen, is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began. In this case, ZTE was the patent holder and Samsung was the alleged infringer at the time the hypothetical negotiation took place.  In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an

80

agreement at that time and had they acted reasonably in their negotiations.  In determining this, you must assume that both parties believe the patents were valid and that both parties were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty that either party would have preferred.  Evidence of things that happened after infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits of that an alleged infringer made may be used to determine an anticipated profit at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

The law requires that any royalty awarded to G+ correspond to the value of the patented invention within the Accused Products, as distinct from other unpatented features or other market factors.  And this is particularly true where the Accused Products have multiple features and multiple components not covered by the patent or where the Accused Products work in

conjunction with other non-patented items.  If unpatented features contribute to the Accused Products, you must apportion that value to exclude any value attributable to unpatented features.  You must determine an appropriate royalty rate that reflects the value attributable to the patent invention alone.

A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when the infringement first began.

And you may have heard references throughout the trial as to whether G+ should be entitled to a running royalty or a lump-sum royalty. If you find that G+ is entitled to damages, you must decide whether the parties would have agreed to a running royalty or a fully paid-up lump-sum royalty at the time of the hypothetical negotiation.  A running royalty, ladies and gentlemen, is a fee paid for the right to use the patent that is paid for each unit of the infringing products that have been sold.  If there are additional units sold in the future, any damages for these cells will not be addressed by you.  If, however, you decide that a running royalty is appropriate, then the damages you award, if any, should

reflect the total amount necessary to compensate G+ for Samsung's past infringement.  However, a lump-sump royalty is when the infringer pays a single price for a license covering both past and future infringing sales. If you decide that a lump-sum is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate G+ for Samsung's past and future infringement.

Now, you have heard that the Asserted Patents have been declared to be standard essential patents or "SEPs," that is, and that G+ asserts that the 5G standard cannot be practiced without using the invention claimed in the Patents-in-Suit.  The original owners of the Asserted Patents made a commitment to ETSI to license the Asserted Patents on Fair, Reasonable, and Non-discriminatory -- or FRAND terms and conditions.  G+ has also committed to license the Asserted Patents on FRAND terms, subject to conditions such as reciprocity of the potential licensees.

If you find that the Patents-in-Suit are indeed essential to the 5G standard, then the FRAND commitment does not require any specific licensing model to determine a FRAND royalty.  You should determine a FRAND royalty in this case, whether or not you find that the Patents-in-Suit are standard

essential, based on the totality of the circumstances.

G+ contends that the Asserted Patents are essential to the 5G standard.  If you agree that an Asserted Patent is essential to the 5G standard, the patent owner's royalty must be premised on the value of the patented features and not any valve added by the standard's adoption of the patented technology.  In other words, you may not consider the success of the standard itself in determining a reasonable royalty for the Asserted Patent.

In determining what amount is a FRAND royalty, you may consider any evidence of patent holdout.  Patent holdout refers to an unwilling licensee of standard essential patents, seeking to avoid taking a license while practicing the standard and enjoying the benefit of the SEP holder's technology.

You may also consider any evidence of patent holdup.  Patent holdup exists when the holder of a standard essential patent demands excessive or unjustified royalty, which is, considering the totality of the circumstances, not fair, reasonable, or non-discriminatory.

Now, in dealing with a standard essential patent, an SEP, there are two special apportionment

issues that arise.  First, the patented features must be apportioned from all of the unpatented features reflected in the standard.  Second, the patentee's royalty must be premised on the value of the patented features, not any value added by the standard's adoption of the patented technology.

In determining the reasonable royalty, you should have consider all the facts known and available to the parties at the time infringement began.

Some of the kinds of factors you may consider in making your determination are:

1.  The rates paid by a licensee for the use of other patents comparable to the Patents-in-Suit.

2.  The royalties received by the patentee for the licensing of the Patents-in-Suit proving or tending to prove an established royalty.

3.  The duration of the patent and the term of the license.

4.  The nature and scope of the license, including with respect to whom the manufactured products may be sold.

5.  The established profitability of the product made under the patent, its commercial success, and its current popularity, taking into account only

the value of the patented technology and not the value associated with incorporating the patented technology into the standard.

6.    The utility and advantages of the patent over alternatives that could have been written into the standard instead of the patented technology in the period before the standard was adopted.

7.    The contribution of the patent to the technical capabilities of the standard and also the contribution of those relevant technical capabilities to the licensee and the licensee's products, taking into account only the value of the patented technology and not the value associated with incorporating the patented technology into the standard.

8.    The extent to which the infringer has made use of the invention and any evidence probative of the value of that use, taking into account only the use and value of the technology itself and not the use and value associated with incorporating the patented technology into the standard.

9.    The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions that are also covered by FRAND-committed patents.

10.    The portion of the realizable profit that should be credited to the invention as distinguished from non-patentable elements, the manufacturing process, business risks, significant features or improvements added by the infringer, or the value of the patent's incorporation into the standard.

11.    The opinion testimony of qualified, experts.

12.    The amount that a licensor and a licensee would have agreed upon at the time the infringement began if both had been reasonably by and voluntarily trying to reach an agreement, that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit, and which amount would have been acceptable to a prudent patentee who was willing to grant a license taking into account the FRAND commitment and its purposes.

Now, ladies and gentlemen, you may have heard these factors referred to during the trial as the "Georgia-Pacific" factors.  No one of these factors is dispositive, and you can and you should consider the evidence that's been presented to you in this case on

each of these factors.  And you have may also consider any other factors which, in your mind, would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent owner would have been willing to accept, acting as normally prudent business people.

Now, in determining a reasonable royalty, you may also consider evidence concerning the ability, or lack thereof, of acceptable non-infringing substitutes or alternatives to the patented invention. To be an acceptable non-fringing substitute, a product must have the advantages of the patented invention that were important to the people who purchased an alleged infringer's product.  You may compare the patented invention to non-infringing alternatives to determine the value of the patented invention, including the utility and advantages of the patent over the old modes or devices, if any, that had been used to achieve similar results.  The party asserting that there is a non-infringing alternative here, G+, has the burden to show by a preponderance of the evidence that a proposed non-infringing alternative was available at the time of the hypothetical negotiation and during the damages period.  You should not consider for damages purposes any alternatives that G+ has not shown were available

at the time of the hypothetical negotiation.

Now, in calculating damages, you may only award damages to G+ for infringement that occurred after the damages period begins.  The damages period for issues related to infringement of the '130 Patent begins on August 4, 2020.  The damages period for issues related to infringement of the '443 Patent begins on March 17, 2020.  If you award damages for these patents, the amount you award must reflect damages for acts of infringement during this period only.

Now, the parties dispute the date that the damages period began for the '776 Patent.  In calculating damages for the '776 Patent, you must consider whether or not G+ or ZTE, or their licensees marked the products that practice the '776 Patent.  Marking is placing on or within those products the word "patent" or "pat," and the number of the '776 Patent on substantially all of the products that include the patented invention.  If you find G+ or ZTE, or their licensees have failed to properly mark their respective products, then you may only award damages to G+ for infringement that occurred after the date G+ gave actual notice to Samsung that G+ believed Samsung was infringing the Asserted Patents.  The filing of the

complaint in this case occurred on March 14, 2022 and that constituted actual notice.  It will be up to you, ladies and gentlemen, to determine when actual notice occurred.  It is G+'s burden to prove either marking or notice by a preponderance of the evidence.

Finally, as I explained earlier, both of the parties contend that the other party has breached its FRAND obligations in this case.  Samsung contends G+ was obligated to negotiate in good faith toward a FRAND license and to offer a FRAND license to the Patents-in-Suit on FRAND terms, and failed to do both. Similarly, G+ contends that Samsung was obligated to negotiate in good faith toward a FRAND license and failed to do so.  To succeed on these claims, the parties must prove them by a preponderance of the evidence.

Now, you may consider various types of evidence to determine whether or not a party acted in good faith during negotiations.  For example, unreasonably delaying negotiations, voluntarily maintaining the other party in prolonged uncertainty, continuing to negotiate when the party has no intention of voluntarily entering into a contract, and making affirmative misrepresentations during the negotiations are examples of the actions that support a filing that

a party failed to negotiate in good faith.

Additionally, you may consider that a party filed one or more lawsuits, even if the lawsuits were allowed to be filed, when you assess the totality of the circumstances to determine whether each party acted in good faith.

If in negotiating for a license to a patent burdened by a FRAND obligation either the patent holder or the implementer of the adopted standard fails to act in good faith and thereby prevents a license from being granted, the other party's obligation to continue negotiations is suspended.  This does not remove the burden of the FRAND obligation from the patent, but avoids obligating a party acting in good faith to continue negotiating when a party fails to do so.  If the bad faith actor ceases its bad faith and begins acting in good faith, the good faith negotiations must also resume.

Now, whether or not a license offer is FRAND will depend on the totality of the particular facts and circumstances.  There is no fixed or required methodology for setting or calculating the terms of a FRAND license, other than when all aspects have been considered, that it is fair, reasonable and non-discriminatory.

Now, in negotiating for a license to a patent where the patent has been contributed to an adapted standard, which patent is known as a standard essential patent, either negotiating party, either being the patent holder or the implementer of the adopted standard, if either of them fails to negotiate in good faith and thereby prevents a license from being granted on fair, reasonable, and non-discriminatory terms, then the party who fails in good faith is liable to the other party for any reasonable damages which arise from such breach, including but not limited to attorney's fees and the cost of litigation.

Now, ladies and gentlemen, with these instructions we'll proceed at this point to hear closing arguments for the attorneys for the competing parties. The Plaintiff may present its first closing argument to the jury.

Would you like a warning on your time, Mr. Sheasby?

MR. SHEASBY: I would, Your Honor. If I can have warning at 15 minutes used and 20 minutes used.

THE COURT: I will give you those warnings. You may proceed with your closing statement.

MR. SHEASBY: May it please this Honorable Court.

92

Honorable ladies and gentlemen of the jury, for you to serve these last six days, you were unable to care for your loved ones, you were unable to get your fair wages, you traveled incredibly long distances in a monsoon, and you have to ask yourself why.  Is it enough for me just to thank you?  Is it enough for me just to say how grateful we are for you to sit here?  It's not.

You are here because of this document. This is not something 15 years ago by some random Congress.  This was written by the founders of our country, and the system that they created was a system that said we are done with great inventions just leaving this country to be used against us.  We want the best ideas in the world and we want them here.  And the patent system is what allows that to occur and it protects us.  It protects us in a very particular and important way.  ZTE, JTX-1, formally set approval to present this patent, as it did for all of them, because of the importance of this technology, so that everyone in this country could use it.

And Mr. Waitley -- Mr. Waitley showed this slide on right, and I've annotated it.  And you see two circles.  The foreign manufactured phones that Samsung sells in our country come into this country.  What

leaves this country is the revenue and the technology that it has taken.  The patent system protects against this.

I don't care what country you are from, you can sell in this country.  But if you sell products in this country, you comply with the law and you don't degrade and destroy a system that ensures we have access to the most important technology.

Mr. Waitley talked about artificial intelligence that they are inserting into their phones. If the patent system is destroyed, we are not going to be able to have access to that technology, [??], and analyze artificial intelligence, just like Samsung has taken the 5G technology without its approval.  You are here to defend a system that was created by our founders.

Ms. Smith came in on crutches to examine Mr. Waitley, and I thought that was amazing.  And then Mr. Waitley said something.  He said, "I'm here because of the seriousness of these allegations."  But he didn't answer the allegations.  He said Samsung's engineers will answer the allegations for you.

Samsung engineers did answer the allegations.  Under oath, they were asked, do you have any other non-infringing alternative to the patents in

this case? And they said again and again and again, I don't know. This is a 3GTT leader at Samsung. If Samsung wasn't using our technology, the engineer who was designated to speak on behalf of Samsung would have said that up and down to the moon. He didn't because they are using our technology.

This case and these serious allegations are so serious that Samsung presented four expert witnesses. They described them as independent expert witnesses. These independent expert witnesses have worked for Samsung on 16 different cases.

Common sense is one of the most powerful tools that you have available to you. It's in the jury instructions that were given by the Court. If Samsung had meritorious defenses, why couldn't it have found independent experts to give that analysis, as opposed to experts who have time and time again -- one of these experts, Mr. Meyer, I'm thinking about this. Mr. Meyer got paid more on this case than my mom taking care of my brother and I made through her entire working life, to tell the ladies and gentlemen of this jury that we're entitled to $160,000. That is not common sense. That is not independence.

Samsung claims they are this innovative company. 20 billion in R&D each year, 130,000 patents.

Their experts couldn't identify one single patent that covered the technology in this case, couldn't identify one contribution that they made to 3GTT relating to the technology in this case.

Yesterday, counsel for Samsung objected when I quoted the phrase "Conquer distractions or they will conquer you."  He didn't want you to hear that. And the reason for that is because the defense in this case is a defense of distraction.

A claim under oath that they induced Dr. Wicker to give, that there was no Samsung source code shown to you folks, in the jury room, JTX-13, if anyone says, oh, that's right, there was no Samsung source code used, you can write down JTX-13.  It will be brought to you and you can show and prove that Samsung source code was shown.

The wrong Qualcomm code was used.  We heard that time and time again.  What we didn't hear is any evidence on that subject.  And the reason for that is because Dr. Wicker was forced to testify on cross-examination that the Qualcomm code that was analyzed across the products has no material variations.  It's the same code as to the issues in this case.  If anyone says to you it was the wrong Qualcomm code, ask to see JTX-14.  It will be brought

to you and you can see the truth.

Samsung, in opening, claimed they had a license to our patents. That's what they told you in opening, and that's a direct transcription from their opening. And what did Mr. Jeon say under oath? He admitted under oath on cross-examination that was the furtherest from the truth. They have no right to our patents.

Samsung claimed we refused to participate in the negotiation. Samsung claimed we just rushed to file suit against them. We begged them again and again and again to enter into a Confidentiality Agreement. But that was a Confidentiality Agreement that would be governed by a Court. If you say something false in a court, it's perjury.

Why did they want their NDA so bad? Why did they want to avoid the Court protection? Because they wanted to give us numbers like what you see on this slide for the number of units they sold for 2030 -- this is the number of units they've actually sold through 2030. It was testified under oath by Mr. Dell. It was not contradicted.

"Conquer distractions or they will conquer you."

There are three issues you will be asked

to decide:

The first issue is infringement.  This is an issue on which G+ bears the burden.  And if one pebble, just one pebble weighs in our favor over Samsung, you are obligated as a matter of law to find infringement.

There are two ways to find infringement: One is literal infringement.  The second is Doctrine of Equivalents.  If it's not met literally, but the difference is not substantial, they still infringe.

So someone in the jury room says, "Well, I don't know if it was exactly there."  It doesn't need to be exactly there.  It needs to be something that is substantially or unsubstantially present.  That is the law you must apply.

We did two types of analyses.  Each of them are independent and on their own establish liability.  The first was the source code analysis. I'm going to get to that one in a moment.

But the second one was an essentiality analysis.  And the Court has instructed you that if you find that these patents are essential, Samsung infringes automatically, because Samsung admits it uses the 5G standard.

Dr. Kowalski has a 30-plus-year career

designing 3GPP systems.  For 20 years he served on 3GPP.  He built and designed the 5G network.  And what he did is he showed you the claim charts that he looked at and he testified that each and every one of those claim charts establish that the patents are essential to 3GPP.

All of this distraction.  Why?  The reason is this:  Mr. Jeon from Korea, who negotiated this agreement, testified under oath that it's Samsung's position that these are patents with a FRAND right associated with them.  FRAND right patents are patents that are essential to practicing the 5G standard.  They are patents that you infringe if you practice the 5G standard.  And he admitted -- he admitted under oath that Samsung practices the 5G standard.

The only individuals in this room who dispute that these patents are essential are the lawyers sitting at this table.  Mr. Jeon, who is the corporate representative, agreed with Dr. Kowalski that these patents are essential, and if they are essential, they are infringed.

Now I'm going to walk you through the source code analysis.  For the '130 Patent there is only one limitation that was disputed, where their

transmission time interval existed in the code.

Someone may ask in jury deliberations, was there really a transmission time interval in the code?  If you ask for JTX-14.1, if you write down that number, we can bring you this code and you can show it to whoever asks.  And it says exactly in the code, transmission time interval.

If someone asks, well, that was for Qualcomm.  What about Samsung?  Samsung said there may be some differences between Qualcomm and Samsung chips. You can show them PTX-7 and you can ask for PTX-7, which expressly admits that in Samsung's design, as well, a transmission time interval is used.

I was particularly taken with Dr. Min. He was a very nice man.  He came here to testify even though his wife was sick.

THE COURT:  15 minutes have been used.

MR. SHEASBY:  Honorable.  What was not honorable was that Samsung didn't even show him the documents and testimony of their own engineers admitting that they used TTI at PTX-7.  Shame on Samsung.  Shame on them for bringing this witness, under the pressure he was under, and not even showing him the documentation that admits that a TTI was used.

The second issue of infringement, the '776

100

Patent.  There are three arguments for non-infringement that were made.

One, that we don't have a sale list for the same priority cells.  JTX-13.1, if you ask for it, it will show that there is a sale list with the same priority cells.

The second argument:  There is no absolute priority.  If you ask for JTX-14.1, you will see in the actual code, absolute priority.  If anyone disputes that, we can bring you the code, JTX-14.1, and show it.

The third argument:  There is no testing.  If someone said there is no testing of these products, PTX-32F3.  Ask for the code.  Ask for it and it will be brought to you, which establishes that they test and that the method is used.

The third non-infringement argument in the '443 Patent, only one limitation is disputed.  A first link type that is predefined.  The code talks about a predefined source link type, which is called Codebook Type 1.  It's in the code.  Dr. Wicker argued that because there is a number of different options depending on the scenario, they are not predefined. But under oath and cross-examination, he admitted the exact opposite.  He skipped in the Codebook over

particular scenarios.

Predefined values can exist for different scenarios. Sometimes you use summer tires, sometimes you use winter tires, sometimes you use off-road tires. Each of those are predefined and it fits the scenarios in which you use them. And, of course, he admitted under oath that what he was really doing is changing the phrase "predefined" and replacing it with "fixed."

Validity. Validity is the issue in which Samsung bears the burden by clear and convincing evidence. Samsung's defense is to show you graphics with egg cartons? Much has been admitted under oath, which is the most complex technology that has ever been created by humans. We don't need analogy for egg cartons. We need the code shown to us. We need the evidence fairly engaged.

Dr. Wicker admitted that there is no system anywhere in the world that anticipates all designs, and Dr. Min admitted the same.

The next issue is damages. We will ask for $237 million in damages. And Mr. Waitley, he had this great line. It was very smooth. He said, "Oh, that's silly." And I think we all laughed when he said it. They've been on notice of these patents for three years. If this technology is silly, take it out,

turn it off.  They have not because it is not.

The next option is contract breaching. This is the behavior of Samsung.  Again and again, we sent them claim charts, we sent them letters.  Before the suit was filed, they never disputed essentiality of validity, they never asked or requested different information.  They never made a counter offer.  They ignored us.  We begged them to continue to work.  We signed an NDA.  After that NDA was signed, no technical information provided, no written response disputing essentiality of validity, no License Agreement provided.

Mr. and Mrs. Pitcock have spent $9 million to support this business to defend these patents.  Do you think they rushed out willy-nilly to file these suits?  Do you think they are excited about the burden that is placed upon them by this?

THE COURT:  20 minutes have been used.

MR. SHEASBY:  They are doing it to protect their technology.

We sent them an offer on January 20, 2022 and Samsung's own expert, Mr. Rodermund, admitted that the offer we sent them, the $1.66 per unit, was FRAND. Ladies and gentlemen of the jury, "Conquer distraction before it conquers you."

Thank you.

THE COURT:  Counsel, approach the bench, please.

**[At the bench, as follows:]**

Mr. Sheasby, you referred to one of the Samsung witnesses as from Korea.  That's a violation of the Court's MIL order.

Mr. Cordell, you have leave to use the word "China" one time.  If I hear any references from either of you during the remainder of your closing arguments to other Asian countries, I'll take other action.

MR. SHEASBY:  Thank you, Your Honor.

MR. CORDELL:  Your Honor, since Mr. Sheasby said that was particularly offensive that this money is going back to Korea, I would like permission to say when the money comes back to ZTE, it comes back to ZTE in China.

THE COURT:  You can use the word "China" one time, but that's all.

MR. CORDELL:  Thank you.  May I also ask, when Mr. Sheasby -- again, the list is spinning in my head, but the one that last came out was he said Mr. and Mrs. Pitcock has $9 million on this lawsuit.  They were litigation funders in this case that had been excluded

from evidence, and we have been told not to mention it whatsoever. That fact is in direct contravention to the actual facts in this case. So there is no $9 million from Mr. and Mrs. Pitcock.

THE COURT: No, it does not open the door to litigation funders. You can't -- I mean, the evidence was $9 million had been spent. Whether they spent it or somebody else did, it is not in evidence.

MR. CORDELL: Well, can I raise that and simply say they --

THE COURT: You can say you didn't hear that they spent it. You don't know who spent it.

MR. CORDELL: Thank you.

THE COURT: But you're not going to identify anyone that spent it.

MR. CORDELL: Thank you, Your Honor.

*[Open court]*

THE COURT: All right, Defendants may now present their closing argument.

Mr. Cordell, would you like a warning on your time?

MR. CORDELL: I would, Your Honor. I would ask that I get a warning at 20 minutes and at 30 minutes, and at 35 minutes. As you know, I sometimes have trouble keeping time.

THE COURT:  All right, I'll warn you when you've used 20 minutes, when you've used 30 minutes and have 10 minutes remaining, and when you've used 35 minutes and have five minutes remaining.

MR. CORDELL:  Thank you.

THE COURT:  Proceed with Defendant's closing argument.

MR. CORDELL:  Thank you.  May it please the Court.

Good morning, ladies and gentlemen.  Again, I'm Ruffin Cordell.  I'm proud to stand before you on behalf of Samsung.  And let me echo something Mr. Sheasby said and thank you for your service.  We know this was a hardship.  We know lots of people depend on you.  And on behalf of Samsung, we really, really do appreciate the time and the effort you've given us.

And you might be asking, you know, why do I have to do this?  Why do I have to deal with a patent case?  They say that in the video.  And the answer is that, you know, we rely on juries for one very important reason, because you are the best judges in the world of whether people are being reasonable or unreasonable.

And in this case, having heard all the

evidence, I hope you agree with me that GComm has not behaved reasonably in this case, that they have made demands that are unreasonable, that they have behaved unreasonably in negotiations.  And even when it comes to the technology, they treat Samsung in an unreasonable way.

So I have a lot to do, and over the next now 38 minutes, I'm going to try to take you through the evidence that you have heard and try to help you sort of organize it in a way that makes it easier for you to make decisions.  My job is to enable you and your job is to make the decision.  So, with that, let me jump in.

Now, what's really going on here?  We now that ZTE had a whole bunch of patents.  We've heard lots of different data.  At one point it was 36,000 patents, but there was also 4,000 patent families that was mentioned.  And they took some of them, just a little snippet, and they gave them over to GComm, and GComm paid them $600,000.  And I at first just thought that was a payment, but what I heard at trial was that it was skin in the game.  I had to look that up.  And I guess that meant that GComm wanted to pay them something, so they were interested.  I'm not sure why that happened.

107

But we also know that ZTE took back 20 percent, a 20 percent interest in the case. So they are looking to make money out of this litigation. There was no ifs, ands, or buts about it.

We know that GComm was formed as a special purpose vehicle to hold these ZTE patents. And we also know that ZTE had already selected the patents they were going to give to GComm. So Mr. Pitcock said, yeah, they did this before, you know, we started talking to them. Them and their lawyers, if you recall the evidence.

We also know that ZTE gave GComm a white list and it said these are the people you can go after. They didn't say, "Hey, these are really valuable patents," or, "Hey, you know, we really think this might play well in the U.S." They gave them a list and they said this is your list of targets, go get them.

And the reality is ZTE was always intended to have an interest in the revenue stream. You've heard that from Mr. Pitcock when he was on the stand. And then he's been in communication with them as the lawsuit has progressed.

And then, ladies and gentlemen, when we started this case, GComm took the position I had never heard before, that they were somehow helping us all,

they were bringing technology to the U.S.  They were making us safer, they said at one point.

But, you know, now these patents and the disclosure of these patents had been around for a long time before Mr. Pitcock and GComm came around.  So, to the extent they were useful, to the extent that we learned anything, we learned it years and years before.

Instead, what we learned is that they actually claimed that by taking money out of the U.S. market, taking money for phones that are sold to people in the United States and sending it back to ZTE in China, they were helping us.

That's where that common sense comes in, ladies and gentlemen.  Does that make any sense at all? Does that appear at all reasonable?

We also know that their damages case, when they went to put that on, that left the plane and reasonability completely.

May I, Your Honor?

THE COURT:  You may.

MR. CORDELL:  We have the charts that Mr. McKeon and Mr. Dell created together.  And you'll recall the numbers on the lefthand side of the chart. Those are Mr. Dell's numbers.  Those are his actual opinions and calculations.  He looked at that

109

agreement.  When I showed the flash card and said, if you do some math, you could figure what the per unit rate is.  Well, he did that, too.

And that's what you come up with, these numbers:  .18, .03, .06, .03.  These are his numbers.  That's what he said these patents were worth.  You don't have to understand anything about technology, you don't have to understand any of this.  It is their expert who decided that those are the appropriate numbers.

But then when he gets to trial, he said, you know, that's not the same anymore.  I now want $2.10.  Is that reasonable, ladies and gentlemen?

We also had kind of a strange debate about whether these patents are for 4G or 5G.  And the problem that they face is that over and over and over again they have said 4G.  In their first letter to us, ladies and gentlemen, they say this is relevant to the LTE standard.  LTE, that's 4G.  They kind of call them 5G patents in a couple of places, but they said the 4G standard.  That's written over, but it's right there on the slide.

We know that when they went to ETSI, where they made their declarations, when they swore that these were going to be used by everybody on a fair and

110

reasonable basis, they said LTE, and that's 4G.

When we asked Mr. Pitcock, he admitted, yep, we declare this is essential to 4G.  All we heard in this case over and over again, is this is 5G, 5G, 5G, and yet we know that in fact it's 4G.

And I skipped over one thing I'd like to point out.  ZTE declared the 2008 '776 Patent as essential to 4G.  You now know that 4G kind of started in the late 2007 to 2010 time frame.  That's exactly when 4G was being debated.

We also know that Ms. Zhu of ZTE -- Dr. Zhu, I apologize -- she said:  We gave them a bunch of patents, yeah, and they were focused on 4G.

Dr. Kowalski, he admitted pretty readily, yep, these are 4G patents.  I'm not really sure why we got in this debate, but we did.

But importantly, what I just heard, kind of what we've heard all the way through trial, is that ZTE made a promise, and I have the declaration up on the board.  GTE made a promise that they were going to offer these patents on a fair and reasonable basis, and now it seems like GComm is trying to wriggle out of that.  But ladies and gentlemen, a promise is a promise.  When they put that declaration into ETSI, they said:  We're going to help make, you know, the

111

next set of standards a reality, whether it was 4G or 5G.  That's what they swore to ETSI, and a promise is a promise.

We're also going to talk a fair amount about reasonability in terms of the licensing and the discussions that happened, their refusal to enter an NDA.  Counsel said, well, you know, we talked about a protective order.  But, ladies and gentlemen, they never sent us a protective order.  They just sort of talked about it in vague terms.

And you heard Mr. Jeon tell you that it's not appropriate.  You've got to be an outside lawyer to be under a protective order.  You've got to be in the United States.  It doesn't really fit that situation.  They had no excuse for waiting a full year to sign an NDA when everybody in the industry, Samsung, ZTE, everybody at ETSI, they use these knees NDAs.  There is just no excuse.

All right, now, let me get into the patents a little bit and I'm going to try to take you back through what we've talked about.  So let's start with just some general points.

It's odd in this case, ladies and gentlemen, that the experts for GComm didn't pick up the phone and talk to the inventors.  If they thought

112

these were so great, if they thought they were something new, they could have told us about their discoveries.  We got nothing.  We got nothing.

We know that they collaborated and we had a lot of fun with them about the fact they copies 60 pages from each other's reports, and I could never really get a straight answer on who copied who.  And they said something about our experts, you know, using eight similar sentences -- or eight similar lines, I'm sorry.  There was only three sentences.  Eight similar lines.  They copied 60 pages, ladies and gentlemen.  We have no explanation for that.

I did have some fun with Dr. Kowalski and Dr. Akl and I said, you know, this word "synoptically" is in your expert report.  I had to go look it up.  And Dr. Kowalski, he jumped right on it.  He said, well, that's just like the Gospel.  And he knew that word. So I'm betting that it came from Dr. Kowalski, but we still don't have any evidence from that.

And then there is the testing.  Dr. Akl told us all about testing, told us all about how important it was.  But then he had admit that he didn't pick these test outfit.  It was some litigation testing outfit.  He didn't go.  He didn't even zoom in to try to supervise the test.  The lawyers were certainly

involved, we know that.  But that's not an independent expert.  Dr. Akl is usually more careful than that.

And then there is the source code.  And I had fun with him about his source code reviewer, because he couldn't remember their name.  One of them he called Mr. Satan, and he wasn't sure that was his name.  I'm sure it's a nickname.  I was certainly pleased when I asked him if he knew Mr. Satan personally, and he said no.  That's a good thing.

But the reality is not knowing the reviewer's names or getting involved, that's not the issue.  The issue is he didn't do it himself.  He didn't bother to go look at the code, nor did Dr. Kowalski, even though it was made available in several places around the country.

And the big problem is the source code reviewers, whether they were named Joe or Bob or Mr. Fredericks or Mr. Satan, they got the wrong code. They got the wrong code.  And it wasn't that hard. Qualcomm told people what the right code was.  You saw the analysis from Dr. Wicker.  He took it right down to the product level over and over and over again, and they got the wrong code.

Counsel keeps inviting you to read source code.  And I would love for you to read source code,

114

too, but it's very, very difficult.  And it starts with having the right code.  Counsel says, no, Dr. Wicker didn't point out differences between them.  He did, he said they were different.  And then they didn't ask him whether any of those differences would actually apply to the claims in this case.  And that was a key omission by the Plaintiffs.  We know that Dr. Wicker and Dr. Min did  go onsite and did review the code, and so their  opinions were based on the actual code.

Now, let's talk about the '776 Patent itself and infringement.  You will remember this is CellReselection, it's a ZTE patent, and there were two issues we talked about.  We talked about priority being the same in two groups.  Remember, you've got to have two groups of cells and they have to have two different priorities and two different frequencies.

And then we also talked about this thing called absolute priority, but it has to be set in a particular -- equal to a particular thing.  We keep skipping over that.  And Dr. Akl conceded that, in fact, these were the two issues.  You got to have a group of cells of one priority, and another group of cells with a different priority, and they have to have different frequencies.

So let's look back at the claims and see

115

if we can find that.  Well, everybody agrees that Samsung's phones only have one list.  There are no two groups.  It's one big list and that list is updated. Every time you move around and another cell is closer or better, it gets put at the top of the list, but it's one long list.  And Dr. Akl did not dispute that.

You see the testimony here where he said, he admitted, "the Samsung devices create a list from the best to the worst.  Correct?

"Yes.  There is sorting."

And they always pick the one at the top. Yes, one list, ladies and gentlemen.  One group. It's not two groups.

It's a little bit like my restaurant analogy where, if you type into your, you know, restaurant search, I want the closest restaurants to me.  You will get a list.  They will give you a list of exactly which ones -- which restaurants are closest. And as you move around, that list will change, because there's now a new restaurant that's closer to you, but it's one list.

The patent says, instead, that you've got to have groups.  So what did Dr. Akl do?  He started drawing boxes around restaurants and saying, well, look, those are two lists.  But it's still one list.

116

You can't draw boxes and change the way the phones actually work.

The restaurant analogy that actually matches the patent is where you name a cuisine -- Mexican, barbecue, something like that -- and you create a smaller group from which you then pick. That's what the patent talks about, not the one list. And so there is no infringement.

Counsel said something about the Doctrine of Equivalents and we talked about that, ladies and gentlemen. We never got a straight answer out of GComm. Because what the Doctrine of Equivalents is, if you are trying a case and say, "You know, we just don't have that, we just don't have that one element with the patent," then the law says, well, okay, you can go and look at a completely different approach, if it's a different analysis, and you could look at this function-way-result test and try to come up in an infringement case.

But they never told us which one was right. Dr. Akl never said: Okay, for this element it's there and we're done, or for this element it's the Doctrine of Equivalents. They were just throwing it back and forth and trying to use the evidence of one and the other, and that's not right. But more

importantly, if you look at the technology itself, grouping a single list by drawing boxes around it doesn't turn it into multiple lists.  You still had one list with one choice at the top.  So there is no infringement.

Now let's talk about this absolute priority issue.  So the claim element says, "the priority of the same priority cells is equal to the absolute priority of the corresponding frequencies." You've got to view the whole thing.  You can't just look for a priority and say we're done.  It's got to be equal to the absolute priority of the corresponding frequencies, and GComm skips it over and over and over again.

And what did the evidence show?  Dr. Min said that he looked at the standard and said, no, you don't have anything that's set equal to the absolute priority of the corresponding frequencies.  Just finding an absolute priority doesn't do it.  You've got to do the whole thing.

And he showed you out of the source code -- now, this is source code.  We were told that we weren't using source code.  We have over and over again where it's relevant, the source code that shows you that it just doesn't happen.  And we have Dr. Min explaining

118

how this priority is used, but it's not equal to the priority assigned to the frequency.  It's just not. And so there is no infringement on that basis as well.

Let's talk about invalidity of the '776 Patent.  So, ladies and gentlemen, for the '776 Patent, we are going to ask that you say no to infringement.

As to validity, His Honor just gave us instructions that what we're looking for is whether the technology is well understood, routine, and conventional, and you heard that phrase a lot as we went through the evidence.

And I took Dr. Kowalski through the only version of the standard, the 4G standard, the standard that came out before they ever came along.  And I took him through it and he found element after element from those claims.  We color-coded them, we went back and forth, and he followed right along.  He found every single one of those claim elements in the 4G standard. They were well known, they were well understood, and they were conventional -- routine and conventional.

Here's the testimony where I did the color-coding, and we went back and forth.  We found inter-frequencies and higher priority and lower priority, and cells that meet the criteria.  I took him through one step at a time, and he checked them

off, every single one of them.

For invalidity, we also showed you that you that if you take Cho, that Samsung reference, you know, we were told that none of the Samsung patents mattered in this case.  Well, that's not true because we proved that Samsung had this before they ever came along, and we showed you how every single element of these claims was found in the Cho reference.  You could also look at this R2 reference if you weren't quite sure.

So, ladies and gentlemen, we're going to ask that you find the claims of the '776, 1 and 2, invalid.

All right, let's talk about the '130.  The '130 is pretty simple.  What we're looking at is this TTI term; right?  Everybody has been talking about this TTI term.  And it's just not in the phones, ladies and gentlemen.

So we know that when you capitalize something, it has a special meaning, and we see that in the claim.  It actually talks about "N," and sometimes capital "N" has a certain meaning, and little "n" has a different meaning.  You've got to pay attention to whether it's capitalized or not.  We know that, you know, that if my son dresses up like a cowboy, that

could mean two different things.  He could be Roy Rogers or it could be Troy Aikman.  If I capitalize it, it's Troy Aikman.

And that's what happened in this case. When they filed this patent, ladies and gentlemen, they thought the industry was going to use the old 4G TTI and 5G.  That's what they say in the patent itself. But what actually happened is they abandoned the TTI and they went to a numerology approach where they actually could put bits in different places and make them different sizes.  They just went away from the TTI concept.

Now, GComm doesn't like that, so they point to this document.  And I think counsel said something about how dare they not show this to poor Dr. Min.  Well, ladies and gentlemen, he told you why. It's because this document was before the 5G standard ever came out.  This was an experiment.  It was a prototype where they were using a 4G system that had TTI because it was a 4G system, and they were making little tweaks to it to see how certain things might work in 5G.  But this was not a 5G system and they know that.

They also pointed to some source code and they said:  Aha, look, it says TTI.  But, ladies and

gentlemen, you got to look at it really, really closely, because what the point is you have two slashes in front of it. And as Mr. Sheasby has invited you to read source code, I will, too. Any time you see those two slashes, it's not source code. Those two slashes, as Mr. Min explained, makes it a comment. It's just a comment.

So this just says there is a section for TTI config. And then Dr. Min explained that here, this FFT, this Fast Fourier Transform, is setting up the TTI part of this for the 4G component. That's what it is. It's not using the TTI in the claimed method. They have to be factual.

THE COURT: 20 minutes have been used.

MR. CORDELL: They have be factual, they have to honest about what this evidence shows.

So let's talk about validity of the '130 patent. This one is actually pretty straightforward, too. I mean, the Bible tells us, now that we're all in the Bible Belt, you are not supposed to reap where you don't sow. And in the patent business, that means you can't claim something that you didn't put in your patent application. It's pretty much that simple.

And hear we know that we have these variables, K and B, and they have specific formulations

122

where they claim this wide variety of these variables. The problem is that they don't tell you how to make these systems using these higher numbers.  So let's focus on the B.

So, for B, it says that it's an integer greater than or equal to 1.  But the only thing they describe is 1 and 2.  And an integer greater than or equal to 1 could be box 3, 4, 5, 6.

So you recall that Dr. Min looked at this and he said there is no disclosure whatsoever, that it's really hard to do numbers like 3, 4, 5, and 6. And they don't tell us anything about how to do it. I would like to invent a car that could get 200 miles to the gallon, but I can't claim that unless I can tell you how to do it.  And the same is true here.

When we asked Dr. Akl -- when I asked him, he said, you know, there is really no example of using even just six bits.  Well, ladies and gentlemen, you can't reap where you don't sow.  If you don't tell us how to do it, your patent is invalid, and we're going to ask you find invalidity on the '130.

Let's talk about the '443.  So we had two specific issues that we talked about with the '443. And they had to do with this first length type and a second length type.  And Dr. Wicker said the claim is

not satisfied for these two reasons, so let's go into them.

For the first length type, you know, the claim says you got have a predetermined length.  I think Mr. Sheasby said something about snow tires and I'm not sure exactly what all that meant.  But the point here is that the phone doesn't predetermine this length.  There are a whole bunch of these "if" statements.  And it changes, ladies and gentlemen.  It changes up to a thousand times a second.  Does that sound predetermined?  Does that sound like anything that you can call predetermined?

Counsel, you know, says, well, it doesn't say anything about fixed.  Well, certainly nobody said anything about changing it a thousand times a second.  It's not predetermined.  They need to be honest and realistic about what their claims mean and they need to apply them honestly.

For the second issue, this second length type, what this basically requires is that the length changes based on the number of errors you get.  This "K" is the number of errors.  And so the idea is that you -- what the patent claim talks about is your container, if you want to call it that, changes size based on the number of errors you have.

124

And the analogy we used was eggs and counsel didn't like that.  He said I'm minimizing it.  But it's actually really close.  Because when you go to buy a dozen eggs, that carton is prefixed.  It's a dozen.  If there are two broken ones or six broken ones, the carton size never changes.  And the same is true in this context.  Sometimes the messages are damaged and has to be repeated or whatever.  But the size of the container doesn't change.

And then they said, well, it depends on K, it depends on K.  And I asked Dr. Wicker one question.  If K changes, does the second link change?  No, it does not.  And that was not disputed by GComm.  So, for that reason, ladies and gentlemen, there is just no infringement.

They also talk about the Doctrine of Equivalents for this one, but basically, they just repeated the same evidence.  They didn't tell you, oh, well, this small difference doesn't matter, it's immaterial for some reason, or it's not substantial.  They just didn't do it.  So, again, we couldn't get a straight answer.  Is it really there or is it not there and you're going to make an excuse?  We just don't know.  They never did it.  So there is no infringement under the Doctrine of Equivalents.

125

There is also a failure of proof here and counsel brought it up, and he said, if anybody tells you that they didn't rely on source code for the '443, well, that's not true because we did.  Remember, it was element B.  They left out element B.  They didn't put any Samsung source code in element B.  Don't let Mr. Sheasby sit down without showing you source code for element 10-B of this patent.

And then we also know that to the extent they looked at Qualcomm source code, the reviewers got the wrong bit.  They just did it incorrectly.  Whatever their names were, I was really entertained because GComm's counsel asked Dr. Akl.  He said the man's name correctly, I assume.  It was a complex name.  I'm not going to try it.  And Dr. Akl couldn't recognize it.  So, again, getting it right is very important.

And then on invalidity, once again, we have the well understood, routine, and conventional aspects.  And we know that the birth date for this patent was July 31, 2015.  And then we showed you some prior art, this Cho and Bhattacharya patent applications and patents were from before the birth date of the '443 Patent.  Remember, the Cho reference actually comes from Samsung.  And counsel said they couldn't show you one system and he's being really

126

cagey about that.  Because he's hoping that nobody notices that when he says one system, the experts say, well, that's a piece of equipment sitting on the floor somewhere.

There is no issue here whatsoever that these documents are prior art to the Patents-in-Suit. There is no question about that.  And they are perfectly good to invalidate.  You don't have to go find it in a warehouse somewhere in order to invalidate.

So Dr. Wicker took you through this in great detail.  I'm not going to try to repeat it.  But he showed you where each of these elements can be found, and that all of this was well-known, routine, and conventional for years, for years before the birth date of the '443 Patent application.

And you see here Dr. Wicker's testimony. But importantly, the one thing they pushed back on, they say, oh, well, maybe there's no HARQ.  Maybe HARQ was different.  Maybe that was something that, you know, the patent doesn't talk.  But remember Dr. Kowalski's testimony.  He said HARQ has been conventional for a long time.  Dr. Wicker said his students were doing it 25 years ago, 30 years ago. It's been a standard part of communications protocols

127

for a long, long time.

The other thing they said about this, they said, well, you know, Cho was all about -- it's all about, you know, Wi-Fi, it's not about cellular.  But Dr. Wicker pointed out that that's not true, that, in fact, these references talk about cellular.  You see here, the 3GPP group that's called whiteout, and you now all know that those are the folks that issue those ESTI standards.  That's all cellular all the time.

And we also had a different validity approach.  So it wasn't just that they were well-known, routine, and conventional.  We found every single element of those claims in the prior art.

Remember, Dr. Wicker said these things weren't new.  Samsung, for example, had it before they ever came along.  And then he took you through each and every one of those elements and showed you how each and every one of those elements was in the Samsung reference before the '443 ever came along.  And, ladies and gentlemen, that means they anticipated, that's the legal term for it.  But you know that it just means it's invalid, that it wasn't new, and they can't have the patent.

And I asked Dr. Akl this.  I, frankly, didn't know what he was going to say.  I asked him, I

128

took him through every one of the those elements.  You know, I'm not good with the alphabet, so I started with 10C.  But, you know, I'm from Louisiana.  So, but then I went through, you know, all of them.  I did 10-C, 10-A, 10-B, 10-D, 10-E.  I went through every single element of that claim and he told me every -- he couldn't dispute that every single one of them was in that reference.  And what that means, ladies and gentlemen, is that this patent is invalid.

So now let's go to FRAND.  So we've talked a lot about FRAND.  You know my main points.  I'm going to start with refusing to negotiate the NDA.  There was a lot of back and forth about this.  You know these fact very well, so I'll go pretty quickly.  But let me throw a couple more things in.

Remember that ZTE and Samsung ultimately reached a license.  And I put the number here on the board.  I don't want to say it out loud because it's confidential, but you can see it written in red.  It was a lot of money.  And Samsung negotiated in good faith with ZTE and reached that license.

Now, ZTE sold the patents to GComm on October 31st of 2020, Halloween of 2020.  And so nothing that ZTE did after that date matters anymore; right.  They sold the patents to GComm.  Now, GComm

took the promises they made.  Everything that ZTE did before that date went with the patents, but not after.

But the same is not true for GComm.  What they did after October 31, 2020 still matters.  And so they signed -- well, before that date, ZTE signed an agreement with Apple.  And you have got the dates up on the screen.  And then they backdated the agreement for GComm so that the Apple license would include the patents in this case.

THE COURT:  30 minutes have been used.  10 minutes remaining.

MR. CORDELL:  Thank you, Your Honor.

But for the Samsung license, the patents in this case were not included because it came after this whole backdated episode.

So counsel said I suggested in opening that Samsung had a license to these patents through ZTE.  I didn't suggest that, ladies and gentlemen.  What I suggested and what I have proven now is that Samsung had negotiated in good faith with ZTE and ultimately took a license, but the patents were taken out on October 31, 2020.

But what do we also know?  We know that, again, ZTE's behavior doesn't matter after they sold the patents.  But GComm's behavior does matter.

Because not two months after Samsung signed this agreement with ZTE, Mr. Pitcock knocked on Samsung's door.

Remember the -- well, here's the evidence where he talked about backdating his agreement to allow the Apple agreement to go forward. We also know that during the discussions nobody ever said anything to Samsung about these patents. But if we look at the big timeline, we know that Mr. Pitcock waited two months after the ink was dry on the Samsung and ZTE agreement to approach Samsung, and he did that in September of 2021. They haven't explained any of that to you. I would love to know why.

But we also know that what they did instead is that they refused to negotiate an NDA. We had a little bit of a dustup about whether they asked us for an NDA. Remember, Mr. Sheasby took me to task over and over again for that. Then when you saw the evidence, Mr. Pitcock admitted, yeah, I did ask them for an NDA. I wanted to see their draft. And I did ask them to send me the NDA. That's kind of a silly issue, but that's what happened and we have accuracy matters.

You've seen these documents. I'm not going to spend a lot of time on them, but we sent them

a draft NDA, and Mr. Pitcock readily admits that he knew he could negotiate that. Of course, it's called "draft" and he readily admitted that.

They tell us all of this thing was abusive and so terrible. Ladies and gentlemen, is suggesting good faith abusive? Is telling the other side we want to have an honest discussion between the two of us? Ask yourself why would GComm object to agreeing to act in good faith. Why would they resist that? Why would they say no? We don't need to sign anything that suggests that we have to act in good faith?

And we have the multiple requests. And to the extent that you would like to see them again, it's DTX-20, 30, and 50. If you ask for those, we'll give you the documents, you can read yourselves. But we asked over and over again. In Mr. Jeon's words, we were pleading with them to give us comment. Give us our contract, you know, tell us what you want. And they just wouldn't do it. They just wouldn't do it.

Dr. Zhu said, you know, I never had one of these without an NDA. Every single one I've ever done, you start with an NDA. Mr. Rodermund said, in 30 years, he's never seen a negotiation without an NDA. It's just not reasonable. And Mr. Jeon echoed the same thing, that there never was a company he negotiated

with, other than GComm, that refused to sign the NDA.

And then finally, we asked him, you know, you're the guy on the front line.  Is this reasonable?  And he was very plain.  He said absolutely not, was not reasonable.

So we also know that they sued us.  They sued us a bunch.  You know, they sued in March, you know, just after they gave us their first offer and claim charts.  It's kind of hard when you're having a dispute with your neighbor and, you know, you tell them, hey, your fence might be too far on my property, and then the next week you sue them before you have a chance to check it out and even respond.

THE COURT:  Five minutes remain.

MR. CORDELL:  Particularly in Texas.  That's not the way we work.

But, you know, they sued us in Brazil, they sued us again in Texas, they sued us in Netherlands.  And why?  Mr. Jeon tells us.  They were using these lawsuits to try to force Samsung into an unreasonable negotiation.  It was supposed to be fair and reasonable, FRAND, and they were using these lawsuits to press Samsung the other way.  And we know the demands were way above fair and reasonable.

They didn't like my milk analogy.  They

said, oh, you know, you get a whole truckload and having a spill.  Well, then you call the company and tell them they made a mistake.  Because the reality is these patents do come in by the thousands and they are treated like a truckload.  That's the only way you could do it.  You can't tear open every gallon of milk and taste it.  But they didn't like this because they didn't want to be fair and reasonable.  They don't want to mask the other offers.

You can see the number that I had on my flashcard here I can now put on the screen, because it's isolated.  And the offers they made, ladies and gentlemen, started out as a thousand times more and went down to a hundred times more.  That gallon of milk went from $4,000 a gallon to $400 a gallon.  Not fair, not reasonable.  They want more than the rest of the industry, these big players, ZTE, Ericsson, all of these big players.  They want more at GComm.  And Mr. Jeon echoed this, said it was absolutely not fair that they did this.

So we're going to ask you for damages.  You can see the number that I've got up on the screen.  It's a million 776.  But, you know, the number to us, ladies and gentlemen, is not important.  The message is important.  So, if you want to give us a dollar, I'll

take a dollar.  Really, what's important here is we need to tell people it's time to be fair, it's time to be reasonable.

So, finally, let's talk about damages, because they are just pie in the sky.  If there is no infringement, ladies and gentlemen, or the patents are invalid, there's no damages.  We don't pay people in this country just for filing suits.

We heard that somehow Mr. and Mrs. Pitcock put in $9 million.  There is no evidence of that at all.  None, zero.  We heard Mrs. Pitcock is not involved in this at all, that was the evidence.  And yet we just heard that somehow they put in a bunch of money.  That's not true.  And we don't pay people just for filing lawsuits.

But if you find infringement of a valid patent, you've got to come up with a proper damages number.  We know ZTE said, you know, we had a bunch of these patents and we didn't give them our best.  We just gave them kind of the leftovers.  That's what Dr. Zhu said.

We know that they charted a bunch of patents, meaning that they created claim charts that they could use to use to show people how good their patents were, and these weren't on the list.  We know

that nobody -- and remember, ZTE and Samsung talked for a long time. Nobody ever mentioned these patents. If they were so good, why wouldn't they bring them up in those negotiations that happened along before -- it started before even 2020.

And then madly, ladies and gentlemen, they are asking for damages out to 2037. It's like your landlord coming in and saying, look, I know you're in the military and you move around every two years, but I want you to pay all your rent right now through 2037.

Nobody knows what the phones are going to look like. Who has the same phone that they had 15 years ago, 10 years ago, three years ago? The generations keep coming. We have no idea. So they are asking us to pay out in the future. It's just pure speculation.

We know that the law says we look at licenses for the same patents or comparable patents. That's the best evidence of what these things are worth. We know from Mr. Dell that there were big licenses out there: Qualcomm, Ericsson, Apple, Huawei. He didn't look at any of them. He didn't ask his lawyers to give him any of these licenses.

Mr. Meyer did a full comparability analysis and compared them and came up with the right

numbers.  We know that the market comparables that had declared patents in them is the way to go.  That's the way everybody in this business does their analysis.  And then the evidence is most important, ladies and gentlemen, is the ZTE Apple license and then these, the ZTE, Samsung, OS Mobil, and 5GIP.  Those are the best comparables for the gallon of milk and the damages context for the rental house, if you want to call it that.

We know that the numbers, if you do the math correctly, come out to pretty reasonable numbers: 15 cents or 37 cents.  And then when you adjust those down to the small number of patents GComm has, it's .0013.  These are the reasonable numbers.  That's what should have been used for damages.  Can't throw these agreements away.  You have to do it right.

And then finally, ladies and gentlemen, if you give a dollar -- $2.10 for every three patents, the phones would cost Samsung $52,000 to make.  There is no way they could be in business.

THE COURT:  Counsel, your time has expired just.  Finish up in just a few seconds.

MR. CORDELL:  Thank you.

So this is slide, ladies and gentlemen, has a variety of damages.  I'm not going to tell you

which one to pick.  That's really up to you.  We believe one royalty is the appropriate number.  And if you believe Mr. Meyer, then it's somewhere between, you know, around 60-to-160,000 dollars.  You could pick the $600,000 number they used to buy the patents.  Or you could go with Mr. Dell's numbers, which come in to 1-to-10 or 1-to-11 billion.

So, with that, I'm going to thank you for your time and attention and we look forward to your verdict.

THE COURT:  All right, Plaintiff may now present the Plaintiff's final closing.  It shows you have 19 minutes and 12 seconds.  Would you like a warning on your time?

MR. SHEASBY:  Yes, I'd like a warning when I have five minutes left, Your Honor.

THE COURT:  I'll warn you at that point.  You may proceed.

MR. SHEASBY:  May it please the Honorable Court.

Can I have slide 209 -- 20.209.

"These patents are no good."  That's what the expert they paid to testify for them seven times admitted under oath:  He cannot give me the name of one patent that is of equal importance to these patents.

Can I have slide 94.

"The Qualcomm code was the wrong code." Samsung's counsel told you to your faces that Dr. Wicker was not asked about whether the code that was used was materially the same as to the disputed limitations.  Samsung's counsel stood in front of you and said the exact opposite of what his expert testified to under oath.

"Conquer distraction before it conquers you."

Can I have slide 95.

Dr. Min provided the exact same testimony.  As to disputed elements, the code is the same for all Qualcomm products.

A lawyer can stand up and say whatever they want.  Facts is what controls in this matter.

I now would like to speak about infringement.  Your Honor, may I approach the table just briefly?

THE COURT:  You may.

MR. SHEASBY:  Can I have slide 128.

The '776 patent.  Still disputing this Absolute Priority requirement.  If someone says there's no Absolute Priority in these patents, you point them to PTX-31, which defines "Absolute Priority" as the

combination of CellReselectionPriority and SubPriority. That's undisputed. That's what's in their code. The combination of CellReselectionPriority and SubPriority. If someone says Absolute Priority is not in the code, you ask them and you ask for JTX-14.2.

It's not in the code because there is two slashes, that was the argument you heard. There's no two slashes there. It's in the code in plain English. Absolute Priority. This is the slide that Mr. Cordell showed. In fact, it's the only piece of source code he showed you. And he said this somehow proves you have Absolute Priority. This code says Priority is equal to the ReselectionPriority plus the ReselectionSubPriority. What's the definition of Absolute Priority? Absolute Priority is the ReselectionPriority and the ReselectionSubPriority. These documents were not shown to Dr. Min.

If we can have slide 113.

Jaewon Kim, the corporate representative on the design of system, testified expressly that the 5G system uses TTI. Samsung did not allow Dr. Min to talk to his engineers.

The size of the TTI in Samsung's product is one to two symbols. That's exactly the length that we invented. Samsung claims that the code doesn't say

TTI configuration.  It is telling what's happening below, which is the TTI is being used, and it's in every single document.

The excuse that counsel gave was that this document doesn't relate to 5G, despite its engineer testifying to the exact opposite.  Well, that excuse fell apart on cross-examination because Dr. Min admitted under oath that this document, PTX-7, relates to 5G, and so does TTI.

Let's go to the '443 patent.  Slide 149. 149.  All right, I'll come back to that.  Let's go to slide 141.

The first link has to be Semi-static. The F scenarios are each scenarios, each of which is predefined, as Dr. Wicker admitted.  Dr. Wicker admitted, as to the second set of designs, that the value for the second set of designs is based on K, and K changes dynamically.  And what he did instead, as his strategy, was to insert the word "only" into the claims.

Samsung invited me to show you the source code for Samsung's products as to element B.  He made a big show of it.  Words are not evidence.

Let's go to validity next.  That's the '130 Patent.  Let's go to slide 160.

He claims the design of the '130 Patent is not expressly in the specification. There is a word-for-word match between what's in the claims and what's in the specification. And, in fact, there are specific examples in the patent selling this embodiment.

Go to slide 171.

As to the '443 Patent, Samsung suddenly claims that their invention and their references apply to something else other than Wi-Fi and they point you to a random paragraph 35 that was never shown. You know why they pointed you to that random paragraph? Because it has nothing to do with disclosing the missing elements in this claim, and missing elements or no acknowledgement of frames is required by the claim. No HARQ and no ACK erroneous transmission.

Let's go to slide 165. You don't have to take my word for it. Dr. Wicker admitted it himself.

Can I have Slide 214.

Samsung wanted to hear the story. Are they invited to hear the story about their behavior that led to this lawsuit? We should tell the story. Samsung chose not to license 5G technology from ZTE. It admitted that it did not license 5G technology from ZTE, it didn't claim it had a license to the 5G

technology.  The agreement expressly says it excludes 5G technology.  And why did it do that?  You see that number that they paid?  Why did they exclude 5G technology?  Why did they not license it?  Because 5G is 10 times faster and they thought they could avoid their liability through the court process.

Let's go to slide 107.

Samsung wants to know the story.  They said we didn't tell the story.  The story was told by Mr. Jeon.  We sent them claim charts for each of the Patents-in-Suit in this case.  Those claim charts were reviewed by their IT center.  After those claim charts were reviewed by the IT center, they came and said, we want a license.  We need a license.

They need a license because they infringed.  And their goal is to use this court proceeding to distract and avoid their obligation.

I'd asked Dr. Kowalski to stand.

Dr. Kowalski, can you stand?

Dr. Akl is an expert in source code analysis.  Dr. Kowalski is an expert in actually building 3GPP 5G designs.  And why are they so bothered by the fact that they teamed up and wrote a joint report?  Why are they so afraid of that?  Why do they keep talking about it?

143

Dr. Kowalski, you have to continue to stand because I'm going to say something very important.

They keep talking about it because they have no 5G 3GPP expert come and testify.  They are afraid of Dr. Kowalski because Dr. Kowalski told you under oath these patents are essential.  And Samsung got up here and degraded Dr. Kowalski for working as a team and jointly publishing a report with Dr. Akl because they are afraid of his conclusions.  They are afraid of the truth, which is that he concluded these patents were essential and they have no defense to that whatsoever.

Dr. Kowalski, you may now sit down.

The next issue that I would like to discuss is the negotiations.  Let's go to slide 231.

Samsung couldn't imagine why you would refuse to sign a non-disclosure agreement that would have prevented us from telling you that we had put them on notice of the patents, and that would prevent us from telling you that we gave them claim charts establishing infringement.  They wanted that to be hid from you so badly.

Why?  He's sitting right there.  Because they are essential and because the claim charts prove

it.  And because of this lawsuit, you are here today and you are here this week because of refusal by this company, these entities, Samsung entities, to engage in reasonable conduct.

Let's go to slide 225.

This is the number of times we asked them to enter into a Confidentiality Agreement.

THE COURT:  Five minutes remaining.

MR. SHEASBY:  They chose not to for a very particular purpose, which they don't deny.  They wanted to provide us with false information.

Let's go to slide 191.

May I approach the easel?

THE COURT:  You may.

MR. SHEASBY:  Dr. Reed-Arthurs did a technical analysis, the technical analysis that's undisputed by Samsung, that showed for each phone they make $12.81 solely from infringing our patents.  This is what you pay when you don't know the patents are essential. This is what their benefit is from infringement.  This is what they are obligated to pay under the law.

Let's go to slide 210.

Apple followed the law.  Apple made sure our patent system is not destroyed.  No one is going to present their technology in this country if folks take

it and refuse to pay for it.  Apple did the right thing.  They paid a very significant amount of money.  And they paid that significant amount of money even though there are only three patents that they were accused or concerned about infringement.  Mr. Meyer could not point to any other patents that were used.

There are 273 million units.  If you use the Apple  rate, you see the number that they would have to pay.  Folks who comply with the law, folks who do the right thing, like Apple, should be rewarded and lauded for it.  "Conquer distraction before it conquers you."  We all follow the law, every single one of us.  And the consequences to each of us or to our family members when we break the law is profound.

In September of 2022 we put them on strict notice with claim charts of their infringement.  They could not be bothered with us.  They ignored us for months and months and months.  And after we initiated these legal proceedings, they wouldn't even agree to talk to us until we signed an agreement to hide from you the facts of this case.

Ladies and gentlemen of the jury, the founders of our country gave this power to you.  The right to a trial by jury is your right.  This is not two squabbling companies.  This is not two sets of

individuals who just can't get along.  This is about a solemn duty to enforce the laws of this land.

Ladies and gentlemen of the jury, this case is in your hands.  Thank you.

MR. CORDELL:  Your Honor, may we approach?

THE COURT:  Yes.  And let's move the chart back to where it was and turn it to a clean sheet, if there are any clean sheets left on it.

*[At the bench as follows:*]

MR. CORDELL:  The only thing, I think, is related to the two that are the most profound:

The allegation that we have broken the law, so we're back into a criminal motif.  And counsel continues to press willful infringement things, even though that is out of the case.  So we heard about [??] strict notice of patent infringement right after he said to the jury that we had broken the law.  I understand that there are civil laws and that sometimes people can be --

THE COURT:  What are you asking me for?

MR. CORDELL:  A curing instruction that this case is not about breaking the law.  There is no intent, there is no -- I'm struggling to come up with the right words.

MR. SHEASBY:  Your Honor, that's actually

incorrect.  There is a good faith claim at issue in this case and there is French law which we believe has been broken.  We actually believe French law has been broken in this case.  I did not want --

THE COURT:  All right, gentlemen, I'm not going to give the jury an instruction in that regard. I do have some final instructions I need to give them. Take your seats.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  All right, ladies and gentlemen, I need to now provide you with just a few final instructions before you retire and begin your deliberations.

You must perform your duty was jurors without bias or sympathy or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or even public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as the Court has given it to you, and only as the Court has given it to you, and reach a verdict regardless of the consequences.

Answer each question in the verdict form from the facts as you find them to be following the instructions that the Court has given you on the law.

148

Again, do not decide who you think should win this case.  And then answer the questions to reach that result.  I'll also remind you, your answers to the questions in the verdict form must be unanimous.

You should consider this as a dispute between persons of equal standing or holding the same or similar stations in life.  The law recognizes no distinction among types of parties.  All corporations, partnerships, LLCs, other business organizations, all stand equal before the law, regardless of their size and regardless who owns them, and they are to be treated as equals.

Now, when you retire to the jury room in just a few minutes to deliberate on your verdict, as I've told you, I'm going to send back to you and you will each have at that time your only printed copy of the final jury instructions that I have given you.  If during your deliberations you desire to review any of the exhibits that the Court has admitted into evidence and have been used during the trial, you should advise me by giving a note to the Court Security Officer specifying which exhibit or exhibits you would like and I will send those to you.  Once you retire, you should first select your foreperson and then conduct your deliberations.  And if you recess during your

149

deliberations for any reason, follow all the instructions the Court has given you about your conduct during the trial.

After you have reached a unanimous verdict, your foreperson is to fill in those answers in the verdict form reflecting your unanimous agreement. Then your foreperson is to sign the verdict form and date it and notify the Court Security Officer that the jury has reached a verdict.

Do not reveal your answers until such time as you are discharged by me, unless I direct otherwise. And you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you have taken over the course of this trial are aids to your memory only. If your memory should differ from your notes, them rely on your memory and not your notes. The notes are not evidence. And a juror who has not taken notes must still rely on his or her own independent recollection of the evidence, and should not be unduly influenced by the notes that were taken by other jurors. Notes are not entitled to any greater weight and should not be used other than to refresh your recollection of the evidence as presented over the course of the trial.

Now, if you need or want to communicate

with me for any reason during your deliberations, you should give a message or question written on a piece of paper signed by your foreperson to the Court Security Officer, and the Court Security Officer will then bring it to me.  And I will respond as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  And I will always disclose to the attorneys in the case any question or message you may send to me and my in intended response before I answer or respond to the same.

Now, after you have reached a verdict and I have discharged you from your position as jurors in this case, you are then free to talk with any you choose to about your service in the case or anything related to the trial.  You are also not required in any way to talk with anyone about your service in this case or your experience during this trial.  That decision at that time will be 100 percent yours and yours alone.

I'm now going to hand eight printed copies of the Court's final jury instructions and one clean copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to conduct your

deliberations.  We await your verdict.

*[Jury out]*

Counsel, you are welcome to wait in the courtroom or have a representative wait here.  You are also free to return to your respective office space.  I don't want you to go any further than that because we may get a question and I may need you back here.  I have a cell phone number for Ms. Truelove and  I have one for Ms. Smith.  Those are the two people I will call if I need to get you back here.  So don't be outside of their hearing very long.

All right.  Awaiting either a question from the jury or the return of their verdict, the Court stands in recess.

*[Lunch Recess/Jury Deliberations]*

Be seated, please.

Counsel, the Court has received the following note from the jury.  I'll read it to you. "Can we get a calculator, please?"  Signed by [name redacted] as foreperson.  That would be Juror No. 8. And I have a calculator which we have used for this purpose before.  Is there any objection to me having Mr. Barnett take this in to the jury?

MS. DEGNAN:  No.

THE COURT:  Any objection from Plaintiff?

MR. SHEASBY:  Do you have one with more digits on it?

THE COURT:  This is what we have, Mr. Sheasby.

MR. SHEASBY:  No objection, Your Honor.

THE COURT:  Any objections?

MR. CORDELL:  No objection, Your Honor

THE COURT:  All right.  Mr. Barnett, if you will take this in to the jury.

CSO BARNETT:  Yes, sir.

THE COURT:  I'm going to mark this note in the upper lefthand corner with a 1 for identification as the first note from the jury and hand the original to the courtroom deputy.  I'm also going to hand two Xerox copies to the courtroom deputy.  And if counsel for either side would like to have one for your files, you can get it from Ms. Brunson.  Other than that, awaiting either another note or return of a verdict, we stand in recess.

*[Recess/Jury Deliberations]*

Be seated, please.

Counsel, a couple of housekeeping matters. First of all, I met with counsel in chambers about DTX-190.  I've heard the arguments.  I've determined that it's properly considered as a pre-admitted exhibit, and I'll order it included in the list of

exhibits used during the course of the trial.

Were there any other outstanding matters that counsel is aware of that I needed to take up on the record?

MR. SHEASBY:  Your Honor, in light of the agreement on the source code binders, I do not believe so.

THE COURT:  And that agreement has been reached?

MR. SHEASBY:  It has, Your Honor.

THE COURT:  And that source code has been delivered to the courtroom deputy?

MR. SHEASBY:  It has, Your Honor.

THE COURT:  All right.  Thank you, then, counsel.

MR. CORDELL:  The only thing I wanted to add, Your Honor, is to thank you and your staff for all the work that you've done.

THE COURT:  Well, that's why we're here.  This has been a hard fought trial.  I don't know what the outcome is going to be, but it's always a pleasure for the Court to have experienced and skilled litigators trying lawsuits in front of a jury.  I consider this the best seat in the house.  Thank you.

All right.  We have a verdict.  I received

the following note from the jury, signed by the foreperson with today's date on it.  And it simply says, "We have a verdict."  I'll hand the original to the courtroom deputy.  I've marked it with a 2 for identification.  And with that, let's bring in the jury.

**[Jury in]**

Please be seated.

I understand that you are the foreperson of the jury; is that correct?

FOREPERSON:  Yes, sir.

THE COURT:  Has the jury reached a verdict?

FOREPERSON:  Yes, Your Honor.

THE COURT:  Would you give the completed verdict form to the Court Security Officer, who will bring it to me.

**[Pause]**

Ladies and gentlemen of the jury, I'm going to announce the verdict into the record at this time.  I'd like to ask each member of the jury to listen very carefully because after I've announced the verdict into the record, I'm going to poll the jury and make sure this is, in fact, the unanimous verdict of all eight members of the jury.

Turning to the verdict form and beginning

on page 4 where questions 1a, 1b, and 1c are found. Question 1A:  Did G+ prove by a preponderance of the evidence that Samsung infringed Claim 1 and/or Claim 2 of the '776 Patent?  The jury's answer is yes.

Question 1b:  Did G+ prove by a preponderance of the evidence that Samsung infringed Claim 20 of the '130 Patent.  The jury's answer is "Yes."

Question 1c:  Did G+ prove by a preponderance of the evidence that Samsung infringed Claim 10 of the '443 Patent?  The jury's answer is "No."

Turning to page 5 of the verdict form where question 2 is found:  Did Samsung prove by clear and convincing evidence that any of the following asserted claims involved only technologies and activities that both alone and in combination of well understood, routine, and conventional from the perspective of a person of ordinary skill in the art as of the priority date of the Asserted Patents?

For Claim 1 of the '776 Patent, the jury's answer is "No."

For Claim 2 of the '776 Patent, the jury's answer is "No."

For Claim 10 of the '443 Patent, the jury's answer is "Yes."

Turning to page 6 where question 3 is found:  Did Samsung prove by clear and convincing evidence that any of the following Asserted Claims are invalid as anticipated, obvious, and/or lacking adequate written description?

The jury's answer for Claim 1 of the '776 Patent is "No."

The jury's answer for Claim 2 of the '776 Patent is "No."

The jury's answer for Claim 10 of the '443 Patent is "No."

And the jury's answer for Claim 20 of the '130 Patent is "No."

Turning to page 7 where questions 4a and b are found, turning to question 4a first:  What sum of money, if paid now in cash, do you find by a preponderance of the evidence would fairly and reasonably compensate G+ for Samsung's infringement of the '776 Patent?  The jury's answer is "$45,000,000."

Turning to question 4b.  What sum of money, if paid now in cash, do you find by a preponderance of the evidence would fairly and reasonably compensate G+ for Samsung's infringement of the '130 Patent?  The jury's answer is "$22,500,000."

Question 4c:  What sum of money, if now

paid in cash, do you find by a preponderance of the evidence would fairly and reasonably compensate G+ for Samsung's infringement of the '443 Patent? Appropriately, the jury put a zero in this blank.

Question 4b:  Are the reasonable royalties you found in questions 4a through c, running royalties or past sales only, or one time lump sums for past and future sales?  The jury's answer is "Running royalties."

Turning to page 9:  I've covered page 8. Turning to page 9, where Questions 5 and 6 are found. Question 5:  Did Samsung prove by a preponderance of the evidence that G+ breached its FRAND obligation by failing to offer a license to the Asserted Patents to Samsung that was fair, reasonable, and non-discriminatory and by failing to act in good faith regarding negotiation with Samsung as to a FRAND license covering the asserted patents?  The jury's answer is "No."

Question 6 is the damages question. Following Question 5, it is appropriately left blank.

Question 7:  Did G+ prove by a preponderance of the evidence that Samsung breached its FRAND obligation by failing to act in good faith regarding negotiations with G+ as to a FRAND license

covering the Asserted Patents? The jury's answer is "No."

And question 8, which is the damages question related to question 7, is appropriately left blank.

That brings the Court to page 11, which is the final page of the verdict form.  I find that the verdict is dated appropriately and correctly with today's date, the 26th of January, 2024, and it is signed by [name redacted] as the jury foreperson.

Ladies and gentlemen, let me poll you at this time to make sure that the verdict I have read into the record is the unanimous verdict of all eight members of this jury.  If this is your verdict as I have read it, would you please stand up.

Thank you, ladies and gentlemen.  Please be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury.

This, ladies and gentlemen, confirms that this is the unanimous verdict of all eight members of the jury.  And having confirmed that, the Court accepts the jury's verdict.  And I'll hand the original verdict form to the courtroom deputy to be included in the

papers of this case.

This now completes the trial of this case, ladies and gentlemen.  From the very beginning I've instructed you repeatedly about not discussing the case with anyone, and not discussing it among yourselves until you retire to deliberate on your verdict.  I'm releasing you from those instructions and those obligations, as well as every other instruction and obligation I've given you about your service as jurors.

I am releasing you and discharging you as jurors in this case.  That means you are now free to talk about your experience in this trial with anyone anywhere, for as long as you would like, and you are equally free to not talk about your experience as a juror in this case with anyone anywhere.

If there is a discussion or conversation about your service as jurors, it will be because you and you alone chose to have that discussion.

Ladies and gentlemen, I'd also like to ask a personal favor of you, and I've done this since coming onto the bench more than 12 years ago now.  In just a minute when you get up out of those chairs to leave, instead of immediately leaving the building and going to your cars, I'd like you to go back into the

jury room for just a couple of minutes and let me come into the jury room.  And I'd like to shake each hand and look each member of the jury in the eye and tell you thank you personally for your service and the sacrifice that you've made in this case.  I think what you've done is important.  I know it is important and I know in my own mind it warrants that kind of a special thank you and a special amount of attention.

I knew it's a Friday afternoon.  I know that we've had a long trial and you've been here late most nights.  We've had bad weather, and every one of you has been on time, you've done everything the Court has asked you to do, and I could not ask for anything more than the way you've comported yourself through this jury trial.  But if you would give me just a few minutes to tell you thank you.

I also have a certificate to hand to you recognizing your service in this case.  And if you would give me just a minute, I promise I won't keep you long and I'll let you be on your way.  But I would consider it a distinct honor and a personal privilege if you would let me have just a minute to thank you in person for your service in this case.

Counsel, the Court has accepted the verdict.  The Court has discharged the jury.  That

completes the trial of this case.

Ladies and gentlemen of the jury, if you will meet me in the jury room, I'll be right there.

Counsel, you are excused.

*[3:26 p.m. - Proceedings adjourned]*

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled cause.

/s/ Ed Reed                          1/31/24
Edward L. Reed                       Date
Court Reporter