IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

G+ COMMUNICATIONS, LLC.,            (  CAUSE NO. 2:22-CV-078-JRG
                                    )
          Plaintiff,                (
                                    )
vs.                                 (
                                    )
SAMSUNG ELECTRONICS CO., LTD.,      (
et al.,                             )  MARSHALL, TEXAS
                                    (  JANUARY 19, 2024
          Defendants.               )  9:00 A.M.
_____

VOLUME 1

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                      LOS ANGELES
                      1800 AVENUE OF THE STARS
                      SUITE 900
                      LOS ANGELES, CA 90067-4276
                      (310) 203-7096
                      BY: MR. JASON SHEASBY
                          MR. BENAJMIN MANZIN-MONNIN

                      IRELL & MANELLA -
                      NEWPORT BEACH
                      840 NEWPORT CENTER DRIVE
                      SUITE 400
                      NEWPORT BEACH, CA 92660
                      (949) 760-0991
                      BY:  MS. LISA GLASSER

                      McKOOL SMITH, P.C. - MARSHALL
                      104 EAST HOUSTON, SUITE 300
                      MARSHALL, TEXAS  75670
                      (903) 923-9000
                      BY:  MS. JENNIFER TRUELOVE
                           MR. SAM BAXTER

FOR THE DEFENDANTS:   FISH & RICHARDSON, PC -
                      WASHINGTON, DC
                      1000 MAINE AVE., SW
                      SUITE 1000
                      WASHINGTON, DC 20024
                      (202) 783-5070
                      BY:  MR. RUFFIN CORDELL
                           MR. MICHAEL McKEON

                      GILLAM & SMITH, LLP
                      303 SOUTH WASHINGTON AVENUE
                      MARSHALL, TEXAS  75670
                      (903) 934-8450
                      BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                      100 E. HOUSTON STREET
                      MARSHALL, TEXAS  75670
                      (903) 923-8546

# **INDEX**

**EXAMINATION**

**Witness Name**                                                                              **Page**

JEREMY PITCOCK

    Direct By MR. SHEASBY........................................   220

THE COURT:  Thank you.  Be seated, please.

Good morning, ladies and gentlemen.  Thank you for being here.

My name is Rodney Gilstrap, and I am the chief United States district judge for the U.S. District Court for the Eastern District of Texas.  I have lived in Marshall, Texas since 1981.  I practiced law in this community and the surrounding area for 30 years before I was nominated by the president and confirmed by the Senate to become a U.S. district judge.

I have a confession to make.  They say confession is good for the soul.  I was not born in Texas, but I got here as quick as I could.  I came to Texas at the ripe old age of 18 to enroll as a freshman at Baylor University in Waco.  I went to college there and graduated, and then I enrolled in and attended law school at Baylor University School of Law.

I'm married to a wonderful lady who grew up in East Texas who I met in college.  We had two grown children.  Sadly, one of them has passed away, but I have four wonderful grandchildren.

Now, I tell you all that because in a few minutes I'm going to ask each of you to give me the same type of information about each of you, and I think you're entitled to know as much about me as I'm about to ask each of you to tell me about yourselves.

Now, we are about to engage in the selection of a jury in a civil case involving allegations of patent infringement. But before we go any further, if you would indulge me, I'd like to give you a brief overview of how we came to have our American civil jury trial system.

If you go back in ancient history and if you look at the first five books of the Old Testament, the Pentateuch, you'll find that the ancient Hebrew nation impaneled juries to determine questions of property ownership and property value.

The ancient Greeks began using a jury system about 1500 BC.  And the Romans, as they did in many other respects, copied the jury system from the Greeks, and the Romans implemented a jury system.  And it was, in fact, the Romans that brought the concept of the jury trial to what we know now to be Great Britain when they crossed the English channel and conquered that island in the 4th century AD.

And from then until the 12th century, for 800 years the jury system took root in Great Britain, and it flourished in Great Britain until in the 12th century AD a rather tyrannical king came to the throne.  His name was King John.  And King John became embroiled in many disputes with his nobles and his subjects, and led that country to the brink of a civil war.

One of the disputes the king had with his subjects was his efforts to curtail and restrict the right to trial by jury among many other disputes.  Thankfully, a civil war at that

time was avoided because the parties, the king and his nobles, reached an agreement that resolved those disputes, and that agreement was signed at a place in England called Runnymede. And the document that set forth their resolution of those disputes you may well have heard of before:  It's called the Magna Carta.  And the Magna Carta provides in writing a guarantee to the right to trial by jury.

And so you can see that the concept of the right to trial by jury crossed the Atlantic Ocean and came to this continent along with those British colonials that came and settled this country.  Our founding fathers brought the concept of trial -- right to trial by jury with them or it was brought by their ancestors, and it flourished in British North America for over a hundred years until another rather tyrannical king came to the throne of Great Britain.  This time his name was King George III.

And like King John, King George III became embroiled in many, many disputes with his colonial subjects here in North America, and those disputes, in fact, did lead to a revolution.  And one of the disputes that the king had with his subjects here was his efforts, like King John before him, to restrict and curtail the right to trial by jury.

As a matter of fact, ladies and gentlemen, when Thomas Jefferson wrote the Declaration of Independence in 1776, it spells out the specific disputes between the colonial citizens

here in America and the king that led the people here to determine they had no other alternative than to separate from England and to form our own independent country. And among those specific reasons set forth in the Declaration of Independence is the king's effort to restrict the right to trial by jury here in America.

And as you know, we did have a revolutionary war, and we did separate from Great Britain and form our own independent country. And shortly after we gained our independence, we developed the governing document for our new nation, the supreme law of the land, the Constitution of the United States.

And shortly after the Constitution was ratified and adopted in 1789, there was an effort to add 10 amendments that had been anticipated but had not yet been actually included in the original Constitution, and many of the states that ratified the Constitution in 1789 did so upon the express promise that these 10 additions would be added as soon as possible, and they were. And these 10 amendments to the Constitution, you have all heard of in history class, in school, as the Bill of Rights.

And within the Bill of Rights, you'll find the Seventh Amendment to the U.S. Constitution which guarantees in writing the right to trial by jury in a civil case. And the Bill of Rights, including all 10 of those amendments, were ratified

and added to the Constitution in 1791.

So since 1791, every American has had a constitutionally guaranteed right to resolve their civil disputes through a trial by jury.  And so I tell folks who appear for jury duty like you have today that in a very real way you are doing your part to preserve, protect, and defend our Constitution, particularly the right to trial by jury in a civil case, as set forth in the Seventh Amendment.

I always tell citizens who appear for jury duty that in my view, my opinion, jury service is the second highest form of public service that any American citizen can render.  In my personal view, the highest form of public service are those young men and women that serve in our armed forces.

Now, as a part of selecting the jury in this case today, the lawyers for the competing parties are going to ask you questions in a little while, and they're going to ask you various questions about various things.  I want you to understand, ladies and gentlemen, they will not be seeking to inquire unduly into your personal affairs.  Said another way, they're not trying to be nosy; they are trying to gather relevant information to work with the Court to secure a fair and an impartial jury to hear the evidence in this case.

I want you to understand that with regards to any questions that you may be asked, there are no wrong answers as long as the answer you give is truthful, full, and complete,

full, complete, and truthful.  As long as that's your response, it will be the right response.

Now, I don't think it will happen today, it very rarely does.  I've been on the bench here for over 12 years, I think I've had it happen two times, and I've tried over a hundred civil jury trials to a verdict since I've been on the bench.  So that's a pretty small percentage.  But it's possible that as a part of the questioning today, you might be asked a question that in your own mind is so personal and private that you're not comfortable answering it in front of everybody here in the courtroom.

Again, I don't think that's likely, but if it should happen, you need to understand you always have the right to say, I'd like to discuss that with Judge Gilstrap.  If that's your answer, then I'll provide an opportunity where you can answer that question outside of the presence of everyone else on the panel.  But, again, maybe two percent of the time, it comes up.  It's not likely to come up, but I want you to know that, if it should, then you do have that option.

Now, the trial in this case is going to start today after the jury is selected, and we're going to go through all of next week.  And I anticipate, based on rulings I've already made with the parties, that we should be able to finish this trial by Friday of next week, a week from today.

What I need to know, ladies and gentlemen, is if there

are any of you on the panel that, if you were selected to serve on this jury, you have a very serious reason why you could not be here today and all of next week.  If you have a surgical procedure scheduled for yourself or the immediate family member who's dependent upon you, if you have pre-paid non-refundable airline tickets to go somewhere and you can't get hundreds or thousands of dollars back, if you have a very serious reason, and those are two examples, why you couldn't be here throughout the trial if you were selected, that's something I need to know about.

If there are any of you that have that kind of situation, if you would, raise your hands and let me make a note of it. No. 2, No. 3, No. 5, No. 8, No. 14.

Anybody in the gallery?  No. 1, did you raise your hand? Anybody else?  1, 2, 3, 5, 8, and 14.  Okay.  Thank you.

At this time I'm going to call for announcements on the record in the case of G+ Communications, LLC., versus Samsung Electronics Company, Ltd., and Samsung Electronics America, Inc.  This is Civil Case No. 2:22-CV-078.

And, counsel, as you offer your announcements for the record, please identify not only yourself but the members of your trial team that are here in the courtroom and any corporate representatives that you may have with you.

What says the Plaintiff?

MS. TRUELOVE:  Good morning, Your Honor.  Jennifer

Truelove for Plaintiff G+ Communications.

With me today at counsel table representing G+ Communications is Mr. Jason Sheasby, Ms. Lisa Glasser, Mr. Sam Baxter, Mr. Ben Manzin-Monnin.  And our client, Your Honor, is Mr. Jeremy Pitcock.  He will be here representing G+Comm for the duration of the case.

We are ready to proceed.

THE COURT:  Thank you.

What says the Defendants?

MR. CORDELL:  Good morning, Your Honor.  Ruffin Cordell from Fish & Richardson on behalf of Samsung.

With me are my partners, Michael McKeon, Melissa Smith, and will be joined by Guy Waitley, our corporate representative.

And, Your Honor, we are ready to proceed.

THE COURT:  All right.  Do you want to introduce the two people seated behind you, Mr. Cordell?

MR. CORDELL:  I'm sorry, Your Honor.  My partner Leonard Davis and Mr. Mike Collins.

THE COURT:  All right.  Thank you.

As I told you, ladies and gentlemen, this is a patent case arising under the patent laws of the United States, and what the plaintiff is claiming in this case is that certain of its patents have been infringed by the Defendants.

Now, the Defendants deny that they have infringed the

Plaintiff's patents, and the Defendants have a claim of their own against the Plaintiff in this case.  They claim or counterclaim, as we call it, that the Plaintiff has breached a contractual obligation to the Plaintiff -- excuse me.  They contend that the Plaintiff has breached a contractual obligation to them related to the Plaintiff's patents.  The Plaintiff also claims that the Defendants have breached the same contractual obligation to them.

Now, what I've just told you is a very informal way of describing the case in layman's terms.  I know you've all seen the film prepared by the Federal Judicial Center regarding patents and patents litigation and, having seen that, you already know more about what's going to go on in this case than most citizens do here in our area.

Now, the lawyers from both sides are going to have an opportunity to question the members of the panel, as I've already told you, for the purpose of gathering relevant information, exercising their rights, and working with the Court through the process of securing a fair and impartial jury to hear the evidence in this case.

I'll tell you again, there are no wrong answers to any questions you're going to be asked as long as your responses are full, complete, and truthful.

Let me just say the lawyers are entitled to ask these questions to gain this information, and they're not trying to

pry into your affairs unduly. And I'll also add, ladies and gentlemen, these are very experienced trial lawyers. They understand the rules of the Court, they understand our Federal Rules of Civil Procedure. I do not expect any improper questions to be asked. If there should be, and I'm surprised, I'll certainly jump in, but I don't think that's going to happen.

Now, one thing I want to talk to you about and call your attention to before the lawyers begin with any questioning, because they might ask you about this in their questioning, is what we call the burden of proof.

In a patent case like this, the jury is called upon to apply two different burden of proofs. A jury may apply a burden of proof known as the preponderance of the evidence as well as a second and different burden of proof known as clear and convincing evidence.

Now, when you might be responding to lawyers' questions about the burden of proof, I need to instruct you that when a party has the burden of proof on any claim or defense by a preponderance of the evidence, that first burden of proof I mentioned, it means that you, the jury, must be persuaded by the credible or believable evidence that that claim or defense is more probably true than not true. I'll say that again--more probably true than not true.

Sometimes this is talked about as being the greater

weight and degree of credible testimony.

Let me give you what I hope will be a useful example to you. In front of me is our court reporter, and in front of the court reporter you'll see a statue here in the courtroom. A statue of the Lady of Justice. She's blindfolded. She holds lowered at her right side the unsheathed sword of justice. She holds in her left hand raised above her the equal and balanced scales of justice. I want to focus on those scales with you for just a minute. They're balanced, they're equal, they're in the same position. And that's where the Plaintiff and the Defendants must start out in this case.

But over the course of the trial, the Plaintiff will present its evidence. Think about it as being placed on one side of those scales. And then when the Plaintiff has presented all of its evidence, the Defendants are going to present their evidence and think about that evidence as being placed on the other side of those scales.

And when all the evidence is in, the Plaintiff's on one side and the Defendants' on the other, you're going to be asked certain questions. And in answering those questions, if those scales tip in favor of the party who has the burden of proof by a preponderance of the evidence, even if they tip ever so slightly, then that party has met its burden of proof of a preponderance of the evidence.

On the other hand, ladies and gentlemen, there is a

second burden of proof that you're going to apply in this case called clear and convincing evidence. When a party has the burden of proof of proving any defense by clear and convincing evidence, it means that you, the jury, must have an abiding conviction that the truth of the party's factual contentions are highly probable. Let me say that again for emphasize--an abiding conviction that the truth of the party's factual contentions are highly probable. That's a higher standard of proof than the preponderance of the evidence.

Let's go back to the same example. The scales start out equal. The parties start out equal. The Plaintiff puts on its evidence. It goes on one side of the scales. The Defendants put on their evidence. It goes on the other side of those scales. When all the evidence is in, if a party has the burden of proof on any question or any issue by clear and convincing evidence, if those scales tip in that party's favor definitely, and they must tip more than ever so slightly, they must definitely tip in that party's favor, if they do, then that party has met its burden of proof by clear and convincing evidence.

Now, it's important for you to understand that neither of these two burdens of proof are to be confused with or have anything to do with a third and altogether different burden of proof that's applied in a criminal case and not a civil case. That third and different burden of proof I'm sure you've all

heard about it:  It's called beyond a reasonable doubt. Beyond a reasonable doubt has absolutely no application in a case like this.

Again, that's the burden of proof applied in a criminal case, not in a civil case.  Beyond a reasonable doubt is a higher burden of proof than clear and convincing evidence, but clear and convincing evidence is a higher burden of proof than the preponderance of the evidence.

And I give you these instructions in case some of the lawyers ask you about your ability, if you're selected, to apply these burdens equally and fairly as I have instructed you between the parties.

Now, before the lawyers begin with their questions and address you, I'm going to let you tell me the same kind of information about each of you that I told you about myself when we started.  Each of you should have a printed copy of or see on the screens in front of you nine standard questions. I'm going to ask each one of you to answer those nine questions one at a time throughout the entire panel.  And we're going to begin with Panel Member No. 1, and then we'll work our way through to the last member of the panel.

And let me explain to you, ladies and gentlemen, how we're going to do this.  We have two court security officers here in the courtroom.  Each of them have a handheld microphone.  I want you to wait until that handheld microphone

is brought to you.  When you get it, I want you to stand up, hold it up to your mouth where it will do some good, and answer those nine questions.

Then when you're through, if you will hand the microphone back to the Court Security Officer or you can pass it to the next member of the panel, we'll go through each member one at a time.  When it's your turn, stand up, use the microphone, and then pass it to the next member of the panel.

A couple of things.  I've seen lots of jurors who talk with their hands, and they do this.  And when the microphone is waving out here, I can't hear what you're saying.  So hold the microphone close.  And I've had lots of jurors who hold it down at their waist.  It won't do any good down at your waist. Hold it up near your mouth, hold it steady, and use the handheld microphone.  This is a big room; we have a lot of people in here.  It's important that we hear everything you have to say and your answers to these questions.

Also, ladies and gentlemen, after we've gone through these nine questions with everyone and you've answered those, then when the lawyers are at the podium asking questions of the panel, if you're called on specifically to answer a question, wait until the Court Security Officer comes to you and brings you that microphone, stand up, hold the microphone up near your mouth, and then answer the question.

It's important that you answer those specific questions

in just the same way that we're going to answer these nine standard questions.  All right?

So with that, we'll begin with Panel Member No. 1.  If you'll take the microphone, sir, and then answer those nine questions for us.

THE PANEL MEMBER:  I am Curtis Inderwiesche.  I live in Pittsburg, Texas, in Camp County.  I have three boys.

And my place of employment and type of work, I work at a company called Viziant, Incorporated.  It does healthcare performance improvement.  And I work in the software engineering and technology delivery director for that area.  I've worked at this place for coming up on two years in April in the industry for 15 years.  Education background, computer science, minor in math.

Spouse's name, Elizabeth Inderwiesche.  Her employment, she works doing marketing for a millwork company, and she also does volunteer work.  How long has she worked there?  She's worked there for -- it was for her parents, so probably whole career.  So I don't know exactly the years.

Prior jury service, I have not served on a jury yet.

THE COURT:  All right.  Thank you, sir.  If you'll hand the microphone to Panel Member No. 2.

Mrs. Sherrill, you're next.

THE PANEL MEMBER:  Yes.  My name is Jessey Sherrill.  I live in Linden, Texas.  I have two children.

And my place of employment is the City of Texarkana, Arkansas, at the Animal Care and Adoption Center.  I am assistant director, and above, below, and in between, I do a little bit of everything.  I have worked there for about a year and a half.  Prior to this, I worked there 13 years ago.

I got through the ninth grade into my 10th grade.  Two months into my 10th grade, I dropped out.

My spouse's name is Stephen Sherrill.  He works at the Henderson Prison, alcohol and drug counselor.  And he has worked there for about a year.

And I have never done jury services before.

THE COURT:  All right.  Thank you very much.

Next is Panel Member No. 3.

THE PANEL MEMBER:  Yes.  My name is Angela King, and I live in Karnack, Texas.  I have no children.

My place of employment is part time at Johnson's Ranch Marina on Caddo Lake.  I've been there about six years.  My education background, I have an Associate's degree in electronics and worked on medical equipment for 18 years. Retired from that around 2007.

My spouse's name is Timothy King.  He has recently become disabled.  He was an employee of General Cable Manufacturing in Scottsville, Texas, was there for 32 years.

I have been on a previous criminal case probably 30 years ago.

THE COURT:  Never on a civil case?

THE PANEL MEMBER:  No.

THE COURT:  Thank you, ma'am.

Next is Panel Member No. 4.

THE PANEL MEMBER:  My name is Terry Zaro, and I live in Queen City, Texas.  I have three adult children.

I work at Christus Trinity Clinic in Texarkana, Texas, as a patient representative.  I've only been there for three months.  I got as high as high school, did some college but did not graduate from any.

My spouse's name is Danny Zaro.  He works at Texas Gonzales and Northern Railroad.  He is a locomotive mechanic.  He has been there for 12 years.

And I have served on one criminal case.

THE COURT:  And you've never served on a civil case, either?

THE PANEL MEMBER:  No, sir.

THE COURT:  Thank you, ma'am.

Panel Member No. 5.

THE PANEL MEMBER:  My name is Brett Newman.  I live in Harleton, Texas.  I have no children.

I work for Sloan Construction, Incorporated, where I'm a superintendent of commercial products.  I've worked there for eight years.  I have a Bachelor of Science from Texas A&M.

My wife's name is Amber Newman, and she is a computer

teacher at the elementary in Harleton.  And best guess, it's been four or five years, but I should pay more attention how long she's been there.

THE COURT:  That's fine.

THE PANEL MEMBER:  I have not served on any previous juries.

THE COURT:  Thank you, sir.

No. 6 is next.

THE PANEL MEMBER:  Good morning, everyone.  My name is Priscilla Williams.  I live here in Marshall.  I have four children, oldest being 44, youngest 23.

I work at Marshall Manning Nursing and Rehab.  I'm an assistant director of nursing there.  I've worked there for 38 years.  I have two years of college.

My husband's name is Benny Williams.  He works at the Dollar General Warehouse as a forklift driver.  He's been there five years.

And I've never served on a jury.

THE COURT:  Thank you, ma'am.

And I'll ask the Court Security Officer to take the microphone around to Panel Member No. 8.  Mrs. Hughes.

THE PANEL MEMBER:  Good morning, everyone.  My name is Olga Hughes, and I live in Gilmer, Texas.  I have three adult children.

I work for the state of Arizona.  I'm a contractor for

them.  I'm a data analyst, and I've worked for them for going on three years.  And I do have my high school diploma, and I have some -- well, I wouldn't say college.  I have my aesthetic license.

My husband's name is Kenneth Hughes, and he's a retired military from the Army.  He also works for Arizona Game and Fish.  He's also a contractor for them.  He's an IT supervisor, and he has worked for them for about I want to say going on eight years.

And I've never served on any jury.

THE COURT:  Thank you, ma'am.

No. 9 is next.

THE PANEL MEMBER:  Good morning, everyone.  My name is Wayne Hunter, and I live in Gilmer, Texas.  I have one child that's currently in Germany with my son-in-law.

I'm the CEO and founder of Avtek Solutions, IT solutions and services company based in Allen, Texas.  We are celebrating our 20-year anniversary this year.  I have three years of college and the naval training in nuclear submarines.

My spouse is Susan Hunter.  She's been homemaker for a blissful 36 years.

And I've never served on a jury.

THE COURT:  All right, sir.  Thank you.

No. 10 is next?

THE PANEL MEMBER:  My name is Phillip Walker.  I

live in Atlanta, Texas.  I have two children.

I work at Walmart, a bakery/deli team lead.  High school is my highest education.

My spouse's name is Crystal.  She works at Beeco doing production.  She's been there two years.

And I never served.

THE COURT:  Where does your wife work.  Sir?

THE PANEL MEMBER:  Beeco.

THE COURT:  What is Beeco?

THE PANEL MEMBER:  That's production of boat panels.  They put those together.

THE COURT:  All right.  Thank you.

No. 11 is next.

THE PANEL MEMBER:  My name is Alan Keith Earl.  I have two sons and a daughter.

I am currently employed with Rockcliff Energy.  I am the assistant production foreman at an oil field company.  I've been there in its field 18 years, for this company six years.  I have an associate of science degree.

My wife's name is Shannon Earl.  She is an Ag teacher at Elysian Fields for the last 10 years.

And I have served on both a -- I served on a criminal case, and I served on a child custody case.  I'm assuming that would be a civil case.

THE COURT:  All right.  How long ago was the child

custody case you served on?

THE PANEL MEMBER:  Oh, seven or eight years ago.

THE COURT:  And that was in state court?

THE PANEL MEMBER:  Yes.

THE COURT:  Never served on a jury in federal court?

THE PANEL MEMBER:  No, sir.

THE COURT:  Thank you very much, sir.

No. 12 is next.

THE PANEL MEMBER:  Good morning.  My name is Dawn Thomason, and I'm from -- come from Gilmer, Texas.  I have four children.

I'm retired.  My previous employment circled around executive secretarial, clerical work, the Associate's Corporation in Irving, Texas, and Wells Fargo out of Des Moines, Iowa.  Total years of employment were 42.  Graduated high school, went into the work force.

My spouse's name is William Thomason.  His current place of employment is Gilmer schools, bus driver.  Prior to that in Iowa, 38 years chief custodian for the Des Moines school district.

And I've been called to jury services twice over in Dallas, but was cut before the final jury selection.

THE COURT:  Thank you, ma'am.

No. 13 is next.

THE PANEL MEMBER:  Yes.  Roger Todd Lovelace.  Two

children, daughter, son.

I work for S & R Construction in Elysian Fields I think seven years now.  Marshall High School graduate.  Tyler Junior college, two years.

Donna Lovelace is my wife.  She works at the Elysian Fields Elementary School for I think 10 years.

I have no prior jury.

THE COURT:  Thank you, Mr. Lovelace.

THE PANEL MEMBER:  Thank you.

THE COURT:  No. 14 is next.

THE PANEL MEMBER:  My name is Heath Stewart from Gilmer, Texas.  I have four children.

I'm currently unemployed, but I did serve 17 years at Lone Star Steel.  My education is high school.

My spouse's name is Emilee Stewart.  Place of work is Salon Pleasure.  She's worked there three years.

And I have not been prior to any jury.

THE COURT:  All right, sir.  Thank you.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  All right.  We'll go to the front row in the gallery.  Panel Member No. 15 is next.

THE PANEL MEMBER:  Jimmy Lamar, Gilmer, Texas.  I have three kids.

Self-employed iron worker about 30 years now.  High school.

Lisa Lamar, she's a homemaker.

And I was on a criminal jury in Gilmer.

THE COURT:  That's your only jury service?

THE PANEL MEMBER:  Sir?

THE COURT:  Say that again, please?

THE PANEL MEMBER:  Done a criminal jury in Gilmer.

THE COURT:  And that was the only time you've served on a jury?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Thank you.

No. 16 is next.

THE PANEL MEMBER:  Good morning.  My name is Darrell Cook.  I live in Gilmer.  I have one daughter.

I work at the Gregg County courthouse in Longview as an IT help desk technician.  I've been there -- I'm in my ninth year now.  I have an Associate's degree from Kilgore College.

My wife's name is Tamera Cook, and she works at Gregg County as well as a caseworker in the health department, and she's in her seventh year there.

And I have never served on a jury before.

THE COURT:  All right.  Thank you, Mr. Cook.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Next is No. 17.

THE PANEL MEMBER:  My name is Tiffany Falls, and I live in Atlanta, Texas.  I have three children.

My place of employment, I work at the Atlanta Middle School.  I am a seventh grade English teacher, a coach, and I am over the -- I'm a coordinator for the athletic program.  I've worked -- this is my sixth year working there.  Educational background, certified teacher and my Bachelor is in arts and applied sciences.

My spouse's name is Antoine Falls.  He is employed at Domtar at Ashdown, Arkansas.  He has been there a year and a half.

And I have never served on a civil or criminal jury.

THE COURT:  Thank you, ma'am.

No. 18.

THE PANEL MEMBER:  Good morning.  My name is Randy Marcove, and I live in Big Sandy.  I have four boys and one favorite daughter.

I am semiretired.  I have been in the industry of continuous improvement, process improvement, for manufacturing companies, some transactional companies.  I've been doing this since 1997.  My educational background, I have a bachelor degree in Colorado State University in social sciences with a minor in economics.

My spouse's name is Sue Williams.  She is the assistant principal at the middle school of Mount Vernon Independent School District.  She's been there two years.  We came from Colorado.  She was a principal there for 20 years.

My prior jury service, I was selected for a civil case in the state of Colorado about 20 years ago as well.

THE COURT:  All right.  And that was in the state courts of Colorado?

THE PANEL MEMBER:  Yes.  Yes, sir.

THE COURT:  Thank you.

All right.  No. 19 is next.

THE PANEL MEMBER:  My name is Larry Fuller.  I live in Avinger.  I don't have any kids.

Place of employment is Atlas Roofing in Daingerfield.  I've been there 11 years.  High school diploma.  No spouse.

Prior jury service is none.

THE COURT:  Thank you, sir.

Next is Panel Member No. 20.

THE PANEL MEMBER:  Good morning.  Richard Holland.  I have three children.

Currently work at Bowman Consulting for I guess the last seven months.  Prior to that, I owned my own land surveying business for seven years.  We mainly do land surveying and civil engineering work.  Educational background, I have a Bachelor's degree in industrial technology.

Married to Colby.  She is a housewife for the last 13 years.

And never any prior jury service.

THE COURT:  Thank you, sir.

No. 21 is next.

THE PANEL MEMBER:  I'm Jana Cornett.  I have two grown children and four grandchildren.

I am a retired business owner.  We owned several mailing centers in Longview, Texas.  My educational background, I have two-and-a-half years of college.

My spouse's name is David.  He also worked at Pack and Mail.

And I was selected for a civil jury service, but it settled before I had to serve.

THE COURT:  Where was that?

THE PANEL MEMBER:  Here.

THE COURT:  In this court?

THE PANEL MEMBER:  I don't know if it was civil.  It was a lawsuit, a trucking lawsuit.

THE COURT:  Okay.  Was it in this building or was it --

THE PANEL MEMBER:  No.  It was the other building.

THE COURT:  The county courthouse.  Thank you, ma'am.

THE PANEL MEMBER:  Uh-huh.

THE COURT:  All right.  Next is No. 22.

THE PANEL MEMBER:  My name is Jennie Tomlin.  I have one child who's eight years old.

I am a secretary at Atlanta Methodist Church.  I've been

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

there for five months.  Before this, I was an elementary art teacher.  I have a Master's degree in human relations and business.

I am unmarried, and I've never served.

THE COURT:  Thank you, ma'am.

No. 23 is next.

THE PANEL MEMBER:  Your Honor, my name is Dusty Collins.  I live here in Marshall.  I have four grown men children.

I am retired military.  I work veteran services here at Texas State Technical College.  I've worked here for about six years.  I have a Bachelor of Science in logistics.

I am divorced and never served on a jury.

THE COURT:  What branch of the military did you --

THE PANEL MEMBER:  I was in the Army, sir.

THE COURT:  All right.  No. 24 is next.

THE PANEL MEMBER:  My name is Christopher Davis from Waskom, Texas.  I have two children.

Own and operate Performance Steel, steel erectors.  I've been there -- worked there, owned it for 24 years.  High school education.

And spouse's name, Melody Davis.  She's worked for park management for 20 years.

Never served on a jury.

THE COURT:  All right, sir.  Thank you very much.

No. 25 is next.

THE PANEL MEMBER:  Good morning.  My name is Darlene Chumley.  I live in Longview, Texas.  I have one son.

I work for LISD mathematics teacher.  I've been there for 30 years.  My educational background, I have a Bachelor of Science degree in mathematics.

My husband is Charles Ray Chumley.  He's retired from Texas Eastman.  He worked there for 45 years.

I have no prior jury service.

THE COURT:  And I assume, Mrs. Chumley, LISD is Longview Independent School District?

THE PANEL MEMBER:  Yes, sir.  I'm sorry.

THE COURT:  Thank you.

No. 26 is next.

THE PANEL MEMBER:  Good morning.  My name is Adeana Sanchez.  I have two lovely children.

I work for Ace Hardware.  I run four of those operations. I previously owned a wrecker service for 15 years.  I have a high school education, IT specialist.  I worked in engineering.

My spouse's name is Anthony Sanchez.  He has been a machinist for 30 years, been married -- no, we've been married 26, so he's been a machinist for 24 years.

I have no previous service for a jury.  I was selected for civil in the other court in Marshall, Texas, but it

settled before that went to trial.

THE COURT:  And how long ago was that?

THE PANEL MEMBER:  That was probably 10 years ago?

THE COURT:  All right.  Thank you, ma'am.

No. 27 is next.

THE PANEL MEMBER:  My name is Gene Cooper.  I live in Hallsville, Texas.  I have three children and twin grandchildren.

I work at Satterwhite Log Homes where I am a construction manager, and I've worked there for 36 years.  I have a high school education.

My wife's name is Karen Cooper, and she works for the Upshur County Co-op where she is a child psychologist, and she's been there 10-plus years.

And I've served on a criminal case many years ago.

THE COURT:  Never a civil case?

THE PANEL MEMBER:  No.  No, Your Honor.

THE COURT:  Thank you, Mr. Cooper.

Next is No. 28.

THE PANEL MEMBER:  I'm James McKnight.  My permanent address is north of Gladewater, but I live in Fort Worth, Texas.  I work at Texas Health Resources as a medical laboratory scientist lead in microbiology and molecular. Education, I have a Bachelor of Science degree in biology and chemistry.

I'm not married, I don't have any kids, and I have no prior jury service.

THE COURT:  Thank you, sir.

Next is No. 29.

THE PANEL MEMBER:  Good morning.  My name is Rebecca Gaitan.  I live in Hallsville, Texas.  I have two children, 18 and 24.

I am a stay-at-home -- I guess not stay-at-home mom anymore because they're both out of the house but I stay at home.  Before that, I worked at a thrift store in Washington state for three years.  The highest level of education was high school.

My husband's name is Gary.  He is retired almost -- well, probably 29 years.  Almost 29 years of service he retired.  He was U.S. Army.  We moved here.  He worked at Master Woodcraft here in Marshall, and now he works -- and left there and now he works for Texas Department of Transportation.  He oversees many projects, be it highways, roads, that TxDOT is in charge of, et cetera.

And I have -- well, I almost served on a jury, but they settled out of court before we could do anything like even interview for, you know, doing this right here.  So...

THE COURT:  All right.

THE PANEL MEMBER:  Yeah.

THE COURT:  Thank you, ma'am.

THE PANEL MEMBER:  Uh-huh.  Thank you.

THE COURT:  No. 30 is next.

THE PANEL MEMBER:  Good morning.  My name is Carol Hill.  I live in Gilmer, Texas.  I have four adult children, six grandchildren.

I am very newly retired.  Prior to that, I was in healthcare for 34 years.  I have three years of college.

My husband's name is James.  He's been retired for 12 years.  Prior to that, he was national auditor for Hertz Corporation.

And I have no prior jury service.

THE COURT:  Thank you.

No. 31 is next.

THE PANEL MEMBER:  My name is Lester browning.  I have one child.

I work at GPI, Graphic Packaging International, been there for six months.  High school education.

My spouse's name is Lindsey Browning.  She is an occupational therapist assistant.  She's currently PRN.  She's been in the field two years.

And no prior jury service.

THE COURT:  What did you do prior to this six months?

THE PANEL MEMBER:  I worked at Pergan Marshall Chemical Company, but I was there for five and a half years,

got laid off.

THE COURT:  Thank you, sir.

THE PANEL MEMBER:  Process operator.

THE COURT:  All right.  No. 32, please.

THE PANEL MEMBER:  Good morning.  I'm Shane Midgley. I live in Hallsville, Texas.  I've got one beautiful daughter and one granddaughter.

I work at Pro Max Diesel in Longview, been there for six years.  We rebuild diesel injection pumps.  Graduated high school, did some college.  That's about it.

My wife is Toni Midgley.  She's retired luckily.  She was a diagnostician at Elysian Fields ISD for 25-plus years.

And I did one criminal case right down the street here about 10 years ago.

THE COURT:  Didn't ever serve on a civil case?

THE PANEL MEMBER:  Not a civil case, no, sir.

THE COURT:  Thank you, Mr. Midgley.

No. 33.

THE PANEL MEMBER:  My name is Nancy Rudolph.  I live in Big Sandy.  I have two grown sons, five grandkids.

My husband and I own a small business.  It's called Industrial Battery Supply.  It's basically forklift batteries sales, service, and installation.  We've had it for a little over 10 years.  I graduated high school.

His name is David Rudolph, and I just said what we did

for 10 years.

And I served on a civil case probably 25 years ago in Nacogdoches.

THE COURT: In state court.

THE PANEL MEMBER: Uh-huh.

THE COURT: Yes? Correct? Am I correct, ma'am?

THE PANEL MEMBER: Yes, sir.

THE COURT: Okay. Thank you.

All right, ladies and gentlemen. Thank you very much for that information. Now, I need to say a couple of more things to you before I turn the questioning over to the lawyers.

The eight of you that are selected to serve as the jury in this case will serve in the role as the judges of the facts, and you will make -- the jury selected will make the sole determination about what the facts are in this case.

Now, my job as the judge is to rule on questions of law, evidence and procedure, to maintain the decorum of courtroom, and to oversee an efficient flow of the evidence and the trial.

Additionally, I want to say a couple of things to you about our judicial system that hopefully will put things in a proper perspective for you. In any jury trial like this, besides the parties themselves, there are always three participants--the jury, the judge, and the lawyers.

Now, with regard to the lawyers, I think it's important

for each of you to understand that our judicial system is an adversary system, which simply means that during the trial each of the parties will seek to present their respective cases to the jury in the very best light possible.

It's no surprise to any of you that lawyers are sometimes criticized in the media. But the Court's observed that some of that criticism comes from a basic misunderstanding of our adversary system in which the lawyers act as competing advocates for the competing parties. And as an advocate, a lawyer is ethically and legally obligated to zealously assert his or her client's position under the rules of our adversary system. And by presenting the best case possible behalf of their clients, the lawyers hopefully will enable the jury to better weigh the relevant evidence, determine the truth, and arrive at a just verdict based on that evidence.

This system, this adversary system of justice, has served our nation well for over 200 years, since our founding, and America's lawyers have been, are now, and will continue to be an indispensable part of this process.

So as we go forward with the trial, even though it's possible from time to time I might frown or roll my eyes at the lawyers, that's just because I'm trying to make sure that their advocacy doesn't go outside the boundaries of our adversary system and the rules of procedure. But you need to keep in mind and it's important for you to know that they are

doing their jobs, and that's important for you to be aware of as we go forward.

Also, ladies and gentlemen, for the eight of you that are selected to serve on this jury, I want you to know that during the trial I am going to do my very best to make sure that no one on the jury knows what I think about the evidence in this case, because determining the facts from the evidence in this case is the jury's job; it is not my job.  And if you're on this jury, you should not take any expressions that you hear or see or think you hear or see or anything coming from me as something to consider in determining what the ultimate facts are in this case.

All right.  At this time, counsel is going to address the panel.

Ms. Truelove, you may address the panel on behalf of the Plaintiff.  Would you like a warning on your time?

MS. TRUELOVE:  Yes, Your Honor.  If you wouldn't mind giving me a warning at five minutes and one minute.

THE COURT:  I'll warn you at five minutes and one minute remaining.

MS. TRUELOVE:  Thank you.

THE COURT:  You may proceed.

MS. TRUELOVE:  Thank you very much, Your Honor.

May it please the Court, counsel, hopefully you-all survived the ice storm.  I did except for the cold that I have

right now, and so I want to apologize for that up front.  I'm going to try and speak up, probably be sniffling a little bit. But if you can't hear me or understand me, let me know.

As you heard my name is Jennifer Truelove, and I work for the McKool Smith law firm right next door here with Mr. Baxter, one of my partners.

And really what I want to do more than anything at the outset is just to thank each of you.  I know that you-all have other places to be, you have other responsibilities, other obligations, and other than those of you who have had the opportunity to serve in the military like my dad and brother have both done, that this is, I think, and I think a lot of people in this room share that opinion with me, one of the most fundamental and important things that you can do in service of your country.  So thank you very much for being here today, particularly in light of the fact also that we had to weather that storm this week.

I think I'll start by just telling you about myself like you-all just did.  I went to Texas A&M undergrad and studied Russian, and then I proceeded to go to -- out to Lubbock and go to school at Texas Tech.  And that's where I met my husband, Kurt Truelove, who was born and raised here in Marshall, Texas.  And we came back here to practice law.

He has an office just across the street.  You may have seen it walking in.  And like I said, I practice in the

building right next door.  So we kind of have the federal courthouse surrounded, so to speak.

We've got three children:  two daughters who both attend UT, University of Texas, in Austin, and our son is a Marshall High Schooler junior, plays the trombone.

I have actually served on a jury, which surprised me when I was selected, being an attorney.  It was a criminal case.  But I'll tell you at the end of the day, I thought it was a wonderful experience and I'm hopeful that those of you that are selected here today will also find the experience to serve to be very rewarding.

I'll tell you a little bit about the company I represent called G+ Communications.  Throughout the trial, you may hear it referred to as just G+, maybe G+Comm, or GComm, but that's all the same, just one company.  And that company was developed, gosh, almost 20 years ago by Mr. Jeremy Pitcock, who is here sitting at counsel table.  He's our client.  He will be here for the duration of the trial.

He and his wife formed this company, and they did it so they could assist different companies, different innovators, with getting their patents licensed.  And that's kind of how we find ourselves here today.  G+ acquired some patents from a company called ZTE, which is a global telecommunications company, and in acquiring those patents, went about trying to assert them and license them.

There's three patents at issue in this suit.  They were innovations of ZTE, and they have been accepted by the U.S. Patent Office, and so we have the ability to pursue those patents here in the United States.

They're necessary basically.  They go to 5G.  Everyone may have heard of 5G.  It's the latest iteration of, you know, what you're using to talk on your phone.  We don't necessarily have a lot of that out here yet, but they go to improving the efficiency and the speed of the 5G communications standard in mobile smartphones.

And the reason the lawsuit is happening is because Samsung makes those 5G smartphones.  And so G+ is claiming that Samsung infringed these three patents and that they did not behave in good faith when G+ asked them to comply with the law and take a license.

And so, as you can imagine, Samsung disputes this, and that's how we find ourselves here today.

And so for the next 25 minutes or so, as His Honor told you, I'm going to have an opportunity to just ask you some questions.  And I know and I appreciate each of you that filled out those questionnaires.  I know they were lengthy, a lot of questions.  Maybe they weren't always very clear.  I'll follow up on some of that.

But really what I want to get to know is if any of you have walked in the door with certain life experience, past

history, that might cause you to lean one way or another when you're sitting in deliberation on this case if you're selected.

And so to give you an example, I'll start, if I could, and ask Mr. Lovelace, Juror No. 13, some questions.

You likely knew this was coming?

THE PANEL MEMBER:  I did.

MS. TRUELOVE:  We know each other, don't we?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  We've known each other for quite a while?

THE PANEL MEMBER:  Quite a while.

MS. TRUELOVE:  Your wife is Donna Lovelace.  Right?

THE PANEL MEMBER:  That is correct.

MS. TRUELOVE:  I guess I met her through the Marshall Symphony League, and we are good friends.  And you're friends with my husband, Kurt.  Correct?

THE PANEL MEMBER:  Oh, yeah.

MS. TRUELOVE:  You guys routinely play golf together.  Is that right?

THE PANEL MEMBER:  That is correct.

MS. TRUELOVE:  And we as couples find ourself interacting in kind of the same social circles?

THE PANEL MEMBER:  All around March Hall.

MS. TRUELOVE:  You can imagine, Mr. Loveless, and

43

it's been a long-time friendship, that that might give the folks sitting over here representing Samsung pause because they may feel like coming in, having that relationship already, might have you leaning towards me -- before you've heard anything about the case, leaning towards me and my client.

And so that's what we're trying to get at, whether it's you know somebody or, you know, have had an experience about something that has to do with this case. And so I just need to ask you, can you, if you were selected as a juror in this case, listen to the facts as presented to you and the law that's given to you by the Judge and base your decision on that without letting the fact that we know each other impact your deliberations?

THE PANEL MEMBER: I certainly can.

MS. TRUELOVE: Okay. Thank you very much. I appreciate that.

THE PANEL MEMBER: Thank you.

MS. TRUELOVE: So that's how this is going to work. And many of you may be thinking, If I just sit here very still and quietly and she doesn't call on me, then I won't make this jury, and it actually works kind of the opposite. You know, the less I know about you, the less reason I have to think, I wonder if they do have a life experience that might bleed into the case and, you know, whether they realize it or not.

And so I am going to do my best to talk to most of you, particularly those of you in the jury box and those of you in the first two rows out in the gallery, because you, for better or worse, probably have the best chance of being seated on this jury.

So let's begin.  You heard a little bit about what this case is about and about G+Comm.  Does anybody -- has anybody ever heard of G+Comm?  That's to be expected.

Now, ZTE, as I mentioned, is a global telecommunications company, and it's their innovations that G+Comm acquired, their patents.  Is anybody familiar with that company, ZTE? If you are, raise your hand.

Anybody heard of them?  Juror No. 9.

THE PANEL MEMBER:  Good morning.

MS. TRUELOVE:  Good morning.  And what do you know about ZTE?

THE PANEL MEMBER:  Just through being in technology for many years, I have -- and dealing with like Williams Communications and MCI 20-plus years ago, heard the name, never dealt with them.

MS. TRUELOVE:  Okay.  So anything about the fact that you've heard of ZTE give me any pause or Samsung any pause about you walking in here with some previous life experience that might bleed into this case and cause you to lean one way or the other?

THE PANEL MEMBER:  No.  Never did business with them, just know the name.  That's it.

MS. TRUELOVE:  Okay.  I appreciate that.  Thank you very much.  And that was Mr. Hunter?  Thank you.

Anybody else ever heard of ZTE?

Okay.  What about Samsung?  I know that a couple of you indicated on your questionnaires that you own Samsung phones.  Who owns a Samsung phone?  Several of you.  Okay.  We'll start with Juror No. 5.

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  You are Mr. Newman.  Correct?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Anything about just owning a Samsung phone in general going to give me a problem in this case or cause you to lean one way or another?

THE PANEL MEMBER:  No, ma'am.  It's been a good product, but it's a product.  So...

MS. TRUELOVE:  Okay.  All right.  But it's not going to affect your ability to sit and be fair and impartial?

THE PANEL MEMBER:  No, ma'am.

MS. TRUELOVE:  Everybody who owns a Samsung feel the same way as Mr. Newman?  Anybody feels like they just need to speak with me about any potential issues there?  Okay.

Now, I know -- is it Mr. Davis, Juror 24?  Yes, sir.

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  I think you indicated on your questionnaire that maybe you had a brother-in-law that does something for --

THE PANEL MEMBER:  Yes.  He works for Samsung in Austin.

MS. TRUELOVE:  Samsung in Austin?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  Anything about the fact that your brother-in-law is actually employed by Samsung walking in this door going to cause you to lean maybe more in Samsung's favor without having heard any of the evidence in this case?

THE PANEL MEMBER:  No, ma'am.

MS. TRUELOVE:  Okay.  And you said your wife's name was Melody.  Is that correct?

THE PANEL MEMBER:  Yes.  Melody Davis.

MS. TRUELOVE:  Is she part of the Marshall Symphony League?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  All right.  Thank you very much.

Now, Samsung's counsel was introduced moments ago by Mr. Ruffin Cordell.  Mr. Cordell and Mr. McKeon are both attorneys for a firm called Fish & Richardson.  They don't actually work out of any of their offices in Texas, but I just want to ask if anybody -- oh, and Mr. Davis, although Mr. Davis, Judge

Davis, His Honor, also with Fish & Richardson, is primarily based in Texas.

Is anyone familiar with any of those names?  Okay.  I don't see any hands.

Now, Ms. Smith, Ms. Smith and I have known each other for quite a while, friends and a very respected colleague.  She works for a law firm called Gillam & Smith.  If you stand on the back steps of the courthouse and look south on Washington, you'll see a historic yellow home.  That's where their Marshall office is.

Anybody familiar with Ms. Smith?  Melissa Smith.  And her partner, her primary partner, is a gentleman by the name of Mr. Gil Gillam.  Anybody familiar with Mr. Gillam, had any interactions with him?

Seeing no hands, let's talk again about patents in this case and the fact that they're from a foreign company, the innovations come from a foreign company.

Can we start with Mr. -- it's Inderwiesche.  Right?

THE PANEL MEMBER:  Correct.

MS. TRUELOVE:  Juror No. 1.

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Do you have any problem with the fact that a foreign company can come -- their patents, their innovations, can then be recognized by the United States?

THE PANEL MEMBER:  No, ma'am.

MS. TRUELOVE:  Okay.  What do you think about that?  Do you think that's a good thing or a bad thing?

THE PANEL MEMBER:  Neutral.

MS. TRUELOVE:  Neutral?  Okay.

THE PANEL MEMBER:  I don't think I know enough to have an opinion on it.

MS. TRUELOVE:  Okay.  And the fact that G+Comm has acquired these patents and is here in court, the one asserting them over this dispute, is there any problem with that with you?

THE PANEL MEMBER:  No.

MS. TRUELOVE:  Okay.  All right.

What about you?  Is it Mrs. Sherrill?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Do you have any problem whatsoever with the fact that these patents were actually kind of developed by a company, a foreign company, and are now being asserted by G+Comm here in the United States?

THE PANEL MEMBER:  Not at all, not at all.

MS. TRUELOVE:  Okay.  It's not going to give you any pause?  You'll be able to listen to the evidence and make your decision based on --

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  -- based on the facts?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE: Okay. Wonderful. What about you, Juror No. 3. And it's Mrs. King. Right?

THE PANEL MEMBER: Yes.

MS. TRUELOVE: Same question.

THE PANEL MEMBER: Okay. I was one who did see if I may could get excused? I guess that hasn't come up yet, just answer the question?

THE COURT: No, ma'am. Just answer the question.

MS. TRUELOVE: And just so you're aware, it will get addressed. And so I'm just curious to know what your thoughts are to the extent that you do end up --

THE PANEL MEMBER: Okay. Well, I don't have a Samsung phone. I almost believe too many companies are foreign companies in the U.S. today. So, you know, I guess I think my opinion of the way the world has went is there's almost too many foreign countries we deal with in America anymore. So I'm real low tech so I don't know much about the phones, but, you know, I just think we don't have enough American companies in America.

MS. TRUELOVE: Okay. All right. Thank you.

There's another part here, and I think you likely heard a lot about this or some about this on the patent video, but -- and we've kind of started to discuss it, the fact that you're going to hear that G+Comm acquired these patents. They didn't -- they're not the innovators. They don't make

anything.  They don't do anything with them.  And so I want to talk a little bit about that.

Mr. Holland, is that Juror 20?  And you said you used to own a surveying company.  Is that right?

THE PANEL MEMBER:  Yes, ma'am, that's correct.

MS. TRUELOVE:  Did you do a lot of surveying like for the different oil companies around here or --

THE PANEL MEMBER:  It was primarily oil and gas work.

MS. TRUELOVE:  And what -- why is it important for those companies to hire a surveyor before they come in and start doing their work?

THE PANEL MEMBER:  It's mainly to -- they're developing a product, well location, pipeline, to know where those are on the correct piece of property, the measurements are correct, all that kind of stuff.

MS. TRUELOVE:  Right.  And what happens if for some reason they set up their well and it's encroaching or over on somebody else's piece of property?  Is that a problem?

THE PANEL MEMBER:  Pretty big problem.

MS. TRUELOVE:  Yeah.  So it's important to be accurate because if they are encroaching on somebody else's property, then you've got to figure out what to do about that. Right?

THE PANEL MEMBER:  That's correct.

MS. TRUELOVE:  Do you move it, do you have to pay them some money to keep it there, those kinds of things?

THE PANEL MEMBER:  That's correct.

MS. TRUELOVE:  Are you pretty, just based upon what you're doing, kind of familiar with mineral rights?

THE PANEL MEMBER:  Yeah, somewhat.

MS. TRUELOVE:  Okay.  So if somebody can have or own mineral rights to a piece of property that entitles them to some type of compensation for oil or gas that's taken out of that tract of land.  Is that right?

THE PANEL MEMBER:  Yes, ma'am, that's correct.

MS. TRUELOVE:  And that individual may not lift a finger to do anything to get those resources out of the ground.  Isn't that true in most cases?

THE PANEL MEMBER:  That's correct.

MS. TRUELOVE:  In fact, you go out and survey and then Rockcliff or whomever comes and they put their rig up there and it's their crews and their money and their time to extract the gas or oil from the ground.

THE PANEL MEMBER:  That's accurate.

MS. TRUELOVE:  And at the end of the day, when they sell it and they make their profit, they still have to pay the mineral rights owner.  Correct?

THE PANEL MEMBER:  That's correct.

MS. TRUELOVE:  Okay.  Do you have a problem with

that at all?

THE PANEL MEMBER:  Not at all.

MS. TRUELOVE:  All right.  Do you see how that's kind of similar to maybe G+ Communications coming into court, having acquired the rights to these patents that they didn't create or innovate, but they are -- the law permits them to come and assert those rights --

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  -- in court?  Are you all right with that in the patent context?

THE PANEL MEMBER:  Yes, I am.

MS. TRUELOVE:  Okay.  All right.  Thank you.  And let me ask:  Is your wife Colby Holland?

THE PANEL MEMBER:  That is correct.

MS. TRUELOVE:  Is she also in the Marshall Symphony League?

THE PANEL MEMBER:  Unfortunately, yes.

MS. TRUELOVE:  All right.  So it's real important to us as we go forward in our case to make sure that everyone that is potentially going to be selected to serve understands what, you know, the laws are and are going to be able to follow them.

And so the law is that if G+Comm owns these patents even though they didn't develop anything, they didn't develop anything and make anything with them, they own them, it's a

property right, and they still have the right to assert them against anyone who is trespassing on their property or using the patents without their permission.

Is everybody okay with that concept as I just talked about with Mr. Holland?  Does anybody have a problem with it?  Okay.  I don't see any hands.  Thank you very much.

Now, just lawsuits in general, some of you were -- expressed on your questionnaires some issues that you had with just lawsuits in general.

I think Juror 15, Mr. Lamar, if I jotted it down right, you felt like lawsuits can be frivolous and damages can be too high.  Is that fair?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Yes, sir?

THE PANEL MEMBER:  Yeah.

MS. TRUELOVE:  Is that something I need to worry about in this case, or is there a particular type of lawsuit you're thinking of when you wrote that down?

THE PANEL MEMBER:  I couldn't understand that last question.

MS. TRUELOVE:  I'm sorry.  Do I -- is that something I need to worry about, that you have kind of a, walking in the door, a feeling about lawsuits that some of them are frivolous and damages are too high?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Do I need to worry about that in this case?

THE PANEL MEMBER:  I wouldn't think so.

MS. TRUELOVE:  Okay.  You're going to hear that we are going to be asking for a large amount of damages based on Samsung's use --

THE PANEL MEMBER:  Right.

MS. TRUELOVE:  -- of the technology in their 5G phones.  Is that going to be a problem for you?

THE PANEL MEMBER:  No, ma'am.

MS. TRUELOVE:  Okay.  Thank you, Juror 15.

And I think, Mr. Newman, you also had a concern.  You said we're kind of abused because we're in an overlitigious culture.  Is that right?

THE PANEL MEMBER:  Yeah.  I read a dictionary that day.

MS. TRUELOVE:  Well, I guess what I need to know for my purposes is, you know, understanding kind of the nature of this case and what you've heard about it being a patent case, is that leaning that you had walking in the door going to cause me a problem going forward?

THE PANEL MEMBER:  I would judge things based on the merits of the case.

MS. TRUELOVE:  Okay.  All right.  Thank you very much.

Anyone else out there -- I know I had a couple of more towards the back.  I think Juror 24, Mr. Davis, and maybe Mr. Cooper had some concerns about, you know, abuse of lawsuits.

Is everybody else comfortable that what we're doing here today and the issues we're talking about, you know, important enough and not maybe in that abuse area that you were thinking about when you walked in the door?

I see you shaking your head, and that's Juror 27, Mr. Cooper.

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  I think you were concerned about it wasting taxpayer money?

THE PANEL MEMBER:  Yes, I was.

MS. TRUELOVE:  Can I not be worried about that notion when you walked in the door after having heard, you know, what this is about?

THE PANEL MEMBER:  You don't have to worry about it.

MS. TRUELOVE:  Okay.  All right.  Thank you very much.

Okay.  Let's come back around over here.  Let me talk to you for a minute, if I could.  Is it Mrs. Williams, Juror No. 6?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Have you ever -- you said you were like in charge of the nursing?

THE PANEL MEMBER:  Assistant director.

MS. TRUELOVE:  Assistant director.  Okay.  Have you ever had the responsibility to execute a contract or sign a contract for your company?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  If you've done that, did you always make it a point to read?

THE PANEL MEMBER:  Of course, yes.

MS. TRUELOVE:  Okay.  And if you saw anything in that contract that looked unreasonable or not fair, what would you do?

THE PANEL MEMBER:  Well, we'd discuss that.  I mean, the decision wouldn't be mine alone, of course, but there would definitely be a discussion about it.

MS. TRUELOVE:  Would you --

THE PANEL MEMBER:  I would get some clarity on it.

MS. TRUELOVE:  Sure.  Would you let the other party know that, hey, we can't sign this like it is because it's not a fair contract?

THE PANEL MEMBER:  Right.

MS. TRUELOVE:  Okay.  And let's say that the other party you are dealing with is, you know, kind of -- they have the concerns, you know, you're not worried about any private information or anything with the nursing home, but they -- they are the ones that really want the contract

because they want to be able to do business with you and still keep all their information protected. Does that make sense?

THE PANEL MEMBER: Right.

MS. TRUELOVE: And they put in these provisions that you don't think are fair. Should it be their responsibility then to come back, and once you've told them you don't think it's fair, and send you another contract for you to consider?

THE PANEL MEMBER: Right.

MS. TRUELOVE: Okay. You think you should have to spell it out for them?

THE PANEL MEMBER: Well, I don't think it would hurt to spell it out for them, you know, so everything is clear.

MS. TRUELOVE: But if they're the ones that are needing the contract and needing the protection, should it be their responsibility to provide you with a contract that's fair to you but that also protects them?

THE PANEL MEMBER: Well, this is what we can do and this is what we can't do. So we either meet in the middle or this is what we can't do.

MS. TRUELOVE: Okay. I appreciate that. Thank you very much.

Is there anybody out there that kind of lives and dies by the feeling that everything's fair in business, you know, gloves are off, anything goes? Anybody feel that way?

Anybody feel like you should negotiate in a fair way and

particularly if there are rules that need to be followed. Right?  If there's a law or rule that needs to be followed, you should follow that.  Everybody agree with that?  Okay.

I want to talk about 5G for a minute.  You heard me say that's at issue here.

Mr. Inderwiesche, Juror No. 1, I know you have some computer science background?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Are you familiar with 5G?

THE PANEL MEMBER:  Yes, but I don't work directly with it.

MS. TRUELOVE:  Are you able to read source code or anything like that?

THE PANEL MEMBER:  Some.

MS. TRUELOVE:  Some?  What type of source code?

THE PANEL MEMBER:  C++, java, java script, angular, SQL, python, pearl.

MS. TRUELOVE:  All right.  You know some code?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  Anything about that going to weigh in on your ability to listen to evidence in this case and judge just based on what you hear in this case?

THE PANEL MEMBER:  No, ma'am.

MS. TRUELOVE:  Okay.  Some of you -- let's see.  Mr. Hunter, I have not visited with you.  Mr. Hunter, I'm sorry.

I did visit with you.  I'm looking at the wrong person.  Can I talk to you?

THE COURT:  You have five minutes remaining.

MS. TRUELOVE:  Thank you, Your Honor.

You indicated I think that one of the places you get your news from is from Facebook, and I think several of you-all did?

THE PANEL MEMBER:  Just because I have to.

MS. TRUELOVE:  Well, I'm just curious if you've heard any -- read any stories on there or heard any stories on the news or articles or elsewhere about 5G.  Anything about 5g?

THE PANEL MEMBER:  I deal with 5G just because it's one of the communication mediums we use to do networking for our customers.  So we deal with it every day.

MS. TRUELOVE:  Do you have any insight into the inner workings of it and how it works?

THE PANEL MEMBER:  A little bit; not a lot.

MS. TRUELOVE:  Okay.  But not really looked at any news stories or anything like that about 5G?

THE PANEL MEMBER:  Just new technology, when it's coming out, what 6G's going to do, so on and so forth.

MS. TRUELOVE:  Okay.  Thank you very much.

Anybody else read any stories, seen anything on Facebook or anywhere else out there in the news or social media about

5G that just got you thinking about it?  Okay.

I want to talk just a minute about burden of proof. Let's -- can we talk to you, Juror No. 4?  That's Mrs. Zaro?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Now, you heard His Honor talk about a couple of different burdens of proof.  He was talking about preponderance of the evidence, and that's our burden for us to prove that Samsung infringed the patents.  And, as he said, it's just a very slight tipping of the scales.

If you think about football season going on right now, it's just the very tip edge of the football crossing the 50-yard line into Samsung's territory.  That's our burden.

Are you comfortable with that being the burden, or -- I just don't want anyone feeling like we should have to bring more evidence than we're required.

THE PANEL MEMBER:  I'm comfortable, yes.

MS. TRUELOVE:  Okay.  And there is another piece to this, which is called validity, and the patents in this case are presumed to be valid.  There's a mechanism in law called a presumption.  Some of you may have heard the presumption of innocence if you're, you know, watching crime shows and whatnot.  And so when you walk in the door, you have to presume that these patents are valid.

Is that something you can do?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  So in order to then overcome that presumption, Samsung has to come in the door and bring evidence and they have to do it by a clear and convincing standard, which makes sense.  Right?

THE PANEL MEMBER:  That's correct.

MS. TRUELOVE:  If it's presumed valid, that burden of proof should be a little bit higher to overcome it.  And if you think about the football analogy, that's like getting the football into the red zone, way down into the red zone, that kind of proof to overcome that presumption.  Can you follow that?

THE PANEL MEMBER:  Yes, I can.

MS. TRUELOVE:  Okay.  Thank you very much.

THE PANEL MEMBER:  You're welcome.

MS. TRUELOVE:  Is everyone comfortable with those concepts of the burden of proof?  Anybody think our burden should be higher to prove infringement or Samsung should be lower for invalidity or -- or invalidity, rather?  Okay.

The last thing I really want to talk to you about is damages.  And as I mentioned earlier, based on the use of our technology, that damages number is going to be north of $200.7 million.  And so I want to talk about that for just a minute.

And so let's look at -- is it Juror 14, Mr. Stewart?

THE PANEL MEMBER:  Yes, ma'am.

THE COURT:  And you have one minute remaining.

MS. TRUELOVE:  So I want you to imagine that you've got some property and it's been in the family for a long time and it's covered in pine trees.  And you're not on it all the time and you go back out to check on it and it's been clear-cut.  Every stick of wood is gone.

Would you want to be compensated for every piece of wood that was cleared?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Every use, not just half?

THE PANEL MEMBER:  Yes, ma'am, all of it.

MS. TRUELOVE:  All right.  So you think it's all right to come in and ask for whatever that number is to be compensated for every bit of use of your technology?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Okay.  Thank you.

Anybody feel differently than Juror No. 14, Mr. Stewart?

All right.  I know my time is done.  I appreciate your attention.  I understand that there may be things that might be rolling around in your head.  If there's something you need to discuss, you have an opportunity to talk to Ms. Smith.

I look forward to working with the eight of you who are selected to be on this panel and thank you again on behalf of myself, the trial team, and Mr. Pitcock.

Thank you.

THE COURT:  All right.  Defendants may now address

the panel.  Ms. Smith, would you like a warning on your time?

MS. SMITH:  Please, Your Honor.  6 and 2, please.

THE COURT:  I'll warn you when you have six minutes remaining and two minutes remaining.  You may proceed.

MS. SMITH:  Thank you, Your Honor.  May it please the Court.

Good morning, everyone.  And in the way of reintroduction, my name is Melissa Smith.  I am from the law firm of Gillam & Smith, and I am proud today to represent Samsung.

Now, I'll join Ms. Truelove in doing probably the most important thing I'll do all morning, and that's to join in thanking you-all.  I've had some jury duty and so I know it's not -- I know what it feels like to get a summons.  And we've had some cold mornings, and you-all -- I saw folks traveled in from as far as Big Sandy and Gilmer, so I know you had probably a longer commute than usual.

So on behalf of the trial team here, on behalf of Samsung, we appreciate you showing up today.

Now, as His Honor said, it's only fair if we're going to ask you questions about yourself, that I also exchange information and introduce myself.  I went to the University of Texas at Austin.  From there, I graduated and, as His Honor did, I went to Baylor Law School.  About two days out of Baylor Law School, I moved to Jefferson, Texas, started

practicing here in Marshall.  That was 26 years ago.  I've been practicing here in Marshall every day since then.

I am married.  My husband's name is Stephen.  He is a retired police officer.  We have two kids.  So we have a 10-year-old girl and a 12-year-old boy, so we're in the midst of fifth and seventh grade.

And I actually have had jury service before.  I had it over in Jefferson, a town of 2,000.  As you might guess, everyone knew me or most people knew me.  The lawyers knew me because I'm a lawyer, and my husband being a police officer over there, I thought there's no way, there's no way I'm going to be picked, but I was.  And as Ms. Truelove said, it was -- I had a ball.  It was great to finally be behind the scenes and see what all the hard work that goes into the process.

On that note, though, His Honor said that, you know, jury service, it is a sacrifice and it's certainly not convenient. Does anyone join me when you got that summons and not being real excited about showing up here?  I see some hands.  I appreciate your honesty.

Kind of the flip side, you know, did anyone get that summons and think, I cannot wait; I've never served on a jury; I can't wait to serve on a jury?  Nobody?  So my little girl -- okay.  Thank you.  Juror No. -- I can't see your number.  I'm sorry.  No. 26.

Mrs. Sanchez, thank you for saving me on that one.  Tell me why you say that.

THE PANEL MEMBER:  Well, I didn't have the honor to serve in any branch of military and really I feel that the United States is the best country in the world.  So our rights as citizens and stuff to withhold and honestly I just like to be fair.  And, I mean, there's black and white, and I live my life by that, I teach my kids that.  I've owned many businesses so I was always fair about that.  And, you know, the deal is, is we get this right as citizens, and I think we should perform that.  So that's basically the reason.

MS. SMITH:  Well, I thank you and I hope this becomes an opportunity for you to serve.

And you said something interesting.  You said something, you know, you want to be fair.  And you can sit down, ma'am.  Thank you so much.

But she's kind of right at the heart of what's going to be discussed here if you're lucky enough to be chosen.  And each side is permitted by His Honor to give you a brief overview of the case, and that's a really good entree into what this case is about.

Samsung, we've heard a little bit about 5G, and Samsung launched its first 5G phone way back almost five years ago, back in 2019.  And if you are lucky enough to be a juror on the this case you're going to meet Mr. Waitley from Samsung,

and he actually led the team that launched that first 5G phone.

And Mr. Waitley is going to come into the courtroom and visit with you about that launch and about Samsung's innovation because, as you've heard, I think we heard a $200 million number before we've heard any of the evidence. You know, Samsung been accused of some pretty serious allegations, so you'll hear from Mr. Waitley.

But for purposes of this brief introduction, I'll tell you that on the note of fairness, we're going to hear a good deal about negotiations between the companies and about something called FRAND. And FRAND stands for fair, reasonable, and non-discriminatory. So we're going to talk about what's fair. And it's Samsung's position in this case that G+ or G+Comm has not negotiated fairly with Samsung.

Two other points. There will be some allegations of patent infringement in the case. It's Samsung's position, that burden His Honor spoke about, it's Samsung's position that the Plaintiff will not be able to meet their burden of proof on infringement.

And, finally, in the video where His Honor in that case or in that video spoke about patents not being valid and it being the jury's real job to determine if patents are valid, it will be Samsung's position that GComm or G+'s patents just aren't valid. So those are the type of things you will hear

if you are lucky enough to be chosen on this case.

Now, I'm going to be absolutely transparent, as Ms. Truelove was, in telling you what I'm trying to smoke out, if you will, this morning, is if I'm starting behind in the case or if Samsung is starting behind for any reason at all, or if we're starting out on an equal playing field.

And I'll tell you, you know, Mr. Lovelace, I'm not in the Symphony League, I'm not in any gala league or anything like that, and quite frankly I'm feeling a little inadequate because my husband would rather be on the shooting range on a Saturday morning.  He knows nothing about golf.  I just use that -- we're rodeo people for what it's worth.

So I just use that as an example if there is -- and you've been very honest with Ms. Truelove that those things would not matter in a patent infringement case.  But if anything comes up in our conversation where you think, gosh, I'm just starting to lean a little towards the Plaintiff in this case, I just truly want the honest answers.

So in this process when I talk to folks, I've heard this fairly often.  You know, they say, well, seems like a big case; it's made it this far; you know, it's a federal court; where there's smoke, there's fire.  If the case has made it this far, then the defendant must have done something wrong. Anybody agree with that statement?  I'm going to call on some people we haven't heard from today.

Juror No. 8, Mrs. Hughes.  Mrs. Hughes, you said you were a data analyst and anesthetician.  Do you do anesthetician work on the side?

THE PANEL MEMBER:  No.  When I moved here to Texas, I closed the spa down.  So since I've moved here, I've only done the data analyst.

MS. SMITH:  Okay.  Thank you.  I just saw that on your questionnaire.

THE PANEL MEMBER:  Yes.

MS. SMITH:  Tell me, you know, because this case is in a federal court, because it's made it this far, do you feel like, gosh, the Defendant must have done something wrong, or am I starting out on the same playing field?

THE PANEL MEMBER:  Repeat the question again?

MS. SMITH:  Of course.  Because the suit's been on file for some time and we're in a federal court, do you feel that naturally the Plaintiff's case has some merit, that the Defendant must have done something wrong, or are both sides really starting out on an equal playing field?

THE PANEL MEMBER:  They are both starting out equal.

MS. SMITH:  I appreciate that.  Thank you, ma'am.

THE PANEL MEMBER:  Uh-huh.

MS. SMITH:  Juror No. 12, I haven't heard much from you, Mrs. Thomason.

THE PANEL MEMBER:  Yes.

MS. SMITH: And my game here is to talk to those folks that Ms. Truelove hasn't had an opportunity to visit with. What do you think about that statement? The case has been on file for a long time. Does that necessarily cause you to believe, well, the Defendant must have done something wrong, or are we both starting on the same equal playing field here?

THE PANEL MEMBER: Well, even in my thinking, I have difficulty with such a well-known company so much, you know, and the smaller guy trying to take care of himself.

MS. SMITH: Okay. Well --

THE PANEL MEMBER: Is that an okay way to say it?

MS. SMITH: As His Honor said, there is no wrong answer. So --

THE PANEL MEMBER: Okay.

MS. SMITH: So speak your truth. I can take it. I'm not always going love what's said, but I want to hear it.

THE PANEL MEMBER: So for me, I feel like I'm like this already because of the big guy company and the little guy -- yeah.

MS. SMITH: So when you say like this, the Plaintiff's up here and Samsung is down here, we're not starting at the same place. The --

THE PANEL MEMBER: In my mind.

MS. SMITH: Well, can I solidify that for you by

telling you whether you call it G+ or GComm, Mr. Pitcock is a one-man show.  So it's an individual against Samsung in this courtroom.  Does that kind solidify the fact that the Plaintiff will be starting ahead?

THE PANEL MEMBER:  Uh-huh.

MS. SMITH:  And that's a -- I'm assuming a long-held belief?

THE PANEL MEMBER:  The little guy against a corporate -- yeah.  Yes.

MS. SMITH:  Your favorite movie *Rocky*?

THE PANEL MEMBER:  I don't know.  I did see *Rocky*, but -- yeah.

MS. SMITH:  I'm just having fun with you.

So you -- you know, His Honor couldn't give you an instruction to stop thinking in that way because that's a belief you've held throughout your whole life, and I appreciate your honesty, ma'am.  Thank you.

THE PANEL MEMBER:  Thanks.

MS. SMITH:  Anyone else agree with Juror No. 12, that by virtue of Mr. Pitcock being an individual, that he's going to start out a little bit ahead?  Anybody agree with that?

Let me see.  I believe Juror No. 15, sir.  Mr. Lamar?

THE PANEL MEMBER:  Yes, ma'am.

MS. SMITH:  I read in a little bit different

question, but I read on your jury questionnaire that you said that you strongly agree that the little guy has no chance when a larger corporation is involved?

THE PANEL MEMBER:  Most of the time.

MS. SMITH:  Tell me about that.

THE PANEL MEMBER:  You're just -- you're already overpowered.

MS. SMITH:  Okay.  Well, I represent Samsung and I'm not shy about the fact that Samsung is a large company.

THE PANEL MEMBER:  Right.

MS. SMITH:  And Mr. Pitcock is a one-man show over here.  So is Mr. Pitcock, knowing your views on that, is he going to start out a little bit ahead in this lawsuit?

THE PANEL MEMBER:  It's pretty well equal right now.

MS. SMITH:  Okay.  I appreciate that.  Thank you, sir.

All right.  I had one more.  Let's see.  Juror No. 22.  Yes, ma'am.  I think you answered that question similar to Juror No. 15.  You said that you strongly agreed that when there's a smaller company involved and a larger company, that the smaller company doesn't have much of a chance.  Can you tell me something about why you said that?

THE PANEL MEMBER:  I don't know.  I guess movies.  I mean, I know that's not a very intelligent answer, but, you know, a little guy.

MS. SMITH:  You're my juror that always -- you always root for the underdog?

THE PANEL MEMBER:  Generally.

MS. SMITH:  Okay.  So you might view a solo owner of a company as an underdog, and he might -- you might start leaning ever so slightly in favor of the Plaintiff in this case.

THE PANEL MEMBER:  Maybe ever so slightly.  I like to think I could be impartial, but...

MS. SMITH:  I appreciate that.  Thank you, ma'am.

All right.  Ms. Truelove talked to you guys about Samsung products.  I kind of want to expand her question and ask you about Samsung cell phones, TVs, appliances.  Who on the first row has ever owned, currently or in the past, a Samsung product?  Okay.  We talked to Juror No. 5.

Juror No. 6, Mrs. Williams, what did you own?

THE PANEL MEMBER:  Yes.

MS. SMITH:  What did you own of Samsung's?

THE PANEL MEMBER:  We have a Samsung TV and cell phones.  My husband and I both do.

MS. SMITH:  Any issues at all that I need to know about with those products?

THE PANEL MEMBER:  No.  My daughter buys all my phones so she's bought my iPhones and Samsungs, so no.  I don't have any -- I really don't have a preference.

MS. SMITH:  I hate to hear that, but -- okay.  I have one more question for you.

THE PANEL MEMBER:  I would have a flip phone if it lasted that long.

MS. SMITH:  Okay.  Thank you, ma'am.  I have one more question for you.

THE PANEL MEMBER:  Okay.

MS. SMITH:  You talked to Ms. Truelove about entering into contracts and things at your hospital, I guess, or nursing home.  She had this exchange with you about someone sends you a draft of an agreement.  Do you recall that?

THE PANEL MEMBER:  Right.

MS. SMITH:  And she said you don't like the draft.  Right?

THE PANEL MEMBER:  Let me correct that.

MS. SMITH:  Yes, ma'am?

THE PANEL MEMBER:  I'm a part of that.  I don't have the final say.

MS. SMITH:  Okay.  Okay.  Okay.

THE PANEL MEMBER:  I have input on it, but I don't have the final say.

MS. SMITH:  Okay.  Well, let's say -- let's -- for purposes of this conversation, let's say you do have final say.  Someone sends you a contract and you don't like how it looks.  Right?

THE PANEL MEMBER:  Right.

MS. SMITH:  So do you mark it up -- if it says Draft real big on it, do you mark it up and say, I'm going to X out this term and X out that term, and you send it back to them, or do you just say no and make them guess about what the problems are?

THE PANEL MEMBER:  Well, I feel like you can negotiate, this is what I would like to have, you know.

MS. SMITH:  Yes, ma'am.

THE PANEL MEMBER:  And see if we can do a little bit over here, if we can change this a little bit.  You know, you just kind of negotiate.  And --

MS. SMITH:  And the drafts go back and forth. Correct?

THE PANEL MEMBER:  Everybody wants to make it better for them, so, you know, you just have to kind of talk about it.

MS. SMITH:  Thank you.

THE PANEL MEMBER:  I think.

MS. SMITH:  I appreciate it.  Thank you so much.

Second row, Samsung, anyone own a product?  Just anyone never owned a Samsung product, TV, handset, or others on the back row?  We'll do it that way.

Mr. Lovelace, never owned --

THE PANEL MEMBER:  I may have a Samsung TV.  I don't

know for sure.

MS. SMITH:  If you don't know, I assume you don't have any big complaints about it.  We tend to remember what aggravates us.  Right?

THE PANEL MEMBER:  Yeah.

MS. SMITH:  So no complaints about Samsung products?

THE PANEL MEMBER:  No, ma'am.

MS. SMITH:  Anybody else on the second row have complaints about Samsung products?

Anyone on those back rows, anything I should know about someone who has a Samsung product and has had a complaint about it?  All right.

Now, Samsung has about 6,000 employees in Texas, about 20,000 nationwide.  They have headquarters in Plano; they have manufacturing facilities down in Austin.  Similar question. We saw someone already, the juror -- I can't see your number -- Juror No. 24 whose brother-in-law works for Samsung? Did I get that right?

Has anybody had an experience with any one of these 20,000 Samsung employees nationwide that I might need to know about?  An unpleasant experience, if you will.  Nobody?  Okay. Thank you.

Now, Samsung is a Korean company, and you know the U.S. military has had, what, 30,000 troops stationed over in South Korea since the '50s, really.  Has anyone ever traveled to

Korea, whether it be for military service, for our troops over there, or otherwise?

Okay.  I see a juror over there and I cannot see your number.  No. 23.  Thank you, sir.  Mr. Collins, tell me about that.

THE PANEL MEMBER:  Yes, ma'am.  Collectively, I lived over there for four years.

MS. SMITH:  And thank you for your service, sir.

THE PANEL MEMBER:  Appreciate it.

MS. SMITH:  Anything about living over in South Korea that would impact your ability to sit on a suit involving a South Korean company?  I can take it.

THE PANEL MEMBER:  I don't know if you want me to.

MS. SMITH:  Well, here we'll do this.  We'll have an opportunity to visit at the bench --

THE PANEL MEMBER:  Let's do that.

MS. SMITH:  -- with His Honor if that would make you more comfortable?

THE PANEL MEMBER:  Absolutely.

MS. SMITH:  I appreciate that.  Thank you, sir.

Anybody ever visited Korea for any reason?  All right.

Now, by virtue of being a Korean company, we're going to hear from some witnesses, whether it be live or on video, that require translated testimony.  So they're going to have a translator, an interpreter there.  And, quite frankly, that

can -- you know, it's not always smooth.  It can be a little clunky, you have a question and it's translated and then you have an answer.

So my question is this.  If you have a scale, say, of 1 to 10, 10 being the most credible witness, U.S. English-speaking witness, and 1 being not a credible witness at all, where would you put a witness, a Korean witness that requires translated testimony right off the bat?

Mr. Stewart?

THE PANEL MEMBER:  Yes, ma'am.

MS. SMITH:  I haven't spoken to you yet.

THE PANEL MEMBER:  I really don't know how to answer that question, to be honest with you.

MS. SMITH:  Okay.  Well, my question is this.  Would the translated testimony, I mean, do you see that as maybe being an aggravation or are you starting out the same place that translated testimony starts out as a 10 as well?

THE PANEL MEMBER:  Yeah, I would say that at a 10, yes.

MS. SMITH:  Thank you, sir.

Juror No. 9, where would you put that translated testimony on my scale of 1 to 10?

THE PANEL MEMBER:  Me?  As translators have to be vetted to do this, I would have to treat them equal to anything else.

MS. SMITH:  I appreciate that, sir.  Thank you.

All right.  You -- we heard about Mr. Lovelace's and some of the other relationships with Ms. Truelove.  Ms. Truelove is married to another lawyer Kurt Truelove, sitting at the table with Sam Baxter.  They are at the McKool Smith firm.  There's also a gentleman another lawyer named Kevin Burgess at that firm, and then there is a gentleman named Todd Parish who works closely with them out of Gilmer.

Other than those that we've already spoken with, does anyone know the Trueloves, Mr. Baxter?

Juror No. 11, Mr. Earl, tell me about that.

THE PANEL MEMBER:  My wife is --

THE COURT:  Just a minute.  Just a minute.

THE PANEL MEMBER:  My wife has done the interior maintenance of Mr. Sam's plants for over 25 years.

MS. SMITH:  Okay.  Well, is that something that should keep me up at night worrying that if you're on this jury because your wife has been working over there for 25 years, I'm in trouble?

THE PANEL MEMBER:  No, ma'am.

MS. SMITH:  All right.  Thank you, sir.

Anybody else know any of the local lawyers that I have mentioned or Mr. Parish from Gilmer?

There is some folks that aren't from Texas at counsel table from the law firm of Irell & Manella.  I'm assuming

nobody recognizes any of those folks this morning.  All right.

Now, does anybody know anybody that has a patent or work for a company that has patents?  Juror No. 9, Juror No. 18.

We haven't heard a lot from Juror No. 18, Mr. Marcove. Tell me about that.

THE PANEL MEMBER:  I worked for a company for about eight years that -- we worked with them in manufacturing and helping them in solving their problems and production where they needed to be creative on the S curve, come out with new innovative ideas.

We would brainstorm, use some kind of innovative ideation tool to create a solution.  Oftentimes, we would co-create it with the company; sometimes we would do it on our own.  If we did it on our own, we would patent it if the client company did not want it.  I was on the committee that did the creation or the ideation to come up with those suggestions.

MS. SMITH:  Sounds like you knew a lot more about patents than most folks that walked in the courtroom today. Fair to say?

THE PANEL MEMBER:  It's tangled, yes.

MS. SMITH:  Okay.  Well, let me tangle it further. It sounds like you were inventing and manufacturing and patenting those things.  Correct?

THE PANEL MEMBER:  Correct.

MS. SMITH:  Are you familiar at all with a bit of a

different business model where you buy patents from folks like your company and then use them to sue other people?

THE PANEL MEMBER:  Not that model, no.

MS. SMITH:  Okay.  Thank you, sir.

Has anybody ever heard of that business model?  It's an investment model, if you will--you buy a patent and then you use it in lawsuits like this.  Has anybody ever heard of that?  Okay.

Now, everyone's probably had an occasion at some point to go shopping for a car, I assume.  Everyone's hands?  Yeah. Who haven't I spoken to?  Juror No. 19.

So you go on down to the car lot.  And are you a truck guy or a car guy?

THE PANEL MEMBER:  Truck.

MS. SMITH:  All right.  You see an F250 Ford?

THE PANEL MEMBER:  Yes, ma'am.

MS. SMITH:  We'll do a Raptor then.  We go down the car lot and you see this brand spanking new Raptor and you can't help yourself but you go take a look at it.  And the salesman comes out, and he gives you a price, I'm going to call it a COVID price, larger than a sticker price, you'd probably walk away.  Right?

THE PANEL MEMBER:  In the heartbeat.

MS. SMITH:  Okay.  Okay.  But you really have your eye on that car.  And my husband does this.  He wants a new

truck and he goes and visits the truck.  He can't buy it, he can't have it, but he visits it occasionally at the lot.  So you go by again, and the salesman gives you a lower price but it's still a pretty high price.  You probably walk away.  Right?

THE PANEL MEMBER:  Yes, ma'am.

MS. SMITH:  Okay.  And he says, well, that big price was fair, but this lower price is fair as well.  Does that -- do you think that big more than sticker price is really fair in the beginning?

THE PANEL MEMBER:  No, of course not.

MS. SMITH:  No.  And then this exercise continues. Every time you visit, he goes down a little and he says, well, all these offers are fair.  Are you buying what he's selling?

THE PANEL MEMBER:  No, not most of the time.

MS. SMITH:  Okay.  So then you go back one day and your Raptor is gone and he's got an F150 there.  And he says, do I have a deal for you.  This is a whole lot less truck, but I'm going to sell it to you for 10 times what that Raptor costs.

Are you buying that truck?

THE PANEL MEMBER:  No.

THE COURT:  You have six minutes remaining.

MS. SMITH:  Thank you, Your Honor.

You've had no -- you've been -- have had no issue in this

back and forth with me on this negotiation, and I'm assuming because this case deals with negotiations, similar negotiations between companies, you wouldn't hesitate to be the judge of who's being fair in a similar negotiation. Correct?

THE PANEL MEMBER:   Correct.

MS. SMITH:   Thank you, sir.  I appreciate it.

Now, if we have a jury -- if we have a jury with all leaders, you guys, the eight of you, will be back there deliberating for two months.  So we can't have all leaders. It's just as important to have some folks that aren't quick to step up and lead.

But I learned so much about you from having you guys identify who you are to me, so I'm going to have two categories.  I'm going to have the first category is folks who are kind of natural leaders.  When there's an opportunity to lead, you accept up and volunteer.  And then a second group where -- I don't want to call you a follower, but you're not quick to take the lead.

The first group, and if you'll keep your hands up for me because I have people writing down the numbers of leaders, who would consider themselves a leader?  We've got 1, 11, 9.  I've got 6, 18, 17, and on the back row 20, 24, 26.  Thank you. And 30.  I saw 30.

All right.  Can I assume by showing of hands that

everyone else is in that second category?  Okay.  All right.

Now, I saw some folks with some -- Mr. Marcove, you said you have five kids?

THE PANEL MEMBER:  Yes.

MS. SMITH:  All right.  And you have one favorite daughter, so I don't know if this question will work with you.  But do those kids get in little disputes growing up?

THE PANEL MEMBER:  Yes.

MS. SMITH:  Okay.  Well, when they got in disputes, was it -- is it sort of like my household where they both race to the parents to try to be first to try to tell their side of the story?

THE PANEL MEMBER:  Honestly, it would run to my daughter and get her opinion and then have her come prepare me.

MS. SMITH:  So they probably ran to -- I'm carving out the favorite daughter in this conversation.

THE PANEL MEMBER:  Okay.

MS. SMITH:  They wanted to be first to get to the favorite daughter because they knew if they sold her on their version of the story, that she could certainly sell you.

THE PANEL MEMBER:  More often, yes.

MS. SMITH:  Okay.  Thank you, sir.

Well, where I'm going with this is this is kind of going to work the same way.  I mean, Ms. Truelove has been a friend

of mine for over 20 years, and she's a great lawyer.  She's going to say some things that make a whole lot of sense.  But as my dad used to say, there's two sides to every pancake, no matter how thin you pour it.

So what I'm asking you is if you'll wait, if you'll wait, to hear from Samsung before making up your mind just like you waited to hear from the favorite daughter?

THE PANEL MEMBER:  Always.

MS. SMITH:  Okay.  Thank you.  I appreciate it, sir.

Everyone else agree there are good lawyers on the Plaintiff's side; they're going to say some smart things, some things that makes sense, but by a showing of hand everyone will agree to hear both sides of the story before making up your mind?

Juror No. 3, we have that agreement?

THE PANEL MEMBER:  Yes.

MS. SMITH:  All right.  Thank you.

All right.  Did anyone know anybody else on the jury when they walked in today?  Anybody know anyone else, recognize anybody?

THE COURT:  Two minutes remaining.

MS. SMITH:  Thank you.

UNIDENTIFIED PANEL MEMBER:  On the jury panel?

MS. SMITH:  Yes, sir.  11 and 17, do you-all know each other?  No.  Okay.  Who did you know, 11, Juror No. 11?

THE PANEL MEMBER:  I know Mr. Lovelace.

MS. SMITH:  Mr. Lovelace?

THE COURT:  Let's talk one at a time, please.

THE PANEL MEMBER:  I know Mr. Lovelace, I know Colby's husband, and I know Lee Davis.

MS. SMITH:  Okay.  I appreciate that.  Thank you, sir.

All right.  I believe I am out of time so I will end kind of where I started, and that's saying thank you again for your time, for your honest answers this morning.  I appreciate them.

To the extent that I can't ask all the right questions, but if I have missed an important question and someone is sitting there thinking, you know, if Ms. Smith would have asked this question, I would have told her that I'm leaning towards Plaintiff and against Samsung this morning.  Is there anyone having that thought right now?  I just didn't ask the right question?  I see no hands.

Well, I look forward to presenting the case to the eight of you that are lucky enough to be chosen.  Thank you.

Thank you, Your Honor.

THE COURT:  Counsel, approach the bench, please.

(The following was had outside the hearing of the jury panel.)

THE COURT:  Ms. Truelove, does Plaintiff have any

challenges for cause?

MS. TRUELOVE:  Your Honor, the only juror that we would challenge would be Juror No. 3 for her comments on too many foreign companies, but she's also indicated that she had something she wanted to speak to the Court about that may resolve the issue.  But if it doesn't --

THE COURT:  She's also the one that said you started way ahead of the other side.  You want to challenge her.  I'll bring her up here if you want to.

MS. TRUELOVE:  She's already coming up.  We would want to explore that particular issue with her.

THE COURT:  All right.  Let me ask it this way:  Was there anybody who didn't indicate they had a scheduling problem that I'll bring up here that you want to additionally or separately challenge them for cause?

MS. TRUELOVE:  Nothing from G+, Your Honor.

THE COURT:  How about Defendants?

MS. SMITH:  We'd like to talk to 12, 13, and 22.

THE COURT:  Anyone else?

MS. SMITH:  Not from Samsung, Your Honor.

THE COURT:  Well, then I have per my notes Panel Members 1, 2, 3, 5, 8, 12, 13, 14 and 22 that we need to bring up here and talk to for one reason or the other.  Does anybody have anything different?

MS. TRUELOVE:  We do not, Your Honor.

MS. SMITH:  No, Your Honor.

THE COURT:  Okay.  Take your seats.  Thank you.

(The following was had in the presence and hearing of the jury panel.)

THE COURT:  Ladies and gentlemen, I'm going to excuse most of you on the panel for a recess at this time. When those of you that are about to recess start the recess, I'm going to ask you to exit through the double doors in the back of the courtroom.  When you go through those double doors, if you take a left and go around the corner, you'll find two important things--the restroom and the water fountains.  I'm also going to ask you not to leave the building; stay on this floor, although you'll be outside the courtroom.

Also, ladies and gentlemen, while you're on recess, if you'd like to have a conversation with somebody, if you know somebody that's here on the panel with you, feel free to have a conversation, but don't discuss anything that's happened in the courtroom this morning.  Talk about this crazy weather we're having, talk about the Super Bowl that's upcoming even though the Cowboys are out of it now, talk about whatever you want to, but don't talk about anything that's happened in the courtroom this morning.

Let me remind you, you have heard exactly zero evidence in this case.  Nothing you've heard this morning is evidence

in this case.

So if you'd like to have a conversation while you're on recess with somebody, feel free to do it, but don't discuss what's happened in the courtroom today. And by the same token, if you'd just as soon not talk to anybody, you don't have any obligation to. But while you're on recess, if you will not discuss anything in the courtroom -- that's happened in the courtroom, I will appreciate it.

Now, there are several of you that I am going to ask you to stay back where you are so that I can talk with you here at the bench one at a time. And when I'm through talking with you at the bench, then I'll allow you to join the rest of the panel outside the courtroom for recess. And once you -- I'll probably tell you this at the bench, those of you that I'm going to talk to individually, but just in case I don't, once you leave the courtroom and you join the rest of the panel for recess, do not discuss anything that's been talked about here at the bench.

The folks that I'm going to ask to stay back to so that I can talk with you one at a time are Panel Members No. 1, 2, 3, 5, 8, 12, 13, 14 and 22. I'll say those again--1, 2, 3, 5, 8, 12, 13, 14, and 22. If you're one of those people, just let everyone else around you pass by, slip out, as they leave the courtroom for recess, but stay in your respective seats, if you will, and then I'll call you up here one at a time to talk

89

with you.

All right.  Those of you that I've not asked to stay behind are excused for recess at this time.

MS. SMITH:  Your Honor, may I approach?

THE COURT:  Just a moment.

MS. SMITH:  Okay.

(Whereupon, the jury panel left the courtroom.)

THE COURT:  All right.  Please be seated.

Counsel, approach the bench.

(The following was had outside the hearing of the jury panel.)

MS. SMITH:  I apologize, Your Honor.  I asked some sensitive questions, and Juror No. 23 said he wanted to talk to you.  He wanted to talk at the bench.

MS. TRUELOVE:  That is correct.

THE COURT:  That's the gentleman who served in the Army and was stationed in Korea?

MS. TRUELOVE:  That's correct.

MS. SMITH:  He had something he was uncomfortable saying.

THE COURT:  That's Mr. Collins.

Let me ask the Court security officer to find No. 23, Mr. Collins, and ask him to come back in, please.

(Pause in proceedings.)

THE COURT:  Mr. Collins, you didn't do anything

wrong.  I just forgot to ask you to stay back, so please have a seat.

THE PANEL MEMBER:  No problem.  Yes, sir.

THE COURT:  Panel member No. 1, Mr. Inderwiesche, if you would step up, please, and come around here.

(The Panel Member approached the bench.)

THE COURT:  Good morning.  This is the microphone. We're just going to talk quietly here, Mr. Inderwiesche.  When we started, I asked if someone had a serious impediment to being able to be here if they were selected.  You raised your hand.  Tell me about that.

THE PANEL MEMBER:  My wife was involved in a car accident yesterday afternoon, significant, and she is not hospitalized, but our vehicle is totaled.  I had to borrow the neighbor's vehicle, and I don't think I can depend on that going forward.  And it's going to put a strain on our family this next week.

THE COURT:  Okay.  I don't want you to tell me more than you're comfortable telling me, but she's not hospitalized?

THE PANEL MEMBER:  She's not hospitalized.

THE COURT:  Did she have physical injuries because of this accident?

THE PANEL MEMBER:  She's very sore today and in lots of pain.  We may end up going to the hospital at some point

this week.

THE COURT:  And your family just had the one vehicle?  It's not a second vehicle?

THE PANEL MEMBER:  We do have two vehicles, and we have three kids.  So we have to get them to schools and stuff like that.  So just coordinating additional support for that is -- I don't know if I can depend on that.

THE COURT:  Okay.  But for jury service, am I assuming correctly that you would not be going to work, you'd be staying home and covering all these bases for the family?  Or are you telling me you'd be going to work anyway?

THE PANEL MEMBER:  I work from home most of the time so I'm able to be near and there's flexibility in my role to go and pick kids up, drop them off, things like that.  Occasionally but not consistently.

THE COURT:  Okay.  If I excuse you from this panel because of this unexpected accident your wife had yesterday, you understand that will just move you to the next jury trial and you'll be called back at a later time.  Do you understand this is not a forever and ever?

THE PANEL MEMBER:  Yes.  I actually appreciated the information provided.  I was kind of excited about being involved, but this would create some strain.

THE COURT:  There isn't some family in the area that could help cover this for a week?

THE PANEL MEMBER: No. My family and my wife's family live out of state.

THE COURT: All right. I'm certainly sorry about your wife's unexpected problem. I'm going to excuse you from the panel. I'm going to ask you to stay with us until we complete the process. So just join the rest of the panel in the rest of the courthouse on recess, and don't discuss anything we talked about in here.

THE PANEL MEMBER: Yes, sir.

THE COURT: Thank you.

(The Panel Member left the courtroom.)

THE COURT: All right. I'm going to excuse Mr. Inderwiesche.

Mrs. Sherrill, would you come up, please?

Good morning, ma'am.

THE PANEL MEMBER: Good morning.

THE COURT: This is our microphone. We are just going to talk quietly here.

THE PANEL MEMBER: Okay.

THE COURT: When we started, I asked if there was anybody on the panel who would have a serious problem or impediment about being here throughout the trial if they were selected, and you raised your hand. Tell me about that, please.

THE PANEL MEMBER: Okay. Well, I have a daughter,

she gets off -- I live in Linden, which is about 35 minutes from here.

THE COURT:  Yes, ma'am.

THE PANEL MEMBER:  My daughter gets off of the school bus at 3:30.  So my thing is, am I going to be home in time for her to get off the school bus?  And she's only 10 years old so I don't have anybody at the house.

THE COURT:  Well, the jury trial's not going to stop before 3:30, and it's certainly not going to stop -- I know where Linden is and I know how long it takes to get there.

Is there an afterschool program, is there another family member in the area, is there somebody that can see about your daughter --

THE PANEL MEMBER:  No, sir.  I have nobody.

THE COURT:  Not a soul?

THE PANEL MEMBER:  No.

THE COURT:  What if you were sick and couldn't go to meet the school bus?  I mean, what happens?  What if you got called out?

THE PANEL MEMBER:  I have a mother, she is retired but she also works for a living.  And so she's always gone working.

THE COURT:  Okay.  Where is your mother?

THE PANEL MEMBER:  She also lives in Linden.

THE COURT:  Okay.

THE PANEL MEMBER:  And if she does not work, she can't pay her rent.  So that's basically why I cannot even count on my own mother for supervision for my daughter.

THE COURT:  I mean, jury service is always a sacrifice.

THE PANEL MEMBER:  Right.

THE COURT:  And everybody on this jury is going to have challenges they have to meet to serve.

THE PANEL MEMBER:  Right.

THE COURT:  So 10 years old, your daughter is in elementary school?

THE PANEL MEMBER:  Yes, fifth grade, yes.

THE COURT:  Is there a program at her school that provides afterschool care for kids?

THE PANEL MEMBER:  No.  We don't have a program for her to be in.

THE COURT:  All right.  Is there a church program or any kind of community program she could get in for a week?

THE PANEL MEMBER:  No.  I sure do not have anybody or anything.

THE COURT:  Have you explored any of those possibilities?

THE PANEL MEMBER:  Yes, I have.  They do have an Ace program, after school ace program, but it has closed down.  It's not opened back up yet.

THE COURT:  And other than your mother, you have no friends or anybody --

THE PANEL MEMBER:  I do not.  My husband works too far away.  He just started this new job, so I don't even have my husband.

THE COURT:  Where does your husband works?

THE PANEL MEMBER:  Henderson state prison.

THE COURT:  How long have you lived in Linden?

THE PANEL MEMBER:  Thirteen years.

THE COURT:  And there is not a neighbor or friend or anybody?

THE PANEL MEMBER:  No, sir.  No, sir.

THE COURT:  All right.  Ms. Truelove, do you have any questions of Mrs. Sherrill?

MS. TRUELOVE:  I don't have any, Your Honor.

THE COURT:  Ms. Smith, do you have any questions?

MS. SMITH:  No, Your Honor.

THE COURT:  Mrs. Sherrill, I'm going to let you join the rest of the panel outside for recess.  Just don't talk about anything we've talked about in here.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Okay?

THE PANEL MEMBER:  Okay.

(The Panel Member left the courtroom.)

THE COURT:  Counsel, I'm not convinced that Mrs.

Sherrill can't cover her daughter for a week.  I'm not convinced that somebody's lived in the community like Linden for 13 years doesn't have a friend or somebody that can help her out.  I'm not inclined to excuse Mrs. Sherrill, but I have a sense that you're going to have a disgruntled juror on this panel if she's forced to serve.

My thought is we will work through the rest of these people, and we will see how many people we have left on the panel.  I'm not going to take a risk that we can't impanel the complete jury here.  If we get through everybody else, I'll come back to Mrs. Sherrill's situation with you and we'll decide whether she stays or goes.

Anybody have a problem with that?

MS. TRUELOVE:  No, Your Honor.

MS. SMITH:  No, Your Honor.

THE COURT:  Okay.

Mrs. King, would you come up?

(The Panel Member approached the bench.)

THE COURT:  Good morning.  This is the microphone. We are just going to talk quietly here, Mrs. King.

Two things.  Number one, you indicated you might have a scheduling problem if you were selected and being able to be here all of next week for the trial.  I need to hear from you on that, and then I have some other questions.  But tell me about that first.

THE PANEL MEMBER:  Okay.  My husband is a stage 4 cancer patient, and he's had two brain surgeries and his last one was six months ago.  And just my -- I have a little part-time job that they let me leave when I need to or check on him.  And so that's why I didn't get a 24-hour care letter from my doctor.  But I just take care of him.  He's disabled now and stays home.  And I just, you know, stay pretty busy taking care of him and keeping up with his doctor's appointments and stuff.

THE COURT:  All right.  Let me ask you this, and if I ask you something you're not comfortable telling me, then please say so.  Is your husband ambulatory?  I mean, is he out of bed?  Is he walking around the house?

THE PANEL MEMBER:  Yes.

THE COURT:  Okay.  He feeds himself?

THE PANEL MEMBER:  Yes.

THE COURT:  Okay.  You're there with him to see about him, but you're not providing every human need he needs all day long?

THE PANEL MEMBER:  He had two brain surgeries, a little memory problem.  I make sure he takes his medicine, and I feed him.  He would feed himself junk.

THE COURT:  I understand.  I'm just trying to get an understanding.

THE PANEL MEMBER:  But yes, sir.

THE COURT:  Okay.  And does he have any doctor's appointments during this coming week?

THE PANEL MEMBER:  No.  But we are waiting for some results from one week ago.  And then he's had an allergic reaction to some of his medicines, so we're going to have to have an allergist look at him.

THE COURT:  Now, you-all live in Karnack.  Is that right?

THE PANEL MEMBER:  Yes, Caddo Lake.

THE COURT:  Yes, ma'am.  Well familiar with it.  Is there family in the area or do you have a good next-door neighbor or somebody that, if you had to serve, could check on him during the week?

THE PANEL MEMBER:  Yes.  He's the baby of the family so all of his bothers are in their 70s.

THE COURT:  Are they in the area?

THE PANEL MEMBER:  Yes, Longview area, yeah.

THE COURT:  Okay.

THE PANEL MEMBER:  Longview, Smith Lynn area.

THE COURT:  All right.  I think the lawyers may have some questions about some of the answers you gave.  I'm going to let them ask some questions right now, and then I'll come back to you.

Ms. Truelove, do you have any questions of Mrs. King?

MS. TRUELOVE:  Yes, Your Honor.  I just -- we had a

conversation if you remember about just foreign companies and these patents being foreign, and I just wanted to confirm that that's not going to be an issue for you in this case.

THE PANEL MEMBER: No, I guess not. You know, there are lots of foreign countries in the -- you know, companies in the U.S. now.

MS. TRUELOVE: Okay. That's all I have.

THE PANEL MEMBER: And that's a mistake on society's part. Maybe not so much one company's.

THE COURT: And, Mrs. King, I think you're going to find out if you're on this jury that the patents were originally issued to a foreign company before they were acquired by G+, and Samsung is a foreign company. So you may find there are some foreigners on both sides of this case before it's over.

But whether there are or whether there are not, you're telling not only Ms. Truelove but you're telling the Court you can treat both sides fairly and equally. Is that right?

THE PANEL MEMBER: I guess so, yes, sir.

THE COURT: Okay. Ms. Smith, do you have questions for Mrs. King?

MS. SMITH: I do not, Your Honor.

THE COURT: Okay. All right, Mrs. King. I'm going to let you join the rest of the panel out in the rest of the courthouse for recess. Just don't discuss anything we've

talked about in here.

THE PANEL MEMBER:  Okay.

THE COURT:  Thank you, ma'am.

(The Panel Member left the courtroom.)

MR. SHEASBY:  Your Honor, I'm sorry for interrupting.  I rented a canoe from Mrs. King about two years ago.  I doubt she remembers me, but I remember her.  I just wanted to disclose it to opposing counsel.

THE COURT:  I assume no one has a problem with that.

MS. SMITH:  No.

MR. CORDELL:  Did she give you a paddle?

MR. SHEASBY:  Two, two paddles.

MR. CORDELL:  She shouldn't send you out without a paddle.

THE COURT:  I'm not going to excuse Mrs. King.  I'm satisfied her husband's matter can be covered and she said she can be fair and impartial.  So Mrs. King stays.

Mr. Newman, would you come up, please, sir?

(The Panel Member approached the bench.)

THE COURT:  Good morning, Mr. Newman.  This is our microphone.  Now, before we start, are you related to Cody or Eddy Grant.

THE PANEL MEMBER:  Eddy Grant's dad.

THE COURT:  You look like him.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  I knew your granddad Ben well.

THE PANEL MEMBER:  Good man.

THE COURT:  Well, we miss him.

When I started, I asked if there were people on the panel who would have a very difficult time being here all next week if selected, and you raised your hand.  I need you to tell me about that.

THE PANEL MEMBER:  Yes, sir.  First off, I'm not worried about my employer and my relationship.  We're fine.  But what I do is oversee large commercial projects, many of which are finishing right now.  And it will cost my boss and our clients money if they have to go and pause because I'm not there.

THE COURT:  Okay.

THE PANEL MEMBER:  I'm kind of integral.

THE COURT:  And you work for Casey Sloan.  Is that right?

THE PANEL MEMBER:  Ross Sloan.

THE COURT:  I know there are two Sloan Construction companies.

THE PANEL MEMBER:  That's fine.  I understand.

THE COURT:  Is that the totality of your concern?  Is there anything else I need to know about?

THE PANEL MEMBER:  No, sir, that's it.

THE COURT:  Okay.  All right.  I'm going to let you

join the rest of the panel outside the courtroom, and just don't discuss anything we talked about in here.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Thank you very much.

THE PANEL MEMBER:  Thank you, sir.

(The Panel Member left the courtroom.)

THE COURT:  Mr. Newman is not excused, although it's admirable he is concerned about his employer's profit margin.

Okay.  That brings us to No. 8.

Mrs. Hughes, would you join us, please?

(The Panel Member approached the bench.)

THE COURT:  Good morning.

THE PANEL MEMBER:  Good morning.

THE COURT:  This is our microphone, Mrs. Hughes. We're just going to talk quietly here.

THE PANEL MEMBER:  Okay.

THE COURT:  When we started the process this morning, I asked if there was anybody on the panel who if they were selected would have a very difficult time being able to be here throughout the trial, and you raised your hand.  Can you tell me about that?

THE PANEL MEMBER:  Yes, sir.  I've scheduled a procedure on Tuesday in Tyler for my neck.

THE COURT:  Okay.  That's for you personally?  Is it an outpatient, is it an in-patient?  I don't want to pry.

THE PANEL MEMBER:  It's outpatient.  They will put me to sleep.

THE COURT:  Okay.

THE PANEL MEMBER:  But I go home the same day.

THE COURT:  And that's Tuesday next week?

THE PANEL MEMBER:  Uh-huh.

THE COURT:  Let me ask you this.  Is that something that you could readily reschedule or is that something that there's a medical reason why it needs to happen next week as opposed to at a later date?

THE PANEL MEMBER:  No, it needs to happen.  I get it every six months, and it's a little late.

THE COURT:  So you have the same procedure every six months?

THE PANEL MEMBER:  Yes, sir, uh-huh.

THE COURT:  Okay.  Is there anything else you can tell me about it that might be helpful for me to know?

THE PANEL MEMBER:  Well, I mean, it's a little late because we lost the doctor in Longview, so now I'm having to travel to Tyler to have a new doctor do the procedure.

THE COURT:  Okay.  But you're telling me, and I don't want to pry into your medical affairs, but you're telling me you couldn't reschedule this for a week or two down the road and it would still be all right, it would fix you physically?

THE PANEL MEMBER:  Yes, sir, it does.  It's hurting me by sitting in the chair.  It's painful.  So I need to have it this next week.

THE COURT:  Okay.  Now, they put you under to do this.  You're asleep?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  And then they do whatever they do and they send you home?

THE PANEL MEMBER:  Yes, sir, uh-huh.

THE COURT:  Okay.  All right.  I'm going to let you join the rest of the panel outside the courtroom for recess, Mrs. Hughes.  I'll just ask you not to discuss anything we talked about in here.  Thank you.

THE PANEL MEMBER:  All right.  Thank you.

(The Panel Member left the courtroom.)

THE COURT:  I'm going to excuse Mrs. Hughes.

Mrs. Thomason, would you come up, please?

Good morning.  How are you?

THE PANEL MEMBER:  I'm good, thank you.

THE COURT:  This is our microphone, and we're just going to talk quietly here.

THE PANEL MEMBER:  Okay.

THE COURT:  During the questioning, Mrs. Thomason, you've made it pretty clear that you always favor the little guy and that I think I saw you raise your hands where G+ was

up here and Samsung was down here already. And as I've told you, you haven't heard any evidence in this case.

What the Court's concerned about and what I'm charged with doing is seeing that both of these parties get a fair and an impartial jury that will be governed by the evidence that's presented under oath from the witnesses and the documents and exhibits that the Court admits into evidence in the case and nothing else.

And what I need to know is, despite what you've told us and the question that you answered and anything else about how you generally look at things, can you wait until you hear the evidence in this case about these parties and make a decision about the things you're going to have to decide based solely on the evidence, or are you going to be affected by your pre-existing views such that you can't treat them equally and they won't start out equal?

These parties need to start out equal. They're both entitled to a fair trial. And if you can give them a fair trial as a juror, I need to know that, and if you can't, I need to know that. And if you can't, it's a lot better for me to know it now than to find out about it later. So that's my question.

How would you respond?

THE PANEL MEMBER: To the question, I would probably have to respond that I don't feel like I could start them out

on an equal plane.

THE COURT:  And there's not a right or a wrong here; it's just what are the facts.  If the facts in your case are you couldn't treat them equally from the beginning and let the evidence decide who wins and who loses, if you can't do that, I need to know that.  And that's what you're telling me.  Right?

THE PANEL MEMBER:  Uh-huh.

THE COURT:  Ms. Truelove, do you have any questions for Mrs. Thomason?

MS. TRUELOVE:  I do, Your Honor.

You understand everything you've heard so far is not evidence.

THE PANEL MEMBER:  Right.

MS. TRUELOVE:  And that will all come out once the trial in the case begins, and your ability to then listen to those facts and then follow the Judge's instructions as he gives you the law, you're saying you don't think you could do that even though you haven't heard any evidence in the case at this point?

THE PANEL MEMBER:  Right.  No, I don't.  It's -- I wrote at the bottom of the questionnaire that I didn't think I'd be a good juror.

MS. TRUELOVE:  I remember that.

THE PANEL MEMBER:  And --

THE COURT:  There's a reason why we give you those questionnaires.

THE PANEL MEMBER:  Right.  And it's just my nature to be a wallflower, not really be opinionated about things, and not show a lot of interest in -- or make decisions on major things.  So I just don't think I can -- I would be a good juror.

THE COURT:  If you're telling me you're afraid to make a decision, that's not a reason to not be on the jury.  If you're telling me you can't treat Samsung the same way you would treat G+ --

THE PANEL MEMBER:  Right.

THE COURT:  -- then that's a different matter.

THE PANEL MEMBER:  Right.

THE COURT:  And that's what I've heard you say.  But I want to make sure that's what you're telling me.

THE PANEL MEMBER:  Yes.

THE COURT:  That's correct?

THE PANEL MEMBER:  Yeah.

THE COURT:  Okay.  Ms. Smith, do you have any questions?

MS. SMITH:  I do not, Your Honor.

THE COURT:  Okay.  All right.  Mrs. Thomason, I'm going to let you join the rest of the panel outside the courtroom.  Just don't discuss about what we talked about in

here.

THE PANEL MEMBER:  Okay.  Thanks.

(The Panel Member left the courtroom.)

THE COURT:  I'm going to excuse Mrs. Thomason.

Mr. Lovelace, would you come up, please?

THE PANEL MEMBER:  Sure.

(The Panel Member approached the bench.)

THE COURT:  Good morning, sir.  This is the microphone.  We're going to talk quietly.  Just so you'll know, my wife is in the Marshall Symphony League, too, so we're similarly situated.

Mr. Lovelace, it was apparent to everybody here that you and Ms. Truelove know each other quite well and you're good friends, maybe socialize in the community together.  If you're on this jury and the jury has to decide who's going to win this case and who's going to lose this case and you feel like Samsung should win this case but you're worried about how you're going to face Ms. Truelove next time you see her if you vote for the other side, that's something I need to know about.

If your relationship with her and her husband, and the entirety of it, if it's something that cannot be put out of your mind completely and if it's going to enter into the decision you make in any way, then I need to know.

But if, on the other hand, if you can tell me in open

court under oath--although I haven't sworn you in, I know you're going to tell the truth--if you can tell me you can do that, I'll certainly take you at your word.  But that's the question I need you to answer to me.

THE PANEL MEMBER:  There is no way that I would do that and take this position on -- you know, no.

THE COURT:  There's no way you would do it knowing that it would affect your decision.  Is that right?

THE PANEL MEMBER:  That's correct.  It will not affect my decision at all.

THE COURT:  Okay.  That's an answer to my question.  Ms. Truelove, do you have any questions of Mr. Lovelace?

MS. TRUELOVE:  I do not.

THE COURT:  Ms. Smith, do you have any questions?

MS. SMITH:  I don't.

THE COURT:  Okay.  Thank you, sir.  I'll let you join the rest of the group outside.  Just don't discuss what we talked about in here.  Thank you.

THE PANEL MEMBER:  Thank you.

(The Panel Member left the courtroom.)

THE COURT:  Mr. Lovelace stays.  Mr. Stewart, would you come up?  Good morning, sir.

THE PANEL MEMBER:  Good morning.

THE COURT:  This is the microphone.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  We're just going to talk quietly up here.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  When we started, Mr. Stewart, I asked if there were people on the panel that, if they were selected, would have a very difficult time being able to be here during the trial --

THE PANEL MEMBER:  Yes, sir.

THE COURT:  -- and you raised your hand.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Can you tell me about that?

THE PANEL MEMBER:  Well, one of them is I've got two children that are in the hospital with pneumonia right now in Tyler.

THE COURT:  In the hospital?

THE PANEL MEMBER:  In the hospital.  Me and my wife are down to one vehicle.  My wife has been sitting in the parking lot since 7:30 this morning.  So we're down to one vehicle.

And my anxiety is so bad, I can't hardly stop shaking and I feel like I'm going to pass out every time I have to get up to speak.  But my main concern is my kids, too.

THE COURT:  How old are the children?

THE PANEL MEMBER:  They are 12 and 7.

THE COURT:  Okay.  Now, do you-all have multiple vehicles?  Is there a reason you're down to one?

THE PANEL MEMBER:  Yes, because mine's in the shop.  Mine's broke down and that's why we're down to hers.

THE COURT:  That doesn't have anything to do with the kids in the hospital?

THE PANEL MEMBER:  Not necessarily, no, sir.  No, sir.

THE COURT:  Okay.  And you said they were in Tyler?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Okay.  And you-all live in Gilmer?

THE PANEL MEMBER:  Yes, sir.  That is correct.

THE COURT:  Okay.  How long have they been in the hospital?

THE PANEL MEMBER:  Two days ago.

THE COURT:  Okay.  What does the doctor tell you about how long they're going to stay?

THE PANEL MEMBER:  He said it could be anywhere from a week to two weeks, depending on how the treatment goes.  They're giving them breathing treatments and stuff like that.

THE COURT:  Okay.  Now --

THE PANEL MEMBER:  Like I say, my anxiety is so overwhelming, I feel like I'm going to pass out.

THE COURT:  Take a deep breath.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  We're going to work through this.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Here's my question.  I'm so sorry about your kids being in the hospital.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  If you weren't here, would you be working, or would you be in the hospital, or would you be at home?  Where would you be if you weren't here?

THE PANEL MEMBER:  I would be at the hospital with my children.

THE COURT:  Have you been there 24/7 since they --

THE PANEL MEMBER:  I left there this morning to--stayed at the hospital last night--to come here.

THE COURT:  Okay.  And the doctor tells you it could be an additional week or two weeks?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Now, if you're not required to be anywhere else, are you telling me you're going to spend every night at the hospital for the next two weeks?

THE PANEL MEMBER:  That's right.  I will be there with them the entire time.

THE COURT:  Is your wife there with you?

THE PANEL MEMBER:  Well, when I'm there, she's working doing hair.  She works at the salon.  But like today she's not able to, so she's not taking any clients.

THE COURT:  And remind me what you do, Mr. Stewart.

THE PANEL MEMBER:  Right now I'm unemployed, but I used to work for Lone Star Steel for 17 years.

THE COURT:  That's right.  You told us that.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  All right.  Is there anything else I need to know about your situation that you haven't told me?

THE PANEL MEMBER:  No, sir.

THE COURT:  Okay.  Any questions for Mr. Stewart, Ms. Truelove?

MS. TRUELOVE:  Let me ask -- Mr. Stewart, understanding everything that is going on with you, would you even be able to concentrate well?

THE PANEL MEMBER:  No, not at all.  I -- I can't -- no, ma'am.

MS. TRUELOVE:  Understood.

    That's all.

THE COURT:  Ms. Smith, do you have any questions?

MS. SMITH:  No further questions.

THE COURT:  All right, Mr. Stewart.  I'm going to let you join the rest of the panel outside.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  And I'm going to ask you not to discuss anything we've talked about in here.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  This won't take too much longer.

THE PANEL MEMBER:  Yes, sir.  Thank you.

THE COURT:  Thank you.

(The Panel Member left the courtroom.)

THE COURT:  I'm going to excuse Mr. Stewart.

Ms. Tomlin, would you come up, please?

Good morning.  This is the microphone.  We'll just speak quietly here.

During the questioning, Ms. Tomlin, I think you said that you might favor the Plaintiff based on what you've heard ever so slightly, but you'd like to think you could be fair, something like that.  Is that correct?

THE PANEL MEMBER:  Yes.

THE COURT:  Okay.  Well, what I really need to know is I need to know if you're on this panel, can you start out with both the Plaintiff and the Defendant in an equal posture and will you listen to the evidence and let the evidence control who wins or who doesn't win, or are your tendencies that you bring with you, as all we humans have them, are those tendencies not going to allow you to put these two people or these two parties in the same equal posture to start out with, and are you going to favor perhaps in this case the Plaintiff, even if it is ever so slightly?

You know, there's a reason we call jurors impartial--they have to start out being able to look at both sides equally and

let the evidence and only the evidence decide who moves forward and who moves backwards from there.  And if you can do that, I need to know that.  And if you have any hesitancy that you can do that, I need to know about it now.

And I'll just be honest with you.  If there's a chance you can't do that, it's a whole lot better if I know about it now than when we put you on this jury and have to try it all over again to a different jury because that comes out later.

So if you could give me your best honest answer about what you think you can do and what you can't do, I'd appreciate it.

THE PANEL MEMBER:  I can be impartial.

THE COURT:  Okay.  You understand how important it is?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Okay.  Ms. Truelove, do you have any questions of Ms. Tomlin?

MS. TRUELOVE:  No, Your Honor.

THE COURT:  Ms. Smith?

MS. SMITH:  No, Your Honor.

THE COURT:  Thank you for your candor, Ms. Tomlin. I'm going to let you join the rest of the panel outside the courtroom.  Just don't discuss anything we talked about in here.

THE PANEL MEMBER:  Sure thing.

THE COURT:  Thank you.

THE PANEL MEMBER:  Thank you.

(The Panel Member left the courtroom.)

THE COURT:  Well, Ms. Tomlin stays on the panel.

Mr. Collins, would you come up?

Good morning, sir.

THE PANEL MEMBER:  Good morning.

THE COURT:  This is our microphone.  We're just going to talk quietly here, Mr. Collins.

During the questioning, you made it clear that you had lived a total of four years in South Korea --

THE PANEL MEMBER:  Yes, sir.

THE COURT:  -- and the question was asked how does that impact how you feel about Samsung, who is a Korean company.  And it was clear that it would be better if we talked about it up here than with everybody in the courtroom.

THE PANEL MEMBER:  Absolutely.

THE COURT:  So tell me.

THE PANEL MEMBER:  I didn't want to taint the jury pool.  The big thing about Korea -- I was sitting over there trying to rehearse in how I wanted to say this.  Korea is essentially split in half.  You got Hyundai and you got Samsung.  Hyundai makes buildings, rail, planes, industrial systems --

THE COURT:  I've been to Korea.

THE PANEL MEMBER:  Okay.  And Hyundai pretty has -- I mean, Samsung pretty much has the other side.

Now, I personally built the sports bar and grill in Dongducheon, South Korea.  It's called Marty's Sports Bar and Grill.  The amount of money that we had to pay to play was ridiculous.  And I'm not talking about $300 LLC or $1500 of a liquor license.  I'm talking about just stupid money going into the bar association, family association, some of the local governments, and so on and so forth.

So to me, Samsung kind of reminds me of, if you recall history, Standard Oil.  Okay?  They didn't have any type of regulation over there in Korea.  Here in the States, we managed to break up Standard Oil into many small companies. They haven't been able to do that over there.  Now it's pretty much overwhelming.  Coming over here the United States, seeing that big company in the manner of my eyes, I see that happening here in the United States.

THE COURT:  Okay.

THE PANEL MEMBER:  Again, that might be my skewed view, but --

THE COURT:  It's your view, whether it's skewed or not.  I understand and I appreciate you being candid with me.

During your experience in Korea with the pay-to-play, as you talked about it, did you attribute any of that directly to Samsung or Samsung employees?

THE PANEL MEMBER:  Not at all.

THE COURT:  Or was it just the general culture?

THE PANEL MEMBER:  General culture.  Men are very bullish, very arrogant, and they don't like Americans, for the most part.  Anything beyond, say, a mile of any military installation, they didn't really care for Americans.

THE COURT:  All right.  Well, it all boils down to this at the end of the day, Mr. Collins, and that is if you are selected to serve on this jury and Samsung is the Defendant and we have this other entity as the Plaintiff, are you going to be able to start off treating each of them the same and putting them in the same position in your mind and letting only the evidence that comes in under oath determine who wins and who doesn't win?  Or is this experience you've had, given Samsung's -- I won't say dominance, but their large position there, is that going to be something that you can't put out of your mind and it might influence your decisions over and above what the evidence might show?  That's what I need to know at the end of the day.

THE PANEL MEMBER:  Yes, sir.  And I understand that.  I think with my dealings in just the tactics, the business tactics, I would be kind of tainted.

THE COURT:  Well, their business dealings are going to be a part of this case.  I think that's clear from everything I know.

Ms. Truelove, do you have any questions of Mr. Collins?

MS. TRUELOVE:  I don't, Your Honor.

THE COURT:  Ms. Smith, do you have any questions of Mr. Collins?

MS. SMITH:  Mr. Collins, first I want to thank you.

THE COURT:  You need to get a little closer to the microphone, Ms. Smith.

MS. SMITH:  Mr. Collins, I want to thank you for not tainting the panel, honestly.

THE PANEL MEMBER:  So you understand now.

MS. SMITH:  I do understand.  And what I'm hearing you say is that if you were chosen as one of the eight on a case involving business negotiations and allegations of Samsung not being fair in business negotiations, it would be impossible for you not to bring that taint into the jury room.

THE PANEL MEMBER:  That would be correct.

MS. SMITH:  Okay.  Thank you, sir.

THE PANEL MEMBER:  Uh-huh.

THE COURT:  All right.  Mr. Collins, I'm going let you join the rest of the panel outside the courtroom during recess.  Just don't discuss anything we've talked about in here.

THE PANEL MEMBER:  Absolutely, sir.

THE COURT:  Thank you very much, sir.

(The Panel Member left the courtroom.)

THE COURT:  I'm going to excuse Mr. Collins for cause.

All right.  According to my notes, and please correct me if you have different notes, Mrs. Hughes has been excused, No. 8; and Mrs. Thomason has been excused, No. 12; and Mr. Stewart I'm excusing, No. 14; and Mr. Collins has been excused, No. 23.  Does anybody have anything else?

MS. TRUELOVE:  I think you also excused Juror No. 1. His wife had been in the car wreck.

THE COURT:  That is correct.

MS. SMITH:  And you reserved --

THE COURT:  I carried Mrs. Sherrill -- Mrs. King rather.  No, No. 2, Mrs. Sherrill.  She's the one with the 10-year-old daughter.

MS. TRUELOVE:  Our concern, obviously, is that she won't be able to focus during the trial if that's, in fact, what her situation is.

MS. SMITH:  I agree.  I think we'll have a disgruntled juror, and I don't know which way that goes, and we, I think, can agree she should be released.

THE COURT:  Well, I carried the decision on her just to make sure we had plenty of people, but if I were to excuse her, that would give us plenty of people to seat a jury and we would strike through No. 22.

Is that what you have, counsel?

MS. TRUELOVE:  That's what I get, Your Honor, yes.

MR. CORDELL:  It's No. 21 or 22.

THE COURT:  No.  7's not there.

MS. TRUELOVE:  I think I counted properly, though.

THE COURT:  Okay.  I'll excuse Mrs. Sherrill.  That means we start with 3 -- 3, 4, 5, 6, 9, 10, 11, 13, 15, 16, 17, 18, 19, 20, 21, 22, and then, if necessary, we go to No. 24.  But that's plenty of people to strike to get a jury of eight.

It's about 8 minutes after noon.  How long do you-all need to strike your list?

MS. TRUELOVE:  Fifteen minutes.

THE COURT:  Okay.  Have your strike list to Ms. Brunson by 25 minutes after 12:00.  All right?  Thank you.

(The following was had in open court.)

THE COURT:  All right.  While counsel exercise their peremptory challenges, the Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Counsel, approach the bench, please.

(The following was had outside the hearing of the jury panel.)

THE COURT:  During the recess, the Court was advised by Plaintiff's counsel that they desired to launch a challenge under the line of cases involving *Edmonson* and *Batson* with

regard to a peremptory challenge exercised by the Defendants.

Let me hear from you on that, please, Mr. Sheasby.

MR. SHEASBY:  May it please your Court, Your Honor.

We object to the peremptory challenges to Tiffany Falls.

THE COURT:  She was panel member No. 17?

MR. SHEASBY:  That's correct, Your Honor.

THE COURT:  What's the basis of your challenge?

MR. SHEASBY:  The basis of the challenge is that Mrs. Falls answered no questions that had any substance relating to leanings one way or the other, and the -- in the panel.  And there was references made to the fact that she has AirPods, but two other jurors that were not stricken also used Apple products.  And there was no discussion whatsoever of her WIC office.  It's not even in the record what a WIC office is.

And, in addition, I did not note that she raised her hand that she knows someone.  And if that was a basis, there was no exploration of it by calling her up.  That leads me to conclude that there was no non-race neutral explanation for the peremptory challenges.

THE COURT:  All right.  And I gather that everyone agrees Mrs. Falls, at least from outward appearances, is African-American?

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  What's your response for the Defendants, Ms. Smith?

MS. SMITH:  Your Honor, indeed Mrs. Falls is African-American.  And I might start by pointing out the Defense did not strike No. 10 or No. 6 who are also African-American.  We struck Mrs. Falls because she's employed by WIC.  That was information she provided to the Court on her official jury questionnaire.  It's historically a profession that leans towards Plaintiff.

Furthermore, Mrs. Falls -- the Court had a time limit on my examination.  Mrs. Falls raised her hand and said that she knew someone on the panel, but I ran out of time and didn't have an opportunity to explore that.

In addition to those things, Mrs. Falls uses Apple products, and Apple products and contracts will be at issue in this case.

MR. SHEASBY:  And, Your Honor, I would note that that cannot be a basis because she's actually not employed by the WIC office.  She is a middle school teacher who runs the athletic program.

MS. SMITH:  And that is correct.  That is her prior employment, but she listed that prior employment, and we're certainly able to take into consideration current jobs and prior jobs, which is why they put that question on the jury questionnaire, Your Honor.

MR. SHEASBY:  I do think it's relevant that counsel has changed their position after it being pointed out that it

was factually inaccurate as to her employment and --

THE COURT:  All right.  I'm looking for a copy of her questionnaire.

Well, it's commonly known and the Court takes judicial notice of the fact that the WIC office means Women, Infants, and Children, and it is a social services agency that deals with food stamps and similar type support for citizens who meet low income thresholds.

And the Court agrees with the Defendant that that association is almost always evaluated as being plaintiffs friendly, and I find that that in and of itself is a non-race basis to have exercised the peremptory challenges.

I don't necessarily think that time ran out when she raised her hand or the fact that she has Apple products is compelling here, but I can tell you, having practiced law 30 years in this district, if I had a venire member and I was representing a defendant in a case like this and they were associated with the WIC program, either presently or previously, they would have a -- I would have a serious question about whether I should exercise a peremptory challenge there regardless of their race.

So I find that the Plaintiff's motion is not well-taken and it's overruled, and the exercise of the peremptory challenge with regard to Mrs. Falls by the Defendants is sustained.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  All right.

(The following was had in the presence and hearing of the jury panel.)

THE COURT:  Thank you for your patience, ladies and gentlemen.  I'm going to ask that you listen carefully as those of you who have been selected to serve as jurors have your names called.  When your name is called, I'll ask that you come forward and take a position in the jury box.

Let me explain how we're going to position the eight members of the jury in the jury box.  Obviously there are two rows in the jury box and there are 14 seats in the jury box.  I'm going to ask that whoever is called first as Juror No. 1 comes forward, enters the front row of the jury box, walks all the way down to the end of the first row, and stands in front of that last chair.

Whoever is called second, if you'll come to the jury box, enter the front row, and walk down and stand in front of the third chair, leaving an empty chair between you and Juror No. 1.  Juror No. 3 will do the same thing on the front row, and Juror No. 4 will do that on the front row.

Beginning with Juror No. 5, I'm going to ask that you go to the second row or back row of the jury box, walk all the way down, and stand in front of the last chair, and then Juror No. 6 will stand in front of the third chair on the second row

so there's, again, an empty chair between Juror No. 5 and Juror No. 6.  And Jurors 7 and 8 will do the same thing, with the result being, ladies and gentlemen, that the first four jurors will be on the front row, the second four jurors will be on the back row, and each juror will have a vacant or an empty chair between them and the next juror.

And I'm going to ask that all eight jurors remain standing until all eight of you are in the box and I have you sworn in.

So with that, I'm going to ask our Courtroom Deputy Ms. Brunson to call the names of the eight members of the panel that have been selected as jurors in this case.

THE CLERK:  Angela King, Terry Zaro, Priscilla Williams, Phillip Walker, Jimmy Lamar, Larry Fuller, Richard Holland, Jana Cornett.

THE COURT:  Thank you.

Would you remain standing?  I'm going to ask our Courtroom Deputy to administer the oath to you at this time. Would the eight members of the jury please raise your right hand?

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please be seated.

Ladies and gentlemen on the panel who were not selected to serve on the jury, I'm about to excuse you at this time. But before I do, I want to say in the most serious and

heart-felt way that I can that the Court and the Court staff, as well as the parties and counsel in the room, appreciate the sacrifice that each of you made to be here this morning and to present yourself for jury duty. And even though you weren't selected to serve on this jury, you made a very real and important sacrifice to be here.

The Court is well-aware that every one of you had other places to be that were important in your lives and other things to do that were important in your lives this morning, and you put those aside and you stepped forward as summonsed and you presented yourself for jury duty in this case. You have each performed a very real and important public service, notwithstanding the fact that you were not selected as an actual member of the jury in this case.

Let me tell you, we could not have selected these eight citizens to be a jury without everyone on the panel, and you being here was a critical part of the process that allows the Court to discharge its constitutional obligations and allows these parties to exercise their constitutional rights. It's a very important thing, and I cannot state too strongly how much the Court and everyone involved in this trial appreciates the service that you've rendered by being here and presenting yourself as summonsed for jury duty in the case.

Now, as you leave in just a minute, you'll exit through the double doors and you'll go around to the right, and as you

do that, you'll pass by the Clerk's Office. You will see Ms. Clendening and her staff there. She's going to want to recover these very valuable numbers that you're all wearing on your clothing. Those are not keepsakes to take with you; we will use them with the next jury panel.

Also, if you need something in writing to verify for an employer where you've been today instead of at work, she has that material for you. If you have any questions about your service as prospective jurors in this case, Ms. Clendening and her staff will be happy to answer those questions for you.

After that, please travel safely. Again, thank you for your service in being here and your positive attitude as we worked through the process today.

With that, those members of the panel not selected as jurors are excused at this time.

(Whereupon, the jury panel left the courtroom.)

THE COURT: Please be seated.

Ladies and gentlemen of the jury, the Clerk's Office has lunch waiting for you in the jury room. I want you to understand that the Court's going to provide your lunch every day during the trial. You're not going to have to go out into the community and find it and locate it and bring it back or eat it there. That will save us time and it will make it much easier and simpler on you.

And I'm going to excuse you to the jury room in just a

couple of minutes so that you can enjoy your lunch and then we can proceed from there. But before you break for lunch, ladies and gentlemen, I have just a couple very, very important instructions that I need to give you.

First of all, do not discuss this case with anyone. And when I say do not discuss it, I mean do not communicate about this case with anyone in the broadest sense of the term. It is absolutely fundamental to the jury trial process that at the end of the trial when the eight members of the jury are asked to answer certain questions and in answering those questions determine and find the facts in this case, that those answers and those decisions about the facts in this case must come from and only come from the sworn testimony of the witnesses presented in open court and by deposition that you will see during this trial and the documents and other matters that the Court has admitted into evidence as exhibits pursuant to the rules of evidence.

The exhibits and the testimony, those are the only things that constitute evidence in this case, and you must make your decision limited to and based solely upon that universe--the testimony and the exhibits; nothing more.

It is absolutely essential that there be no outside influences, no outside communication, no outside information of any kind, and if there is, that taints the entire process and it very likely risks having to throw this case out with

this jury and start over with a new trial between the same parties and a brand new jury, and would waste hundreds, if not thousands, of hours and thousands of dollars in resources.

And so it is critically important that there be nothing that you will base your ultimate decision on about the facts in this case that relates to or comes from or is supported by anything other than the sworn testimony of the witnesses offered under oath and subject to cross examination and the exhibits the Court has admitted into evidence. That is it, ladies and gentlemen. Therefore, it is essential that you not communicate with anybody in any way about this case.

I can promise you, when you get home this evening after we recess for the day, no matter where you live, unless you live by yourself, whoever is in the house when you walk through the door, the first thing out of their mouth is going to be, Well, tell me what happened in federal court in Marshall today.

Do not answer that question. Do not try to answer that question. When you get that question, blame it on me. That's part of what I'm here for and what I get paid for. Tell whoever asks you that question that that very stern federal judge told you not to answer that question, and when the trial is over and when the judge has released you and you are no longer jurors, then you'll be able to talk about the case, but not until.

And when I say don't communicate about the case with anyone, ladies and gentlemen, that includes the eight of you, too. You are not to discuss the case or the evidence during the trial, you are not to discuss anything about the process with each other until that point where all the evidence has been heard, I have given you the Court's final instructions on the law that you are to apply, and you have heard closing arguments from the attorneys in the case.

And when those things have happened, I will say to you, "Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate upon your verdict," and when I say those words and at that one point in time, it's like a light switch being flipped, because you go from being prohibited from discussing the case with each other to being required to discuss the case with each other.

And when you've heard all the evidence and when I've given you my final instructions and when you've heard closing arguments from the attorneys and when I instruct you to retire and deliberate on your verdict, then you must discuss the evidence in the case as you answer the questions in the verdict form.

And your answers and your verdict in this case will be -- will have to be unanimous. It is required to be unanimous. So you must discuss all the evidence to reach a unanimous conclusion about how to answer the questions that are going to

be in the verdict form.  But until that time, it is absolutely essential that you not communicate with each other about the case.  That's after hours, that's during the trial, that's when you're at lunch, that's when you're on a recess--you must not discuss anything about the case, not only with everyone else outside the jury but also you must not discuss the case among the eight members of the jury until that time that I've indicated to you.  And again, if this instruction is violated, it puts into jeopardy the entire process.

And so, ladies and gentlemen, I can tell you from having done this more than a few times, you're going to hear this instruction from me over and over and over during the trial.  Pretty much every time you get up out of those seats you're going to hear me say, "Ladies and gentlemen, do not discuss the case with anyone, follow all my other instructions, do whatever I instruct you to do," but you're going to hear this over and over.  You're going to be tired of hearing it by the time the case is over, but it's that important.

And when I say don't communicate, that also means, ladies and gentlemen, not to do any outside research of any type.  You are not to get on the computer, you are not to pull an encyclopedia off the shelf, you are not to do any research about either these parties, any of the concepts involved, any of these lawyers.  You're not to do any research of any kind related to this case, period.  That's highly improper and you

must not do it.

Also, for those of you that are users of social media, don't post anything on Facebook, don't tweet on Twitter, don't do whatever it is you do on those other social platforms. That's communication. That is communicating about the case. So do not do anything with regard to social media related to this case during this trial and while you are jurors.

At some point after you have returned a verdict and I have accepted it and I have discharged you and released you from being jurors, at that point, ladies and gentlemen, you're free to talk about your experience with anybody you want to. You're also free not to talk about it with anybody unless you want to. But at that point it will be your decision. But from the time you took the oath this morning until the time I release you as jurors, you must not communicate about the case in any way with anyone, including the eight of yourselves, unless I've told you otherwise.

Also, ladies and gentlemen, I don't think it will happen in this case, but this is an important case. And there are no unimportant cases that get to a trial before a jury these days. Because it's an important case, it is possible, although it is not likely, but it is possible some outside person may try to contact you over the course of the trial and may try to exert influence over you with regard to what your verdict will be in this case.

If anyone from anywhere of any type has any kind of interaction with you that you feel is awkward or out of place or strange or anything that it shouldn't be about this trial, then you need to let Ms. Clendening know immediately, she will inform the Court, and the Court will deal with it. I don't think it's likely, but it is within the realm of possibility and you at least need to be aware that it is within the realm of possibility.

Also, ladies and gentlemen, over the course of this trial as you come in each day and leave each evening as we have recesses and breaks, there is going to be times when you are going to be in close physical proximity to one or more of these lawyers, one or more of the witnesses, one of the corporate representatives. This is -- as federal courthouses go, this is a small federal courthouse. And when you're in close proximity to any of these people, their support teams, their paralegals, anybody related with this trial, none of those people are going to speak to you.

If you walk right by them six inches apart coming in the front steps on the morning, they're not going to say, Good morning, how are you, it's good to see you. They're not going to be friendly and open and gregarious like we are used to in East Texas, and that's because I've instructed them not to do that.

And I've instructed them not to do that because it is

absolutely essential--back to the fundamental principle--that the only information you will draw upon to answer the questions in the verdict form must be limited to the sworn testimony of the witnesses presented, subject to cross examination, during this trial as well as the exhibits presented to you over the course of the trial that the Court has found to be admissible under the rules of evidence. That's it.  That is the sole universe of the evidence, and it must be the only thing that supports and results in the decisions you make at the end of the case, as reflected in your verdict.

So don't think folks are being rude or unfriendly if they walk right by you and don't speak; understand that they're simply doing what I have instructed them to do.

Now, with that, ladies and gentlemen, as I told you, lunch is waiting for you in the jury room.  I'm going to have other instructions for you after lunch is over, then we'll proceed with the lawyers for each of the competing sides giving you what are called their opening statements.  And then after you've heard opening statements from each side in the case, then we'll proceed with the first witness.

It's two minutes after 1:00, so you're having a late lunch.  I'm going to recess for approximately 45 minutes. About 1:45, I'll have you back in here and we'll proceed with my additional instructions I need to give you on the record.

Please follow all the instructions I've given you, including not to discuss the case.  And as I've told you, you've heard absolutely no evidence up until this point in this case, ladies and gentlemen.

With that, you're excused to the jury room for lunch.  We will see you in about 45 minutes.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel.  I'd like to see you in chambers about 1:25, and that will give us about 20 minutes to go over additional matters before the jury's back in and we proceed with my preliminary instructions.

With that, the Court stands in recess.

(Lunch recess.)

THE COURT:  Be seated, please.

Counsel, is there anything I need to hear from you on the record before I bring in the jury and proceed with my preliminary instructions?

MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

MR. CORDELL:  Your Honor, we did want to raise just one issue.  It's a preservation issue.  The Court has ruled that we're not to mention the word 'injunction' I think during the openings, and we would again ask permission on the record to be allowed to say that.

THE COURT:  Well, as I told you in chambers, the fact that there has been litigation in other nations that may

or may not relate to the issues in this case, that certainly is probative and I'm going to allow that in.

Delving into the particulars of that litigation and what the theories were and the relief that's been granted and what's on appeal and where it stands, all that goes much further than is necessary and quickly loses any probative value and runs a real risk of being prejudicial and confusing to the jury.

So we're going to follow the path I've laid out for you, which is not to get into the particulars of the litigation outside of this case. But the fact that it has been filed, where it was filed, when it was filed, between these parties, that certainly can come in. But I'm going to sustain my earlier instruction to you, and consequently I'll overrule your request to mention the word 'injunction' before the jury.

MR. CORDELL: Thank you, Your Honor. Nothing further.

THE COURT: All right. Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Welcome back, ladies and gentlemen. Please have a seat.

Members of the jury, I now have some preliminary instructions that I need to give you on the record before we start with the opening statements from the lawyers and then

get on to the evidence.

You've each been sworn as jurors in this case, and as the jury, you are the sole judges of the facts. And as such, you will decide and determine all the facts in this case. As the Judge, I will give you instructions on the law, decide any questions of law that arise over the course of the trial, and handle all matters related to evidence and procedure. I'm also responsible for managing the flow of the evidence in the course of the trial and maintaining a proper decorum in the courtroom.

At the end of the evidence, I'll give you detailed instructions about the law to apply in deciding this case, and at that time I'll give you a list of questions that you are then to answer. This list of questions is called the verdict form. And as I've told you, your answers to those questions will need to be unanimous, and those unanimous answers to those questions will constitute your verdict in this case.

Now, I want to briefly tell you what the case is about. This case involves a dispute regarding three separate United States patents. I know you've each seen the patent video prepared by the Federal Judicial Center, but I need to give you additional instructions in this regard now and on the record.

Patents, ladies and gentlemen, are either granted or denied by the United States Patent and Trademark Office.

You'll sometimes hear that simply called the PTO for short, you'll also sometimes hear it simply called the Patent Office for short.  But those references relate to the United States Patent and Trademark Office, which is an agency of the United States government.  It's actually part of the Department of Commerce in the Executive Branch of our government.

Now, a valid United States patent gives the patent holder the right for up to 20 years from the date the patent application is filed to prevent others from making, using, offering to sell, or selling the patented invention within the United States, or from importing it into the United States, without the patent holder's permission.  A patent is a form of property referred to as intellectual property.  And like other forms of property, a patent can be bought or sold.

A violation of a patent holder's rights is called infringement.  A patent holder may try to enforce a patent against persons it believes to be infringers by filing a lawsuit in a United States District Court, and that's what we have in this case.

The process of obtaining a patent from the PTO is called patent prosecution.  To obtain a patent, one must first file an application with the PTO.  As I've told you, the PTO is an agency of the United States government, and it employs trained examiners who review applications for patents.

Now, an application submitted to the Patent Office

includes within it something called a specification.  The specification contains a written description of the claimed invention telling what the invention is, telling how it works, and telling how to make it and how to use it.  The specification concludes or ends with one or more numbered sentences, and it is these numbered sentences that we refer to as the patent claims.

And when a patent is granted by the United States Patent and Trademark Office, the claims define the boundaries of its protection and it's the claims that give notice to the public of those boundaries.

Now, patent claims, ladies and gentlemen, may exist in two forms referred to as independent claims or as dependent claims.  An independent claim from within a patent does not refer to any other claim within the patent.  It's independent.  It's not necessary to look at any other claim to determine what the independent or an independent claim covers.

On the other hand, a dependent patent claim refers to at least one other claim within the patent.  A dependent claim includes each of the limitations or elements of that other claim or claims to which it refers, or as we sometimes say, you may hear, from which it depends, as well as those additional elements or limitations recited within the dependent claim itself.  As a result, to determine what a dependent patent claim covers, it's necessary to look at both

141

the dependent claim itself and the independent claim or claims to which it refers, or as we say, from which it depends.

Now, the claims of the patents in this suit use the word 'comprising'. Comprising means including or containing. And a claim that includes the word 'comprising' is not limited to the devices or methods having only the elements that are recited within the claim, but also covers devices or methods that add additional elements.

Let me give you an example. Take, for example, a claim that covers a table. If the claim recites a table comprising a tabletop, legs, and glue, that claim will cover any table that includes these three structures, even if the table also contains other or additional structures, such as leaves that would expand the size of the tabletop or, for example, possibly wheels that would go on the bottoms of the legs.

Now, that's a simple example using the word 'comprising' and what it means. In other words, it can have other features, additional features, beyond those what are covered by the patent.

Now, after the applicant files their application with the PTO, the PTO assigns an examiner, and the examiner reviews the application to determine whether or not the claims presented are patentable--that is, appropriate for patent protection, and whether or not the specification adequately describes the claimed invention.

The examiner reviews certain information about the state of the technology at the time the application was filed.  The PTO searches for and reviews this type of information that was publicly available or that was submitted by the applicant, and this type of additional information, ladies and gentlemen, is called prior art.  The examiner reviews this prior art to determine whether or not the invention that's claimed is truly an advance over the state of the art at the time.

Prior art is defined by law, and I'll give you specific instructions later as to what constitutes prior art, but in general, prior art includes information that demonstrates the state of the technology that existed before the claimed invention was made or before the application for a patent was filed.

Now, a patent contains within it a list of certain prior art that the examiner has considered.  That considered prior art is listed on the face of the patent, and the items in that list are called the cited references.

Now, after the prior art search and examination of the application, the examiner informs the applicant in writing of what the examiner has found and whether the examiner considers any claim to be patentable, in which case it would be allowed.  And this writing from the examiner to the applicant is called an office action.

Now, if the examiner rejects the claims, the applicant

has an opportunity to respond to the examiner and try to persuade the examiner to allow the claims.  The applicant also has a chance to change or amend the claims, or to submit altogether new claims.  And the papers generated, ladies and gentlemen, by this back and forth between the examiner and the applicant are called the prosecution history.

This process may go back and forth between the applicant and the examiner for some time until the examiner is ultimately satisfied that the application meets the requirements for a patent, in which case the application will issue as a United States patent; or, in the alternative, if the examiner ultimately concludes that the patent application should be rejected, then no patent is issued.

Now, sometimes patents are issued after appeals within the Patent Office or to a court.

Now, the fact that the PTO grants a patent does not necessarily mean that any invention claimed in the patent, in fact, deserves the protection of a patent.  While an issued United States patent is presumed to be valid under the law, a person who is accused of infringement has the right to argue here in federal court that a claimed invention in the patent is invalid.

Now, it's your job as the jury to consider the evidence presented by the parties and to determine independently and for yourselves whether or not the Defendant has proven that a

patent is invalid.

Now, to help you follow the evidence, I'm going to give you a brief summary of the positions of the competing parties. As you know, the party that brings a lawsuit, that initiates a lawsuit, is called the plaintiff, and the Plaintiff in this case is G+ Communications, LLC. You're going to hear them referred to simply as the Plaintiff. You're also going to hear them probably called GComm, you may hear them called G+, but all of those references are to the same entity, which is the patent in this case.

And you also know, ladies and gentlemen, that the individual or the entity against which a lawsuit is filed is called the defendant. In this case we have two Defendants. They are related companies. They are Samsung Electronics Company, Ltd., and Samsung Electronics America, Inc. And you're going to hear these two parties, these two Defendants, referred to throughout the case collectively simply as the Defendants. You'll hear them called the Defendants. That means both of those entities. You'll also hear them called collectively again Samsung. So if you hear Samsung or Defendants, it means these two entities that I've identified for you.

Now, in this case the Defendants, Samsung, is making an affirmative claim that the Plaintiff, G+, they're making an affirmative claim against the Plaintiff G+, just as if Samsung

was a plaintiff and G+ was a defendant.  Now, when made by a defendant like Samsung, this kind of an affirmative claim from a defendant against the plaintiff is called a counterclaim. In this regard, Samsung can be referred to properly as a counterclaim plaintiff and G+ can be referred to properly as a counterclaim defendant.  Now, I'll tell you more about Samsung's counterclaim in a little bit.

As I told you during jury selection, this is a case that involves allegations of patent infringement brought by the Plaintiff G+ against Samsung.  And as I've already mentioned, there are three United States patents that are issued -- that are at issue in this case and owned by G+.

Now, the patents that G+ is asserting are United States Patent No. 8,761,776; United States Patent 10,736,130; and United States Patent 10,564,443.  And as you may know, patents are commonly referred to by their last three digits.  So in this case, Patent No. 8,761,776 is going to be referred to as the '776 Patent.  You might hear it called the '776 Patent.

Patent No. 10,736,130 is going to be called the '130 Patent.  You might hear it called the '130 Patent.  And Patent No. 10,564,443 you'll hear referred to as the '443 or the '443 Patents.

Now these three patents, the '776, the '443, and the '130 Patent, they will be referred to throughout the trial collectively as the asserted patents.  You may also hear them

referred to collectively as the patents-in-suit.  Those terms mean the same thing.  And these asserted patents generally relate, as you've been told, to 5G technology.

Now, the Plaintiff G+ contends that the Samsung Defendants are infringing certain claims of the patents-in-suit by importing, making, leasing, or selling products that include its patented technology.  G+ also alleges that Samsung has induced and continues to induce infringement by others.  And, finally, G+ contends that it's entitled to money damages as a result of that infringement.

Now, the Defendants Samsung deny that they are infringing any of the patents-in-suit.  The Defendants also claim that some of the patents-in-suit are invalid as being anticipated, as being obvious, or as from lacking an adequate written description.

Separately, the Defendants contend that some of the claims, both individually and as an ordered combination, are invalid because they involve no more than well-understood, routine, and conventional activities, as understood by a person of ordinary skill in the art.

Now, the 5G technology in the asserted patents is governed by certain technical standards.  A standard, ladies and gentlemen, is a uniform design for a product.  Companies make devices in accordance with the same standard so that the devices made by different manufacturers can work together in

the same ecosystem.

These standards are set by what are known as standard-setting organizations, sometimes called SESOs.  A standard-setting organization in this case is the Third Generation Partnership Project, which you'll probably hear referred to for short as 3GPP, the Third Generation Partnership Project, 3GPP.

Now, that is an organization that develops standards such as 5G, and it's comprised of a number of organizational partners, including the European Telecommunication Standards Institute.  And you will hear this entity, the European Telecommunication Standards Institute, referred to simply for short as ETSI, and it's going to be pronounced ETSI.  So if you hear ETSI, that means the European Telecommunication Standards Institute.  And this agency, this entity, ETSI, oversees the development of standards related to information and communications technologies.

Now, if a patent implements technology that is covered by a standard and it would not be technically possible to implement the standard without infringing the patent, then the patent is called a standard essential patent.  And you'll sometimes hear standard essential patent referred to by shorthand as S-E-P.  Some people might call it SEP.  I generally hear it referred to as S-E-P, standard essential patent.

This means if a company makes a device that implements a standard that is covered by a standard essential patent, a SEP, then that company may need to obtain a license to use that technology.

Now, G+ is bound by a commitment to ETSI that it will license standard essential patents to other parties on a fair, reasonable, and non-discriminatory basis.  This is known as FRAND, F-R-A-N-D, fair, reasonable, and non-discriminatory.

Now, the Defendants in this case, Samsung, and this is in their counterclaim against G+ that I told you about, Samsung argues that the Plaintiff G+ has breached its obligations to offer standard essential patents to be licensed on fair, reasonable, and non-discriminatory terms.

G+ denies that it has breached its obligation to offer standard essential patents for licensure on FRAND, F-R-A-N-D, fair, reasonable, and non-discriminatory terms and conditions. And I'll give you further discussions on FRAND at the conclusion of the trial.

Also and in turn, G+, the Plaintiff, contends that Samsung has breached obligations arising from these FRAND commitments, and I'll explain this to you in greater detail later.

Now, I know, ladies and gentlemen, that there have been many new words and new concepts that have been thrown at you since you got here at the courthouse this morning.  I'm going

to define a lot of these words and these concepts for you as we go through these instructions.  The attorneys are going to discuss them in their opening statements and that will be helpful to you.  The witnesses are going to help you as they go through their testimony better understand these words and terms and concepts.  So please do not feel overwhelmed at this point.  I promise you it will all come together as we go through the trial.

Now, one of your jobs in this case is to decide whether or not the asserted claims of the patents-in-suit have been infringed, and you'll be asked to decide whether or not certain of the asserted claims are invalid.  That's a different question, but you'll be asked that as well.

Now, if you decide that any claim from the patents-in-suit has been infringed by the Defendants and it is not invalid--that is, the presumption of validity survives--then and only then you'll need to decide what amount of money damages, if any, should be awarded to the Plaintiff as compensation for that infringement.

Now, my job in this case is to tell you what the law is, handle rulings on evidence and procedure, and to oversee the trial.  In determining the law, ladies and gentlemen, it is specifically my job to determine the meaning of any language from the claims from within the asserted patents that needs to be interpreted.  I've already determined the meanings of

certain claim language from the patents-in-suit, and I'm going give you these determinations in a little bit in writing, and you must accept these meanings and interpretations that the Court has reached with regard to this particular claim language, and you must apply those determinations or interpretations of that claim language when you answer the questions about infringement and validity or invalidity.

And as I say, I'm going to give you a document in a few minutes that reflects those meanings or constructions, interpretations that the Court's already arrived at regarding that particular language from some of the claims.

Now, for any claim language that I did not define or construe and haven't provided you with a definition, then you must apply the plain and ordinary meaning of that language. But if I have provided you with a definition, you are to apply my definition to those terms and that language throughout the case.

However, ladies and gentlemen, the Court's interpretation of any language from the claims is not to be taken as an indication that the Court has any personal opinion or any opinion at all regarding the issues of infringement, invalidity, damages, or any other issue in the case.  Those issues are yours to decide and yours alone to decide.

As I say, I'll provide you with more detailed instructions on the meaning of the claims before you retire to

deliberate and reach your verdict.

Now, in deciding the issues that are before you, you'll be asked to consider specific legal rules, and I'll give you an overview of those rules now, and then at the conclusion of the case I'll give you much more detailed instructions.

The first issue that you're asked to decide is whether the Defendants, whether Samsung, has infringed any of the asserted claims from the patents-in-suit.  Infringement, ladies and gentlemen, is assessed and determined on a claim-by-claim basis.

Also, G+, the Plaintiff, must show by a preponderance of the evidence that a claim has been infringed and, as a result, there may be infringement of one claim but no infringement as to another claim.  Also there are a few different ways that a patent can be infringed, and I'll explain the requirements for each of these types of infringement to you in detail at the conclusion of the case.

But, in general, a defendant may infringe an asserted patent by making, using, selling, or offering for sale in the United States, or importing into the United States, a product meeting all of the requirements of a claim from an asserted patent or one that practices all the required steps of a method claim.  And I'll provide you with more detailed instructions on the requirements for infringement at the conclusion of the case.

The second issue that you will be asked to decide is whether certain claims from the asserted patents are invalid. Invalidity is a defense to infringement.  Therefore, even though the U.S. Patent and Trademark Office, the PTO, has allowed the asserted claims, and even though a patent is presumed to be valid, you, the jury, must decide whether some of those claims are or are not invalid after hearing the evidence presented during this trial.

You may find a patent claim to be invalid for a number of reasons, including because the subject matter is not eligible, because it claims subject matter that is not new, because it claims subject matter that is obvious, or because it is not supported by the written description in the patent specification.

All patents must claim patent eligible subject matter. As a general rule, a patent is directed towards eligible subject matter if it claims a process, machine, manufacture, or composition of matter, or any new or useful improvement thereof.  In some cases, the jury must determine whether the patent only covers activities that were well-understood routine and conventional at the time the patent was filed. And I'll provide you with more detailed instructions on this issue at the conclusion of the trial.

For a patent to be invalid because it is not new, the party challenging the validity must show by clear and

convincing evidence that all of the elements of the claim are sufficiently described in a single previously printed publication or patent.  If a claim is not new, it is said to be anticipated by the prior art, and as a result, it's simply called being anticipated.

For a patent claim to be invalid, on the other hand, because it is obvious, the Defendants must show, again by clear and convincing evidence, that the claim would have been obvious to a person of ordinary skill in the field of the technology of the patent at the relevant time.  You'll need to consider a number of questions in deciding whether the invention claimed in the asserted patents is obvious.  And I'll provide you with more detailed instructions on these questions at the conclusion of the trial.

Now, another way that a claim can be found to be invalid is that there may be a lack of an adequate written description.  A patent may be invalid if its specification does not describe the claimed invention in sufficient detail so that one skilled in the art can reasonably conclude that the inventor actually had possession of the invention that they are claiming.

You need to consider a number of questions in deciding whether any of the patents-in-suit contain a sufficient written description, and I'll provide you with more detailed instructions on this at the conclusion of the trial.

Now, if you decide that any of the claims from the patents-in-suit have been infringed and they are not invalid, then you'll need to decide what amount of money damages should be awarded to the Plaintiff G+ as compensation for the infringement that you have found.

A damage award, ladies and gentlemen, must be adequate to compensate the patent holder for the infringement, and in no event may a damage award be less than what the patent holder would have received if it had been paid a reasonable royalty for the use of its patent.  However, damages, if you award them, are meant to compensate the patent holder and they are not meant to punish the Defendants, and you may not include in any damages award an additional amount as a fine or a penalty above what is necessary to fully compensate the patent holder for the infringement.

Also, damages cannot be speculative, and the Plaintiff G+ must prove the amount of its damages for the alleged infringement by a preponderance of the evidence.  However, the fact that I'm instructing you on damages now does not mean that G+ is or is not entitled to recover damages.  And I'll give you more detailed instructions on the calculation of damages for the Defendants' alleged infringement of the patents-in-suit at the conclusion of the trial, including by giving you specific instructions with regard to the calculation of a reasonable royalty.

Another question that you will need to decide is whether G+, the Plaintiff, has breached any contractual commitments it made to the standard setting organization known as ETSI, which I've already described to you.  Samsung, the Defendants, allege that they are the beneficiary of these commitments and that G+ breached these obligations.

G+ denies that it has breached any contractual obligations or commitments to ETSI, and Samsung has the burden to prove any such breach by a preponderance of the evidence. Again, this relates to what is called Samsung's counterclaim against G+ in this case.

Similarly, you are going to need to decide whether Samsung has breached any contractual obligations arising out of G+'s commitments to ETSI.  G+, the Plaintiff, alleges that its commitments to ETSI give rise to reciprocal contractual obligations on the part of Samsung, and G+ alleges that Samsung has breached those contractual obligations.  I'll give you more detailed instructions on Samsung and G+'s breach of contract claims at the conclusion of the trial.

Now, ladies and gentlemen, you're going to be hearing from a number of witnesses during the trial of this case, and I want you to keep an open mind while you're listening to the evidence and not decide any of the facts until you've heard all of the evidence from all of the witnesses.

And this is important.  While the witnesses are

testifying, remember that you, the ladies and gentlemen of the jury, will have to decide and determine the degree of credibility and believability to allocate to each witness and the testimony and evidence that they give.

So while the various witnesses are testifying in this case, you should be asking yourselves things like this:  Does the witness impress you as being truthful?  Does he or she have a reason not to tell the truth?  Does he or she have any personal interest in the outcome of the case?  Does the witness seem to have a good memory?  Did he or she have an opportunity and ability to observe accurately the things that they've testified about?  Does the witness appear to understand the questions clearly and answer them directly?  And, of course, does the witness' testimony differ from the testimony of any other witness?  And if it does differ, how does it differ?  These are some of the things you should be thinking about while you're listening to each witness over the course of the trial.

Also, ladies and gentlemen, I want to talk to you briefly about expert witnesses.  When knowledge of a technical subject may be helpful to you, the jury, a person who has special training and experience in that particular field--we call them an expert witness--is permitted to testify to you about his or her opinions on those technical matters.  However, you're not required to accept an expert's or any other witness's opinions

at all.  It's up to you to decide whether you believe what an expert witness has told you and whether that in any matter is correct or incorrect or whether you want to believe it or not believe it.

Now, I anticipate that there will be expert witnesses testifying in support of both sides of this case.  But when they do, it will be up to you to listen to their qualifications.  And when they give you an opinion and explain the basis for that opinion, you will have to evaluate what they say and whether you believe it and whether you want to give it any weight or credibility.  And if you do, what degree and weight of credibility do you want to give it.

Remember, ladies and gentlemen, judging and evaluating the credibility and the believability of each and every witness is a very important part of your job as jurors.

Now, during the course of the trial, it's possible that there will be testimony from one or more witnesses that are going to be presented to you through what we call a deposition.  In trials like this, it's difficult to get every witness here in person in the courtroom at the same time.  So the lawyers for both sides prior to the trial take the depositions of all the witnesses.

In a deposition, the witness is present, they are sworn and placed under oath, a court reporter is present just as if this was in open court, and then the parties through their

counsel ask the witness questions and the questions are answered by the witness under oath, and it is all recorded and taken down.  Sometimes it's taken down only in writing, sometimes it is taken down in writing and recorded by video camera, but in any event, it is always recorded.

Now, it's important, ladies and gentlemen of the jury, that during the course of the trial when these deposition witnesses are presented to you, it's important for you to know that -- let me explain it this way.  An ordinary deposition may last up to seven hours, and so there's seven hours of questions and answers that are asked of this person.

When it comes time for the trial, that person can't be here in person so their testimony is presented by way of a deposition.  But let's say, for example, only 30 minutes of those seven hours is determined by the lawyers to be relevant and important to show the jury.  Well, you will not have to listen to seven hours of testimony to get 30 minutes of testimony.  That seven hours will be cut and spliced and reconnected.  If it's videotape, it will be spliced and put back together, and you will see and have played to you just that 30 minutes.  But it may come from different parts of that overall seven-hour deposition.

So while you're watching a deposition witness who's being presented by video, you may see little glitches or skips or you may hear differences in tone or voice or anything like

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

that.  Just know that's an unavoidable part of pulling that 30 minutes out of that seven hours and putting it together for you.  And hearing a few glitches and seeing a few irregularities is a whole lot better than having to listen to seven hours just to get 30 minutes' worth of testimony.

So when that happens, don't pay attention and don't get focused on and don't get distracted by those glitches or irregularities or different voices.  Focus on the questions asked and the answers given under oath.  But that's what I wanted to explain to you so you would understand it if you see it that way.

Now, I want you to understand that deposition testimony under the law is entitled to the same consideration and insofar as is possible should be judged by you, the jury, as to its weight and credibility and otherwise considered just as if the witness had been personally present in the courtroom and given their testimony from the witness stand.

Also, ladies and gentlemen, over the course of this trial, it's possible that you're going to be shown certain documents as exhibits, and in some of those exhibits there may be what we call redactions.  Some portion of the language in that document may be blacked out so that you can't read it.  That -- if that is the case, you need to understand that those redactions have been ordered by the Court, and you're not to focus on what's not there; you are to focus on what is there.

Pay attention to what you can read and what's legible and understandable from the document shown to you. Don't try to guess what's blacked out and redacted and you can't see. Focus on what you can see and ignore the redactions. But understand if they are there, they're only there because the Court found that they were proper and necessary and ordered them to be put in place.

Now, I want to compliment the parties in this case because long before today, many, many hours were spent working with the Court and the parties through their counsel to streamline what's going to be presented to you over the course of this trial. And one of the things that's been streamlined is the issue of exhibits.

There have been many exhibits that have been presented to the Court by the parties. Some of them have been objected to by the Plaintiff against an exhibit proposed by the Defendant or by the Defendants, they've objected to an exhibit that would be proposed by the Plaintiff. All those objections and all those disputes regarding the exhibits have already been heard by the Court. The Court's already ruled on them.

So if something wasn't objected to, then it's certainly available to be shown to you as an exhibit during the trial. If it was objected to and the Court, hearing the arguments and examining the document, determined that it was properly admissible under the rules of evidence, then I have admitted

it as an exhibit and it, too, will be available to be shown to you over the course of the trial.

If it was presented and objected to and I found the objections to be valid, then I have sustained those objections and that document is not an exhibit in the case and you won't see it and it won't be presented to you. And the process of many hours going through many, many documents has already taken place between the lawyers and the Court, and you don't have to sit here during this trial and hear all that presented and let me make a ruling right then and there. I've already done it.

So when a document is shown to you as an exhibit, understand the Court's already reviewed it and judged that it is admissible or there was no objection to it in the first place. And this process of what we call pre-admitting the exhibits and taking up all those disputes long before today has saved you many, many hours of having to sit there in the jury box and watch us go through that now as opposed to having done it earlier.

And both sides and their lawyers are to be complimented for working with the Court over that lengthy period of time to get that done and it has saved you a lot of time. You may not understand it or appreciate it, but I can promise you it has saved you a lot of time over the course of this trial, and the parties are entitled to be thanked and complimented for that.

But even though that's the case and even though that's been done, it is still possible that objections may arise over the course of the trial. If I should sustain an objection to a question addressed to a witness, then you must disregard the question entirely and you may draw no inference from its wording or speculate about what the witness would have said if the Court had allowed them to answer the question.

On the other hand, if I overrule an objection addressed to a question that's been asked of a witness, then you should consider the question and the answer just as if no objection had been made.

You should also know, and I alluded to this earlier during jury selection, ladies and gentlemen, the law of the United States permits a United States district judge to comment to the jury on evidence in the case but such comments from the Judge to the jury on the evidence are only expression of the judge's opinion, and the jury is free to disregard those comments in their entirety because, as I've told you, you, the jury, are the sole judges of the facts of this case and you, the jury, are the sole judges of the credibility and believability of the witnesses and how much weight, if any, to give to all the testimony and evidence.

Therefore, even though the law may permit me to comment to you on the evidence, as I've told you already, I am going to do my very best not to comment on the evidence, not to let

you know what I think about the evidence, but because, again, determining the facts in this case from the evidence is your job as the jury.  It is not my job in this trial as the judge.

Now, Mr. McRoberts, who's sitting in front of me, is our court reporter, and his job is to take down everything that's said in the courtroom over the course of the trial.  But the written transcription of what was said, the questions that were asked, the answers that were given, that's not going to be prepared and available for you to consider when you retire at the end of the evidence to deliberate on your verdict. That means, ladies and gentlemen, you're going to have to rely on your memory of the evidence and the testimony that's been presented over the course of this trial.

And you are entitled to take notes during the course of the trial about the evidence, if you choose to do so.  If you do, those notes are for your own personal use.  But even if you take notes, you're still required to rely upon your own memory of the evidence.  And if you take notes, those notes are meant just to reflect and refresh your recollection about the testimony that was given and your memory of the testimony and evidence that was given.  You should not abandon your own recollection of the evidence because some other juror's notes might indicate something differently.

Again, if you take notes, your notes are solely to refresh your recollection of the evidence and that's the only

reason you should be keeping them, if you decide to take them. That's up to you.

Now, at this time I'm going ask our Court Security Officer to distribute juror notebooks to each member of the jury.

(Pause in proceedings.)

THE COURT:  Thank you, Mr. Barnett.

In these notebooks, ladies and gentlemen, if you'll look at them with me briefly, you're going to see that in the front you each have a copy of each of the three asserted patents, the patents-in-suit that we've talked about and that are at issue in this case.

Then behind these patents, you are going to find an insert that provides to you the constructions and the definitions that the Court has already reached about any of the claim language that needed to be interpreted.  You'll see the language from the claims that needed to be interpreted, and across from it corresponding to it, you'll see the constructions or the definitions that the Court has already reached.  And as to that language, you must apply those definitions to the issues that you're asked to decide in this case.

Now, behind that, I'll call it, claim construction insert where the Court's construed some of the claim language, behind that you'll find a section of tabbed witness pages.  For any

witness that might testify in this case, either live or by deposition, there should be a page in there for each witness. And at the top of each page there should be a head-and-shoulders photograph of the witness and their name, and then below that there should be ruled lines if you want to take notes there.

The Court's found that it's been very helpful to juries in the past to be able to look back and see a picture of the person that testified when you're trying to recall all the evidence during your deliberations.  So that's why those witness pages are there.  And there should be tabs on each page because there are quite a few witnesses that may be called and that will make it easier for you to find the particular page that relates to that witness.

And then behind these witness pages, you should find a new legal pad that's been hole-punched so that it will fit in these notebooks, and there should be a pen in these notebooks for you to use so that if you decide to take notes you can take notes anywhere in that notebook you want to--on the legal pad, on the witness pages, anywhere you want to take notes. It's up to you, if you decided to, to take those notes.

But, again, if you take notes over the course of the trial about the testimony and the evidence, you still have to rely on your recollection of the evidence, and those notes are there simply to refresh your recollection about the testimony

and the evidence that you've heard.

Now, in a moment we're going to hear opening statements from the attorneys in the case. These opening statements are designed to give you, the jury, a roadmap about what each side thinks and expects the evidence will show you in this case.

And you should remember, ladies and gentlemen, as I've already mentioned, what the lawyers tell you in this case is not evidence. The evidence is the sworn testimony that you're going to hear from each witness, subject to cross examination, and the exhibits which the Court has determined are properly admissible under the rules of evidence. The sworn testimony of the witnesses and the admitted exhibits, those are all the evidence in this case. And what the lawyers tell you is not evidence.

Now, the lawyers have a duty to try and point out to you what they believe the evidence is, but remember, what they tell you isn't evidence. The sworn testimony and the exhibits are the evidence.

Now, after each side through its counsel presents these opening statements to you, then we will move on to the actual evidence in the case, and at that time the Plaintiff will call its witnesses. The Plaintiff will call its witnesses, they'll testify, the Defense lawyers will cross-examine their witnesses. Then the next Plaintiff's witness will be called, they will testify, and they'll be cross-examined by the

Defense lawyers, and we'll go through each of the Plaintiff's witnesses.

And when all the witnesses that the Plaintiff calls have been -- have testified and they've been cross-examined, then the Plaintiff will rest what's called the Plaintiff's chase in chief. It will rest its case in chief.

When the Plaintiff rests its case in chief, then we'll switch to the other side, and we'll proceed with the Defendants' case in chief, which means the Defendants will then call their witnesses and the Defendants' witnesses will testify and they'll be cross-examined by the Plaintiff's witnesses [sic]. And we'll go through each of the Defendants' witnesses until we've heard all of the Defendants' witnesses, at which point the Defendants will rest the Defendants' case in chief.

Now, at that point, the Plaintiffs have an option to call, if they choose to, but they're not required to, what are called rebuttal witnesses to rebut anything the Defendants have put on in the Defendants' case in chief. If the Plaintiff elects to call rebuttal witnesses, then they'll testify and they'll be subject to cross examination by the Defense lawyers.

And when all these rebuttal witnesses, however many there are, have been presented, then the Plaintiff will rest its rebuttal case.

At the end of the Plaintiff's case in chief and the Defendants' case in chief, if there is no rebuttal witnesses, then that will complete all the evidence.  If there are rebuttal witnesses, then at the end of the Plaintiff's rebuttal case, that will complete all the evidence.

And once all the evidence has been presented, then at that point the Court will give you its final instructions on the law.  This is often called the Court's charge to the jury.  And after I've given you my final instructions on the law that you're to follow in reaching your verdict, then the parties through their attorneys will present to you their closing arguments.  The Plaintiff will present its closing arguments and then the Defendants will present their closing arguments.

After you've heard the closing arguments from both sides, that's when I will say, "Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict."  And I will send a document back with you at that point, a printed document, that will have various questions in it that you are to answer.  That document is called the verdict form.  And your unanimous answers to each of those questions will constitute the jury's verdict in this case.

And after you've reached a unanimous verdict, you will inform the Court security officer that you've reached a verdict, I will bring you back in the courtroom, I will receive your verdict and review it, and if I find it to be

proper, everything's been done as the way I've instructed you to do it, then the Court will accept your verdict.

And once I've accepted the verdict, the trial is over and I will release you and dismiss you as jurors. So that's the overview of the steps we'll take and the structure of the trial.

Let me do this because it's so important. I want to remind you, throughout this trial you are not to discuss or communicate with anyone about this case, including the eight of you, and only when you are in the jury room after you've heard all the evidence and you've heard my final charge to the jury and you've heard closing arguments of the lawyers and I've instructed you to deliberate on your verdict, only then you are at that point required to discuss all the evidence you heard in coming to a unanimous decision as to how to answer those questions in the verdict form. But until that point, you must not discuss this case or anything about it among the eight of yourselves or with anybody else.

And I'll touch on this very briefly just one more time. Over the course of this coming week, if you see these folks, the lawyers, the witnesses, the support team, and they are not friendly and they don't speak to you, just understand they're doing what I've told them to do. Don't take that as being rude or unfriendly. Don't try to start a conversation with them because they're not going to talk with you.

Again, the only information that you should have and what you must be limited to in answering the questions in the verdict form is the sworn testimony of the witnesses and the exhibits admitted into evidence by the Court.

So with that, ladies and gentlemen, at this point we're going to proceed to hear opening statements from the parties. We will begin with the Plaintiff's opening statement, and then we'll hear the Defendants' opening statement.

Mr. Sheasby, you may present the Plaintiff's opening statement to the jury. Would you like a warning on your time?

MR. SHEASBY: I would, Your Honor. May I have a warning with 15 minutes left and with 5 minutes left?

THE COURT: I will give you those warnings.

You may proceed when you are ready.

MR. SHEASBY: May it please this Honorable Court.

Ladies and gentlemen of the jury, my name is Jason Sheasby, and I speak on behalf of the Plaintiff in this matter, G+.

I want to emphasize how grateful G+ is for your service. I'm acutely aware that this process will be a financial sacrifice. It will be a personal sacrifice for each and every one of you.

Judge Gilstrap spoke about the fact that the right to a trial by jury is a constitutional right. And when we think about the right to the trial by jury, we think it's the right

of the Plaintiff G+ or the Defendants in this matter, the Samsung entities, to have a jury trial.  That is not what our founders had in mind.

When our founders enshrined the right to the trial by jury, the right is the right of the citizens of this country, the citizens alone of this country, to decide the most important issues.  The right to the trial by jury is your right as citizens, the power is in your hands.

Can I have the slides?  We have a technical issue.

Just as the right to the trial by jury is a constitutional right, so is the right to obtain a patent law -- a patent.  In fact, as we see --

Your Honor, may we have a moment?  We are having a technical issue.

THE COURT:  What do you suggest?

MR. SHEASBY:  If I just -- could I briefly step away so that we can get the screen working, Your Honor?

THE COURT:  You may.

(Pause in proceedings.)

MR. SHEASBY:  Your Honor, I believe there is a defect in the cord with the screen keep coming on and off.

THE COURT:  Do you have a replacement cord you can substitute?

MR. SHEASBY:  Your Honor, let me go back and let me go check.

THE COURT: All right.

MR. CORDELL: If it would be helpful, Your Honor, we are happy to have our AV guy put their slides up.

MR. SHEASBY: Your Honor, it's a problem with the court system. It's not a problem with our -- our interface. It was working before.

THE COURT: All right. Well, we have an IT person here on staff.

Ladies and gentlemen of the jury, I hate to do this, but I'm going to ask you to retire to the jury room. As soon as we can get this fixed, I'll bring you back out and we'll start the Plaintiff's opening statement again.

Follow all my instructions, don't discuss the case among yourselves, and we'll have you back as quickly as we can.

The jury's excused to the jury room.

(Whereupon, the jury left the courtroom.)

THE COURT: All right. Be seated, please.

Let's go off the record while we try to get this technical issue fixed.

(Discussion held off the record.)

THE COURT: All right. Let's bring in the jury. We'll go back on the record.

(Whereupon, the jury entered the courtroom.)

THE COURT: Thank you, ladies and gentlemen, for your patience and cooperation. Please have a seat. And by

the way, you did exactly the right thing with those notebooks. You took them with you when you left your chairs. They're not to be left where somebody who shouldn't have access to them can have access to them.

So either keep them with you, and at the end of the day I'm going to ask you to take them to the jury room and leave them on the table there so they'll be there the next morning for you. There may be times when I will simply say, we're going to take a short recess for just a few minutes, you can leave your notebooks closed and in your chairs in the jury box. And if I tell you that, that's okay. But if I don't give you instructions, have it on your person or in your possession. Okay?

We're going start over again with Plaintiff's opening statement.

So, Mr. Sheasby, I will give you the warnings you've asked for. You may begin your opening statement.

MR. SHEASBY: Thank you, Your Honor.

May it please the Honorable Court again.

The gravity with which this case should be treated is significant. Just as the right to the trial by jury is a constitutional right, in our original founding document, the original document, provision was made for the protection of inventions and the granting of patent rights.

A patent right is a sacred property right. It is no

different than the right in your homestead, it is no different than the right in your house.  If that property right is being violated, the infringer, who in this case is the Samsung entities, is strictly liable for that behavior.

These are the three patents that are at issue in this case.  We refer to them by their last three numbers--'776, '130, and '443.  The patents were created by a global telecommunications company called ZTE, and ZTE sought permission to file those patents in the United States.

The United States patent law permits global companies who do research outside the United States to seek patents in the United States.  And the reason for it is both incredibly important and unique.  So much great innovation is created in this country, and what happens to it?  It leaves.  Competitors in other countries take the technology, they use it, they benefit.

Under the United States patent system, the best inventions that are created outside of the United States are brought into the United States and patents are granted on them.  Those patents make our economy stronger and they make us safer.  They make us safer because if something incredible and important is created overseas, our companies, our economy needs it to compete.

Now, what the United States Patent Office has said and what the Congress says is that if a patent right is being

infringed, a reasonable royalty must be paid.  Samsung is violating the law by not complying with that obligation, and its violation of the law breaks down the system that keeps us strong, that keeps us competitive, and that keeps us safe.  Their violation of the law weakens all of us.

ZTE created the patents.  To give you an idea about how innovative ZTE is, it is 13 times smaller than Samsung and it has contributed a greater number of designs to the cellular industry than Samsung.  And ZTE worked with G+ Communications.

What is G+ Communications?  Mr. Jeremy Pitcock and his wife, who are both trained specialists in patents, about 20 years ago formed a business together, and their business was to protect and license important innovations created by companies throughout the world.  There was a reference to Mr. Pitcock being a one-man show.  Mr. Pitcock and his wife have dedicated their professional lives to the protection of intellectual property.

And as part of the agreement in which G+ protects these important inventions, ZTE, who made extensive investments in research, obtains 20 percent of the return because of the importance of these inventions.

ZTE sought formal permission from the United States government to file for and obtain patent rights in the United States, and this is an example of that formal permission.  The United States Patent Office recognized the incredible

importance of these patents.

The technology at issue in this case relates to cellular communications, and cellular communications are a central part of our economy.  Our first responders, our logistics industry, our entertainment industry, our manufacturing industry, all of them rely on cellular communications to operate and function.

And the amount of data that is necessary and that travels across the cellular network in this country and throughout the world is massive.  One exabyte is one billion billion bites of data.  And by 2027, there will be 3,428 exabytes of data traveling across the cellular networks every year.  How large is that?  A single exabyte is a trillion pages of printed text.

Because of this mass amount of data that travels across our networks, because of the fact that there are so many different cellular phone manufacturers and infrastructure makers who design these networks, the industry came together as a group and created the 3GPP initiative.  And all the major research companies and manufacturers like Samsung attend 3GPP.  And research innovators such as ZTE submit proposals to 3GPP.  They disclose the important technology they've created because disclosure makes us strong, keeps us safe.

3GPP jointly selects the best designs for use in the 5G standards.  And each of the three patents in this case were selected by 3GPP for inclusion in the standards.

And then it publishes a technical specification.  This is a technical specification.  It is a complex, complex recipe book that, if you follow, the phones you make will be able to communicate with every other 5G phone and every other 5G network in the United States and the world.  And Samsung follows this cookbook.

In 2018 and 2019, Samsung was faced with a very significant business challenge.  This is an internal Samsung document.  One of the things Judge Gilstrap said is that the statements I make, what I say, is not evidence, but this is evidence.  And you see in the bottom corner, you see that little stamp, JTX 8?  In deliberations if you write down that number, you can request that exhibit.

And so this is a secret Samsung document.  Big companies, important companies, they have press companies, they have marketing firms, they use glossy advertisements, but in federal courts we're allowed to delve into what they're saying behind the curtains.  And what Samsung was saying when they're deciding whether to launch 5G or not was they were saying, We need to offer a disproportionate amount of additional value over LO.

Who is LO?  LO is a secret code name that Samsung uses for Apple.  They call them under their secret code name lovely opponent.  And Apple did not have 5G technology.  And Samsung, the record will show, knew that it needed technology to

compete with Apple.

And its customers were telling it exactly what it needed. This is another piece of evidence, JTX 7.  They wanted as the second most important factor a hyperfast connection.  That was the second most important thing to their customers.

And 5G was the exact recipe that Samsung customers were demanding and that Samsung needed to compete with its lovely opponent--Apple.  Ten times faster than the previous networks that had existed.  And Samsung made the decision to launch 5G without having all the legal rights to it, and they did that because they needed to compete, and the riches that they obtained, the record will show, from making that decision are significant.  Introducing 5G caused their market share to grow by nine percent.  What I say is not evidence.  What is before you, ladies and gentlemen of the jury, is.

Mr. Pitcock and his wife created G+ in 2020.  After a year of careful analysis of the patents, they formally put Samsung on notice that they held 5G essential patents.  And they told Samsung that each of the patents-in-suit in this case were essential patents, and they told them that they needed to take a license to these patents to comply with their obligations.

A month later Samsung wrote back, and they said, We'll talk to you.  Here's an NDA to sign.

An NDA stands for non-disclosure agreements.  Now, there

are appropriate uses of non-disclosure agreements.  For example, if Samsung was going to give us a piece of their technical code, that would be reasonable and we'd want to keep that confidential.

But in this case the NDA that Samsung proposed had some disturbing features associated with it.  This is that NDA that they proposed in DTX 20.  You have to read the fine print.  We know that from our experience.  And Samsung inserted into their agreement that acknowledgement that we agreed they were acting in good faith.

Wait a minute.  Before they even negotiated with us, they were telling us we had to agree that they were acting in good faith?  They were barring us from telling juror members like yourself that they were acting in bad faith.  If a company was intending to act in good faith, you don't need to slip in language that blocks the argument they are acting in bad faith.  Now, a company that was planning to act in bad faith, the record will show, could use that language they slipped in.

They slipped in additional language.  Although we had provided Samsung with formal notice of the patents, we provided them with claim charts which are detailed technical analysis as to why the patents are infringed, Samsung included in their non-disclosure agreement language that would have blocked us from telling the ladies and gentlemen of the jury, you, that they were on notice of infringement, that they

received claim charts showing their infringement.

The record will show that if you were innocent, you wouldn't need that language.  Now, of course, if you're violating the law, if you're an infringer, this language blocking us from disclosing their behavior to a jury would be of significant value.

In September of 2021, we put Samsung on notice.  And 10/2021, Samsung seeks an NDA with this improper and abusive language in it.  But we didn't give up.  We didn't give up.

THE COURT:  Fifteen minutes have been used.

MR. SHEASBY:  Despite their behavior, we sent them a settlement offer.  We asked them to compromise.  We sent them additional evidence of our use -- their use of our technology.

And then between September and March of 2022, no response from them disputing our patents were essential or valid, no request for additional information or a meeting, and no counteroffer, they remained utterly silent other than to propose this improper and abusive NDA.  And we initiated proceedings in the United States to enforce our property rights.  And, in fact, Samsung's illegal behavior extends not just to the United States.  The record will show it extends to other countries, including Brazil and the European Union, with our parallel proceedings investigating their violation of the law.

But we didn't give up.  We made effort after effort after

effort to convince them to deal appropriately.  We said we will treat any communications as confidential under the Federal Rules of Evidence.  We offered to use a confidentiality agreement governed by this Court so they could share with us any information they wanted.  But they kept insisting, no, you must sign an NDA, you must sign an NDA, you must sign an NDA.  And we signed that NDA.

And after we signed that NDA, they invited us to Korea, we flew 18 hours, we made a presentation to them, and they responded to us by saying, we hope you enjoy your cultural experience, we'll get back to you.

And then a couple of months later, they did something interesting once that NDA was signed.  By the way, the final NDA doesn't include any of the improper language.  They sent us a document, and in that document they said, You've got it totally wrong on the number of units we sell.  You say we sell 1.7 billion units; we sell only 417 million units.

That's what they used the NDA for--to disclose this information.

Now, why would they do that?  Why would they insist on this behavior?  The reason they insisted on this behavior because the information they provided under the NDA was demonstrably false.  417 million is what they say they sold? Their own expert, their own expert, says they sold more than $2 billion [sic].

The record will show that the party who is -- that an individual who is guilty of a serious crime spends the most amount of time complaining about fairness.  And in this case Samsung's behavior of accusing us of acting improperly, of attacking us for enforcing our property rights, why?  Why are they acting that way?  The answer is desperation.

They presented a corporate representative who testified under oath as to whether they had any other alternatives to our technology.  His answer was, I don't know, I'm not sure.  He was the corporate representative on behalf of Samsung, which you will hear is one of the largest companies in the telecommunications space in the world, and yet their corporate representative admitted he's got no explanation as to any alternative other than the G+ technology.

And, in fact, the reason for this desperation is because of the massive amount Samsung makes on 5G.  For every 5G phone, they charge $200.  Two identical phones, everything is the same except for 5G, and they charge $200 or more.

There are three issues you'll be asked to decide.  The first issue is infringement.  We will present two methods of establishing infringement.  The first is analysis of source code and field experiments.  We will look at the actual code that is used to define Samsung's products, and we'll show you how that code reflects the limitations of the claims.

Remember, you heard from the video that a claim is split

into elements, and it's our property right, and we will show you how each element is in the claim.  And to give you one example, this is from the '776 Patent, you see how it says multiple frequencies with a second priority as the same priority cells.  And we will show you in Samsung's actual code the claims of every single one of our patents.  Ask yourself if Samsung shows you any source code in their opening.

In addition to that, we will present another form of analysis.  Not only does Samsung's code independently prove infringement, but the patents actually match the portions of the 5G recipe book that Samsung implements.  So this is one of the 5G recipe books, and you will see if you compare the claim language selecting the new cell, selecting the new cell, same priority cells, equal priority cells, offset based reselection, offset disreselection, we will show you how our patents match the recipe book and that Samsung uses this portion of the recipe book.

And by the way, Samsung's witnesses will testify under oath that they use this portion of the recipe book.  They will show you lots of other sections that they say they don't use, but they admit they use this section.

The second issue you'll be asked to decide is validity.  Our patents have a presumption of validity that exists because trained specialists in the Patent Office analyze our patents.  And what Samsung will do is they will cobble together lots of

different references, patents from other companies, proposals that were never adopted, and they have hired experts who admitted under oath that the Samsung lawyers passed them this, quote, prior art that invalidates our patents, and they will admit under oath that there's no evidence in the real world that these references were ever implemented.

If this is routine, if this is trivial, what's Samsung's behavior with the improper and abusive NDA?  Samsung's behavior with never disputing that our patents were valid and infringed before filing the lawsuit and pointing to art that no one has ever combined to create our invention.

The third issue you'll be asked to decide is damages.  We believe Samsung has behaved in grave bad faith.  The question of the damages that are due for patent infringement has nothing to do with that.  Patent infringement is strict liability.  Samsung could have behaved in the best possible way and still if it uses our technology, if it's on our property, it must pay a reasonable royalty.

And the patent statute sets out that standard:  "In no event less than a reasonable royalty for the use made of the invention by the infringer."  That is what we are entitled to.

And these patents, because they are essential, have a special protection associated with them.  It's not just any type of reasonable royalty that we're entitled to.  We're entitled to FRAND reasonable royalty--fair, reasonable, and

non-discriminatory. And what the rules say is that we are to be adequately and fairly rewarded. Not just compensated; rewarded. And why is that? Disclosure makes us safe, disclosure makes us strong, protecting the patent system protects our economy, protects our security.

The standard for how you evaluate the importance of an essential patent has been admitted by Samsung's own experts. Friedhelm Rodermund, Samsung describes him as a 3GPP ETSI negotiation expert. They never showed him and asked him to analyze the improper NDA that they proposed to us.

THE COURT: Five minutes remaining.

MR. SHEASBY: But he did admit under oath that the FRAND rate is based on the technical and commercial benefit of our patents.

Another technical expert that they hired also admitted that the standard for damages is based on the technical impact of our patent.

Samsung uses our technology because if they didn't, their design would be 11 percent slower. They would not be able to compete with what they've euphemistically describe as their lovely opponent. And we hired a designer who actually sits in 3GPP meetings and analyzes the tech--his name is Doctor Kowalski--to analyze the importance of these patents. And the analysis will show that solely from the act of infringements, solely from the use of these patents, Samsung generates over

$2.8 billion in revenue, and we will ask for a reasonable royalty of $237 million.

This lawsuit should not exist.  This lawsuit must exist to protect our Constitution, to protect the patent system, and to ensure that Samsung complies with the law.  We made effort after effort after effort to get Samsung to behave lawfully, and today the power to enforce the laws of this country is in your hands.

I hope you understand after hearing this presentation, after seeing evidence, how incredibly important this case is to G+, and we thank you for your service.

Thank you.

MR. CORDELL:  Your Honor, may we approach?

THE COURT:  Approach the bench, counsel.

MR. CORDELL:  So three issues, Your Honor.  First of all, Mr. Sheasby continues to refer to Your Honor by your name.

THE COURT:  That's a violation of the MILs.  There's a clear MIL that says you're not to identify any judicial officer presiding by name.

MR. SHEASBY:  I apologize, Your Honor.

THE COURT:  Don't do it again.  If you do it again, I'll impose some kind of a curative sanction.

MR. CORDELL:  No. 2, Mr. Sheasby went into great detail about ZTE, its make-up, its research, its size.  First

of all, none of that's in the evidentiary record, but may I have some latitude to characterize them and their revenues or anything of the sort?  The way jury selection went, they made it sound like, you know, it's one -- you know, a small operation, David versus Goliath.  It's clearly Goliath versus Goliath.  I think I need some latitude to develop that.

MR. SHEASBY:  Your Honor, to be clear, he may point to anything that's going to come in the record.  My concern is any discussion about ZTE and the Communist party or its foreignness, I don't think there's any MIL to describe the size of ZTE at all.

MR. CORDELL:  I'm not going to go into the Communist party, but the fact they are a large telecommunication company.

THE COURT:  I think Mr. Sheasby opened the door to that.  He said they were 13th of the size of Samsung.

MR. CORDELL:  Seventh is what he said.

THE COURT:  Again, there was some analogy or some comparison made.  I think the door's open.  Do not mention the Communist party --

MR. CORDELL:  I will not.

THE COURT:  -- in any way with anybody.

MR. CORDELL:  And then, finally, we heard a great deal about Samsung's intent, scienter.  Those are the elements of willful infringement that G+ has withdrawn from this case.

And our understanding is that when they withdrew those, we would have a straight-up patent fight where the patent claims would be presented, technology would be presented, and motivations and competing with the lovely opponent and all of that becomes irrelevant. And yet we were just treated to at least 15 minutes of it in opening.

MR. SHEASBY: Well, Your Honor, I can address that. One, there is a good faith issue in this case despite our request that it not be in this case. I made those discussions completely separate from the patent infringement, and I repeatedly told the jury good faith or bad faith is utterly irrelevant to any issue that relates to patent infringement.

MR. CORDELL: It was inflammatory.

THE COURT: What are you asking for, Mr. Cordell?

MR. CORDELL: Well, I'm asking that I be allowed to describe the events leading to the ZTE/Samsung license and that these were part of the corpus of the patents that were to be licensed. They then cut a deal with G+, and they were approved without Samsung's knowledge.

MR. SHEASBY: Your Honor, that is directly related to willfulness. It is not even their willfulness case, and I was very clear. These slides were all previewed in advance, and they never said there was going to be any waiver associated with these slides. It is highly prejudicial. I made clear repeatedly that this had nothing to do with

willfulness or the liabilities under the damages.

I believe this was planned all along to come and make these statements.  I read what was on the slides, and they never said it was in the slides would result in any type of --

MR. CORDELL:  It is not in the slides.

THE COURT:  There was clearly an element of impassioned right and wrong inserted into that opening by the Plaintiff.  I'm going to give you enough latitude to respond in kind, but I'm going to watch it very carefully and you're not going to overreach in that regard.  If you do, I will stop you and we'll have a discussion of it here at the bench.

MR. CORDELL:  So I'm just trying to make sure I understand the guardrails.  So do I have permission to tell the jury that Samsung was negotiating with ZTE at the time that they pushed these patents over to GComm and that fact was not made known to Samsung?

MR. SHEASBY:  Your Honor, that is highly prejudicial.  He can get into that with Mr. Pitcock, but that was excluded that was only based on willfulness.  Willfulness is out of the case.  We've withdrawn willfulness, and we expressly -- I expressly said none of that -- what I said had any related to infringement.  This has been planned all along for them to make this argument.

MR. CORDELL:  It absolutely was not.  We filed a

paper earlier this week warning them that if they opened the door, we were going to go into those facts and I thought they would respect that.

MR. SHEASBY:  And we did not open the door.  We showed these slides in advance and said nothing that was on the slides.

THE COURT:  Well, I think you did open the door to some extent, Mr. Sheasby.  But opening the door calls for and permits a proportionate response.  It does not -- cracking the door does not take it off the hinges.  And I think you know what I mean, Mr. Cordell.  I'm not going to allow you to go further than responding in equal manner to what Mr. Sheasby said.

MR. CORDELL:  Well, the response is there is no intent here.  We had an expectation that we were getting those patent rights from ZTE.

MR. SHEASBY:  Your Honor, that is so prejudicial, that is what we tried -- that is not in the record.  That is not -- that hasn't been vetted and that -- and I made very clear intent is not an element of infringement.  I never said anything about any behavior before we sent them notice.

THE COURT:  Well, this opening statement also goes to the FRAND contractual obligation issues, and who was acting in good faith, who was acting in bad faith, and I think that what Mr. Cordell is asking for at least goes to the good

faith/bad faith issue.

MR. SHEASBY:  But, Your Honor, you expressly said it doesn't go to that because you ruled the good faith and bad faith issue has nothing to do with what happened between ZTE in the past.  Your Honor, this is so prejudicial.  I'm asking you not to let this out but at least consider it overnight or, you know, at the break for the examination.

But for them to say they got these patents -- they thought they were getting these patents from ZTE, that is so prejudicial and has nothing to do with anything.

MR. CORDELL:  Mr. Sheasby used the word 'crime'.  He accused us of being criminals.  He said the criminal is the one that complains about fairness.

MR. SHEASBY:  I said someone who is guilty is someone who complains about fairness.

MR. CORDELL:  Come on.  You used the word 'crime'.

MR. SHEASBY:  Your Honor, we had this entire briefing on this subject.

THE COURT:  I know we had the briefing.  I know what I've argued.  But I'm sitting here in real time, and you're opening the door to this, Mr. Sheasby.  And I can't keep the Defendant from responding proportionally because you opened the door.  You don't get to tie one hand behind their back and to keep yours both opened.  And you have inserted emotion and passion and state of mind and criminality and everything else

in your opening statement, and it's not fair for me to tell the Defendant they can't respond.

And I'm going to let Mr. Cordell respond, but he is only to respond targetedly and move on.

You're not going to harp and keep going over and over. You're going to hit it and move on.

MR. CORDELL:  May I say that we -- Mr. Sheasby made the suggestion that somehow --

THE COURT:  You can respond to what he said.

MR. CORDELL:  -- we violated these rights, we thought we were negotiating with ZTE in good faith and acquired rights from ZTE.  Can I say that?

THE COURT:  Yes.

MR. CORDELL:  And unbeknownst to us, the patents were moved to GComm.

THE COURT:  I'm assuming there is going to be a witness that you are going to call to support that.

MR. CORDELL:  Mr. Jeon.

THE COURT:  And despite all the argument that we've heard so far, as I said repeatedly, opening statements exist to give the jury a preview of what the evidence will be and you need to present it in the context of you will present evidence that will show.

MR. CORDELL:  I will.

THE COURT:  Let's go forward.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Defendants may now present their opening statement to the jury.

Would you like a warning on your time, Mr. Cordell?

MR. CORDELL:  I would, Your Honor.  May I have a warning at 15 minutes and then again at five.

THE COURT:  I'll give you those warnings.  Proceed with your opening statement.

MR. CORDELL:  Thank you.

Good afternoon, ladies and gentlemen.  I am Ruffin Cordell, and I'm proud to stand before you on behalf of Samsung along with my colleagues.  And let me echo everyone who has thanked you for your time and your attention and your service.  We know this is an imposition, and we really, really do appreciate it.

And I have a lot to cover today, and so I apologize about that.  I would normally introduce myself and say I've been married for 34 years and I've got three kids and it's -- but I just don't have time because I have a lot to cover.  So I apologize in advance.

But, you know, these patent lawsuits are really complicated.  Right?  We talk about technology.  Mr. Sheasby just showed you some of it.  He showed you some source code, little snippets, very technical stuff.  But at the end of the

day, they always boil down to kind of the same basic things. You know, what's fair, what's reasonable.

And in this case what you're going to find as you listen to the evidence as I try to take you through a little bit of a road map of what we're going to hear over the next week, what's really important is keeping promises. Because we all know that it's important to keep promises. We were taught that as kids. Right? That when you make a promise, you got to come through.

And what you're going to learn in this case is that promises were made, first by this big international conglomerate ZTE, and then they passed those to GComm. And the promises were to be fair and reasonable. And what you're going to find out in this case is while the rest of the world is being fair and reasonable, Mr. Pitcock and GComm had decided that they just don't want to.

So you're asking yourself, why are you here? Why are we taking up a week of your lives? And the answer is very clear: If GComm and Mr. Pitcock would just be fair and reasonable, we wouldn't be here. But that's not the case.

So let's get into it. Now, most of you know who my client is. You know who Samsung is. You have their products. They make great TVs and appliances, but we're here to talk about the phones, and we're going to do a lot of that.

One thing you may not know is that while, you know, we

heard a couple of times they say Samsung is from Korea, and that's true, but Samsung has an enormous U.S. presence.  We had a lot of debate this morning about, you know, companies from outside the U.S., but Samsung makes a huge investment in the U.S.

They have 20,000 U.S. employees, 6,000 in the state of Texas alone.  They've got almost $20 billion of R&D investment here, and they've got over 130,000 United States patents.  Mr. Sheasby went on and on about how great it is to file patents, and we agree with that.  And so that's why we do it.

But make no mistake, to the extent they're trying to suggest that this is a U.S. versus some other place kind of issue, that's just not true, because Samsung is here and they're here for the duration.

Now let's talk about GComm.  I'm a little bit confused because I heard this morning that GComm had been around for 20 years, and then I heard it again from Mr. Sheasby a few moments ago he said that Mr. Pitcock and his wife formed this 20 years ago or something.  But then he said it was formed just a couple of years ago.

And what the evidence will show in this case is that it was just formed a couple of years ago because they took patents from ZTE.  And Mr. Pitcock, we have a quote up on the slide here, he admitted this.  He admitted this right up front that GComm or G+, whatever we're calling them, and I

apologize, we use different names for them, it was formed as a special purpose vehicle. I had to look that up, didn't know what that was. It just means a company.

They formed this company expressly for one reason, and that was to take some patents from ZTE and go off and try to enforce them, try to license them. They have no products. They have no engineers. They have no R&D. They have an office some place in Texas, but we'll talk about that a little bit later.

So the rest of the story here for those of you that are Paul Harvey fans is that ZTE is this, you know, entities that circling this entire case. We know that ZTE took back 20 percent. They have 20 percent of this. They didn't file the cases, and we know they're a multinational corporation. But there's nothing wrong for them coming in here and enforcing patents. If they felt like this technology was valuable, if they thought this technology was important, ask yourselves, where are they? Why aren't they here?

We know that ZTE sold, it turns out, sold the patents to GComm. And I'm going to show you that in a few minutes. But they're not here to tell you how great the technology is. All of those things that Mr. Sheasby just described about ZTE, I learned some things for the first time. You know, he said they're seventh the size of Samsung. Well, that's a really big company.

Now let's talk about standards.  The standards in this case are very, very important.  So what are they?  Well, in order for me to make a phone call on my Samsung phone, and I want to call Mr. Sheasby on his Apple phone, well, what has to happen?

My Samsung phone has to talk to a tower some place, a base station called infrastructure, it might be a Nokia piece of equipment.  Then it goes over my network which is T-Mobile, and it goes to Mr. Sheasby's network which is AT&T, and then it goes through an Ericsson base station going to his phone, and then it goes to his Apple phone.  Every one of these devices has to talk to each other, they have to speak the same language, they have to work perfectly together or you don't make a phone call, you don't send a text.

So how do we do that?  Mr. Sheasby showed you a picture of one of the meetings.  And it's true that there's this -- this organization called ETSI, and their goal is to get all of these companies to come together because there are tens of thousands of technologies that all have to work together, there are tens of thousands of patents, you got to put all this together to make the network work, and it's got to be reasonable so that we can all afford it.  So at the end of the day what ETSI does is really, really important in standards.

So the way I like to think of standardization is imagine you were here, I don't know, a hundred years ago, and you had

a farm.  And you had -- the only way to get crops to market is you had to get to a river.  And so you, you know, you did your best if you weren't too close to the river to get them there, but maybe you'd get together with your neighbors and say, hey, let's build a road, let's build a road.

So we're all going to get together and the county, you know, will pay us for a little strip of land, but none of us can ask for too much because if we do, you can't build the road, or if one landowner refuses, well, we're just going to go around you.

And so that's the same kind of thing with a standard. All these companies, there are tens of thousands of companies -- maybe not tens of thousands but a lot of companies and tens of thousands of technologies that have to be integrated, and everybody has to agree to share them, to license them to each other, or you can't make it happen.

Because it's not just getting, you know, across a county here.  This is like building a road across the state of Texas where you've got to go the entirety of the state of Texas, those thousands and thousands of technologies, those thousands of patents, all have to be on the same page.

So how does this work?  Well, the way it works is that the patented technology is presented to the standards bodies. The standards bodies then make sure that you agree, when you come to them, it's voluntary, just like you volunteer to put

the road across your land, you agree that you're going to share your patents, license your patents, on fair and reasonable terms.

They then create technology that might use your technology or it might not. You just don't know. But the point is you've already told the world that this is going to be a standards essential patent, it's going to be a FRAND patent, if you want to call it that.

And the ETSI rules are very clear that if you decide you're going to share your technology, if you decide you're going to share your patent, you have to agree to a fair and reasonable royalty. And Mr. Sheasby suggested that's a lot of money, but it's not, ladies and gentlemen. That fair and reasonable royalty, remember, we all have to work together. It ends up being a very small royalty. It's an important royalty, but that's sort of the -- that's the trade-off.

You put your technology into the standard, and the standard says, okay, we're going to pay you, but we're going to pay you a smaller amount if it's used, if it's used. And that's very important.

So a few things you have to realize about ETSI. What the evidence is going to show is that the patent owners declare them to the standards body, nobody at ETSI says, that's a good one or that's a bad one. They don't do that. And, in fact, some of the studies that you're going to hear about in this

case suggest that only eight percent, like less than one in 10 of these patents, are actually used.

But the patent owners don't do that on the front end. They don't know what's ultimately going to happen.  So what they do is they make declarations.  And if you make the declaration, if you say I want to be a standards essential patent, then you're bound by that FRAND promise.  You make the decision if you want in, you're bound by FRAND.  And that's the way it works even if they're not used.

So what happened in this case?  So ZTE, back in 2010, filed one of these declarations with the standards body.  They said, we want to be included, we want to be included.  And you know that because attached to their declaration is a list of patents.

And what I've got blown up on the screen here is one of the patents, and you -- you know, you can't really read it in small form so I've got it blown up.  And it does things like tells you that it's LTE, which is the 4G standard that we've all heard about, and they give a patent number.  And that patent number is a Chinese patent Application, CN2009071266, and it's got a title.

And then we look at the U.S. patent.  And Mr. Sheasby said something about having to get permission to file in the U.S.  There is no permission required.  You have a right to file.  If you are a foreign company or you have a foreign

patent, as long as you obey the rules, you can file in the U.S.

And that's what happened in this case. They filed that application in the U.S. And you can see the same patent number appears in both. And, ladies and gentlemen, that is the '776 Patent. You see the number there. I don't know how well you can see it. So there's no dispute in this case, none, that the patents in this case were declared ETSI. They are FRAND patents. No ifs, no ands, no buts about it.

And here's the IPR licensing declaration that goes along with what they filed with ETSI, and you can see it was filed by ZTE. Ms. Min Fung signed it on behalf of ZTE, and that was filed. It's irrevocable. And once it's in, it's done.

And it binds the patent. So whoever owns the patent, if it's owned by G+ or owned by ZTE, the FRAND obligation remains. It's a promise and a promise is a promise.

So what happened in this case? Well, what happened is you had ZTE transfer ownership of 70 patents to GComm, and in return GComm paid them $600,000, which to me is a lot of money but to these companies, not as much. But, importantly, ladies and gentlemen, if you do the math, they got 70 patents for $600,000. That's less than $10,000 per patent.

Now, again, that's a lot of money to me, but it might tell you a little something about how much ZTE valued those patents. They were the ones who invented this stuff. They

were the ones who had the engineers. They are the ones who developed it. And so in 2020 when they transferred this over to GComm, they valued it at a little less than $10,000. You might ask yourself why. And the answer, it's the FRAND obligation. It's the FRAND promise. These are FRAND patents. And that means you've got to be fair and reasonable about the amount of money you demand.

And so, yeah, that seemed like a reasonable amount of money because what I'm going to show you in a few moments is that the whole world, all those other landowners in the technological world, they are taking those kinds of numbers for their patents.

So in September of 2021, GComm seemed to be willing to live up to their FRAND obligation. They sent us a letter to Ms. Kim. And in the letter, the first line says, here's a list of our patents that have been declared essential to the 3GPP LTE standard. LTE is the 4G standard. So they admitted right off the bat that these are going to be FRAND patents.

They then tell us that they are ready to give Samsung a license on fair, reasonable, and non-discriminatory terms. So at least back in September, they seemed willing to live up to their promise. But it turns out that when you look at the evidence, what the evidence is going to show is that they didn't live up to that promise.

And I'm going to try to focus on three points. One, that

their demands were above fair and reasonable levels.  They were a landowner saying we want all the money, we aren't sharing with anybody.

Number two, that they refused to negotiate an NDA.  You heard Mr. Sheasby talk about this over and over again.  What I'm going to show you in a moment, ladies and gentlemen, is that they just didn't respond at all.  It wasn't that they thought that something was wrong with the NDA.  They just sat there quiet for almost a full year, in fact it was a full year.  And then they went and sued us in several places before negotiations.  So let me take you through each of those.

So how do you know what's fair and reasonable?  Well, when you go to buy a gallon of milk, you go to Kroger, you pick it up, it says $4.05.  The question is, is that reasonable or not?  Is that fair?  Well, how do you know? Well, you go to other shops.  You go to Walmart, it's $3.98.  Aldi, a little less, $3.87.  Brookshire's, $4.29.  So you know you're kind of in the neighborhood.  It's -- that's a fair and reasonable rate.

Same thing is true with these kinds of patent licenses, these FRAND licenses.  What we're going to show you--and I'm not doing it now because I'd have to seal the courtroom, that's why a big confidential written across it--is that when you do the math, there were 16 patent families that GComm got. When you compare those 16 patent families to the thousands of

patent families that these other licensees offered, so for example here's the ZTE/Samsung license, we're going to talk a lot about that license.  And in the ZTE/Samsung license, they offered over 1700 patent families.

THE COURT:  15 minutes have been used.

MR. CORDELL:  Thank you, Your Honor.

You do an apples-to-apples comparison here and that's how you get the amount of money that would be fair, that would be reasonable.  Right?  We here not buying a pallet of milk. We're buying a gallon.  So you have to -- you have to do the math to make it reasonable.

And there are two agreements that I'm really going to ask you to focus on.  And it's these two.  Because it turns out that ZTE reached a license with Apple a little while ago, and when they did, they licensed everything, including the patents in this case.  ZTE still owned the patents and licensed them to Apple.

So when you're asking yourself what's the best shop to walk into to figure out if that jug of milk is the right price, this is a very good one.  In fact, this is the best one you are going to see because it included these patents.

And I can't put this on the slide because, again, confidentiality.  I understand.  You know, we were the ones insistent on an NDA so we are very keen on confidentiality. So I can't publish this to the whole world, but I'll show just

you, ladies and gentlemen of the jury, this number.  And it's not a big number.

But you got to remember that there are tens of thousands of these patents and there are hundreds of millions of the phones that are sold.  And when you multiply this rate times the hundreds of millions of phones, it ends up being real money.  But this is an important number.  That's the Apple/ZTE number.

Now let me show you envelope No. 2 because it turns out that Samsung also has a license with ZTE.  They are a willing licensee.  They've proven it.  They actually negotiated a license with ZTE.  And, ladies and gentlemen, this is the number, again on an apples-to-apples comparison, if you look at the number of patent families, this is the number.  Does that look familiar?  It might.

And, again, it's a small number, but you got to multiply it by the hundreds of millions of units and you got to multiply it by all of the patent families that were licensed.

While I'm talking about the ZTE/Samsung license, let me just -- let me just preview one little fact for you, and it's this:  Mr. Sheasby just called us all kinds of names.  He called us criminals, I think, a few minutes ago, and he suggested that somehow Samsung had done something wrong.

Well, the facts in this case, ladies and gentlemen, you're going to hear this from Mr. Jeon, who's going to

testify, he's sitting back there, the facts are that Samsung had been negotiating with ZTE for a long time, a long time before GComm ever came along, and Samsung ultimately did take a license to ZTE.  They thought they were getting ZTE's patent rights, and it was for this rate.

So don't call Samsung wrong, don't say that they behaved badly, because they behaved ethically and exactly the way they were supposed to.

I'm then going to show you a bunch of the GComm offers. So over time they made a series of offers to Samsung.  And remember one of the issues you're going to be asked to decide is who was behaving reasonably and who was being unreasonable, who was being fair and who was being unfair.  And you're entitled to look at the offers that they made to Samsung.

And I'm not going to show you the numbers because they're confidential, but you saw the number I just showed you.  The first offer they made in January of 2022 was over a thousand times more.  So that gallon of milk at the G+ store is over $4,000.

They then made a couple of more offers that we think are also unreasonable, we don't think they were being fair in November and December, but they came down the way you would expect.

And then the final offer they made was in May, and that, ladies and gentlemen, was over a hundred times more the number

I just showed you.  So the number that Apple is getting or ZTE is getting from Apple or ZTE is getting from Samsung, they wanted -- your gallon of milk would have cost $400, and we're going to ask that you find that that was unreasonable.

And we do have Mr. Fred Rodermund here.  He's going to testify, and he's an ETSI expert.  He knows a lot about these licensing things.  And his conclusion was, in fact, that these offers were not fair, they were not reasonable, and they broke their FRAND promise.

So let's talk about the NDA.  We heard a lot about the NDA, ladies and gentlemen, so I have to do this quickly.

There's no question that this is a required part of these negotiations.  We will present the testimony of Doctor Mang Zhu, who was the chief of IP strategy at ZTE.  She's done these deals for 20 years, and every single one of them starts with an NDA.  Why?  Because they want to exchange these numbers, they want to exchange the technology.  It's the first step that the industry is standard on.

And what happened in this case?  Well, in this case they sent us a letter in September -- it was actually GComm -- Mr. Sheasby didn't mention this -- GComm that asked for an NDA in November -- I'm sorry -- October of '21.  And a week later Samsung sent them an NDA.  And here's the letter.  This is from Ms. Kim at Samsung, and she said here's a draft NDA.  She didn't say, this is the only thing we will sign.  You know, we

talked about a little bit this morning that when you get a contract, you usually say, I can work with this or I can work with that.

Well, what did they say in response?  They said, We don't want an NDA.  So they finally wrote back about three months later and said, you know, we don't think we need an NDA.

And we wrote back and said, you know, no, we said we really think we need an NDA.  We've got to have confidential discussions here, confidential information, per the usual practice for FRAND negotiations.  And then Ms. Kim said, you know, send us -- I'm sorry this is Mr. -- yeah, this is Ms. Kim still.  Send us a revised version, give us your NDA if you don't like what we've got.

And what do they do in response?  The answer is nothing. They responded and didn't even mention the NDA.  That was in -- in May.

So Samsung asks a third time in August, and this now is Mr. Jeon who is here, and said, you know, give us an NDA, we're starting to question whether you're willing to negotiate in good faith.  Please give us the NDA.

What do they say in response?  Nothing.  Didn't even respond.

So, again, a little later August 14, Mr. Jeon sends another message, says, look it's common practice, we need an NDA, we want to have discussions with you.

What do they do in response?  Nothing.

A fifth time he asks for an NDA, and he said, please give us edits, do whatever you have to do.  And, ladies and gentlemen, I have good news.  After a year of trying, in fact, GComm did send them an NDA.  And within a couple of weeks, the parties had gotten together and signed it.

What we believe, ladies and gentlemen, that was a breach of good faith.  They broke their promise to be fair and reasonable.  And Mr. Rodermund will take you through exactly why that is an industry practice and why that that is a breach.

And then, finally, they filed a bunch of lawsuits.  So let's talk about that.  So you-all know that, you know, your neighbor puts up a fence and you think it's on your property.  So the first thing you do is not run to court and sue them.  The first thing you do is you sit down with your neighbor and try to work it out.  Well, FRAND kind of expects that same thing.  You know, you're supposed to try to work things out, you're supposed to be fair, you're supposed to be reasonable.

Licensing negotiations began in December of 2022.  That's after they signed the NDA, they finally can sit down and talk turkey.  Well, what did GComm do?  They didn't wait for that.  They filed a lawsuit eight, nine months earlier in March.  And it wasn't just a lawsuit.  It turns out that what we now know because we can take discovery in these cases is that GComm and

Mr. Pitcock were working with their damages expert for about six months before they filed the lawsuit, coming up with ways to avoid their FRAND promise.  They weren't going to take the money that all the other companies are taking.  They weren't going to be a fair landowner.  They wanted a big piece.

But there's more.  They went off in April and sued us in Brazil -- again, without talking.  Then they filed another case here to try to help with their Brazilian lawsuit, and then they filed another one in the Netherlands in November, all of which before they could sit down and actually have a discussion.  And we think that is also a breach of their FRAND promise, ladies and gentlemen.

And we're going to ask you for damages because it was a promise, that's a contract, they broke their contract, it's a breach of contract, and we're going to ask you for damages at the end of this.

Now I'm way behind in my time so I pick up the pace a little bit.  Let's talk about the patent issues.  And this it is one of my favorite exercises is to try to illustrate what patent infringement really consists of.  But, you know, I have a patent on a soccer ball and Mr. Sheasby makes a football, the question is, does it infringe.  Well, you compare them.

And my patent says, it's made of leather.  Yes, it's made of leather.  And my patent says, it's stitched together.  Is his football stitched together?  Yes.  Is it filled with

compressed air?  Outside of Tom Brady, yes.  And then is it round?  Well, it turns out it's not and so it's different.  And remember there are 12 million issued patents these days.  So you have to be very precise and they only can claim what is in their patent.  They can't go outside of it.  And if it doesn't fit, then there's no liability.

So the three patents in this case, and I'm going to have to do this quickly.  I apologize.

THE COURT:  You have five minutes.

MR. CORDELL:  Thank you, Your Honor.

You're going to hear from the experts.  You're going to hear from Doctor Wicker and Doctor Min, who are going to explain all of this technology in great detail.

And let me just touch on the '776, if I can quickly.  It has to do with when you're driving around and your phone is picking cell towers.  Right?  And it's always communicating with more than one and it's deciding which one is the best one.  And that's been done that way for 20 years.  This is nothing new.

And what makes this patent a little different is you got to make a few choices.  First, you group them, group the cells together, and then you pick one out of that group.  So you make two choices instead of one.  That's kind of a simplification, but that's what it's like.

Sort of like if you're picking a restaurant in Marshall.

You can pull up Door Dash or Google or something.  And if you want to, you can list every restaurant in Marshall and then pick one.  You just make one choice.  Or you can pick Mexican barbecue, and that creates a subset, and then you pick among that set.  That's two choices.  First you pick the kind of food, then you pick the restaurant.  Two choices instead of one.

We believe that the Samsung devices don't do that. Instead, they just pick from the long list and they call it a day.

There's another problem which is the law says that you can't patent something that's just conventional to do an abstract thing.  And His Honor is going to take care of the abstractness and what you're going to be asked is whether these are conventional, whether these are just sort of a -- kind of expected things.

And it turns out that making two choices instead of one, ladies and gentlemen, we think is just expected, that this is routine and conventional.  And we are going to ask that you find the patent invalid for that.

And, finally, we're going to show you some prior art. We're going to show you that people were selecting cells like this before ZTE ever came along, and, therefore, the patent is invalid because you can't patent what other people did before.

Okay.  My last two minutes, let me talk about my least

213

favorite subject which is damages because other than the fact we're asking for damages in this case, you know, we're the Defendant, we don't think any damages are owed.  And the law says if these patents are not infringed or invalid, damages are zero.  That's the law.

Just because you have a patent doesn't mean you make money.  And, remember, only about eight percent of the patents that are declared essential that are FRAND patents are actually used, so they have to -- we're going to have to put GComm to its proofs.  And it's very complicated stuff.  And, again, as I showed you with the '776 patent, there are differences between what Samsung does and what they patented.

We're going to present Mr. Paul Meyer, who is here today, and he's going to help us crunch the numbers because there's a lot of math involved.  Remember, we have to -- we have to compare agreements that have thousands of patent families to the patents that GComm is asserting.  Remember, GComm is only asserting three patents, not even patent families in this case.

And how do you do that?  Well, it's sort of like when you're going to rent a house and you want to know how much to pay.  Well, you look around, you look at what your neighbors are paying, and you kind of figure out based on comparables what that should be.

It's a little bit like what I talked about earlier.  And

we're going to look at some of that same evidence. We're going to look at that ZTE/Apple agreement. We're going to look at what Apple paid. And they paid a lot, ladies and gentlemen. It's a pretty big number. But you've got to remember they were getting a lot. They were getting thousands and thousands of patent families. All GComm is offering us here are three patents. So they have to be fair and reasonable about what they're demanding.

We're going to show you the ZTE/Samsung license. We're going to show you the OX Mobile/Samsung license. We're going to show you the 5G IP/Samsung license. We're going to show you a lot of these licenses so you understand what that gallon of milk in the damages context should really cost.

So some of this I had to redact because it's confidential, but Mr. Meyer is going to take you through this, and he's got lots of analyses that show kind of what these patents are really ought to be worth. But, ladies and gentlemen, ultimately you're going to be asked to decide who is being fair, who is being reasonable. $237.5 million is not fair, is not reasonable for three patents. There are tens of thousands of these. If you paid that for every three patents, you just -- you just couldn't do it.

So these are the key takeaways. GComm breached its FRAND commitment. We're going to ask them to hold them accountable for their promise.

The infringement case is something that we're going to have to see actually proven in this case because the differences are profound.  And then their request for $237.25 million is just untenable.

So with that, I'll thank you for your time and attention, and we look forward to putting on the case.

THE COURT:  All right, ladies and gentlemen.

MR. SHEASBY:  Your Honor, may we approach briefly?

THE COURT:  Not at this moment, Mr. Sheasby.  Have a seat.

Ladies and gentlemen of the jury, I need to give you some clarifying instructions in light of the opening statements that you just heard.

You've heard much of these opening statements at ZTE and its conduct prior to the time that it transferred the patents-in-suit to G+.  I want to make one thing abundantly clear to you.  G+ and ZTE are separate and distinct entities, and you may not hold ZTE's conduct against G+ after G+ acquired these patents.

You can only consider ZTE's conduct prior to the time that G+ acquired the patents from ZTE and how, if at all, it impacted Samsung's good faith or bad faith.

You must not consider ZTE's conduct for evaluating whether G+ breached its FRAND obligations after it acquired the patents-in-suit from ZTE.  So while ZTE owned the patents

and was in negotiations with Samsung, that's proper to consider with regard to the breach of the FRAND obligation or the -- or not breaching the FRAND obligation.

Once G+ acquires the patents, then what ZTE does or doesn't do is not proper to consider with regard to whether or not there's a breach of the FRAND obligation either by G+ or by Samsung. I hope that clarifies some of what you've heard.

All right. Let me ask counsel this. Does either party wish to invoke the Rule?

MR. SHEASBY: Plaintiffs wish to invoke the Rule, and we would also like to approach briefly, Your Honor.

THE COURT: All right. Is your request to invoke the Rule, Mr. Sheasby, to exclude expert witnesses from the Rule?

MR. SHEASBY: No, Your Honor. Yes, Your Honor, expert witnesses may be present.

THE COURT: All right. Then the rule has been invoked excluding expert witnesses, which means if you are not an expert witness but a fact witness in this case, you must remain outside the courtroom until you're called to testify. Expert witnesses are permitted to remain inside the courtroom while other witnesses testify.

Now, counsel may approach the bench.

MR. CORDELL: Well, before we do that, Your Honor, may corporate representatives remain?

THE COURT:  Corporate representatives are here as the human representative of the corporation.  Therefore, they're parties to the suit and they're entitled to remain in the courtroom --

MR. CORDELL:  Thank you, Your Honor.

THE COURT:  -- unless there is an issue with confidential information that would indicate otherwise.  Otherwise, they are permitted to remain.

Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

MR. SHEASBY:  Mr. Cordell three times said ZTE is not coming here, why isn't ZTE here, why isn't ZTE bringing this suit.  That's a direct and express violation of MIL No. 25, precluding any evidence of failure to call a witness or that a party's not here.  It was repeated.  It was done repeatedly.  It creates a clear shadow over this.

I did not want to stand up in the middle of the closing -- opening because I know Your Honor doesn't like that.  I also know Your Honor warns me that if I don't do it, I waived it.  But in the situation he didn't say it, once he said it three times, I do believe a curative instruction is appropriate in this situation because it's a direct violation of the MIL.

THE COURT:  All right.  What's your response?

MR. CORDELL: My response is that I only did it because Mr. Sheasby brought it up and talked about the size of ZTE and its acumen and its research and the fact that it made more 5G contributions than anyone on the planet.

MR. SHEASBY: That is all fair game. But saying something with ZTE not being here or suggesting why ZTE did not sue under these patents, it is a clear and express violation of the Court's motion in limine, standard Motion in Limine No. 25. It's not even a special one. It's the default one that we all apply.

MR. CORDELL: But it's exactly the dovetail to the argument Mr. Sheasby made. It's the rejoinder that suggests that if these were important, ZTE would have filed --

THE COURT: All right. All right. All right. I've heard enough. It's clear to me that Mr. Sheasby violated the limine orders repeatedly by referencing the Court by name. It's clear that you may have violated the limine order making reference to the absence of ZTE.

I'm not going to give an instruction to the jury on either. I am instructing both of you here at the bench on the record not to violate either of those provisions or any of the other provisions in the Court's MIL orders any further.

If you sense the other party has violated a MIL, then I want you to stand up then and raise it and not wait until the person has continued to go on down the road and then come to

the bench with it.  Understood?

MR. CORDELL:  Understood.

MR. SHEASBY:  That's a taint that is never going to cure what he did.

THE COURT:  That's your opinion, Mr. Sheasby.

MR. SHEASBY:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right, ladies and gentlemen.  We've been back from lunch a fairly long period of time.  We're going to take a short recess at this point.

I'm going to ask you to take your jury notebooks and just close them and leave them in your chairs as you go to the jury room.

Let me also remind you of all my instructions, including not to discuss the case with each other or anyone else.  And we'll have you back in here 10 or 12 minutes, and we'll continue at that point with the Plaintiff's first witness. We'll begin the Plaintiff's case in chief at that time.

With those instructions, the jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  I want to see counsel in chambers.  The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Mr. Sheasby, are you ready to prepared to go forward with your first witness?

MR. SHEASBY:  We are, Your Honor.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen. Please have a seat.

Plaintiff, call your first witness.

MR. SHEASBY:  Your Honor, Plaintiff calls Mr. Jeremy Pitcock.

THE COURT:  Mr. Pitcock, if you'll come forward and be sworn by the Courtroom Deputy, please, and then take a seat on the witness stand.

THE WITNESS:  Yes, Your Honor.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around; have a seat on the witness stand.

THE WITNESS:  Thank you.

THE COURT:  All right, Mr. Sheasby.  You may proceed with direct examination when you're ready.

JEREMY PITCOCK, SWORN,

testified under oath as follows:

DIRECT EXAMINATION

BY MR. SHEASBY:  ?

Q.   Good afternoon, Mr. Pitcock.  Could you introduce

yourself to the Court and the jury?

A.    Yes.  My name is Jeremy Pitcock.  I am the managing director of G+ Communications.

Q.    Mr. Pitcock, counsel for Samsung in his opening told the ladies and gentlemen of the jury that the agreement you reached with ZTE meant that the patents were sold for $600,000.  Was that testimony accurate or inaccurate?

A.    It was not accurate.  Instead, the $600,000 just represented roughly the cost of filing for the patents for ZTE --

THE COURT:  Mr. Pitcock, you answered his question when you said "It was not accurate."  If he wants you to go beyond that, he'll ask more questions.  Try to keep your answers limited to the questions asked.

THE WITNESS:  Sorry, Your Honor.

THE COURT:  That's all right.

Go ahead, counsel.

Q.    (BY MR. SHEASBY)  Mr. Pitcock, why was what the Samsung's counsel said to the jury not accurate?

A.    It was not accurate because that $600,000 was basically to cover the cost of filing for all the patents.  The real benefit was the 20 percent of the revenue to ZTE.

Q.    Did Mr. -- did counsel for Samsung make the jury aware of the fact that ZTE obtains 20 percent of the revenue?

A.    It may have been on the slide, but just so it's clear,

ZTE would be entitled to 20 percent of the net revenue that we achieve from licensing the patents.

Q.   Roughly 20 years ago, did you and your wife, who's also an attorney, come together to create a new business?

A.   We did.

Q.   What was that business?

A.   So my wife and I are both specialists in intellectual property, and so we decided that we were going to specialize together in helping various companies that owned patents and wanted to license their inventions with that process.

Q.   Can you give us some examples of companies you have assisted?

A.   Yes.  So there are a few.  Some examples are we helped a company called Mobile Data Technologies, which has patents in location-based mobile services.  We helped a company that has router and switch technology which speeds up internet connections, which I'm sure we can all appreciate.  We represented an individual inventor who had come up with some semiconductor devices that helped make lights brighter.  We have also represented companies that engage in 2-D barcoding, which are those little symbols that you can scan on some products that will take you to a website or an advertisement or tickets.  And we're also currently representing a company called Soup Box which is an -- it's a start-up in video streaming technology as well as smart devices.

Q.   Did counsel for ZTE at some point in time approach you about assisting ZTE?

A.   So it was a law firm that had represented ZTE for a number of years in the various litigation matters.  They approached us to see if we would be interested in helping ZTE license some of its valuable patents in 5G.

Q.   Counsel for Samsung asked questions to the jury such as why isn't ZTE here.  Do you remember that?

A.   I do.

Q.   Do you have experience with specialized licensing companies like the ones you and your wife create?

A.   I do.

Q.   Is it common in the industry from major telecommunications companies to use specialists like the companies you and your wife create to license IP?

A.   Yes.  So major telecom companies are mostly in the business of selling phones or TVs, and so it's very common for them to essentially outsource patent licensing to a specialist group.  There are numerous examples of it in the telecommunications industry.

          MR. SHEASBY:  Mr. Svenson, can I have slide 35?

Q.   (BY MR. SHEASBY)  Counsel for Samsung represented to the jury that Samsung has rights in the patents that G+ owns.  Do you remember that argument?

A.   I do.

Q.    At any point in time over the years that you attempted to negotiate with Samsung did Samsung ever claim they had rights in the G+ patents?

A.    No, they did not.

Q.    At any point in time over the years that you attempted to negotiate and settle with Samsung did Samsung ever claim they thought they were getting rights from ZTE?

A.    They did not.

Q.    At any point in time before this lawsuit was initiated did Samsung dispute that these patents were essential and valid?

A.    They did not.

Q.    At any point in time before this lawsuit was initiated did they ever request a meeting with you?

A.    They did not.

Q.    Did they ever request additional information from you?

A.    They did not.

Q.    Did they ever make an offer to you?

A.    They did not.

Q.    What is G+ Communications?

A.    G+ Communications is a company that was designed to hold and license the inventions of ZTE and 5G.

        MR. SHEASBY:  Mr. Svenson, can I have slide 2, please?

Q.    (BY MR. SHEASBY)  How is G+ able to protect the patents

created by another company?

A.    So patents are property just like land or a house, and they can be transferred from one company to another.  G+ now owns these patents from ZTE.

Q.    What are the patents-in-suit and what do they relate to?

A.    So there are three patents-in-suit.  They are commonly abbreviated by their last three digits so you don't have to spell out the whole long number, which is usually in the millions.  They are the '776, the '130, and the '443, and they all relate to high-speed high-efficiency 5G communications.

Q.    Counsel for Samsung in their opening represented to the jury that no permission was sought by ZTE to obtain patent rights in the United States.  Were you aware of that -- did you hear that testimony?

A.    I heard that argument, yes.

Q.    Is that accurate or inaccurate?

A.    That's inaccurate.

Q.    What does PDX -- JTX 1 depict?

A.    It shows the form that you have to file to ask permission to file patents in the U.S. Patent Office.  This one relates in particular to the '776 Patent.

Q.    And did ZTE take that step for every single one of the patents-in-suit in this case?

A.    It did.

Q.    What -- as part of your preparation and decision-making

on whether to sign a contract with ZTE, did you investigate and become familiar with 5G technology?

A.   I did.

Q.   What is your understanding of 5G technology?

A.   So my understanding of 5G technology is that it represents a significant advance in transferring data predominantly over mobile cellular networks.

Q.   Why is 5G technology, in your mind, something important enough for you and your wife to want to help protect?

A.   So if you look at this graph in front of you, you'll see, and it's in exabytes, which is quadrillions or 10 to the 18th bytes.  You'll see that the amount of data that's being transferred over mobile networks is increasing exponentially.  An exabyte is an almost unimaginable measure of data, so if you had a typical four-minute song, to make a good recording of it, it would take about eight-and-a-half megabytes.  And an exabyte would give you 186 billion songs, and if you played them back-to-back, it would take almost a million years to play.

Q.   What is your educational background?

A.   So I have a Bachelor of Science in physics from the Massachusetts Institute of Technology, commonly abbreviated MIT, I have a law degree from the University of Pennsylvania, or Penn, and I have also been registered to practice before the United States Patent and Trademark Office so that I can

represent inventors in getting patents in that office.

Q.    Do you and your wife have a family?

A.    We do.  So my wife and I have been married for 18 years.
We have three sons.  Two of them are in high school--one's a
senior, one's a sophomore--and my youngest is in fourth grade.

Q.    Where do you live?

A.    I live in Tenafly, New Jersey, which is close to New York
City.

Q.    Why did you believe it was important to protect the
innovations of companies like ZTE?

A.    So in this country the U.S. patent system is critical if
we want to remain competitive.  So many of the incredible
inventions that are made here are used abroad.  We have to be
able to use inventions made abroad here if we want to be
competitive with our own products.  The U.S. Patent Office
facilitates this.

When a foreign company makes an invention that everybody
needs, they file it in the U.S. Patent and Trademark Office,
and that increases the knowledge for U.S. companies on how to
do that.  But the law is clear that you're entitled to a
reasonable royalty for the use of those patented inventions,
and if the companies who use the inventions break the law and
don't pay that royalty, the entire system breaks down and we
won't have the use of all these inventions.

Q.    Before deciding to form G+, did you study ZTE's record of

innovation?

A.    I did.

Q.    Did ZTE invest significant amounts in research and development of 5G?

MS. SMITH:  Objection; leading.

THE COURT:  Sustained.

Q.    (BY MR. SHEASBY)  Are you familiar with the R&D efforts of ZTE?

A.    So, yes.  When we were deciding whether or not to spend the time to try to license these inventions, we looked at ZTE's background and we found that they had a significant record of invention in the 5G space.

Q.    Did you familiarize yourself with the level of research in 2017?

A.    I did.  In the lead-up to 5G, ZTE had over --

MS. SMITH:  Objection, Your Honor; foundation.

THE COURT:  Can you be more specific?

MS. SMITH:  And hearsay.

He has no personal knowledge of the inner-workings of ZTE, Your Honor.

MR. SHEASBY:  Your Honor, I believe he just laid a foundation that he familiarized himself with the -- his understanding of ZTE's R&D development before deciding to work with ZTE.

THE COURT:  I'll allow the question.  It can be

addressed on cross examination by the Defendants.

MS. SMITH:  Thank you, Your Honor.

THE WITNESS:  So, yes, in 2017 and the lead-up to 5G, which really started in 2019, ZTE had over 3,000 engineers working on 5G, and they spent over $300 million on research and development.

Q.   (BY MR. SHEASBY)  Did ZTE partner with any other companies to create working networks?

A.   They did.  So the very first 5G network was created between ZTE and a company called Qualcomm where ZTE made the transmitter commonly called a base station--it's the cell phone tower that your phone connects to in order to connect to another cell phone--and Qualcomm made the modems for the phones.

Q.   And where is Qualcomm located?

A.   Qualcomm is in San Diego, California.

Q.   Did ZTE only -- did ZTE have innovations in addition to creating base stations?

A.   They did.  So ZTE actually created the world's first 5G compatible smartphone.

Q.   Does -- did ZTE -- does ZTE continue to innovate?

A.   It does.  So ZTE and, again, in connection with Qualcomm, demonstrated the world's fastest 5G connection in 2022.

Q.   Does G+'s agreement with ZTE ensure that ZTE is compensated for its research?

A.    It does.  As we mentioned before, ZTE is entitled to substantial revenue--20 percent of all the licensing revenue that we generate.

Q.    How are the patents that G+ decided to protect selected?

A.    Well, they went through multiple layers of review.  The first layer of review was that a law firm that had worked with ZTE for years spent over a year looking at their portfolio in order to select patents that had particular value in 5G licensing.

Q.    Does ZTE have any role in decision-making regarding this lawsuit?

A.    They do not.

Q.    Based on the knowledge you gained as a managing director of G+, can you explain how 5G was created?

A.    So 5G is created by a group called 3GPP.  You'll get a lot of abbreviations in this case.  It's the third generation partnership that includes all the major industry players like Samsung and ZTE in this space.  They all come together and innovators like ZTE, they all submit proposals for what should go into the next generation of mobile communications.  That group jointly selects the very best contributions and inventions, and then they become part of what's called a standard.  And a standard is basically a recipe for any -- that anyone can use in order to create any of the equipment used, like a smartphone for 5G communications.

Q.    Did you familiarize yourself with the number of contributions ZTE has made to 3GPP in history?

A.    Yes.  So ZTE by most metrics is one of the top five contributors to 3GPP, and it actually has more contributions than Samsung, even though Samsung is 13 times larger.

MR. SHEASBY:  Can we have slide 15, please?

Q.    (BY MR. SHEASBY)  What are the documents that describe how 5G is implemented?

A.    So they are called technical specifications, and they explain -- they're basically the particular recipes for a particular technology that's used in 5G.

Q.    Do the specifications contain warnings to handset manufacturers like Samsung regarding patent rights?

A.    They do those -- the people who implement these standards, they know that lots of people have contributed like ZTE to the inventions that go into the standards, and so they are instructed that they are to pay a fair reward for patent rights that they use when implementing the standards.

Q.    What is a standard essential patent?

A.    So a standard essential patent is essentially a patent that you have to practice if you're practicing the standard.

Q.    Did ZTE take any steps to make sure the world was aware of the patents in this case?

A.    They did.  So they filed what are called declarations with ETSI, which is the administrative body that runs these

technical specifications, and in that they essentially said these are patents that relate to 5G technology.

Q.   So we were just looking at PTX 1, and that's the document that discusses the flags that patent rights exist.  Is that right?

A.   That's right.  And you can see in the exhibits that 5G is specifically called out, the relevant technical specifications are called out, the original patent application filed by ZTE is called out in those declarations.

Q.   What is JTX 17?

A.   So JTX 17 is an example of one of the declarations that was filed by ZTE.

Q.   And does this relate to the patents-in-suit?

A.   So, yes.  This is for the '776 Patent, and you can see on the left-hand column that it relates to 5G technology, and then there are various technical standards that are referenced that it may relate to, and then the original patent application numbers, and then the title of the patent.

Q.   And was this same disclosure made for the '130 Patent, if you look at JTX 16?

A.   It was.  If you look at the exhibit, you can see that the patent number is listed there, the original patent number that it's related to 5G, particular technical standards, and the title of the patent.

Q.   So this is the listing that ZTE made.  Is that correct?

A.    Yes.  These were declarations filed with the administrative body ETSI, which implements the technical standards.

Q.    And it says 5G.  Is that correct?

A.    It does.

Q.    And all these are publicly available.  Is that correct?

A.    They are.

Q.    And then here it says 'TS 38'...   What are those?

A.    So TS is the abbreviation for technical standard, and then they're given this numerical identifier, kind of like a really bad Dewey Decimal System.

Q.    That's the recipe book?

A.    That's right.  That's the recipe book.

Q.    And then this is the original grandparent application number.  Is that correct?

A.    That's correct.  That's the original application filed by ZTE.

Q.    And then that matches the listing of the patent application on the patent-in-suit.  Is that the case?

A.    That's the case.  And if you go to the United States Patent and Trademark Office for the '130 Patent, you can see that it's related to that same parent patent.

Q.    And this was done for the '776, it was done for the '130, and looking at JTX 15 was it also done for the '443?

A.    Yes, it was.  You can see all the same information was

filed with ETSI for all three patents.

Q.    Now, did G+ take steps to ensure that the patents that it presented to Samsung are actually necessary for 5G?

A.    Yes.  So we went through a four-step process.  The first was working with --

Q.    Mr. Pitcock, I'm sorry for interrupting you, but let me ask you the question.

A.    Oh, I'm sorry.  I apologize.  I didn't mean to jump ahead.

Q.    It's no problem at all.

What was the first stage of the analysis?

MS. SMITH:  Objection, Your Honor; foundation.  He's asking about ZTE's analysis, not G+, GComm's, or Mr. Pitcock's.

MR. SHEASBY:  Your Honor --

THE COURT:  Response?

MR. SHEASBY:  Your Honor, I'm asking about the G+ analysis that was done.

THE COURT:  As long as it's G+ analysis, I'll allow it.

MR. SHEASBY:  In case there was any misstatement, I will re-ask the question so it's unambiguous.

THE COURT:  Let's clarify it and we'll then move on.

Q.    (BY MR. SHEASBY)  Did G+ take steps to ensure that the patents are necessary for 5G?

A.    We did.  So we were working with the law firm that had worked with ZTE to review their portfolio to find valuable patents.

Q.    So what's the first step in the analysis?

A.    So the first step in the analysis was to do a comparison between the claims and the technical specifications, the recipe books for 5G.

Q.    And how long did the law firm that was originally involved examine ZTE's portfolio before selecting these patents?

A.    They spent over a year reviewing the portfolio before selecting the patents.

Q.    What was the second level of analysis?

A.    So then to confirm that the patents did read on the technical standards, we hired a technical specialist to do a claim-by-claim analysis where they compared the claims to the technical specifications.

Q.    And what was the third and fourth level of analysis?

A.    So after the litigation was filed, we hired experts, which you'll hear from, Doctor Akl as well as another technical expert in order to confirm the technical analysis that had already been done.

Q.    Is that other technical expert Doctor Kowalski?

A.    Yes, it is.  Sorry about that.  Yes.

Q.    I think Doctor Kowalski is actually in the --

A.    He is.

Q.    Don't forget Doctor Kowalski.

A.    I'll try not to.

Q.    Are there rules that companies must comply with when it comes to patents that are necessary for 5G?

A.    There are.  So when a company implements a standard, they are instructed that if there are any patents that are used in that standard, they are to pay a fair amount for use of those patents.

Q.    And this is DTX 17.  These are the rules that govern essential patents.  Is that what you just testified to?

A.    Yes.  And as you can see in DTX 17, ETSI specifically tells implementors that patent holders are to be adequately and fairly rewarded.

Q.    Okay.  So we're going to define some terms.  First, IPR holders.  Who are the IPR holders?

A.    So IPR is intellectual property rights.  It's an abbreviation for patent owners.

Q.    And is that G+?

A.    Yes.

Q.    And then you said implementors.

A.    Yes.

Q.    Who is an implementor?

A.    So an implementor is somebody who implements or practices the standard, like Samsung.

Q.   So what is Samsung obligated to pay G+ if it uses G+'s essential patents?

A.   An adequate and fair reward, commonly abbreviated FRAND.

Q.   Did G+ formally put Samsung on notice of its need to comply with the law?

A.   We did in September of 2021.  As you can see on the timeline, we sent them a letter that listed all of the patents-in-suit.

Q.   And is DTX 25 that letter?

A.   It is.  It's actually a blow-up of that letter where you can see specifically we've identified the three patents-in-suit.

Q.   And what did you ask Samsung to do?

A.   We asked them to comply with the ETSI standard that they had agreed to and pay us a fair and adequate amount for use of our patents.

Q.   And Samsung's counsel in opening represented to the jury that G+ did not offer a license to Samsung.  Was that accurate or inaccurate?

A.   That was inaccurate.

Q.   What does the paragraph that you've highlighted say?

A.   It says that we are prepared to offer them a FRAND license.

Q.   In addition to the charts that list the patent and the recipe book, the table that lists the patent and the recipe

book, did Samsung -- did G+ supply Samsung with any additional materials?

A.   We did.

Q.   What are the additional materials you provided them with?

A.   So we provided them what are called claims charts, which is a comparison of the specific language of our patent claims to the technical specifications that you implement in 5G.

Q.   And this is in DTX 25.  Correct?

A.   Yes, that's an example for the '776 Patent where you can see we're comparing the first part of claim 1 to the parts of the technical standard that you have to implement if you're going to have it be 5G compatible.

Q.   Now, Samsung's counsel in opening represented to the jury multiple times that you requested an NDA.  Do you remember that?

A.   I do.

Q.   Was that statement accurate or inaccurate, that representation he made to the jury?

A.   That was inaccurate.

Q.   I'm showing you DTX 20.  And what is DTX 20?

A.   So -- and I'm sorry, Your Honor, but my monitor isn't working, so I'm kind of looking over the shoulder and can't see with a high degree of detail, but --

        MR. SHEASBY:  Your Honor, this is a problem we can solve.

Q.   (BY MR. SHEASBY)  Mr. Pitcock, there's a binder in front of you, and if you turn to tab -- turn to the tabs, I believe you'll be able to find that tab.

A.   Which tab is it?  I'm sorry.

Q.   It's no problem.  I'll find it.

THE COURT:  You should have hard copies, in other words.

THE WITNESS:  I do; I just don't know which tab it is.

THE COURT:  He'll direct you.

THE WITNESS:  Thank you.

Q.   (BY MR. SHEASBY)  Aha.  Tab 23, Mr. Pitcock.

A.   Yes.  So when I sent that original letter to Samsung, they had told me they were going to send me an NDA.  I didn't request one; they just said that they were going to send one. And this is me following up with Hye Jin Kim asking her to send it to me when she got a chance.

Q.   So this is for the ladies and gentlemen of the jury, because you can't see the screen.  If we go from the bottom of the email, this is your September 9th letter saying we are prepared to offer you a FRAND license.  That's the bottom. Correct?

A.   That's correct.

Q.   And then the next piece is Hye Jin Kim writing back and saying, We will send you a draft NDA next week?

A.    That's correct.

Q.    And that was about a month after you sent them the letter.  Is that correct?

A.    That's correct.

Q.    And did they send you the NDA immediately?

A.    They sent me the NDA I believe the next week, a draft NDA.

Q.    And was that after you reminded them that they had requested an NDA?

A.    Yes.

Q.     Now, what is an NDA, non-disclosure agreement?

A.    So an NDA is one way that companies can share secret information with one another.

Q.    And have you entered into NDAs in your career?

A.    I have; many times.

Q.    Does ETSI have a view as to whether there's a potential for misuse of non-disclosure agreements?

A.    They do.  So ETSI permits the use of NDAs, but they specifically warn that you're only to be used -- they're only to be used in fair and impartial honest negotiations.

Q.    What terms did Samsung propose for the non-disclosure agreement that they wanted you to sign before they would negotiate with you?

A.    So they wanted us to waive various legal rights before we've even begun negotiating with them.

Q.   What was the first legal right they wanted you to waive?

A.   So the first legal right they wanted us to waive was that we could never state that they had acted in bad faith no matter what they did.

Q.   And what was the second legal right that they've asked you to waive?

A.   So they asked us to not be allowed to tell you in a dispute that we had sent them claims charts and a notice of infringement to begin the negotiations.

Q.   And just unpack this.  This is Samsung's language on this slide.  Is that correct?

A.   It is.

Q.   And Samsung is saying -- referring to any communications and information exchanged prior to this agreement.  Do you see that?

A.   I do.

Q.   And what had you exchanged before this agreement, the draft agreement?

A.   The only thing that had been exchanged is we sent them our letter identifying the patents and claims charts.

Q.   And putting them on notice of infringement?

A.   Yes.

Q.   And then it says, "Such communications shall not be used to constitute notice of patent infringement."  That's what they asked?

A.    That's what they asked for.

Q.    How long have you been in this industry?

A.    Approximately 20 years.

Q.    Have you ever seen any company anywhere in the world try to include these types of provisions in a non-disclosure agreement?

A.    I haven't.

Q.    Did Samsung still try to negotiate with -- strike that.

      Did G+ still try to negotiate with Samsung despite this behavior?

A.    We did.  We sent them an offer in January of the next year, 2022.

Q.    And what type of offer was it?

A.    It was a FRAND offer where we were asking for the benefit that we were due under the ETSI policy for our patents.

Q.    Was it a -- let's dig into it a little more.  DTX 578, is that the letter you sent to Samsung?

A.    It is.

Q.    Now, were you here when Samsung counsel told the ladies and gentlemen of the jury multiple times that you never told Samsung that its NDA was improper?

A.    I was here.

Q.    When Samsung's counsel said that multiple times to the ladies and gentlemen of the jury, was he being accurate or was he being inaccurate?

A.    He was being inaccurate.  I told Samsung several times that there were problems with their NDA.

Q.    And on January 22nd, what did you say about their NDA?

A.    I specifically referring to their NDA draft that it appeared to contain several issues and was contrary to the spirit of good faith negotiations obligatory to both parties in a licensing negotiation.

Q.    And was that the only time you expressed your concerns with Samsung?

A.    It was not.

        MR. SHEASBY:  If we can go to slide 48, Mr. Svenson.

Q.    (BY MR. SHEASBY)  This is DTX 20.  So Samsung's counsel told the jury you never told Samsung the NDA was abusive. What does DTX 20 say to Samsung?

A.    Well, it explains how it was abusive in great detail. It's basically a one-sided agreement where we're not allowed to use information but Samsung was allowed to use information. We couldn't have told you that we had put them on notice that we were operating in good faith, and no matter what they did we could never accuse them of bad faith.

        MR. SHEASBY:  Let's go back to PDX 2.30.

Q.    (BY MR. SHEASBY)  And so then you say -- you use the phrase 'a settlement offer'.  Do you see that?

A.    I do.

Q.    Why did you call it a settlement offer?

A.    So if you're engaged in trying to settle claims, you always have to ask for less than you think you would get at a trial or no one will negotiate with you.

Q.    Is a settlement offer a form of compromise?

A.    It is.  In fact, you know, the rules that govern it specifically call it an offer to compromise.

Q.    In what regions do -- does G+ hold patent rights?

A.    So we hold patent rights all around the world, but we have a lot of patent rights in three areas--the United States; south America, particularly Brazil; and Europe.

Q.    Do you also hold patents in China?

A.    We do.

Q.    Did you disclose to Samsung that the damages in a litigation may be substantially higher than the settlement offer that you were making to them?

A.    We specifically advised them of that.

Q.    And does DTX 578 present that?

A.    Yes.  We specifically said that in our first settlement offer to Samsung.

Q.    You write in it, "actual litigation in which there is individual findings of infringement, validity, and technical contribution on a patent-by-patent basis the FRAND damages amount may be substantially higher."

A.    That's correct.

Q.    Now, did you engage a licensing expert to assist in

evaluating your settlement offers?

A.    Yes.  As is common, we engaged Mr. Stephen Dell.

Q.    Does Mr. Dell have real-world experience negotiating settlement agreements?

A.    He does.

Q.    Is Mr. Dell still involved in this case?

A.    He is.

Q.    Are the patent damages that Mr. Dell concluded are due under the law higher than G+'s settlement offers?

A.    They are.

Q.    What is your belief as to why they are higher?

A.    So I'm not an expert, and you'll probably hear from Mr. Dell at length at some point in this trial, but essentially once you have access to all the confidential information that I didn't have when I was making my original settlement offers, it often causes the technical value of your invention to go up, and any reasonable expert would find that it's worth more than your original offer to compromise.

Q.    Did you have access to any of Samsung's confidential information?

A.    I did not.

        MR. SHEASBY:  Your Honor, may I approach counsel's table just briefly?

        THE COURT:  You may.

        MR. SHEASBY:  Thank you, Your Honor.

Thank you, Madam Courtroom Deputy.

Q.   (BY MR. SHEASBY)  Were you aware of these secret internal Samsung documents when you were negotiating with them?

A.   I wasn't.  I wasn't aware of the value of the inventions to Samsung.  These were not shared with me.

Q.   Were you aware of Samsung's internal calculations of how much their revenue grew by adopting 5G?

A.   No.  They never shared that information with me.

MR. SHEASBY:  Thank you, Madam Courtroom Deputy.

Q.   (BY MR. SHEASBY)  After the settlement offer in January of 2022, did you continue to attempt to engage Samsung?

A.   We did.

Q.   Did you send Samsung additional information?

A.   We did.  We sent them additional claims charts comparing our patent claims to the 5G standard.

MR. SHEASBY:  Your Honor, may I approach the technical advisor just briefly?

THE COURT:  You may.

MR. SHEASBY:  Thank you, Your Honor.

(Pause in proceedings.)

Q.   (BY MR. SHEASBY)  Before you initiated the federal lawsuits that were filed, did Samsung ever provide a technical explanation disputing the essentiality and validity of the patents?

A.   They did not.

Q.   Did they ever request additional information from you?

A.   They did not.

Q.   Did they ever request a meeting with you?

A.   They did not.

Q.   Now, Samsung counsel in opening showed a slide like this. Do you see that?

A.   I do.

Q.   And Samsung counsel represented to the jury that you repeatedly refused to sign a confidentiality agreement.  Do you remember that representation?

A.   I do.

Q.   Was that representation accurate or inaccurate?

A.   It was inaccurate.

Q.   So this is Samsung's slide.  Is that correct?

A.   That's what I remember, yes.

Q.   And I want to fill in some things.  So first, in January of 2022 what did G+ do?

A.   So we made our original settlement offer and we pointed out the problems with their NDA.

Q.   Now, did G+ give up on Samsung after that January 2022 letter?

A.   No.  We sent them more claims charts in February of 2022.

Q.   And did G+ propose other ways of having confidential communications with them?

A.   Yes.  So in May of 2022, after Samsung had agreed to

negotiate without an NDA, we proposed simply negotiating under a Federal Rule of Evidence that allows for such discussions to be confidential, which is actually referenced in their NDA.

Q.   And in August 5th of 2022, what did G+ propose?

A.   So in August we proposed simply using the protective order, which is a court-ordered confidentiality agreement that was already in place in this case to exchange confidential information.

Q.   And did -- and then in August 20th, 2022, what did G+ do again?

A.   We proposed the same thing.  At that point, the protective order had been agreed to by the parties and governed confidentiality.  It had multiple layers of confidentiality, so they could have shared some things with me and then kept things only to the experts under that agreement.

Q.   And did Samsung at any point in time accept any of these proposals that you had made to treat their information as confidential either under the Federal Rules of Evidence or using a court administrative protective order?

A.   They did not.

Q.   Now, did Samsung continue to insist upon a written NDA with G+?

A.   They did.  They insisted on a contract.

Q.   And did G+ on its own propose a confidentiality agreement for Samsung to execute?

A.   We did.  We sent them a typical NDA without the abusive terms in it to sign.

Q.   And when counsel for Samsung represented to this jury that G+ never agreed to or proposed terms for the exchange of any confidential information Samsung wanted to share, was that accurate or inaccurate?

A.   In my opinion, it was inaccurate.

Q.   Now, did Samsung immediately sign the proposed confidentiality agreement?

A.   No, they took about six weeks to negotiate it.

Q.   Did Samsung attempt to inject the improper terms again into the NDA?

        MS. SMITH:  Objection; leading, Your Honor.

        THE COURT:  That's sustained.

        MS. SMITH:  Thank you.

Q.   (BY MR. SHEASBY)  What type of terms did Samsung attempt to inject into the NDA after you proposed it in September 2022?

A.   They proposed certain limitations on the use of the information and litigation that had already been exchanged.

        MR. SHEASBY:  Now, let's go back to slide 35.

     And just for the record, that email exchange was DTX 50, not DTX 20.  So I'll make that clear for the record.

Q.   (BY MR. SHEASBY)  So after the initiation of the federal investigations in Brazil and the United States and then

ultimately in the Netherlands, did G+ continue to try to make settlement offers with Samsung?

A.   We did.  We did everything we could to try to compromise with them.

Q.   Did G+ -- or did you travel to Korea?

A.   I did.  I went to Samsung's headquarters in Korea to meet with them and to try to negotiate a compromise.

Q.   How long was the flight?

A.   It's -- 18 hours.

Q.   And you gave a presentation to Samsung?

A.   I did.  I tried to give a detailed presentation based on the publicly available information that I had in order to convince them to negotiate a fair and reasonable deal.

Q.   What was Samsung's response to your presentation?

A.   So they didn't have any substantive response.  They did thank me and hoped that I appreciated the --

Q.   Let me --

A.   Sure.  Sorry.  I didn't realize you were drinking water.

Q.   It's okay.  It should be question and answer.

A.   Yes.

Q.   After meeting with Samsung in person, did they make a counteroffer to you?

A.   They did not.

Q.   Did you stay in Korea for multiple days in order to try to engage with Samsung?

A.    I did.  It's a long flight, so I wanted to try to do everything I could to compromise with them.

Q.    Did you reach out to Samsung and request that they have another conversation with you?

A.    I did.

Q.    And what was Samsung's response?

A.    They said that they weren't ready to get back to me; that they didn't have any response.

Q.    Did they say anything about your trip to Korea?

A.    They did.  They hoped that I'd enjoyed the cultural experience.

Q.    So this NDA was signed in 11/2022.  Do you see that?

A.    Yes.

Q.    Did Samsung at any point in time, either before or after that NDA was signed, show you a single piece of technical confidential information?

A.    They did not.

Q.    Did Samsung at any point in time show you a single piece accurately reporting their internal views of the importance of 5G?

A.    They did not.

Q.    And did Samsung ultimately make an offer in this case?

A.    They did.

Q.    And how long after they were put on notice did they make that offer?

A.   About a year and a half; 18 months.

Q.   And why is G+ maintaining this lawsuit?

A.   We think that Samsung should have to follow the patent laws of the United States.

MR. SHEASBY:  Your Honor, I pass the witness.

THE COURT:  All right.  Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

THE COURT:  The information I have is that the estimate of direct on this witness was an hour and the estimate of the cross was an hour.

You had the witness about 30 minutes, Mr. Sheasby.

Ms. Smith, what do you -- as we stand here, what's your anticipated length for your cross examination?

MS. SMITH:  At least an hour, Your Honor.  I have a 60-page outline that hasn't varied since Mr. Sheasby got up.

THE COURT:  Well, it's going to be dark in 30 minutes and some of these jurors have 40 or 50 miles to drive to go home.  I don't intend to keep them up here late on a Friday.  I don't want anybody to think that I'm giving the Defendant some unfair advantage by having the weekend to prepare your cross, but I don't think that there's any way I can go an hour plus at this point and then perhaps have redirect with this witness.  We're not going to finish Mr. Pitcock today.  This looks to me to be a logical place

to break.

If anybody has a problem with that, tell me.

MR. SHEASBY:  It's absolutely appropriate for safety, and I believe this is the proper step.

THE COURT:  Then I'm going to recess for the day at this time.

MR. SHEASBY:  Thank you.

MS. SMITH:  Thank you.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Ladies and gentlemen of the jury, there's going to be lengthy cross examination of this witness and there may be more direct examination by Plaintiff's counsel once the cross examination is finished.  It's 5:30 on Friday and many of you have a long distance to drive.  I'm not going to keep you up here any longer today.  We're going to recess until Monday morning.

I have a couple of things to go over with you before I actually let you go.  First of all, I want you to take the notebooks that you have and leave them closed in the jury room, and they'll be there Monday morning when you pick them up.

Also, I need to give you some idea of what I anticipate with regard to how we're going to schedule the trial days between -- I'll wait a minute until it's quiet in here.

I need to give you some idea of how I'm going to schedule the trial going forward.  My plan is to start Monday at 8:30, and I'm going to ask you to plan your travel so that you can be here at the courthouse no later than about 8:15 or 8:20 and be ready to go.

I need you to understand that every day before you will come in and begin that day's trial that there are multiple things I am taking up with counsel outside of your presence.  And you don't need to know what those are, but you do need to know that some days I may be waiting on you at 8:30 and some days you may be waiting on me at 8:30.  It's not an exact science.  But we're going to target 8:30 to start every day.

As I told you, the Court's going to provide your lunch every day.  I anticipate we'll take about a 45-minute break for that purpose each day.  And once we get started Monday, we will probably go until 5:30.  We may go until 6:00.  If we're going to finish this case next week, and I think that's something that we need to make a priority, we're going to have to go to 5:30 or 6:00 each night.  So you need to plan for that in your travel.  You need to plan for that with your families letting them know what you're expected to do.  The weatherman tells me it's going to rain most of next week and so you need to take that into account as well.

But I have had jurors tell me consistently over the last 12 years since I've been on the bench here that they would

much rather work a longer day each day and be away from their homes and their work and their families a shorter number of days.  We can try this case and stop at 4:30 every day and start at 9:00, but it will take us two weeks to try it if we do that, and I don't think you want to do that and I don't want to do that.  So to avoid that, we're going to have to have long days.

And if you'll plan to be here each day starting Monday at 8:30, I'll do my best to be ready so we can start then, and we'll follow the schedule I've told you.  Just like right now we're not finished with this witness, but this is a good place to break.  I really don't like to break in the middle of an examination, but they passed the witness and this is as good a time as any.  We may find ourselves at the end of one day next week where there's a witness on the witness stand and it's 5:45 and I may be told they can finish by 6:15, and if the witness has been on the witness stand a long time we may go and get that witness finished.  There may be a witness that finishes at 5:30 and the next witness is going to be two hours long, and I'm probably not going start the next witness for two hours at 5:30 in the evening.

So again, it's not an exact science, there is a give and take to it, but I'm trying to give you a general idea of what to expect from me.

It's very important that you remember all the

instructions I've given you today.  And I'm not going to go over them again.  I am just about going to guarantee you, though, that unless you live alone--and if you live alone, you may have a talking parrot--but one way or another you are going to get asked when you walk in the door, What happened today.  Don't even try to answer that question; just blame it on me.

Don't discuss this case in any way with anyone, and that means don't communicate in the broadest sense of the word with anyone about it in any way.

At this point I'm going to suggest that you have a safe and good weekend, come prepared ready to go Monday morning, and with those instructions, ladies and gentlemen, you're excused until Monday morning.

(Whereupon, the jury left the courtroom.)

THE COURT:  You may step down, Mr. Pitcock.

THE WITNESS:  Thank you.

THE COURT:  Be seated, please.

Mr. Sheasby, are you aware of anything we need to take up before we recess today?

MR. SHEASBY:  Only one thing, Your Honor.  Since cross examination has not started, I'd like not to have to sequester Mr. Pitcock all weekend so we can eat dinner and be convivial and all that sort of good stuff, and I just want to make sure sequestration has not begun yet.

THE COURT:  Well, let me say this.  Mr. Pitcock as a licensed attorney understands he's not to discuss his testimony with anybody in any way until he's back on the stand Monday morning and he's cross examined by Defense counsel.  And so -- if as long as he doesn't enter into any discussions or communications with anyone about his testimony between now and Monday, he does not have to be otherwise sequestered or he doesn't have to restrict his movements.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  All right.

MR. SHEASBY:  That's all I was asking.

THE COURT:  All right.  Mr. Cordell, do you have anything that needs to be taken up from the Defendant's standpoint?

MR. CORDELL:  No, Your Honor.  Thank you.

THE COURT:  All right.  Counsel, I'm going to remind you of your ongoing efforts and obligations to meet and confer concerning the witnesses in this case and any potential objections that may come up.

We are running slower than we typically do at this point, and in my mind that's almost completely attributable to the gross number of exhibit disputes, demonstrative disputes, and other disputes that were tendered to the Court last evening and this morning.  And we have worked diligently every spare minute we weren't on the record in the courtroom to work those

out and move along, but it is a big burden with the quantity of disputes between these parties.  Most of them have not been huge; they've just been immense in their number.

I'm going to ask both sides to exert better efforts than they have up until this point to keep those to a reasonable minimum.  When I have to use all our spare time, like I have today, with the disputes over opening statements, then I have no time to get the next witness disputes out of the way so that we can continue.  And I do not want to delay this trial, and I don't intend to delay the trial because I've just been inundated by both sides with so many exhibit disputes and demonstrative disputes and other disputes that we can't keep the pace of the trial going forward.

I told you this morning if I need to delay the jury so that we can get the disputes out of the way one day and it takes an extra hour, then I'm going to take an hour of trial time away from both sides.  You're not going to abuse the system because you cannot keep a reasonable position with the number of disputes you've raised between each other.

I understand this is hard-fought, I understand there's a lot at stake, I understand that there may be tensions between counsel; that's no excuse for the number of disputes I've been subjected to today.  And I can only make it as clear to you as I can make it to you, but if I can't keep this trial moving at the pace it needs to because of your conduct, I will find ways

to penalize you for that.  And I haven't done that so far, but I'm putting you on clear notice that this level of dispute between the parties, which is -- I won't speculate about whether it's driven by acrimony, or what it's driven by I won't speculate, but it needs to come back down to earth, and it needs to get reasonable.  And if it's not, I'm prepared to take appropriate steps.  So bear that in mind as you continue to meet and confer.

If there are disputes over the weekend that you cannot resolve, you're to communicate with the Court, as I've already instructed through the pretrial practice.  And I'll be here early Monday morning to take up as many as I can with you. I'm not going to come up here at 4:00 in the morning because you-all can't be reasonable in how you're acting with each other.  I will be here at least an hour before the jury comes in and I will use every minute of that hour to resolve your disputes, and that is to maximize your trial time.  But if you can't live with those rules, then your trial time is going to suffer.  And I don't know how to be any plainer than I can be about that.

All right.  If there aren't other issues that need to be raised, I will see you Monday morning.

Until then, the Court stands in recess.

(The proceedings were concluded at 5:40 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                01/19/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

.