IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

G+ COMMUNICATIONS, LLC.,          (   CAUSE NO. 2:22-CV-078-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,    (
et al.,                           )   MARSHALL, TEXAS
                                  (   JANUARY 22, 2024
          Defendants.            )   8:30 A.M.
_____

VOLUME 2

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                      LOS ANGELES
                      1800 AVENUE OF THE STARS
                      SUITE 900
                      LOS ANGELES, CA 90067-4276
                      (310) 203-7096
                      BY: MR. JASON SHEASBY
                          MR. BENAJMIN MANZIN-MONNIN

                      IRELL & MANELLA -
                      NEWPORT BEACH
                      840 NEWPORT CENTER DRIVE
                      SUITE 400
                      NEWPORT BEACH, CA 92660
                      (949) 760-0991
                      BY:  MS. LISA GLASSER

                      McKOOL SMITH, P.C. - MARSHALL
                      104 EAST HOUSTON, SUITE 300
                      MARSHALL, TEXAS  75670
                      (903) 923-9000
                      BY:  MS. JENNIFER TRUELOVE
                           MR. SAM BAXTER

FOR THE DEFENDANTS:   FISH & RICHARDSON, PC -
                      WASHINGTON, DC
                      1000 MAINE AVE., SW
                      SUITE 1000
                      WASHINGTON, DC 20024
                      (202) 783-5070
                      BY:  MR. RUFFIN CORDELL
                           MR. MICHAEL McKEON
                           MS. LAUREN DEGNAN

                      FISH & RICHARDSON, P.C. -
                      DALLAS
                      1717 MAIN STREET, SUITE 5000
                      DALLAS, TEXAS  75201
                      (214) 292-4084
                      BY:  MR. THOMAS REGER

                      GILLAM & SMITH, LLP
                      303 SOUTH WASHINGTON AVENUE
                      MARSHALL, TEXAS  75670
                      (903) 934-8450
                      BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
                       MARSHALL, TEXAS   75670
                       (903) 923-8546

## <u>INDEX</u>

**EXAMINATION**

**Witness Name**                                                                 **Page**

JEREMY PITCOCK
   Cross By MS. SMITH ............................................... 262
   Redirect By MR. SHEASBY ........................................ 390
   Recross By MS. SMITH ........................................... 407
ROBERT AKO, PH.D.
   Direct By MR. MANZIN-MONNIN .................................... 414
   Cross By MR. CORDELL .......................................... 512
   Redirect By MR. MANZIN-MONNIN ................................. 572

THE COURT: Be seated, please.

Counsel, are the parties prepared to read into the record those items from the list of pre-admitted exhibits that were used during last Friday's portion of the trial?

MS. TRUELOVE: We are, Your Honor.

THE COURT: All right. Let's proceed to do that now.

MS. TRUELOVE: Jennifer Truelove on behalf of Plaintiff. The exhibits used yesterday were DTX 017, DTX 020, DTX 025, DTX 050, DTX 578, JTX 01, JTX 15, JTX 16, JTX 17, and PTX 01.

THE COURT: All right. Any objection to that rendition from the Defendants?

MS. SMITH: No objection, Your Honor.

THE COURT: Do Defendants have anything else to add?

MS. SMITH: We do not.

THE COURT: All right. Thank you.

All right. Mr. Pitcock, you may return to the witness stand. I remind you you remain under oath.

THE WITNESS: Thank you, Your Honor.

THE COURT: Is there anything else I need to hear from counsel on before I bring in the jury?

MS. TRUELOVE: Nothing from Plaintiff, Your Honor.

MR. CORDELL: Nothing from Defendants, Your Honor.

THE COURT: All right. As soon as Mr. Pitcock is

seated, Mr. Barnett, if you'll bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Please have a seat.

As you will recall when we recessed for the day on Friday, Mr. Jeremy Pitcock was on the witness stand as the Plaintiff's corporate representative.  The Plaintiff's counsel had completed their direct examination and passed the witness. We will pick up this morning with Defense counsel's cross examination of Mr. Pitcock.

Ms. Smith, you may go to the podium and proceed with cross examination on behalf of Samsung.

MS. SMITH:  Thank you, Your Honor.

JEREMY PITCOCK,

having been previously sworn, testified further as follows:

CROSS EXAMINATION

BY MS. SMITH:

Q.   Good morning, Mr. Pitcock.  My name is Melissa Smith.  I represent Samsung, and you and I have not yet met.  Correct?

A.   That's correct.

Q.   Well, it's nice to meet you and welcome to Marshall, sir.

A.   Thank you.

Q.   Now, where I want to start is I want to quickly refresh as to what we heard a little bit from you last Friday.  Is that okay?

A.    Of course.

Q.    Okay.  You told the ladies and gentlemen of the jury that all of the patents in this case, the three patents in this case, came from ZTE.  Correct?

A.    I did.

Q.    And we heard that ZTE is a global telecommunications company.  Correct?

A.    It is.

Q.    A sophisticated company.  I think it had been called a sophisticated company several times.  Correct?

A.    Actually I don't remember sophisticated, but I'll take your word for it.

Q.    Well, do you dispute it's a sophisticated company, sir?

A.    No, I don't dispute that.  I don't work for the company, though, so I don't have personal knowledge of it.

Q.    Well, you don't have personal knowledge of many things ZTE, but you told us on Friday you had done much research into ZTE.  Correct?

A.    I did.

Q.    And you provided a bunch of statistics to the jury about ZTE.  Correct?

A.    I did.

Q.    All right.  Now, when visiting with your lawyer, you talked about there are three patents in the suit, but you specifically talked about the '776 Patent as an example.

Correct?

A.   I did.

Q.   Okay.  Now, as we sit here, back in 2008, that's what? 16 years ago, a couple of folks from ZTE, they filed a Chinese patent application.  Correct?

A.   I'm unaware of the exact year of the filing, but I'll take your word for it.

Q.   You don't know when the Chinese patent application was filed?

A.   Not off the top of my head, no.

Q.   Okay.  Well, then fast forward and later ZTE filed a related patent here related to that patent that you're a little unclear about, and that became the '776 Patent. Correct?

A.   Yes, it did.

Q.   All right.  Now, Mr. Pitcock, you testified Friday that ZTE needed some type of special permission to file patents in this country, did you not?

A.   I don't recall those exact words, but, yes, you need permission to file in this country.

Q.   Well, you pointed to something that we both know is a national phase application.  Correct?

A.   Yes.

Q.   Okay.  Did you know that -- you'd actually met Mr. McKeon prior to coming to the courtroom this week.  Correct?

A.    I have.

Q.    He took your deposition.  Is that right?

A.    He did.

Q.    And you've seen Mr. Cordell at counsel table since Friday.  Correct?

A.    I have, yes.

Q.    Okay.  Did you know that Mr. McKeon and Mr. Cordell were actually both United States patent examiners at one point?

          MR. SHEASBY:  Your Honor, absolutely -- objection, relevance.

          THE COURT:  What's the relevance, Ms. Smith?

          MS. SMITH:  I'm just framing a discussion I'm going to have about the national phase application process, which Mr. Sheasby put at issue in his examination Friday.

          MR. SHEASBY:  The qualifications of the lawyers are not relevant for this purpose, Your Honor.

          THE COURT:  I understand.  But -- I'll allow this, but we need to focus on the framing that you're talking about.

          MS. SMITH:  Of course, Your Honor.

          THE COURT:  The objection is overruled.

          MS. SMITH:  Thank you.

Q.    (BY MS. SMITH)  Now, you understand that this national phase application, like the one you showed us, what you have to do is you have to fill out a form, check some boxes, and you have to pay your fee.  Correct?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A.   Well, it has to go through examination, but, yes, that's the form you fill out, yes.

Q.   And if you do the form right, you get what you showed the jury.  You get a receipt for filling out the form and paying. Correct?

A.   You fill out the form correctly, you will receive a receipt, yes.

Q.   And everybody gets a receipt that fills out the form correctly.  Right, sir?

A.   I don't know.

Q.   Well, they tell me that in this country it doesn't matter who you are or where you're from; that the USPTO treats everyone the same.  Correct?

A.   Actually, I believe there's a treaty with certain countries that allows them to file in this country that I'm not sure that it's worldwide, so...

Q.   But my question, sir, is when you go up to the USPTO and apply for a patent they don't say, well, it depends up on where you're from if you can apply, if you can fill out that form.  Correct?

A.   I don't believe they do.

Q.   Okay.  That's not the case in China.  Correct?

A.   I don't believe it is.  I think they are part of the patent cooperation treaty.

Q.   Okay.  So when you talked to Mr. Sheasby about getting

this permission to file, this special permission to file, is it true that ZTE had to get permission from China to file in the U.S.?  Correct?

MR. SHEASBY:  Your Honor, may we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. SHEASBY:  Your Honor, this is a violation of your MIL.  There has been a reference to China, China procedure, permission from China at least seven times in her examination.  This is not appropriate.  You said the fact that ZTE is from China could be said once.  This has been said repeated and repeated and repeated.  I know I'm in the doghouse, but this has gone overboard, Your Honor.

THE COURT:  What's your response, Ms. Smith?

MS. SMITH:  There's no MIL on China to start with. Your Honor gave us some guidance, and Mr. Sheasby put this in issue on Friday.  He made it sound like ZTE got this special permission, this prestigious permission, required to file a U.S. patent, and there's no such thing.

MR. SHEASBY:  Your Honor, there is a MIL on referencing the national location of the parties.  I can go back and get it for you.  This is a violation of the MIL.

THE COURT:  I have the MIL.  I know what the MIL says.

MS. SMITH:  It's a Chinese patent.

MR. SHEASBY:  It's not a Chinese patent.  It's a U.S. patent.

MS. SMITH:  It came from China 2008.  I laid the foundation for that --

MR. SHEASBY:  Then she should move on because this idea of --

THE COURT:  All right.  You need to ask that ZTE is based in China, you need to finish this discussion, and then you move on.  And then I don't want to hear about China anymore in the rest of this trial --

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  -- without prior leave.

MS. SMITH:  I'm going put the patents up and they say on the side --

THE COURT:  I don't have a problem with that.

MS. SMITH:  Okay.  Okay.  Thank you.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Let's proceed.

Q.   (BY MS. SMITH)  Mr. Pitcock, on Friday you discussed with your lawyers where GComm was based.  Correct?

A.   Yes.

Q.   And you discussed GComm partnering with Qualcomm at one point.  Correct?  And you said Qualcomm was based in San

Diego.  Correct?

A.   That's incorrect.

Q.   You did not say Qualcomm was based in San Diego?

A.   I did say Qualcomm was based in San Diego.

Q.   Thank you, sir.  And we've been open about Samsung being a Korean company.  Correct?

A.   I assume so, yes.

Q.   Well, you heard me stand up the first minute I met the jurors and say, Samsung proudly is a Korean company?

MR. SHEASBY:  Your Honor, objection.  May I approach?

THE COURT:  State your objection, Mr. Sheasby.

MR. SHEASBY:  Your Honor, the narrative about being open and the preamble for the question is not proper.  Counsel should just ask the question.

THE COURT:  So is your objection as to the form of the question?

MR. SHEASBY:  Form, Your Honor.

THE COURT:  Overruled.  This is cross examination.  Go ahead, counsel.

MS. SMITH:  Thank you, Your Honor.

Q.   (BY MS. SMITH)  Mr. Pitcock, what we didn't hear on Friday is where is ZTE based, sir?

A.   ZTE is based in China, but also has offices in Richardson, Texas; Basking Ridge, New Jersey; and all around

the world.

MS. SMITH:  Thank you, sir.

THE COURT:  Mr. Pitcock, she asked you where it was based.  She didn't ask you where it had offices.  We haven't gone through where all the Qualcomm offices around the globe might be, we haven't gone through where all the Samsung offices around the globe might be.

You need to limit your answers to the questions asked.  All right?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Let's proceed.

MS. SMITH:  Thank you, Your Honor.

Q.  (BY MS. SMITH)  All right.  Mr. Pitcock --

MS. SMITH:  If we could pull up JTX 1, please.

Q.  (BY MS. SMITH)  -- does that look familiar, Mr. Pitcock?

A.  Yes.  This is the front page of the '776 Patent.

Q.  Okay.  And what we see here, we see that date up on the top right.  The '776 Patent issued in 2014.  Correct?

A.  Yes.

Q.  And we see the assignee language right there at 73 that says ZTE was the original owner.  Correct?

A.  Yes.

Q.  And we heard from you on Friday that ZTE actually owned all three patents in this case until up about 2020.  Correct?

A.  Yes.

Q.   Okay.  And in that 2014 window when this issued and the 2020 window, the world saw -- the world saw the 4G standard kind of play out.  Correct?

A.   I'm sorry, counsel.  Would you mind repeating your question?

Q.   During that 2014 to 2020 window, the 4G standard was in play during that window.  Correct?

A.   It was.

Q.   And we also saw the introduction during that window of 5G.  Correct?

A.   Yes, in 2019.

Q.   Yes, sir.  And the world and ZTE saw Samsung sell both 4G phones and 5G phones.  Correct?

A.   I'm sorry.  When?

Q.   During that 2014 to 2020 period, the world and ZTE saw Samsung sell both 4G phones and 5G phones.  Correct?

A.   I'm not sure when Samsung sold their first 5G phone, but yes, they were selling 4G phones.

Q.   4G phones and then 5G phones, sir, in that window?  Correct?

A.   I honestly am not sure when they introduced but probably 2020 or so.

Q.   Okay.  Thank you, sir.

And also during this window, in the later part of the window, you know that ZTE licensed Apple to thousands of its

patents.  Correct?

A.   I know that ZTE has a patent license with Apple.  I don't know the extent of it.  I've never seen it.

Q.   Okay.  They have -- ZTE and Apple do have a license, though.  You know that much.  Correct?

A.   I do.

Q.   Okay.  And ZTE also licensed Samsung to its patents with a few exceptions.  Correct?

A.   I don't know, actually.

Q.   You have no knowledge of ZTE having a license with Samsung at all?

A.   If they did, it was after our transaction.

Q.   All right.  Now, and we'll get to that later, sir, but we talked about the Apple deal.  About the time ZTE was doing the deal with Apple, let's call it 2020, you were sitting in your office outside New York City and you got a call from a lawyer that worked for ZTE, did you not?

A.   No, that's not my recollection.

Q.   Okay.  Well, at some point during that window you got a call from a lawyer that works for ZTE.  Correct?

A.   I don't recall if it was a call or an email, but I was contacted by a lawyer who had done work for ZTE, yes.

Q.   And I apologize, sir.  Either a call or an email, you got some outreach.  Correct?

A.   I did.

Q.   And we didn't hear that lawyer's name on Friday.  That was a Mr. Erick Robinson.  Is that correct?

A.   It is.

Q.   Okay.

MS. SMITH:  And I think, if we could have -- we have a demonstrative with Mr. Robinson's photo on it, perhaps.  I don't have a DDX number.  I apologize for that.  There we go.

Q.   (BY MS. SMITH)  Is that Mr. Robinson?

A.   It is.

Q.   All right.  And Mr. Robinson approached you to set up a joint interest between himself, ZTE, and you as a potential buyer.  Correct?

A.   Well, he approached me as an attorney wanting to represent the eventual acquisition company G+, yes.

Q.   And Mr. Robinson approached you because he has special expertise in the overseas patents, if you will.  Correct?

A.   Well, I believe they had done almost all their research on the U.S. patents, and it wasn't particularly related to overseas patents.

Q.   Okay.  Does Mr. Robinson -- you know Mr. Robinson fairly well, do you not?

A.   I know him fairly well, yes.

Q.   Okay.  And he certainly has expertise in foreign patents.  Correct?

A.   I only know him as a U.S. patent litigator.  I know he

worked overseas for some time, and I assume he has some knowledge of foreign patents.

Q.   Okay.  Have you ever had an opportunity to look up Mr. Robinson on his website that we're looking at here, sir?

A.   You know, I don't know that I have.

Q.   All right.  Now, in this case Mr. Robinson -- when you got that email, Mr. Robinson and ZTE already had patents in mind and they had already chosen patent families for the deal you-all were going to do before you got involved.  Correct?

A.   For the most part, yes.

Q.   And Mr. Robinson was the lawyer that offered to kind of broker a deal where you could buy 70 ZTE patents for an initial payment of $600,000.  Correct?

A.   I wouldn't describe it that way.

Q.   Well, how would you describe it, sir?

A.   So, we made an initial payment to put skin in the game and also to cover basically the cost of filing for all those patents, but it wasn't really a sale in that sense because ZTE was always intended to have an interest in the revenue stream.

Q.   And the skin in the game that you-all put in was you gave ZTE $600,000 for an initial payment and they gave you 70 patents.  Correct?

A.   They -- yes.

Q.   Okay.

A.   That's -- the initial payment was $600,000.

Q.   And so that's roughly a little less than $10,000 a patent if you divide 70 into 600,000.  Correct?

A.   I mean, there's no disputing that math, but that wasn't what we were doing.

Q.   Okay.  Now, you bought the patents because you wanted -- you wanted this reward that we talked about last week.  You wanted money from the patents.  Correct?

A.   Yes.  A monetary reward that we were entitled to for our inventions, yes.

Q.   Okay.  And you also told your lawyer that you wanted to bring technology to the U.S.  Is that correct?

A.   Yes.

Q.   Okay.  But, Mr. Pitcock, these patents were -- they were filed here long before you ever got involved.  Correct?

A.   Yes.

Q.   Okay.  The '776, for example, was published here in the United States in 2011.  Correct?

A.   That sounds right.  Actually, my monitor isn't up anymore, but I assume that's correct.

Q.   And I don't know if I can get you the publication date, sir.

         MS. SMITH:  Can I pull that patent up?

Q.   (BY MS. SMITH)  Does that help, sir?

A.   Yes.  It looks like it was published in 2011.

         THE COURT:  Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

MS. SMITH:  Yes, Your Honor.

THE COURT:  Unless I'm mistaken, Mr. Pitcock testified that it wasn't a sale intended between ZTE and GComm because there was always intended to have a 20 percent revenue stream go back to ZTE.  If he is going to tell the jury that there was not a sale between ZTE and GComm, then we may have a party to this case who's not in the courtroom and we may have prior acts imputable in this case if ZTE is still an owner of the patents.

MR. SHEASBY:  I understand, Your Honor.

THE COURT:  I do not want this jury confused about who owns what when and where.

MR. SHEASBY:  I will make sure that's clear on redirect, Your Honor, and I will show the assignments.

THE COURT:  All right.  Let's do that.

MS. SMITH:  Your Honor, I wasn't trying to set him up for this in any way.

THE COURT:  I'm not imputing that.  I was just very surprised when he said it wasn't intended to be a sale.

MS. SMITH:  We all were.

THE COURT:  All right.  Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed, please.

MS. SMITH:  Thank you, Your Honor.

Q.   (BY MS. SMITH)  So we -- Mr. Pitcock, we'd just taken a look at that publication date for the '776.  And so bottom line is whatever value the '776 technology has, it was here in the U.S. long before you became involved.  Correct, sir?

A.   I don't know what you mean by 'here in the U.S.'  It's now owned by a U.S. company which it wasn't in 2011.

Q.   It was published in the U.S. in 2011, sir.  Correct?

A.   Yes, it was -- the application was published, it looks like, July 7th, 2011.

Q.   Okay.  Now, your lawyer told the jurors that these patents make our U.S. economy stronger.  Do you recall that statement?

A.   I do.

Q.   And it's your position that by taking money out of the U.S. market and sending it back to ZTE, that's somehow making our U.S. economy stronger, sir?

A.   Yes, it is.

Q.   Okay.  And you're going about making the U.S. economy stronger by sending this money back by asking for damages for just U.S. sales.  Correct?

A.   Well, in this case only U.S. sales are relevant.  That's correct.

Q.   So you are asking just for U.S. sales.  Correct?

A.   In this case, yes.

Q.   You're asking for damages for every sale of anyone who buys a Samsung phone in the U.S.  Correct?

A.   So, yes, the royalty would be based on all of Samsung's U.S. sales.  Correct.

Q.   And in this suit you aren't asking for damages from, you know, France or Japan or Venezuela, are you?

A.   I'm not allowed to, so no.

Q.   Okay.  So, in fact, you're asking this jury to give you and ZTE almost $240 million out of the U.S. market.  Correct, sir?

A.   I'm not sure that it is.

Q.   Well, if you take revenue from Samsung in the U.S. and you send it to ZTE, you're taking money out of the U.S. market; you're not in your counsel's words 'making the U.S. economy stronger,' are you, sir?

A.   Well, we are making the U.S. economy stronger through the patent system.  That's what it was designed to do, and I believe that money would be going to Korea and not the United States, but I don't know exactly how they do their revenue distribution.

Q.   Now, you talked about these three patents.  We talked about ZTE being a sophisticated company.  Correct?  You didn't dispute that?

A.   I didn't dispute they had some sophistication, yes.

Q.   And you're aware that ZTE is fully able to license its own patents when it so chooses.  Correct?

A.   As a legal right, sure, you can license patents that you own, yes.

Q.   Well, it's more than a legal right because ZTE actually licenses its own patents at times.  Correct?

A.   I understand they have, yes.

Q.   We talked about them licensing to Apple, for instance.  Correct?

A.   That's correct.

Q.   Okay.  And in this court, you've taken a position that these ZTE patents, they not only make the U.S. economy stronger as we just talked about, but these patents that ZTE chose to sell instead of license, these ZTE patents, they make us, in your counsel's words, safer here in America.  Correct?

A.   I believe that was the counsel's words in the opening statement, yes.

Q.   And your counsel mentioned first responders in opening statement.  Correct?  Do you remember that?

A.   I believe he did, yes.

Q.   He called them incredibly important.  Do you remember those words?

A.   I do.

Q.   And when talking about patent rights, he used the word 'sacred'.  Do you recall that, sir?

A.   I do.

Q.   Okay.  But what we'll hear, I think, from the experts in this case, is that your allegation is that these patents, all three of them combined, it takes all three of them combined, they allegedly contribute to the 5G standard by increasing download speed by 11 percent.  Is that correct, sir?

A.   That's my understanding, yes.

Q.   And that is what's making every American safer.  Correct?  That's your position.

A.   Yes.  My understanding is that better mobile data networks does, in fact, increase the safety of everybody in the United States.

Q.   And that increased safety and improved economy and 11 percent downspeed increase is the basis for the almost $240 million that you're asking to be your reward.  Correct, sir?

A.   Well, because it's based on confidential information, I haven't actually seen Mr. Dell's report, but my understanding is that those are some of the factors that he considered in calculating the appropriate damages, yes.

Q.   But someone's told you -- you've heard what GComm is asking for in this case.  Correct?

A.   I have, yes.

Q.   And you make the calls at GComm, sir.  Right?

A.   I do, yes.

Q.   And when they said -- what is it? -- $237 million for

your reward?

A.   I believe it was $237-and-a-half million, yes.

Q.   I apologize.  I apologize.  237-and-a-half.  You authorized them to ask the jury for that reward.  Correct?

A.   Yes, I did.

Q.   Okay.  And you say that's fair?

A.   I do.

Q.   And you say that's reasonable?

A.   I do.

Q.   And that's what you've told this jury.

A.   Well, that's what Mr. Dell will tell this jury, yes.

Q.   Now, Mr. Pitcock, if it's okay, I'd like to take about the next hour and go into a few details about what we've talked about.  Does that sound good?

A.   Sure.

Q.   All right.  Now, as a global company, we're going to talk about ZTE.  As a global company, you know that ZTE publishes what we call an annual report.  Correct?

A.   I don't actually know that, but, yes, I would assume that as the fourth largest telecom company, they probably publish some form of annual report.

Q.   Well, they've got stockholders and shareholders and potential investors.  Correct?

A.   I would assume so, yes.

Q.   Global telecommunications company.

And as a lawyer, you know what an annual report is. Correct?

A.   I -- yes.

Q.   Okay.  And you'd expect in an annual report that ZTE or any company would talk about major events for the year. Correct?

A.   Material events is normally the U.S. standard.  I don't know what the standard is for financial reports everywhere.

Q.   Okay.  And it would make sense that a major event would also be a material event.  You want to tell your shareholders and your potential investors what's important and what's gone on that year.  Correct?

A.   I'm not sure about your characterization.  I'm not an expert in financial statements or disclosures.  But, I mean, you generally want to report your revenues for the year.

Q.   Okay.  And when you were doing your research into ZTE, did you have a chance to take a look at their annual report from 2020, the year you did your deal with ZTE?

A.   I don't think I looked at their annual reports.

Q.   Okay.  Would it surprise you that in that annual report -- I looked at it, sir, and would it surprise you to learn that ZTE's annual report never mentions GComm?

A.   It would not surprise me.

Q.   Okay.  And that's because these patents don't make anyone safer, sir, do they?

A.    I disagree with your statement.

Q.    They don't improve foreign economies, do they, sir?

A.    I disagree with your statement.

Q.    Well, don't you think if a company has these patents that improve foreign economies and make hundreds of millions of people safer, it might make it into the annual report, sir?

A.    I -- that's not my understanding of what annual reports do, but...

Q.    So your understanding of what annual reports do is not talk about big deals with important patents and important IP?

A.    No.  My understanding is that they generally report on revenues as -- from selling products.

        MS. SMITH:  Well, if we could look at DDX 129.2, please.  All right.  If I could have that summary of the company's business.  I think you had the blow-up.  Thank you, sir.

Q.    (BY MS. SMITH)  Now, I'll represent to you that this is ZTE's -- a portion of ZTE's 2020 annual report.  We're reading down and we see that they are talking about the 36,000 patents that they've been licensed -- that they had licensed.  Correct?

A.    Yes, they -- where you've highlighted it, yes.

Q.    They talk about -- going on, they talk about filing patent applications for over 4,000 chips.  Correct?

A.    I see that.

Q.   But what we don't see in here is any mention of selling 70 patents to GComm.  Correct?

A.   I don't see that in this summary that you've put up.

Q.   Okay.  And you just mentioned that you would expect revenue to be any important revenue to be discussed in an annual report.  Correct?

A.   About -- yes, for that year per quarter.

Q.   Excuse me, sir.  I'm sorry?

A.   I apologize.

Q.   And when you sell something, that's -- you get revenue.  Correct?

A.   Yes, generally speaking, you get revenue from selling things.

Q.   Okay.  Now, in doing your research, did you --

          MS. SMITH:  And you can take that down, sir.

Q.   (BY MS. SMITH)  In doing your research, did you also have an opportunity to look at ZTE's website?

A.   I know I looked at it at some point, but I don't remember exactly when.  I know I probably looked at it in the lead-up to the acquisition, yes.

Q.   Okay.  And as with many websites, they have a drop down where you can see press releases.  Correct?

A.   I'm sure they do, yes.

Q.   Yeah.  And it wouldn't come as a surprise to you that ZTE issues dozens and dozens of press releases throughout the

year.  Correct?

A.    It would not surprise me.

Q.    Okay.  They issued press releases in September and October of 2020 when you bought the patents from them.  Does that sound reasonable?

A.    I'm sure they did.

Q.    Okay.  Would it surprise you that not -- there's not a single word in that 2020, you know, September and October time period when your deal's going down, there's not a single word in a ZTE press release about your deal.  Does that come as a surprise, sir?

A.    No.  Our deal was confidential.

Q.    And you talked about confidentiality, and you wanted to keep the deal confidential?

A.    No.  We eventually filed and recorded the assignment of the patents in the USPTO, and it was published in several publications nationally.  So it wasn't a secret, but it doesn't surprise me that they didn't take out a press release.

Q.    Okay.  And then when it did become a matter of public knowledge, would it surprise you that they didn't follow up with a press release on this great deal they'd done?

A.    It wouldn't surprise me.  I mean, it was already published and it was well-known in November, two months after, that we had acquired the patents, so I wouldn't know why they would think they needed to tell anybody.

Q. Well, if you do a big deal and you do an important deal and you have patents that are making an entire country safer, wouldn't you want to announce the deal, sir?

A. Not necessarily. I mean, it wasn't -- it hadn't resulted in the license or revenue yet, so I wouldn't expect it to be something that they would necessarily publish.

Q. Okay. But if this case results in a big revenue, if they get the -- if you-all, you and ZTE get your $237.5 million in revenue, or a reward, they'll probably shout that from the roof tops over at ZTE, won't they?

A. I don't know what they'll do. They, I'm sure, will report the revenue on their annual report.

Q. Now, sir, Samsung brings its latest and greatest phones into the U.S. Correct?

A. I would assume it brings all new models of its phones to the U.S., yes.

Q. They launched a new phone last week in fact. Did you see that?

A. I think I did. I remember seeing an advertisement on one of the football games over the weekend, so --

Q. That's fair. And ZTE is a phone company as well. Correct?

A. They are. They do sell phones.

Q. But they do not sell phones in the U.S. Correct?

A. That is incorrect. They do sell phones in the U.S.

MS. SMITH: Your Honor, may I approach?

THE COURT: Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT: What's the issue?

MS. SMITH: This is an input from Mr. Meyer's report that they don't sell phones, and he just said they do sell phones. I mean, there's a ban on them, and I can't -- there's MIL that I can't get into that, but I don't know how to deal with his answer.

MR. SHEASBY: Your Honor, Ms. Smith is just incorrect. There's no ban on ZTE phones. ZTE phones are available for purchase on Amazon. So she doesn't have to get into any ban whatsoever. He said there's phones in the United States. If she wants to ask him the basis for that, she can do so.

MS. SMITH: They can't sell -- they can sell through a website coming from outside the U.S., but they can't come in and sell phones in the U.S., Your Honor. I mean, there's -- and I don't know how to ask him that without stepping on the MIL.

MR. SHEASBY: Then she shouldn't have asked the question. There is no ban in place. But the other issue is that the phones are available on the Amazon website.

THE COURT: I understand the difference between a

direct sale by ZTE and a secondary sale through somebody else.

MR. SHEASBY:  It's not a secondary sale.  ZTE has a web -- ZTE hosts a ZTE store on Amazon.

THE COURT:  What MIL are you referring to, Ms. Smith, that you feel bound by?

MS. SMITH:  I need to go get my MILs.  It's -- I guess it's one of Plaintiff's MILs.  And if it's not a MIL, I'm happy to talk about the ban.

MR. SHEASBY:  Well, a ban would be -- that's clearly a violation of the MIL because it relates to a judicial proceeding outside the United States.  But there is no ban.

If they want -- if we want to leave the Court and talk about a ban, we can.  But I can tell you the Trump Administration through an act of Congress lifted the ban in 2019.  ZTE is entitled to sell telecommunications equipment in the United States.  And so what she's saying is just factually incorrect.

So I think if she wants to make a proffer --

THE COURT:  Just a minute.  If this gentleman has made a prior inconsistent statement where he has indicated that there is a ban, then you can impeach him.  Unless you're going to impeach this witness, I don't see any benefit to go any further with this.

And if there's a statement in some other witness' report that's contrary to this, then you can call it out when you go

through that witness' testimony.

MS. SMITH:  Okay.

THE COURT:  Okay?

MS. SMITH:  Thank you, Your Honor.  Can I have just one moment to pull his deposition to find his inconsistent statement?

THE COURT:  You can have a moment, yes.

MS. SMITH:  Thanks.

THE COURT:  All right.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  Either impeach him or move on.

MS. SMITH:  Okay.

(The following was had in the presence and hearing of the jury.)

Q.   (BY MS. SMITH)  Excuse me, sir.

A.   Sure.

Q.   Now, Mr. Pitcock, your lawyer also talked to you about a 5G infrastructure project between ZTE and he specifically called out that project being with a San Diego company, Qualcomm.  Is that correct?

A.   Yes.  So there are actually two projects, as I understand it, that involved Qualcomm that were mentioned.

Q.   And any infrastructure project in the past is just that--it's in the past because ZTE is not providing infrastructure currently in the United States of America, is

it?

A.   I don't believe they are selling base stations in the United States.

Q.   Thank you, sir.

        MS. SMITH:  If we could pull up the cover page of the '776 at JTX 1, please.

Q.   (BY MS. SMITH)  All right, Mr. Pitcock.  We are back to that '776 Patent.  Correct?

A.   I see it up on my screen, yes.

Q.   All right.  And on the left by the number 75, we see the inventors.  Do you see that?

A.   I do.

Q.   And then we see a Mr. Yada Huang.  Is that a mister or Ms.

A.   I believe it's a mister.

Q.   And then we see a Zhongda Du.  Is that a Mr. or Ms.?

A.   I believe it's a mister.  But I also think he's a doctor, so I'm not entirely sure.

Q.   All right.  Thank you, sir.  I can call both of them mister, and that would be appropriate?

A.   That would be fine with me, yes.

Q.   Okay.  Now, when you were doing the deal with ZTE, you spoke with the ZTE folks by phone maybe two or three times when you're buying the patents.  Correct?

A.   I don't recall the exact number of times, but we spoke on

the phone a few times.  We also had a number of email communications.

Q.   Okay.  And you were specifically speaking to a Mr. Tongue.  Correct?

A.   Yes.

Q.   And you were not speaking to Mr. Huang or Mr. Du. Correct?

A.   I did not speak to them, no.

Q.   In fact, you've never spoken to Mr. Huang or Mr. Du. Correct?

A.   I've never spoken to them, no.

Q.   It's been three years since you've bought the patents and you really know nothing about these inventors.  Is that correct?

A.   I disagree with that.

Q.   You haven't talked with them.  Correct?  You never met them?

A.   I have never spoken to them, no.

Q.   And you've never met them.  Correct?

A.   I have never met them personally, no.

Q.   Okay.  Now, you personally never traveled overseas to meet with ZTE, either.  Correct?

A.   Well, this was during the pandemic.  So, no, I did not travel overseas anywhere.

Q.   And after the pandemic was over, you didn't follow up and

travel to visit with ZTE about these patents.  Correct?

A.   I did not follow up and go overseas.

Q.   Okay.  And we heard what I would call some frustration on Friday with your trip to Korea.  Is that correct?

A.   It was not productive, yes.

Q.   Okay.  But you spent 18 hours on a plane, you said, going to Korea to try to get paid.  Correct, sir?

A.   To negotiate a fair and reasonable license, yes.

Q.   Which means getting paid.  Correct, sir?

A.   Yes.

Q.   Okay.  But you didn't fly overseas one time to meet with these inventors.  Correct?

A.   I did not fly overseas to meet with the inventors, no.

Q.   And these are the gentlemen that you say are making the U.S. stronger and are making American citizens safer.  Correct?

A.   Well, their inventions are.  They personally are not involved in that, I don't believe.

Q.   Okay.  Their inventions are.

You don't know what they were working on back in 2008.  Correct?

A.   Well, I do generally, yes.

Q.   Well, you don't know the details.  You don't know if they were working as, say, a large team.  Correct?

A.   Well, actually I assume they were working in a team at

ZTE.  I don't know how large it was, but --

Q.   Well, you say you assume because you've never talked to them.  Right?

A.   Well, but I've also seen their contributions to the 3GPP standard, and I've seen the textbook that one of them helped edit for technical contributions.  So I am somewhat familiar with what they were doing and what they were working on.

MS. SMITH:  I'm going to object to non-responsiveness.

THE COURT:  Sustained.

The question was, You never talked to them, and the answer you gave was not a responsive answer to that question.  You need to respond to the questions, Mr. Pitcock.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Either re-ask the question or move on, Ms. Smith.

MS. SMITH:  Thank you, Your Honor.

Q.   (BY MS. SMITH)  Well, you don't know if they were -- you weren't there, either, back in 2008, were you?

A.   No, I was not.

Q.   So you have no way to know if they're working in a lab, do you?

A.   Other than my previous answer, I never met with them personally in a lab, no.

Q.   And your previous answer you said, "I assumed."  So you'd

just be speculating, wouldn't you, sir?

A.   I would not.

Q.   You don't know what projects they were working on.

Correct?  What products they might be planning.

A.   I would actually, yes.

Q.   Now, to know what they were working on, you would need to

see their inventor notebooks.  Correct, sir?

A.   No, I would disagree with that.

Q.   Well, inventor notebooks are important, aren't they, sir?

A.   They can be, but they're not particularly important.

Q.   The notebooks where the inventors make all of

their -- put all their work, you say that's just not

important, sir?

A.   I'm saying it can be important.

Q.   It could be important, but you didn't care to ever even

ask for them, so we don't know if they're important or not, do

we, sir?

A.   I mean, anybody could have asked for them, but, no, I

didn't specifically ask for inventor notebooks, no.

Q.   Well, I couldn't ask for them, sir, could I?

A.   I believe you probably could have in the litigation, but

I don't know whether you did or not.

Q.   Setting aside the litigation, you were specially situated

to ask these inventors for their work, their notebooks, and

you just didn't do it, did you, sir?

A.   I don't know what you mean by specially situated, but I didn't ask for inventor notebooks, no.

Q.   What I mean by specially situated is you own the '776 Patent which came out of that 2008 Chinese patent.  Correct?

A.   Yes.

Q.   So that would cause you to be more specially situated than, say, the ladies and gentlemen of the jury.  Correct?

A.   Yes.  I would suppose.

Q.   Thank you, sir.

Now, having not spoken with the inventors, you don't know what the inventors think of these patents, do you?

A.   I don't personally know what they think of the patents, no.

Q.   And you don't know what they think the benefits of these patents are, do you?

A.   I don't know their personal opinions on the patents, no.

Q.   And because you haven't talked to the inventors in order to understand the alleged inventions, we have to go off what the patents -- the four corners of the patents say.  Correct?

A.   Well, I think you have to do that anyway.  But, yes, you have to use the patents and the prosecution history in the Patent Office.

Q.   And you heard your lawyer in opening statement say that this patent, the '776 Patent, and the others, were all about 5G throughput, or speed.  Correct?

A.   I don't think he said that, but I know that they increase 5G efficiency in particular.

Q.   Did you hear him mention 5G when he was making representations about what these patents -- about these patents?

A.   I did.

Q.   Okay.

     MS. SMITH:  And if we could see PDX 1.42, please. Well, that's not what I'm looking for.  I'm looking for the one that says throughput speed, please.  Thank you.

     THE COURT:  Come on, gentlemen.  Somebody step through the door.  Get in your seats.

     Let's continue.

Q.   (BY MS. SMITH)  Sir, does this look familiar?  This is something we saw from your counsel in the opening statements.

A.   I remember this from opening statements, yes.

Q.   Okay.  And we see the term 'throughput speed' up in the bright red box on the right.  Correct?

A.   I see that, yes.

Q.   And you know, sir, that the '776 Patent, we could look at that and read that patent all day and it never mentions the word 'throughput'.  Correct?

A.   I do not have it memorized -- I'm sorry -- to that degree.  I don't know if it's in there or not.

Q.   Have you taken a look at the patents you purchased, sir?

A.   Of course, yes.

Q.   And if at the heart of the patents is, as your lawyer says, is this throughput speed, that might be memorable if the patents actually said that.  Correct?

A.   Well, the patent deals with, I mean, an obvious throughput issue.  So I don't know that it needs to use that exact terminology.

MS. SMITH:  Objection, non-responsive.

THE COURT:  It's close.  Overruled.

MS. SMITH:  Thank you, Your Honor.

THE COURT:  Let's move on.

Q.   (BY MS. SMITH)  And the patent doesn't mention download, does it?

A.   I want to answer your question, I really do.  I don't recall whether it uses the word 'download' or not.

Q.   And the patent doesn't mention the word 'speed', does it?

A.   I mean, it's talking about -- I'm sorry.  I don't remember --

THE COURT:  Mr. Pitcock, it either uses the word, it doesn't use the word, or you don't know.  Pick one of those three and answer the question, please.

THE WITNESS:  I don't remember.  I'm sorry.

Q.   (BY MS. SMITH)  Thank you, sir.

Would you be surprised if it did not use the word 'speed'?

A.    Not particularly.

Q.    Okay.  Now, you know that the '776 Patent is talking about is an idle on the phone.  Did you read that in the '776 Patent?

A.    I'm sorry.  Is a what on the phone?

Q.    An idle on the phone.  Ideally.  It's my Texas accent.

A.    No.  I'm sorry.  I understood what you said.  I generally agree with you that it's talking about an idle state, yes.

Q.    Okay.  And you know that something in an idle state means that the phone is not active.  Correct?

A.    No, I would disagree with that.

Q.    Well, idle means that the phone isn't downloading anything at all, doesn't it, sir?

A.    Not really.

Q.    So your position under oath is something that is idling -- a phone that is idling is downloading while it's idle?

A.    I don't know what definition of downloading you're using.  But during this process, there is data going back and forth between the phone and the cell phone tower.

Q.    While the phone is idle, in idle.

A.    I mean, the idle state is part of what it's trying to solve, but yes.  I mean --

Q.    All right, sir.  Now, you formed GComm as a special purpose vehicle for ZTE's patents.  Correct?

A.   I did.

Q.   Your words, special purpose vehicle?

A.   It's common parlance.

Q.   Okay.  And the patents in the case were already selected to be sold by ZTE before you ever got involved.  Correct?

A.   For the most part, yes.

Q.   Okay.  And so there's no misunderstanding here from Friday, GComm was formed on August 4th, 2020.  Correct?

A.   Yes.

Q.   Okay.  Not 20 years ago.  Correct, sir?

A.   It was not formed 20 years ago, no.

Q.   And in your lawyer's opening, he mentioned your wife several times.  Right?

A.   Yes.

Q.   He seemed to take issue with me calling GComm a one-man show.  Correct?

A.   I don't think that GComm is a one-man show, but, yes, I agree with that statement.

Q.   Okay.  And in your direct testimony, you mentioned your wife several times.  Correct?

A.   I did mention my wife and children.

Q.   Okay.  And your wife's a lawyer.

A.   She is.

Q.   Okay.

         MS. SMITH:  And if we could see DDX 130, please.

There we go.

Q.   (BY MS. SMITH)  There she is.  Correct, sir?

A.   Yes, that is a picture of her.

Q.   And this is a picture of her taken off your law firm website.  Correct?

A.   It is.

Q.   And that's the Pitcock Group.  Correct?

A.   Pitcock Law Group, yes.

Q.   Pitcock Law Group.  And that's different than G+. Correct?

A.   It is.  It's a different entity.

Q.   But your lawyer said you and your wife formed this company GComm.  Correct?  You heard him -- that statement?

A.   I don't remember him saying that.

Q.   Okay.  Well, the truth is, GComm has no employees. Correct?

A.   Unless you consider me an employee, it has no other employees.  That's correct.

Q.   And you're not an employee, sir, are you?

A.   No.  I would be an officer.

Q.   So GComm has no employees.  Correct, sir?

A.   Yes.

Q.   You gave yourself the title of GComm manager.  Correct?

A.   Well, that's the legal title, but yes.

Q.   But you assumed that title.  Correct?

A.    I did.

Q.    Okay.  And you don't manage any employees.  What you do is you manage legal teams.  Correct?

A.    I manage consultants, lawyers, lots of different people.

Q.    Legal teams and all the people surrounding the legal teams.  Correct?

A.    Well, they are not just involved in legal proceedings, but yes, there are consultants having to do with the patents, yes.

Q.    Okay.  There are no other managers at GComm.  Correct?

A.    That's correct.

Q.    And because GComm is a Delaware-based LLC, it doesn't have a board.  Correct?

A.    That's right.  Legally it's not structured that way.

Q.    And, in fact, sir, your wife has no official position with GComm.  Correct?

A.    That's correct.  There's no official position for her at the company.

Q.    Because, Mr. Pitcock, you're the only human that's officially associated with GComm.  Correct?

A.    I'm the only one who's officially listed in the legal documents, yes.

Q.    So when your lawyer said that you and your wife formed this company, he was incorrect.  Correct, sir?

A.    Well, my wife owns 50 percent of everything that I do,

and we work together.  As you mentioned, we're on the same web firm site, so I wouldn't say that's exactly correct.

Q.    Well, sir, you're a lawyer.  You know there's a difference between a law firm and a GComm, LLC.  Correct?

A.    I do.

Q.    And you were the only human being officially associated with GComm.  Correct?

A.    That's right.

Q.    All right.  Now, you live in New Jersey just outside of New York City.  Correct?

A.    That's correct.

Q.    But you've actually leased some office space in Plano. Correct?

A.    I have.

Q.    And you strategically leased that space in Plano to be both close to your lawyers and close to who you call your targets.  Correct?

A.    I don't think I called them targets, but there are a lot of telecommunications companies that are located in Texas, so it's -- makes sense to have an office in Texas.

Q.    Okay.  And, coincidentally, then, SEA, Samsung Electronics America, it's also located in Plano, is it not, sir?

A.    I believe they have offices there.  I'm not sure if that's where they're headquartered or not, just...

Q.   And, sir, my question was they're located there.

A.   They have offices there, yes.

Q.   Big office.  Correct?

A.   Yes.

Q.   Okay.  Thousands of people.  Correct?

A.   I don't know how many people they have there, but I know it's a substantial office.

Q.   Okay.  Now, GComm doesn't make any products.  Correct, sir?

A.   It does not.

Q.   Okay.  And it doesn't develop any products.  Correct?

A.   It does not.

Q.   It doesn't sell any products?

A.   It does not sell products.

Q.   It does no research and no development.  Correct?

A.   I mean, we are involved in continuation patent applications from the ZTE patents, but other than that, nothing else.

Q.   You're not doing any research on new products or new innovations, are you, sir?

A.   We are not.

Q.   Okay.  In fact, you never had any intention, did you, sir, for GComm to make products?

A.   No, I did not.

Q.   Okay.  What GComm does is it buys patents, it hires

lawyers to get money from those patents.  Correct?

A.    Well, GComm tries to license patents.  And if people refuse, then we eventually have no choice but to enforce them in court.

Q.    So it buys patents, it hires lawyers, those are the folks that are enforcing or litigating.  Correct?  It hires lawyers. Right?

A.    For licensing, yes.

Q.    And it does those things to get money from the patents it bought.  Correct?

A.    Yes; to obtain licenses, yes.

Q.    And so it's GComm's mission statement, if you will, to generate revenue from patents.  Correct?

A.    Yes.

Q.    Okay.  Now, patent licensing and lawsuits like this are GComm's only two sources of potential revenue.  Correct?

A.    Licensing -- yes.  That's correct.

Q.    But GComm has not licensed anybody to its patents. Correct?

A.    Not yet.

Q.    So GComm hasn't made any money from its patents. Correct?

A.    Not to date.

Q.    Okay.  But you said not yet.  Correct, sir?

A.    That's correct.

Q.   Okay.  But if you do, if you make your 200-and-something million dollars in this case, you'll divide up that money with your partner ZTE.  Correct?

A.   ZTE is entitled to 20 percent of the net revenue, yes.

Q.   So you'll divide up any money, any reward with your partner ZTE.  Correct?

A.   I'm -- I wouldn't call them a partner that way, but yes, they will receive money if we are successful.

Q.   So you take issue with me calling them a partner?  A business associate?

A.   I'm not taking issue; I just -- that's a legal term that I wouldn't normally apply to them.  But, yes, they are a business associate.  That's fine.

Q.   And I apologize, sir.  I think I -- maybe it's a Texas thing, partner, but I meant no legal meaning.  So I do apologize.

A.   Okay.  Sure.

        MS. SMITH:  Now, Your Honor, I believe I need to seal the courtroom at this point.

        THE COURT:  All right.  This is to protect confidential information?

        MS. SMITH:  Yes, Your Honor.

        THE COURT:  All right.  Then based on counsel's request, I'll order the courtroom sealed to protect confidential information.  This will also seal this portion of

307

the record and the transcript.

Those of you that are present who are not subject to the protective order are directed to remove yourselves from the courtroom and remain outside until the courtroom is reopened and unsealed.

(Courtroom sealed.)

(Courtroom unsealed.)

THE COURT:  And having unsealed the courtroom, the jury is excused for recess at this time.

(Whereupon, the jury left the courtroom.)

THE COURT:  The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Counsel, before we continue with Defendants' cross examination of the witness, I need to confirm something on the record with you.

The Court has reviewed Document 572 and Document 573 filed on the docket, being G+'s unopposed motion for leave to add exhibits and Samsung's unopposed motion to add exhibits. On the G+ motion, those exhibits are PTX 31 and 32, and on the Samsung motion, they are DTX 162 and DTX 551.

Both motions represent that these were inadvertently missed and overlooked during the pretrial process and, as provided by the Court's standing order on exhibits, that allows the offering of an exhibit for the first time at or during trial.  Neither of these motions is opposed by the other party.

For the record, they're both granted, and these four exhibits are added to the list of exhibits that may be used properly during the trial.

All right.  Are you prepared to continue with your cross examination, Ms. Smith?

MS. SMITH:  I am, Your Honor.

THE COURT:  Mr. Sheasby, you're on your feet.  Tell me why.

MR. SHEASBY:  Your Honor, I just wanted to flag I

believe now there's going to be some discussion of the settlement offers, and the Court had indicated a limiting instruction would be given at the beginning of the discussion of settlement offers.  I do not want to intervene during the examination but wanted to give you a heads-up.

THE COURT:  Is that correct, Ms. Smith?

MS. SMITH:  It is, Your Honor.

THE COURT:  All right.  Then I'm going to instruct Defense counsel to let me know at the point but before you go into those offers, and then I'll give this instruction.

MS. SMITH:  Understood, Your Honor.

MR. CORDELL:  Your Honor, could I be heard just briefly on this?  Super succinct.

THE COURT:  This is not your witness, Mr. Cordell.

MR. CORDELL:  It is my issue, though, because if you recall in opening, G+ successfully restricted our ability to juxtapose the damages and the FRAND offers.  However, yesterday or on Friday counsel examined Mr. Pitcock extensively on the juxtaposition of the FRAND offers and settlement -- and the overall damages model.

If you recall there was a great deal of colloquy about precisely that they are asking for more now than they did in the FRAND context and why, and Mr. Pitcock testified for a couple of pages about that.

So I'm wondering if the curative instruction still

applies, given that they have essentially linked those two issues.

THE COURT:  Well, I'm going to give the instruction as indicated.  And it may be your issue, but what happened on direct is Ms. Smith's responsibility, not yours.  Have a seat.

Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen. Please have a seat.

We'll continue with the cross examination of Mr. Pitcock by counsel for Samsung.

Ms. Smith, you may proceed.

MS. SMITH:  May it please the Court.

THE COURT:  And we are unsealed at this point because I can't recess with a sealed courtroom.

MS. SMITH:  Thank you, Your Honor, for the reminder. I would ask that the courtroom be sealed.

THE COURT:  All right.  That's why I raised it just to make sure we didn't make a mistake.

All right.  Counsel's requested that I seal the courtroom to protect confidential information.  I'm going to grant that request and order the courtroom sealed.  This order will also direct this portion of the transcript to be sealed.

I'm going to direct that all persons present who are not subject to the protective order that's been entered in this

case excuse themselves from the courtroom and remain outside until it's reopened and unsealed.

(Courtroom sealed.)

(Courtroom unsealed.)

THE COURT:  Having done that, ladies and gentlemen, we're going to break for lunch.  It's about 5 minutes until noon.  I understand from Ms. Clendening your lunch should be waiting for you in the jury room.

If you will take your notebooks with you over the lunch break; follow all my instructions, including not to discuss

the case among yourselves; and in 45 minutes, give or take, we'll be back in here and we'll proceed at that point with redirect examination by Plaintiff's counsel of this witness.

The jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, the jury gets 45 minutes; you get 30 minutes.  In 30 minutes, I want to see you in chambers, and we'll go over some of the plethora of deposition designation disputes and counterdesignation disputes that you've dumped on me.

Until then, we stand in recess.

(Lunch recess.)

THE COURT:  Be seated, please.

Are you prepared to proceed with redirect, Mr. Sheasby?

MR. SHEASBY:  I am, Your Honor.

THE COURT:  You may go to the podium.

While he's going to the podium, let's bring in the jury, please.

MR. SHEASBY:  Thank you, Your Honor.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back from lunch, members of the jury.  Please be seated.

All right.  We'll proceed with redirect examination of the witness by Plaintiff's counsel.

You may proceed, Mr. Sheasby.

MR. SHEASBY:  May it please the Court.

Good afternoon, ladies and gentlemen.  Nice to see you again.

REDIRECT EXAMINATION

BY MR. SHEASBY:

Q.   Mr. Pitcock, I want to start at the beginning and ask you a -- let me withdraw it.

Mr. Pitcock, in your opening -- in your direct examination, you spoke about the patents-in-suit.  Is that correct?

A.   I did.

MR. SHEASBY:  And if we go to PDX 2.11.

Q.   (BY MR. SHEASBY)  Each of the patents-in-suit, what were they declared as potentially essential to?

A.   5G.

Q.   And this is for the '776, this is for the '130, and this is for the '443.  Is that correct?

A.   That's correct.

Q.   Now, you obtained the patents, they were assigned to G+ in 2020.  Correct?

A.   That's correct.

Q.   And between 2020 and when you sent formal notice to Samsung on September 2021, did any steps or analysis occur?

A.   Yes; substantial.

Q.   What occurred?

A.    So we -- after we had done the diligence on the patents as part of the transaction, we ended up hiring a technical consultant in order to chart the claims of the patents against the 5G standard.

Q.    Counsel for Samsung suggested the patents were simply selected by ZTE.  Was that an accurate or an inaccurate statement?

A.    That was an inaccurate statement.

Q.    How long did the law firm you worked with analyze ZTE's portfolio to select these patents?

A.    They worked for more than a year to review the patents.

Q.    And counsel for Defendant suggested that in September of 2021, you simply sent a list with the patent numbers on them.  Do you recall that?

A.    I do.

Q.    Was that an accurate or an inaccurate statement that was made to the jury?

A.    That was inaccurate.

Q.    What type of detail was included in the September 2021 notice that went out to Samsung?

A.    So as you can see from the pull-out here, we had a listing of the various families, the title, what it related to in terms of technology, the technical standards.  This ISDL number is the reference number for the declarations of essentiality to the standard as well as the other patents in

the same family.

Q.    And in addition to this detailed information that Samsung could analyze, did you present anything else?

A.    We did.  We sent them claims charts.

Q.    And counsel for Defendant Samsung entities suggested that the jury did not hear or see any evidence on infringement or essentiality in your direct examination.  Was that an accurate or an inaccurate statement?

A.    That was inaccurate.

Q.    What was presented to Samsung in DTX 25, which is an exhibit the jurors can actually go and look at?

A.    So in this exhibit, and this is just an excerpt from it, it's a very detailed comparison between claim 1 of the '776 Patent and the technical standards that are part of 5G.

Q.    And is this the recipe book?

A.    Yes.  So the technical standards are the recipe book that all implementors use when they implement 5G.

Q.    And how many claim -- for the patents-in-suit, how many claim charts did Samsung receive?

A.    Well, they eventually received a claims chart for each of the patents-in-suit.

Q.    And they received additional claim charts for other patents that you held?

A.    That's correct.

Q.    All right.

MR. SHEASBY:  Can we go to slide 34, Mr. Svenson?

Q.   (BY MR. SHEASBY)  So I want to talk about the time from the original claim -- between 9/2021 when you sent the original notice to the time Samsung made its first offer for settlement.  Did Samsung ever in writing dispute the essentiality or validity of the patents?

A.   They did not.

Q.   Did Samsung ever present any technical confidential information to you?

A.   They did not.

Q.   After the NDA was signed, did Samsung present any confidential license agreements with you?

A.   They did.

Q.   Did Samsung ask for any confidential license agreements from you?

A.   They did not.

Q.   So when counsel for Samsung represented to the jury that the NDA was necessary for Samsung to send confidential information that that they wanted to send you, was that an accurate or inaccurate representation?

A.   In my opinion, it was inaccurate.

MR. SHEASBY:  Let's pull up JTX 1, Mr. Svenson.  And for the context, JTX 1 is the first of the patents-in-suit. It's the '776.  Let me know when you're ready, Mr. Svenson. Wonderful.  And why don't we blow up the title and the

inventors.

Q.   (BY MR. SHEASBY)   Now, counsel for Samsung represented to the jury on their examination that you didn't know anything about the inventors of these patents.   Do you recall that?

A.   I do.

Q.   Was that an accurate or inaccurate representation?

A.   It's largely inaccurate.

Q.   Can you tell us about the inventors on the '776 Patent as well as the other patents-in-suit and what detailed information, if any, exists on their work?

A.   So the inventors on the patents-in-suit have over 500 publications in technical fields related to 5G.   Two of them, including Zhongda Du, who was mentioned by opposing counsel, edited essentially a textbook on 5G, technical articles related to 5G, and they have all had numerous technical contributions to the 3GPP standards.

Q.   And counsel for Samsung made reference to lab notebooks. Do you remember that?

A.   I do.

Q.   And for telecommunications, what is the document that evidences the technology that's been created?

A.   So in telecommunications, usually it's the contribution to the standards.   So they're working on documents to present to 3GPP that describe the inventions.

Q.   Did all the inventors make contributions to the

396

standards?

A.   They did.

Q.   Are those standards accessible to any member of ETSI, including Samsung?

A.   They are.

Q.   Did counsel for Samsung show you a single one of the hundreds of contributions that these inventors made to the patents?

A.   They did not.

MR. SHEASBY:  Madam Courtroom Deputy, if I could have the elmo.

Q.   (BY MR. SHEASBY)  Counsel for Samsung represented that these patents were old technology or technology that was not very valuable.  Do you recall that?

A.   I do.

Q.   And I want you to speak to the ladies and gentlemen of the jury -- I withdraw that question.

They also said -- I think counsel suggested that the word 'speed' did not occur in writing of the patents.  Do you recall that?

A.   I do.

Q.   Can you describe for the ladies and gentlemen of the jury what the importance is of the '776 Patent and how it creates that remarkable speed increase?

A.   So while I'm not a technical expert, it was explained to

me that it's essentially a method for every time you drop a call, you lose the connection to a cell tower, or you're moving and you need to switch from cell tower to cell tower, it's a way of incorporating frequency information into that switch to make it much faster.

Q.   And can you describe the importance of the '130 Patent as you understand it?

A.   So the '130 Patent, it's essentially trying to make the signals that you have to send throughout the network --

MS. SMITH:  Objection, Your Honor.  We're getting into expert opinions.  These aren't his opinions and he's not been tendered as an expert.

MR. SHEASBY:  Your Honor, he was asked extensively about whether the word 'speed' or idle occurs in the patents. He is a patent attorney, he has an understanding of this technology, and he should be able to explain why these patents are directly related to speed based on the direct -- cross.

THE COURT:  He's clearly said in his answer on the '776 that he is relating what someone else has told him.  We don't need hearsay testimony.  I'm sure who told him that is going to testify later in the case and can talk about it on a first-hand basis.  So I'm going to sustain the objection.

MR. SHEASBY:  Okay.  Thank you, sir.

Q.   (BY MR. SHEASBY)  At any point in time, did Samsung in its negotiation with you, either before or after the NDA was

signed, ever once point to you a single Samsung patent that had the same performance benefit as these patents?

MS. SMITH:  Objection; leading.

THE COURT:  Sustained.

Q.   (BY MR. SHEASBY)  Did Samsung ever point to you any Samsung patents during your negotiation with them?

MS. SMITH:  Objection, leading.

THE COURT:  Sustained.

Q.   (BY MR. SHEASBY)  Were there any patents discussed during Samsung's negotiations?

A.   Samsung never brought up any patents during our negotiations.

Q.   Did Samsung make any statements relating to the quality of its patents?

A.   They did not.

Q.   Mr. -- counsel for -- Mr. Cordell in opening and counsel for Samsung on cross examination talked to you about skin in the game.  Correct?

A.   Yes.

Q.   And they suggested that the purchase price of these patents was $600,000.  Is that correct?

A.   That's what they suggested, yes.

MR. SHEASBY:  And if we could have PDX 2.55.  So this is back to the demonstratives.

Q.   (BY MR. SHEASBY)  What are we looking at on DTX 18?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

399

A.   So this is a blow-up of part of the agreement with ZTE to transfer the patents.

Q.   And down below is the percent net royalty that you're obligated to pay to ZTE.  Correct?

A.   That's correct.

Q.   And that's a 20 percent net royalty?

A.   That's correct.

Q.   Now, in addition to the agreement, has G+ had to invest in litigation costs associated with ensuring that Samsung complies with the law?

A.   That's correct.

Q.   How much has those litigation costs been for G+?

A.   Spent about $9 million to date.

Q.   And I now want to talk about -- Samsung counsel made some reference to negotiations regarding NDAs.  Do you remember that?

A.   I do.

        MR. SHEASBY:  And if we could have slide 26, please, Mr. Svenson.

Q.   (BY MR. SHEASBY)  And this is part of the NDA that was proposed by Samsung.  Is that correct?

A.   That's correct.  This is an excerpt from that.

Q.   And this was another part that -- by the way, did counsel for Samsung show you this part of the NDA they proposed --

A.   They did not.

Q.    -- on cross examination?

A.    Sorry.

Q.    What was your understanding of what this NDA would have done if you would have signed it?

A.    We wouldn't have been able to show you the notice and the claims charts that we had sent to Samsung.

Q.    And counsel for Samsung represented that you never expressed concern about the NDA to Samsung.  Correct?

A.    That's correct.

Q.    Was that an accurate or an inaccurate statement?

A.    That's inaccurate.

Q.    This is the January 20, 2022, letter that you sent.  What does it say in the yellow highlighted passage?

A.    It says, "Moreover, the draft appears to contain forum selection and other clauses that are not only unnecessary, but contrary to the spirit of good faith negotiations obligatory to both parties in a fair, reasonable, and non-discriminatory (FRAND) licensing negotiation."

Q.    Did Samsung ever dispute that?

A.    They did not.

        MR. SHEASBY:  If we could have slide 54, Mr. Svenson.

Q.    (BY MR. SHEASBY)  Is this another example of where you expressed concerns to Samsung?

A.    It is.

Q.    And what were your concerns?  And did Samsung ever express -- dispute the concerns you've expressed in this DTX 50?

A.    So the concerns I expressed were that the proposed agreement was really a one-sided non-use agreement and abusive.  We had previously agreed to keep discussions confidential under one of the Federal Rules of Evidence.  We had also suggested that we could keep settlement discussions confidential under the protective order, which counsel referenced in this case, and that we were willing to discuss any specific provisions that needed to be added to the protective order.

Q.    I now want to --

        MR. SHEASBY:  If we could go to slide 33, Mr. Svenson.

Q.    (BY MR. SHEASBY)  At any point in time between September 2021 and the initiation of the federal lawsuit, did Samsung ever dispute essentiality or validity?

A.    They did not.

Q.    Did they request additional information from you or request a meeting?

A.    They did not.

Q.    Did they make any counteroffer?

A.    They did not.

Q.    After the federal lawsuit was filed, did they respond the

next day and say something?

A.    They did not.

Q.    How long did it take them to even respond to you?

A.    I believe the first communication was May 12th, 2022.

Q.    And May 12th, 2022, of course at that point they would have made an offer.  Correct?

A.    They did not.

Q.    In May of 2022, they would say -- well, I withdraw the question.

At any point in time before or after the NDA, did they share with you the copy of the ZTE/Samsung license agreement?

A.    They did not.

Q.    Did they tell you that ZTE/Samsung license agreement was relevant to any issue in your negotiation?

A.    They never did.

Q.    Does ETSI provide rules for what happens when the parties cannot come to a voluntary agreement?

A.    It does.

MR. SHEASBY:  If we can have PDX 32.

Q.    (BY MR. SHEASBY)  What is the sole dispute resolution mechanism set out by ETSI?

A.    The only thing you can do if you're unable to agree to a license agreement is bring a lawsuit like this one.

Q.    Samsung's counsel suggested to the jury that you violated the ETSI rules by initiating legal proceedings.  Do you

remember that?

A.    I do.

Q.    In your view, is that accurate or inaccurate with the rules that govern FRAND negotiations?

A.    In my view, it's inaccurate.

Q.    What national court of law has sole authority over the dispute about the damages for infringement of U.S. patents?

A.    Federal courts in the United States like this one.

        MR. SHEASBY:  Let's go to slide 46, Mr. Svenson.

Q.    (BY MR. SHEASBY)  We saw this.  How many times did you attempt to convince Samsung or propose to Samsung confidentiality provisions that they could have used if they needed them?

A.    Several times.

Q.    Did they accept any of your proposals?

A.    They did not.

Q.    Now, counsel for Samsung talked about a protective order that Mr. Dell had signed.  Do you remember that?

A.    I do.

        MR. SHEASBY:  And if we could have PDX 2.60.

Q.    (BY MR. SHEASBY)  Counsel didn't show the protective order to the ladies and gentlemen of the jury, did she?

A.    I don't remember that, no.

Q.    And under your understanding of the protective order, could Mr. Dell share or use a single piece of information

under the protective order for the purposes of settlement negotiations when it says, under this order only in the litigation of this action and shall not be used for any other purpose.  Let me withdraw the question and ask it this way.

You see where the protective order says that designated material can only be used in the litigation of this action and shall not be used for any other purpose?

A.    I do.

Q.    Did Mr. Dell -- was he legally able to share any information under the protective order with you or in the settlement negotiations?

A.    So he could not have shared any material designated Outside Eyes Only Attorneys.

Q.    And could he share any of that information with you?

A.    No, he couldn't have.  I'm not one of the attorneys in the case.

Q.    You spoke about -- counsel spoke to --

MR. SHEASBY:  We can take that down, Mr. Svenson.  I can take it down, Mr. Svenson.

Q.    (BY MR. SHEASBY)  We spoke about the fact that -- counsel made reference to a comparable license methodology and a top-down methodology.  Remember that?

A.    During the settlement negotiations, yes.

Q.    Did any of those methodologies have the benefit of confidential Samsung information?

A.    They didn't.  They were based solely on publicly available information.

Q.    If confidential information is available, what method do you use to determine a royalty?

A.    So my understanding is you're supposed to use the specific information related to the patents at issue.

         MR. SHEASBY:  And if we could go back to the elmo, Madam Courtroom Deputy.

Q.    (BY MR. SHEASBY)  Is this an example of specific information that the jury will have available to them?

A.    It is.

Q.    Now, I also want to speak about one final thing, which is counsel suggested, I think, that perhaps you had a vendetta against Korean companies like Samsung.

         MS. SMITH:  Objection, Your Honor.  I did not suggest anybody had a vendetta.

         THE COURT:  Ask a question, Mr. Sheasby.  Don't characterize opposing counsel's examination.

         MR. SHEASBY:  Thank you, Your Honor.

Q.    (BY MR. SHEASBY)  Can you explain -- counsel -- can you explain why the patent system that involves accepting innovations from overseas companies makes us safer?

A.    So all the technology that's being used for 5G is used by people who need to get data to each other quickly, whether it's doctors, first responders, police, everybody who uses a

mobile cell phone, which is almost everyone these days, benefits from this technology.

The trade that you make is by disclosing the technology here in the United States so that we can all use it, you're supposed to receive a reasonable royalty for its use.

Q.   And when Samsung, in your opinion or your view, what happens to this system of foreign overseas global technology coming in and being used and disclosed in our country if companies like Samsung don't comply with the law?

THE COURT:   Mr. Sheasby, this is not an expert witness.  That is a rank opinion you are asking for.

MR. SHEASBY:   I withdraw the question, Your Honor.

Q.   (BY MR. SHEASBY)  Mr. Pitcock, two final questions.

First, I want to be very clear --

MR. SHEASBY:   If we go to PDX 1.57.  PDX 2.57. Excuse me, Mr. Svenson.

Q.   (BY MR. SHEASBY)  Who owns the patents at issue in this case?

A.   G+.

Q.   And is this -- what is this document that's being depicted here?

A.   This was the -- so the Patent and Trademark Office has a recording system where you can essentially show who owns patents and you record that so that anybody can access it.

Q.   And what does this show as the owner of the

patents-in-suit in this case?

A.   So this shows that we were the owner -- I believe this was filed in November, shortly after the transaction.

Q.   And these are the two -- the '130 and '443 Patent.  Is that correct?

A.   I believe so.

Q.   And what patent is that?

A.   The '776 Patent.

MR. SHEASBY:  Your Honor, may I approach just briefly?

THE COURT:  Approach the bench.

MR. SHEASBY:  Thank you, Your Honor.

(The following was had outside the hearing of the jury.)

THE COURT:  Yes, sir.

MR. SHEASBY:  There was repeated examination about ZTE being sophisticated and there being problems with transferring patents for the use of asserting.  And based on that, I would like leave to make clear that Samsung uses the same mechanism for patents that it uses -- that it was not one time, there was extended examination about there was something improper about ZTE making these transfers or that these patents --

THE COURT:  You're talking about a special purpose entity like G+ being created to monetize ZTE's patents?

MR. SHEASBY: Yes. And Samsung does the exact same thing.

MS. SMITH: Well, he's trying to call Samsung a troll, and I went nowhere near this.

THE COURT: That's okay. It's already been addressed. Mr. Pitcock made it clear that that model's been used throughout the industry. He said that in his response.

MR. SHEASBY: I understand. But because it was repeatedly said by her, I would like permission to just say, does Samsung use this model. That's all I want to ask.

THE COURT: No. Overruled.

MR. SHEASBY: Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

Q.   (BY MR. SHEASBY) Mr. Pitcock, thank you for your time.

MR. SHEASBY: I pass the witness, Your Honor.

THE COURT: All right. Is there additional cross examination?

MS. SMITH: Yes, Your Honor, briefly.

THE COURT: All right. Proceed with additional cross, please.

RECROSS EXAMINATION

BY MS. SMITH:

Q.   Hello, again, Mr. Pitcock.

A.   Hello.

Q.   Now, you said that you asked Samsung to agree to use a protective order instead of an NDA.  Did I hear that correctly?

A.   That was one of the alternatives I suggested.

Q.   Okay.  But you know, sir, that the PO only applies to counsel and experts.  Correct?

A.   I don't believe that's correct.

Q.   Well, let's take a look at it.

        MS. SMITH:  If we could pull up PDX 2.60.

        THE TECHNICAL ADVISOR:  No.  The highest I have is 35.

        MS. SMITH:  Excuse me, Your Honor.

        THE COURT:  Take a moment.

                (Pause in proceedings.)

Q.   (BY MS. SMITH)  Well, I can short-circuit this, sir.  You know that you and Mr. Jeon are not part of the PO.  Correct?

A.   I don't understand that, so no.

Q.   You agree that you and Mr. Jeon, Mr. Jeon is not part of this PO.  Correct?  You didn't sign off on this PO?

        THE COURT:  You mean protective order when you say PO, counsel?

        MS. SMITH:  Yes, Your Honor, yes.

        THE WITNESS:  I don't understand that.

Q.   (BY MS. SMITH)  Well, you would know if you were.  Fair, sir?  You signed off on some protective order?

A.    If you're asking me whether I signed an undertaking under the protective order, then, no, I did not.

Q.    Thank you.

A.    I assume Mr. Jeon did not, either.

Q.    That's what I'm asking.  Thank you, sir.

Now, you talked a little bit about, again, the patent selection process, and I believe you said that ZTE didn't select the patents.  Is that what I heard?

A.    I'm not sure what you heard, but it was a process where a law firm was working with ZTE to select patents.

Q.    And that law firm is Mr. Robinson's law firm.  Correct?

A.    Well, it was his law firm at the time.  He's not there any longer.

Q.    And Mr. Robinson's law firm at the time did a lot of work and Mr. Robinson did a lot of work for ZTE.  Correct?

A.    I know they did some work.  I don't know exactly how much they did.

Q.    So ZTE wasn't selecting the patents, but the lawyers that do some work for ZTE were selecting the patents.  Correct, sir?

A.    I believe they were working together.

Q.    Okay.

MS. SMITH:  Now, if we could see JTX 18, please.

Q.    (BY MS. SMITH)  And that's that declaration you visited with Mr. Sheasby about.  Correct?

A.    I know it's one of the declarations, yes.

Q.    Okay.  He put it on a slide.

MS. SMITH:  All right.  If we could see page 10 of that declaration and if we could highlight the last row.

Q.    (BY MS. SMITH)  And what we see here is that this declaration is declaring the patent essential to LTE.  Correct?  Not 5G.

A.    Well, I think it's saying that it might be relevant to LTE, yes.

Q.    Okay.  And if we go over, we look and we see it says cell reselection method and terminal.  Do you see that, sir?

A.    I do.

Q.    All right.

MS. SMITH:  And if we could pull up JTX 1, please, sir.

Q.    (BY MS. SMITH)  And what we see is right by 54, we see the same wording on the '776 Patent--cell reselection method and terminal.  Correct?  Do you see that?

A.    Yes.  That's the title of the patent.

Q.    It's the same title that we saw down in that LTE declaration.  Correct?

A.    Yes.

Q.    So you understand that ZTE declared the '776 Patent to the 4G LTE standard.  Correct, sir?

A.    They declared it might be essential to 4G, yes.

Q.   May or may become essential.  Correct?

A.   That's right.

Q.   Okay.  Now, let's talk a little bit about the $9 million that you said you put into -- your expenses for this litigation.  Correct?

A.   Yes.

Q.   Is that expenses just in this case or is that all five cases you've brought against Samsung?

A.   Well, there are three country cases, yes, and it would include all the lawsuits, yes.

Q.   Okay.  So out of your skin in the game, which is -- well, out of your cut, your 80 percent cut, you have to carve out $9 million to cover your expenses.  Correct?

        MR. SHEASBY:  Your Honor, may we approach?  Objection.

        THE COURT:  Approach the bench.

        (The following was had outside the hearing of the
        jury.)

        MR. SHEASBY:  Executive compensation is an express MIL in this court.  She's gone over this repeated times.  What she's trying to get at, there's litigation funders who take up a large portion of that 80 percent.  This has no relevance whatsoever to anything in this case.

        THE COURT:  Where are you going with this, Ms. Smith?

MS. SMITH:  Mr. Sheasby put this in issue.  I'm responding to Mr. Sheasby's redirect specifically.  I was never --

THE COURT:  I understand he raised it, but how are you responding to it?

MS. SMITH:  They corrected me and said I was not making accurate statements.  So it was a personal attack on me, and so I have to clear up the record that I will agree that, you know, there's a $9 million carve-out, but he still gets the rest of the 80 percent.

MR. SHEASBY:  He does not get the 80 percent.  He does not because of litigation funding.  He testified he gets 10 percent.  She's doing something that could only elicit information about litigation funding or who the other source of information.  She can -- it has no basis other than the MIL about litigation funding or the structure of investors --

MS. SMITH:  That's not why I asked the question, Your Honor.

THE COURT:  We're not going to talk about litigation funding, but I don't see that the question requires it.

MS. SMITH:  It doesn't.  I don't want to hear anything about litigation funding.

THE COURT:  I'll allow the examination to extend the way you described it to me.

MS. SMITH:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

Q.   (BY MS. SMITH)  Mr. Pitcock, would you like me to repeat the question?

A.   If you wouldn't mind.  Sorry.

Q.   Of course.  Of course.  So you talked to your lawyers about the $9 million that you've spent across the five lawsuits against Samsung.  So I stand corrected.  The 80 percent, your 80 percent share, would be less the $9 million.  Correct?

A.   Yes.  It would be less that $9 million.

Q.   Okay.  But you would still stand to -- your reward for this litigation would still be tens and tens of millions of dollars, would it not, sir?

A.   My reward, if the jury would hold in our favor, could be tens of millions of dollars, yes.

Q.   Thank you, sir.

         MS. SMITH:  I'll pass the witness, Your Honor.

         THE COURT:  All right.  Is there further direct?

         MR. SHEASBY:  There is no further direct, Your Honor.

         THE COURT:  All right.  You may step down, Mr. Pitcock.

         THE WITNESS:  Thank you.

         THE COURT:  If you'll return to your seat at counsel

table as corporate representative for the Plaintiff.

I'll ask plaintiffs to call their next witness.

MR. MANZIN-MONNIN:  Plaintiff calls Dr. Robert Akl.

THE COURT:  All right.  Doctor Akl, if you'll come forward and be sworn, sir.

You may go to the podium, counsel.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat at the witness stand, Doctor Akl.

Counsel, are there binders to distribute in advance of examination?

MR. MANZIN-MONNIN:  Yes, Your Honor.

MR. SHEASBY:  May I approach the Court?

THE COURT:  Let's get that done.

MR. MANZIN-MONNIN:  The witness has theirs and counsel have theirs.

THE COURT:  All right.  If everybody is seated and we're ready to proceed, counsel, proceed with direct examination.

MR. MANZIN-MONNIN:  Thank you, Your Honor.  May it please the Court.  Benjamin Manzin-Monnin for Plaintiff G+.

ROBERT AKL, PhD.,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MANZIN-MONNIN:

Q.    Good morning, Doctor Akl.  Can you introduce yourself to the jury?

A.    Yes.  My name is Robert Akl.  My family came to this country when I was four.  I went to school in Maryland.  I went to college in St. Louis.  And then I moved to Texas for the majority of my professional career where I live in the D/FW area.

Q.    Now, before we get into your analysis, can you summarize the conclusions that you reached in this case?

A.    Yes.  My conclusions are that Samsung infringes claims 1 and 2 of the '776 Patent, claim 20 of the '130 Patent, and claim 10 of the '443 Patent.

Q.    Can you describe your professional background?

A.    Yes.  I have a Bachelor of Science in computer science, a Bachelor of Science in electrical engineering, a Master of Science in electrical engineering, and a Doctor of Science in electrical engineering, all from Washington University in St. Louis.

Q.    And what do you do now?

A.    I am a professor at the University of North Texas.  I've been a professor for over 20 years in the Department of Computer Science and Engineering.

Q.    What research contributions have you made in the field of wireless communications?

A.    I have authored over a hundred scientific publications,

journal papers, conference papers, presentations, and taught over a hundred courses in the field.

Q.   And are you involved in any charitable efforts in this field?

A.   Yes.

Q.   And could you tell me about those?

A.   Yes.  So for 12 years I was able to raise over a million dollars from the state of Texas and from foundations to have summer camps for middle and high school kids to come to UNT for a week and learn about robotics, learn about programming. And it's a way to get women and young men interested in engineering at that point where it's critical to them in the middle school/early high school.

Q.   Have you consulted on wireless communication technology?

A.   Yes.  I have consulted in the field for many years.

Q.   Have you ever been hired by the attorneys from Fish & Richardson to analyze cellular communication systems?

A.   Yes, I've actually worked with counsel for Samsung over 20 times in the past.

         MR. MANZIN-MONNIN:  Your Honor, we offer Doctor Akl as an expert on mobile communications, including on the subject matter of the asserted patents.

         THE COURT:  Is there objection?

         MR. CORDELL:  No objection, Your Honor.

         THE COURT:  Without objection, the Court will

recognize this witness as an expert in those designated fields.  Please continue.

Q.   (BY MR. MANZIN-MONNIN)  How did you approach your task in this case?

A.   So first I looked at the patents.  Then I looked at the accused products.  I looked at documentations on the products, both confidential and publicly available.  I looked at source code, and source code is the actual programming that runs on the chips in the phones.  I looked at testimony of Samsung engineers, and I also looked at the communications between the parties, the Court's claim construction.  And, finally, I looked at the standards from the 3GPP body related to 5G.

Q.   And what are 5G specifications?

A.   So companies come together and then submit proposals, and the best proposal usually gets adopted.  And then you have these standards that incorporate that technology that everybody uses for interoperability.

Q.   And is there another G+ expert who's going to be focused specifically on these standards?

A.   Yes.  Doctor Kowalski will testify also.

Q.   And how does your analysis compare to his?

A.   So I am looking at the actual source code, and I do an analysis on exactly how the products behave and implement the functionality.  I also look at the standards.

Doctor Kowalski will describe the standards and

419

how -- and why they're important.

Q.    Now, does 5G represent a significant change from 4G?

A.    Yes.   5G is at least ten times faster than 4G.

Q.    And what are you showing here?

A.    So what I'm showing on this figure is the frequency that is used in 4G, and the frequency is under 6 gigahertz.  So just like your FM radio, AM radio, there is a frequency range that is used and regulated by the FCC.  For 4G, we operate under 6 gigahertz.  For 5G, you can go up to a hundred gigahertz.

Q.    Can you give us a sense, how many vibrations per second is a hundred gigahertz?

A.    So mega is 10 to the 6th.  Giga is 10 to the 9.  So it's, you know, millions and millions in terms of the vibrations per second at that frequency.

Q.    Does a hundred million sound about right?

A.    Yes.

Q.    Is 5G widely used?

A.    Yes.  5G is widely used in Texas, and there are thousands of cell towers that are used in Texas.

Q.    What is a cell tower?

A.    So the phone is the cell phone because the term cell comes from the area that a -- that's covered by a tower.  So we call it a cell tower, which is the antenna that you may see driving on the highway or on top of buildings, and it covers

an area.  That's where the power from the antenna is received.  That's called the cell, and the antenna is called a cell tower.

Q.    Is it also called a base station if we hear that word?

A.    Yes.  The base station is the little room that's at the bottom of the tower with the computers.  But a lot of times those terms are used interchangeably.

        THE COURT:  Doctor Akl, could you slow down just a little bit?

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  I'd appreciate it.  Thank you.

    Let's continue, counsel.

Q.    (BY MR. MANZIN-MONNIN)  Did you oversee any independent testing as part of your analysis?

A.    I did.

Q.    And can you describe that testing?

A.    Yes.  So I worked with a third party that can capture and provide me with the actual communication that the phone does with a tower.

Q.    And what are you able to observe with that testing?

A.    So they use a laptop that they connect the phone to, and that laptop will record all the messages that's communicated between the phone and the cell tower.  So I can look at the data going from the phone to the cell tower and the data that's coming from the cell tower to the phone and analyze it.

Q.   Now, did Samsung perform any testing to dispute your findings?

A.   No.

Q.   What is a patent claim?

A.   The claims are the numbered sentences at the end of the patent.

Q.   How did you assess the meaning of the claims?

A.   So the Court helps us out and for some terms there is a claim construction order and we use the definitions given by the Court.  For all the other terms, we use plain and ordinary meaning as understood by a person of ordinary skill in the art.

Q.   What level of training would a person of ordinary skill in the art of cellular communications have had in this case?

A.   They would be somebody with like a Bachelor's degree in computer science or electrical engineering or similar field and about two years of experience.

Q.   And how is infringement determined?

A.   So you look at the claim language and you see if it's literally infringed, literally practiced, by the accused products or you can see if it's practiced under doctrine of equivalents.

Q.   What's that?

A.   So doctrine of equivalents is when you don't have literal infringement, if the product behaves substantially the same

way, does substantially the same function in substantially the same way to obtain substantially the same result, it's called function way result test. If it meets it, then you can say it infringes under the doctrine of equivalents.

Q. Just to make sure this is all clear, so you analyze each claim element against the product, and if one's not literally there, it can still infringe under this test?

A. Yes. There would be literally infringement on a claim, single element of a claim analysis that would support that.

Q. How many hours have you spent working on this case?

A. Hundreds of hours over four years.

Q. And did you prepare reports in this case that provide the details of your analysis?

A. Yes. Over a thousand pages of reports.

Q. Are you being compensated for your time working on the case?

A. Yes.

Q. Is your compensation dependent in any way on the outcome of the case?

A. No. I have no financial stake in this matter.

Q. Let's turn to the technology at issue in this case.

What aspects of wireless communications are you going to be discussing?

A. So for the first patent, the '776, I'm going to talk about cell reselection. And then for the other two patents,

the '130 and the '443, I'm going to talk about uplink control signaling.

Q.    We'll get back to those in more detail.

For now, what Samsung products are at issue in this case?

A.    The Samsung 5G Note, the Samsung 5G Galaxy S, the Galaxy A, the Galaxy Z, the Galaxy Tab 5G, and those are going to have a Qualcomm chip or a Samsung chip.

Q.    Are these all 5G devices?

A.    Yes.

Q.    Are there any differences in your infringement analysis of the various accused phones?

A.    No, not for the functionality that I'm going to be looking at.

Q.    Why do processors like the ones made by Qualcomm and the ones made by Samsung operate in the same way?

A.    Because they all have to comply with the 5G standard, and they need to operate with other phones and other base stations.  Because of the standards, they all tend to work the same way.

Q.    Let's turn to the '776 Patent.  What are you showing here?

A.    So this is the cover or part of the cover of the '776 Patent, which shows the full number of the patent, we refer to the last three numbers for ease of use, the date, and the title, cell reselection method and terminal.

Q.   There was some questions earlier about the -- whether the exact word 'speed' is located in this patent.  Do you recall that?

A.   Yes.

Q.   Now, does this patent have anything to do with speed?

A.   Yes.  It's a benefit.

Q.   What is cell reselection?

A.   So cell reselection is the process where a phone, and I show one here in the middle, needs to find and use the best cell tower--and in this example we see three on the left and three on the right--in order to really take advantage of 5G. You want the phone to connect to the best tower that gives you the best signal.

Q.   Are there challenges for a phone to choose which cell tower to connect to?

A.   Yes.

Q.   And what are some of those challenges?

A.   So first there is a lot of towers and a lot of different frequencies for these towers.  So the phone has to know which is the best tower to connect to, because if it doesn't, then you're not going to have the full advantage of 5G on your phone.

Q.   And what is ping-ponging?

A.   Ping-ponging, just like the sport where the ball goes back and forth, we use the term ping-ponging as something bad

where if the phone is switching back and forth between two towers, it's called a ping-pong effect and it's a bad thing. It wastes resources and it's not something you want.

Q.   How do the challenges associated with cell selection compare between 4G and 5G networks?

A.   So the problems are much harder in 5G because you have a lot more towers, because you also have a lot more frequencies, and because also the higher the frequency, the smaller the range or the penetration of that signal.  And so as we go to higher and higher frequencies, those cells are going to be smaller, so you're going to need a lot more of them.  And you're going to have a lot more frequencies, so you have a lot more choices.  And so picking the right one and making the right choice is very important.

Q.   And if we look at an example with several cell towers of different frequencies, can you explain why not just choose the closest one?

A.   So more often than not, the closest tower may not be the best tower because there could be a building, there could be something interfering.  That could be -- the frequency isn't the right one for that instance.  So you have to look at the towers that are neighboring, and the phone needs to decide, should I connect to the one that is closest or, in this example, the green one is closest but the one on the left may actually be the one that I need to connect to to get the best

signal to take full advantage of 5G.

Q.   Let's turn to the claims.  Did you do a patent claim analysis?

A.   Yes.

Q.   And which Samsung products did you analyze for the '776 Patent?

A.   I analyzed the Samsung phones with the Qualcomm chip and the Samsung phones with the Samsung chip.

Q.   For your analysis of the '776 Patent, were there any differences between these accused devices?

A.   The -- I see the source code, the actual programming for both.  It's fairly similar, and we're going to walk through both, but the functionality at a high level is the same.

Q.   And so as it relates to your infringement analysis, any differences?

A.   No.

Q.   What is the first element of claim 1?

A.   It's -- so the first element, I have them labeled just so that it makes it easier.  So the A, B, C, D are my own labelings, and the first element is element 1A, which starts with a cell reselection method.

Q.   Do the accused products perform a cell reselection method?

A.   Yes.

Q.   And what are you showing here?

A.    So I'm showing deposition testimony.  And so Samsung puts forth engineers and corporate representatives that can answer questions that G+ wants answers to.  And this is an example of testimony under oath by Mr. Han from Samsung.  When asked, Do the Samsung phones perform cell reselection, he says yes.

Q.    When cell reselection occurs, is the phone connected to a serving cell with a first priority?

A.    Yes.

Q.    And do the other cells in the area each have a second priority?

A.    Yes.

Q.    How does the source code show us that?

        MR. MANZIN-MONNIN:  Oh, excuse me, Your Honor.  Before I go forward, I do think we need to seal the courtroom at this stage.

        THE COURT:  All right.  Based on counsel's request, I'm going to order the courtroom sealed at this time.  I'll direct that those present who are not subject to the protective order that's been entered in this case excuse themselves until the courtroom's reopened and unsealed.

                        (Courtroom sealed.)

(Courtroom unsealed.)

(Brief recess.)

THE COURT:  Be seated, please.

Mr. Manzin-Monnin, are you prepared to go forward with the remainder of your examination?

MR. MANZIN-MONNIN:  Yes, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen. We'll continue with the Plaintiff's direct examination of Dr. Robert Akl.

Counsel, please continue.

MR. MANZIN-MONNIN:  And, Your Honor, we're going to be entering into third-party confidential information right away, so I would ask that we seal the courtroom.

THE COURT:  All right.  Based on counsel's request,

I'll order the courtroom and the transcript sealed.  I'll direct that all persons not subject to the protective order in this case excuse themselves and remain outside the courtroom until it's reopened and unsealed.

(Courtroom sealed.)

512

(Courtroom unsealed.)

THE COURT:  Are there any binders to distribute at this point?

MR. CORDELL:  Yes, Your Honor.  We took the liberty of providing the Court and the witness's binders at the break. So they're all behind me.

I didn't know if counsel wanted to retrieve his --

MR. MANZIN-MONNIN:  Oh, sure.  Thank you.

MR. CORDELL:  Your Honor, may I move the easel up a bit?

THE COURT:  You may.

MR. CORDELL:  Again, I don't know if counsel needs the electronics.

THE COURT:  Anything you left behind, please pick it up.

MR. MANZIN-MONNIN:  Apologies, Your Honor.

THE COURT:  We follow the kindergarten rule.  We

clean as we go around here.

MR. MANZIN-MONNIN:  I don't want to lose it.

THE COURT:  More things have been lost around here.

Can you see that in the jury box?  Okay.

Are you ready to proceed, counsel?

MR. CORDELL:  Yes, I am, Your Honor.

THE COURT:  Let's proceed then.

CROSS EXAMINATION

BY MR. CORDELL:

Q.   Good afternoon, Doctor Akl.

A.   Good afternoon.

Q.   It's been a little while, but it's nice to see you.

A.   Thank you.

Q.   I'd like to start with something kind of easy, I think.

MR. CORDELL:  Your Honor, may I approach?

THE COURT:  You may.

Q.   (BY MR. CORDELL)  The -- you gave a lot of testimony the last few hours, and I want to make sure we were crystal clear on it.

Did I hear you correctly that -- well, let's start with something very easy.  Originally, you had evaluated three patents--the '776, the '443, the '130.  Right?

A.   Yes.

Q.   And you looked at Qualcomm processors, Exynos processors, and MediaTek processors.  Right?

A.    No, I don't discuss MediaTek at trial.

Q.    You didn't discuss it at trial, but --

MR. MANZIN-MONNIN:  Your Honor, may we approach?
Objection.

THE COURT:  All right.  Approach the bench.

(The following was had outside the hearing of the
jury.)

MR. MANZIN-MONNIN:  These are dropped claims.  We
are not accusing them here.  There's no question we haven't
been accusing them here at trial.  It's irrelevant to show the
jury that there were potentially claim charts or some argument
in the past about other products.

THE COURT:  All right.

MR. MANZIN-MONNIN:  It's not relevant here.

THE COURT:  Just a minute.

What's the response?

MR. CORDELL:  These were the products that were
accused as of the pretrial order, Your Honor.  It is true that
earlier this week, last week now, they did withdraw, I
believe, the MediaTek allegations.  I think I need to confirm
that.

MR. MANZIN-MONNIN:  Well, it's in the expert
reports, Your Honor.  I'm happy to show it to you if you'd
like.

THE COURT:  I mean, is there some doubt in your mind

that these products have been dropped?

MR. CORDELL:  I'd like to confirm it because I'd like to be able to have the damages guys have an eye on it, if need be.  So I think it's important to do it on the record.  It's simple.  He'll simply say that they're not accused.

THE COURT:  All right.  Confirm it and then move on.

MR. CORDELL:  I will.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

Q.   (BY MR. CORDELL)  So just to level set, Doctor Akl, when Samsung makes a phone, the guts of it, if you will, is called a baseband processor.  Right?

A.   Yes, I agree.

Q.   Okay.  And that baseband processor sometimes is made by Qualcomm.  Yes?

A.   Yes.

Q.   Sometimes it's made by Samsung itself.  Yes?

A.   Yes.

Q.   And when that happens, it's called the Exynos processor?

A.   Yes.

Q.   And then there's another company called MediaTek that makes them.  Right?

A.   Yes.

Q.   You are not offering this jury any opinion that the

MediaTek phones infringe.  Correct?

A.    Yes.  I agree.

Q.    And more than that, as I was listening to your testimony, I was listening very carefully because I was expecting that you were going to address the '443 Patent, and you did.  Right?

A.    Yes.

Q.    But when you addressed the '443 Patent, you didn't offer an infringement opinion that the Exynos processor infringes the '443.  Right?

        MR. MANZIN-MONNIN:  Objection, Your Honor.  It's misleading.  It's incorrect.

        THE COURT:  Misleading is not an evidentiary objection.  Overruled.

        THE WITNESS:  I disagree.  You have the order switched.  So I -- so I disagree.

Q.    (BY MR. CORDELL)  Oh?  You disagree.  You believe that you have an opinion that the Exynos processor infringes the '443 Patent.

A.    Yes.  It's the '130 that doesn't.

Q.    Well, you gave us an expert report in this case.  Right, Doctor Akl?

A.    Yes.

Q.    And, you know, the way this process works is you're supposed to give us all your opinions in your expert report.

517

Right?

A.    Yes.

Q.    So if you think something infringes, you got to tell us in the expert report.  Right?

A.    Yes.

Q.    And sometimes in your expert report, you tell us something doesn't infringe.  Right?

A.    Sometimes, yes.

Q.    So I'd like you to turn in your expert report, it's in one of those big binders behind you, and turn with me to paragraph 189 on page 77.  And this is the paragraph after you do a whole lot of discussion about the '443 Patent.  Right?

A.    Yes.  I see paragraph 189.

Q.    And that comes at the end of a lot of analysis you did of the '443 Patent that you just told the jury all about.  Right?

A.    Actually, no, I disagree.

Q.    Okay.  Well, but in paragraph 189 you tell us that you cannot confirm these devices infringe the asserted claims of the '443 Patent at this time.  Right?

A.    Paragraph 189 does have a typo, yes.

Q.    A typo, sir?  You say that the Exynos and MediaTek processors, you cannot confirm these devices infringe the asserted claims of the '443 Patent.  Right?

A.    Yes.

Q.    There's no typo there.  Right?

A.    No.  The typo is Exynos should not be there.

Q.    I see.  You just accidentally admitted that the Exynos processors don't infringe.

A.    No.  The typo is in paragraph 189.

Q.    Well, again, sir, am I reading your expert opinion correctly?  Let me read the whole thing.  "Certain features of the '443 asserted claims could not be confirmed in the source code for Samsung's devices with Exynos and MediaTek processors or the testing results I've reviewed and, therefore, I cannot confirm these devices infringe the asserted claims of the '443 Patent at this time."

Did I read that correctly?

A.    Yes, you did.

Q.    And that was the expert opinion you put in your report and gave to us.  Right?

A.    In paragraph 189, out of hundreds of pages, yes.

Q.    But there's more, because for the -- so for the '443, you're saying this is a typo when you put Exynos.  Is that right?

A.    Yes.

Q.    Okay.  And on the '130, you had a similar paragraph, and you told us that neither the Exynos nor the MediaTek processors infringe the '130 Patent.  Right?

A.    That's correct.  I didn't testify Exynos infringes in this court today.

Q.   So you're saying Exynos is out.  Right?

A.   Yes.

Q.   For the '130.  And MediaTek is out for the '130.  Right?

A.   Yes.

Q.   But you're saying when you gave us your opinion in your expert report, that you made a mistake and admitted that the Exynos processor does not infringe.  Do I understand that right?

A.   Yes.  In one paragraph there's a typo.

Q.   Now, I don't have my phone, but if I did, looking across the room, you wouldn't be able to tell me which processor was inside without examining it a little more closely.  Right?

A.   I would agree.

Q.   Okay.  Now, you spent a lot of time talking about source code.  Correct?

A.   Yes.

Q.   Actually before I do that, let's -- let me just ask you, sir.  You're a -- you're a -- you're a technical expert. Right?

A.   Yes.

Q.   And you know these experts working for Samsung in this case.  Correct?

A.   There is two.  I know both of them.

Q.   Well, Doctor Min, you know Doctor Min very well.  Right?

A.   Yes.

Q.   He was your advisor in your master's and your doctorate. Right?

A.   Yes.

Q.   You have a lot of respect for Doctor Min.  Right?

A.   Yes.  It was good to see him today.

Q.   And Doctor Wicker, you know he's a long-term professor of computer and electrical engineering at Cornell University focusing on wireless and computer networks.  Right?

A.   Yes.

Q.   And you also believe he's very qualified.  Right?

A.   Yes.

Q.   And you've done a lot of this work over the last few years.  Right?

A.   Yes.

Q.   I think you mentioned the fact that, you know, we worked together in the past.

A.   Yes.

Q.   And in all these cases, you're being compensated for your work.  Right?

A.   Yes, for my time.

Q.   And you would be -- you would expect that Doctor Min and Doctor Wicker are also compensated for their time.  Right?

A.   Yes.

Q.   And you've made, you know, well, as of September you made about $225,000 testifying in this case?

A.   Yes.

Q.   And you've obviously worked several months since then. Right?

A.   Yes.

Q.   And you get $850 an hour?

A.   Yes.

Q.   Now, Doctor Akl, you're not an inventor on any patents, are you?

A.   Correct.

Q.   And -- but you testified about the patents in this case at some length.  Right?

A.   Yes.

Q.   So, of course, you spoke with the inventors for each of the three patents.  Right?

A.   No.

Q.   Did you ever ask your lawyers to -- to put you in touch with the inventors?

A.   No.

Q.   Can you remind me of who the inventors are for the '776?

A.   No.  I don't know their names memorized.

        MR. CORDELL:  Can I have JTX 1?  Give us the front page.

Q.   (BY MR. CORDELL)  So there they are, Mr. Huang and Mr. Du.  Is that right?

A.   Yes.

522

Q.   And you can't tell this jury what department they were working in when they developed this patent, can you?

A.   That's correct.

Q.   You can't tell this jury whether they were software engineers or hardware engineers or something else.  Right?

A.   That is correct.

Q.   What about for the '443?  Do you know anything about those inventors?

A.   No.

Q.   What about the '130?  Do you know anything about those inventors?

A.   I do not.

Q.   Did you ask your lawyers to put you in touch with any of the inventors in this case?

A.   No.

Q.   All right.  Now, you started working on this matter even before GComm filed the lawsuit.  Right?

A.   That is correct.  About four years.

Q.   You helped Mr. Pitcock choose or at least evaluate the ZTE patents he was going to buy.  Right?

A.   That's fair.

Q.   And you helped the lawyers try to map claims on to different things.  Right?

A.   I did some work at different points in time, yes.

Q.   Okay.  You helped with infringement contentions, for

example.  Right?

A.   At some points in time, yes.

Q.   Okay.  And in your view, you did a lot of work, hundreds of hours.  Right?

A.   Yes, over four years.

Q.   Okay.  But, sir, you didn't write your expert reports in this case.  Right?

A.   I did.

Q.   Well, you said that it was a collaborative effort between you and the lawyers and some other -- other people.  Right?

A.   Yes.

Q.   Now, which were the lawyers you collaborated with on your expert report?  Do you remember?

A.   Yes.

Q.   Who were they?

A.   They are in Carter Arnett law firm.  There is Brad Liddle, and there is Michael Pomeroy, I think, if I'm pronouncing his last name correctly.

Q.   Okay.  Anybody else?

A.   Ben who -- Manzin who took my deposition.  I'm sorry.  He did my direct.  I collaborated with him, too.

Q.   And did you have conversations with Doctor Kowalski, the other expert for GComm in this case?

A.   Yes.  We had multiple calls.

Q.   Okay.  And, in fact, sir, in preparing your report, you

had conversations with yourself.  Right?

A.   I'm sorry?

Q.   Well, when you wrote your expert report, you had a conversation with yourself.  Correct?

A.   I'm not sure what that means.

          THE COURT:  Just a moment.

          MR. MANZIN-MONNIN:  We'll withdraw the objection.

          THE COURT:  It's hard to withdraw it when it hasn't been stated.  But nonetheless.

Q.   (BY MR. CORDELL)  Well, let me see if I can refresh your recollection.  Your expert report is still in front of you.

A.   Yes.

Q.   Let's look at paragraph 180.

A.   Yes.

Q.   This is your expert report.  Right, sir?

A.   Yes.

Q.   And in it, does that refresh your recollection that you had a conversation with yourself in preparing this report?

A.   Yes.  I see those words.

Q.   And you obviously didn't have a conversation with yourself.

A.   No.  That was supposed to say Doctor Kowalski.

Q.   Okay.  Well, maybe you just copied this from Doctor Kowalski's report.  Is that right?

A.   Correct.  I -- I worked with him on this section, and

that was -- that was a result of the copy from his part of the report.

Q.   So you said, "I have also confirmed through my conversations with Doctor Robert Akl" -- that's you -- "that Samsung products at issue implement the portions of the standards mapped to the claims."  Did I read that correctly?

A.   Yes, that is correct.

Q.   So maybe the lawyers wrote that part of the report?

A.   I think Doctor Kowalski did.  And when I copied it, I forgot to change it to me because we were working on it together.

Q.   You went through a lot of source code here today.  Correct?

A.   Yes.

Q.   Now, can you read source code, Doctor Akl?

A.   I'm sorry?

Q.   Can you read source code?

A.   Yes.

Q.   Okay.  So you're able to read C++ code and make sense out of it?

A.   Yes.

Q.   Okay.  But in this case you didn't go and actually review the source code yourself.  Right?

A.   I did not review it electronically at the computers myself, that is correct.

526

Q.    Well, you know, source code is really sensitive in these cases.  Right?

A.    Yes, it's important.

Q.    We're not supposed to make copies of it, for example. Right?

A.    We can under special conditions according to the protective order.

Q.    Right.  But in order to review it, you got to go to the facility where the source code is and actually look at it and figure out what's relevant and what's not.  Right?

A.    I disagree.

Q.    Well, in this case source code was produced in Los Angeles by Qualcomm.  Right?

A.    Yes.

Q.    And they had a special little room that you had to go to and you could review the source code there.  Right?

A.    Yes.

Q.    And you did not go.  Correct?

A.    I did not go to that room, that is correct.

Q.    And for the Samsung source code, we made that available at GComm's request in San Diego at our offices there.  You didn't go there, either, did you?

A.    That is correct.

Q.    Instead, you sent three fellows to review the code for you.  Right?

A.   Yes.

Q.   You sent a fellow by the name of Mr. Barth.  Is that right?

A.   Yes.

Q.   And the second guy by the name of Mr. Metra.  Is that right?

A.   Yes.

Q.   And then a third one was named Mr. Satan?

A.   I don't know if that's his last name.

Q.   Okay.  But that's what you called him in your deposition. Right?

A.   I think that's probably a transcription error.

Q.   Okay.  So he doesn't go by Mr. Satan normally?

A.   I don't think so.

Q.   Well, do you know him?

A.   No, not personally.

Q.   Do you know what name he goes by other than Mr. Satan?

A.   I don't have his name memorized, no.

Q.   And all of that source code that you presented in front of this jury was derived from those three people.  Right?

A.   Yes.

Q.   You didn't pick these guys.  Right?

A.   No.  Counsel did.

Q.   And counsel meaning which lawyers picked them?

A.   I believe Carter Arnett.

528

Q.   So not the lawyers here in court.

A.   That is my understanding.

Q.   And these three fellows, they're not your -- your employees.  Right?

A.   That is correct.

Q.   They're not your consultants.  Right?

A.   That is correct.

Q.   You've never worked with them before.  Right?

A.   That is correct.

Q.   You didn't check any references on these guys.  Right?

A.   I did not personally.  The lawyers did.

Q.   You didn't check any background on them.  Right?

A.   I did not personally.  The lawyers did.

Q.   One of these guys is named Mr. Satan, and you still didn't check up on him.  Right?

A.   Again, I don't remember if that's his name.

Q.   Okay.  So you put a lot of eggs in that source code basket during your direct testimony.  Right?

A.   Yes.

Q.   And let me ask you this, sir.  What's a build ID?

A.   A build ID is, with Qualcomm code, they associate a number with different source code that relates to a specific model of a phone.  And you can match, when you look at the path name, they produce those files, in the file name there is usually a number that's going to unique and match to a

specific phone because different codes will vary slightly. And so to keep track of it, that build ID would tell you exactly which Qualcomm code maps to which exact phone model.

Q.   Okay.  And which build ID from the Qualcomm code did you rely on for the testimony you presented the ladies and gentlemen of the jury?

A.   I relied on a representative build ID.  I don't know that number by heart.  It's a long value, but I picked a representative one.

Q.   Okay.  Well, let me see if I can help you.

         MR. CORDELL:  Can I have Doctor Akl's report, addendum M at page 27?

Q.   (BY MR. CORDELL)  okay.  So that's it.  Right?  That's the build ID you used to evaluate the Samsung phones with Qualcomm source code on them.  Right?

A.   Yes.  That's one example.

Q.   Well, but that's the one you analyzed.  Right?

A.   That's the one that's representative.

Q.   Well, that wasn't my question, Doctor Akl.  This is the code build you analyzed.  Right?

         MR. MANZIN-MONNIN:  Objection, Your Honor.  I believe this is third-party confidential information.  At least the courtroom needs to be sealed to bring it up, and I also think it's improper to be showing excerpts from an expert report in this manner.

THE COURT:  Well, it's on the screen.  Let's pull it down.

First of all, Mr. Cordell, if the witness gives you an answer that you don't think's responsive, it's not proper to say, That wasn't my question.  It's proper to turn to the court and say, Your Honor, the witness is being non-responsive.

MR. CORDELL:  Yes, sir.

THE COURT:  Do it that way going forward.

Now, tell me what the basis to exhibit this section from the report is other than to refresh his recollection.

MR. CORDELL:  It's to refresh his recollection, Your Honor, but it is an unwieldy string of characters.  I'm ready to admit that at any moment.  And so having it in front of the witness will assist his testimony going forward and I think all of us in understanding it.

But I do take counsel's point about sealing the courtroom.  I'm about to go into some other source code, so it's probably a good idea to seal the courtroom.

THE COURT:  All right.  Well, we'll come back to this specific slide in just a second, but at this juncture I think it's apparent that the courtroom needs to be sealed, and I'll order the courtroom sealed at this time.

I'll direct the Court Security Officer to escort those present outside of the courtroom who are not subject to the

protective order in this case.

(Courtroom sealed.)

(Courtroom unsealed.)

THE COURT:  Ladies and gentlemen of the jury, I'm about to excuse you until tomorrow morning.  We've run later than I wanted to.  This witness has to be in another proceeding elsewhere tomorrow; otherwise, I would have stopped earlier in the day.  But we will pick up with the next Plaintiff's witness first thing in the morning.

If you'll take your notebooks to the jury room and leave them closed on the table there, follow all my instructions to you, including, as you would expect me to remind you, not to discuss the case with anyone, including the eight of yourselves.  Please travel safely to your homes.  The roads are slick out there.  It's rained all day.

We're going to start at 8:30 in the morning again tomorrow.  If you'll arrange your travel, especially in light of the weather, so that you'll be here and we can start on time, the Court would certainly appreciate it.

Have a good evening, and you're excused until tomorrow morning.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated, please.

Counsel, for your information, we have used a total of

7 hours and 29 minutes of trial time today.  We used just over 50 minutes of trial time last Friday.  As of right now the Plaintiff has used 4 hours and 6 minutes--I'm rounding to the nearest minute--and the Defendant has used 4 hours and 13 minutes.  The Defendant has actually used more time at this point in the trial than the Plaintiff has.  You are going to have to manage your time, especially in the Defendants' case in chief.  Plaintiff has 8 hours and 55 minutes of trial time remaining; Defendant has 8 hours and 47 minutes of trial time remaining.

All right.  Mr. Sheasby, who do you intend to call as your next witness so the Court can be prepared?  I'm not going to put on another witness today; I want to know for planning purposes.

MR. SHEASBY:  Your Honor, it will be either the depo plays that you've already approved or it will be Doctor Kowalski, but in either instance everything will be -- it -- either is ready to go.

THE COURT:  Well, there are three depositions I've reviewed the objections to designations and counterdesignations with counsel on.  Are you intending to play those three depositions or are you planning to play two of them, one of them, or what are you planning to do?

MR. SHEASBY:  It will be those three and Doctor Kowalski, or it will be Doctor Kowalski and those three.  The

point is that before -- we are ready to go first thing tomorrow morning without any sort of -- any sort of resolution.

THE COURT:  Any unresolved disputes that would hold up the trial process.

MR. SHEASBY:  Yes; that's my understanding.

THE COURT:  All right.  Counsel, let me remind you again to increase your best efforts with the process of meeting and conferring overnight.  I am still struggling to keep up with the vast number of objections you're raising to each other's demonstratives and other matters and keep this trial moving as I've told the jury it will move.  It would be a great help to the Court if the avalanche of the objections were to slow down a little bit, but that's in your hands, not mine.  You will certainly get more due process if we have fewer objections, but again, that's in your hands and not mine.

I'll be in chambers prepared to take up anything that's unresolved overnight an hour before we bring the jury in in the morning.

Is there anything further that Plaintiff and Defendant need -- or Defendant need to raise with the Court before we recess today?

MR. CORDELL:  Not from Defendants, Your Honor.  Thank you.

MR. SHEASBY:  Not from Plaintiffs, Your Honor.

THE COURT:  All right.  Earlier today I entered an order and opinion in response to the motion for construction or interpretation of foreign law under Federal Rule of Civil Procedure 44.1.  I trust you've seen it.  If not, you can see it when you leave here, but it's been entered on the docket.

All right.  I will be available in the morning, as I say.  Until then, we stand in recess until tomorrow morning.

(The proceedings were concluded at 6:00 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts               01/22/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER