IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

G+ COMMUNICATIONS, LLC.,          (  CAUSE NO. 2:22-CV-078-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,   (
et al.,                           )  MARSHALL, TEXAS
                                  (  JANUARY 23, 2024
          Defendants.            )  8:30 A.M.
_____

VOLUME 3

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:        IRELL & MANELLA, LLP -
                          LOS ANGELES
                          1800 AVENUE OF THE STARS
                          SUITE 900
                          LOS ANGELES, CA 90067-4276
                          (310) 203-7096
                          BY: MR. JASON SHEASBY
                              MR. BENAJMIN MANZIN-MONNIN

                          IRELL & MANELLA -
                          NEWPORT BEACH
                          840 NEWPORT CENTER DRIVE
                          SUITE 400
                          NEWPORT BEACH, CA 92660
                          (949) 760-0991
                          BY:  MS. LISA GLASSER

                          McKOOL SMITH, P.C. - MARSHALL
                          104 EAST HOUSTON, SUITE 300
                          MARSHALL, TEXAS  75670
                          (903) 923-9000
                          BY:  MS. JENNIFER TRUELOVE
                               MR. SAM BAXTER

FOR THE DEFENDANTS:       FISH & RICHARDSON, PC -
                          WASHINGTON, DC
                          1000 MAINE AVE., SW
                          SUITE 1000
                          WASHINGTON, DC 20024
                          (202) 783-5070
                          BY:  MR. RUFFIN CORDELL
                               MR. MICHAEL McKEON
                               MS. LAUREN DEGNAN

                          FISH & RICHARDSON, P.C. -
                          DALLAS
                          1717 MAIN STREET, SUITE 5000
                          DALLAS, TEXAS  75201
                          (214) 292-4084
                          BY:  MR. THOMAS REGER

                          GILLAM & SMITH, LLP
                          303 SOUTH WASHINGTON AVENUE
                          MARSHALL, TEXAS  75670
                          (903) 934-8450
                          BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
                        MARSHALL, TEXAS   75670
                        (903) 923-8546

## <u>INDEX</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| SUNGJIN PARK | |
|     Direct By BY VIDEO DEPOSITION | 602 |
| JOHN KOWALSKI, PH.D. | |
|     Direct By MS. GLASSER | 605 |
|     Cross By MR. CORDELL | 641 |
|     Redirect By MS. GLASSER | 706 |
|     Recross By MR. CORDELL | 715 |
|     Redirect By MS. GLASSER | 720 |
|     Recross By MR. CORDELL | 723 |
| STEPHEN DELL | |
|     Direct By MS. TRUELOVE | 728 |
|     Cross By MR. McKEON | 786 |
|     Redirect By MS. TRUELOVE | 858 |

594

THE COURT:  Be seated, please.

All right.  Are the parties prepared to read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MR. MANZIN-MONNIN:  Yes, Your Honor.

THE COURT:  Please go to the podium and make that offer.

MR. MANZIN-MONNIN:  May it please the Court.  G+ Communications used exhibits JTX 03, JTX 04, JTX 13, JTX 14, JTX 28, PTX 06, PTX 07, PTX 21, PTX 23, PTX 26, PTX 31, and PTX 32.

THE COURT:  All right.  Is there any objection to that rendition from the Defendants?

MR. SHEASBY:  So there is an issue I did want to flag on PTX 13 and 14, Your Honor.

THE COURT:  Just a minute, Mr. Sheasby.  Let me see if Defendants have any objection to what your co-counsel read into the record.

MR. CORDELL:  So I think the reason why Mr. Sheasby is addressing the podium is that, in fact, we do have an objection, Your Honor.

You recall yesterday at some point they brought out a stack of paper that was several thousand pages high.  That was source code.  And I don't recall whether that stack they presented was Qualcomm or Samsung, but the protective order is

very clear that that is to be -- it's not to be copied, it's not to be reproduced electronically.  We have all these rules.  And when it's used in court, we are supposed to use the minimum amount necessary to support whatever point is being made.

The wholesale introduction of that code is -- violates the protective order, and it creates administrative burdens for the Court and for the parties because under the protective order we're supposed to track those copies, we're supposed to know where they are, and then we have to destroy them at the end of the case.

So what we've asked is that -- we have no problem with them putting in the code they actually relied on, and if they need a few pages on either side for context, that's okay.  But putting in 10,000 pages in one fell swoop is not acceptable.

THE COURT:  What designation did this 10,000 or so pages of code have?  What exhibit number?

MR. CORDELL:  It was either JTX 13 or 14, and I don't recall which one they -- but I think they're both similar.  They're both thousands of pages long.

THE COURT:  All right.  In your view, they're both the same thing?

MR. CORDELL:  One's Qualcomm, one's Samsung, but it's all source code.  It is supposed to be single copy, no duplication.  We've seen a lot of that in this case where we

were handed copies that had our watermark on it, but it's faded, you can see that it's been photocopied.  That's a violation of the protective order.

We haven't made a big deal about that, but it's -- you know, we've tried to follow up where we can and get people to obey the protective order.  We all suffer.  Third parties like Qualcomm won't produce their code anymore.

THE COURT:  I understand.

MR. CORDELL:  And my client is going to be very concerned about it as well.  Thank you.

THE COURT:  All right.  Mr. Sheasby, now I'll hear from you.

MR. SHEASBY:  Thank you.  I agree that we need to be judicious on the protective order.

Here's the issue.  Late last night they told us pick the pages that were used.  The process of finding the specific pages that are used is extremely, extremely time-consuming.  So I was going to propose, before my brother got up and gave his speech, as a compromise is we know there are portions of JTX 13 and 14 that are in evidence.  We know 20,000 pages is not going to sit in a box here to go back to the jury.  We would just like the Court's indulgence, that it is going to take some time to pull out the specific pages.

I should also note that it's probably premature to do it now because the code's going to be used throughout the case.

And so what we were hoping to do is there would be -- we will get them the list of what was used yesterday so they can agree to it.

And then as we continue to use the code, day after day, we'll continue to update the list.  And at the end of the process, with the Courtroom Deputy, we will isolate the specific pages that are -- formally have been shown to the jury and those will be available to go back to the record.  That's what I was going to propose.

THE COURT:  Well, that seems -- I don't dispute the amount of intensive labor it probably would take to identify and pull out those particular pages out of that quantity.  I have no problem carrying JTX 13 and 14 until the end of the trial and let you have a running opportunity to isolate just the code that's used.

But my intention is, as far as a part of the record in this case and as far as the admitted exhibits JTX 13 and 14, to limit it to the code actually used before the jury during the trial.

MR. SHEASBY:  I agree, Your Honor.

THE COURT:  All right.  Do you see any problem with that, Mr. Cordell?

MR. CORDELL:  I don't, Your Honor.  We did start this debate or discussion Sunday night, we had an intensive discussion about it Sunday night.  But I take counsel at his

word and we will work with them to isolate the code.

THE COURT:  All right.  That's how we'll handle it.

Anything else related to the exhibits from yesterday?

MR. SHEASBY:  Nothing for Plaintiff, Your Honor.

MR. CORDELL:  Nothing from Defendant, Your Honor.
Thank you.  Oh, I'm sorry.  I stand corrected.

THE COURT:  You have something else?

MR. CORDELL:  We do.  We have to admit our exhibits.
I'm sorry.  And I have them in my hand.

THE COURT:  Just read the exhibits you used
yesterday into the record, please.

MR. CORDELL:  Thank you.  DTX 18, DTX 422, DTX 610,
and JTX 18.

MR. SHEASBY:  So they have not precleared these with
us, and I know that there's at least one we have an objection
to which was an LTE declaration which was thrown up in front
of Mr. Pitcock who didn't even know what it was.  And so we're
not prepared to agree that these were properly in evidence.

THE COURT:  These are have not been disclosed from
Samsung to G+?

MR. CORDELL:  They were, Your Honor, and we
discussed them last night on the meet-and-confer.

MR. SHEASBY:  And we flagged in particular our
concerns about the LTE declaration.  They're trying to submit
a declaration relating to LTE.  Ms. Smith did this.  She tried

to show it to Mr. Pitcock.  Mr. Pitcock didn't recognize it.

THE COURT:  Okay.  Just a minute, Mr. Sheasby.

You either did or didn't discuss them during the meet-and-confer last night.

MR. SHEASBY:  There was a discussion during the meet-and-confer, and we flagged for them the LTE declaration issue.

THE COURT:  Then I'm happy to hear your objection to a specific exhibit, but I don't want to --

MR. SHEASBY:  I understand.

THE COURT:  -- fail to admit and recognize as having been used exhibits that are not questioned or in dispute.

MR. SHEASBY:  Sure.  DTX 18, no objection.  DTX 422, no objection.  DTX 610, no objection.  DTX 18 -- I'm sorry, JTX 18.  JTX 18 is where the objection is.

JTX 18 is a declaration of applications that was made by ZTE relating to LTE.  LTE is not accused in this case.  We had a sidebar when Ms. Smith tried to inject the issue of LTE into the case.  She said LTE -- she conceded LTE has no relevance to the case other than to show the technology is old.

She then tried to inject this exhibit JTX 18 into the record --

THE COURT:  Let me stop you for a minute.  JTX 18 is a pre-admitted exhibit.  Correct?

MR. SHEASBY:  It's a pre-admitted exhibit, but --

THE COURT: All right. Just a minute. And it was used before the jury initially where it referenced LTE, and then on the flip side you are able to go back and show where it also referenced 5G. Is that the document that I'm thinking of?

MR. SHEASBY: There are two separate documents, but yes. And --

THE COURT: Or two pages of the same document.

MR. SHEASBY: Something to that effect. But Mr. Pitcock did not recognize JTX 18. So if there's another witness they can try to get JTX 18 in through, they can. But it's not in yet.

THE COURT: Okay. Well, the witness doesn't have to recognize it. It has to be deemed admissible under the rules by the Court in the pretrial process. If you want to use it with another witness, that's fine, but I'm not going to exclude it at this point and I will consider JTX 18 part of the record.

MR. SHEASBY: Thank you, Your Honor.

MR. CORDELL: Thank you, Your Honor.

THE COURT: Now, at the risk of extending this because we're already past when I told the jury we would start, as we discussed in chambers this morning, my understanding is that with regard to Document 567, which is Samsung's motion for clarification regarding Document 548,

you-all are meeting and conferring about working this out as to what is a legal conclusion and should be excluded and what's not a legal conclusion and should be preserved from these paragraphs.

I'll look for some kind of announcement from you hopefully by the end of the day on this.  All right?

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  Okay.  Is there anything else either side's aware of that we need to take up before we bring the jury in?

MS. GLASSER:  Your Honor, just a housekeeping matter.  The first witness will be a deposition played, and we have revised time updates.  The parties have cut a little bit, and I was just wondering if Your Honor would like me to announce that on the record after the play or to do that outside the presence of the jury.

THE COURT:  Just announce it when you identify the witness for the record before the deposition is played.  Give the times at that point if you will.

MS. GLASSER:  Thank you, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, members of the jury.  Please have a seat.  It's good to see you this morning.  I

602

hope you didn't have too much difficulty in getting home last night in the rain.

I apologize for the length of the proceedings yesterday. But as I mentioned, Doctor Akl is required to appear in another proceeding today and couldn't be here. I couldn't bring him back and I had to get him finished and the lawyers wouldn't quit asking him questions. So I apologize for the delay in getting you home last night. We'll try to do better.

All right. We're going to continue with the Plaintiff's case in chief.

Plaintiff, call your next witness.

MS. GLASSER: Thank you, Your Honor.

Good morning.

G+ calls by video deposition Samsung engineer Sungjin Park. Mr. Park was designated by Samsung as its representative for this litigation on the question of why Samsung claims it does not infringe and whether Samsung identified alternatives.

MR. CORDELL: Your Honor, I hate to interrupt, but I thought we weren't doing --

THE COURT: You're going into too much detail, Ms. Glasser. You identified him as a Samsung employee, and that's all you need to do other than give the Court the times designated to each side for the portions of the deposition that are going to be played.

MS. GLASSER:  Will do, Your Honor.  This time is entirely to the Plaintiff.  It is 5 minutes and 2 seconds.

THE COURT:  All right.  Then let's proceed with this witness, Mr. Park, by deposition.

SUNGJIN PARK, BY VIDEO DEPOSITION,

Q.   Mr. Park, what's your position at Samsung?

A.   My position is senior engineer.

Q.   What products do you work on as a senior -- as senior engineer at Samsung?

A.   I work on communication standard work.

Q.   Do you participate in 3GPP?

A.   Yes, I do.

Q.   So 3GPP is the body that creates the 4G and 5G standard. Correct?

A.   Right.

Q.   Were you designated to speak on topics relating to whether Samsung's devices comply with 3GPP standards?

A.   Right.

Q.   And you've been designated to speak on behalf of Samsung as to why it claims it does not infringe this and the other patents-in-suit.  Correct?

A.   Right.

Q.   I'm asking, do you know if the information in this appendix B that Samsung presented that is the claimed reason for why it does not infringe, if it's accurate?  Did you check

its accuracy?

A.    No, I did not check myself.

Q.    And this appendix B is what Samsung claims is the reason it does not infringe.  Is that correct?

A.    Right.  That's how I understand it.

Q.    Did you determine whether there was any knowledgeable engineer who checked the accuracy of the document?

A.    I am not sure.

Q.    So my understanding is you've been designated on the topic of all products that defendants allege to be non-infringing alternatives.  Correct?

A.    Right.

Q.    So on behalf of Samsung, what are the acceptable alternatives that existed to the '776 Patent?

A.    I am not sure.

Q.    On behalf of Samsung, what are the actual acceptable alternatives that existed to the '130 Patent?

A.    I am not sure.  I don't really recall.

Q.    On behalf of Samsung, what are the actual acceptable alternatives that existed to the '443 Patent?

A.    I am not sure.

Q.    Do you understand that you've been designated to speak on the basis, if any, for why Samsung denies that the patents-in-suit are essential to the 3GPP standard?  Correct?

A.    I understand.

605

Q.   So on behalf of Samsung, based on your expertise, what is the factual basis for disputing the conclusions in the Exhibit 40 claim chart showing that the '776 Patent is essential to the 3GPP standard?

A.   I am not sure.

Q.   And you're Samsung's corporate representative.  Correct?

A.   Right; I am.

Q.   Why don't you look at 125.

A.   Right.  So No. 125, as I understand it, I have been assigned to it.

Q.   And 125 is any non-patented contributions separate from the patent that are reflected in the functionality that's accused of infringement.  Correct?

A.   That's my understanding, yes.

Q.   Did Samsung contribute to or invent any of the functionality that's accused of infringement in this chart?

A.   I am not sure.

Q.   Is there any portion of this functionality that Samsung created or invented itself?

A.   I am not sure.

Q.   You've been designated to speak on behalf of Samsung as to any non-patented contributions that you claim you have made to the functionalities accused of or referenced in Plaintiff's infringement contentions.  Correct?

A.   Right.

THE COURT:  Does that complete this witness by deposition?

MS. GLASSER:  It does, Your Honor.

THE COURT:  Call your next witness.

MS. GLASSER:  May it please the Court, Plaintiff G+ calls as its next witness Doctor Kowalski.

THE COURT:  All right.  Doctor Kowalski, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please have a seat on the witness stand, sir.  If you'd like to pour a cup of water, feel free to go ahead and do that.  You've got a bottle of water with you.  Okay, fine.

All right.  Counsel, you may proceed with direct examination.

MS. GLASSER:  Thank you, Your Honor.

JOHN KOWALSKI, PhD.,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. GLASSER:

Q.   Good morning, Doctor Kowalski.

A.   Good morning.

Q.   Could you please introduce yourself to the Court and the jury?

A.   Yes.  My name is John Kowalski.  I am a researcher in

communication systems, in particular cellular systems.  I have a wife of over 20 years, and I have a son who just graduated college.

Q.   And, sir --

MS. GLASSER:  Let's have the slides.

Q.   (BY MS. GLASSER)  What did you investigate for this case?

A.   I investigated whether the patents-in-suit are essential to the 5G standard, and I assessed the benefits of these patents.

Q.   And what did you conclude?

A.   I concluded that the patents in this suit are essential to the 5G standard, and there is at least an 11 percent speed benefit from using these patents.

Q.   Before we get into the details, could you please tell us about your education and your professional background in industry?

A.   Yes.  I have a bachelor's, master's, and Ph.D. degree from what is now New York University.  I started my career in the field of wireless communication systems in the defense industry, and so I have over 35 years' experience designing wireless communication systems for companies.

In particular, I was working in the field of cellular communications in the mid '90s at InterDigital Corporation where we developed fundamental 3G technology, and I worked at Sharp Laboratories of America from 1997 until January 2022

developing patents and supervising a team of researchers developing technology for the 4G and 5G standards.

Q. You said you retired from Sharp in 2022. Is that right?

A. That is correct.

Q. And what have you been doing since that time?

A. I have been evaluating patents for their applicability to cellular standards.

Q. Now, having just retired, is this your first time testifying as an expert in a jury trial?

A. Yes, it is.

Q. Now, while you were working in industry, did you obtain for the companies that you worked for any patents?

A. Yes. I am an inventor on over 135 patents, the vast, vast majority of which are directed towards cellular systems.

Q. Now, there was some questioning yesterday about something called a lab notebook. Did you hear that?

A. I did.

Q. Did you have lab notebooks for your 135 patents?

A. No. Lab notebooks haven't been used for decades.

Q. In your particular industry?

A. Yes.

Q. And why is that, actually? Why do folks put down their inventions in other documents in particular for telecom?

A. Particularly in the field of cellular standards, there is a -- an impetus that it's very important to get patents filed

as soon as possible, and so typically what happens is that the invention description is written up and then a provisional patent is filed.

Q.   So your slide mentions 3GPP, and we have heard about that already in the trial.  Did you participate directly in 3GPP?

A.   I did.  I was a delegate in 3GPP from 2006 until late 2021, and made many, many contributions, participated in discussions, votes, and managed, again, a team of researchers that did the same.

Q.   So when we see the pictures up on the screen, that's the kind of activities you and the researchers that you were working with participated in?

A.   Yes, it was.

Q.   Do you have industry experience specifically in assessing whether patents practice standards promulgated by 3GPP?

A.   Yes.  That was one of my functions as a manager at Sharp was to evaluate patents for their applicability to the 3GPP standards.

Q.   And as part of your 35 years of work experience, did you also obtain experience evaluating technical benefits?

A.   Yes, I did.  That was an important part to determine which technologies to select or promote or advocate for in 3GPP.

        MS. GLASSER:  Your Honor, at this time G+ offers Doctor Kowalski as a technical expert in telecommunications.

610

THE COURT:  Is there objection?

MR. CORDELL:  No objection, Your Honor.

THE COURT:  All right.  Without objection, the Court will recognize this witness as an expert in the designated fields.

Please continue.

Q.  (BY MS. GLASSER)  Let's turn first to the '776 Patent.

Now, from your work in industry, did you know about the '776 Patent technology before you got involved in this case?

A.  Yes, I did.  I was aware of the technology.

Q.  Did you know the specific patent number or just the technology generally due to its importance?

A.  I knew of the technology generally.  I don't follow patent numbers.

Q.  And did you determine whether ZTE -- from your work in this case, did you determine whether ZTE disclosed to industry that the innovations of the '776 Patent were covered by its patent?

A.  I'm sorry.  Can you repeat the question?

Q.  Sure.  It was a mouthful.

A.  Yeah.

Q.  Did you review documents in this case to determine whether ZTE disclosed to industry that its innovations were covered by the '776?

A.  Yes, I did.

Q.   What are we looking at here?

A.   We are looking at an IPR disclosure statement which indicates whether a particular patent application may be or may become essential in relation to 3GPP standards.

Q.   And looking at the slide, there's also these TS numbers. For example, we have underlined TS 38.304.  What does TS stand for?

A.   TS stands for technical specification.  You've heard the term recipe book.  It is, in effect, the recipe book that developers must follow if they are to make equipment that is interoperable with the standards, in this case the 5G standard.  We know that because it says 38.

Q.   And you mentioned the 38 refers specifically to 5G.  This one also includes two 36 series.  Is that right?

A.   That is correct.

Q.   And -- but it's all for 5G.  Correct?

A.   I'm sorry.  Can you repeat the question?

Q.   Sure thing.  So this refers to 5G in the disclosure. Correct?

A.   Correct.

Q.   And how does that come to be that you end up having some 36 series specification sometimes being declared on even though the patents are only used for 5G?

A.   Again, the IPR disclosure statement indicates patents that may be or may become essential to the 5G standard.  And

612

when these information disclosures are made, the patent may or may not have been granted yet.

Q.    Was the '776 Patent approach actually implemented for those to 4G standards referenced?

A.    No, it was not.

Q.    Now, when one looks at a document like this, how do you go about checking to see which standards, if any, the patent is actually essential to?

A.    Typically you look at or create or evaluate a claim chart that is -- pertains to a particular patent.

Q.    So let's look at an example of this.  On the left-hand side, we're looking at the front page from the 38.304 standard document.  Correct?

A.    Correct.

Q.    Okay.  And over on the right-hand side, what are we looking at?

A.    On the right-hand side, we are looking at a claim chart which shows elements of the claim on the left and on the right excerpts from the standard upon which the patent reads.  And the point is that the functionality mentioned in the claim or the device that has that functionality mentioned in the claim is reflected in the functionality of the standard.

Q.    Now, did Samsung present -- let me take a step back.  Did you have the opportunity as part of your work in this case to review some of the sworn deposition testimony from Samsung?

613

A.    Yes, I did.

Q.    And did you identify any Samsung testimony regarding the question of whether 38.304 is necessarily practiced by the '776?

A.    I did.

Q.    What are we looking at here?

A.    Again, we are looking at testimony from Dr. Sungjin Park who you just saw, and he was asked about the basis for disputing whether the '776 Patent is essential to the 3GPP standard, and he was not sure.

Q.    And what was the particular significance of Mr. Park, the fact that he didn't identify any basis to dispute essentiality?  Why was that relevant to your analysis?

A.    Yes, because Doctor Park was designated to speak for Samsung on whether the patents are essential to the 5G standard.

Q.    And was he somebody who, in your understanding, should have been able to answer the question if there was a basis to dispute?

          MR. CORDELL:  Objection, Your Honor.

Q.    (BY MS. GLASSER)  Can you tell us whether or not --

          THE COURT:  Just a minute, Ms. Glasser.  Whether you're going to rephrase or not --

          MS. GLASSER:  Okay.

          THE COURT:  -- let me rule on the objection before

you launch into another version of the same question that hopefully is not in a leading nature.

I'm going to sustain the objection.  This is direct examination.

MR. CORDELL:  And may I add another objection, Your Honor?  Counsel is characterizing the evidence in her questions while leading the witness.  I would ask that we just ask questions of the witness.

THE COURT:  Well, if the witness is examined in a non-leading form, I think that will take care of your other problem as well.

I'm going to sustain the objection.  Either rephrase the question in a non-leading form or move on, counsel.

Q.    (BY MS. GLASSER)  Can you tell us whether or not the testimony of Mr. Park was significant to your analysis?

A.    Yes, it was.  I remember Doctor Park in 3GPP meetings with me, although not by name, and so he should know whether or not these patents are essential to the 5G standard.

Q.    Did you just rely on Mr. Park or did you go and independently analyze whether the '776 Patent is essential?

A.    I went through and analyzed the '776 Patent's essentiality myself.

THE COURT:  Let me interrupt a minute.

Doctor Kowalski, you're consistently referring to this gentleman as Doctor Park and Ms. Glasser is consistently

referring to him as Mr. Park.  Did he have an earned doctorate to your knowledge?

THE WITNESS:  Yes, he did.

THE COURT:  Then let's both call them Doctor Park so the record is clear.

MS. GLASSER:  Absolutely, Your Honor.

THE COURT:  All right.  Let's continue.

Q.   (BY MS. GLASSER)  Now, did you -- when you say you analyzed the claim charts, can you tell us, did you walk through just some of the elements or all of the elements of the claim?

A.   I went through all of the elements of the claim.

Q.   And we've been through a lot of claim charts already in this case, but can you give us just an example of how you do that type of analysis?

A.   Yes.  So, for example, this claim element is talking about setting cells on multiple frequencies with a priority, a same priority cells, and selecting cells according to a priority-based reselection principle.  And here we see that the multiple frequencies are matched to an inter-frequency cell reselection criteria in a section of the standard.  The priority-based reselection principle is matched with green, and the same priority cells are matched to this pink kind of color as well.

Q.   To confirm our record is clear, you're talking about TS

38.304 that you matched to the '776.  Is that right?

A.    That is correct.

Q.    And can you give us another example of the type of analysis that you did?

A.    Yes.  So another claim element talks about selecting a cell as a reselected cell from a -- same priority cells according to a cell reselection principle that's offset-based.  And here we see that equal priority is matched to same priority, cell reselection is matched in light blue to cell reselection, and the best cell reselection principle, i.e., the ranking of the cells, is offset-based matched to the Qoffset parameter.

Q.    And as a result of analyzing all of the elements, what did you conclude regarding the claim chart that G+ prepared for the '776 Patent as to 38.304?

A.    I concluded that the '776 Patent reads on 38.304 and, hence, is essential to the 5G standard.

Q.    Now, how common or how rare is it for a patent to be actually essential?

A.    It is very -- well, it -- there are a lot of patents declared essential, but -- and some patents are -- many patents are essential to the standard, but only a few patents are really important.

Q.    About how many patents are actually essential as a percentage?  Have you seen that in the literature?

A.    Yes.  For the 5G standard, one study that I've read showed that only eight percent of all declared patents are essential to the standard.

Q.    And were you drawing a distinction in your prior answer between some patents that are essential but not as important and some patents that are very important?

A.    That is correct.  For example, with the '776 Patent you might not have the ability to select cells differentiating on frequency, and this is a key aspect of 5G.

Q.    Did you also review some of the source code in this case?

A.    Yes, I did.

Q.    And did you pull all that source code yourself or go to that room they were talking about to look at the million lines of code?

A.    No, I did not.  Again, in order for Plaintiff to evaluate infringement, you do have to evaluate millions of lines of code, and that is why code reviewers were used.

Q.    Is that common practice in your experience?

A.    In my experience, yes.

Q.    Now, what's the term that's used to describe the core code that has the essential functions?

A.    The term is called base to build code.

Q.    And do you know whether or not the code Doctor Akl showed was that core code?

A.    Yes, I do.  It was base to build code, and this is

important because that code is basically used to model all the essential features, so a developer doesn't have to reinvent the wheel for every --

MR. CORDELL:  I hate to interrupt, but I have to object.  This is outside his report.

MS. GLASSER:  I disagree, Your Honor.  There is extensive discussion of the code in his report.  In fact, he incorporates that same analysis by Doctor Akl.

THE COURT:  All right.  Well, I can't deal with this without looking at the report itself, so I'll have to do that, and I'm going to excuse the jury to the jury room while I take that up.

Members of the jury, if you just close your notebooks, leave them in your chairs, follow all my instructions, including, of course, you would expect me to remind you, don't discuss the case among yourselves, and we'll have you back in here just as quickly as possible.

The jury should retire to the jury room.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated.

Let me have your objection one more time, Mr. Cordell, and then I'll hear a response from Ms. Glasser.

MR. CORDELL:  Yes, Your Honor.  Now that the jury is out of the room, I'll tell you what I think is going on, and perhaps we should have the witness sequestered as well.  May I

ask that?

THE COURT:  I don't know where you're headed, but --

MR. CORDELL:  It's okay.  Thank you.  I can do it.  Where I think they're going with this is that yesterday Doctor Akl admitted that he had analyzed the wrong code, he had picked the wrong code build and based his analysis on it.  I believe they are trying to back-fill with Doctor Kowalski some linkage between the wrong code and what they think is the --

MS. GLASSER:  I can set his mind --

THE COURT:  Just a minute, Ms. Glasser.

MS. GLASSER:  Apologize.

THE COURT:  I will acknowledge when I want to hear from you.

MS. GLASSER:  Thank you.

THE COURT:  Go ahead.

MR. CORDELL:  Doctor Kowalski did no source code analysis at all.  He admitted in his deposition that he did no source code analysis.  He can say he relied on Doctor Akl's source code analysis, and if that's where it stops, that will be fine.  But what we can't do is have him go and become a second conduit for that analysis when he didn't do it himself.

THE COURT:  Now I'll hear a response.

MS. GLASSER:  Thank you, Your Honor.

So the fear appears to be unfounded, but I do want to clarify there's absolutely nothing Doctor Akl said yesterday about using the wrong code.  They tried to show him something from their own expert's report that doesn't say that, either, but there was a suggestion made that the code that both experts relied upon was somehow wrong.

And so given that Doctor Kowalski in his report does expressly refer to that code, he incorporates parts of Doctor Akl's analysis, and he also attaches claim charts that cite the very parts of the code that Doctor Akl was being cross-examined about yesterday.

And so we're not going to go down this in endless detail, but I do want to be able to confirm that that is the same code that he looked at and that to him there was a good reason to look at the code.

MR. CORDELL:  May I read from his deposition, Your Honor, at page 16, line 1?

THE COURT:  Just a moment.  Doctor Akl said many times yesterday that there were 60 pages in his report that were directly lifted from, copied from, and included in his report from Doctor Kowalski's.

I assume Doctor Kowalski may have a similar section that he lifted from Doctor Akl's report.  That may be a reciprocal practice between the two of them.  But unless the report shows that Doctor Kowalski did his own independent analysis of the

code, I'm not going to allow him to do it on the witness stand for the first time.

If he adopted the analysis of Doctor Akl, then he can certainly testify that he adopted the analysis of Doctor Akl. And if he stated -- if he took certain pages from Doctor Akl's report and included them in his own that showed what Doctor Akl analyzed, he can certainly reference that. But he's not going to turn Doctor Akl's analysis into his analysis any more than yesterday Doctor Akl was able to turn Doctor Kowalski's analysis into his own.

So I don't have any problem with you exploring what's in Doctor Kowalski's report. But if it is characterized as an adoption of Doctor Akl's and not his own, then it's going to have to be presented that way.

MS. GLASSER:  I think I can do it very briefly, Your Honor.  And if it makes it simpler, I can grab right now while the jury is out, this will just take a second, an actual document to put up on the elmo so we know that it's something that was actually attached to Doctor Kowalski's report.  But I want to get pre-permission to do that because it is part of the report itself.

MR. CORDELL:  Your Honor, we would object to that. As Your Honor just pointed out, there's a difference between this expert doing analysis and simply attaching somebody else's.

THE COURT:  I assume, Mr. Cordell, you have this witness on deposition saying, I didn't analyze the code.

MR. CORDELL:  I do.  Page 16, lines 1 through 11.

THE COURT:  Well, you may want to use that when it comes to cross examination.  We'll see.

If you have something you want to specifically query this witness about, Ms. Glasser, put it on the elmo.  I'd like to see it.  I'd like to know if there's going to be a dispute about it now.

MS. GLASSER:  And I'm happy to proceed with just a couple of additional questions without the elmo.  I was just trying to resolve the objection and keep it just really tethered to the report, but I think my questions are quite high level anyway.

THE COURT:  Well, if the questions fall within the scope of the report and if they are clearly structured so that they reference adopted analysis from Doctor Akl as his analysis and not this witness', I don't have a problem with it.

MS. GLASSER:  And do you mind, Your Honor -- I lost the train of what the last question was.  Can we just check that quickly?

THE COURT:  You can check the transcript.

All right.  Do we have more on this that we need to discuss?  Do you have anything further for me, Mr. Cordell?

MR. CORDELL:  I don't think so, Your Honor, but I haven't seen where counsel's going.

THE COURT:  Well, as I told you-all yesterday, this time that is being used while the jury's out of the courtroom is time that's going to count against your trial time, and I'll allocate that as I see fit, but it's not just free time that we can drag this process out.  So be mindful of that.

All right.  Do you have anything further on this, Ms. Glasser?

MS. GLASSER:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury back in.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen. Thank you for your cooperation.

Let's proceed, counsel.

MS. GLASSER:  Thank you, Your Honor.

Q.   (BY MS. GLASSER)  Doctor Kowalski, I'll restate the question.  Do you know whether the code that you adopted from Doctor Akl was that core code you just described?

A.   Yes, it was.

Q.   And were you here yesterday where there was discussion about how the source code reviewers go about themselves checking to see if the different versions have any material differences?

A.   Yes, I did.

Q.   And so how does the conclusion of the reviewers that the code was representative, how does that relate to your findings, your opinions, about essentiality under the standard?

MR. CORDELL:  Objection; leading.

THE COURT:  Sustained as to leading.

Q.   (BY MS. GLASSER)  Does the finding of the source code reviewers that the code was representative between versions, does that have any connection one way or the other to your findings regarding essentiality under the standard?

MR. CORDELL:  I object to the characterization of the evidence by counsel.

THE COURT:  Well, I'm not going to comment on the characterization, but it continues to be leading and you're going to have to examine this witness in a non-leading fashion, counsel.

MS. GLASSER:  Absolutely, Your Honor.

THE COURT:  I'll sustain the objection.  Rephrase the question in a non-leading form or move on.  Your decision.

Q.   (BY MS. GLASSER)  Can you explain to us whether the source code reviewer's representativeness analysis had any connection to your opinions?

MR. CORDELL:  Again, leading, Your Honor.  She needs to ask the basic question in order to elicit testimony, not

lead the witness.

THE COURT:  Well, without conducting a refresher course for everybody in the room, a non-leading question is one that does not include the answer within the question.

MS. GLASSER:  Right.  That's why --

THE COURT:  Try it again, Ms. Glasser.

MS. GLASSER:  I apologize.  I thought I did.

Q.    (BY MS. GLASSER)  Can you tell us whether or not the work of representativeness analysis by the source code reviewers had any connection to your opinions?

MR. CORDELL:  Objection, leading.

MS. GLASSER:  It's completely open-ended, Your Honor.

THE COURT:  It's a leading question because it includes the answer to the question in the question.

MS. GLASSER:  All right.  I can --

THE COURT:  I'm going to sustain the objection.

MS. GLASSER:  Thank you, Your Honor.

Q.    (BY MS. GLASSER)  Why did you -- I guess so your conclusion relates to essentiality under the standard --

MS. GLASSER:  I'll withdraw that, Your Honor.

Q.    (BY MS. GLASSER)  Can you tell us about what connection there is, if any, between a finding of representativeness of the source code and a finding that the patents are essential to the standard?

MR. CORDELL:  Your Honor, I'm going to add one more objection which is this witness said nothing about these reviewers.  It is nowhere in his report, it's completely off of his particular points, so it's outside the scope.

THE COURT:  Do you have a response to that objection, Ms. Glasser?

MS. GLASSER:  It's background to the report.  He did, I believe, review the resumes of the reviewers at one point, and he also just testified without objection a few minutes earlier about the source code reviewers.

THE COURT:  I'm going to allow this question.  I'll overrule the objection.

THE WITNESS:  I'm sorry.  Could you --

THE COURT:  Restate the question for the witness, please.

MS. GLASSER:  Sure.

Q.   (BY MS. GLASSER)  Can you tell us whether there was any connection between the representativeness analysis by the source code reviewers -- what connection, if any, there was between the representativeness analysis and your findings on essentiality?

A.   Yes.  The findings by the source code reviewers correlated, indicated that they were exercising the functions of the patents that are at issue here.

Q.   Did you, after finding essentiality, did you go on to

analyze any technical benefits issues?

A.   Yes, I did.

Q.   And now, to put us in a frame of reference from yesterday, there was a discussion of ping-ponging.  Do you recall that?

A.   Yes, I do.

Q.   And can you just remind us, at a high level, what is ping-ponging and why it is an issue in cellular communications?

A.   Yes.  In cellular communications, you do not want to spend a lot of time and energy alternating between various cells and selecting them because that is time that you are not communicating with.

Now, as the '776 Patent teaches, for inter-frequency cell selection, the handset has to burn more battery power to do that, so it is very inefficient from the standpoint of energy usage.

In addition, in certain circumstances, you have to recover from a link failure, for example, and that means you are not communicating when you are recovering from a link failure.  So ping-ponging is a very big problem that all network operators, cell phone manufacturers, and so forth, want to avoid.

Q.   And you were here yesterday when Doctor Akl did an analysis that he worked with you on and, in fact, you wrote

628

portions for him regarding the benefits -- speed benefit of the '776.  Is that right?

            MR. CORDELL:  Objection, leading, Your Honor.

            MS. GLASSER:  It's just foundational, Your Honor.

            THE COURT:  It's perfectly fine to ask the witness if he was here during another witness' testimony and to ask the witness about that testimony.  It would be a lot simpler if you broke it up into smaller questions, Ms. Glasser.  Let's rephrase.

            MS. GLASSER:  Will do, Your Honor.

Q.    (BY MS. GLASSER)  Were you here when Doctor Akl testified about the speed benefit of the '776?

A.    Yes, I was.

Q.    And did the two of you work together on that analysis?

A.    Yes, I did.  We did.

Q.    And I don't want to have you repeat things for the jury necessarily, but given that you did a lot of this analysis, can you walk us through this publication that was shown and explain why it is relevant to your findings?

            MR. CORDELL:  I'm going to object to the narrative, Your Honor.  We need questions and answers.

            THE COURT:  I'll permit the question, but I'm going to instruct counsel to avoid a narrative in her questions.  But I'm going to allow this question.

            Go ahead and answer the question, Doctor Kowalski.

THE WITNESS:  Yes.  And, again, I'm sorry.  Could you please repeat the question?

Q.    (BY MS. GLASSER)  Sure.  Can you remind the jury about how this publication on the screen helped inform the speed benefits analysis?

A.    Yes.  This paper in particular shows that the more you reduce ping-ponging, the higher the throughput.  And this paper, which was submitted to an engineering conference showed that with the scheme that they proposed, that throughput gains of between 5 and up to 33 percent could be achieved by judiciously designing cell reselection algorithms to reduce ping-ponging.

Q.    Who submitted that publication and when?

A.    This was submitted in 2021 or perhaps late 2020 by Samsung engineers.

Q.    And what numbers specifically did the Samsung engineers calculate?

A.    Again, they calculated a throughput gain of between 5 and 33 percent.

Q.    And the article on the screen refers to SIM dual or dual SIM.  Do you see that?

A.    I do.

Q.    And does the '776 Patent have any connection to dual SIM?

A.    It most certainly applies to dual SIM products.

Q.    Why did you see this publication as being helpful to your

speed analysis?

A.    Because it showed a direct relationship between reduction of ping-ponging and throughput.

Q.    And is that consistent -- do you have any insight into that from your own industry experience?

A.    Yes, I do.  And, again, certainly in the event of radio link failure -- by the way, if you -- if a handset experiences radio link failure, it is still in a communications mode, but it is unable to communicate.  So we took this as a basis from which to evaluate benefits of the '776 Patent.

Q.    And why did you conclude or choose to use the lowest number, the most conservative one?

A.    I chose to use the lowest number as the most conservative, again, because there were scenarios where the penalty for not using the '776 Patent could be much larger.  I mentioned the radio link failure situation, but there are certain cells -- if you remember, Doctor Akl yesterday talked about the best cell that you select to may not be the closest one.

On the other hand, the best cell that you select may offer vastly greater throughput, vastly greater speed than other cells, and this is -- this behavior is enabled by the '776 Patent.  So we thought five percent would be conservative.

Q.    Now, what are we looking at here and how does it relate

to your conclusion that five percent is conservative?

A.    Yes.  So, again, we are looking at Doctor Park's testimony from his deposition, and he was designated by Samsung to be discussing non-infringing alternatives.  And he was not sure about whether there were acceptable alternatives to using the '776 Patent.

Q.    Let's turn to the '130 Patent.  And you were here in court when Doctor Akl gave an overview of this patent.  Is that right?

A.    That is correct.

Q.    Now, what types of data sets is this technique particularly important for?

A.    This is particularly important for when you are transmitting one-of-a-kind messages.  For example, if you need to acknowledge messages from the base station that are involved with initially connecting to the network, handing over to the network and such, this is very useful for that purpose.

Q.    And were you able to determine whether or not ZTE had declared the '130 Patent as essential or may be essential to 5G?

A.    Yes, I did.  And what is in yellow is the patent application, and we see the patent application reflected as priority data on the face of the '130 Patent and the title of the '130 Patent is essentially the same as the title of the

632

patent application declared to ETSI.

Q.   And you've highlighted one of them, TS 38.211.  Is that right?

A.   That is correct.

Q.   And did you review Samsung's testimony to see if it shed light on whether Samsung uses that particular specification?

A.   Yes, I did.

Q.   And what did you find?

A.   I found that Samsung's representative indicated that the source code that was being used was designed to match the discussion of the physical uplink control panel data that is also format 0, you'll hear, in the 3GPP standard for TS 38.211.

Q.   Is there a reason that the testimony says 138.211 and the standard document says 38.211?

A.   Yes.  There are standards published by 3GPP and there are standards published by ETSI.  They are identical in function except that the ETSI standards have a 1 in the --

Q.   Okay.  And did you proceed then to do that claim chart analysis for this patent as well?

A.   I did.

Q.   And can you give us an example of -- first, are we looking at the claim chart here on the screen?

A.   That is correct.

Q.   And can you give us just an example of the type of

analysis you did as you went through the claim charts?

A.    Yes.  So the -- for example, in this claim element, it talks about sending k predefined sequences on M transmission symbols and those k predefined sequences are sent on those OFDM symbols in yellow to send B uplink -- B business of uplink control information, that's the blue 2 there, and the -- what is below, by the way, is the actual equation for generating those sequences, which I won't get into gory detail here.

Q.    What did you conclude regarding essentiality of the patent with respect to this 38.211?

A.    Yes.  With respect to 38.211, this patent is standard essential and mandatory to implement.  Anybody that develops a 3GPP device has to be able to either send this or understand its reception.

Q.    Did you perform analysis of the technical benefit to Samsung?

A.    Yes, I did.

Q.    What are we looking at here?

A.    We are looking at testimony from Mr. Kim, Samsung's licensing representative, who indicated that if format 0 was not available, the next best alternative would be format 1 or format 2.  And he indicated that was correct.

Q.    Did you review -- were you able to identify any T docs, any of those submissions to the standards body that helped you

quantify the benefit?

A.    Yes, I did.

Q.    And actually before we get into the document, I don't think we've talked about this yet.  This is PTX 26.  How large is PTX 26?  Is it a big or small document?

A.    It's like several pages.

Q.    Several pages?

A.    Yeah.

Q.    Just this one right here?

A.    Well, yeah.  This particular document is like three or four -- it's like four or five or so pages.  I don't remember the exact number.

Q.    I think you have it in your binder in front of you, 26. It's a compilation document.  If you could look at that and refresh.

A.    All right.  PTX 26.  There it is -- I believe there's an error here.  Hold on.

        MS. GLASSER:  Does someone have another copy of PTX 26?

        THE WITNESS:  Yeah.  PTX 26 in this binder is -- relates to the '776 Patent.

Q.    (BY MS. GLASSER)  Oh, take a look at page 308 of that document.

A.    Page 308.  Oh, I see.  It's big.  Gotcha.  Oh, there it is.  Thank you so much.

Q.   So PTX 6, can you describe what that document is?

A.   Yeah.  So this document, which --

THE COURT:  You're going to have to speak in the microphone, Doctor Kowalski.

THE WITNESS:  Oh, sorry.

THE COURT:  That's okay.

THE WITNESS:  This document is -- which is several pages is discussing a -- what's called a link level analysis for alternative forms of the physical uplink control channel.

MS. GLASSER:  Apologies for the confusion.  Just for the record, PTX 26 [sic] is a compilation document that includes that T doc among others.

Q.   (BY MS. GLASSER)  So was there anything in this particular technical document from 3GPP that helped you to analyze the performance benefits?

A.   Yes.  What we see on this curve is what's called a bit error rate curve.  And the thing to pay attention to is, as Doctor Akl indicated yesterday, is a format similar to the legacy PUCCH format and a sequence-based PUCCH format.

Now, what the upper curves represent is, for a given level of received power transmitted, the probability that the base station fails to receive an acknowledgement.  Now, if the base station fails to receive an acknowledgement, base station's going to think that the handset didn't correctly receive the data, so it's going to send it again.  That means

it's going to make a retransmission.  That directly relates to a reduction in speed because that time could have been used -- that bandwidth could have been used to send new data.

Q.   And who submitted this data and to whom?

A.   This was submitted by ZTE to the RAN 1 working group in 3GPP.

Q.   So what types of folks, companies, and people had access to this at the time it was submitted?

A.   All participants in 3GPP, which would be the service providers such as AT&T and Verizon, handset manufacturers such as Samsung or Sharp, and base station manufacturers such as Ericsson or Samsung or Nokia.

Q.   Do you need to interview the inventors to understand these types of technical documents?

A.   No.  As someone who has worked in this field for decades, I can readily understand what this curve indicates and what its impact on performance is, and that's why they are submitted this way so that professionals who are deeply skilled in the art can evaluate them.

     THE COURT:  Doctor Kowalski, counsel asked you do you need to interview the inventors to understand these types of documents, and you said no, and that was a complete answer.  And then you went on and explained why you said no, but she didn't ask you why you said no.

     So try to wait until you get the question and try to

limit your answers to the question that's actually asked.  All right?

THE WITNESS:  Okay.  I'm sorry.

THE COURT:  That's all right.

Let's continue.

Q.   (BY MS. GLASSER)  Can you explain specifically how you used the points in this chart to calculate the speed benefit?

A.   Yes.  So as you see, the green curve -- and on this curve, the lower the curve, the better.  The lower the curve, the lower the error rate.

The sequence-based PUCCH format 0, which again is the '130 Patent, hits a one percent error rate at a 0DB -- at a particular receive signal level.  The alternative similar to PUCCH format 1 would be at 3 percent there.  And so -- and by the way, you want to operate -- operators want to operate the network so that this error rate is roughly one percent.  And this is specified in other 3GPP specifications.

Q.   What was your conclusion regarding the specific speed benefit of the '130 Patent?

A.   That there would be a two percent benefit in throughput or speed.

Q.   Let's turn to the '443 Patent.  Did you determine whether ZTE disclosed to industry that the innovations of the '443 Patent were, in fact, patented?

A.   Yes.

Q.   And how did you do that?

A.   I reviewed the information, IPR licensing declaration statement that ZTE submitted to ETSI, and again, in yellow is the Chinese patent application number and in green is the title of the application.

Q.   Did you perform that claim chart analysis you described earlier but with respect to the '443?

A.   Yes, I did.

Q.   And what did you conclude?

A.   I concluded that the '443 Patent reads on the 3GPP standards and is mandatory essential to implement in handset.

Q.   Can you give us an example of how you did that analysis for one of the claim elements for the '443?

A.   Yes.  Here we see an excerpt from the standard TS 38.213, and the claim element talks about a first length type being predefined and a second length time indicating a value of M2 bits being based on k, k being the number of erroneous transmission blocks.

     And here we see that the first time maps to the HARQ-ACK code book being semi-static, type 1, and the second length time indicating the value of M2 based on k mapping to the type 2 HARQ-ACK code book as dynamic.

Q.   Now, with respect to your own analysis, you were looking at standards.  Correct?

A.   Yes.

Q.    Did you also incorporate into your report any of Doctor Akl's source code write-up?

A.    I did.

Q.    And did you become aware at some point in time of the typo he mentioned yesterday in that one paragraph?

A.    Yes.

Q.    And how did you know that it was a typo?

A.    I knew that it was a typo because it did not match what I knew about the standard.

Q.    Can you tell us whether or not after you found out about the typo you were able to determine whether Doctor Akl had disclosed the detailed source code for that element?

            MR. CORDELL:  Objection; leading.

            THE COURT:  Sustained.

Q.    (BY MS. GLASSER)  And how did you know that it was, in fact, purely a typo?

A.    Because the source code provided by Doctor Akl indicated as such.

Q.    And did you see some of that code yesterday on the screen?

A.    Yes, I did.

            MR. CORDELL:  Objection, leading.

            MS. GLASSER:  I'll withdraw it, Your Honor.  We can move on.

            THE COURT:  All right.  Let's do that.

Q.   (BY MS. GLASSER)  Does the standard itself provide any insight into what the next best alternative would be to infringing the '443?

A.   Yes, it does.

Q.   What are we looking at here?

A.   We are, again, looking at an excerpt from the standard TS 38.213, and it states that if a UE is not provided with any PDSCH HARQ-ACK code book in particular, the UE generates at most one HARQ-ACK information bit.

Q.   Did you -- how did the Samsung testimony you saw relate to that?

A.   Yes.  Again, Doctor Park was not able to identify any -- any existing acceptable alternatives to the '443 Patent.

Q.   Did you yourself take a look at what would happen if Samsung tried to use that alternative of sending a single bit?

A.   I did.

Q.   And what is the probability of any given receive data unit being in error?

A.   Yes.  As quoted in this paper, again submitted to a conference by Samsung in which Doctor Park is a co-author, by the way, they indicated that a typical operating point for -- or error rate would be 0.095, or roughly 10 percent.

Q.   And this is PTX 23.  Is that right?

A.   Yes.

Q.   And who again is the coauthor?

A.    Doctor Sungjin Park.

Q.    So using -- does that comport with your understanding from industry?

A.    Yes.  I hadn't mentioned it earlier, but also at Sharp I worked in WiFi, and typically these networks are set up to operate that way because it is the most efficient way to trade off battery usage and time frequency resources, bandwidth, spectrum, that is used to do these transmissions.

Q.    In your experience, what is the approximate probability of a receive data unit being in error?

A.    It's approximately 0. -- about point -- about 10 percent or 9.5 percent, as used in this paper.

Q.    So using that knowledge, can you walk us through how did you calculate the speed benefit?

A.    Yes.  And I should point out that this is really conservative because the '443 Patent is used to send a -- it can be used to send a lot of acknowledgements of transport blocks all at once.  So -- but I took a small example.  I took four, although it could be as high as 20 in an actual system.

If you were to use one bit to acknowledge four transmissions, that you would mean that your probability of retransmission, all other things being equal, would be 33 percent.  However, in 3GPP, you could take those four transmissions and group them in groups of two, in which case your probability of retransmission becomes 18 percent.  And --

Q.   So once we have those numbers, how do we get to the conservative benefit you calculated?

A.   Right.  So with the invention, there's approximately a 10 percent probability of retransmission of a given transport -- of the given transmission.  And so we took 18 percent minus 10 percent equals 8 percent.  But because there might be delay issues that make it irrelevant to transmit again, we decided to be extra conservative and make that four percent.

Q.   Thank you, Doctor Kowalski.

Could you go ahead and summarize for the jury what is the total speed loss if Samsung did not infringe?

A.   Yes.  So, again, these are conservative estimates.  So for the '776 Patent, it would be five percent; for the '130 Patent, it would be two percent; and for the '443 Patent, it would be four percent, for a total of 11 percent.

Q.   Thank you very much.

        MS. GLASSER:  I pass the witness.

        THE COURT:  All right.  Cross examination by the Defendants.

        MR. CORDELL:  May I proceed, Your Honor?

        THE COURT:  You may proceed, counsel.

        MR. CORDELL:  Thank you.

                    CROSS EXAMINATION

BY MR. CORDELL:

Q.   Good morning, Doctor Kowalski.

A.   Good morning.

Q.   My name is Ruffin Cordell.  I don't think we've had a chance to meet before?

A.   No, but I caught your name.

Q.   Good.  You know I represent Samsung in this case.  Right?

A.   Yes.

Q.   Okay.  So your counsel just asked you a bunch of questions about a typo.  Do you remember that?

A.   Yes.

Q.   And she specifically asked you about Doctor Akl's typo. Do you remember that?

A.   I do.

Q.   Now, I used this board with Doctor Akl --

          MR. CORDELL:  May I, Your Honor.

          THE COURT:  You may.

Q.   (BY MR. CORDELL)  Were you here when Doctor Akl and I went through this board?

A.   I was.

Q.   And you agree that there are three patents in this case--the '776, '443, and '130.  Right?

A.   Yes.

Q.   And the phones --

          MR. CORDELL:  May I go back to my seat for a moment, Your Honor?

THE COURT:  You may.

Q.   (BY MR. CORDELL)  The accused phones in this case which I now have include one of three baseband processors, either Qualcomm, Exynos, or MediaTek.  Correct?

A.   Yes.

Q.   And as you sit across the room, you can't tell which chip is in my phone.  Right?

A.   Not from across the room.

Q.   Okay.  But suffice it to say that for all the accused products, it's either going to be Qualcomm, Exynos, or MediaTek.  Right?

A.   That is correct.

Q.   And Qualcomm makes the Qualcomm chip.  Right?

A.   Yes.

Q.   Samsung makes the Exynos chip.  Right?

A.   Yes.

Q.   And MediaTek makes the MediaTek chip.  Right?

A.   Actually to be honest, I think it's TSMC that makes it.

Q.   Okay.  So what your point is, is MediaTek designs the chip and then they give it to a fabrication house like TSMC that actually prints it on the silicon and makes a little chip out of it.  Right?

A.   That is correct.  And I think the same is true for Qualcomm.

Q.   In fact, you know, very few companies actually have both

the design stuff and the fabrication stuff in-house.  Right?

A.    Correct.

Q.    Okay.  But the one thing that we're clear about is we're talking about either a Qualcomm chip, an Exynos chip, or a MediaTek chip.  Right?

A.    Correct.

Q.    You now agree with Doctor Akl that MediaTek chips are not accused of infringement in this case.  Right?

A.    I do not believe that is an accurate characterization.  I believe what Doctor Akl indicated was that he was not able to confirm infringement, although I could -- you know --

Q.    Okay.  But yesterday you heard him say that he was not offering an infringement opinion about the MediaTek products.  Fair?

A.    Okay.

Q.    And this morning you haven't offered any opinion to this jury suggesting that the MediaTek products infringe any of the patents in this case.  Right?

A.    I disagree.

Q.    Okay.  Did you mention MediaTek a single time in your testimony, sir?

A.    I mentioned that every handset has to -- and every base station has to be able to use the features of the three patents-in-suit because they are standard essential mandatory.

          MR. CORDELL:  May I have an instruction, Your Honor?

My question was, did you mention MediaTek --

THE COURT:  All right.  I gather your objection which you haven't really said so, but I gather your objection is the witness is non-responsive.

MR. CORDELL:  Yes, Your Honor.  Thank you.

THE COURT:  And I'll sustain that objection.

Doctor Kowalski, you need to not only limit your answers to the questions asked, you need to answer the question that is asked.  And the answer you gave didn't respond to the question that was asked.

Questions are not an opportunity for you to say what you want to say.  A question is an opportunity for you to answer the question that's asked.  And that's why both sides get to get up to the podium multiple times.  If there's something that Mr. Cordell asked you and you answer his question and Ms. Glasser thinks it's important to the case, she can revisit it when she gets back up.

So it's not an opportunity for you say what you want to say or what you think is important to be said.  It's an opportunity for you to answer the question counsel, either for Plaintiff or Defendant, puts to you.

So re-ask the question, and we'll see what answer we get.

Q.   (BY MR. CORDELL)  In your direct testimony, Doctor Kowalski, you did not mention the word MediaTek a single time.  Correct?

A.   Correct.

Q.   You did not provide this jury with any analysis of a product by brand name, for example, that it contained a MediaTek product.  Correct?

A.   Correct.

Q.   So, in fact, as far as this jury has evidence to consider, you did not isolate the MediaTek products at all. Correct?

A.   Could you please repeat the question?

Q.   So you understand that it is GComm's burden to prove infringement.  Right?

A.   I believe so.

Q.   The lawyers have told you that.  It's in your report. Right?

A.   Uh-huh.

Q.   And you understand --

          THE COURT:  Wait a minute.  Un-huh won't answer --

          THE WITNESS:  Yes.

          THE COURT:  Won't show up in the record.  You need to give a verbalized answer.

          THE WITNESS:  Okay.  Sorry.

          THE COURT:  That's all right.

Q.   (BY MR. CORDELL)  So you have given the jury no evidence specifically to the MediaTek products for them to conclude that either we do or don't infringe.  Right?

648

A.    I do not agree with -- I do not agree.

Q.    Well, you didn't mention MediaTek for the '776 Patent. Right?

A.    That is correct.

Q.    All right.  I'll make yours black to differentiate from Doctor Akl.  You didn't mention MediaTek for the '443 Patent, did you?

A.    No, I did not.

Q.    And you didn't mention MediaTek for the '130 Patent, did you?

A.    No.

Q.    Okay.  For the '130 Patent, you went further and you said affirmatively that you could not provide an infringement opinion that the Exynos or MediaTek parts infringe the '130 Patent.  Correct?

A.    I disagree with that.

Q.    Do you have your expert reports in front of you, sir?

A.    Yes, I do.

Q.    I want you to turn to paragraph 106 in your opening expert report.

A.    Yes, I see.

Q.    Did you read it to yourself, sir?

A.    Yes.

Q.    Does that refresh your recollection that you cannot determine that these devices, Exynos and MediaTek devices,

infringe the '130 Patent?

A.   Could you please ask the question again?

Q.   Sure.  Having reviewed your expert report, does that refresh your recollection that in your opinion you cannot say that the Exynos and MediaTek versions of the Samsung products infringe the '130 Patent?

A.   My recollection is refreshed, and I disagree.

         MR. CORDELL:  Your Honor, may I publish?

         THE COURT:  You may.

         MR. CORDELL:  Can I have paragraph 106?

Q.   (BY MR. CORDELL)  So this is your expert report.  Right, Doctor Kowalski?

A.   That is correct.

Q.   This is what you give us so that we know what your opinions are going to be before you come into court.  Right?

A.   That is correct.

Q.   And you try to be accurate and complete in your expert reports, don't you?

A.   I do.

Q.   You don't try to hide anything from us, do you?

A.   No.

Q.   And what you told us is, "However, certain features of the 130 asserted claims could not be confirmed in the source code for Samsung's devices with Exynos and MediaTek processors, or the testing results I've reviewed, and

therefore I cannot confirm these devices infringe the asserted claims of the '130 Patent at this time."

Right?

A.    It says that.

Q.    And that's what you told us in your expert report. Right?

A.    It says that.

Q.    So you said MediaTek is off the list for a second reason, and Exynos is off the list.  Correct?

A.    I disagree with that characterization.

Q.    But that's what you told us before we got to trial. Right?

A.    I wrote in my expert report what we see here.

Q.    And for the '443, I think you told counsel that it was a typo.  Is that right?

A.    That is correct.

Q.    You said Doctor Akl made a mistake when he admitted that the Exynos and MediaTek processors do not infringe the 443. Is that right?

A.    Correct.

Q.    And the typo was a paragraph in his expert report. Right?

A.    Yes.

Q.    Well, it turns out, Doctor Kowalski, you also put into your expert report an opinion that the Exynos and MediaTek

processors do not infringe the '443 Patent.  Correct?

A.   I believe there is a cite from Doctor Akl's report to that effect, yes.

Q.   In fact, sir, in your expert report, without citing Doctor Akl, you affirmatively tell us that the Exynos and MediaTek processor versions of the Samsung products do not infringe the '443 Patent.  Correct?

A.   I disagree.

Q.   Well, go back to your expert report, and now let's look at paragraph 102.

THE COURT:  While he's doing that, counsel, I'm happy for you to use that marker, but would you put the cap back on it when you're not using it?  The fumes are about to run me out of this courtroom.  Maybe that's your intention, but put the cap back on.

MR. CORDELL:  I haven't had my coffee, Your Honor. Maybe that's helpful.  Thank you.

THE COURT:  All right.  Let's go back to the report.

Q.   (BY MR. CORDELL)  Can you review paragraph 102, sir?

A.   Yes, I have.

Q.   And can you confirm that you affirmatively offered us an opinion that the Exynos and MediaTek processor products do not infringe the '443 Patent?

A.   I disagree.

Q.   Well, Your Honor, may I publish this one?

THE COURT: You may.

MR. CORDELL: Can I have paragraph 102?

Q.   (BY MR. CORDELL)  Which reads, "However, certain features of the '443 asserted claims could not be confirmed in the source code for Samsung's devices with Exynos and MediaTek processors, or the testing results I've reviewed, and therefore I cannot confirm these devices infringe the asserted claims of the '443 Patent at this time."

That is what you told us.  Right, sir?

A.   It is -- it's written in the report.

Q.   You didn't say it was a typo.  Right?

A.   No.

Q.   You didn't say that you accidentally copied it from Doctor Akl.  Right?

A.   No.

Q.   You didn't tell us that we could just, you know, set aside your significant admission that two out of the three products don't infringe the '443 Patent, did you?

A.   I disagree with that characterization.

Q.   Okay.  But you told us Exynos is off and MediaTek is off for a second time.  Right?

A.   I disagree with that characterization.

Q.   I could read it again if you'd like, sir.  "I cannot confirm these devices infringe the asserted claims of the '443 Patent at this time."

Right?

A.   Those words are there.

Q.   Okay.  Now, mercifully, we're not going to talk about source code this morning.  Is that right?

A.   Hopefully.

Q.   And that's -- you told us in your deposition that you had not reviewed any source code as part of your analysis.  Right?

A.   I -- I actually don't recall.

Q.   Okay.  Well, let me refresh your recollection.  Open your binder up to your deposition at page 16, lines 1 through 11.

A.   You said page 16?

Q.   Yes.  And, Doctor Kowalski, you got to remember, these are on a grid.  So there's four on a single page, so you have to look at the tiny pages.  Otherwise, it's page 5, if that helps you, if you look at the big page numbers.

A.   Page 16.  Right?  Could you -- could you direct me again, please?

Q.   Yes.  It's your deposition --

THE COURT:  Counsel, I have a hard copy.  If there's not an objection, I'll hand the witness a hard copy.

MR. CORDELL:  Thank you, Your Honor.

THE WITNESS:  Thank you.

I see.  I said, I can't recall having done so.

Q.   (BY MR. CORDELL)  Okay.  And also you didn't do any testing in this case.  Right?

A.   Well, testing wasn't necessary, and in the case of the '776 Patent would have been impossible.

MR. CORDELL:  Your Honor, I object.

THE COURT:  Sustained.

THE WITNESS:  I'm sorry.

THE COURT:  The question was, did you do testing or did you not do testing, not whether it was necessary or you thought it was a good idea.

Again, answer the question asked, please.

THE WITNESS:  I'm really sorry.

No.

Q.   (BY MR. CORDELL)  And we heard about some testing from Doctor Akl, but you didn't -- you weren't involved in that testing.  You didn't supervise it or monitor it or anything like that.  Right?

A.   No.

Q.   And you didn't talk to the inventors in this case. Right?

A.   No.

Q.   You didn't ask your lawyers to put you in touch with any of the inventors to find out kind of what they were working on at the time of these patents.  Right?

A.   No.

Q.   And you said something about inventor notebooks haven't been used for decades.  You were at Sharp America.  Right?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A.   Sharp Labs of America, right.

Q.   Right.  And is it your sworn testimony that Sharp hasn't used inventor notebooks for decades?

A.   For researchers and standards, yes.

Q.   Sir, I'm asking you about the corporation you work for, Sharp, I guess, Sharp Laboratories America.  Is it your sworn testimony that they have not used inventor notebooks for decades?

A.   To my knowledge, I don't really know.

Q.   Okay.  And whether you looked at a notebook or something else, you didn't ask your lawyers or the people back at ZTE, if you could review some of the work they were doing that led up to these patents.  Right?

A.   Could you -- could you repeat the question?  I want to make sure I get it right.

Q.   Sure.  You didn't ask anybody to try to get for you the work, whether it was in a lab notebook or a bunch of draft memos or draft contributions in whatever form, you didn't ask for that as part of your analysis in this case.  Right?

A.   Yes.

Q.   Okay.  And by yes, you mean you did not ask for it.  Right?

A.   Yes.

Q.   Thank you.  My question was poor.  I apologize.

     Now, you're being paid for your work in this case.

Right?

A.   I am being paid for my time, yes.

Q.   Okay.  Like Doctor Akl and the other experts.  Right?

A.   Yes.

Q.   And it looks like as of September or so, you were about $267,000.  Is that right?

A.   I don't know where you got that number.

Q.   Well, is that right, sir?

A.   I don't think so.

Q.   What's your hourly rate?

A.   As of September, my hourly rate was $225 an hour.

Q.   And you dispute that you were paid $267,185.25 as of September 7 of last year?

A.   I certainly wasn't paid that.

Q.   Okay.  And you've obviously continued to work on this case since that date.  Right?

A.   Yes, I have.

Q.   Okay.  The three patents in this case, Doctor Kowalski, they were declared essential to the 5G standard.  Fair?

A.   Yes.

Q.   And if I suggested to you that somehow 3GPP reached out and selected these patents on their own, would that be right or wrong?

A.   That would be wrong.

Q.   And that's because ZTE declares them to the standard.

657

Right?

A.    They declare that the patents may be or may become essential to the standard.

Q.    And when a company does that -- well, in this case it happened to ETSI.  Right?  That's the standard body we're talking about.  Is it ETSI?

A.    I'm sorry.

Q.    I'll try again.  Thank you.

So ZTE declared these three patents to the ETSI standard body.  Right?

A.    Yes.

Q.    They fill out a form.  I can show you --

MR. CORDELL:  Can I have JTX 15?

Q.    (BY MR. CORDELL)  So this is the -- this is the declaration for the '443 Patent.  Correct?  Do you recognize that?

A.    I actually can't tell that it's with respect to the '443 Patent from this screen.

Q.    Well, you see Doctor Mang Zhu's name on it.  Right?

A.    I do.

Q.    And we're going to hear from her later.  She's the head IP officer at ZTE or was then.  Right?

A.    That's -- it says so.

MR. CORDELL:  And if we scroll down, maybe the next page.  There we go.  And can we go down to No. 19?  Can we

expand No. 19?  Thank you.  Actually can I have the whole thing so that the witness gets the whole -- there we go.

Q.    (BY MR. CORDELL)  Can you read that, Doctor Kowalski?

A.    Yes.

Q.    Okay.  And does that refresh your recollection that, in fact, this is the declaration that ZTE used to declare to ETSI that the '443 might be essential?

A.    It seems so.

Q.    Okay.  And you could -- well, do you see the -- you say it seems so.  Do you see the patent application written next to ZTE Corp?

A.    Yes.

Q.    It's CN20151465184?  Did I read that right?

A.    I see there is an application number highlighted in yellow, yes.

Q.    Okay.

MR. CORDELL:  And then can we have the actual patent, JTX 3, at column 1, lines 1 through 13?  That's page 5, yes, column 1, lines 1 through 13.

Q.    (BY MR. CORDELL)  Okay, sir.  Do you see the same number?

A.    Yes.

Q.    So you confirm that the JTX 15 declaration is, in fact, the declaration that was used to declare the '443 to ETSI.  Right?

A.    Yes.

Q.   Now, when a company declares a patent to ETSI, there's not like an intake review board at ETSI that decides whether it's a good patent or a bad patent.  Right?

A.   I don't think so.

Q.   If you and I come up with an invention this afternoon and file a patent on it, we can with declare it to ETSI tomorrow and nobody is going to tell us we can't.  Right?

A.   Not to my knowledge.

Q.   In fact, there is no formal process or informal process at ETSI for testing whether a patent really should be a FRAND patent or really isn't a FRAND patent.  Right?

A.   Could you please repeat the question?

Q.   You prefer essentiality.  Is that a better term?

A.   I just -- I want to understand the question.

Q.   Absolutely.  Let me try again.  So there is no process at ETSI to decide either formally or informally whether a patent really is essential or might not be ultimately used in products.  Fair?

A.   Yes.

Q.   And you -- in your direct you talked about a couple of studies that suggested that maybe as few as eight percent of the patents declared as essential are actually used in products.  Right?

A.   Yes.

Q.   And that's because companies tend to declare their

660

patents and you don't really know ultimately what's going to

happen as the products are actually produced.  Right?

A.   Among other things, yes.

Q.   So what we can't do is we can't say, well, if a patent is

declared essential, that automatically means it's going to be

used in the products.  Right?

A.   Yes.

Q.   Because maybe as few as eight percent of them actually

are used.  Right?

A.   Yes.

Q.   So with respect to the '776 Patent, you showed us slide

3.9.

          MR. CORDELL:  Can I have that?

Q.   (BY MR. CORDELL)  PDX 3.9.  You remember this one.

Right?

A.   I do.

Q.   And I think what you told the jury is that it was

declared essential to a bunch of these TSs.  Right?

A.   It was declared that it may be or may be become

essential.

Q.   And TS is technical specification.  Is that what it

stands for?

A.   That is correct.

Q.   And then it's got a number after it to identify which one

we're talking about.  Right?

661

A.   Yes.

Q.   And if you piled up the whole spec or specification for 4G, it would be as tall as I am.  Right?

A.   I assume so.

Q.   Might be taller.  Right?  It's thousands and thousands of pages.

A.   Yeah.  I haven't counted.

Q.   But these numbers do tell somebody like you kind of what standard you're talking about.  Right?

A.   Yes.

Q.   So when you see a 36, you think 4G.  Right?

A.   Yes.

Q.   Do we also call 4G LTE sometimes?

A.   Yes.

Q.   And when you see a 38, you think 5G.  Right?

A.   Yes.

Q.   Okay.  And I think I heard you tell this jury that, well, they named 4G in their declaration to ETSI, but it really isn't -- really isn't used in 4G.  Did I understand you correctly?

A.   Yes.

Q.   But, sir, previously you told us that the '776 Patent was, in fact, required in the 4G standard.  Right?

A.   I disagree.

Q.   Well, look at your expert report.  Let's go back at page

662

34, paragraph 95.

A.   Yes.

Q.   So, first of all, Doctor Kowalski, a normative requirement in your words is something that is absolutely required by a particular standard.  Right?

A.   Yes.

Q.   And you tell us that the '776 Patent features were adopted as a normative requirement for both 3G -- 4G and 5G. Right?

A.   I disagree with that characterization.

Q.   Okay.  Well, let's -- did you read paragraphs 95 and 96 to yourself?

A.   Yes, I did.

Q.   Okay.

        MR. CORDELL:  Your Honor, may I publish?

        THE COURT:  You may.

Q.   (BY MR. CORDELL)  So 95, you say, "Novel features of the '776 Patent were adopted as a normative requirement in both the 3GPP TS 36.304 and TS 38.304 standards as the priority-based cell reselection method in 4G/LTE and 5G/NR, respectively."

        Did I read that correct, sir?

A.   Yes.

Q.   And when you say normative requirement, you mean it's a must do.  Right?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A.    Yes.

Q.    And then if we go to paragraph 96, you say it again, "The reselection method of the '776 patent claiming the above features, and is incorporated into the normative portion of TS 36.304 and TS 38.304 specifications, is a mandatory requirement for all UEs in 4G/LTE and 5G/NR."  Correct?

A.    It says that.

Q.    Well, this is your expert report, Doctor Kowalski.  Right?

A.    Yes.

Q.    And when you say UEs, that's another word for phone.  Right?

A.    Among other things.

Q.    Okay.  User equipment.  Anything that I have, that's user equipment?  Could be a tablet?  You have to answer yes or no.

A.    Yes.

Q.    Thank you.

        THE COURT:  Counsel, I'm going to interrupt.  We're going to take a short recess at this juncture.  I know there's additional cross examination to be had, but we've been in here long enough to where I think a recess is in order.

    Ladies and gentlemen of the jury, if you'll leave your notebooks in your chairs, follow all my instructions, including not to discuss the case with yourselves, and we'll be back shortly to continue with cross examination of Doctor

Kowalski.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, just so I can memorialize what I told you in chambers, I'm ordering that both sides mutually cooperate and produce a revised and updated proposed final jury instruction and verdict form by 3:00 tomorrow, which is January 24th.

With that, we stand in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Counsel, let me inquire.  There is a matter pending on the docket under Document No. 569, entitled Plaintiff's Proffer Regarding *Georgia-Pacific* Factors to Account for ETSI FRAND Obligation.  What is the status of this so far as you're aware at this point in time?

Is there some agreement?  Are you-all discussing an agreement?  Are you at an impasse and you need the Court to give you direction?  What's the current status of this issue?

MR. SHEASBY:  We have proposed in that document that Mr. Dell use the language that the Defendants proposed in their proposed instructions.  I don't know what Defendants' position is.  They haven't responded to the proffer.  So the language is agreed to for factors 8, 9, and 10 because we adopted their language.

The issue is I think there's still debate as to whether Mr. Dell gets to talk about those factors if he uses their proposed language.  If Your Honor remembers, he has those factors he used in his headings, the unaltered versions of those factors, but in the actual text he did, his analysis does what those factors say.  So he said, I've removed the standard essentiality value of it.

So I think there's sort of two levels of debate--what the language should be and whether what's in the slides separate from whatever language they agreed to is actually in the report.

THE COURT:  All right.  Mr. McKeon, what's Samsung's view on this?

MR. McKEON:  Good morning, Your Honor.  We're of the view, Your Honor, that 8, 9, and 10 are out of the case.  The jury shouldn't be instructed on it.  We have -- there is language that was used in Evolved.  So if the Court is going to instruct the jury on it, we want to use that language, and I think counsel --

THE COURT:  Is that the language Mr. Sheasby's referring to?

MR. McKEON:  That's right, Your Honor.  But the main objection we have is with Mr. Dell's analysis on 8, 9, and 10, in his report he doesn't do any analysis with respect to different versions of factors 8, 9, and 10 at all.  So we

have -- really the objection for us is Mr. Dell, not necessarily the language of 8, 9, and 10.

THE COURT:  Well, this is simple.  We're going to hear from Mr. Dell before I see your latest iteration on the proposed final jury instructions at 3:00 tomorrow.  I'll hear his testimony, and then I'll see what that proposed iteration says.  And then, if necessary, I'll rule on this if it's not moot at that point.

MR. SHEASBY:  Thank you, Your Honor.

MR. McKEON:  Thank you, Your Honor.

THE COURT:  All right.  Are you prepared to continue cross examination, Mr. Cordell?

MR. CORDELL:  I am, Your Honor.  Thank you.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

We'll continue with the cross examination of Dr. John Kowalski by counsel for Samsung.

You may continue, Mr. Cordell.

MR. CORDELL:  Thank you, Your Honor.

Can I have PDX 3.15?

Q.   (BY MR. CORDELL)  Doctor Kowalski, this is one of the slides you showed the jury this morning.  Right?

A.   Yes.

Q.   And you took this from TS 38.304.  Right?

A.    Yes.

Q.    And because it has a 38, we know that's a 5G standard. Right?

A.    Yes.

Q.    And 304 is a section of the standard.  Right?

A.    Yes.

Q.    And what you did here is you took the jury through this and you mapped claim elements like selecting a cell to the standard where it says, in all cases the UE shall reselect a new cell.  Right?

A.    Yes.

Q.    You were color coding the correspondence, in your opinion, between the claim elements and what the standard says.  Right?

A.    Yes.

Q.    So you called out things like the new cell being better than the serving cell as corresponding to best cell reselection.  Correct?

A.    Yes.

Q.    And you highlighted a Qoffset to correspond to the offset-based cell reselection principle.  Right?

A.    Yes.

Q.    It turns out there were prior versions of this standard or this section in other standards.  Right?

A.    There is -- yes, there are prior versions.

Q.    You're an expert on standards.  Right, sir?

A.    Yes.

Q.    You know them pretty well.  Right?

A.    I know them well.

Q.    There was a section 304 in the 4G standard.  Right?

A.    Yes.

MR. CORDELL:  Can I have DTX 551?  Can I have the first page, please?  Thank you.

Q.    (BY MR. CORDELL)  So you recognize this as the 4G version of section 304.  Right?

A.    Yes.

Q.    And this, when I say 4G, that means LTE.  Right?

A.    Yes.

Q.    And this standard also includes that same subsection 5.2.4.6.  Right?

A.    It includes a section 5.2.4.6.

MR. CORDELL:  Can we put that side-by-side with Doctor Kowalski's slide?  Thank you.

Q.    (BY MR. CORDELL)  So we now have 5.2.4.6 from DTX 551, the 4G standard, next to your slide of 5.2.4.6 from the 5G standard.  Fair?

A.    Yes.

Q.    Okay.  And it turns out the 4G standard had a lot of the same elements that you identified in the 5G standard.  Right?

A.    The -- it has similar, if not -- but different

functionalities.

Q.   Well, let's go through a couple.  So you -- for selecting a cell as a reselected cell by the terminal in the 5G standard on the right, you highlighted in all cases the UE shall reselect the new cell.  Right?

A.   I'm sorry.  Could you repeat the question?

Q.   Sure.  It's what you highlighted in blue, sir.  Can you follow that?

A.   Yes.

Q.   So for selecting a cell as a reselected cell by the terminal, you highlighted in all cases the UE shall reselect the new cell.  Right?

A.   It says that, yes.

Q.   When we go back to the 4G standard, we see in all cases, the UE shall reselect the new cell.  Right?

A.   Yes.

Q.   In fact, the whole sentence is the same because it continues, "In all cases the UE shall reselect the new cell, only if the following conditions are met."  Right?

A.   It says that there.

Q.   And it's identical, both in your slide in the 5G form and in the document I showed you from 4G.  Right?

A.   What is the it to which you're referring, sir?

Q.   I'm showing you up on the screen, I've got 5G on the right and 4G on the left.  You follow me?

A.    Yes.

Q.    And the sentence is identical in both versions of the standard.  Right?

A.    Yes.  Those sentences are the same in that part of the particular clauses to which you have referenced.

Q.    And then for the green part of the claim on the right, you highlighted for best cell reselection principle, The cell ranking criterion -- sorry.  You highlighted, The new cell is better than the serving cell.  And then you highlighted the cell-ranking criterion.  Right?

A.    Yes.

Q.    And if we go to the 4G version on the left, we have the first bullet point, "The new cell is better ranked than the serving cell."  Right?

A.    In that section of the 4G standard.

Q.    And then we also have, if you go a little further down, The cell ranking criterion R.

        MR. CORDELL:  It's on the next page, Mr. Andryszak, in the 4G.  It's on page 38.

        MS. GLASSER:  Your Honor, I don't have an objection to this exact question, but I would like to have a sidebar regarding what I think is a pending upcoming issue relating to it after the witness answers if I may.

        THE COURT:  Well, then all you have to do is stand up at that time and say, may we approach the bench.

671

MS. GLASSER:  Will do, Your Honor.

THE COURT:  All right.

MR. CORDELL:  And I misspoke, Your Honor.  It's actually page 19.  It's on page 19, the product page.  It's at the top.

Q.   (BY MR. CORDELL)  Do you see that, the cell ranking criteria R on the left?

A.   Yes.

Q.   That is what you highlighted on the right, the cell ranking criterion R?

A.   Yes, I see that in that section of the 4G standard.

MR. CORDELL:  Do we still need to approach, Your Honor?

MS. GLASSER:  May we approach, Your Honor?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  All right.  If you want to approach the bench, then ask to approach the bench.  Don't stand up and tell me in front of the jury why you think you might need to approach the bench in the future because I'll take it as a strategic move to break the rhythm of the cross examination, and I'll view it as improper.

MS. GLASSER:  Understood.  It wasn't meant that way.

THE COURT:  Well, whether it was or wasn't, I'm just

telling you how it will be perceived going forward.

So what is the issue?

MS. GLASSER:  So I think he's already doing it now, but I'm fine permitting him a little bit of leeway.  I think he's trying to adjust prior art issues with the witness, and what he's asking right now has anything to do with the actual opinions offered by Doctor Kowalski in terms of the mapping of the standard to the patent.  He's trying to talk about some concepts that he's going to argue are in the prior art.

And so I want to have some guardrails, if you will, because I think it's probably already gone past where it should, and if it -- this is just totally outside the scope of the direct.

THE COURT:  What response do you have?

MR. CORDELL:  They made it an issue, Your Honor, as to whether these patents apply only to 5G versus 4G and 5G.  I am proving up these patents by his own admissions apply to 4G as well.  I'm going through the claim to make sure --

THE COURT:  The door's been opened to that.

MR. CORDELL:  And that's what I'm doing.

MS. GLASSER:  Your Honor, the only reason we brought that up was to respond to their questioning of other witnesses on that topic.  That was not something that we opened the door to in the first instance.  We just cleared that up after they brought it up.  And I do think he is trying to get into

showing that this or suggesting that this is prior art.

THE COURT: I have not seen anything that ties this to the prior art. If and when that arises, you can certainly raise it with me.

MS. GLASSER: Understood, Your Honor.

THE COURT: He is entitled to pursue this line.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed.

Q. (BY MR. CORDELL) So if I can have that back, let's keep going.

Do you see your slide on the right for the same priority cells limitation in pink, you highlighted equal priority inter-frequency cell. Do you see that.

A. I see that.

Q. Now, when we go to the 4G standard on the left, again at page 19, we see intra-frequency cell reselection criteria. Right? That's what it called right at the outset.

A. I see that.

Q. Both have the same title, intra-frequency cell reselection criteria.

And the standards come from contributions from companies. Right?

A. Yes.

MR. CORDELL: We can take that down, Mr. Andryszak.

Q.   (BY MR. CORDELL)  There's a big meeting -- you showed us pictures of big meetings where people get together and offer what they think is a good technology for the standard body to consider.  Right?

A.   Yes.

Q.   It's a bunch of engineers that all are wearing that T-shirt, I'm an engineer, Let's assume I'm right.  Is that how it goes?

A.   No, I'm afraid not.

Q.   I'm an engineer.  I can say that.

But what happens is people come in and you argue about, you know, are we going to go with Nokia's proposal or Ericsson's proposal or Apple's proposal or Samsung's proposal, that kind of thing.  Right?

A.   Not exactly.

Q.   Well, let's look at one of them.  When they make a submission, sometimes it's called a contribution.  Is that right?

A.   Correct.

Q.   So companies come in and they make contributions.  Let me show you R2-082208, which is DDX 111.

MS. GLASSER:  Objection, Your Honor.  May I approach?  This is the exact issue I raised a moment ago.

THE COURT:  Approach the bench.

(The following was had outside the hearing of the

675

jury.)

THE COURT:  What's the objection?

MS. GLASSER:  That he is now expressly trying to address the prior art.  He's addressing a reference called a Huawei reference which is unelected prior art cited on the face of the patent.

THE COURT:  Response?

MR. CORDELL:  It is a non-infringing alternative, Your Honor.  I'm going to have him admit it's a non-infringing alternative, and that's the purpose of why I'm doing it.

MS. GLASSER:  If it's just one Q and A on that, that's okay.  But I think he's really trying to go into the prior art.

THE COURT:  Well, I'll allow him to ask it being a non-infringing alternative.  If it goes further, reurge your objection.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

MR. CORDELL:  So let me have DDX 111.

Q.   (BY MR. CORDELL)  You've seen this before.  Right, Doctor Kowalski?

A.   Yes.  Yes, I've seen it.

Q.   And it's titled Cell Reselection to an Equal Priority Later.  Right?

A.    Yes, I have.

Q.    Okay.

A.    It does, rather.

Q.    And this relates to the same technology as the '776 Patent.  Correct?

A.    It's related.

Q.    Well, more than related, sir.  You said it was the next closest alternative to the '776 Patent.  Right?

A.    Yes.  It's related.

Q.    In your expert opinion, Doctor Kowalski, the R2-082208 submission from Huawei is the next closest alternative to the '776 Patent.  Correct?

A.    Yes.

Q.    In fact, you called it a non-infringing alternative.  Right?

A.    Yes, I did.

Q.    Now, do you stand by your opinion that the 5G version of section 304 is covered by the '776 Patent claims?

A.    Could you repeat the question, please?

        MR. CORDELL:  Can I have the side-by-side again, please?

Q.    (BY MR. CORDELL)  Now, you -- on the right-hand side from your slide PDX 3.15, we have TS 38.304.  Right?

A.    Yes.

Q.    That's the 5G version of section 304.  Right?

677

A.    Yes, it is.

Q.    And it's your opinion that the '776 Patent claims cover the 5G section 304.  Right?

A.    Yes.

Q.    And we just walked through the 4G version of section 36.304, 5.2.4.6, and the elements you pointed to in the 5G version existed in the 4G version.  Right?

A.    I disagree with that characterization.

Q.    I don't want to go back through it again, sir.  But we went through every little highlighted color boxes on the right and we found them on the left.  Right?

A.    We went through elements of the sections, yes.

Q.    Okay.  And you understand that the 4G version on the left was based on the Huawei reference that we looked at just a moment ago, DDX 111.

          MR. CORDELL:  Can I have that back up?

          THE COURT:  I assume that's a question?

          MR. CORDELL:  Yes.

          THE WITNESS:  I would have -- I'm not entirely sure. It -- the Huawei submission is clearly related to the material in 36.304.

Q.    (BY MR. CORDELL)  And it's related to the '776 Patent material.  Correct?

A.    It's in the same area.

          MR. CORDELL:  If I can have point 4 on the Huawei

submission.  There we go.

Q.   (BY MR. CORDELL)  Point 4, they tell us, we use 3GPP TS 36.304 V8.1.0 as the baseline for the text proposal below.  Correct?

A.   It says that, yes.

Q.   So it is right in there in the 4G version of section 304.  Correct?

A.   Again, what is the it to which you're referring, sir.

Q.   The Huawei submission was directed right to section 304 of the 4G version of the standard.  Correct?

A.   The -- it was directed to the 304 standard.

Q.   And in particular, the 4G version of the 304 standard.

A.   The 4G.

Q.   And you've told this jury that the Huawei submission is a non-infringing alternative.  Correct?

A.   Correct.

Q.   Let's look at one more section.

      MR. CORDELL:  Can I have 38.304, 5.2.4.5?  And actually can I have Doctor Kowalski's slide at PDX 3.14?

Q.   (BY MR. CORDELL)  So, once again, Doctor Kowalski, you went through the patent claim elements here, and then you looked back at 38.304 and you tried to find those elements in the standard.  Right?

A.   That is correct.

Q.   And you highlighted certain things and you went and

looked for them in the standard.  Right?

A.    That is correct.

Q.    Now, there is a corresponding version of 304 for these elements in the 4G standard as well.  Right?

A.    I'm sure there is a related version.

Q.    Okay.

          MR. CORDELL:  Can I put 5.2.4.5 from the TS 36.304 up on the screen side-by-side?

Q.    (BY MR. CORDELL)  So at DTX 55.1, page 18, we have section 5.2.4.5.  Do you see that?

A.    I do.

Q.    And you highlighted inter-frequency from the 5G standard on the right and we see inter-frequency in the 4G standard on the left.  Right?

A.    I see that.

Q.    You highlighted higher priority and equal priority and lower priority, and we go over on the right in the 5G standard and then on the left we find that we have higher priority, higher priority, and lower priority on the left.  Right?

A.    Those words are there.

Q.    And, in fact, we have equal priority down a little lower. Right?

A.    Yes, we do.

Q.    And on the right we have more than one cell meets the above criteria.  And on the left in the --

MR. CORDELL:  I need a little more, Mr. Andryszak, of that 5.2.4.5.

Well, my apologies, Your Honor.

Mr. Andryszak, I need the following sentence.  It bridges two pages is the problem.  There we go.

Q.   (BY MR. CORDELL)  So I need more than one cell meeting the above criteria, and I find that in the 4G standard as well.  Correct?

A.   That phrase is in both standards, yes, it is.

Q.   Okay.  Now, one difference between the 5G and the 4G is that the 4G refers to something called an RAT.  What is an RAT?

A.   An RAT is a radio access technology.  It is a technology in the context of LTE that is not LTE.  That would be 3G UMTS or it would be 2G GSM.

Q.   And RAT stands for radio access technologies.  Right?

A.   Yes, it does.

Q.   And RAT has multiple frequencies.  Right?

A.   I am not sure.

Q.   Okay.  But if the RAT does have multiple frequencies, they can have different priorities.  Fair?

A.   Not in the sense of the '776 Patent, no.

Q.   Okay.  Well, let's talk about the value of the '776.  You say that it has some benefits.  Right?

A.   I do.

Q.   And I believe at your slide 3.19, you said that you based your opinion about the benefits on a paper from Doctor Kim and his colleagues.  Right?

A.   I did.

Q.   Okay.  Now, you didn't do any testing of the devices yourself.  Right?

A.   No, I did not.

Q.   Tell the jury what a simulation is in the telecom business.

A.   A simulation is a computer program which is meant to model and carry out some specific experiment which you would use a statistical criteria to verify or disprove a certain hypothesis.

Q.   So you sit in your office and you kind of come up with a computer description of a device and then you feed it kind of some real-world work and see how it performs.  Right?

A.   In some cases.

Q.   You've done simulations for things like my phone, products like my phone many, many times.  Right, Doctor Kowalski?

A.   Many times.

Q.   Thousands of times?

A.   I lost count decades ago.

Q.   And yet you did not even attempt to do a simulation in this case.  Right?

A.    I reviewed this paper.  Right.

Q.    And you didn't even try to do a simulation.  Correct?

A.    It really wasn't needed in my opinion.

MR. CORDELL:  Your Honor, I object.

THE COURT:  Sustained.  That's not responsive to the question, Doctor.  You need to answer the question that's asked.

THE WITNESS:  Okay.  Sorry.

THE COURT:  Did you or did you not do a simulation?

THE WITNESS:  No.

Q.    (BY MR. CORDELL)  Instead, you relied on this Kim -- the paper from Doctor Kim.  Right?

A.    Yes.

Q.    Now, this paper from Doctor Kim doesn't come from ZTE.  Right?

A.    No.

Q.    It actually came from Samsung.  Right?  Or at least Doctor Kim is with Samsung.  Right?

A.    Yes.

Q.    Now, tell the --

MR. CORDELL:  Can I have DDX 112, the paper itself?

Q.    (BY MR. CORDELL)  So this relates to a dual SIM phone.  What is a dual SIM phone, Doctor Kowalski?

A.    A dual SIM phone such as -- well, dual SIM phone, SIM stands for subscriber identity module, and many -- all phones

683

have subscriber identity modules.  As the name suggests, it associates a particular subscriber and a particular phone number with a particular phone.

And a dual SIM is a phone that has two of these such devices in them.

Q.   So maybe to simplify, the SIM card is that little card that when you go to the phone company at Verizon or AT&T or T-Mobile, they take out of a package and they put in your phone and it assigns a phone number to your phone and lets the network know you're alive.  Right?

A.   Not necessarily.

Q.   Well, the basic purpose of the SIM card is to identify your phone by a particular IMI or phone number.  Right?

A.   Of a SIM card, yes.

Q.   And some people live in very rural areas.  You're aware of that.  Right?

A.   Yes.

Q.   Sometimes you don't get very good cell coverage from Verizon in one place, and as you're driving home, you don't get it from AT&T.  Are you aware of that?

A.   Yes.

Q.   So sometimes you get a phone that has two SIM cards in it, one on Verizon and one on AT&T, so that you can talk no matter where you are.  Is that it?

A.   I am not really sure of the exact implementation, but

essentially, yes.

Q.   Okay.  Some people just have two SIM cards because they want two phone numbers.  Is that right?

A.   Yes.

Q.   Okay.  But how many people have you ever met that had two SIM cards in a phone?

A.   I've met at least one.

Q.   Okay.  Is that Doctor Kim?

A.   No.

Q.   Okay.  But it's pretty rare, wouldn't you say?

A.   I would say not.

Q.   Well, and the thing about a dual SIM card is that the two SIMs, if you want to call it, they have to share the phone. Right?

A.   Yes.

Q.   They can't -- you can't be talking on both numbers at the same time.  Right?

A.   Not simultaneously.

Q.   And what we learned yesterday is that all the '776 stuff about cell reselection, that happens when the phone is idle. Right?

A.   Not necessarily.

Q.   Well, the vast majority of the time, it happens when the phone is idle.  Correct?

A.   I wouldn't characterize it that way.

Q.   Okay.  Well, how would you characterize it?

A.   It would be when the phone is idle or when, during a radio link failure mode when the phone is in connected mode, that it has to do cell search to re-establish a link.

Q.   I see so it happens when it's idle a lot, but if you're driving down the road and you get too far from a tower, it might need to find a new one.  Fair?

A.   And that is a typical instance, yes.

Q.   But with a dual SIM phone, you have another problem, don't you?  Because you could be talking on one number and the other number wants to do cell reselection at the same time.  Right?

A.   Yes.

Q.   That's a problem because, you know, they are competing for the radio transmitter at the same time.  Right?

A.   Could you rephrase your question, because I don't understand how it makes sense?

Q.   When you you're talking on the phone on SIM card No. 1, and SIM card No. 2 says, I'm idle so I'm going to do cell reselection, that's a problem.  Right?  They can't both use the radio transmitter at the same time.

A.   In that circumstance, they both don't use the radio transmitter at the same time.

Q.   So that ping-ponging we've heard so much about in this case is a real problem when you have a dual SIM phone.  Right?

686

A.   Among other situations.

Q.   And, in fact, the paper tells us that.

MR. CORDELL:  Can I have the bottom of the right-hand column starting at tune-away model?  A little bit higher, Mr. Andryszak.  Thank you.

Q.   (BY MR. CORDELL)  In this paper we primarily considered that SIM 1 PSS is the primary SIM PSS on an active data session in connected mode while SIM 2 PSS is a secondary SIM PSS in idle mode.  Right?

A.   That's what it says.

Q.   And it's talking about SIM 1 talking to the network, downloading something, whatever it's doing, and SIM 2 is in idle and it's thinking about cell reselection.  Right?

A.   It is -- okay.

Q.   And the whole goal here is less interruption or tune-away leading to higher throughput.  Right?

A.   Yes.

Q.   Because you got one that's talking and you got one that's idle and that ping-ponging is a real problem.  Right?

A.   Yes.

Q.   And so what the guys that wrote this paper did is they did a bunch of tests to see how big a deal that ping-ponging was.  Right?

A.   Yes.

Q.   And they tell us that you can test these things by just

using plain old commercial phones.  Right?

A.    Yes, if you know the software in the phones.

Q.    Well, let's look at the paper, sir.

        MR. CORDELL:  Can I have at page 4 under performance evaluation, down at the bottom left, that paragraph.

Q.    (BY MR. CORDELL)  Do you see that they tested -- we tested on a controlled 5G network for SIM 1 and LTE, et cetera, using -- there we go -- using a commercial UE that supports DSDS.  Do you see that?

A.    I see that.

Q.    Just a plain old commercial phone.  Right?

A.    Yes.

Q.    And they were able to do all kinds of tests just using plain old commercial phones.  Right?

A.    Samsung phones, yes.

Q.    And the important part of the '776 Patent has to do with the offset that's used to decide when we're going to go for reselection.  Right?

A.    Among other things.

Q.    It's one of the things that you circled, the Qoffset in your claim charts.  Right?

A.    Among other things.

Q.    And this test tells us that they eliminated negligible components like offsets.  Right?

A.    I don't believe that is an accurate characterization of

what the paper is saying.

Q.   Well, let's go to page 2 of the paper.

MR. CORDELL:  And at the very bottom, can I have that paragraph on the right side on that?  Thank you, Mr. Andryszak.

Q.   (BY MR. CORDELL)  So using the parameter and they come out with a bunch of formulas, they say, Eliminating negligible components, e.g., the terms of offset, hysteresis, and compensation factor.  Do you see that?

A.   I see that it says this here.

Q.   So the test you relied on, sir, eliminated offset from the analysis.  Right?

A.   I disagree with that characterization.

Q.   The '776 Patent doesn't say how you are to measure reselection.  Right?

A.   I think that's inaccurate.

Q.   Well, as you sit here, can you tell me any part of the '776 Patent that tells me how to measure reselection criteria?

A.   Would -- if I went through the patent, I could certainly do so at this point and this time.

Q.   I'll let your lawyer go through that with you on their time.

As you -- you know the Kim article talks about penalties. Right?

A.   Yes.

Q.   The ping-ponging penalty.  Right?

A.   Yes.

Q.   The '776 Patent doesn't talk about penalties.  Right?

A.   Not in the same sense exactly.

Q.   And the '776 Patent says nothing about dual SIM devices.

Right?

A.   No.

Q.   The '130 Patent deals with something called PUCCH.

Right?

A.   Yes.

Q.   And there are multiple formats where you can use PUCCH

signaling.  Right?

A.   Yes.

Q.   There's format 0, format 1, 2, 3, and 4.  Right?

A.   Yes.

Q.   Those are all part of 5G.  Right?

A.   Yes.

Q.   And it is your opinion that only format 0 utilizes the

'130 Patent.  Right?

A.   Yes.

Q.   Now, there's a thing called frequency hopping.  Right?

A.   Yes.

Q.   And sequence hopping.  Which do you prefer frequency or

sequence?

A.   They're both terms of art used in the standard.

690

Q.   You agree that format 0, the one you said uses the '130 Patent, does not have frequency hopping.  Correct?

A.   I would have to see the context.

Q.   Okay.

     MR. CORDELL:  Can I have JTX 23, which is the standard, at section 6.3.2.1?  It's at page 37.  Sorry.  Under general at the very bottom.

Q.   (BY MR. CORDELL)  Do you see, sir, it tells us that intraslot frequency hopping is configured for PUCCH formats 1, 3, or 4.  Right?

A.   I see that.

Q.   Not format 0.  Right?

A.   It -- yes.

Q.   And you showed the jury slide 31.

     MR. CORDELL:  Can I have 31?

Q.   (BY MR. CORDELL)  And just to review, PUCCH format 1 does have frequency hopping.  Right?

A.   It has intraslot hopping.

Q.   0 has no hopping, 1 has hopping.  Right?

A.   Yes.

Q.   So when we go to your slide, you compared format 1 to format 0.  Right?

A.   Yes.

Q.   And you used that to come up with a speed benefit of two percent.  Right?

A.   Yes.

Q.   And you said these are the same except for the '130 Patent or something like that?

A.   I said that the sequence-based PUCCH format 0 is pretty much what the '130 Patent is teaching, yes.

Q.   Before we do that, sir, can I ask you a question?  See this at the very top?

A.   Yes.

Q.   So you didn't really go through this chart.  This is a algorithmic chart down the -- down the left side.  Right?

A.   Yes.  It's semialgorithmic, yes.

Q.   So we go 10 the 0, 10 to the minus 1, the numbers get smaller and smaller as you move down.  Is that right?

A.   Yes.

Q.   And then going across, the power goes up.  Right?

A.   Yes.

Q.   Power of the received signal?

A.   Yes.

Q.   Okay.  Why does it say 3 kilometers per hour at the top of the chart?

A.   Because this represents a use case for 3GPP standards. It represents a particular channel that would be representative of a pedestrian walking at approximately three kilometers per hour.

Q.   So it means the phone is moving.

A.   Yes.

Q.   Okay.  But you didn't address any of that in your opinions.

A.   I could have.

Q.   Now, it turns out when you -- when you made your slide -- did you make these slides, sir?

A.   I excerpted this slide from the submission of ZTE.

Q.   Well, did you make the slide or did somebody else make the slide for you?

A.   The slide was adapted by someone from my opening report.

Q.   Okay.  By someone?  Who?

A.   Somebody in the law firm.

Q.   Okay.  So one of the lawyers made this slide?

A.   I don't know.

Q.   Okay.  Well, one thing we know is whoever made this slide left a whole bunch of stuff out.  Right?

A.   I disagree.

        MR. CORDELL:  Well, can we go back to the actual document, which is PTX 26, at page 308.  And can we enlarge the top figure, Mr. Andryszak?

Q.   (BY MR. CORDELL)  So there's a lot more information in this paper that was left out of the slide.  Right?

A.   There was information that was not put in to focus attention on the crucial aspects.

Q.   Well, so option 2, without hopping, ACK missing, that's

the one you say is format 0.  Right?

A.    No.  The one -- it would be option 2 hopping ACK missing.

Q.    So option 2 with hopping ACK missing?

A.    Yes.

Q.    I'm sorry.  I picked the wrong one.  And option 1 ACK missing you say is format 1.  Right?

A.    I have said it's format 1.

Q.    Okay.  But there's a different kind of hopping, as I think you pointed out earlier.  Sometimes it's frequency hopping and sometimes it's slot or sequence hopping.  Right?

A.    Sometimes both.

Q.    Okay.  So in this chart are they talking about frequency hopping or sequence hopping?

A.    Frequency.

Q.    And you agree with me that format 0 does not have frequency hopping.  Right?

A.    I disagree with that characterization.

Q.    You believe format 0 does have frequency hopping.  Right?

A.    Yes.  There are resources that the network sets up and tells the UE to do that.

Q.    And, again, that's your sworn testimony, sir---format 0 uses frequency hopping.  Yes?

A.    To the best of my knowledge, yes.

Q.    All right.  It is your sworn testimony as well that the '130 Patent has been declared essential to the 5G standard.

Correct?

A.   Yes.  As per the IPR disclosure statement, it has been declared that it may be or may become essential, yes.

Q.   You provided an expert opinion regarding the '443 Patent. Correct?

A.   Yes, I did.

Q.   Now, you told us what the '443 Patent is all about. Right?

A.   Yes, I did.

Q.   And it's something called HARQ technology, H-A-R-Q. Right?

A.   Yes.

Q.   And that stands for hybrid automatic repeat request or something like that?

A.   Yes.

Q.   And you agree that's been around for a long time.  Right?

A.   Not in the form as taught in the '443 Patent.

Q.   But HARQ technology has been around for decades.  Right?

A.   Elements of it have.

Q.   Well, the patent tells us that it's been around for a long time, HARQ technology.  Right?

A.   HARQ technology in general has been around.

Q.   The patent tells us that HARQ technology existed in 4G. Right?

A.   Yes.

695

Q.   And it is your sworn testimony that the '443 Patent was declared essential to at least one of the standards.  Right?

A.   Yes.  May be or may become essential.

Q.   And your test -- your opinion, sir, the '443 Patent is mandatory for at least the 5G standard.  Right?

A.   Yes, it is.

Q.   It is also true that the '443 Patent is mandatory for the 4G standard.  Correct?

A.   No, it is not.

Q.   In your expert opinion, sir, the '443 Patent includes the same features as the standards in 4G.  Correct?

A.   They are similar.

Q.   Sir, your sworn opinion is that the standards for which the '443 family -- patent family was declared cover the same features as the standards TS 36.302 and TS 36.212.  Correct?

A.   The statement that you just -- the question that you just asked is not correct.

Q.   Okay.  Look at your expert report, sir, at paragraph 53.

A.   Oh, expert.  I'm sorry.  Paragraph 53, you said?

Q.   Yes.

A.   I see that.

Q.   It is your sworn testimony, sir, that the '443 Patent covers the same features as are in the 4G 302 and 212 standard sections.  Correct?

A.   Oh, I see where you got that.  I'm sorry.  The 36.302 is

a type of -- it should stand for -- no, actually -- yeah.  I was -- it says that the standards for which the '443 Patent family was declared cover the same features as the standards 36.302 and 36.212.

Q.    That's your opinion.  Correct, sir?

A.    Yes.

Q.    And in paragraph 197, you tell us that the speed reduction that you claimed for the '443 exists in 5G or 5G.  I'm sorry.  4G or 5G.  Correct?

A.    What paragraph is that?

Q.    197.

A.    And could you repeat the question, please?

Q.    Sure.  The speed advantage that you told the jury about from the '443 existed both in 4G and in 5G.  Correct?

A.    If it was deployed for 4G, it would be.

Q.    Well, you don't qualify your statement in your expert report, do you, sir?

A.    No.

Q.    You simply tell us that your reduction in throughput from the '443, would happen in either 4G or 5G.  Right?

A.    For -- it would be obvious for units that practiced it, yes.

Q.    Now, part of what we talk about with the '443 Patent are codebooks.  Right?

A.    Yes.

Q.   And the things you talked about in your testimony this morning were type 1 and type 2 codebooks.  Right?

A.   Yes.

Q.   Remind us of what a codebook is.

A.   A codebook is a way of formatting these acknowledgement -- negative acknowledgement bits so that they would then be formatted in such a way as to be sent over the air and be more resistant to errors that the channel might make on them.

          MR. CORDELL:  So let's have PDX 3.38.

Q.   (BY MR. CORDELL)  So here you focus on one version of the codebook, this pdsch-HARQ-ACK codebook.  Right?

A.   Yes.

Q.   But you left out codebook-r16 and ACK-oneshotfeedback?

A.   Yes.

Q.   And your point is that the UE has to generate at most one HARQ-ACK information bit.  Right?

A.   Yes, that's what it says.

Q.   The message only has to be one bit long?

A.   That's what it says.

Q.   But it turns out that if you use some of these other codebooks, you might have more than one information bit. Right?

A.   Yes, you would.

Q.   So, for example, the type 3 codebook has the capability

of transmitting more than one HARQ bit.  Right?

A.    I suppose so.

Q.    And if we look at the standard itself --

MR. CORDELL:  Can I have section 9.1.4, which is PTX 1.97?

Q.    (BY MR. CORDELL)  And at the very top under 9.1.4, it talks about information bits, plural.  Right?

A.    Yes.

Q.    So the standard fully contemplates that you might use a codebook that has more than one HARQ bit.  Right?

A.    If you have pdsch-HARQ-ACK OneShotFeedback configured, yes.

Q.    And you didn't consider those as possible alternatives to your throughput analysis on the '442 [sic].  Right?

A.    Right.

Q.    You talked a little bit about ZTE in your direct.  Do you remember that?

A.    I remember I talked about ZTE in my direct.

Q.    You talk about all the contributions they'd made to the standards bodies.  Right?

A.    Yes.

Q.    In your report, you told us that ZTE made 9,737 contributions to the RAN 1 working group.  Right?

A.    As of the time the report was written, yes.

Q.    And you identified technologies like reference and

synchronization signals.  Right?

A.    Yes.

Q.    And MIMO.  Right?

A.    Yes.

Q.    MIMO is multiple input multiple output?

A.    That's what it stands for.

Q.    Special kinds of antennas.  Right?

A.    Special kinds of communication with a plurality of antennas.

Q.    And we heard yesterday that ZTE has 36,000 patents.  Were you here for that?

A.    Yes, that sounds about right.

Q.    So, of course, before you offered this jury any testimony or opinions about the value of the three patents in this case, you must have looked at the other ZTE patents.  Right?

A.    No.

Q.    So you didn't bother to look at any of the 36,000 ZTE patents to see if they were more or less valuable than the ones in this case?

A.    No.

Q.    Let me show you DDX 116.  Have you seen this one before, Doctor Kowalski?

A.    I might have.  I don't recall.

Q.    Do you see this talks about inter-cell reselection parameters?

A.   And handover, yes.

Q.   That's right up the alley of the '776 Patent.  Right?

A.   It's in the same general area.

Q.   And would it surprise you to learn that this was declared essential by ZTE to the ETSI body?

A.   If it was declared to the ETSI body, it was declared that it may be or may become essential.

Q.   Okay.  But if you declare that it is or may be become essential, it's a FRAND patent.  Right?

A.   Not necessarily, no.

Q.   Well, you're not a lawyer.  Right?

A.   I am not a lawyer.  I'm a technical person.

Q.   But you didn't look at this patent.  Right?

A.   I don't recall if I have or haven't, frankly.

          MR. CORDELL:  Can I have DDX 120?

Q.   (BY MR. CORDELL)  That's another ZTE patent.  This one's for a method or for sending hybrid automatic repeat request.  That's HARQ.  Right?

A.   That's what HARQ stands for.

Q.   Did you look at that patent before you offered us an opinion about how valuable the '443 Patent would be?

A.   I don't remember.

Q.   And would it surprise you to learn that this one has been declared to the ETSI standard body?

A.   It would not surprise me.

Q.   So try one more.

MR. CORDELL:  Let's try DDX 133.

Q.   (BY MR. CORDELL)  Have you seen this patent before, Doctor Kowalski?

A.   I don't know if I have seen it before, frankly.

Q.   This is that MIMO technology we were just talking about. Right?

A.   Yes.

Q.   It's another ZTE patent it says right on the face. Right?

A.   Yes.

Q.   And would it surprise you to learn that this one was also declared to the standards body?

A.   It would not surprise me, no.

MR. CORDELL:  Let's do just one more.  DDX 135.

Q.   (BY MR. CORDELL)  So this is another ZTE patent.  Have you looked at this one, 8,804,641?

A.   I don't think I have.

Q.   And this one is method and device for detecting downlink control information.  Right?

A.   That's what this title is.

Q.   That sounds a lot like the PDSCH that we've been talking about for the '130 Patent.  Right?

A.   Actually, no, it doesn't.

Q.   Okay.  Well, it is PDSCH.  Right?

A.    I would have to read the patent.  There's a lot of ways of detecting downlink control or there's multiple ways, I should say, of detecting down link control information which don't necessarily concern configuration signaling.

Q.    But you don't recall ever looking at this patent, either. Right?

A.    I don't believe I have.

Q.    Would it surprise you to learn that this one was declared essential to the ETSI standard body?

A.    No, it would not.

Q.    Would it surprise you to learn that ZTE has licensed all of these patents to a number of very large companies?

A.    I haven't followed who has licensed which patents to whom.  I'm a technical person.

Q.    And you've been in this business a long time.  Right, Doctor Kowalski?

A.    I have.

Q.    And you know that the patents that are declared essential carry a FRAND obligation.  Right?

A.    At a very high level.  I know what FRAND stands for, but I'm a technical person, I don't really know the details.

Q.    Well, you know that when someone makes a decision to declare a patent to the standards body, they are agreeing to license their patents on fair and reasonable terms.  Right?

A.    Again, I am not certain of the details.  I'm a technical

person.  I don't know what the ramifications are of declaring a patent to ETSI.

Q.  You know that when you declare a patent to ETSI, you are agreeing to take a very small royalty for that patent. Correct?

A.  I disagree.

Q.  Okay.  Your expert report and Doctor Akl's have a lot of pages that are identical.  Right?

A.  We have some pages that are identical, yes.

Q.  Did you copy his report or did he copy your report?

A.  I disagree with that characterization, sir.

Q.  Okay.

A.  We cited sections of each other's reports.

Q.  Did he -- well, I'm not being pejorative, sir.  I just want to know how the information got -- who started it.  Was it your stuff that made it into his report or was it his stuff that made it into your report?

A.  It was mutual, sir.

Q.  So you copied material from Doctor Akl's report?

A.  We cited material.

Q.  Well, there's a different between citing and copying. Right?

A.  Citing and excerpting material is not simply copying.

Q.  Well, it is if you do it verbatim and you renumber them as your own paragraphs.  Right?

A.   As Doctor Akl pointed out yesterday, the formatting system renumbers the paragraphs itself.

Q.   Once you copy them in.

A.   Once you paste them in, yes.

Q.   So my question is really basic.  Did the stuff start in your report and end up in his or did it start in his report and end up in yours?

A.   Again, it was a joint effort.

Q.   There were 60 pages that were identical.  Right?

A.   I'll take your word for it.

Q.   What does synoptically mean?

A.   Synoptically, I'm glad you asked.  As I'm sure you folks know, there's something called the synoptic gospels, the gospels of Matthew, Mark, and Luke.  And it means that syn, S-Y-N, meaning together and optically meaning see.

     So, for example, a claim chart is a synoptic version of a functionality.  On the left-hand side is the claim.  On the right-hand side is the sections of the standard that indicate the functionality that is corresponding to the claim elements at issue.

Q.   So since that's the word that Doctor Akl couldn't identify and you can, can we conclude that it was your material originally?

A.   Well, he cited it.

Q.   Well, he copied it.  Right?

A.    Again, he cited it.

Q.    And didn't know you would leave John out of the synoptic gospels?

A.    It's not part of them.

MR. CORDELL:  Thank you, Your Honor.  I pass the witness.

MS. GLASSER:  May I approach briefly, Your Honor.

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MS. GLASSER:  There is one document I was hoping to show and I wanted to get clearance first before doing so.  I think Mr. Cordell has now opened the door to the question of -- by his questioning about the paragraph from Doctor Kowalski's report about the source code not showing infringement of the Exynos.  I'd like to publish the charts that were attachments to Doctor Kowalski's report that show that code.

MR. CORDELL:  All I had him do, Your Honor, was verify that he had not read any code.

THE COURT:  Show me what you want to publish, Ms. Glasser.

MS. GLASSER:  I will do it just by showing this one page here, which is that exact code on the type 1, type 2 codebook.  He was suggesting there wasn't code for that and it

wasn't really a typo, and you see it's right here in the attachment to his report.

MR. CORDELL:  The typo paragraph says nothing about code at all; it simply says that he couldn't verify it.

MS. GLASSER:  It does say 'source code' in that paragraph.

MR. CORDELL:  Well, but the linkage between that and this is an ocean.

MS. GLASSER:  No, it's literally the exact code.

MR. CORDELL:  It's the code you say demonstrates infringement.  We have no testimony --

THE COURT:  All right, counsel.  I'm going to permit you to publish that one page.

MS. GLASSER:  Thank you, Your Honor.

THE COURT:  Now, while I have you up here outside of the jury's presence, is Doctor Reed-Arthurs to follow Doctor Kowalski?

MS. GLASSER:  I believe that our current plan, unless it's --

THE COURT:  Your plan seems to be a moving target.

MS. GLASSER:  I was going to say, unless it's more convenient for the Court.  Otherwise, it would be to just play the Jaewon Kim deposition and take us to lunch.

THE COURT:  We'll see where we go.  Let's proceed.

(The following was had in the presence and hearing

of the jury.)

THE COURT:  Mr. Cordell, you need to take your board down unless Ms. Glasser's going to use it.

MR. CORDELL:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed with redirect examination by the Plaintiff.

MS. GLASSER:  Thank you, Your Honor.  May I proceed?

THE COURT:  You may proceed.

MS. GLASSER:  Could we publish first slide 37 from Doctor Kowalski's direct examination?  No. 37, please.

REDIRECT EXAMINATION

BY MS. GLASSER:

Q.   You had some questions from opposing counsel about whether the '443 Patent is just HARQ.  Do you remember that?

A.   I remember that.

Q.   And can you remind the jury what some of the other features that are important to the '443 Patent are?

A.   Yes.  The other features that are important to the '443 Patent is the functionality that a HARQ-ACK codebook can be switched on as either semi-static--that means it doesn't vary for a long period of time; this is really good when you've got predictable amounts of payload coming down to the handset at a constant rate--whereas the -- it can also be switched -- the HARQ-ACK codebook can be switched to dynamic, which means based on the amount of feedback that the handset has to

deliver at any given time, the number of bits the handset is sending back can vary.  And this is really good when the amount of feedback is not constant.  So it -- this is very good in that it saves control resources, it saves battery life of the UE, so it's extremely beneficial.

Q.   There was some questioning from opposing counsel as well about the question of whether Doctor Akl in the incorporated section of your report had cited source code for the Exynos processor.  Do you recall that?

A.   I recall that.

MS. GLASSER:  And could I have the elmo, please? And remind me how to zoom?

THE COURT:  The wheel at the top.

One hand on the wheel at a time.

Q.   (BY MS. GLASSER)  And what are we looking at here?

A.   Yes.  We are looking at cited sections of source code for the HARQ-ACK, and a portion of the code.

Q.   And I put a little arrow by one of them.  Can you describe how that one corresponds to the codebooks?

A.   Yes.

MR. CORDELL:  Objection, Your Honor; leading.

MS. GLASSER:  I'm happy to re-ask it, Your Honor.

THE COURT:  Just a moment.

I'll overrule that.  "Can you describe how it corresponds" is not a leading question.

MR. CORDELL:  My objection, Your Honor, is that she's suggesting the nature of the software.  We don't know that this witness has any knowledge of these modules.

THE COURT:  Well, that's not objection, leading; that's something different.

MR. CORDELL:  Well, foundation.

THE COURT:  Well, I'll consider that objection untimely.

You may proceed, Ms. Glasser.

THE WITNESS:  I understand the question.

THE COURT:  Then please answer it.

THE WITNESS:  Yes.  The line here corresponds to a reference to code for the processor corresponding to the type 1 codebook which is where the codebook is of a fixed size.

Q.   (BY MS. GLASSER)  What about the line of code right under that?

A.   And that corresponds to the type 2 codebook where the number of bits you're feeding back is varying, which in the claim is based on the number of errors that can possibly be in the -- received.

Q.   And what was the allocation of work between you and Doctor Akl in terms of who did the source code analysis and who did the standards benefits analysis?

A.   Generally Doctor Akl was responsible for the source code

710

analysis and I was responsible for the standards-based analysis.

Q.   And so who wrote those portions of Doctor Akl's report that he attributed to you?

A.   The standards-based parts.

Q.   And who wrote them?

A.   I did.

Q.   And then were there parts of his report on the source code?  Did you incorporate any of those into your report?

A.   Yes, I did, and I cited Doctor Akl.

Q.   And then showing a part of your report, just the part that --

MR. CORDELL:  I object, Your Honor.

MS. GLASSER:  This is the same part that opposing counsel showed.  I just put a little post-it on it to recreate it.  I don't have the slide.

THE COURT:  Well, counsel showed portions of the report with leave of the Court for purposes of impeachment. You're not in that posture.

MS. GLASSER:  Okay.  Sure.

THE COURT:  The witness is on the stand.  He can testify about his report.

MS. GLASSER:  Sure.  Do I have permission to publish the same parts so he can explain it?

THE COURT:  You can cover the same subject matter,

but you don't necessarily have leave to publish the same portion of his report.

MS. GLASSER:  Sure.

Q.   (BY MS. GLASSER)  Doctor Kowalski, do you have your report in front of you?

A.   Now I do.

Q.   Could you take a look at paragraph 106 on page 38, please?

A.   Sure.  Yes, I'm ready.

Q.   And that portion that opposing counsel referred you to, was that specific to the source code or did that relate to your standards opinions?

A.   That related to the source code; it did not relate to my standards opinion.

Q.   Now, what is your conclusion specific to the standards opinion as to whether the 5G devices infringe?

A.   As to the -- my standards opinion on the 5G devices infringing with respect to the '130 Patent, which is referenced in that sentence, there definitely is infringement because, again, those are mandatory portions of a standard. Anybody that builds a handset, if they use code from MediaTek, if they use code from Qualcomm, if Samsung uses Exynos code, they must have this functionality even if it was not confirmed in the source code evaluation.

Q.   Okay.  Now, I want to ask you some questions about that

Case 2:22-cv-00078-JRG   Document 601   Filed 02/13/24   Page 123 of 207 PageID #: 35397

712

Huawei document.  Do you recall that questioning?

A.   I recall that questioning, yeah.

MS. GLASSER:  Now, could we have slide 51 of the redirect?

Q.   (BY MS. GLASSER)  And opposing counsel asked you whether you considered Huawei to be different and an alternative to the '776.  Is that right?

A.   That's correct.

Q.   Can you explain some of the fundamental differences between the Huawei document and the '776?

A.   Yes.  The '776 Patent talks about setting cells on multiple frequencies with a second priority, which is the same priority as -- same priority cells, as well as cells that -- on multiple frequencies with a second priority higher and with a second priority lower than this first priority, and where the priority of the same priority cells is equal to the absolute priority of the corresponding frequencies.

Now, if we were to bring up the Huawei document, you'll note that this higher and lower priority as taught in the '776 Patent isn't there.

Q.   There was some questioning by opposing counsel about different words that appear in the earlier standard and also appear in the 5G.  Is that right?

A.   That is correct.

Q.   Okay.  What was one of the entities that was responsible

Federal Official Court Reporter

for actually causing that change that led to the different wording in the 5G?

A.   I would say ZTE was.

MS. GLASSER:  Can we bring up -- I think we have this on slide 53.  It's PTX 26 at page 198.

Q.   (BY MS. GLASSER)  What are we looking at here?

A.   We are looking at a change request that was submitted to ZTE in 2008 for 4G, and they noted that if the change request was not approved, that the handset would not know how to rank cells if they are located in different frequencies but with the same absolute priority.

MS. GLASSER:  Your Honor, may we offer the witness water?

THE WITNESS:  I have water.

THE COURT:  Let's proceed.

Q.   (BY MS. GLASSER)  And if we go to the next slide, what were some of the specific changes that were made proposed by ZTE?

A.   So ZTE proposed to clarify that cells in frequencies of the same priority should be ranked together and that without this change, again, they wouldn't know how to rank cells in the different frequency but of the same absolute priority, and so as you see at the bottom --

THE COURT:  Doctor Kowalski, slow down, please.

THE WITNESS:  I'm sorry.

THE COURT:  You picked up speed all of the sudden.

THE WITNESS:  Okay.  Sorry.

THE COURT:  That often happens between cross and redirect, by the way.

Go ahead.

THE WITNESS:  Okay.  Thank you.

So as you see from the excerpt -- from the proposed excerpt below, that the highest priority frequency was changed to 'frequencies', and, again, a specific reference according to the criteria defined in the particular subclause that we've seen already.

Q.   (BY MS. GLASSER)  And so even though there are some words that were the same from the old standard, were there differences as well?

A.   Yes, there were.

MS. GLASSER:  Could we pull up DDX 112, page 2?

You know, I think this is the other side's actually.  Are you able to display the graphic?  You know what?  Let's fast forward this.

Q.   (BY MS. GLASSER)  Do you have in mind the copy of the document opposing counsel showed you where you were talking about whether the article eliminated offset?

A.   I don't have it at my fingertips.  I'm sorry.

MS. GLASSER:  Let's have the elmo.  I can pop it up.

THE COURT:  Let's make sure we talk one at a time.

I want to keep the record clear.

Q.    (BY MS. GLASSER)  And this part of the bottom of the page, can you see it, sir?

A.    Yes, I do.

Q.    Okay.  And so it sounded like you wanted to explain what you meant there.

A.    Yes.  So they were talking about reselection criteria for equal priority where a received signal power was compared to the current serving cell, the current cell to which the handset was associated with that received power.  That, however, was not the sole criteria for doing cell reselection as Samsung counsel showed elsewhere.

Q.    Now, in all that questioning from opposing counsel, did they ask you any questions that actually challenged the essentiality?

A.    No, they did not.

Q.    Thank you.

        MS. GLASSER:  I pass the witness.

        THE COURT:  All right.  Is there further cross examination?

        MR. CORDELL:  Yes, Your Honor.

        THE COURT:  All right.  Let's proceed with additional direct.  Excuse me; additional cross.

        MR. CORDELL:  Thank you.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

RECROSS EXAMINATION

BY MR. CORDELL:

Q.    Doctor Kowalski, I want to be crystal clear about this. Did you review any source code when you formed your opinions in this case?

A.    Yes.

Q.    Can you turn back to your deposition, sir?

A.    Are you referring to the page 16 that was previously discussed?

Q.    Yes.  You recall when you were deposed in this case. Right?  It was on around August 17 of 2023?

A.    Yeah.  At that point I couldn't recall having done so, but I knew I had later on.

Q.    My question is very clear, sir.  Do you recall your deposition?

A.    I recall my deposition.

Q.    You recall swearing to tell the truth.  Right?

A.    Yes.

Q.    And you recall that you were asked whether you ever reviewed source code.  Right?

A.    That is correct.

Q.    And you told us you had not reviewed source code. Correct?

A.    No.  I said I did not recall.

Q.    I see.  So you somehow think your sworn testimony that

717

you didn't recall reviewing source code would be okay for you now to tell us all about source code.  Is that right?

A.    In the heat of the moment in the deposition I did not recall, sir.

Q.    So you just forgot?

A.    Yep.

Q.    And your counsel asked you a bunch of questions about a module that was attached to your reports.  Do you remember that?

A.    Yes.

Q.    What was the module?

A.    It was related to C++ source code.

Q.    What was the title of the module, sir?

A.    I don't remember the exact name.  I do know that we were discussing the type 1 and type 2 codebooks.

Q.    Well, she pointed you to type 1 and type 2 codebooks.  Right?

A.    Yes.

Q.    Do you have any independent recollection of what that source code looked like as you sit here today?

A.    Well, I do recall it now having seen this testimony.  If you're asking me did I recall it earlier, I don't know.  So, I mean, I don't know how to answer your question.

Q.    Which patent did the source code that Ms. Glasser asked you about relate to?

A.    The '443 Patent.

Q.    Did you see Samsung code, Qualcomm code, or MediaTek code?

A.    It was not MediaTek code.

Q.    You know that because there's no MediaTek code in this case.  Right?

A.    Yes.

Q.    Your sworn testimony today, sir, your final answer, was it Samsung code or Qualcomm code?

A.    At this moment I can't really tell, frankly.

Q.    We know that in your expert report for the '443 you told us that you cannot confirm these devices infringe the asserted claims of the '443 Patent.  Right?

A.    Can you repeat the question?  I want to make sure I get it right.

Q.    In your expert report you told us, "I cannot confirm these devices infringe the asserted claims of the '443 Patent."  Right?

A.    Yes, as regards to the software.

Q.    I can put the board back up.  And that was the Exynos and MediaTek processors.  Right?

A.    Okay.

Q.    And you said, "I cannot confirm the devices infringe." Right?

A.    Based on the software, yes.

Q.   And the -- well, you didn't qualify your statement, sir. You said you can't confirm they infringe.  Right?

A.   The topic of the paragraph was the software, yes.

Q.   And for the '130 Patent, you said the same thing--you cannot confirm that the Exynos and MediaTek processor products infringe the '130 Patent.  Correct?

A.   Yes, based on the software.

Q.   Again, your sentence was, "I cannot confirm these devices infringe."  Right?

A.   Again, in the context of the software, yes.

Q.   Well, we know you didn't read any software.  Right?

A.   I don't recall having read it at that time.

Q.   The chart that Ms. Glasser showed you is something you just copied from Doctor Akl's report.  Right?

A.   No, it was not.

Q.   Well, it's a whole bunch of routines listed on a page and you can't tell me anything about them.  Right?

A.   I disagree with that.

Q.   Well, you can't tell me what -- which company's code it is.  Right?

A.   I would have to look at it again.  Again, this is kind of a high stress situation, sir.

Q.   Understood.

        MR. CORDELL:  Let me have PDX 4.98.

Q.   (BY MR. CORDELL)  This is one of Doctor Akl's slides.

For the '130 Patent, he says he only had access to relevant code for devices with Qualcomm processors.  Do you see that?

A.    I see that.

Q.    And does that explain why you told us that for the '130 Patent, Exynos and MediaTek you could not show infringement?

A.    From the software, yes.

Q.    And despite your testimony about the software, you can't really tell me even which company's software it is that Ms. Glasser showed you.  Right?

A.    At the moment I draw a blank.

MR. CORDELL:  Pass the witness, Your Honor.

THE COURT:  Any further direct?

MS. GLASSER:  Your Honor, I'd like to ask one question, and then also for rule of completeness could I have the witness read in the rest of the deposition answer that he's been questioned about?

THE COURT:  Ask your question first.

MR. CORDELL:  I would like the witness not to be shown the document.  If she's going to question him without leading him, that's fine, but if she shows him the document it's not --

THE COURT:  Say that again.

MR. CORDELL:  I object to leading, Your Honor.  If she publishes the document it's leading.

MS. GLASSER:  Turn it off for now.

But I don't agree with the objection, obviously --

THE COURT:  No, showing a document doesn't necessarily make any following inquiry leading in nature or not.

So you've told us you have additional direct.  Ask your first question, please.

MS. GLASSER:  Could we have the elmo, please?

REDIRECT EXAMINATION

BY MS. GLASSER:

Q.   Could you read into the record what the Bates label is, the numerical identification for that line of code we've been talking about?

A.   I'm sorry.  Could you speak a little louder?  I didn't get it.

Q.   Sure.  I'm not by the microphone anymore, am I?

Could you read into the record the Bates label, the alphanumeric designation at the end of the line for the code?

A.   Yes.  So you mean SAM-GC-SC0341 SAM-GC-SC0342.  Correct?

Q.   And do you have any understanding of what the S-A-M refers to?

MR. CORDELL:  Objection; leading.

THE COURT:  Sustained.

Q.   (BY MS. GLASSER)  I'm sorry.  I have to re-ask the question.  Please don't answer.

What does S-A-M refer to?

A.   It refers to Samsung.

MS. GLASSER:  And Your Honor, the only other thing I would like to do is for rule of completeness read into the record the rest of that deposition.

THE COURT:  You're going to show that to opposing counsel and I'll see if opposing counsel objects.

All right.  Is there objection to what Ms. Glasser has requested, Mr. Cordell?

MR. CORDELL:  We worked it out, Your Honor.

THE COURT:  So I gather the answer is no?

MR. CORDELL:  Yes.  Thank you.

THE COURT:  Then proceed, Ms. Glasser.

MS. GLASSER:  And for Your Honor's protocol, should I just go ahead and read it in or have the witness read it?

THE COURT:  Is it on this slide?

MS. GLASSER:  It is not.  I have to read it from the transcript, or the witness could do so as well.

THE COURT:  If it's from the transcript, it's already in the record.  I don't understand what the optional completeness is.  That's where you add something that hasn't been put into the record previously to complete the process.

MS. GLASSER:  Yes, Your Honor; the deposition transcript, which is not in the record.

THE COURT:  Show him his deposition transcript.

Q.   (BY MS. GLASSER)  Sir, could you turn back to that page

16, please?

THE COURT:  I thought you meant the trial transcript.

MS. GLASSER:  Apologize, Your Honor.  I probably wasn't clear.

THE WITNESS:  Yes, I have it in front of me.

Q.    (BY MS. GLASSER)  Okay.  If you could read into the record starting at line 18 on page 16?

MR. CORDELL:  I object, Your Honor.

THE COURT:  State your objection.

MR. CORDELL:  I was told by counsel that she was going to read the question including --

MS. GLASSER:  I apologize.  We can go all the way back.

Q.    (BY MS. GLASSER)  So if you could read starting at line 12, but omitting the objection, please, sir?

A.    Certainly.  Question:  "And you don't opine at all on any such code in your opening report.  Correct?"

Answer:  "I would have to look at my opening report to determine that.  I know there's been discussions that I have had about the source code with those involved, Doctor Akl and so forth, as part of the creation of the opening report."

Q.    It continues on.

A.    Yes.  So let's see.  "Is this searchable?

"So I do know that it has been an issue that has been

discussed on or around the time that the opening report was being created."

Q.   And that's immediately following the portion that opposing counsel directed you to earlier.  Is that right?

A.   Exactly.

Q.   Okay.  Thank you very much.

        MS. GLASSER:  I pass the witness.

        THE COURT:  Anything further from the Defendants?

        MR. CORDELL:  Just briefly, Your Honor.

        THE COURT:  Well, we're into the noon hour.  Let's try to bring this to a close.

    Go ahead.

                    RECROSS EXAMINATION

BY MR. CORDELL:

Q.   Doctor Kowalski, you never told us a single time that you looked at source code and this is what it means.  Right?

A.   I'm not sure I understand the question, frankly.

Q.   In any of your reports or any of your depositions, you never told us, I looked at source code and this is what it means.  Correct?

A.   I thought the titles were kind of obvious.

Q.   You said you talked to Doctor Akl, but you didn't say you looked at the source code.  Right?

A.   I said I did not recall if I looked at the source code.

        MR. CORDELL:  Thank you, Your Honor.  Nothing

further.

THE COURT:  Anything further from the Plaintiff?

MS. GLASSER:  Nothing further, Your Honor.

THE COURT:  You may step down, Doctor Kowalski.

THE WITNESS:  Thank you.

THE COURT:  All right, ladies and gentlemen.  We're going to break for lunch at this point.  I'm going to ask you to take your notebooks with you to the jury room over the lunch break.  Ms. Clendening has informed me that your lunch is there waiting on you.

Please follow all my instructions, including not to discuss the case with each other.  We'll try to keep this to approximately 45 minutes, like we did yesterday, and then we'll be back to proceed with the next Plaintiff's witness.

The jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel.  Let me ask for a point of clarification.  Ms. Glasser, it is Glasser, isn't it?

MS. GLASSER:  Yes.  Thank you, Your Honor.

THE COURT:  Mr. Cordell, it's not Glazer (ph).  That's about three times.  And I'll assume that was unintentional.

MR. CORDELL:  It was, Your Honor.

THE COURT:  You-all know each other.  You ought know each other's names and say them right.

All right.  We'll recess for lunch at this time.

(Lunch recess.)

THE COURT:  Be seated, please.

Let me make something clear for the record.  Throughout a trial like this, the Court has a challenge to keep the evidence moving to run the trial efficiently and to be mindful of the demands on everyone's time, both the travel time to and from the courthouse for the jury members as well as everything else about the trial.  That rests with me.

Part of what I rely on are representations from counsel as to the order of the witnesses with regard to almost every witness.  Maybe there's one exception.  There have been multiple, many disputes lodged by the competing parties as to demonstratives, on the witnesses, and the Court doesn't have the time to resolve every demonstrative dispute before every witness before coming into the courtroom.

Therefore, I try to stay ahead of the process by relying on that order of trial and working with the parties outside the presence of the jury to resolve those demonstrative disputes and keep ahead of the process.

Today the Plaintiffs unilaterally, after giving the Court a different order of witnesses, took the position an hour ago that it was absolutely essential for their case in their view that they take another witness out of order.  The Court was not prepared on the demonstrative disputes for that witness

because the Court had been not made aware that that witness was going to be called at this time.

I've taken the extra hour over this extended lunch break to get through all those demonstrative disputes and to be prepared to go forward with Mr. Dell at this point well in advance of when Mr. Dell was otherwise set to testify today.

I'm going to charge that wasted hour or that unanticipated hour while the jury's been in the jury room for almost two hours at lunch, I'm going to charge that additional hour to the Plaintiff's trial time and reduce it by an hour.

I am happy to work with the parties, but the parties have to work with me and you have to be straightforward with the Court about what your plans are.  And when you come to me and say the world's hanging in the balance if we don't get to do something completely different than what we told you we're going to do and which you relied upon in structuring the trial and handling the disputes, then there's a price to pay, and the Plaintiff's going to pay that price in this regard by losing an hour of trial time.

So with that, Mr. Sheasby, I assume you're prepared to call Stephen Dell as a witness as soon as we get the jury in here?

MR. SHEASBY:  We are, Your Honor.

MS. TRUELOVE:  Yes, Your Honor.

THE COURT:  You're going to take this witness, Ms.

Case 2:22-cv-00078-JRG   Document 601   Filed 02/13/24   Page 139 of 207 PageID #: 35413

728

Truelove?

MS. TRUELOVE:  That's correct, Your Honor.

THE COURT:  Just so I'll have some inkling of an accurate understanding, what is Plaintiff's intended order of witnesses after Mr. Dell?

MS. TRUELOVE:  We will call Dr. Rebecca Reed-Arthurs, and then we have one depo.

THE COURT:  And which depo is that?

MS. GLASSER:  Jaewon Kim.

MS. TRUELOVE:  And I believe our intent is to put Mr. Dell on, if it pleases the Court, to play the depo testimony, and conclude with Dr. Rebecca Reed-Arthurs.

THE COURT:  And you intend that to be the completion of your case in chief?

MS. TRUELOVE:  That's correct, Your Honor.

THE COURT:  All right.  I'll rely on those representations.  We'll proceed with Mr. Dell as soon as I get the jury in here.  And let's finish distributing any binders and get all that done first.

MS. TRUELOVE:  Is it all right for me to remain here, Your Honor, or would you like me --

THE COURT:  It is.  You are fine.

Are you prepared to go forward?

MS. TRUELOVE:  I am, Your Honor.

THE COURT:  Let's bring in the jury.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please have a seat, ladies and gentlemen.

I wouldn't be surprised if you're wondering if the Court knows how to tell time.  I told you a 45-minute lunch break, and it's now over two hours.

There have been matters arise between counsel and the Court that I had to deal with and that were properly dealt with outside your presence.  That's why the break has been longer than I anticipated.  I certainly didn't know about those issues which arose after you left for lunch, but that's why it's taken as long as it has to get you back in here.

All right.  Plaintiff, call your next witness.

MS. TRUELOVE:  Your Honor, at this time we call Mr. Stephen Dell.

THE COURT:  All right.  Mr. Dell, if you'll come forward and be sworn by the Courtroom Deputy.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand.

All right.  Ms. Truelove, you may proceed with direct examination.

MS. TRUELOVE:  Thank you, Your Honor.

STEPHEN DELL,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. TRUELOVE:

Q.   Good afternoon, Mr. Dell.  Would you please state your name for the record and introduce yourself to the jury?

A.   Hi.  My name is Stephen Dell.

Q.   And what did G+ ask you to do in this case?

A.   I was retained to calculate the reasonable royalty damages owed to G+ as a result of Samsung's infringement of the three patents at issue in this case.

Q.   And what was your ultimate opinion as to what Samsung should pay G+ for the infringement of the three patents-in-suit?

A.   It is my opinion that the reasonable royalty damages owed in this case is a discounted lump-sum damages of $237,256,507.

Q.   All right.  We're going to go through that in detail as we go throughout the afternoon, but let's start with a little bit about you.

A.   Sure.

Q.   Where do you live?

A.   I was born and raised in Houston, and I now live in a suburb just north of Houston called the Woodlands.

Q.   Who is living there with you?

A.   So I've been married to my wife for 22 years, and I've got two boys, sophomores and juniors in high school.

Q.   And where did you go to college?

A.    I went to the University of Texas at Austin.

Q.    And what was your degree?

A.    A degree in economics and a minor in business.

Q.    And what did you do after graduating UT?

A.    So right after graduation at the University of Texas, I went into doing valuation and financial consulting work for intellectual property.

Q.    And when was it that you graduated?

A.    In May of 2001.

Q.    All right.  2001.

      Did you have any other degrees or certifications?

A.    I do.  I have a certification in valuation called the Certified Valuation Analyst.

Q.    What is that?

A.    A CVA, as we call it for short, is a credential that allows me to provide certified opinions of value in business disputes as well as other business transactions such as buy-sell agreements or even valuations of companies or intellectual property like patents.

Q.    And how many times would you say you've been hired to provide an expert damages analysis in a patent case?

A.    More than 200 times.

Q.    What percentage of your work that you do is related to litigation?

A.    So around 70 percent of my work that we do is related to

litigation matters such as this.

Q.   All right.  And so what does the remaining 30 percent of your work involve?

A.   The remaining 30 percent is financial consulting or advisory services in which we help or assist companies in licensing or valuing patents.

Q.   And how do you go about helping and assisting companies to license or value their patents?

A.   Oftentimes we're retained to provide companies with guidance looking at market information, other types of financial information that is available publicly, to assist them in coming up with offers to compromise or to come to licensing terms with other companies they may be in negotiations with.

Q.   And how many times have you found yourself doing that type of work over the 20-plus years you've been doing this?

A.   I've certainly done it more than 50 times, but 12 times specifically in negotiations.

Q.   Okay.  And what type of clients and companies have you worked with over your career?

A.   So as we see on this slide, I've worked in matters involving a variety of clients and companies very well known, Fortune 500 companies.  For example, Xerox is a client that I've worked on behalf of, as well as other very well-known consumer electronics companies, manufacturers of smartphones,

733

and other consumer electronics devices.

Q.   Okay.  And I see you've kind of broken this slide into two sections with the top tab indicating patent valuation and damages.  What are you trying to represent with that title?

A.   So that represents the work that I've done in the litigation context or where there's a dispute that didn't involve litigation.

Q.   And the bottom half that you've got a tab with licensing, what does that represent?

A.   So that represents the other portion of the work that I do, which is the advisory work in licensing negotiations and helping clients with the assessment of royalty rates or values for their intellectual property.

Q.   And, Mr. Dell, were you here during opening statements?

A.   Yes, I was.

Q.   And do you recall Samsung's counsel talking about Mr. Pitcock working with a damages expert about six months before the lawsuit was filed to come up with ways to avoid their FRAND promise?  Do you remember that?

A.   Yes, ma'am, I do.

Q.   And who was that expert?

A.   That was me.

Q.   All right.  Was that surprising to you to hear?

A.   Well, what was surprising was the context that I was retained to somehow assist G+ in breaching its FRAND

734

obligation or avoiding its FRAND obligation if I recall the quote correctly. That couldn't be further from what I was doing.

In the licensing work that I'm involved in outside of the context of litigation, we oftentimes always rely on publicly available information which we use to assist companies and guide companies in determining offers for compromise or determination of values that they can then enter into a negotiation to seek to license their patents.

Q. So prior to the lawsuit being filed in this case, where would you have placed G+ on the slide we're looking at?

A. Prior to the lawsuit? They'd be on the bottom portion of this slide.

Q. Okay. And how did you -- how did you behave with G+? Any differently than any of these other companies you've worked for to try to assist in valuing and licensing their patents?

A. No different. I had access to the same type of public information that I would in any licensing negotiation that I've been retained to assist in.

Q. And let's talk about that public information that you've referred. What type of information -- you've indicated public information, but what type do you have available to you when you're not in a litigation setting and you're trying to assist a client with valuing their assets, their patents?

735

A.   So the type of information that we rely on at my firm is there's industry data that can be acquired.  It's actually quite expensive data from analysts that track industries.  And so we use that type of information.  It's from a company called International Data Corporation, or IDC.

THE COURT:  Mr. Dell, slow down a little bit, please.

THE WITNESS:  Certainly.

And we use that type of information to provide guidance on the size of the market or the types of products that are sold, even in some cases market estimates of the amount of units or revenues that are applicable in those markets.

Q.   (BY MS. TRUELOVE)  Now, once a lawsuit is filed, what type of information do you typically have access to when you've been engaged to provide a damages analysis?

A.   So very different information.  We have confidential, secret information that's kept by the licensee or the infringer.  We have direct access to that information.

Q.   And let's go back to your background.  Have you received any recognition or awards for your work in the area of patent valuation and damages?

A.   Yes, ma'am, I have.

Q.   And what was that?

A.   So I've been recognized by Intellectual Asset Management, or IAM, which is an industry group that has recognized me as

one of the world's leading patent damages and patent valuation experts.

Q.   Do you belong to any professional organizations?

A.   Yes, I do.

Q.   What organization is that?

A.   So I belong to a group called the Licensing Executives Society, and they are a group of 6500 licensing and executive professionals that analyze or assess what licensing is in the real world.

Q.   And, Mr. Dell, are you being compensated for your time in this case?

A.   Yes, ma'am.

Q.   And what is your hourly rate?

A.   $550 per hour.

Q.   And is your rate or payment in this case at all dependent upon what this jury ultimately decides?

A.   No, it is not.

Q.   Okay.

MS. TRUELOVE:  Your Honor, at this time we would offer -- tender Mr. Dell as an expert in the field of patent valuation, licensing, and damages.

THE COURT:  Is there objection?

MR. McKEON:  No objection, Your Honor.

THE COURT:  All right.  Without objection, the Court will recognize this witness as an expert in those designated

fields.

Please continue.

MS. TRUELOVE:  Thank you, Your Honor.  May I have permission to retrieve Mr. Cordell's demonstrative and use that?

THE COURT:  You may.

Q.   (BY MS. TRUELOVE)  All right.  Mr. Dell, you've been here or have you been here throughout the duration of the case?

A.   Yes, ma'am.

Q.   Okay.  And is this something that you've seen various individuals discuss during their testimony?

A.   I have.

Q.   Okay.  Now, just at the outset when you're engaged to provide a damages opinion, what is it that you're required, if anything, to assume at the outset of forming your opinion?

A.   In a litigation matter, I am required to assume that the patents are valid and that they are infringed.

Q.   And the infringement part of the case, that's the technical experts that we've heard from Doctor Akl and Doctor Kowalski.  Correct?

A.   Yes, that's correct.

Q.   Okay.  Now, as it relates to this chart in particular and what it was you were asked to do --

MS. TRUELOVE:  May I approach the easel, Your Honor?

THE COURT:  You may.

Q.    (BY MS. TRUELOVE)  Mr. Dell, when you walked into the courthouse Friday -- can you see that all right?

A.    Yes, ma'am.

Q.    -- you know, for the beginning of this case, what -- how many Samsung products with MediaTek chips did you include in your damages number?

A.    Zero.

Q.    So none of these --

A.    That's correct.

Q.    -- are included.

A.    That's correct, none of them.

Q.    All right.  How many -- when you walked into the courthouse on Friday for the beginning of this case, how many Samsung products that have the Exynos chip and practice the '130 Patent did you include in your damages analysis?

A.    Zero.  There were none.

Q.    Why is that?

A.    Because those products were not accused of infringement.

Q.    In this case.

A.    In this case.

Q.    And what does that mean?

A.    That means that they were not included in my calculation of damages.

Q.    All right.  How much of your damages calculation includes products in this case that are accused of using the Qualcomm

chips and in the case of the '776 Patent the Exynos chip?

A.    Over 99 percent of the damages are attributed to those specific products that include the Qualcomm chip and the Exynos chip for the '776 Patent.

Q.    Okay.  What about the Exynos chip for the '443 Patent?

A.    Less than one percent of the units at issue in this case include or are included for the '443 that have the Exynos chip in them.

Q.    How many units would that be on the '443 Patent that are accused that have the Exynos chip?

A.    It was right around 2 million units, if I recall.

Q.    Now, you were here for the testimony of Doctor Akl?

A.    Yes, ma'am.

Q.    And did you hear in his testimony -- or how did he provide his testimony as far as infringement of the '443 Patent?

A.    So Doctor Akl's infringement analysis was based on his review and analysis of the source code that he had access to.

Q.    You remember --

        MS. TRUELOVE:  Could I have the elmo please?  Thank you.

Q.    (BY MS. TRUELOVE)  You remember that slide during his direct?

A.    Yes.

Q.    Okay.  And then we heard from Doctor Kowalski today.  Is

that correct?

A.    Yes, we did.

Q.    And you were here for his testimony.

A.    Yes, ma'am.

Q.    All right.  And how did he testify the patents-in-suit, all of them, would infringe -- or the Samsung products, rather, would infringe the patents-in-suit?

A.    My understanding is Doctor Kowalski's analysis is that the patents at issue in this case are essential to the 5G standard and that Samsung's phones practice the 5G standard and, because of that, they would therefore infringe the patents at issue.

MS. TRUELOVE:  May I approach the easel again, Your Honor?

THE COURT:  You may.

MS. TRUELOVE:  Thank you.

Q.    (BY MS. TRUELOVE)  So under Doctor Kowalski's analysis on our board here, what infringes?

A.    Everything would infringe under Doctor Kowalski's analysis based on a representation of the Samsung devices practicing 5G technology.

Q.    Even the MediaTek?

A.    Yes, that's my understanding.

Q.    But they're not accused in this case.

A.    That's correct.

Q.   So they weren't included in your analysis.

A.   That's correct.  I did not include them in my analysis.

THE COURT:  Ms. Truelove, the witness has already testified that his opinions are based on the assumption that the accused products infringe and that the patents are valid. What's the relevance of going through the prior infringement evidence with regard to this witness other than just repetition?

MS. TRUELOVE:  First and foremost, to demonstrate that we were being conservative by not including everything that was included in the standard; that -- to make clear that those products, the MediaTek products, would have been -- which have been put front and center through the duration of this case by Samsung are not accused.

It doesn't mean they're not infringed.  It just means they are not accused and they are not included.  And I wanted to make certain that this jury understood that not only were they not accused, but they are not in any way part of Mr. Dell's calculation for damages.

THE COURT:  Well, he's already told everybody that all the accused products are assumed to infringe and all three of the patents are assumed to be valid as a part of his analysis.  So there's no need to go through the prior infringement or validity evidence.  We need to talk about his damages calculations.  So let's move on to that direction.

MS. TRUELOVE:  Certainly, Your Honor.  Happy to.

Q.   (BY MS. TRUELOVE)  All right.  So let's begin with just kind of what types of information you reviewed at the outset of the case when you were starting your damages analysis.

A.   Sure.

Q.   And I think we've got a slide, but what are some of the first things you looked at?

A.   Sure.  The first thing we look at in any case that we get engaged in for litigation is the patents-at-issue, so an understanding of the technology.  But because I'm not a technical expert, as I just mentioned, I gain an understanding of that technology from discussions with the technical experts, so Doctor Akl and Doctor Kowalski, who you've heard from today.

And in addition to that, I also rely on analysis from other experts retained in the case, including Doctor Rebecca Reed-Arthurs, as well as I had discussions with Mr. Pitcock, who we've heard from already.

Q.   What other documents did you look at besides the patents?

A.   So the other documents we have access to are all the confidential documents from both sides.  And so I reviewed confidential documents produced by Samsung as well as by G+, including license agreements as well as the deposition testimony from the witnesses, some of which we've heard from, and also the expert reports from all of the experts that were

retained and submitted reports in this case.

Q.    Did you do any independent research in this matter?

A.    Yes, I did.  I do my standard industry research in my practice of looking at the industry to gain an understanding of what the products and the relevant participants in the markets that are relevant to the case.

Q.    How many people from your firm did you have helping you on this matter?

A.    I had three other members from my firm working with me on this case.

Q.    And how many documents would you say you-all reviewed in order to ultimately come to your opinion?

A.    By my last recollection, there was more than 450,000 documents produced in the case.  My team and I reviewed tens of thousands of documents and pages from what -- from what I recall.

Q.    Okay.  And how many hours?

A.    Over the period we've been retained, we've spent 1600 hours collectively as a team, and I have personally spent 350 hours working in this case.

Q.    So going back to your summary of damages, what is your opinion of the damages owed by Samsung if they are found to infringe?

A.    So to summarize my opinion is that the discounted lump-sum damages are $237.3 million, which is based upon a

reasonable royalty rate of $1 per unit applied to the sales of infringing products for the '776 Patent.

For the '130 Patent, it's based on a reasonable royalty rate of 35 cents per unit for the products found to infringe the '130 Patent.

And for the '443 Patent, a reasonable royalty rate of 75 cents applied to those units found to infringe the '443 Patent.

Q.   And you mentioned there or you've got a label there, a discounted lump sum.  What do you mean by discounted?

A.   Well, discounted is, when we look at a patent license, a patent license also takes into account future use and all use. So the parties would agree to make a payment for right to use the technology through the expiration of the patents.  And in this case, that would be through 2037 for one of the patents.

And so what we know in calculating damages is a dollar today is not always worth the same as a dollar tomorrow or in five years because of interest, inflation, things like that. So we calculate -- we discount those royalties over that entire period for what they would be paid as of today that we'll talk about here in a moment.

Q.   And what was that total discount?

A.   So the total discount, as you can see on this slide, is over 52 percent because if you add up the royalty, my royalty opinion, to all of the accused products over the period, it

would be more than $458 million in total royalty payments.

Q.   Let's dive into your analysis.  Where do you start?  How do you start your damages analysis in every case?

A.   The first thing we do is we turn to the law for guidance.

Q.   And what are we looking at on this slide?

A.   This is the patent damages statute.

Q.   And what does that statute tell us about how you go about determining patent damages?

A.   So the statute says that "damages shall be adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."

Q.   And why did you underline "for the use made of the invention by the infringer"?

A.   Because that's the focus of damages is looking at what the extent of use or the use made by Samsung for the patents at issue in this case.

Q.   And the statute also says, no less than a reasonable royalty.  What is a royalty?

A.   Some may be familiar with the term 'royalty' or heard it before, but a common analogy I use when I try to explain to my friends what it is I do for a living is as we've heard patents are property, and so a property analogy I use is using an apartment.

      If somebody wants to use that apartment or rent that

apartment, they'll enter into what's called a lease agreement. And in return for the rights to use that apartment, they'll pay rent. Similarly, in a patent case or in a patent license, companies that want to use property or use a patent enter into what's called a license agreement. And in return for the rights to use that patented property, they pay royalties, or like rent in my apartment analogy.

Q. So now that we have the understanding of a royalty, what is the first thing you do as part of your analysis?

A. So the first thing we do is look at and gain an understanding of what are the accused products.

Q. And what are we looking at here in this slide?

A. So we saw this in Doctor Akl's presentation. These are the specific Samsung 5G products that are accused of infringing the three patents at issue in this case.

Q. What are the 5G products that are accused of infringing the '443 that use the Exynos chips?

A. There's only one product. It's the Galaxy A53 product.

Q. And so what did you look at to determine how much sales or profits Samsung has made from selling the accused profits [sic] in this case?

A. So in this case we had access to Samsung's confidential sales information. And so I was able to use or review that information to gain an understanding of what the sales of the specific accused products are in this case as I've summarized

on the slide.

Q.    And what was the time period that you had that confidential sales data for the accused products?

A.    The data produced was from 2019 through December 2023, so as of about a month ago.

Q.    And what did that sales data tell you?

A.    So as we can see on the slide, I've summarized the infringing units for each of the respective patents as well as the revenues and the profits from those sales.  So, for example, for the '776 Patent, Samsung has sold 48 million infringing phones, generating revenues of $34.4 billion and associated profits of $4.4 billion for specifically those devices accused of infringement in this case.

Q.    And you mentioned that the lump sum, the discounted lump sum royalty takes into account sales of products over the term of the license.

A.    Yes, ma'am, that is correct.

Q.    How did you determine what those sales and profits would have been?

A.    Because we have access to historical data, we can look at what that information is and also make projections or estimates into future sales.  So looking at historical information as well as my access to industry information that I mentioned previously, I'm able to make a reasonable estimate or forecast of what Samsung's sales would be over the entire

license period that would be at issue in this case, which would be through 2037.

Q.   And is that a common methodology that folks in your position use to try and make this type of determination?

A.   Yes, it is.  It's what I do in every case.

Q.   And how -- have you seen anything in the record that indicates that Samsung does that as well?

A.   I did.  In fact, there's certain documents produced by Samsung which shows, when they've entered into licensing agreements, they've used the exact same forecasting methodology of looking at sales of future products over some relevant future period.

Q.   So what did you determine is the extent of infringing use for the term of the license?

A.   So based on the actual data plus my forecasting, again for each of the respective patents, for the '776 Patent, I determined there would be 166.1 million units generating infringing sales of $117.8 billion and resulting profits of $13.7 billion.

For the '130 Patent, I have forecast or determined there would be 250.5 million units sold, generating revenue of $185.5 billion, resulting in profits from those infringing sales of $19.5 billion.

And, finally, for the '443 Patent, I've determined that there would be 273.4 million units generating infringing

revenue of $193 billion and associated profits of $21.5 billion.

Q.   So once you've established the royalty base, what's your next step?

A.   So the next step is to determine the royalty rate.

Q.   And how do you go about determining a royalty rate?

A.   So we use a concept called or a construct called the hypothetical negotiation.

Q.   What is that?

A.   Well, as it sounds, it's a hypothetical or a recreation of a negotiation that would take place back at the time of first infringement between a patent owner and an infringer or a patent user.

Q.   And how did you come up with this hypothetical negotiation?

A.   Well, it actually comes from a case called the *Georgia-Pacific* case.  So it's guidance again provided by the law and what damages experts must assume in doing their analysis.

Q.   And what does that law from the *Georgia-Pacific* case tell you that you must do in regards to this hypothetical negotiation?

A.   So there's some important ground rules in the hypothetical negotiation, and the first is that the asserted patents are presumed valid and infringed, the parties would

750

agree.  And in this case the parties would also agree that the products accused of infringement infringe.  So Samsung at this hypothetical negotiation would agree that the -- its products infringe.

And as a result of that, it would recognize that it must pay for rights to use that intellectual property.  And in doing so, the parties willingly negotiate to come to an agreement.  They can't walk away from the table and they can't withhold information.  They have -- and in this reconstructed negotiation, they have to provide all information to one another.

Q.    And this last bullet, all data is available-book of wisdom, what is meant by that?

A.    So that's that last concept I mentioned.  There is -- all information is made available, all confidential information, all secret information.  The parties wouldn't -- they wouldn't withhold anything from one another at this hypothetical negotiation.

Q.    So to use a poker analogy, all the cards are face up on the table?

A.    That's correct.

Q.    And what can a party do or what can a damages expert in your position do as far as skipping any of these ground rules?

A.    You can't.  This is required ground rules for a hypothetical negotiation.  All experts must take into account

and assume these factors.

Q.    So looking at this case, when did you determine the hypothetical negotiation would occur?

A.    So in this case the hypothetical negotiation takes place on April -- or in April of 2019 when Samsung sold its first 5G-capable device.

Q.    Okay.  Now, there's three patents in this suit.  Would there be multiple hypothetical negotiation dates or do you use just one?

A.    No.  In my opinion in this case there would be just one hypothetical negotiation for all three patents.

Q.    Why?

A.    Well, at the time in April 2019, the '776 Patent had issued, but the '443 and '130 Patents were pending applications.  So parties, it's typical in licensing, would understand that those patents would likely soon issue and they would, therefore, negotiate for rights to all three patents that they would understand they would need to gain access to in a license agreement.

Q.    Would any part of your analysis change if you did, in fact, look at it from three separate hypothetical negotiation dates?

A.    No, ma'am.  I looked at it from also considering different hypothetical negotiation dates, but the outcome is the same.

Q.   All right.  And who are the parties at this hypothetical negotiation?

A.   So the patent owner at this time is ZTE and the infringer is Samsung.

Q.   Why is G+ not at the table?

A.   So that's a good question.  As we heard Mr. Pitcock testify earlier, the patents at issue in this case were acquired by G+ in September of 2020.  So back in April 2019, ZTE was still the owner of those patents and, therefore, they would be the party at the hypothetical negotiation.

Q.   Did you look into the confidential documents produced in this case and try and determine kind of where everybody's mindset was back in April of 2019?

A.   I did, and that's the construct as we go back in time to understand how the parties would enter this negotiation.  And so I had access to Samsung confidential documents that allowed me to analyze that.

Q.   And what did Samsung's documents, their confidential documents, tell you about their view of the value of 5G to Samsung in 2019?

A.   So as we can see on the slide, JTX 8 is a Samsung presentation titled, "What is the value of 5G?"  So this is an internal Samsung confidential document which describes that Samsung recognized that it needed to offer a disproportionate amount of additional value over LO.

Q.   And what's LO?

A.   Well, I think we heard Mr. Sheasby talk about this in opening, but LO is Samsung's internal nickname or code name, if you will, for Apple.  They're what they call their lovely opponent.

Q.   And what is it that Samsung expected would happen when it released a device with 5G functionality?

A.   So in the same document we see, based on Samsung's internal analysis, that they expected that introducing 5G into their devices or to their products would grow total Samsung share or market share by nine percent, which is switching Apple buyers to Samsung buyers.

Q.   Okay.  And when Samsung first infringing in this -- or first infringed in this 2019 period with the release of their 5G smartphones, how many 5G smartphone products did Apple have on the product?

A.   None.  Apple had not introduced 5G in its devices at that time.

Q.   So now that we have the hypothetical negotiation framework and we see the market expectations back in 2019, how do you then determine what the royalty payment the parties would have agreed to at the hypothetical negotiation would be?

A.   So, again, we turn back to the law here.

Q.   And what law is that?

A.   The *Georgia-Pacific* factors that I mentioned a moment

ago.

Q.    Okay.  And what are the *Georgia-Pacific* factors?

A.    So the *Georgia-Pacific* factors are a set of factors that provide guidance in what types of information should be considered and analyzed in licensing a patent or determining the value of a royalty rate in a patent license.

Q.    And are all damages experts required to look to these factors?

A.    Yes, ma'am, they are.

Q.    And does it change any at all if you're talking about patents that are standard essential patents?

A.    Yes, it does.  There are some modifications or adaptations to some of the *Georgia-Pacific* factors when you deal with patents that are declared essential to standards.

Q.    And did you consider all of those factors when you were -- when you were looking at and considering the hypothetical negotiation in this case?

A.    Yes, I did consider them, but not all of them are relevant in every case that I'm involved in.

Q.    Okay.  Well, let's run through the factors that you analyzed.  What was the first one?

A.    So the first factor is a factor that we call the extent of use.

Q.    And that sounds similar to what we just talked about from the patent statute.  How does it differ, if any?

A.   Well, it differs only in a couple of ways, but the extent of use is the use made of the invention.  And we looked at some sales information, which is also similar to the damages statute, but also how the technology is being used in the products.

Q.   Okay.  And did you see any evidence in the record that provided you input into this particular factor use by the infringer?

A.   Yes.  There are more Samsung documents that are also relevant to this.

Q.   And what is JTX 7?

A.   So JTX 7 is another Samsung confidential document titled, "Hubble Feature Prioritization Report."  And Hubble is actually Samsung's internal code name for its S20 smartphone device.

Q.   And what did you gather from your review of JTX 7?

A.   So as we see on the slide, this is an internal customer survey that was done by Samsung, and what the results of the survey showed were that Samsung's customers ranked fast connectivity or hyperfast connection as the second highest feature among all features that were measured.  And in fact 61 percent of those customers that were surveyed indicated that hyperfast connection was a gotta-have-it feature.  So it was a highly demanded feature.

Q.   And what are we looking at in JTX 6?

A.    So JTX 6 is another Samsung confidential presentation related to its Note10 smartphone device.  And what this document shows is the overall importance of 5G to Samsung in implementation or including that in their devices.  And by doing so, Samsung was able to charge $200 more just for 5G even when it looked at the same devices.  So simply by adding 5G, it would be able to realize $200 of additional value that its customers were willing to pay.

Q.    And what would Samsung have to do with this information during the negotiation process at the hypothetical negotiation with ZTE?

A.    This would be part of the information in the all-cards-face-up scenario.  So they would have to provide this type of information to ZTE at the hypothetical negotiation.

Q.    What's the next factor that you looked at?

A.    So the next factor is the profitability and advantages of patents over alternative technology.  And it's important taking into account only the value of the patented technology and not the value associated with incorporating the patented technology into the standard.

So it's one of those adaptations and modifications that we talked about but being very specific that we are looking only at the value of the patent specifically.

Q.    And how do you go about analyzing these factors?

757

A.    So if we go to the next slide.  So we've seen a little bit of this analysis already, but one of the analyses that I had asked was to look at the technological contribution.  And as we've heard from Doctor Akl and Doctor Kowalski, they did an investigation specifically directed at looking at what that technical contribution of the patents at issue in this case are.

Q.    And what did they determine was the next best non-infringing alternative available when the industry adopted 5G?

A.    So based on Doctor Kowalski and Doctor Akl's analysis, they determined that -- if we can go to the next slide -- that the patents at issue specifically would result -- without using the patents at issue, I should say, there would be an 11 percent aggregate loss in speed in the accused devices.

Q.    And so how is their testimony and their conclusions relevant to your analysis?

A.    Well, it goes specifically to the question of understanding what the direct technical contribution of the patents at issue are.  So it's isolated specifically to the benefits of only the three patents themselves.

Q.    And what was the next factor that you looked at?

A.    So the next factor is the profit attributable to the invention, so looking at -- understanding what value from a monetary perspective is created from that technological

improvement.

Q.   And how did you determine that value or that incremental price or profit that can be generated from the use of the patents in this case?

A.   So we start with an understanding of what the technical contribution is, and then the next step is an understanding of how you place or assign value or determine value as to specifically what those technological benefits are.

Q.   And so do you start first with this 11 percent?

A.   Yes, ma'am, that's correct.

Q.   And is there any testimony from Samsung that confirms Doctor Kowalski's analysis of major speed loss?

A.   There is.  One of the things as we've heard is to make sure you're looking at it over any non-infringing or alternative technologies.  And Doctor Kowalski, as we just heard, as well as the testimony we've heard, is I'm not aware of any non-infringing alternative technologies that would provide those benefits.

Q.   Other than the testimony that we've heard in court so far, did you see anything in the record that indicated that there was a non-infringing alternative?

A.   Nothing.

Q.   No testimony?

A.   No testimony.

Q.   Expert reports?

A.    No expert reports.

Q.    Interrogatory responses?

A.    No.

Q.    So what's the next step in your analysis?

A.    So the next step is assigning or understanding the economic benefit from that technical contribution.

Q.    And how do you go about doing that?

A.    So as I mentioned earlier, I also reviewed analysis that was prepared by Dr. Rebecca Reed-Arthurs, who is a survey expert that was also retained in this case, and she did a specific analysis called a choice-based conjoint survey to isolate the value attributed to the speed loss that we just discussed.

Q.    And what did her analysis ultimately conclude?

A.    As we see here summarized on the slide, her analysis concluded that for the '776 Patent, that there was per-unit profit that was solely attributed to the benefit of that patent of $5.83 per unit; and for the '130 Patent, the profit attributed solely to the benefit of that patent was $2.32; and that for the '443 Patent, the isolated or incremental profit specifically attributed to the '443 Patent was $4.66, for an aggregate total of $12.81.

Q.    So what is the real-world impact of this loss in speed if Samsung is not able to use the G+ patents?

A.    So the real-world impact is that Samsung would realize

that it would generate $588.8 million of incremental value directly attributed to each of the three -- or to the three patents at issue in this case based on that analysis.

Q.    And what time period does this cover?

A.    This is from 2019 through December of 2023.

Q.    And did you estimate that out through the period of infringement, the latest period of infringement to 2037?

A.    Yes, ma'am, I did.

Q.    And what did that come to?

A.    So using the same forecast that we discussed earlier and applying the direct incremental benefit attributed to the patents at issue results in a total profit of $2.8 billion that Samsung would enjoy from the infringement of the patents at issue in this case.

Q.    And what is the next factor that you considered?

A.    So the next factor is industry licensing practice.

Q.    What does that have to do with?

A.    I think we've heard a little bit about this before, but this looks at licensing practices in the industry, and in this case we talk about FRAND.

Q.    And so that's where the ETSI policy regarding FRAND comes into play?

A.    Yes, ma'am.

Q.    And what is FRAND and how is it relevant here?

A.    Well, as we heard Doctor Kowalski testify, the patents at

issue in this case have been determined to be essential to the 5G standard.  And as a result, when patents are declared essential or are essential, parties must enter into an agreement under FRAND terms, which means fair, reasonable, and non-discriminatory.  So Samsung would have to pay a FRAND rate as part of this license negotiation.

Q.   And what does ETSI require when a company chooses to implement the standard into their products?

A.   So ETSI requires that patents that are determined to be essential, those patent holders that own those patents are to be rewarded for their contributions of those patents in the standard.

Q.   I want to go back to opening and just see if you recall a statement made by opposing counsel or Samsung's counsel that you put your technology into the standard and the standard says, okay, we're going to pay you, but we're going to pay you a smaller amount if it's used.  If it's used.  And that's very important.

Do you recall that?

A.   Yes, I do.

Q.   Is there any statement in the ETSI policy that you reviewed that states that an amount paid is a smaller amount if it's used?

A.   No, not at all.  That's nowhere in the ETSI directives.

Q.   What's the policy?

A.    The policy is that patent holders are rewarded for their contributions for patents that have been determined essential for the standard.

Q.    Have you seen any evidence from Samsung regarding its statements about FRAND licensing practices?

A.    Yes, ma'am, I have.

Q.    What is it that we're looking at here, PTX 24?

A.    So this exhibit is a Samsung response in a formal submission to the government, and what it states is that Samsung is acknowledging and stating that FRAND terms are not a uniform set of terms.  And the reason why is because license negotiations are unique, and the factors and circumstances in every negotiation should be considered and it depends, too, on the technologies being licensed in those negotiations.

Q.    Anywhere in PTX 24 do you see Samsung stating that FRAND requires and ETSI requires that you only pay a small amount?

A.    No, ma'am, I do not.

Q.    Okay.  Were you here in the opening when Samsung asked why ZTE was not present saying we know that ZTE took back 20 percent and they have 20 percent of this, they didn't file the cases, where are they.  Do you remember that?

A.    I do.

Q.    Does Samsung use licensing companies for its own patents?

A.    It does, yes.

Q.    And what do you know about that?

A.   So it's common in the patent licensing industry that large technology or companies or consumer electronics companies will transfer patents to other companies or other entities, and have those companies go license patents on their behalf.  It's a very common practice in the industry.

Q.   And who is it that Samsung has worked with that you're aware of?

A.   Ones I'm familiar with is Samsung has transferred patents to a group called Avanci, and they license cellular technology to automobiles.  So now that you have cellular connectivity in your car, that's one group that Samsung has transferred patents to and Avanci licenses on their behalf.

Q.   Is that what we see here on the screen?

A.   Yes, it is.

Q.   So what is your --

     MS. TRUELOVE:  Can we take that down and go back to my presentation?

Q.   (BY MS. TRUELOVE)  What is your take-away or conclusion from looking at the evidence under the industry practices factor?

A.   Well, that Samsung would recognize that every negotiation is unique and that the factors and circumstances specific to that negotiation should be considered when negotiating for the FRAND royalty.

Q.   Okay.  What is the next GP, *Georgia Pacific,* pardon me,

factors that you considered?

A.   So the next set of factors are called the license factors.

Q.   And what do these factors relate to?

A.   So these factors relate to the royalties that have been received by the patent owner as well as any royalties that have been paid by the infringer or the licensee in a license agreement.

Q.   And we're talking about the hypothetical negotiation?

A.   Yes, ma'am, that's correct.

Q.   And so who are the parties we're talking about?

A.   So in this case, again it would be ZTE and Samsung.

Q.   Okay.  And with that in mind, did you review any of the licenses that Samsung has entered into as a part of your analysis?

A.   Yes, ma'am.

          MS. TRUELOVE:  Your Honor, at this time we're going to go into Samsung confidential as well as third-party confidential information as it relates to these license agreements, and we would respectfully request the Court seal the courtroom.

          THE COURT:  All right.  At counsel's request and to protect confidential information, I'll order the courtroom sealed which will seal this portion of the transcript.  Those present who are not subject to the protective order in this

case should excuse yourselves and remain outside the courtroom until it is unsealed and reopened.

(Courtroom sealed.)

(Courtroom unsealed.)

THE COURT:  All right.  Please continue, counsel. The courtroom is reopened.

MS. TRUELOVE:  Thank you, Your Honor.

Q.   (BY MS. TRUELOVE)  Moving on to the next set of *Georgia-Pacific* factors that you considered, what are those?

A.   So the next set are the apportionment factors that deal with apportioning the value of the technology that's being analyzed.

Q.   And what about the second factor listed there on the

slide?

A.   So part of an apportionment analysis as we touched on a minute ago is reliance on the opinion of other experts to determine things like the technological contribution as well as aspects of the economic contribution.

Q.   And did you do that analysis in this case?

A.   I did, yes.

Q.   And so remind the jury again what you considered in regards to the technological and economic contributions.

A.   So as a brief reminder, in terms of the economic contributions, Doctor Reed-Arthurs performed a survey which isolated specifically the value of the three patents at issue in this case which she determined was $12.81.

Q.   And what then, again, would be the real-world impact of this loss in speed to Samsung if it was not able to use G+ patents?

A.   So the profits specifically attributed to the technical benefits of the three patents at issue in this case was $588.8 million.

Q.   Through which period of time?

A.   From 2019 through December of 2023.

Q.   And what about through the patent term?

A.   Through the patent term, the total profits specifically attributed to the infringement would be $2.8 billion.

Q.   Is there anything else that would happen in your view at

the hypothetical negotiation in order for the parties to agree on a royalty?

A.    Certainly.  I've also considered at any negotiation the parties would also, in particular Samsung, would try to enter the negotiation to reduce its royalty obligation and negotiate the royalty payment that it would make.

Q.    And what are we looking at on this slide as it relates to Samsung wanting to try and reduce the rate?

A.    So Samsung would look at -- in an attempt to lower its royalty obligation would look at royalty rates or royalty payments that would look at the average rate for each patent, including all of the patents that have no value that we've just discussed.  So it would look at these low per-unit rates as a way to drive down or to negotiate down its royalty payment obligations.

Q.    And how would ZTE respond to that argument at the hypothetical negotiation, in your view?

A.    Well, ZTE again would point to the contradicting evidence of looking at how it has entered into negotiations and indicates that specifically that the technical contribution of the patents that are being licensed should be considered and that each negotiation is distinct and that that negotiation should take place accordingly, specifically for the patents that are being licensed.

Q.    Can you walk the jury through the different

apportionments that you looked at and did in order to get at your ultimate reasonable royalty rate that we see here on the furthest right-hand column of the screen?

A.   Yes.   So in the negotiation Samsung would seek to negotiate downward, the parties would take into account the -- its position that it should pay a lower rate.  And as a result, the parties would negotiate.  And I've applied an apportionment factor of 22.5 percent to the incremental profit analysis that we just discussed.

Q.   And what else did you do?

A.   So the next thing after the parties would further consider and Samsung would also negotiate for the fact that it is the company that would be commercializing or selling the products that are using the inventions, and it should be given credit for that use.  And the parties would, therefore, and ZTE would agree to give Samsung additional credit for its contributions and would, therefore, further apportion the incremental profit rate using a further 25 percent apportionment amount or approximately a reduction of 25 percent.

Q.   And is that what gets us to that final reasonable royalty rate for each of the patents?

A.   Yes, that's correct.

Q.   Mr. Dell, did you consider any other methods of calculating damages in this case?

A.    Yes, ma'am, I did.

Q.    And what did you consider?

A.    Well, again, I considered, as I mentioned, Samsung's position that you should look at all patents declared and divide -- and look at the average rate per patent and use that to drive down the royalty rate.

Q.    And, again, how would the parties or how would ZTE respond to this argument by Samsung?

A.    As I just mentioned, they would look to the evidence that they would have to -- Samsung would have to disclose at that hypothetical negotiation which indicates its own policies and practices of how it would enter into a FRAND negotiation.

Q.    Has Samsung provided any guidance as to whether it is appropriate to ignore the unique value of the patents in this suit?

A.    Yes, it has.

Q.    And what is PTX 24 again?

A.    So PTX 24 is, again, Samsung's admissions to a government how it would approach and the factors it should consider at a hypothetical -- excuse me, at a FRAND negotiation.

Q.    And what are some of these elements?

A.    So Samsung says that -- specifically that the parties should look to the value that is attributed to the patented technology and also that the value should be determined at the time of the implementation of the technology into the

standard.

Q.   And is that what you did in this case?

A.   That's precisely what I did as well as what Doctor Kowalski and Akl did and what Doctor Reed-Arthurs has measured as part of her analysis.

Q.   And, Mr. Dell, can you remind us again of what Samsung's own witness has said on this issue?

A.   Yes.  Mr. Rodermund has specifically said that FRAND rates should be based on the technical and commercial benefit of the patent as compared to the next closest alternative.

Q.   And how does that align with Samsung's own public statements about FRAND that we just looked at in PTX 24?

A.   They're directly aligned, and it also is aligned directly with Doctor Kowalski's analysis and Doctor Akl's analysis.

Q.   So what would the parties ultimately conclude as to calculating the royalty payment at the hypothetical negotiation?

A.   So the parties would agree that they would follow the statute in determining the use made of the invention by the infringer.

Q.   And so what's your ultimate opinion?

A.   So based on my analysis, the parties would look directly to the incremental contribution of each of the respective patents and would agree to a royalty rate of $1 per unit for the '776 Patent, 35 cents per unit for the '130 Patent, and 75

cents for the '443 Patent, resulting in a total discounted lump-sum damages of $237.3 million.

Q.    I want to take just a moment and talk about your role with G+ prior to the filing of the lawsuit.

A.    Sure.

Q.    And you were retained by them.  Correct?

A.    Yes, ma'am.

Q.    And why did they retain you?

A.    Because I -- as I mentioned, I've been involved in licensing negotiations in the real-world for many years.

Q.    And when did you get retained by them?

A.    I believe September -- late August or early September of 2021.

Q.    And what was your role specifically in assisting G+ with their negotiations with Samsung?

A.    So I was providing G+ the types of data and information relevant to the patents in terms of the market information as well as royalty rate -- publicly available royalty rate information that I had access to that I routinely provide clients in those types of engagements.

Q.    What type of information was that?

A.    It was all public information.

Q.    Did you have any Samsung confidential information to assist you at that point?

A.    No.  In 2021 I did not.

Q.    Okay.  Did you help G+ craft their offers?

A.    I helped provide information to which I understand Mr. Pitcock made the offers, but I didn't craft the royalty rate specifically.

Q.    And why don't you discuss those royalty rates in connection with the damages analysis that you did in this case?

A.    Well, because my understanding the Court has provided guidance on the relevance of settlement offers that are made in litigation, but again, as we see, the offers are only to be considered with respect to G+'s commitment to negotiate license on a FRAND term, but not to be considered with respect to the determination of damages awarded in this case.

Q.    And there may be some confusion.  Could you have, once the litigation was begun and you had access to confidential Samsung, third-party, whomever, information, could you have used that information to help inform G+ in their ongoing negotiations with Samsung?

A.    Absolutely not.

Q.    And why not?

A.    Because those are strict -- the protective orders in cases are very strict confidentiality provisions, and I'm not allowed candidly even to tell my wife about the information.

Q.    Okay.  Let's look at what the offers were pre-suit in this case.  What was the range of offers?

A.    Based upon the sales price of the device, it was between $1.07 and $1.66 per unit.

Q.    And how did that compare to the analysis that Dr. Rebecca Reed-Arthurs did in this case?

A.    Well, it's extremely reasonable given that the economic analysis shows that the profits directly attributed to the use of the patents by Samsung generated $12.81 per unit.

Q.    And you mentioned that you only had access to public information.  At any point in time when you were engaged in assisting G+ was G+ provided with information from Samsung about their total units?

A.    Yes, at one point in time, yes.

Q.    And is that what we see here on PTX 08?

A.    Yes, ma'am.

Q.    And what did Samsung say?

A.    Samsung, I guess, indicated to G+ that it would only sell 417 million units through 2030, the year 2030.

Q.    Okay.  And then once you became involved in the litigation and you are now in the situation with all cards face up, what was your understanding of the actual units that were at issue?

A.    Well, I mentioned the number of units that we talked about already, but Samsung's own expert, Mr. Meyer, even calculated the total amount of units based on the same data that I had access to of over 2 billion units through 2030.

Q.   So, in conclusion, Mr. Dell, just remind the jury what your opinion is on the damages that should be paid by Samsung to G+ for their use of technology in this case?

A.   So it is my opinion that the reasonable royalty damages owed to G+ as a result of Samsung's infringement is a discounted lump-sum payment of $237,256,507.

Q.   Thank you, Mr. Dell.

MS. TRUELOVE:  Your Honor, at this time we pass the witness.

THE COURT:  All right.  Cross examination by Samsung?

MR. McKEON:  Yes, Your Honor.

THE COURT:  Let's proceed.

Ms. Truelove, if you'll take down that board and move the chart, please.

Mr. McKeon, you may proceed with cross examination when you're ready.

MR. McKEON:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. McKEON:

Q.   Well, good afternoon, Mr. Dell.

A.   Good afternoon.

Q.   As you may know, my name is Mike McKeon, and we've met before.  Right?

A.   Yes, we have.

Q.    Now, of course, everyone in this courtroom knows this is a patent infringement case.  Isn't that right?

A.    Yes.

Q.    And you're not offering any opinions related to infringement.  Isn't that right?

A.    That's correct.

Q.    And you didn't evaluate whether Samsung's products actually use the patents.  Isn't that right?

A.    From a technical perspective, I would agree.

Q.    And your opinion about the measure of damages that you just testified about, your opinion only applies if the jury finds that the patents are both valid and infringed.  Isn't that right?

A.    Yes.  Damages are to be awarded for patents that are valid and infringed.

Q.    So if the jury finds that the patents are not valid or not infringed or both, you agree that the damages that should be awarded is zero.  Isn't that right?

A.    I would generally agree, yes.

Q.    And -- well, let me follow up on that.  You say generally agree.  If the jury says that the patents are invalid or not infringed or both, you're not testifying to the jury that they should still award damages.

A.    No, sir.  You were just saying that there's more than one patent.  So there could be a determination of one patent

versus another, so I was more answering it in that context.

Q.   Okay.  But let's just assume all patents not invalid, not infringed, zero damages, we agree on that.  Isn't that right?

A.   Yes, that's my understanding.

Q.   And the jury's heard many times already in this courtroom that the patents at issue in this case are subject to FRAND. Isn't that right?

A.   Yes.

Q.   And FRAND means fair, reasonable, and non-discriminatory. Correct?

A.   Yes, that is the definition.

Q.   So what we also know about the damages award in this case, it cannot be unfair, it can't be unreasonable, and it can't be discriminatory.  Isn't that right?

A.   It should be based on FRAND negotiations is how I calculate damages, yes.

Q.   Right.  So to put a fine point on it because I think it's very important, the damages in this case cannot be unfair, cannot be unreasonable, and they cannot be discriminatory. Correct?

A.   Again, they need to be based on FRAND principles, yes.  I would say it from that perspective is how I would answer your question.

Q.   Well, FRAND principles we just established means fair, reasonable, and non-discriminatory.  Isn't that right?

A.   That's correct.

Q.   I didn't think we would get in an argument about this, but you agree then the damages award that ultimate that you're saying to the jury, that award needs to be fair, reasonable, and non-discriminatory.  Right?

A.   Yes, sir.

Q.   Now, let's pull up your slide, PDX 3 -- 6.3.  And this is a slide you presented on direct.  Isn't that right?

A.   Yes, sir.

Q.   And what you're saying here is that for just the three patents in this case, your testimony is that $237.3 million is fair and reasonable.  Isn't that right, sir?

A.   Absolutely.

Q.   In fact, you believe that Samsung would have to pay ZTE in this hypothetical negotiation $102.58 million just for the '776 Patent alone.  Isn't that right?

A.   Yes, sir.

Q.   And you didn't add numbers up, but if you add the reasonable royalty rate that you have here on your slide on a per-unit basis, what you're saying here is it's $2.10 per Samsung 5G phone.  Isn't that right?

A.   Yes.  For the phones that would infringe all three patents, that's correct.

Q.   All right.  So the phones that infringe all three, you believe that the fair and reasonable rate is $2.10 per phone.

Isn't that right?

A.    Yes, that's correct.

Q.    Okay.  And let's turn to your slide 16.

Now, you testified earlier about the hypothetical negotiation, and I have a few questions about that.  In the hypothetical negotiation --

MR. McKEON:  Slide 16, please.  Thank you.

Q.    (BY MR. McKEON)  In the hypothetical negotiation, what we do is we imagine that these two parties are in a room together and they're going to be in that room and they're going to agree on a license agreement with terms that are fair and reasonable.  Isn't that right?

A.    Yes, that's correct.

Q.    And we call it a hypothetical negotiation because it really never happened.  Isn't that right?

A.    That's fair.

Q.    And even though that the Plaintiff in this case is GComm, the hypothetical negotiation would not be between Samsung and GComm.  Isn't that right?

A.    That's correct.

Q.    And as you've indicated here it, would actually be between Samsung and ZTE.  Isn't that right?

A.    Yes, sir.

Q.    And that would be back in April of 2019.

A.    That's correct.

Q.   And as you've told the jury, that in this hypothetical negotiation, the parties would have all the relevant information, in that room they'd know all the relevant facts. Right?  There would be cards up, no one's hiding anything. Isn't that right?

A.   That is correct.

Q.   And they would even know -- in a hypothetical negotiation, you actually know future things are going to happen.  Right?  That haven't happened yet, but you actually know about that because of the book of wisdom you mentioned. Isn't that right?

A.   Yes, that's correct.

Q.   So we agree that in this hypothetical negotiation, unlike a real world negotiation, you've got a lot of information.

A.   I would agree, particularly in this case, yes.

Q.   Okay.  Now, ZTE and Samsung in this hypothetical negotiation --

        MR. McKEON:  Mr. Andryszak, you can take this down. Thank you.

Q.   (BY MR. McKEON)  In this hypothetical negotiation, they would know all the details about the agreement where GComm bought the ZTE patents.  Isn't that right?

A.   Generally, yes, in the construct of the book of wisdom, yes.

Q.   Right.  And they would have -- they would actually have

that agreement in the room when they're negotiating.  Isn't that correct?

A.    Generally, that's fair.

Q.    Okay.  And they would know the terms and they would know all the payment provisions.  Isn't that right?

A.    Yes, as a part of the agreement.

Q.    And they would know that in this agreement, GComm bought 70 patents from ZTE in 2020.  Isn't that right?

A.    Yes.

Q.    And they would also know that for buying these 70 patents, including the three patents in this case, that GComm would be -- that GComm would pay for those three patents and all the others of the 70 $600,000 at closing.  Isn't that right?

A.    As the first payment, yes.

Q.    Well, ZTE and GComm agreed--right?--that ZTE gets nothing else.  They just get the $600,000 if GComm doesn't get any other revenue from these patents.  Isn't that right?

A.    The outline of the agreement would guide how much they would get depending on whatever license they would agree upon.  But if there were no agreements, then I would agree there would be no additional revenue.

Q.    Right.  So the day of closing this agreement, no dispute about it, we know that GComm paid ZTE $600,000 and that was the only money guaranteed that ZTE would ever get.  Isn't that

right?

A.    No, I disagree with the last part of that.

Q.    Well, if GComm just said, you know what, I don't want to enforce these.  Mr. Pitcock says, you know what, I'm going to retire and move to the Bahamas, never work again, and have a martini, if he does that--right?--they wouldn't get a single dime.  Isn't that right?

A.    Again, I don't know what any future terms would be in terms of maintaining the patents in the agreement, I don't recall, but if there would be no future revenue, then there would be no sharing of that revenue.

Q.    Okay.  So $600,000 is all that ZTE would get.  Correct?

A.    Based on that limitation, yes.

Q.    And we also know, though, that ZTE gets a kicker if there is revenue from these patents down the road.  Isn't that right?

A.    I don't characterize it as a kicker.  There's an additional payment term, yes.

Q.    Okay.  Well, it's 20 percent -- we heard about it already in this courtroom.  It's 20 percent of the revenue that Mr. Pitcock may get through licensing or litigation.  Isn't that right?

A.    Yes, that's one of the payment terms.

Q.    Okay.  So ZTE has skin in the game.  We all know that. Isn't that right?

795

A.    Yes.  They have an ongoing interest.  I would agree.

Q.    So, for example, if the jury were to award $237.3 million, ZTE gets roughly $50 million?

A.    Again, I think Mr. Pitcock testified to however the expenses may be taken care of.  But on that math, yes, that would work.

Q.    Tens and tens of millions of dollars.  Isn't that right?

A.    They would get 20 percent of whatever the net receipts would be, yes.

Q.    And when it came to your analysis about the hypothetical negotiation, you said that the ZTE/GComm purchase agreement is not indicative of a royalty and is not economically comparable.  Isn't that right?

A.    That's correct.

Q.    So for the purposes of the royalty damages that you're telling the jury to award, when it comes to the agreement between ZTE and GComm that involves the purchase of the very patents that we're talking about in this case, you say, you know what?  In the hypothetical negotiation, the parties wouldn't consider it, they wouldn't care about it.  Isn't that right?

A.    No, I didn't say they wouldn't care about it.  I said they would acknowledge the differences of why it wouldn't be a relevant comparable license for them to look at.

Q.    Okay.  But you're saying that even though this agreement

transfers the very assets we're in this courtroom debating even though there's agreement transfers those assets, you're saying the parties wouldn't use it to value what would be the reasonable royalty.  Isn't that right?

A.    That's exactly right.  Under the hypothetical negotiation construct, that's correct, it would not be relevant or comparable.

Q.    Now, Mr. Dell, you did some analysis in this case using what is called a comparable license approach.  Isn't that right?

A.    Yes.  I analyzed the agreements under that approach, correct.

Q.    I think there was like 90 pages in your expert report dealing with comparable licenses.  Isn't that right?

A.    I don't know if it was quite 90, but, yes, there is a discussion in my report about it.

Q.    Okay.  And the basic idea is that we're looking at market comparables, and this is sort of analogous to renting a house.  You testified to that effect in your direct.  Isn't that right?

A.    Yes.  I used an apartment analogy as an analogy for royalty.

Q.    Okay.  Apartment or a house that if you're renting, and the idea here is if you go to a house and you want to rent it, in order to figure out what is the really reasonable and fair

rate per month to rent that house, you're going to look to the left -- in that street, you're going to look to the left and to the right of the house, and you're going to figure out what people are charging in the neighborhood, aren't you?

A.    You can if you're limiting it to that small area, yes.

Q.    Well, we're trying to get to a market assessment of what the value of the rent would be for this house, five bedrooms, big house, a couple of bathrooms, maybe an acre of property, you're going to want to look in the neighborhood, maybe go beyond the neighborhood, but you want to look at similar houses in that area and that will give you an indication of what the fair and reasonable rent would be for that house. That's really the concept we're talking about.  Isn't that right?

A.    Yes.  If you're looking at a specific area, then, yes, you can look at similar houses per your -- to use your example.

Q.    Well, I'm not talking about, you know, if I have a house here in Marshall, I'm not talking about looking for houses in Dallas.  I'm talking about in this general area, to get a market comparable, I'm going to look at houses in the same sort of level of home and that gives me an indication what I should rent.  You agree with that.  Right?

A.    I agree that that's a market comparable approach.

Q.    Okay.  And when we talk about market comparable approach,

that's the concept we're talking about.  Isn't that right?

A.   Yes.  It's the framework of how you can look at comparables.

Q.   So just to put a finer point on it, if we're doing this approach on the rent and I go -- and I'm here in Marshall and I go and I have a house for a thousand dollars and I want to rent a house, and the one on the left is a thousand dollars, the one on the right is $1100, same size house, same number of bedrooms, if the renter -- the potential landlord says, you got to pay me $50,000 a month, I'm going to look at them and go, You're nuts.  Isn't that right?

A.   I don't know.  I couldn't tell you.  It depends on the amenities and what else is in the apartment.

Q.   Okay.  But the point is you're really going to look at the economics of the comparable homes.  Isn't that right, sir?

A.   Correct, and the specific benefits that you would get from living in a particular home.

Q.   All right.  Now, you also testified about something called the *Georgia-Pacific* factors.  Do you recall that?

A.   Yes, sir.

Q.   Kind of a famous case that lays out 15 factors that damages experts like you consider in every case.  Isn't that right?

A.   Yes, that's correct.

Q.   Okay.

MR. McKEON:  Let's look at your slide 19, please.

Q.   (BY MR. McKEON)  And this was the *Georgia-Pacific* factors that you discussed with the members of the jury.  Isn't that right?

A.   It is.  This is the slide I showed, yes.

Q.   Now, they are normally numbered 1 through 15.  So on the upper left here, you have this factor, and that's really what they call factor No. 1.  Isn't that right?

A.   Yes.  Aligning that with the 15 factors, yes.

Q.   And the second one here, they call factor 2.  Isn't that right?

A.   Yes.

Q.   And the first factor in this list is the royalties received by the patentee for licensing the patents-in-suit.  Isn't that right?

A.   Yes, that's what it says.

Q.   So this is -- it's number one because it's important information that you have about the value of the very, very patents that are at issue.  Isn't that right?

A.   No, it's not number one ranked in priority if I understood your question correctly.

Q.   Well, it's factor No. 1, and in all these cases that we do, we call it factor No. 1.  Isn't that right, sir?

A.   It's listed first, yes.

Q.   Okay.  So factor No. 1 is the factor that values the very

patents at issue in the case.  Isn't that right?

A.   To the extent they exist in some cases, yes.

Q.   To the extent.  You mean to the extent the licenses that include the patents at issue in the case.  Is that what you mean when you say to the extent they exist?

A.   Yes, to the -- not all cases, as I mentioned, are all factors relevant or is there information in all factors.

Q.   Okay.  So when you say to the extent they exist, you mean to the extent there are licenses out there, that actually license the patents-in-suit, they're pretty important because they're factor No. 1.  Right?

A.   Again, not because they're the first factor, but yes, they -- it is a factor that's considered under *Georgia-Pacific*.  That's correct.

          THE COURT:  Let me interrupt for a minute before we proceed further.  And I know this cross examination has longer to go.  We're going to take a short recess, ladies and gentlemen of the jury.  If you'll simply close your notebooks, leave them in your chairs, follow all my instructions, including not discussing the case among yourselves, and we'll continue back to continue with the Defendants' cross examination of Mr. Dell.

     The jury's excused for recess.

          (Whereupon, the jury left the courtroom.)

          THE COURT:  The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Mr. McKeon, are you prepared to proceed with cross examination?

MR. McKEON:  Yes, I am, Your Honor.  Thank you.

THE COURT:  Let's bring the jury in then.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

We'll continue with the Defendants' cross examination of Mr. Stephen Dell.

Mr. McKeon, please continue.

MR. McKEON:  Thank you, Your Honor.  And unfortunately I'm going to have to start by closing the courtroom because we are going to get into confidential licenses.

THE COURT:  All right.  Then based on that request, I'll order the courtroom sealed.  I'll direct that all persons present not subject to the protective order excuse themselves and remain outside until the courtroom is reopened and unsealed.

And if you'll let me know when we reach that point, counsel.

MR. McKEON:  Thank you, Your Honor.  I will.

(Courtroom sealed.)

831

(Courtroom unsealed.)

THE COURT:  All right.  The courtroom is reopened and unsealed.

Please continue, Mr. McKeon.

Q.   (BY MR. McKEON)  Okay.  Now, with respect to the three agreements that we were just discussing, the Ericsson, the Qualcomm, and the InterDigital agreements, you believe that those agreements are comparable and are inherently apportioned to account for the value of the licensed patents.  Is that right?

A.   Yes, as a part of the analysis I looked at.

Q.   And in plain English, that means that the rates in these agreements reflect the value of the patents.  Isn't that right?

A.   In part, yes, that's correct.

Q.   Okay.  And going back to our discussion we had at the beginning that these agreements are comparable, therefore they're really good at evaluating the rent I'm going to charge for the house I'm seeking to rent because they're data points on the left and on the right of the house.

That's really what we're talking about here when we talk about market comparables.  Correct?

A.   Generally, that's correct.

MR. McKEON:  Now, let me pull up slide 38, if I may.  Your slide 38.

Q.    (BY MR. McKEON)  And you showed this to the members of the jury when you were discussing the Samsung/Ericsson agreement.  Do you recall that?

A.    I do.

Q.    But you didn't -- I don't recall.  I might have missed it and correct me if I missed it, but you didn't tell the jury the rate that you actually calculated per patent royalty.

MR. McKEON:  Let me take that down.  I think we have a Samsung confidential document here, Your Honor, so I'd like to seal the courtroom but Samsung representatives can stay in.

THE COURT:  What's your position, Mr. Sheasby?

MR. SHEASBY:  I was about to say he should not be showing that.

THE COURT:  All right.  I think we've established that.

MR. SHEASBY:  So people who are not under the -- not Samsung employees should leave.

MR. McKEON:  That's correct.  Thank you.

THE COURT:  All right.

MR. McKEON:  Thank you, Mr. Sheasby.

THE COURT:  I'm going to order at counsel's request to order the courtroom sealed.  I'll direct all persons not subject to the protective order to excuse themselves.  Samsung personnel are excluded from this, given that counsel has represented only Samsung confidential information will be gone

into.

(Courtroom sealed.)

(Courtroom unsealed)

THE COURT:  We will pick up with Ms. Truelove's further direct examination of Mr. Dell in the morning.

If you, ladies and gentlemen, will do what you've done so far, very, very well and I want to compliment you, and that's be here and be ready to go by 8:30, I'll do my best to be ready to go with you.  Travel safely to your homes, follow all any instructions, including not to discuss the case with each other or anyone else in any way, and we'll see you tomorrow morning.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

The jury's excused for the evening.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated, please.

Counsel, let me remind you to be working jointly on an updated and hopefully simplified joint proposed and newer iteration of the final jury instructions and verdict form so that I can have that tomorrow afternoon.

For your information and for management of your trial time, let me tell you that as of right now the Plaintiff has used 8 hours and 2 minutes and has 4 hours and 58 minutes of trial time remaining.  The Defendant has used 7 hours and 20 minutes and has 5 hours and 40 minutes of trial time remaining.

I'll be in chambers as usual to take up disputes that we can resolve before we start with the jury.  I would hope that they will continue to moderate, but I'll deal with whatever you give me.

Are there any issues we need to discuss or take up before we recess for the evening?

Anything from the Plaintiff, Mr. Sheasby?

MR. SHEASBY:  No, Your Honor.

THE COURT:  Anything from the Defendant, Mr. Cordell?

MR. CORDELL:  No, Your Honor.  Thank you.

THE COURT:  All right.  I'll ask Defendants to take

this board down as we leave.

Other than that, we stand in recess until tomorrow.

(The proceedings were concluded at 5:46 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                01/23/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

.