IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

G+ COMMUNICATIONS, LLC.,          (   CAUSE NO. 2:22-CV-078-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,    (
et al.,                           )   MARSHALL, TEXAS
                                  (   JANUARY 24, 2024
          Defendants.            )   8:30 A.M.
_____


VOLUME 4

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:       IRELL & MANELLA, LLP -
                         LOS ANGELES
                         1800 AVENUE OF THE STARS
                         SUITE 900
                         LOS ANGELES, CA 90067-4276
                         (310) 203-7096
                         BY: MR. JASON SHEASBY
                             MR. BENAJMIN MANZIN-MONNIN

                         IRELL & MANELLA -
                         NEWPORT BEACH
                         840 NEWPORT CENTER DRIVE
                         SUITE 400
                         NEWPORT BEACH, CA 92660
                         (949) 760-0991
                         BY:  MS. LISA GLASSER

                         McKOOL SMITH, P.C. - MARSHALL
                         104 EAST HOUSTON, SUITE 300
                         MARSHALL, TEXAS  75670
                         (903) 923-9000
                         BY:  MS. JENNIFER TRUELOVE
                              MR. SAM BAXTER

FOR THE DEFENDANTS:      FISH & RICHARDSON, PC -
                         WASHINGTON, DC
                         1000 MAINE AVE., SW
                         SUITE 1000
                         WASHINGTON, DC 20024
                         (202) 783-5070
                         BY:  MR. RUFFIN CORDELL
                              MR. MICHAEL McKEON
                              MS. LAUREN DEGNAN

                         FISH & RICHARDSON, P.C. -
                         DALLAS
                         1717 MAIN STREET, SUITE 5000
                         DALLAS, TEXAS  75201
                         (214) 292-4084
                         BY:  MR. THOMAS REGER

                         GILLAM & SMITH, LLP
                         303 SOUTH WASHINGTON AVENUE
                         MARSHALL, TEXAS  75670
                         (903) 934-8450
                         BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                      100 E. HOUSTON STREET
                      MARSHALL, TEXAS  75670
                      (903) 923-8546

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| STEPHEN DELL | |
| Redirect By MS. TRUELOVE | 878 |
| Recross By MR. McKEON | 879 |
| JAEWON KIM | |
| Direct By BY VIDEO DEPOSITION | 889 |
| REBBECCA REED-ARTHURS | |
| Direct By MS. TRUELOVE | 897 |
| Cross By MR. CORDELL | 901 |
| Redirect By MS. TRUELOVE | 905 |
| GUY WAITLEY | |
| Direct By MS. SMITH | 908 |
| Cross By MS. GLASSER | 929 |
| DAEJIN JEON | |
| Direct By MR. CORDELL | 933 |
| Cross By MR. SHEASBY | 954 |
| Redirect By MR. CORDELL | 969 |
| MANG ZHU, PH.D. | |
| Direct By BY VIDEO DEPOSITION | 978 |
| FRED RODERMUND | |
| Direct By MR. McKEON | 985 |
| Cross By MR. S HEASBY | 1004 |
| Redirect By MR. McKEON | 1023 |
| Recross By MR. SHEASBY | 1027 |
| PAUL MIN, PH.D. | |
| Direct By MS. DEGNAN | 1030 |
| Cross By MR. SHEASBY | 1088 |
| Redirect By MS. DEGNAN | 1133 |

THE COURT:  Be seated, please.

Are the parties prepared to read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?  We do this every morning first thing.  This should not be a surprise to anybody.

Are we ready?

MS. TRUELOVE:  Ready, Your Honor.

THE COURT:  All right.  Let's go to the podium and make this announcement into the record, please.

MS. TRUELOVE:  All right.  Thank you, Your Honor. Jennifer Truelove for Plaintiff.

These are the exhibits:  DTX 041, JTX 06, JTX 07, PTX 08, PTX 24, and JTX 08.

THE COURT:  All right.  Any objection to that rendition from the Defendants?

MR. FREEMAN:  No objection, Your Honor.

THE COURT:  Do Defendants have additional exhibits to read into the record?

MR. FREEMAN:  We do, Your Honor.

THE COURT:  Please proceed.

MR. FREEMAN:  DTX 041, DTX 410, DTX 551, and JTX 23.

THE COURT:  All right.  Any objection to that rendition from the Plaintiff?

MS. TRUELOVE:  No objection, Your Honor.

THE COURT:  All right, counsel.  Thank you.

878

Let me ask Defense counsel who was at the podium just identify himself for the record, please.  I think this was your first trip to the podium for this trial.

MR. FREEMAN:  That's correct.  Mr. Will Freeman, Your Honor.

THE COURT:  Thank you, Mr. Freeman.  We'll get your name in the transcript so you can tell your grandchildren you participated in this trial.

MR. FREEMAN:  Thank you, Your Honor.

THE COURT:  Okay.

All right, Mr. Dell, are you in the courtroom and ready to continue?

THE WITNESS:  Yes, sir.

THE COURT:  Please return to the witness stand.  I remind you, as you well know, that you remain under oath.

And correct me if I'm wrong, Ms. Truelove, were you examining the witness when we stopped yesterday?

MS. TRUELOVE:  I was, Your Honor.

THE COURT:  Please return to the podium.

And while she's doing that, let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  Welcome back and please have a seat.

We're going to continue with the examination of Mr. Stephen Dell, and Plaintiff's counsel, Ms. Truelove, was

redirecting the witness when we recessed yesterday.  So we'll continue with the Plaintiff's redirect examination of the witness.

You may continue, Ms. Truelove.

MS. TRUELOVE:  Thank you, Your Honor.

Could I please get PDX 6.3?

STEPHEN DELL,

having been previously duly sworn, testified further as follows:

REDIRECT EXAMINATION Continued

BY MS. TRUELOVE:

Q.   Mr. Dell, what was your ultimate conclusion broken down by patent, please, as to your lump-sum royalty damages -- discounted lump-sum royalty damages that you found in this case?

A.   For the '776 Patent, it's my opinion based on our reasonable royalty rate of $1 per unit that the lump-sum royalty damages would be $102,582,538.

For the '130 Patent, based on a royalty rate of 35 cents per unit, the discounted lump-sum royalty damages would be $39,996,226.

For the '443 Patent, based on a royalty rate of 75 cents per unit, the discounted lump-sum damages would be $94,677,743.

Q.   Thank you, Mr. Dell.

880

MS. TRUELOVE:  I pass the witness, Your Honor.

THE COURT:  All right.  Is there additional cross, Mr. McKeon?

MR. McKEON:  Yes, there is, Your Honor.

THE COURT:  Please proceed with additional cross.

MR. McKEON:  Thank you, Your Honor.

RECROSS EXAMINATION

BY MR. McKEON:

Q.   Good morning, Mr. Dell.

A.   Good morning.

Q.   Now, during your -- the redirect session yesterday, you mentioned Mr. Rodermund's testimony regarding patents and these portfolios having different values.  Do you remember that?

A.   Yes.

Q.   Okay.  And you testified that patents in these massive portfolios, you actually said there's a lot of patents that are worthless.  Do you recall that testimony yesterday?

A.   That's correct.  They have no value.

Q.   And is it your testimony, sir, in these negotiations between these -- between sophisticated companies that have thousands, thousands, of SEPs that have been declared essential to the standard, is it your testimony, sir, that in these negotiations they go in there and say, yeah, you know what, we're right, most of my patents are worthless so just

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

forget about those.

Is that what's going on in these negotiations, sir?

A.   Yes, that's what happens in the real world.  That's correct.

Q.   And they go in and they just say, I have thousands of declared SEPs and, except for a couple of them, they are all worthless.  That is what you are saying happens in the real world in these negotiations, sir?

A.   Yes, that is what happens in the real world.

Q.   Well, why is it then, sir, with respect to the Apple/ZTE license and the Samsung/ZTE license, why is it that the license specifically covers all declared patents to the standard?  Every one of them.  Are you aware of that, sir?

A.   Yes.

Q.   So they license every single patent they declare.  Right?

A.   Yes.  They have license rights to them.  That's correct.

Q.   Correct.  And your testimony is, is, you know what, in the room they're all worthless, we don't even need that license, but you got to give it to us anyway.  Is that what you're saying?

A.   Yes.  It's common in licensing that they get access to the full portfolio.

Q.   Now, in your redirect yesterday you testified about a Samsung document that was submitted to the government regarding FRAND.  Do you recall that?

A.    I do.

Q.    And just so we're clear, the government that you mentioned, that's not the United States government.  Isn't that right?

A.    No.  It's the European Commission.

Q.    Right.

MR. McKEON:  And if we can pull up, if we can, your slide 68.

Q.    (BY MR. McKEON)  And just so we're clear, you testified that with respect to this document, you should look at the incremental value when you are assessing the value of standard essential patents.  Is that right?

A.    Yes.  This is Samsung's statements.  Correct.

Q.    And these are statements that Samsung made that you presented to the members of the jury.  Is that right?

A.    Yes, sir.

Q.    And just to go through what you have on the slide here and I'm going to focus your attention on the bullet point here, do you see that bullet point?

A.    I do.

Q.    And what you didn't highlight for the jury is that in bullet point Samsung's saying, in light of the value contributed by all SEPs for the same standard practiced.  Do you see that?

A.    No, I don't see that.

Q.   Let's try it again.  "In light of the value contributed by all SEPs for the same standards practiced."  Do you see that?

A.   I see that portion, yes.

Q.   Okay.  You didn't highlight that for the jury.  Isn't that right?

A.   I didn't highlight that portion.  That's correct.

Q.   And this doesn't say, well, not the worthless ones.  This says, all, every one of the SEPs.  Isn't that right, sir?

A.   That statement is talking about that.  The highlighted statement talks about the patents being analyzed in that negotiation.

Q.   And this is really a reference to the top-down approach where you look at all the SEPs.  Isn't that right?

A.   It's not referencing the top-down approach, no.

Q.   Well, you do agree it's talking about all SEPs, not some smaller portion of them.  Isn't that right?

A.   This is talking about looking at the patent that's being licensed relative to all of the patents.

Q.   All patents.  Correct?

A.   That's correct.

Q.   All right.

        MR. McKEON:  And if I could get the elmo.

Q.   (BY MR. McKEON)  Now, in your slide I noticed that you presented -- do you see that, sir?

A.    I do.

Q.    That's the list you presented.  You stopped the list to this bullet point here.  Isn't that right?  The relevance and importance of the technology covered by the IPR, et cetera, that's where you stopped on your slide.  Isn't that right?

A.    Yes, sir, that's correct.

Q.    And you didn't show the members of the jury the bullet points below that.  Isn't that right?

A.    Correct.  I summarized the first five of these -- of the list.

Q.    But we do know, sir, that in the statement that Samsung made to this European entity, in that statement Samsung was very clear that what needs to be considered in the FRAND negotiations are existing licenses covering use of the claims of the SEP, where such licenses were not obtained, et cetera. Do you see that?

A.    I do.  The et cetera part is important, but, yes, I do.

Q.    Well, it is important.  I agree with that.  But let's focus on what existing licenses covering the IP.  You know that that means *Georgia-Pacific* factor No. 1.  Right?

A.    If it relates to patents-in-suit or at issue?  Yes.

Q.    The patents that we're talking about in the FRAND negotiation, the actual license agreements for the very patents and we've established yesterday that's *Georgia-Pacific* factor 1.  Right?

A.   Yes.  If you're looking at the patents at issue, that's correct.

Q.   So that's what this is right here, GP 1.  Isn't that right?

A.   Yes, it would fall under that factor.

Q.   And we also know, sir, that you have here whether the licensor has previously offered or granted to the other parties a license for the same or a similar portfolio of IPR. Do you see that?

A.   Yes, sir.

Q.   That's *Georgia-Pacific* factor No. 2.  Correct, sir?

A.   Generally, that's correct, yes.

Q.   So Samsung's telling the government -- you focused on other portions of this.  You didn't show the jury this.  But Samsung was very clear that, you know what, it's very important in these negotiations, you got to get the factor 1 licenses and you got to get the factor 2 licenses.

        Isn't that what Samsung's saying here, sir?

A.   Correct.  But I would disagree I didn't show this.  I talked about my analysis of these factors.

Q.   All right.

        MR. McKEON:  Your Honor, may I approach the easel here?

        THE COURT:  You may.

Q.   (BY MR. McKEON)  Now, we went through this chart we

created yesterday.  Do you recall that?

A.   Yes, sir.

THE COURT:  If you'd like to bring that forward, counsel, you can.

MR. McKEON:  Oh, yeah, yeah.  Thank you, Your Honor. I appreciate that.

THE COURT:  Some of those numbers are kind of small on that.

MR. McKEON:  Yes.  I appreciate that.

Q.   (BY MR. McKEON)  Can you see them, Mr. Dell?

A.   I can.  Thank you.

Q.   Now, we covered this yesterday, but on redirect I heard you say something about your analysis that we got from you in your expert reports, that analysis that you did, you weren't suggesting that the rates were appropriate.  Did you say that?

A.   I don't recall -- I may not understand your question, but I don't recall saying that specifically.

Q.   Okay.  Well, let's put a fine point on it.  Yesterday we went through the Samsung/Ericsson license, the Samsung/Qualcomm license, and the Samsung/InterDigital license.  Do you recall that?

A.   Yes, sir.

Q.   And you acknowledge, sir, that in those agreements, those agreements -- the patents are inherently portioned to reflect the value of the licensed patents.  Isn't that right?

A.   Yes.  I say that in my expert report.

Q.   Inherently apportioned.  And what we mean in plain English is the rates in these agreements reflect the value of the patents.  Correct?

A.   Relative to that analysis, yes.

Q.   Well, sir, you testified yesterday, sir, that in plain English that means the rates in these agreements reflect value of the patents.  Isn't that right?  You said, in part, yes, that's correct.  You agree with that testimony you gave yesterday.  Correct?

A.   In part, yes, that's correct.

Q.   And just so we know here, we see in the chart that you did -- and just to remind the members of the jury, these calculations on the left, they all came from you.  Isn't that right?

A.   Yes.  They were part of my analysis.

Q.   Okay.  And these are the numbers that you calculated.  Correct?

A.   For some of -- for most of them, yes.

Q.   And the agreements that you just testified to the members of the jury, Ericsson, InterDigital, and Qualcomm, the value of the patents, it's inherently apportioned so it reflects the value of the patents in the portfolio.  Correct?

A.   Based on the analysis and the way that it was performed, that's what it was looking at on a per-patent rate.

888

Q.   And in a per-patent rate, sir, what we have here is for three patents, your analysis was 18 cents, 3 cents, and 3 to 12 cents.  Is that right?  For three patents per patent rate, you get those numbers.  Isn't that right?

A.   Well, my analysis was -- I didn't do the math that you did in the way that you did it, but I looked at it on a per-patent rate.

Q.   And we all did the math yesterday, but you know, you multiply that by three, you get the numbers we see here. Isn't that right?

A.   Correct.

Q.   So that's for three patents.  Correct?

A.   Yes.  The math that you did was for three patents.

Q.   You are telling the members of the jury, sir, that what they should award if they find validity and infringement, they should award $2.10 for three 5G patents when we know in real-world licenses with real parties sitting down, they would say 18 cents, 3 cents, and 3 to 12 cents.  That's what you're telling the jury.  Isn't that right?

A.   Yes.  The royalty would be $2.10.  But the numbers on the left are not real-world licenses.  It's an analysis.

        MR. McKEON:  Your Honor, I move to strike that.

        THE COURT:  Sustained.  That's non-responsive.

     You fully answered the question when you said yes, Mr. Dell.  Limit your answers to the questions asked.

Let's continue.

MR. McKEON:  Thank you, Your Honor.  With that, I pass the witness.

THE COURT:  Is there additional direct, Ms. Truelove?

MS. TRUELOVE:  No, nothing, Your Honor.

THE COURT:  All right.  Then you may step down, Mr. Dell.

THE WITNESS:  Thank you.

THE COURT:  Mr. McKeon, if you'll return that chart where it was --

MR. McKEON:  Yes, sir.

THE COURT:  -- and turn it to a blank sheet, please.

MR. SHEASBY:  May I get the binders?

THE COURT:  Am I correct the next witness is by deposition?

MR. SHEASBY:  Yes.

THE COURT:  Let's go ahead and get the deposition witness next.

Plaintiff, call your next witness.

MS. GLASSER:  Thank you, Your Honor.

Plaintiff G+ calls as its next witness Mr. Jaewon Kim. He is a Samsung engineer and corporate representative of Samsung.  Your Honor, the time allocation is 12 minutes and 3 seconds to the Plaintiff and 6 minutes, 32 seconds, to the

890

Defendant.

THE COURT:  All right.  Let's proceed with this witness by deposition.

KIM JAEWON, BY VIDEO DEPOSITION,

Q.   Please state your full name.

A.   It is Kim Jaewon.

Q.   How many years have you worked at Samsung?

A.   It has been 21 years.

Q.   And to be clear, you have absolutely no knowledge whatsoever of the other modems besides the Exynos used in the A53 5G for the other products accused of infringement in this case.  Correct?

A.   I don't have any knowledge about other modems besides Exynos.

Q.   Do you understand that you were designated to testify on behalf of Samsung in relation to certain topics?

A.   Yes, I do.

Q.   And do you understand that, as to those topics, you speak on behalf of all of Samsung and not just on behalf of yourself?

A.   Yes, I do.

Q.   Are the 5G devices accused of infringement in this case compliant with the 5G standard?

A.   With respect to PUCCH, which I am involved, it supports a 3GPP standard.

891

Q.   Does Samsung perform any testing, such as field testing or testing in laboratories, to confirm that each of its 5G products is compliant with the PUCCH portions of the 3GPP 5G standard?

A.   Some validation team validates and checks whether any product functionality works as intended.

Q.   And it performs that validation with regards to the PUCCH functionality in each and every Samsung 5G device.  Correct?

A.   Yes, correct.

Q.   What is an uplink control signal in relation to 5G?

A.   Uplink control channel is PUCCH, and then PUCCH is something through which feedback information can be sent and other information can be sent as well.  As for feedback information, that is the information to let everyone know whether the downlink information is received well or not.

Q.   What is a transmission time interval in 5G?

A.   In 5G, my understanding is the term 'transmit time interval' is not quite used.  My understanding is in 5G transmission is done on a slot-by-slot basis.

Q.   And what does it mean for transmission to be done on a slot-by-slot basis?

A.   In NR, one slot is comprised of 14 OFDM symbols.  So in NR, the transmission unit is on a slot-by-slot basis.

Q.   And you understand that this topic relates to Samsung-accused products that include Qualcomm broad -- excuse

892

me -- Qualcomm modems.  Correct?

A.    I have now understanding that Topic 105 is a topic related to Qualcomm.

Q.    And you understand that you were designated to speak on behalf of all of Samsung as to Topic 105.  Correct?

A.    It is right that I'm here to testify on behalf of Samsung, but I don't think I can testify on something on which I don't have any knowledge.

Q.    And Exhibit 2 is titled "ETSI TS 138.211, version 16.5.0."  Do you see that?

A.    Yes, I do see it.

Q.    Prior to your presentation for this deposition, were you familiar with this document?

A.    Yes.  This document is what we refer to when we work on our development.

Q.    Is it necessary to implement the physical channels as described in this document to establish communication between a user device and a base station with 5G?

A.    Yes, it is.

Q.    Do all Samsung 5G devices implement the physical channels in accordance with the ETSI TS 138.211 standard?

A.    There's Exynos models that support what is described in the document, in part.

Q.    Which part?

A.    In establishing or generating 5G, what we did was to

implement what should be implemented as fundamental elements. Sitting here today, I can't really recall which chapter pertains to that, but something that are considered the fundamentals were -- was implemented.

Q.    And is it necessary to implement the PUCCH in a user device consistent with this description in section 6.3.2 in order to practice 5G communication?

A.    Yes, it is necessary.  It is needed.

Q.    And so all of the Samsung 5G devices must practice the functionality as described in section 6.3.2 in order to practice 5G communication.  Correct?

A.    I can speak about Exynos models.  It's not like for all functionalities or features.  What we do is that we implement those features that are subject to functionality validation in relation to the network.

Q.    Is it necessary to support PUCCH formats 0, 1, 2, 3, and 4 as defined by the 3GPP 5G standard to communicate on a 5G network?

A.    Supporting from 0 through 4 is needed in order to communicate on 5G network.

Q.    And so if the device is sending PUCCH information for less than or equal to 2 bits, it will use either format 0 or 1.  Correct?

A.    Correct.

Q.    For 5G devices, only one sequence is sent on each symbol.

Correct?

A.   Yes, one sequence is sent on one symbol.

Q.   So the answer is no, nobody at Samsung suggested to you that this patent wasn't infringed prior to the litigation. Correct?

A.   Correct.

Q.   Can you identify any Samsung 5G device that does not implement what is described in section 5.2.2 of the 3GPP standard number 138.211?

A.   That I don't know.

Q.   The question is, in any context at any time are you aware of Samsung making a statement outside of the context of this litigation that its products, its 5G products, are only partially and not fully compliant with the 5G standards?

A.   That I'm not aware.

Q.   Is compliance with the 3GPP 5G standards an important focus during the design of Samsung's 5G products?

A.   Supporting a procedure that is described in the standard is needed in terms of interoperability with products that are made by other companies.  In that regard, it is important.

Q.   For PUCCH format 0, one sequence is sent per symbol. Correct?

A.   Right.  A sequence is selected and sent.

Q.   So in the accused products, the base station first sends a base sequence to the user device.  Correct?

A.    Right.  Base sequence is provided by the network.

Q.    In your 20-plus years working at Samsung, do you have any knowledge of what the phrase 'transmission time interval' means?

A.    Previously when I was working on the LTE, someone responsible for search, the term TTI was used to mean 1 millisecond.

Q.    Mr. Kim, yes or no, do you understand TTI, or transmission time interval, to mean the amount of time for a transmission?

A.    It could be understood as so, yes.

Q.    Is it your testimony that Samsung never uses the phrase 'transmission time interval,' or TTI, when describing transmissions in 5G?

A.    I am an Exynos developer, and when we develop the NR, that's not something that we use.  We would use slots and symbols as described in the specification for our development.

Q.    Let's bring up Exhibit 36, and I will share that on the screen.

      And this is a document from Samsung Research labeled, "5G new radio specifications PHY number 3:HARQ and scheduling" from February 7th, 2018.  Do you see that?

A.    Yes, I see it.

Q.    And I'll turn to page 29.  It's labeled internally as slide 28.  And the title reads, "Time selective interface

within TTI in NR," and the first bullet reads, "In NR, TTI of interference can be different compared to data."

Q.    Do you see that?

A.    I see it, yes.

Q.    Now, as Samsung's corporate representative, is it still your testimony that Samsung does not use the phrase 'transmission time interval' when discussing 5G?

A.    When we actually develop, in order to avoid any ambiguity, we only use terminology that comes only from the specification.  However, in terms of the document that you have shown me, to me they appear to be a comparison against LTE, and it is using the word TTI to explain.

Q.    Based on the number of bits of uplink control information, the user equipment determines the number of sequences to send in the PUCCH.  Correct?

A.    For format 0, that is so.

Q.    So as Samsung's representative for the source code relating to the '130 Patent, you agree that this source code was expressly designed to match the discussion of PUCCH data in 3GPP standard TS 138.211.  Correct?

A.    Right.

Q.    So if PUCCH format 0 was not available, the next best alternative would be to use either format 1 or format 2. Correct?

A.    Right.

Q.    In a given transmission time interval for PUCCH feedback using format 0, either one or, at most, two sequences can be transmitted.  Correct?

A.    Right.

THE COURT:  Does that complete this witness by deposition?

MS. GLASSER:  It does, Your Honor.

THE COURT:  All right.  Plaintiff, call your next witness.

MS. TRUELOVE:  Your Honor, at this time we'd call Dr. Rebbecca Reed-Arthurs.

THE COURT:  All right.  Doctor Reed-Arthurs, if you'll come forward and be sworn by the Courtroom Deputy, please.

MS. TRUELOVE:  May I go to the podium, Your Honor?

THE COURT:  You may.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand.

MR. SHEASBY:  May I approach with binders?

THE COURT:  Hand it to the Court Security Officer, please.

Feel free to move any of those prior binders around.

THE WITNESS:  Thanks.

THE COURT:  Put them behind you.  Just whatever you

need to do to get them out of the way.

All right.  Ms. Truelove, you may proceed with direct examination.

MS. TRUELOVE:  Thank you, Your Honor.

REBBECCA REED-ARTHURS, Ph.D.,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. TRUELOVE:

Q.  Would you please state your name for the record and introduce yourself to the jury?

A.  Good morning.  My name is Rebbecca Reed-Arthurs.

Q.  And why are you here, Doctor Arthurs?

A.  So we heard from Professors Akl and Kowalski that the patents in this case improve 5G download speeds.  I was asked to design a survey to measure how much those specific changes in speeds are worth to smartphone buyers like you and me and also to Samsung.

Q.  And what do you do for a living?

A.  I work at BRG.  It's an economic consulting firm.

Q.  And what is your education in the field of economics and surveys?

A.  So I have a Bachelor's degree in economics from UC-Berkeley and Master's and Ph.D. degrees in economics from UC-Davis.  There my dissertation actually touched on issues of survey design and analysis.

Q.   And how many times have you testified in court regarding surveys?

A.   Four times.

Q.   And what type of survey?

A.   A CBC survey is what I used here.

Q.   And what is a CBC survey?

A.   In a CBC survey, you ask survey takers to choose between several different devices, for example, four different smartphones that vary based on different features like brand and screen size and price.  And you ask them which smartphone they'd be most likely to purchase.

Q.   And is that what you did in this case?

A.   It is, yes.

     MS. TRUELOVE:  Your Honor, at this time we'd offer Doctor Reed-Arthurs as an expert in survey and economics.

     THE COURT:  Is there objection?

     MR. CORDELL:  No objection, Your Honor.

     THE COURT:  Without objection, the Court will recognize this witness as an expert in those designated fields.

     Please continue, counsel.

     MS. TRUELOVE:  Thank you, Your Honor.

     Could I get PDX 5.7?

Q.   (BY MS. TRUELOVE)  What do we see here on the screen, Doctor Reed-Arthurs?

A.   So this is an example of one of the actual survey questions that my survey takers would have answered.  You can see here that we have four smartphones, that's across the top here, and then we can see the features that the smartphones are varying over across the side here.

And at the bottom, you can see the feature that we're talking about and measuring here which is a change in 5G download speed.

Q.   And what are you trying to accomplish with this type of question in your survey?

A.   I'm trying to roughly recreate what someone might experience if you walk into, say, the AT&T store here in Marshall and someone basically is choosing a phone.  They see a bunch of different phones that are going to vary based on different features, and they can decide which one to buy.

Q.   And who took your survey?

A.   1500 people started my survey, took my survey.  Those respondents were representative of actual or potential Samsung 5G smartphone purchasers.

Q.   And could we see -- well, let me ask this.  How many of these type questions that we see on this screen did each of those survey takers take in your survey?

A.   Each survey taker would have answered 12 questions like this that vary based on the different features and levels for each phone.

Q.   And how did you use the answers to their questions to inform your survey?

A.   So I used standard econometrics.  That's just an economic statistics approach to figure out how people are trading off between the different features and price.  That allowed me to calculate how much people are willing to pay for the different features, including changes in 5G speed.

From there, I took that and I analyzed Samsung's actual real-world financial data and how they compete in the smartphone markets, and I applied a simple economic model to determine how those changes in willingness to pay for 5G speed impact Samsung's profit.

MS. TRUELOVE:  Could I please see PDX 5.26?

Q.   (BY MS. TRUELOVE)  What were your results in the change in profit from your survey?

A.   So this slide gives those results.  You can see on the left here we have the different patents, we see the different changes in speed that we've heard from the technical experts, and you can see my conclusions as to the change in profits.

Specifically for the '776 Patent, that produced a change in Samsung's profits per phone of $5.83.  For the '130, that produced a change in Samsung's profits due to those changes in 5G speed of $2.32.  And for the '443 Patent, that produced a change in Samsung's profits of $4.66.

Q.   Thank you, Doctor Reed-Arthurs.

902

MS. TRUELOVE:  Your Honor, at this time I would pass the witness.

THE COURT:  All right.  Cross examination by the Defendants?

MR. CORDELL:  May I proceed, Your Honor?

THE COURT:  Mr. Cordell, you may proceed with cross examination.

MR. CORDELL:  Thank you.

CROSS EXAMINATION

BY MR. CORDELL:

Q.   Good morning, Doctor Reed-Arthurs.  I am Ruffin Cordell. I don't think we've met before, have we?

A.   We haven't.  It's nice to meet you.

Q.   Nice to meet you.

Now, the 11 percent number you offered the jury is something Doctor Kowalski told you.  Right?

A.   Doctor Kowalski and I also heard it from Doctor Akl.

Q.   It's not in anything you calculated on your own at all. Correct?

A.   That's correct.  I'm relying on the technical experts.

Q.   And you have no other source but their opinions to rely on.  Correct?

A.   Well, I've seen some sources in the trial so far.

Q.   Okay.  But as far as your opinions are concerned when you did your report and you told us what your opinions were, it

was Doctor Kowalski and Doctor Akl's say-so.  Right?

A.   I did get those percentage changes from them, yes.

Q.   You did a survey to try to figure out what 5G download speeds to consumers was worth.  Right?

A.   That is correct.

Q.   And -- but you acknowledge that these phones also provide 4G functionality.  Right?

A.   That is true.

Q.   And you didn't test for 4G speeds at all.  Right?

A.   No, I didn't test for that separately.

Q.   And you acknowledge that the speed of the phone depends on a whole lot of factors.  Right?

A.   The speed of the phone can -- well, the speed people experience can depend on other factors.

Q.   Kind of depends on the network you choose.  Right?

A.   Yes.

Q.   Depends on, you know, where you are.  Right?

A.   The speed you experience, yes, that's possible.

Q.   Some cities have better coverage than others.  Right?

A.   I believe that's true.

Q.   Are you a football fan, Doctor?

A.   Sorry, not so much.  I like it, but I don't know it very well.

Q.   How about the State Fair?  Have you ever been to the State Fair?

A.   Yes.

Q.   Well, you know when you go to the State Fair, your phone slows down because there's so many people in one spot.  Right?

A.   I don't know that that's happened to me personally, but I believe it could happen.

Q.   Okay.  Now, when you did your survey, you offered people a choice between 800 -- I'm sorry.

MR. CORDELL:  May I begin again, Your Honor?

THE COURT:  You may.

Q.   (BY MR. CORDELL)  When you did your survey, you offered people a choice between 200 megabits a second at the high end and 25 megabits per second at the low end.  Right?

A.   There were several different speed options.  Those are two of them, yes.

MR. CORDELL:  Your Honor, may I have an instruction?  It's a pretty precise question.

THE COURT:  You need to answer the question and limit your answer to the questions asked, Doctor Reed-Arthurs.

THE WITNESS:  Thank you.

THE COURT:  Ms. Truelove gets another chance to come back and follow up.  You know that.  This is not the first time you've testified in this court.  You know what the rules are.  Please comply with them.

All right, counsel.  Let's continue.

Q.   (BY MR. CORDELL)  So the choices you offered, at the high

end you had 200 megabits per second, and at the low end you had 25.  Right?

A.    Yes.

Q.    That's eight times difference.  Right?

A.    Yes.

Q.    That's an 800 percent difference between 25 megabits and 200 megabits.  Right?

A.    Yes.

Q.    You designed your survey before you ever spoke to Doctor Kowalski or Doctor Akl.  Right?

A.    No, that's not entirely accurate.

Q.    Well, let's put it this way.  You learned about their 11 percent number after you designed your survey.  Right?

A.    That is correct.

Q.    And 800 percent is a lot bigger than 11 percent.  Wouldn't you agree?

A.    I would.

Q.    And when you -- you finished your testimony discussing what people consider when they go in to buy a phone.  Right?

A.    Certainly that's the -- what my survey is designed to mimic.

Q.    But when people go to buy a phone, they think about the brand of the phone.  Right?

A.    Yes, likely many do.

Q.    They think about the price of the phone.  Right?

A.   Yes, that's common.

Q.   They think about the screen size.  Right?

A.   Yes.

Q.   They think about storage capacity.  Right?

A.   Many people do.

Q.   Battery life.  Right?

A.   Many people do.

Q.   Charging speed.  Right?

A.   That's something many people might consider.

Q.   Camera quality.  Right?

A.   Some people might consider that.

Q.   The 11 percent that you've been talking about in here have nothing to do with those features.  Correct?

A.   That is correct.

          MR. CORDELL:  Thank you, Your Honor.  I pass the witness.

          THE COURT:  All right.  Is there redirect, Ms. Truelove?

          MS. TRUELOVE:  Yes, Your Honor.

          THE COURT:  Let's proceed with redirect.

                    REDIRECT EXAMINATION

BY MS. TRUELOVE:

Q.   Doctor Reed-Arthurs, did you have access to Samsung's confidential information when you prepared to design your survey?

A.    I did, yes.

Q.    Did that include surveys?

A.    Yes, it did.

Q.    Okay.

          MS. TRUELOVE:  Could we get PDX 5.5?

          MR. CORDELL:  Your Honor, outside the scope.

          THE COURT:  Overruled.

Q.    (BY MS. TRUELOVE)  What did -- in Samsung's own surveys, what did consumers say that they cared most about?

A.    So in Samsung's own surveys here, we're seeing why they purchased a 5G phone.  And when asked that question, they said, Because I wanted the fastest speeds available.

      That was the most common answer.

          MS. TRUELOVE:  Nothing further, Your Honor.  Pass the witness.

          THE COURT:  All right.  Further cross?

          MR. CORDELL:  No, Your Honor.  Thank you.

          THE COURT:  You may step down, Doctor Reed-Arthurs.

      Plaintiff, call your next witness.

          MR. SHEASBY:  Your Honor, at this time Plaintiff respectfully rests its case in chief.

          THE COURT:  All right.  Ladies and gentlemen of the jury, the Plaintiff has rested its case in chief and we will transition to the Defendants' case in chief at this time.

      Mr. Cordell, Defendants should call their first witness.

MR. CORDELL: Before we do that, Your Honor, would you like to have applications or should we defer that until the end of the trial?

THE COURT: As is the usual practice here, we will defer that until all the evidence has been submitted.

MR. CORDELL: Thank you. And at this time Defendants call Mr. Guy Waitley.

THE COURT: All right. If you'll come forward and be sworn by the Courtroom Deputy, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, have a seat on the witness stand.

MS. SMITH: Good morning, Your Honor.

THE COURT: Good morning, Ms. Smith.

Ladies and gentlemen of the jury, I'm informed Ms. Smith had a fall in the parking lot this morning. That's why she has crutches today and she didn't have crutches yesterday.

Are you prepared to go forward, Ms. Smith?

MS. SMITH: I have my own glasses now which is helpful. Thank you. I am, Your Honor. I apologize for the delay, Your Honor.

THE COURT: From everything I know, it was unavoidable. All right. You may proceed with direct examination when you're ready.

MS. SMITH: Thank you. Good morning, ladies and

gentlemen.

GUY WAITLEY,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SMITH:

Q.   Good morning, Mr. Waitley.

A.   Good morning.

Q.   How are you this morning?

A.   I'm good.  Good to see you.

Q.   Better than me.  Fair?

A.   Yes.

Q.   All right.  If you would introduce yourself, Mr. Waitley, to the ladies and gentlemen of the jury.

A.   Sure.  I'm Guy Waitley.  I am married.  I have four children, two boys, two girls, two in college, two out of college.  And I live in Fairview, Texas.

Q.   And how long have you lived in Fairview, Texas?

A.   I have lived in Fairview the past seven years.

Q.   Sir, what is your educational background?

A.   I'm originally from Kansas.  I went to the University of Kansas, studied business, and then I also went to law school at the University of Kansas.

Q.   Where do you work currently?

A.   I work for Samsung Electronics America --

Q.   Okay.

A.   -- in Plano, Texas.

Q.   Okay.  And we often call that SEA, and we've heard that in the courtroom this week?

A.   We do.

Q.   Okay.  Now, how is SEA related to Samsung Electronics Corporation, the Korean company?

A.   SEA is a wholly-owned subsidiary of SEC, and we bring the products to market here in the U.S. on behalf of SEC.

Q.   And how long have you worked for SEA?

A.   I've worked for SEA since January of 2012.

Q.   And what's your title there, Mr. Waitley?

A.   I'm director of product launch operations.

Q.   Okay.  Now, taking a step back, before joining Samsung, what did you do?

A.   As I mentioned, I went to law school.  Coming out of law school, I originally joined Sprint Telecommunications Company in Kansas City.  I reviewed contracts for them.  And I quickly transitioned into a business development role where I could be closer to product and in the sales and marketing aspects of product.

Q.   Okay.  So is it fair to say that you've worked in at least the telecom industry your entire career?

A.   Yes.

Q.   Okay.  Now, you mentioned that you went to law school. Did I hear that correctly?

A.   Yes.

Q.   Okay.  Why on earth would you stop doing what I do--practicing law?

A.   Yeah.  I'm a fully reformed attorney and have turned my back on it.  But for me, I negotiated agreements when I was working for Sprint, and across from me was a business person that dealt with the sales, the marketing and the products.

And more and more that became more interesting to me. And when I looked at, you know, having a long-term career, that's where I wanted to position myself, and I intentionally tried to find that opportunity and was successful in doing that fairly -- fairly quickly so made that move.

Q.   Okay.  And was going from the legal side of telecom to the business side, did that turn out being a good move for you, sir?

A.   It's been a great move.  There's been a lot of exciting products that I've been a part of, and just being a part of a process of a product going from beginning to delivery to the market is very exciting.

Q.   Okay.  So, sir, if you -- why are you testifying here today?

A.   So GComm has made some serious allegations against our -- some of our 5G products, and I'm responsible at Samsung Electronics America here in the U.S. for the launch of 5G devices.  So I'm here to speak on behalf of Samsung.

Q.   Okay.  And just a point of clarification, are you here to testify about how Samsung's products work from an engineering perspective?

A.   I'm not.  That will be done by our Samsung experts and Samsung engineers.

Q.   Okay.  Now, I've brought some slides to visit with you about this morning.

MS. SMITH:  If we could pull up our slide deck, please.  Thank you, sir.  And if we could go to that second slide.  Thank you.

Q.   (BY MS. SMITH)  Now, Mr. Waitley, if you would for the ladies and gentlemen of the jury provide a little background on SEC.

A.   Sure.

Q.   And looking at the left side of the screen here, sir.

A.   Sure.  SEC is, as mentioned, is based in South Korea, originated in 1938 actually as a garment and fish industry business, non-technical, but eventually made it into the technology giant that it is today.

And then SEA is the wholly-owned subsidiary here in the U.S.  SEC employs over 250,000 employees across the world, 20,000 employees here in the United States, and 6,000 employees here in Texas.

Q.   Okay.  Now, as to that 6,000 -- the 6,000 employees in Texas, what operations does Samsung have in Texas?  And I'll

ask you to look at that picture on the right, if you would.

A.    Sure.  So we currently have four operations here in Texas.  We have the office that I work out of Plano, Texas; we have a facility in Coppell; we have a facility in Round Rock and Austin.

And then we have a very large semiconductor fabrication plant that's being built in Taylor, Texas.  It's not quite completed yet, but it will be soon.

Q.    Okay.  Now, you've been here each day of trial.  Correct?

A.    I have, yes.

Q.    Did you hear Doctor Kowalski yesterday tell the jury that MediaTek and Qualcomm, they don't make their own chips?

A.    I did.

Q.    What's going on down there in Taylor as far as Samsung goes?

A.    Yeah.  That's the whole point of having the fabrication plant is that we do produce our own chips.

Q.    Okay.

MS. SMITH:  If we could go to that next slide.

Q.    (BY MS. SMITH)  Mr. Waitley, can you tell the jurors a little bit about Samsung's various product lines, please?

A.    Sure.  So we have a wide variety of consumer electronics, including mobile phones, home appliances, washer/dryers, refrigerators, and then also TVs obviously is what many people know us by.

914

Q.    Okay.  And you said you worked in Plano.  What does SEA do in Plano specifically?

A.    Plano is our mobile headquarters.  So for the whole United States the headquarters is based in Plano, and that's where the base of bringing the products to market comes from.

Q.    And I think or I brought a picture of your office there in Plano.

        MS. SMITH:  If we could bring that up, sir.  Thank you.

Q.    (BY MS. SMITH)  You said that that's the headquarters of the business where you bring the part -- products to the U.S. market.  If you could give the jurors a short overview of what that involves, sir.

A.    Sure.  It's really -- really two parts, and there's an evergoing loop of feedback that we provide back to SEC relative to market insights, customer feedback, product information that we gain from our experience here in the U.S., and that contributes to the development side at, we call it, HQ, but the SEC corporation.

    And then the other part is sales marketing, customer care, and product management that is located there for the go-to-market parts.

Q.    Thanks.

    Now, Mr. Waitley, do you have a good sense of what Samsung customers value in Samsung cell phones?

A.   I do.  That's a large part of what I do in bringing the products to market, and that has consistently involved the camera, the battery, and the display.

Q.   And, Mr. Waitley, I asked that you bring a few of Samsung's cell phones to show with the jury.  Did you remember those today?

A.   I did.

Q.   All right.

A.   Yes.

Q.   All right.  Tell us about what you have here.

A.   Yeah.  So this is one of our most innovative products that we've had recently, and this is the Flip 5 that was launched in August.  As you can see, it's a full glass display in the front, but I can actually fold it in half and there's no crease or anything.  But it's full sized as a regular, what we call, candy bar full phone.

Q.   All right.  Now, sir, you told the jurors that you're in charge of product launch.  Can you describe for the jury what a product launch is all about?

A.   Product launch is a big deal, and it takes a lot of time.  So we start about 25 weeks before launch, and that's after SEC or headquarters has been working on development for probably 12 to 18 months before launch as well.

      So then we get to a 25-week point before the scheduled launch, and we coordinate within our Plano office across the

organization from sales and marketing.  You see some of the departments here, but there's actually 21 or 22 different departments that are involved because each one of them has to prepare their own component of what they're going to do.

So marketing creates the marketing.  Customer care has to create training transcripts and their plans for how they are going to support the next device.

And I operate as kind of a control tower, if you will, across all these different cross-functional teams to make sure that they are fully informed, that they have the information that they need, and that we're all coordinated in delivering the tasks in preparation for a great launch.

Q.   You said you operate as kind of the control tower.  Just to be clear, who -- when Samsung launches a new cell phone, who's in charge of that launch?

A.   That's my responsibility.

Q.   How many launches have you participated in over all of your years at Samsung?

A.   At least over 50 products.

Q.   Okay.  And am I correct that Samsung launched a new phone just last week?

A.   We did.

Q.   Is that right?

A.   Last Wednesday actually, and I have the other phone.  So this is the S24 that we launched.  It's got a titanium bezel

around it.  It's our Galaxy S24, so our S series.  It looks very similar to what we have seen in the past, but there are enhancements to the display, the camera, the battery.

But the big addition to this is the artificial intelligence that's built into it, the partnership with Google that's going to enhance that.  And you can -- as an example, you can circle -- make a circle on a picture of any item in that picture, and it will populate it that so you can either shop for it, you can get more information, or provides other alternatives that you can automatically see with the circle on your phone.

Q.   And SEA undertook some marketing for this -- for this big launch.  Is that correct?

A.   Yeah.  That's been exciting to see because this is kind of the first time that, you know, we're stepping into another pillar and that you look at artificial intelligence, and that's a huge jump and obviously it's kind of a buzz word lately.

But I've seen that -- I'm a half Cowboys, half Chiefs fan so part of me died a couple of weeks ago, but the Chiefs are still alive.  So watching the Chief's games and seeing the advertisements that come up, you know, it brings great pride. So you see the promotions that we're coordinating with the carriers and their promotions of our devices so that we can bring those to market.

Q.   Okay.

THE COURT:  Mr. Waitley, pull the microphone a little closer, please.

THE WITNESS:  Sure.

THE COURT:  I want to make sure everyone in the room hears you.

Go ahead, counsel.

THE WITNESS:  Thank you, Your Honor.

MS. SMITH:  Thank you, Your Honor.

Q.   (BY MS. SMITH)  Now, I'd like to shift your attention to 5G phones generally.  When did Samsung launch the first -- its first 5G phone?

A.   Oh, we launched the first device in spring of 2019, approximately March.

Q.   Okay.  And who was first--Samsung or Apple?

A.   Samsung by about a year and three or four months.

Q.   Okay.  And who was the air traffic controller or point person in charge of that launch?

A.   Again, that was me.

Q.   Okay.  How was 5G marketed back at the time when it first launched?

A.   So when 5G was coming out, it was a new frontier.  It was going to solve a lot of speed and bandwidth issues, the videos were going to get more detailed, it was a lot of grandiose promises.  And it's been significant improvement, but, you

know, the carriers were competing with each other to gain customers, and from a network upgrade perspective, they were really selling the upgrade to 5G hard.

MS. SMITH:  Okay.  Now, if we could pull up JTX 8.34, please, sir.

Q.   (BY MS. SMITH)  Mr. Waitley, you were here during opposing counsel's opening statement.  Correct?

A.   I was.

Q.   Okay.  Does this look familiar to you?

A.   Yes.

Q.   And this is at least a part of a Samsung internal document.  Correct?

A.   That's correct.

Q.   Okay.  What I'd like to do is go to the first page of this document, which is at JTX 8.1.  And what do we see here, Mr. Waitley?

A.   So this document that included the previous slide was done by our consumer shopper and market insights group which continuously provides different surveys and reports to provide information to us.  And this was a portfolio forecasting report of Hubble, which was code name for the S20 5G device, which was going to launch -- this was December of 2019.  S20 was going to launch in three or four months in 2020.

Q.   And, Mr. Waitley, we see the word 'forecasting' very large on the front.  What does that tell us?

A.   It means it's just a forecast.  So this is -- and this is just one group's proposed possibilities of what might happen within the corporation of, you know, different elements that they include.

          MS. SMITH:  Now, if we could go back to Plaintiff's -- the slide Plaintiffs referenced at 8.34, please.  There we go.

Q.   (BY MS. SMITH)  Now, in Plaintiff's opening statement, did you hear counsel refer to Samsung and say that, quote, introducing 5G caused their market share to grow by nine percent?  Did you hear that statement?

A.   I did.

Q.   Was this forecast ultimately accurate?

A.   It was inaccurate.

Q.   Why not?

A.   I mean, we actually lost share -- from 2018 to 2019, our market share went down.  From 2019 to 2020 our market share went down.  So ultimately it was not accurate, and the interest -- part of it had to do with carriers' roll-out of their networks, but there's a lot of confusion around what 5G -- what you would get for having 5G included, and there wasn't the activity towards it as much as we had thought.

Q.   Okay.  How competitive is the smartphone market, sir?

A.   It's very competitive.

Q.   Okay.  And who are some of Samsung's competitors in the

United States market today?

A.    Apple, Google, Motorola, kind of the primary competitors these days.

Q.    How many patents does Samsung have?

A.    130,000 approximately.

Q.    And how much does Samsung spend annually on research and development?

A.    About $19 billion annually, and that's a global number, not just U.S.

Q.    Okay.  Sir, is there risk involved in innovation?

A.    Absolutely.  And Samsung prides itself on being an innovative company.  The risk is, you know, disappointment, failure.  But the great thing is, once you have a failure or disappointment, that's the first step to the next evolution of that product.  And very soon after you refine it enough, you see success.

THE COURT:  Mr. Waitley, I'm going to give you the same instruction I've given several other witnesses.  The question was, is there risk involved, and you said absolutely.  That was a complete answer.  What is the risk, how does it apply to us, all those other things you volunteered weren't in the question.

Please wait until the question is asked.  These lawyers on both sides are very capable, and if they want a witness to go beyond a yes or no, they'll ask another question.  Okay?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Let's continue.

MS. SMITH:  Thank you, Your Honor.

09:44    If we could pull up PTX 9, please.  And if we could go to the next page, sir.  There we go.

Q.   (BY MS. SMITH)  What is this, Mr. Waitley?

A.   This is a product management cover page to a document for our Galaxy A series device.

Q.   And what date do we see on this document?

A.   This is July 20th, 2021.

Q.   And how does that -- where does that date fall in relation to the launch of 5G?

A.   It's about two years after the initial launch of our 09:45 first 5G products.

Q.   So fair to say you know a lot more about the launch of 5G at this point?

A.   Yes.

Q.   Okay.

MS. SMITH:  If we could go in this document to page 30, please.

Q.   (BY MS. SMITH)  And you see that, Mr. Waitley?

A.   I do.

Q.   All right.  What are we seeing here?

A.   So this is a product profile page.  So we're trying to summarize the key components of it and its go-to-market aspects.  At the top, it says key USPs.  USPs is unique selling points, and those are, as I mentioned, screen, camera, battery, which is consistent across our devices.

     The second level below that is additional features, and there is reference to performance with 5G indicator and then also enhanced storage.

Q.   Okay.

          MS. SMITH:  And we can take that down, sir.

Q.   (BY MS. SMITH)  Now, Mr. Waitley, what are the main ways that people use Samsung phones today?

A.   We've seen consistently that for the most part people are texting, emailing, still calling some, although not as much with texting, checking email, checking weather, playing games, and short video-viewing.

Q.   Are those tasks what we'd call download intensive tasks?

A.   They are not.

Q.   Why not?

A.   Just doesn't take that much bandwidth in order to conduct those activities.  Most of them are short-term hits to the network, and it's not that much data that's being pulled down.

Q.   Okay.  Sir, you were in the courtroom, as we discussed earlier, when Doctor Kowalski testified.  Correct?

A.   Yes.

924

Q.    Okay.   Did you hear Doctor Kowalski testify that GComm's patent claims improve 5G download speed by 11 percent?  Did you hear that testimony?

A.    I did hear that.

Q.    Okay.  Have you had an opportunity to download something using any of the Galaxy phones you have in your pocket recently?

A.    Yes.

Q.    And that download was on a 5G network, sir?

A.    It was.

Q.    Okay.  Let's say that that download took about two seconds.  Do you follow me?

A.    I do.

Q.    What would it mean if the download speed was 11 percent faster?

A.    So 11 percent faster it means it was 1.8 seconds versus 2.

Q.    So the difference between 1.8 and 2?

     Based on your experience, is that going to help you sell phones?

A.    No, that's not going to help us sell phones.

Q.    If your team makes up an ad, and it says, folks, this new great invention is going to allow you, you know, to download a picture of your kid in 1.8 seconds versus 2 seconds, is that going to give you an edge in your competition?

A.   No, not at all.  It's silly.

Q.   Thank you, sir.

Now, were you familiar with the details of this case before this week?

A.   Briefly familiar with the general component of it.

Q.   Okay.  Now, you were here for Mr. Dell's testimony as well.  Correct?

A.   Yes.

Q.   Did you hear Mr. Dell tell the jury that GComm wants damages up to the year 2037, sir?

A.   I did hear that.

Q.   You heard that testimony?

When is the anticipated launch of 6G?

A.   The current targets that I've seen is approximately 2029 and 2030.

Q.   Now, sir, in your three decades in telecom, had you ever heard of GComm before this case?

A.   I had not.

Q.   Have you ever heard of Mr. and Mrs. Pitcock?

A.   I have not.

Q.   Thank you so much, Mr. Waitley.

MS. SMITH:  Your Honor, I'll pass the witness.

THE COURT:  Ladies and gentlemen, we're going to take a recess before cross examination by the Plaintiff.  If you will, just leave your notebooks in your chairs, follow all

my instructions, including not to discuss the case among each other, and we'll be back shortly to continue, as I say, with the Plaintiff's cross examination of the witness.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Ms. Glasser, are you prepared to go forward with cross examination?

MS. GLASSER:  I am, Your Honor, but I did want to ask Your Honor for clarification under a MIL before the jury comes in.

THE COURT:  What was your question?

MS. GLASSER:  So there was a MIL that made reference to foreign locations without leave and just given the fact that he extensively discussed both Korea and then suggested that Samsung Electronics America is in the United States, I would plan to do three or four questions about that topic with Your Honor's permission.

THE COURT:  What's your response, Ms. Smith?

MS. SMITH:  Your Honor, we are within the confines of Your Honor's pretrial ruling that we can say where SEA is located.  It is in the United States.  And we were very forthcoming and upfront about SEC being Korean, and I think

you said you can ask those questions but not go beyond that. And that's what I asked.

THE COURT: All right. Just so we don't keep the jury out any longer than possible, Ms. Glasser, you can approach and ask for leave, but I'm going to have to hear the question before I say you can or you can't. Okay?

MS. GLASSER: I have only a very, very small number of questions so it will probably be my first question.

THE COURT: Well, in light of Ms. Smith's lack of full mobility, why don't you tell me what your questions are now and we'll just do this bench conference in the courtroom before the jury comes in.

MS. GLASSER: Sure. So the questions would be around the fact that he pointed to a manufacturing facility but the phones are not actually made at that facility or in the U.S., and then also the fact that the entity with America in the name is actually controlled by the Korean entity.

THE COURT: All right. You have leave to ask him that the phones are not actually made at the manufacturing facility in or near Taylor, Texas. That's fine. The other question I think goes too far and I'm not going to grant you leave on this second question.

MS. GLASSER: Well, Your Honor, I'm trying to think what else I could ask. He did suggest it was an American entity. The concern we have is there was a statement made by

Samsung --

THE COURT: There are two entities in this case. One is Korean and one is American. It's owned by a Korean parent, but it's an American entity.

MS. GLASSER: It is actually fully owned and controlled by the Korean entity.

THE COURT: And it's a domestic U.S. corporation.

MS. GLASSER: The problem that we have with this is the door was opened to this by Samsung counsel when they made the suggestion to the jury that money that -- the quote was that money would be coming out of the U.S. if they rendered a verdict which was inappropriate on numerous levels, but I do want to make very, very clear for the jury that the money is not coming out of the U.S.

MS. SMITH: I think if that question was inappropriate, they've waived any objection they had to it, quite frankly. We're hearing about this 48 hours later.

I would ask for a point of clarification, Your Honor. The Plaintiff in pretrial wanted to get into the fact that Samsung is manufacturing in Vietnam and specific places like that, and Your Honor said they're not allowed to ask those questions.

THE COURT: No. My leave to Plaintiff to ask the witness to confirm that the manufacturing facility he testified about in Texas is not where the phones at issue in

this case are actually manufactured is not leave to then say where are they manufactured and hopscotch around the planet.

MS. GLASSER:  I have no plan to do that.

THE COURT:  It's just simply to confirm they are not made in Texas.

MS. GLASSER:  Of course.  The second issue is I think the jury was literally told if they rendered a verdict, there would be hundreds of millions of dollars that --

THE COURT:  I understand that, Ms. Glasser, but Ms. Smith is right, that was two days ago, and I don't know why I'm hearing about it now for the first time.

MS. GLASSER:  I mean, we've had a lot of references in this case to China many, many more than Your Honor has originally permitted.  We can't be hopping up every time there's an inappropriate reference to geography.  I think it would be highly disruptive.  We just simply want to briefly be able to clarify for the jury that the Korean entity is the one that controls the American.

THE COURT:  You can -- I will grant you leave that Samsung Electronics Company, Ltd., the parent, has control over Samsung Electronics America, the domestic subsidiary.

MS. GLASSER:  Understood.

THE COURT:  But I'm not going to grant you leave to talk about money flowing one way or the other.  Okay?

MS. GLASSER:  And just for clarity, can I introduce

it for context by referencing the comment by Samsung counsel?

THE COURT:  No.

MS. GLASSER:  Okay.

THE COURT:  All right?  I'll charge this time to both sides equally, and let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen. As I indicated, we'll proceed with cross examination of the Defendants' corporate representative, Mr. Waitley, by counsel for the Plaintiff.

Ms. Glasser, you may proceed with cross examination.

MS. GLASSER:  Thank you, Your Honor.

<u>CROSS EXAMINATION</u>

BY MS. GLASSER:

Q.   Good morning.

A.   Good morning.

Q.   I'll start where your counsel began, which was getting clarification about who the two Samsung Defendants are in this case.  You mentioned that the first one, which you abbreviate SEC, they are the Korean parent entity.  Correct?

A.   That's correct.

Q.   And the second one has the word 'America' in the name. Correct?

A.   Samsung Electronics America, yes.

Q.   Just to be completely clear, the one with America in the

name SEA, they are fully controlled and owned by the Korean entity.  Correct?

A.    It's a wholly-owned subsidiary.

Q.    And you also talked about a manufacturing facility that's located here in Texas.  Do you recall that?

A.    I do.

Q.    And just to be completely clear for the ladies and gentlemen, that manufacturing facility does not make any of the phones at issue in this case.  Correct?

A.    It makes semiconductor fabrication.  It does not make phones.

Q.    To be completely clear, sir, that facility does not manufacture any of the phones at issue in this case.  Correct?

A.    That's correct.

Q.    And you'd agree that the allegations in this case are serious.  Correct?

A.    I agree.

Q.    Now, you --

         MS. GLASSER:  Can we get PTX 9 on the screen?

Q.    (BY MS. GLASSER)  PTX 9 is a document that you talked about during your direct examination.  Correct?

A.    I don't know it by number.

Q.    Your counsel put up a document on the screen, and she talked about how this was an important document because it was from 2021.  Do you recall that, this document here?

A.    Yes.  Yes.  Thank you.

Q.    So let's turn to one of the pages that she did not look at with you, which is page 79.  And I think at one point in your examination, you said emphatically it is just silly to care about 11 percent speed.  Is that right?

A.    It was the translation of that into seconds that I was referring to.

Q.    Is it silly to care about 11 percent speed benefit?  Yes or no.

A.    It depends on the translation of that.

THE COURT:  Mr. Waitley, pull the microphone a little closer or speak up a little bit, please.

THE WITNESS:  Thank you.

THE COURT:  Go ahead, counsel.

Q.    (BY MS. GLASSER)  And is it silly for a customer who, for example, needs to download videos or do work functions on their phone, is it silly for them to highly value having their phone be 11 percent faster?

A.    From what I have seen, the translation of that into real time is not significant.

Q.    Let's take a look at -- now we have on the screen this page 79, and this is from that exact same document that you were looking at with your counsel, but it's a page she didn't show.  Correct?

A.    That's correct.

Q.   And what we see here is that people absolutely care about something like 11 percent.  What 49 percent of your customers said they value is the fastest speed available.  Correct?

A.   That's what this slide says, yes.

MS. GLASSER:  I pass the witness.  Thank you very much, sir.

THE COURT:  Redirect, Ms. Smith?  Is there redirect?

MS. SMITH:  There is not, Your Honor.

THE COURT:  Then you may step down, Mr. Waitley.

All right.  Defendants, call your next witness.

MR. CORDELL:  Your Honor, at this time Samsung calls Mr. Daejin Jeon.

THE COURT:  All right.

MR. CORDELL:  And he will be a translated witness, Your Honor.

THE COURT:  I understand that.

For the benefit of the jury, this witness is going to testify in his native language which is not English.  He is going to be aided by a translator, Mr. James Victory, and the translator has been previously sworn by the Court and qualified in advance of his testimony.

If the witness will come forward to be sworn.  If he needs the assistance of a translator for swearing in, that's fine.

All right.  Let's proceed with the oath.

934

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Thank you.  Please have a seat at the witness stand.

And, ladies and gentlemen, I'll remind you the important thing for you to do is to focus on the English question and the English answer and not be distracted by the interpretation process.

All right, Mr. Cordell.  You may proceed with direct examination.

MR. CORDELL:  Thank you, Your Honor.

DAEJIN JEON,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CORDELL:

Q.   Good morning, Mr. Jeon.  Could you please introduce yourself to the jury?

A.   Good morning.  My name is Daejin Jeon.  I am married.  I have one son.

Q.   And do you work for Samsung?

A.   Yes.

Q.   How long have you worked for Samsung?

A.   It's been over 20 years.  I have started working for Samsung since 1996.

Q.   What are your primary responsibilities at Samsung?

A.   I work on licensing in the intellectual properties

department.

Q.    And about how many license agreements have you reviewed over your career at Samsung?

A.    Over 100.

Q.    How many licensing negotiations have you been involved in at Samsung?

A.    Over 50.

Q.    Does Samsung respect intellectual property?

A.    Of course.

Q.    And why do you say that?

A.    We respect intellectual properties because we have our own intellectual properties as well.  We have many engineers who are working day and night to come up with new technologies and better.  Technologies and for these technologies, we have patents that we apply for and we have.  So I believe it's important to respect intellectual properties.

Q.    And does Samsung from time to time get demand letters from other companies and people?

A.    Yes, we do.

Q.    About how many demand letters does Samsung get every year?

MR. SHEASBY:  Your Honor, I object on relevance. The number of demand letters Samsung gets each year has no issues in this case.

THE COURT:  Overruled.  I'll allow it for

background.

Go ahead.

THE WITNESS:  It depends.  Each year we have different numbers.  However, on average 40 to 50 demands.

Q.   (BY MR. CORDELL)  Does Samsung take these demands seriously?

A.   Of course.

Q.   And does Samsung negotiate licenses with these folks in good faith?

A.   Yes, of course.

Q.   Does Samsung use NDAs to protect licensing negotiations?

A.   Yes, we do.

Q.   In all of your negotiations, has any company other than GComm refused to sign an NDA with Samsung?

A.   Never happened.

Q.   Are NDAs important to Samsung?

A.   Yes, of course.

Q.   Why?

A.   That's because we share confidential information when we start negotiating, we provide confidential information to them and sometimes we receive confidential information from them, and it is important that we protect these confidential information.

Q.   Does Samsung have a standard NDA form it uses?

A.   Yes, we do.

Q.   From time to time have companies simply signed Samsung's standard NDA without changes?

A.   On occasions, yes.

Q.   Do companies sometimes want to revise Samsung's standard NDA?

A.   Yes, that as well.

Q.   And when a party wants revisions to Samsung's standard NDA, what do you do?

A.   We work together.  It's an agreement, so there might be some confidential information that they want to protect, and as such, we do work together to revise it.

Q.   And has anyone from time to time wanted you to use their standard NDA form?

A.   Yes, that does happen.

Q.   And if someone wants to use their own form, what does Samsung do?

A.   We work with the form that they also suggested.

Q.   Have you heard of a company called ZTE?

A.   Yes, I have.

Q.   Did Samsung negotiate a license with ZTE?

A.   Yes, we have.

Q.   How long did the negotiations between Samsung and ZTE take?

A.   Multiple years.

Q.   Were the negotiations between Samsung and ZTE ongoing in

the year 2020?

A.    Yes, that's correct.

Q.    Was there an NDA in place that protected the negotiations between Samsung and ZTE?

A.    Yes, there was.

Q.    Which company's form was used for the NDA in the ZTE/Samsung negotiation?

A.    ZTE's.

Q.    In those years of negotiations, were there disagreements between ZTE and Samsung?

MR. SHEASBY:  Your Honor, objection.

THE COURT:  What's your objection?

MR. SHEASBY:  It's foundation.  Mr. Jeon was not involved in the ZTE/Samsung negotiations in any form in any way.  There's no personal knowledge of it.  So anything he would be saying on this would be based on speculation, hearsay, or double hearsay.

THE COURT:  All right.  What's your response, Mr. Cordell?

MR. CORDELL:  My response is that Mr. Jeon is part of the licensing department, it's a very small group, and they have weekly meetings every week where they discuss all of the ongoing negotiations and he was part of that week after week. I'm not asking him for a lot of specifics.  I just want general information about the way the negotiation happened.

MR. SHEASBY:  Your Honor, if that was the case, the person who did the negotiation should be testifying, but hearing it from someone who heard it from someone is the essence of double hearsay, which is what he's trying to recapitulate right now.

MR. CORDELL:  He was our corporate witness, Your Honor, and Mr. Sheasby questioned him at length about these very events and he was able to offer competent testimony as to these events.

MR. SHEASBY:  He testified under oath he had no personal knowledge of what happened, and so I don't understand how a corporate representative can come in and republish double hearsay under oath in a court.

MR. CORDELL:  Again, he's not relating what someone told him, he's relating events.  He's relating the fact that they had a negotiation and they reached an agreement.  These are events, and they're well within the knowledge of both Mr. Jeon and the corporation.

MR. SHEASBY:  He's already related to that and that is perfectly appropriate because it's an objective fact based on the agreement, the exchange of communications between those parties.  The person who negotiated that agreement for Samsung should be here testifying to that if someone's going to be here testifying to that.

THE COURT:  All right.  To the extent that

examination calls for a response that is beyond the personal knowledge of this witness, I'm going to sustain the objection. He's not going to come and testify under oath as to what someone else who actually did the negotiation within the group told him when there was a group meeting.  That is hearsay.

He is -- he was deposed as the corporate representative of the company.  He can state what the company's position is on these issues, but he's going to have to have personal knowledge as to direct interactions which he does not appear to have.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  So to that extent, the objection's sustained.

MR. SHEASBY:  Thank you, Your Honor.

Q.   (BY MR. CORDELL)  So, Mr. Jeon, to your personal knowledge, were there any disagreements between ZTE and Samsung during the negotiation instances?

MR. SHEASBY:  Your Honor, objection.  This is now leading because it -- he's going to translate that he has personal knowledge.  He needs to lay the foundation as to whether he was personally involved in the negotiations.

MR. CORDELL:  I am not going to limit my questions the way counsel insisted, Your Honor.

THE COURT:  Well, it is a leading question.  Rephrase it in a non-leading form.  But the question couched

in terms of what the witness has personal knowledge of is perfectly fine, and it should limit him from attempting to give information he doesn't have personal knowledge of.  So restate the question in non-leading form.  Otherwise, it's not precluded.

MR. SHEASBY:  Thank you, Your Honor.

Q.   (BY MR. CORDELL)  Mr. Jeon, are you aware of any disagreements that arose between ZTE and Samsung during the negotiation of their license agreement?

A.   Yes, there were.

Q.   And did those disagreements result in a lawsuit?

A.   No.

Q.   To your knowledge, did ZTE ever mention to Samsung anything about the GComm patents?

A.   No, no such comments.

Q.   Did -- to your knowledge, did ZTE ever threaten Samsung as part of their negotiations?

A.   No.

MR. CORDELL:  And can I have DTX 41?

Q.   (BY MR. CORDELL)  Mr. Jeon, parts of this are blacked out because of some prior rulings of the Court, so I don't want you to be distracted by that, but what is the document you see on the screen?

A.   This is a patent license entered into between ZTE and Samsung.

Q.   And how many patents were included in this license?  Was it tens?  Was it hundreds?  Was it thousands?  Can you give us an idea?

A.   In multiples of thousands.

Q.   And, in general, what technology does this license cover?

A.   Communications standards patents.

Q.   And what's the date of this agreement?

A.   July 9th, 2021.

MR. CORDELL:  We can take that down, Mr. Andryszak. Thank you.

Q.   (BY MR. CORDELL)  How did GComm first contact Samsung?

A.   There was a letter sent to us.

MR. CORDELL:  Can I have DTX 25 at page 4?

Q.   (BY MR. CORDELL)  Is this the letter?

A.   That's correct.

Q.   And what's the date of the letter?

A.   September 8th, 2021.

Q.   And did GComm tell Samsung where it got these patents?

A.   From ZTE.

Q.   Did GComm tell Samsung when it acquired these patents?

A.   No, no such mention.

Q.   Did GComm tell Samsung what technology these patents related to?

A.   It says LTE standards.

Q.   And remind the jury, what generation is the LTE standard?

A.    4G.

Q.    Did GComm make a FRAND offer as part of this September 8 letter?

A.    No.

Q.    Did Samsung respond to this letter?

A.    Yes, we did.

MR. CORDELL:  Can I have DTX 20?  And, Mr. Andryszak, can you scroll down, please?  Go to the next page.

Q.    (BY MR. CORDELL)  So the bottom email here looks like one from Mr. Pitcock to Samsung.  Right?

A.    Yes, that is correct.

Q.    And then the response, if we can go up, is this the response from Ms. Kim?

A.    That is correct.

Q.    And then if we can go up further, Mr. Pitcock wrote again on October 15.  Do you see that?

A.    Yes, I see it.

Q.    And what did Mr. Pitcock ask for?

A.    He says he did not receive the draft of NDA and that he would like to receive it.

Q.    Okay.  And did Samsung then respond by sending him a draft NDA?

A.    Yes.

MR. CORDELL:  Can you scroll up, Mr. Andryszak?  Maybe zoom out just a bit.  There we go.

Q.   (BY MR. CORDELL)  And so what is this October 18, 2021, communication?

A.   This is an email that we had sent to Mr. Pitcock.  It includes the draft NDA.

Q.   Why did you call it a draft NDA?

A.   As it states, it's a draft.  It's an initial writing, and it indicates that we have a willingness to enter into a more revised version.

Q.   Was this using the Samsung standard draft NDA?

A.   That is correct.

Q.   Do you consider the standard draft NDA from Samsung to be abusive?

A.   No, I don't think so.

Q.   Why not?

A.   It's a draft.  It's something that we can agree to negotiate further.

Q.   For the next almost one year up to September of 2022, did GComm ever send you a revised draft of the NDA?

A.   No, that never happened.

Q.   What did GComm do in March of 2022?

A.   Out of the blue, the legal action was initiated.

Q.   And by legal action, do you mean this lawsuit?

A.   That is correct.

Q.   In your experience, is that normal?

A.   No, not normal.

Q.   Why not?

A.   It rarely happens that during the negotiations that a lawsuit would be started.  We had already sent the letter back, we had sent a draft of NDA, and this is really out of the blue.

Q.   Did Samsung -- strike that.

Did GComm only sue Samsung in the United States?

A.   That's not true.

Q.   Where else did GComm sue Samsung?

A.   Brazil and the Netherlands.

Q.   And did GComm file a second lawsuit in Texas?

A.   Yes, that is correct.

Q.   Did GComm ever warn Samsung that it was going to sue them in Brazil?

A.   No, no such warning.

Q.   Did GComm ever even tell Samsung about the Brazil patent that it sued on?

MR. SHEASBY:  Your Honor, I object.  May I approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. SHEASBY:  The details of the patent that was asserted in Brazil is going to the specifics of the Brazilian case.  So in addition to being a violation of the MIL --

THE COURT:  I agree.

MR. SHEASBY:  -- it was openly done, and so I would ask an instruction for that to be completely disregarded because it's actually not even factually true.  I don't want to have to dig into it.

MR. CORDELL:  I'm only going to ask them whether they told them about the patent first.

THE COURT:  I'm going to sustain the objection to your question, which asked whether they told him about the patent first, and then we're going to move on without an instruction.  We're not going to go beyond the fact that a suit in Brazil was filed.

MR. CORDELL:  Understood.

THE COURT:  All right?

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  The objection is sustained. Let's move on to the next question.

Q.   (BY MR. CORDELL)  Did GComm ever use the lawsuit in Brazil as part of your negotiations?

A.   Yes, it has.

Q.   In what way?

A.   GComm asked us to accept this unreasonable offer since there was an action, a legal action, that had also been taken in Brazil already.

Q.   After GComm sued Samsung in the U.S. and in Brazil, did

Samsung walk away from any discussions?

A.   No, we have not.

Q.   Did Samsung reach out to GComm again to urge them to sign an NDA?

A.   We did make that request.

     MR. CORDELL:   Let me have DTX 30, the bottom email, the email of May 12th.

Q.   (BY MR. CORDELL)  What is this, Mr. Jeon?

A.   This is an email we had sent to Mr. Pitcock on May 12th, 2022, and basically it says that the offer that's been made to us is not a FRAND offer, and that in order for us to continue our discussions, we need the NDA.

Q.   And did you follow up again requesting an NDA later?

A.   Yes, we have.

     MR. CORDELL:   Can I have DTX 50 at page 5 and 6, the August 6th email?

Q.   (BY MR. CORDELL)  What do you say in your August 6th email, Mr. Jeon?  In particular, what do you mean when you talk about Samsung providing a draft non-disclosure agreement?

A.   As I have stated earlier, we had already sent the draft of the NDA, and we had asked for revisions if there were to be any to such NDA.  There was no response at all to the request for the revision, and that we were insisting that an NDA be entered.

Q.   And what did you tell Mr. Pitcock about his willingness

to negotiate?

A.   Basically stating that we were in good faith trying to enter into the NDA and into the negotiations; however, the -- GComm's unwillingness to enter into an NDA is an indication that they were not acting in good faith.

Q.   Now, at one point Mr. Pitcock suggested something like you would use the protective order.  Do you remember that?

A.   Yes, I do recall.

Q.   Is entering the protective order a good or possible alternative to an NDA?

MR. SHEASBY:  Your Honor, just an objection.  I let this go on for some time --

THE COURT:  You're going to have to speak up, Mr. Sheasby.

MR. SHEASBY:  This line of questioning has been exceedingly leading.  I object as the leading.  The answer is built into the question.  I sat down for some time, but I am going to lodge the objection now.

THE COURT:  I'll sustain the leading objection as to the last question.

Rephrase or move on, counsel.

Q.   (BY MR. CORDELL)  Mr. Jeon, did Samsung view entering the protective order as a viable option here?

A.   No, it did not.

Q.   Why not?

A.    That's because protective orders are within a legal action.  That's how you would use it to restrict the access to confidential information to outside counsels only.  However, the NDA is different.  It protects information that's broader than that, and it includes information to be disseminated outside of the country.

MR. CORDELL:  Now, let's look at your August 14 email, DTX 50, at page 4.

Q.    (BY MR. CORDELL)  And did you, once again, request an NDA from Mr. Pitcock?

A.    Yes, I have.

Q.    Does this say anything about modifications that you might accept to an NDA?

A.    Yes, it does.

Q.    And what did you tell Mr. Pitcock?

A.    I was telling him that we would like to continue the negotiations, and that in order for the negotiations to continue further, it's important that there would be an NDA entered by the parties and that I would be happy to accept edits if there were to be any and move on.

Q.    Did you follow up again on August 22nd?

A.    Yes.

Q.    And did you -- what did you ask on August 22nd?

MR. CORDELL:  Can I have pages 1 to 2?

THE WITNESS:  It's very similar.  In order for us to

950

discuss global FRAND negotiations, it was important that they would enter into an NDA with us and, as such, ask for edits to the NDA.

Q.    (BY MR. CORDELL)  Did GComm ever send you a mark-up of the Samsung NDA?

A.    No, that never happened.

Q.    Did ultimately GComm send you their own draft NDA?

A.    After about a year, yes, they did send us their draft.

Q.    Do you think it was reasonable or unreasonable for GComm to have refused to revise the NDA for a year?

A.    No, not reasonable.

Q.    Why is that?

A.    Both sides were aware of the importance of the NDAs, and it would not be reasonable for them to withhold sending these NDAs.  There were no revisions that were made, and for them to all of the sudden send their own draft NDA is not reasonable.

Q.    And did ultimately the parties sign an NDA based on GComm's form?

A.    Yes, we did.

Q.    And when was that?

A.    Sometime in November 2022.

Q.    And after that, did Samsung make any offers to license the patents to GComm?

A.    Yes, we did.

Q.    And what methodology did Samsung use to value the GComm

patents as part of that offer?

A.    The patents that GComm were holding were purchased from ZTE, and as such, we compared the value that we had assigned in the ZTE license to the offer that was being made to GComm.

Q.    How do you make sure you're comparing the right licenses?

A.    When we make comparisons, we look to similar technologies and similar companies.

Q.    And how do you figure out the number of standards essential patents that are involved in these licenses?

A.    That would be based on what's been declared as the standard essential patents.

Q.    In your experience, is that common or uncommon to look at the number of declared patents?

A.    That's correct.  That would be common.

Q.    Sitting here today, are there other agreements similar to this GComm situation that you know about?

A.    Yes, I am.

Q.    And what are those agreements?

A.    That's the agreement that we had entered into with Ox Mobile.

Q.    Why is that similar to this situation?

A.    Like the GComm patents, Ox Mobile patents were also purchased from ZTE and these were also declared as standard essential patents.

Q.    Has GComm ever offered a royalty rate that is anywhere

close to the agreements that you've been discussing?

A.    No.

Q.    Based on all your licensing experience, is it fair and reasonable for GComm to demand much higher rates than the other standards essential patent licenses?

A.    Absolutely not.

Q.    Mr. Jeon, is Samsung willing to negotiate a real FRAND license with GComm?

A.    Of course.

            MR. CORDELL:  Pass the witness, Your Honor.

            THE COURT:  Cross examination by the Plaintiff.

            MR. SHEASBY:  Yes, Your Honor.  And I'm going to be almost immediately getting into confidential -- sealed information.

            THE COURT:  All right.

            MR. SHEASBY:  Do you want to seal it now or do you want me to go five minutes and then seal?

            MR. CORDELL:  May I ask Your Honor if it's Samsung confidential.

            MR. SHEASBY:  It is Samsung confidential.

            THE COURT:  All right.  First of all, I prefer you wait to ask me until you're at the podium and not ask me as you're walking across the room.  But I think it's most efficient if I seal the courtroom now, but this sealing will exclude Samsung personnel since it's their confidential

953

information.

So I'm going to order the courtroom sealed.  If you're present and not subject to the protective order in this case and you are not Samsung employees, then you are to exit the courtroom and remain outside until the courtroom is reopened and unsealed.

(Courtroom sealed.)

978

(Courtroom unsealed.)

THE COURT:  Having done that, ladies and gentlemen it is straight up 12 noon by my clock.  We are going to break for lunch.  It should be there in the jury room waiting for you.  We will take approximately a 45-minute break for lunch.

During this time, let me remind you of all my earlier instructions, including not to discuss the case, any of the evidence, or anything about the trial with each other during this recess.  We'll have you back after that period of time, and we'll continue with the Defendants' case in chief.

With those instructions, the jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  The jury's left the courtroom.

Counsel, for your planning and information purposes, the Plaintiff has 3 hours and 45 minutes remaining.  The Defendant has 4 hours and 4 minutes remaining.  I'll look for your submission on the updated jointly proposed charge and verdict form by 3:00, as I instructed earlier.

I do need to work through the Rodermund disputes with you which we have not been able to reach so far, so I'm going to ask you to take about 25 minutes and at about 25 minutes after 12:00, meet me in chambers, and we'll take those up during the

remainder of this lunch break.

The Court stands in recess.

(Lunch recess.)

THE COURT:  Be seated, please.

All right.  Defendants, do I understand you have a deposition witness to present next?

MR. CORDELL:  We do, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back from lunch, ladies and gentlemen.  Please have a seat.

We'll proceed with the Defendants' case in chief.

Defendants, call your next witness.

MR. McKEON:  Your Honor, Defendants call Dr. Mang Zhu.  Doctor Zhu is the former chief IP strategy officer of ZTE, and the witness will be presented by videotaped deposition.

And the time allocation, Your Honor, is for Samsung, 7 minutes and 50 seconds.  And for GComm, it's 3 minutes and 1 second.

THE COURT:  All right.  Proceed with this witness by deposition, please.

MANG ZHU, Ph.D., BY VIDEO DEPOSITION,

Q.  Good morning.  Can you please state your full name for

the record?

A.   Mang Zhu.  First name is M-A-N-G, the last name is Z-H-U.

Q.   And where are you physically located today?

A.   Oh, I'm in Vernon Hills, Illinois.

Q.   What does ZTE stand for?

A.   There's no stand for ZTE.  ZTE is ZTE.

Q.   And where is ZTE Corporation headquartered?

A.   Shenzhen.

Q.   And where are you based?

A.   I'm based in Chicago.  I'm in U.S.

Q.   What is your current title?

A.   Oh, they give me a title as Chief IP Strategy Officer.

Q.   How many patents has ZTE declared to the 5G standard?

A.   Oh, I think we lost track the very last time.  I think we declared close to 4,000 or already over 4,000 family members. Some are granted; some are just applications.

Q.   How many patents were part of the Samsung/ZTE negotiation?

A.   How many claim charts we discussed?

Q.   Sure.  How many claim charts?

A.   We both discussed the 25 claim charts.

Q.   25?

A.   Yeah.

Q.   Maybe I'll ask a higher level question.  An individual patent could be essential to the 4G standard and the 5G

standard.  Right?

A.   Yes.

Q.   What is ZTE's FRAND framework?

A.   What is our FRAND framework?  We determine a license rate by looking at the different angles.  Then we use our -- use the top-down method to verify if the offer or the rate we -- we determined is in the range of verified by that top-down method.

Q.   Are you familiar with the market comparable approach?

A.   I know there are all different kinds of FRAND or the rate determination method.  There are -- top-down is one of the ones, and also they have -- it's called comparable license, not comparable market.  Okay.  So I'm not sure.  Maybe there is a comparable market.

And then there are some other ways of comparable stuff to determine a FRAND rate, and also it's all depends on the court, what court is taking.  Right?  So ZTE can only decide what we are going to do because we can only do at our ability, you know.

Q.   So if I understood correctly, you have been involved in three patent negotiations while you've been at ZTE.  Is that right?

A.   Yeah.

Q.   Were all of these negotiations protected by an NDA?

A.   Of course.

Q.    Why do you say of course?

A.    Any patent negotiation is under NDA.

Q.    Would you say that's industry standard?

A.    Yes.

Q.    Why do you say that?

A.    Because every single negotiation I has been involved in my whole career, about 20 some years, it's all under NDA.

Q.    How does ZTE determine if it is negotiating in good faith?

A.    Oh, we always negotiate following at least a general rule, you know, for issuing, you know -- the formatting of our communication matters and we giving all the information the other side needed.  And we negotiate patent to be very transparent, and also we give our offer explaining how we -- how our offer was -- basically means, and all that, so showing our willingness.

Q.    You were able to provide that transparency because an NDA is in place.  True?

A.    Yes.  Well, it's not because.  It's we have to.  Right?  But certainly we should under NDA because we give all the information.

Q.    Out of the 4,000 patent families that have been declared essential to 5G, do you know a range of how many U.S. patent applications have been charted to essentiality standards?

A.    We have been doing it since 2018.  So every year we have

a budget to do about 70, so it's like how many?  A little bit less than a thousand.

Q.   And it is correct that the patents that were sold to G+ were already existing families.  Correct?

A.   Yes, I believe they are filed before I joined the company.

Q.   And the patent families that were sold to G+ are focused on 4G.  Correct?

A.   At the beginning.

Q.   And bring up the first page.

First, just can you see Exhibit 15 on the screen, Ms. Zhu?

A.   Yeah.

Q.   So this declaration also lists ZTE as the IPR holder. Right?

A.   Right.

Q.   But it was submitted by Min Fang.  Is that right?

A.   Yeah.

Q.   It's okay.  How does ZTE determine whether to license a patent family itself as opposed to selling the patent family to someone else to do the licensing work?

A.   Oh, this is -- as I said, it's like a family-by-family difference -- I mean, case-by-case.  Right?  So these particular ones, as I said, like Dai, he has tons of patents. So this might be a inquiry or a fact, what fact asserting,

hey, I can sell Dai's patents more than the patents covering security patents. Honestly, we don't have so many security patents.

I would try to keep the security patents for these physical layer patents. Right? If we have already charted a hundred, then the 101, then the one can be sell. Right? So it's not really have to be a good one, better one, whatsoever, you know. It's more of if it will ever affect my licensing, you know, doing this and also if it will really make any revenue. Right?

Q. Okay. But just specific to your team, your team at ZTE did not provide any claim charts related to the patents it sold to G+. Right?

A. I don't recall. I don't think we did.

Q. Were you involved in all of those technical and business discussions?

A. I was involved in all of these technical and business discussions before COVID.

Q. Was there an NDA in place before these negotiations began?

A. Yes.

Q. Were any of those 25 patent families including any of the families that are in the -- that were sold to G+?

A. No.

Q. How do you know?

A.    How do I know?  Because I know.

Q.    When these negotiations began with Samsung, ZTE had not yet begun negotiating with G+.  Right?

A.    No.  No.  I'm not sure if anybody else started a negotiation with G+ or not.  But these patents were already identified to be in a package for -- for sale.

Q.    The patents that were later sold to G+?

A.    Yeah.

Q.    Okay.  And so were they purposely kept out of the Samsung negotiations?

A.    It's not purposely -- thank you.  It's not purposely kept out.  It's --

Q.    And has ZTE made contributions to 5G technology?

A.    Certainly, you know, in terms of the -- we started it from the standards development contribution.  Right?  So as in my -- actually Bryan showed my -- the -- the -- the -- the paper somebody wrote, if we have our dedicated standards research team and which may do the background simulations and the proposed new ideas that create patents.  And we have a front-end patent standards contributors which go to each standards meetings and make contributions.

       And also in 5G products, we are among one of the first companies that provide the 5G equipment for infrastructure and the build and the testing environment and all kinds of stuff.  So ZTE is one of the leading 5G, you know, in terms of

technology development as well as the product development company.

THE COURT:  Does that complete this witness by deposition?

MR. McKEON:  Yes, it does, Your Honor.

THE COURT:  Call your next witness, please.

MR. McKEON:  Your Honor, Samsung calls Mr. Fred Rodermund.

THE COURT:  All right.  Mr. Rodermund, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, sir, have a seat at the witness stand.

Let's distribute binders, counsel.

MR. McKEON:  Thank you, Your Honor.

THE COURT:  All right.  Mr. McKeon, you may proceed with direct examination.

MR. McKEON:  Thank you, Your Honor.

FRED RODERMUND,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKEON:

Q.   Good afternoon, Mr. Rodermund.

A.   Good afternoon.

Q.   Please introduce yourself to the members of the jury?

A.    Yeah.  My name is Fred Rodermund.  I live in Copeland, Germany, next to the Rhine River with my family, including two kids.  I work as a consultant for my own company IOTECC, and in my free time I like to do kite surfing.

Q.    And you prepared some slides to assist in your testimony today?

A.    Yes, I did.

Q.    Let's take a look at those, please.  And if we go to your first slide, what is your educational background?

A.    Yeah.  I studied electrical engineering with a full course on telecommunications at the Universities of RWTH Aachen, Germany, and Trondheim, Norway.

Q.    And what kind of experience do you have?  Well, let me ask you this question.  What is your current employment?

A.    Yeah.  I am the founder and managing director of IOTECC, which provides consultancy services around standards, technologies, and patents for the internet of things.

Q.    And could you explain what industry work you've done with respect to telecommunications standards?

A.    With respect to telecommunication standards, I have been working for cellular operators in the development of 2G standards, and later I've been working for ETSI in the development of the 3G standard.

Q.    And how many years have you been working with ETSI in the development of 3GPP standards?

988

A.    So my first ETSI meeting I attended in 1996, so which case it will be more than 25 years of experience.

Q.    And can you remind the members of the jury, what is ETSI?

A.    ETSI is European Telecommunications Standards Institute.

Q.    And how did your work with ETSI begin?

A.    Yeah.  So as I mentioned, first I was a delegate 1996, and then I worked also at ETSI in various projects.

Q.    Okay.  So you actually worked at ETSI, employed by ETSI?

A.    Yes.  That's true.  I worked in the technical areas of 2G standards development and 3G standards development.

Q.    And how long did you do that for?

A.    It was six, six and a half years.

Q.    And what was your title at ETSI?

A.    My title was secretary and project manager for several 3GPP working groups.

Q.    And what were your responsibilities while you were at ETSI?

A.    Yeah.  My responsibilities include to ensure that my working groups were working according to the rules and procedures and to ensure that the companies were aware about their obligations regarding the ETSI IPR policy, to manage the work plan.  But I also was custodian of the records, documents, and address specifications, and involved in public relation activities such as writing articles about specific standards.

Q.    And you are still involved with ETSI today?

A.    Absolutely.  My company, IOTECC, is an ETSI member.

Q.    And are you a delegate of some sort with ETSI today?

A.    Yes.  Attending 3GPP meetings, but I'm also attending the ETSI IPR committee.

Q.    Now, do you attend these ETSI and 3GPP meetings today?

A.    I do, yes, yeah.

Q.    And how many meeting have you attended in your -- in your career?

A.    I have attended more than 150 ETSI and 3GPP meetings.

Q.    And you mentioned the ETSI IPR special committee.  What does that committee do?

A.    That committee is responsible for the ETSI IPR policy and is also involved in maintaining the policy and trying to increase transparency around the application of patents in the standardization context as one example.

Q.    Did you do any other work related to standard essential patents outside of ETSI?

A.    Yes, I do.  My company offers a prior art research service which search during patent prosecution, but I'm also offering a seminar at the German University which is also -- where we just got a call to standard essential patents for the internet of things.

      And, furthermore, I have been called to the advisory board of a European Commission project about challenges -- to

990

greater study about challenges in the licensing of SEPs.

Q.   And have you offered any opinions in patent disputes in the past?

A.   Oh, yes, I have, several times all over the world.

Q.   About how many?

A.   I have been involved in about 40 cases.

Q.   And how about here in Texas?

A.   In Texas, I believe it was around seven cases.

Q.   And your prior work as an expert witness related to the compliance with ETSI IPR policy and FRAND behavior?

A.   Yes, it did several times, yes.

Q.   Has a Court ever qualified you as an expert in ETSI IPR policy?

A.   Yes.

        MR. McKEON:  Your Honor, Samsung offers Mr. Rodermund as an expert in the field of ETSI IPR policy and related FRAND obligations.

        THE COURT:  Is there objection?

        MR. SHEASBY:  No objection.

        THE COURT:  Without objection, the Court will recognize this witness as an expert and as indicated.

    Let's continue.

        MR. McKEON:  Thank you, Your Honor.

Q.   (BY MR. McKEON)  Now, Mr. Rodermund, can you explain for the members of the jury what is a standards development

organization?

A.    Yeah.  Standards development organizations, often also called standard setting organizations, develop standards and practices for the purposes of different devices from different manufacturers to work together in one system such as smartphones in a silicon network.

THE COURT:  Mr. Rodermund, would you please speak more slowly, please.

THE WITNESS:  Okay.

THE COURT:  You have a German accent, as we would expect you to, but we will understand you better if you will speak more slowly.

THE WITNESS:  Okay.

THE COURT:  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Please continue, counsel.

MR. McKEON:  Thank you, Your Honor.

Q.    (BY MR. McKEON)  And could you describe, you know, who is in ETSI?  Who is part of ETSI?

A.    Yeah.  You have different categories of ETSI members.  So first you have the carriers such as T-Mobile and AT&T and others, and another category are the infrastructure members such as Nokia, Ericsson providing base stations and other equipment, and furthermore you have the mobile device vendors such as for smartphone vendors Samsung, Apple, and others.

Q.   How does the standard get agreed upon in the first place?

A.   Yeah.  This follows a process of which I highlighted a high-level version here on this slide.  At first a new standard is planned, possibly announced, such as 5G.

Then you have the different working groups working on different parts of the standard.  They have many committee meetings over the development during which technical proposals are presented and discussed, like, thousands of technical proposals.

And some of these proposals are selected and finally agreed upon, and these -- some of these selected technical proposals makes up the standard in the end.

Q.   And how does the work on the standard get finalized and sort of captured for the future?

Yeah.  The work is captured in documents, and they are called technical specification.  Short, TS.  And -- yeah.

Q.   And how large is a complete standard generally?

A.   Yeah.  So each standard such as 4G or 5G comprises of several hundred of these technical specifications and, in total, you will have several 10,000 of pages for a standard.

Q.   And how long does the process of standardization take from start to finish?

A.   It depends on the standard.  It may be between one-and-a-half and sometimes even five years.

Q.   And how many features are covered in the 4G and 5G

standards?

A.    Oh, it's thousands.  I'm showing a page here, a slide which shows the content of -- a table of contents of just one of these several hundred documents.  And you can already see here there are hundreds of entries on the table of content indicating there are hundreds of features in just one single document.

Q.    And when was the 4G LTE standard released?

A.    4G LTE was released in 2008.

Q.    And when was the 5G standard released?

A.    It was in 2018.

Q.    Can you explain for the members of the jury what the ETSI IPR policy is?

A.    The ETSI IPR policy governs the framework and the rules under which patents are treated during standardization.

Q.    Okay.  And what does ETSI require for an owner of an intellectual property who thinks they have an SEP?

A.    Yeah.  There are like two main obligations required from the owner of a potentially essential patent.  The first one is that the owner is obliged to declare its patent to ETSI in a timely fashion.  And the second one is that the owner has to declare to make licenses available on his patents on a fair, reasonable, and non-discriminatory, FRAND, terms.

Q.    And what must an ETSI declaration include when you submit it?

A.   You have a declaration, basically contains a table which is a list of patents and standards and other related information.

Q.   And after a declaration is submitted, is it cataloged anywhere for the public to access it?

A.   Yeah.  After submitted, it's -- the information is stored in the so-called ETSI IPR database.

Q.   Now, when someone submits a declaration identifying a particular patent family as potentially essential, does ETSI make a determination of whether it actually is essential?

A.   No, nobody checks that because that's not practical considering that we have like 10,000s of patents declared to ETSI.

Q.   And are NDAs discussed in the ETSI IPR policy?

A.   No.  The ETSI IPR policy doesn't mention an NDA, but that's mentioned in a complementing document called the ETSI IPR guide.  As you can see here on my slide, this is an extract mentioning that NDAs may be used to protect the commercial interest of both parties.

          THE COURT:  Mr. Rodermund, pull the microphone a little closer to you, please.

          THE WITNESS:  Okay.

          THE COURT:  Thank you.  Let's continue.

          MR. McKEON:  Thank you, Your Honor.

Q.   (BY MR. McKEON)  Mr. Rodermund, can you provide an

overview of the events that you examined in this case?

A.    Yeah.  I examined timeline of events and actions of the -- of the parties, starting with the first letter sent by G+ to Samsung in September '21, and going over several actions from both parties and letters exchanged, and then the investigation or my analysis finished with the NDA being signed in November '22.

Q.    Okay.  Well, let's take a look at that.  What was relevant about the initial September 2021 letter for your analysis?

A.    Yeah.  So the initial letter was announcing at the G+ announced they were offering here highlighted patents which were practicing the LTE standard to Samsung.  And, furthermore, you can also see below that in this entry, the specification highlighted here is a 36 series specification which makes clear this was -- specification was related to the 4G standard.

Q.    And did -- in this initial communication, did GComm provide a royalty rate offer?

A.    No.

Q.    What was the next event in the timeline that you thought was relevant?

A.    In October 18, '21, Samsung sent the draft NDA to G+.

Q.    Was anything about the draft NDA relevant in your analysis?

A.    Yes.    The relevant aspect was that it was called a draft NDA and not just an NDA or final NDA.    Draft NDA was indicating that Samsung was willing to negotiate a contract.

Q.    Well, first, was it surprising or unusual based on your years of experience in this industry that Samsung would send an NDA in this -- at the beginning of this discussion with GComm?

A.    No, it was not surprising at all because NDAs are a common industry practice.

Q.    And why do you say NDAs are common industry practice?

A.    Well, first, in my 30 years of career, I've seen many NDAs.    I have been working with many companies.    I have signed many NDAs myself.    So I'm aware of this practice.

Second, Mr. Jeon from Samsung also confirmed they are using NDAs in licensing negotiations, as well as Doctor Zhu also confirmed that every licensing negotiation she have been involved in was under NDA.    So it shows that it's very common industry practice.

Q.    Thank you, Mr. Rodermund.

Have you ever -- in your 30 years in this industry, have you ever seen a company refuse to sign an NDA?

A.    No, I have never seen that.

Q.    And what was the next event in your timeline that you analyzed?

A.    So on January 20, 2022, G+ sent another letter to Samsung

saying that they think that an NDA is not required at this time.

Q.   Okay.  And in this letter where they communicated an NDA wasn't required, did GComm provide a -- a FRAND royalty rate?

A.   Yes, they provided also an offer, yeah, in this letter.

Q.   Now, we have a next event in your timeline.  What do you show here?

A.   Yeah.  This is a communication from -- February 8, 2022, when G+ sent the claim charts of two of the three asserted patents to Samsung.

Q.   Okay.  Let's go to the next event in your timeline here. What was the next event that was relevant in your analysis?

A.   The next relevant event was in March 14, 2022, when G+ filed a lawsuit in Texas.

Q.   And you've identified different events here.  How are the relationships of these events relevant to your analysis?

A.   Yeah.  So as you can see here, also highlighted in red, the time it took for G+ to compile the information about the offer and the technical information, it took them five months to bring this together and send it over to Samsung.  But then after just five weeks, they -- they sued Samsung in this court.

Q.   Thank you, Mr. Rodermund.

And what was the next event in the timeline that you found relevant to your analysis?

A.    Yeah.  The next event is the filing of the Brazil lawsuit on April 5th, 2022.

Q.    And at this point was there an NDA that was entered between the parties?

A.    No.  The NDA was still not signed.

Q.    Have you seen any of the evidence in the record that suggests that GComm told Samsung or gave them a warning that they were going to sue them in Brazil?

A.    No, I have not seen any evidence about a warning.

Q.    And were you in the courtroom when Mr. Pitcock testified?

A.    Yes.

Q.    And what was your understanding of the reason that Mr. Pitcock filed this lawsuit in Brazil?

A.    My understanding is that this was done to gain additional leverage towards Samsung.

Q.    Okay.  Now we have a next event in the timeline here. You've indicated May 22nd.  Can you describe for the members of the jury why this is relevant to your analysis?

A.    So here in this letter which I'm showing here, Samsung mentions that the offer made by G+ in their opinion is not FRAND.  Furthermore, they remind about the NDA which the thing is important to protect confidential information from both parties, and they would be happy to review any provided provision from G+.

Q.    And what was G+'s response to that communication that you

999

analyzed?

A.    Yeah.  In the response, they don't even mention the NDA. Instead, they mention that they at this point in time do not even know that they were limited to -- to FRAND terms.

Q.    And what was the next event in your timeline you analyzed?

A.    The next event is June 7th, 2022, when G+ filed another lawsuit in Texas.

Q.    And before we move on, what was -- what's your understanding of the reason that they filed that lawsuit?

MR. SHEASBY:  Your Honor, I object.  It's a violation of a motion in limine.

MR. McKEON:  And, Your Honor, this is -- this was disclosed in his expert report.  He's going to testify about the purpose of --

MR. SHEASBY:  It is in violation --

THE COURT:  Let him finish before you speak again, please, Mr. Sheasby.

MR. McKEON:  Your Honor, this was in his expert report, and this event here, the filing of the second lawsuit the jury's heard about already in this case, deals with the leverage -- getting discovery for the Brazil case.

MR. SHEASBY:  Your Honor, he's just testifying in violation of the MIL through his answer.  So I'd like to approach now if I may.

1000

THE COURT:  Can you identify the MIL you're referring to?  There are 20-something of them in this case or maybe 30.

MR. SHEASBY:  Yes.  It's G+'s MIL -- give me one moment, Your Honor.  It's MIL No. 3, G+ MIL No. 3.  It's also part of the default MILs, Your Honor.  Your default MILs would be any discussion of outside proceedings.

If I could explain this at the bench, I think I could move it along expeditiously, Your Honor.

THE COURT:  I can't hear you again, Mr. Sheasby.

MR. SHEASBY:  If you'd allow me to approach, I think I can explain it expeditiously.

THE COURT:  All right, counsel.  Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  Are you talking about other litigation?

MR. SHEASBY:  He's talking about other litigation. He's going to say that the purpose of this second Texas suit was to gain leverage in Brazil.  That is absolutely improper and he did it and he just did it intentionally by injecting it into his questioning.  He was testifying through questioning.

MR. McKEON:  Mr. Pitcock already testified --

THE COURT:  One at a time.

MR. McKEON:  I'm sorry.

MR. SHEASBY:  We are not allowed to talk about the

1001

substance of other litigations.  That's the express ruling Your Honor gave, just their existence.

MR. McKEON:  Mr. Pitcock already testified about this event, Your Honor.  This is already in the record.  It's the second lawsuit to get discovery to support the Brazil case.

MR. SHEASBY:  He did not testify to that at all.  He intentionally injected what the subject of it, to gain leverage in his question.

THE COURT:  All right.  There's been testimony that the litigation in Brazil was to gain leverage in the negotiations between G+ and Samsung here.

Are you telling me that the second lawsuit filed in Texas is not before the jury for the same purpose?  Are you telling me that has not come into the trial?

MR. SHEASBY:  I'm telling you there is no testimony that the initiation of the Brazilian lawsuit was for leverage.  That's not what he testified to.  And the subject matter of the -- what he's talking about is the second Texas action was to get discovery in the Brazilian action.

And so Your Honor already struck the exhibits that relate to that because it gets into the specifics of proceedings.

THE COURT:  Well, with regard to the Brazil action, no matter how you appreciate or understand Mr. Pitcock's former testimony in the trial, Mr. Rodermund has just

1002

testified that that was the reason, was that the Brazil action was undertaken, and that was testimony offered without any objection.

Now, with regard to the second action filed in Texas, I agree that ostensibly it was to gather discovery related to the litigation in Brazil. I don't remember any testimony so far, Mr. McKeon, that it was for the purposes of leverage.

MR. McKEON: Your Honor, all I was going to ask him was it was for the purpose of supporting the Brazil case, getting documents for the Brazil case. That's all I wanted to ask him.

THE COURT: Well, we are -- I have to draw a line somewhere as to how far or how -- where to stop going into this other litigation. And we're not going to talk about the reason for the second Texas litigation. Otherwise, we're going to talk about the reason for the Brazil litigation and it's going to be a slippery slope.

MR. SHEASBY: Your Honor, I just wanted to flag that I'm -- I just will do this in redirect, but I didn't object on the leverage because I think they've opened the door to the fact that by talking about leverage from the Brazil action, that we succeeded in the Brazil action, and that Brazilian court said it was not for leverage.

MR. McKEON: That's not --

THE COURT: We're not going to talk about the result

1003

of the Brazilian litigation.  I don't think the door's been opened to that.  But I am going to sustain your objection as to inquiry as to the purpose of the second Texas litigation.

MR. McKEON:  Okay, Your Honor.  I'll move on.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Let's proceed.

MR. McKEON:  Thank you, Your Honor.

Q.    (BY MR. McKEON)  All right.  Let's go to the next event in your timeline, and what do you show here, Mr. Rodermund?

A.    Yes.  In August, Samsung sent three more requests for a revised NDA to G+.

Q.    And what are you showing here on the next slide reflecting DTX 50?

A.    Yeah.  So on the slide here, I show there's three more requests from August 6, 14, and 22nd, which clearly indicate that Samsung was desiring the NDA, was pleading to get comments from G+, and also mentioned that whatever edits you propose the draft -- to the draft NDA, they would be happy to review a redlined draft.

Q.    And based on your review of the record, how many times at this point had Samsung requested that GComm enter an NDA?

A.    At least five times.

Q.    And is there any doubt in your mind based on your review of the record that Samsung was very clear about its desire to

1004

enter an NDA with GComm?

A.    No, there is no doubt.

Q.    And, sir, based on your review of the record, did Samsung insist on the terms or did they indicate a willingness to negotiate an NDA?

A.    No, we did not insist at all.  They invited comments several times.

Q.    And what are the final events on your timeline, Mr. Rodermund?

A.    So in October, G+ came to the negotiating table regarding the NDA and submitted their own template to Samsung which Samsung agreed to -- to take as a basis.  And then there was a pretty short negotiation until the NDA was signed in November 7, 2022.

Q.    And that NDA, is that DTX 425 that you have on your slide?

A.    That's correct, yes.

Q.    So in this situation, is it correct that it's GComm that proposed the template NDA in this situation?

A.    That's correct.  G+ proposed the template and Samsung accepted the template after some edits.

Q.    Okay.  Thank you, Mr. Rodermund.

        MR. McKEON:  Your Honor, I pass the witness.

        THE COURT:  All right.  Cross examination by the Plaintiff.  Proceed when you're ready, Mr. Sheasby.

1005

MR. SHEASBY:  Good afternoon, ladies and gentlemen of the jury.

CROSS EXAMINATION

BY MR. SHEASBY:

Q.   Mr. Rodermund, it is nice to see you again.  We've spoken before.

A.   Same here.

Q.   Now, I always refer to you as Friedhelm Rodermund.  Is it Fred or Friedhelm?

A.   Everybody calls me Fred.

Q.   Okay.  I apologize for calling you Friedhelm so many times.

A.   No problem.

THE COURT:  Let's call him Mr. Rodermund on the record.

Q.   Mr. Rodermund, I want to start by focusing on your relationship on this case.  And I didn't hear it, but I want to be clear about it.  You are a paid witness of Samsung's in this proceeding.  Correct?

A.   I'm paid by Samsung in this proceedings, yes.

Q.   You are not here representing ETSI.  Correct?

A.   That's correct.

Q.   How much are you paid on an hourly rate by Samsung?

A.   It's 470 Euros.

Q.   And I notice you didn't identify to the ladies and

1006

gentlemen of the jury, but you've been paid by Samsung to be an expert over four times in the last few years.  Correct?

A.   Four times out of 40 cases, yes.

Q.   So four times you've been paid by an expert by Samsung. Correct?

A.   Yes.

Q.   And each time that's when Samsung has been accused of infringement of violating people's patent rights.  Correct?

A.   That's correct.

Q.   And, in fact, a hundred percent of your expert witness work is -- has -- in the last few years is for defendants that are accused of patent infringement.  Correct?

A.   In earlier years, I also did some work for plaintiffs. But in the past --

        MR. SHEASBY:  Your Honor, I move to strike.

        THE WITNESS:  -- yes, that's correct.

        THE COURT:  One at a time.  One at a time, gentlemen.

        MR. SHEASBY:  I move to strike as non-responsive, Your Honor.  Anything -- the second half was responsive --

        THE COURT:  I understand your motion, counsel.

        THE WITNESS:  Should I continue?

        THE COURT:  All right.  The portion of the witness' answer that said, In earlier years, I did some work for plaintiffs, is non-responsive, and I order that struck.

MR. SHEASBY:  Thank you, Your Honor.

Q.   (BY MR. SHEASBY)  So just to be clear, four times, paid Samsung expert.  Correct?

A.   Yes.

Q.   Paid to be an expert in this case at $400 an hour.  Correct?

A.   I said 470 Euros, yes.

Q.   Euros is -- it's more than 400 U.S. because Euros are -- because of the exchange rate.  Correct?

A.   A little bit.

Q.   50 percent of your income is from being a paid expert witness.  Correct?

A.   About that, yes.

Q.   And a hundred percent of your work in the last few years, just like it has been every time for Samsung, is when defendants are accused of infringing patents.  Do I have that correct?

A.   Yes.

Q.   Thank you.

Now, you talked a lot about licensing to the ladies and gentlemen of the jury.  Fair?

A.   I talk also about licensing.

Q.   Yes.  You put up a timeline.  Correct?

A.   Correct.

Q.   You said they sued them here and they sent them letters.

You gave that full timeline to the ladies and gentlemen of the jury.  Correct?

A.    That's correct.

Q.    And that was to describe the license negotiation process between the people -- between the folks.  Correct?

A.    Yes.

Q.    The reality is you have never in your career negotiated a license agreement for patents when there has been an allegation of patent infringement.  Correct?

A.    I have never -- it was never my role to sit at the table of these licensing negotiations.

Q.    You do not do commercial negotiation.  Correct?

A.    That's correct.

Q.    You have never been employed by a company in which your job responsibility was to negotiate SEP license agreements.  Correct?

A.    That is correct.

Q.    And counsel for Samsung talked about your years and years of experience with license negotiation, didn't he?

A.    No.  Well, I have years and years of experience in this arena, but there's many other activities than sitting at the table of the negotiations.

Q.    And, in fact, you can only think of two instances in your entire career in the real world where you supported license negotiations.  Correct?

1009

A.   In two instances I supported licensing negotiations, but I have many other activities done in this working area of licensing negotiations.

        MR. SHEASBY:  Your Honor, I move to strike as non-responsive the second half of the answer.

        THE COURT:  Overruled.

Q.   (BY MR. SHEASBY)  So to be clear, two times as licensing in the real world.  Correct?

A.   Correct.

Q.   Never been hired by a company with a job responsibility to negotiate patents for SEPs.  Correct?

A.   It was never my role.  Correct.

Q.   And also you spoke about the IPR policy, the ETSI IPR policy.  Correct?

A.   That's correct.

Q.   And, in fact, you were designated as an expert on behalf of ETSI, if I heard it.  ETSI and FRAND was what your counsel said.  Correct?

A.   Correct.

Q.   The reality is you were never involved in drafting the ETSI IPR policy.  Correct?

A.   The policy was drafted in early '90s.  I was not involved.

Q.   And you have no role in drafting the ETSI guide for IPR policies.  Correct?

A.   That's correct.

Q.   Yes.  And in your CV you don't identify yourself as a license negotiation expert, do you?

A.   That's correct.

Q.   Now, if I may, I want to talk about something where I do -- well, you do have expertise in analyzing patents, though. Correct?

A.   I do.

Q.   And, in fact, you were here in the courtroom --

MR. SHEASBY:  If I can have the elmo, Madam Courtroom Deputy.

Q.   (BY MR. SHEASBY)  -- when Doctor Kowalski testified. Correct?

A.   No.

Q.   You were not in the courtroom when Doctor Kowalski testified?

A.   No.

Q.   You were -- you read Doctor Kowalski's report, though. Correct?

A.   I believe I read only a portion of it.

Q.   You did not provide any type technical rebuttal to Doctor Kowalski's report.  Correct?

A.   That's correct.

Q.   And, in fact, you have the ability to do technical analysis, like Doctor Kowalski did in his report, as to

1011

essentiality.  Correct?

A.    That's correct.  It was done by other experts in this case.  Yes.

01:44

Q.    So you have the ability to do that technical analysis. Correct?

A.    In principle, yes.

Q.    You are an expert on 3GPP essentiality.  Correct?

A.    I also can do essentiality checks, yes.

Q.    And you did not provide any opinion that any of the patents in this case are not essential.  Correct?

A.    Correct.

Q.    And, in fact, you didn't even take the time to analyze the --

          THE COURT:  Mr. Sheasby, slow down, please.

Q.    (BY MR. SHEASBY)  And, in fact, you didn't even take time to analyze G+'s patent portfolio, did you?

01:45

A.    I did not analyze the portfolio, correct.

Q.    So for the ladies and gentlemen of the jury, you came here to talk about license negotiation involving a patent portfolio that you didn't even review.  Correct?

A.    The patent portfolio was reviewed by other experts, as I mentioned, yes.

          MR. SHEASBY:  I move to strike as non-responsive, Your Honor.

          THE COURT:  Overruled.

Q.   (BY MR. SHEASBY)  You did not review the portfolio, did you, sir?

A.   Correct.

Q.   Now, I want to --

MR. SHEASBY:  Let's go to slide 18, if we may, Mr. Svenson.

Q.   (BY MR. SHEASBY)  You showed the ladies and gentlemen of the jury a section of the ETSI guidelines that says NDAs can be used.  Correct?

A.   Correct.

Q.   But you didn't highlight this bottom portion of the provision.  Correct?

A.   Yes, I did not highlight that part, yes.

Q.   And it says that if you use an NDA, it cannot be a barrier to engage in impartial and honest discussions.  Correct?

A.   It doesn't say the exact words, but, yes, it says that ETSI expects its members to engage in impartial and honest negotiations.

Q.   We all agree that it's improper to use behavior that blocks impartial and honest discussions under ETSI.  Correct?

A.   Yeah.

Q.   And you mentioned an NDA that was proposed by Samsung.  Correct?

A.   That's correct.

Q.    And you've expressed concerns about NDAs and reports you've been involved in.  Correct?

A.    Could you please repeat the question?

Q.    You were involved in reports indicating that sometimes there are abuses associated with NDAs.  Correct?

A.    I have been involved in the report where the situation was mentioned, but there are occasions when NDAs may be abusive or -- I don't know the exact words.  Yeah.

Q.    There's a potential for NDAs to be abusive.  Correct?

A.    There is a potential, yes.

Q.    Yes.  And this is the NDA that Samsung proposed. Correct?

A.    Yes.

Q.    Okay.  And you actually have never in your life negotiated a specific NDA agreement.  Correct?

A.    That's incorrect.

Q.    You have been -- you have seen several such agreements, but you have never negotiated such a specific agreement yourself--correct?--for SEP negotiations.

A.    Are you talking only about litigations and negotiations? Well, I have negotiated many NDAs myself, but not for licensing negotiations, yes.

Q.    Let me be as precise as I can.  For the standard essential patents at issue in this case, never in your career have you negotiated an NDA.

1014

A.   I've never in my career negotiated an NDA specifically for licensing negotiations.

Q.   Okay.  And you understand that Samsung offered you as an expert on FRAND licensing negotiations involving SEPs.  Correct?

A.   Correct.

Q.   Now, this is the NDA, or at least part of it.  Correct?

A.   That's correct.

Q.   And this NDA was kind of a condition that was required by Samsung for it to start negotiations.  Correct?

A.   No, it's not correct.

Q.   All right.  Why don't you turn to your deposition.  It should be in front of you.

A.   I have many binders here.

        MR. SHEASBY:  Your Honor, may I approach to assist the witness?

        THE COURT:  You may approach with a copy of his deposition, if it's not already up there.

        THE WITNESS:  Thank you.

Q.   (BY MR. SHEASBY)  And if you can turn to page 27, lines 4 through 14.

        THE COURT:  Counsel, do you have the same binder for the Court?

        MR. SHEASBY:  Yes.  One was handed up, but I --

        THE COURT:  I don't find it.

MR. SHEASBY:  I will make it happen.

THE COURT:  I have several up here.  It could be I misplaced it, but I don't find one.

MR. SHEASBY:  May I approach, Your Honor?

THE COURT:  You may.

MR. SHEASBY:  Thank you.

Q.   (BY MR. SHEASBY)  So we're looking at page 27, lines 4 through 14.  Correct?

A.   Sorry.  The small pages.  Right?

Q.   The small pages, yes.

A.   Page 27.  Which lines?

Q.   Lines 4 through 14.

A.   Okay.

Q.   Sir, the NDA that was sent by Samsung, "it was a kind of a condition -- kind of the thing which was required before the negotiation could start."  Correct?

A.   It's what I'm saying here, but what I meant is a condition to have an NDA, not specifically exactly the text which was proposed in the draft NDA.

MR. SHEASBY:  Your Honor, I move to strike as non-responsive and request permission to publish.

THE COURT:  I'll grant your objection.  I'm not sure you've established a basis to publish this.  You may ask additional questions of the witness, if you choose to.

Q.   (BY MR. SHEASBY)  When Samsung sent the NDA, "it was kind

1016

of a condition, right, to -- kind of the thing which was required before the negotiation were able to start." Correct?

A. An NDA was requested by Samsung for the negotiations to start, but they indicated that they are flexible regarding the content.

MR. SHEASBY: Your Honor, may I now publish the testimony?

THE COURT: You may publish it.

Q. (BY MR. SHEASBY) The question, referring to the NDA, "And this was sent before Samsung had made any offer or engaged in any substantive communications. Correct?"

Answer: "Yeah. It was kind of the condition, right, to -- kind of thing which was required before the negotiation were able to start."

Did I read your testimony correctly, Mr. Rodermund?

A. Yes.

MR. SHEASBY: Now, let's pull that back down and go back to the slides.

Q. (BY MR. SHEASBY) We saw these portions in the NDA. The NDA that Samsung signed required G+ to acknowledge that Samsung was negotiating in, quote, good faith. Correct?

A. Yes. Both parties were required to do this, yes.

Q. So the NDA that Samsung required G+ Communications to sign required G+ to acknowledge that Samsung was negotiating in, quote, good faith. Correct?

1017

A.   Yes.

Q.   And this NDA was actually sent after G+ had put Samsung on notice of infringement of the patents.  Correct?

A.   That's correct.

Q.   And you've been hired by Samsung and paid to be an expert on FRAND negotiation.  You talked about this NDA extensively with the jury.  Correct?

A.   Yes.

Q.   You have no opinion as to whether it was common and reasonable for a party to demand that notices provided -- notices of infringement that are provided are inadmissible evidence as a condition for entering into an NDA.  Correct?

A.   Could you please repeat the question?

Q.   You have no idea and you did not analyze whether the specific terms of this NDA that Samsung was proposing was proper.  Correct?

A.   I did not have to analyze all the terms because it was a draft NDA which was open for negotiations.

Q.   Sir, you did not analyze whether this NDA was proper. Correct?

A.   I analyzed the NDA.

Q.   Sir, you didn't analyze whether this NDA was abusive. Correct?

A.   I had looked at the NDA, yes.

Q.   Sir, you didn't analyze whether it was common and

1018

reasonable for Samsung to propose these terms, did you?

A.   Well, I did read the NDA--right?--but I did not analyze all the terms in detail because the NDA was not cast in stone; it was a draft NDA.

Q.   Sir, you have never been involved in an NDA for standard essential patents where there was a condition for entering into negotiation that the party has to acknowledge the good faith of another party.  Correct?

A.   Correct.

MR. SHEASBY:  If we can turn to slide 38, Mr. Svenson.  Or actually slide 40.

Q.   (BY MR. SHEASBY)  Mr. Pitcock proposed a number of alternatives--Federal Rule of Evidence 408, confidentiality agreements governed by courts--month after month after month. Correct?

A.   I recall at least one of the alternatives he proposed which was a protective order in this Court.

Q.   And you did not analyze that protective order to determine if there was anything insufficient about it. Correct?

A.   I made sure I got information about the visibility of the protective order from other experts, but I did not analyze it myself.

Q.   Sir, you're the expert for the ladies and gentlemen of the jury.  Correct?

1019

A.    I am not the expert on protective orders.

Q.    So for the ladies and gentlemen of the jury, when they see Mr. Pitcock again and again and again proposing a protective order, you can't provide any expert testimony on why Samsung would refuse that.  Correct?

A.    No, I'm not providing my own analysis, but I have listened to the analysis of other experts which was that the protective order was not usable for this litigation.

Q.    What expert did you listen to for that, Mr. Friedhelm -- Mr. Rodermund?

A.    Yeah.  I listened to Mr. Jeon of Samsung who explained that this was not a useful instrument for protecting the information because it, for example, protects the information in the sense with only outside lawyers can see it, so not the negotiating parties.  But I also spoke to Samsung counsel about it.

Q.    Oh, so the experts you spoke to were Samsung's counsel; the ones sitting at this table?

A.    Yes.

Q.    Okay.  So for the ladies and gentlemen of the jury, you purported to be an independent expert on the issue of the negotiation.  Correct?

A.    Yes.

Q.    You've been paid by Samsung four times to be an expert.  Correct?

1020

A.    That's correct.

Q.    And you relied on the expertise of the lawyers who are being paid by Samsung to defend them against these serious allegations.  Correct?

A.    Because this was a legal procedure, the protective order, so I relied on their expertise, yes.

Q.    Not your expertise.  Correct?

A.    My expertise sits with the NDAs, common industry practice, and that's the way to go.

Q.    And your expertise says nothing about whether these proposals were the equivalent of an NDA on its own.  You didn't do that analysis.  Correct?

A.    Sorry.  Could you please repeat?

Q.    Sure.  I'll even go -- NDAs are common.  That's what you just said to the ladies and gentlemen of the jury.  Correct?

A.    NDAs are a common industry practice, yes.

Q.    You didn't say anything about the terms that Samsung was proposing.  Correct?  In your testimony --

A.    Well --

        MR. SHEASBY:  I'll withdraw the question, Your Honor.

        THE WITNESS:  I'm happy to answer --

        THE COURT:  Let's talk one at a time.

        MR. SHEASBY:  I'm happy to withdraw the question.

        THE COURT:  Just a minute.  The witness and counsel

are going to speak one at a time. I am not going to have confusion in this record.

This is a witness who has testified more than once. This is not his first time in court, and this is a counsel who has tried many cases in this court and knows the rules exceptionally well. We are not going to speak at the same time. So I will expect that from this point forward.

Ask your next question.

MR. SHEASBY: Sure.

Q. (BY MR. SHEASBY) Now, you agree that Samsung can't discriminate against G+. Correct?

A. Correct.

Q. And you also agree that a common part of the standard practice in an NDA -- in an SEP negotiation is where one party is provided a technical analysis of why the patents are infringed, the other party --

THE COURT: Slow down, please, counsel. I know you're reading, but slow down.

MR. SHEASBY: Sure.

Q. (BY MR. SHEASBY) Sir, it's standard practice for when one party provides claim charts with a technical answer -- technical analysis for the other party to respond to that technical analysis. Correct?

A. Yes.

MR. SHEASBY: So let's go to slide 51.

1022

Q.   (BY MR. SHEASBY)  So you see the '130 Patent is designated as 5G.  Do you see that?

A.   I see that.

Q.   These other technical specifications are designated as 38.  Those are 5G technical specifications.  Correct?

A.   The one you highlighted, yes.

Q.   And down here, again, 5G technical specifications. Correct?

A.   Not all of them, but several, yes.

Q.   All the 38s are 5G technical specifications.  Correct?

A.   Yes.

Q.   And --

          MR. SHEASBY:  We can clear that.

Q.   (BY MR. SHEASBY)  Now, there are, indeed, many cases where essential patents can be very valuable.  Correct?

A.   Correct.

Q.   And not all standard -- the flip-side is that not all standard essential patents are valuable -- not all declared standard -- declared standard essential patents are actually standard essential.  Correct?

A.   Correct.

Q.   And you don't dispute that Samsung practices the 5G standard.  Correct?

A.   Correct.

Q.   And you believe that the 5G rate should be based on the

technical and commercial benefit of the patent and technology in comparison to the next closest alternative that was available at the time of the standardization.  Correct?

A.   This may be one of the evaluating factors.

Q.   Okay.  And --

A.   But there are others.  Right.

Q.   Yes.  And ETSI leaves the question of FRAND negotiations up to the parties themselves.  Correct?

A.   That's correct.

Q.   ETSI provides no definition of FRAND--correct?--other than fair, reasonable, and non-discriminatory.

A.   That's correct.

Q.   But ETSI does make clear a specific mechanism that is to be used if the parties cannot come to an agreement.  Correct?

A.   They mention a mechanism, yes.

          MR. SHEASBY:  And if we go to slide 26.

Q.   (BY MR. SHEASBY)  The mechanism if the parties can't come to a conclusion or an agreement is the national courts of law have the sole authority to decide the question of the FRAND rate.  Correct, sir?

A.   That's correct, but this is not in the ETSI IPR policy.

Q.   So this is in the ETSI Directed Guides on Intellectual Property Rights.  Correct?

A.   That's correct.

Q.   And it says that if the parties cannot come to agreement,

the sole authority to decide that question is the national courts.  Correct?

A.    That's correct.

Q.    This is a national court, isn't it, sir?

A.    Yes.

MR. SHEASBY:  Pass the witness.

THE COURT:  Further direct from the Defendants?

MR. McKEON:  Yes, briefly, Your Honor.

THE COURT:  While he's coming to the podium, Mr. Rodermund, you are going to need to speak up.  I want the jury to understand your answers, and given the softness of your voice and your accent, I am concerned that what you're saying isn't resonating with the fact-finder, the jury.

Please speak up and please speak slowly.  All right?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you very much.

Mr. McKeon, please proceed.

MR. McKEON:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. McKEON:

Q.    Now, Mr. Rodermund, you had some questions about your experience serving as an expert witness.  Do you recall those questions from counsel?

A.    Yes, I recall.

Q.    And just explain, if you can, the work you've -- let me

strike that.

Q.    Have you worked for both defendants and plaintiffs in your years of experience of serving as an expert?

A.    I've worked for both, yes.

Q.    And, now, you mentioned in your examination with counsel about you don't sit at the table during licensing negotiations.  Do you recall that?

A.    That's correct.

Q.    Okay.  And what do you mean by that?

A.    Yeah.  So I have broad experience in the area of FRAND negotiations and other IPR policy topics.  For example, I was responsible for implementing the ETSI IPR policy in the early days of 3GPP, including teaching at companies about FRAND obligations.

Furthermore, I am -- following seven years now, I am sitting in the ETSI IPR special committee, which is also responsible for FRAND negotiations and many other aspects on SEPs.

Also I was involved and supported many litigations where I got a lot of insight into the negotiation behavior of parties, and some of them I was also the one who was assessing the negotiation behavior.

Furthermore, I'm teaching a seminar on SEPs, which also includes -- besides patent strategy and other things, it includes also negotiation behavior in negotiations for

standard essential patents.

And, finally, as I mentioned, I'm also -- I've been called to the advisory board of the study of the European Commission which is specifically about challenges in SEP licensing negotiations.

Q.   Thank you, Mr. Rodermund.

Now, you were asked some questions about your deposition. Do you recall that?

A.   Yes.

Q.   And there is testimony about the kind of condition -- the kind of thing which was required before negotiation was able to start.  Do you recall that?

A.   Yes.

Q.   Can you put that in context, that testimony?

A.   Yes.  I said in my deposition it's a kind of condition to start the negotiations because what I meant is the NDA, which was requested from Samsung, was a kind of precondition to start exchanging confidential information, so to really enable the negotiation to kickoff.

So I never meant that this draft NDA was a condition to start the negotiations.  It was obviously not the case because Samsung signaled several times that they are willing to negotiate the NDA.

Q.   And in your years of experience, Mr. Rodermund, in this business, have you ever seen somebody refuse to sign an NDA

and, instead, say, We're not going to sign the NDA, but we're going to use a protective order in a litigation instead?

Have you ever seen that?

MR. SHEASBY:  Your Honor, objection; leading.

THE COURT:  Sustained.

Q.   (BY MR. McKEON)  Mr. Rodermund, let me ask this question. Is a protective order in a litigation, is that something you've seen used before in your many years of experience in negotiations for FRAND licenses?

A.   No, I have never seen that.

Q.   Now, you provided testimony about the technical benefit may be used in evaluating FRAND licenses.  Do you recall that?

A.   Yes.

Q.   Are there other things used in the industry to value patents in the context of FRAND licensing?

A.   Yeah.  There are several other approaches which are used. One very commonly used approach is the comparable license approach, which was also mentioned today, but there are also other approaches, like the so-called top-down approach, for example.

Q.   And have you seen those approaches used in your years of experience in this business?

A.   Oh, yes; sure.

MR. McKEON:  Your Honor, I pass the witness.

THE COURT:  All right.  Additional cross

examination?

MR. SHEASBY:  Just briefly, Your Honor.

THE COURT:  All right.  Proceed briefly.

MR. SHEASBY:  If I can have the elmo, Madam Courtroom Deputy.

RECROSS EXAMINATION

BY MR. SHEASBY:

Q.   Counsel just suggested you have much experience negotiating FRAND terms.  Correct?

A.   Well, I had a lot of insight in many negotiations, yes.

Q.   This was Samsung's -- this was G+'s original offer converted to a per-unit rate.  Were you aware of that?

A.   I've not looked into the commercial rates in this case.  That was not my role.

Q.   Okay.  And this was what Mr. Dell testified to yesterday as what Samsung makes per unit?

MR. McKEON:  Your Honor, I'm going to object based on the instruction that we're not going to compare offers with the damage case.

THE COURT:  This is beyond the scope of the expert's opinions in this case.  It's clearly outside his report.  He's already said that as to the first slide.  Let's take this down.

I'm going to sustain that objection.

Q.   (BY MR. SHEASBY)  You did not render any opinion

whatsoever in this case that the proposals that were made by G+, the financial proposals, were anything other than FRAND. Correct?

A.   I did not render any opinion on the proposals of both parties in this case.

MR. SHEASBY:  Pass the witness, Your Honor.

THE COURT:  All right.  Any further direct?

MR. McKEON:  Nothing further.  Thank you, Your Honor.

THE COURT:  Mr. Rodermund, you may step down, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  Ladies and gentlemen of the jury, we're going to take a short recess at this time.  I will warn you there are some things I need to take up with counsel outside of your presence.  I'm going to try to be as quick as I can.  This may be more than a short recess, but hopefully not.  We'll see.

If you will, leave your notebooks in your chairs; leave them closed.  Follow all my instructions, including not to discuss the case among yourselves, and we'll be back in court to continue as soon as possible.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  The Court stands in recess.

Counsel, I'll see you in chambers in about five minutes.

(Brief recess.)

THE COURT: Be seated, please.

Defendants, are you prepared to call your next witness?

MR. CORDELL: We are, Your Honor. In the meantime may I ask that Mr. Jeon be excused?

THE COURT: I assume there is no objection.

MR. SHEASBY: No objection, Your Honor.

THE COURT: Mr. Jeon is excused.

MR. CORDELL: Thank you. And with him, his interpreter?

THE COURT: Of course.

MR. CORDELL: Thank you.

THE COURT: Thank you for your help, Mr. Victory.

All right. Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT: I told you it might be longer than an ordinary recess. Please have a seat.

All right. We're prepared to go forward with the Defendants' next witness. Correct?

MR. CORDELL: We are, Your Honor.

THE COURT: Call your next witness.

MS. DEGNAN: Good afternoon. My name is Lauren Degnan. I represent Samsung, and Samsung calls as its next witness Dr. Paul Min.

THE COURT: Doctor Min, if you'll come forward and

be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand, sir.

All right.  Ms. Degnan, you may proceed with direct examination.

PAUL MIN, Ph.D.,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. DEGNAN:

Q.   Good afternoon, Doctor Min.

A.   Good afternoon.

Q.   Would you please introduce yourself to the members of the jury?

A.   My name is Paul Min.  I'm 64 years old.  I was born in South Korea.  I came to the United States 1977, so I spent pretty much all my adult life here in the U.S.  I'm married for 37 years and have three daughters, all grown up.

Q.   At a high level, what are you here to testify about today?

A.   I'm here to testify whether the '776 Patent and '130 Patent were the certain products that are accused from Samsung truly infringe those patents and the validity of the '776 and '130 Patent.

Q.   Did you prepare some materials to help you testify today

with the jury?

A.    I did.

MS. DEGNAN:  May we have the slides, please.

Q.    (BY MS. DEGNAN)  And while we're doing that, would you briefly describe for the jury your educational background?

A.    I went to the University of Michigan, got my BS, MS, Ph.D., from the University of Michigan in '80s.  So it's been a while.

Q.    Do you have fond memories of the University of Michigan?

A.    Yeah, now I do.

Q.    Why is that?

A.    You know, it's a place where I met my wife my freshman year.

Q.    I -- excuse me.

A.    You know, you know, I was a young man, so, you know, struggled through what I had to do to make it work.

Q.    Can you also describe your work history following your university work?

A.    So graduating from the University of Michigan in 1987, I went to work for Bell Corp. in New Jersey.  So like a Bell Lab, AT&T Bell Lab, but, you know, the local company version of it.  I was there for about three years.

Then I came to Washington University in St. Louis in 1990.  I've been there since -- ever since for 35 years.

Q.    What is your job responsibilities at University of

1033

Washington?

A.    Actually, it's Washington University.  I'm a senior professor over electrical and systems engineering.

Q.    Do you have any particular areas of research?

A.    I do communications and computing work and, in particular, related to wireless cellular communication and high speed networks like internet.

Q.    Do you have any other industry experience?  And by industry, I mean in the areas of telecommunications.

A.    Yeah.  So in the mid to late '90s, my former students and I got together, we started a couple of companies, and I ran those companies for about 12 years.  A lot of people from there end up making good career so actually quite proud of that.

Q.    Does your work in education relate to the subject matter of the patents in this case?

A.    Yes.

        MS. DEGNAN:  At this time we would tender Doctor Min as an expert in the field of telecommunications, including cellular communications.

        THE COURT:  Is there objection?

        MR. SHEASBY:  No objection, Your Honor.

        THE COURT:  All right.  Without objection, the Court will recognize this witness as an expert in those designated fields.

Please continue, counsel.

Q.    (BY MS. DEGNAN)   What was your task in this case?

A.    I was asked to respond to the GComm's expert, in particular with related to the infringement issues regarding '776 Patent and '130 Patent, and also the invalidity of or validity of the '776 and '130 Patent, and also respond to certain technical benefits and so forth.

Q.    What information did you consider in developing the opinions you've rendered in this case?

A.    Of course, you have to start with the patents-in-suit, the two of them that I am responsible.  Patent and patent publication, lots of technical documents, source code from Samsung and Qualcomm, and Doctor Akl and Doctor Kowalski who already testified, both of them, and their reports and the cited materials they used, and some deposition testimonies, and 3GPP technical specifications.

Q.    Now, did you go to Los Angeles to spend some time in the source code room?

A.    I did.

Q.    Were you there alone?

A.    No.  I was there with another gentleman who helped me, and I was there for two days and going through some really tedious source code from Qualcomm.  And I instructed the gentleman who helped me as to what to look for and how to go about finding things that we need.

Q.   Did you also go to a source code room in connection with the Samsung source code?

A.   Yes, I did.

Q.   Where was that?

A.   It was in New York City.  I was there for three days.  I had similar help in, once again, going through just lines and lines of the source code, looking for certain evidence to support some of the conclusions.

Q.   Are you being compensated for the time you spent in this case?

A.   Yes, I am.

Q.   What is your hourly rate?

A.   My hourly rate is $500 an hour.

Q.   And do you have a sense of how much you have been paid for your time in this case since you were hired?

A.   Over two years, about $300,000.

Q.   So at $500 an hour, is that a lot of hours?

A.   600 hours.

Q.   Now, in forming your opinions, what constructions of the patent claims did you apply?

A.   The patent claims that Judge Gilstrap issued for certain claim terms.  And those terms that are not construed by the Court, I used the plain and ordinary meaning.

Q.   Now let's turn to the '776 Patent.  And at a high level would you tell the jury what this '776 Patent relates to?

1036

A.   So '776 Patent relate to -- the title says "Cell Reselection Method and Terminal."  So, you know, I have my phone in my pocket, say.  It's certainly not doing anything for me, but it still has to be connected to the network because if it's not connected, if somebody wants to call me, it doesn't know how to reach it.  So that's called idle mode. It's not active idle.

In that period of time, I may be driving.  Right?  But my phone is in my pocket.  My cell may lose a connection to the one that's connected in which case the cell has to look for something else to connect.  That's called reselection.

Q.   Okay.  And what are you showing here in this illustration on slide 7?

A.   So in slide 7, it's a cellular structure with all the cells.  The one in the middle is the cell G, and that's the one that the phone is connected to.  And this cell selection involves if the condition of connecting to that cell G, the one in the middle, is somehow affected by whatever the reason, it must look for something else in the neighborhood.  So in this case we see six cells surrounding the cell G.  You have to find one that you can connect to.

Q.   Now, were the named inventors the first ones to come up with the idea for doing any kind of cell reselection?

A.   No.  The cell reselection is as old as the mobile communication itself.  I mean, the mobile communication is

1037

such that you move around, then, you know, there's no guarantee that you would be connected to anything. So cell reselection is a decade old.

Q.   Would you give the jury an example of a known way of performing cell reselection before the '776 Patent?

A.   Yes. And the '776 Patent has a background section, and in fact all the patents that I have read have a background section. What that section does is the inventors describe the state of art before they go on telling what their own invention is.

So through the background section of the '776 Patent, the inventor said what was known, and here one of the criteria it's talking about is called best cell reselection, a method also known as offset-based. Basically what it tells is look for the cell around you, the cell phone, and find the one that's ranked the best. That's what best cell reselection is.

Q.   All right. Do you have an illustration that will show how this best cell reselection also known as offset-based selection happened prior to the patent?

A.   Yes. So in best cell reselection, you basically measure the signal strength around. So in this case on the left serving cell is the one that you're actually connected to right now, your phone is.

Now, for whatever reason you need to do with selection, there are three other cells called neighbor cells, cell 1, 2,

1038

and 3 at the top in green.  So serving cell not providing enough signal quality, the phone will look for those other three cells and do some measurement.  The measurement is denoted here as RN 1, RN 2, RN 3, telling you those are the signal strength from those respective cells.

Q.   Doctor Min, after the measurements are all taken, what happens next?

A.   Well, you have to take into consideration, the first you do the ranking.  So you have this measurement so you rank them according to the signal strength.

And then you are making that connection.  That's the changing.  So if whatever you're going to change to cannot be just a little bit better, like when you refinance your mortgage, you don't want to jump around because it's just slightly there.  It has to be substantially there; it has to be worthwhile.  So you apply something called offset.  Whatever you're changing to must be that much better in addition, and that's called offset-based reselection.

Q.   Now, are there any costs associated with this best cell or offset-based reselection approach that predated the patent?

A.   Yes.  There is no restriction as to which one that you need to measure your signal, so you look for all the cells that your phone can find around you.  So there's a lot of computation going on, measurement going on, so the energy consumption is quite high.

1039

Q.    Besides this best cell reselection technique, were there other ways of performing cell reselection before the '776 Patent?

A.    Yes.  So in the background of the patent, it also describe a method called priority-based cell reselection method.  So what that is is there is a certain priority among the frequencies that are known.  It could be that, you know, your network provider tells you use like a more recent frequency or pitch to 5G instead of a 4G.  There is a priority among them.

Then the -- my phone, if it trying to reconnect, will look for the cells that has those frequencies that has a higher priority.

Q.    Besides signing priority based on the frequency the cell uses, are there other criterias that were used prior to this patent to assign priority to cells?

A.    Yeah.  So, for example, even if the cells have same frequencies, they may be one cell might be very congested, lots of people there, so the load condition of that particular different cells may also affect the priority as well.

Q.    Do you have an example for the jury on how priority-based reselection prior to the patent worked?

A.    Yes, I do.

Q.    Would you walk us through it, please?

A.    So here your cell set on north by some kind of

1040

instruction from the network what the highest priority frequency that you should look for.  So in this slide, and it looks complicated, but each cell has a name, cell A, B, C, D, and so forth, has two numbers.  One in the circle is the priority of the cell, and then one in the diamond is the frequency of the cell.

So that in the priority-based reselection, it look for the one that has the highest priority, in this case priority 1.  So cell A nearby has the priority 1, and then look for that, and then that happen through the highest, there's nothing else higher, so the cell phone will be connected to that right there.

Q.   Would you describe for the jury the problem that the '776 Patent identified in these pre-existing cell reselection methods?

A.   So '776 Patent inventors thought that because, you know, sometimes the priority 1 I just talked about may not be just a single frequency.  Maybe there's different cell nearby that has a different frequency, not the same as this one, but has also the same priority.

Their view, the inventors', thought that the existing method was not adequate to describe the same priority but different frequency.

Q.   Do you have an illustration to demonstrate this difference to the jury?

A.    Yes.

Q.    Okay.  Will you walk us through it?

A.    Yeah.  So here on the screen the serving cell -- the current serving cell is the one in the middle.  This phone has to reselect.  It has to look for the priority -- the frequency that has a high priority.

Now, it happens so that the cell A, C, E, has all priority 1, the red circle number 1, and also happened to have the same frequency, 2, 2, 2.  And the inventors thought the problem was that if this is the case, you look for the cells not only with the same priority but also the same frequency.

Now, note that the cell B at the top also has number 1, the priority 1, but the frequency of that cell B at the top is 1 which is different from the rest.  So that got the signal in the process at the time the '776 Patent was applied.

Q.    I'm not sure I heard you right.  Did you say that cell B would be ignored because it has a different frequency?

A.    Yes, that's correct.

Q.    All right.  So did the -- what was the alleged improvement that the '776 Patent came up with?

A.    It says, look, there may be other cells with the same priority on a different frequency.  Let's include that in consideration as well.

Q.    Okay.  So do you have an illustration here for the jury?

A.    Yes.

Q.   All right.  Walk us through it, please.

A.   What it does, it's basically a two-step process.  The first step is to identify all the cells with the same priority, all number 1s in the red circle regardless over what frequency they're on.  So it identifies cell A, B, C, and E, excluding the one you are currently connected to which is G, they'll all be considered -- put together as a group first.  So that's the first process.  And that's called the same priority cells because they have all the same priority.

     And then as a step 2, among those same priority cells, you apply the best cell reselection principle, which is looking for the signal strength.

Q.   And in this example, could the cell phone in G, cell G, actually go to cell B?

A.   Yes, in this case that is correct.

Q.   Now, in this alleged improvement, does the cell phone look at every single possible cell around it?

A.   No.

Q.   Why not?

A.   Because it's got the two-step I have labeled 1 and 2, using figure 1 from the '776 Patent.  It involves the first step is you identify a group of cells that has the same priority, put them together.  And then the second step, you look for the best cell among them.

     So the other cells outside of that same priority are not

considered.  For example, some of the cells have a different priority like a cell F and D, priority-3, they're not going to be considered.

Q.    Would it be fair to say that the alleged improvement here does more work than the priority-based approach the patent criticized but less work than needed to look at all possible cells?

A.    Yeah.  That would be correct.

Q.    Sort of a happy medium?

A.    Somewhat, yes.

Q.    Do we see that happy medium approach reflected in the asserted claims here?

A.    Yes.  The language that's highlighted as a 1 and 2 on claim 1 correspond to that two-step process.  The first, the green, is the one that actually put together a subgroup, same-priority cells, multiple cells with multiple frequencies that has the same priority, put them as a single group.  And then second step is looking for the best cell among them.

Q.    All right.  Moving on then to invalidity, would you summarize for the jury your opinions as to whether the claims of the '776 Patent are invalid?

A.    Yes.  So it's my opinion that the asserted claims of the '776 Patent are invalid due to two reasons.  Number one, they are related to the patent ineligible subject matter; and, number two, the invention recited in the patent claims are not

new and is obvious or were existing out.

Q.   All right.  And in performing your analysis, did you examine the issues from the perspective of a person of ordinary skill in the art at the time of the invention?

A.   Yes, I did.

Q.   And tell the ladies of the jury, if you would, who is that person in your opinion?

A.   So what that means is so what is this patent written for, for its audience.  A POSITA would have had a Bachelor's degree in electrical engineering and two years of work experience with wireless communication technology.  And if you could have an additional degree like a Master's, then you can have less experience.

Q.   Now, do you meet the test of a person of ordinary skill in the art?

A.   I exceeded that POSITA test definition.

Q.   Well, given that you exceed it, how are you able to do the analysis from that person's perspective?

A.   This is what I do for a living.  I'm a teacher and I teach to my students.  So whatever I teach, I need to think how am I going to explain this so that they can understand. You know, I do this work all the time.

Q.   All right.  With that background in evaluating whether the claims are invalid for lack of eligible subject matter, what was your task?  What were you looking for?

1045

03:29

A.    The task that I performed is what is cited in the claim, the invention, only covers activities that were well-understood, routine, and conventional at the time of the patent -- at the time that the patent was filed.

Q.    So in doing your analysis, what date did you use for the '776?

A.    September 19, 2008.

Q.    All right.  So which claims did you assess using this criteria?

03:29

A.    Claims 1 and 2.

Q.    Okay.  So at a high level, what is claim 1?

A.    So claim 1 conceptually at a high level, so I have highlighted some portions, is about performing cell reselection, you know, the one that you're looking for the next cell while the phone is idle, on a multiple frequency, not just one at a time, the multiple frequency will have the same priority, which is called second priority, something

03:30

other than the one that the current being served on your serving cell.

And then you do the two-step thing that I talked about.  So same priority cells are first found as a group, and then the second step is you find the fastest cell among them based on some kind of a signal criteria.

Q.    Okay.  How is claim 2 different, if at all?

A.    So the claim 2 is essentially the same except from the

perspective of terminal. So it says a terminal used to, that means your cell phone or likewise, whereas claim 1 is about method. So it means something -- some steps that have been performed. But what is recited is essentially the same.

Q. Okay. When we see the language in gray, first reselection module and second reselection module, what sort of hardware would be doing the -- the steps associated with those modules?

A. We're talking about some kind of a processors like a computer processors, but processors that are used in the cell phones and 5G devices, and then some memories attached to it.

Q. As of September 2008, were processors and memory well-understood, routine, and conventional?

A. Yes, of course.

Q. Okay. And with that -- with that overview, can you explain to the jury how you went about showing the claims are full of elements that are well-understood, routine, and conventional?

A. Yes. So the test is what is recited in the claim, some activities or concept. I need to identify what they are. So I put together a list before I make a decision as to the order activities or concept in the claim were well-understood, conventional, routine, and all that. So what I did was coming up with a list.

Q. So based on your own experience over the past 30-plus

1047

years, are all the activities you identified in your list well-understood, routine, and conventional?

A.    Yeah, that is my opinion.

Q.    Okay.  Well, have you found any evidence in the record that supports and corroborates your opinion in this regard?

A.    Yes, I did.

Q.    Would you give the jury an example?

A.    So as I mentioned, the background section is what inventors view as what was known, the current state of art at the time.  So I look at the background section of the '776 Patent itself.

Here on the left I highlight some portion.  Now, this talks about those R values, the signal strength, and so we're talking about best cell reselection which is checked near the bottom.  And then it talks about the offset-based, the Qoffset, all as a part of the background section.  So I checked the offset-based reselection.  And then, of course, this whole thing is about cell reselection so I checked that as well.

Q.    According to the patent, was anything else on your list also well-understood, routine, and conventional by September 2008?

A.    Yes.

Q.    What -- where did you find that?

A.    So, once again, in the background of the '776 Patent, it

1048

talks a lot.  The inter-frequency neighboring cell, you know, the inter-frequency meaning something different from yours. So if you are in frequency 1, if your neighbor is frequency 2, changing over that is inter-frequency.

So we're talking about having a serving cell priority. So the current cell is a serving cell, is a first priority, and some other frequency, that reselected cell that has a second priority, and that's disclosed right here.

And, of course, it talks about at the bottom of this -- what's shown on the left-hand side, it talks about a cell on a higher -- on a frequency with a higher priority, and then serving cell, and you get the reselection, and then use the offset-based.  So all this concept, I can just check just from the background section of the '776 Patent.

Q.   Were you referring to column 1, starting at line 66 to column 2, line 44, in this part of your discussion?

A.   Yes.

Q.   All right.  Does the patent teach that the last item on your list, absolute priority of the cells being equal to the absolute -- excuse me.

Does the patent teach that the last item on your list is also conventional, well-known, and routine?

A.   Yeah, it does.

Q.   Where did you find that?

A.   Once again, it's all part of the background.  And so here

I highlight on the left-hand side, and this is found from the patent column 2, line 2 through 11, the terminal first ranks the frequencies based on their absolute priority and finds out the frequency of the top priority and so forth, and in fact, of course, this is the priority-based reselection method.

Q.   Did you find any other evidence besides the '77 [sic] Patent itself that supports your opinion that all the elements on your list are well understood, routine, and conventional as of September 2008?

A.   Yes.  So the background section tells you what inventors knew.  And I can go out and look for something else and what other people are doing, and that's called prior art.  As shown here, I identified four referenced document shown on the left.

Q.   Just for the record, would you tell the jury what they are and what you're going to refer to them as you go on?

A.   Yes.  So they're all on the left two column near 2007 and 2008 time frame.  The first one is R2075041.  I'm just going to pull it out to document.  Okay.  And that's the JTX 20. Iwamura document, DDX 159; Lee document, JTX 19; Cho document, 162.  I just used those as examples.

Q.   All right.  Do these four documents show that cell reelection was well understood, routine, and conventional before September 2008?

A.   Yes.

Q.   Would you give an example to the jury, please, from your

slide?

A.    Yes.  So the oldest document I have highlighted for corresponding portion, but I use the Cho document as an example.  This one on the left top one, the title of the document is "Cell Reselection," and every other document has similar disclosure.

Q.    Are there any other activities on your list that these exemplary documents show were well-understood, conventional, and routine?

A.    Yes.  So the next one is the best cell reelection, also known as offset-based.  And the Court construed the meaning of that to be you have to use this variable called Qoffset and reselection.  And each of these documents -- and I used the Cho document again, and each of the Cho documents shown on the upper left in corner box, the Rn, you know, the ranking, the signal strength, utilizes that same variable, the Qoffset, as a part of the reselection criteria.

Q.    Are you referring to column 8, lines 46 to 55, here for Cho?

A.    46 to 55.

Q.    And that's DTX 162?

A.    Yes.

Q.    Well, was priority-based cell reselection also well understood, routine, and conventional before September 2008?

A.    Yes.

Q.   What evidence do you have of that?

A.   Well, once again, those four documents disclosed there, and I used the DTX 162 Cho as an example.  So here as I highlighted, when the priority is provided on the network, and I also highlighted UE performs the inter-frequency measurement and inter RAT measurement according to the priority, all part of a reselection.

Q.   Is there another document on this slide that you could highlight for the jury for the same concept?

A.   Yeah.  So I use this R2 document, which is the bottom left side.  Now, this one is -- just spells out priority-based scheme and also talks about the absolute priority between frequencies as well.

Q.   Are you referring to JTX 20 under the heading No. 2, inter-frequency load balancing?

A.   Yes.

Q.   All right.  Was it also well-understood, routine, and conventional before September 2008 for the priority to be equal to the absolute priority of the corresponding frequencies?

A.   Yes.

Q.   How do you know?

A.   Well, this example, once again, the R2 document on the upper left-hand corner, the priority -- by the way, this R2 document actually compares two different schemes that are

well-known, and one of which happened to be the priority-based scheme. And it said clearly it utilizes absolute priority between frequencies.

Q. Now, just so the jury -- we're all clear, when it talks about the priority corresponding to the frequencies, what are the frequencies referred to?

A. The frequencies of a different cell.

Q. Was that information that the cell receives from somewhere in the network?

A. Yeah, it -- the base station, the system, when your cell phone gets first connected, will receive what's called a system information. So, you know, the UO phone has to know what system it's getting connected to. So the system information has to come from the base station when the phone is first connected. That system information is -- contains things such as, okay, this is the priority of cells that you're going to use among other things.

And, in fact, the Cho document that I show here on this slide, two excerpts from Cho document, right-hand side, the upper and lower one, it talks about the UE, the user equipment, your cell phone, receiving those system information that include the priority -- the absolute priority of the frequencies.

Q. Okay. And for the -- were you referring to, for the Cho, lines 9:58 to 64, and lines 6:25 to 33?

A.    Yes.

Q.    All right.  Was the fact that cells operated on different frequencies something that was also well-understood, routine, and conventional before September of 2008?

A.    Yes, it was.

Q.    All right.  Is the range you highlight on one of your documents for the jury, please?

A.    Yeah.  So I just use the Cho document here.  So the Cho document in the context of the cell reselection, it talks about the different frequency bands.  So, you know, the cell tower has many frequency band.  And the different EUTRAN, that's ITE, frequencies were different inter RAT.  The RAT with respect EUTRAN method 4G, they are talking about 3G or 2G.  So different frequencies.

Q.    And for Cho, was that at column 9, line 26 to 41?

A.    Yes.

Q.    All right.

        THE COURT:  Ms. Degnan, can you slow down some, please?  You are awfully fast.

        MS. DEGNAN:  Thank you, Your Honor.

        THE COURT:  Thank you.  Let's continue.

Q.    (BY MS. DEGNAN)  Was grouping cells into a subset in making a selection therefrom something that was well understood, conventional, and routine as of September 2008?

A.    Yes, it was.

Q.    Can you give the jury an example?

A.    So, you know, if you think about the -- what -- what -- what is that really about?  We are talking about two step.  So you have all this possibilities.  I give you an example using like ordering food from restaurant.

So I go home to my wife tonight, say, and she and I talk, what do you want to eat tonight?  She says Mexican.  She loves Mexican.  And I say barbecue.  Okay.  And, you know there are many possible different cuisines.  Right?  But we chose those two specific cuisine type.  Over all the possible restaurant types, two of us decide to narrow down to something that is much smaller.

So that's the first step basically like, you know, the two-step cell reselection process.  So the first time, the first -- you select certain cells based on its priority.

Now, like ordering food, I apply the second criteria, which is, okay, now we narrow down to Mexican and barbecue.  You know, we don't want to spend too much money so let's look for $2 signs or maybe a rating graded, you know, or whatever.  That will enable me and my wife to pick a specific restaurant.

And in the claim, the second step is, okay, now you have the same priority cell.  You apply the best signal one.  So that concept is very well-understood and conventional and routine.

Q.    Is there any aspect or activity of claims 1 and 2 that

was not well-understood, routine, and conventional before September 2008?

A.    I don't think so.

Q.    Was the ordered combination of the claim elements well-understood, conventional, and routine before September 2008?

A.    Yeah.  It's basically applying the first step with the one criteria and the second step with the 2 criteria, of course it was.

Q.    Let's move on to your other invalidity opinions.  Can you summarize for the jury the other reasons you found claims 1 and 2 invalid?

A.    So if a claimed invention is known, anticipated by another prior art, in other words, something that exist before, then it is invalid.  I think we call that anticipation.  Or you could have a combination of two, two document.  So I find the Cho document that I've been using as an example anticipates claim 1 and Cho document in combination of -- with the R2 document renders that claim 1 obvious.

Q.    Okay.  What are you showing in this table with respect to the first column?

A.    So the claim language is long, so just to -- for the ease of reference, I've broken down and then I sort of like I gave it a label 1-Pre, 1-a, and so forth.

Q.    All right.  Since we're talking about references the

jury's heard about, we'll try to move this along.  Did you find that the Cho reference discloses everything that's in the claim 1 preamble?

A.    Yeah, it does.  And I color-coded so it will match to the Cho on the right to the language of the claim 1-Pre on the left.

Q.    Are you showing the jury the abstract that you went through with them earlier?

A.    Yes.

Q.    Okay.  Are you also looking at figure 1?

A.    Yes.

Q.    Have you looked -- we've got claim 1[a] and 1[d] together on this slide.  Why did you do that?

A.    It's because the claim element 1[a] talks about the same priority cells, and claim element 1[d] actually describe what they are.  So it's logical to combine these two together and talk about it.

Q.    Did you find that Cho discloses elements 1[a] and 1[d]?

A.    Yes, I did, and I also color-coded from the left to right.  The right-hand side is the disclosure from the Cho and column 10, lines 25 through 53.  And you can see the higher priority yellow on the right-hand side, the low priority blue on the right, green the same.

Q.    Did you find element 1[b] in Cho?

A.    Yes, I did.

1057

Q.    Where did you find it?

A.    Column 10, line 6 through 24, in particular as highlighted.  So it's talking about performing the priority-based cell reselection, and here it says the UE can perform inter-frequency measurement or inter RAT measurement according to priority, all in the context of doing cell reselection.

Q.    On your next slide, you combine elements 1[c] and [f] on the same slide.  Why did you do that?

A.    Here, once again, the claim element 1[c] talks about best cell reselection principle, and claim element 1[f] tells you what that is.  And here it says the best cell reselection principle is an offset-based cell reselection principle.

Q.    So for element 1[f], did the Court provide a construction of a term offset-based reselection principle that was something other than plain and ordinary meaning?

A.    Yes.

Q.    Did you use it?

A.    Yes.

Q.    And it would you tell the jury what it was?

A.    It means using Qoffset as a variable for reselection.

Q.    And so applying that construction, did you find that Cho discloses elements 1[c] and 1[f]?

A.    Yeah.  So as I show in the right-hand side, that -- you know, the Rcriterion that we used to compare the different

1058

cells, the Rn, which is all the neighbor cells, utilizes the same variable, Qoffset, as a part of reselection.

Q.   And are you pointing to column 8, lines 52 to 55?

A.   Yes.

Q.   Does Cho also disclose element 1[e]?

A.   Yes, it does.

Q.   Where do you find it in Cho?

A.   So as I described before, when your cell phone gets connected to the network, the network provide this system information.  So you need to know this to do anything in that system.

So what's shown in the right-hand side two of the excerpt in Cho document, the UE, user equipment, your cell phone, receive this system information that contains the absolute priority of all frequencies.

Q.   And for the record, was that column 9, 58 through 64?

A.   And also column 6, line 25 through 33.

Q.   Now, was Cho the only reference that disclosed element 1[e]?

A.   No.  You know, there's the R2 document.  Once again, the R2 document is highlighted here.  The R2 document compares the two well-known schemes, and one of which is a priority-based scheme and it's clearly state that the priority-based scheme used this absolute priorities between frequencies.

Q.   And is this at JTX 20 at page 1?

A.    Yes.

Q.    Now, would a person of ordinary skill in the art at the time of the alleged invention have been motivated to combine the teachings of Cho with the teachings of the R2 document?

A.    Yes.

Q.    Why is that?

A.    I mean, this document, the R2 document actually talks about the benefit.  It talks about the priority-based scheme, and then the bullets.  It is simple.  It's always simple is good.  And then it talks about the saving power.  It just tells you what the benefit is.  So it's really easy to see, incorporating this priority-based scheme that's disclosed in two document together with Cho.

Q.    All right.  Would you summarize your opinion with respect to whether Cho alone anticipates the claim?

A.    Yeah.  During my explanation just now, I identified all the disclosure, corresponding disclosure, in Cho that basically tells you exactly what they are in each and every one of the element.  So Cho anticipates claim 1.

Q.    Does the combination of Cho and the R2 document render claim 1 obvious?

A.    Yes.

Q.    Did you do the same analysis for claim 2?

A.    Yes, I did.

Q.    What are some additional claim constructions in claim 2?

1060

A.    Yes, I did.

Q.    Did you use them?

A.    Yes, I did.

Q.    And what did you find?

A.    I find the same conclusion:  Cho anticipates claim 2 and combination with Cho and R2 document renders claim 2 obvious.

Q.    Now, with respect to the limitations that are similar in claim 2 compared to claim 1, is all the evidence we already talk about the evidence you relied on?

A.    Yes, I did.

Q.    All right.  Switch gears and talk about non-infringement. Doctor Min --

        THE COURT:  Just a minute, counsel.  I'd like to see lead counsel at the bench, please.

            (The following was had outside the hearing of the jury.)

        THE COURT:  Yesterday I ordered the parties to meet and confer and to submit an updated and improved proposed final jury instruction and verdict form by 3:00 today. Nothing was received until after 3:30 today.  What came in for the proposed final jury instruction is 67 pages long and embodies 131 disputes between the parties.  There is absolutely no human way I can get through that and we can get this case to the jury in a reasonable time.  And I consider that kind of a submission almost abuse on the Court.

I'm rejecting what came in late at 3:30, 3:35, whenever it came in, it was after -- well after the 3:00 deadline, and I'm instructing you to go back to the blackboard and get me a completely new submission by 7:30 tonight.  And it better not have 131 disputes in it.

I did not receive any kind of an updated submission on the proposed verdict form which I also ordered, but at this point it appears that there are so many disputes over so many issues, it probably was impossible to even come up with a proposed verdict form.

I want a better job done, and I need to communicate that to your trial teams that are offsite working or whoever you need to communicate it to right now so they can go to work.

MR. SHEASBY:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Ms. Degnan, I apologize for the interruption.  You may continue.

Q.   (BY MS. DEGNAN)  Doctor Min, in your opinion, do the Samsung -- does Samsung infringe the '776 Patents claims?

A.   In my opinion, Samsung accused product do not infringe claims 1 and 2 of '776 Patent.

Q.   Before we dive into the details, would you tell the jury what Samsung products are at issue for this patent?

A.   They are Samsung 5G devices as shown on this slide.

1062

Q.    Are all the Samsung devices the same?

A.    No, they're not.

Q.    How are they different?

A.    These phones have different baseband processors. Baseband processors are like the brain of the cell phones.

Q.    Okay.  What are the three types of baseband processors used in the Samsung accused products?

A.    One from Samsung themselves Exynos, Qualcomm baseband chip, and MediaTek baseband chips.

Q.    Now, were you in court for Doctor Akl's testimony?

A.    I was.

Q.    Did you hear -- did you see him prove infringement with respect to any product that uses a MediaTek processor?

A.    I did not.

Q.    In your opinion, does the MediaTek-based products infringe any claim of the '776 Patent?

A.    In my opinion, they do not.

          MR. SHEASBY:  Your Honor --

          THE COURT:  Go ahead.

          MR. SHEASBY:  -- I object.  There was no source code provided for the MediaTek processors.

          THE COURT:  Speak up, Mr. Sheasby.

          MR. SHEASBY:  Sure.  No source code was provided for the MediaTek processors.  No one has been able to analyze the MediaTek processors.  Doctor Min's opinion is that he didn't

have access to the source code, not that he reviewed the source code and concluded it doesn't infringe.

THE COURT:  Have we not established already, counsel, that the MediaTek processors are not at issue in this case?

MR. SHEASBY:  Your Honor, from our standpoint --

THE COURT:  Just a minute, Mr. Sheasby.

Ms. Degnan, is there a dispute about that?

MS. DEGNAN:  I -- I -- I believe that they have not proven infringement of those products and they are as a result not infringing.

MR. SHEASBY:  Your Honor --

THE COURT:  Do you believe those products are asserted and accused in this case?

MS. DEGNAN:  Not anymore, Your Honor.

THE COURT:  Okay.  Then we need to move on and forget about the MediaTek processors and the products that embody them.

MR. SHEASBY:  Thank you, Your Honor.

MS. DEGNAN:  Understood, Your Honor.

THE COURT:  All right.

Q.   (BY MS. DEGNAN)  With respect to the other two processor-based products, in order to conclude that there's no infringement, what did you have to find?

A.   I have to find the -- the accused products must satisfy

all the requirement. So in order to prove non-infringement, I have to find at least one missing requirement from the claim.

Q.   And how many missing elements are enough for there to be no infringement?

A.   Any one.

Q.   Did you find at least one?

A.   I found multiple.

Q.   All right. What are the first set of limitations you found were not present in the accused products?

A.   So what I found is that the very concept of a two step. So first you find and group them all the same priority cells. That's the first step shown here as No. 1. And then apply the best cell reselection as a step No. 2. That's not there in the accused products.

Q.   Have we already talked about this limitation earlier today?

A.   Yes.

        MS. DEGNAN:  At this time, Your Honor, we would request to close the courtroom as we will be going into confidential information of Samsung and third-party Qualcomm.

        THE COURT:  I'll do it if you'll talk slower. I've asked you twice, and you're just getting faster and faster.

        MS. DEGNAN:  I will do better, Your Honor. Thank you.

        THE COURT:  Thank you.

1065

All right.  I'll order the courtroom sealed.  I'll direct all those persons present who are not subject to the protective order in this case to excuse themselves and remain outside the courtroom until it is reopened and unsealed.

(Courtroom sealed.)

1146

(Courtroom unsealed.)

THE COURT:  And with that, counsel, we stand in recess until tomorrow morning.

(the proceedings were concluded at 5:55 p.m.)

1147

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                01/24/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

.