IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| G+ COMMUNICATIONS, LLC., | ( | CAUSE NO. 2:22-CV-078-JRG |
| | ) | |
|     Plaintiff, | ( | |
| | ) | |
| vs. | ( | |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., | ( | |
| et al., | ) | MARSHALL, TEXAS |
| | ( | JANUARY 25, 2024 |
|     Defendants. | ) | 8:30 A.M. |

_____

VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

APPEARANCES

FOR THE PLAINTIFF:          IRELL & MANELLA, LLP -
                           LOS ANGELES
                           1800 AVENUE OF THE STARS
                           SUITE 900
                           LOS ANGELES, CA 90067-4276
                           (310) 203-7096
                           BY: MR. JASON SHEASBY
                               MR. BENAJMIN MANZIN-MONNIN

                           IRELL & MANELLA -
                           NEWPORT BEACH
                           840 NEWPORT CENTER DRIVE
                           SUITE 400
                           NEWPORT BEACH, CA 92660
                           (949) 760-0991
                           BY:  MS. LISA GLASSER

                           McKOOL SMITH, P.C. - MARSHALL
                           104 EAST HOUSTON, SUITE 300
                           MARSHALL, TEXAS  75670
                           (903) 923-9000
                           BY:  MS. JENNIFER TRUELOVE
                                MR. SAM BAXTER

FOR THE DEFENDANTS:        FISH & RICHARDSON, PC -
                           WASHINGTON, DC
                           1000 MAINE AVE., SW
                           SUITE 1000
                           WASHINGTON, DC 20024
                           (202) 783-5070
                           BY:  MR. RUFFIN CORDELL
                                MR. MICHAEL McKEON
                                MS. LAUREN DEGNAN

                           FISH & RICHARDSON, P.C. -
                           DALLAS
                           1717 MAIN STREET, SUITE 5000
                           DALLAS, TEXAS  75201
                           (214) 292-4084
                           BY:  MR. THOMAS REGER

                           GILLAM & SMITH, LLP
                           303 SOUTH WASHINGTON AVENUE
                           MARSHALL, TEXAS  75670
                           (903) 934-8450
                           BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
                       MARSHALL, TEXAS  75670
                       (903) 923-8546

## INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| PAUL MEYER | |
|     Direct By MR. McKEON | 1152 |
|     Cross By MR. SHEASBY | 1190 |
|     Redirect By MR. McKEON | 1213 |
| STEPHEN WICKER, PH.D. | |
|     Direct By MR. CORDELL | 1217 |
|     Cross By MR. SHEASBY | 1239 |
|     Redirect By MR. CORDELL | 1266 |
|     Recross By MR. SHEASBY | 1268 |
| SEOUNGHEE HAN | |
|     BY VIDEO DEPOSITION | 1274 |
| ROBERT AKL, PH.D. | |
|     Direct By MR. MANZIN-MONNIN | 1276 |
|     Cross By MR. CORDELL | 1301 |
|     Redirect By MR. MANZIN-MONNIN | 1314 |

THE COURT:  Be seated, please.

08:34    All right.  Are the parties prepared to read into record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MS. TRUELOVE:  Yes, Your Honor.

THE COURT:  Please proceed.

MS. TRUELOVE:  Good morning.  Jennifer Truelove.

08:34  Plaintiff used one exhibit yesterday and would move PTX 16.

THE COURT:  Any objection from Defendants?

MR. FREEMAN:  No objection, Your Honor.

THE COURT:  Do Defendants have a similar rendition?

MR. FREEMAN:  We do.  Good morning, Your Honor.  Will Freeman for the Defendants.

THE COURT:  Good morning, Mr. Freeman.  Please proceed.

MR. FREEMAN:  Defendants used DTX  030, DTX 162, DTX

08:34  409, DTX 425, JTX 013, and I'll note this is the large source code exhibit, which per the earlier discussions, the parties have agreed to provide specific pages on at a later date.

THE COURT:  All right.

MR. FREEMAN:  JTX 019, JTX 020, PTX 09.

THE COURT:  Any objection from Plaintiff?

MS. TRUELOVE:  No objection, Your Honor.

THE COURT:  Thank you, counsel.

All right.  One quick thing, counsel.  Having finished

our in-chambers meeting to go over your overnight disputes, I failed to tell you that with regard to the use of DTX 25 and DTX 41, I believe with Mr. Meyer there was a dispute about whether those documents should or should not have references to the Brazilian litigation redacted. I'm ordering that they be redacted. The version that has those redactions in it is what should be used.

All right. Mr. Sheasby, there is a very late breaking as in five minutes ago less motion on your part to admit an exhibit at this portion of the trial. I'll hear you on this motion very briefly.

MR. SHEASBY: Thank you, Your Honor.

We made a critical mistake in not including a data sheet to one of the accused products on our exhibit list. It was completely our mistake. It does not satisfy the Court's standard for generally admitting exhibits.

The data sheet was discussed by Doctor Akl in his report. Last night -- yesterday afternoon, Doctor Min made an argument about them using an alternative type of 5G. It was at that point that we realized two things--the data sheet was not on our exhibit list, which is not excusable error, we should have known it, and the second thing was at that point it became relevant to being able to rebut this argument that Doctor Min made that we could not anticipate.

Your Honor has no willing -- Your Honor has no obligation

1150

to admit this new exhibit.  It is completely my fault, but I beg the Court's indulgence for the purpose of due process to allow this exhibit in.

THE COURT:  All right.  Is there any response from Samsung?

MR. CORDELL:  Like you, Your Honor, we were somewhat surprised by this request on the last morning of the substantive evidence, and we took a look at the exhibit.  It has a lot of technical details that we have not been able to evaluate.  It appears to come from the UK website rather than the U.S. website, and we simply don't have any ability to resolve it on this kind of a pace.

And I would point out that there were many, many other documents already in the record that discussed the use of 5G.

Thank you.

THE COURT:  All right.  Well, the Court has clearly set forth in its standing order on exhibit practice a requirement allowing or a provision for allowing the offering for admission and the admission of up to four documents during trial and beyond the pretrial process where the vast majority of these disputes are to be taken up in the case where a document is discovered to have been inadvertently overlooked as a part of the pretrial exhibit process.

I find it very improbable that on the last day of evidence for the first time an exhibit was discovered as being

overlooked.  At least I'll say if it was, it should have been discovered well before the last day of evidence.  I think an admission at this late date as a new exhibit is unfair to the opposing party, and I'm going to deny Plaintiff's request for the late admission of this data sheet that is the subject of the motion.

All right.  Who is the next witness that the Defendants plan to call?

MR. McKEON:  It's Mr. Paul Meyer, Your Honor.

THE COURT:  All right.  Are you prepared to go forward with Mr. Meyer?

MR. McKEON:  We're ready to roll, Your Honor.

THE COURT:  Let's bring the jury in, please.  I'm glad you're ready to roll.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Welcome back.  Please have a seat.  We will proceed where the Defendants' case in chief.

Defendants, call your next witness.

MR. McKEON:  Thank you, Your Honor.  Your Honor, Samsung calls Mr. Paul Meyer to the stand.

THE COURT:  All right.  Mr. Meyer, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, sir, have a seat at

the witness stand.  I assume any witness binders have already been distributed?

MR. McKEON:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Mr. McKeon, you may proceed.

MR. McKEON:  Thank you, Your Honor.

PAUL MEYER,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKEON:

Q.   Good morning, Mr. Meyer.

A.   Good morning.

Q.   Could you please introduce yourself to the members of the jury?

A.   Yes.  My name is Paul Meyer.  I am a partner at HKA Consulting.  I grew up in Virginia in a military family, been married 40 years, have two sons.  One played with the Giants baseball for a while, and that's my personal background.

Q.   Thank you. And did you prepare slides to assist your testimony today?

A.   Yes, I have.

Q.   Okay.

MR. McKEON:  If we can get those, please.

Q.   (BY MR. McKEON)  Can you describe your professional background?

A.    Yes.  I work for a consulting company.  It's called HKA Consulting.  We have 40 offices around the world.

THE COURT:  Slow down, Mr. Meyer, please.

THE WITNESS:  Yes, sir.

We have 40 offices around the world, we have a couple of offices here in Texas, and we do all kinds of consulting.  I lead their intellectual property practice, involves helping companies license.  It also involves getting involved in determining royalties in situations like this, and I've worked over the last 15 years in about 30 FRAND assignments determining FRAND royalties.

You'll see on the screen many of the companies that I've either worked for or evaluated their portfolios.  I've done with FRAND through those assignments both licensing, royalty valuation.  Also have testified in cases here in the United States, including the International Trade Commission, I've testified in London on FRAND, and I've used methodologies that I'm going to use here today in providing testimony in Spain, The Netherlands, Germany, India, and Asia on the issue of FRAND.

Q.    And can you describe the specific FRAND work you've done for companies involved in SEPs?

A.    Yes.  You'll see on the screen like with Qualcomm and Ericsson, InterDigital, Nokia, and others, I probably have evaluated across the 5G stack of patent assets over 50 percent

of the licenses and the royalties over the last 15 years as those products have gone from 3G to 5G.

And I've done that with many of the major implementors, including Apple and obviously Samsung and other big handset companies.

Q. And what is your educational background?

A. I went to UVA, went to Virginia. I studied accounting in quantitative methods. And then I taught for almost 30 years at Stanford. I've taught a class in engineering in the engineering school about accounting and finance and valuation, taught a thousand students, and I've done some other lecturing just in professional conferences.

Q. And how about certifications? Do you have any certifications?

A. Yes. I was first certified in Virginia in 1985. I live in California now. I'm certified in California as a CPA. And as part of being someone that does intangible asset valuation, for example, patents, I'm also certified in -- as a CPA ABV, and I have a license -- professional licenses in terms of providing valuation of other assets. And so I've got those.

Q. You have valuation experience in actually helping companies in negotiating real life licenses?

A. Yes. I don't -- I'm not the decision maker, I don't have the authority, I don't sign the licenses, but provide a lot of financial and economic and valuation data to that process.

That's my role in licensing.

Q.   How many license agreements would you say you have analyzed in your career?

A.   Over the last 30 years, it's probably been close to 10,000 and probably over a thousand FRAND royalty licenses.

Q.   Has the Court ever qualified you as an expert in the field of FRAND valuation and patent damages?

A.   Yes, sir.

        THE COURT:  Mr. McKeon, I'm going to ask you to do the same thing I asked Mr. Meyer to do, and that is, slow down.

        MR. McKEON:  Sorry, Your Honor.  I'll work on that.

Q.   (BY MR. McKEON)  Have you worked for Samsung before?

A.   Yes.  I've worked for Samsung probably six or seven times over the last 10 years.

Q.   Now, is your company -- does the company that you work for, do they bill Samsung for the hours you spend working on the case?

A.   Yes.  The hours that I spend and my colleagues are billed at our standard rate.  So if we are doing research or looking at the licenses, looking at industry data, we keep those hours and then we -- my firm bills for my time.

Q.   And does that include the time that your colleagues work with you on the case you're working on?

A.   Yes.  Both my hours and then the hours -- so on an

1156

assignment like this, I probably had three or four colleagues helping out.  So it's all the hours of the team, not just mine.

Q.   And over the past 10 years, what have your companies fees been on Samsung-related work?

A.    I wouldn't know exactly, but it's probably been a half million dollars a year over the last 10 years.

Q.   Now, what opinions will you be offering to the jury today?

A.   Well, they're on the screen here, and we'll go through all these, but basically these are the five opinions that we're going to talk about today.

Q.   Now, the jury's heard a lot about FRAND already, but can you, you know, as a FRAND expert, can you describe the framework you did to value the patents?

A.   Yes.  I think we heard a lot about this already from Mr. Dell, and I followed the same structure.  Ultimately we're doing this hypothetical negotiation, and it's really specified as factor 15 under *Georgia-Pacific*.

The important difference is with this assignment, compared to others with royalties, is that in this hypothetical, you'll see the negotiation in the hypothetical is FRAND so we'll get a fair and reasonable royalty.

And I think interestingly here, because the case involves GComm and Samsung, the licensor, the company giving the

1157

license in the hypothetical, is ZTE because at the time of the hypothetical in April of 2019, ZTE owned these three patents.

Q.   Now, when we're talking about the hypothetical negotiation, does that mean the patents are actually valid and infringed?

A.   In our hypothetical, as Mr. Dell said, the Court asks us to assume valid and infringed for purposes of doing the FRAND royalty analysis.  But, in contrast, if there's no infringement, there's no damages, and the patents, you know, not valid, there's no damages.

Q.   Okay.  To make sure we are clear here, just because you have to assume that in the hypothetical negotiation, does that mean you're offering opinions that the patents are actually valid and infringed?

A.   No.  I'm not addressing the engineering liability issues at all.  That's up to others in the case.

Q.   Now, ZTE is at the table in the hypothetical negotiation. How did GComm become the owner of the patents?

A.   Well, you heard about --

THE COURT:  Just a minute.  Mr. McKeon, that is so fast.

MR. McKEON:  Sorry, Your Honor.

THE COURT:  You know, we've got a jury that's trying to absorb what you say and what this witness answers.  And when you're that fast, nobody's going to be able to take it in

and it mean anything.

MR. McKEON:  Yeah.

THE COURT:  And I know you're here to advocate for your client and to persuade this jury.  If you're going to do that, you're going to have to slow down.

MR. McKEON:  Yes, absolutely, Your Honor.  Thank you.

THE COURT:  Thank you.

Q.   (BY MR. McKEON)  Now, could you describe the transaction that occurred between ZTE and GComm?

A.   Yes.  This was in 2020.  And as you heard, GComm acquired 16 patent families from ZTE, including the three patents in this case.  And that's the top blue arrow there.  So that property is going to the GComm, they own that property now.

And then on the bottom side, you'll see that to date GComm has paid $600,000.  And that's really important for us to note because any additional payments, we would call contingent fees.

And so now it's been three years later and nothing else has been paid and, importantly, when you look at the agreement, ZTE has no control over these patents now.  They have no authority to do any of the licensing or any of the other pursuit of what they call monetization and they can't claw back those patents.

And so it says to me that one outcome is that that's all

they're ever going to receive from their perspective is $600,000.

Q.   Thank you, Mr. Meyer.

MR. McKEON:  Your Honor, before I proceed, I want to offer Mr. Meyer as an expert in the field of FRAND valuation and patent damages.

THE COURT:  Is there objection?

MR. SHEASBY:  No objection.

THE COURT:  Without objection, the witness will be recognized by the Court as an expert in those designated fields.

Please continue, counsel.

MR. McKEON:  Thank you, Your Honor.

Q.   (BY MR. McKEON)  Does the ZTE/GComm agreement influence your opinion on the FRAND royalty for the GComm patents?

A.   Ultimately, and we'll get this later on, I believe the parties in the hypothetical negotiation would be aware of this transaction and the amounts paid to date and bring that into that negotiation.

Q.   Now, the jury's already heard about the 20 percent portion that ZTE gets of any proceeds.  Is there any guarantee of that?

A.   No.  It's called contingent.  It's not guaranteed.

Q.   How did you determine what is fair and reasonable?

A.   It's -- you know, analogies are always sort of difficult,

1160

but when we think about everyday life, when we go out to rent a house or an apartment, you look in the neighborhood, you can, you know, look online and say, what are all the neighbors paying for something that's comparable.  And then that obviously becomes very instructive to what you'd want to pay.

And that's pretty much the same thing we do with patent asset valuation with some differences, and you see that on this screen right here.  Basically renting a house, on the left-hand side, you look for comparable property that informs what you pay and what you offer, and what the parties agree upon.

And on the right-hand side, if you can get prior licenses, we call them market comparables, that match up to what we're valuing here, we call that the subject property, so the property we're valuing here, we can match it up to prior transactions, that gives us objective data to help figure out what would happen in this hypothetical.  That's how you do it.

Q.   Thank you, Mr. Meyer.

What is the next opinion that you're going to be offering today?

A.   Well, after I determine that market comparables is most reliable in these circumstances, I did an analysis which I'll show the jury.  And it's my opinion, when it comes to the FRAND royalty in this case, it should be no more than $6,999,000.  And I'll walk you through why I believe that's

the truth.

Q.    What framework did you use to determine the FRAND reasonable royalties for the GComm patents?

A.    Well, there was this court case 50 years ago, and they had the same circumstances we have.  And they came up with these 15 factors, *Georgia-Pacific* 15 being the most important for the hypothetical.  But I went through all these factors. I'm going to talk today about the most important factors, but they all were considered, and some were just less important in a situation like this.

Q.    Why do you have highlighted here factors No. 1 and factor No. 2 of the *Georgia-Pacific* factors?

A.    Because in the list when you think about market comparables, they come into play in *Georgia-Pacific* 1 and 2 because what they say is, are the licenses for the same patents because then basically we have rent for the same house.  That's number one.

And then No. 2 is, do we have licenses for what we call licenses that Samsung has entered into that are comparable to our circumstances here that we can use secondarily to also bring in and give us objective data about what they should pay.

So factors 1 and factors 2 in my opinion in this case are most important.

Q.    And are there comparable license agreements that you have

analyzed?

A.   Yes.   These are the four that I believe are most instructive to these circumstances.   And there's one that we've heard about, the ZTE/Apple, on the left-hand side, and that includes these exact three patents.   So that's factor 1.

And on the right-hand side, that's three licenses, they're factor 2, but where Samsung has licensed in comparable technology.

Q.   Now, is the use of market comparable agreements to analyze the hypothetical negotiation, is that something that's widely used in analyzing FRAND royalties in the industry?

A.   It is.   I was thinking about this after I heard Mr. Dell testify over my almost 15 years of doing FRAND data analysis and FRAND economic licensing analysis, and I've been able to see all the major SEP holders' positions on this, market comparables is the gold standard in determining a FRAND royalty.   That's what everybody considers and uses.   Obviously they don't always agree on the adjustments or the matching, but market comparables is the gold standard.

Q.   And can you describe for the jury the process you used to perform your market comparable analysis?

A.   Yes.   There's a lot of analyses.   I've tried to make it simple, but it always becomes complex.   In step 1, we obviously have to figure out, do we have some comparables that we can analyze.   And so I've determined that these four

1163

comparables are economically and technically comparable.  So that was my first step.

Q.   What did you do in your second step?

A.   Well, then the second step requires additional analysis. And so these agreements will be what we call agreed-upon, up-front compensation or consideration.  And it's mostly cash but sometimes includes what they call non-monetary, and I'll talk about that.

So there are these lump-sum amounts, and so I have to take those and convert them to what we call this one-way consideration, and I do it on a per-unit basis.  And so that gives us like a common basis to begin to understand comparability economically.  So that's the second step.  I do that, and I'll talk about that a little bit more.

And then the last step is really done in conjunction, and it really is very, very important.  I could not do this analysis without this third step, which means I have to compare these licenses and what we call those patent assets to our three patents here.

And so, one, I have to potentially adjust them for size because there are three patents here and the other ones have potentially more assets.  And then, two, this is really important, and I need to get an assessment of quality.  And that's a technical assessment, and I can't do that because I'm not a communications, you know, engineer.  So I receive data

1164

and input from Doctor Min and Doctor Wicker that analyzed the three patents and gave me an assessment of a quality of those -- what we call, those patent assets. And so that's a very important step also.

Q. And before you jump into what was communicated to you, how did you receive this information from Doctor Min and Doctor Wicker?

A. Well, before I filed my report on comparability and my FRAND opinion, I talked to each of them separately. So I talked to Doctor Min, who was on a Zoom, and then I talked separately with Doctor Wicker. And they gave me these inputs directly.

Q. And what was important in terms of the technical issues in the case?

A. Well, you have to sort of think about this deeply, but basically to make comparisons back to the four other transactions, I wanted to know how they assessed these three GComm patents in terms of quality. Were they -- you know, they would assess what they actually provide for and are they comparable to the declared patents in the standard.

And so they were -- they came back with this important feedback, and we need to take it slowly. They said each GComm patent, that's the three patents, is less than technical average value than other SEPs, because I'm obviously going to look at other SEPs in my analysis. So I know that they're

1165

less valuable technically from Doctor Min and Doctor Wicker.

And then this was actually important, too.  They said that when they did that work, that at best or at most it's typical -- they're typical of other patents declared to the standards.  So they gave me that technical assessment that I'm relying upon that I've worked into my opinions.

Q.   And how did you account for the number of GComm patents in your analysis?

A.   Well, I mentioned I needed to deal with size, and so I had to understand here, on the left-hand side, that's GComm's patents, the three patents.  We know they acquired 16 families, I believe 70 patents from ZTE.  And that's all within this 5G stack.

And all the 5G stack is it's all the declared SEPs by all of the other SEP owners.  And that's Qualcomm and Nokia and Ericsson and InterDigital and Huawei.  All the science that's gone into that standard has been declared.  So that's the total almost 70,000 patent families, and we're going to focus on the three here today.  That's the size adjustment.

Q.   Now, we heard from Mr. Dell that owners of SEPs take the position that 90 percent of their patents are worthless and have no value.  Do you agree with that?

A.   In my experience over the last 15 years in all these FRAND assignments, I don't agree with that.  It's simply not the case.

Q.   All right.   Jumping now into the licenses, I want to first start with the ZTE/Apple agreement.   Why is that comparable?

A.   Well, it's comparable because ZTE is the licensor in the hypothetical and was also the licensor here to Apple, including these three patents.

Q.   And how is Samsung situated relative to Apple?

A.   Well, they are a direct competitor.   And so they're one and two in the market, and obviously they sell the same devices or products.   They obviously are in the U.S., and they compete head to head.   And when you think about fair and reasonable, you know, you basically want to compare Samsung to its number one competitor, Apple, and see how they match up with this deal.

Q.   Thank you, Mr. Meyer.

          MR. McKEON:   Your Honor, at this point I'm going to have to close the courtroom or request to close to courtroom based on confidential information.

          THE COURT:   You're asking the Court to seal the courtroom and the record?

          MR. McKEON:   That's correct, Your Honor.   Thank you.

          THE COURT:   All right.   Based on counsel's request, I'll order the courtroom sealed which will seal this portion of the transcript.

          All persons present who are not subject to the protective

1167

order in this case should excuse themselves until the courtroom is reopened and unsealed.

Let me know when you covered anything confidential, and I can reopen the courtroom.

MR. McKEON:  Thank you.  Thank you, Your Honor.

(Courtroom sealed.)

1205

(Courtroom unsealed.)

THE COURT:  Having done that, I'm going to remind the ladies and gentlemen of the jury not to discuss the case with each other, but simply leave your notebooks closed and in your chairs, and we'll be back shortly and continue.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, I'm going to do my best to keep this short.

Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Are you prepared to continue with cross examination, Mr. Sheasby?

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Thank you, ladies and gentlemen.  Please have a seat.

Are you prepared to continue with cross examination?

MR. SHEASBY:  Yes, Your Honor.  But I would request that we seal the courtroom.

THE COURT:  All right.  Having unsealed it for the recess, I will order the courtroom sealed again.

I'll direct the Court Security Officer to make sure that anyone not subject to the protective order in this case has excused themselves and left the courtroom.

So if you are not subject to the protective order, you should exit the courtroom at this time.

(Courtroom sealed.)

1216

(Courtroom unsealed.)

THE COURT:  Defendants, call your next witness, please.

MR. CORDELL:  At this time, Your Honor, Defendants call Dr. Stephen Wicker.

THE COURT:  All right.  Doctor Wicker, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please have a seat on the witness stand.

THE WITNESS:  Thank you, Your Honor.

MR. SHEASBY:  Your Honor, there are excess number of binders.  Can we switch out binders?

THE COURT:  I'll ask the Court Security Officer to

move any previously used binders behind the witness.  That will clear the table.  If we have binders for this witness, let's get them distributed.

All right.  We'll proceed with direct examination by the Defendant.

Mr. Cordell, you may proceed.

MR. CORDELL:  Thank you.

STEPHEN WICKER, Ph.D.,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

Q.   BY MR. CORDELL:

Q.   Good morning, Doctor Wicker.

A.   Good morning.

Q.   Can you introduce yourself to the ladies and gentlemen of the jury?

A.   Yes.  Good morning.  My name is Steve Wicker.  I'm a professor of electrical and computer engineering at Cornell University.

Q.   Can you tell us a little bit about your personal details?

A.   Certainly.  I'm originally from Mississippi.  I have a wife and four kids.

Q.   I understand one of your sons is in the service?

A.   That is correct.

Q.   Can you tell us about that?

A.   Certainly.  My oldest, my son is an Army ranger.  He's

1218

currently serving in the Middle East.

Q.   Has he been there a couple of times?

A.   Yes.

Q.   And did you prepare some slides to help with your testimony this morning?

A.   Yes, I did.

        MR. CORDELL:  Can we have those, please?  Next slide, please.

Q.   (BY MR. CORDELL)  Can you summarize your education and experience for the jury?

A.   Certainly.  I have three degrees.  They are all in electrical engineering.  I attended the University of Virginia, Purdue University, and the University of Southern California where I got my Ph.D.

     I have worked at a number of places.  I started with my first real job at Bell Laboratories.  I then went to work for Hughes Aircraft where I worked on wireless systems.  In 1987, I left Hughes to become an assistant professor at Georgia Tech, and I went to Cornell University '96, and I'm still there.

Q.   You're a professor at Cornell?

A.   Yes, that's right.

Q.   And you say that you published some work on HARQ.  What's that all about?

A.   Okay.  HARQ is, again, Hybrid ARQ.  It's a term that

refers to a type of error control.  I've actually been working on this since the beginning of my career.  I've published papers on it with my students going back to 1987, 1986.  So it's something I'm familiar with and something I've worked on for a long time.

Q.   And you have a book there.  Did you actually write the book on HARQ?

A.   I did.  This is an error control book so it deals with a number of different topics, but there is an entire chapter on Hybrid ARQ.

MR. CORDELL:  Your Honor, Samsung offers Doctor Wicker as an expert in mobile and cellular communications, including the subject matter of '443 Patent?

THE COURT:  Is there objection?

MR. SHEASBY:  No objection.

THE COURT:  Without objection, the Court will recognize this witness as an expert in those designated fields.

Please continue.

Q.   (BY MR. CORDELL)  Doctor Wicker, what are you going to testify about today?

A.   I'd like to talk a little bit about the Samsung accused products, the 5G products.  I'd like to say a few words about the '443 Patent and what it covers, and then talk about considerations for patent valuation--what this--what's been

patented by the '443, is it valuable or is it not.

Q.   And what materials did you rely on in doing your work?

A.   Well, I started with the patent itself, and read it through a number of times.  I then studied the Samsung and Qualcomm source code.  That's what tells me how the accused devices actually operate.  I studied the standards, and I looked at a number of other technical documents.

I then read Doctors Akl and Kowalski's reports, the expert reports they provided in this case, and I looked at what they cited.  I read the depositions of a number of witnesses, some of which have been played in court.

And, of course, I studied the Court's claim construction order.

Q.   And did you apply the Court's claim construction order and the definition on what one of ordinary skill as part of your opinions in this case?

A.   Yes, I did.

Q.   Okay.  Let's move ahead.

MR. CORDELL:  Can I have the elmo?

Q.   (BY MR. CORDELL)  So the products that are at issue here, Doctor Wicker, I think -- do you agree that the MediaTek products are now out of the case?

A.   Yes, that's my understanding.

Q.   Okay.  So for the '443 Patent, we're talking about the Samsung phones --

MR. SHEASBY:  Your Honor, let me object.  The MediaTek products are not out of the case.  They were never in the case.  So I would ask that that question be stricken as inaccurate.

THE COURT:  That's not an objection.  You can certainly address it on cross examination.

MR. SHEASBY:  Understood.

THE COURT:  There's no need to interrupt counsel's examination.  You can clarify it on cross.  That's not an evidentiary basis to strike anything.  Overruled.

Q.    (BY MR. CORDELL)  So the products that are at issue for you are the Samsung phones that have Exynos processors in them and the Samsung phones with Qualcomm.  Is that right?

A.    That's correct.

Q.    Now, were you here -- well, you weren't here; you and Doctor Akl both had another trial going on.  Right?

A.    Yes, we did.

Q.    Okay.  But have you reviewed Doctor Akl and Doctor Kowalski's testimony?

A.    Yes, I have.

Q.    Let me show you Doctor Akl's slides.

MR. CORDELL:  Can I have slide PDX 4.148?  Actually let me just put it on the elmo, if I can.

Q.    (BY MR. CORDELL)  Are you familiar with this slide?

A.    Yes, I am.

1222

Q.   Okay.  And then let me show you one more.  How about this slide?

A.   I'm familiar with that as well.

Q.   And can you tell the jury what code these two slides relate to?  Is it Samsung code, is it Qualcomm code, is it MediaTek code?

A.   Okay.  So this code is actually Qualcomm code.  So in order to see it, I had to go to a Qualcomm facility and actually read the code.

Q.   Okay.  And did they ever show any Samsung code at all?

A.   No.

Q.   Okay.  So there was no Samsung code for the '443 Patent.  Right?

A.   That's correct.

Q.   So what we're talking about is Qualcomm code.  Is that fair?

A.   Yes, that's right.

Q.   Okay.  Now, you just said that you went to review code.  Can you describe that for the jury?

A.   That's correct.  Qualcomm makes its code available in a special facility.  So you have to, you know, leave your laptop, your phone, everything behind, and you go into a locked area.  And I was given access to a Qualcomm laptop, and through that, I was able to look through all of their code.

Q.   And, Doctor Wicker, did you create any kind of a record

1223

of the Qualcomm code and the products that it related to?

A.   I did.

MR. CORDELL:  Your Honor, may I approach?

THE COURT:  You may approach.

MR. CORDELL:  And, Your Honor, it's source code so it's separately packaged.  I'm sorry.  I'm going to approach the witness.

THE COURT:  All right.

MR. CORDELL:  But while I'm here, may I hand that to the Court?

And, Your Honor, we're going to have to go on the confidential record for Qualcomm.

THE COURT:  All right.  I'll order the courtroom sealed at counsel's request to protect this confidential information from third party Qualcomm.

I will direct persons present not subject to the protective order excuse themselves until the courtroom is reopened and unsealed.

(Courtroom sealed.)

(Courtroom unsealed.)

Q.    (BY MR. CORDELL)  So with that, Doctor Wicker, can we go into the '443 Patent a little bit?

A.    Certainly.

Q.    So what are you showing us here on slide 9?

A.    Okay.  So this is the '443 Patent, or at least the first page on the left.  On the right, I have a summary of some information from that page:  the number of the patent; the fact that it deals with transmitting method, receiving method, and nodes for Hybrid ARQ information; and, finally, the date of the Chinese application with which this is associated. That date is July 31st, 2015.

Q.    Is that kind of the birthday of the patent?

A.    Yes, that's right.

1227

Q.    Now, tell us just a little bit about or remind us what HARQ and these ACK and NACK codes are all about.

A.    Okay.  So the basic idea behind HARQ is that a transmitter is going to send out a block of information.  The receiver will take it and try and decode it.  If the receiver can decode it correctly, it sends back to the transmitter an ACK, A-C-K, acknowledgement.  If the receiver cannot decode it correctly, if it thinks it's -- has errors, there's something wrong with it, it will send a NACK, which is a negative acknowledgement.

Q.    Let me show you claim 10.  Do you have an opinion about whether or not the Samsung products infringe claim 10?

A.    Yes.

Q.    And what is your opinion?

A.    That there is no infringement.

Q.    Okay.  So you first highlight a length type of M2, including a first length type.  Tell us about that.

A.    Okay.  So this is one of the requirements of the claim that there be a first length type for that response for that Hybrid ARQ collection of ACKs and NACKs that has a length that is predefined.

Q.    Okay.  And were you able to find a first length type indicating a value of M2 that was predefined in the standard?

A.    No.

Q.    And why is that?

1228

A.    Well, what Doctor Akl pointed to in his testimony was something called the type 1 Hybrid ARQ ACK codebook.  When I studied the standard to see how that codebook worked, I found that it actually varied over time in its lengths.

Q.    So was it predefined or not predefined?

A.    It's not predefined.

Q.    Okay.  And why is that?

A.    Well, here's a sample of the standard.  The standard is a long document and unfortunately quite complicated, but what I've done here is I've highlighted the ifs.  So each one of these if statements corresponds to a statement that if such-and-such is the case, the codebook is going to have a certain length.

So with every one of these if statements -- I won't mark them all, but with every single one of these, the length is varying, the length of the codebook.

Q.    And this is from PTX 1.71 at 9.1.2.1?

A.    That's correct.

Q.    Okay.  And were you able to carry this through the rest of the algorithms in the standard?

A.    Yes.  There were actually 12 pages of if statements.  And so for each one of these pages, each if statement, the length of that type 1 codebook is varying over time.

Q.    Well, how often does it vary over time?

A.    It can vary as much as once per millisecond, once per

thousandth of a second.

Q.   So that would be a thousand times a second?

A.   Yes.

Q.   Can you give us an example of how this might play out in a real product?

A.   Okay.  So one of those if statements has to do with how information is being transmitted through the antennas.  We can have information just going through one antenna or we can use two antennas and send twice as much information, send information through one antenna and then different information through another.  It's a powerful aspect of 3G, 4G, and 5G.

Well, as you vary the number of antennas, the length of that Hybrid ARQ codebook changes.  So for one antenna and four transport blocks, we have four bits.  For two antennas and four transport blocks, we've doubled the length of that codebook.

Q.   So is that length fixed?

A.   No, it's not.

Q.   And I think Doctor Akl also offered us something called the doctrine of equivalents.  Are you familiar with that?

A.   Yes, I am.

Q.   Do you agree with Doctor Akl's opinion about equivalents?

A.   No.

Q.   Why is that?

A.   Well, the doctrine of equivalents, as I understand it,

1230

requires that what is being accused be substantially or insubstantially different, excuse me, from what the claim limitation says.

And when I looked at the limitation and it talked about predefined, I found that the semi-static codebook was actually substantially different. That codebook is based on parameters that vary frequently and it's not predefined.

Q. So the claim also talks about a second length type. Can you tell us if you were able to find that in the standard?

A. I was not able to find that, either. Doctor Akl pointed to another codebook, the type 2 Hybrid ARQ ACK codebook as meeting that limitation, and I did not agree.

Q. He found that M2 was determined based on k?

A. Exactly. That's what the claim requires, being the number of blocks that you've received that are wrong. So k varies over time, and would be the number of erroneously received blocks.

Q. And were you able to find that in the standard?

A. No, there is no such thing in the standard.

Q. Can you give us an example of -- of why this is?

A. Okay. So the codebooks are sort of like an egg carton where you've got a fixed number of spots. In the codebook, each one of the spots corresponds to a receive block. We're going to send an ACK or a NACK.

To have the length determined based on k would be as if

our egg carton's length were based on the number of broken eggs. Well, as you can see, you can have a varying number of broken eggs in an egg carton, but the egg carton is always the same length. Okay. That's what's going to happen with that type 2 codebook.

It doesn't matter how many of the receive blocks are in error; the size of the codebook will correspond to the number of transmissions, whether they were good or not.

Q. So the -- in the Samsung products, the egg carton is always the same size?

A. Yes, that's right.

Q. Okay. What about doctrine of equivalents? Doctor Akl said it infringed under the doctrine of equivalents. Do you agree?

A. No, I don't agree.

Q. Why is that?

A. Well, again, the question is whether what's being pointed to, that type 2 codebook, is insubstantially different from that claim language determined based on k, and I found that the dynamic codebook was actually substantially different. It's based on the number of transmitted blocks, not the number of blocks that are erroneously received.

Q. All right. So just to sum it up, were you able to find the first length type or the second length type in the -- in the 5G standard?

A.   No.

Q.   And were you able to find these limitations in the corresponding Samsung devices?

A.   No.  They're not there.

Q.   And what's the -- what's the outcome of this?

A.   Well, what it means is that the accused products don't satisfy this claim limitation that calls for these two length types, and that means that there is no infringement of claim 10.

Q.   Okay.  I'd like to turn to invalidity.  And I'm going to ask you a series of questions about whether something is well-understood, routine, and conventional.  Is that okay?

A.   Yes, that's fine.

Q.   Okay.  So when we look at the patent and we're looking at it, what is your opinion about whether the concepts in the '443 are well-understood, routine, and conventional?

A.   It's my opinion that they are because the patent at suit, in this case the '443, is dealing with Hybrid ARQ protocols.

Q.   And were you also able to find the concepts of the '443 Patent in prior art?

A.   Yes, I was.

Q.   That means patents that came before the birthday of the -- of the '443 Patent?

A.   That's right.

Q.   Okay.  And what prior art are you going to show the jury?

1233

A.    Okay.  I focused on two patents or, excuse me, a patent application due to Cho and another patent application due to Bhattacharya.

Q.    And the Cho patent is a Samsung patent?

A.    It is.

Q.    Okay.  And did both of these come before the birthday of the Chinese patent application?

A.    Yes, they did.  I created a timeline here.  And as you can see on the timeline, there we go, this is when the Chinese application was filed, July 31st, 2015.  Bhattacharya was published by the Patent Office in 2013, two years earlier, and the Cho patent was published in 2006.  It was actually more than nine years earlier.

Q.    So let's go through the claim elements.  In element 10a, did you find -- well, is it your opinion this was well understood, routine, and conventional at the time?

A.    Yes.

Q.    And did you find evidence of it as actually disclosed in the prior art?

A.    I did.

Q.    And where did you find it?

A.    I found it in both Cho and Bhattacharya.  As you can see here, what's called for in this first limitation is a processor, memory, and computer executable code.  When we look at Cho, we see, well, there's the memory, there's the

1234

processor, and here's a discussion of the computer executable code.

Over here in Bhattacharya, there is our processor, there's the memory, and here is a reference to retrieving the instructions for executing the modules.  That's the computer executable instruction.

Q.    And that's Cho at page 15 and Bhattacharya at 14?

A.    Yes, that's right.

Q.    What about detecting in transmission blocks, claim 10b? Were you able to find that?  Was that well-known at the time?

A.    Yes, it was.

Q.    And were you able to find it explicitly disclosed in each of the prior art references?

A.    Yes.  I've highlighted it here in Cho where it talks about checking the reception status of the plurality of frames.  That's detecting in transmission blocks.

Q.    And in Cho were you able to find it as well -- I'm sorry, in Bhattacharya were you able to find it as well?

A.    Yes, we see that right here at the top where it talks about indicating the status of the reception of the frames.

Q.    Okay.  And what about element 10c, the M bits and M2 bits?  Were you able to find -- well, was that routine and conventional as of the time?

A.    It was.  It was well known that you could respond to the reception of blocks with these ACKs and NACKs.  In fact, like

1235

I said my students and I were doing this back in the '80s.

Q.    Were you able to find it in the Samsung Cho patents?

A.    Yes, I was.  This is figure 4 of the Cho patent, and here we see a block ACK bitmap, 0s and 1s, that tell you whether or not the blocks were received correctly.  And this tells you how to interpret the bitmap.  It's the starting sequence number.  And the rest of the bits help set up that Hybrid ARQ process.

Q.    Is that Cho in figure 4?

A.    Exactly.

Q.    Were you able to find it in Bhattacharya as well?

A.    Yes.

Q.    And was that Bhattacharya figure 3B?

A.    Yes, it is.  We see a similar diagram.  Here is the bitmap, here is the starting sequence control, and there's other information provided as well.

Q.    What about element 10d?  Was that well known, routine, and conventional at the time?

A.    Yes.  What's called for here, excuse me, is the first and the second length types that we discussed earlier.

Q.    Okay.  And were you able to find that in the Samsung Cho reference?

A.    Yes.  Just a reminder, the first length type is predefined.  So we look at Cho and it talks about the bitmap field having a fixed length of 128 bytes.

If you look at Bhattacharya, we see -- where did it go -- an 8-byte long block acknowledgement bitmap field. So those are disclosed.

And with regard to the second length type, remember the key is it's determined based on k. It's based on the number of erroneously received blocks. And that's exactly what we see disclosed in Cho. It says, when errors occur in all frames or no frames, we don't have to send one of the fields. So it's changing the length.

And we look at Bhattacharya, we see something similar. It's based on the number of unsuccessfully received frames when that's less than or equal to a certain threshold. So in both Cho and Bhattacharya, we see that determination of a second length type based on the number of erroneously received blocks.

Q.   And then what about 10e? Was that well known back in 2015?

A.   10e is really quite simple. It's sending the HARQ transmission back to the transmitter, back in this case to the second node.

Q.   And were you able to find it both in Cho and Bhattacharya?

A.   Yes. I highlighted it. It's explicitly stated in Cho, sending the compressed block ACK frame to the transmitting station. Bhattacharya, we see virtually the same words:

1237

transmit multiple acknowledgement messages to the transmitter.

Q.    Doctor Wicker, was the '443 Patent new in 2015?

A.    No, it was not.

Q.    And you have on your slide here that it's anticipation. What does that mean?

A.    That means that the Cho and the Bhattacharya patent applications actually disclose what's claimed.

Q.    So Samsung had the '443 Patent claim before GComm or before ZTE did?

A.    That's correct.

Q.    Okay. And did you verify that by going through each and every element with the prior art?

A.    Yes. In fact, that's what I just did in showing that it was conventional. I showed that these two references Cho and Bhattacharya actually contain all of those limitations.

Q.    So when you found it explicitly in each of the references, does that relate to this chart?

A.    Yes, it does.

Q.    So let's talk about patent valuation quickly. What's your understanding of Doctor Kowalski's opinion about the value of the '443 Patent?

A.    Well, he actually gave it significant value. He assumed that single bit approaches were in use and that this patent had evolved a new way of responding using Hybrid ARQ information.

Q.    Do you agree with him?

A.    No.  No.  I just showed that it was actually not new.

Q.    Let me jump ahead here.  Did you do an analysis of other patents in this case?

A.    I did.

Q.    And can you tell the jury whether the '443 Patent is more valuable, equal valuable, or less valuable than the other patents?

A.    Okay.  I looked at two of the portfolios that were discussed earlier, the Ox Mobile portfolio and the 5G IP portfolio.  And in looking at the patents, example patents in those portfolios, I found some that were fundamental to cellular technology.

       For example, this notion of a handoff.  When you're driving and talking over the phone, you're actually handed off from cell to cell.  It allows you to continue the conversation even though you're moving.  So that's fundamental to cellular.  It's been around since 1G.

       With regard to the 5G IP Holdings, I also saw important technologies, for example, the use of secondary nodes.  That's relatively recent, but it gives us some powerful techniques for 4G and 5G.

       So I felt that these were certainly in the same general subject area as the '443 Patent, cellular technologies, but they were actually more valuable.  The '443 deals with

formatting information, changing the way you send 0s and 1s as opposed to fundamental elements of cellular technology.

Q. And how about patents from companies like ZTE and Ericsson, InterDigital and Nokia? Can you characterize the value of that '443 Patent compared to those companies' patents?

A. I would say the '443 is less valuable than that.

MR. CORDELL: Thank you, Your Honor. I pass the witness.

THE COURT: All right. Cross examination by the Plaintiff.

MR. SHEASBY: Yes, please, Your Honor.

May I approach, Your Honor?

THE COURT: You may.

                    CROSS EXAMINATION
BY MR. SHEASBY:

Q. Good morning, Doctor Wicker.

A. Good morning.

Q. It's nice to speak with you again. Thank you for your son's service and thank you for your family's service.

A. Thank you.

Q. I want to start with a point of clarification. You were actually in another hearing when Doctor Akl testified, and because of that, you were not able to view the slides he actually used. Correct? While he was using them.

1240

A.    While he was using them.  No, I didn't get to see them while he was using them, no.

Q.    And if I wrote it down correctly, you told the ladies and gentlemen of the jury that as to the '443 Patent, Doctor Akl didn't show any Samsung code.

A.    That's my recollection, yes.

Q.    Okay.

MR. SHEASBY:  Why don't we go to the Wicker cross module, Mr. Svenson.  It's this one.  We'll go to the elmo.

Q.    (BY MR. SHEASBY)  This is a slide that Doctor Akl showed when analyzing the '443 Patent.  You recognize in orange that is the disputed limitation of the '443 Patent.  Correct?

A.    Yes, that's correct.

Q.    And you see below that is Samsung's source code?

A.    Immediately below that, that's right.

Q.    Okay.  And then if we go to this next slide, this is another disputed limitation.  Correct?

A.    That's correct.

Q.    Once again, Doctor Akl showed source code.  Correct?

A.    There is certainly Samsung code on this slide.  That's right.

Q.    Okay.  And --

THE COURT:  Counsel, I don't think anybody can see this with any detail, but we are not sealed and we are in a public session.

MR. SHEASBY:  We need to seal, Your Honor.

THE COURT:  All right.  Then I'll order the courtroom sealed and direct the Court Security Officer to see to it that all persons not subject to the protective order excuse themselves and remain outside until the courtroom is reopened and unsealed.

(Courtroom sealed.)

(Courtroom unsealed.)

THE COURT:  Ladies and gentlemen of the jury, we have less than 20 minutes until noon.  I'm informed by Ms. Clendening that lunch is waiting for you in the jury room, so we're going to break at this juncture for lunch.

I do have one question I want to ask Mr. Cordell before we break for lunch.  Does the Defendant have additional

witnesses in its case in chief?

MR. CORDELL:  No, Your Honor.  At this time the Defendant rests.  And I assume that we will make applications after the jury is excused.

THE COURT:  That's a correct assumption.

Mr. Sheasby, does the Plaintiff wish to call rebuttal witnesses?

MR. SHEASBY:  Your Honor, if it pleases the Court, we will call two rebuttal witnesses; a short video --

THE COURT:  I just want to know yes or no.

MR. SHEASBY:  Yes.

THE COURT:  All right.  Thank you.

We'll take up the Plaintiff's rebuttal case after lunch, ladies and gentlemen.  As you just heard, the Defendants have rested their case in chief.  Please take your notebooks with you over the lunch break.  Please follow all my instructions, including not to discuss the case.

We are getting close to the end of the evidence.  It would be a shame if any of my instructions were violated and all the work and effort that's gone into this trial was placed in jeopardy, so please be sure that you continue to scrupulously follow all my instructions.

With that, ladies and gentlemen, we'll try to have about the same length of a break as we've had all trial, and please enjoy your lunch.

1272

The jury's excused for lunch at this time.

(Whereupon, the jury left the courtroom.)

MR. CORDELL:  Your Honor?

THE COURT:  Yes.

MR. CORDELL:  Before we excuse everyone, can I retrieve the copies of the source codes that I distributed earlier, or the paralegals will beat me if I don't return it.

THE COURT:  I'm handing mine to the Courtroom Deputy, and you can certainly get it from her when we recess.

MR. CORDELL:  Thank you.

THE COURT:  All right.  You intend to call Doctor Akl in rebuttal.  Is that correct?

MR. SHEASBY:  Yes, and a very short video deposition if we have sufficient remaining time.

THE COURT:  And that's on Han--H-A-N?

MR. SHEASBY:  Yes, sir.  Yes, Your Honor.

THE COURT:  And is that the entirety of the Plaintiff's rebuttal case?

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  All right.  Are there issues that the Court needs to hear from counsel on before we recess for lunch?

MR. SHEASBY:  Your Honor, with your indulgence, could we have the time remaining on the Court's clock?

THE COURT:  Yes.  I'm showing 42 minutes for

1273

Plaintiff and 8 minutes for Defendant.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  Anything further?

Anything from the Defendants?

MR. CORDELL:  No, Your Honor.  Thank you.

THE COURT:  All right.  We stand in recess for lunch.

(Lunch recess.)

THE COURT:  Be seated, please.

Mr. Sheasby, is the Plaintiff prepared to proceed with its rebuttal case?

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back from lunch, ladies and gentlemen.  Please be seated.  We will proceed at this time with the Plaintiff's rebuttal case.

Plaintiff, call your first rebuttal witness.

MS. GLASSER:  Thank you, Your Honor.  Plaintiff G+ calls by video deposition Mr. Seounghee Han.  He is an engineer and corporate representative of Samsung.

THE COURT:  All right.  Proceed with this witness by deposition.

MS. GLASSER:  And, Your Honor, it is a little under

1274

3 minutes to G+ and a little under one minute to the Defendants.

THE COURT:  All right.

SEOUNGHEE HAN, BY VIDEO DEPOSITION,

Q.    How long have you been at Samsung?

A.    I joined the company in 2019, so it's been around 14 years.

Q.    Are there any items within the -- within the version of that 3GPP standard that are not mandatory?

A.    Yes.

Q.    When that evaluation is performed, does it rank the frequencies of the neighboring cells?

A.    Rank is performed according to each frequency priority.

Q.    Did you ever have a case where multiple cells -- cells on different frequencies have the same priority?

A.    If you're asking -- the case that you are asking about, are you asking about the -- about the actual operation itself?

Q.    Yes.

A.    Yes.  There is a case like that.

Q.    Once the cells on multiple frequencies are ranked, then is one of those cells ultimately chosen as the neighboring cell?

A.    All cells that are observed nearby except for the serving cell are neighboring cells.

Q.    Can you go to paragraph 5.2.4.6, please?

A.   Yes, I'm there.

Q.   Is the expression for these R values, is that how Samsung implements this for its products?

A.   Yes.  Implementation is done according to the guidelines in the spec.

Q.   Do you see where it says configure and evaluate cell list with same priority?

A.   Yes, I see it.

Q.   Can you explain what the code is doing here?

A.   So as mentioned in the -- in my previous answer, among the cell measured, specific cells are grouped.  Likewise, the cells that are on the same frequency priority are grouped.

THE COURT:  Does that complete this witness by deposition?

MS. GLASSER:  It does, Your Honor.

THE COURT:  All right.  Call your next rebuttal witness, please, Plaintiff.

MR. MANZIN-MONNIN:  G+ calls Dr. Robert Akl.

THE COURT:  All right.  Doctor Akl, if you'll return to the witness stand, and I remind you, you remain under oath.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Mr. Manzin-Monnin, you may proceed with direct examination.

MR. MANZIN-MONNIN:  Thank you, Your Honor.

Mr. Svenson, may we have the slides?  And could we jump

1276

to slide 20, please?

ROBERT AKL, Ph.D.,

having been previously duly sworn, testified further as follows:

DIRECT EXAMINATION

BY MR. MANZIN-MONNIN:

Q.    Doctor Akl, if it's okay with you, can we start with the validity of the patents?

A.    Yes.

Q.    And what is your understanding of how validity is determined?

MR. CORDELL:  Your Honor, I object.  This was one of the slides I believe Your Honor struck this morning.

MR. SHEASBY:  No, Your Honor, that's incorrect.

THE COURT:  I don't remember this slide being contested this morning.

MR. SHEASBY:  Your Honor, it was not struck.

THE COURT:  It's fine, Mr. Sheasby.  And this is not your witness.  If there's a response needed, counsel who has the witness will respond

MR. CORDELL:  We'll recheck our notes, Your Honor.  But then I'll object the witness is not to instruct the jury on the law.

THE COURT:  Well, this is consistent with the preliminary instruction I've already given the jury, so I'm

1277

going to allow it.

Let's continue.  Objection's overruled.

Q.  (BY MR. MANZIN-MONNIN)  So, Doctor Akl, what is your understanding of how validity is determined for the patents-in-suit?

A.  So patents are assumed to be valid.

Q.  And what is the standard by which Samsung must show that the patents are invalid?

A.  Clear and convincing evidence.

Q.  Let's start with the '130 Patent.  Is it your understanding that Samsung alleges that the '130 Patent, claim 20, is invalid due to a lack of written description?

A.  That is my understanding.

Q.  And could you explain what elements of the claim Samsung alleges are not described in the specification?

A.  The M, which is the transmission symbols; B, which is the bits for the uplink control; k, the predefined sequences; and then N on which they're all mapped on.

Q.  Do you agree or disagree with Samsung's position that these variables are not described in the specification of the '130 Patent?

A.  I disagree.

Q.  And why is that?

A.  Because the specification of the patent describes exactly what those variables are and how they are used, so K is the

1278

predefined sequences, M is the transmission symbols, you have B-bits for uplink control information, and N is the length on to which you're going to map the N subcarriers, the sequence on.

Q.   And were there examples in the patent specification describing what these variables relate to?

MR. CORDELL:  Your Honor, may we approach?

THE COURT:  Approach the witness [sic].

(The following was had outside the hearing of the jury.)

MR. CORDELL:  So I do owe the court an apology about the prior exhibit.

THE COURT:  That's all right.  We don't have time to waste.

MR. CORDELL:  Yeah.  It's just it was renumbered. That the problem.  They've all been renumbered.

THE COURT:  What are we up here for, Mr. Cordell?

MR. CORDELL:  This is background.  It was supposed to be used in background.  It wasn't supposed to be an element-by-element analysis, and that was the ruling this morning.

THE COURT:  That was the ruling.

MR. MANZIN-MONNIN:  Your Honor, I didn't do an element-by-element analysis.  I asked if the variables are discussed in the patent specification.  If M, B, if there's

examples of them and if they're discussed.  That's simply background on the specification.

THE COURT:  Well, background is a rather amorphous term.  I think you're beginning to put a toe over the line to go beyond background.  You need to curtail this examination on this slide.

MR. CORDELL:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

MR. MANZIN-MONNIN:  Go to the slides, please?

Q.   (BY MR. MANZIN-MONNIN)  Now, Doctor Akl, you were here for the testimony of Doctor Min.  Is that correct?

A.   Yes.

Q.   And there was some suggestion during that examination by Samsung's lawyers that the variables in the claim are unlimited.  Did you hear that testimony or that questioning?

A.   I did.

Q.   Now, as a practical application, is that right?

A.   No.

Q.   And why is that?

A.   Because the claims specifically say you need to transmit those sequences in a transmission time interval.  And a transmission time interval, we're making it smaller and smaller.  So they're not -- they're very limited by the TTI, which is very, very small.

Q.   Would it make sense, in your opinion, for the specification to describe examples with huge numbers of bits being sent on a TTI?

A.   No.  That's not a practical situation.

Q.   Let's turn to the '443 Patent.  Do you agree or disagree that the references Samsung showed, either alone or in combination, teach the elements of the '443 claims?

A.   I disagree.

Q.   Now, Samsung's attorney asked Doctor Wicker about two references--Cho and -- I'm probably going to mispronounce this -- Bhattacharya.  Can you give an example of why Bhattacharya does not anticipate?

A.   Yes.  It's a patent related to WiFi.  It's not related to cellular.

Q.   And is the same true of the second reference, Cho, that was discussed with Doctor Wicker?

A.   Yes.  It is also a WiFi patent, not a cellular patent.

Q.   Did Samsung's attorneys ask Doctor Wicker about any sections of those documents relating to cellular systems at issue in this case?

A.   No.

Q.   And so in your opinion, could alleged prior art references that have nothing to do with cellular communications establish that the technology claimed in the '443 Patent is routine or conventional?

1281

MR. CORDELL:  Objection, leading.

THE COURT:  Sustained.

12:55

Q.    (BY MR. MANZIN-MONNIN)  What is your opinion on whether the prior art references relied on by Samsung's counsel and Doctor Wicker render the claims of the '443 Patent routine and conventional?

A.    I disagree that they would render the claims routine and conventional.  They're not even cellular patents.  They relate to WiFi.

12:55

Q.    Let's turn to the '776 Patent.

Now, do you agree that the references shown by Samsung's counsel and Doctor Min, either alone or in combination, teach the elements of the '776 claim?

A.    I disagree.

Q.    Does any of the references relied on by Samsung's counsel and Doctor Min propose to set the priority of the same priority cells equal to the absolute priority?

12:56

A.    No.

Q.    Now, do you recognize this reference?

A.    Yes.

Q.    And this is one of the prior art documents that Samsung's counsel and Doctor Min presented.  Do you recall that?

A.    Yes.

Q.    And does this reference propose to set the priority of the same priority cells equal to the absolute priority?

12:56

A.   No.

Q.   And why do you say that?

A.   What this reference is proposing is not a priority related to corresponding frequencies, but it's looking at doing load balancing.

Q.   And how about this reference?

A.   This is another reference, DTX 159, and it also discusses and the purpose is load balancing.

Q.   And is the same true of each and every reference that Samsung's counsel showed to Doctor Min?

A.   Yes.  They all deal with and pick based on the load across cells.

MR. MANZIN-MONNIN:  Madam Courtroom Deputy, may I have the elmo?

Q.   (BY MR. MANZIN-MONNIN)  And so do you recognize this document?

A.   Yes.

Q.   And what is this?

A.   This is DTX 19.  It is a patent application for Lee.

Q.   And is this one of the references that Samsung's counsel showed to Doctor Min regarding the '776 Patent?

A.   Yes.

Q.   And if we zoom in here on the abstract section, what does it say here about the type of information that's being considered as part of cell reselection in this reference?

1283

A.   It describes receiving cell load information and performing cell reselection by using the cell load information.

Q.   And so to conclude, in your opinion, does any of these references presented by Samsung's counsel render the claims of the '776 Patent routine and conventional?

A.   No.  They all deal with a different way of -- of picking a cell based on balancing load.

Q.   And is there any way that you could combine these different references and somehow end up at the '776 claims?

A.   No.

          MR. MANZIN-MONNIN:  Could we have the slides back, please?  And could we jump to slide 1?

Q.   (BY MR. MANZIN-MONNIN)  So I'd like to ask you about some of the testimony we heard regarding your opinions on infringement.  Would that be okay?

A.   Yes.

Q.   All right.  So let's start with the '130 Patent.  Did you hear Samsung's counsel argue as their only defense to infringement on the '130 Patent that TTI does not exist in 5G?

A.   Yes, I heard that.

Q.   Is that correct?

A.   No, I disagree.

Q.   What did Samsung's witnesses have to say about whether TTI exists in 5G?

1284

A.    That the sequences are sent on symbols in a transmission time interval for format 0.

Q.    And so how do we know whether Mr. Kim is testifying about 5G here?

A.    Because when we look at format 0 in PTX 6, on top, this document and the cover is 5G new radio specification, physical uplink.

Q.    And whose document is this?

A.    This is a Samsung document.

Q.    Now, what is the TTI for format 0 in 5G?

A.    Looking at the first row, it says it's 1 or 2 OFDM symbols.

            MR. CORDELL:  Your Honor, may we approach?

            THE COURT:  Approach the bench.

            MR. CORDELL:  Can we leave the slides up, please?

            (The following was had outside the hearing of the jury.)

            MR. CORDELL:  I know counsel's under the gun and I hate to -- to take time, but I'm going to have a real problem crossing him because they're bringing up slides we haven't seen before.  They're not scandalous or outrageous.  They are completely different.  This is PDX, 4.2.  It is a completely different slide.

            MR. MANZIN-MONNIN:  Your Honor --

            MR. CORDELL:  So I think in the the record, it's

going to be a real challenge for me.

THE COURT: You're telling me that Plaintiff's counsel is using demonstratives that were not produced to you?

MR. MANZIN-MONNIN: No, Your Honor.

THE COURT: Let me talk to him. I'll talk to you in a minute.

MR. CORDELL: So, you know --

THE COURT: Is that right, Mr. Cordell?

MR. CORDELL: I -- I don't have them. I mean, if they have been produced, I would particularly like to know when and where because what I have --

THE COURT: Well, you're not the only lawyer representing Samsung here. Have they been produced to your trial team?

MR. CORDELL: My team tells me they have not, that this one has not. I can't say about the others, but I've been trying to follow along and pull slides that I need for cross, and when I go look for them, I can't find them.

MR. MANZIN-MONNIN: Well, we're happy to pull up slides for you, but these were all played in live court during Doctor Akl's direct examination already. You objected --

THE COURT: Wait a minute. The fact that they were used in the parties' case in chief doesn't necessarily mean that they're demonstratives for the rebuttal case. You have to disclose your demonstratives for your case in chief, the

Defendant has to disclose theirs for their witnesses in their case in chief, and you have to disclose yours for your rebuttal witnesses.

I assume you made a disclosure of your demonstratives for this rebuttal witness because we sure as heck went through a lot of disputes about them this morning.

MR. MANZIN-MONNIN:  Absolutely.  But we also represented that we could rely on our demonstratives from direct.  There was no objection to that.  We met and conferred extensively last night about this, and no objection was raised.

THE COURT:  Well, that's news to me, but of course I wasn't a part of those meet-and-confer discussions.

MR. CORDELL:  I would say two things, Your Honor.  I didn't find this in the slides we went through this morning, and I don't find it in the original set that -- I'm holding the original set.  And PDX 4.2 is a completely different slide.

MR. MANZIN-MONNIN:  They get renumbered when you cut slides out.  I will be happy to give you access to our slides during your redirect.

MR. CORDELL:  So here's the issue.

THE COURT:  The issue is I don't want the Defendant surprised and I don't think you do, either, but we need to get to the bottom of this and we don't have time to be wasting up

here at the bench hashing through all this.

MR. CORDELL:  May I ask for a paper copy of the slides that counsel is using now?

MR. MANZIN-MONNIN:  Yes.

THE COURT:  Do you have an extra copy?

MR. MANZIN-MONNIN:  Happily.

THE COURT:  Give those to Mr. Cordell.

MR. MANZIN-MONNIN:  Sure, Your Honor.

(The following was had in the presence and hearing of the jury.)

MR. MANZIN-MONNIN:  Your Honor, may I go retrieve those?

THE COURT:  Yes, please do.

MR. MANZIN-MONNIN:  Doctor Akl, do you have a copy of the slides?

THE WITNESS:  Yes, I have a copy of my slides.

MR. MANZIN-MONNIN:  Your Honor, would it be --

THE COURT:  I'd prefer you not talk about across the courtroom with the jury in the box.  But if there is an extra set of slides at the podium, you can retrieve it.  The Court security officer will hand it to you.

Do you want to check them and make sure that's the right group, counsel?

MR. MANZIN-MONNIN:  Yep.  These are correct.  Thank you, Your Honor.

THE COURT: All right. If you'll hand them to opposing counsel, we'll go back to where we were.

Next question, please.

Q. (BY MR. MANZIN-MONNIN) So could you repeat again, what is the TTI for the format 0 in 5G?

A. It is one or two OFDM symbols as shown on the first row.

Q. How does that compare to the patent's description of the TTI?

A. It's identical. The patent specification says that you want the length of the TTI to be small and as small as 1 or 2 OFDM symbols.

Q. Now, you were here in court when Samsung's counsel was talking about how the source code you showed in your direct was really just about synchronizing a watch to go on a mission. Do you recall that?

A. Yes.

Q. What's your reaction to that?

A. I disagree.

Q. Can you explain why?

A. Yes. So this is the Qualcomm source code, and specifically it is 5G. We know that from --

MR. MANZIN-MONNIN: I apologize, Your Honor. We need to seal the courtroom for this part of the testimony.

THE COURT: All right. At counsel's request I'll order the courtroom sealed.

Those present not subject to the protective order in this case, please exit the courtroom and remain outside until it's reopened and unsealed.

(Courtroom sealed.)

1304

(Courtroom unsealed.)

Q.   (BY MR. CORDELL)  So, Doctor Akl, you began your direct testimony on the '130 Patent.  Is that right?

A.   Yes.

Q.   And I tried to write this down as fast as I could, but I think your testimony was it's not practical for the patent to show examples with huge numbers of bits.  Did I get that right?

A.   No.

Q.   You remember the issue.  We say the claim says you can have a large number of bits and that the patent doesn't show that large number of bits.  Do you remember that?

A.   I remember Samsung's position, yes.

Q.   And I thought I -- if I misunderstood you, please correct, me.  But I thought you said that it's just not practical for the patentees to have shown examples with a large number of bits because it's too unwieldy.

A.   That is not what I was saying.  I can tell you what I said if you want.

1305

Q.    Sure.

A.    I was saying the -- because it depends on transmission time interval, which is smaller and smaller, those numbers are bounded by the fact that they depend on being transmitted in TTI.

So it would be impractical in a real situation to have these large numbers because that is not a practical situation, because the transmission time interval is not unlimited.  So you would not have these unlimited embodiments.

Q.    Okay.  And so it's -- it's -- well, you understand that it's a legal requirement for a patent in this country that the patent applicant tell everybody about their invention.  Right?

A.    Yes.

Q.    And that's sort of the trade-off.  Right?  The inventor tells us all about the patent, and they get -- they get patent claims.  That's the deal.  Right?

A.    Yes.

Q.    So it may be impractical for the inventors to have told us all about these examples.  Right?  Isn't that what you just said?

A.    I'm saying it's not a practical implementation.

Q.    Okay.  And yet it wasn't impractical for them to claim an unlimited amount of bits when they got to the patent claims.  Right?

A.    I don't think they did.

1306

Q.   Well, the claims just say plural bits.  Right?

A.   That's one of the things it says, yes.

Q.   And that could be 2 bits.  Correct?

A.   Yes.

Q.   It could be 6 bits?

A.   Possibly.

Q.   I won't say a dollar, but it could be more than that. Right?

A.   As long as the other limitation algorithms also met.

Q.   Okay.  And it's -- so you acknowledge the claims would cover 6 bits, for example.  Right?

A.   I don't think I specifically entered a number in my analysis.

Q.   Well, you said the claims could cover a larger number of bits.  Right?

A.   I did.

Q.   But in your view it's just too impractical, it's too hard, for the inventor to have told us how to do that.  Right?

A.   No.  It's impractical in a real system because it's also limited on transmission time interval.

Q.   The inventors didn't tell us how to do it.  Right?

A.   They did for a practical system.

Q.   But they didn't tell us for the claimed system.  Right?

A.   No, I disagree.

Q.   Well, they didn't tell us how to handle 6 bits.  Right?

1307

A.   They did not give an example.

Q.   And six bits would be covered by the claim.  Right?

A.   It could be.

Q.   Let's go to '443 Bhattacharya.  You said, if I understood you right, that the Cho reference was about WiFi?  Is that right?

A.   Yes.

Q.   And you seem to think that somehow the fact that it might or might not be WiFi is relevant to the validity analysis?  Did I understand you right?

A.   Yes.

          MR. CORDELL:  Can I have DDX 5-30?  Or we could just do claim 10 of the '443 Patent.

Q.   (BY MR. CORDELL)  Okay.  This is the '443 Patent.  Correct, sir?

A.   Yes.

Q.   Okay.  And you understand that it's Samsung's contention that claim 10 is anticipated in this case.  Right?

A.   Yes, I understand that.

Q.   And that means that the stuff that's written in this claim was done earlier by somebody else.  Right?

A.   Yes.

Q.   And that somebody else in this case is actually Samsung.  Right?

A.   That's their position, yes.

1308

Q.   And you say that the Cho -- the Samsung Cho reference is talking about a WiFi system, the thing that we use in this courtroom to communicate.  Right?

A.   Yes.  It's a different standard.

Q.   And, I'm sorry, but is there a standard called out in claim 10?

A.   No.

Q.   In fact, it just says a node.  Right?

A.   Correct.

Q.   And that node could be a WiFi node, it could be a cellular node, it could be a -- oh, you know, an ATM node. Right?

A.   It could.

Q.   It just means it's a -- it's a -- one end of a communication system.  Right?

A.   For that word on its own, yes, that is correct.

Q.   And I listened carefully to your testimony, sir, and you didn't point out a single substantive element in this claim that was missing from the Cho reference.  Did I miss something?

A.   I didn't go into that.  That's correct.

Q.   You did not dispute any of the limitations that Doctor Wicker said were all contained within the four corners of the Cho reference.  Right?

A.   No, I do.

1309

Q.   Well, you think that the Cho reference doesn't count because it's WiFi.  Right?

A.   Yes.  It's a different standard.  There is no NACK in WiFi.

Q.   So, for example --

MR. CORDELL:  If I can have the elmo.

Q.   (BY MR. CORDELL)  Doctor Wicker took us through all of the elements of claim 10 of the '443 Patent.  Right?

A.   Yes.

Q.   And he checked off every single one of them being in the Cho reference.  Right?

A.   Correct.

Q.   And you haven't told the jury that any of these elements 10[a], 10[b], 10[c], 10[d], or 10[e] is missing from the Cho reference.  Correct?

A.   I did, at a high level.

Q.   Okay.  But you never said, You know, that Cho reference it's missing 10[c].  Right?

A.   That's fair.

Q.   And you didn't say it was missing 10[a].  Right?

A.   I did not.

Q.   And you didn't say it was missing 10[b].  Right?

A.   I did not.

Q.   And you didn't say it was missing 10[d].  Right?

A.   I did not.

1310

Q. And you didn't say it was missing 10[e]. Correct?

A. I did not.

Q. Okay. So with respect to the '776, I think you were taking issue with whether the prior art was combinable with one another. Did I get that right?

A. In part.

Q. Okay. And I think your point there is, you know, Yeah, this stuff might have all been out there, but nobody put it together just the right way. Is that fair?

A. No. It's not related because, again, WiFi is different than cellular, and their implementation is very different, so it wouldn't even apply.

Q. I'm talking about the '776 Patent now, sir.

A. Oh, I thought we were still on the '443. I was confused.

Q. I'll take that down.

We don't even have an obviousness challenge on the '443. Are you aware of that? We didn't offer one at trial.

A. That is correct.

Q. Okay. So for the '776, your point was, you know, the prior art doesn't go together very well, or something like that. Did I get that right?

A. That was one of my arguments for obviousness for the '776.

Q. Okay. But when it came down to actually disputing whether somebody had done the '776 Patent before, you didn't

say, Oh, element [b] is missing, did you?

A.    Yes, I think I did.

Q.    Well, I guess we'll have to rely on our memories for that.  But the point there is that you didn't pull up the '776 Patent and say, That element right there is missing from the prior art and this is why.  Correct?

A.    I verbalized the elements that are missing.

Q.    On the '130 Patent for TTI --

MR. CORDELL:  Can I have PDX 4.2?  Please?

Your Honor this is where my -- may I return to my seat one more time?

THE COURT:  You may.

Just so you know, you have 3 minutes and 30 seconds of trial time remaining.

MR. CORDELL:  Thank you.

Q.    (BY MR. CORDELL)  PDX is a completely different slide you presented in your first testimony.  Right, sir?

A.    I don't understand the question.

Q.    You see the number 4.2 down here?

A.    Yes.

Q.    That's a different slide than what you presented today.  Right?

THE COURT:  Mr. Sheasby, take your seat, please.  I don't want you to block the jury's view of the podium.

THE WITNESS:  I agree that the slides have different

content.

Q.    (BY MR. CORDELL)  More than that, sir, you gave me two slides with the same number.  Right?

A.    Okay.  I mean, I didn't give them to you, but okay.

Q.    Okay.  But this is the slide you presented just a few minutes ago.  Right?

A.    Yes, I did.  I used this slide.

Q.    And the question that was asked to Mr. Kim is "In a given transmission time interval," et cetera, et cetera.  Do you see that?

A.    Yes.

Q.    Those words are not capitalized.  Correct, Doctor Akl?

A.    In the question in the deposition transcript they are not.

Q.    So when we capitalize words, sometimes they have a different meaning.  Isn't that correct?

A.    Not in a deposition transcript.

Q.    My son dressing like a cowboy could be Roy Rogers or it could be Troy Aikman.  Right?

A.    Yes, in your example.

Q.    It would be capitalized if it was Troy Aikman; it would be small C if was Roy Rogers.  Right?

A.    In your example, yes.

Q.    Let's talk about the '776 testing.

      Whose burden is it to prove infringement?

1313

A.    G+.

Q.    And on cross examination you and I talked a lot about the testing that you had another service due.  Do you remember that?

A.    Yes; a third party.

Q.    And you didn't supervise what they were doing.  Right?

A.    I disagree.

Q.    Well, you didn't go down there, did you?

A.    I did not go in person.  I had calls with them.

Q.    You didn't Zoom in while they were doing the tests.  Right?

A.    I had Zoom calls to discuss the tests.

Q.    Okay.  So the point here is it's your burden to prove infringement and it's your burden to satisfy this jury that the testing that was done wasn't just done by the lawyers.  Right?

A.    Of course.

Q.    And it wasn't just done by a bunch of guys that you hired who do patent litigation support.  Right?

A.    They could provide patent litigation support and do testing.  I would disagree with that.

        MR. CORDELL:  Your Honor, I pass the witness.

        THE COURT:  You have one minute remaining.

    Is there redirect?

        MR. MANZIN-MONNIN:  Yes, Your Honor.

1314

THE COURT:  All right.  Let's proceed with redirect.

REDIRECT EXAMINATION

BY MR. MANZIN-MONNIN:

Q.   Are the claims of the '130 Patent to an unlimited number of bits?

A.   No.

Q.   How are they limited?

A.   They are limited -- there is an equation and there is also language that says you need to transmit in a transmission time interval, so they are limited in two ways.

Q.   So Samsung's counsel asked you if there are any examples in the patent that use six bits, for example.  Is that right?

A.   Yes.

Q.   Are there examples in the patent that use the k predefined sequences, the B-bits the M symbols, and the N length?

A.   Yes, there are examples with those variables.

Q.   Does Samsung concede that a person of skill in the art can make and use the full scope of these claims?

        MR. CORDELL:  Objection; leading.

        THE COURT:  Sustained.

Q.   (BY MR. MANZIN-MONNIN)  Do you know what Samsung's position is on whether a person of ordinary skill in the art reading the claims could make and use a system with, for example, six bits?

A.    I don't think they're disputing that.

Q.    So they concede that point.  Is that right?

A.    Yes.

Q.    Let's turn to the '443.  Now, you were asked if you identified any particular claim elements that were not shown in the prior art.  Do you recall that?

A.    Yes.

Q.    Now --

        MR. MANZIN-MONNIN:  Can I approach the table, Your Honor?

        THE COURT:  You may.

                (Pause in proceedings.)

        MR. MANZIN-MONNIN:  While they bring it up, I'll just ask the question.

Q.    (BY MR. MANZIN-MONNIN)  You understand that the claims of the '443 require the generation of HARQ information.  Correct?

A.    Yes.

Q.    What is -- what -- how does HARQ relate to the generation of ACKs and NACKs that we've talked a lot about?

A.    So with HARQ you need to have both an acknowledgement for success and a NACK or a negative acknowledgement for a failure.

Q.    Does WiFi generate any NACKs?

A.    No.  WiFi only generates an ACK, and if you don't receive something you don't send the NACK, and the base station your

router will time out and then retransmit, but there is no NACK in WiFi.

Q.   Does the Cho or Bhattacharya reference say the word 'HARQ' anywhere inside that document?

A.   They do not.

          MR. CORDELL:  Objection; leading, Your Honor.

          THE COURT:  Untimely.  Let's move on.

Q.   (BY MR. MANZIN-MONNIN)  So, in your opinion, do either of those references anticipate any of the limitations related to HARQ?

A.   They do not.

Q.   Now, there were also some questions about the evidence you showed for infringement of this patent.  Do you recall that?

A.   Yes.

          MR. MANZIN-MONNIN:  Now, if we could bring that back up, please.

Q.   (BY MR. MANZIN-MONNIN)  And specifically you were asked about this element [b].  Is that right?

A.   Yes.

Q.   Has Samsung contested at any point in this trial that all of the accused products infringe element [b]?

          MR. CORDELL:  Objection; leading.

          THE COURT:  Sustained.

Q.   (BY MR. MANZIN-MONNIN)  Can you tell us one way or

another what Samsung's position is about element [b]?

A.   Element -- my understanding is element [b] is not disputed as infringed by the Samsung products, and they only pointed -- that's it.  I'll stop here.

Q.   And so did any of the source code you did show while discussing the '443 Patent evidence that, in fact, the Samsung products with Samsung processors perform the functionality described in element [b]?

A.   Yes.

Q.   And so when you showed code relating to among the M bits there, being these specific M2 bits, for example, did that also provide evidence for the M bits in claim element [b]?

MR. CORDELL:  Objection; leading.

THE COURT:  I'm going give counsel some latitude. You're both running out of time.  Let's finish this examination.  Overruled.

THE WITNESS:  Yes.  So the fact that I show it for M bits and M2 bits for [c], it would be the same code for element [b].

Q.   And just for the record, switching back to the validity arguments for a second on this patent -- are you with me?

A.   Yes.

Q.   So could references such as Cho and Bhattacharya that don't involve NACK satisfy limitations regarding indicating the positions of k erroneous transmission blocks?

A.    No.

Q.    And why is that?

A.    Because, again, there is no negative acknowledgement, so you're not indicating positions of k erroneous transmission blocks.

Q.    So the only two references Samsung showed don't involve HARQ.  Is that right?

A.    Correct.

Q.    They don't talk about k erroneous transmission blocks. Is that right?

A.    Correct.

Q.    So could they anticipate this claim?

A.    No.

Q.    And let's turn to the '776.

       Has Samsung shown a single priority art reference or combination of references that involves same priority cells where the priority is equal to the absolute priority?

A.    No.

          MR. MANZIN-MONNIN:  No further questions, Your Honor.  I pass the witness.

          THE COURT:  All right.  Is there further cross examination?

          MR. CORDELL:  No, Your Honor.  Thank you.

          THE COURT:  You may step down, Doctor Akl.

          THE WITNESS:  Thank you, Your Honor.

THE COURT:  Plaintiff, call your next rebuttal witness.

MR. SHEASBY:  Your Honor, may it please the Honorable Court, G+ rests its case.

THE COURT:  All right.  Plaintiff and Defendant, subject to final instructions from the Court to the jury and closing arguments, rest and close.  Am I correct?

MR. SHEASBY:  Yes as to Plaintiff.

MR. CORDELL:  Yes, Your Honor.

THE COURT:  All right.  Thank you, counsel.

Ladies and gentlemen of the jury, that means you have now heard all the evidence in this case.  There are certain procedural things I need to work through with counsel for the parties that do not require your presence and they're going to take some length of time.  They're not particularly quick or short.  I wish they were, but they're not.  Consequently, I'm not going to keep you here the remainder of the afternoon. I'm going to let you go for the rest of the day, but I want you back in the morning ready to go at 8:30 as planned.

If you will, take your notebooks with you when you leave the courtroom in just a minute or two, and leave them on the counsel table -- or on the jury room table closed so that'll be there tomorrow.  Follow all my instructions.  We are getting close to the end of the trial.  Please make sure that no one slips up and no one fails to follow my instructions.

Tomorrow I expect to start by giving you my final instructions on the law that you're to apply in this case, then following that I expect you will hear closing arguments from the attorneys for the competing parties.  After you hear all the closing arguments from counsel tomorrow, that is when you can expect me to say, "Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict."  And as I told you on the first day, when that time comes, things will change and you will go from being prohibited from discussing the evidence among each other to being required to discuss the evidence among each other in an effort to reach a unanimous decision about the questions you will answer in the verdict form, which will establish the facts in this case, because, as I've told you throughout the trial, you will determine the facts in this case and no one else.

So with that, ladies and gentlemen, travel safely to your homes.  What you do with this time back is a small downpayment on the lateness I have kept you over this week, and I don't know how we could have avoided it.  But the case should be in your hands tomorrow, and I think that is a good schedule to keep us on.

So with that, you're excused until tomorrow morning at 8:30.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel.  Be seated, please.

For the record, the Plaintiff had 6 minutes of trial time left and the Defendant had one whole minute left.

All right.  It is 12 minutes until 2:00.  I'm going to take a recess until 2:00.  At 2:00 I intend to come back and hear motions from either party pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  After I have heard and ruled on those motions, I'll conduct an informal charge conference with regard to the most current version of the final jury instructions and the verdict form.

Notwithstanding significant progress on that, there are still a lot of objections to be gotten through with regard to the charge and the verdict form, and I will expect counsel to work efficiently with the Court in that regard.  If you are going to be involved in presenting closing arguments tomorrow, you are not required to be here for 50(a) motions or for the charge conference.

After I've completed the informal charge conference, I'll take the input of the parties into account, I'll generate what the Court believes to be the appropriate final jury instruction and verdict form, I'll furnish it to counsel with an opportunity to review it, and then I'll conduct a formal charge conference on the record where either party may lodge such objections as they believe are appropriate and necessary. It may be that we will do that early in the morning.  It

1322

depends on how the process goes.

I don't mind staying up here after 5:00, but I do not intend to keep my staff up here until after 5:00, and they have to be here for the formal charge conference. If we can get this done through the rest of the day, then we'll do the formal charge conference the last thing before we leave today; if we can't, we'll do it first thing in the morning. We'll see how it goes.

And let me just say this, please. I understand that there are counsel on both sides who fancy themselves avid appellate lawyers. 50(a) motions should be targeted. They should be short. I've heard all the evidence. You certainly can reurge them once you've raised them on 50(a), if necessary, on 50(b). I don't need a lengthy argument where you are reading a preprogrammed motion of 15 or 20 pages on 50(a) motions. That's not necessary.

Also, 50(a) practice is typically where lawyers who have not participated in the trial get an opportunity to go to the podium and participate. I welcome the younger lawyers, the less-experienced lawyers participating, but please be mindful of the fact that I have been here throughout the whole trial. I've heard all the evidence. I have a good understanding of what each side has put on. I cannot count the number of times a young lawyer's gone to the podium on 50(a)s looked at me and said, Your Honor, this is a patent case. We don't need that

today.

All right.  I think you understand what I'm trying to say.

Mr. Sheasby, are you going to be presenting closing for Plaintiff or are you going to split with co-counsel?

MR. SHEASBY:  Your Honor, right now I think I'm going to be presenting it on my own.

THE COURT:  Mr. Cordell, I assume you will be presenting closing for Defendants.

MR. CORDELL:  I will, Your Honor.

THE COURT:  You two gentlemen are not required to be here throughout the rest of the day.  You can work on your closing arguments.  You're certainly welcome to be here if you want to be, but you're not required to.

Also for the record I'll note that the expert witnesses, primarily on the Plaintiff's side, have been here throughout the remainder of the trial.  I don't see all the Defense expert witnesses, but just for clarity on the record I'm excusing all the witnesses in the case.  They're free to get on a plane and go back to wherever they need to go.

MR. CORDELL:  Thank you, Your Honor.  I did communicate with Doctor Wicker, and he is at the hotel and was going to come back, but I appreciate that.

THE COURT:  You have something, Mr. Sheasby?

MR. SHEASBY:  I do, Your Honor.

First off, I apologize for delaying the break.

There is going to be a potential and I think to effectively close we're going to need to show source code, because this has been such a source code intensive case. It seems to me that there's two ways of doing it. One is to seal the courtroom because so much of it is going to be -- involve source code. There's an alternative way, which is to say on the screens that the public sees there will be no source code, the confidential source code, and we can either put a television right in front of the jury which will show the form that has source code on it, which I know may displease the Court because it alters the Court's physical structure. Or the alternative we could have handouts for the jury specifically for the slides with source code that would maximize the public availability.

THE COURT: Have you met and conferred with opposing counsel about this issue?

MR. SHEASBY: It just came up. I'm flagging it for you now. And we will meet and confer about it as soon as this is over, but it implicates the proper sort of running of your courtroom and so I did want to flag this as far in advance as possible.

THE COURT: All right. Well, I'll direct you to meet and confer with Mr. Cordell about this. Certainly I'm going to protect the confidentiality of source code, but those

1325

are perhaps three different ways to do it.  I'd like to hear from both of you after you've met an conferred on it, and I'll be open to further discussions, but one way or the other we will not disclose source code during closing arguments.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  All right.  Anything further?

MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

MR. CORDELL:  Nothing from Defendants, Your Honor, other than just please to remind everyone that we continue to have slides produced with source code on them with no legends whatsoever.  And I know this from bitter and painful experience that particularly third-parties that produced this code to us will hold us all, Mr. Sheasby and myself, personally responsible for any breach that occurs because of this.  So I may -- I've made speeches.  I'd just to resurge that we refocus on making sure that our source code hygiene is very good.

THE COURT:  Well, thankfully I don't participate in the generation of the slides.  Certainly your point is well-taken and I will do what I can to encourage all the parties and all counsel to be particularly vigilant with regard to the use of source code, both party source code and third party source code.

MR. CORDELL:  Thank you, Your Honor.

THE COURT:  All right.  Given the time we've taken

since I started this, I'll be back at 10 minutes after 2:00 and we'll take up 50(a)s at that point.

The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

All right.  The Court is now prepared to hear from the competing parties with regard to any motions either party may care to make pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

The Court's typical practice here is first to ask both sides to identify topically what they may wish to move on under Rule 50(a), and then after I've identified the subject matter or the topics of the motions, then I'll come back and hear argument.  It is often the case that there are diametrically opposed motions that can be argued concurrently for efficiency.

So let me ask Plaintiff or a representative of Plaintiff to go to the podium and identify for me by subject matter any matter it cares to move for relief on under Rule 50(a), and then I'll hear the same from Defendant.

MR. LINETESKI:  Good afternoon, Your Honor.  Justin Lineteski representing G+.  G+ intends -- sorry.  Your Honor --

THE COURT:  Yes.

MR. LINETESKI:  -- Plaintiff respectfully moves

1327

under Rule 50(a) for judgment as a matter of law on five issues:  infringement, validity, specifically written description, anticipation, obviousness, and 101 in regards to '776 and '443.

THE COURT:  Hang on just a second.  102, 103, 112, and 101?

MR. LINETESKI:  Correct.

THE COURT:  What's the third topic?

MR. LINETESKI:  G+'s breach of the FRAND claim, Samsung's breach of FRAND claim, and damages.

THE COURT:  All right.  Thank you.

Let me hear a similar offering from Defendants, please.

MS. DEGNAN:  Good afternoon, Your Honor.  Lauren Degnan for Samsung.

THE COURT:  Yes, ma'am.

MS. DEGNAN:  We'll be moving for non-infringement of all asserted claims, of all asserted patents literal and DoE. We'll be moving invalidity --

THE COURT:  Just a moment.  All right.  Validity.

MS. DEGNAN:  For validity under 50(a) and it will be the '776, sections 101, 102, and 103.  For the '130 Patent, it's section 112, written description.  And the '443 Patent, it's section 101 and 102.

THE COURT:  All right.

MS. DEGNAN:  We'll be moving for no damages on

1328

Plaintiff's patent infringement claims.

THE COURT: Next?

MS. DEGNAN: GComm has a breach of the NDA claim against Samsung, and we're moving for JMOL on that claim. That's separate from the FRAND allegations. It's the separate thing they pled, and we're moving for that one.

THE COURT: Next?

MS. DEGNAN: And then on the FRAND and SE related contract claims, we'll be moving for them. GComm failed to establish that Samsung did not negotiate in good faith and they failed to establish that Samsung has a contract with ETSI that could be breached.

THE COURT: Just a moment. So you're saying that the claim by Plaintiff against Defendant pursuant to the FRAND obligation is subject to the motion.

MS. DEGNAN: Yes, Your Honor.

THE COURT: All right. Are you moving on the Defendants' counterclaim for breach of FRAND?

MS. DEGNAN: Yes, we are.

THE COURT: Okay. What's next that you seek relief under Rule 50(a) in regard to?

MS. DEGNAN: They both fall within the ambit of the FRAND, and we can give detail later. They're a little unusual for me so I don't know how much I should actually say now.

THE COURT: I'm just looking to identify the subject

matter.  I'll come back and hear the argument.

MS. DEGNAN:  It will be on the FRAND, both our claim and theirs.

THE COURT:  FRAND both ways?  I got it.

MS. DEGNAN:  Thank you.

THE COURT:  Next?

MR. McKEON:  Your Honor, just one clarification on that.  We're going to add to that we're moving on damages under FRAND as well separate from the patent damages.  So the liability portion of the breach of contract, we're going to move both ways.  And then they haven't proven damages, that they were damaged by any alleged breach with Samsung, and we're going to move that we've proven damages and they haven't rebutted that at all.  So that's the damage part of that as well.

THE COURT:  All right.  Is there anything else either party needs to identify for the Court that they have not?

MS. GLASSER:  No, Your Honor, although I would ask permission for me to address the motion with respect to the breach of NDA.

THE COURT:  Well, you can certainly argue your side of that issue when it comes up.  I'll let whoever is the appropriate counsel argue each of these issues as they come up.

MS. GLASSER:  Thank you, Your Honor.

THE COURT:  It looks like we have diametrically-opposed positions of the parties with regard to the infringement issue.  So let me hear argument on both infringement and non-infringement literally and under the doctrine of equivalents from both parties, starting with the Plaintiff.

And again, counsel, it's the Court's view that Rule 50(a) does not require you to cover every possible iteration of the relief you've requested.  It merely requires that you identify the relief you're seeking after that issue's been fully heard by the jury.

So this is not an argument before the Court of Appeals for the Federal Circuit.  It's simply identifying what you think your relief is, and the Court will then draw on its recollection of the entirety of the evidence and either grant or deny judgment as a matter of law.

So go ahead, counsel.

MR. LINETESKI:  Understood, Your Honor.

Plaintiff moves for judgment as a matter of law that no reasonable jury could find that Samsung has not infringed the patents-in-suit literally or under the doctrine of equivalents.

G+ presented evidence that Samsung infringed the patents-in-suit for two independent reasons:  First, the

1331

patents-in-suit read on portions of the 5G standard that are mandatory, and even if not mandatory, Samsung admits it practices. And, two, the admissions of Samsung's engineers and the Samsung and Qualcomm source code used in the accused products confirm that Samsung practices each asserted claim.

THE COURT: Counsel, let me stop you. If you're going to read a prepared statement, slow down. If you can just summarize without reading a lengthy statement verbatim, I'd appreciate it. But, again, I'm not going to tell the parties how to practice law.

But if you're going to read something prepared, almost every human doubles their speed when they start reading as opposed to ordinarily speaking. So please slow down.

MR. LINETESKI: Understood.

THE COURT: Thank you.

MR. LINETESKI: In addition to the source code documents and Samsung admissions, this is supported by the opinions of Doctor Akl, Doctor Kowalski, and the admissions of Samsung's experts on cross.

With respect to standard essentiality, G+'s expert Doctor Kowalski testified without rebuttal that the asserted claims of the '130, '443, and '776 Patent read on the 5G standard.

Further, there is no dispute that Samsung implements 5G, including the specific technical specifications that Doctor Kowalski mapped to the patents.

1332

Additionally, Samsung's corporate representative, Daejin Jeon, admitted that Samsung considered these patents to be standard essential, and that is why Samsung was entitled to a FRAND royalty rate.

With respect to the '130 Patent, Doctor Min's sole argument was that the 5G standard does not include TTI, but Samsung's own corporate representative and documents confirm that TTI is present in 5G.

Independent of standard essentiality, G+ presented undisputed evidence that Samsung's products practice the asserted claims of each patent in both literally -- in the suit both literally and under the doctrine of equivalents.

For claim 1 of the '776 Patent, which is a method claim, Doctor Akl explained that Samsung meets all the limitations of the claim.  Samsung itself performs all the steps set forth in claim 1 and that Samsung itself also tests -- directs and controls other performance of these steps via testing to ensure that the phone is compatible with the network.

As Doctor Akl explained, each step is satisfied by pointing to either Samsung or Qualcomm source code, Samsung documentation, and testimony from Samsung's engineers.

Doctor Akl also explained how each of these steps are satisfied under the doctrine of equivalents because the accused products perform substantially the same function, work in substantially the same way, and achieve substantially the

same result as the requirement of the claim. This testimony went completely unrebutted by Samsung.

For claims 1 and 2 of the '776 Patent, claim 20 of the '130 Patent, and claim 10 of the '443 Patent, Doctor Akl testified that the accused products perform the requisite functions in steps both literally and under the doctrine of equivalents applying the Court's claim construction. Samsung did not provide any legally sufficient testimony and did not provide any testimony specific to claim 2.

For claim 10 of the '443 Patent, Doctor Akl explained how Samsung meets all limitations of this claim as well, both under the literal infringement and doctrine of equivalents standard, citing to Samsung's source code, documentation, and the testimony of Samsung engineers.

Samsung only disputes the length type limitations found in element C of claim 10. But not only are these limitations mandatory parts of the 5G standard, they are also implemented in both Samsung and Qualcomm source code. Doctor Kowalski testified that type 1 and type 2 codebooks are mandatory requirements of the 5G standard. Doctor Akl further testified that the source code implements this specific functionality.

Finally, for claim 20 of the '130 Patent, Doctor Akl explained that Samsung meets all limitations of the claim under both literal infringement and the doctrine of equivalents, relying on source code, Samsung documentation,

and testimony from Samsung engineers.

Samsung's sole argument with respect to this claim is that its code does not implement the TTI limitation. As just explained, however, all data transmission employs TTI since TTI is just representative of a duration.

For these reasons G+ respectfully requests that the Court enter judgment in their favor on the issue of infringement and hold that Defendants have infringed the patents-in-suit.

Thank you, Your Honor.

THE COURT: Thank you, counsel.

Let me hear from Defendants in response.

MS. DEGNAN: So, Your Honor, we oppose that motion, and the reason for that will be overlapping with the reasons we give for our own motion. So I'll just do it all at once.

THE COURT: That's why I'm doing it this way. Please proceed.

MS. DEGNAN: For non-infringement, we'll start with the '776 Patent. So we seek judgment on the '776 Patent, no literal infringement and no infringement under the doctrine of equivalents.

The limitations that are missing -- I'm just going to -- we were using shorthand notation, and given Your Honor's instruction, I will use that again. So it's element 1-A, 1-C, 2-A, and 2-B. Those are the ones that require setting a subset of cells in the same priority cells and then selecting

1335

from one of those cells.  We heard that those limitations are missing, both literally and under the doctrine of equivalents.  In addition, there's elements 1-E and 2-E.  Those limitations are -- have the clause wherein the priority of the same priority cells is equal to the absolute priority of corresponding frequencies.

Again, the evidence was that those limitations were missing, both literally and under the doctrine of equivalents.  And that evidence, to summarize, will be the testimony of Doctor Min, the source code that he looked at, the technical documentation, the standards and admissions as well by Doctor Akl and Doctor Kowalski.

And without giving you more detail, I will refer to the evidence as it came in from those witnesses as to why not only are those limitations not met, but the operation of the Samsung accused products is substantially different and there's no infringement under the doctrine of equivalents.

In addition, we have some additional arguments to make with respect to non-infringement.  First, for claim 1 of the '776 Patent, which was a method claim, there's no evidence that Samsung has performed that claim in the United States for the extent of the damages that their experts are seeking.  It's a method claim, and these products are sold.  They do not function, they are not operating.

The evidence counsel referenced with respect to testing,

1336

the record will show and has shown no indication that that testing was done in the United States.  And so we move on no direct infringement with respect to claim 1, the method claim for failure to show the method is practiced by Samsung.

Finally, Your Honor, this covers multiple patents.  We seek JMOL of no infringement with respect to all products that include the MediaTek baseband processor.

I understand there's been a lot of colloquy on that.  We think if you look at the transcript, this is the only pages I will give you, Your Honor.  Starting at 645 through about 649, Doctor Kowalski repeatedly offered opinion that the three patents cover the standard.  We just heard counsel make that same argument in his JMOL motion.  They put this at issue that all products practice the standard and therefore infringe.

We think that issue of infringement of the MediaTek-based products is in the pretrial order.  And even though there was insufficient evidence in this record for them to have proven infringement given the many admissions we heard, is a live issue and we want judgment of no infringement with respect to the MediaTek-based products for all asserted patents.

On the '130 Patent, that argument extends to the Samsung Exynos baseband processor as well.  It was a complete failure to prove that the Samsung products with MediaTek-based processors infringe.  Both GComm's experts admitted they did not look at the source code.  And so we extend that argument

with respect to the '130 and the Samsung Exynos products.

Moving on to the '130 Patent, the additional reasons for no infringement literally and under the doctrine of equivalents, the Samsung products do not have the limitation that reads in claim 20, sending k predefined sequences on M transmission symbols in a capitalized transmission time interval, TTI, to send B-bit uplink control information. That limitation is missing both literally and under the doctrine of equivalents.

Again, the evidence is Doctor Min's testimony, the source code, the standards that we referenced, and admissions by GComm's experts. The evidence that GComm identified, both for this patent and frankly the '776, from our witnesses does not support their position. It supports ours.

In addition, with respect to the '130 Patent, the accused products -- in the accused products, the number of bits to be sent does not determine the number of sequences that can be used. Doctor Akl took the position that that functionality had to be proven and present for there to be infringement. It is not in the accused products, as Doctor Min explained, again with reference to the source code and documentation.

With that, Your Honor, with the Court's permission, I will ask for Mr. Phillips to talk to you about the details on the '443 Patent.

THE COURT: All right.

MR. PHILLIPS:  Thank you, Your Honor.  Ralph Phillips on behalf of Samsung.

THE COURT:  Please proceed, Mr. Phillips.

MR. PHILLIPS:  All right.  Thank you.

Just to add on again for the '443 Patent to what Ms. Degnan started off, again we oppose GComm's motion for judgment as a matter of law as to infringement both for the '443 as well and ourselves move for judgment as a matter of law of non-infringement, both literal and doctrine of equivalents -- under both literal and the doctrine of equivalents for claim 10 of this patent.

So as my colleague mentioned, the same logic as to the motion with respect to MediaTek applies to this patent. However, the MediaTek-based processors, the products with the MediaTek-based processors, it also extends, however, to accused products using Samsung's Exynos baseband processor.

Doctor Akl relied solely on source code evidence to do his mapping to walk through the claim elements.  And as to products with this particular baseband processor and, in particular, what he identified as element 10-B, he did not provide any source code evidence.  So there is a hole in his proof.  You can see that from his testimony in the transcript in page 563.

And beyond that, while Doctor Kowalski did say that he, you know, found it standard essential and, you know, made

passing statements of infringement, he really only cursorily explained how two of the limitations were met in this patent by the standard, which again is not sufficient to support a finding of infringement.

In addition to the motion as to Samsung products using MediaTek and Exynos baseband processors on '443, we also move for a failure of proof as to infringement with respect to Qualcomm-based processor Samsung accused devices.

Here, as Doctor Wicker explained today in his description of his analysis of the code, he confirmed what build IDs -- what the particular build ID that Doctor Akl prepared -- presented to the jury, and relied on for analysis, he confirmed that that does not actually match up with any of the code that's used in production phones and in particular any of the accused phones. So long story short, he was looking at the wrong code. That can be seen in his trial testimony at page 539 to 540 --

Similarly, when -- and by that -- that was Doctor Akl's testimony, that cite when, he was confronted with it, Doctor Wicker discussed his own findings consistent with that today, his testimony today.

And, beyond that, the only thing Doctor Akl really did in his testimony to try to argue this was some sort of representative product was reliance on code reviewers that he testified, you know, for the 35 different builds that -- that

are at issue here, he relied on reviewers who were hired by counsel who he never interviewed, spoke to only by phone. You can see that in the trial transcript from page 532 and 525, and as well as 527 to 528.

And, again, as to this code as well, Doctor Kowalski provided only a cursory explanation that two limitations are met by the standards, does not address all limitations, and as such, the infringement case as to those products, again the products -- the Samsung products using Qualcomm-based processors fails as well.

In addition, to the straight failure of evidence-based portions of the motion, GComm has also failed across the board for all Samsung 5G products to show that they meet the first length type or the second length type limitations of claim 10.

Doctor Wicker's testimony today, he showed how the first length type is in fact not met by the type 1 semi-static codebook as alleged by GComm. And you can see that again in addition to his testimony from the documentation that he cited, including PTX 1.71, which is the relevant 3GPP standard that GComm points to.

Further as to the DoE, he further, using that same evidence, testified as to how the distinctions are significant and certainly not insubstantial between the implementation in the standard and what's in the claim.

THE COURT: Are you going to walk through the

1341

entirety of the record here?

MR. PHILLIPS:  I'll just quickly note that using the same -- the same standard, he applied the same analysis to the second length type.  And so, again, we respectfully move for a judgment as a matter of law as to non-infringement, both literal and non-infringement, for the accused products under the '443 Patent.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

MS. DEGNAN:  Your Honor, may I add one thing?

THE COURT:  If you'll do it briefly.

MS. DEGNAN:  I will, and I appreciate your patience. I think in my effort to sit down quickly, I just want to say on the record for the '130 Patent, we extend our motion to the doctrine of equivalents because this testimony and the evidence was that the differences were substantial.  Doctor Min said that.

Thank you.

THE COURT:  Thank you.

All right.  Let's go on to the competing motions between the parties regarding the issue of validity and invalidity. These also appear to be pretty much diametrically opposed. Since Defendant carries the burden on the invalidity issue, I'll hear from Defendant on this issue first, followed by argument from the Plaintiff.

1342

MS. DEGNAN:  Thank you, Your Honor.

Again, for the '776 Patent, we move for JMOL of invalidity under section 101.  Briefly, as you know, step 1 has been handled, the trial's been focused on step 2, and the evidence has been overwhelming that there is nothing in the claim, that the claim covers only activities that are well-understood, routine, and conventional.

The evidence of that is shown in the background which Doctor Min went through extensively, showing that everything in the claim was acknowledged in the prior art -- excuse me, came before; and after going through what was in the background, which in many cases what the background, the admissions by the inventors, is more than enough for the Federal Circuit to affirm even a motion to dismiss.

Doctor Min went further, went through multiple -- four examples of other corroborating evidence, Cho, the R2 document, Lee, and Iwamura.  So the evidence on that is overwhelming and then on the 101 ground, and we move for that on that basis.

Even both individually and as an ordered combination, the evidence covered how all this was well known and understood prior to the invention.

And with respect to 102, Your Honor heard from Doctor Min that the Cho reference, DTX 162, anticipates each and every element of the claim, and that's enough for invalidity under

1343

102. We really didn't hear much in the way of rebuttal to that.

Under 103, the combination was Cho and this R2 reference, which was JTX 20. Again, Cho had everything. R2 added element 1-E and 2-E, and Doctor Min went through the motivation to combine.

We also know that there is no evidence of any secondary considerations. This might come up in jury instructions. Doctor Akl was eerily silent on that, so there was no commercial success with a nexus. There was absolutely no discussion of any nexus. There's no commercial success --

THE COURT: Could you slow down a little bit, please?

MS. DEGNAN: Of course.

THE COURT: Thank you.

MS. DEGNAN: And the other factors as well which Your Honor is aware of, no unexpected results, long-felt need, failures of others, skepticism, copying. There's nothing like that. So that's relevant to 103 argument with respect to the '776 Patent. The evidence, as I said, is Cho, Min, Doctor Min, the R2 document, and Doctor Akl's testimony as well.

With respect to the '130 Patent, we move for a lack of written description. The written description does not support the full breadth of claim 20 which includes the transmission. The specific limitation talks about how these certain

1344

parameters relate to each other.  None of them are really bounded.  But, in particular, k is unbounded.  B, which is a number of bits, there's no limit on it.  K, of course, is the sequences.  And the written description does not provide support for how complicated the transmission structure would be when these limits are unbounded.

We heard from Doctor Akl today, that he says there are unstated limits in the claim.  And I think the way he even put it is showing that his testimony can't be relied upon to find written description support for this limitation.  The evidence is the patent itself, Doctor Min, and the admissions of Doctor Akl.

Thank you.

THE COURT:  All right.  Let me hear from Plaintiff in response, please.

MS. DEGNAN:  I'm sorry, please forgive me.  My colleague, Mr. Phillips, who now --

THE COURT:  He's got another patent.

MS. DEGNAN:  He's got another patent, and he's going to do it much more quickly.

THE COURT:  Good.  Go ahead, Mr. Phillips.

MR. PHILLIPS:  Yes.  Yes, I will.  Thank you, Your Honor.

Real quick on the '443 Patent, we oppose Plaintiff's motion as to validity and move for judgment as a matter of a

1345

law of invalidity both under section 101 and 102.

Starting first with section 101, Samsung has shown by clear and convincing evidence claim 10 is invalid and because being directed to ineligible subject matter. Obviously the issue of the abstract idea is resolved by Your Honor's motion at Docket No. 205.

And as to step 2 of the *Alice* inquiry, the evidence here shows that each and every element meets -- each and every element of claim 10 was well understood, routine, and conventional as of July 31st, 2015, individually and as an ordered combination.

The evidence supporting that is Doctor Wicker's testimony wherein he confirmed that all the elements were -- you know, meet that standard at the time of the patent, based on prior art as well as his own work and experience. And, in particular, he referenced the Cho and Bhattacharya patents in the record at JTX 24 and 25.

Turning to the issue of 102, relying on those same two, Cho and Bhattacharya, references, Doctor Wicker today went through each claim element in detail showing how each reference on its own anticipates every element of the claim.

So with that, I thank Your Honor, and again respectfully request that judgment as a matter of law be entered of invalidity under both 101 and 102 as to claim 10 of the '443 Patent.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Now I'll hear from Plaintiff in response, not only in response but in regard to Plaintiff's affirmative motion on this topic.

MR. LINETESKI:  On the issue of validity, Plaintiff opposes Samsung's motion and respectfully moves for judgment as a matter of law that no reasonable jury could find that the patents-in-suit are invalid.

In regards to the '776 Patent, Samsung failed to present evidence sufficient to support a finding that claims 1 or 2 are invalid by clear and convincing evidence.

First, Samsung presented no evidence at all that claim 2 under the Court's construction of the means plus functions term.  Instead, Doctor Min simply stated claim 2 is essentially the same except from the perspective of the terminal.  He said -- he then said, so it means something, some steps have been performed, but what is recited is essentially the same.

This is legally incorrect because it does not acknowledge, much less purport to apply, the Court's construction to apply the means-plus-function terms in this case.  Moreover, Doctor Min never actually said that claim 2 was anticipated, obvious, or routine, conventional, and well-known.

This theory should not be permitted to go to the jury since Samsung bears the burden and did not even attempt to offer evidence under the Court's construction.

With regards to anticipation, Samsung did not demonstrate that the '776 Patent was anticipated by the prior art with clear and convincing evidence.  For example, Samsung failed to identify evidence that Cho discloses each and every limitation of the '776 Patent, including at least the limitation relating to the absolute priority.

With regards to obviousness, Samsung did not demonstrate that the '776 Patent would have been obvious to persons having ordinary skill in the art in the field of wireless communications at the time the invention was made.  For example, Samsung presented no evidence on the absolute priority issue and no explanation for why their selected combinations would remedy the deficiencies that were identified.

With regards to section 101, Samsung failed to present evidence upon which a reasonable jury could find that claim elements individually and as an ordered combination were routine, well-known, and conventional at the time of the invention.  Samsung, instead, told the jury that the claims were full of elements that are well-understood, routine, and conventional, and then gave purported examples that did not actually cover all of the actual elements.

1348

Samsung's counsel asked Doctor Min a single leading question as to whether the ordered combination of the claims -- the claim elements was well-understood, conventional -- or conventional, and routine before September 2008 to which Mr. Min responded -- Doctor Min responded, "Of course," with virtually no other explanation.

Moreover, for the parts of the claim -- for other parts of the claim, my apologies, Samsung's expert only discussed ordering food from a restaurant.

In regards to the '130 Patent, Plaintiff explains that with respect to the written description Samsung has not demonstrated by clear and convincing evidence that the specification does not describe the full scope of the claimed invention, including each element thereof, either expressly or inherently.

Samsung's argument that the '130 Patent specification does not provide examples for every theoretically possible value for these variables is contrary to the law.  There is no requirement to disclose embodiments relating to every potential implementation of the invention.

And, finally, on '443, Samsung also did not also meet its burden by clear and convincing evidence that any prior art references render the '443 Patent invalid.

Thank you, Your Honor.

THE COURT:  All right.  Thank you, counsel.

Next I want to hear from the parties on the competing claims with regard to allegations of breach of FRAND as well as the damages issue related to FRAND.

But before I hear this argument, I would like a literal clarification from the Plaintiff in regard to your identified topic for argument concerning damages regarding infringement of the patents.  Does that include disputes and arguments pursuant to section 287 and the marking statute?

MS. GLASSER:  It does not, Your Honor, other than, as we've submitted to the Court, Samsung never raised the issue of marking during the discovery period.

THE COURT:  Which is why I'm asking you if it's a part of your JMOL motion.

MS. GLASSER:  Your Honor, I think we will go ahead then, just for a more complete record, and I can handle that piece of it.  Our understanding and belief is that that just was never part of these proceedings at all, but I'm happy to additionally just out of an abundance of caution do a JMOL on the issue.

THE COURT:  Well, let me step back -- with that clarification on the damages issue, let me step back and next take up the competing motions for JMOL regarding Defendants' allegation that Plaintiff has breached its FRAND obligation and Plaintiff's obligation that Defendant has breached its FRAND obligation.

1350

MS. GLASSER:  Your Honor, may I offer just a clarification on that?

THE COURT:  All right.

MS. GLASSER:  So the reason Mr. Lineteski had been originally planning to do all arguments, and I think perhaps he still can, is that we had not understood that there would be some separate motion about an NDA.  It sounded like the Defendants were planning to do that.

As Your Honor will recall from pretrial, we were not to inject into the trial proceedings any allegations about breaching the NDA during the Brazilian proceedings.  I think that's what they're referring to.

And at this point the parties just have competing claims for overall breach of good faith and FRAND.  So they had -- it sounded like suggesting breaking out some issue on the NDA, and in our view it makes more sense just to proceed with both parties having their cross motions on the breach of good faith and breach of good faith rather than breaking out subissues like that.

THE COURT:  Well, I don't find anything in the latest submission from the parties regarding a separate breach of the NDA claim.

I'm going to hear arguments on the competing allegations of breach of FRAND and the Defendants' JMOL regarding damages for any breach of FRAND.  And to the extent the NDA is a part

1351

of that argument, I'll hear it.  If it's not, I'll come back and ask Defendants separately what they intended by that.

MS. GLASSER:  That makes sense, and I know that Mr. Lineteski had planned to cover both parties' claims for damages as part of his argument regarding the breach of FRAND on each side.

THE COURT:  I want to hear simultaneous argument on all of these FRAND-related claims.  That's why I grouped them that way.

MS. GLASSER:  Makes sense, Your Honor.  Thank you.

THE COURT:  All right.  Let me begin with Defendants with regard to their allegation that the Plaintiff has breached its FRAND obligations with regard to the three standard essential patents at issue, including their request for JMOL relief concerning the embedded issue of damages for breach of FRAND.

And then I'll hear competing argument from the Plaintiff as to their breach of FRAND theories and anything else related to the FRAND topic.

Go ahead, Mr. Reger.

MR. REGER:  Good afternoon, Your Honor.  Tom Reger on behalf of Samsung.  Your Honor, this is not only a patent case; this is also a FRAND case.

Your Honor, with respect to our counterclaim with respect to breach of FRAND, Your Honor, we ask for judgment as a

1352

matter of law because it is undisputed that there is a contract between GComm and ETSI.  It is undisputed that Samsung is a third-party beneficiary.  The terms of that contract are undisputed, and Samsung's damages claim was not disputed in any way through any testimony or evidence before the Court.

With respect to the breach issue, no reasonable jury could find that GComm did not breach and that they did not negotiate in good faith or offer FRAND terms.

Your Honor, with respect to that -- with respect to GComm's claim that Samsung did not negotiate in good faith or that Samsung -- Your Honor, no reasonable jury could find that Samsung failed to negotiate in good faith as required by French law.  To the contrary, the evidence overwhelmingly showed that Samsung was responsive and reasonable, they continued to try to negotiate an NDA throughout the course of the negotiations, and they continued to ask GComm to revise or provide another NDA.

Your Honor, if I could take a break for one moment, the issue about the breach of NDA is because GComm has two claims related to the NDA.  That's claim 11 and claim 12 in their amended complaint.  We had asked the Plaintiff to drop those claims; they did not.  So ultimately, Your Honor, that is a separate issue that was not heard during the course of this trial.

THE COURT:  All right.  Please continue.

MR. REGER:  Thank you, Your Honor.

Your Honor, GComm also has a claim that suggests that Samsung supposedly breached a contract with ETSI, which is a separate claim than the negotiation in good faith.

Your Honor, GComm did not present any argument or evidence suggesting that the ETSI IPR policy is actually a contract.  We have no French law expert suggesting the ETSI IPR policy is actually a contract.  They presented no evidence that there was any breach by Samsung of the ETSI IPR policy.  And more to the point, Your Honor, they presented no damages that could be attributed to any alleged breach by Samsung of the ETSI IPR policy.

So with respect to their claim that Samsung breached the ETSI contract, we ask for judgment as a matter of law, Your Honor.

THE COURT:  What else?

MR. REGER:  I believe that's it with respect to the FRAND issues, Your Honor.  But --

THE COURT:  All right.  I'm sorry.  Go ahead.

MR. REGER:  Would you like me to be heard on damages as well or wait for the next --

THE COURT:  Well, I assume I've heard from you on damages insofar as they relate to the FRAND claims.  Damages as relate to the asserted infringement, I'll hear

1354

on separately at a different time.

MR. REGER: Understood, Your Honor. The only thing I'd like to point out is with respect to their alleged damages claim, the only reference to any possible damages by GComm is supposedly some $9 million. There is no evidentiary support for that. Mr. Pitcock did not tie that to anything. And ultimately, Your Honor, they did not meet their obligations through discovery or Rule 26 to disclose those in advance which is unlike what Samsung did.

Thank you, Your Honor.

THE COURT: Thank you.

Let me hear from Defendants [sic] in response with regard to the FRAND issues. I'm sorry. Plaintiff. I've heard from Defendants. Plaintiff, please.

MR. LINETESKI: On the matter of Samsung's FRAND claim, the Plaintiffs oppose Samsung's motion for judgment as a matter of law and respectfully move for judgment as a matter of law on the issue that no reasonable jury could conclude that G+ has not satisfied its FRAND obligation.

As a matter of law, to satisfy the FRAND obligation, an SEP owner is not -- is only required to either offer a FRAND license or negotiate in good faith towards a FRAND license. Samsung failed to identify any evidence of good faith and its own expert did not testify either that G+ acted in bad faith or that its offers were not FRAND.

1355

Samsung's suggestion to the jury that not entering into an NDA is bad faith is contrary to the law. Samsung cited no ETSI rule or French law requiring an NDA, and none exists. The ETSI policy, in fact, expressly states that NDAs may or may not be used.

To the extent Samsung attempts to argue that G+'s filing of lawsuits in Brazil and Europe constitutes bad faith, the Court has already properly rejected this contention. While the Court held that Samsung could introduce evidence regarding G+'s foreign litigations for context, it also held that Samsung should not suggest or imply that the act of filing cases in international courts and/or the act of seeking an injunction is improper or violative of the ETSI rules.

Samsung also failed to identify or prove any recoverable damages on this issue. Samsung identified only its litigation costs from other litigations. But as this Court has already held, the mere filing of these suits was not wrongful. Samsung provided no alleged link at all between its NDA theory and the costs of foreign litigation.

Accordingly, G+ is entitled to judgment as a matter of law on Samsung's breach of FRAND claim.

In regards to G+'s FRAND claim, Plaintiff opposes Samsung's motion for judgment as a matter of law, and respectfully moves for judgment as a matter of law that no reasonable juror could find that Samsung did not breach its

duty to negotiate a FRAND license in good faith based on the documents and the testimony from Mr. Pitcock and Samsung's own witnesses.

Indeed, Samsung's own experts did not testify that its conduct was good faith or that Samsung's offers were FRAND. G+ also introduced undisputed evidence of its litigation costs and evidence that it filed and pursued litigation as a direct result of Samsung's failure to negotiate in good faith. Accordingly, G+ is entitled to judgment as a matter of law on G+'s breach of FRAND claim.

Thank you, Your Honor.

THE COURT:  Thank you.

All right.  Next I'd like to hear argument from the competing parties with regard to the issue of damages as related to the alleged infringement of the patents-in-suit, including, as clarified on the record, any disputes or arguments regarding the application of section 287.

Let me hear from the Plaintiff first, please.

MS. GLASSER:  One moment, Your Honor.  Apologies.

Your Honor, with your permission, we'll split the argument, and I'll handle just the 287 piece.

THE COURT:  That's fine.

MR. LINETESKI:  On the issue of damages, G+ respectfully moves for judgment as a matter of law.  G+ is entitled to judgment as a matter of law on past damages

1357

together with interest and costs as fixed by the Court under 35 U.S.C. 284.

G+ has proven as a matter of law that it is owed damages for Samsung's infringement of the patents-in-suit. G+'s damages expert testified that he calculated a reasonable royalty based on the apportioned value of the patented technology. Based on all of the evidence, Mr. Dell testified that a reasonable royalty would be a discounted lump-sum damages -- lump-sum amount of $237.3 million.

Mr. Dell's testimony was based on the technical benefits of the patents as established by the testimony of G+'s technical experts, Doctor Akl and Doctor Kowalski. It was also based on the survey evidence produced by Doctor Reed-Arthurs demonstrating that consumers highly value speed of connection. Samsung has not rebutted any of Mr. Dell's analysis.

Indeed, Samsung's corporate representative on non-infringing alternatives, Sungjin Park, admitted he was unaware of any non-infringing alternatives for any of the patents-in-suit.

For these reasons, G+ has met their burden to establish damages on these points, and the Court should enter judgment as a matter of law for a $237.3 million lump-sum payment.

My co-counsel will now address the 287 issue.

Thank you, Your Honor.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1358

THE COURT:  Thank you, counsel.

Let me hear from you on that, Mrs. Glasser.

MS. GLASSER:  Yes, Your Honor.

So G+ pled recovery of pre-suit damages.  At no point during the discovery period did Samsung ever do what would be necessary to shift the burden to G+, which would be to make a proffer claiming that G+ had unmarked articles.  The issue of burden-shifting never was invoked in the case.

THE COURT:  Under the *Arctic Cat* case.

MS. GLASSER:  Correct, Your Honor.  And so, again, I said our position, we haven't even been intending to move for JMOL because the issue is just not part of this case.  However, to the extent it were part of the case, Samsung did not meet its burden at this trial, either.  Samsung did not identify evidence of any alleged unmarked articles such that it would have shifted the burden to G+.

THE COURT:  All right.  Thank you.

Let me hear competing argument from the Defendants with regard to the damages for alleged infringement issue, including the 287 issue.

MR. REGER:  Thank you, Your Honor.

With Your Honor's permission, I will start with the 287 issue.

THE COURT:  All right.

MR. REGER:  Your Honor, just to put us in context

with respect to the *Arctic Cat* letter, as a reminder, the ZTE/Apple agreement was finally produced to us after the close of discovery.  It was actually given to us after the opening expert reports which is why the initial experts had to supplement their reports to consider the Apple license.

Once we got the Apple license, we realized there was no marking term in it, and we sent an *Arctic Cat* letter promptly to GComm noting that the Apple products are 5G products, they're allegedly standard compliant products.  We identified them as unmarked products according to the agreement in ZTE/Apple, and we saw no evidence elsewhere of any marking.

When it comes to the actual evidence in this case, we actually got admissions from Mr. Dell that Apple sells 5G products, again, that comply with the 5G standard, and GComm is making a standard compliant infringement read.  So he's actually admitting throughout this case that supposedly under their infringement read, the Apple products practice the patents in this case.

We also asked Mr. Dell, from his extensive review of the ZTE/Apple agreement, did -- was he aware of any marking requirement in that agreement.  Mr. Dell testified he was not aware of that.  So ultimately, Your Honor, what --

THE COURT:  You're not telling me Mr. Dell testified in this case before the jury about section 287 or any marking obligation, nor are you telling me that this letter supposedly

1360

produced late was introduced as evidence in this trial.

MR. REGER:  The *Arctic Cat* letter was not introduced as evidence, that's correct, Your Honor.

THE COURT:  And Mr. Dell did not testify about marking.  Correct?

MR. REGER:  Your Honor, I don't have it in front of me, but we asked Mr. Dell, from his review of the agreement, was he aware of a marking requirement.

THE COURT:  I will be candid with you, Mr. Reger.  I don't remember hearing the word 'marking' at any time during the trial.  It may be in his report, but I don't remember hearing that word.  I can do a control search through the transcript, but I do not recall hearing the word 'marking' one time.  If you know of something contrary, please point it out to me.

MR. REGER:  Your Honor, I'm pretty confident, but again I don't have that in front of me.  I apologize, Your Honor.

THE COURT:  Okay.

MR. REGER:  So, Your Honor, it would be -- just so we are clear, that testimony would have been through cross examination of Mr. Dell.  We believe we asked him, in his thorough review of the ZTE/Apple agreement, did he see any marking requirement, and he said he does not remember.  That, I believe, is the rough sense of his testimony.

THE COURT:  All right.  Why don't you move on to the rest of your motion.

MR. REGER:  Thank you, Your Honor.

Your Honor, at the outset, damages are not appropriate because there is no infringement liability as a matter of law. Setting that to the side, GComm has been fully heard on its damages contentions, and there is no legally sufficient evidentiary basis for them to maintain their damages claim or for a reasonable jury to award damages to GComm.

There are a number of distinct issues I would like to briefly touch on.  GComm has not conducted a proper damages analysis under *Georgia-Pacific* factors as required by *Ericsson v. D-Link* case as well as the *CSIRO* case which tell us that the GP factors must be modified and/or removed for standard essential patent cases.

While Mr. Dell acknowledged the adjusted factors, he did not actually adjust any of his analysis, any of his numbers, based upon the clear mandate from the Federal Circuit.  Just like in his expert report, he had never done that.  In front of the jury again, he did not adjust any of his analysis.

Second, Your Honor, Mr. Dell's damages numbers are unreliable and speculative.  He relies on Doctor Kowalski's analysis that was unreliable for Doctor Kowalski relied on various articles that are unrelated to the actual patented technology.

And, Your Honor, Doctor Reed-Arthurs failed to consider the many features of the phone that also drive demand consumer preferences. Mr. Dell ultimately did speculative apportionment of this incremental profit and then did a black box downward adjustment.

Finally, Your Honor, with respect to the damages claim, we respectfully submit that the future damages are improper as a matter of law. Section 287 -- excuse me, section 284 allows for damages to compensate for the infringement. Future damages necessarily rely on future infringement that has not occurred yet, particularly when there are other things in play.

Your Honor, with respect to that, I believe -- oh, Your Honor, if you -- with respect to marking, what I'm seeing here is the trial transcript, page 816.

THE COURT: I did a control search while you were arguing as well. I find one question where Mr. Dell was asked, "And you know that ZTE did not require Apple to mark its 4G or 5G phones with ZTE patent numbers. Isn't that right?"

And the answer is, "I would have to look at the agreement specifically on that clause. It's a legal aspect of the agreement, but I really -- but I don't recall specifically."

That's the only reference I find.

MR. REGER: I believe that is the only reference,

1363

Your Honor. And also just for point of reference, the ZTE/Apple agreement is in evidence now, and there is no marking requirement.

Thank you, Your Honor.

THE COURT: Thank you.

All right. With regard to the allegation by -- with regard to an allegation by Plaintiff that there is a separate theory of recovery for breach of the non-disclosure agreement, I'll hear argument on Defendants' motion for JMOL relief with regard to that.

I am considering that separate and apart from whether any evidence regarding a breach or not of the NDA would be appropriate with regard to the underlying FRAND issues. But as a separate theory of recovery, to the extent there is such a theory raised by Plaintiff, I'll hear argument on it.

MS. GLASSER: I may have misspoke, Your Honor, earlier. Our view at this point is, at least for purposes of the jury trial, it's not a separate theory. It's all rolled up together. That was it.

THE COURT: Okay. Does that clarify your point, Ms. Degnan, that you raised that you identified this as a subject for JMOL relief?

MS. DEGNAN: So I'm going to ask Mr. Reger to go and respond to that. This is his area.

THE COURT: Okay.

1364

MR. REGER:  And, Your Honor, my apologies.  I'm a little bit unclear what the question before the Court is right now.

THE COURT:  All right.  Let me see if I can clarify it for you.

As I understand it, your side of the case raised initially as a subject for which you sought relief under Rule 50(a) judgment as a matter of law concerning what you believe to be Plaintiff's allegation of breach of the NDA as a separate theory of recovery.

MR. REGER:  Yes, Your Honor.

THE COURT:  Plaintiff has now clarified on the record that they do not consider that they have brought or presented any evidence on breach of the NDA as a separate theory of recovery.

Plaintiff has clarified, at least as I understand it, that any evidence regarding whether there was or wasn't a breach of an NDA between these parties would perhaps be appropriate evidence to be considered on the breach of FRAND obligation theories.  But breach of the NDA as a separate, stand-alone theory of recovery, I understand Plaintiff to have just told me is not an issue in this case.

So if it's not a separate, stand-alone issue, I would think your initial indication that you were moving for JMOL relief on it would not be necessary.  But that's what I have

1365

you up here, to tell me how you're looking at this.

MR. REGER:  Thank you for the clarification, Your Honor.

Your Honor, just to go back again, their amended complaint includes two claims related to breach of the NDA separate and apart from the FRAND obligations, the breach of FRAND, the breach of the duty to negotiate in good faith. They have a claim -- they have a Count 11 and 12 in their amended complaint -- Your Honor, actually if I could take a step back for a moment.

Your Honor, I was before this Court more than a year ago. GComm had sought a temporary restraining order and preliminary injunction based on an alleged breach of the NDA.  Samsung had filed the NDA under seal in the Brazilian court, and GComm filed a temporary restraining order seeking Samsung to withdraw that NDA from being filed under seal in the Brazilian court.

Your Honor, they have lost that temporary restraining order, they did not get the preliminary injunction.  Your Honor was very clear that they failed to meet every element of their request for the TRO and for the preliminary injunction.

That notwithstanding, they maintained a claim in their amended complaint, Count 11 and 12; they maintained it throughout this case and have not withdrawn it, that supposedly Samsung breached the NDA by filing it under seal

1366

with a Brazilian court in an entirely sealed case.

So with that, Your Honor, at least according to what GComm has presented to us, Your Honor, those issues are still live. It's Count 11 and 12, and they have not withdrawn them.

THE COURT: Well, and let me ask Plaintiff to clarify one more time on the record. As I understand it, separate and apart what may be left over in the most recent amended complaint, Plaintiff's acknowledging that they have not raised breach of the NDA as a separate recoverable theory for relief during this trial and before the jury and you're not seeking any relief from the jury regarding the breach of an NDA as a separate theory of recovery; only as part and parcel of the broader breach of FRAND allegations.

Is that correct, Ms. Glasser?

MS. GLASSER: That is correct. That is not in our view an issue for this jury trial. In fact, we had understood Your Honor's pretrial guidance to be not to include that issue relating to Brazil as part of this trial.

Whether there are separate issues, matters of equity with the Court or in the Brazilian proceeding, we certainly may still have arguments there. But for purposes of this jury trial, this verdict, that is not some separate claim.

THE COURT: Okay. All right. Thank you.

Now, let me ask a broader question.

Having heard you for the last hour-plus on motions under

Rule 50(a), do either Plaintiff or Defendants believe that there are issues or arguments related to 50(a) practice that have not been raised and argued and presented to the Court? Have we missed anything?  Plaintiff?  Defendant?

MS. GLASSER:  Not from Plaintiff, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  All right.  Thank you.

All right.  With regard to the competing claims and arguments from counsel concerning the issues of infringement of the asserted patents, both literally and under the doctrine of equivalents, as well as the positions of the Defendant regarding non-infringement of the asserted patents, either literally or under the doctrine of equivalents, with regard to products that might use or implement the MediaTek baseband processor, I'm going to grant that as to all asserted patents.

With regard to products that use the Samsung Exynos baseband processor and are accused only in regard to the '130 Patent, I'm going to grant that motion.

With regard to the issue of infringement or non-infringement on all of the products under all of the remaining patents, I'm going to deny the motion.

The only relief I'm granting under JMOL with regard to the broader topic of infringement or non-infringement, either literally or under the doctrine of equivalents, is as to products that implement the MediaTek baseband processor

1368

against and as regards all three patents-in-suit and with regard to products that implement the Samsung Exynos baseband processor but only as to the '130 Patent.

With regard to the issues of validity or invalidity of the patents-in-suit under the various theories that have been argued, including section 101, section 102, section 103, and section 112 in various applications among the three competing patents-in-suit or the three patents-in-suit, those motions, both by Plaintiff and Defendant, are denied.

With regard to the issues relating to allegations of breach of FRAND, both from Plaintiff against Defendant and Defendant against Plaintiff, including issues as to relief under Rule 50(a) regarding any damages for any breach of FRAND obligation that would be established, I'm going to deny those motions for JMOL.

With regard to any allegation of breach of a non-disclosure agreement as a separate theory of recovery on a stand-alone basis unrelated to the breach of FRAND allegations or I should say separate and apart from the breach of FRAND obligations, I'm going to grant JMOL on that, but I'm going to recognize that evidence and testimony presented during the trial with regard to the non-disclosure agreement between the parties is appropriate evidence concerning the breach of FRAND obligations between the competing parties.

With regard to the issue of damages for patent

infringement among the three asserted patents, I'm going to deny those motions for JMOL, including a motion related to section 287.

All right. Are there questions from counsel as to the Court's rulings on these various motions under Rule 50(a)?

MS. GLASSER: Yes, Your Honor. With respect to the MediaTek products, those claims were dropped without prejudice prior to the start of trial. And so we believe it would not be appropriate to issue any ruling on them as part of JMOL pursuant to the Court's normal practice with regard to narrowing -- pretrial narrowing procedures.

THE COURT: It would have been helpful, Ms. Glasser, if you had made that clear during your argument. You're telling me that those claims as to accused products that implement the MediaTek baseband processors were effectively dismissed without prejudice through the Plaintiff's narrowing of the case before the trial started?

MS. GLASSER: Absolutely, Your Honor. That was why we kept popping up on that during the trial, too, that the Defendant just kept wanting to reference a dropped claim, which was inappropriate. But those were absolutely dropped as part of the pretrial narrowing process.

THE COURT: All right. What's Defendant have to say on this? I'm sure you don't agree, but let me hear from you.

MS. DEGNAN: We don't agree, Your Honor. As I

1370

mentioned in my original presentation, there was testimony in this case. What happened was I think the day before opening, we got a new -- new spreadsheet of what their damages was going to be.

From that, we literally tried to deduce what they were doing and by, on our side, identifying which products were no longer in their spreadsheet, we said, it looks like they're no longer -- they may not be going after MediaTek. They made no clear, prior to opening, change in the pretrial order. They made no clear statement.

And then we heard, as I said, testimony about how the patents cover the standard. And I encourage you, if you want to, is to look at Kowalski's testimony. He says over and over again in cross examination when Mr. Cordell is simply going --

THE COURT:  Slow down, please.

MS. DEGNAN:  -- simply going over this very issue. For example, "You haven't offered any opinion suggesting that the MediaTek products infringe."

Answer, "I disagree."

It goes on for two or three more pages where he repeatedly talks about how he has an opinion that the MediaTek products infringe.

That issue was not properly dropped ahead of time and kept getting raised by their witnesses. Counsel right now moved for JMOL on that very issue in terms of that all the

products infringe because they cover the standard. But the evidence is wholly lacking in terms of a true analysis.

Kowalski did not go element by element. We would have remembered since March. He did not go element by element through the standard, so there's no evidence that they proved infringement of these products. Both of their experts said there was no source code, they had no opinion, they could not prove infringement of those products.

And, quite frankly, we've gone so far, now is the time we get JMOL on it and it's over. We're never going to have to go after and hear about MediaTek-based products again. They had in their complaint, we had all discovery on it, it went through the fires of *Daubert*, we -- and we not only had it in the pretrial order, it was the night before openings we have to sort of try to figure out where they were going. And then it still kind of raised its head through their witnesses and their counsel.

Now is the time we get judgment on these products. These products are never, ever going to be subject to those claims again because of their failures in this case. That's our position.

THE COURT: All right. Do you have anything else to add on this topic, Ms. Glasser, so that I can make sure I hear fully from both sides?

MS. GLASSER: Yes, absolutely.

The idea that they got some notification the day before trial, what she's referring to is Samsung didn't update their sales figures until two days before trial, and so we did serve a revised supplement of damages based on that.  But that's all that's about.

But we certainly dropped MediaTek before trial.  So their motion is akin to our moving for JMOL on all of the 101 and 103 references that they dropped in the middle of trial.  And we can go ahead and move for JMOL that none of their other invalidity and obviousness theories have any merit, but that's not how this Court proceeds here.

If a party participates in the narrowing process pretrial or even, in their instance, in the middle of the trial dropping arguments, we don't treat it as disposition on the merits.

So I feel incredibly strongly about this, Your Honor.  As you know all these parties, all these lawyers, have been in front of this Court many times.  We all cooperate together to narrow the case before trial, and that's -- that's the way we do it to make it work well for each other and for the jury.  So it's -- it would be akin to JMOL on a dropped claim or their dropped invalidity theories which we just don't do.

I do agree Mr. Cordell extensively sought to open the door on this, and I think the jury is confused about it, but that's entirely their doing.  That was in our view

inappropriate. But whether the Court views it as proper or not, we shouldn't be granting JMOL on a claim that was dropped prior to trial.

MS. DEGNAN: May I respond?

THE COURT: Yes.

MS. DEGNAN: So, again, just to be very clear, we were not told in certain terms that these MediaTek products were no longer being accused of infringement. As I said, it was some sort of -- we tried to deduce it from the spreadsheet they sent us, and even during trial, what should have been an easy answer out of Doctor Kowalski, yes, I have no opinion about MediaTek, but it was not. He injected it in.

So we disagree with counsel's representation that it was dropped in a clear and unequivocal way prior to trial. And even during the trial, I and the rest of our team continued to have questions about what they might be doing with respect to MediaTek. But the evidence is not there, Your Honor, and we're entitled to judgment.

THE COURT: All right. With regard to the claims for infringement relating to the accused products that implement the MediaTek baseband processor and the accused products that implement the Exynos processor as relates solely to allegations of infringement regarding the '130 Patent, the Plaintiff is right that the Court has traditionally encouraged a narrowing of the respective cases as trial approaches and

has done so by recognizing that dropping of claims in advance of trial is typically without prejudice.

However, that requires clear notice to the other side and a clear understanding at the start of trial as to what is in and what is out.  That did not happen here, and I believe there has been at a minimum a lack of communication on the issue, perhaps at a maximum more than a mere lack of communication.

But the MediaTek products and the Samsung Exynos products regarding the '130 Patent have been a part of this trial, they've been litigated, and I'm going to grant JMOL on those products, and they are not going to survive this trial having been injected in it to the extent they have without prejudice to be raised at a later time.

MS. GLASSER:  Your Honor, I know I'm going to potentially invoke irritation for not having raised this earlier, but this is that the important.  May I please read from the transcript?  Because I think it directly contradicts what opposing counsel just said and what Your Honor relied upon.

THE COURT:  Well, I'll hear from you, Ms. Glasser.  But, again, I've been here through the whole process, I've seen the charts, I've seen the boards, I've seen and smelled the markers as the MediaTek products were talked about both with red markers and blue markers.

MS. GLASSER:  Understood, Your Honor.

THE COURT:  These were not dropped in advance of the trial so that that they didn't come up and it was clearly set aside before the trial began.

MS. GLASSER:  Your Honor, it absolutely was.  So this is on page -- that was a hundred percent injected in the trial by the Defendants intentionally to create confusion.  This is page 514 of the transcript.

You asked at line 16, "What's the response?

"Mr. Cordell:  These were the products that were accused as of the pretrial order, Your Honor.  It is true that earlier this week -- no last week now, they did withdraw the MediaTek allegations."

That's Mr. Cordell acknowledging that at the sidebar -- at the first time that this came up, and we were begging him, stop doing this, stop injecting this into the trial, we withdrew.  And he acknowledged to Your Honor that even though they were in the pretrial order, they had been withdrawn before trial.

And then, see, it goes on.  "Is there some doubt in your mind these products have been dropped?"

And then, "Mr. Cordell:  Well, I think to confirm it --," and then he said, "I'm just going to confirm it on the record.  It's simple.  So simply just say they're not accused."

You said, Your Honor, "All right.  Confirm it and then

1376

move on."

So he did it and they didn't move on. They kept injecting it over and over and over, but we dropped those claims before the trial as was acknowledged on the record.

THE COURT: Well, there may be a failed communication here. Let me see what Defendant has to say to the portion of the transcript that you've just called to the Court's attention.

MS. DEGNAN: So, Your Honor, I think -- again, I don't have it right in front of me, but the page she read was 514. But the pages I've been telling you have been in the 600s after -- where it was still injected into the case by their witness.

And I'm going to reiterate one more time, part of their JMOL motion today was seeking JMOL that all the products infringe because the claims read on the standard. And that's exactly what the testimony I referred to in the 600s earlier refers to from Kowalski.

And I appreciate that GComm's counsel wants to keep arguing this point, but Your Honor was right the first time you ruled in our favor. You were right again. You heard the evidence, I heard the evidence. You and I had a colloquy during my examination of Doctor Min on this issue where I was precluded from making it even clearer that it wasn't in the case, and the ambiguity is why judgment attaches now.

They very clearly could have made this -- they can't point to anything they filed with the Court, they can't point to any proposed amendment to the pretrial order, and Mr. Cordell in the middle of the examination saying, I have to double-check, and I'm trying to take them at their word, but it came up over and over again.

And Your Honor has rules in the Federal Rules of Civil Procedure to avoid this ambiguity.  If they wanted to avoid dismissal with prejudice, judgment against them in their favor, I think the least cost to avoid the situation was for them to have been clear, unequivocal, in writing on the docket, and filed.  There was confusion for sure in our side throughout the case.

Even when counsel stood up and made his JMOL motion, I questioned, is this issue still live in the case?  It's been repeatedly injected by them, by their witnesses, and it should be judgment on these products for time immemorial.

THE COURT:  Let me ask you this, counsel.  And I'm thinking through the various steps of the trial as you're arguing to me.  Mr. Cordell, your lead counsel, presented a prepared board on an easel that was probably six feet-by-four feet in size, and it had a row for MediaTek, it had a row for Exynos, and it had a row for Qualcomm.  And that was the first time that the MediaTek baseband processor products were raised in the case.  So -- and that's what gave rise to the comment

by him that they weren't accused in this case, and he wanted to make that clear.

So it's hard for me to believe, as I sit here, that the Plaintiffs injected the MediaTek products into the case, thinking about your presentation through your lead counsel with his board and making a big point and drawing a big red X through the line that had MediaTek for each of the three patents in front of the jury.

It is my recollection, as I sit here, that your side of the case raised the MediaTek baseband processor products for the first time before the jury.

MS. DEGNAN:  Well, let me explain --

THE COURT:  Do you dispute that?

MS. DEGNAN:  Let me explain the context.

THE COURT:  Do you dispute that?  Did anybody from the Plaintiff's side raise the MediaTek baseband processor products prior to Mr. Cordell and his demonstrative board that I've just described to you?

MS. DEGNAN:  Yes, but I -- and I would like to explain.

THE COURT:  Well, you've told me yes, so tell me -- explain the yes to me.

MS. DEGNAN:  So as I said, there was no clear, unequivocal withdrawal of those products, and we were trying to discern what was going on.  And we thought that the -- the

questioning was designed to get a very clear simple answer, I agree these products are not in the case, I agree there's no opinion on infringement.  And that is not what we got.

THE COURT:  Well, let me stop you there.  Do you get a clear and equivocal answer to this by putting on a demonstrative and presenting it to the jury, or do you meet with the Court and opposing counsel outside the presence of the jury and get to the bottom of it before it's part of the evidence in the case?  I mean, those are two very different things.

MS. DEGNAN:  But it's also relevant, Your Honor, that there is no opinion that these other products do not infringe.  That is an issue that is off the table.  I think it's relevant in terms of putting the -- the evidence in context, especially with respect to the allegations about whether the standards infringe.

I mean, there's sort of a tension in their case in that they're saying the standards infringe, but we're not allowed to point out that their witnesses don't have opinions about infringement with respect to some other products in our case that equally practice the standard.  They have a tension here, and that was a viable cross examination.

So while I can agree with you I don't recall the MediaTek coming up in openings and with another witness, it's not that it was completely irrelevant.  And given the ambiguity that's

1380

surrounded the dropping -- the supposed dropping of these products, and the testimony, we could have gotten a very clear answer from their witnesses, but we didn't.

THE COURT:  Well, let me ask you this.  I will grant both sides that it is entirely possible that in the lead-up to the start of the trial, there was some confusion about whether the accused products implementing the MediaTek baseband processors were in the case for purposes of trial or not in the case.  I will grant you that could have been a point of misunderstanding or failed communication between the parties.

But if that was the case, I can't understand why Defendants' lead counsel would not have raised it with the Court and opposing counsel outside the presence of the jury and before the trial began, or if the trial had already begun, then at least outside the presence of the jury with the Court to get some kind of direction.

I don't know how you put it on a demonstrative, show it in front of the jury, mark it out with a red X, and say, that's so we could get clarification on an issue we misunderstood.

MS. DEGNAN:  I've been handed another piece -- another data point for Your Honor.

THE COURT:  I want to hear this issue out fully.

MS. DEGNAN:  We were having conversations with them prior to the openings.  And on January 17th they filed a

notice with the Court, G+ notice of narrowing claims for purposes of trial. It is utterly silent on the MediaTek issue. It's utterly silent that they withdrew. This was January 17th.

So they never made a clear and unequivocal disclosure to us or to you that they were -- that these products were no longer in the case, Your Honor. We were talking with them, and this is what they filed when we asked them to be clear. And I'd forgotten about this before. I apologize.

THE COURT: Certainly, certainly, neither your side nor the Plaintiff's side raised this with me prior to the introduction of it on the demonstrative before the jury with the red X's. Now, you'll agree with that, won't you?

MS. DEGNAN: Okay.

THE COURT: I'm not talking about what's filed on the Docket.

MS. DEGNAN: No, I understand.

THE COURT: I'm talking about raising it with the Court.

MS. DEGNAN: I don't believe it was raised, and honestly at this point I cannot remember if in the openings anyone explained that there are multiple processors associated with our products. That I don't remember in the openings.

I think it's possible that the openings talked about the types of chips, and so I don't know. So I agree that I don't

think it was brought up in chambers when I was in chambers with you.

THE COURT:  I certainly have no recollection that this was ever raised until I saw it on the board in open court with the jury in the box as injected into the trial by Defendants' lead counsel.

I can understand there might have been some confusion. What I can't understand is if it was unclear, then why, to get clarity, supposedly, Defense counsel injects it in the middle of the trial without any notice to me or the other side on a demonstrative and makes a big to-do about these are not in the case, they've not been accused.

I mean, if that's -- you would only do that if you had certainty on the subject.  And if he had certainty on the subject that they were not in the case, then I don't think that supports a JMOL in your favor.  If he had a lack of certainty, I don't know why he would have sought certainty in the manner of raising it as he did.  That's where I am.

If you have something that reads on that consideration or observation other than what you've already told me, I'll be happy to hear it.

MS. DEGNAN:  So again, I respectfully don't think the fact that -- the timeline is that we received -- there's no -- there was no MediaTek source code.  The expert reports were clear that they had no opinions on infringement with

1383

respect to MediaTek.  We were entitled to get those admissions in front of the jury.  When we sought those admissions, we didn't get them.  And Doctor Kowalski went one step further and said all the products infringe.

We were entitled to find out and close these witnesses out in front of the jury, and this idea that there should be dismissal without prejudice on these products that have been through litigation, through *Daubert*, and not -- clearly and unequivocally not withdrawn with this January notice and by the Plaintiff -- the Plaintiff should be the ones that have to be much more clear.  And we -- our activities during court in front of the jury to lock the witnesses down about non-infringement should not be being held against us.  They're the ones --

I'm being reminded that the MediaTek source code issue and the Samsung source code issue was in the expert reports, and they said that they didn't have opinions, they didn't infringe, and then we heard quite the contrary from Kowalski.

And so, again, I don't think we should be penalized for their lack of kind of going through the rules, and we, at this point, deserve judgment because they have not proven it.

THE COURT:  You said that a couple of times.  I know how you feel about it.

MS. DEGNAN:  I'll settle down then, Your Honor. Thank you for your patience.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

THE COURT: Anything further from Plaintiff's side on this, and then we're going to bring it to a conclusion?

MS. GLASSER: No, Your Honor, than just to -- I think Your Honor is well aware. We were absolutely explicit that Mr. Manzin-Monnin before Mr. Cordell went through any of this questioning, "These are dropped claims. We are not accusing them here. There's no question. We haven't been accusing them here at trial." So it was completely clear.

And obviously with Doctor Kowalski, that was Mr. Cordell opening the door to it. Mr. Kowalski -- Doctor Kowalski didn't say anything about it at all in his direct examination.

THE COURT: All right. Here's what the Court's going to do out of an abundance of caution. I'm going to set aside any ruling I have given you heretofore on the infringement or non-infringement issues, either literally or under the doctrine of equivalents, regarding the accused products that might implement or that do implement the MediaTek baseband processors as applies to the issues related to all three patents, or the accused products that implement the Exynos baseband processor as to only the '130 Patent.

It is clear, among all the other confusion here today, that these products are not part of the case before this jury and these products are not going to be considered part of the accused products for purposes of closing argument or the verdict in this case.

The one thing both sides seem to agree upon is that they are not a part of this case, and I am going to preclude counsel from mentioning these products in closing on either side of the case, and I do not intend for them to be a part of the verdict that's submitted to the jury.

With regard to whether they're out of this case with prejudice or out of this case without prejudice, I'm going to carry that issue and I'm going to instruct both sides to produce letter briefs of not more than 10 pages, each to be delivered to me within 10 days of a return of the verdict in this case.

And I'll consider with more time and the ability to focus more clearly rather than this instant on whether they're surviving as claims that could be considered later without prejudice or whether they don't survive and are out of this case and prejudice has attached to them.

But they are clearly not a part of this case, and that's the one thing that seems to have been made clear to the jury, and they're not going to be a part of any verdict that's returned or any issue of infringement or damages in this case.

That's the Court's ruling on those particular products.

All right.  That should complete argument and ruling from the Court on issues raised under Rule 50(a) of the Federal Rules of Civil Procedure.

Does anybody have a difference of opinion on that?

MR. McKEON:  Your Honor, we don't have -- we agree that that concludes that issue.  I just wanted one clarification on your ruling regarding the non-infringement JMOL.

THE COURT:  All right.  Was I not clear?  Did you not understand what I just said?

MR. McKEON:  You said 'these products'.  Are you including in your --

THE COURT:  I'm talking about the accused Samsung products that implement the MediaTek baseband processors as would be applied to all three of the patents or--excuse me--and the accused Samsung products that implement the Samsung Exynos baseband processor as to the '130 Patent.  Those products are still in this case as to the other two patents-in-suit, but they're not in this case as to the '130 Patent.

MR. McKEON:  Just on that point, Your Honor, the Exynos one, which was the X in the middle, that -- they put on an infringement case on that chip.

MS. GLASSER:  Not for the '130.

THE COURT:  The Exynos one is on the right.

MR. McKEON:  '130.  I'm sorry, Your Honor.  Okay.  I just wanted to get that clarified.  Thank you, Your Honor.

THE COURT:  All right, counsel.  This has been more involved than I anticipated, but I appreciate your argument.

1387

It's 10 minutes until 4:00.  Let's take a 10-minute recess, and at 4:00, or shortly thereafter, I will meet those of you that are going to participate in the informal charge conference in chambers, and we'll turn our attention to the current version of the proposed final jury instruction and verdict form.

Court stands in recess.

(The proceedings were concluded at 3:50 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                01/25/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER