**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| G+ COMMUNICATIONS, LLC | |
| Plaintiff, | |
| v. | Civil Action No. 2:22-cv-00078-JRG |
| Samsung ELECTRONICS CO., LTD.;
Samsung ELECTRONICS AMERICA, INC.; | **JURY TRIAL DEMANDED** |
| Defendants. | |

**DEFENDANTS' COMBINED RULE 50(B) MOTION FOR JUDGMENT
<u>AS A MATTER OF LAW AND RULE 59 MOTION FOR A NEW TRIAL</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.      GComm's Allegations Relating to the '776 Patent ................................................. 3

        A.      The Asserted '776 Patent Claims Are Directed to Ineligible Subject Matter ......... 3

        B.      The Record Regarding the Well-Understood, Routine, and Conventional Nature of the Activities Addressed by Claims 1 and 2 of the '776 Patent ............ 8

        C.      The Record Regarding Invalidity Under Sections 102 and 103 ........................... 10

        D.      The Record Regarding Alleged Infringement of the '776 Patent ........................ 10

II.     Samsung Moved for JMOL in the First Trial, and the Jury Returned a Split Verdict Awarding $67.5 Million with a Running Royalty for Two Patents .................... 11

III.    GComm Sought over $100 Million in Damages for a Single SEP ................................. 12

IV.     Samsung Moved for JMOL, and the Jury Returned a $61 Million Verdict .................... 15

APPLICABLE LEGAL STANDARDS ........................................................................ 15

ARGUMENT ...................................................................................................................... 16

I.      This Court Should Enter JMOL That the '776 Patent Is Invalid, or Alternatively Order a New Trial on Invalidity ........................................................................ 16

        A.      The Asserted Claims Are Invalid Because They Claim Patent-Ineligible Subject Matter ................................................................................................ 16

                1.      JMOL Is Warranted Because the Intrinsic Record Overwhelmingly Demonstrates That the Additional Elements of the Claims Are "Well-Understood, Routine, and Conventional," and the Court Should Set Aside the Jury's Contrary Determination ............................... 17

                2.      The Extrinsic Record Confirms the Subject-Matter Ineligibility of the Asserted Claims ................................................................ 24

        B.      The Asserted Claims Are Also Invalid Under Sections 102 and 103 .................. 27

        C.      Alternatively, the Court Should Grant a New Trial on Invalidity ....................... 29

II.     Samsung Is Entitled to JMOL of, or Alternatively a New Trial on, Noninfringement ........................................................................................................ 29

i

    A.    Samsung Is Entitled to JMOL of Noninfringement of the '776 Patent ................ 29

           1.    GComm Failed To Meet Its Burden To Prove Infringement of MediaTek Products ...................................................................... 30

           2.    Substantial Evidence Does Not Support Any Finding That the Accused Samsung Products Select a Reselected Cell from Among "Same Priority Cells"........................................................ 32

           3.    Substantial Evidence Does Not Support Any Finding That the Priority of the Same-priority Cells Is "Equal to the Absolute Priority of Corresponding Frequencies"................................... 34

    B.    In the Alternative, the Court Should Order a New Trial on Infringement........... 37

III.    Samsung Is Entitled to JMOL, or Alternatively a New Trial, on GComm's Breach of Its FRAND Obligations ................................................................ 38

IV.    Samsung Is Entitled to JMOL, or Alternatively a New Trial, on Damages .................... 40

    A.    The Court Should Enter JMOL of No Damages.................................... 43

           1.    GComm's Incremental Profit Approach Is a Legally Flawed Theory That Lacks Any Legally Sufficient Evidentiary Basis ................ 43

                   a.    Mr. Dell Ignored Per Unit FRAND Royalties from His Own Comparable License and Top-Down Analyses................... 43

                   b.    GComm's Use of NIAs Was Legally Improper .......................... 46

                   c.    GComm Failed To Tie the Alleged 5% Download Speed Reduction to the Facts of the Case................................ 47

                   d.    GComm Failed To Provide Legally Sufficient Evidence of the Alleged Per Unit Profit Attributable to the '776 Patent.......... 49

                   e.    Because Mr. Dell Failed To Perform a Proper Apportionment Analysis, His Testimony Does Not Support the Jury Verdict.......................................................... 50

           2.    Substantial Evidence Does Not Support Any Award for Future Damages........................................................................ 52

    B.    Alternatively, the Court Should Grant JMOL That Damages Are No More Than $10.5 Million ............................................................... 55

    C.    If the Court Does Not Grant JMOL, It Should Order a New Trial on Damages................................................................... 56

1. Sixty-One Million in Damages for a Single SEP Is Against the Great Weight of the Evidence ................................................... 56

2. Mr. Dell's Unreliable Testimony Should Have Been Excluded .............. 56

3. GComm Inappropriately Attempted To Capture the Value of 5G Standardization, Not Just the Value of the Asserted Patents ................... 57

4. The Jury Should Have Been Instructed on Royalty Stacking and Samsung Should Have Been Permitted To Develop This Issue Further ......................................................................................... 62

5. GComm Should Not Have Been Permitted To Present Overall Samsung Sales Figures to the Jury .......................................... 64

6. The '130 Patent Damages Award Irreparably Tainted the '776 Patent Damages Award ........................................................... 65

D. Alternatively, the Court May Condition the New Trial on a Remittitur ............ 66

V. The Court Should Order a New Trial Because of GComm's Improper Trial Conduct ............................................................................................ 67

CONCLUSION ............................................................................................ 73

\* All emphasis in this brief is added unless noted otherwise.

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000).................................................................38

*AI Visualize, Inc. v. Nuance Commn'cs, Inc.*,
97 F.4th 1371 (Fed. Cir. 2024) (Fed. Cir. 2024)....................................23

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) (issued June 19, 2014).......................................4, 17

*Allergan Sales, LLC v. UCB, Inc.*,
No. 15-cv-01001-JRG-RSP, 2016 WL 8222619 (E.D. Tex. Nov. 7, 2016) ..........................54

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016).................................................................22

*In re Bd. of Trs. of Leland Stanford Junior Univ.*,
989 F.3d 1367 (Fed. Cir. 2021).................................................................20

*BE & K Const. Co. v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO*,
90 F.3d 1318 (8th Cir. 1996) ....................................................................70

*Bell Atl. Network Servs. v. Covad Commc'ns Grp., Inc.*,
262 F.3d 1258 (Fed. Cir. 2001).................................................................37

*Beteiro, LLC v. DraftKings Inc.*,
No. 2022-2275, __ F.4th __, 2024 WL 3077636 (Fed. Cir. June 21, 2024)..........................17

*Bonin v. Sabine River Auth. of Texas*,
2022 WL 19731177 (E.D. Tex. Nov. 9, 2022) (quoting *Robison v. Cont'l Cas. Co.*, 2022 WL 336900, at *9 (E.D. Tex. Jan. 6, 2022)))........................50

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
977 F.2d 1555 (Fed. Cir. 1992).................................................................53

*BSG Tech. LLC v. BuySeasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018).................................................................22

*In re Cal. Expanded Metal Prod. Co.*,
No. 2023-1140, 2024 WL 1190943 (Fed. Cir. Mar. 20, 2024)................66

*CareDx, Inc. v. Natera, Inc.*,
40 F.4th 1371 (Fed. Cir. 2022) .................................................................21

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
   807 F.3d 1283 (Fed. Cir. 2014) ................................................................44

*Cates v. Creamer*,
   431 F.3d 456 (5th Cir. 2005) ..................................................................16

*Chamberlain Group, Inc. v. Techtronic Indus. Co.*,
   935 F.3d 1341 (Fed. Cir. 2019) ................................................................23

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) .................................................................23

*Commonwealth Sci. and Indus. Rsch. Org. v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015) ......................................................46, 49, 58

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   No. 2:14-CV-911-JRG, 2016 WL 4440255 (E.D. Tex. Aug. 23, 2016), *aff'd*,
   880 F.3d 1356 (Fed. Cir. 2018) ................................................................48

*Cowart v. Erwin*,
   837 F.3d 444 (5th Cir. 2016) ..................................................................15

*Delahoussaye v. Performance Energy Servs., L.L.C.*,
   734 F.3d 389 (5th Cir. 2013) ..................................................................67

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
   888 F.3d 753 (5th Cir. 2018) ..................................................................38

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.*,
   914 F.3d 1374 (Fed. Cir. 2019) ................................................................36

*Edwards v. Sears, Roebuck & Co.*,
   512 F.2d 276 (5th Cir. 1975) ..............................................................70, 73

*Eli Lilly & Co. v. Aradigm Corp.*,
   376 F.3d 1352 (Fed. Cir. 2004) ...............................................................15

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
   909 F.3d 398 (Fed. Cir. 2018) .............................................................53, 54

*Factory Mut. Ins. Co. v. Alon USA L.P.*,
   705 F.3d 518 (5th Cir. 2013) ..............................................................42, 50

*In re FEMA Trailer Formaldahyde Prods. Liab. Litig.*,
   628 F.3d 157 (5th Cir. 2010) ..................................................................31

*G.A. Thompson & Co. v. Partridge*,
   636 F.2d 945 (5th Cir. 1981) ..............................................................31, 32

*Guile v. United State*s,
    422 F.3d 221 (5th Cir. 2005) ............................................................34, 48

*In re Innovatio IP Ventures, LLC, Pat. Litig.*,
    No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ....................................62

*Intell. Ventures I LLC v. Cap. One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015)....................................................................21

*Intellectual Ventures II LLC v. FedEx Corp.*,
    No. 2:16-CV-00980-JRG, 2019 WL 2297048 (E.D. Tex. Mar. 29, 2019)............................24

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001)....................................................................53

*IP Innovation L.L.C. v. Red Hat, Inc.*,
    705 F. Supp. 2d 687 (E.D. Tex. 2010) ..............................................................45

*Kim v. ConAgra Foods, Inc.*,
    465 F.3d 1312 (Fed. Cir. 2006)....................................................................48

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)......................................................................43

*Longoria v. Hunter Express, Ltd.*,
    932 F.3d 360 (5th Cir. 2019) ......................................................................16

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009).........................................................45, 53, 54, 66

*Memphis Cmty. Sch. Dist. v. Stachura*,
    477 U.S. 299 (1986)................................................................................66

*Microsoft Corp. v. Motorola, Inc.*,
    No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ............................41, 46

*MobileMedia Ideas LLC v. Apple Inc.*,
    780 F.3d 1159 (Fed. Cir. 2015)....................................................................34

*Montano v. Orange Cnty., Tex.*,
    842 F.3d 865 (5th Cir. 2016) ................................................................15, 42

*Oiness v. Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996).....................................................................56

*Open Text S.A. v. Box, Inc.*,
    2015 WL349197 (N.D. Cal. Jan. 23, 2015) ..........................................................52

*Polanco v. City of Austin, Tex.*,
   78 F.3d 968 (5th Cir. 1996) ........................................................................16

*Promega Corp. v. Life Techs. Corp.*,
   875 F.3d 651 (Fed. Cir. 2017).............................................................42, 55

*ResQNet, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010).........................................................................43

*Samsung Elecs. Co. v. G+ Commc'ns, LLC*,
   IPR2023-00171, Dkt. No. 34 (P.T.A.B. Apr. 29, 2024) ......................3, 15

*Shows v. Jamison Bedding, Inc.*,
   671 F.2d 927 (5th Cir. 1982) ........................................................................56

*Smith v. Transworld Drilling Co.*,
   773 F.2d 610 (5th Cir. 1985) .................................................................16, 66

*SSL Servs., LLC v. Citrix Sys.*,
   769 F.3d 1073 (Fed. Cir. 2014).......................................................................44

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
   802 F.3d 1283 (Fed. Cir. 2015).......................................................................43

*Techsearch LLC v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002)..............................................................33, 36

*TGIP, Inc. v. AT&T Corp.*,
   527 F. Supp. 2d 561 (E.D. Tex. 2007) ..........................................................15

*In re TLI Commn'cs LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016).........................................................................23

*Tronzo v. Biomet, Inc.*,
   236 F.3d 1342 (Fed. Cir. 2001).............................................................55, 56

*Uniloc USA Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011).......................................................................51

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
   69 F.3d 512 (Fed. Cir. 1995).................................................................43, 44

*Virnetx Inc. v. Apple Inc.*,
   No. 6:12-cv-855 ............................................................................................68

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)..............................................48, 50, 51, 64

*VLSI Tech. LLC v. Intel Corp.*,
  87 F.4th 1332 (Fed. Cir. 2023) ...................................................................33, 37, 38

*Westbrook v. Gen. Tire & Rubber Co.*,
  754 F.2d 1233 (5th Cir. 1985) ...........................................................................67, 69

*Whitehead v. Food Max of Miss., Inc.*,
  163 F.3d 265 (5th Cir. 1998) ...................................................................................73

*Whitserve, LLC v. Comput. Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012)....................................................................................45

*Wi-LAN Inc. v. Sharp Elecs., Corp.*,
  992 F.3d 1366 (Fed. Cir. 2021).................................................................................50

**Statutes**

35 U.S.C. § 271..............................................................................................................71

35 U.S.C. § 284.......................................................................................................54, 71

**Other Authorities**

Fed. R. Civ. P. 44.1........................................................................................................40

Fed. R. Civ. P. 50(a) ...........................................................................................11, 30, 43

Fed. R. Civ. P. 52(c) .....................................................................................................24

Fed. R. Civ. P. 703.........................................................................................................42

Fed. R. Civ. P. 50(b), 59, and 60 ....................................................................................3

**TABLE OF EXHIBITS**

| Citation | Description |
|---|---|
| Ex. 1 | Excerpts from January 2024 trial demonstratives of Dr. Paul Min (DDX4), including DDX4-12, DDX4-15, DDX4-31, DDX4-32, DDX4-33, DDX4-38, DDX4-55, and DDX4-56 |
| Ex. 2 | Published U.S. Patent Application 2011/0070888 (DDX-159) |
| Ex. 3 | Excerpts from April 2024 trial demonstratives of Stephen Dell (PDX6), including PDX6.4, PDX6.14-15, PDX6.27, PDX6.37, PDX6.60, and PDX6.78 |
| Ex. 4 | Excerpts from January 2024 trial demonstratives Dr. Robert Akl (PDX4), including PDX4.61, and PDX4.151 |
| Ex. 5 | U.S. Patent No. 8,432,131 |
| Ex. 6 | Excerpts from deposition transcript of Jean-Sebastien Borghetti |
| Ex. 7 | Office Action dated May 1, 2024 from the *Ex Parte* Reexamination File History of U.S. Patent No. 8,761,776 |
| Ex. 8 | Excerpt from April 2024 trial demonstratives of Dr. Robert Akl (PDX4), including PDX4.21 |
| Ex. 9 | Parties' joint submission of trial evidence disputes (emailed to the Court on April 14, 2024 at 11:55 p.m. C.S.T) |
| Ex. 10 | Excerpts from GComm's April 2024 trial closing demonstratives (PDX20), including PDX20.14 |
| Ex. 11 | Excerpts from GComm's January 2024 trial closing demonstratives (PDX20), including slide bearing stamp PDX4.151 |

**TABLE OF ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| '776 Patent | U.S. Patent No. 8,761,776 |
| '130 Patent | U.S. Patent No. 10,736,130 |
| '443 Patent | U.S. Patent No. 10,564,443 |
| JMOL | Judgment as a matter of law |
| IPA | Mr. Dell's incremental profit approach |
| NDA | Non-disclosure agreement |
| NIA | Noninfringing alternative |
| Samsung | Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. |
| Samsung Accused Products | Samsung 5G products |

## INTRODUCTION

The jury verdict upon which judgment has been entered cannot be sustained in light of the applicable legal standards and GComm's numerous evidentiary shortcomings.

The '776 patent's validity is the first problem.  The Court held before trial that the claims were directed to an abstract idea and thus left only the *Alice* step two inquiry for the jury.  At trial, the jury heard undisputed evidence that the '776 patent itself admits that the elements of the claims beyond the abstract idea were all well-known in the industry.  Given these unequivocal admissions, substantial evidence does not support the jury's finding that the asserted claims do not involve well-understood, routine, and conventional technologies and activities.  The '776 patent claims simply cannot survive section 101 scrutiny.

Substantial evidence also does not support the jury's findings that the prior art does not invalidate the claims under sections 102 and 103.  GComm's expert identified only one claim limitation he said was absent from the prior art, but failed to address, let alone rebut, the explicit teachings of that limitation in the prior art.  This is another independent reason to set aside the jury verdict.  The record evidence does not support the finding of infringement either.  For example, it was not disputed that the Samsung Accused Products create a simple single list of potential cells for reselection which makes impossible the claim requirement of selecting "from among" cells that had been set as "same priority cells."

The damages case remains in utter disarray, which is unsurprising in light of GComm's continued pressing of flawed damages theories and the purposeful interjection of Samsung's total revenue and profits that improperly inflated the damages horizon.  While GComm sought $102.6 million for infringement of the '776 patent alone, the jury rejected that amount and instead awarded $61 million—an amount untethered from any request, theory, or evidentiary basis.  That alone is enough to vacate the award.

But there are additional serious problems with GComm's damages case. The opinion of GComm's expert, Mr. Stephen Dell, is legally insufficient to support the verdict. Mr. Dell used an "incremental profit approach" ("IPA") that is wholly inappropriate for valuing standard essential patents and, making matters worse, the foundational inputs to his approach are unsustainable. Mr. Dell was little more than a mouthpiece for flawed opinions of other experts, including survey expert Dr. Reed-Arthurs and her (very flawed) survey supposedly showing that Samsung would lose ███ profit per unit if Samsung could not maintain the alleged 5% increase in download speed. First, Dr. Reed-Arthurs never testified in the retrial and Mr. Dell is admittedly not a survey expert—thus the basis for the damages number was never subject to cross examination and cannot stand. It is rank hearsay and speculation. Second, the purported 5% increase in speed did not come from anything related to the '776 patent but rather was sourced from an IEEE study, published more than ten years after the filing of the '776 patent, relating to ping-ponging between cell towers when a phone includes dual SIM cards. The '776 patent is not mentioned in the article and, notably, has nothing to do with dual SIM cards. Beyond that, the 5% comparison is legally irrelevant because any such valuation must be done with respect to a noninfringing alternative that could have been written into the standard, something neither GComm nor its experts did.

In addition to these fatal deficiencies in his IPA methodology, Mr. Dell ignored indisputable evidence of comparable licenses that establish the appropriate market rates for the technology at issue, a point particularly problematic for SEPs that are subject to FRAND obligations. Mr. Dell then compounded that legal error with another—the bulk of Mr. Dell's damages number is for future sales that have not yet occurred and that may never occur. The jury's damages award cannot be sustained based on a theory that calculated a running royalty

into the future when no infringement has been established for such future, speculative sales.

For at least these reasons and as fully explained herein, Defendants Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. (collectively, "Samsung") move pursuant to Rules 50(b), 59, and 60 for judgment as a matter of law, for a new trial, to set aside or reduce damages, and/or to reconsider, correct, or amend the judgment.

## BACKGROUND

GComm's amended complaint in this action alleged infringement of five patents.  Dkt. 49 at ¶ 123.  GComm dropped two patents from the case, proceeding to trial on the '776, '130, and '443 patents.  Dkt. 560.  The jury found the asserted claim of the '443 patent to be directed to well-understood, routine, and conventional technology and that Samsung did not infringe it. Dkt. 584 at 4-6.  The parties subsequently conducted a damages retrial addressing only the '776 and '130 patents.  Dkt. 629-34.  After the damages retrial, the PTAB found the only asserted claim of the '130 patent unpatentable.  *See Samsung Elecs. Co. v. G+ Commc'ns, LLC,* IPR2023-00171, Dkt. No. 34 at 41 (P.T.A.B. Apr. 29, 2024).  The Court then severed and stayed GComm's claim of infringement based on the '130 patent.  Dkt. 639.  This Brief thus addresses grounds for vacating the jury award for only the '776 patent.

GComm also maintained breach of FRAND and breach of a non-disclosure agreement claims against Samsung, and Samsung asserted a breach of FRAND counterclaim against GComm.  Dkt. 49 at ¶¶ 93-98; Dkt. 59 at ¶¶ 264-75.  The jury did not find either party liable for breach of FRAND.  Dkt. 584 at 9-10.  This Brief also addresses Samsung's breach of FRAND claim.

I. **GComm's Allegations Relating to the '776 Patent**

   A. **The Asserted '776 Patent Claims Are Directed to Ineligible Subject Matter**

The '776 patent is a mobile networking patent.  Trial Tr. at 1035:24-1039:20.  It

describes techniques that a mobile device (*e.g.*, phone) might use to "reselect" which of a mobile network's "cells" will act as the phone's communication path to the rest of the network. *Id.* at 1036:12-21. Cell reselection occurs when the phone is idle. JTX-1 (1:11-23). For this case, the '776 patent's priority date is September 19, 2008. *Id.* (cover). The '776 patent issued on June 24, 2014—less than a week after the Supreme Court decided *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (issued June 19, 2014)—and the Patent Office issued its Notice of Allowance about two months earlier on April 11, 2014. As a result, the '776 was not scrutinized under *Alice*'s standard.

At trial, computer scientist Paul Min, Ph.D. explained that "cell reselection is as old as [ ] mobile communication itself" because mobile networks necessarily must deal with phones that move from cell to cell. Trial Tr. at 1036:22-1037:3. For example, in conventional 3G mobile communication systems, a phone measured the quality of signals in all neighboring cells and compared the quality of such cells with "the quality threshold of the signal in the serving cell," and would transfer to a neighboring cell with higher quality when such a cell "meets the reselection standard within a specific time." JTX-1 (1:27-33). The '776 patent admits that this quality-based reselection technique calculates "cell reselection assessment value[s]" Rs (serving cell) and Rn (neighboring cell) using "standard specifications." *Id.* (1:34-44).

The '776 patent discloses that the conventional 4G mobile communications system "continues to use the foregoing cell reselection method [used in 3G] to perform intra-frequency cell reselection." *Id.* (1:47-65). The patent explains that this conventional method is known as a "best cell" reselection method. *Id.* (1:59-60); Trial Tr. at 1037:11-16 (Min). It further describes the known use of a parameter known as Qoffset, which "stands for a level offset of a neighbouring cell." JTX-1 (1:51-57); Trial Tr. at 1037:17-1038:18 (referring to DDX4-12). As

4

Dr. Min explained, using an offset (Qoffset) when comparing the signal strength of the current and neighboring cells ensures that reselection occurs only when it is worthwhile. *Id.* at 1038:6-18.



Ex. 1 at DDX4-12. The '776 patent admits that this known method "is also called an offset-based cell reselection method." *Id.* (1:60-65); Trial Tr. at 1037:11-16. In this conventional approach, the phone "look[s] for all the cells [it] can find around [it]." Trial Tr. 1038:21-25; JTX-1 (1:66-2:1) (explaining "it is necessary to measure all intra-frequency and inter-frequency neighbouring cells when the offset-based cell reselection method is adopted").

The '776 patent also describes another known, conventional cell reselection technique called "a priority-based reselection method." JTX-1 (2:2-10); Trial Tr. 1039:1-13. In the conventional, priority-based reselection method, the phone still employs the known offset-based best cell reselection method. *Id.* (2:7-10). However, the phone also "groups all neighbouring cells by frequency" and "ranks the frequencies based on their absolute priority," which is information supplied by the network. *Id.* (2:4-7); Trial Tr. 1039:4-1040:12 (referring to DDX4-15); *id.* at 457:6-11, 544:18-545:25 (Akl).



Ex. 1 at DDX4-15. From the group of cells with the highest priority (based on the absolute priority of the frequency on which the cells operate), the phone selected a new cell using the known offset-based best cell reselection method. *Id.*; JTX-1 (2:4-9).

The '776 patent's alleged innovation is to modestly adjust the prior art, conventional reselection process for situations where multiple cells use frequencies of the same priority. Trial Tr. at 1040:13-23. The network may assign different frequencies the same absolute priority. *See* JTX-1 (2:44-45) (describing cells on frequencies having the same priority); *see also* Tr. at 1040:13-1043:17. Rather than initially grouping cells based on frequency alone, the '776 patent groups cells based on their priority (which is dictated by the absolute priority of the frequency on which each cell operates) such that cells in the group have the same priority but may operate on different frequencies. JTX-1 (4:13-26); *id.* (2:48-57); Trial Tr. at 1040:24-1042:9. From this group of cells having the same priority, the phone selects a new cell using the known offset-based best cell reselection method. JTX-1 (4:24-26); *id.* (4:61-67) ("[T]he offset-based reselection principle has been described in details [sic] in the background of the present invention, so it will not be described here again."); Trial Tr. at 1042:10-1043:3.

████████████████████████

The asserted claims' key terms are:

- **cell reselection**—i.e., the basic process of selecting a phone's new cell when the phone is idle;
- **priority-based reselection**—i.e., reselection based on priority;
- **absolute priority of a corresponding frequency**—i.e., the priority assigned to a frequency by the network;
- **best-cell reselection**—i.e., reselection based on signal strength (level and/or quality); and
- **offset-based cell reselection**—i.e., best-cell reselection using offsets.

Claim 1 recites a "first priority" (i.e., the priority of the serving cell) and a "second priority (i.e., the priority of cells other than the serving cell, from which reselection is performed).[1] It recites grouping cells having a second priority together as "same priority cells." *See* Dkt. 169 at 10 ("'[S]ame priority cells' are simply a grouping of cells with the same priority into a logical 'bucket.'"). The same priority cells are cells on multiple frequencies.[2] The claims then require a "best cell reselection" to be applied to the "same priority cells" to select the reselected cell. The claims further require that the best cell reselection be an offset-based reselection. JTX-1 (6:58-8:18). The asserted claims thus recite a method and system that considers a somewhat larger group of cells (compared to the conventional "priority-based reselection method," *id.* (2:2-10)), from which the phone selects a new cell using the known offset-based best cell reselection technique. Trial Tr. at 1038:19-25, 1041:16-18, 1042:16-1043:18 (Min); JTX-1 (4:61-67).

Before trial, the Court determined that claims 1 and 2 of the '776 patent are directed to an abstract idea. Dkt. 548 at 3; Dkt. 518 (138:22-139:6). This abstract idea is using multiple criteria to make a decision—creating a subset using one criterion and then using a second

---

[1] Claim 2 is essentially method claim 1 written in device form. *Compare* JTX-1 (6:58-7:16), *with id.* (7:17-8:18); *see also* Trial Tr. at 464:1-15, 466:10-471:8, 1045:8-1046:4.

[2] The Court rejected Samsung's argument that ZTE's disavowal during prosecution requires the priority of the frequency on which the cell operates and the priority of the cell itself to be distinct concepts. *See* Dkt. 169 at 10-11. Samsung preserves all rights to challenge the Court's claim construction rulings adverse to Samsung.

criterion to select from the subset.  *See, e.g.*, Dkt. 205 at 1-3 Dkt. 251 at 1-2.  At trial, the parties disputed whether those claims "involve only technologies and activities that, both alone and in combination, were ***well-understood, routine, and conventional*** from the perspective of a person of ordinary skill in the art as of the priority date[.]"  Dkt. 584 at 5.

### B.    The Record Regarding the Well-Understood, Routine, and Conventional Nature of the Activities Addressed by Claims 1 and 2 of the '776 Patent

Both the '776 patent itself and the trial testimony confirm that every element in the claims was routine, conventional, and very well understood as of September 2008.  The '776 patent expressly confirms it—***all elements of the asserted claims are in the patent's "Background.***"  The "Background" confirms, for example, that cell reselection was a well-understood topic in mobile networking.  *E.g.*, JTX-1 (1:20-33) ("Background" describing known, prior art cell reselection).  It further confirms that best-cell reselection was known in the field as a technique for cell reselection based on signal strength (e.g., signal "quality").  *Id.* (1:27-46 (describing the use of "best signal quality").  It explains that the variant in claims 1 and 2, offset-based cell reselection, was also known.  *Id.* (1:47-65) (explaining use in conventional networks, stating terminals "will select the best cell," and calling this technique "offset-based cell reselection").  The Background also explains that prioritization based on frequencies can be used to achieve priority-based reselection based on the absolute priority of corresponding frequencies in which both the "serving cell" and "reselected cell" have separate priorities based on frequency, with frequencies ranked based on "absolute priority."  *Id.* (1:66-2:44).

Beyond this intrinsic evidence of conventionality, Dr. Min further explained that ***all*** the principal technologies of the asserted claims—cell reselection, priority-based reselection, absolute priority of corresponding frequencies, best-cell reselection, and offset-based cell reselection—were well-known to those in the field well before the priority date.  *See generally*

Trial Tr. at 1046:5-1055:9.  Dr. Min walked the jury through the "Background" section of the '776 patent, explaining at each step how the patent's own disclosures, discussed above, recognized that every one of these technologies pre-dated the patent.  *Id.* at 1046:15-1049:5. Notably, GComm's technical expert Robert Akl disputed ***none of these facts***.  Dr. Akl's testimony did not discuss, at all, the '776 patent's various admissions that each of the technologies above was known in the prior art.

Dr. Min's analysis went beyond the patent itself.  He also explained to the jury how the five principal concepts of the asserted claims are all in undisputed prior art, and presented four references confirming as much.  Trial Tr. at 1049:6-24.  Dr. Min highlighted four references: R-2075041 from 2006 (JTX-20), and Iwamura (DDX-159 (Ex. 2)), Lee (JTX-19), and Cho (DTX-162) from 2008.

Referring to this extrinsic evidence corroborating the '776 patent's admissions, Dr. Min explained that each of these references discuss the basic concept of **cell reselection**.  Trial Tr. at 1049:21-1050:6.  He also explained how the linked concepts of **best-cell reselection** and **offset-based cell reselection** appear in all four references.  *Id.* at 1050:7-17.  Dr. Min testified that these references also describe **priority-based reselection**.  *Id.* at 1050:23-1051:16.  He further explained that three references describe using **absolute priority of corresponding frequencies**. *Id.* at 1051:17-1053:1.  Dr. Min confirmed that cells using different frequencies was also well-known.  *Id.* at 1053:2-17.  Finally, Dr. Min explained to the jury that the basic concept of using subsets to group cells was not a new one.  *Id.* at 1053:22-1054:24 (describing how the core concept of using a first selection to narrow options for a second selection was not new); *see also id.* at 1054:25-1055:6.

GComm's counsel did not cross Dr. Min on any of these statements.  GComm's expert

Dr. Akl presented only a minimal response.  His only objection was that the references Dr. Min presented related to "picking a cell based on balancing load," ignoring that nothing in claim 1 or 2 excludes load balancing from falling within the claim scope.  *Id.* at 1283:4-8; *see also id.* at 1039:14-20 (Min) (explaining that priority may be based on the frequency the cell uses or other criteria such as the load condition of the cell).

### C.    The Record Regarding Invalidity Under Sections 102 and 103

Addressing invalidity under sections 102 and 103, Dr. Min relied on two of the same references he highlighted in his section 101 analysis: Cho (DTX-162) and R2-075041 (JTX-20). He provided a detailed analysis as to why Cho alone and in combination with R2-075041 renders the asserted claims of the '776 patent invalid.  Trial Tr. at 1049:21-1060:10.  In rebuttal, Dr. Akl focused on the references' discussions of "load balancing" and challenged only that Cho and R2-075041 do not propose to set the priority of the same priority cells to equal the absolute priority of the corresponding frequencies.  *Id.* at 1281:10-1283:11.  He did not challenge Dr. Min's testimony on motivation to combine or that Cho, alone or in combination with R2-075041, discloses every other limitation.  *See id.*

### D.    The Record Regarding Alleged Infringement of the '776 Patent

GComm accused Samsung 5G products (collectively, "Accused Samsung Products") of infringing claims 1 and 2 of the '776 patent.  These products contain different baseband processors sourced from Qualcomm, MediaTek, or Samsung itself (Exynos processor).  Trial Tr. at 515:11-24 (Akl).  However, GComm failed to obtain the source code for any of the MediaTek-based products and its technical experts ultimately failed to present any evidence that the MediaTek-based products infringe the '776 patent's asserted claims.  *See, e.g.*, *id.* at 515:25-516:2; 554:23-555:1.

For products with Qualcomm and Exynos processors, GComm relied on Dr. Akl who

attempted to map the claim limitations to the Accused Products.  GComm also presented Dr.

Kowalski, but he did not discuss any evidence specific to the Samsung Accused Products,

focusing instead on snippets from the 5G standard.  In rebuttal, Dr. Min pointed out the

deficiencies in GComm's analysis, including Dr. Akl's failure to show that Accused Samsung

Products perform the recited two-step cell reselection by selecting "from among" cells that are

grouped together as "same priority cells," and his failure to apply the claim requirement that the

"priority of the same priority cells" must be "equal to the absolute priority of corresponding

frequencies."  *See, e.g.*, Trial Tr. 1070:4-22, 1071:15-21, 1072:1-1075:13.

## II.    Samsung Moved for JMOL in the First Trial, and the Jury Returned a Split Verdict Awarding $67.5 Million with a Running Royalty for Two Patents

At the close of the evidence in the first trial, Samsung moved for JMOL on several issues

pursuant to Rule 50(a).  Trial Tr. at 1327:13-1329:15.  The Court granted Samsung JMOL of no

breach of the NDA.  *Id.* at 1368:16-24.  The Court denied Samsung's motions for JMOL of

noninfringement for each of the asserted patents, *id.* at 1367:8-1368:3, 1384:12-1385:20, Dkt.

617; Samsung's motion for JMOL of invalidity under sections 101, 102, 103, and 112, Trial Tr.

at 1368:4-9; Samsung's motion for JMOL of breach of FRAND obligation, *id.* at 1368:10-15;

and Samsung's motion for JMOL of no damages.  *Id.* at 1368:25-1369:3.

On January 26, 2024, the jury returned its verdict, finding that Samsung infringed the

asserted claims of the '776 and '130 patents, and that Samsung did ***not*** infringe the asserted

claim of the '443 patent.  Dkt. 584 at 4.  The jury also found the '443 patent's claim to be

directed to well-understood, routine, and conventional technology, but did not find Samsung met

its burden for any other invalidity contention.  *Id.* at 5-6.  The jury did not grant either party's

competing breach of FRAND claims.  *Id.* at 9-10.  The jury awarded $45,000,000 for

infringement of the '776 patent, $22,500,000 for the '130 patent, and running royalties for both

patents.  *Id.* at 7-8.

The Court *sua sponte* ordered a new trial on damages as to the '776 and '130 patents, explaining "the Court has material concerns about jury confusion regarding the form of the reasonable royalty awarded herein—*i.e.*, that the jury may have awarded damages in the form of a running royalty when it intended to award them as a lump sum."  Dkt. 607 at 2.

### III.    GComm Sought over $100 Million in Damages for a Single SEP

In the damages retrial, GComm presented its damages case through its expert, Stephen Dell, who testified about damages in the form of a reasonable royalty.  Retrial Tr. at 347:8-11. Out of the gate, Mr. Dell's first substantive slide showed "infringing" sales of



Ex. 3 at PDX6.4.  Mr. Dell then opined that the parties would agree, at a hypothetical negotiation, to a lump sum royalty of $102.6 million for a license to the '776 patent and $40 million for use of the '130 patent.  Retrial Tr. at 397:10-23.  To arrive at these figures, Mr. Dell used an "incremental profit approach" or "IPA" relying first on GComm technical experts to opine that the '776 and '130 patents provide 5% and 2%, respectively, improvements in throughput or download speed.  *Id.* at 389:2-7.  Mr. Dell next testified that he "relied upon the

████████████████████████████

opinions and analysis of Dr. [Rebbecca] Reed-Arthurs to determine the economic contribution related to those specific speed benefits." *Id.* 389:23-390:1.

Dr. Reed-Arthurs did not testify. Nonetheless, Mr. Dell told the jury that Dr. Reed-Arthurs's choice-based conjoint survey analysis showed that "a five percent loss in speed [without the '776 patented technology] would result in at least a ███ loss in profit to Samsung, and that for the '130 patent, that at least a two percent loss in speed would result in at least a ███ loss in profit . . . ." *Id.* at 390:2-10. These opinions from Dr. Reed-Arthurs were presented by Mr. Dell as fact, even though Mr. Dell is not a survey expert and did not analyze Dr. Reed-Arthurs's survey results himself. *See id.* at 349:21-354:11; 389:23-390:10. Mr. Dell opined that Samsung and ZTE (which owned the asserted patents as of the hypothetical negotiation's date) would have performed a 22.5% "first step of apportionment" and that Samsung would further negotiate the royalty down to a precise ███ (out of the ███ alleged profit) per unit for the '776 patent and ███ (out of the ███ alleged profit) per unit for the '130 patent. *Id.* at 394:14-395:4, 395:19-396:14. Mr. Dell did not explain either the 22.5% figure or the rounding further. *See id.*

Mr. Dell testified that Samsung and ZTE would have agreed to a lump sum payment structure that included the rights to use the patents through expiration. Retrial Tr. at 396:15-397:9. Mr. Dell then purported to apply his ███ per unit royalty for the '776 patent through patent expiration and then discounted that value to present value "to today" to arrive at $102.6 million for the '776 patent. *See id.* at 397:10-398:14. Mr. Dell's final slide shows his unexplained alleged sales through 2030, unsupported "infringing" profits, and his unexplained apportionment to reach his $102.6 million damages for the '776 patent (along with $40 million for the '130 patent):

13



Ex. 3 at PDX6.78.

Samsung responded to GComm's damages case through its expert Paul Meyer. Mr. Meyer analyzed numerous licenses, including ███████████████████████ and real-world Samsung licenses, and explained that a hypothetical negotiation would have resulted in a FRAND royalty of no more than $3.125 million. Retrial Tr. at 534:17-535:5. Mr. Meyer testified that the industry uses comparable licenses for FRAND licensing, that he had never seen the IPA methodology used in FRAND licensing, and that all of the other evidence, including Mr. Dell's own work, shows that GComm's $102.6 million ('776 patent) and $40 million ('130 patent) lump sum royalties are non-FRAND, particularly when considering there are close to 70,000 patents in the 5G stack. *See id.* at 512:7-514:15, 516:2-522:19. Mr. Meyer explained that real-world comparable licenses—████████████████████████ ██████████████████████████████████—show that a FRAND lump sum royalty for the asserted patents is ████████. *Id.* at 528:19-532:12, 533:5-23. Mr. Meyer also discussed other Samsung licenses, highlighting ███████████ ████████████████████████████████ ████████████████████████████████

14

████████████████████████████

████████████████████████ he opined that awarding $3.125 million for a license to both asserted patents would be reasonable, as well as consistent with GComm's FRAND obligations.  *See id.* at 523:8-525:10, 526:3-25, 533:25-535:5.

## IV.    Samsung Moved for JMOL, and the Jury Returned a $61 Million Verdict

At the close of evidence in the second trial, Samsung moved for JMOL of no damages, Retrial Tr. 566:19-567:2.  The Court denied this motion.  *Id.* at 576:1-3.  The jury returned its verdict on April 17, 2024, awarding GComm lump sum royalties of $61 million for the '776 patent and $81 million for the '130 patent.  Dkt. 631 at 4.

The Court stayed this action pending the outcome of mediation between the parties (Dkt. 636), during which time, the PTAB found the only asserted claim of the '130 patent to be unpatentable.  *See Samsung Elecs. Co. v. G+ Commc'ns, LLC*, IPR2023-00171, Dkt. No. 34 at 41 (P.T.A.B. Apr. 29, 2024).  The Court then severed and stayed GComm's claim of infringement based on the '130 patent, Dkt. 639, and entered final judgment with respect to the '443 and '776 patents based on the jury verdicts, Dkt. 642 at 2-3.

## APPLICABLE LEGAL STANDARDS

"When a case is tried to a jury, a motion for judgment as a matter of law is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016) (internal quotation omitted).  "JMOL should be granted when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 873 (5th Cir. 2016) (internal quotation omitted).  The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli*

*Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

The Court may grant a new trial if the verdict is against the weight of the evidence, the damages are excessive, the trial was unfair, or prejudicial error occurred. *See Smith v. Transworld Drilling Co*., 773 F.2d 610, 612-13 (5th Cir. 1985); *Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005). Additionally, "when the award is deemed merely 'excessive,' the district court may remit the award." *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 981 (5th Cir. 1996). For deciding a remittitur award, the Fifth Circuit follows the maximum recovery rule. *See Longoria v. Hunter Express, Ltd*., 932 F.3d 360, 364-65 (5th Cir. 2019) (The court should "award the highest amount the jury could have awarded," which "preserves as much of the jury's award as possible" and is the "only remittitur approach . . . compatible with the Seventh Amendment.").

## ARGUMENT

Samsung is entitled to JMOL on the issues of invalidity, noninfringement, and damages as to the '776 patent and on its counterclaim that GComm breached its FRAND obligation and owes Samsung damages of ███████. In the alternative, the Court should order a new trial.

**I.    This Court Should Enter JMOL That the '776 Patent Is Invalid, or Alternatively Order a New Trial on Invalidity**

Samsung proved by clear and convincing evidence that the asserted claims of the '776 patent are invalid.

**A.    The Asserted Claims Are Invalid Because They Claim Patent-Ineligible Subject Matter**

The Court is familiar with the two-step *Alice* framework for assessing whether a patent claim is directed to patent-eligible subject matter. Here, the Court has already performed the necessary analysis for the first step and has confirmed that claims 1 and 2 of the '776 patent are directed to an abstract idea. Dkt. 518 (138:22-139:6); *see also* Dkt. 548 at 3. The abstract idea is

16

using multiple criteria to make a decision—creating a subset using one criterion and then using a second criterion to select from the subset. *See, e.g.*, Dkt. 205 at 1-3; Dkt. 251 at 1-2.

Abstract ideas are unpatentable unless there is some "inventive concept" in the claim's other elements sufficient to "transform the nature of the claim into a patent-eligible application" of the core idea. *Alice*, 573 U.S. at 217. Determining whether claims recite an inventive concept is a ***legal determination***, though it may be informed by underlying fact finding regarding whether those additional elements are well-understood, routine, and conventional. *Beteiro, LLC v. DraftKings Inc.*, No. 2022-2275, __ F.4th __, 2024 WL 3077636, at *5 (Fed. Cir. June 21, 2024). Here, the record overwhelmingly warrants a determination that none of the additional elements in claims 1 and 2 exhibits an "inventive concept" sufficient to bestow patent-eligibility.

> **1.    JMOL Is Warranted Because the Intrinsic Record Overwhelmingly Demonstrates That the Additional Elements of the Claims Are "Well-Understood, Routine, and Conventional," and the Court Should Set Aside the Jury's Contrary Determination**

The jury's determinations regarding the conventionality of the "additional elements" in claims 1 and 2 of the '776 patent cannot be reconciled with the record and the Court should set them aside. The '776 patent alone states unequivocally that the "additional elements" in those claims (i.e., the elements separate from the core "abstract idea") were all well-known in the industry. GComm's expert Dr. Akl ***never disputed the numerous admissions in the '776 patent's specification***. *See* Trial Tr. at 1281:10-1283:11, 1310:19-1311:7, 1318:14-18 (entire rebuttal direct, cross, and redirect for '776 patent). Dr. Akl did not dispute them because he plainly could not credibly do so. The "Background" section of the '776 patent explains in detail how all principal elements in claims 1 and 2 (i.e., **cell reselection**, **priority-based reselection**, **absolute priority of corresponding frequencies**, **best-cell reselection**, and **offset-based cell reselection**) were indisputably ***known and understood in the prior art***.

The patent's "Background" (as discussed in Dr. Min's unrebutted trial testimony) confirms this fact beyond serious doubt. As the slide below shows, Dr. Min explained how the "Background" unambiguously recognizes that concepts of **cell reselection**, **best-cell reselection**, and **offset-based cell reselection** were not only understood but implemented in live LTE (4G) mobile networks:



Ex. 1 at DDX4-31. *See* Trial Tr. at 1046:25-1047:19; *see also id.* at 1036:22-1037:3, 1037:11-1038:18; Section I.A., *supra.* The patent openly acknowledges that conventional LTE networks used a "$Q_{offset}$" calculation (i.e., **offset-based cell reselection**) to calculate "cell reselection assessment values Rs" which are ranked to identify the "**best cell**" for reselection purposes. JTX-1 (1:47-65); *id.* (1:27-46) (describing "best cell" cell reselection in 3G networks, where "the method of calculating Rs and Rn is determined by standard specifications"); *id.* (1:47-65) (explaining LTE (4G) "continues to use the foregoing [3G] cell reselection method"). This undisputed statement makes impossible the jury's determination that there was anything unconventional surrounding these limitations.

Dr. Min's discussion of other elements was equally clear.  He laid out how the "Background" confirms that **priority-based reselection** based on the priority assigned to a cell's frequency by the network (i.e., the absolute priority), and the linked concepts of having an initial (serving) cell having a priority and a "reselected" (neighboring) cell having a priority, were known and used in the prior art:



Ex. 1 at DDX4-32.  *See* Trial Tr. at 1047:20-1048:14; *see also id.* at 1039:1-1040:12; Section I.A., *supra*.  The patent discusses in-detail prioritizing based on "frequency" priority, as well as performing a second round of prioritization based on signal strength (i.e., the "offset-based" best cell reselection method discussed above).  JTX-1 (1:66-2:44); *id.* (4:61-67) ("[T]he offset-based cell reselection principle has been described in details [sic] in the background of the present invention, so it will not be described here again.").  GComm presented no rebuttal—Dr. Akl never addressed the '776 patent's admissions that these elements were known building blocks used for cell reselection.  The jury's determination cannot reconcile with this undisputed recitation.

Finally, the "Background" section also discusses using the **absolute priority of**

**corresponding frequencies** in a priority-based cell reselection, confirming that it was conventional and well-understood:



Ex. 1 at DDX4-33. *See* Trial Tr. at 1048:21-1049:5; *see also id.* at 1039:1-1040:12; Section I.A., *supra*. The "Background" is wholly unambiguous here, expressly explaining how known, prior art systems would "rank[ ] the frequencies based on their absolute priority." JTX-1 (2:2-11). GComm similarly presented no rebuttal to this evidence. This undisputed recitation shows that the jury's determination is unsupportable.

Regarding claim 2, there is no legitimate dispute that the recited structure that performs the method recited in claim 1 is also conventional. Specifically, claim 2 recites a "terminal used to perform reselection" that includes a "first reselection module" and a "second reselection module." JTX-1 (7:17-8:18). This Court construed these two modules as means-plus-function elements whose corresponding structure is a processor programmed to perform algorithms the specification admits were known. Dkt. 169 at 16-18 & n.3. Processors were certainly well-understood, routine, and conventional as of September 2008 and cannot supply the required "inventive concept." *See* Trial Tr. at 1045:11-1046:14; *see also In re Bd. of Trs. of Leland*

*Stanford Junior Univ.*, 989 F.3d 1367, 1374 (Fed. Cir. 2021) (finding "method steps carried out by a 'computer system' with a 'processor' and a 'memory'" insufficient to provide an inventive concept); *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1368, 1371 (Fed. Cir. 2015) (noting that a "processor" operates "in a conventional manner" and that element "does not confer patent eligibility").

The Court's assessment of *Alice* step two can and should stop here. The Court should hold that the asserted claims lack the "inventive concept" necessary to establish patent-eligibility because the patent's own "Background" confirms as much. Evidence of conventionality, routineness, etc. can ***come from the asserted patent itself*** and such evidence can support judgment as a matter of law notwithstanding any "extrinsic evidence" that might be in the record. *E.g.*, *CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1381 (Fed. Cir. 2022) (affirming determination that perceived fact issues were "non-genuine" in the presence of an "explicit contradiction between [the] extrinsic evidence and the numerous admissions of conventionality in the intrinsic record"). *CareDx*'s reasoning should apply here. In that case, as in this one, the district court initially found triable issues surrounding "the conventionality of the techniques for performing the claimed methods." *Id.* at 1375. Later, upon re-evaluating the record—and particularly the statements in the intrinsic record—the district court changed its view and entered summary judgment, and the Federal Circuit affirmed. *Id.* at 1381. JMOL of invalidity is the correct path here.

There is simply nothing in the record that might support the jury's apparent determination that the '776 patent's "Background" section does not establish that all the "additional elements" in the claims were known to be routine and conventional as of the critical date. GComm presented no opinions from Dr. Akl, or anyone else, adopting that view. As such, the jury's

21

contrary determination cannot be reconciled with the record and should be set aside.

That outcome is also required by controlling precedent. Where, as here, there has been a determination that the core of the claims is an abstract idea, that abstract idea cannot be used to establish patent-eligibility. *See BSG Tech. LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."). At *Alice* step two, the "inventive concept" must come from only "additional elements," which are the elements responsible for *implementing* that abstract idea. *E.g.*, *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016) (explaining that at step two, eligibility can be established by showing generic components operating in an unconventional manner).

The record here shows beyond doubt that ***all*** the additional components were well-known individually and as an ordered combination. *See* Trial Tr. at 1053:22-1055:9 (Min). Further, all are being used according to their ordinary, expected function. References to **best-cell reselection**, and **offset-based cell reselection** in the asserted claims are applying those terms' ordinary, understood meaning. *See, e.g.*, JTX-1 (4:63-67). Likewise, the claims' use of **priority-based reselection** and **absolute priority of corresponding frequencies** are no different than how those concepts are explained in the Background. There is simply nothing here that is different, in any way—and certainly not in an inventive way—from how these concepts were already understood to work in the prior art.

Indeed, the only aspect of the claims that the '776 patent asserts is new is grouping cells of different frequencies into a set of same-priority cells—i.e., creating a somewhat larger subset of cells than had been done by the conventional cell reselection method that grouped cells on the

same frequencies, JTX-1 (4:13-26, 43-51 (S102), 59-60)—and then selecting from among that larger subset of cells using the known best-cell / offset-based reselection method, *id.* (4:61-67 (S104)).  However, this is merely the abstract idea of using multiple criteria to make a decision—creating a subset using one criterion and then using a second criterion to select from the subset.  *See Chamberlain Group, Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1349 (Fed. Cir. 2019) ("Wireless communication cannot be an inventive concept here, because it is the abstract idea that the claims are directed to.").  And, in any event, that abstract idea, itself, is indisputably known and conventional.  *See* Trial Tr. at 1053:22-1054:24.

This case is similar to *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019).  There, as here, the claims were directed to an abstract idea.  At step two, the Federal Circuit examined each of the additional elements recited in the claims and determined that they were all pre-existing and routine—and specifically, had been identified as such in the "Background" section of the patent.  920 F.3d at 774 ("This cannot supply an inventive concept in this case.").[3]  That is the case here.  The Court should set aside the jury's finding regarding

---

[3] The *ChargePoint* court relied on an admission in "the 'Background of the Invention' section . . . [that] demonstrates that demand response has been in use in other consumer services, such as with air conditioning and lighting, which may be reduced during periods of high demand."  920 F.3d at 774 (citing U.S. Patent No. 8,432,131 at 1:41-52); *see also* Ex. 5 ('131 Patent) at 1:41-52 ("Electricity grids have periods of high demand from customers where the demand may approach or even exceed the electricity supply.  Conversely, there are periods of low demand which coincide with high electricity production.  Demand Response is a mechanism for reducing consumption of electricity during periods of high demand.  For example, consumer services such as air conditioning and lighting may be reduced during periods of high demand according to a preplanned load prioritization scheme.  Demand Response may also be used to increase demand at times of high electricity production."); *see also, e.g.*, *AI Visualize, Inc. v. Nuance Commn'cs, Inc.*, 97 F.4th 1371, 1380 (Fed. Cir. 2024) (Fed. Cir. 2024) ("[T]he intrinsic record undermines AI Visualize's argument by showing that virtual views were known in the art.  The shared specification provides that technology existed at the time of the invention 'to present richer three-dimensional (3D) views from existing two-dimensional (2D) scans that may lead to better diagnosis and prognosis.'" (quoting U.S. Patent No. 9,106,609 at 1:22-25)); *In re TLI Commn'cs* (continued…)

conventionality and should enter JMOL that the asserted claims are invalid as directed to patent-ineligible subject matter.

> ### 2. The Extrinsic Record Confirms the Subject-Matter Ineligibility of the Asserted Claims

Although the Court can and should resolve the case on the intrinsic record, the extrinsic record wholly bolsters the conclusion discussed above. The core concepts in the asserted claims (i.e., **cell reselection**, **priority-based reselection**, **absolute priority of corresponding frequencies**, **best-cell reselection**, and **offset-based cell reselection**) were all described in patents, published applications, and papers well before the critical date.

As Dr. Min explained at trial, R-2075041, Iwamura, Lee, and Cho contain detailed discussion of every element. *First*, he explained that all four references discuss the basic concept of **cell reselection** (Trial Tr. at 1049:21-1050:6):

- R2-075041 discusses the advantages and disadvantages of **cell reselection** based on signal strength (JTX-20.1-.2);
- Iwamura, Lee, and Cho all discuss **cell reselection** in their "Abstract" sections (DDX-159 (Ex. 2 at abstract)); *see also* JTX-19, DTX-162).

He specifically highlighted Cho's disclosure of cell reselection in its title. Trial Tr. at 1049:25-1050:5.

*Second*, Dr. Min explained how the linked concepts of **best-cell reselection** and **offset-based cell reselection** appear in all four references (Trial Tr. at 1050:7-17):

- Cho, Iwamura, and Lee all discuss use of **offsets** for this purpose, including

---

*LLC Patent Litig.*, 823 F.3d 607, 613-14 (Fed. Cir. 2016) (affirming dismissal where specification described elements as "known"); *Intellectual Ventures II LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG, 2019 WL 2297048, *15-16 (E.D. Tex. Mar. 29, 2019) (pursuant to Rule 52(c), finding method claim 1 of the '581 patent ineligible where the patent itself "concedes these claimed components were known" and stating "[t]hese concessions leave nothing in the claims that was not well known in the art, commercially available, or standard technology" (citing patent statements such as "devices well known in the art," "standard telecommunications technology," "[i]t is generally known," "known mapping programs")).

algorithms using a variable called $Q_{offset}$ (DTX-162 at 8:46-55); (DDX-159 (Ex. 2 at ¶ 101)); (JTX-19 at ¶ 60);

- R2-075041 similarly describes a "$Q_{offset}$ based scheme."  (JTX-20.1).

Dr. Min specifically highlighted Cho's disclosure of determining and ranking R values ("cell reselection assessment values Rs," JTX-1 (1:37-38)) for neighboring cells and using "Qoffset as part of the reselection criteria."  Trial Tr. at 1050:10-22.

   ***Third***, Dr. Min testified that these references also describe **priority-based reselection** (Trial Tr. at 1050:23-1051:16):

- Cho describes use of **priority** for ranking (DTX-162 at 10:6-24);
- Lee's Figure 13 depicts the use of "cell-specific **priority**" (JTX-19 at Fig. 13);
- Iwamura also describes use of "**priority**" for balancing among cells (DDX-159 (Ex. 2 at ¶ 87));
- R2-075041 depicts in detail a "**priority** based scheme" (JTX-20.1).

He specifically noted the discussion in Cho of how, when priority is provided by the network, the phone performs measurements according to the priority as part of its cell reselection efforts. Trial Tr. at 1050:23-1051:7.  He further explained that the network provides the phone with the "**absolute priority of the frequencies**" that the cells use.  Trial Tr. at 1052:4-1053:1; DTX-162 at 6:25-33, 9:58-64 (describing using "system information" and other "basic information" (e.g., frequency)).  Dr. Min also highlighted the priority-based scheme described in the R2-075041 reference, including its use of **absolute priority**.  *Id.* at 1051:8-1052:3; JTX-20.1 (describing a "priority based scheme" that uses "**absolute priorities between frequencies**"); *id.* (describing a benefit of "[s]implicity" because "relying on absolute priority, simple measurement/cell reselection rules can be achieved").  The examples showing that using the **absolute priority of corresponding frequencies** was known and conventional also included Iwamura (DDX-159 (Ex. 2 at ¶ 144)), which describes using "priority information" from the base station:



Trial Tr. at 1051:17-1053:1; Ex. 1 at DDX4-38.

**Fourth**, Dr. Min confirmed that cells operating on different frequencies was also well-known (Trial Tr. at 1053:2-17):

- Cho describes cells with different frequencies (DTX-162 at 9:26-39);
- R2-075041 has similar disclosure (JTX-20.2); and
- Iwamura confirms the use of "different frequency bands" (DDX-159 (Ex. 2 at ¶ 14)).

He specifically highlighted Cho's discussion of "the different frequency bands" in the context of cell reselection. Trial Tr. at 1053:8-16.

The only substantive basis that GComm's expert offered for disputing this evidence was to argue that none of the references alone or in combination "involve same priority cells where the priority is equal to the absolute priority." Trial Tr. at 1318:14-18 (entire rebuttal redirect for '776 patent); *id.* at 1281:10-1283:11 (entire rebuttal direct for '776 patent); *id.* at 1310:19-1311:7 (entire cross for '776 patent). As an initial matter, Dr. Akl's testimony rebuts Samsung's arguments for invalidity under sections 102 and 103, not section 101. More importantly, Dr. Akl never addressed R2-075041's explicit disclosure of a "Priority based scheme – absolute priorities

between frequencies" or its discussion of the "[s]implicity" benefit arising due to that scheme's "relying on absolute priority, simple measurement/cell reselection rules can be achieved[,]" JTX-20.1.  *See* Trial Tr. at 1281:10-1283:11, 1310:19-1311:7, 1318:14-18.  Dr. Akl likewise did not mention Cho (DTX-162) or its passages that Dr. Min highlighted for the jury.  *Id.*  Therefore, even if Dr. Akl identified some discussion in these references about considering cell load as part of cell reselection, the record is ***undisputed*** that these references also disclose a priority-based cell reselection scheme that uses the <span style="color:red">**absolute priority of corresponding frequencies**</span>.

Though unnecessary to reach in view of the intrinsic record, the extrinsic record confirms the subject-matter ineligibility of the claims.

### B.    The Asserted Claims Are Also Invalid Under Sections 102 and 103

The asserted claims are also invalid based on Cho alone and in combination with R2-075041.  At trial, Samsung's expert, Dr. Min discussed the disclosures of Cho and R2-075041, first to show that they corroborate the admissions in the '776 patent that the claim limitations were well-understood, routine, and conventional.  Trial Tr. at 1049:6-1053:16.  He then emphasized these teachings further and provided a detailed analysis as to why Cho alone and in combination with R2-075041 renders the Asserted Claims of the '776 patent invalid.  *Id.* at 1049:21-1050:6 (discussing Cho's teachings of cell reselection), 1050:7-22 (discussing Cho's teachings of best cell and offset-based reselection); 1051:1-13 (discussing Cho's and R2-075041 teachings of priority-based reselection); 1052:4-1053:1 (discussing Cho's teachings of absolute priority of frequencies); 1053:6-16 (discussing Cho's teaching of cells on different frequencies); *see also* 1055:20-1060:10 (providing element-by-element of Cho alone and with R2-075041).

In rebuttal, GComm's expert, Dr. Akl focused on the references' discussions of "load balancing" and argued only that Cho and R2-075041 do not propose to set the priority of the same priority cells to equal the absolute priority of the corresponding frequencies.  Tr. at

1281:10-1283:11.  Dr. Akl's challenge, however, ignores the disclosures of Cho and R2-075041

that Dr. Min highlighted, which in Cho's case, states that the priority is provided by the network[4]

and, in R2-075041's case, explicitly states that known cell reselection techniques prioritized cells

using  "absolute priorities between frequencies."





---
[4] Dr. Akl admitted that the absolute priority for each frequency is assigned by and sent from the network.  Trial Tr. 456:4-13, 457:6-11, 544:18-545:2.

28

Ex. 1 at DDX4-55, DDX4-56; DTX-162 (6:25-33, 9:58-64); JTX-20.1. As such, Dr. Akl's only distinction against the prior art is irrelevant and unsupported by the trial evidence. Given the undisputed testimony of Dr. Min and the disclosures of Cho and R2-075041 themselves, the jury's verdict lacks substantial evidence.

### C.    Alternatively, the Court Should Grant a New Trial on Invalidity

If the Court does not grant Samsung JMOL on invalidity under sections 101, 102, and/or 103, the Court should grant a new trial. First, for the reasons explained above, the jury's verdict stands against the great weight of the evidence. Second, in distinguishing prior art, Dr. Akl failed to consistently analyze the claims for invalidity and infringement. As discussed, Dr. Akl distinguishes the prior art by asserting that the priority of the same priority cells is not equal the absolute priority. Tr. at 1281:10-1283:11. But in contrast, as discussed on Section II.A.3 below, Dr. Akl glossed over the requirement that the priority of the same-priority cells is ***equal to*** the absolute priority of corresponding frequencies when conducting his infringement analysis. In fact, Dr. Akl's testimony demonstrates that within the accused products, the alleged priority of the same priority cells is not equal the absolute priority of the corresponding frequencies. Trial Tr. at 457:12-458:4, 544:18-545:25. As such, new trial should be granted on this basis as well.

## II.    Samsung Is Entitled to JMOL of, or Alternatively a New Trial on, Noninfringement

### A.    Samsung Is Entitled to JMOL of Noninfringement of the '776 Patent

GComm accused Samsung 5G products of infringing claims 1 and 2 of the '776 patent. Samsung is entitled to JMOL of noninfringement as to certain of the Accused Samsung Products containing MediaTek baseband processors because GComm failed to provide any evidence on the operation of the MediaTek processors. Samsung is also entitled to JMOL of noninfringement as to all Accused Samsung Products because GComm failed to provide sufficient evidence showing that the Accused Samsung Products meet two distinct limitations of the asserted claims.

### 1.    GComm Failed To Meet Its Burden To Prove Infringement of MediaTek Products

In the initial trial, GComm failed to meet its burden to prove infringement of Accused Samsung Products containing MediaTek baseband processors (collectively, "MediaTek Products").  Specifically, GComm broadly accused *all* Samsung 5G products (Dkt. 1 at ¶ 49) and maintained infringement assertions against *all* Samsung 5G products even once trial began.  Pre-Trial Order, Dkt. 345 at 6 ("G+ contends that Samsung infringes claims 1-3 of the '776 Patent . . . [by *inter alia*, selling] *Samsung 5G enabled products* and any Samsung products that operate in the same manner in material parts.").  Indeed, even after trial started, GComm's experts continued to accuse *all Samsung 5G products*.  Trial Tr. at 645:20-24 (Kowalski) ("*[E]very handset* has to . . . be able to use the features of the three patents-in-suit because they are standard essential mandatory."); *id.* at 739:25-740:23 (Dell) ("[T]he patents at issue in this case are essential to the 5G standard and that Samsung's phones practice the 5G standard and, because of that, they would therefore infringe the patents at issue.").  Finally, after evidence closed, GComm continued to argue that all Samsung 5G products infringe when it sought JMOL under Rule 50(a).  *See id.* at 1330:20-1332:8.

Despite these contentions, GComm indisputably failed to prove that the MediaTek Products infringe in the initial trial.  Its technical experts failed to complete the required analysis.  Dr. Akl admitted as much.  Trial Tr. at 515:25-516:2; 516:8-20, 517:3-518:13; 518:17-519:4; 554:23-555:1.  Accordingly, Samsung moved for JMOL of noninfringement on the MediaTek Products.  *See* Trial Tr. at 1336:5-20.  After lengthy argument, the Court ordered additional briefing on the topic.  *Id.* at 1369:6-1386:25; Dkts. 593, 594.  The Court thereafter ruled that the MediaTek products were dismissed without prejudice based in large part on the fact that GComm sent updated appendices to the damages expert report of Mr. Dell to Samsung on the eve of trial

removing, *sub silentio*, MediaTek Products from the damages base.  Dkt. 617 at 4-5.

Samsung respectfully disagrees with the Court's ruling and hereby renews its request for JMOL on this issue.  Although this Court has "traditionally encouraged a narrowing of the respective cases as trial approaches and has done so by recognizing that dropping of claims in advance of trial is typically without prejudice," it has also cautioned that such dropping "requires **clear notice** to the other side and a clear understanding at the start of trial *as to what is in and what is out*."  Trial Tr. at 1373:19-1374:8.  GComm's service of updated appendices to a damages report did not provide clear notice GComm intended to drop its claims of infringement against the MediaTek products.

The appendices were served the day before the initial trial (January 18, 2024), at 6:20 pm Central time, with a cover email that stated only: "Counsel, [p]lease see the attached."  Dkt. 594-12 at 1.  The supplemental damages appendices included unchecked boxes that appeared to remove certain Samsung products from Mr. Dell's damages calculations.  One can discern which processors were removed only by looking up the processor each of these particular Samsung products uses.  *Id*. at 19-50.  At even this late hour, the night before trial, GComm did not provide this explanation or express any intent to withdraw infringement claims against the MediaTek Products.  Such an obtuse disclosure on the eve of trial is simply too little and too late to constitute "clear notice" that MediaTek Products were no longer at issue in the trial.  *See In re FEMA Trailer Formaldahyde Prods. Liab. Litig.*, 628 F.3d 157, 162-63 (5th Cir. 2010) (noting it causes "[p]lain legal prejudice" to dismiss without prejudice "at a late stage of pretrial proceedings").  The Court should enter judgment of noninfringement as to the MediaTek Products or, at a minimum, dismiss those claims **with prejudice.**  *See G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 953 (5th Cir. 1981) (If appellee had not presented evidence on a claim,

████████████████████████████████

and "the count had not been dismissed, it would have been considered tried at the conclusion of the case" and "appellee would have lost for not carrying his burden").

> ### 2. Substantial Evidence Does Not Support Any Finding That the Accused Samsung Products Select a Reselected Cell from Among "Same Priority Cells"

The asserted claims recite a specific two-step process for cell reselection. First, the asserted claims require setting cells on multiple frequencies as "same priority cells." JTX-1 (cls. 1, 2). Next, the reselected cell must be selected "from among the same priority cells." *Id.* The '776 patent's written description reflects this two-step process. *Id.* (Fig. 1, 2:60-3:12). GComm's technical expert, Dr. Akl, likewise confirmed that the claims recite this two-step process. *See* Trial Tr. 547:17-21, 548:21-24.

At trial, however, GComm failed to present any evidence—let alone substantial evidence—that the Accused Samsung Products perform the recited reselection by selecting from among cells that are grouped together as "same priority cells." Rather, the trial evidence demonstrates that ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

       ███████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████    As such, the Accused Samsung Products do not perform reselection "from among the same priority cells"—i.e., from among a group of cells having the same priorities.  Samsung is therefore entitled to JMOL of noninfringement.  *See Techsearch LLC v. Intel Corp*., 286 F.3d 1360, 1373-74 (Fed. Cir. 2002) (affirming a grant of summary judgment of noninfringement where an expert ignored claim limitations).

Further, to the extent infringement was found under the doctrine of equivalents, GComm failed to provide sufficient evidence to support such a finding.  *See VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1342-45 (Fed. Cir. 2023) ("[W]e have long demanded specificity and completeness of proof as crucial to enforcing the limits on the doctrine: The patentee must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device." (internal quotation, citation omitted)).  At trial, GComm presented a cursory doctrine of equivalents analysis:



Q. So understanding that it is incorrect, even under Samsung's position, does Samsung still infringe?

A. Yes. There would still be infringement under the doctrine of equivalents for this limitation.

Q. And can you explain why?

A. Yes, because under Samsung's position you would still meet the function way result test because ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

Q. So what is your conclusion about elements B and D?

A. They infringe literally and under DoE.

Trial Tr. at 440:18-441:7. Dr. Akl's testimony does not identify the alleged equivalent of the "same-priority cells" in the Accused Samsung Products, much less how ████████████ ██████████████████████████ is the equivalent of selecting from a group of cells having the same priority. As Dr. Min testified, ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ *Id.* at 1071:15-21. Dr. Akl's conclusory analysis, therefore, does not support the jury's verdict. *See, e.g.*, *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015) ("Conclusory statements by an expert . . . are insufficient to sustain a jury's verdict."); *Guile v. United State*s, 422 F.3d 221, 227 (5th Cir. 2005).

   **3. Substantial Evidence Does Not Support Any Finding That the Priority of the Same-priority Cells Is "Equal to the Absolute Priority of Corresponding Frequencies"**

  GComm's trial presentation ignored the requirement that "priority of the same priority cells" must be equal to "the absolute priority *of corresponding frequencies*." At trial, Dr. Akl focused his analysis on the appearance of the words "absolute priority" within the 3GPP

███████████████████████████████████

technical specification.  *See* Trial Tr. at 456:2-457:11; *see also* 1/26/24 Trial Tr. at 100:7-11, 138:21-139:17 (closing referring to only "absolute priority").  But as the claim language demonstrates, the claims require more than a moniker or an incantation of the words "absolute priority."  Instead, the claims require that the absolute priority be "of the corresponding frequencies."  The trial evidence demonstrates that ███████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████

      ██████████████████████████████

█████████████████████████████

████████████████████████████████

███████████████████████████████

█████████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████████

████████████████

    ██████████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████



Because Dr. Akl ignored the actual claim language—"equal to absolute priority of corresponding frequencies"—his opinion cannot support the jury's finding of infringement.  *See Techsearch LLC*, 286 F.3d at 1373-74; *cf. Duncan Parking Techs.,*

███████████████████████████

*Inc. v. IPS Grp., Inc.*, 914 F.3d 1374, 1363 (Fed. Cir. 2019) (explaining "where the parties do not dispute any relevant facts regarding the accused product . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment" (internal citation, quotation marks, and bracketing omitted)).

Further, to the extent infringement was found under the doctrine of equivalents, GComm failed to provide sufficient evidence to support such a finding. *See VLSI*, 87 F.4th at 1342-45. GComm's presentation on the issue of doctrine of equivalents was cursory. Trial Tr. 462:10-22. Dr. Akl provided no analysis concerning how ████████████████████████████ ████████████████████████████ would equivalent to using priorities that are **equal to** the absolute priority of corresponding frequencies. *Id.* Indeed, Dr. Akl's theory of equivalents entirely vitiates the limitation in claims 1 and 2 requiring that priority be "**equal to** the absolute priority **of corresponding frequencies**." *Bell Atl. Network Servs. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1279-80 (Fed. Cir. 2001). Accordingly, there legally can be no infringement under the doctrine of equivalents. *Id.* at 1279 ("[U]nder the 'all elements rule,' there can be no infringement under the doctrine of equivalents if even one element of a claim or its equivalent is not present in the accused device.").

### B.    In the Alternative, the Court Should Order a New Trial on Infringement

If the Court does not grant JMOL of noninfringement, it should, in the alternative, grant a new trial because the verdict was against the great weight of the evidence for the reasons discussed above. *See* Section II.A., *supra*.

Further, new trial is warranted because Dr. Akl provided inconsistent analysis for purposes of infringement and invalidity. *See* Section I.C. As discussed, Dr. Akl relied on the limitation that the priority of same-priority cells is **equal to** the absolute priority of corresponding frequencies when attempting to distinguish prior art. *See* Section I.B. But he ignored that very

limitation when advancing his infringement analysis. *See* Section II.A.3.

In addition, the Court's instruction on infringement under the doctrine of equivalents was legally erroneous and prejudicial. *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 784 (5th Cir. 2018) ("A district court can grant a new trial if it finds the verdict was against the weight of the evidence, the damages awarded were excessive, the trial was unfair, or prejudicial error was committed in its course." (internal quotation marks omitted)); *see also Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000). Specifically, over Samsung's objection, the instruction failed to explain that GComm must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device. *See VLSI*, 87 F.4th at 1342-45; 1/26/24 Trial Tr. at 8:3-25 (objection).[5] The omission was prejudicial because it denied the jury the tools it could have used to reject the cursory opinion of Dr. Akl's opinions on infringement under the doctrine of equivalents. *See* Sections II.A.2. & .3., *supra*. If properly instructed, any reasonable jury would have had to conclude that GComm failed to prove infringement under the doctrine of equivalents.

These errors deprived Samsung of a fair trial and warrant a new trial.

## III. Samsung Is Entitled to JMOL, or Alternatively a New Trial, on GComm's Breach of Its FRAND Obligations

Regarding Samsung's claim that GComm breached its FRAND obligations, the Court's instruction to the jury was legally flawed by requiring Samsung to prove more than the law

---

[5] Samsung asked the Court to deliver the following instruction: "However, G+ must provide particularized testimony and linking argument as to the 15 insubstantiality of the differences between the claimed invention and the Accused Device, or with respect to the function, way, result, and it must be on a claim limitation-by-limitation basis to support a finding of infringement under the doctrine of equivalents. Generalized testimony as to the overall similarity between the claims and the Accused Products is not sufficient to support a finding of infringement under the doctrine of equivalents." 1/26/24 Trial Tr. at 8:13-23.

requires.  Specifically, over Samsung's objections, the Court instructed the jury: "For Samsung

to succeed on its claim, Samsung must prove, by a preponderance of the evidence, that G+ failed

to offer a license to the patents in this lawsuit on fair reasonable and non-discriminatory, or

'FRAND,' terms, *and* that GComm failed to negotiate toward a FRAND license in good faith."

1/26/24 Trial Tr. at 48:15-21; *see also id.* at 5:22-6:10, 22:2-23:2, 26:1-15 (objection).  In other

words, the Court erroneously told the jury that Samsung's breach claim must fail even if

Samsung proved that GComm did not negotiate in good faith.

Because GComm's FRAND declarations are contracts governed by French law, both

parties agree that French law applies to evaluate Samsung's breach claim against GComm.

Under French law, there is *always* a duty to negotiate in good faith, and failure to do so is a

breach *regardless* of whether other specific contract terms—such as the requirement to offer

FRAND terms—are breached.  *See* Dkt. 528-6 (Molfessis Op. Rpt.) at ¶¶ 51-52 (quoting and

translating French new Civil Code at Article 1104 ("'contracts must be negotiated, entered into

and performed in good faith'"); *id*. at Article 1112 ("negotiations 'must necessarily meet the

requirements of good faith'"); French old Civil Code at Article 1134 ("contracts must be

'performed in good faith'").  GComm's French law expert, Professor Borghetti, affirmatively

stated that "*the patent owner is therefore obligated to negotiate in good faith* towards a license

on FRAND terms."  Dkt. 552-5 (Borghetti Re. Rpt.) at ¶ 21; *see also* Dkt. 528-6 (Molfessis Op.

Rpt.) at ¶¶ 50-58 (Samsung's French law expert agreeing, including: "After its formation, failure

to act in good faith is a breach of contract, and will be remedied on the grounds of contractual

liability.").  GComm's expert even admitted that failure to do so is an independent breach:

> It is generally accepted, however, that good faith, in the context of the negotiation
> or performance of a contract, consists in essence in a duty of loyalty and sincerity.
> French courts' decisions give examples of how a party can breach the duty to act in
> good faith, and thus act in bad faith, especially in the context of contractual

████████████████████████████████████

> negotiations.  For example, the *Cour de cassation* has accepted the view that unreasonably delaying negotiations is an example of bad faith.  The [French] Court has also accepted that "voluntarily maintaining the other party in prolonged uncertainty" is a "breach of the rules of good faith in commercial relations."

Dkt. 528-7 at ¶ 43 (citations omitted).  Professor Borghetti further admitted that tenent at his deposition:

> Q    So setting aside that all remedies may not be available, acting in bad faith is still a breach of the contract.  True?
>
> A    Yes, you could call that a breach of the contract.  In a way it certainly breached of a duty arising out of the contract, yes.

Ex. 6 (Borghetti Dep. Tr.) 103:10-18;[6] *see also id*. at 100:5-103:9.

Here, ***regardless*** of whether GComm eventually made FRAND-compliant offers, GComm breached its obligations under French law by negotiating in bad faith.  Samsung proved that GComm breached its obligation by unreasonably (1) ███████████████████ ██████, and (2) suing Samsung in this jurisdiction and Brazil ███████████████████ ██████████.  *See* Trial Tr. 353:13-23; 354:3-7, 13-18; 356:2-13; 936:13-937:17; 944:1-945:15.  As GComm's French law expert admitted, such "unreasonably delaying [of] negotiations is an example of bad faith" according to French courts.  Borghetti Op. Rpt. at ¶ 43.  And Samsung provided unrebutted evidence of litigation costs from GComm's breach in the amount of ██████████.  *See* Trial Tr. 1190:6-11.[7]  Samsung, therefore, requests judgment as a matter of law that GComm breached its FRAND obligation by failing its duty to negotiate in good faith and that Samsung is entitled to damages of ██████████.  In the alternative, Samsung requests a new trial on GComm's breach of contract under the appropriate legal standard.

## IV.    Samsung Is Entitled to JMOL, or Alternatively a New Trial, on Damages

---

[6] Despite listing Mr. Borghetti as a potential trial witness, GComm did not present him at trial.

[7] Pursuant to FRCP 44.1, the Court properly found that litigation costs are compensable losses for breach under French law.  *See* Dkt. No. 575.

██████████████████████████████████████

Because the '776 patent is a declared SEP, GComm is contractually obligated to license it on FRAND terms.  Retrial Tr. at 368:22-369:3.  When faced with a plethora of *Georgia-Pacific* factor 1 and 2 licenses—including licenses GComm's expert admits are comparable and ██ ███████████████████████████████—that all indicate a FRAND royalty would be on the order of ██ ████████ per unit, GComm conjured up an "incremental profit approach" to seek damages orders of magnitude higher.

███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████    *See Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217, *19, 28, 42 (W.D. Wash. Apr. 25, 2013).  GComm did not even try to present such an evaluation. *See, e.g.,* Retrial Tr. at 298:13-302:19; *see also id.* at 280:17-25.

███████████████████████████████████████████

██████████████████████████████████████    *See id.* at 390:2-391:17.  Critically, GComm did not present its survey expert at trial, and GComm did not otherwise introduce this survey, survey methodology, or survey expert analysis into evidence.

41

██████████████████████████████████

*See id.*  Mr. Dell is not a survey expert[8] and cannot simply serve as a mouthpiece to parrot the conclusions of other experts, whether technical or survey.  *See Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("Rule 703 was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." (internal quotation omitted)).  ████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████

     In the context of asking for more than $100 million for a single 5G standard essential patent—where nearly 70,000 patent families are declared essential to 5G (Retrial Tr. at 424:14-18, 509:4-21)—the lack of legal and evidentiary support for this sum is astounding.  Because GComm's IPA approach is not a legally proper theory and is not supported by legally sufficient evidence, the Court should enter JMOL of no damages.  *Montano*, 842 F.3d at 873; *see also Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("[A] patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory.").  Alternatively, the Court should grant JMOL that the only legally proper award supported by the evidence is $10.5 million—the highest legally-proper amount offered by Mr. Dell (albeit still flawed), Retrial Tr. at 415:21-416:11 (highest Dell rate of ███ per unit for one asserted patent, resulting in $21 million lump

---

[8] GComm offered "Mr. Dell as an expert in the field of patent valuation, licensing negotiation, and damages."  Retrial Tr. at 354:5-11.

sum for two patents)—or order a new trial conditional on remittitur of damages to that amount.

### A.    The Court Should Enter JMOL of No Damages

As the Federal Circuit held in *Apple Inc. v. Wi-LAN Inc.*, "'a reasonable or scientifically valid methodology is nonetheless unreliable where the data used is not sufficiently tied to the facts of the case.' *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). Likewise, 'ideal input data cannot save a methodology that is plagued by logical deficiencies or is otherwise unreasonable.'" 25 F.4th 960, 970-71 (Fed. Cir. 2022). "Any [royalty] rate determined by the trier of fact must be supported by relevant evidence in the record." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). GComm bears the burden to provide "legally sufficient evidence regarding an appropriate reasonable royalty." *ResQNet, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010). The jury's $61 million damages award is unsupported for multiple independent reasons, each of which Samsung raised in its Rule 50(a) motion. Retrial Tr. at 566:18-567:3, 570:17-575:13.

### 1.    GComm's Incremental Profit Approach Is a Legally Flawed Theory That Lacks Any Legally Sufficient Evidentiary Basis

#### a.    Mr. Dell Ignored Per Unit FRAND Royalties from His Own Comparable License and Top-Down Analyses

A damages award cannot stand where the patentee's expert wholly disregards comparable licenses, especially licenses to the asserted patents. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79-81 (Fed. Cir. 2012). In *LaserDynamics*, the Federal Circuit explained that, where "the licenses to the patents-in-suit were all for lump[] sum amounts not exceeding $1 million," the patentee's "6% running royalty theory cannot be reconciled with the actual licensing evidence, which is highly probative of the patented invention's economic value in the marketplace, and of the form that a hypothetical license agreement would likely have taken." *Id.* Indeed, licenses to an asserted patent "carry considerable weight in calculating a

██████████████████████████████████████████████

reasonable royalty rate." *Unisplay*, 69 F.3d at 519; *see also Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1304 (Fed. Cir. 2014) ("Past licensing practices of the parties and licenses for similar technology in the industry may be useful evidence."); *SSL Servs., LLC v. Citrix Sys.*, 769 F.3d 1073, 1093 (Fed. Cir. 2014) (finding agreements sufficiently comparable because "they involve the actual parties, relevant technology, and were close in time to the date of the hypothetical negotiation"). Ignoring comparable licenses is even more problematic for SEPs subject to contractual FRAND obligations because it is contrary to industry practice. DTX-17.44-45; Trial Tr. at 1027:14-23, 1162:9-19; Retrial Tr. at 513:2-23.

GComm's expert admitted that three Samsung licenses are comparable for a hypothetical negotiation regarding the '776 patent ████████████████████████████████████████

████████████████████ Retrial Tr. at 408:25-410:10. ███████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

| Source | Calculated Royalty |
|--------|-------------------|
| ██████████████████ | ████ |
| ███████████████████ | ████ |
| ██████████████████ | ████████ |
| ██████████████ | ████ |
| ████████████████ | ████ |
| ███████████████ | ████ |
| ██████████████ | ████ |

*Id.* at 412:14-415:24. ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



Despite these admitedly comparable licenses and an ███████████████,

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████ *See id.* at 412:14-415:24, 396:7-14.  The Federal Circuit has rejected a multiple of just three times an actual license amount.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009) ("[W]e see little evidentiary basis under *Georgia-Pacific* Factor 2 for awarding roughly three to four times the average amount in the lump-sum agreements in evidence."); *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30-31 (Fed. Cir. 2012) (rejecting a jury award that "was over 3 times the average of the lump sum licenses presented").

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ *See IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691 (E.D. Tex. 2010).  The comparable license evidence in this case demonstrates that the jury's $61 million damages award is not FRAND and lacks support from legally sufficient evidence.  *See Whitserve*, 694 F.3d at 30-31 (vacating jury's damages award where patentee's damage expert's testimony was "conclusory, speculative and,

---

[9] ███████████████████████████, Samsung's damages expert calculated a lump sum royalty of only ████████.  *See id.* at 529:5-531:3, 532:7-12, 533:5-23.

[10] As discussed below, GComm's "lump sum" figure also improperly includes Mr. Dell's speculation on future sales.  *See* Section IV.A.2., *infra.*

█████████████████████████████████████

frankly, out of line with economic reality").  Indeed, particularly for SEPs, when the evidence indisputably includes comparable licenses under GP Factors 1 and 2, it is legally improper to ignore those licenses and rely instead on alternative damages theories such as Mr. Dell's so-called "incremental profit theory" which results in untenable damages awards far removed from anything that could be deemed a FRAND royalty.

### b.      GComm's Use of NIAs Was Legally Improper

██████████████████████████████████████████

████████████████████████████████████████████ Retrial Tr. at 298:13-300:15,[11]

GComm failed to introduce any evidence that the NIAs were legally proper, namely, that they could have been implemented in the ETSI standards.  As *Ericsson, Inc. v. D-Link Systems, Inc.* explains, Factors 9 and 10—the factors for which Mr. Dell discusses NIAs—are irrelevant and skewed for SEPs because one must practice an SEP to use the standard.  773 F.3d 1201, 1230 (Fed. Cir. 2014).  In an SEP case, NIAs must be evaluated in the context of alternatives that ***could have been written into the standard*** in place of the patented technology.  *See Commonwealth Sci. and Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1305 (Fed. Cir. 2015) ("*CSIRO*") (vacating a damages award and awarding a new trial in a RAND case that failed to account for standardization when evaluating on *Georgia-Pacific* factors 8-10); *Microsoft*, 2013 WL 2111217, at *19 ("Through [factor 9], the parties to a hypothetical negotiation under a RAND commitment would consider alternatives ***that could have been written into the standard*** instead of the patented technology.").

This Court correctly provided final jury instructions with modified *Georgia-Pacific* factors to require proof that a relevant NIA could have been written into the standard.  Retrial Tr.

---

[11] Dr. Akl also provided this opinion, though he admitted that the ████████ comes from Dr. Kowalski whose report he copied on this point.  *See* Retrial Tr. at 279:2-6, 280:17-25.

███████████████████████████████

at 606:2-5 (discussing Factor 6: "The utility and advantages of the patent over alternatives that could have been written into the standard instead of the patented technology in the period before the standard was adopted."); *see also id.* at 607:24-608:3 ("In determining a reasonable royalty, you may also consider evidence concerning the availability, or lack thereof, of acceptable non-infringing substitutes or alternatives to the patented invention that could have been written into the standard.").  But GComm presented ***no*** testimony or other evidence that the alleged NIA were legally viable.  GComm's experts were completely silent on this point even though GComm bore the burden to prove its asserted NIAs were available and could have been written into the standard.  Retrial Tr. at 607:24-608:18.  Because GComm failed to introduce evidence of such an available alternative, the alleged 5% speed benefit must fail as a matter of law.

### c.    GComm Failed To Tie the Alleged 5% Download Speed Reduction to the Facts of the Case

█████████████████████████████████████████

GComm's experts relied exclusively on an IEEE study, published more than ten years after the filing of the '776 patent, relating to ping-ponging between cell towers when a phone includes dual SIM cards.  *Id.* at 298:13-300:6, PTX-21 at 1.  The '776 patent has nothing to do with dual SIM cards.  *See* JTX-1 at Abstract; Retrial Tr. at 318:7-319:1.  ████████████████████████

████████████████████████████

████████████████████████████
████████████████████████
████████████████████████████
██████████████████████████
██████████████████████████████
████████
███████████████████████████████
███████████████████
███████████████████████████████



Retrial Tr. at 299:8-300:6.  Neither Dr. Kowalski nor Dr. Akl explained how the 5% speed benefit discussed in the IEEE article is sufficiently linked to the *'776 patent*.

This testimony is legally insufficient to provide the jury a reasonable basis on which to rely.  *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014) (stating "conclusory assertions cannot form the basis of a jury's verdict").  A reasonable jury cannot rely on an expert's bald assertions that an opinion is based on their "experience" and is "conservative."  *See Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) ("conclusory testimony" from an expert not sufficient to defeat JMOL); *Guile*, 422 F.3d at 227 ("An expert's opinion must be supported to provide substantial evidence; we look to the basis of the expert's opinion, and not the bare opinion alone.  A claim cannot stand or fall on the mere ipse dixit of a credentialed witness." (internal quotations and citations omitted)); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-911-JRG, 2016 WL 4440255, *14 (E.D. Tex. Aug. 23, 2016) (ordering new trial where opinions were not adequately tied to facts of the case), *aff'd*, 880 F.3d 1356 (Fed. Cir. 2018).

This flaw infects GComm's entire IPA damages calculation. ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ *See*

Retrial Tr. at 388:19-389:8 ███████████████████████████



Id. at 390:2-6.  In other words, GComm's damages framework is based on NIAs that lack a sufficient evidentiary basis and thus JMOL is appropriate.  *See CSIRO*, 809 F.3d at 1305.

### d.    GComm Failed To Provide Legally Sufficient Evidence of the Alleged Per Unit Profit Attributable to the '776 Patent

Retrial Tr. at 390:2-6.  The survey expert, Dr. Reed-Arthurs, did not testify at trial, and GComm did not introduce any evidence relating to this survey other than Mr. Dell's testimony referencing the results.  *See, e.g.*, *id.* at 389:19-390:10.  Attempting to immunize Dr. Reed-Arthurs's (in Samsung's view, extremely flawed) survey results by not subjecting her to cross-examination, Mr. Dell simply parroted the alleged survey conclusions and told the jury that Samsung had received ████████ in profits-to-date from infringing (by multiplying Samsung's sales by the alleged █████████████).  *Id.* at 390:18-23.  Mr. Dell then projected future sales to declare Samsung's total profits by using the infringing technology over the '776 patent's term would be nearly ██████.  *See id.* at 391:10-17; Ex. 3 at PDX6.60.

. *See* Retrial Tr. at 394:18-396:14.  ███████

*Id.* at 397:10-19.  Mr. Dell provided no substantive analysis and submitted no evidence regarding the ████████████ that he touted repeatedly to the jury.  *See id.* at 389:19-391:17; 396:7-14.

███████████████████████████████

The record is devoid of evidence for which a reasonable jury could have concluded that a ███████████████████████████████ loss in profit to Samsung.  Mr. Dell's testimony on this point is legally untenable because Mr. Dell is not a survey expert, did not analyze the survey results, and did not provide any testimony regarding how the survey concluded a ███ ███████████████████████████ *See id.* at 349:21-354:11.  His opinions rest entirely on the conjoint survey analysis of Dr. Reed-Arthurs.  However, Mr. Dell cannot serve as a mouthpiece for another expert's survey results.  *Bonin v. Sabine River Auth. of Texas*, 2022 WL 19731177, at *6 (E.D. Tex. Nov. 9, 2022) ("An expert cannot parrot the opinions and conclusions of other experts whose testimony is not subject to cross-examination." (quoting *Robison v. Cont'l Cas. Co.*, 2022 WL 336900, at *9 (E.D. Tex. Jan. 6, 2022))), *adopted*, 2022 WL 19731176 (E.D. Tex. Dec. 20, 2022); *see also Wi-LAN Inc. v. Sharp Elecs., Corp.*, 992 F.3d 1366, 1374 (Fed. Cir. 2021); *Factory*, 705 F.3d at 524.

"'The crucial issue' is whether the testifying expert has 'independently evaluated or verified the opinions upon which he relies.'" *Bonin*, 2022 WL 19731177, at *5 (quoting *Robison*, 2022 WL 336900, at *9).  Because Mr. Dell did not, and could not, independently evaluate Dr. Reed-Arthurs's opinions, his opinions are "inherently unreliable," *Robison*, 2022 WL 336900, at *9, and do not qualify as substantial evidence that can support the jury's damages award.

        **e.**      **Because Mr. Dell Failed To Perform a Proper Apportionment Analysis, His Testimony Does Not Support the Jury Verdict**

The Federal Circuit has consistently rejected arbitrary profit apportionments.  For example, in *VirnetX*, the Federal Circuit held that reliance on a 50/50 profit sharing starting point was improper even though the patent owner's expert adjusted the split (in the defendant's favor) based on the facts of the case and applied the split to incremental profits.  767 F.3d at 1333-34.  Similarly, in *Uniloc*, the Federal Circuit rejected "as fundamentally flawed," the so-called "25%

███████████████████████████████████████████

Rule," a rule of thumb assuming that the alleged infringer should pay 25% of its profits to the patent owner as a royalty, while retaining a 75% majority to reflect product development, commercialization risks, and other contributions. *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1313-18 (Fed. Cir. 2011).

Mr. Dell squarely violated this precedent by applying an arbitrary ████████████ ████████████ Retrial Tr. at 394:18-22. █████████████████████████████ ████████████████████████████████████████████████ and thus is legally deficient for the same reasons that these arbitrary splits were rejected in *VirnetX* and *Uniloc*. *See VirnetX*, 767 F.3d at 1333-34; *Uniloc*, 632 F.3d at 1313-15. Further, Mr. Dell's testimony in support of his ████████████████████████████████████████████ ████████████████████████████████████ Retrial Tr. at 394:20-22, follows the same rejected "underlying assumption" supporting the 25% rule of thumb in *Uniloc* that "the licensee should retain a majority (*i.e.*, 75 percent) of the profits, because it has undertaken substantial development, operational and commercialization risks, contributed other technology/IP and/or brought to bear its own development, operational and commercialization contributions." 632 F.3d at 1313.

Mr. Dell's "additional apportionment," which is nothing more than a rounding down under the guise of conservatism, does not render his opinions legally sufficient. Retrial Tr. at 394:23-396:14 ████████████████████████████████████████████ ████████████████████ To the contrary, this black-box "additional apportionment" highlights the unduly speculative nature of Mr. Dell's opinion because the record does not show from where this adjustment came. *See Uniloc*, 632 F.3d at 1317 ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the

████████████████████████████████████████████████

case nevertheless results in a fundamentally flawed conclusion.").

There is no rhyme or reason, furthermore, as to why the adjustments for the '776 patent and the '130 patent differ from one another, other than Mr. Dell's apparently seeking round numbers for the per unit royalties.  *See* Retrial Tr. at 396:1-14 ████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████  One cannot mask a baseless theory under the guise of conservatism.  *See, e.g.*, *Open Text S.A. v. Box, Inc.*, 2015 WL349197, at *6 (N.D. Cal. Jan. 23, 2015) ("[P]urportedly 'conservative' gestures do not come with the reward of using over-inclusive calculations elsewhere.").

### 2.    Substantial Evidence Does Not Support Any Award for Future Damages

Nearly ████████ of GComm's damages demand was based on sales that have not yet occurred, going all the way out to 2030.  Retrial Tr. at 357:25-358:7; 359:7-360:7.  ████████████

███████████████████████████████████████████████████

████████████████████████████████████  This award is unsupported in the evidence and under the law given GComm's damages presentation.

Mr. Dell said he applied his ████████████████████████████████████████

███████████████████████████████████████.  Retrial Tr. at 357:25-358:7 ████████████████████████████  359:7-360:7 █████████████████████

██████████████████████████████████████████████████

████████████; Ex. 3 at PDX6.14-15.  He then calculated alleged revenue and profit from those total sales and discounted that value to present value "to today" to arrive at $102.6 million lump sum award for the '776 patent.  *See* Retrial Tr. at 391:10-17, 397:10-398:14; Ex. 3 at PDX6.78. Importantly, Mr. Dell did not present any evidence or testimony regarding ***how*** he arrived at his

projected sales figures.  *See* Retrial Tr. at 358:11-360:11.  Mr. Dell simply asserted the projected

sales numbers as if they were fact, without showing or explaining ***any*** supporting evidence.  *See*

*id.*

 "Parties agreeing to a lump-sum royalty agreement may, during the license negotiation,

consider the expected or estimated usage (or, for devices, production) of a given invention,

assuming ***proof is presented to support the expectation***."  *Lucent*, 580 F.3d at 1327; *see also*

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 412 (Fed. Cir. 2018)

(reversing JMOL denial because the record lacked substantial evidence for a damages expert's

future sales projections of the accused products in support of the lump sum damages awarded by

the jury).  Here, Mr. Dell's testimony is rank speculation because he did not support his

conclusions about projected sales with any evidence whatsoever.  As a result, his testimony is

insufficient to support the jury award.  *Lucent*, 580 F.3d at 1327 ("[A]n explanation urging jurors

to rely on speculation, without more, is often insufficient."); *cf. Brooktree Corp. v. Advanced*

*Micro Devices, Inc.*, 977 F.2d 1555, 1580-81 (Fed. Cir. 1992) (noting that the "burden of proving

future injury is commensurately greater than that for damages already incurred, for the future

always harbors unknowns" and upholding exclusion of speculative future lost profit damages).

Furthermore, GComm and Mr. Dell did not show that the parties to the hypothetical

negotiation would have considered any estimated future sales of the Samsung Accused Products,

let alone the *ipse dixit* projections on which Mr. Dell relied.  Indeed, Mr. Dell did not even try to

assert that, in 2019, when ZTE and Samsung would have been negotiating, they would have

discussed projected sales of the Samsung Accused Products through 2030.  *Contra, e.g.*,

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001)

(finding no error in expert's use of projections in defendant's own business plan prepared two

months before infringement began).  Similarly, Mr. Dell offered no opinion on whether any of the licenses he admitted were comparable considered estimated future sales in arriving at the lump sum payments in those agreements.  In short, GComm utterly failed to introduce any evidence that would allow Mr. Dell to use projected sales in his lump sum damages analysis.

In any event, GComm's theory of recovery for future damages suffers from a more fundamental problem.  Under the Patent Act, "the court shall award the claimant damages adequate to compensate for *the infringement*."  35 U.S.C. § 284.  On its face, this statute does not apply to infringement that has not happened, and it would offend basic notions of due process to allow such damages.[12]  Future conduct is inherently speculative.  A patent defendant, post-verdict, may cease conduct found to infringe (through re-design or otherwise) and the asserted patent may be invalidated or held unpatentable.  To be sure, when comparable licenses are used to calculate a fully paid up, lump sum rate for the "life of the patent," it is appropriate that a verdict adopting such a rate settles all potential (but uncertain) infringement into the future.  But that is not what happened here.  Mr. Dell's used a running royalty based on his (independently erroneous) IPA theory that assessed a royalty for future units of unknown, speculative quantities and, of course, un-adjudicated infringement.  *Cf. Allergan Sales, LLC v. UCB, Inc.*, No. 15-cv-01001-JRG-RSP, 2016 WL 8222619 at *2 (E.D. Tex. Nov. 7, 2016) ("A running royalty does not accrue until a sale or use occurs," and so future damages opinions

---

[12] The *Enplas* court stated "we have held that a jury may award a lump-sum, paid-in-full royalty in lieu of a running royalty on future sales.  *See Lucent*, 580 F.3d at 1325.  But that lump-sum must be based on an estimate of the extent of future sales of accused products, not on past sales of non-accused products."  909 F.3d at 412.  Neither *Enplas* nor *Lucent* establishes a blanket rule allowing a patentee to recover damages for sales that have not occurred; *Lucent* simply reminds that parties to the hypothetical negotiation may consider the expected or estimated use or production of the patented invention, if such estimates are supported by record evidence.  580 F.3d at 1327.

"cannot be presented to the jury because they are based on a running royalty applied to future acts of infringement that have not yet occurred."). And the prospect of future infringement (through 2030) is particularly speculative here because the '776 patent is undergoing *ex parte* reexamination in the Patent Office, where the examiner has rejected the claims. Ex. 7.

Accordingly, substantial evidence does not support the jury's damages award and the Court should enter JMOL of no damages.

### B.    Alternatively, the Court Should Grant JMOL That Damages Are No More Than $10.5 Million

The Federal Circuit has held that a reduction of the damages award as a matter of law—rather than a new trial—is appropriate where the plaintiff relied upon a legally flawed damages theory to assert damages greater than what the record supported. *See Tronzo v. Biomet, Inc.*, 236 F.3d 1342 (Fed. Cir. 2001) (upholding reduction of a compensatory damages award for a state law claim). In *Tronzo*, the Federal Circuit rejected the plaintiff's argument that the district court's reduction of a damages award from $7,134,000 to $520 should be treated as a remittitur. *Id.* at 1346-47, 1351. The court explained that "the district court did not reweigh any evidence, nor did it exercise its discretion in computing the damages award[,]" and instead "awarded the maximum damages possible given the lack of competent evidence" for an award greater than $520. *Id.* at 1351.

Ignoring the legally relevant evidence, GComm deliberately pursued a legally-flawed damages theory, presenting Samsung revenues and profits to urge the jurors to an exorbitant damages award lacking any legal or evidentiary support. *See Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) (explaining a plaintiff may not be entitled to damages or a new trial where it fails to put on a legitimate damages case). However flawed, ▮▮▮▮▮▮▮

██████████████████████████████████

████████████████████████████████. *See* Retrial Tr. 412:14-

415:24.  At the highest end of GComm's legally acceptable numbers, Samsung would owe

damages of $10.5 million.  Confirming this range is FRAND, Mr. Meyer similarly concluded

that comparable licenses result in a lump sum paid-up reasonable royalty of $3.125 million.  *Id.*

at 523:8-535:5.

Therefore, there is reliable evidence in the record supporting a damages award, such that

awarding a new trial is unnecessary.  *See Tronzo*, 236 F.3d at 1346-47.  The Court should grant

JMOL of no more than $10.5 million in damages, which is the maximum amount supported by

substantial evidence in the record.  Retrial Tr. at 415:21-416:7.

### C.  If the Court Does Not Grant JMOL, It Should Order a New Trial on Damages

If the Court does not grant Samsung's motion for JMOL on damages, it should grant a

new trial.  *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) (holding that a new

trial may be granted even if there is substantial evidence that would preclude JMOL).

### 1.  Sixty-One Million in Damages for a Single SEP Is Against the Great Weight of the Evidence

The Court should grant Samsung a new trial on damages because the jury's award was

unduly excessive and against the great weight of the evidence.  *See Oiness v. Walgreen Co.*, 88

F.3d 1025, 1030 (Fed. Cir. 1996).  As discussed above, GComm's damages evidence, among

other things: (1) ignored numerous comparable licenses; (2) failed to base the ████████████

████████████████████████████████ that could have been written into the standard; (3)

failed to provide evidence supporting the █████████████████████ based on the patented

technology; and (4) relied on speculative future damages.

### 2.  Mr. Dell's Unreliable Testimony Should Have Been Excluded

Mr. Dell's damages opinions were unreliable and should have been excluded.  *See* Dkt.

206.  Specifically, Mr. Dell's opinions were improper because they:

- ignored licenses Mr. Dell acknowledged are comparable and his own calculations for FRAND rates for the '776 patent, including in offers to Samsung, *id.* at 2-6;

- improperly relied on flawed opinions from other experts related to the ███████ benefit and ████ profit from the '776 patented technology, *id.* at 6-9;

- failed to adjust *Georgia-Pacific* factors 8-10 to account for the '776 patent being declared standard essential and FRAND-encumbered, *id.* at 10; and

- improperly speculated about future damages for future infringement, which further lacks sufficient evidentiary support, *id.* at 10-14.

The failure to exclude Mr. Dell's damages opinions was prejudicial and erroneous, and led to a grossly excessive damages award that is against the great weight of the evidence.  Dkt. 548 at 3 (denying motion to strike Dell opinions).  The Court should order a new trial where such testimony is excluded.

### 3.    GComm Inappropriately Attempted To Capture the Value of 5G Standardization, Not Just the Value of the Asserted Patents

The Court should order a new trial because GComm improperly swayed the jury with the alleged importance of the entire 5G standard and based its damages claims on the value of the 5G standard as a whole.  This approach directly contradicts Federal Circuit precedent, which holds that damages awards in SEP cases cannot capture value created by standardization and must be limited to the specific value created by the asserted patents.

"When dealing with SEPs . . . the patentee's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology."  *Ericsson*, 773 F.3d at 1232.  This is "necessary to ensure that the royalty award is based on the incremental value that the patented ***invention*** adds to the product, not any value added by the standardization of that technology."  *Id.*  "In other words, a royalty award for a SEP must be apportioned to the value of the patented invention (or at least to the approximate value thereof),

not the value of the standard as a whole." *Id.* at 1233. Indeed, "Supreme Court precedent also requires apportionment of the value of the patented technology from the value of its standardization. *Id.*

This apportionment is critically important because, for SEPs, "the value of the patented invention . . . is distinct from any value that artificially accrues to the patent due to the standard's adoption." *CSIRO*, 809 F.3d at 1305. "[R]easonable royalties for SEPs generally—and not only those subject to a RAND commitment—must not include any value flowing to the patent from the standard's adoption." *Id.* at 1305. "Without this rule, patentees would receive all of the benefit created by standardization—benefit that would otherwise flow to consumers and businesses practicing the standard." *Id.* at 1305. "When a technology is incorporated into a standard, it is typically chosen from among different options. Once incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because its use is necessary to comply with the standard." *Ericsson*, 773 F.3d at 1233. "[W]idespread adoption of standard essential technology is not entirely indicative of the added usefulness of an innovation over the prior art." *Id.*

GComm flaunted this rule throughout the damages retrial by repeatedly conflating its patents with the 5G standard and attempting to capture value of 5G standardization, not just the incremental value of the asserted patents. For example, one of GComm's consistent themes throughout trial was that Samsung allegedly charges $200 more per phone for 5G—i.e., 5G as a whole, not the small portions of the 5G standard related to the asserted patents. This theme began during opening statements, when GComm's lead counsel explained that Samsung "charge[s] $200 more per phone for 5G technology" and told a story about 5G allowing Samsung to compete with Apple:

██████████████████████████████████████████

And what they studied, JTX 7, is that the two most important features that their customers demanded were speed and battery life. They've got to have them. And 5G met that demand. 5G is dramatically faster than 4G, it's 10 times as fast, and it does it with incredible power efficiency. Samsung's response to its, quote, lovely opponent was to launch 5G over a year-and-a-half before Apple. But launching that 5G a year-and-a-half before Apple doesn't mean that it had the rights to that technology. In fact, it's been found that those rights are held by ZTE and now by G+. How important was this technology to them? They sell the identical phone with the identical features except for one difference—5G. They charge $200 more per phone for 5G technology. It was central to their strategy to defend against Apple.

Retrial Tr. at 164:12-165:1 (GComm opening).

The $200 per-device value of 5G theme continued during GComm damages expert Mr. Dell's testimony, when he explained to the jury that ZTE and Samsung would have negotiated over the entire value of the 5G standard—not just the technology in the asserted patents—at the hypothetical negotiation:

Q.    So in your review of the evidence, was the introduction of 5G important to Samsung?

██    ███████████████████████████████████████████
██████████████████████████████████████

██    █████████

██    ███████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████

Q.    *And is this also something they would have to tell ZTE sitting at the table, we can get $200 more per device just by adding 5G?*

A.    *Yes, ma'am, that's correct.*

Retrial Tr. at 368:1-17 (Dell). He put this improper comparison on a slide, explaining that "Samsung Valued 5G Functionality at $200 Per Device":



Ex. 3 at PDX6.27; Retrial Tr. at 368:1-17.  Indeed, Mr. Dell had reviewed Samsung documents with that specific purpose in mind—to assess how much Samsung valued 5G, instead of how much Samsung valued the technology in the asserted patents:

> Q.    And what did Samsung's confidential internal documents tell you about the value of 5G to Samsung in 2019?
>
> A.    

Retrial Tr. at 364:6–15 (Dell).  According to Mr. Dell, ████████████████████

████████████████████████████████████████

████████████████    *Id.* at 364:22-24.

Mr. Dell went a step further, showing to the jury the alleged exponential benefit of 5G in cellular standard landscape:

60



Ex. 3 at PDX-6.37; Retrial Tr. at 375:20-376:6.

GComm's reliance on the value of the 5G standard as a whole, instead of the value of the asserted patents, was pervasive and extended far beyond GComm's lead counsel and its damages expert. For example, GComm's corporate witness Mr. Pitcock told the jury how much money ZTE spent on research and development for all of 5G, without ever mentioning ZTE's R&D investment for just the asserted patents:

> Q. Did ZTE invest amounts in R&D on 5G?
>
> A. Yes. They -- they did.
>
> Q. How much did they invest?
>
>                                  * * *
>
> [A]: It was publicly announced that they spent more than $300 million a year on research and development and had over 3,000 engineers working on 5G starting in 2017.

Retrial Tr. at 203:16-204:1. The problem continued with GComm's technical expert Dr. Akl, who touted the benefits of the entire 5G standard: "5G has had a huge impact on the economy, on businesses, even on individuals in the way we consume vast amount of data, and that data is available to us even when we are mobile." *Id.* at 269:2-4. He visualized this impact on a slide, explaining that "if we think of the small amount of frequency available in 4G as like a single

61

road, then with 5G we have this 24-lane Houston-Katy highway that gives us this huge vast amount of frequency, which is great because it enables higher speeds and higher data." *Id.* at 270:18-22; Ex. 8 at PDX4.21.

Allowing GComm to tout the benefits and value of 5G standardization repeatedly, instead of the specific value of the asserted patents, was prejudicial error that led to an unfair trial and an excessive damages award contrary to *Ericsson* and *CSIRO*. Samsung consistently objected to GComm's use of this evidence throughout trial and a new trial is necessary to correct this prejudicial error. Retrial Tr. at 137:10-139:6 (counsel for Samsung and GComm agreeing that Samsung maintained a running objection to this evidence throughout the duration of trial); Ex. 9 at 9, 23, 25-27, 36, 47. That the jury was instructed to base its damages award on the value of GComm's inventions instead of the 5G standard as a whole did not cure the immense prejudice created by the GComm's focus on the value of 5G standardization and the value of the 5G standard as a whole. Once GComm repeatedly flouted the value of 5G as a whole, the bell could not be unrung.

### 4. The Jury Should Have Been Instructed on Royalty Stacking and Samsung Should Have Been Permitted To Develop This Issue Further

The Court made prejudicial errors by refusing to instruct the jury on royalty stacking and by preventing Samsung from more fully developing its royalty stacking defense. "Royalty stacking can arise when a standard implicates numerous patents, perhaps hundreds, if not thousands," and so "[i]f companies are forced to pay royalties to all SEP holders, the royalties will 'stack' on top of each other and may become excessive in the aggregate." *Ericsson*, 773 F.3d at 1209. A jury must be instructed regarding royalty stacking when the evidence presented supports such an instruction. *See id.* at 1234; *see also In re Innovatio IP Ventures, LLC, Pat. Litig.*, No. 11 C 9308, 2013 WL 5593609 at *9-10 (N.D. Ill. Oct. 3, 2013) (explaining royalty

████████████████████████████████████

stacking evidence must be evaluated when determining a RAND royalty).

Samsung presented evidence at the damages retrial that GComm's damages demand in this case creates a royalty stacking problem. *See, e.g.*, Retrial Tr. at 509:4-510:2, 510:18-511:23, 516:2-23. Mr. Meyer explained that the asserted patents are just two of the approximately 70,000 patent families in the 5G stack. *Id.* ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ *Id.* at 558:25-559:5. Samsung would have introduced even more evidence of the royalty stacking problem that GComm's damages demand creates, but for an incorrectly sustained objection. Specifically, during Mr. Meyer's testimony, GComm objected to a question relating to royalty stacking on the basis that "[t]here's no royalty stacking defense in this case." *Id.* at 522:24-523:5. The Court sustained GComm's objection without giving Samsung the opportunity to respond. *Id.* at 523:6. Had Samsung been permitted to respond, it would have explained that Mr. Meyer's rebuttal expert report was replete with examples of royalty stacking discussion. *See, e.g.*, Dkt. 191-1 at ¶¶ 21, 40-43, 137. Indeed, before trial, GComm had moved to strike these very portions of his report and the Court denied GComm's motion. Dkt. 191 at 1 (seeking to strike paragraphs 21, 40-43, and 137 of Mr. Meyer's rebuttal report relating to "[d]iscussions of patent hold-up and royalty stacking"); Dkt. 548 at 2 (denying motion to strike those paragraphs). Thus, preventing Samsung from fully developing its royalty stacking evidence constituted an abuse of discretion.

In addition, the Court refused to instruct the jury on royalty stacking, over Samsung's objection. Retrial Tr. at 585:1-13. The additional royalty stacking evidence that Samsung would have presented would have further necessitated this royalty stacking instruction. The Court's

refusal to provide a royalty stacking instruction had prejudicial effect because the jury awarded $142 million for two patents. *See, e.g., VirnetX*, 767 F.3d at 1328 (remanding for a new damages trial because a jury's damages award was tainted by an erroneous jury instruction). As Samsung explained in the first trial in this case—and would have explained in the retrial had it been permitted—the rate implied by GComm's damages demand would require Samsung to pay ███ ███ per phone in licensing fees. Trial Tr. at 1186:4-20.

### 5. GComm Should Not Have Been Permitted To Present Overall Samsung Sales Figures to the Jury

Over Samsung's objections, GComm introduced large Samsung revenue numbers that were not appropriately connected to its damages demand. *See* Retrial Tr. at 137:12-138:11 (running objection). This prejudicial error inflamed the jury to award inappropriately high damages. GComm's conduct infected the entire damages verdict, as was particularly apparent, for example, in the jury's award of more than double the amount GComm's damages expert sought for the '130 patent—Mr. Dell said that $40 million should be awarded for the '130 patent and the jury awarded $81 million. Retrial Tr. at 403:12-404:4; Dkt. No. 632 at 4.

The Federal Circuit has warned that there is "considerable risk" when too high a royalty base—for example, one based on the entire market value of a product—is presented to the jury, because an overly large base "cannot help but skew the damages horizon for the jury" and "make a patentee's proffered damages amount appear modest by comparison." *Ericsson*, 773 F.3d at 1227 (quoting *LaserDynamics*, 694 F.3d at 67, 68). Thus, "where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product." *Id.* at 1226.

GComm did exactly what the Federal Circuit has cautioned against. It told the jury that

███████████████████████████████████

Samsung would make ████████████ in sales of 5G phones through 2037, and collect over ██████ in profits from those sales:



Ex. 10 at PDX20.14; Retrial Tr. at 612:22-24, 644:10-12, 647:4-9.  These outrageously high numbers were untethered to GComm's damages theories and the purpose of showing them was obvious—to put a gigantic number on the screen to "make [GComm's] proffered damages amount [of $142.6 million] appear modest by comparison," exactly as the Federal Circuit warned is improper.  *Ericsson*, 773 F.3d at 1227.

GComm's lead counsel similarly argued in closing that the $142.6 million number—the number its damages expert presented—was actually the "low end," and that the jury could consider numbers up to the ████████████ in alleged profits that GComm claimed Samsung would make.  Retrial Tr. at 617:22-618:4.  This closing argument was a clear attempt to skew the damages horizon for the jury.  Samsung objected to this during trial and its objections were overruled.  Ex. 9 at 7, 15-16, 45, 51.  This prejudicial error led to an unreasonable damages award and a new trial is warranted.

      **6.**      **The '130 Patent Damages Award Irreparably Tainted the '776 Patent Damages Award**

The Court should also order a new trial because the '776 damages award was irreparably tainted by the unsupportable award for the '130 patent. GComm presented evidence supporting only $40 million in damages for the '130 patent. Retrial Tr. at 397:20-23; 569:5-9. Nonetheless, the jury awarded $81 million in damages for this patent—an excessive amount plainly unsupported by substantial evidence. Dkt. 632 at 4. The jury appeared simply to take the approximately $142 million total damages sought by GComm and subtract the flawed $81 million '130 patent award to arrive at $61 million for the '776 patent. Beyond that math, one is at a loss to ascertain how the jury arrived at a lump sum royalty of $61 million—no per unit royalty mentioned to the jury yields this sum, nor does any theory presented by any expert suggest that the hypothetical negotiation would have produced this amount.

The damages award should be set aside because such an award—devoid from any evidentiary support—is unreliable and must be based on impermissible speculation. *See In re Cal. Expanded Metal Prod. Co.*, No. 2023-1140, 2024 WL 1190943 at \*2 (Fed. Cir. Mar. 20, 2024) (setting aside a jury damages award because it was based on speculation lacking sufficient evidentiary support); *Lucent*, 580 F.3d at 1310 (a jury's patent damages award cannot be based only on speculation or guesswork); *Smith*, 773 F.2d at 612-13 (a new trial is warranted if the jury's verdict is unreliable); *cf. Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 312 (1986) ("When damages instructions are faulty and the verdict does not reveal the means by which the jury calculated damages, '[the] error in the charge is difficult, if not impossible, to correct without retrial, in light of the jury's general verdict.'" (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256, n.12 (1981))). Therefore, the Court should order a new trial on damages for the '776 patent.

### D.    Alternatively, the Court May Condition the New Trial on a Remittitur

The Court may order a new trial conditioned upon remittitur of "the maximum amount

66

the trier of fact could properly have awarded." *Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 394-95 (5th Cir. 2013). Mr. Dell's IPA analysis is fundamentally unreliable and cannot support any damages award. *See* Section IV.A., *supra*. Mr. Dell did provide other reliable evidence of damages, however, when he testified regarding numerous comparable licenses and top-down analyses. *See* Retrial Tr. at 412:14-415:24. Using the highest per unit royalty from the range of values that GComm's own expert calculated, the maximum reasonable royalty supported by the record is ███, which equates to a lump sum damage amount of no more than $10.5 million. Retrial Tr. at 415:21-416:7. Consequently, if the Court remits the damages award, it should reduce it: $10.5 million.

## V.    The Court Should Order a New Trial Because of GComm's Improper Trial Conduct

To the extent the Court does not grant JMOL or a new trial as set forth above, a new trial is nevertheless warranted for multiple independent, additional reasons based on the conduct of GComm's counsel. Throughout the two trials, GComm's counsel committed multiple material violations of this Court's rulings and Standing Order on Motions *in Limine* ("MILs"), including by (1) making multiple, gratuitous references to the verdict in the original trial during the retrial (2) improperly commenting on the national origin of Samsung and its witnesses, (3) alleging Samsung engaged in illegal behavior, and (4) making a false representation of the record. Having "exceeded the limits of advocacy as to cause a prejudicial verdict," counsel's statements justify a new trial. *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985).

***First***, GComm made repeated, unnecessary, and inflammatory references to the prior verdict during the damages retrial. Over Samsung's objection, during the damages retrial the Court instructed the jury that Samsung had been found to infringe and the patents had been found not invalid during the first trial. *See* Retrial Tr. at 581:1-13; Dkt. 614. Also over Samsung's

67

objection, GComm was allowed to refer to the prior verdict during its presentation.  Dkt. No. 614; Ex. 9 at 5-7, 13, 19, 22-23, 45, 47; *see, e.g.*, Retrial Tr. at 161:8-14, 163:11-20, 166:11-166:4.

Beyond the error of allowing GComm to refer to the prior verdict at all, GComm abused the Court's rulings and took the issue a step too far, to Samsung's substantial prejudice.  GComm consistently argued that the '776 and '130 patents were worth more than any other patents because of the prior verdict.  *See* Retrial Tr. at 610:20-21 (arguing in closing that "***something special happens when a patent is found infringed and valid***"); *id.* at 645:8-13 (attempting to distinguish a comparable license by arguing it involved "***patents that are not infringed [and] not valid***").  Even if the Court's instruction itself, standing alone, could be considered not unduly prejudicial,[13] GComm's repeated emphasis of the prior jury's verdict deprived Samsung of a fair trial and unduly influenced the jury, leading it to award damages unsupported by the trial record. *See, e.g.*, *Virnetx Inc. v. Apple Inc.*, No. 6:12-cv-855 (E.D. Tex. Jul. 29, 2016 (J. Schroeder), Slip Op. at 10-14 ("While the Court allowed *Apple I* to be discussed through its rulings, . . . the parties went well beyond what was appropriate and should not have referred to *Apple I* with such frequency.  Indeed, many statements regarding *Apple I* were unnecessary. . . . The Court is left with the conclusion that repeated statements such as these—more than 50 in all, many of which were either redundant or gratuitous—tipped the balance towards unfairly prejudicing Apple. . . . The repeated references to *Apple I* may have influenced the royalty rate selected by the jurors.").

***Second***, GComm's counsel made jingoistic comments in closing arguments in both trials to inflame the jury against Samsung on the basis of national origin.  Specifically, during the

---

[13] Samsung objected to the Court's informing the jury in the damages retrial that the '776 and '130 patents had been found to be infringed or valid.  *See* Dkt. 614; Retrial Tr. at 581:1-13.

retrial GComm's counsel deliberately juxtaposed the Korean nationality of Samsung's witness against the collective U.S. nationality of the jury. *See* Retrial Tr. at 609:21-610:1 (referring to the "power to enforce the patent laws of the United States" resting "in the hands of the citizens of ***this country***"); *id*. at 642:1-6 ("We flew to ***Korea*** to ask them to comply with the law[.] . . . The ***laws of the United States*** will be enforced here today."); *id.* at 644:15-17 ("Their U.S. subsidiary ships all the revenue to Korea. And the suggestion that we should be ashamed at asking Samsung and its ***Korean parent to comply with the law***?"). He employed the same tactic in the first trial. *Compare* 1/26/24 Trial Tr. at 92:24-93:8 ("The ***foreign*** manufactured phones that Samsung sells in ***our country*** come into ***this country*** . . . if you sell products in this country, you comply with the law and you don't degrade and destroy a system that ensures we have access to the most important technology."), *with* 98:8 (referring to a Samsung witness as "█████████ ***from Korea***"); *see also id.* at 186:3-8 ("We made effort after effort after effort to get Samsung to behave lawfully, and today the power to enforce ***the laws of this country*** is in your hands.").

These statements violate the Court's Standing Order on MILs No. 2, which prohibits a party "from introducing evidence, testimony, or argument that raises . . . national origin . . . of a party, witness, attorney, or law firm." Such an "us-against-them plea can have no appeal other than to prejudice by pitting 'the community' against a nonresident corporation." *Westbrook*, 754 F.2d at 1238. An improper "community conscience" plea is not limited to "specific words; it extends to all impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation. Such appeals serve no proper purpose and carry the potential of substantial injustice when invoked against outsiders." *Id.* at 1238-39. The remarks of GComm's

counsel served no purpose but to inflame the jury against a foreign corporation.[14]  *See BE & K Const. Co. v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 90 F.3d 1318, 1331 (8th Cir. 1996) (remanding for a new trial where plaintiff's attorney "asked the jury to send a message to 'these large unions who go around the country doing things like International Falls that the publicity campaign and the type of interference that they are doing is not permitted *in this country*.'" (internal brackets and ellipsis omitted)).

*Third*, GComm's counsel also improperly prejudiced the jury against Samsung by comparing Samsung to criminals, repeatedly characterizing Samsung's conduct as breaking the law, and thereby implying Samsung was guilty of criminal behavior.  Such repeated statements further support the conclusion that the verdict was infected by passion and prejudice, especially when coupled with the abuse of the Court's instruction about the prior finding of infringement and no invalidity, and GComm's pitting the jury against Samsung based on national origin.  By way of example, in its opening statement at the first trial, GComm's counsel stated:

> The record will show that if you were *innocent*, you wouldn't need that language. Now, of course, if you're *violating the law*, if you're an infringer, this language blocking us from disclosing their behavior to a jury would be of significant value. . . . And, in fact, Samsung's *illegal* behavior extends not just to the United States. The record will show it extends to other countries, including Brazil and the European Union, with our parallel proceedings investigating their *violation of the law*.
>
> *  *  *
>
> The record will show that the party who is—that *an individual who is guilty of a serious crime* spends the most amount of time complaining about fairness.  And in this case Samsung's behavior of accusing us of acting improperly, of attacking us for enforcing our property rights, why?  Why are they acting that way?  The answer is desperation.

---

[14] Although Samsung did not object to these statements during GComm's closing argument (and the others highlighted herein), as is the practice before this Court given its instructions about the sanctity of closings, Retrial Tr. at 591:19-23, an objection was unnecessary because GComm's misconduct "was of such magnitude . . . particularly in the circumstances of this case, as to have seriously prejudiced defendant's right to a fair trial."  *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975).

Trial Tr. at 180:2-24; 182:1-6.  He continued these accusations in closing argument, stating "if you sell products in this country, you **comply with the law** and you don't degrade and destroy a system that ensures we have access to the most important technology."  1/26/24 Trial Tr. at 93:4-8.  In its closing argument at the damages retrial, GComm's counsel continued this theme by arguing "**Samsung did not comply with the law**.  There are consequences to that.  Those consequences exist today."  Retrial Tr. at 647:1-2.

No part of the Patent Act makes patent infringement "illegal," nor are those found to have infringed a patent "serious crim[inals]."  Rather, the Patent Act simply defines what acts constitute infringement.  *See* 35 U.S.C. § 271 (defining acts of infringement and specifying that one can be "liable as an infringer").  Further, the Patent Act makes clear only civil remedies exist for any such infringement.  *Id.* § 281 ("A patentee shall have remedy by civil action for infringement of his patent."); *see also id.* § 284 ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.").  GComm's counsel's allegations of criminality on Samsung's behalf were without basis in law, inflammatory, and improper.

*Fourth*, in its rebuttal closing at the initial trial, GComm's counsel improperly presented materials as evidence that were never used with a witness during trial and are not trial evidence. During trial, Samsung maintained that GComm failed to prove infringement of claim 10 of the '443 patent, in part, because it did not identify for the jury source code showing that the accused products with Samsung Exynos baseband processors met limitation 10(b).  *See, e.g.*, Trial Tr. 563:15-564:9, 1302:14-1303:25.  Indeed, during cross-examination of Dr. Akl, counsel for Samsung walked Dr. Akl through all the slides that he used to support his opinion that the

███████████████████████████████████████

accused products practice limitation 10(b) and confirmed those slides displayed only **Qualcomm** source code.  *Id.* at 1303:15-20.

In closing, lead counsel for Samsung placed great emphasis on this failure.  *See* 1/26/24 Trial Tr. at 125:1-8.  Samsung's counsel challenged GComm to show Samsung source code for limitation 10(b).  *Id.* ("They left out element B.  They didn't put any Samsung source code in element B.  Don't let Mr. Sheasby sit down without showing you source code for element 10-B of this patent.").  In GComm's rebuttal closing, counsel for GComm presented the jury a demonstrative purporting to show Samsung source code applied to claim limitation 10(b) while stating: "Samsung invited me to show you the source code for Samsung's products as to element B.  He made a big show of it.  Words are not evidence."  *Id.* at 140:21-23; Ex. 11 ███████████████

███████████████████████████████████████████████████ Critically,

this demonstrative was ***never*** presented during the presentation of evidence at trial.  *Compare* Ex. 11, *with* Ex. 4 at PDX4.151 ████████████████████████████

██████████████████████████████

In short, GComm failed to map Samsung source code evidence to limitation 10(b) during trial, and then when this failure threatened GComm's credibility, GComm's counsel improperly backfilled its closing argument slides with "evidence" for this limitation that was never, in fact, presented to the jury.  Although the jury returned a verdict of noninfringement as to the '443 patent, Samsung's counsel represented to the jury in closing that there was an utter absence of evidence on element 10(b) and challenged GComm's counsel to identify the slide ***from the trial record*** that presented that evidence.  GComm simply fabricated evidence where there was none. This tactic was a direct attack on the credibility of Samsung's lead counsel that undermined

credibility across the entire case—what should have been a boost to Samsung became a liability, and one delivered in final close when Samsung could no longer respond.  Given the prejudicial impact of GComm's closing, the Court should order a new trial for all issues decided adversely to Samsung.

GComm's improper conduct, coupled with the excessive verdict, indicate that passion and prejudice infected jury deliberation.  A new trial is therefore required.  *See Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 278 (5th Cir. 1998) (granting new trial on damages based on improper closing argument followed by large jury verdict); *Edwards*, 512 F.2d at 282-83 (granting new trial on liability and damages based in part on improper closing argument).

## CONCLUSION

For the foregoing reasons, the Court should enter judgment of invalidity and noninfringement in favor of Samsung on the '776 patent; and judgment that GComm is entitled to no damages or, in the alternative, that the only damages award the evidence supports is $10.5 million.  The Court should also enter judgment for Samsung on its counterclaim that GComm breached its FRAND obligation and owes Samsung damages of ▆▆▆▆▆.  In the alternative, the Court should order a new trial on invalidity, noninfringement, patent damages, and Samsung's breach of FRAND counterclaim for the reasons discussed above.

Dated: July 15, 2024                           Respectfully submitted,

By: */s/ Michael J. McKeon*
Melissa Richards Smith
TX Bar No. 24001351
melissa@gillamsmithlaw.com
GILLAM & SMITH, LLP
303 South Washington Ave.
Marshall, Texas 75670
Telephone: (903) 934-8450

Facsimile: (903) 934-9257

FISH & RICHARDSON P.C.

Ruffin B. Cordell
TX Bar No. 04820550
cordell@fr.com
Michael J. McKeon
D.C. Bar No. 459780
mckeon@fr.com
Lauren A. Degnan
D.C. Bar No. 452421
degnan@fr.com
Ralph A. Phillips
DC Bar No. 475571
rphillips@fr.com
Linhong Zhang
DC Bar No. 982341
lwzhang@fr.com
Kenton W. Freeman, Jr.
DC Bar No. 1671507
will.freeman@fr.com
Sun Young Park
NY Bar No. 5412739
apark@fr.com
Bryan J. Cannon
DC Bar No. 1723657
cannon@fr.com

FISH & RICHARDSON P.C.
1000 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

Leonard Davis
Texas Bar No. 05521600
ldavis@fr.com
Thomas H. Reger II
Texas Bar No. 24032992
reger@fr.com
Rodeen Talebi
Texas Bar No. 24103958
talebi@fr.com
1717 Main Street, Suite 5000
Dallas, TX 78766

74

███████████████████

Tel: (214) 747-5070
Fax: (214) 747-2091

John Thornburgh
CA Bar No. 154627
thornburgh@fr.com
Aleksandr Gelberg
CA Bar No. 279989
gelberg@fr.com
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070

*Attorneys for Defendants Samsung
Electronics Co., Ltd. and Samsung
Electronics America, Inc.*

75

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically in compliance with Local Rule CV-5 on July 15, 2024.  As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECG system under Local Rule CV-5(a)(3)(A) and by electronic mail.

/s/ *Michael J. McKeon*
Michael J. McKeon