IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

G+ COMMUNICATIONS, LLC.,        (  CAUSE NO. 2:22-CV-078-JRG
                                )
          Plaintiff,            (
                                )
vs.                             (
                                )
SAMSUNG ELECTRONICS CO., LTD.,  (
et al.,                         )  MARSHALL, TEXAS
                                (  APRIL 15, 2024
          Defendants.           )  9:00 A.M.
_____

VOLUME 1

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:     IRELL & MANELLA, LLP -
                       LOS ANGELES
                       1800 AVENUE OF THE STARS
                       SUITE 900
                       LOS ANGELES, CA 90067-4276
                       (310) 203-7096
                       BY: MR. JASON SHEASBY
                           MR. BENAJMIN MANZIN-MONNIN

                       IRELL & MANELLA -
                       NEWPORT BEACH
                       840 NEWPORT CENTER DRIVE
                       SUITE 400
                       NEWPORT BEACH, CA 92660
                       (949) 760-0991
                       BY:  MS. LISA GLASSER

                       McKOOL SMITH, P.C. - MARSHALL
                       104 EAST HOUSTON, SUITE 300
                       MARSHALL, TEXAS  75670
                       (903) 923-9000
                       BY:  MS. JENNIFER TRUELOVE
                            MR. SAM BAXTER

FOR THE DEFENDANTS:    FISH & RICHARDSON, PC -
                       WASHINGTON, DC
                       1000 MAINE AVE., SW
                       SUITE 1000
                       WASHINGTON, DC 20024
                       (202) 783-5070
                       BY:  MR. RUFFIN CORDELL
                            MR. MICHAEL McKEON
                            MS. LAUREN DEGNAN

                       FISH & RICHARDSON, PC - DALLAS
                       1717 MAIN STREET, SUITE 5000
                       DALLAS, TEXAS  75201
                       (214) 292-4084
                       BY:  MR. THOMAS REGER

                       GILLAM & SMITH, LLP
                       303 SOUTH WASHINGTON AVENUE
                       MARSHALL, TEXAS  75670
                       (903) 934-8450
                       BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
                        MARSHALL, TEXAS  75670
                        (903) 923-8546

## INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| JEREMY PITCOCK | |
|    Direct By MR. SHEASBY | 192 |
|    Cross By MR. CORDELL | 215 |
|    Redirect By MR. SHEASBY | 237 |
| SUNGJIN PARK | |
|    BY VIDEO DEPOSITION | 243 |
| SEOUNGHEE HAN | |
|    BY VIDEO DEPOSITION | 245 |
| JAEWON KIM | |
|    BY VIDEO DEPOSITION | 246 |
|    Direct By MR. MANZIN-MONNIN | 249 |
| ROBERT AKL, PH.D. | |
|    Direct By MR. MANZIN-MONNIN | 249 |
|    Cross By MR. CORDELL | 279 |
|    Redirect By MR. MANZIN-MONNIN | 289 |
| JOHN KOWALSKI, PH.D. | |
|    Direct By MS. GLASSER | 294 |
|    Cross By MR. CORDELL | 309 |
|    Redirect By MS. GLASSER | 330 |

THE COURT:  Be seated, please.

Good morning, ladies and gentlemen.  Thank you for being here.

My name is Rodney Gilstrap, and I am the chief United States district judge for the U.S. District Court for the Eastern District of Texas.  I practiced law in this general area for 30 years before I was appointed to the bench in 2011.

And they say, ladies and gentlemen, that confession is good for the soul so I'll start with a confession this morning.  I was not born in Texas, but I got here just as quick as I could.  At the ripe old age of 18, I left Florida and moved to Texas to go to college at Baylor University in Waco.

I met a beautiful blond, blue-eyed girl from east Texas, got married, went to law school at Baylor University, graduated, and came back to Marshall to begin my law practice.  And as I told you, I practiced here about 30 years in this general area before being appointed to the bench.

Now, I tell you these things about myself because in a few minutes I'm going to ask each of you to tell me the same kind of information about each of you, and I think you're entitled to know as much about me as I'm going to ask you to tell me about each of you.

Now, we are about to engage in the selection of a jury in a civil case where the jury will be asked to establish the

level of money damages, if any, for patent infringement.  But first, if you will indulge me before we go any further, I'd like to take a minute and review with you how we came to have our American civil jury trial system.

If you go back in ancient history, if you begin with the Pentateuch, the first five books of the Old Testament, you will see that the ancient Jewish nation impaneled juries to decide issues of property ownership and property value.

The ancient Greeks began using a jury system about 1500 BC.

The Romans, as with many other things, copied the jury system from the Greeks, and the Romans are the ones that brought the jury system across the English Channel to what we now know to be Great Britain when they conquered that island in the 4th century AD.  And having brought the jury system to England, to Great Britain, that system took root and flourished in that country for 800 years until in the 12th century a rather tyrannical king came to the throne of England named King John.

And King John became embroiled in multiple disputes with his nobles and his subjects that led nearly to the brink of a civil war.  One of the disputes driving those problems and those issues was King John's efforts to curtail the right to trial by jury.  There was not a civil war.  Those disputes were resolved in a lengthy document signed by the king and his

nobles at a place in England called Runnymede, and that document which resolved those disputes and which placed in writing a guaranteed right to the trial by jury for all English men is called the Magna Carta.

And so you can see, ladies and gentlemen, that the concept of trial by jury came across the Atlantic Ocean with those British colonists who came to North America and established the colonies here. And as with the prior experience, the right to trial by jury, the practice of jury trials in colonial North America, took root and flourished and existed well for over a hundred years until another tyrannical king came to the throne of Great Britain.

This time you may be able to guess his name was King George III. And King George III became embroiled in many disputes with his British colonists here in North America. And it was King George's efforts to curtail the right to trial by jury that were won -- made up one of those disputes.

As a matter of fact, ladies and gentlemen, when Thomas Jefferson wrote the Declaration of Independence outlining the various reasons why the colonists in North America felt compelled to separate from the mother country and form our own independent nation, one of the reasons spelled out in the Declaration of Independence for that conclusion was the king's effort to curtail the right to trial by jury. If you read the Declaration of Independence, it's clearly in there in black

and white.

And as you know, we did revolt from England, and we did form our own independent nation.  And shortly after we achieved our independence, the United States of America adopted the governing document for our country, the supreme law of the land, the Constitution of the United States.  And shortly after the Constitution was ratified in 1789, there were 10 amendments immediately added to the Constitution.  You know those 10 amendments as the Bill of Rights.

As a matter of fact, students of history will tell you that several of the states refused to ratify the original Constitution unless there was an ironclad promise to immediately add those 10 amendments.  And the Bill of Rights was ratified in 1791.  And if you will look at those first 10 amendments you will find the Seventh Amendment to the U.S. Constitution, which guarantees the right to resolve civil disputes in a jury trial.

So since 1791, ladies and gentlemen, every American citizen has had a constitutionally-guaranteed right to resolve their civil disputes through a trial by jury.

Now, I always tell citizens who appear, like you have this morning for jury duty, that jury service is a very real and important public service.  As a matter of fact, in my own personal view, jury service is the second highest form of public service that any American citizen can render for our

country.  In my personal view, the highest form of public service that any American can render are those young men and women that serve in our armed forces.

Now, as a part of the process of selecting the jury in this case this morning, the lawyers are going to address you, the members of the jury panel, and they are going to ask you various questions as a part of that process.

Now, I want you to understand, ladies and gentlemen, that none of the questions the lawyers will be asking this morning are intended to pry into your personal affairs unduly. They're not intended to be nosy.  They are intended to elicit relevant information for purposes of working with the Court to secure a fair and an impartial jury to hear the evidence in this case.

The important thing for each of you to keep in mind, as we go forward, is if you are asked a question, there are no wrong answers to any question you'll be asked as long as your response to that question is full, complete, and truthful.  As long as your answer is full, complete, and truthful, there are no wrong answers to anything you'll be asked this morning.

Now, I don't know if it will happen this morning, I suspect it won't, it's unlikely, but I need to let you know that if you were asked a question that you viewed to be so personal and private that you are not comfortable answering it in front of everyone else on the panel, you have the right to

simply say, I'd like to discuss that with Judge Gilstrap.  And if that's your answer, I'll provide an opportunity where you can answer that question outside of the presence of everyone else on the panel.

But I have to tell you, ladies and gentlemen, I've been on the bench over 12 years, and I think that has come up maybe two or three times in 12 years.  So it's not likely, but I want you to know that you do have that option.

Now, the trial in this case is going to begin today after the jury is selected, and I expect that we will go through Wednesday of this week.  This is a relatively short trial. But those of you selected to serve on this jury are going to need to be available through Wednesday of this week.

Now if between now and then there are any of you on the panel who have a very serious reason why you could not be here today, tomorrow, and Wednesday, then I need to know about that.

Now, I want to be clear about this, ladies and gentlemen. I'm not asking if it would be inconvenient for you to be here because jury service by its nature is inconvenient.  Every one of you has other things to do that are important in your lives that would have to be set aside if you're selected to be on this jury until the trial is over.  I understand that.  That's why it's valuable public service, because it is inconvenient, it is a sacrifice.

But if there is something else that would create a very serious impediment to you being able to be here, let me give you an example:  You or an immediate family member has a surgical procedure scheduled that can't be easily rescheduled and needs to take place in the next couple of days, that's something I need to know about.  If you and your family have bought non-refundable airline tickets for thousands of dollars and you can't get your money back and you're supposed to leave today or tomorrow or Wednesday, that's something I need to know about.

I'm interested in very serious impediments to you being able to serve.  I'm not interested in you being inconvenienced because, as I say, everybody who serves on this jury will be inconvenienced.  That's just the nature of jury service.  So if there are any of you who have, as I say, a very serious impediment to being able to be here throughout this relatively short trial if you were selected to serve on this jury, I need to make a note of that at this time.

If there's anybody that falls in that category, would you please raise your hands?  All right.  I don't see anybody in the jury box.

And, ma'am, I can't see your number.  What is that?

UNIDENTIFIED PANEL MEMBER:  No. 19.

THE COURT:  No. 19.  All right.  Anybody besides No. 19?  Thank you.

Now, at this time for the record I'm going call for announcements in the case of G+ Communications, LLC, versus Samsung Electronics Company, Ltd., and Samsung Electronics America, Inc. This is Civil Case No. 2:22-CV-078.

And, counsel, if you'll identify yourself, the members of your trial team that are present, and any corporate representatives that you have with you.

We'll begin with the Plaintiff. What says the Plaintiff?

MS. TRUELOVE: Good morning, Your Honor. May it please the Court. Jennifer Truelove for Plaintiff G+ Communications.

With me at counsel table, I have Mr. Jason Sheasby, Ms. Lisa Glasser, who will both be participating in the trial. We have our corporate representative, Mr. Jeremy Pitcock, and Ms. Tara Trask.

And we are ready to proceed, Your Honor.

THE COURT: All right. Thank you.

What says the Defendants?

MR. CORDELL: Good morning, Your Honor. Ruffin Cordell from Fish & Richardson on behalf of Samsung.

And with me at counsel table is Ms. Melissa Smith, Mr. Michael McKeon, Ms. Lauren Degnan. And our corporate representative is Mr. Guy Waitley. And Mr. Mike Collins is here as well.

And we're ready to proceed, Your Honor.

THE COURT:  All right.  Thank you.

Now, as I've told you, ladies and gentlemen, this has to do with a patent case arising under the patent laws of the United States.  In a previous trial before a different jury, it's been established that the Defendants, the Samsung parties, infringed certain claims of the Plaintiff's patents.  It's also been established in that trial that those claims were valid or, said technically correctly, they were not invalid.

Now, it should be noted by everyone here that the Samsung Defendants dispute those findings, and they have retained their rights to challenge and eventually appeal those decisions.  But should you be selected to serve on this jury, you should not let the fact that an earlier jury made these factual findings influence your decision about what you are asked to decide in this case, and that is, what is the fair and reasonable compensation that G+ should receive from Samsung in light of those earlier findings of infringement.

You should know that in that earlier trial, the issue of what a reasonable royalty, what the monetary damages should be, was not resolved, and that's why you are being impaneled as a new jury in a new trial to decide that one issue and that one issue only.

Now, while the Defendants, the Samsung parties, dispute the prior findings of infringement and validity, they are also

going to present evidence of what they believe fair compensation should be. The Plaintiff, the G+ parties, are going to also present evidence in this trial of what they believe fair compensation should be.

And even though those prior findings should not influence your decision about what a reasonable royalty in this case should be, you are entitled to know the background of why you are here and why you're being asked to resolve this one single issue.

Now, I know you've all seen the video prepared by the Federal Judicial Center, and that gives you a good background on patent litigation, and you already know more about the patent system having seen that video than most people do who appear for jury service in this court.

Now, as I mentioned earlier, the lawyers from both sides are about to question the panel to gather information, to exercise their rights, and work with the Court to secure a fair and an impartial jury to hear the evidence in this case. As I told you, ladies and gentlemen, there are no wrong answers to anything you're going to be asked, as long as your responses are full, complete, and truthful.

Now, if for any reason you are asked a question that I don't think is proper, I will certainly not hesitate to stop the attorneys and address that. But you need to understand these are very skilled and experienced trial lawyers on both

sides.  They understand the rules of civil procedure in federal court, they understand the rules of evidence under our federal system, and they understand the orders and the standing orders of this Court.  So I don't expect that to happen.  But if it should, I won't hesitate to jump in.

Now, there is one thing I want to call your attention to before the lawyers begin with their questions because it's possible that in their questions the lawyers may ask you about your ability to apply this in this case if you're selected to serve as a juror, and that is what's called the burden of proof.  In this case the jury selected is going to apply to the evidence presented a burden of proof known as the preponderance of the evidence.  I'll say that again--the preponderance of the evidence.

Now, when responding to questions from the lawyers about the burden of proof, I need to instruct you that when a party has the burden of proof on any issue by a preponderance of the evidence, that means that you, the jury, must be persuaded by the credible or believable evidence that that claim or defense is more probably true than not true.  I'll say that again for emphasis--more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Let me give you an example that I hope will be helpful to you.  In front of me is Mr. McRoberts, our court reporter.  In

front of Mr. McRoberts is a statue of the Lady of Justice.  If you'll look at that statue, you'll see that she's blindfolded.  You'll see that she holds lowered at her right side the unsheathed sword of justice.  She holds raised on her left side the balanced and equal scales of justice.

I want you to focus on those scales for just a minute.  They are balanced and they are equal, and that's where these parties must start out in this case, in the same position--balanced and equal.

But when you're thinking about the burden of proof and the preponderance of the evidence, think about it this way, ladies and gentlemen.  Over the course of this trial the Plaintiff, G+, is going to put all of their evidence on one side of those scales.  Then the Defendants, the Samsung parties, are going to put all their evidence on the other side of those scales.  And when all the evidence has been presented to the jury, a party who has the burden of proof on any issue by a preponderance of the evidence, if you then look at those scales and those scales tip in favor of the party with that burden of proof, then they will have met that burden of proof of a preponderance of the evidence.

And this is true even if those scales tip ever so slightly.  If they tip in that party's favor even ever so slightly, then that party has met its burden of proof by a preponderance of the evidence.

Now, this burden of proof applied in a civil case is completely different from other burdens of proof you have probably heard about from the movies and on television and the media.  You've heard of a different burden of proof, I'm sure, called beyond a reasonable doubt.  Beyond a reasonable doubt is the burden of proof applied in a criminal case, and it has no application whatsoever in a civil case like this.  The burden of proof to be applied to the issues in this trial is the preponderance of the evidence.

Now, I give you these instructions in case some of the lawyers ask you in their questioning about your ability to apply that standard, that burden of proof, to the evidence that will be presented to you if you're selected as a juror in this case.

Now, before the lawyers begin with their questions and address the panel, I'm going to ask each of you at this point in time to tell me about yourselves, the same kind of information I told you about me when we started.  Each of you have nine standard questions.  Some of them are printed; some of them are on your monitors.  They're easily accessible to you.  And if you would, we're going to go one at a time throughout the panel and let you answer those questions for us.

And let me explain how we're going to do this.  We're going to do it one at a time.  We're going to begin with the

first member of the panel.  The Court Security Officers, there are two--one in the back, one in the front.  They each have a handheld microphone.  The Court Security Officer will bring you that handheld microphone and hand it to you.

When you've received it, I want you to stand up and then answer those nine questions and then pass the microphone either to the next person or back to the Court Security Officer.

And let me say this, ladies and gentlemen.  It's important for us all to hear the answers to these nine questions.  And in that regard, please hold the handheld microphone up near your mouth.  It won't do any good if you hold it down at your waist.  And I can't tell you how many people show up for jury duty and they hold the microphone down at their waist.  Hold it up near your mouth.

And if you're like some people and you talk with your hands, if you wave that microphone around in your hands, it's not going to amplify anything and we're not going to hear your answers.  So, please, you can wave your left hand or your right hand, whichever one you're not holding the microphone with, but the microphone hand, please hold it near your mouth so that it will amplify your voice and we'll all hear the answers to the questions that you're giving.

As I say, when you finished answering those nine questions, pass the microphone to the next person in line, and

we'll go through the entire panel one at a time.

And also, ladies and gentlemen, I want you to know that later in the process the lawyers are going to ask individual questions. They may single you out and ask, you know, Panel Member No. So-and-So, what about this, or Panel Member Such-and-Such, what about that.

When you're asked a specific question, I want you to answer it in the same way. I want you to wait until the Court Security Officer brings you the handheld microphone, take the handheld microphone, stand up, and then hold it near your mouth and answer that question, then hand it back to the Court Security Officer. We're going to follow the same process when you're asked individual questions as we are when you give us your answers to these nine standard questions at this time.

So with that, we'll begin with Panel Member No. 1, Mr. Ratliff. If you'll take the microphone, stand up, and answer those nine questions for us, please, sir.

THE PANEL MEMBER: All right.

THE COURT: And hold it near your mouth, please.

THE PANEL MEMBER: All right. Zachary Ratliff. Like you, I'm not from Texas. I'm actually from Arkansas. I moved here in 2012, here in Marshall. I have four children--three boys, one girl.

I work in Daingerfield, Delta Fabrication and Machine. I'm a certified -- not certified but I'm in school for a

certified welding inspection.  I'm a welding inspector for them until I get that.  Been there for six years.  I do have my high school education.  And like I said, I'm in school for certified welding inspection.

Wife's name is Mary Ratliff.  She's a nurse up here at the hospital, the medical clinic up here, Christus.  She's been there five years, I believe.

And, no, I do not have any prior jury service.

THE COURT:  All right.  Thank you, Mr. Ratliff.  If you'll hand that to Panel Member No. 2, Mrs. Bothman?

THE PANEL MEMBER:  My name is Julie Bothman, and I live in Big Sandy, Texas.  I've been there for probably 15 years.  And I have two girls.  They're older.

My place of employment was Gladewater ISD.  I worked there for 21 years.  And I have a high school diploma.

And my spouse's name is Arthur Bothman.  And he works for Hallsville ISD, and he's been there about seven years.

And I have no jury -- I have no --

THE COURT:  What did you do for Gladewater ISD for 21 years?

THE PANEL MEMBER:  Well, for 12 years I worked with special needs kids, and then the last half I worked for the cafeteria.

THE COURT:  All right.  Thank you, ma'am.  If you'll pass that to No. 3 on our panel, Mrs. Dawson.

THE PANEL MEMBER:  Yes.  I live in Queen City, Texas.  I have two children, one deceased which would have been three.

My place of employment is a beauty salon owner.  I am a cosmetologist.  I've worked for 30 years.  High school diploma and trade certificate.

Spouse's name is Rubin Dawson.  He's worked, and he works currently at -- oh, let's see.  Recovery -- he's got two jobs so -- my mind just went blank.  Recovery for drug abuse and addicts, also at Red River Behavioral Hospital.  He has worked there for a total of about 25 years in both jobs.

And I have no prior jury service.

THE COURT:  All right.  Thank you, Mrs. Dawson.

Next is No. 4, Mr. Downs.

THE PANEL MEMBER:  My name is Jeff Downs, and I live in Jefferson.  I have two children, a boy and a girl.

I worked for Center Point Energy for 42 years.  Then I retired.  And I have a GED.

My spouse's name, Tony.  She worked at Sunoco making big grills for -- and she worked there 18 years and she retired.

And I was on a jury in Jefferson.  It was a child molester deal, and I don't know if that's criminal or what.

THE COURT:  How long ago was that, sir?

THE PANEL MEMBER:  About five years ago or something like that.

THE COURT:  Okay.  And what did you do before you retired?

THE PANEL MEMBER:  I was a construction foreman.  I did maintenance, fixed leaks and went to different towns fixing leaks.

THE COURT:  For Center Point?

THE PANEL MEMBER:  For Center Point.  Yes, sir.

THE COURT:  All right, sir.  Thank you very much.

THE PANEL MEMBER:  Uh-huh.

THE COURT:  Next is No. 5.

THE PANEL MEMBER:  Brad Strube.  I live in Pittsburg.  Three kids.

I work at Cox Concrete Products in Mt. Pleasant, been there a year this month.  I'm a truck driver there.  High school diploma.

My wife's name is Michelle Strube.  She works at Texas Real Estate Executives.  She's a realtor there.  She's been there for I think close to six years.

And no prior jury.

THE COURT:  All right, sir.  Thank you, Mr. Strube.  Next is No. 6, Ms. Garcia?

THE PANEL MEMBER:  My name is Ilen Garcia.  I live in Pittsburg, Texas.  I have four children--two boys, two girls.

I worked at the Springs Nursing Home.  They closed.  I

worked there six years.  I didn't finish high school.

I've been divorced for two years, but he works for the City of Dallas.  He's been there for 30 years.

And I've never served on a jury.

THE COURT:  Thank you, ma'am.

No. 7 is next?

THE PANEL MEMBER:  Good morning.  Robert Cline. Live in Gilmer, Texas.  My wife and I have one boy, Hudson.

Place of employment is Brenntag.  I work in IT business management, been there 17 years.  Educational background is Bachelor's in business management.

My wife's name is Brenna.  She also works for Brenntag in transportation management.  She's been there 12 years.

And I have no prior jury service.

THE COURT:  Thank you, sir.

We'll go around to the back row of the jury box and start with No. 9, Mrs. Oden.

THE PANEL MEMBER:  Hi.  My name is Debrenda Oden.  I live here in Marshall, Texas.  I have two children, a boy and a girl.

I work for JH Oden Contracting.  I'm the secretary.  I've worked there for 15 years.  Graduated from high school.

My husband is Tom Oden.  He's a rancher probably for all his life, 40 years.

And I have no prior service, jury service.

THE COURT: All right. Thank you, ma'am. If you'll hand that to Miss Archield.

THE PANEL MEMBER: Yes. My name is Velvet Archield. I live in Karnack, Texas. I have three children.

I work for the Texas Department of Family & Protective Services. I'm an investigator. We investigate cases of abuse, neglect, and exploitation for people that are 65 and older, or individuals that are 18 to 64, and they have to have a substantial impairment. I've worked for the state of Texas for 25 years.

I went to high school actually in Karnack. I attended undergraduate school at East Texas State University and graduate school at Abilene Christian.

I am not married, and I have never participated in jury service.

THE COURT: All right. Thank you very much. Next is No. 10, Mrs. Smith.

THE PANEL MEMBER: Hello. My name is Celita Smith. I live in Gilmer, Texas. I have two girls.

I work for FedEx. I'm a lead coordinator there. I've been there 25-plus years. I have a high school diploma. I also have a certificate in legal office assistant, never pursued that, though.

I am widowed, and I have served on a criminal case.

THE COURT: Where was that?

THE PANEL MEMBER:  In Gilmer, Upshur County.

THE COURT:  And how long ago?

THE PANEL MEMBER:  Oh, gosh, 10 years.

THE COURT:  That's the only time you've served on a jury before?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Thank you very much, ma'am.

All right.  Next is No. 11.

THE PANEL MEMBER:  I'm Paul Soape.  I live in Marshall.  I have four children.

I am retired, been retired about 10 years from Blue Cross Blue Shield of Texas, worked in customer service.  I have a Bachelor's degree.

My wife's name is Terry.  She hasn't worked since she's been with me.

And I have never worked -- I've never served in a jury.

THE COURT:  Did you tell us whether you had children or not or did I miss it?

THE PANEL MEMBER:  I have four children.

THE COURT:  Four children.  Thank you, sir.

All right.  Next is No. 12.

THE PANEL MEMBER:  My name is Kevin Rager.  I live in Hallsville, and I have one daughter.

I also work for FedEx.  I drive a truck.  I've been there four years.  Finished high school.

My wife's name is Christi.  She does not work.

And I have no prior jury service.

THE COURT:  Now, do you know Mrs. Smith at FedEx?

THE PANEL MEMBER:  I don't, actually.

THE COURT:  Okay.  Thank you, sir.

No. 13 is next, Mr. Cadman?

THE PANEL MEMBER:  My name is Matthew Cadman.  I live in Jefferson, Texas.  My wife and I have six children.

We own Shady Grove Ranch.  We've owned that for 14 years, I believe.  I have a Bachelor's of Science in mechanical engineering from LeTourneau University.

My wife's name is Jarica Cadman.  She works for me.  I probably work for her more, though.  She's been there 14 years also.

And I've never served on a jury.

THE COURT:  Thank you, sir.

No. 14 is next, Mrs. Reese?

THE PANEL MEMBER:  My name is Alethea Reese.  I live in Longview, but on the Harrison County side.  I have three teenaged children.

I'm a stay-at-home mom, most of 20 years.  I have a Bachelor's degree in landscape horticulture from Colorado State University.

My husband's name is Norman Reese.  He teaches mechanical engineering at LeTourneau University.  He's been there for 14

years.

And I have never served on a jury.

THE COURT:  Thank you, ma'am.

All right.  We'll go to the first row in the gallery, No. 15, Mr. McDaniel.  As soon as you get a microphone, if you'll answer those questions for us, sir.

THE PANEL MEMBER:  Thank you.  Good morning.

THE COURT:  Good morning.

THE PANEL MEMBER:  My name is Wes McDaniel.  I have -- well, I live in Omaha, Texas, but I'm so far out in the sticks that my mailing address is actually Naples, Texas. I have two kids that are grown, a third one who's adopted us.

My place of employment is Wadley Regional Medical Center. I've worked there for three years.  I'm an EKG/EEG tech.  My educational background is I have a Bachelor's degree in business management.

My wife's name is Janet Christine.  She goes by Chris. She's a registered nurse, and she works at UT-Tyler Medical Center in Pittsburg.  She's been there for two years.

And I have served on a civil case before.

THE COURT:  And where was that, sir?

THE PANEL MEMBER:  That was in Tarrant County.

THE COURT:  All right.  Was it in state court or federal court?

THE PANEL MEMBER:  It was -- must have been -- it

was county court.

THE COURT:  It wasn't a patent case.

THE PANEL MEMBER:  No, it was not.

THE COURT:  Okay, sir.  Thank you very much.

THE PANEL MEMBER:  Thank you.

THE COURT:  All right.  Next is No. 16?

THE PANEL MEMBER:  My name is Karla Medina.  I live in Pittsburg, Texas.  I don't have children.

I work for Focused Care, Mt. Pleasant, Texas.  It's a nursing home.  I've been working there for more than two years, and I got my Associate's Degree on science.

My husband's name is Tibolo (phon.) Medina.  He works for Pittsburg Steel, and he works with metal.  And I think he been there for more than two years.

And I never been in jury service.

THE COURT:  Never served on a jury?

THE PANEL MEMBER:  Never.

THE COURT:  Thank you, Mrs. Medina.

Next is No. 17, Mr. Andrews.

THE PANEL MEMBER:  My name is Nathaniel Andrews.  I live in Queen City, Texas.  I have four children.

My place of employment is the City of Atlanta.  I've been there for 16 years.  High school diploma.

My wife's name Latronia Andrews.  She works for Texas County Emergency Center.  She's been there for like eight

months.

And I've never served on a jury.

THE COURT:  What do you do for the City of Atlanta, sir?

THE PANEL MEMBER:  I'm a waste water operator.

THE COURT:  Thank you.

All right.  Next is No. 18, Mrs. Clement?

THE PANEL MEMBER:  My name is Rebekah Clement.  I live in Gilmer, Texas.  I have three children.

I work for Christus Good Shepherd Breast Center.  I'm a mammographer and breast ultrasound tech for 14 years.  And I have a Bachelor's of radiologic sciences.

My husband's name is Brad Clement.  He is the everything in Innovative Solution Services, our company that we own together.  And he's worked there for 10 years.

And I have served on a criminal case in Gilmer in the last 10 years.

THE COURT:  Is that the only time you've served on a jury?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Thank you, Mrs. Clement.

All right.  Next is No. 19, Mrs. Johnson.

THE PANEL MEMBER:  Good morning.  I'm Alexandria Johnson.  I live in Longview, Texas.  I have two children.

I work for Hallsville Independent School District as a

special education teacher with an emphasis on emotional disturbance. I've worked there for four years. I have a Master's degree in psychology.

My spouse is Jeff Johnson. He works for Longview Police Department in property and evidence, and he's worked there for five years.

I've served on one jury. It was civil, 32 years ago.

THE COURT: Where was that?

THE PANEL MEMBER: Nashville, Tennessee.

THE COURT: Okay. Was that in federal or state court?

THE PANEL MEMBER: State.

THE COURT: All right. Thank you very much.

Next is No. 20.

THE PANEL MEMBER: My name is Brynnin Taylor. I live in Hughes Springs, Texas. I have a three-year-old son.

I work at Priefert Manufacturing as a drill operator. I've worked there for almost a year. I have a high school diploma.

My wife's name's Shelby Taylor. She works at East Texas Ear Nose & Throat as an assistant. She's worked there for about seven months.

And then I did jury service like middle of last year.

THE COURT: And where was that, Mr. Taylor?

THE PANEL MEMBER: It was here.

THE COURT:  In this courtroom?

THE PANEL MEMBER:  Yeah.

THE COURT:  All right.  Do you remember the case that you were on?

THE PANEL MEMBER:  It was with Samsung.

THE COURT:  All right.

THE PANEL MEMBER:  It was over a patent.

THE COURT:  All right, sir.  And did the jury return a verdict for Samsung or for the Plaintiff or do you remember?

THE PANEL MEMBER:  I don't know.  I got sent home like at 12:00.  I just had to do the --

THE COURT:  Okay.  You weren't actually on the jury.

THE PANEL MEMBER:  No, I wasn't on the jury.

THE COURT:  You were summonsed like today, but you weren't selected.

THE PANEL MEMBER:  Yeah, I wasn't selected.

THE COURT:  Okay.  Have you ever served on a jury where you were actually a member of the jury?

THE PANEL MEMBER:  No, sir.

THE COURT:  Okay.  That clarifies that.  Thank you, Mr. Taylor.

     Next is No. 21?

THE PANEL MEMBER:  My name is Donnie Ramsey.  I live in Marshall, Texas.  I have one daughter.

     Place of employment is Bass Pro.  I've worked there four

years.  And education is high school.

My wife's name is Laurie Ann Ramsey.  She works at Salvation Army.  She's been there for 21 years.

I hadn't been on no jury service or anything.

THE COURT:  Okay.  When you say Bass Pro, sir, are you talking about the facility in Shreveport or where actually do you work?

THE PANEL MEMBER:  Bossier.  We're all connected, but I work in Longview.  We have a place in Longview.

THE COURT:  All right.  And it's a retail location?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Are you -- do you work on the floor and sell stuff or --

THE PANEL MEMBER:  I'm a marine technician, certified marine technician.

THE COURT:  All right.  Thank you.  That clarifies that.

All right.  Next is No. 22.

THE PANEL MEMBER:  Good morning, sir.  My name is David Fonteno.  I live in Big Sandy.  I have three grown children and three grown stepchildren.

I'm retired.  Prior to that -- recently I just retired from Kilgore College as a professor of psychology there. Prior to that, I worked at three other colleges while I was finishing my education.  And prior to that, I was in law

enforcement for about 20 years.  I hold a doctorate in clinical psychology.

I am widowed.  And I do have prior jury service.  I served on a jury about 20 years ago in a JP court case in Williamson County on a misdemeanor.

THE COURT:  That's the only jury service?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  All right.  Thank you.

Next is No. 23?

THE PANEL MEMBER:  My name is Laurie Honea.  I live in Leesburg, Texas.  I have one son that's 21 years old.

I've been in banking for 25 years.  I currently work as the director of Retail Operations for Alliance Bank in Sulphur Springs.  I've been there for eight years.  I have a high school diploma and some college.

My husband's name is Adam Honea.  He has worked for the City of Rockwall for 18 years as a firefighter.  We also own an AC business in Rockwall that he's owned for the last 15 years.

I have not served on a jury duty before.

THE COURT:  All right.  Thank you, ma'am.

Next is No. 24, Mrs. Weir.

THE PANEL MEMBER:  My name is Cindy Weir.  I have two children.

I am retired from Pack-N-Mail as a store clerk.  I worked

there for 25 years.  Eleventh grade.

My spouse's name is Steven Weir.  He is retired from Caterpillar Holt.  He's worked there 10 years.

And I've served on jury -- criminal jury twice, once in Marshall, once in Jefferson.  About a year-and-a-half ago was the last one.

THE COURT:  All right.  The criminal jury that you served on in Marshall, was it at this courthouse or the Harrison County courthouse?

THE PANEL MEMBER:  It was in Jefferson.

THE COURT:  Oh, it was in Jefferson.  Okay.  So have you ever served on a jury outside of Jefferson, ma'am?

THE PANEL MEMBER:  No.

THE COURT:  All right.  Thank you.

All right.  No. 25 is next.

THE PANEL MEMBER:  My name is Berlin Aguirre.  I've lived here in Marshall all my life.  I have one girl.  She's 10.

And then I work at Jucy's Hamburgers about six years now.  I'm an assistant manager.  And I have a high school diploma.

My husband's name is Juan Reyes.  He work as a mechanic for 12 years.

And I've never served jury.

THE COURT:  All right.  Thank you.

Next is No. 26.

THE PANEL MEMBER:  Good morning.  I'm Christopher Hicks.  I have no children.

I work at the Postal Service going over 15-plus years.  I did graduate from high school.  I am currently unmarried.

I have served on a criminal jury in Linden, Texas, and that was about, I would say, over a year ago.

THE COURT:  And where do you live, Mr. Hicks?

THE PANEL MEMBER:  Hughes Springs, Texas.

THE COURT:  Hughes Springs.  Thank you.

Next is No. 27.

THE PANEL MEMBER:  Hi.  My name is Virma Phillips.  I live in Marshall.  No kids.

I work at the hospital as a patient care, night shift.  How long?  One month.  I'm new.  I have Bachelor's degree in criminology.  I got that in the Philippines.

My husband's name is Shawn Phillips.  He work at the hospital.  He's an RN for like 11 years.

I never served in a jury.

THE COURT:  All right.  Thank you, Mrs. Phillips.

No. 28 is next Mrs. Johnson.

THE PANEL MEMBER:  My name is Atra Johnson.  I live in Marshall.  I have no biological children.  I have three through marriage.

I work at Tyson Foods.  I've been there for 25 years as a procurement administrator.  I have a high school background,

some college.

My husband's name is Lonnie Johnson.  He works at Pro HGE for about two months.

And I have no jury services.

THE COURT:  All right, ma'am.  Thank you.

No. 29, Mr. Ramsey.

THE PANEL MEMBER:  My name is Hunter Ramsey.  I live in Naples, Texas.  I have two children--two daughters, 7 and six weeks old.

I work at CrafCo in Naples, Texas, as a production supervisor.  We manufacture road preservation products and polymer-modified asphalts.  I've worked there five years.  I have an Associate's Degree.

My spouse's name is Megan Ramsey.  She is currently unemployed.

And I have no prior jury services.

THE COURT:  All right.  Thank you, sir.

No. 30 is next, Mr. Heatherly?

THE PANEL MEMBER:  Good morning.  I'm Braydon Heatherly.  I've lived in Longview for 21 years.  I have no children.

And I work at FedEx freight in Longview.  I'm a material handler on a forklift.  I've worked there for coming up on three years.  I graduated high school.

I do not have a spouse, and I have not served jury duty

before.

THE COURT:  Mr. Heatherly, do you know either of these FedEx employees earlier?

THE PANEL MEMBER:  I do not.

THE COURT:  Okay.  Thank you.

Next is No. 31.

THE PANEL MEMBER:  Good morning, Judge.

THE COURT:  Good morning.

THE PANEL MEMBER:  My name is Benjamin Puesta.  City is in Marshall, Texas.  I have currently zero children.

I'm retired.  My place of employment used to be United States Department of Health and Human Services Center for Disease Control and Prevention.  I've worked there for 30 years.  Prior to that, it was 12 years of duty in the Navy.  High school education.  I've got a Bachelor's degree in economics from the University of Illinois in Chicago.

My spouse's name is Christi.  My spouse does work at Christus hospital as a contact specialist.  She's been there for about three years.

And I have two prior service incidents in criminal case courses.

THE COURT:  You've served on a jury in two criminal cases?

THE PANEL MEMBER:  Correct, sir.

THE COURT:  All right.  Where was the last time you

served on a jury?

THE PANEL MEMBER:  The last time was in Gwinnett County in Atlanta, Georgia area, in Atlanta, Georgia, yes, sir.

THE COURT:  All right.  How long ago was that?

THE PANEL MEMBER:  Maybe about 10 years ago.

THE COURT:  All right, sir.  Thank you very much.

THE PANEL MEMBER:  You're welcome.

THE COURT:  Next is No. 32.

THE PANEL MEMBER:  Hello.  My name is Philinda In.  I have three children, and I have just have a newborn.

I work at the Lucky Liquor store.  I'm a manager.  I work there for 16 year.  I'm a high school.

My husband name, Alan In.  He owned the Lucky Liquor store for 21 years.

And I never served a jury before.

THE COURT:  Thank you, Mrs. In.

No. 33 is next.

THE PANEL MEMBER:  My name is Warren Shepard.  I live in Bivins, Texas.  I have four children.

I work for CPKC Railway, signal engineering.  I'm a signalman there.  I worked there for 22 years.  High school education.  Diploma and vocational auto mechanics.

Divorced, and I have no prior jury service.

THE COURT:  Thank you very much, sir.

Thank you, ladies and gentlemen.

Now, I need to say a couple of things additionally to you before I turn the questioning over to the lawyers.

The jurors that are selected from this panel will serve in the role as the judges of the facts.  And the jury selected will make the sole determination about what the facts are in this case.  Now, my job as the Judge is to rule on questions of law, evidence, and procedure that might arise during the trial, to maintain the decorum of the courtroom, and to oversee an efficient flow of the evidence.

Also I'd like to say a couple of things to you about our judicial system that will hopefully put things in a proper perspective for you.

In any jury trial, including this one, besides the competing parties themselves, there are always three participants--the jury, the judge, and the lawyers.  Now, with regard to the lawyers, it's important for you to understand that our judicial system is an adversary system, which simply means that during the trial each of the parties will seek to present their respective cases to the jury in the very best light possible.

Now, it's no surprise to you that lawyers as a group are sometimes criticized in the media, but some of that criticism the Court has observed is simply caused by a basic misunderstanding of our adversary system in which the lawyers

act as advocates for the competing parties.

And as an advocate, a lawyer is ethically and legally obligated to zealously assert his or her client's position under the rules of our adversary system, and by presenting the best case possible on behalf of their clients, the lawyers hopefully will enable the jury to better weigh the relevant evidence, to determine the truth, and arrive at a just verdict based on that evidence.

This system of justice, this adversary system of justice, has served our country well for over 200 years, and America's lawyers have been and are now and will be in the future an indispensable part of that process.

So as we go forward during the trial, even though it's possible that I might occasionally frown or clear my throat or make some other noise directed at the lawyers, I'm simply trying to make sure that they keep their advocacy within the boundaries of our adversary system.  But you should keep in mind, ladies and gentlemen, they are simply doing their jobs, and I think it's important for you to be aware of that as we go forward.

Also, ladies and gentlemen, I want you to know that if you're selected to serve on this jury, I am going to work very hard over the course of the trial to make sure that no one on the jury knows what I think about the evidence in this case, because determining the facts from the evidence in this case

is the jury's job, it is not my job, and those of you that are selected to serve on this jury should not take any expressions or comments or things you see or hear or think you see or hear coming from me as a factor to consider in deciding the ultimate facts in this case.

All right. At this time, counsel will present their examinations to the jury panel. Plaintiff may address the panel.

Would you like a warning on your time, Ms. Truelove?

MS. TRUELOVE: Yes, Your Honor. Would you mind telling me when I have five minutes remaining?

THE COURT: I'll warn you when you have five minutes remaining.

MS. TRUELOVE: Thank you.

THE COURT: You may proceed.

MS. TRUELOVE: May it please the Court.

Good morning. I want to begin by just saying thank you. Thank you on behalf of myself, on behalf of our client G+ Communications and Mr. Jeremy Pitcock. I know that all of you had somewhere else to be today, this morning, and many of you drove from far away, Hughes Springs, Queen City, Big Sandy, and so I understand that that's been a burden on you and we're very, very appreciative. We recognize that this is an inconvenience and a disruption in your lives, so thank you.

I'll start where you started and introduce myself. I

attended Texas A&M University where I got the very useful degree in the Russian language, so I promptly decided to go to law school so that I might better be able to support myself, and there I met my husband of almost 24 years, Kurt Truelove.

We ended up moving here to his home town where we both practiced law. I started out over there at the Harrison County courthouse where I was a prosecutor, and I actually handled all the CPS cases. So I tried a lot of cases where children were removed from their homes. We have three kids. The oldest just graduated from the University of Texas, the middle one is still there, and our youngest is going to finish up his junior year in high school in Marshall.

I have actually served on a jury. I was on a criminal jury in Jefferson when we lived there for a time and was actually I guess maybe not surprisingly the foreperson on that jury. So that's a little bit about me.

I want to give you just a few minutes' overview about the case. You know, you heard that the Court say that a prior trial had established infringement and validity of these patents, and your job is going to be to determine a fair and reasonable compensation, what is a reasonable royalty.

And so just to give you a little bit of background on the technology, there's two patents in the case that are at issue here, and they both are fundamental patents to 5G technology. So the 5G that not all of us around here have on our phone

yet, I think mine still says LTE, but the 5G which is the most recent technology.  It's dramatically faster, as we know; uses less battery life.  And one of these ways that it achieves this is through dramatically increased bandwidth.

And if I could have the elmo, please, madam.

So you can look at this slide and think about it in this way, that the older technology, the 4G, has a much smaller bandwidth, whereas the 5G, if you think about it, super highway as opposed to our old country road highway.

And so along with this additional bandwidth that we're looking at, there is a very large number of cell towers.  And the cell towers, as you-all may or may not know, is what you're communicating with.  And so if the communication is not happening the right way and quickly with the cell towers, then you have a problem where the speed is decreased --

MS. SMITH:  Excuse me, Your Honor.  I'm going to object.  This is expert testimony, it's disputed testimony. She's arguing about the standard and the speed at which 5G increases 4G, all at issue in this court in this case.

THE COURT:  Well, at this juncture the purpose is to give the jury panel a very high-level background, nothing more.

I'll let you finish your sentence, Ms. Truelove, but we need to get back to what this jury's going to do, which is how they're going to set reasonable royalty damages.

MS. TRUELOVE:  Certainly.  And that was about all I had to say about that, that the -- you know, the data transmissions can get lost and these patents have to do with this technology.  And you will hear a little bit about that in this case.

And the reason -- primarily two-fold reason why I bring up the case is that you heard that there's been a previous trial.  So my first question to each of you is, with that background, is there anyone here who has heard or read anything about this case, G+, Samsung, or anything like that?  Anyone?

Okay.  I don't see any hands.

And before I get into to kind of additional questioning, I just want to make sure everyone understands the purpose of voir dire.  Basically this is our opportunity to see how you feel about certain things.

We all come into court with our own personal background.  I worked as a prosecutor for almost a decade.  I tried a ton of child abuse cases.  And if this were a case about child abuse, I feel certain that the defendant would want to know that I worked for a long time with child abuse, and am I bringing any of that personal -- any of those personal feelings into the courtroom; would I be able to set those aside, listen to just the evidence of that case, apply the facts as I heard them, and render a ruling, a judgment, a

verdict, based just on that information and not how I felt for being a prosecutor for almost a decade.

Does that make sense with everyone?  That's all we're trying to accomplish.

So if there is a question that you get asked that I -- I wouldn't expect this, but if it did make you feel uncomfortable, we can certainly approach the bench and address it.  But that's all that each side is really trying to accomplish here.

So getting right to it, as you heard the Court say, those of you who are selected are going to have one job basically, and that's to determine what damages, if any, will fairly compensate G+ for Samsung's infringement of the two patents in this case.

And so my first question really is if the Court instructs you that you're to accept that prior trial decision, can each of you do that?

Mr. Ratliff, Juror No. 1, do you mind standing?  If that's the instruction, that you are to determine damages and you have to rely on another decision from another trial as to validity and infringement, are you able to do that?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  You don't need to find that for yourself.  You can trust someone else's decision in that regard and focus just on the information you hear regarding

damages in this case.

THE PANEL MEMBER:  Yeah.  I mean -- yeah.

MS. TRUELOVE:  Okay.  Well, you hesitate a little bit.  Is there a concern there?

THE PANEL MEMBER:  Because it's more of a -- me listening to a word-of-mouth kind of deal; like, I wasn't there to make the decision, it's me going off what somebody else said.

MS. TRUELOVE:  Is that going to be a problem for you?

THE COURT:  Mr. Ratliff, hold that microphone up, please.

THE PANEL MEMBER:  Okay.  Yes, sir.

THE COURT:  Thank you.

THE PANEL MEMBER:  No, it wouldn't.

MS. TRUELOVE:  Okay.  All right.  Thank you.

What about you?  And that's Juror No. 2, is Mrs. Bothman.

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Would you be able to just take that prior decision that the patents are valid and infringed and make a decision without you making that factual determination on your own?

THE PANEL MEMBER:  Honestly, probably not.  I would need to see the facts to -- yeah, not hearsay.

MS. TRUELOVE:  So --

THE PANEL MEMBER:  I would need to know for myself and not from someone else's decisions.

MS. TRUELOVE:  Okay.  And if the Court instructs you to just take that prior trial decision for infringement and validity and just to focus on damages, you're saying there's no way you could do that?

THE PANEL MEMBER:  Not from a prior -- I don't like gray area.  I want to see it all for myself.  It would be hard to go on what someone else said, what someone else decided.

MS. TRUELOVE:  Is there anybody else that feels like Mrs. Bothman does?  Let's do it that way.

All right.  Juror 19.

Thank you, Mrs. Bothman.

That's Mrs. Johnson, correct, Juror 19?

THE PANEL MEMBER:  I have a question --

MS. TRUELOVE:  Sure.

THE PANEL MEMBER:  -- if that's okay.

MS. TRUELOVE:  Absolutely.

THE PANEL MEMBER:  So it's my understanding, correct me if I'm wrong, but it's my understanding from what was spoken before, that there was some question as to the validity of the decision.  So was there a -- was there a decision made in the prior trial?

THE COURT:  Let me answer that.  A decision was made, that decision is still subject to appeal.  But before

that decision can go up to be considered on appeal, the entire scenario needs to be addressed, and setting the amount of the damages, if any, is a part of that process.

So Samsung has disputed the decision of the prior jury, they disagree with it, they have a right to attack that or to challenge that on appeal, they have a right to challenge that before this Court.  That process is still ongoing.  But that has nothing to do with what reasonable royalty damages would be based on the premise that the infringement found by that prior jury exists and that the patents are valid.

So this jury is going to be told by me you have to accept that premise that the prior decision was correct and, based on that premise, answer the subsequent question of what are reasonable royalty damages in that scenario.

That doesn't mean Samsung agrees with the prior decision and they have the right to disagree and they have the right to pursue an appeal and they'll do that.  But this jury is here only to answer the question of, based on the premise that the prior decision in the prior trial is correct, what would in those facts -- under those facts, what would a reasonable royalty, the amount of monetary damages for infringement, That's all this jury is going to answer.

This jury is not going to go back and re-examine the process of reaching the decision on infringement or on validity.

THE PANEL MEMBER:  Thank you.

Could you ask your question again, please?

MS. TRUELOVE:  Yes.  And I just want to know if you'll be able to accept what His Honor has just advised you, that you're going to proceed on the premise that the patents are valid and infringed and just focus on coming back with a damages number.  Are you able to do that?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  Thank you very much.

THE PANEL MEMBER:  Thank you for the clarification.

MS. TRUELOVE:  And thank you, Your Honor.

Okay.  Let's talk about Samsung's counsel.  I think you're going to be hearing a lot from Mr. Cordell, who introduced himself.  He's from a firm called Fish & Richardson out of D.C., and then his partner, Mr. McKeon, is at counsel as well.

Anybody know or seen Mr. Cordell or Mr. McKeon?  I wouldn't expect it but just in case.

All right.  Now, Ms. Smith is a more local person like myself.  She's a friend and colleague and actually was a resident of Jefferson.  So I don't know if Mr. Cadman or Downs or Mrs. Weir -- I was actually also a resident of Jefferson for about 10 years.  But anybody know Ms. Smith?

She practices with a firm Gillam & Smith.  Their office in Marshall is just directly behind the courthouse.  Anybody

familiar with her or Mr. Gillam?  No.

All right.  Thank you.

Okay.  So I want to thank each of you for filling out those questionnaires.  They were lengthy and it was very small print, but it did help us kind of focus our questioning and hopefully will make this go a little bit quicker.

One of the things that was inquired on there was whether or not you had -- I guess you kind of graded how you felt about the particular parties in this case.  And the parties in this case are Samsung, of course, and G+.  But there's another party to this case, not party to the case, but there's another company that's relevant to this case called ZTE.

So I want to first talk about Samsung.  Some of you indicated that you feel very favorably about Samsung.  And so I guess, first of all, who has Samsung phones?  Several of you.  Jurors 1, 5, 6, 18, 15, 27 maybe, and 28 back there.

Anything about the fact that you own a Samsung phone just in and of itself going to cause you to favor Samsung more in this case?  Anybody that raised your hand?

I think like Miss Archield, Juror No. 9, I think you indicated you were more favorable like a four to five for Samsung.  Anything about that give me pause or concern?

THE PANEL MEMBER:  No.  I own Samsung products, not necessarily a phone, but I do own electronics from Samsung. So I do know the name, and I think they're well-known, I think

they're popular, but that will not interfere with the fact of the case or the things that are going on.  I will weigh that at the merit.

MS. TRUELOVE:  Okay.  Perfect.  Thank you, Miss Archield.

And for those of you, I think Ms. Garcia, Mr. Hicks, Mrs. Alexandria Johnson -- I mean Mr. McDaniel, some of you have those kind of higher four to five rankings for Samsung.  Does anybody not agree with what Miss Archield just said, if you were ranking Samsung higher, can you-all because you own a product set aside your liking of the products and just listen to the facts in this case?  Are we good on that?  All right.

Anybody own stock in Samsung?  Juror 26?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  And that's Mr. Hicks.  Right?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Anything about the fact that you own stock in Samsung going to cause you to potentially lean in favor?

THE PANEL MEMBER:  I would say in theory, no.

MS. TRUELOVE:  In theory, no?  See, that makes me nervous.  In all honesty, I mean, the fact that you have a financial tie to the Defendant in this case, potentially going to cause you to lean in their favor when you get back there and ultimately have to deliberate?

THE PANEL MEMBER:  I mean, I can't say for what the future holds, but I do own stock.  So if the judgment was ruled that they would lose a lot of money, then obviously my stock would go down.

MS. TRUELOVE:  All right.  Thank you for that, Juror 26.

Anybody been to Korea?  Have any business dealings with Samsung?  No?  Okay.

All right.  Let's talk a little bit about ZTE and G+.  As I mentioned, ZTE is not a party, but I think what you're going to hear in this case is G+ and Mr. Pitcock established this company to acquire some ZTE patents.  And the two patents that are at issue in this case, that's how they came to be part of G+ and those are the ones that were litigated before and that we're talking about now with damages.

So who out there is familiar with ZTE?  I know a couple of you kind of ranked them and that's kind of a weird question on the questionnaire because it may just be that because you've never heard of them and you ranked them, but if there's anyone out there that is familiar with ZTE, please raise your hand.  It's a telecommunications company.

Yes, sir, Juror 22.  It's Mr. Fonteno.  Correct?

THE PANEL MEMBER:  Yes, ma'am.  Just to clarify my hearing.  GTE?

MS. TRUELOVE:  Z as in zebra, T-E.

THE PANEL MEMBER: Oh, I misunderstood you.

MS. TRUELOVE: That's okay. So you're not familiar with ZTE?

THE PANEL MEMBER: No, never heard of either one.

MS. TRUELOVE: All right. Anybody else? Yes, sir, Juror 13. That's Mr. Camden?

THE PANEL MEMBER: Cadman.

MS. TRUELOVE: Cadman. I'm so sorry. My apologies.

THE PANEL MEMBER: I mean, I've heard of them. I don't know much about them at all, but I have heard of ZTE.

MS. TRUELOVE: Anything about what you've heard going to be a problem in this case?

THE PANEL MEMBER: No.

MS. TRUELOVE: Okay. Why don't you just stay standing for me for a minute because I want to talk a little bit about, like I said, G+ acquired these patents, and they came from a company that's not from the United States.

So did you have a problem just in general with a foreign company coming to the United States and getting U.S. patents for their technology or their innovations?

THE PANEL MEMBER: Not if it's legal.

MS. TRUELOVE: Okay. So if it's legal, you don't have a problem with that.

THE PANEL MEMBER: No.

MS. TRUELOVE: Okay. Thank you very much.

Does anybody have a problem with the fact that companies from foreign countries can take their innovations, maybe they have patents on them in their country, maybe they don't, but they can take those innovations and come to the United States and go through the patent process in the United States.  And if the Patent Office decides that it's a novel idea and it's worth patenting, they can get a patent.  Everybody okay with that?

Anybody not okay with it?  All right, Juror 15.  I saw a nod and a wink so let's chat.  That's Mr. McDaniel.  Right?

THE PANEL MEMBER:  That's correct.

MS. TRUELOVE:  Okay.  Did you know you could even do that?

THE PANEL MEMBER:  No I did not.

MS. TRUELOVE:  Okay.  Maybe that was the nod and the wink.  What do you think about that?

THE PANEL MEMBER:  Like the gentleman over here said, as long as it's legal, it's fine.

MS. TRUELOVE:  Okay.  And if they do get a U.S. patent and -- let me ask you this.  So -- so ZTE is a telecommunications company, makes a lot of stuff.  They make things.  They do things.  G+ acquired the patents, and they're here enforcing them.  They don't make anything.  What do you think about that?

THE PANEL MEMBER:  It sounds legal, so I don't have

a problem there.

MS. TRUELOVE:  Okay.  Are you familiar with like mineral rights at all?

THE PANEL MEMBER:  A little bit.

MS. TRUELOVE:  A little bit?  So you understand that I could own a piece of property, but somebody else could own the mineral rights to that property.

THE PANEL MEMBER:  Correct.

MS. TRUELOVE:  Right.  And if they own the mineral rights, you know, we -- oil and gas company can come in, they can -- they can put a well on the property I own, and let's say you own the mineral rights, and they have the right to -- to drill, they bring in their property to do the work and try and extract gas, for instance.  You understand that?

THE PANEL MEMBER:  Yes, uh-huh.

MS. TRUELOVE:  And at the end of the day, I own the property.  I'm not going to get the benefit of anything they pull out of the ground.  Right?

THE PANEL MEMBER:  Right.

MS. TRUELOVE:  You own the mineral rights, you will get proceeds presumably based on whatever your particular contract rights are towards those minerals.  Right?

THE PANEL MEMBER:  Right.

MS. TRUELOVE:  So that's kind of -- kind of what we're talking about here.  A patent is property.  Do you

understand that?

THE PANEL MEMBER:  Yes.  Yes, I do.

MS. TRUELOVE:  Okay.  And property that is now owned by G+, these patents, and, therefore, they have a right to come into a court and get what they are owed for the use of that property, use without permission of that property.

THE PANEL MEMBER:  Sure.

MS. TRUELOVE:  Are you all right with that?

THE PANEL MEMBER:  Yes, I am.

MS. TRUELOVE:  All right.  Thank you very much, Mr. McDaniel.

Everybody else understand kind of that concept?  Does anybody else have a problem with it?  Anybody who thinks, you know, G+ didn't really make anything, they didn't do anything, they just acquired these patents, why should they be able to come into court and make Samsung pay for the use?  Anybody have a problem with that?  Okay.  I don't see any hands.

Mr. Soape?

That's Juror No. 11.

You okay with that concept?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Yes?  And you've worked for Center Point.  Do I have that right?

THE PANEL MEMBER:  No.

MS. TRUELOVE:  No, no, no, no.  You are retired from

Blue Cross Blue Shield in customer service.  Correct?

THE PANEL MEMBER:  Correct.

MS. TRUELOVE:  And what types of things did you do as far as customer service?  What were you handling?

THE PANEL MEMBER:  Mostly call center, answering phones.

MS. TRUELOVE:  So were you dealing primarily with the people who had your insurance?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Trying to work out claims and that kind of thing?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Okay.  All right.  Thank you very much.

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Let me ask you this.  Is it Juror 12, Mr. Rager?

THE PANEL MEMBER:  Rager.

MS. TRUELOVE:  Rager?  Okay.  Well, I messed up Mr. Cadman so I wanted to do my best.

So, Mr. Rager, let's say that -- let's go back to what we were talking about with the -- with the mineral rights and the purchase.  Let's say that you purchase a piece of land and afterwards you discover oil on the land.

THE PANEL MEMBER:  Right.

MS. TRUELOVE:  Okay?  And if you were to find out that someone took that oil without permission, do you think it's reasonable for them to come back and argue that they only need to pay based on what you purchased the piece of land for?  In other words, you buy a couple of acres for $10,000.

THE PANEL MEMBER:  Uh-huh.

MS. TRUELOVE:  And then they come in and they find oil or gas.

THE PANEL MEMBER:  Right.

MS. TRUELOVE:  Do you think it's reasonable for them to say, well, you only paid 10 grand for these two acres, even though this gas is worth hundreds of thousands or millions of dollars?

THE PANEL MEMBER:  Right.  I mean, personally, I don't think it's right, but, you know, I mean, whatever the law is.

MS. TRUELOVE:  Well, I mean, if the law says you have to pay for the value of the gas or the value of the technology, do you think that's fair?

THE PANEL MEMBER:  Yeah.

MS. TRUELOVE:  Okay.

THE PANEL MEMBER:  Yeah, I mean, yeah.  My mother-in-law had some land and she thought she owned the mineral rights to it for ages, and then of course they found oil on it and she found out the hard way that she didn't own

the mineral rights.

MS. TRUELOVE:  It's frustrating.

THE PANEL MEMBER:  Oh, yeah.

MS. TRUELOVE:  Absolutely.  But let's assume that she did own the mineral rights.  She would expect to be paid for the value of the gas coming out of the ground.  Right?

THE PANEL MEMBER:  Absolutely.

MS. TRUELOVE:  And not just the value of what she purchased the land for?

THE PANEL MEMBER:  Correct, yeah.

MS. TRUELOVE:  Thank you, Mr. Rager.

Some of you on your -- on your questionnaires indicated just some feelings about lawsuits.  I believe we have too many lawsuits, I think was stated.  Too many people are too quick to sue.

Mrs. Oden, I think you talked a little bit about some of them are unnecessary.  And I think that's pretty astute, that some can be unnecessary.  Are you -- are you saying, though, that there aren't situations where it's right for people to come in and file a suit?

THE PANEL MEMBER:  No, I believe it is right.  I just think sometimes it's abused.

MS. TRUELOVE:  Okay.  And in a situation where maybe people have been notified, Hey, I think you're using my technology, I think you're using my patent, and there's back

and forth, and -- and nothing can be resolved as far as what -- what needs to happen in -- in the course of compensating, do you think it's appropriate in that situation --

THE PANEL MEMBER:  Definitely.

MS. TRUELOVE:  -- to bring suit?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Thank you, Mrs. Oden.

Mr. Cline.  Yes, sir.

I think you indicated on your questionnaire that you used to work for or maybe you still work for a company that you believe got patents in the chemical area.  Is that right?

THE PANEL MEMBER:  Yes.  Yes.  I worked for a chemical company.

MS. TRUELOVE:  Okay.  And so if somebody was using their technology on one of their patents, and let's say they -- your company wrote a letter to the company that was infringing and said, Hey, look, we think you're using our technology, we want to be paid for it, and they refuse, are you okay with the fact that then your company's in a position where they have to either go on not getting paid for their technology or they have to bring a lawsuit?

THE PANEL MEMBER:  They should bring a lawsuit.

MS. TRUELOVE:  Okay.  And you're all right with that?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  Thank you very much.

How about 5G?  Who are my people out there that are real familiar with 5G technology?  Anybody?  No?  Anybody like read anything online or news stories about 5G that give you pause?

Mrs. Johnson again, Juror 19.

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  What have you read about 5G or --

THE PANEL MEMBER:  Just basic, generally speaking, it's an internet connection, WiFi connection, that you can place in your home or business and that it -- something about disperses more particles or something or other.  It's more broadband maybe?  Anyway, it's a higher level of technology that allows higher speeds, faster upload and download.

MS. TRUELOVE:  Okay.  Perfect.  Thank you.  Thank you.

I want to talk about a couple more things.  I think my time is getting short here.

Burden of proof.  The Judge mentioned it, and in connection with damages since that's what you're going to be asked to ultimately decide in this case.  And in this case I think you're going to hear G+ say that the damages are in excess of $140 million for the use of these two patents.

And so let me talk to you, is it -- Juror No. 4 would be Mr. Downs.  Correct?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  It's a big number, huh?

THE PANEL MEMBER:  It's a big number.

MS. TRUELOVE:  It is a big number.  Let me -- let me -- let's think about it this way.  Let's imagine that you own some property, and it's covered in pine trees.  And you don't live there.  You go out there periodically when you have family reunions and that kind of thing.  It's just a treasured family space.

And so you're getting ready for your 4th of July picnic out there, and you show up, and it's been clear-cut, every single tree is gone.  How do you feel about that?

THE PANEL MEMBER:  Bad.  Somebody stole my timber.

MS. TRUELOVE:  Right.  So let's say you find out who cut it and you reach out to them and you say, Hey, you used or you came and you clear-cut my land.

And they say, Oh, I'm sorry, our mistake.  We thought we were on the right place; we weren't.  We meant to cut over here.

And you say, Well, it's my land, you got to pay me for it.

They say, how about we pay you for half the trees?

Are you okay with that?

THE PANEL MEMBER:  No.

MS. TRUELOVE:  You want to be paid for the full

value of --

THE PANEL MEMBER:  Full value, yeah.

MS. TRUELOVE:  -- of every single tree on that -- on that piece of land.  That was your right and your property.  Right?

THE PANEL MEMBER:  That's right.

MS. TRUELOVE:  And thank you very much, Mr. Downs.

Can we all agree that you should get paid for what you can prove is the value of your property?  Everybody agree with that?  I see lots of head shaking.  And that value, when you're dealing with technology, can be high, in the hundreds of millions of dollars.

Is there anybody who is not comfortable considering a range of damages that can be in the hundreds of millions of dollars?  Anybody not comfortable with that?  You have to at least be able to consider it.

Okay.  Now, burden of proof, as His Honor told you, is by a preponderance of the evidence, which means just tipping the scales ever so slightly.  If you think about it in a football analogy, it's just barely getting the nose of the football across the line of scrimmage, you know, what you're trying to get, the first down or the touchdown.

It's not a very high standard of proof when you consider it to other things like beyond a reasonable doubt when you're trying to put something -- put somebody in jail, in prison.

64

Anybody have a problem with the fact that that's the standard of proof?  In other words, does anybody think the standard of proof should be higher, that we should have to prove by a higher standard of proof in order to make a damages request that's in that high range?  Does that make sense?

Yes, ma'am, Mrs. Bothman.

THE PANEL MEMBER:  I think it would have to be proved on the even scale.

MS. TRUELOVE:  On an even scale.  So we start out even --

THE PANEL MEMBER:  Uh-huh.

MS. TRUELOVE:  -- which is what the law says that we do, and then our burden, the Plaintiff's burden, is to just tip it ever so slightly by a preponderance to prove the damages.

THE PANEL MEMBER:  It's the gray area.

MS. TRUELOVE:  That's all right.  That's all right.

THE PANEL MEMBER:  I like things wrote out.

MS. TRUELOVE:  So you maybe are saying that you would require a higher burden?

THE PANEL MEMBER:  Probably.

MS. TRUELOVE:  All right.  Thank you, Mrs. Bothman.

Anybody feel like Mrs. Bothman?  And if you do, it's okay.

All right.  Let me talk to you -- is it Strube?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Mr. Strube, Juror No. 5.

Let's say you are facing hundreds of millions of dollars in damages, like what's alleged in this case, and you had another way to use the technology in your products where you would not be infringing.  In other words, you could put something else in there and not use the technology that you're being accused of and that alternative would get you out of being on the hook for hundreds of millions.

Do you think it would be reasonable to do that?

THE PANEL MEMBER:  I think so, yeah.

MS. TRUELOVE:  Okay.  Everyone agree that it just makes sense if you've got an alternative way to do something that doesn't infringe and you're being accused of using somebody's property without their permission and it's like a big number, you would use the other -- other way of doing it?

THE PANEL MEMBER:  Yes, ma'am.

MS. TRUELOVE:  Okay.  All right.  Thank you, Mr. Strube.

Now, I know that there are several of you who are from -- I mean, we've already worked out that nobody that works at FedEx knows each other, but there are several of you that are from the same town, small town.  I think Mrs. Bothman and Mr. Fonteno, you're both from Big Sandy.  Do you guys know each other?  I see shaking of the heads.  Okay.

Several of you from Jefferson, Mr. Cadman, Mr. Downs, and Mrs. Weir.  Any of you-all familiar with each other?

And the only reason I ask is, you know, if you get back in the jury room and it turns out you're neighbors on the panel, you know, I want -- I want everyone to be able to go back there and exercise your own view.  You hear the facts as you hear them and you make your own decisions.

So is there anybody out there on the panel that there's somebody else in the jury pool that -- that you know and that you would be like, I would follow along with them because I don't want to disappoint them?

Yes, ma'am, Juror 14.  And you're Mrs. Reese.  Right?

THE PANEL MEMBER:  Uh-huh.  I don't know Mr. Cadman, but we have lots of mutual friends.  So I don't know -- I don't know if that will sway anything.

MS. TRUELOVE:  I appreciate -- no, I appreciate you being forthcoming about that.  Nothing about, you know, being familiar with Mr. Cadman is going to cause you, if you both get selected to sit on the panel, to not voice your own opinion and to go along with him.

THE PANEL MEMBER:  I don't think so.

MS. TRUELOVE:  You don't think so?  Okay.  All right.  Thank you.

Well, let me ask you this while I've got you there, Mrs. Reese.  I'm sorry.  You know, one of the things and you heard

His Honor, you know, tell you that you-all are the judges of the facts.  And one of the things is you're going to have to judge the credibility of the witnesses, and there are going to be several expert witnesses.  And as you would expect, since this is about damages, some of those experts are going to be talking about what they think the damages should be in the case.

And I guess -- how do you feel about having to decide between who you believe, this expert versus that expert.  Is that something you're comfortable doing?

THE PANEL MEMBER:  I'll do my best.

MS. TRUELOVE:  Okay.  You know, some of the things that -- that you would have to consider or could -- not have to, could consider when you're looking at testimony of any witness, expert or otherwise, is like the manner and demeanor, whether -- whether or not they've been contradicted by other evidence, made any statements contrary.  But you get to decide.  Right?  And so --

THE COURT:  You have five minutes remaining.

MS. TRUELOVE:  Thank you very much, Your Honor.

Is that something that you think you can do?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  Thank you very much.

What about you?  Is it Mrs. Smith, Juror 10?  How do you feel about being tasked with judging the credibility of the

witnesses?

THE PANEL MEMBER:  I don't have a problem with that at all.

MS. TRUELOVE:  Okay.  And even if it's expert testimony, you're going to hear --

THE PANEL MEMBER:  No.

MS. TRUELOVE:  Okay.  You're going to hear folks get on the stand and talk about their credentials and all the things that -- that they've done and give you their opinion and likely you're going to see two different opinions.  Are you okay?

THE PANEL MEMBER:  Uh-huh, yes, ma'am.

MS. TRUELOVE:  Okay.  All right.

Everybody okay with having to judge the credibility?  All right.

Juror No. 9?  You know, that's funny.  Actually I meant 6, and it's upside down, and -- but -- I apologize.  I should have paid attention to where you're sitting.  And that's Ms. Garcia.  Correct?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  And you are working for a nursing home right now?

THE PANEL MEMBER:  I did.  It closed down.  The Springs closed down.  Hughes Springs, Texas, is closed.

MS. TRUELOVE:  Okay.  So are you not working at all?

THE PANEL MEMBER:  No.  I take care of my grandkids now full time.

MS. TRUELOVE:  Okay.  And I just -- if you were working night shifts or something like that, I was just curious.

THE PANEL MEMBER:  I was working day shifts.

MS. TRUELOVE:  Okay.  Thank you very much.

And Juror No. 3, Mrs. Downs?  Dawson.  Oh, my gosh.  Mr. Downs is next to you.  My apologies, Mrs. Dawson.  And you own a salon.  Is that right?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  And isn't that your business in operation today and working?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Okay.  Is there any going to be any problem with you not being at the salon and being here for three days?

THE PANEL MEMBER:  No.  I'm the boss.  No.

MS. TRUELOVE:  So you're the boss.  So you can -- you can handle the schedule.  Perfect?

THE PANEL MEMBER:  Yes.

MS. TRUELOVE:  Thank you very much.

So usually in this situation, and since my time is definitely running low, I'd like to take the opportunity -- you know, we've talked about a lot of things.

Some of you may have had stuff pop up in your mind about questions, and so I really just want to take a minute to see if any of you have a question or you're sitting there and you're thinking, If Ms. Truelove had asked me this or if she had talked to me about that, she would definitely want to hear what I have to say.  Anybody feel that way?

All right.  Well, with that, Your Honor, I will give you back a minute or two, and turn over the podium.

THE COURT:  All right.  Thank you, counsel.

Defendants may now address the venire panel.

Ms. Smith, would you like a warning on your time?

MS. SMITH:  I would, Your Honor, please.  May I have five and one?

THE COURT:  I'll warn you when you have five minutes remaining and when you have one minute remaining.

MS. SMITH:  Thank you, Your Honor.

THE COURT:  All right.  You may proceed.

MS. SMITH:  Thank you.

May it please the Court.

Good morning, everybody.  In the way of reintroduction, my name is Melissa Smith and I'm here today proudly representing Samsung.

Now, I'm going to start where Ms. Truelove, my good friend started, and that's by thanking you.  I know -- I know you had some long drives today, but I know your work actually

started before you got here today because you filled out some pretty lengthy questionnaires. And so on behalf of Samsung I thank you for that time.

We certainly know that time every minute and every hour you spend in this courtroom is time away from your friends and your family and, quite frankly, things you would probably rather be doing, so thank you. We thank you.

I will also introduce myself. The Court has taken some time to say a few words about himself and Ms. Truelove did the same. I graduated from the University of Texas at Austin, and then I like His Honor went on to Baylor Law School. That was 26 years ago. From Baylor about a week after graduation, I moved to Jefferson. I started practicing here in Marshall. I've been practicing here in Marshall for the last 26 years.

I am married. My husband's name is Steven. He is retired law enforcement. He was a police officer. And we have two children. We have a 10-year-old girl and a 12-year-old boy. And so we're in fifth and seventh grade, and we're kind of on the home stretch right now to make it through that last month. So that's a little bit about me.

I actually I have had jury service. I served in Jefferson on a -- it was remarkable that I was selected as a lawyer, but it was a criminal panel and I knew the prosecutor and I knew the defense attorney. And so they trusted me to be on their case, but I opted out of being the foreperson because

I thought it was fascinating and I wanted to see basically how you-all do your work.  It's helped me a lot in practice, quite frankly.

His Honor gives us a few minutes to introduce you, three minutes to introduce you to our case, and you heard from Ms. Truelove how Mr. Pitcock and GComm view their case.  And you've already heard a lot about or something about the 5G standard, and Juror 19 explained some of her thoughts on that standard.

In this case I want to be crystal clear:  You're going to have one task, and that's going to set, if necessary, if anything is owed, to set a royalty or a price for two patents that have been declared essential to that 5G standard.  And that's two patents out of 69,000 patents that are declared essential to the standard.

And so how you're going to do this is you're going to kind of go back in time and you're going to look at what we call a hypothetical negotiation.  So you-all will sit in judgment of this negotiation.  And at the negotiating table, we're going to see Samsung -- stay with me, Juror No. 12 and 13.

A PANEL MEMBER:  Sorry.  My stomach's growling.

MS. SMITH:  I'm sorry, sir?

A PANEL MEMBER:  My stomach's growling.

MS. SMITH:  Oh, I apologize for calling you out on

that one then.

The hypothetical negotiation is -- is something you only find in a courtroom, and so that's why I thought you were shaking your head.

But anyway, at this hypothetical negotiation, we're going to see Samsung on one signed side.  And then as you've heard, Mr. Pitcock and GComm bought their patents from ZTE.  So ZTE is going to be at the other side.

And what I think you're hear from His Honor is that this negotiation is going to look a little different than the negotiations that you-all have been engaged in throughout life.  And I saw in your questionnaires that many, many of you have experience in negotiations.

This negotiation actually has a requirement, a requirement that ZTE, the company at the table with Samsung, be both fair and be reasonable.  So it's not going to have anything to do with striking oil or cutting down a bunch of trees on family land.  Your job will be to determine, if at all, what is fair and what is reasonable.

Now, I'm going to be completely transparent about what I'm doing here, same thing as Ms. Truelove did.  I'm trying to figure out through some questions I've crafted for you today if you start out leaning -- bless you, ma'am -- if you start out leaning a little bit towards the Plaintiff before we even hear the evidence in the case.

So being transparent, that's what I'm looking for--jurors that say, you know, in my heart of hearts I haven't heard the evidence yet, but I just -- based on life experiences and things of that nature, I start out leaning a little bit towards the Plaintiff.

So we'll start here.  You heard a lot from Ms. Truelove. She's a good lawyer.  Is anyone sitting there, thinking, you know, my mind's not made up, but from what I've heard, I'm leaning a little bit towards Plaintiff today?  Anybody on the first row?  Second row?  All right.

Now, Ms. Truelove is married the Kurt Truelove, another lawyer in town.  Anybody know the Trueloves?  All right.  She works at the McKool Smith firm next door.  A bunch of folks over there.  Sam Baxter is one of her partners.  Anyone know Mr. Baxter?

Mr. Baxter's in the courtroom this morning.  Anyone recognize Mr. Baxter?  Okay.

Mr. Baxter is married to Lauren Parish, and Ms. Parish also has a brother working on the case, Todd Parish. They're from -- they're from Gilmer.  Has anybody ever heard of the Parishes or know the Parishes?  I knew we had some Gilmer folks.  I see some heads nodding no.  Nobody ever heard of the Parishes?

All right.  There are some folks visiting us from out of state, from California at counsel table, Mr. Sheasby and Ms.

Glasser.  Has anybody ever heard of Irell & Manella law firm or know or have seen these folks at counsel table?  All right.

Now, I want to go down the road a little bit further with you about Samsung -- Samsung generally and your experience with Samsung -- Samsung products.

You guys, you-all gave me some information about your impressions of Samsung, and I'm going start with Juror No. 1, Mr. Ratliff.

I believe you have had some experience with Samsung products.  Correct, sir?

THE PANEL MEMBER:  Yes.

MS. SMITH:  All right.  Anything I need to know about that?  Are you generally satisfied with Samsung products?

THE PANEL MEMBER:  Yeah.

MS. SMITH:  What kind of product do you have?

THE PANEL MEMBER:  Phone, televisions.  Yeah, just the phone and television right now.

MS. SMITH:  Standing in the courtroom representing Samsung, no problems I need to be aware of?

THE PANEL MEMBER:  No.

MS. SMITH:  Okay.  Thank you, sir.  Appreciate you.

All right.  Juror No. 5, Mr. Strube.  You own some Samsung products, sir?

THE PANEL MEMBER:  Yes, ma'am.

MS. SMITH:  What do you have?

THE PANEL MEMBER:  Same--phone, TVs.

MS. SMITH:  All right.  Any issues with those?

THE PANEL MEMBER:  No, ma'am.

MS. SMITH:  Anything I need to be aware of?

THE PANEL MEMBER:  No, ma'am.

MS. SMITH:  All right.  Thank you, Mr. Strube.

Juror No. 6, Ms. Garcia?  Yes, ma'am.  What do you own?  What kind of Samsung products do you own?

THE PANEL MEMBER:  I have phones, TVs.  My kids have phones.  My kids in Dallas have phones, all Samsung.  All of us own Samsung.

MS. SMITH:  Well, then I'm hoping since you're -- thank you for that.  I'm hoping because you're a repeat buyer, you don't have any issues I would need to know about then?

THE PANEL MEMBER:  I have no issue with them.  No problem at all.

MS. SMITH:  Thank you, Ms. Garcia.

All right.  Anyone in the back row have any issues with Samsung products?  I'm seeing heads shaking no.  All right.

Juror No. 7, Mr. Cline.  Do you have some experience with some Samsung products?

THE PANEL MEMBER:  I do own a Samsung TV and have Samsung products in my place of business.

MS. SMITH:  Okay.  Any issues with any of those products?

THE PANEL MEMBER:  No, ma'am.

MS. SMITH:  Okay.  When I was reading your questionnaire, I felt like we didn't get our highest marks when I was looking at your questionnaire.  Any reason for that?

THE PANEL MEMBER:  So I just have the one Samsung TV that I've recently purchased so generally new.  My background in the workplace, we have Samsung tablets.  Generally work fine.

MS. SMITH:  Okay.  Thank you, sir.  I appreciate it.

All right.  Now, I was doing this little exercise at one point for a much different company, and I asked this question--does anyone -- I'll put it in the context of Samsung here.  Does anyone have any issues -- set aside your experience with the products.  Does anybody have any issues, any negative views or anything I might need to know about about Samsung?

And I tell you, when I was working for another company, I asked this question, and about five minutes later I had had an earful about a jingle this company put out in an ad that people hated.  But I can take it.  So, you know, the exercise here is to be honest.  Is there anybody that for any reason has negative feelings about Samsung for any reason at all?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

I'm braced for it.

Juror No. 1.  Yes, sir, Mr. Ratliff.

THE PANEL MEMBER:  I mean, I wouldn't just say just negative negative.  The only thing I have with is say they come out with a phone, 5G phone, and then you live in an area and there's not 5G there, but you have to pay these prices for the 5G phone.

MS. SMITH:  All right.  Now, Mr. Ratliff, I respect that you take issue with that, but you do understand that Samsung is not -- is not delivering service to our area, for instance.  That would be the carriers that deliver 5G like AT&T and Verizon?

THE PANEL MEMBER:  I mean, yes, they don't deliver the service, but they sell the product and they get rid of the other products and only sell the 5G products.

MS. SMITH:  Understood, sir.  Understood.  Thank you.  Anything about that that's going to start me from behind in this case?  Every time I stand up and say something in this trial, are you going to think --

THE PANEL MEMBER:  No.

MS. SMITH:  -- she's working for that company that --

THE PANEL MEMBER:  No.

MS. SMITH:  Okay.  Thank you, sir.

All right.  Samsung has about 6,000 employees in Texas,

20,000 nationwide. They've got headquarters in Plano, they've got -- they're down in Austin making chips. So it's not uncommon in this process to meet somebody that has a family member that works for Samsung or knows somebody that works for Samsung.

Do I have -- anybody know anybody that works for Samsung?

Juror No. 30, are you just scratching your nose out there?

THE PANEL MEMBER: I don't know anybody.

MS. SMITH: Okay. Okay. Okay. That's dangerous like at an auction. Anyway, nobody knows anyone at Samsung. Okay.

All right. Has anybody had any kind of interactions with a Samsung employee that might make me start out a little behind? Juror No. 12?

THE PANEL MEMBER: Yeah. I had a --

MS. SMITH: That's Mr. Rager?

THE PANEL MEMBER: Yeah. So I had an issue with -- I bought a new refrigerator, and the ice maker didn't work.

MS. SMITH: Okay.

THE PANEL MEMBER: I bought it brand new; the ice maker didn't work.

MS. SMITH: I apologize for that.

THE PANEL MEMBER: And I stayed on hold with support for, I don't know, it seemed like ages, never did get any

help, and I finally just hung up.

MS. SMITH:  Now, Mr. Rager, I can --

THE PANEL MEMBER:  I'm sorry.  I talked to somebody briefly and they were like supposed to come back and get with me and they never did.  So I don't know.

MS. SMITH:  Now, Mr. Rager, I can apologize to you live in court which I do on behalf of Samsung.  But, you know, when I stand up and I make a case for Samsung, are you going to be thinking, you know, I'm still waiting for that call back?  So I start a little bit behind?

THE PANEL MEMBER:  I feel like I can be fair, but, you know, I mean, I'm only human.

MS. SMITH:  I appreciate that.  Only human meaning what?  I'm sorry to keep you up.

THE PANEL MEMBER:  I'm fallible, you know, in some ways, but I feel like I can be, you know, honest and unbiased and do my best.

MS. SMITH:  Thank you, sir.  I appreciate you.

All right.  I want to talk a little bit about why -- what motivated you to buy your cell phone.  So everyone on the front row have a cell phone, whether it's smart or not?  You've all got cell phones by a show of hands.

All right.  Juror No. 2, Mrs. Bothman, I haven't spoken with you yet.  You know, jurors buy cell phones for all different reasons.  Some care about the brand, some are real

price-driven, some care about the size of the screen.  Give us -- give me some idea -- what kind of phone do you have, first of all?

THE PANEL MEMBER:  I have an iPhone.

MS. SMITH:  Okay.  I hate that for you.

THE PANEL MEMBER:  I like it.  It's simple.

MS. SMITH:  That's okay.  My own mother has an iPhone.  Can't make her quit it.

Why did you buy the iPhone?

THE PANEL MEMBER:  Because it's simple.  You just push a button and it comes on and not a lot of figuring out.

MS. SMITH:  Okay.  Thank you, ma'am.

Juror No. 3, Mrs. Dawson, what kind of cell phone do you have?

THE PANEL MEMBER:  IPhone.

MS. SMITH:  That's okay.  We're speaking the truth, so... why did you buy that iPhone?

THE PANEL MEMBER:  Recommended by my daughter.

MS. SMITH:  All right.  Does your daughter have the iPhone?

THE PANEL MEMBER:  Yes.

MS. SMITH:  Is your daughter more tech savvy than you are?

THE PANEL MEMBER:  Very.

MS. SMITH:  What is it that you like about that

iPhone?

THE PANEL MEMBER:  Well, it's simple for me.

MS. SMITH:  Okay.  All right.  That works for me. Thank you, ma'am.

Mr. Downs, I haven't spoken with you yet.  What kind of phone do you have?  Juror No. 4?

THE PANEL MEMBER:  My wife's hand-me-down.

MS. SMITH:  Okay.  What kind of phone did your wife have?

THE PANEL MEMBER:  It's a Verizon.

MS. SMITH:  What brand, though?  That's a carrier, so...

THE PANEL MEMBER:  It might be a Tracfone.  I don't know.

MS. SMITH:  Okay.  Well, what do you like about that phone?

THE PANEL MEMBER:  Free.

MS. SMITH:  Okay.  Thank you, sir.

I'm coming for you, Juror No. 5, Mr. Strube.  What do you have?

THE PANEL MEMBER:  It's the -- what is it -- the Galaxy Note 22?  I think that's what it is.

MS. SMITH:  Thank you.  Yes, that's exactly what it is.  And why did you buy the Galaxy Note?

THE PANEL MEMBER:  Well, my wife's the one that

picked it up.  When we went to upgrade our phones, that's what she brought me so that's how I ended up with it.

MS. SMITH:  Okay.  Well, let me take you -- let me take you shopping.  Let's pretend like let's leave the wives at home, and we'll go to the cell phone store.  Okay?  And if someone says -- you have any idea how much you paid for that Samsung phone?

THE PANEL MEMBER:  No, I'm not sure.

MS. SMITH:  Okay.  Well, if someone says, do I have a deal for you.  I'll sell you a phone that will go about one second faster when you're trying to download a website, for instance, and that will cost you $500.  Will you take that deal?  One second.

THE PANEL MEMBER:  Probably.

MS. SMITH:  Okay.  Okay.

THE PANEL MEMBER:  Probably.

MS. SMITH:  What about a half a second?  A portion of a second, like faster than that (snaps fingers).  Just don't know?

THE PANEL MEMBER:  Probably would--faster, I guess.

MS. SMITH:  Okay.  Thank you, sir.  I appreciate it.
One more.  Juror No. 6.  Let's see.  Ms. Garcia, what kind of phone do you have?

THE PANEL MEMBER:  I have a Galaxy Note.

MS. SMITH:  All right.  And what motivated you to

buy that Galaxy?

THE PANEL MEMBER:  My kids got it for me.  I had an Apple iPhone.  They wanted me to get rid of it.  I kept having problems, so they got me a phone.

MS. SMITH:  Okay.  What do you like about that phone?

THE PANEL MEMBER:  I like it because it's easy.  I mean, you don't have to keep updating every time.  You know, on iPhone, you have to update it all the time.  So I didn't want to deal with it anymore.  And I love my galaxy.

MS. SMITH:  Did you get into, like, when you were having the conversation with your kids, did you say, you know, what's most important to me is X, it being easy or screen --

THE PANEL MEMBER:  I wanted something because where we live at, we live way out in the country, and it buffs all the time.  And the Galaxy just don't seem to, like, buffing. It just works really great.

MS. SMITH:  That sounds great.  Thank you, ma'am. Appreciate it.

Ms. Truelove talked to you-all a little bit about foreign companies, and you've heard that there are foreign interests on both sides of this suit.  My question's a little bit different.  We may hear from some witnesses that -- where their testimony needs to be translated.  So it's a little bit clunky, to tell you the truth.  You know, someone asks the

question and it has to be translated.  Is there anyone -- and, as Ms. Truelove said, you know, you're the judges of the credibility of the witnesses.

Is there anybody that says, well, that's a frustration, you know, translated testimony, you're just going to start off a little bit behind?  Anybody have that thought?

Mrs. Oden, Juror No. 8, everyone's starting off on the same -- in the same place?  One side has some translated testimony and the other doesn't?

THE PANEL MEMBER:  I have no idea.

MS. SMITH:  That's fair.  I really called on you, I looked at you, and I wanted to ask you, are you kin to Beverly Oden, Leonard Oden, any of those Odens from Marshall?

THE PANEL MEMBER:  Distant.

MS. SMITH:  Distant.  How distant?

THE PANEL MEMBER:  I have no idea.  I married into the family.

MS. SMITH:  Okay.  That's fair.  Okay.  I appreciate it.  Thank you, ma'am.

All right.  Has anybody ever been -- Ms. Truelove asked if anybody had ever been to Korea.  Has anybody ever traveled to China, spent any time in China?  I see no hands.

All right.  I want to talk for one more minute about ZTE.  Some of you had some dealings with -- with ZTE.  And, again, ZTE is the company that Mr. Pitcock and GComm purchased these

patents from.

I believe, Mrs. Medina, No. 16, I believe in your questionnaire you had some impressions about ZTE. Tell me about that.

THE PANEL MEMBER: I remember one friend, she used to own a phone with that -- with the company or whatever, and that's it.

MS. SMITH: That's it? Otherwise, ZTE and Samsung are starting out kind of in the same place?

THE PANEL MEMBER: No.

MS. SMITH: No, they aren't starting out in the same place? If we have a negotiation going on and ZTE's at the table and Samsung's at the table, there's nothing about your dealings with ZTE, your knowledge about ZTE, that would put ZTE a little bit ahead in that negotiation?

THE PANEL MEMBER: No.

MS. SMITH: Okay. Thank you, ma'am.

All right. Some of you checked a box that you had some impression of GComm before coming in today. I don't think you're going hear that GComm makes any products or anything of that nature, but was there anyone, now that you've heard a little bit more about GComm because there could have been some misunderstanding, it sounds a little bit like other companies, anybody heard of GComm or have any dealings with GComm before coming in today? All right.

Now, I don't think Mr. Pitcock, again, is going to claim to have invented anything in this case himself, but he certainly owns these patents.  And so I'm interested in visiting with Mr. Cline, Juror No. 7.

I think I read in your questionnaire that it was your great grandfather that was an inventor?

THE PANEL MEMBER:  Yes.

MS. SMITH:  Tell me about that.

THE PANEL MEMBER:  They invented the first prerig plastic fishing lure and weedless hook.

MS. SMITH:  Did he get a patent on it?

THE PANEL MEMBER:  He did.

MS. SMITH:  What did he do after he got a patent on it?

THE PANEL MEMBER:  They had a brick-and-mortar sporting goods store from the late 1960s to the early 1970s.

MS. SMITH:  Okay.  Ever need to file a lawsuit --

THE PANEL MEMBER:  I don't believe so.

MRS. SMITH:  Okay.  All right.  Now, again, Mr. Pitcock isn't an inventor here, but you've got an inventor in your family and we're dealing with patents.  So any reason that I should lose sleep if you're on this jury because the gentleman that owns the patents, you may have some connection to him?

THE PANEL MEMBER:  No, ma'am.

MS. SMITH:  Okay.  Thank you, sir.  Appreciate it.
All right.  I believe Mr. Cadman, you're actually an inventor.  Correct?

THE PANEL MEMBER:  Of sorts.

MS. SMITH:  Well, tell me what sorts.

THE PANEL MEMBER:  Well, I've designed a number of farm implements for chicken production, mobile chicken coops.

MS. SMITH:  Okay.

THE PANEL MEMBER:  Roll out nest boxes, conveyor belts, things like that.

MS. SMITH:  Okay.  Have you pursued a patent on any of it?

THE PANEL MEMBER:  No.

MS. SMITH:  Any reason why not?

THE PANEL MEMBER:  A couple of reasons.  Every time I invent something, I see all the things I should have done differently, and so I feel like I'm already ahead of the curve for the next rendition.  And I never put anything into production for sale.

MS. SMITH:  All right.  Any reason why I should worry about you feeling, I guess, some connection or leaning towards the Plaintiff in this case before we get started?

THE PANEL MEMBER:  No.

MS. SMITH:  Okay.  Thank you, Mr. Cadman.  Appreciate it.

All right.  Ms. Truelove told you a little bit about Mr. Pitcock and GComm's business model, that they are -- they buy these patents as investments, if you will.  Has anybody ever heard of that business model before coming into court where you're not the inventor but you buy some patents and then ultimately end up in litigation?  Anybody ever hear anything about that?  Okay.

Has anybody ever read anything, any articles or anything, about that business model?  Okay.

All right.  Let's see.  Who haven't I heard from?  Juror No. 14, Mrs. Reese.

All right.  I want to talk about what's fair and what's reasonable with you.  Now, let's say you have some land and it's out in the middle of nowhere, out in the country.  Okay?  Okay.  And you've got, let's say, 10 acres and there's folks around you that have 10 acres, but you're kind of what I call landlocked.  Do you follow me?  No way in, no way out.  Okay?  So the county comes up with a deal and says, you know what?  We're going to build a road, but everyone needs to pitch in, everyone needs to pitch in some land.  And the land, we'll pay you for that land, we'll give you $2,000 for that land, everyone's pitching in half an acre and they're getting $2,000.  Follow me?  Okay.

And everyone's in favor.  It's going to, you know, allow everyone to travel to the main highway, if you will.  But

there is one landowner that says, you know what?  I live at the end of the line and you can't do this without me, so I'm not taking the same $2,000 everyone else is taking, I want $200,000.  Do you think that would be fair?

THE PANEL MEMBER:  I don't think that's fair.

MS. SMITH:  And do you think it would be reasonable?

THE COURT:  Mrs. Reese, hold the microphone a little closer, please, or speak up.

THE PANEL MEMBER:  I'm sorry.  Ask your question again.

MS. SMITH:  Same piece of land, same location, half an acre, benefits everybody, everybody's given their half acre up for $2,000, and this one guy says, you have to have mine, you can't do it without me, so I'm going to charge you $200,000 so there is no road made.  Not a very fair deal.  Correct?

THE PANEL MEMBER:  Un-huh.

MS. SMITH:  Thank you, ma'am.

All right.  Everyone agree with that?  Does anyone disagree with that?  Mr. Cadman, do you agree or disagree?  You're a landowner.  Right?

THE PANEL MEMBER:  I am.  So, you know, on one side of the coin, it's my land and I can do whatever I want with it, I feel like.  However, there's probably lots of laws in this country that say otherwise and we really don't truly own

the land if we stop paying taxes and things like that.  So I guess you'd have to go back to the law books again.

MS. SMITH:  Well, what if the law book tells you that you have to be fair and you have to be reasonable?  What if that's the law for this transaction, you have to be fair and reasonable?  Would that $200,000 hold-up be fair or reasonable?

THE PANEL MEMBER:  Well, if everybody -- if it was determined that the road must go in, then that would not be fair and reasonable.  If it's on the table whether the road may go in or not, then the landowner can probably say no deal.

MS. SMITH:  Thank you, sir.  Appreciate it.

All right.  And we're kind of easing into negotiations.  And I think we've all been involved in some negotiation in life.  Correct?  Raise our hands.  Everybody.  Juror No. 11, you are shaking your head, so we will -- Mr. Soape, we'll work with you.

Tell me what kind of negotiations you've engaged in in life.  Bought the car, bought a house?  Anything like that?

THE PANEL MEMBER:  I don't recall any negotiations necessarily, but I have bought cars and negotiated that way for sure.

MS. SMITH:  There we go.  So when you go out to buy a car, do you take the first price they offer?

THE PANEL MEMBER:  I try to get the best price I can

get.

MS. SMITH:  Okay.  Do you -- in trying to get the best price you can get, do you maybe do a little research to see if the dealership sold the same car?

THE PANEL MEMBER:  Yes.

MS. SMITH:  What price they may have sold the same car for.  Correct?

THE PANEL MEMBER:  Yeah, I do all kinds of research to get the best buy.

MS. SMITH:  Okay.  You may look at other dealerships as a price point and see what they sold the same car for.  Correct?

THE PANEL MEMBER:  Correct.

MS. SMITH:  Okay.  Well, what I will tell you is in this case there will be licenses from -- that ZTE has been involved in, that Samsung has been involved in previously.  And so when you're tasked with finding a royalty, if any, I believe somebody may ask you to take a look at those licenses.  That's something you'd be comfortable with.  Correct?

THE PANEL MEMBER:  Yes.

MS. SMITH:  Something that makes sense when you're trying to set a price for something to see maybe what it went for or what similar deals were?

THE PANEL MEMBER:  Yes.  Some research.

MS. SMITH:  Thank you, sir.  Appreciate it.

THE PANEL MEMBER:  Yes.

MS. SMITH:  Juror No. 10, Mrs. Smith.

THE PANEL MEMBER:  Yes, ma'am.

MS. SMITH:  All right.  Same kind of question.  What kind of negotiations have you been involved with?

THE PANEL MEMBER:  Car, home.

MS. SMITH:  Cars.  Our homes.  Let's do homes with you, do something different.

Did you do some research before you pulled the trigger on --

THE PANEL MEMBER:  Not really.

MS. SMITH:  Well --

THE PANEL MEMBER:  I was a first-time buyer.  I mean, I knew what I wanted, I knew what I could afford.

MS. SMITH:  Okay.

THE PANEL MEMBER:  So that's what I did, you know.

MS. SMITH:  Do I have a home to sell you.  My home is for sale right now.

THE PANEL MEMBER:  I probably couldn't afford it.  But, no, you know, you have to do what you can afford, so...

MS. SMITH:  Right?

THE PANEL MEMBER:  You can't go up --

MS. SMITH:  I'm sorry, ma'am.

THE PANEL MEMBER:  No.  Cars, I buy what I can afford.

MS. SMITH: Okay.

THE PANEL MEMBER: I mean, of course, there's negotiation there, but there's not negotiation there to some degree.

MS. SMITH: Well, would you look at a Blue Book and see what some cars are going for, for instance?

THE PANEL MEMBER: Yeah. You don't want to get ripped off.

MS. SMITH: Yes, ma'am. Look at the -- I'm just talking about comparables or similar cars. You'd look around to make sure at least you were getting a deal that's fair and reasonable and similar to the other similar deals. Correct?

THE PANEL MEMBER: Yes, absolutely.

MS. SMITH: Thank you, ma'am. Appreciate it.

THE PANEL MEMBER: Uh-huh.

MS. SMITH: All right. ZTE and Samsung are not small companies, and they will be at the negotiating table, but Mr. Pitcock and GComm are not as large as the major telecom companies. Some of you in your questionnaires responded to a question, and the question was whether or not you agree or strongly agree whether small businesses have little chance with dealing with larger companies.

So I'm going to start with Mr. Ratliff.

You, sir, said you strongly agree that businesses have -- smaller businesses have a chance when dealing with larger

companies.  Tell me about why you said that.

THE PANEL MEMBER:  A lot of times I feel they don't have a chance because they don't have the resources in order to deal with the larger companies, basically.

MS. SMITH:  Okay.  Anything about that -- again, ZTE and Samsung are at the negotiating table, but we do have a smaller company in the room.  Anything about that that might impact your ability to have both sides starting out in the same place, starting out on even ground in this case?

THE PANEL MEMBER:  As far as having Samsung and ZTE starting out in an even place?

MS. SMITH:  Yes, sir?

THE PANEL MEMBER:  No.

MS. SMITH:  As far as having Samsung and GComm, the Plaintiff, in this case starting out even in this case?

THE PANEL MEMBER:  I mean, it's kind of like a yes and a no because, I mean, it's like, yes, he can be, they can be in the same place, and then again they can't as far as --

THE COURT:  Mr. Ratliff, would you hold that up?  I can't hear you.

THE PANEL MEMBER:  Sorry.  I say yes and -- and no, because I don't know the length of how long -- was it GComm?

MS. SMITH:  Yes, sir.

THE PANEL MEMBER:  -- has been around --

MS. SMITH:  Yes, sir.

THE PANEL MEMBER:  -- or anything like that.  That's why I say, yes, they may be, because they have been around --

MS. SMITH:  Okay?

THE PANEL MEMBER:  -- and have the experience that Samsung has.  No, because maybe they're newer, may get stomped over or something like that.  So --

MS. SMITH:  I mean, I'll tell you, this is always fascinating to me, but Samsung started out a gazillion years ago selling groceries.  I mean, they have been around a long time --

THE PANEL MEMBER:  Uh-huh.

MS. SMITH:  -- and then they moved into small electronics, and look where they are now.  So I can tell you that GComm has not been around as long as Samsung.  Does that cause you to slightly favor GComm as you stand there right now?

THE PANEL MEMBER:  I mean, I would look at GComm as far as being the -- the underdog of the situation because they don't have the amount of years that or whatever that Samsung has.

MS. SMITH:  And so after establishing them as the underdog, I mean, I meet people all the time in this process and they say, you know, my favorite movie was *Rocky,* I love *Secretariat,* I am a champion of the underdog, and that starts me out favoring the underdog.  Did I get that right?  Is that

where you are?

THE PANEL MEMBER:  Honestly, yes, I'm more favorable to underdogs than anything.

MS. SMITH:  And that just causes you to ever so slightly start leaning to the Plaintiff.

THE PANEL MEMBER:  Kinda.

MS. SMITH:  I appreciate your honesty.  Thank you.

Anybody else on the first row have the same feeling as Juror No. 1, Mr. Ratliff?  Anyone on the second row?

All right.  Juror No. 14.

Mrs. Reese, talk to me.

THE PANEL MEMBER:  I just have a heart for the underdog.  Always have.  I can't explain it.

MS. SMITH:  And I respect that and appreciate that. And so my question is this:  Because there is a smaller company on the Plaintiff's side of this case, might you be a better fit for a different case, knowing that you kind of start out leaning towards the underdog?

THE PANEL MEMBER:  Possibly.

MS. SMITH:  Fair to say that when the underdog is involved, Samsung is involved, you will lean ever so slightly in the beginning towards the Plaintiff?

THE PANEL MEMBER:  Uh-huh.

MS. SMITH:  Thank you, ma'am.  Appreciate it.

THE COURT:  You have five minutes remaining.

MS. SMITH:  Thank you, Your Honor.

Juror No. 15, Mr. McDaniel?

THE PANEL MEMBER:  Yes.

MS. SMITH:  Same type of feelings?  I read your questionnaire.  You answered that question that you might start leaning a little or you strongly believe that when a small company is up against the larger one, they don't have a chance.  Can you tell me about that?

THE PANEL MEMBER:  I don't necessarily think that they don't have a chance.  I think they're a little bit disadvantaged because they don't have the power, the resources, the finances, or the experience to be able to stand up as much.  I mean, but then again, the big company is a big company for a reason.

MS. SMITH:  Should that make me, you know, lose sleep at night if you make this jury, you know?  Can I know with certainty?

THE PANEL MEMBER:  No, no.

MS. SMITH:  With certainty, everyone's starting on the same playing field, everyone's starting out even?

THE PANEL MEMBER:  I think so, yes.

MS. SMITH:  Thank you, sir.  I appreciate it.

All right.  One more question.  In recent years -- there was a question on your questionnaire that said, in recent years I think damage awards in lawsuits have been way

too low.

I want to talk to Juror No. 17 because I haven't spoken with you yet, Mr. Andrews.  You told us that jury awards and lawsuits have been too low in recent years.  Tell me about that.

THE PANEL MEMBER:  I feel like it's been low because, like he was saying, the big dogs, I mean, they just walk in and stomp over them.  So you're going to take this or take nothing.

MS. SMITH:  Well, and I'm not saying Samsung's a big dog, but it is -- it is not small.  So knowing that this is a damage case, you think awards have been too low, need to be higher.  Right?

THE PANEL MEMBER:  I guess, yes.

MS. SMITH:  And knowing that you favor the smaller company, do you start out leaning a little towards Plaintiff, just ever so slightly, as you stand there?

THE COURT:  Mr. Andrews, you're going to have to hold that mic up so I can hear you.

THE PANEL MEMBER:  No, I don't.

MS. SMITH:  No?

THE PANEL MEMBER:  I mean -- no.  Is it on?

THE COURT:  It is now, yeah.

THE PANEL MEMBER:  I don't -- I don't -- I don't lean towards either side, you know, because just being

honest --

MS. SMITH:  Yes, sir.

THE PANEL MEMBER:  -- I'm listening to everything. I really don't have no opinion which way or other, you know.

MS. SMITH:  So all I need to know is Samsung and GComm are starting off exactly even with you.

THE PANEL MEMBER:  I guess.  I mean, I don't know. I mean, I listened to what you saying.

MS. SMITH:  Yes, sir.  Yes, sir.

THE PANEL MEMBER:  She works for GComm.

MS. SMITH:  Yes, sir.

THE PANEL MEMBER:  She going to convince us to stand on GComm's side.

MS. SMITH:  Uh-huh.

THE PANEL MEMBER:  You work for Samsung.

MS. SMITH:  Yes, sir.

THE PANEL MEMBER:  You going to convince me to say, hey, be fair with my side.

MS. SMITH:  That's right.

THE PANEL MEMBER:  She's going to say the same thing.

MS. SMITH:  Yes, sir.

THE PANEL MEMBER:  So -- and, plus, we are in a court of law so you have to be fair all the way around.

MS. SMITH:  And that's my question.  I just want to

make sure, as you stand there this morning, that you're not leaning one way or another without hearing any of the evidence yet.

THE PANEL MEMBER:  No.

MS. SMITH:  Okay.

THE PANEL MEMBER:  Because I don't know what's going on.  I mean, from what I've heard, that's all I know.

MS. SMITH:  Okay.  Thank you, sir.

All right.  Anyone out there thinking, you know, I haven't -- there were several of you that hadn't had jury service before.  Anyone thinking, man, I have heard enough, I cannot wait to be on this jury.  I'm not telling a joke. Occasionally people raise their hands.  Anybody have any interest in serving on this jury?  No.  All right.

Last question.  You know, I -- I try to think of every question I can.  It might not be as eloquent as I'd like, but I stay up late trying to figure out the right questions to ask you-all to understand if you start out leaning a little bit towards Plaintiff, and I can't always come up with the right questions.

THE COURT:  You have one minute remaining.

MS. SMITH:  Yes.  Thank you, Your Honor.

So my last question is this:  Is there anyone out there thinking, You know what?  If Ms. Smith just asked me this one question, I would tell her that either I'm leaning a little

towards Plaintiff or I'm just not the best fit for this case or there's some compelling reason you don't need to be serving this week as well?  Anyone in any of those categories?  I see heads -- no hands.

Well, once again, on behalf of Samsung, on behalf of lead counsel, Mr. Cordell, and our entire trial team, and Mr. Waitley, our corporate representative, we thank you for your time and look forward to visiting with the eight of you that are lucky enough to be chosen.

Thank you, Your Honor.

THE COURT:  All right.  Counsel, approach the bench, please.

(The following was had outside the hearing of the jury panel.)

THE COURT:  Let me say this before I forget it.

When Mr. Andrews was answering Ms. Smith's questions, Mr. Sheasby and to some extent Ms. Truelove were visibly shaking their heads up and down in agreement with him.  I don't need any non-verbal communication going on.  No head shaking side to side or up and down.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  Okay.  Does Plaintiff have any challenges for cause?

MS. TRUELOVE:  Juror No. 2, inability to -- or requiring a higher burden of proof on damages.

And then Juror No. 26, on owning stock, although I don't know if we'll make it that far.

THE COURT:  It's my view that 26 would be disqualified as being a partial owner in the company, holding stock.  Does anybody disagree with that?

MS. SMITH:  I don't disagree with that.  I don't think we're going to reach him.

THE COURT:  I don't think we're going to reach him, either, but I don't think he's qualified to serve.  I mean, even if it is ever so slight, an interest in the company itself, so he's disqualified in my view.

MR. SHEASBY:  No. 2, she couldn't trust what happened previously.

THE COURT:  All right.  2 and 26.  Ms. Truelove, anybody else?

MS. TRUELOVE:  No one else for Plaintiff.

THE COURT:  All right.  Ms. Smith, does Defendant have challenges for cause?

MS. SMITH:  Yes--1, 12, and 14.

THE COURT:  All right.  And the only one that's indicated a scheduling problem is No. 19, Mrs. Johnson.

MR. SHEASBY:  That's correct, Your Honor.

THE COURT:  All right.  We'll bring them up one at a time, if you-all will take your seats, and I'll let everybody recess except these folks.

(The following was had in the presence and hearing of the jury panel.)

THE COURT:  All right, ladies and gentlemen.  I'm going to let most of you recess for a break in just a few seconds.  When I excuse you for recess, if you'll exit the courtroom through the double doors, and when you go through those double doors, if you'll take a left and go around the corner, you'll find the restrooms and the water fountain.  That might be of interest to some of you.

Also, ladies and gentlemen, while you're on recess, I'm going to ask you not to leave the building and not to go to any other floor in this building.  Stay on this floor, stay inside the building.

Also, ladies and gentlemen, while you're on recess, don't discuss anything that's happened in the courtroom this morning.  Let me just make this abundantly clear for everybody.  You have heard no evidence in this case at this point.  Nothing you've heard is evidence in this case.

So if you'd like to have a conversation with somebody, maybe you're from the same small town or you're from the general area, feel free to have a conversation during recess with anybody you'd like to, although you're not required to.  But if you do have a conversation with somebody else, talk about your family, your grandkids, talk about sports, talk about the weather, talk about anything you want to talk about,

but don't talk about anything that's happened in the courtroom because, again, there has been no evidence presented in this case so far, none whatsoever.

With that said, I'm going to ask the following members of the panel to stay behind so that I can talk with you briefly here at the bench one at a time.  And when everyone else recesses, if you'll just let the rest of the members of the panel slip around you and leave the room, if you'll stay where you are, please.

And the folks I'm going to ask to stay behind are Panel Member No. 1, Mr. Ratliff; No. 2, Mrs. Bothman; No. 12, Mr. Rager; No. 14, Mrs. Reese; No. 19, Mrs. Johnson.

So in reverse order--19, 14, 12, 2, and 1.

Everybody else, if you'll follow those instructions I've given you, you're excused for recess at this time.

(Whereupon, the jury panel left the courtroom.)

THE COURT:  All right.  Be seated, please.

Counsel, approach the bench.

(The following proceedings were had at the bench.)

THE COURT:  And, Mr. Ratliff, would you come up and join us here?

(The Panel Member approached the bench.)

THE COURT:  This is our microphone, Mr. Ratliff, and you and I are just going to talk quietly here --

THE PANEL MEMBER:  Yes, sir.

THE COURT:  -- if that's okay with you.

THE PANEL MEMBER:  Uh-huh.

THE COURT:  As a part of the process this morning, you said that you tend to favor the underdog and you view G+ as the underdog.  And I think, in response to Ms. Smith's question about would you, quote, ever so slightly lean toward the Plaintiff before the case gets started and before you hear any evidence, you indicated that you might.

What I need to know, Mr. Ratliff, is, can you treat both of these companies the same even though one is a bigger company than the other one, and can you make a decision if you're on this jury based solely on the evidence that comes in during the trial, the sworn testimony of the witnesses and the exhibits that the Court admits into evidence, only those things?  Because that's the evidence in this case.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  And the fact that Samsung is a big international company and that GComm, who bought these patents from ZTE, is a small company, I think you're going to hear the evidence that GComm is basically Mr. Pitcock.  There's not 10 employees.  There's probably one employee.

THE PANEL MEMBER:  Right.

THE COURT:  It's basically a very small entity.  Can you set that aside and let that dichotomy between the big company and the little company, can you make sure that doesn't

influence you in any decision and that you'll make your decision only from the evidence?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Can you do that?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Don't have any doubts about that?

THE PANEL MEMBER:  No.

THE COURT:  Okay.  Do you have questions for Mr. Ratliff, Ms. Smith?

MS. SMITH:  No, Your Honor.

THE COURT:  Okay.  Mr. Ratliff, I'm going to let you join the rest of the group outside.  Just don't discuss anything we talked about in here.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Thank you, sir.

(The Panel Member left the courtroom.)

THE COURT:  All right.  Challenge for cause on Mr. Ratliff is overruled.  He stays on.

Mrs. Bothman, would you come up, please?

(The Panel Member approached the bench.)

THE COURT:  Good morning.

THE PANEL MEMBER:  Good morning.

THE COURT:  This is the microphone.  If you and I can just talk quietly here, Mrs. Bothman.

THE PANEL MEMBER:  Can I -- may I say something?

THE COURT:  Sure.

THE PANEL MEMBER:  I was so nervous this morning.

THE COURT:  I haven't bitten a juror yet.

THE PANEL MEMBER:  I am retired from the school for 20 some years, but not from Gladewater.  It was only like 17 years from Gladewater.

THE COURT:  Okay.

THE PANEL MEMBER:  So I wanted to clarify that.

THE COURT:  Glad you did.

What was the other school district?

THE PANEL MEMBER:  Sabine ISD.

THE COURT:  Okay.  Well, thank you for doing that.

This is real simple.  It's not anything to be nervous about.

The questions I need to ask you about, Mrs. Bothman, are, it was discussed earlier this morning that the issue of Samsung having been found in this earlier trial to infringe certain patents and that those patents were valid has already been established for purposes of this trial.  And I've made it as clear as I can that Samsung doesn't agree with that result and they're going to challenge that result at a later time.

But before that challenge can go forward, the issue of what kind of money damages, a reasonable royalty, is appropriate in this case has to be set, and that earlier jury did not set that properly.  And so I've ordered a new jury to

come in for this one purpose, and that is to determine what is fair and reasonable compensation.

Now, you don't have to go back and this jury doesn't have to go back and determine all over again whether Samsung did or didn't infringe these patents, and you don't have to go back and determine whether those patents are or are not valid, but you do have to accept that premise that that decision for purposes of this trial has already been made.

And then based on that premise, not going behind it, accepting that premise, you then have to -- this jury will be asked to decide based on the evidence what is reasonable compensation for that infringement.  And that's really the only question this jury's going to have to answer.

Now, I know you said you like things black and white, don't like gray, and I know you said you like things written down and simple, but this jury is going to have to listen to competing evidence and will probably hear two different stories about what is reasonable and what is fair and what's not reasonable and what's not fair and then make a decision.

Do you think you can accept the premise for this trial that the decision about liability, about infringement and validity, has already been made, or are you going to feel like unless you can go back to the very beginning and make that decision for yourself all over again, you can't answer the question about damages?

THE PANEL MEMBER:  I don't think so.  I would be comfortable.

THE COURT:  Okay.  Now, one other thing you said I want to ask you about.  There was some question about the preponderance of the evidence standard, more probably true than not true.  And there are a lot of examples given--the scales tip ever so slightly, sometimes they say in a football context you get the football just over the 50-yard line.  There are various examples --

THE PANEL MEMBER:  Yes.

THE COURT:  -- but it's a slight majority of the evidence.  And if a slight majority of the evidence indicated that this number was fair and reasonable for Samsung to pay and GComm to receive, could you go along with that?  Or do you feel like slightly more than 50 percent's not enough; that it needs to be two-thirds or three-fourths or some different percentage?

THE PANEL MEMBER:  No.

THE COURT:  Because the Court's going to instruct the jury that that preponderance of the evidence standard, that slightly more than 50 percent, is the proper standard to apply.

And I guess my question is, if I instruct the jury that that's the basis, the standard to apply, can you do that if you're on this jury?  Or do your feelings about needing a

higher standard interfere with you being able to do that?

THE PANEL MEMBER:  No.

THE COURT:  You think you can do that?

THE PANEL MEMBER:  Uh-huh.

THE COURT:  Okay.  Ms. Truelove, do you have any questions for Mrs. Bothman?

MS. TRUELOVE:  No, Your Honor.  Thank you.

THE COURT:  All right.  Mrs. Bothman, I promise nobody's going to make this hard for you.

THE PANEL MEMBER:  I just felt bad for saying what I did, and it wasn't right.

THE COURT:  That's an honest mistake.  No problem.

THE PANEL MEMBER:  It's just I'm nervous.

THE COURT:  I'm going to let you join the rest of the panel outside the courtroom.  Just don't discuss anything we talked about in here.

THE PANEL MEMBER:  Okay.  Thank you.

THE COURT:  Thank you, ma'am.

(The Panel Member left the courtroom.)

THE COURT:  All right.  Plaintiff's challenge for cause on Mrs. Bothman is overruled.  She stays on the panel.

Mr. Rager, would you come up, please?

(The Panel Member approached the bench.)

THE COURT:  How are you, Mr. Rager?

THE PANEL MEMBER:  Good.  How are you?

THE COURT:  Good.  This is the microphone.  If we could talk quietly up here, that would be good.

You know, I've spent half of my weekend waiting for a call back from a customer service 800 number.

THE PANEL MEMBER:  Uh-huh.

THE COURT:  I know exactly what you're talking about.  But I have to ask you, because they didn't give you any feedback on your ice maker, is that going to keep -- is that going to be a factor in your mind when it comes down to what is fair and reasonable compensation for Samsung to pay and G+ to receive based on this earlier finding of infringement?

Or is that something that it happened, but you're not going to let it influence any decision you would make?  And there's not a right or wrong answer.  And if it's going to be a problem, now is the time to find out.

THE PANEL MEMBER:  Yeah.  I mean, to be honest, when I bought my home, I bought all the Samsung products, washer/dryer, and, you know, I've had issues with it, and I've tried hard to get them all fixed.  Now, they did respond and come fix the washer because there was like a recall because apparently, when it went into spin cycle, the lid would fly off.  But the refrigerator, you know...

THE COURT:  So the refrigerator's not the only problem you've had with a Samsung product.

THE PANEL MEMBER:  Correct.  And, I mean, I can sit here and tell you that, you know, I can be fair, and I think I can, but, you know...

THE COURT:  You can't tell me beyond a doubt that that wouldn't influence you.  Is that right?

THE PANEL MEMBER:  Right.  You know, and I was also involved in a case of my own where I was injured and, you know, it's --

THE COURT:  So have you been a plaintiff in a lawsuit before?

THE PANEL MEMBER:  Yeah.  And I've been sued a couple of times, but, you know, we settled right before we went to trial.  But, you know, I remember thinking, you know --

THE COURT:  Let me ask it another way.  No matter what experiences you've had, whether it's with other lawsuits or appliances or something that we haven't talked about at all, can you tell me that you're satisfied--only you know this--but can you tell me that you're satisfied that none of those experiences are going to influence how you would determine what's fair and reasonable compensation if you're on this jury?  If you're -- can you answer that for me just as honestly as you can?

THE PANEL MEMBER:  Honestly, I mean, I feel like this probably isn't the right jury for me.

THE COURT:  Okay.

THE PANEL MEMBER:  Just because of my personal experience with Samsung and with, you know, being --

THE COURT:  Well, there's a difference, Mr. Rager, besides what we want to do and what we think we can do?

THE PANEL MEMBER:  Right.  I mean --

THE COURT:  And it sounds like to me you say you want to be fair, but you're not completely sure you can be.

THE PANEL MEMBER:  Right.  I'm not a hundred percent, but, you know, I don't know.  I don't know any other way to say it.  I'll do my best, but...

THE COURT:  Okay.  Ms. Smith, do you have any questions for Mr. Rager?

MS. SMITH:  I do not, Your Honor.

THE COURT:  All right.

THE PANEL MEMBER:  Am I done?

THE COURT:  Do you have questions, Ms. Truelove?  You look like you do.

MS. TRUELOVE:  If the Court would allow me.

You do understand, Mr. Rager, that this suit has nothing to do with washers and dryers --

THE PANEL MEMBER:  I do.

MS. TRUELOVE:  -- and refrigerators; it has to do with patents and the technology that goes into phones; and really not even that, just what should be --

THE PANEL MEMBER:  Right.

MS. TRUELOVE:  -- paid, if anything, for the use of that technology.  And just putting it in that context, is that a situation where you believe you could listen to the evidence as it relates to damages that are potentially owed or could be owed relating to use of patents, since it doesn't have anything to do with --

THE PANEL MEMBER:  I mean, you know --

MS. TRUELOVE:  -- household appliances?

THE PANEL MEMBER:  I get that.  But in my mind, you know, am I going to want to stick it to Samsung a little from my bad experience?  I mean, I say no, but I don't know.

THE COURT:  Okay.

THE PANEL MEMBER:  I'm sorry.  It's just a battle for me.

THE COURT:  There's not a right or wrong.  And, believe me, if there's an issue, now's the time to find out.

Okay.  Mr. Rager, I'm going to let you join the rest of the panel outside the courtroom.  Just don't talk about anything we've talked about in here.

THE PANEL MEMBER:  Thank you.

(The Panel Member left the courtroom.)

THE COURT:  I'm going to sustain the challenge for cause of Mr. Rager.  He's excused.

Mrs. Reese, would you come up?

Good morning.

THE PANEL MEMBER:  Good morning.

THE COURT:  How are you?

This is the microphone.  We're just going to try to talk quietly here, Mrs. Reese.

In responding to some questions this morning, you said that you favor the underdog, and that my understanding of what you said is that you might lean toward Plaintiff because of that and view them as the underdog in this situation.

You know there's not a right or wrong here.  But if somebody is going to be influenced by any of those prior experiences, now is the time for me to find out --

THE PANEL MEMBER:  Uh-huh.

THE COURT:  -- because the jury that hears the evidence in this case needs to be able to commit that they will make their decision based solely and only on the evidence that comes in during this trial, and anything else that ever happened, any prior experience, anything they bring with them, as we all do, is not going to have any impact on that process and that decision.

And if you can tell me that you're satisfied that you can treat these two companies the same, you can listen to their respective witnesses, you can judge the credibility of each witness, which story you believe and which story you don't believe, because this jury is, in all likelihood, going to

hear two different stories about why a big number is fair and reasonable or a much smaller number is fair and reasonable, and they're going to have to decide who to believe and who not to believe.

And if your perception of the Plaintiff as an underdog and your tendency to favor underdogs is going to be a factor, then now's the time for me to know about it.  If you're satisfied that it won't be and you can make any decision if you're on this jury based solely and only on the evidence, then that's something I need to know.  But that's really the question.

THE PANEL MEMBER:  I think I would -- I think I would still sway toward the underdog.  That's just how I am.

THE COURT:  Okay.  Well, you know, I went to Baylor University and I don't root for anybody but the underdog because we were the underdog in every game we ever played.  I understand that.

Do you have any questions of Mrs. Reese, Ms. Smith?

MS. SMITH:  I don't.

THE COURT:  Okay.  All right.  I'm going to let you join the rest of the panel outside, Mrs. Reese.  Just don't discuss anything we've talked about in here.

THE PANEL MEMBER:  Okay.

THE COURT:  Thank you.

THE PANEL MEMBER:  Thank you.

(The Panel Member left the courtroom.)

THE COURT:  I'm going sustain the challenge for cause to Mrs. Reese.

Mrs. Johnson, would you come up, please?

Good morning.

THE PANEL MEMBER:  Good morning.

THE COURT:  How are you?

THE PANEL MEMBER:  Good, thank you.

THE COURT:  This is the microphone.  We're just going to talk quietly here at the bench, Mrs. Johnson.

When I started, I asked if anybody would have a serious impediment to being here throughout the trial if they were selected, and you raised your hand.  Tell me about that.

THE PANEL MEMBER:  I work with emotionally disturbed children at Hallsville ISD.

THE COURT:  Yes, ma'am.

THE PANEL MEMBER:  And the Texas Education Association, TEA, has mandated two dates this week, Tuesday and Thursday, for standardized testing.  I'm responsible for administering these standardized tests also on Wednesday, but Wednesday can be rescheduled within the testing window. Tuesday and Thursday are firm dates that cannot be rearranged.

THE COURT:  Is there anybody else that can administer this test at Hallsville ISD?

THE PANEL MEMBER:  Yes.  There are qualified

individuals who can administer the test, but it would not be in the best interest of my students.

THE COURT:  Okay.

THE PANEL MEMBER:  So I thought I'd bring it up and you can make your best judgment, as that is your job.

THE COURT:  It is.

Did you ever work with Carol Greer at Hallsville ISD?

THE PANEL MEMBER:  No.

THE COURT:  Okay.  She's retired now.  I know her quite well.

Is there anything else about that issue that I need to know about that you haven't explained to me?

THE PANEL MEMBER:  No.  No, sir.

THE COURT:  Okay.  All right.  Well, I'm going to let you join the rest of the panel outside, Mrs. Johnson.  Just don't discuss anything we talked about in here.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Thank you very much.

THE PANEL MEMBER:  Thank you.

(The Panel Member left the courtroom.)

THE COURT:  Mrs. Johnson stays on the panel.

I don't see any reason to call Mr. Hicks up here.  Does anybody else see it differently?  I don't even think he's in the courtroom anymore, as a matter of fact.

Okay.  So 12 and 14 have been excused.  We're going to

seat eight.  Each side strikes four.  That's 16.  Two more should take us through 18.  Is that correct?

MS. SMITH:  So we could excuse her if she's not going to be used?

THE COURT:  Say that again?

MS. SMITH:  You could excuse 19.

MR. SHEASBY:  We won't get to her.

THE COURT:  It's going to be the same result whether I excuse her or she's not reached.  She's not going to be on the jury.

MS. SMITH:  That's true.  I just thought you might want to make her day, Your Honor.

THE COURT:  Her day will be made when she's excused as somebody not selected.

MS. SMITH:  I understand, Your Honor.

THE COURT:  All right.  It's 20 minutes until 12:00.  Have your strike list back to Ms. Brunson by 12:00.  All right?

MR. SHEASBY:  Thank you.

MS. TRUELOVE:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury panel.)

THE COURT:  All right.  While counsel exercise their peremptory challenges, the Court will stand in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Counsel, is there anything we need to take up before we announce the members of the jury?

MS. TRUELOVE:  Yes, Your Honor.  I want to address one matter about the strikes.

THE COURT:  Approach the bench, counsel.

(The following was had outside the hearing of the jury panel.)

THE COURT:  All right.  What do you have, Ms. Truelove?

MS. TRUELOVE:  Yes, Your Honor.

My understanding is I understand that Defendants have made two strikes, Juror No. 1 and Juror No. 9.  We don't think that there has been a prima facie case established for a race-neutral reason for striking Juror No. 9, which is on the first page, Miss Archield.

THE COURT:  All right.

MS. TRUELOVE:  So we have a *Batson* challenge.

THE COURT:  What's Defendants' position with regard to a race-neutral basis for the exercise of that peremptory challenge with regard to Venire Member No. 9?

MS. SMITH:  Miss Archield, she is a CPS caseworker for 25 years.  She specifically is a caseworker for elderly and disabled people, a helping position, traditionally a plaintiff's juror.

Ms. Truelove spent a fair amount of time talking about her time as an assistant DA and speaking with or to that juror as to their mutual connection.  Ms. Truelove's job was to take children into custody and take them out of households, similar to what Miss Archield is doing.

MS. TRUELOVE:  Well, if that is the case, then the strike should be made for other people that are in helping professions, which would be the customer service profession that Mr. Soape is in.  It has to go across the board.

MS. SMITH:  Mr. Soape was in customer service for Blue Cross Blue Shield.  His job is denying claims.

THE COURT:  I don't think, quote, helping professions is targeted or tailored enough to where it should apply in every case to everybody.  These all have to stand up on their own individual basis.

I'm satisfied that the basis Defendants have enunciated is adequately race neutral.  I'm going to deny the *Batson* challenge.

MS. TRUELOVE:  Okay.  Thank you, Your Honor.

MS. SMITH:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury panel.)

THE COURT:  All right, ladies and gentlemen.  If you will listen carefully, if your name is called, come forward to the jury box.

Let me explain how we're going to do this before our Courtroom Deputy Ms. Brunson calls the actual names of the eight of you that have been selected as the jury in this case.

We're going to seat eight jurors from among this panel. I'd like the first four jurors on the front row of the jury box and the second four, 5 through 8, on the back row of the jury box.

Whoever's name is called first, when you come forward, if you would enter the front row of the jury box, walk all the way down to the last seat, and stand and remain standing in front of the last seat on the front row. The second person called for jury duty, if you would enter the jury box on the front row as well, walk down and stand in front of the third seat from the end; leave a vacant seat between Juror No. 1 and Juror No. 2. And then Juror 3 will do the same, Juror 4 will do the same.

And the Juror 5 will enter the back row, the second row of the jury box, walk all the way down to the last chair, and remain standing in front of that last chair. Then No. 6 will, as No. 2 did, go to the back row -- or will go to the second row of the jury box, walk down, and stand in front of the third seat.

My goal, ladies and gentlemen, is to have four on each row and to have a vacant seat between each member of the jury so you're not seated right next to each other. We have enough

chairs in the jury box to accommodate that.  And so we'll have the first four on the front row with a vacant seat between each of you, and we'll have the second four jurors, 5 through 8, on the second row or the back row of the jury box with a vacant seat between each juror.  And those will be your positions throughout the trial.

Also, I'm going to ask that all eight of you whose names are called, remain standing in the jury box until all eight of you are there and I give you further instructions.

So with that, I'm going to ask Ms. Brunson, our Courtroom Deputy, to call the names of the eight members of our panel who've been selected as jurors in this case.

THE CLERK:  Judy Bothman, Marsha Dawson, Jeffery Downs, Bradley Strube, Ilen Garcia, Debrenda Oden, Celita Smith, Karla Medina.

THE COURT:  Mrs. Medina, if you'll let Mrs. Smith go in before you.  You're No. 8.  You're the last one.  Thank you.

All right.  Ladies and gentlemen of the jury, I'm going to ask Ms. Brunson to administer the oath to you as jurors at this time.  If you'll each raise your right hands, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please have a seat, ladies and gentlemen.

Those of you on the panel who were not selected as jurors

in this case, I'm about to excuse you.  Before I do that, though, ladies and gentlemen, let me take a minute and say as emphatically as I can how much the Court appreciates your presence and your participation this morning.  Every one of you had other things to do today and other places to be that were important in your respective lives, and you set those aside and you appeared as summonsed and you presented yourself for jury duty in this case.

Even though you weren't selected, you have, nonetheless, done very real and important public service by being here, and I want you to know that not only the Court and the Court staff but the parties in this case, the lawyers in this case, everybody appreciates you being here and you presenting yourself for jury duty.  You are an important part of making the process work.  And even though you were not selected as jurors in this case, what you've done is important and it is worthy of an expression of gratitude and appreciation, and the Court certainly thanks you for what you've done.

Now, as you leave the courtroom in just a few minutes, if you will exit through the back doors and then go around to your right, you'll go right past the Clerk's Office where Ms. Clendening's office is.

I'm going to ask you to do a couple of things.  Please leave those very valuable numbers you have clipped to your clothing with Ms. Clendening.  We will use those again with

another jury.  Those are not souvenirs.

Also, if you need written -- a written statement from the Clerk's Office for an employer indicating where you have been this morning, why you were not otherwise at work, she has that kind of material and will be glad to furnish that to you.  If you have any questions about your service this morning, Ms. Clendening's office will be happy to help you and assist you in any way.

Again, ladies and gentlemen, thank you for being here.  I look forward to seeing you perhaps at a future date.  And when you come back in the future, I hope you'll have the same positive attitude that you've shown this morning.

With that, those on the panel not selected as jurors are excused.

(Whereupon, the jury panel left the courtroom.)

THE COURT:  All right.  Be seated, please.

Ladies and gentlemen of the jury, I'm going to excuse you for lunch in just a couple of minutes.  One thing I need to make you aware of is, throughout this trial, lunch is being provided to you each day by the Court.  It will be brought to you in the jury room.  You will not have to leave the building or go out into the community and look for a place to eat or stand in line.  That will make it easier on you and it will save us time which will help us move the process forward more efficiently.  So Ms. Clendening will have lunch for you in the

jury room when I excuse you in just a few minutes.

But before I do, I need to give you just a very few important instructions about your conduct as jurors.

First of all, ladies and gentlemen, do not discuss this case with anyone.  Do not discuss this case or communicate about it in the broadest sense of the term with anyone.  I promise you when you get home tonight, unless you live alone, when you walk through the door the first thing you're going to hear is, Tell me what happened in federal court in Marshall this morning.

Don't even try to answer that question, because even if you just try to answer it, you will almost assuredly violate this instruction.  You are not to communicate with anyone in any way about this case, and that includes the eight of yourselves, ladies and gentlemen.  Throughout this trial, you are not to communicate in any way with anyone about the case.

When you have heard all the evidence, when I have given you my final instructions on the law that is to apply, when counsel for the competing parties have presented their closing arguments to you, at that point I will say, "Ladies and gentlemen of the jury, you may retire to the jury room to deliberate on your verdict."

Now, at that point, ladies and gentlemen, it's in my mind like a light switch gets turned off or on--you go from being prohibited from discussing the evidence among the eight of

yourselves to being required to discuss the evidence among the eight of yourselves in an effort to reach a unanimous decision about your verdict in this case.  But throughout the trial and until I release you as jurors after I have received your verdict, you are not to communicate with anyone else about this case whatsoever.

And when I say communicate, I mean in the broadest sense of the term.  Don't email anybody, don't send a text message. If you're a social media person, don't post anything on Facebook or don't tweet on what used to be Twitter or use Instagram or any of the other myriad social media platforms out there.  All of that is communication.  You're not to discuss the case or communicate about it in any way.

And this, so you'll understand, ladies and gentlemen, goes back to the same fundamental foundational principle that underlies and undergirds the entire trial process, and that is, when you've heard all the evidence and you retire to the jury room to deliberate on your verdict, the only, the only, information that you must have before you in deciding how to answer the questions in the verdict form must be limited to the sworn testimony that you've heard in this courtroom from the witnesses under oath and subject to cross examination and the exhibits that the Court, applying the rules of evidence, has admitted into evidence.

The witnesses' sworn testimony and the exhibits the

Court's admitted into evidence, those must be the sole and only universe of the information that you call upon to answer the questions in the verdict form.  Therefore, any outside communications, any outside information of any type, runs counter to that fundamental principle.

And, quite honestly, if this instruction were to be violated and there were to be outside communications, it would jeopardize the entire process and could very well lead the Court to dismiss you and have to go back to the very beginning and impanel a completely new jury and start all over again, which would be a tremendous waste of time, money, and other resources.  So please do not communicate with anybody in any way about this case in the broadest sense of the term.

And until I instruct you to retire and to deliberate on your verdict after all the evidence is in, you must not discuss the case among the eight of yourselves.  That means during the trial when we take a recess or we break for lunch and the eight of you are in the jury room, there shouldn't be, Well, what did you think about that last witness, or, what did you think about that document.

There should be -- there must be no communication about the trial between the eight of you until you've heard all the evidence and I've instructed you to deliberate on your verdict, and that's where the light switch gets flipped and at that point you go from being prohibited to discussing the

evidence among yourselves to being required to discuss the evidence among yourselves as you focus on the verdict and deliberate about what your verdict will be in this case.

Also, ladies and gentlemen, you're not to do any outside research. Do not go home at night and get on your computer and Google G+ or Samsung or Ms. Truelove or Ms. Smith or anything related in any way to anything about this trial. You are not to do any outside research in any way.

Also, I don't think this is likely to happen--I want to preface this statement with that--I don't think it's likely to happen, but this is not an unimportant case, ladies and gentlemen. There are no unimportant cases that get to a jury trial in a United States District Court. Therefore, it is possible, I don't think it's likely, but it is possible some outside person might try to contact you during this trial and influence you about your decision in this case.

If that should happen, if there is -- if you receive any communication from any source during this trial that you feel is out of place, awkward, inappropriate, you're uncomfortable with it, you should let Ms. Clendening know immediately, Ms. Clendening will advise the Court, and the Court will deal with it. Again, I don't think this is likely, but I can't tell you it's outside the realm of possibility, so I want to put you -- make you mindful of that as well.

Another thing, ladies and gentlemen. During the course

of this trial, as you come each morning, as you leave in the evenings, as we're here together, this is a small building, there's one set of steps in the front door, and it is almost assured that at some point you are going to come in close physical proximity to one of the lawyers in this case, one of their support staff, one of the witnesses, one of the representatives of these companies.  At that point I want you to know, ladies and gentlemen, none of these people are going to speak to you, none of them are going to visit with you or be friendly or outgoing or gregarious, as we generally expect from others in East Texas.  That's because I have instructed them not to communicate with any of you in any way.

So when you walk up the front steps and one of these lawyers is coming down the other way and they pass right by you, if they walk right by and they don't say a word, which is what they should do, don't think they're being rude, don't think they're being friendly [sic], and don't hold that against them; just understand that they are following my instructions.

Because, again, it goes back to that same fundamental premise--the only information that you must have before you to draw upon at the end of the trial when you are deliberating about how to answer the verdict form must be limited, must be limited, to only the sworn testimony of the witnesses and the exhibits the Court has admitted into evidence; nothing else.

And that's why they're not going to speak or enter into conversation or ask you how you're doing. And don't hold that against them. Again, they are simply following the Court's instructions.

Now, after lunch, ladies and gentlemen, I'm going to have more instructions for you, but we will break at this time for lunch. As I say, it should be waiting for you in the jury room. It's about 25 minutes after 12:00. We'll try to reconvene shortly after 1:00.

Please follow all my instructions, including not to discuss the case with each other. And after lunch we'll be back and I'll proceed with additional instructions, then we'll hear opening statements from the parties through their lawyers, and then we will get on to the witnesses in the case.

With that, ladies and gentlemen, the jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

THE COURT: All right, counsel. Are there any issues you need to take up with me before we break for lunch?

Anything from the Plaintiff?

MR. SHEASBY: Your Honor, nothing for Plaintiff. If the schedule is Mr. Pitcock followed by jury plays, I think there are some outstanding disputes on jury plays I just wanted--depo plays. Excuse me, Your Honor. I just want to flag that for you, that there are some outstanding disputes in

the evidence.

THE COURT:  All right.  I have looked at the disputed designations and counterdesignations that came in Friday.  Are you talking about deposition disputes that would go beyond those that came in Friday?

MR. SHEASBY:  No, Your Honor.  Just the ones on Friday.

MS. GLASSER:  And, in fact, there's a slightly updated that was sent last night.  The parties resolved a small number of the disputes.

THE COURT:  All right.  Well, I have reached decisions about what to sustain and what to overrule as far as those objections go.  If you don't have the benefit of that information, I will get it to you over the lunch hour.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  Is there anything from the Defendant that we need to take up?

MR. CORDELL:  Just this, Your Honor.  As part of my planning for the opening statement, during the last trial we had a technological solution to our closing of the courtroom where we would turn off the monitors except in front of the jury if we were in part of the confidential record, and my concern is that I have only 20 minutes, and that's going to go very, very quickly --

THE COURT:  That's because Ms. Smith had 40 minutes

for voir dire.

MR. CORDELL:  Well, I tried to get her to give me 10, but it didn't quite work out that way.

THE COURT:  If you'll ask me to turn off the monitors in the gallery at that point, I can do that and I'll be glad to do that.

MR. CORDELL:  Thank you, Your Honor.

THE COURT:  Anything further?

MR. SHEASBY:  Your Honor, there's only two issues associated with that.

The first is that these monitors can't be turned off, and Mr. Pitcock would actually have to leave during the middle of the opening, the reason being is that this is confidential information of including Apple, who's actually sued counsel for releasing their confidential information.  And so I want no part of that.

And so I would ask that, at least as to the Apple and the ZTE -- there's two minor agreements that I don't think anyone's going to care about that.  But on behalf of ZTE and on behalf of Apple, I do have to say that Mr. Pitcock is not authorized to see them and the screens will show in the gallery.

THE COURT:  Well, the screens on counsel table can be turned so they're not visible to the gallery, and we'll need to do that.  They can also be turned off in the lower

right-hand corner with a button if you don't want to turn them.  But I don't see that as a problem.

MR. SHEASBY:  Okay.  I just wanted to -- I'm flagging it for the record.  I'm not trying to --

THE COURT:  With regard to Mr. Pitcock, Mr. Cordell, do you have some response?  Are you intending to produce and publish information that would run afoul of Mr. Pitcock being present?

MR. CORDELL:  I will not, Your Honor.  In fact, I will -- I will use the screens to avoid verbalizing the information, so he will not be exposed to it.

THE COURT:  He's going to be at counsel table with the screen on unless something's done differently.

MR. CORDELL:  Well, you can see they repositioned it already so that it's not within his view.  And that was my expectation, which is what I think we did last time as well. If we can pivot the screens so that the client representatives don't see --

MR. SHEASBY:  There's Mr. Waitley as well.  He's not authorized to see the ZTE/Apple agreement, either.

THE COURT:  Well --

MR. CORDELL:  I will police that, Your Honor.  I will make sure that our client representative also does not see the information.

THE COURT:  With 20 minutes for opening and with the

inherent delays and disruptions it causes by formally sealing the courtroom and sending anyone out who's not subject to the protective order, I'm inclined to turn off the monitors in the gallery, to instruct counsel to adjust the monitors on counsel table so they're not visible by anyone who should not see them, and try to minimize the impact of the disruption. And I would do that for both sides.

But I think, given what we're working with, that is a better solution than formally closing the courtroom and waiting for people to get up and physically leave the room before we proceed.

MR. SHEASBY: And to be clear, I'm not trying to be obstructive to Mr. -- I'm just trying to get on the record -- yeah.

THE COURT: And I think there are steps easily taken, Mr. Sheasby, that can prevent what you're concerned about, and I'm instructing both sides to take those easily procurable steps.

MR. SHEASBY: And, Your Honor, with that, I'd like to be able to show -- do the same thing.

THE COURT: Same thing works for you, absolutely. Just let me know when.

MR. SHEASBY: Thank you, Your Honor.

MR. CORDELL: Thank you, Your Honor.

THE COURT: All right. We will attempt to reconvene

about 10 or 12 minutes after 1:00.

Court stands in recess.

(Lunch recess.)

THE COURT:  Be seated, please.

All right, counsel.  Before I bring in the jury and proceed with the Court's preliminary instructions and then move on to opening statements, is there anything necessary to be raised on the record?

MR. SHEASBY:  Nothing for Plaintiff, Your Honor.

MR. CORDELL:  From Defendants, Your Honor, yes, Your Honor, yes.

This morning at the Court's direction we met to try to work out disputes that we anticipated during the course of the trial.  And as part of that, we had objections to what we perceived the Plaintiff to be planning that we believe would be contrary to binding Federal Circuit precedent.  Mr. Sheasby assured me that this was his risk and that he was the Plaintiff and he would see this through if he had to.

I understand that.  But I need to preserve my record.  So with the Court's permission, I would like to go ahead and make my objections, and there are three principle legal objections.  One is claiming the standard rather than the patented technology.  So the Federal Circuit in the *CSIRO v. Cisco* case and the *Ericsson v. D-Link* case that comes from this district said very clearly that you have to target the patented

technology, and it is error to tout the overall standard.

The second is presenting gross revenue numbers to the jury.  The Federal Circuit again in the *Ericsson/D-Link* case said it is error to present these gross revenue numbers to a jury and instead it needs to be targeted profits tied to the footprint of the invention.

And then the third, Your Honor, our third objection is that the Plaintiff is going to introduce evidence of non-infringing alternatives, which we believe again under the *Ericsson/D-Link* case and the *CSIRO* case have no part in patents that are standards essential.

And, therefore, we advance those three objections to the evidence we believe that the Plaintiff will adduce during this trial.

THE COURT:  And it's my understanding that you've agreed to preserve your objections but to not otherwise raise the objections during the course of the trial?

MR. CORDELL:  Well, that's my -- that's my hope, Your Honor, so that I don't have to make a continuing objection, and I -- I will let Mr. Sheasby speak to whether that is his intention as well.

MR. SHEASBY:  Yes.  I agree that Mr. Cordell is -- is acting in a way that I find collegial and appropriate, and I consider this a rolling objection.

THE COURT:  All right.  And his representations are

accurate as you understand them?

MR. SHEASBY:  That's what he articulated me as his three concerns.  Obviously I disagree what we're doing with that and I disagree with his characterization of the law, but I believe from -- as G+'s representative, I accept this is a running objection.

THE COURT:  All right.  Thank you, counsel.

MR. CORDELL:  Well, if I can add one thing, Your Honor.  I tried my first case in this -- this room in 1996 before Judge Folsom.  I saw Mr. Roth in the audience this morning.  He was my local counsel.  And I have been taught by some of the great lawyers in this district how to try cases.  And one of the things that we don't do is we don't interrupt people generally when they're doing opening and closing statements.

However, in the last trial we had several unfortunate statements that were made, both in opening and in closing.  For an example, there were accusations that our client were criminals and that our client had violated the law, and that if you're innocent, you don't need to complain.

That has no part in this case.  I will do my best to stay in my seat.  I don't want to disrupt anything.  But there were a number of those that were made and, perhaps even more critically, in closing there was evidence that was shown to the jury for the very first time in closing arguments which we

think violates almost every rule.

I say all of this, again, in the hopes that I don't have to take my feet and make objections during opening statements. But, again, I wanted to beg the Court's indulgence if that becomes necessary.

THE COURT:  Understood.

MR. CORDELL:  Thank you.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back from lunch, ladies and gentlemen.  Please have a seat.

As I mentioned before we broke for lunch, I have some additional preliminary instructions to give you on the record before we start with the opening statements from the attorneys and then get on to the actual evidence in the case.

You've now been sworn as the jury in this case, and as such, you are the sole judges of the facts, and you will determine what all the facts are in this case.  As the Judge, I will give you instructions on the law, decide questions of law that arise during the trial, and handle all matters relating to evidence and procedure.  I'm also responsible for maintaining an efficient flow of the evidence over the course of the trial, and maintaining an appropriate decorum of the courtroom.

At the end of the evidence, ladies and gentlemen, I'll give you detailed instructions about the law to apply in deciding this case, and I'll give you a list of questions that you are then to answer.  This list of questions is called the verdict form.  And your answers to those questions will need to be unanimous, and those answers to those questions will constitute the jury's verdict in this case.

Now, let me briefly tell you what this case is about.  This case involves a dispute regarding two United States patents.  I know you've seen the patent video this morning prepared by the Federal Judicial Center, but I need to give you some additional instructions on the record about a patent and how one is obtained.

Patents are either granted or denied by the United States Patent and Trademark Office, sometimes simply referred to as the Patent Office, or the PTO.  A valid United States patent gives the patent holder the right for up to 20 years from the date the application is filed to prevent others from making, using, offering to sell, or selling the patented invention within the United States, or from importing it into the United States, without the patent holder's permission.

A patent is a form of property called intellectual property, and like other forms of property, a patent can be bought or sold.  A violation of the patent holder's rights is called infringement.  And the patent holder may try to enforce

a patent against persons it believes to be infringers by filing a lawsuit in federal court.

Now, the process of obtaining a patent from the PTO is called patent prosecution.  To obtain a patent, one first files an application with the PTO.  The PTO is an agency of the United States government.  It's actually a part of the U.S. Department of Commerce.  And the PTO, upon receiving an application, assigns a trained examiner to review the application.

After the application is filed and the examiner reviews the application to determine whether or not the claims are patentable, that is, appropriate for patent protection.  And the process between the applicant and the examiner may go back and forth for some period of time until the examiner is ultimately satisfied that the application meets the requirements for a patent, and in that case, the application issues as a United States patent.  Or if the examiner ultimately concludes that the application should be rejected, then no patent is issued.  And sometimes patents are issued after an appeal within the PTO or to a court.

Now, to help you follow the evidence in this case, I'm going to give you a brief summary of the positions of the parties.

As you know, the party that brings a lawsuit, that initiates a lawsuit, is called the plaintiff.  The Plaintiff

in this case is G+ Communications, LLC, which you will hear referred to during this trial either as the Plaintiff or simply as G+, G+ Communications. You might hear them called GComm. Those all mean the same party, the Plaintiff in this case.

And as you know, the party against whom a lawsuit is brought is called the defendant, and there are two Defendants in this case. They are Samsung Electronics Company, Ltd., and Samsung Electronics America, Inc., and you will hear them referred to throughout the trial either as the Defendants or you may hear them simply called Samsung collectively.

Now, as I told you during jury selection earlier today, this is a trial to set a fair and reasonable damages award for previously established patent infringement. As I've mentioned, there are two U.S. patents that you're going to hear about during this trial. They are United States Patent No. 8,761,776, and United States Patent No. 10,736,130.

And as you've heard, patents are commonly referred to by their last three digits. So in this case, the 8,761,766 -- excuse me, 8,761,776 Patent, you'll hear referred to as the '776 Patent; and 10,736,130, you'll hear referred to as the '130 or maybe the '130 Patent.

And these two patents are going to be referred to collectively during the trial as the asserted patents. You may hear them called the patents-in-suit. That means both of

them collectively.  And these patents relate generally to 5G technology.

Now, it's already been decided in a prior trial in front of a different jury that certain of the Defendants' products infringe one or more of the asserted patents and that the claims of the asserted patents are not invalid.  However, you should understand that the Defendants, the Samsung Defendants, strongly disagree with these findings, and they have preserved their right to challenge and appeal these decisions in the future.  But before such an appeal can take place, the amount of those damages related to those prior findings must be set, and that's why you, the jury, are being called upon to set the amount of those fair and reasonable damages.

You should not let the fact, ladies and gentlemen, that these prior findings of infringement and validity have been found, you should not let those findings directly influence any award of monetary damages that you make in this trial However, you are entitled to know that these prior findings of infringement and no invalidity are what give rise to the need and the reason why you are being impaneled as the jury in this case to determine reasonable royalty damages.

And as a result of those prior findings, this trial is solely for the purpose of setting a fair and reasonable compensation for that infringement that's previously been found.  And this trial is only going to be concerned with that

single issue.

Now, your job, ladies and gentlemen, is to determine the amount of monetary damages, if any, that should be awarded to the Plaintiff as compensation for the Defendants' previously established infringement.

Also, the 5G technology in the asserted patents is governed by certain technical standards.  A standard is a uniform design of a product.  Companies that make devices in accordance with the same standard -- they make devices in accordance with the same standard so that devices made by different manufacturers can work together in the same ecosystem.

These standards are set by what is known as standard-setting organizations, or SSOs, and the standard-setting organization in this case is the Third Generation Partnership Project known as 3GPP.  3GPP is an organization that develops cellular standards such as the 5G standard, and it is comprised as a number of organizational partners, including the European Telecommunications Standards Institute, which is often referred to by its initials E-T-S-I, or ETSI.  ETSI oversees the development of standards related to information and communications technologies.

Now, if a patent implements technology that is covered by a standard and it would not be technically possible to implement the standard without infringing that technology,

that patent, then that patent is called a standard essential patent, or an SEP, standard essential patent.  This means that if a company makes a device that implements a standard that is covered by an SEP, a standard essential patent, then the company may need to obtain a license to use that technology.

G+ is bound by a commitment to ETSI that it will license standard essential patents to other parties on fair, reasonable, and non- -- on a fair, reasonable, and non-discriminatory basis.  And this basis is known as FRAND, F-R-A-N-D, which stands for fair, reasonable, and non-discriminatory.  And I'll give you more instructions on these matters at the end of the trial.

Now, ladies and gentlemen, I know that there are many new words and concepts that have been thrown at you since you appeared in federal court this morning.  I'm going to define a lot of these terms and concepts as we go through these instructions to help you.  The attorneys are going to discuss them in their opening statements.  And the witnesses are going to help you as we go through the trial with their testimony to understand these words and concepts.  So please do not feel overwhelmed at this point.  It will all come together as we go through the trial, I promise you.

Now, your job in this case is to decide what amount of money damages are to be awarded to the Plaintiff as compensation for the infringement of their two patents.  My

job in this case is to tell you what the law is, to handle rulings on evidence and procedure, and to oversee the conduct of the trial as efficiently and effectively as possible, and to maintain the appropriate decorum in the courtroom.

In deciding the issues that are before you, you're going to be asked to consider specifically certain rules, and I'll give you an overview of those rules now.  And then at the conclusion of the case, I'll give you more detailed instructions.

The first and only issue that you're going to be asked to decide in this case is what amount of money damages should be awarded to the Plaintiff G+ to compensate it for the Defendants' previously established infringement of the two patents-in-suit.

A damages award, ladies and gentlemen, must be adequate to compensate the patent holder for the infringement, and in no event may a damage award be less than what the patent holder would have received if it had been paid a reasonable royalty for the use of its patented technology.

However, the damages that you award are meant to compensate the patent holder and they are not meant to punish the defendant.  And you may not include in any damages award you might make an additional amount as a fine or a penalty above what is necessary to fully compensate the patent owner for the infringement.

Additionally, ladies and gentlemen, damages cannot be speculative, and G+, the Plaintiff, must prove the amount of its damages by a preponderance of the evidence.  I'll give you more detailed instructions on the calculation of damages at the conclusion of the trial, including by giving you specific instructions with regard to the calculation of a reasonable royalty.

Now, I want you to understand that over the course of the trial you're going to be hearing from a number of different witnesses in this case, and I want you to keep an open mind while you're listening to the evidence and not decide any of the facts until you've heard all the evidence from all the witnesses.

This is important, ladies and gentlemen.  While the witnesses are testifying, remember you, the jury, will have to decide the degree of credibility and believability to allocate to each of the witnesses.

So while the witnesses are testifying, you should be asking yourselves things like:  Does the witness impress you as being truthful?  Did he or she have a reason not to tell the truth?  Did he or she have any personal interest in the outcome of the case?  Does the witness seem to have a good memory?  Did he or she have an opportunity and ability to observe accurately the things that they've testified about?  Does the witness appear to understand the questions and answer

them -- did the witness answer them directly?  And, of course, does the witness' testimony differ from the testimony of any other witness?  And if it does, how does it differ?

These are some of the things that you should be thinking about while you're listening to each and every witness over the course of this trial.

Now, I also want to talk to you briefly about expert witnesses.  When knowledge of a technical subject may be helpful to you, the jury, a person who has special training and experience in that particular field--we refer to them as an expert witness--is permitted to testify to you about his or her opinions on those technical matters.

However, ladies and gentlemen, you're not required to accept an expert witness' or any witness' opinions at all.  It's up to you to decide whether or not you believe what an expert witness is telling you or what any other witness is testifying to, and whether in your opinion that is correct or incorrect, or whether or not you want to believe what they say.

Now, I anticipate that there are going to be expert witnesses testifying in support of each side in this case, but it will be up to you to listen to their qualifications when they're called to testify.  And when they give an opinion and explain the basis for that opinion, it will be up to you to evaluate what they say, whether you believe it, and to what

degree, if any, that you want to give that opinion weight.

Remember, ladies and gentlemen, judging and evaluating the credibility and the believability of each and every witness is an important part of your job as jurors.

Now, during the trial it's possible that there will be testimony from one or more witnesses that's going to be presented to you through what's called a deposition. In trials like this, it's difficult to get every witness here in person at the same time so they can all testify in person from the witness stand. So before the trial begins, the lawyers from each side take the deposition of the witnesses.

In a deposition, the witness is present, they're sworn and placed under oath, a court reporter is present who takes down the questions and answers that are exchanged, and all of that is recorded. It is often transcribed in writing and often recorded by video recording.

Now, it's important to understand, ladies and gentlemen, that over the course of this trial when deposition witnesses are presented to you, you'll be seeing spliced clips of their recorded testimony presented. Let me explain this to you. In an ordinary deposition, a witness is questioned for up to seven hours. All those questions and all those answers are taken down and recorded. Again, they're often video recorded.

It may be when it comes to the trial, the lawyer who wants that witness to testify may only need 20 minutes of

actual testimony out of that seven-hour-long deposition.  So rather than playing a seven-hour videotape for you to watch to get 20 minutes of information, prior to the trial various sections of that deposition will be cut out and spliced together to present as a group that 20 minutes' worth of testimony.  And it's much easier for all of us to listen to 20 minutes than to listen to seven hours.

But as a part of doing that, when that 20 minutes in my example is played to you from a deposition, there are necessarily going to be little glitches, little sections where you can tell it's been spliced together.  You may see a little irregularity along the way.  You may hear a different sounding voice.

When all those things happen, do not lose focus on what's actually being asked and what's being answered.  Don't focus on any irregularities; focus on the questions asked and the answer that's given under oath from the witness.  And by doing that, we can listen to 20 minutes of testimony as opposed to having to listen to an unedited, unspliced seven-hour-long deposition.  It will save us all a lot of time, and that's the way deposition witnesses are going to be presented over this trial.

But, again, don't be distracted by any of the necessary parts of splicing that testimony together in a single presentation to save us all that time.  Focus on the questions

that are asked of the witness and the answers that the witness gives under oath.

And you should know that deposition testimony is to be considered by you, the jury, and so far as possible weighed as to its credibility and believability just as though the witness were present in open court and testified from the witness stand.

Also, ladies and gentlemen, over the course of this trial you're going to see various documents.  Some of those documents are going to have redactions in them.  That is to say that some of them are going to have words and phrases and sentences that are blacked out that you can't read.

When those documents are presented to you, understand that those redactions are there because the Court ordered them.  Don't focus on what's blacked out, don't try to guess what was blacked out and you can't read it; focus on what's legible, what's there and readable, and ignore what's been blacked out or redacted.

Understand any redactions in documents shown to you are there because the Court has previously decided those are appropriate and necessary, and don't be distracted by the redactions.

Now, over the course of the trial, it's possible that the lawyers will occasionally raise and make objections.  And when they do, I will issue rulings on those objections.  Understand

that it's the duty of an attorney to object when the other side offers testimony or other evidence that the attorney believes is not proper under the orders of the Court, the Rules of Civil Procedure, or the Rules of Evidence.

Now, upon allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court does not in so doing express any opinion as to the weight or effect of the evidence.  Again, weighing the evidence is your job as the jury; it is not my job as the Judge.

As I've told you, you are the sole judges of the credibility and believability of all the witnesses and the amount of weight, if any, to give to all of the testimony and evidence.

Now, in advance of today, ladies and gentlemen, a great amount of time has been spent with the parties and their counsel working through various objections to exhibits and documents.  By doing that, the Court has already ruled on what's admissible and can be shown to you as exhibits during this trial.

You need to understand that many, many hours have been saved by that process and you will not have to listen and go through that.  That's all been done in advance of the trial. So when an exhibit is shown to you over the course of the trial, understand the Court has already found it to be admissible and that it's proper for you to see it.  And the

parties can simply present it, put it in a proper context, and show it in front of any witness that they care to.

They are not going to have to go through all the arguments about its admissibility and hear the counterarguments from the other side about its admissibility and let the Court ask questions and then eventually the Court rule on each of these documents.  All of that has been done at an earlier time outside of your presence.

You may not fully understand that, but I can promise you that has saved you many, many hours during this trial not having to listen to that.  But just understand the exhibits that are presented to you over the course of this trial have already been determined by the Court to be admissible and are properly presentable to you over the course of the trial as evidence.

Now, even though that's all true, it is still possible that objections may arise during the course of the trial.  If I should sustain an objection to a question addressed to a witness, then you must disregard the question entirely and you may draw no inference from its wording or speculate about what the witness would have said if I had allowed them to answer the question.  On the other hand, if I overrule an objection regarding a question addressed to a witness, then you should consider the question and the answer just as if no objection had been made.

As I told you during jury selection, even though the Court may have the ability to comment on the evidence during the trial, I'm going to work very hard not to comment on the evidence and not to let you, the jury, know what I think about any of the evidence in this case, because it is up to you to decide the facts in this case from the evidence presented and that is not part of my responsibility during this trial.

Now, our court reporter will take down and has been since you were sworn in this morning, has taken down everything that's been said during these proceedings, but that written transcription of everything that's said during the trial, ladies and gentlemen, is not going to be available to you to review or examine during your deliberations.  That means you're going to have to rely on your memory of the evidence once you begin to deliberate and reach a decision on the verdict in this case.

In a moment to assist you in that regard, the Court's going to give each of you a juror notebook.  And in this notebook there are multiple places where you can take notes during the course of the trial if you wish to take notes. It's up to each one of you to decide whether you want to take notes, and if you do, how extensive you want those notes to be.  But remember if you take notes over the course of the trial, those are for your own personal use, they're to refresh your recollection of the evidence during the trial, and you

still have to rely ultimately on your memory of the evidence.

A juror should not abandon their own recollection of the evidence just because some other juror's notes indicate something differently.  Notes, if you take them, are meant only to refresh your recollection, and that's the only reason you should have them.

All right.  I'm now going to ask our Court Security Officer at this time to pass out these juror notebooks to each member of the jury.

(Pause in proceedings.)

THE COURT:  All right, ladies and gentlemen.  If you'll open these notebooks, you'll see that at the front you have a complete copy of the two patents-in-suit.  You have a complete copy of the '776 Patent and then next you have a complete copy of the '130 Patent.

Then behind that, ladies and gentlemen, you will find a section of tabbed witness pages where there is a single page for each witness that may testify over the course of the trial, and you have a photograph of the head-and-shoulders of that witness with their name at the top of that page.

The Court's found that when you retire to deliberate on your verdict and you begin to review all the evidence you've heard, it's very helpful to look back at a picture of the witnesses who testified before you.  So you'll find a witness page separately tabbed for each witness that may testify.  And

then below their picture and name, you'll find spaces where if you want to put additional notes, you can certainly put additional notes on each page. And you should have a tabbed page for each potential witness. Hopefully, those tabs will make it easier for you to find those pages as we go through the trial.

And then behind those tabbed witness pages, you'll find a new legal pad in the back of the notebook, and that's for additional note-taking if you choose to take notes. And you should find in the front of each notebook a pen to use in case you don't have one to take notes, should you choose to do that.

Now, these juror notebooks, ladies and gentlemen, should be with you at all times. They're not to be left around where someone who shouldn't see them is going to have access to them. You should have them with you unless I tell you otherwise.

Now that said, there may be times during the trial when we're going to take a short recess, you're only going to be out of the jury box a few minutes, in which case I may say, ladies and gentlemen, you may simply close your juror notebooks and leave them in your chairs. And if I say that, that's perfectly fine.

But if I don't give you those specific instructions, you should have the notebooks with you. When you go to lunch each

day, you should take them to the jury room with you, and when we recess for the evening and you go home, you should take them to the jury room and leave them closed on the table in the jury room each night so they'll be there the next morning when you come in.

Now, in a moment you're going to hear opening statements from the lawyers representing both sides in this case.  These opening statements, ladies and gentlemen, are designed to give you a roadmap of what each side expects to offer by way of evidence.

And you should remember throughout the trial what the lawyers tell you is not evidence.  The evidence is the sworn testimony of the witnesses, subject to cross examination, and the exhibits that have been admitted into evidence by the Court.  That constitutes the evidence in this case, and what the lawyers tell you is not evidence.  And what the lawyers tell you are not instructions on the law.  Any instructions on the law that you receive will come from me and from no other source.

Now, after the opening statements are presented by the competing parties, the Plaintiff will call its witnesses and present its evidence through those witnesses.  That's called the Plaintiff's case in chief.  And when the witnesses are called by the Plaintiff, Plaintiff's counsel will examine them, and then Defense counsel will cross-examine them, and

we'll go through each one of the Plaintiff's witnesses.  When the Plaintiff's presented all their witnesses, they will rest the Plaintiff's case in chief.

When the Plaintiff rests its case in chief, then we'll transition to the Defendants' case in chief, and the Defendants will call their witnesses, they will examine their witnesses, and Plaintiff's counsel will then cross examine their witnesses.  And we'll go through each one of the Defendants' witnesses.  And when the Defendants have presented all their witnesses, the Defendants will rest the Defendants' case in chief.

After the Defendants have rested their case in chief, the Plaintiff has the option to call what are known as rebuttal witnesses to rebut what the Defendants may have presented through their case in chief.  Plaintiff is not required to call rebuttal witnesses.  If the Plaintiff doesn't call rebuttal witnesses, then when the Defendant rests its case in chief, you will have heard all the testimony and evidence, and that will conclude the presentation of the evidence.

If the Plaintiff elects to call rebuttal witnesses, then those witnesses will be called by the Plaintiff, examined by Plaintiff's counsel, cross-examined by Defense counsel.  And when all the Plaintiff's rebuttal witnesses have testified, then at that point you will have heard all the evidence in the case.

Once you've heard all the evidence in the case, I will give you my final instructions on the law that you are to apply. Those final instructions, ladies and gentlemen, are often called the Court's charge to the jury. Once I've given you my charge to the jury, then the parties will present their closing arguments.

Once both sides have presented their closing arguments, that's when I will say, "Ladies and gentlemen of the jury, you may retire to the jury room to deliberate on your verdict." And I will send a printed verdict form with you to the jury room. That is the time when you go from being prohibited from talking about the evidence presented over the course of the trial with each other to being required to talk about the evidence with each other during your deliberations in an effort to reach a unanimous decision about how to answer the questions that are in the verdict form.

And that should give you structurally an idea of how the trial will progress, ladies and gentlemen.

So with that, we'll proceed to hear opening statements from the parties at this time.

The Plaintiff may present its opening statement to the jury.

Would you like a warning on your time, counsel?

MR. SHEASBY: Your Honor, I would. If I could have a warning at 10 minutes in and 18 minutes in, so with 10

minutes left and with two minutes left.

THE COURT:  I'll warn you at those times.  You may proceed with opening statement, Mr. Sheasby.

MR. SHEASBY:  May it please this Honorable Court.

Good afternoon, ladies and gentlemen.  My name is Jason Sheasby, and I speak on behalf of the Plaintiff in this matter, G+ Communications.

I want to echo what the Court has said about the sacrifices that you are making by being here.  I am acutely aware that it is both a financial burden and a personal burden for you to be here, but I hope after hearing from the Court that there has been a finding of infringement and validity of duly issued United States patents, you can understand the seriousness of this case.

The Court spoke about the right to a trial by jury in our Constitution.  And a lot of folks, they think the right to the trial by jury is the right for the plaintiff or the Samsung entities, who are the Defendant, to have a jury of their peers.  It's not what our founders had in mind.  It's not.

The right to the trial by jury is the right for the citizens of this country, the citizens of this country, to decide the most important questions.  The right to the trial by jury is your right.  It's your power, and you're exercising that power as citizens in this process.

Just as the right to trial by jury is a constitutional

right, so are patent rights enshrined in the Constitution. This is our original founding document. And back when we were founded, we were a small country. But even as a small country, we were focused on innovation. And what the patent laws allow for is something very important. So much incredible inventions are created here and they're taken overseas and used by foreign companies. What the patent system does is the patent system says if overseas there is an incredible invention that's been created, we want you to bring it to this country because having that invention in this country makes us competitive, it makes us stronger, it makes our industry more powerful. The system that has been created of allowing incredible overseas inventions to receive United States patent protection after going through the legal process that is necessary to do that is the system that we use to make sure we remain competitive.

The patents-at-issue in this case are referred to by their last digits, the '776 and the '130 Patents. The patents were created by ZTE. ZTE was founded 40 years ago outside Hong Kong. It was founded to build telephone systems, old-time rotary telephone systems for communities. But after decades and decades of research, it's become a leader in 5G technology.

G+ Communications is managed by Mr. Pitcock. He's an expert and specialist in licensing. And he is using his

expertise to protect a group of inventions that ZTE created relating to 5G.

5G. Why is 5G so important? Well, industry, logistics, manufacturing, telemedicine, media, the massive amounts of data that are transiting over our network require 5G technology because it is fast and it is efficient. In fact, it is so important that even if your phone doesn't show 5G when you're making a call, it is highly likely that the data that is being transferred by your phone is being transferred by this critical 5G infrastructure.

It has been decided that Samsung's most advanced phones that they sell use the technology at issue in this case. They infringe the patents that are held by G+. And these are the products that infringe.

The infringement began in 2019. And in 2019, Samsung was facing a crisis. The smartphone market was flat. People weren't buying more smartphones because there was not a lot of additional innovation. And what Samsung was focused on and focused laser-like on was making sure that it could sell the most premium and advanced phones.

And we know that because of documents like this one. This is JTX 8. In the bottom left-hand corner is an exhibit stamp, and you're actually entitled in your deliberations to ask for this document. And so if you see a document you think is important or is critical, you can write down the number and

you can request it.  And what this document shows, this internal document, is they say we need to offer a disproportionate amount of additional value in order to compete against what they describe as LO.

What is LO?  LO is their internal code name for Apple. It refers to them as, quote, lovely opponent.  So in 2019 Samsung knew that it needed to offer a dramatic amount of additional technology.  And this is the internal documents. Big companies, they have PR firms, they have glossy advertisements, but in this case in this forum we get to see the internal documents.

And what they studied, JTX 7, is that the two most important features that their customers demanded were speed and battery life.  They've got to have them.  And 5G met that demand.  5G is dramatically faster than 4G, it's 10 times as fast, and it does it with incredible power efficiency.

Samsung's response to its, quote, lovely opponent was to launch 5G over a year-and-a-half before Apple.  But launching that 5G a year-and-a-half before Apple doesn't mean that it had the rights to that technology.  In fact, it's been found that those rights are held by ZTE and now by G+.

How important was this technology to them?  They sell the identical phone with the identical features except for one difference--5G.  They charge $200 more per phone for 5G technology.  It was central to their strategy to defend

against Apple.

There is a statute that governs the damages that are due in this case, and that statute states that we're entitled to in no event less than a reasonable royalty for the use made of the invention by the infringer.  It's a statutory requirement. And when we present our damages number to you at the end of this case, as Judge Gilstrap said, we must only satisfy that by a preponderance of the evidence.  So if one pebble weighs in our favor as to the appropriate damages, you are obligated as a matter of law to rule for us.

Now, there's something special about these patents. There are tens and tens of thousands of patents floating around in the world.  Counsel for Samsung said there's over 60,000 of them in which people are proposing ideas for cellular technology.  But there is a very, very small number of them that are actually used in 5G technology, that are actually infringed, that are actually valid.

And for those small number, a special standard applies. Fair and reasonable is what Samsung counsel said, but they omitted the most critical word in DTX 17 which Samsung will admit governs their obligations--adequate and fair reward must be provided to us.  And when you think about that, that makes sense.  The gauntlet that we have gone through, the tens of thousands of proposals that have been made, the small number of patents that are actually implemented in 5G, the even

smaller number of patents that are infringed and valid, all of which are satisfied in these patents, makes them truly unique, and in that case they are entitled to a fair and adequate reward.

The first issue you'll be asked to consider is the use of invention made by the infringer --

THE COURT:  10 minutes remaining.

MR. SHEASBY:  -- as required by the statute, and the use is vast.

It is projected that through the life of these patents, Samsung will sell over 250 million infringing units.  And that from those 250 million infringing units, it will make infringing revenue of over $185 billion, solely from infringement since 2019 through the term of these patents, solely for the infringement of these patents in the United States.

The second issue you will be asked to decide is the technical benefits that are associated with this patent.  We are in a special proceeding.  This is not an outside negotiation.  This is a judicial process in which we have full access to information.

And in that context we actually took under oath the deposition of a Samsung industry expert who has testified on behalf of Samsung multiple times.  And what he testified unequivocally under oath is that the rate that Samsung is

required to pay must be based on the technical and commercial benefit of the patent. This is what Friedhelm Rodermund, Samsung's own expert, said.

Why am I emphasizing that? Because today and this week Samsung will attempt to convince you of the exact opposite--that the technical and commercial benefits of these patents should not be considered, the exact opposite of what their expert has testified to under oath.

And, in fact, we have presented two technical experts, Professor Akl and Doctor Kowalski -- and I'd like them both to stand just briefly.

Thank you.

Professor Akl has performed over 200 technical investigations. Doctor Kowalski is a real-world expert. He's actually built 5G systems in the world. And they analyzed these patents and spoke about the incredible speed and power benefits that are associated with these patents.

There was a reference to a one-second benefit. These patents can achieve up to a 33 percent increase in speed when they are used and a dramatic decrease in power.

The first patent, the '776 Patent, relates to reselection. Samsung's own engineers admit that reselection is a basic function that is required for Samsung's technology. Our patent is called reselection. Samsung admits that reselection is essential.

4G, a very small bandwidth; 5G, a dramatically larger bandwidth. But to take advantage of that bandwidth, you need to be able to access a very large number of antennas. And accessing those antennas is extremely energy taxing. The patent speaks about the terminal will consume electric energy when it has to switch between all of those different towers.

And the patent speaks about the fact that our system is allowed to select and obtain the best cell. Cell is the tower that is used to select the inventions.

The other patent, the '130 Patent, relates to control information.

In 4G, data packets were sent no faster than one millisecond. That may seem like a very fast amount of time. But in 5G, the transmission is almost 16 times as fast. That's what makes 5G so fast and efficient. And obtaining that 16 times increase in speed requires you to be able to communicate with the tower efficiently and correctly. And that's what the '130 Patent relates to.

This is the '130 Patent. It relates to transmission efficiency, it reduces delay, and its communication efficiency is improved. These are not my words. The Court has made clear that what I say is not evidence. The secret documents from Samsung, the statements in the Patent Office duly issued by the United States government are evidence.

Samsung's corporate representative, Samsung witnesses,

admitted that they had other options.  There were other available options to them.  There were alternatives.  But when we asked their corporate representative, were any of them acceptable?  They admitted they were not.  Samsung infringes these patents because of the dramatic improvement they make in speed and power, and the dramatic revenue it creates associated with them.

What are Samsung's excuses?

Madam Courtroom Deputy, could you please turn off the system?  Thank you.

Samsung's records have allowed us to discover a group of license agreements.  Samsung pays immense amounts of money for access to 5G and 4G technology, and these are some of the agreements it has signed.  Something critically important about these agreements:  in not one of these agreements has there been a finding of infringement and validity.  All these agreements are portfolio agreements that were entered into without the solemn decision that was already made in these cases.  And you see the terms, how short they are?  Our patents last until 2037.  And so Samsung faces an extraordinary challenge because it knows how valuable these patents are.

And so it creates a number of excuses.  The first excuse it uses is it speaks about the fact that we twice made them settlement offers, and we made those settlement offers before

the jury trial at which there was a finding of infringement and validity.

And now after having been adjudicated an infringer of valid patents, they are going to say, oh, we want to use the same model we used in those settlements, even though in those settlements we had no access to the confidential information that I've showed you today that you'll see this week. We had no access to the source code establishing that they were infringing these patents.

Samsung's next excuse is, we don't know what you're talking about. You don't focus on the incremental profits associated with the advantages of those patents. That's crazy talk. No one does that. They say it's unprecedented for us to ask that the technical benefits of our patents be fairly compensated for.

And this is a document, PTX 24. This is a document that they submitted to a government agency in which they speak about the fact that when you calculate royalties on essential patents, the special unique patents that are essential, infringed, and valid like ours, you must focus on the incremental value of the innovation. They will deny that this week.

The reality is they will focus instead on agreements that have no connection to the issues we face. They will point to agreements with two companies called Ox Mobile and 5G IP.

Those agreements involve patents in which there's no evidence that they were even used in a commercial system, there was no evidence Samsung was even planning on using them, and there was no evidence of a technical benefit.

These patents were entered into, the record will show, to avoid the nuisance of a litigation.  They have no connection to the power and importance of the patents at issue in this case.  They will point to the Ox Mobile and 5G license agreements as how you should set the damages in this case, and they will not disclose any of these admissions that were obtained and will be given by Samsung's expert in this case --

THE COURT:  Two minutes remaining.

MR. SHEASBY:  -- showing how irrelevant the agreements are.

Damages will be analyzed by two experts, Dr. Reed-Arthurs and Dr. Stephen Dell.  And I'd like them both to stand right now.

Thank you very much.

Putting aside the extraordinary energy efficiency benefits of this, putting aside the fact that there can be up to a 33 percent speed benefit, what our experts did is took the most conservative measure of damages possible, and they analyzed how much Samsung makes by selling phones that are as fast as they possibly can be.

And, of course, that's how Samsung competes with Apple.

It needs to offer massive amounts of additional value to compete.  It needs to be the best.  It needs to be the fastest.  And it turns out if you take the most conservative speed benefit for just one of the features, they make $8 every time our phones [sic] are infringed.

And what you will have to do is determine what portion of the $8 is attributed to the work of the G+ inventors and what portion is attributed to Samsung.  You will have guidance in this fact.  Dr. Paul Min, who is a Samsung expert who has testified for Samsung over eight times, will come in here and will have to admit under oath that he could not identify one thing that Samsung contributed to the value of these patents.

250 million units through 2037, profits solely from the infringing feature, using the $8.15 number, not all the profits they make, not the profits from any other aspect or feature, solely from the patents, they make over $1.5 billion.

THE COURT:  Counsel, your time has expired.  Take a second and finish up.

MR. SHEASBY:  Ladies and gentlemen of the jury, we are in your hands.

MR. CORDELL:  May we approach, Your Honor?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. CORDELL:  I'd like to get the Court's guidance

on two issues.

Counsel a dozen times talked about the special characteristic of these patents because they had been adjudicated as infringed.  My understanding is the Court was to instruct the jury, which the Court did, that we had a prior verdict and it was not to have any kind of impact on their -- on their determination.  So I guess I'd like some guidance as to what latitude I have to respond to that.

And the other issue is the settlement offers.  We've had this long debate about the settlement offers, and Plaintiff has done all they can to keep those things out, and then counsel just opened on it and he talked about the settlement offers.  What do I do with that?  Do I put the numbers up there?  Do I not put the numbers up there?

He seems to have presaged it for the jury.  And if I were in the jury box, I would wonder, well, what are these offers?  And when they don't hear about them, all we have is that there was this good faith effort by the Plaintiff and there's nothing from us to show what they actually did.

MR. SHEASBY:  Your Honor, this was planned in --

THE COURT:  Just a minute.  On the first issue, I think you're entitled to respond.  I think you're entitled to restate the instructions I've given the jury.  They're not to be influenced by the prior finding.

I think you're entitled to state that Samsung disputes

those findings and intends to seek their being overturned through the appeal process. I think you should have fairly wide latitude there.

MR. CORDELL: And could I also add that the law doesn't provide for any kind of special case? There is no *Panduit* kicker. That has been out of the law for 25 years.

THE COURT: Well, I don't think you want to say *Panduit* kicker in front of the jury. They'll have no idea what you're talking about. But I'm trying to tell you that I think you're entitled to a fair amount of latitude there.

MR. CORDELL: Thank you.

THE COURT: As long as you don't stray too far from the instructions I've given.

Now, with regard to the second issue, you were going to respond in some way, Mr. Sheasby?

MR. SHEASBY: Yes, I was. So over our objections, the settlement methodologies had come in. I was merely pointing out that they're attempting to use our settlement methodologies even though that those are just what they were, settlements, which is exactly what Mr. Dell has said in his report, and they're well aware -- I can tell you that these -- coming up at break, which is Mr. Cordell's common tactic, we discussed this openly this morning, he was aware that we were going to say this about the settlement, he approved the slide that showed the settlement offers.

And so the crocodile tears that he's making now, settlement offers are not coming in any more than their structure, which is what the Court allowed and what I made reference to.

MR. CORDELL:  I pulled the slides, Your Honor.  I pulled the slide that had the settlement structure in it.  That's -- because it was objected to.  We couldn't come to an agreement.  And if you recall, the edict was if we didn't agree, we couldn't use any slides.  So we pulled it.  It's not in my deck.

MR. SHEASBY:  That's not incorrect [sic].  He was allowed to use the slide.  He just had to redact the underlying numbers.  What Mr. Cordell is saying is highly inaccurate.

THE COURT:  Well, the Court stands by its previous order.  The numbers are excluded.  But, otherwise, to show the structure of the agreements are -- are permissible.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  I don't know how to guide you any further.  You know, here we are, we haven't called the first witness, and I'm already hearing about such language as crocodile tears.  We all know what's going on here, gentlemen. We don't need to be any more flamboyant with our language than the facts will bear.  Let's try to keep -- try to keep focus on that.

All right.  Do your opening.

MR. CORDELL:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  The Defendants will now proceed, ladies and gentlemen, with their opening statement.

Would you like a warning on your time, Mr. Cordell?

MR. CORDELL:  I would, Your Honor.  I would like -- if I could have 10 minutes and then five and then two.

THE COURT:  All right.  I'll warn you with 10 minutes remaining, five minutes remaining, and two minutes remaining.

You may proceed.

MR. CORDELL:  May it please the Court.

Good afternoon, ladies and gentlemen.  I am Ruffin Cordell, and I'm proud to stand before you on behalf of our client, Samsung.

I've been -- I'll do the same deal that you guys did this morning.  I have been married for almost 36 years.  I have three children, one grandchild.  Grew up in Louisiana, went to LSU and got an engineering degree, and I currently live in Florida, contrary to what Ms. Truelove told you.  But I'm very proud to be here and appreciate all the time and attention you're giving us.

Let me echo what everybody said.  We know this is not

what you had planned for this week, and we know what a sacrifice it is, and we really appreciate it. And I only have a few minutes with you so I'm going to try to dive right into this.

But the first thing that I have to respond to is, why are we here? What is it that we're here? We just heard a lot from Mr. Sheasby. And he's very good at this, and he said, oh, there's all this technology and look at -- look at all the things it does and whatnot.

But we're here for a very particular reason. You heard it from the Court just a few minutes ago. You-all are here not to decide whether patents are used or not used or who shot John. We're here for one reason and one reason only: We are trying to come up with a fair and reasonable price for a license to these two patents. That's it. That's it.

So any time anybody gets up here, me included, and starts trying to distract you with these other issues, a little bell ought to go off, and you ought to ask yourself, why are they doing that? Why don't they just show me what I need to come up with a fair and reasonable license?

Now, the other thing I have to respond to is we just heard a lot about this verdict and that somehow these patents are special and you really have to give them some extra value because of what -- was happened in -- in the last case. But that's not what the law is and that's not what the Court just

instructed you to do.

And, in fact, the Court instructed you to do something very particular:  You should not let the fact of these prior findings directly influence the award of monetary damages in this trial.  That's the instruction.  That's what we have to do.

So everything that you just heard from counsel about these somehow being special, that is completely out of left field.  That is not the law, and we're all bound to follow the law.

Now, the other thing that we're going to have to do to kind of level set here is realize that no way, no how, in no universe did GComm -- we call them GComm, sometimes they're called G+ -- no way did GComm invent 5G.  That's absurd.  These patents are very narrow.  They relate to very, very small aspects of the way the phones work.

And you-all know this, that your phones do all kinds of things.  They do all kinds of crazy things.  And it turns out there are almost 70,000 patents that go into 5G--70,000.  This is two.  This is two patents, one of which is from, I mean, almost 20 years ago, long before 5G was ever even -- even a concept.  That's what we're here to talk about.

We have to be realistic about it because it turns out -- I didn't hear Mr. Sheasby tell you how much money he wants, so let me tell you how much money he wants.  He's

asking you for $42.6 million [sic].  And, ladies and gentlemen, if you had to pay every patentee that came along with two patents 146 -- did I say 46?  I meant 146, $142.6 million, our expert will tell you that the phone would cost $50,000 to make and nobody would have a phone.  It's that simple.

So the law has long recognized this.  GComm will say, well, you know, not all these 70,000 are used, but they'll tell you at least about 7,000 of them are used.  And, again, if you do that math, it would cost billions and billions of dollars, so they just can't do that.  That's not the way it works.  That's not fair, and that's not reasonable, and that's not the law.

So what does the law do?  Well, you heard -- you heard the Court tell you about this ETSI outfit.  It's actually an outfit in France, and they have rules about this.  They are the ones that set the standard, and I'm going to talk a little bit about the standard.  But they require you, if you want to play in the standard, you've got to agree to license your patents on a fair and reasonable level, a fair and reasonable price.

We had some discussion this morning about, you know, if you're building a road, and I'm going to talk about a road in a minute, and you don't want to sell your land to the county, well, you don't have to; they can build the road around you.

The same is true here.  You don't have to put your patents into the standard.  That's completely voluntary, but that's completely what happened in this case.  The company that originally came up with these patents, ZTE, you've heard about them, they chose to put their patents into the standard because they wanted their technology to be adopted.

And that's a good thing.  But then on the backside, what the rules say is that you have to give irrevocable licenses on fair, reasonable, and non-discriminatory terms.  That's the price you pay.  So you put your patents into the standard, that's a good thing.  But in exchange for that, you're going to take a fair and reasonable royalty rather than these swing-for-the-fences numbers that the Plaintiff is asking for.

So how does this work?  You're going to hear again a lot of instructions from the Court about this, but what you have to do is you have to imagine yourself back in 2019 and Mr. Samsung and Mr. ZTE -- remember these patents didn't come from GComm.  So it's that company ZTE that's sitting at the table.  And the question is, what kind of deal would they come up with?

We talked this morning about buying a car.  You can imagine the hypothetical negotiation for a new, you know, 2024 Camry.  What might people do to negotiate for that?  Well, they look at other cars.  They look at lots of things.  They look at the comparables, the other deals that are being made.

And the same is true here.

But there's a little bit different.  The way the law works on this is everybody turns their cards over.  So everybody knows the same information.  So you know what the car dealer paid for the car, you know what kind of features and what they cost, you know what everybody else in town has paid for that car.  You can cut a pretty fair deal if you have all that information.

And that's what the law tells you in this context, this hypothetical negotiation, to set a FRAND, a fair and reasonable level, that price, you're going to have all that information.

The other thing you have to remember is that the law tells you validity and infringement don't matter.  You heard a lot from Mr. Sheasby about how, well, you know, these are special patents.  But the law says we treat all patents the same.  We treat them all equally.  We assume that they're valid and infringed.

So there is no -- there's nothing in the law about this -- this adjudication that he talked about.  Everything has to do with your assumption that they're valid and infringed, and all we're doing is setting a price.  That's what we have to stay focused on, and we can't get distracted by that.

So what do you do?  So if you're out to buy or rent a

house, you know, the first thing you do is you look at the neighborhood and you look at other houses on that street. Now, I'm going to rent a house. I want a three bedroom, two bath house. I look at what my neighbors have paid or are paying, and that's how I set a price. And that's a reasonable way to do it. We talk about cars, you could get the Blue Book. That works, too. You look at comparables. You look at what other people have done.

And what we're going to show you in this case, we're not going to show you a bunch of pie-in-the-sky numbers. We're not going to talk about revenues which have nothing to do with this case because what we're talking about is the value of inventions. What we're going to do is we're going to show you agreements that other people have entered into, some of which for these two patents, and what the value of these two patents is in the marketplace. And we think that's the information you need to come up with a fair and reasonable price.

If I could have the monitors turned off. Thank you.

So here's one set. Remember, ZTE is the company that came up with these patents. ZTE is the one that owned them for a long time. And so ZTE entered into agreements with some big companies. They entered into an agreement with Samsung. Samsung is a good and ethical company, ladies and gentlemen. They enter into license agreements all the time. And you can see the amount here that they paid. That's a big number.

But what you got to remember is while that's a big number, it was for 1792 licensed patent families. We call them families sometimes, but you can just think of them as patents. So, you know, on a per-patent basis, it came down to a smaller number. I call it $165,000. Now, that's a fair and reasonable amount for these patents -- for two patents. We calculated it for two patents.

But here's another one. This ZTE/Apple agreement, that agreement was entered into at almost exactly the same time as you are going to be asked to think about your negotiation, that hypothetical negotiation. And they paid a lot for them. And I won't mention how many patent families, but it was a whole lot. And our experts have done that calculation, and you know what? It comes out to about that same $165,000 number for two patents, again a pair of patents, 82-5 apiece.

THE COURT: Ten minutes remaining.

MR. CORDELL: So what I hope you kind of see here is that there is kind of a market level that's being established. You see it over and over again. And, importantly, this Apple/ZTE agreement, ladies and gentlemen, included these two patents. The house has already been rented. We know exactly what they paid for it. It's Apple. It's the -- Mr. Sheasby called them -- he gave them some name, but it's their biggest competitor. Right? So you would understand that Mr. Samsung sitting at the table would say, that's a pretty important

piece of information.

But we're not going to stop there because when what you're going to be asked to do is to compare that to what GComm is demanding--$142,600,000 for just two patents out of the almost 70,000 that are declared essential to 5G.

There's another way to look at this, and I just want to -- I'm going to let this sink in.  When we look at that Apple/ZTE agreement, remember it's for these two patents and a whole bunch more, you know, thousands more.  When you do the math, what you realize is Apple sells a lot of product, and on a per-phone basis, this is what they were paying.  I won't say it out loud, but that's the number that they asked for Apple for these two patents plus over 4,000 more.

And what are they asking of us for two patents?  $1.35.  It's almost four times that.  Now, does that seem fair?  If you found out your neighbor was renting the same house as you and they were paying not four times, ladies and gentlemen, because remember this is for thousands of patents.  If you take this number down to just being the two patents, that number becomes less than a penny.  So it's hundreds, it's even thousands of times larger when you do the math.

So how do we get here?  Well, ZTE did own these patents, and you're going to hear some testimony from Dr. Mang Zhu.  She's the chief of IP strategy at ZTE.  And it is by deposition.  And I apologize.  It's kind of hard to get

through it.  But she's going to say, well, we had some extra patents, and so we decided we were going to -- we were going to sell them to Mr. Pitcock over at GComm.

But, ladies and gentlemen, Mr. Pitcock's -- he's a lawyer.  I'm a lawyer.  There's nothing wrong with that.  Right?  But he had never done one of these things before.  He's never done a 4G or 5G deal.  Mr. Pitcock's all by himself.  He's a one-man band.  He is a solo.  He's the entirety of GComm.  He never met anybody at ZTE.

And they not only picked him out of the 330 million Americans they could have chose, they picked him out, and they not only said you're going to take these patents, they sold him about 70 patents but not all of them were U.S. patents, they picked him out, and they said, we're going to give you these patents and we're going to give you a list of targets that we want you to go after.

And what did he pay for patents they're telling you are worth $142.6 million?  He paid $600,000.  Now, something's not right.  If these patents are really worth $142.6 million -- ZTE had just done a deal with Samsung.  They knew how to do that.  They could have gone and asked for the 140 million, given them a little discount.  But, instead, they set Mr. Pitcock up.

And the other thing they did is they took a 20 percent sort of interest back so that they could make some money off

of whatever Mr. Pitcock could do.

So at the end of the day you've got to ask yourself why, you know?  Why is it that they would give him those patents for $600,000 when they say they're worth 142.6?  Now, we don't know is the answer.  I'm going to be listening to the evidence just like you are.  But what we do know just prior to that when they did an agreement with Apple, they got about $165,000 for those same two patents.

Could it be they were trying to get out from under that promise they made, that FRAND promise?  I don't know.  We're going to have to see.

So let's talk just a bit about standards.  So His Honor instructed you on this, and he had it exactly right, that, you know, if I've got a Samsung phone and I want to talk to somebody who -- who has an Apple phone, I've got to go over a Nokia base station that's out on the side of the road, I've got to use my AT&T account, they might have T-Mobile, it goes back over Ericsson, you know, to an Apple phone.  In order for that to work --

THE COURT:  Five minutes remaining.

MR. CORDELL:  -- every one of these companies has to talk to every other one.  They've got to all speak the same language.  If they don't, it's not going to happen.  So when they put these patents into the standard, everybody is allowed to use them.  Anybody that wants to make a 5G phone is allowed

to use them.  We have to pay a fair and reasonable amount for them, but you're allowed to use them.

We talked a little bit about building roads.  So imagine you were a hundred years ago and you needed to get crops off your farm.  You're Mr. Porter here, and the county says, let's build a road.  So everybody says, yeah, I'll sell you a little strip of land at the edge of my property.  But one person says, you know what?  No.  I want a hundred, a thousand times the money.  Well, then you know what happens?  We don't get a road.

And the same thing is true with technology.  If everyone doesn't cooperate, if everyone doesn't do the kinds of things they need to do, you don't get the road.

So these are the kinds of documents you see.  This is a promise that ZTE made in 2010 for the '776 Patent.  They said, you can use it on a fair and reasonable basis.  You can use it.  They made an irrevocable promise to the standards body, and we're going to show you a lot more of that.  And this is the -- this is the actual document.  You can see the -- this is the Chinese patent application that they referred to that became the '776 Patent.  And we'll show you all that in great detail.

So let me give you a little bit of good news.  We have Mr. Paul Meyer here.  He's our damages guy.  He's a very skilled guy.  He's done a ton --

Mr. Meyer, can you stand?

He's done a ton of work to try to get to the bottom of what a fair and reasonable price should be.  He's going to show you those comparables.  He's going to show you a bunch of agreements.  He's going to take you through the big two that counsel mentioned, and he knows about these because they're really important.  We have the Ox Mobile and the 5G IP agreements.

And why are they important?  Well, they have the same kinds of technology and they kind of -- they kind of have the same number of bedrooms and baths, if you want to think about it that way.  Ox Mobile, in particular, ladies and gentlemen, is going to be very important.  Why?  Because the Ox Mobile patents came from ZTE.  Ox Mobile is a little bitty, you know, lawyer shop or whatever you want to call it that got patents from ZTE and then went out and tried to license and enforce them.

They had four patents, not just two.  They had four U.S. patents that were all declared to 5G.  They had four 5G patents and look at the amount of money they got for those four 5G patents, ladies and gentlemen, and compare that in your mind to $142.6 million.  Who's being fair?  Who's being reasonable?

We also have Mr. Dell, who is the expert helping GComm, that was hired by GComm, and Mr. Dell did some of this

work, too, and he looked at a bunch of comparables.  And when he did this work -- this is not my work or Mr. Meyer's work, this is Mr. Dell's work, he said the right range is between 2.1 and $21.7 million.

THE COURT:  Two minutes remaining.

MR. CORDELL:  This is his work, ladies and gentlemen.  So you can see that what you have is you have Mr. Meyer's work, and he looks at this comparable at 3.125 million.  We have Mr. Dell, the expert on the other side, he said it's somewhere between 2 and 21.  So you kind of know you're in the right range.  You know, the houses are all selling or renting for the same kind of prices.

And then we have this crazy IPA method.  And counsel said it was unprecedented.  He took that word from my slide, I think, because we'd never seen it before.  It's the kind of thing that you just don't -- you don't run into.

Dr. Paul Min is here, and he's going to tell you about the technology that the Ox Mobile and the 5G IP patents have are actually more valuable than the patents in this case. They're very meaningful.  They actually relate to a call that you're making, whereas the patents that we're talking about for GComm relate to when the patent -- the phone is just sitting on the table.  It's just not the same.

And so what we're going to ask you to do is compare these comparables.  We're going to ask you to look at the Ox Mobile,

look at the 5G IP, and then look at their demand, ladies and gentlemen, and ask yourself, who is being fair and who is being reasonable.

And you'll take all of this information, and at the end of the day the decision will be yours.  You will be the ones who ultimately have to decide what is a fair and reasonable rate.

But I hope you'll see that Samsung, being a good, ethical company, pays lots of people for their patents.  They want technology.  They want to share technology.  That's a very important part of their business.  But it has to be done at a fair and reasonable rate or none of us have phones.  The network simply won't work.

So with that, I'll thank you for your time and attention, and we look forward to working with you and putting on the rest of the case.

Thank you.

THE COURT:  Counsel, does either party wish to invoke the Rule?

MR. SHEASBY:  Plaintiff wishes to invoke the Rule but not as to experts.

THE COURT:  All right.  The rule has been invoked excluding experts, which means if you're a fact witness in this case, not an expert witness, then you are to be maintained outside the courtroom until such time as you're

called to testify.

And I'll rely on each side to keep me apprised of anybody that fails to comply with that instruction.

MR. CORDELL:  And, Your Honor, may I also ask whether that excludes our corporate representatives?

THE COURT:  It does unless we get to a point where they're precluded by confidential information, and we'll address that on a case-by-case basis.

MR. CORDELL:  Thank you.

THE COURT:  All right.  Plaintiff, call your first witness.

MR. SHEASBY:  Your Honor, Plaintiff calls Mr. Jeremy Pitcock.

THE COURT:  All right.  Mr. Pitcock, if you'll come forward and be sworn in by the Courtroom Deputy.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please have a seat on the witness stand.

MR. SHEASBY:  Your Honor, may I approach counsel's table just briefly?

THE COURT:  You may.

MR. SHEASBY:  Thank you.  May it please the Court.

THE COURT:  You may proceed, counsel.

JEREMY PITCOCK,

having been duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. SHEASBY:

Q.   Good afternoon, Mr. Pitcock.  Could you introduce yourself to the Court and the jury, please?

A.   Yes.  My name is Jeremy Pitcock, and I am the managing director of G+ Communications.

Q.   And what is G+ Communications?

A.   So G+ Communications is a company that was formed to hold and license the inventions created by a global telecommunications company called ZTE.

Q.   And how is G+ able to protect the patent rights created by another company?

A.   So patents are like a piece of land or house.  They can be transferred.  ZTE owned them, and they transferred them to G+.

Q.   And what are the patents and what do they relate to?

A.   So I'll use the same three digits that you'll get used to.  The '776 and the '130 are both United States patents.  They both relate to improvements in speed and efficiency for 5G communications.

Q.   Did ZTE receive permission to file for the United States patents that it obtained?

A.   They did.  And you can see on your screen --

        MR. CORDELL:  Object, Your Honor, as calling for a legal conclusion.

        MR. SHEASBY:  Your Honor, Mr. Pitcock is a patent

prosecutor.  He knows exactly what steps are taken to nationalize.

THE COURT:  I don't see that this calls for a legal conclusion.  I'll overrule the objection.

THE WITNESS:  So if you look on your screen, this is an example of the permission that you get when you file a U.S. patent from abroad.

Q.    (BY MR. SHEASBY)  You used the word 5G.  What -- did you gain an understanding of what 5G technology is as part of your role as the managing director of G+?

A.    I did.

Q.    What is 5G?

A.    So 5G is the latest version of mobile technology that's used in your phones today.  The G stands for generation, and previously we were on 2G, 3G, 4G, and now we're on 5G.

Q.    When was 5G first introduced?

A.    So 5G was first introduced in 2019.

Q.    And why was 5G introduced?

A.    So 5G was introduced because of the massive amount of data that's now traveling on mobile networks.  If you take a look at this slide, this is in exabytes, which is a billion gigabytes.  It represents 250 million four-minute songs in data.  We're already at 15 exabytes.  And one exabyte of music would take about 2000 years to play.  So it's just an enormous amount of data.

Q.    Did ZTE take steps to ensure that the patents it was committing to protect were important?

A.    Yes.  So -- and I'm sorry.  I think you said ZTE and you meant G+.

Q.    Thank you for the correction, Mr. Pitcock.

Did G+ take steps to ensure that the patents it was committing to protect were important?

A.    Yes.  So we went through four layers of review.  The first layer was --

Q.    Mr. Pitcock?

A.    I'm sorry.  I apologize.

Q.    Because it's a court proceeding, I need to do it through a question-and-answer process.

A.    I understand.

Q.    What was the first analysis?

A.    So the first analysis was a law firm that had worked extensively with ZTE on their portfolio reviewed the portfolio to try to determine patents that had particular value for licensing.

Q.    What was the second analysis?

A.    So the second analysis is we hired a technical specialist to compare the patents to parts of the standard, the technical standards for 5G.

MR. SHEASBY:  If I could have the elmo, Madam Courtroom Deputy.

Q.   (BY MR. SHEASBY)  So counsel for Defendant showed this slide and suggesting that there that there were 69,000 patent families in 5G.  Do you see that?

A.   I do.

Q.   Was that an accurate or inaccurate representation?

A.   This was a highly inaccurate representation.

MR. SHEASBY:  If I may move the --

THE COURT:  You may.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  You're going to need to speak up, Mr. Sheasby.

Q.   (BY MR. SHEASBY)  At the top, there are -- do you know what it means to declare a patent to ETSI?

A.   Essentially it means that one of the companies, and there are many that are involved in these standards, think that the patent may have something to do with mobile telecommunications.

Q.   Is that called declared?

A.   Yes.  They have a duty to declare patents that may be relevant to the standard to the body.

Q.   Now, is the fact that a patent is declared to a standard setting body, the 68-, 69,000 that Mr. Cordell represented to the jury, does that mean it's actually essential to the standard?

A.   No.  There have been many, many studies that show that

only a very small percentage of the patents that are declared actually have anything to do with the standard.

THE COURT:  Mr. Pitcock, you answered the question fully when you said no.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  Just limit your answers to the questions that are asked.

THE WITNESS:  Yes, Your Honor.

Q.   (BY MR. SHEASBY)  What's the data that's estimated that the number of patents that are actually essential?

MR. CORDELL:  Objection, hearsay.

MR. SHEASBY:  I'll withdraw and re-ask, Your Honor.

THE COURT:  All right.

Q.   (BY MR. SHEASBY)  In part of your role as the managing director of G+, did you familiarize yourself and reach a conclusion as to the number of patents that are actually essential?

A.   I did.

Q.   What's that number?

MR. CORDELL:  Objection, hearsay.

THE COURT:  He's testifying for what his own personal knowledge is.  That's overruled.

THE WITNESS:  So as put in my initial letter to Samsung, it's estimated that less than 10 percent, somewhere around eight percent, of patents that are declared have

anything to do with the standard.

Q.    (BY MR. SHEASBY)  And then after a patent is declared essential, does that mean that the patent is actually used by a given company?

A.    No, it doesn't.

Q.    What's the next step in the analysis?

A.    So the next step in the analysis is you have to determine whether the patent is infringed and valid, actually being used and patentable over the prior art.

Q.    Now, what does it mean for the patent --

        MR. SHEASBY:  Madam Courtroom Deputy, if we could have back to the video screen.

Q.    (BY MR. SHEASBY)  What does it mean for a patent to be essential?

A.    So these technical standards, which essentially tell you how to implement 5G, are thousands of pages long.  To be essential just means it has something to do with the technical standard.

Q.    And how many pages are there in these technical standards?

A.    Hundreds of thousands.

Q.    And did you perform an -- did you ask someone to perform an investigation as to whether the patents were essential in this case?

A.    Yes.  So the technical --

MR. CORDELL:  Objection, Your Honor.  The answer should have been yes, and then the follow-up I would object to as hearsay.

THE COURT:  Well, he answered the question fully when he said yes.  To go beyond that would be non-responsive, and to go into what some third party prepared might be hearsay, but that's not where he went.  But I'll sustain as to non-responsive and limit the answer to yes.

Q.   (BY MR. SHEASBY)  Did you ask an expert to investigate whether the patents were essential?

A.   I did.

MR. SHEASBY:  And if I could go to slide --

Q.   (BY MR. SHEASBY)  This is JTX 17.  This is the declaration phase for -- well, what is this that we're looking at, JTX 17?

A.   So as was mentioned before, when you think that a patent might be relevant to the standard, you file a declaration with ETSI, which was the governing body, where you list the patent along with what you think it may be relevant to.

Q.   And the language may be.  Is that correct?

A.   That's correct.

Q.   And are these the declarations on may be essential that were made for the patents-in-suit?

A.   Yes.

Q.   So that's that 68-, 69,000 number that Mr. Cordell was

referencing to the jury.  Is that correct?

A.   That's right.  That's how many patents I suppose he's added up were declared by anybody that may be relevant to the standard.

Q.   And based on the analysis of this independent expert, what did you conclude as the two patents-in-suit in this case?

MR. CORDELL:  Objection, hearsay, Your Honor.

MR. SHEASBY:  Your Honor, that is --

THE COURT:  Just a moment.

MR. CORDELL:  He's parroting the hearsay by referencing the entity in question.

THE COURT:  When you're asking, based on the analysis of the expert, what did you conclude, that's pretty close to saying what did the expert conclude, Mr. Sheasby. I'm going to sustain that as hearsay.

Q.   (BY MR. SHEASBY)  In this case, what was your conclusion as to the patents-in-suit and whether they are essential?

A.   So I concluded that the two patents-in-suit, the '776 and the '130, were essential.

Q.   And then did you do -- was a fourth level of analysis performed as to whether the patents were infringed and valid?

A.   Yes.  Professor Akl and Doctor Kowalski --

MR. CORDELL:  Your Honor, I object as beyond the scope.

THE COURT:  Beyond the scope of what?  This is

direct examination for the first witness.

MR. CORDELL:  The question -- the answer was yes and then everything after that is beyond the scope of the question.

THE COURT:  All right.  I would call that non-responsive, counsel.  If you use that term, I'll know what you mean next time.

MR. CORDELL:  My apologies, Your Honor.

THE COURT:  Sustained.

Q.   (BY MR. SHEASBY)  Did you ask Professor Akl and Doctor Kowalski to perform an analysis of infringement and validity?

A.   I did.

Q.   And that's that bottom level that we're talking about here.  Is that correct?

A.   Yes.  That's the bottom of your funnel figure is whether the patents are infringed and valid.

MR. SHEASBY:  So going back to the elmo.

Q.   (BY MR. SHEASBY)  When counsel is showing 69,859, was he being accurate or inaccurate with the jury?

A.   In my opinion, inaccurate.

Q.   Are the two patents-at-suit in this case just declared essential patents?

A.   No.

Q.   What are they?

A.   They are actually essential patents that have been

determined to be infringed and valid.

Q.   What is your educational background?

A.   So I have a Bachelor's of Science in physics from MIT, the Massachusetts Institute of Technology.  I have a law degree from the University of Pennsylvania.  And in 2001 I took -- I became registered to practice before the United States Patent and Trademark Office, which is a special designation that lets me help inventors get patents here in the U.S.

Q.   Can you tell us about your family?

A.   Yes.  So I've been married for over 18 years.  I have three boys, ages 17, 16, and 10.

Q.   Where do you live?

A.   I live in New Jersey.

Q.   Tenafly, New Jersey, if memory serves me.

A.   That's exactly right.

Q.   What is your professional focus?

A.   So my wife and I a number of years ago--she's an attorney as well--we decided to focus on helping companies license and protect their patents and other intellectual property.

Q.   Counsel suggested that you don't have any experience in this space to the ladies and gentlemen of the jury in the opening.  Can you give some examples of inventive companies you've assisted in protecting their patents for?

A.   Yes.  So I have helped protect and licensed patents from

large companies like Intel, JDS Uniphase, and 3Com.

I've also helped a number of small companies, a video streaming start-up, a small single inventor semiconductor company.

And I've also helped numerous different companies with their intellectual property.

Q.   Before deciding to form G+, did you study ZTE's record of innovation?

A.   I did.

Q.   Does ZTE invest in R&D for 5G?

A.   Yes, they do.

Q.   What is their level of investment?

A.   So starting in 2017, ZTE invested more than $300 million a year.

MR. CORDELL:  I object as hearsay, Your Honor.  He never worked at ZTE.  He's just reading this off of the internet.

THE COURT:  Can you lay a foundation, Mr. Sheasby?

MR. SHEASBY:  Yes.

Q.   (BY MR. SHEASBY)  Before deciding to form G+, did you study ZTE's record of innovation?

A.   I did.

Q.   Did you not just study public press documents, but did you actually establish the facts as you understand about what they did?

MR. CORDELL:  Objection, leading.

THE COURT:  Sustained as to leading on direct examination.

Q.    (BY MR. SHEASBY)  What steps did you take to establish personal knowledge of ZTE's role?

A.    So I reviewed the record of the individual inventors who are named as inventors on the patents.  I looked at ZTE as a company.  I looked to see whether or not they had done inventive work in 5G and telecommunications generally, and I noted that they had -- they're a public company, so they have a number of public announcements about their activities, research, development, and other financials.

MR. CORDELL:  Move to strike as hearsay, Your Honor.

THE COURT:  Overruled.

MR. SHEASBY:  Let's go to slide 5, Mr. Svenson.

Q.    (BY MR. SHEASBY)  Did ZTE invest amounts in R&D on 5G?

A.    Yes.  They -- they did.

Q.    How much did they invest?

MR. CORDELL:  Hearsay, Your Honor.  He's never worked for ZTE.

THE COURT:  You can address this with him on cross examination.  Overruled.

THE WITNESS:  It was publicly announced that they spent more than $300 million a year on research and development and had over 3,000 engineers working on 5G

starting in 2017.

Q.   (BY MR. SHEASBY)  Did you investigate any significant technical achievements that ZTE has made in 5G?

A.   I did.

Q.   Can you give us three examples?

A.   Yes.  So working with a company called Qualcomm, ZTE had the first voiceover 5G communication ever in history.  In 2022, ZTE, again working with Qualcomm, announced that they had the fastest 5G communication known.  And this year in 2024, working with IBM, they achieved the highest 5G communication that was error free.

Q.   When was ZTE founded and where?

A.   So ZTE was founded about 40 years ago outside of Hong Kong.

Q.   And what were they focused on?

A.   So at the time they built phone systems for communities.

Q.   Did you -- do you know if ZTE has offices in the United States?

A.   I do.

Q.   Where are those offices located?

A.   So ZTE has offices in Basking Ridge, New Jersey, and Richardson, Texas, which are both centers for telecommunications research.

Q.   Do the ZTE agreements with -- did the G+ agreements with ZTE ensure -- let me ask it this way.

You were here for the opening when Mr. Cordell, Samsung's counsel, represented that you paid $600,000 for these patents.

A.    I was.

Q.    Was that -- was he being accurate or inaccurate with the jury?

A.    In my opinion, inaccurate.

Q.    Does the ZTE agreement -- does the G+ agreement with ZTE ensure that ZTE is compensated for its research, and if so, how?

MR. CORDELL:  Objection, leading.

THE COURT:  Overruled.  But you need to slow down, Mr. Sheasby.

MR. SHEASBY:  Understood, Your Honor.

THE WITNESS:  So the agreement with ZTE gives them 20 percent of the net licensing revenue, which is intended to compensate them for their research and development.

Q.    (BY MR. SHEASBY)  Does ZTE have a role in decision making regarding the lawsuit?

A.    They don't.

Q.    Did ZTE -- did G+ make an upfront payment to ZTE?

A.    We did.  We made an upfront payment that basically covered the cost of filing for the patents.

Q.    Do you and your business partner, who I think is your wife, retain a portion of the revenue from G+ after costs?

A.    Yes, we do.

Q.   What portion is that?

A.   It depends a little bit on various circumstances, but it would be less than 10 percent.

Q.   Now, are there other examples of ZTE using specialists to assist -- well, I'll withdraw the question.

You were here in opening when counsel for Samsung represented that ZTE engaged G+ because it wanted to avoid some type of FRAND obligation.

A.   I did hear that suggestion.

Q.   Are you aware of other examples of ZTE using specialists to assist with patent licensing in the United States for cellular communications patents?

A.   Yes, I am.

Q.   Can you give me an example?

A.   So ZTE uses a company called Avanci to help license patents in both the smart meter and automotive space that deal with telecommunications.

Q.   You were here in opening when Mr. Cordell, and I think he said it twice, Samsung is an ethical company.  Do you remember that?

A.   I do.

Q.   Does Samsung use specialists to assist it with licensing of its cellular patents?

A.   It does.

Q.   Can you give us an example of that?

A.    So one company is called PanOptis that Samsung transferred patents to to help them license.

Q.    So Samsung transferred cellular essential patents to a third-party specialist like yourself called PanOptis.

          MR. CORDELL:  Objection, leading.

          THE COURT:  Sustained.

Q.    (BY MR. SHEASBY)  As part of your work as managing director of G+, did you familiarize yourself with the inventors in this case?

A.    I did.

Q.    Did the inventors make contributions to 5G?

A.    They did.  So they made over 500 contributions to 5G, among other things.

Q.    What other things did they do?

A.    So they helped write a 5G -- well-known 5G textbook, and they had years and years of research in the field.

Q.    As part of your role as head of G+, did you learn the technology covered by the patents-in-suit?

A.    I did.

Q.    What does the '776 Patent relate to?

A.    So 5G requires an enormous number of antennas to take advantage of the higher speed, and so the '776 Patent allows the cell phone to choose the best antenna for the communications.

Q.    And what does the '130 Patent relate to?

MR. CORDELL:  I'm going to object as calling for expert testimony, Your Honor.  We've got no 701 or 702 report from this witness.

THE COURT:  Unless he gets more technical than he is, counsel, he's the representative of the party that owns the patents.  He can state in simple terms what they cover. He's not -- I'm not going to allow him to go into great technical detail, but this is not that at this point.

Overruled.

Q.   (BY MR. SHEASBY)  What does the '130 Patent relate to?

A.   So at a basic level, the '130 Patent -- there's an enormous amount of data that has to come from the cell tower to the phone in data transmission.  And the '130 Patent covers an efficient way of telling the tower whenever there's a mistake in the data.

Q.   Did G+ formally put Samsung on notice of its need to license patents?

A.   We did.

Q.   When did you do that?

A.   So in September of 2021, we sent them a letter that gave them notice of their need to take a license, and it specifically listed the two patents-in-suit, the '130 and the '776.

Q.   And is this DTX 25 that letter?

A.   Yes.  This is a blow-up from that letter.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

Q.   Did you include anything else with that letter besides just the patents?

A.   We did.

Q.   Is this one of the things that was included?

A.   Yes.  This is a claims chart.

Q.   And what does a claim chart do?

A.   So a claims chart basically describes the relationship between the patent and the technical standards.

Q.   Did you attempt to negotiate with Samsung?

A.   I did.

Q.   Did you propose a structure for settlement?

A.   I did.

Q.   And when was that?

A.   So in January of 2022, we sent a settlement offer to Samsung.

Q.   And why do you call it a settlement offer?

A.   Well, it's a settlement because it's intended to be a compromise.  You're essentially offering to take less than you think you would be entitled to if you ended up in a court proceeding like this.

Q.   And is DTX 578 that settlement agreement?

A.   Yes.  This is a copy of the letter.

Q.   Did you provide any warning to Samsung about settlement and its relationship to damages in a court case?

A.   We did.

Q.   What did you say?

A.   Well, we specifically said in the highlighted region here that in an actual litigation where there are individualized findings of infringement, validity, and technical contribution, the damages could be far higher than the settlement offer.

Q.   You made another statement to them that -- what does this statement relate to?

A.   I'm sorry.  I'm not sure exactly what you're asking me.

Q.   Sure.  This is another part of the letter you sent.  Is that correct?

A.   Yes.

Q.   And you said, A study commissioned by Ericsson indicates that approximately 8 percent of patents are declared essential to --

THE COURT:  You're going to have so slow down, Mr. Sheasby.

Q.   (BY MR. SHEASBY)  It says approximately 8 percent of patents declared essential to 3GPP are actually essential.  Do you see that?

A.   I do.

Q.   And it says, This does not take into account validity and therefore is highly conservative.  What do you mean by that?

A.   What I mean by that is just because a patent is essential and reads on the standard, doesn't mean that it's going to be

211

found valid over the prior art.

Q.   Did Samsung ever dispute in writing the statement that you made about the consequences of FRAND damages in an actual court case?

A.   They never did.

Q.   Did Samsung during your negotiation provide its source code and materials necessary to determine infringement and validity?

A.   They did not.

Q.   Did you engage a licensing expert to assist in evaluating your settlement offers?

A.   I did.

Q.   Is -- who was that expert?

A.   So Mr. Dell, who's also the damages expert in this case, is a licensing expert, so I hired him to help us.

Q.   Is Mr. Dell -- he's still involved in this case obviously.  Is that correct?

A.   Yes.  Yes, he is.

Q.   Are the patent damages that Mr. Dell concluded different than the methodology in the G+ settlement offers?

A.   My understanding is they are.

Q.   Why do you say understanding?

A.   Well, I'm still not allowed to see all the materials that Mr. Dell relied upon in his damages report, so I haven't been able to confirm exactly how they differ.

212

Q.   As the managing director of G+, do you have views as to why settlement offers that you calculate are different than damages analysis?

A.   Well, in addition to being compromises and before a finding of infringement or validity by a court, they're also based on basically public information.  We don't have any of the information that you're going to see as part of this proceeding in order to make a damages determination.

Q.   After seven months, what steps did you take?

A.   So seven months after we sent the initial notice letter, I authorized the initiation of a lawsuit.

Q.   And after that lawsuit was initiated, what did Samsung claim?

A.   So Samsung claimed the patents were not infringed and invalid.

Q.   Did you attempt to continue to settle with Samsung after it made that claim?

A.   Yes, I did.

Q.   What is Samsung's current position, as you understand it?

A.   So after the jury trial in January of 2024 determined that the patents were infringed and valid, Samsung is taking the position --

MR. CORDELL:  May we approach, Your Honor?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the

jury.)

MR. CORDELL:  I have no idea what they plan for him to say, but a question like what is Samsung's position, it tells me nothing about the subject matter that they're going into.  I'm afraid what they're going to do is they're going to parrot what Mr. Pitcock believes are our countersettlement offers that --

THE COURT:  Well, he doesn't have any basis to know what Samsung's thinking on something is.

MR. CORDELL:  That was the question.

THE COURT:  That should have raised an objection.

MR. CORDELL:  Okay.

THE COURT:  But you didn't.

MR. SHEASBY:  I'll withdraw the question.  It wasn't meant to go there.

THE COURT:  He's not going to go into all of the negotiations between Samsung and G+.

MR. SHEASBY:  He's not.

THE COURT:  Because this timeline looked like that was where you were headed.

MR. SHEASBY:  He's not going to do that.

THE COURT:  All right.  Let's move on.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Let's continue.

Q.    (BY MR. SHEASBY)  In your career, what is the frequency of having the opportunity to negotiate a license after a finding of infringement and validity?

A.    It is extremely rare.

Q.    Why is G+ maintaining this lawsuit?

A.    We think our patents are important and that Samsung should pay a reasonable royalty for using them in accordance with the law.

            MR. SHEASBY:  Your Honor, I pass the witness.

            THE COURT:  All right.  Cross examination by Samsung.

            MR. SHEASBY:  Your Honor, I'll move the board back.

            THE COURT:  Are you going to use that chart, Mr. Cordell?

            MR. CORDELL:  No, Your Honor.

            THE COURT:  All right.  Then let's move it back and turn it to a clean sheet.

            MR. SHEASBY:  Yes, Your Honor.

            THE COURT:  All right.  Let's proceed with cross examination.

            MR. CORDELL:  I believe we have binders, Your Honor. Have we -- they've been distributed, Your Honor.  Thank you. May I proceed?

            THE COURT:  You may proceed.

            MR. CORDELL:  Thank you.

CROSS EXAMINATION

BY MR. CORDELL:

Q.   Good afternoon, Mr. Pitcock.

A.   Good afternoon.

Q.   Now, all the patents in this case came from ZTE.  Is that what you said?

A.   Yes, I did.

Q.   And in September of 2020--I want to make sure I'm crystal clear about this--you paid ZTE $600,000 in up-front cash for at the time it was about 70 patents.  Is that right?

A.   It's not exactly right.

Q.   Well, you paid them $600,000.  Right?

A.   No.  That's what's not exactly right.

Q.   Okay.  You're saying that you did not transfer $600,000 to ZTE.

A.   That was part of the transaction, sure.

Q.   Okay.  So I'm going to be really precise about my question, sir.  In 2020, you transferred $600,000 in cash to ZTE.  Correct?

A.   As part of the compensation for the patents, yes.

Q.   Okay.  So I didn't -- I didn't get the number wrong.  Right?  It's $600,000.  Right?

A.   I believe that's correct.

Q.   Okay.  And that comes to about $10,000 per patent up front.  Fair?

A.    I can't dispute your math.  I assume that's right.

Q.    And these two patents were part of that transaction.
Right?

A.    Yes.

Q.    So at least for the upfront money, $600,000, you now
think you should get $142.6 million.  Right?

A.    I believe that's the damages calculation in this case,
according to your statement, yes.

Q.    So even if we assume all of the $600,000 went for these
two patents, that's over a 23,000 percent profit.  Right?

        MR. SHEASBY:  Your Honor, I object.  The ZTE/G+
agreement is not comparable.  No one has indicated it's
comparable agreement to be used for the purposes of damages.
He is transparently using it for the purposes of damages.

        THE COURT:  Overruled.

Q.    (BY MR. CORDELL)  Do you remember the question?

A.    I'm sorry.  Would you mind repeating it?

Q.    Even if we assume all of the 600 grand was for just these
two patents, then you realized about a 23,000 percent profit
if you get the 142.6 million.  Right?

A.    I can't do the math that quickly, but I'll assume you've
got it correct.

Q.    Okay.  Now, you formed GComm as a, quote, special purpose
vehicle to take ZTE's patents.  Right?

A.    Yes.

Q.   You formed the company because of this deal.  Is that fair?

A.   That's fair.

Q.   And GComm has no employees other than yourself.  Right?

A.   That's correct.

Q.   And GComm doesn't make any products.  Correct?

A.   It does not.

Q.   GComm doesn't sell any products.  Correct?

A.   It doesn't.

Q.   GComm's sole mission is to take these patents and try to make money from them.  Right?

A.   That's correct.

Q.   And licensing and suing are the only two ways that you have tried to make money with these patents.  Right?

A.   Yes.

Q.   But GComm hasn't licensed anybody to these patents. Correct?

A.   Not yet.

Q.   And if you do, you're going to split the money with your partner ZTE.  Right?

A.   I will split the money in accordance with the agreement, yes.

Q.   So you said something a few minutes ago, that you and your wife would only get 10 percent of the money?  Did I understand you right?

A.    That's correct.

Q.    Well, who gets the rest?

MR. SHEASBY:  Your Honor, may we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. SHEASBY:  He's clearly violating a MIL.  The money goes to investors who have litigation funding associated with it.  He has no business to even ask this question.  It should just be withdrawn and he should move on.

MR. CORDELL:  He kicked the door wide open, Your Honor.

THE COURT:  You did.  You opened that door.  Now, I don't want to talk about litigation funding.

MR. CORDELL:  I'm going to ask who gets the money.

THE COURT:  But the door's been opened.  I'll allow the question.

(The following was had in the presence and hearing of the jury.)

Q.    (BY MR. CORDELL)  Do you remember the question, Mr. Pitcock?

A.    Would you mind repeating it?  I'm sorry.

Q.    You said that you and your wife get 10 percent of the money.  Is that right?

A.    A little less actually, yes.

Q.   So who gets the rest?

A.   The people who've invested more than $10 million in this proceeding so far.

Q.   Okay.  What -- can you tell me what that means?

A.   Yes.  It takes substantial resources to take on a large company like Samsung, and there are people who invested in the outcome of this.

Q.   Okay.  Does that include the law firm?

A.   If you're referring to Irell, no.  Oh, I mean, the costs do, sure.

Q.   Okay.  I'm just trying to figure out who gets the money. Does the law firm get the money or --

        MR. SHEASBY:  Your Honor, we don't get a cent of this money.  This is an absolutely outrageous --

        THE COURT:  If you have an objection to make, state your objection.  I don't need a speech from the floor of the courtroom.

        MR. SHEASBY:  Objection, relevance, Your Honor.

        THE COURT:  With regard to law firms, I'll sustain that.

    Let's move on, Mr. Cordell.

        MR. CORDELL:  Okay.  Thank you.

Q.   (BY MR. CORDELL)  But as far as we know, there are some other people some place who are getting 90 percent of the money.  Is that right?

A.    Yes, approximately.

Q.    So you and your wife are going to get, I don't know, $14 million?

A.    If the jury agrees with us, yes.

Q.    That's a lot of money, isn't it?

A.    I would say it's a lot of money.

Q.    And you testified that -- you told us a lot about ZTE. Right?

A.    Yes, I testified about ZTE.

Q.    You've never worked for ZTE.  Correct?

A.    I have not.

Q.    You've never -- at the time you made this deal, you'd never even met anybody from ZTE.  Correct?

A.    If you mean in person, no.

Q.    And ZTE, you've told us a lot of statistics about ZTE. That's stuff that you just went off and researched.  Right?

A.    Yes.

Q.    Okay.  You didn't ever travel over to ZTE and look at their operations.  Correct?

A.    I did not.

Q.    You didn't -- you testified about some achievements, that there were 3,000 engineers working on R&D.

        MR. CORDELL:  May I have the elmo?

Q.    (BY MR. CORDELL)  Do you remember this?

A.    I do.

Q.   You haven't met those engineers.  Correct?

A.   I have not.

Q.   You testified they spend $300 million a year on R&D. You've never seen their research facilities.  Correct?

A.   No, I haven't.

Q.   And you say that they performed a bunch of work with Qualcomm.  Who was it from ZTE that went over to Qualcomm to work with them?

A.   I'm not sure which of their engineers worked with Qualcomm.

Q.   How about IBM?  You testified about IBM right here.  Who from ZTE went to work with IBM?

A.   I don't know which engineers were involved.

Q.   So who told you to say all these things about ZTE, Mr. Pitcock?

A.   Who told me to say them?  I just knew them from my research.

Q.   Okay.  Well, who told you to go do research on ZTE?

A.   I do that kind of research whenever I'm looking at potential intellectual property deals.

Q.   Now, you know that ZTE filed declarations with ETSI for the two patents in this case.  Right?

A.   I do know that.

Q.   You showed us some of that.  Right?

A.   I believe at least one of them was shown.

Q.   Okay.  And you went -- the way you found those is you went to the files of ETSI and you pulled the declarations. Right?

A.   Actually, I think I was given the ISDL numbers, and somebody else pulled them.  But that's how you would do it.

Q.   Did you get them from the law firm?

A.   I don't think I got them from the law firm, no.  I think I had them long before I engaged the law firm.

Q.   The point is you had nothing to do with ZTE filing those declarations with ETSI.  Right?

A.   I didn't have anything to do with the filing.

Q.   The first one was filed in 2010.  Correct?

A.   I believe for the '776, yes.

Q.   That was more than a decade before you ever started this with ZTE.  Right?

A.   Yes.

Q.   And you know that because ZTE filed those declarations, they had to commit to the FRAND promise.  Right?

A.   Yes.

Q.   And they promised that the price of any license would be limited to fair and reasonable amounts.  Right?

A.   Yes.  The reward was -- got to be fair and reasonable.

Q.   Well, you keep saying reward, but the point is the FRAND promise just says that the terms of the license have to be fair and reasonable.  Correct?

A.    Well, a license is a reward.  So I'm not sure how it's different, but yes.

Q.    The FRAND promise just says the terms of the license have to be fair and reasonable.  Correct?

A.    That is part of FRAND, yes.

Q.    And the only term --

THE COURT:  Let me interject.  It's fair, reasonable, and non-discriminatory.  You keep leaving off the non-discriminatory, and I've already instructed the jury FRAND means fair, reasonable, and non-discriminatory.  So let's be complete.

MR. CORDELL:  I appreciate that, Your Honor.

Q.    (BY MR. CORDELL)  And so when we're talking about fair, reasonable, and non-discriminatory, that means that you can't pick favorites.  Right?

A.    I'm not sure what you mean by that.

Q.    You can't give a license to one company because you like them at a low rate and then charge a lot to another company. Right?

A.    I'm not sure legally whether you can do different deals. I think Samsung has taken that position.

Q.    Well, I mean, the fact is that non-discriminatory means you got to treat everybody equally.  Right?

A.    Non-discriminatory means you can't discriminate against various companies, yes.

Q.   So, for example, it would be wrong for GComm or ZTE to license Apple at one rate and then charge Samsung a hundred times more.  Fair?

A.   For the exact same thing?  Arguably.

Q.   Now, when you bought the patents from ZTE, you knew they had licensed Apple.  Right?

A.   I believe they were listed as a licensee in the agreement.

Q.   And you don't have to say it out loud, but you know that Apple paid them a lot of money for that license.  Right?

A.   I had no idea what the terms are and still don't.

Q.   Okay.  But you know it was a lot of money.  Right?

A.   I would assume they paid a lot of money, but I don't know how much.

Q.   And ZTE didn't share any of that money with you.  Right?

A.   For the -- I'm sorry.  For the Apple license?

Q.   Yes.

A.   No, they did not.

Q.   And ZTE, again the owner of these patents, also did a deal with Samsung, not including these patents but they did a deal with Samsung.  Right?

A.   I don't know the terms of their deal with Samsung, but I have heard you say that, yes.

Q.   Well, you've seen it in court.  Right?

A.   I don't think I have actually.  I think I've always been

out of the room.

Q.    And the deals they did with -- with Apple and Samsung were kind of for the same amount of money per patent.  Let's call it $165,000 per patent.  Right?

A.    I have no idea, but they wouldn't have calculated it on a per-patent basis like that.

Q.    Well, but that's what the numbers show us.  Right?  That these were fair and reasonable amounts that they licensed Apple and Samsung.  Correct?

A.    No one would treat every patent the same, the way you're saying so in your calculation.

Q.    So, yeah, you might find one is more valuable might be twice as much.  Might be $300,000.  Right?

A.    My understanding is a very small percentage of the patents contain a vast majority of the value.

Q.    In fact, we can go back to the 70,000 patents, if we can, since you brought that up.  You don't dispute that there are almost 70,000 patents declared as essential to 5G.  Correct?

A.    I don't dispute it.  I don't know where you got this from, but I don't dispute it.

Q.    You have no basis to say that that's untrue.  Correct?

A.    That's correct.

Q.    And it's your position that really only about 10 percent of them are really good patents.  Fair?

A.    No.  It's my position that less than 10 percent have

anything to do with the standard at all.

Q.   Well, you said on direct eight percent.  Is that your number?

A.   That was the number that Ericsson calculated that I cited in my letter to Samsung.

Q.   So if it's eight percent, eight percent of 70,000 is 5600.  Correct?

A.   That sounds right to me.  Again, I can't do the math quite that quickly, but --

Q.   I went to LSU; you went to MIT.  I mean, come on.  8 percent of 70,000 is 5600.  Right?

A.   It's about right, yes.

Q.   And 5600 times $142.6 million is billions and billions and billions.  Correct?

A.   I just can't do the math in my head that quickly, but I'm sure it's a lot of money, yes.

Q.   Did we know that ZTE did a deal directly with Apple really at the same time that we're supposed to be assessing damages here.  Right?

A.   I don't know any of that.

Q.   Okay.  Well, will you accept that it was in 2020?

A.   I have never seen the deal, so I don't know why I would be accepting anything about it.

Q.   Well, it was in your GComm/ZTE purchase agreement, they told you they had a pre-existing license with Apple.  Correct?

A.   They did list Apple as a licensee, yes.

Q.   Okay.  And so you know they knew how to negotiate a license with a big company.  Fair?

A.   I don't know who worked on that, but they certainly had a license with Apple before I did my deal.

Q.   And they had a license with Samsung.  Correct?

A.   Not at the time I did my deal, no.

Q.   But you know that they did do a deal with Samsung in 2021.  Correct?

A.   I have heard you say that and I have no reason to dispute it, but I don't know anything about that deal.

Q.   So instead of dealing with Samsung directly, you say ZTE chose you out of all of the possible Americans they could have picked to do this deal.  Right?

A.   I don't know if they were limited to Americans, but yes, they chose G+ and me to do this deal with.

Q.   Well, you formed G+ after they asked you to do the deal.  Right?

A.   Well, it was in connection with doing the deal that I formed G+, yes.

Q.   Okay.  And they chose you even though you had never done any work with 4G or 5G telecom patents.  Right?

A.   I had not dealt specifically with 4G and 5G telecom patents.

Q.   They chose you even though you had never met anybody at

ZTE.  Right?

A.   I had not met any of them in person, no.

Q.   And they chose you after they had chosen the patents to push off to GComm.  Right?

A.   Well, technically, it was the law firm that selected the patents.

Q.   You know, all I have is your testimony where you told us that the patents had been chosen before you got involved. Correct?

A.   Yes, by the law firm that worked with them, yes.

Q.   And then --

A.   For the most part.

Q.   And then ZTE also gave you a list of targets they wanted you to go after.  Right?

A.   No.

Q.   Well, let me have the agreement.

        MR. CORDELL:  Your Honor, this is confidential.  I wonder if we can just turn off the monitors again.

        Can I have DTX 18 at page 18?

        THE COURT:  You're going to need to move that monitor on Defense table so it's not viewable in the gallery.

        MR. CORDELL:  Thank you, Your Honor.

Q.   (BY MR. CORDELL)  This is what they called a whitelist in your deal with ZTE.  Right?

A.   Yes.

Q.   And the whitelist here means this is the targets you can go after.  Right?

A.   It's the list of companies that don't have a license, yes.

Q.   Well, it's more than that.  These are the ones they told you you could go after.  Right?

A.   No.  It's a list of companies that don't have a license.

Q.   And they called it a whitelist.  Why do they call it a white list?

A.   To distinguish it from the blacklist which is a list of companies that you -- already have a license.

Q.   Now, you're going to -- you're going after Samsung right now.  Right?  No. 16.

A.   Yes.

Q.   And we heard these analogies this morning about people cutting your trees and taking your property.  We're not taking the patents from you in this case.  Right?

A.   I'm not sure exactly what you mean by that.

Q.   After this case is over, you're still going to have these patents.  Right?

A.   Yes.

Q.   And you're going to go after Amazon and BlackBerry and ePlus and Google and HTC, et cetera.  Correct?

A.   I haven't made any determination as to any of those companies.

Q.   Well, the point is you could if you wanted to.  Right?

A.   Yes.  They're unlicensed.

Q.   Okay.  So you never met anybody at ZTE before you did this deal.  Right?

A.   Do you mean in person?  I'm sorry.  I just want to be accurate in my answers to your questions.

Q.   You had never visited ZTE before you did this deal?

A.   I have never visited ZTE before the deal.

Q.   You paid them 600 grand up front.  Right?

A.   That was part of the compensation, yes.

Q.   ZTE had already chosen the patents.  Correct?

A.   No.  The law firm had already selected the patents.

Q.   Well, somebody other than you chose them before you got involved.  Right?

A.   For the most part, yes.

Q.   They had already chosen the targets on the whitelist. Right?

A.   That's just not correct.

Q.   Well, they gave you a whitelist.  Right?

A.   As part of the agreement, there was a list of unlicensed companies, yes.

Q.   Okay.  And the idea is that you're going to go after the unlicensed companies.  Yes?

A.   It has nothing to do with it.  That's just people that don't have a license already to the patents.

231

Q.   And you know ZTE knew how to approach these big companies because they had done deals in the past.  Right?

A.   ZTE -- I have no idea how they did their previous licenses.

Q.   But what we know is that if ZTE approached Samsung directly, Samsung would say, hey, you just did a deal with Apple and we want the same rate you gave Apple.  Right?

A.   I have no idea.

Q.   And so by giving you the patents, maybe they could get out from under that FRAND promise.  Is that true?

MR. SHEASBY:  Your Honor, I object.  The FRAND -- object.  This is argumentative and it's irrelevant.

THE COURT:  Well, it calls for speculation about what ZTE's mindset may have been.

MR. CORDELL:  If you know.

MR. SHEASBY:  And, Your Honor, may I approach?

THE COURT:  Let's let the witness answer this question.  Then I'll see you at the bench.

THE WITNESS:  I don't think you can get out of a FRAND promise by transferring patents anyway.  So I just -- I don't understand your theory.

Q.   (BY MR. CORDELL)  But instead of taking $165,000, you're asking for 142.6.  Right?

A.   Your entire basis for calculation I disagree with, but you were asking for whatever the damages are in this case,

yes.

Q.   You also testified about bringing or maybe it was Mr. Sheasby mentioned that you were bringing technology to the U.S.  Did I understand that right?

A.   That's what the U.S. patent system does, yes.

Q.   Okay.  But the technology was in the U.S. years before you got involved.  Correct?

A.   The filings of the patents, yes.  They were disclosed at that time.

Q.   Not just filed.  They were published and patented before you ever got involved.  Correct?

A.   I mean -- so not entirely, but these two patents were already issued when I got involved, yes.

Q.   Okay.  So just so the jury is clear, you didn't bring these patents to the United States.  Correct?

A.   If you -- I did not file the patents in the USPTO, no.

Q.   Well, you didn't do anything with these patents.  They were already here and issued right on the books when you got involved.  Correct?

A.   I'm not sure what you mean by on the books, but they were already issued before I acquired them, yes.

Q.   You said you were a patent lawyer.  Right?

A.   Yeah.

Q.   You passed the PTO exam?

A.   I did.

Q.   Yeah.  So you know what it means to have an issued patent.  Correct?

A.   I do.

Q.   And the '776 Patent issued more than 10 years ago. Right?

A.   I would have to look at the face of the patent, but it issued before I acquired it.

Q.   Okay.  Now, you talked a little bit about your offer letters during your direct.  Do you remember that?

A.   I do.

Q.   And you referred to Mr. Dell, your damages expert, as part of your offer letters.  Right?

A.   Yes, I did.

Q.   And it's a fact that you had Mr. Dell do calculations of what a bunch of comparable agreements would be worth. Correct?

A.   Are you talking about in the January letter?

Q.   I am talking about the December letter.

A.   So if I recall, there were a number of calculations in the December letter when I went to Korea.

Q.   And you had -- you had those calculations done to figure out kind of what those agreements were worth.  Right?

A.   No.  I was trying to engage in a settlement licensing discussion with Samsung.

Q.   Well, but the point is, Mr. Dell's work was to take, for

example, an agreement with Nokia and come up with a number as to what the price of that license was. Fair? You don't have to tell me what the price was. I just want to know if that was the method you used.

A.   I don't remember which companies or the specifics of it like that, but there were a number of different methodologies in the settlement license that you're referring to.

Q.   Okay. You and Mr. Dell worked on a bunch of different methods to calculate what licenses were worth. Fair?

A.   We engaged in different methodologies trying to come up with a settlement licensing amount, yes.

Q.   You looked at agreements and tried to figure out what they were worth to do a comparable license analysis. Correct?

A.   So there were a number of methodologies used. I believe they were averaged, and I think one of them was comparative when we were trying to come up with a settlement licensing amount, yes.

MR. CORDELL:  Your Honor, may I have an instruction to answer the question.

THE COURT:  The question was, You looked at the agreements, tried to figure out what they were worth to do a comparable license analysis. Correct?

The answer should have been, yes, I did, or no, I didn't. You need to answer the question as asked.

I'll sustain the objection as non-responsive.

Q.    (BY MR. CORDELL)  Let me ask it again, Mr. Pitcock.  Did you -- did you do a comparable agreements analysis as part of your work in December of 2022?

A.    As part of the settlement licensing, yes, we did.

Q.    And you also did what Mr. Dell calls a top-down analysis. Correct?

A.    That was one of the other methodologies, yes.

Q.    What you didn't do was an incremental profit approach analysis.  Correct?

A.    We did not.

            MR. CORDELL:  Pass the witness, Your Honor.

            THE COURT:  All right.  Approach the bench, counsel.

            (The following was had outside the hearing of the jury.)

            THE COURT:  Do you have anything at this juncture?

            MR. SHEASBY:  Five minutes.  I think we should just get it over with.  It's literally five minutes.

            THE COURT:  No.  Do you have anything you want to raise at the bench?  You asked to come to the bench --

            MR. SHEASBY:  Oh.  Yes, sir.

            THE COURT:  -- I let him answer the question, and then we kept going.

            MR. SHEASBY:  Your Honor, it's been twice there's been a suggestion that the transfer of these patents is a violation, that it was to evade FRAND.  I think this is

opening the door that the fact that the previous jury has found that we complied with all of our FRAND obligations.  It is completely unnecessary to ask these two questions.  And I'd like leave or you to instruct the jury that we have complied that the jury, that the jury has already held that we have complied with all of our FRAND obligation.  It was done once, and I accepted it was --

THE COURT:  I'm not going instruct the jury -- I'm not going to instruct this jury about what the previous jury found unless it's absolutely necessary, and I don't think that we're at that point.

MR. CORDELL:  He answered the question in the way I think Mr. Sheasby wanted it answered.

MR. SHEASBY:  Your Honor, it was an absolutely inappropriate question to suggest that this transfer was to avoid FRAND.  That issue was litigated and decided.

THE COURT:  The instructions I've given this jury are unequivocal, that any royalty due here is subject to the FRAND obligation.  There's nothing that's been asked that's challenged or changed that as far as I can see.

MR. SHEASBY:  Your Honor, I have one other question.  Some of his investors were his alumnae, his college friends.  May I elicit that without opening the door as to what his other investors are since he went so deep into this?

MR. CORDELL:  Shaky ground, Your Honor.

THE COURT: I don't think we need to go back there because all it's going to do is open the door further and that's not going to benefit anybody.

MR. SHEASBY: Okay.

THE COURT: Let's do redirect.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed with redirect examination by the Plaintiff.

REDIRECT EXAMINATION

BY MR. SHEASBY:

Q. Counsel indicated that you have only one employee, which is yourself. How many technical consultants have worked on analyzing these patents to understand their value?

A. Over 10.

Q. Counsel suggested that these patents were selected by ZTE. Who did the first level of analysis of these patents?

A. So it was a law firm that worked with ZTE extensively. They had represented them before, and they spent more than a year reviewing the portfolio to select the patents.

MR. SHEASBY: This is DTX 217, Madam Courtroom Deputy.

Q. (BY MR. SHEASBY) Counsel suggested that Samsung was not obligated to provide fair and adequate reward. Do you remember when they represented that to the jury?

A.    I do.

Q.    What does DTX 17 say about Samsung's obligations?

A.    So the ETSI policy is that IPR holders, which are intellectual property rights holders, patent holders, should be adequately and fairly rewarded for the use of their IPRs.

Q.    Samsung indicated that it was being discriminated against by Apple because it didn't receive the exact same -- it's not going to receive the exact same terms as Apple.  Correct?

A.    Something to that effect, yes.

Q.    All right.  Did Samsung ever present you any evidence that Apple was using their technology?

A.    They did not.

Q.    Did Samsung make public statements to the government about what its policy is on FRAND negotiation?

        MR. CORDELL:  Objection, hearsay.

        THE COURT:  Sustained.

Q.    (BY MR. SHEASBY)  Did you research whether Samsung made any public statements about FRAND policy as part of your role as a G+ manager?

        MR. CORDELL:  That's a yes or no, Your Honor.  No objection.

        THE WITNESS:  Yes.

Q.    (BY MR. SHEASBY)  All right.  Did you review that policy as part of your business dealings?

A.    I did.

MR. SHEASBY:  Let's have PTX 24.

Q.   (BY MR. SHEASBY)  Is that the policy that you reviewed?

MR. CORDELL:  Your Honor, objection, hearsay.

THE COURT:  He can state what he reviewed. Overruled.

THE WITNESS:  I'm sorry.  Yes, this appears to be this, the part of what I reviewed.

Q.   (BY MR. SHEASBY)  And if I remember correctly, Samsung's counsel was basically saying it gets to be treated the exact same way as Apple.  Is that correct?  That was the representation that was made?

THE COURT:  Either object or sit down, Mr. Cordell.

MR. CORDELL:  My objection is this, Your Honor.  The characterization of my questioning is improper.  He can just ask a question.  So my objection is that's not a question.

THE COURT:  Overruled.  He's entitled to question the witness with some latitude just as you are.

Q.   (BY MR. SHEASBY)  Has Apple been found to infringe valid United States patents owned by G+ or ZTE?

A.   Not that I know of.

Q.   And what does Samsung say in its statement to the government?  Does it say there's one set of terms for every party?

A.   No.  It's the exact opposite.

Q.   What does Samsung state?

A.    So Samsung states --

MR. CORDELL:  Objection, hearsay, Your Honor.

THE COURT:  This witness can't speak for Samsung, and he can't repeat out-of-court statements made by Samsung. That is hearsay.  I'm going to sustain that.

MR. SHEASBY:  Your Honor, I've just laid a foundation that this is a Samsung document.  So it's an admission against adverse interests that he reviewed, and so I believe he can properly speak about it.

THE COURT:  You've laid a foundation that this witness has read this document, but I don't know that it rises to the level of an admission against interest.

Q.    (BY MR. SHEASBY)  Who was this document submitted to?

A.    It was submitted to the --

MR. CORDELL:  Objection, hearsay.

THE COURT:  He either knows who it was submitted to or he doesn't.  He can testify of his own personal knowledge. Overruled.

THE WITNESS:  My understanding is it was submitted to the European Directorate General, which is the competition board for -- involving intellectual property.

Q.    (BY MR. SHEASBY)  And what did -- in this document did you understand Samsung's position to be?

A.    Their position is that because licensing negotiations are individualized, you don't have to come to the exact same

agreement with every company even on standard essential patents.

Q.   Now, do you remember when counsel indicated that you didn't do an incremental profits analysis in your settlement negotiations with Samsung?

A.   I remember that.

Q.   Were you able to do such an analysis?

A.   No.  I wouldn't have had any of the data necessary to do that analysis.

Q.   Did Samsung give you any of that data?

A.   They did not.

Q.   Turning to the next page of Samsung's presentation to the European Union on standard essential patents, what does it say must be considered in the last bullet point?

        MR. CORDELL:  Objection, hearsay, Your Honor. Again, he's just reading a document to the jury.

        THE COURT:  I think he's effectively and eventually laid an adequate predicate and foundation.  Given that this is a Samsung document, it's an admission by a party opponent, it fits within the exception to hearsay.  Finally, I think he's gotten there.

    I'm going to overrule the objection.

        THE WITNESS:  So this document by Samsung indicates that you are supposed to use the incremental value of the innovations covered by the IPR, the patent right, in your

considerations for determining value.

Q.    (BY MR. SHEASBY)  Is another word for that the incremental profits analysis?

A.    Yes.

MR. SHEASBY:  Pass the witness, Your Honor.

THE COURT:  Is there additional cross examination?

MR. CORDELL:  No, Your Honor.

THE COURT:  Then you may step down, Mr. Pitcock.

Ladies and gentlemen of the jury, we're going to take a short recess at this point.  If you will simply close your notebooks and leave them in your chairs, please follow all the instructions I've given you about your conduct, particularly including not to discuss the case with each other or anybody else.  And we'll be back shortly to continue with the next witness.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  Let me see lead and local counsel in chambers.

We stand in recess.

(Brief recess.)

THE COURT:  Be seated, please.

All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

Plaintiff, call your next witness.  Do I understand you have depositions to present at this time?

MS. GLASSER:  Yes, Your Honor.

THE COURT:  All right.  Call your first witness by deposition then.

MS. GLASSER:  With the Court's permission, the Plaintiff G+ calls by video deposition Sungjin Park.  He is a Samsung engineer and Samsung corporate designee.

THE COURT:  Do you have the time on this deposition, Ms. Glasser?

MS. GLASSER:  2 minutes, 13 seconds to the Plaintiff, Your Honor.

THE COURT:  All right.  Proceed with this witness by deposition.

                    SUNGJIN PARK,

                 BY VIDEO DEPOSITION

Q.   Mr. Park, what's your position at Samsung?

A.   My position is senior engineer.

Q.   What products do you work on as a senior -- as senior engineer at Samsung?

A.   I work on communication standard work.

Q.   Do you participate in 3GPP?

A.   Yes, I do.

Q.   So 3GPP is the body that creates the 4G and 5G standard. Correct?

A.   Right.

Q.   So my understanding is you've been designated on the topic of all products that Defendants allege to be non-infringing alternatives.  Correct?

A.   Right.

Q.   So on behalf of Samsung, what are the acceptable alternatives that existed to the '776 Patent?

A.   I am not sure.

Q.   On behalf of Samsung, what are the actual acceptable alternatives that existed to the '130 Patent?

A.   I'm not sure.  I don't really recall.

Q.   Why don't you look at 125.

A.   Right.  So No. 125, as I understand it, I have been assigned to it.

Q.   And 125 is any non-patented contributions separate from the patent that are reflected in the functionality that's accused of infringement.  Correct?

A.   That's my understanding, yes.

Q.   Is there any portion of this functionality that Samsung created or invented itself?

A.   I'm not sure.

THE COURT:  Does that complete this witness by deposition?

MS. GLASSER:  It does, Your Honor.

THE COURT:  Call your next witness by deposition.

MS. GLASSER:  Your Honor, G+ calls by video designation Mr. Seounghee Han.  He is also a Samsung engineer and also a Samsung corporate representative for the litigation.

The video time split is 1 minute to the Plaintiff and 46 seconds to the Defense.

THE COURT:  All right.  Proceed with this witness by deposition.

SEOUNGHEE HAN,

BY VIDEO DEPOSITION

Q.   How long have you been at Samsung?

A.   I joined the company in 2009, so it's been around 14 years.

Q.   Does Samsung perform any internal analysis and market studies related to the importance and benefits of cell reselection?

A.   Well, in fact, so reelection function is a basic function in 5G smartphone.  So if you don't have this function, you cannot launch -- do launch.

Q.   And so does that mean there is or isn't internal analysis and market studies prepared by Samsung related to the importance and benefits of cell reselection?

A.   So not for the function of reselection itself, but I can assume that there would be a -- some sort of studies done with regard to the demand for 5G smartphones, and in that there

could be a part on reselection -- cell reselection.

THE COURT:  Does that complete this witness by deposition?

MS. GLASSER:  It does, Your Honor.

THE COURT:  Call your next witness by deposition.

MS. GLASSER:  Plaintiff calls Mr. Jaewon Kim.  He is also a Samsung engineer and corporate representative for this litigation.

The time split is 4 minutes, 23 seconds to the Plaintiff, and 40 seconds to the Defense.

THE COURT:  All right.  Please proceed.

JAEWON KIM,

BY VIDEO DEPOSITION

Q.   How many years have you worked at Samsung?

A.   It has been 21 years.

Q.   Do you understand that you were designated to testify on behalf of Samsung in relation to certain topics?

A.   Yes, I do.

Q.   And do you understand that as to those topics, you speak on behalf of all of Samsung and not just on behalf of yourself?

A.   Yes, I do.

Q.   Is it necessary to support PUCCH formats 0, 1, 2, 3, and 4 as defined by the 3GPP 5G standard to communicate on a 5G network?

A.     Supporting from 0 through 4 is needed in order to communicate on 5G network.

Q.     And so if the device is sending PUCCH information for less than or equal to 2 bits, it will use either format 0 or 1.  Correct?

A.     Correct.

Q.     And what are the advantages or disadvantages of format 0 as compared to format 1?

A.     Format 0 uses two symbols or fewer than two symbols. Format 1 uses a more number of the symbols.  Format 1 can provide some more reliable communications by -- as it utilizes more symbols, and this aspect is considered as an advantage over format 1.  As for format 0, it uses fewer, or less, resources which is considered as format 0's advantage.

Q.     What is the advantage of using fewer resources when using format 0 as compared to format 1?

A.     There is no particular advantage from the perspective of the user terminals.  But speaking of an advantage from the perspective of the network, the network should distribute resources to -- distribute the resources so when a symbol length is smaller, it can provide the support for more of user devices.  That may be considered as an advantage.

Q.     And what is the advantage of being able to support more user devices?

A.     A network being able to support more of the user devices

simultaneously would be something considered as an advantage, but I am not a person who works on network side, so I'm not quite sure, though.

Q.   For PUCCH format 0, one sequence is sent per symbol. Correct?

A.   Right.  A sequence is selected and sent.

Q.   So if PUCCH format 0 was not available, the next best alternative would be to use either format 1 or format 2. Correct?

A.   Right.

THE COURT:  Does that complete this witness by deposition?

MS. GLASSER:  It does, Your Honor.

THE COURT:  Call your next deposition witness.

MS. GLASSER:  We will be calling a live witness next with Your Honor's permission.

THE COURT:  All right.  Call your next witness then.

MR. MANZIN-MONNIN:  Plaintiff G+ calls Dr. Robert Akl.

THE COURT:  All right.  Doctor Akl, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand, Doctor Akl.

THE WITNESS:  Thank you, Your Honor.

MR. MANZIN-MONNIN:  May it please the Court.

THE COURT:  You may proceed, counsel.

ROBERT AKL, Ph.D.,

having been duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MANZIN-MONNIN:

Q.   Good morning.  Can you introduce yourself?

A.   Good afternoon.  My name is Robert Akl.  I am a professor at the University of North Texas in Denton.

MR. MANZIN-MONNIN:  Your Honor, may I approach counsel table for one moment?

THE COURT:  You may.

Q.   (BY MR. MANZIN-MONNIN)  What analysis did you perform in this case?

A.   So, first, I looked at Samsung's phones, accused phones, and did an analysis and determined that they infringe the two asserted patents.

Q.   What is the second step you performed?

A.   I analyzed the two patents and looked at the prior art and determined that the patents are valid and novel.

Q.   Has there been a jury verdict on these first two questions you analyzed?

A.   Yes.

Q.   And what was the conclusion?

A.   The conclusion is consistent with the analysis that I had

done, that Samsung infringes the two patents and that the patents are valid.

Q.   What then is the subject of your testimony today?

A.   Today I will be discussing the technical importance of the two patents.

Q.   What do the patents relate to?

A.   The patents, looking at the first one, the '776, it enables one of the fundamental concepts in 5G that relates to significantly more bandwidth.

Q.   How about the '130 Patent?

          MR. CORDELL:  Your Honor, may we approach?

          THE COURT:  Approach the bench, counsel.

          (The following was had outside the hearing of the jury.)

          MR. CORDELL:  I think they're going to now ask him about the 16 times faster metric, and we have scoured their expert reports, we had lots of exchanges with them, and they pointed to two paragraphs in these reports supporting a 16 times metric, and it's just not there.  These are the two paragraphs, and --

          THE COURT:  All right.  We're talking about a question that hasn't been asked yet that you would, when it was asked, objected it was outside the scope of his report --

          MR. CORDELL:  Yes, Your Honor.  Thank you.

          THE COURT:  -- if I'm ahead of you --

MR. CORDELL:  Spot on.

THE COURT:  -- correctly.  Well, this is certainly premature.

I assume you're going to go into that, Mr. Manzin-Monnin?

MR. MANZIN-MONNIN:  Correct, Your Honor.  It's on a slide that counsel withdrew their objection to.  So it's a little surprising they're now raising an objection on this exact issue.

MR. CORDELL:  I was --

MR. MANZIN-MONNIN:  Excuse me, counsel.

We met and conferred extensively about this issue, and we explained exactly where the 16 times comes from.  And if you'd like to go over it now, I can do it here or we can wait until the next question when it will come up.

MR. CORDELL:  I was assured that it was in these two paragraphs, Your Honor.  I scoured them, I've asked my experts and asked my team, and it's just not there.

THE COURT:  Well, what's going to happen is he's going to ask the next question, you're going to raise the outside-the-scope-of-the-report objection, although this witness has not yet been qualified as an expert, but nonetheless I'm going to have to send the jury out and then we're going to have to get into this.  If you-all want to burn that much time, that's fine.

MR. MANZIN-MONNIN:  Your Honor --

THE COURT:  I can't resolve these kind of objections at the bench in a few seconds.  I'm going to have to get the report, which I've got them all stacked up back here, and actually get into it, and that's what we'll do if that's what we have to do.

MR. MANZIN-MONNIN:  Your Honor, this is -- I'm happy to do that and we've done this several times as you'll recall, me and Mr. Cordell.  I've shown you just where things are.  I'm happy to do it again, but the fact that they withdrew the objection to an opening slide and allowed us to admit something to the jury and withdrew the same objection to my slide --

MR. CORDELL:  Is --

MR. MANZIN-MONNIN:  Excuse me, Mr. Cordell -- that is highly improper.

THE COURT:  Well, I'm not questioning your representation, counsel, but I don't know what they've withdrawn and what they haven't withdrawn.  That's been between the two of you-all or your teams in some meet-and-confer context.

MR. MANZIN-MONNIN:  Do you disagree?

MR. CORDELL:  I do disagree.  I wasn't with Mr. Manzin-Monnin.  I was with Mr. Sheasby, and he assured me that they were there.  The agreement was he would check, and I withdrew a whole bunch of them even though they're really

specious.

THE COURT:  All right.  We aren't going to have everybody in the trial team up here.  You haven't asked the question that's elicited the objection we're talking about.  We'll take this in turn.

If you're going to ask the question and you're going to make the objection, I'll deal with it when it comes up.  Okay?

MR. SHEASBY:  Your Honor, may I say one thing?

THE COURT:  What is it, Mr. Sheasby?

MR. SHEASBY:  Mr. Cordell and I had an agreement that all objections to these slides were withdrawn unless they came up to us and identified ones that were out.  It's been four hours since we had that agreement.  They haven't identified one slide that was out.  I'll sign a sworn declaration to that.  I believe this is being done to suck time away from our case in chief, Your Honor.  This is not what we agreed to.  We sat in a room and agreed that all these slides were okay.

THE COURT:  You-all did sit in a room, and I am not in a position to say what did or didn't happen in that room. I am in a position to deal with objections if and when they're raised on the record in court, and that's the way we're going to proceed.

So continue with your direct.

If you're going to make an objection when it gets to an

appropriate place, make your objection.

MR. CORDELL:  Is counsel going to qualify Doctor Akl?

MR. MANZIN-MONNIN:  Of course.

THE COURT:  Let's go, counsel.

MR. MANZIN-MONNIN:  I would request that this time be counted against them.  There was no objection whatsoever.

THE COURT:  I'll allocate it as I think appropriate. Let's go.

MR. MANZIN-MONNIN:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

Q.    (BY MR. MANZIN-MONNIN)  How about the '130 Patent?  What does it relate to, Doctor Akl?

A.    The '130 Patent enables --

MR. CORDELL:  Objection, calls for opinion, Your Honor.

MR. MANZIN-MONNIN:  He's an expert, Your Honor.

THE COURT:  He may be an expert, but it's not been shown to the Court or the jury that he is at this point.  If you'd like to address his qualifications, this would be the appropriate time.

Q.    (BY MR. MANZIN-MONNIN)  Doctor Akl, can you please describe your professional background?

A.    Yes.  I have a Bachelor of Science in computer science, a Bachelor of Science in electrical engineering, a Master's in electrical engineering, and a Doctorate in electrical engineering, all from Washington University in St. Louis.

Q.    And what is your profession?

A.    I am a professor at the University of North Texas and have been a professor there for over 22 years.

Q.    What classes do you teach?

A.    I teach undergraduate and graduate courses related to wireless communication, advanced wireless communication, and computer networking.

Q.    Have you performed any research in this field?

A.    Yes.

Q.    Can you tell us about some of that research?

A.    I have worked with the Texas Workforce Commission and the governor's directive to help train students to pursue a career in engineering.

I've also worked with industry.  One example is Raytheon. I worked with them over a two-year period to develop a glove that military armed forces will wear, and by doing gestures that they already do in close combat, the glove will capture their muscle movement, recognize that close combat gesture, and transmit it to another soldier's screen when they have radio silence and they have no line of sight so they can't see the other soldier's hand.

Q.    And how about the Department of Defense?

A.    I worked with the Department of Defense to establish at UNT a center for cybersecurity that has allowed us to issue a Bachelor's in cybersecurity and a Master's in cybersecurity in addition to the degrees that we issue in our department in computer science and computer engineering.

Q.    Have you received any recognition for your work?

A.    Yes.  I've received many awards over the years, and I'm highlighting two here.  One is the IEEE, which stands for the Institute of Electrical and Electronics Engineers.  It's the -- a professional society in my field, and I got their professionalism award for promoting engineering.

Another award I'm very proud of is the UNT Outstanding Teacher Award.

Q.    And have you published any papers in this field?

A.    I have published over a hundred peer-reviewed publications, journals, presentations, mostly related to wireless communication.

Q.    Have you consulted on wireless communications technology?

A.    Yes.  I have done -- have consulted for many companies. A lot of them are household names that are known, including in some cases local law enforcement.

Q.    What did you do for local law enforcement?

A.    There was a double homicide.  And in such an investigation, they needed a telecommunications expert to help

them with the investigation of doing geolocation of the phone the person was carrying at the time of the double homicides. And I was helping them with that location of which tower the phone was talking to to help establish the whereabouts.

MR. MANZIN-MONNIN:  Your Honor, we offer Doctor Akl as an expert in wireless communications, including the subject matter of the asserted patents.

THE COURT:  Is there objection?

MR. CORDELL:  No, Your Honor.  Thank you.

THE COURT:  Without objection, the Court will recognize this witness as an expert in those designated fields.

Let's continue.

Q.   (BY MR. MANZIN-MONNIN)  Doctor Akl, can you tell us what the '130 Patent is about?

A.   Yes.  The '130 Patent enables very fast response time that is crucial in 5G by sending control signals in a very small amount of time.  That is key in 5G that is 16 times faster than what it was in 4G.

MR. CORDELL:  Move to strike, Your Honor; outside the scope.

THE COURT:  Your objection is that that's outside the scope of this expert's report?

MR. CORDELL:  Yes, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, there

is a matter I need to take up with counsel outside of your presence.  I'm going to have to ask you to retire to the jury room.

If you will, simply close your notebooks and leave them in your chairs.  Remember my instructions not to discuss the case among each other, and I will have you back in here just as quickly as possible to continue.

The jury should retire to the jury room at this time.

(Whereupon, the jury left the courtroom.)

THE COURT:  Be seated, please.

All right.  The question has to do with whether the testimony sought regarding 16 times faster is or is not within the scope of the expert's report.  I have copies of Doctor Akl's reports here at the bench.

Mr. Manzin-Monnin, if you can identify where and in which report, I'll be glad to look at it if you believe there is support.

MR. MANZIN-MONNIN:  Yes, Your Honor.  There is support, and we can start in the opening report of Doctor Akl, and I would direct you to paragraph --

THE COURT:  I have three volumes up here.  Do you have any idea which volume it's in?

MR. MANZIN-MONNIN:  It should be the non-supplemental original expert report of Doctor Akl.  I believe there's one supplemental opening and a rebuttal report

you may have there, Your Honor.  This is one of three volumes in his opening report I have.

It looks like you have appendixes included as well, and I apologize for that, Your Honor.

THE COURT:  Give me a paragraph number.

MR. MANZIN-MONNIN:  Yes.  141 I would start with, and this is kind of a high level description of the shortening of TTI from one millisecond in 4G, down to one to two OFDM symbols.

THE COURT:  Let me find that paragraph first, please.

MR. MANZIN-MONNIN:  Yes, Your Honor.

Can I have the elmo?

THE COURT:  All right.  I'm at paragraph 141.

MR. MANZIN-MONNIN:  Yes.  And I would turn to, on page 57, where it says, one solution for reducing this delay is to decrease the 1 millisecond size of TTI and explains the sentence before that that's the 4G transmission time interval for these uplink control signals that are at issue in the '130, down to one to two OFDM symbols.

Now, throughout the report, Doctor Akl will show the source code and how these symbols are, in fact, or these TTIs are in fact reduced to one to two symbols.

He further cites throughout his report the 3GPP specification that includes the information about the length

of these symbols.  These symbols vary depending on what's called sub-carrier spacing.

And so he describes sub-carrier spacing.  I can point you to that.  He cites the tables that show the length of different sequences depending on the specific sub-carrier spacing which are in the standard and are included in our submission to the Court last night.

And so it's simple math to deduce that at the lowest sub-carrier spacing, which there is multiple options in 5G, results in a .06 millisecond TTI.  That's just 1/16th of what 4G was.

And he explained that reducing the TTI in this manner to one to two symbols is the whole purpose of the '130 Patent.  It's in the patent itself.  It describes reducing to these one to two symbols.  We have the product specifications that show that it's one to two symbols, and that is 1/16th the TTI.

THE COURT:  What's your response, Mr. Cordell?

MR. CORDELL:  I certainly can do math, Your Honor, and I don't see 16 times advantage here.  The paragraph that counsel points to says that they decrease the one millisecond size of TTI by half.  It doesn't say 16 times.  It says from one millisecond to .5 millisecond, or even to one to two OFDM symbols which can vary in format and length.  There's nothing in here that says 16 times.

THE COURT:  So I gather neither of you disputes that

the report says there's a substantial reduction in the amount of time, but I gather Samsung's objection is it never explicitly says 16 times faster.  Is that right?

MR. CORDELL:  Well, what it says, Your Honor, is the length of the TTI is reduced substantially below .5 milliseconds.  That doesn't tell us that the system operates faster by any particular metric or even substantially.  So it just talks about the length of the TTI interval.

MR. MANZIN-MONNIN:  First of all, it certainly says the beginning of this paragraph --

THE COURT:  Hang on a minute.  We're on paragraph 138 now?

MR. MANZIN-MONNIN:  Same paragraph 141.  I'm sorry. Did I move on the elmo?

In this very paragraph, it starts by describing how the patent claims novel features for reducing overhead in 5G systems where a shortened TTI is used.

And if we -- I can direct you, if you'd like, to the testimony Doctor Akl relies on from the engineers that discuss the different spacings which can vary.  I agree with counsel that they can vary, this length of the one to two OFDM symbols.

But there's four options for how those things can vary, and it's four different kilohertz lengths that range from 15 to 120 kilohertz.  And at 15 kilohertz, you have a .06

millisecond TTI; at 30, you have a .12; at 60, .24; at 120, .5, just what we see can range from .5 milliseconds to one to two symbols. It's right there in his report, and that's how every symbol in every communication is automatically those lengths.

You set which kilohertz, and it automatically has these lengths. I can bring you to the testimony that about the lengths. I can bring you to the section of the standard that dictates based on that length how you determine the time. It's all in his report if you want me to walk through step by step.

MR. CORDELL: It would be apparent, Your Honor, if the expert had put in there that using the '130 Patent you get a 16 times speed advantage or something like that. But that's not what we have. There are variability here, there are different symbols that can be used, and notably there's nothing that counsel has shown us that suggests that the one to two symbols is .06 milliseconds, which is another aspect of I think a linchpin in his analysis.

So if that's what Doctor Akl wanted us to know, I think he would put it in his report. If what he wanted us to do is go out and derive it using extrinsic evidence, that's not in the report. That's a different matter.

And, frankly, I -- I don't think counsel's correct. I think that there were a lot of different options, and the

speed advantages can depend on a bunch of different factors. And the statement that we just heard is that it's 16 times faster is just nowhere to be found.

MR. MANZIN-MONNIN:  It's right here, Your Honor.

THE COURT:  Show it to me.

MR. MANZIN-MONNIN:  It's either between .5 milliseconds and one to two OFDM symbols.  There's four settings in length.

I can show you -- let me take it to the testimony.  So this is testimony cited in Doctor Akl's report that we submitted overnight that explains there are different definitions for sub-carrier spacing.  For a sub-carrier spacing of 15 kilohertz, one symbol is one millisecond.  And then there could be other sub-carrier spacing such as 30, 60, or 120.  And at these different sub-carrier spacings, this is the length of a TTI.

Doctor Akl states throughout his report in the benefits section that shortening the TTI in this matter is the benefit of the '130 Patent.  And it gives the range as .5 milliseconds to one to two symbols.  One symbol is .06 milliseconds. That's just a law of physics in communication systems.  And in 5G communication systems, one symbol is .06 milliseconds at 15 kilohertz.

MR. CORDELL:  Well, counsel just walked us through the fact that it could be 15 kilohertz, 30 kilohertz, or 60

kilohertz, which will change the length of that symbol.  And I don't even see the .06 disclosed here.  So I think that foundationally we can try to do some advanced math, but the high-level point that they're trying to make is just not supported here.

I think Your Honor is correct that they can say that in his opinion it improves performance.  That will be okay.  But this 16 times faster is something that we heard over and over again in opening, and I believe is a damages point. It's -- I'm not doing this just to engage in the technology. It's what the Plaintiff is using to prove up a bigger -- a bigger monetary -- for the license.

THE COURT:  All right.  Do you have anything further, Plaintiff?

MR. MANZIN-MONNIN:  Yes.  I think it's highly prejudicial that counsel withdrew objections to our opening slides that specifically said 16X shorter TTI.  It's highly prejudicial that we were allowed with no objection to present that to the jury as the evidence they would hear in this case. We gave counsel these exact slides that say the same thing. They withdrew their objection.

If they had an objection, the appropriate time to tell us was the overnight dispute process, the meet-and-confer process where they withdrew those objections.  We would not have presented 16X to the ladies and gentlemen of the jury had they

maintained that objection and we'd resolved it with Your Honor.

MR. CORDELL:  We had an agreement, Mr. Sheasby and I --

THE COURT:  Let me stop you, because I don't have either the time or the interest in hearing what each of you are going to tell me about the agreements that you privately had, and I'm going hear two different, completely diametrically-opposed stories.

As I told you first thing this morning at 7:00 a.m., the meet-and-confer process has substantially broken down in this case between the parties, and I am not at all unaware of the impact these squabbles back and forth are having on your designated trial time, and I'm not at all convinced there's not some gamesmanship afoot here with regard to trying to put the other side in a bind with time being used on objections to limit your otherwise available trial time.

This case has not gotten off to a good start, and I am intent on getting this train back on the track.  I have tried every way I know how to do it, but you-all seem intent on frustrating that.

I don't find that 16 times faster is in this expert's report.  But if, in fact, Plaintiff presented that in their opening slides without objection from the Defendant, I think the Defendants lying behind the log to jump out and now raise

it when it's being presented through the witness after they've already taken a position on the record and before the jury that you didn't object to.

I'm going to do this. I'm going to allow Plaintiff to go forward with this examination. I'm going to bill this time equally to both sides because I think you're both equally at fault. I think there is some laying behind the log by the Defendant, and I think the Plaintiff has overreached as to what the report actually says.

Now, the slide that you've got that has the disputed or the objected to 16 times faster in it, if you can put a sticky note over that 16.5, you can use that slide or, excuse me, 16 times faster. If you can alter it and drop that out, that's fine. I don't want to see 16 times faster anymore.

But, quite honestly, Mr. Cordell, I would be -- I would be very upset if I was in Plaintiff's position and you had not objected to these slides in opening and they had been shown to you with that on it and now you're raising it after you've let me walk out on that limb. It smacks of pure gamesmanship, and I don't appreciate that.

MR. CORDELL: In my defense, Your Honor, the conversation we had was precisely about this, and I was told that in opening he was taking whatever risks he was taking. So that's -- that's up to Mr. Sheasby, I understand that, but he knew we had an objection to this and it was pending our

review of the expert reports.

THE COURT:  Well, again, I'm not privy to those private discussions as you meet and confer.  I am sure if I wasted the time to ask, I'd hear something completely different from the other side.  But it doesn't reflect well on anybody that we're at this juncture right here.

Let's modify the slide.  Let's go forward.  Half of this time is being billed to the Defendant as a -- hopefully an incentive not to try and create a waste of time going forward.

Anything else before I bring the jury back in?

MR. MANZIN-MONNIN:  I just would request, Your Honor, that we're allowed to, consistent with the parts or the part that are underlined, highlight how substantially faster the TTI is in the invented solution.

THE COURT:  I think as long as you cue to what's in the report, you're on safe ground.

MR. MANZIN-MONNIN:  And can we just resolve that now so we don't waste more time?

It says, support higher rates, ultra low time delay, higher reliability.  And it says right there that the TTI is decreased and that's the way in which this is achieved.

Is that sufficient, Your Honor?

THE COURT:  Is there objection to that from Defendant?

MR. CORDELL:  I don't know what the question is,

Your Honor.

MR. MANZIN-MONNIN:  That there's a substantial increase in speed due to a shortened TTI.

MR. CORDELL:  If Doctor Akl sticks to his report, of course there's objection.

THE COURT:  Well, that's the answer I will give you as well.

MR. MANZIN-MONNIN:  Thank you, Your Honor.

THE COURT:  Let's bring the jury in.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Thank you for your patience, ladies and gentlemen.  Welcome back.  Please have seat.

All right.  We'll continue with the Plaintiff's examination of Dr. Robert Akl.

Mr. Manzin-Monnin, you may proceed.

MR. MANZIN-MONNIN:  May I have slide 13, please?

Q.   (BY MR. MANZIN-MONNIN)  We covered your professional background.  Can you tell us a little bit about your personal history?

A.   Yes.  I was born overseas in Lebanon.  In 1976, at the age of four, my family had to flee Lebanon because of the civil war.  We came to this great country.  I went to school in Maryland, I went to college in St. Louis, and I have lived in Dallas and Denton for the majority of my professional career.

Q.   What has been the impact of 5G?

A.   5G has had a huge impact on the economy, on businesses, even on individuals in the way we consume vast amount of data, and that data is available to us even when we are mobile.

Q.   What are we looking at here?

A.   We're looking at a chart showing projections.  5G launched in 2019, which is on the left part of the chart, and the chart -- the X axis are number of years.  The year that we're in now is 2024, and we see around 40 -- between 30 and 40 giga bytes of data per phone per month.  So this chart is showing the vast amount of data that a phone is consuming on average per month, and that data is projected to double over the next few years.

Q.   Has 5G been widely adopted?

A.   Yes.

Q.   And what are you showing here?

A.   So this figure is again showing in 2024 worldwide we have over 2 billion 5G phones and it's expected to double in the next few years also.

Q.   Which Samsung products have been found to infringe G+'s patents?

A.   The figure showing the different Galaxy Note in different models of Samsung's most advanced 5G phones and tablets.

Q.   Let's turn to the '776.  What is the title?

A.   "Cell Reselection Method and Terminal."

Q.   What is cell reselection?

A.   Cell reselection is how a phone picks the tower or the base station or the antenna to access a 5G network.  It's the gatekeeper in terms of how a phone can get on a 5G network, pick the right tower to be able to make sure you're getting the advantages of 5G if you've picked the right cell.

Q.   What is the cellular spectrum?

A.   Cellular spectrum refers to the frequency that a phone uses to access the cellular network.  Just like, you know, in your car, you're listening to FM radio, for example, or AM radio, there's a frequency, a phone needs a specific frequency to access the wireless network.

Q.   What part of the spectrum could 4G phones access?

A.   4G phones operate up to six gigahertz in spectrum.

Q.   How about 5G?

A.   5G goes up to a hundred gigahertz.

Q.   What are you showing on the top?

A.   So if we think of the small amount of frequency available in 4G as like a single road, then with 5G we have this 24-lane Houston-Katy highway that gives us this huge vast amount of frequency, which is great because it enables higher speeds and higher data.

Q.   What is the downside of all this spectrum?

A.   The downside is we're going to need a lot of towers, a lot of antennas, a lot of 5G towers and antennas to be able to

take advantage of that.

Q.   And what are you showing here?

A.   So this is -- so in Texas alone we have thousands of 5G towers and antennas for 5G.

Q.   Does the '776 Patent discuss the importance of cell reselection?

A.   Yes.

Q.   And what are you showing here?

A.   So this is the specification of the patent, column 1, lines 11 through 19, discussing how important cell reelection is in order to maintain the quality of the signal that's received by a UE.  'UE' means phone; it's user equipment.

Q.   What other impacts does cell reselection have on the system?

A.   Cell reselection uses a lot of power and data because the phone needs to measure the power of the adjacent towers and determine which one to pick.  So it's an energy-hungry process.

Q.   And so what does that tell you?

A.   That you have to do it right and not keep flipping back and forth, or ping-ponging is what we refer to it, where you're switching from one tower to another, because you would be wasting power.

Q.   Does Samsung recognize the importance of cell reselection?

A.    Yes.

Q.    What are you showing here?

A.    This is Mr. Han, and we saw his deposition testimony. He's a corporate representative and designated to speak on behalf of the company answering the question related to the importance of cell reselection.  They cannot launch without it.

Q.    So what does that tell you about the importance of this technology?

A.    Samsung cannot launch 5G without the '776 Patent.

Q.    How does the '776 invention solve the issue of cell reselection?

A.    The claims, which are the numbered paragraphs at the end of a patent, define the invention, and I'm showing claim 2 which is an asserted claim of the '776, and in that claim I'm showing -- I'm highlighting some language that claim 2 is describing performing reselection.  And you're going to have cells with different frequencies, and they're going to have -- some of those are going to have the same priority and you're going to group them and you're going to pick the ones -- you're going to group them if those have priority that is higher or priority that is equal or priority that is lower than the cell that you're on, and then you're going to break ties and pick the best one.  The very last part of the claim, you're going to do a best cell reselection principle with an

offset, which is like a penalty, to pick the best cell.

Q.   Has Samsung at any time said they have an alternative to the '776?

A.   Yes.

Q.   Did you analyze those alternatives?

A.   I have.

Q.   And what did you conclude?

A.   None of them are acceptable.

Q.   Did Samsung provide an engineer to testify on its behalf as to alleged alternatives?

A.   Yes.

Q.   And who is Mr. Park?  Doctor Park; excuse me.

A.   Doctor Park is another corporate representative of Samsung designated to answer questions about different topics. One of them is alternatives.

Q.   Was Doctor Park able to identify any alternatives to the '776 Patent to achieve the benefits?

A.   He was not.

Q.   Let's turn to the '130 Patent.

     And what are you showing here?

A.   The cover of the patent, which includes the title "Method and Device for Uplink Control Signal Transmission, User Terminal, and Storage Medium."

Q.   What does 5G do with all the bandwidth we just discussed?

A.   It sends -- 5G sends a lot of data very fast from the

274

towers to the phones.

Q.    How many packets per second?

A.    So we have millions and millions of data coming from a tower per second from a single tower to different phones.

Q.    You have labeled there control signal.  What's that?

A.    Control signal is the response from the phone back to the tower to tell the tower if the data is received correctly or not, because the data coming from the tower may or may not be received correctly at a phone and the tower needs to know that.

Q.    Why are control signals important?

A.    Control signals are important because if the tower doesn't know if the data is received correctly or not, the whole process breaks down.  The tower can only send as fast as it receives those control signals.

Q.    Can you show us an example?

A.    Yes.

Q.    And what are you showing here?

A.    So this is showing a 5G tower on the left sending data to a phone.  The data is received correctly, which I'm designating with a checkmark.  And the phone is going to send -- it's called an ACK, A-C-K, which stands for acknowledgement.  It means a success; the data was received correctly.

Q.    What if the data is not received correctly?

A.    If the data is not received correctly to the phone, the phone will respond with a NACK, or a negative acknowledgement, telling the tower that there's a failure.

Q.    What happens when the tower receives that NACK?

A.    Then the tower can retransmit the data, and in this case the data's received correctly and the phone sends another control signal, the ACK.

Q.    How many ACKs and NACKs are sent each second?

A.    There are hundreds of thousands of ACKs and NACKs sent by a phone to a tower per second.

Q.    Is this a bottleneck to the 5G speed?

A.    Yes.

Q.    Can you explain what you mean?

A.    Yes.  So if -- those ACKs and NACKs have to be sent very quickly, also in a very short amount of time.  And just like the data, they may or may not be able to be received correctly, so there has to be a way not only to send them but to send them efficiently and to have them protected so that they do also arrive at the tower correctly; otherwise, the entire communications -- if you're watching a video, it would stutter or it would stop; if you're on a call, it could be dropped.  That's the result of the control signals not received correctly.

Q.    Is there a name for the time it takes a device to send an ACK or a NACK?

276

A.    Yes.

Q.    And what is that name?

A.    Transmission time interval, or TTI.

Q.    What length TTI does the patent propose?

A.    The patent proposes making the TTI smaller and going all the way down from one millisecond to one or two symbols, OFDM symbols.

Q.    And the '130 Patent here, what's the exhibit number?

A.    This is JTX 4, and I'm looking at column 1, lines 43 to 49.

Q.    What is an OFDM symbol?

A.    It's the smallest amount of time that you can send a unit of information in 5G.

Q.    How does the TTI in the Samsung infringing products compare to the proposed TTI in the patent?

A.    As you can see from Samsung's own documentation, they are the same.  So for the first row in this table, using format 0, which is the infringing format of the '130 Patent, they use one to two OFDM symbols.

Q.    How does the '130 invention enable this shortening of TTI?

A.    So, again, the claims define the invention.  And I'm looking at claim 20.  It's an asserted claim of the '130 Patent.  And I've highlighted some language describing an uplink control signal transmission.  Those are the ACKs and

NACKs.  And you're going to send them using sequences in a transmission time interval, the TTI, and they're going to be limited by certain restrictions, and that's how you're going to get those ACKs and NACKs to the tower.

Q.   What does the invention achieve?

A.   So, again, the patent itself in column 2, lines 50 to 54, tell us that we are -- that it's creating an efficient uplink control information that's improved, which is going to reduce the delay of the transmission time which will give us a much more improved communication efficiency.

MR. MANZIN-MONNIN:  Mr. Svenson, can we have slide 49, please?

Q.   (BY MR. MANZIN-MONNIN)  And was Doctor Park, Samsung's representative, able to identify any alternatives to the '130 Patent to achieve these benefits?

A.   He was not.

MR. MANZIN-MONNIN:  Mr. Svenson, could we please have slide--one moment--12, please?

Q.   (BY MR. MANZIN-MONNIN)  Did you prepare your analysis in this case as part of a team?

A.   Yes.

Q.   And what are you showing here?

A.   I'm showing a slide on -- summarizing Doctor Kowalski's qualifications.  He's going to testify after me.  He also has a doctorate, a Ph.D. in electrical engineering.  He's an

industry leader, and his professional experience complements mine.  He's somebody who has worked in industry for many, many years.  I am an academic.  I've worked as a professor for many, many years and analyzed patents from a technical point of view.  And we work together on some aspects of the -- of my report.

THE COURT:  The question was, "What am I showing on this slide?"  We need to do this with distinct questions and answers, not a narrative.

MR. MANZIN-MONNIN:  Yes, Your Honor.

THE COURT:  Let's proceed.

MR. MANZIN-MONNIN:  Could we have slide 50, please?

Q.   (BY MR. MANZIN-MONNIN)  Can you describe your collaboration with Doctor Kowalski?

A.   Yes.  Doctor Kowalski did a quantitative analysis of the benefits of the '776 and the '130 Patent.  I had calls with him.  I looked at his opinions and his analysis.  I agree with his numbers.  They're very conservative.  They only take into account speed.  And in my report I cited and incorporated his analysis after I agreed with it in my report.

Q.   So you mentioned that Doctor -- strike that.

Does this capture all of the benefits of the patents?

A.   No.  These are very conservative numbers that only capture at the minimum just speed.  There are other benefits like power savings, quality of service, that are not part of

these numbers.

Q.    And so what is your conclusion based on your analysis with Doctor Kowalski?

A.    My conclusion is that there is at least a five percent benefit to the '776 and at least a two percent benefit to the '130 Patent, and --

Q.    Let's stop you there, Doctor Kowalski.  I'm sorry; Doctor Akl.

     Can you summarize for the jury the technical importance of the '776 and '130 Patent?

A.    Yes.  So the '776 gives you an important benefit by allowing you to get on the right tower, and the '130 Patent builds upon that by allowing you to then send very -- be able to enable the fast speeds by having these control signals so that you can -- now that you are on the right tower, you can take advantage of the 5G speeds when you're communicating actively.

          MR. MANZIN-MONNIN:  I pass the witness.

          THE COURT:  Cross examination by the Defendant.

     All right, Mr. Cordell.  You may proceed with cross examination.

          MR. CORDELL:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. CORDELL:

Q.    Good afternoon, Doctor Akl.

A.    Good afternoon, sir.

Q.    How are you today?

A.    I'm good, thank you.

Q.    You just left with telling the jury about somebody else's work--Doctor Kowalski.  Is that right?

A.    Yes.  We collaborated.

Q.    So when you say you 'collaborated', what you really mean was you were looking over his analysis and then presenting it to the jury as yours.  Right?

A.    Can you repeat the question, please?

Q.    What you mean by 'collaborated' is you looked over Doctor Kowalski's analysis and then you presented it to the jury as yours.  Right?

A.    I looked at his analysis, I agreed with it, when I did the analysis I incorporated it in my report, and I did present it today.

Q.    Well, you copied about 60 pages of his report.  Is that right?

A.    I cited and I incorporated 60 out of a thousand, which my report was over a thousand PAGES.

Q.    You copied them word for word.  Right?

A.    I incorporated, yes.

Q.    And that whole five percent and two percent we just saw, that came from Doctor Kowalski; that wasn't you.  Right?

A.    He did the initial analysis.  That is correct.

Q.    Okay.  And are we going to hear from him in this trial?

A.    Yes.  He should go after me, I think.

Q.    Okay.  Now, you're being paid for your work here.
Correct?

A.    I am compensated for my time, yes.

Q.    You're getting $850 an hour?

A.    Yes.

Q.    And you've done, I don't know, a thousand hours?

A.    I've done around 500 hours over three years.

Q.    Okay.  So roughly a half a million dollars; maybe
400,000?

A.    It's a lot of money, yes.

Q.    Okay.  Now, you've testified about the technical
advantages of the '776 Patent.  Right?

A.    Yes.

Q.    And it's your opinion that the '776 Patent adds to speed.
Is that fair?

A.    Yes.

Q.    You understand that the '776 Patent talks about two
states--idle and connected.  Right?

A.    Yes.

Q.    And connected is when my phone is actually making a call,
for example.  Right?

A.    Yes.

Q.    Or downloading a movie.  Correct?

A.   Yes.

Q.   Or sending a text it will be connected at least for a little while.  Right?

A.   Yes.

Q.   And idle is when my phone is just sitting on the table all by itself.  Right?

A.   Yes.

Q.   And chances are, since I haven't done anything with my phone in a while, it's in the idle state right now.

A.   That could be, yes.

Q.   And the '776 Patent you said was about cell reselection.  Right?

A.   Yes.

Q.   And that's a concept that only happens in idle mode.  Correct?

A.   Yes.

Q.   So what we're talking about here is increasing the speed of my phone when it's in idle mode.  Correct?

A.   Picking the right cell when it's in idle mode.

Q.   But the point is you said it increased speed.  Right?

A.   Yes.

Q.   So we're making it go faster when it's idle.  Correct?

A.   I wouldn't agree with that, no.

Q.   Well, it's not downloading a movie right now.  Right?

A.   Correct.

Q.    So the '776 Patent is not helping me download a movie faster.  Fair?

A.    No, that's very unfair.

Q.    Well, the '776 Patent doesn't talk about, say, handover. Right?

A.    I think it does, but not the claim.

Q.    Well, the claim talks about cell reselection.  Right?

A.    Yes.

Q.    That's idle mode.  Correct?

A.    Yes.

Q.    And when I'm driving down the road and I have to switch towers, that's what you guys call a handover.  Right?

A.    If you're connected it's handover.

Q.    Okay.  So good point by you.  If I'm downloading a movie while I'm driving down the road and I have to switch towers, that's a handover.  Right?

A.    Yes.

Q.    So that's when I'm actually streaming data into my phone. Right?

A.    Yes.

Q.    But in idle mode, by definition my phone is just sitting there.  Right?

A.    It's not connected.  That's correct.

Q.    And you say that the '776 Patent might help it if I ever were to connect in the future.  Right?

A.   By being on the right cell, you can hit the ground running.  Yes.

Q.   Okay.  So you think that this jury should set a license price of over a hundred million dollars to make my phone work faster when it's not doing anything.  Correct?

A.   I never mentioned money.

Q.   Well, let me ask you, sir.  Do you think the '776 Patent is worth a hundred million dollars?

A.   I -- yes, but I haven't done an analysis on damages.

Q.   So you do lots of cases for lots of big companies, and you think a development the size of the '776 Patent is worth a hundred million dollars.

A.   This is a key patent fundamental to 5G.

Q.   Well, you say that, sir, but when was the '776 Patent filed?

A.   I don't know the year from memory.

Q.   Well, do you know when it was issued?

A.   I would have to look at the cover.  I can tell you.

Q.   It's in your binder.  Open it up.

A.   2014.

Q.   And when was it filed?

A.   Actually that part is covered, and I was looking at one of my slides.

Q.   Would it surprise you that it was 2008?

A.   No.

Q.   So you're telling this jury that a patent that was filed in 2008 is somehow important for 5G.  Right?

A.   Yes.  It's key.

Q.   And what standard were we using in 2008?

A.   3G or 4G.

Q.   5G wasn't even a distant far-off-in-the-future concept in 2008.  Correct?

A.   Correct.

Q.   Now, you have tested phones before.  Correct?

A.   I've directed testing.  I don't do testing myself, but yes.

Q.   And you've done simulations on phones before.  Right?

A.   I have.

Q.   But you didn't do any tests or any simulations on phones for this case.  Correct?

A.   I did do.

Q.   Well, you didn't testify about any today.  Right?

A.   Correct.

Q.   You also testified about something called ping-ponging.  Right?

A.   Yes.

Q.   And you said that ping-ponging would be a bad thing.  Right?

A.   Yes.

Q.   But you'd agree with me that the '776 Patent addresses

ping-ponging by use of something called a Q offset.  Right?

A.   Part of the invention uses Q offset, yes.

Q.   And Q offset was around a long time before the '776 Patent.  Right?

A.   Not how it's used in the '776, no.

Q.   And cell reselection was around a long time before the '776 Patent.  Correct?

A.   Not how it's used in the '776, no.

Q.   But sir, my question is very direct.  Was cell reselection known before the '776 Patent?  Yes or no.

A.   The concept was, yes.

Q.   So when we see statements like you must have cell reselection to make the phone work, that's been true for 20 years.  Right?

A.   For every generation you need a cell reselection that works with that generation.  I would agree.

Q.   Okay.  Let's talk about the '130.  There are multiple formats that one can use in something called the PUCCH. Right?

A.   Yes.

Q.   Tell the jury what a PUCCH is.

A.   Physical uplink control channel.

        MR. CORDELL:  May I advance this, Your Honor?

        THE COURT:  You may use the chart.

        MR. CORDELL:  May I have just one moment?

THE COURT:  You may.

Q.   (BY MR. CORDELL)  Let me just move to a different topic, if I can.

You have done patent work for a long time.  Right?

A.   I would agree with that, yes.

Q.   You've looked at a lot of patents.  Right?

A.   I have.

Q.   So were you in the courtroom this afternoon when we were talking about the number of patents that have been declared for 5G?

A.   Yes.

Q.   And you have seen dozens and dozens of very important patents declared to 5G.  Correct?

A.   Yes, I would agree.

Q.   Look in your binder at --

A.   I'm sorry.  Which one?

Q.   I confess I don't know.

A.   I have five binders.

Q.   I bet.

It's DDX 173.  Can you find that one?

A.   Can you please repeat the tab?

Q.   It's a demonstrative, DDX 173.  It's the '528 Patent.

A.   I have it.

Q.   You recognize this patent.  Right, Doctor Akl?

MR. CORDELL:  Mr. Andryszak, can I have DDX 173?

Q.   (BY MR. CORDELL)  This is an Ericsson patent.  Right?

A.   Yes.

Q.   And this is a patent that you have analyzed personally. Correct?

A.   Yes.

Q.   And it relates to that same physical uplink control channel, or PUCCH, you talked about a moment ago.  Right?

A.   It relates to a power control on it, so a different aspect of it.

Q.   But still the PUCCH.  Right?

A.   Yes.

Q.   And that's the same PUCCH that the '130 Patent relates to.  Right?

A.   The same channel that's going to carry control signals, yes.

Q.   And you would agree with me that the '528 Patent, this Ericsson patent, teaches away the increase system throughput by reducing the TTI.  Right?

A.   Yes.  Reducing the TTI is important.

Q.   And that's the same thing you said was the improvement in the '130 Patent.  Right?

A.   Not exactly.  Reducing TTI is something everybody wanted to do.  The solution in the '130 is different.

Q.   Well, the fact is they both achieved a reduction of TTI down to .5 milliseconds.  Right?

A.    The '130 can achieve a TTI reduction down to .06 milliseconds.

Q.    Okay.

A.    Which is one to two OFDM symbols, so it is much better.

Q.    The point is there are a lot of patents that reduce the length of the TTI.  Right?

A.    Yes.  Everybody is trying to reduce the length of TTI.  I would agree.

Q.    Thank you.

        MR. CORDELL:  Pass the witness, Your Honor.

        THE COURT:  Is there redirect?

        MR. MANZIN-MONNIN:  Yes, Your Honor.

        THE COURT:  All right.

        MR. MANZIN-MONNIN:  Mr. Svenson, could we have slide 74, please?

                    REDIRECT EXAMINATION

BY MR. MANZIN-MONNIN:

Q.    Doctor Akl, you were asked how performing cell reselection when the device is in idle mode could possibly impact data speeds.  Do you recall?

A.    Yes.

Q.    Can you explain for us?

A.    Yes.  When the device is idle is actually the best time to do reselection because this is when you want to be on the best cell because at any point you're going to be

communicating after that and you want to make sure that you're not then switching or realize you're on the wrong cell. So cell reselection in idle is key. And also that's when you have the best results for power estimates to -- because you're not transmitting. So these are two reasons why it's very important to do it right and do it quickly in idle.

Q. Is it disruptive to try to change cells in the middle of downloading something?

A. Yes. That's handover, and a lot of times you can end up with a dropped call as a result of handover.

Q. You were asked about whether you're familiar with patents being declared to the standard. Correct?

A. Yes.

Q. Have you ever studied the issue of whether -- of what percentage of declared patents are actually essential to the standard?

A. I have.

Q. And what did you conclude?

A. So there are hundreds or thousands -- hundreds of thousands of patents declared. Everybody declares, and they overdeclare. I did a study over a two-year period going through and figuring out what percentage are actually essential by trying to find a claim that maps directly, and the number that actually is essential is under 10 percent and is as low as four percent.

MR. MANZIN-MONNIN:  Pass the witness.  Nothing further, Your Honor.

THE COURT:  Further cross examination?

MR. CORDELL:  No, Your Honor.  Thank you.

THE COURT:  You may step down, Doctor Akl.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You're welcome, sir.

Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT:  What's the status of the remainder of these deposition witnesses?

MR. SHEASBY:  Your Honor, it would be Doctor Kowalski next, and then it would be the two depositions, Jeon and Rodermund, and then it would be the damages experts.

THE COURT:  Do we have disputes on demonstratives for Kowalski?

MS. GLASSER:  Our understanding was no.

I think in view of what just happened, I would ask for you to confirm that.

But we heard there were zero disputes remaining.

MR. CORDELL:  So the -- I don't think so, Your Honor.  Again, it depends a little bit on the questions that are asked.

THE COURT:  You don't think there are demonstrative

disputes.

MR. CORDELL:  I don't think there are demonstrative disputes for Kowalski.

THE COURT:  Then let's go with Kowalski.

MR. SHEASBY:  Your Honor, there are so many binders, would you give me a minute to clear binders?

THE COURT:  That's fine.

(The following was had in the presence and hearing of the jury.)

MR. CORDELL:  Your Honor, may we be heard at the bench for just one moment --

THE COURT:  All right.

MR. CORDELL:  -- while they're distributing binders?

(The following was had outside the hearing of the jury.)

THE COURT:  Let's get lead counsel for the Plaintiff back up here.

MR. SHEASBY:  I need to be there?

THE COURT:  Yes, sir.  You're lead counsel for the Plaintiff.

What is it, Mr. Cordell?

MR. CORDELL:  I just want to make sure the Court's ruling about the 16X applies going forward, because Doctor Kowalski also put that on some slides, and he --

MR. SHEASBY:  Well, Your Honor, I have some good

news and some bad news, because on redirect he just elicited that the size one to two --

MS. GLASSER:  On cross.

MR. SHEASBY:  On cross that the size of one to two OFDMs is .06, so it is now in the record that the size of one to two OFDM is .06 --

MS. GLASSER:  At the same time I don't think we need to do that with Doctor Kowalski because it's already been handled, so...

THE COURT:  Well, if Doctor Kowalski's report does not say that it produces 16 times increase in speed, then I wouldn't expect -- or benefit in speed, I would not expect to hear him testify to that.

MR. CORDELL:  Thank you.

THE COURT:  All right.  Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Plaintiff, call your next witness.

MR. SHEASBY:  Your Honor, Plaintiffs call Doctor Kowalski.

THE COURT:  All right.  If you'll come forward and be sworn, Doctor Kowalski.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please have a seat on the witness stand, sir.

Ms. Glasser, are you going to use the flip chart in your direct?

MS. GLASSER:  I don't anticipate that, Your Honor. Would you like me to move it to the side?

THE COURT:  Yes, please.  Move it back where it was, please.

She is perfectly capable of moving it Mr. Sheasby.  I know you like to help everybody, but she's up there.  Let her take care of it.

MS. GLASSER:  I think he's better at it.

Is that good, Your Honor?

THE COURT:  That's fine.

Let's proceed with direct examination, please.

MS. GLASSER:  Thank you, Your Honor.

<u>JOHN KOWALSKI, PH.D.</u>,

having been duly sworn, testified under oath as follows:

<u>DIRECT EXAMINATION</u>

BY MS. GLASSER:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Could you please introduce yourself to the Court and the jury?

A.   Yes.  I'm John Kowalski.  I am an expert in wireless communications, and cellular communications in particular. I've got a wife of 23 years and a son who recently graduated

college.

Q.   What are you here to discuss?

A.   I'm here to discuss the benefits of the '130 and '776 Patents.

Q.   Could you tell us about your background?

A.   Yes.  I have a Ph.D. in electrical engineering from NYU, I've got 35-plus years experience in wireless communications. Started out in the defense industry designing wireless communication systems that were resistant to jamming.  I was at InterDigital Communications Corporation for five years where I was involved with designing fundamental technology for 3G.

     After that I spent 25 years at Sharp Laboratories of America where I led a team of researchers developing technologies for 4G and 5G cellular standards.

Q.   So you've mentioned three generations of cellular standards.  Does that mean you've been involved with this 3GPP?

A.   Yes.  Since -- from 2006 to 2021, I was a delegate for Sharp Corporation for 3GPP.

Q.   And what can you tell us about your professional experience specifically evaluating technical benefits?

A.   Yes.  A large part of my job, both as an inventor and as a manager, was the evaluation of competing technical approaches and, thereby, examining the trade-offs and benefits

of one particular technology versus another.

Q.    Are you being compensated for your time working on the case?

A.    Yes, I'm being compensated hourly for my time, yes.

Q.    And is that compensation in any way dependent on the outcome?

A.    No, it is not.

MS. GLASSER:  Your Honor, at this time G+ would formally offer Doctor Kowalski as an expert in the technical benefits in the telecommunications industry.

THE COURT:  Is there objection?

MR. CORDELL:  No objection, Your Honor.

THE COURT:  Without objection, the Court will recognize this witness as an expert in that field.

Go ahead, counsel.

Q.    (BY MS. GLASSER)  Regarding the '776 Patent, what technical benefits did you analyze for the '776 Patent?

A.    I analyzed the technical benefits for the '776 Patent in terms of a speed increase, power savings, and whether or not cost was impacted by using it.

Q.    Now, we saw this part of the patent with Doctor Akl.  Can you tell us, before the '776 Patent were there other ways that people tried to go about doing effective cell reselection?

A.    Yes, there were.  And it was done because it's extremely important to connect to a cell for communication so that the

handset--the UE, as Doctor Akl noted--can receive the signal from the tower properly.

Q.   Now, did -- you said you were involved with 3GPP.  Is that right?

A.   Yes, I was.

Q.   Did ZTE, the entity that invented the '776 Patent, did they present to 3GPP on the problems with the earlier approaches?

A.   Yes, they did.

Q.   Can you give us one example of that?

A.   Yes.  Well, they noted that if all frequencies were rated the same or there was no frequency differentiation, the UE would not be able to select cells of equal priority but perhaps a better radio condition, and this could result in ping-ponging.

Q.   And we're looking at PTX 26?

A.   Yes, we are.

Q.   Okay.  So tell us more about this ping-ponging.  What exactly is that and why is it such a problem?

A.   Yes.  It's such a problem because -- and it happens, as mentioned already, when you're initially trying to connect or when you're in connected mode recovering from link failure, the handset is selecting a tower, and then if there is no way to get the cell phone to stick to that tower, it will select another tower, and perhaps another tower, and this is time

lost when you could be communicating, as well as the possibility that you picked the wrong tower.

Q.   So what parts of the phone are involved in this reselection process?

A.   Well, since, again, we're talking about receiving radio signals, the cellular -- all the parts of the cellular radio are the antenna; what we call the RF front end module, which receives and amplifies the signal from the antenna; the memory and baseband processor, which processes the received signal to determine the cell reselection algorithm; as well as the battery that powers the memory baseband processor and RF front end.

Q.   So what speed benefit does an entity like Samsung that's using the '776 Patent, what speed benefit do they obtain?

A.   My estimate would be that they would obtain somewhere between a five and 30 percent speed benefit.

Q.   Were you able to locate any evidence from Samsung regarding the relationship between speed gain and reduced ping-ponging?

A.   Yes, I was.

Q.   And we're showing on the screen PTX 21.  What is that?

A.   This is a publication that Samsung submitted to a research conference back in 2021.

Q.   And does it relate to cell reselection?

A.   Yes, it does.  It's title is "An Enhanced Cell

Reselection Scheme For Dual SIM User Equipment in 5G Networks."

Q.   So you mentioned dual SIM.  What is that?

A.   Dual similar means basically when your phone has two -- what's called a subscriber identity module.  It means that your phone can have two phone numbers.  Now -- okay.  I think that's enough.

Q.   Well, tell us, though, why did you view this particular dual SIM setup as particularly useful for confirming the relationship between ping-ponging and speed?

A.   Yes.  In this study, which used Samsung's own phone, they provided a very good model that we can observe ping-ponging in a real system.

Q.   And so this is a scenario where ping-ponging still exists and we can observe it?

A.   Exactly.

Q.   And what did the Samsung employees state regarding the relationship between reducing ping-ponging and increasing speed?

A.   They noted that the more you reduce ping-ponging, the higher speed or higher throughput you get.

Q.   And so what did you conclude conservatively, from your own experience and this article, regarding the reduction in--I'm sorry--the reduction in ping-ponging, but, more importantly, the increase in speed from the '776?

A.    Yes.   Considering the way cell reselection is done and its relationship to other aspects of the cell phone protocols, I estimated that their measurements of between five and 33 percent would be consistent with my experience, but conservatively a five percent throughput speed reduction would result without the '776 Patent.

Q.    So let's unpack that a little bit.

You said consistent with your own experience it would be conservative.  Why is that?

A.    Well, as I mentioned before, you might select to the wrong cell.  And as we've previously -- as Doctor Akl has previously stated, 5G networks can be a lot faster than 4G networks, so that's part of it.  And there's other aspects of it, too, which deal with, again, link recovery from radio link failure.  So, yeah, five percent is very conservative.

Q.    Are there other benefits to the '776 Patent being used by Samsung?  Do they get other benefits beyond the speed?

A.    Most certainly, because you are not -- let me back up a little.

As mentioned in the patent and as mentioned in my opening report, you have to retune the RF front end as you go from one frequency to another frequency, and this becomes really critical in 5G networks because these frequencies are several times what they would have been in 4G, typically, and so significant energy savings is obtained.

Q.    Is energy savings another word for power savings?

A.    Yes; power savings.

Q.    And how does that all impact the battery of the phone?

A.    Well, if you're doing useless ping-ponging, you're running down the battery for no good reason.

Q.    Now, did you assess the alternatives that Samsung put forward throughout the litigation that it said it could have used instead of infringing the '776?

A.    Yes, I did.

Q.    And what was your view on whether any of those would achieve the benefits you've described?

A.    None of the alternatives put forth would achieve the benefits of the '776 Patent because they did not take into account what the '776 Patent does.  In particular --

Q.    I'm sorry.  Go on, sir.

A.    In particular, '776 and the prior alternatives did not address the fact -- the case when there's several cells on different frequencies with the same priority that meet a reselection condition.  In that case ping-ponging would occur.

Q.    So can you give a specific example of a scenario where you have multiple different cells and without this technology you're going to select to the wrong one and be inefficient?

A.    Yes.  So, for example, you could have two cells on a high priority, but their signal strength is very low.  But if you -- but if using the '776 Patent you group those frequencies

with another frequency that has a much higher signal strength, you're able to select to that cell, stay on the cell, and communicate at a higher data rate, hence higher speed.

Q.   So did you review the testimony of all the Samsung engineers to see if any of them believed they had any viable alternative to using the '776?

A.   I did.

Q.   And what did you find?

A.   Well, again, Doctor Sungjin Park, who I knew from my days in 3GPP, looked at whether or not there were any non-infringing alternatives that were acceptable, and he was not able to identify any.

Q.   So taking together everything you've talked about, your industry experience, the documents you reviewed, the testimony, what do you conclude regarding the key benefits that Samsung obtained by infringing the '776?

A.   Yes.  There's a minimum of five percent and as much as a 33 percent speed benefit that one obtains from the '776 Patent, along with power savings and no increase in cost.

Q.   Let's turn, then, to the '130 Patent.

     What technical benefits did you analyze for the '130 Patent?

A.   I analyzed the power savings, speed increase, increased channel resources, and whether or not there was any cost impact.

Q.    Okay.  And so Doctor Akl showed us this passage from the '130 Patent.  Did you review that as well?

A.    Yes, I did.

Q.    Now, did you see whether Samsung itself seemed to acknowledge the benefits of this approach of the '130 Patent?

A.    I did.

Q.    What are we looking at here?

A.    Again, we're looking at Mr. Kim, Samsung's corporate representative on this subject, and he noted that format 0, which is what the '130 Patent is called in these 3GPP standards, format 0 uses one or two symbols which he considered format 0's advantage.

Q.    So format 0 is describing the '130 Patent approach.  Is that right?

A.    Yes, it does.

Q.    So did the Samsung witness Mr. Kim identify what he believed was the next closest thing that Samsung in theory could have tried to use instead?

A.    Yes, he did.

Q.    What did he say?

A.    He answered affirmatively that if format 0 was not available, format 1 and format 2 might be alternatives.

Q.    And as between those two, which one did you think was closer to something that they could at least try to do?

A.    Yeah.  In that case, format 1 would be most appropriate.

Q.   And so did you then go on to analyze what specific problems Samsung would experience if it had stopped infringing and switched to using format 1 for these communications?

A.   Yes, I did.

Q.   Okay.  So before we dive into that, what are we looking at on the screen?

A.   Okay.  So here we are looking at an excerpt -- a graph that ZTE submitted to a 3GPP working group on this very subject, and the topmost curve is a format similar to format 1.  Below that is the format 0, such as is in the '130 Patent.

Q.   And just to stop you for a minute, to be very, very clear, the underlying graph and all that writing on it, that is from ZTE.  Correct?

A.   Correct.

Q.   And then you added the red circle, the yellow highlight, the two arrows, and then the language off to the right-hand side.

A.   Exactly.

Q.   Okay.  And so tell us, why did you annotate the graph this way and how does it tell you what the power savings are from the '130 Patent?

A.   Right.  Okay.  So wireless channels will always make mistakes on signals that are transmitted, but networks are designed so that they are -- there is -- they are using

resources of the channel as efficiently as possible.  This means for the situation we're talking about that the network wants to operate at a one percent error rate.  So you see 10 to the minus 2 on the vertical axis.  That means one percent error rate.  And on the horizontal axis, that's a measure of transmitted power.  And what this -- and it's a measure of transmitted power and what engineers call decibels.

And you can see that when format 0 gets a one percent error rate, format 1 is getting the same error rate -- format 1, rather, takes 3dB more energy--more power, rather--to transmit to get to a one percent error rate.  Now, 3dB in everyday terms literally means it takes twice as much power.

Q.    How does the fact that switching to format 1 for these format 0 communications would consume twice as much power, how does that translate to the experience a consumer is going to have with their battery?

A.    It's going to obviously negatively impact battery life if you don't have format 0.

Q.    Now, were you able to use data in the same chart to calculate out the speed benefit to Samsung from using the '776?

A.    Yes, I was.

Q.    I'm sorry.  The '130.

A.    The '130.

Q.    Let me ask it again.  So it's getting --

THE COURT:  Just a minute.  We have to make sure we talk one at a time.  We're trying to keep the record clear.  This is not a conversation; it's a direct examination under the rules of evidence and the rules of procedure.

So please make sure, Doctor Kowalski, she's finished before you speak; and Ms. Glasser, make sure he's finished before you speak.  All right?

MS. GLASSER:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Let's --

THE WITNESS:  Yes.

THE COURT:  -- continue on that basis.

Q.   (BY MS. GLASSER)  So how do we use there chart to show the speed benefit from Samsung for infringing the '130?

A.   Yes.  So, again, looking at the point where the format 0 like approach reaches a one percent error rate, the format similar to format 1 reaches a three percent error rate, so three percent minus one percent, two percent.  Now, what that means -- what this means is that when -- this ACK/NACK is in error when the base station doesn't receive this signal.  The base station thinks that the handset didn't get the signal that's being acknowledged, so it resends it, and that's where you get your speed decrease.

Q.   So is there another reason that using the '130 Patent is beneficial, valuable for Samsung?

A.   Yes.  Again, as Mr. Kim noted here, when the symbol

length is smaller, it can provide support for more user devices.  And in any communication system you want to minimize the amount of control signaling, because what people really want is throughput, they want speed, they don't want control signaling.

Q.    Now, you mentioned the idea of format 1 or format 2.  Did you also review the various other theoretical alternatives that either the Samsung lawyers or their expert put forth in the litigation process?

A.    Yes, I did.

Q.    What did you conclude about them?

A.    I concluded that none of the alternatives put forward by Samsung captured all the benefits of the '130 Patent.  And as I noted in my opening report, there are aspects of the '130 Patent that are the best you can possibly do from a communications theoretic stand point in terms of power transmitted, energy efficiency, error rate.  None of the patents considered captured all of that.

Q.    Now, similar to the '776, did you take look at the Samsung testimony, review the testimony to see what the internal engineers thought about whether there were viable alternatives?

A.    I did.  And again, Doctor Park, who is the designated corporate representative in this regard, was not able to identify any acceptable alternatives to the '130 Patent.

Q.   So taking everything together, could you summarize for us, what did you conclude regarding the minimum benefit that Samsung is obtaining by infringing the '130 Patent?

A.   The minimum benefit that Samsung is obtaining by infringing the '130 Patent is at least two percent.

Q.   Oh, I'm sorry.  I may have accidentally asked you just about the speed.  I'll ask it again more broadly for our record.

A.   Okay.

Q.   Could you summarize for us, what did you conclude regarding the minimum technical benefits that Samsung is obtaining from infringing the '130 Patent?

A.   Yes.  They are obtaining power savings, they are obtaining at least a two percent increase in speed, they are enjoying increased channel resources so that there can be even more throughput than what we are saying here, and this is with no increase in cost.

Q.   Thank you, Doctor Kowalski, for your time.

        MS. GLASSER:  I pass the witness.

        THE COURT:  All right.  Cross examination by Samsung?

    All right.  Let's proceed with cross examination.

        MR. CORDELL:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. CORDELL:

Q.    Good afternoon, Doctor Kowalski.

A.    Good afternoon.

Q.    It's good to see you again.

      You testified that you've done a lot of work with 3GPP. Right?

A.    Yes.

Q.    Let me show you JTX 17.1.  It should be in a binder, but we'll bring it up on the screen.

      Are you familiar with this, sir?

A.    I'm aware of it.  I -- you know, I am aware of it.

Q.    This is the declaration that Doctor Mang Zhu of ZTE filed with 3GPP for the '776 Patent.  Right?

A.    That's what it says.

      MR. CORDELL:  Okay.  And if we go to page 17.7 and highlight 41, row 41.

Q.    (BY MR. CORDELL)  That is, in fact, the -- that tells us it's the declaration that ZTE filed for the patent that became the '776 Patent.  Right?

A.    Yes.

Q.    Just a patent application at the time.  Right?

A.    Yes.

Q.    But it says "Cell Reselection Method and Terminal." Right?

A.    Yes.

Q.    And then we have --

MR. CORDELL:  Can I have JTX 16.1?

Q.  (BY MR. CORDELL)  And this is the declaration that ZTE filed for the '130 Patent.  Correct?

A.  Yeah.  I don't see that.

Q.  Well, you see Mang Zhu again.  Right?

A.  I see that, yes.

Q.  Okay.  And you confirm she's the head of ZTE's patent department, if you want to call it that.  Right?

A.  Well, she was the IP strategy officer.  I don't know what her duties were.

MR. CORDELL:  Okay.  And then if we can go down to column--I'm sorry--row 42.  It's on page 6.  I'm sorry.  16.6. There we go.

Q.  (BY MR. CORDELL)  And is that the '130 Patent, sir?

A.  Yes, I believe it is.

Q.  Okay.  Thank you.

Now, you've testified a moment ago about the '776 Patent. Right?

A.  Yes.

Q.  And you agree with Doctor Akl that the '776 Patent only applies when the phone is in idle mode?

A.  I disagree.

Q.  Okay.  Well, you see that the '776 Patent talks about a connected state and an idle state.  Correct?

A.  Correct.

Q.    And connected is when I'm watching a movie.  Right?

A.    Not necessarily.

Q.    Streaming a movie.

A.    Not necessarily.

Q.    Okay.  So you quibble with those definitions.  Is that fair?

A.    Yes.

Q.    Okay.

        MR. CORDELL:  Can I have the '776 Patent, and at column 1, line 17 through 26?

Q.    (BY MR. CORDELL)  You read the '776 Patent.  Right, sir?

A.    Multiple times.

Q.    Okay.  So starting at line 20 of column 1, it says that in a connected state the transfer between base stations is called handover.  Right?

A.    Yes.

Q.    And in an idle state the change of the cell where the terminal camps is implemented via a cell reselection process. Right?

A.    Correct.

Q.    So cell reselection is associated with the idle state. Correct?

A.    Not exclusively.

Q.    Well, is the answer to my question yes, sir, that you associate cell reselection with the idle state?

312

A.    Not exclusively.

Q.    Okay.  Well, let's just try a different way.  For the vast majority of cell reselections, it happens when my phone is idle.  Correct?

A.    I -- that I don't know.

Q.    Okay.

A.    How often the phone does cell reselection in idle mode vis-a-vis radio link failure or handover failure or similar things, I don't know.

Q.    Okay.  Well, let's put it this way.  Often when my phone is in idle mode, when it's just sitting here, that's when cell reselection occurs.  Fair?

A.    Among other times.

Q.    Okay.  Again, I don't want to quibble with you, sir, but you heard Doctor Akl tell us that idle mode and cell reselection, those go together.  Right?

A.    I heard what Doctor Akl said.

Q.    Okay.  But what you say is that the '776 Patent increases the speed of this cell reselection process.  Right?

A.    Yes.

Q.    Even if it's in idle mode.  Right?

A.    By selecting the best cell, yes.

Q.    Okay.  Even when the phone's not doing anything.  Right?

A.    Well, it's doing cell reselection.

Q.    Well, it's not streaming a movie.  Right?

A.   No.

Q.   It's not carrying a phone call.  Right?

A.   No.

Q.   It's not carrying a text.  Right?

A.   I'm sorry?  Can you repeat that?

Q.   That's okay.  Let me move on.

You pointed to the Kim article a few moments ago.

MR. CORDELL:  Can I have PTX 21?

Q.   (BY MR. CORDELL)  You used this as part of your analysis.  Correct?

A.   Yes.

Q.   And you said this shows the value of doing cell reselection.  Right?

A.   Yes.

Q.   And you also said that Samsung had no possible alternatives to the '776 Patent.  Right?

A.   Yes.

Q.   But this is a Samsung paper.  Correct, sir?

A.   Yes.

Q.   And were you aware that this Samsung paper is the subject of a patent application?

A.   No.

Q.   Did you even look?

A.   No.

MR. CORDELL:  Can I have DDX 172?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

MS. GLASSER:  May I approach, Your Honor?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  What's the issue?

MS. GLASSER:  So he is, I think, about to put on the screen a Samsung patent that wasn't disclosed during discovery.

MR. CORDELL:  It's examination cross, Your Honor.  I just want to know --

MS. GLASSER:  I believe it violates one of the common MILs, too.  I was just going to check on that.  But I think the fact it wasn't disclosed alone is sufficient grounds.  It's Rule 37, right?

MR. CORDELL:  It's cross examination.  I'm entitled to find out what he knows and what he didn't, what he prepared for, and if...

THE COURT:  Tell me specifically what your objection is, Ms. Glasser.

MS. GLASSER:  So my first objection is I think he's about to put in a Samsung patent that was not disclosed during discovery, so it's, you know, FRCP 37.  Right?  But additionally I believe it violates common MIL 4.  Let me just pull it out.

THE COURT:  It's not offered as prior art, is it?

MR. CORDELL: No, Your Honor.

THE COURT: So we're not talking about validity in this --

MS. GLASSER: I think I got it -- maybe I'm misreading the note from my team. I apologize on that. Right?

So the point is they were asked during discovery to disclose patents. Their witnesses were specifically asked about that, and none of them identified anything. We literally just saw that in the testimony that was played.

There's also an agreement between Mr. Cordell and Mr. Sheasby that is documented in writing and is referenced in the filing the other day that they would not try to put into evidence anything that their 30(b)(6) witnesses were unable to identify, so this falls right into that bucket as well.

MR. CORDELL: I'm not trying to admit this, Your Honor; I'm just using it to cross examine the witness.

MS. GLASSER: It's absolutely tainted, the content of it. It's the same thing.

THE COURT: What is the purpose of this?

MR. CORDELL: The purpose is to show that he didn't -- he's misinterpreting the article; that the article was not about the concept that he's concerned with; it's about something different and they've got their own patent on. That's --

MS. GLASSER:  This has nothing to do with the article from anything that was disclosed in discovery. They've never disclosed that even in response to our 30(b)(6) notice on alleged alternatives.  In their expert report responding to Doctor Kowalski it's not anywhere in the record, and they had many opportunities they would have been required to disclose that.

MR. CORDELL:  He offered direct testimony that is completely different system somehow informs the damages analysis.  I'm entitled to show that it's different and this is one --

MS. GLASSER:  He can absolutely ask about being different, which I think Doctor Kowalski already talked about, but to try to put in some Samsung patent when their own witnesses were unable to identify any when they were repeatedly asked, that would be inappropriate and highly prejudicial because --

MR. CORDELL:  They were never asked whether this article bore a patent application.  They were asked a completely different question, which was whether or not there was a patent on a particular device.  We've never made this --

MS. GLASSER:  We asked about any alternatives and we asked about any Samsung contributions.

THE COURT:  All right.  I've heard enough.  I'm

going to allow this within the broad scope of cross examination, but if it crosses some line, I'm not going to precluded Ms. Glasser from raising an objection at this point.

MS. GLASSER:  And Your Honor, for clarification, what would be that point?  I don't want to pop up just to be disruptive.

THE COURT:  Well, it wouldn't be anything you've already told me because I'm not keeping him from using it.  I can't imagine how there might be some problem with it.  I'm just trying -- I'm trying to make it clear I'm not foreclosing you from raising something else if it were justified as we go forward, but I'm not going to stop him from cross examining the witness about it.

MS. GLASSER:  Understood.  Thank you.

THE COURT:  All right.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Let's proceed.

MS. GLASSER:  Apologies, Your Honor.

Q.   (BY MR. CORDELL)  So Doctor Kowalski, I take it you were not aware that Samsung filed a patent application on this Kim article.  Right?

A.   No but I'm not surprised.

MR. CORDELL:  Okay.  Can I have DDX 172?

Q.   (BY MR. CORDELL)  And do you recognize the authors here,

Doctor Sangtae Kim and the two Doctor Lees here?

A.   I don't know them personally, but I presume they are the authors of the paper.

Q.   If we can go back to PTX 21, do we see Dr. Sangtae Kim, Jaehyung Lee, and Youngyong Lee?

A.   Yes.

Q.   Now, this paper talks about a dual SIM phone.  Right?

A.   Yes.

Q.   Now, SIM is the subscriber identifier or identity module, the little card that goes in the side of your phone.  Right?

A.   Yes.

Q.   The kind of thing you go to Verizon and they stick it in your phone for you.  Right?

A.   Yes.

Q.   Okay.  But this article is talking about a phone that has two SIMs in it.  Right?

A.   Yes.

Q.   And some people want to have a phone that has two phone numbers, for example.  Right?

A.   Yes.

Q.   And this article talks about the special situation when you have two SIM cards in a single phone.  Right?

A.   That's what it's directed towards.

Q.   Okay.  The '776 Patent says nothing about dual SIM phones.  Correct?

A.    Not to my knowledge.

Q.    And you've never -- you've met one person that you could ever recall who had a dual SIM phone.  Correct?

A.    I'm sorry.  Can you repeat the question?

Q.    You've only met one person in your life ever that had one of these two SIM phones.  Correct?

A.    No.

Q.    Well, do you remember testifying previously about this dual SIM phone?

A.    I don't recall.

Q.    Okay.  Well, it is a fact, sir, that you can only recall meeting one person in your life who had a dual SIM phone. Correct?

A.    I don't recall that.

Q.    You don't recall one way or the other?

A.    I own a dual SIM phone.

Q.    Can you turn in your binder -- and I apologize because I'm not sure what tab it is.  It's in a binder that's called "Reports and Testimony of John Kowalski."

A.    Uh-huh.

Q.    Did you find it and the --

A.    I found the binder.

Q.    Okay.

A.    Where in the binder would you like me to go?

Q.    Turn to the first tab.

A.    First tab.

Q.    And look at page 684.  I want you to read lines 5 to 7.

A.    Ahh.

        THE COURT:  Not out loud.  Read them to yourself.

        THE WITNESS:  Okay.  I've read it.

Q.    (BY MR. CORDELL)  Okay.  Does that refresh your recollection, sir, you've met one person in your life who had a dual SIM phone?

A.    The text actually says, "I've met at least one."

Q.    Okay.

        MR. CORDELL:  May I read the quote, Your Honor?

        MS. GLASSER:  Your Honor, it's not impeaching, so I'd object on that.  But if he wants to read it down to line 11, I would certainly have no objection at all.

        MR. CORDELL:  That's called optional completeness, Your Honor, and I think that's a different --

        THE COURT:  I know what it's called.  The answer is not inconsistent enough to warrant publication, so your request to publish it is denied.

        Let's move on.

        MR. CORDELL:  Thank you.

Q.    (BY MR. CORDELL)  So with respect to the '130 Patent, Doctor Kowalski, you were dealing with this thing called a PUCCH.  Right?

A.    Yes.

Q.   And there are multiple formats that are used in a PUCCH.
Correct?

A.   They may be used.

Q.   Okay.  Well, in the context of the '130 Patent, you just
told us about format 0 and format 1.  Do you remember that?

A.   I remember that.

          MR. CORDELL:  May I move this, Your Honor?

          THE COURT:  You may.

Q.   (BY MR. CORDELL)  So when we're dealing with the '130
Patent, we have '130 Patent, and then we have not the '130
Patent.  Are you with me?

A.   So far.

Q.   Okay.  And I believe it's your testimony that for the
'130 Patent we need to focus on format 0.  Right?

A.   Yes.

Q.   Okay.  So format 0 goes on the '130 Patent side.  Right?

A.   Yes.

Q.   How do you write 0?  Do you put a cross through them?

A.   It doesn't matter.

Q.   Okay.  And on the not '130 Patent, you have like format
1, for example.  Right?

A.   Yes.

Q.   Okay.  So format 0 and format 1.  And one of the things
that we know about format 0 is it doesn't use a concept that
we call frequency hopping.  Right?

A.    Wrong.

Q.    So you're saying that format 0 does use frequency hopping?

A.    Most certainly.

Q.    Okay.  Even though it's a single symbol.

A.    On two symbols.

Q.    Okay.  But when it has only one symbol--we're talking about format 0--it's a fact that it does not use frequency hopping.  Correct?

A.    In that limited case, yes.

Q.    Okay.  So when it's format 0, we have no--I don't know how to write this--frequency hopping.  Right?

A.    Wrong.

Q.    Well, what do you say is wrong about that?

A.    It's only partially correct.  When it uses two symbols, frequency hopping can be configured for format 0.

Q.    Okay.  So no frequency hopping with one symbol.  Right?  You'll go along with that?

A.    Yeah, generally.

Q.    Okay.  And format 1, it does use frequency hopping.  Right?

A.    If it's so configured.

Q.    But it commonly uses frequency hopping.  Yes?

A.    If it's configured.

Q.    Okay.  So now let's look at some of your slides.

So this is one of the slides you presented this afternoon.  Right?

A.    Yeah.

Q.    Is that --

A.    Yes.

Q.    Okay.  And I think the point you were trying to make to the jury is that format 0, which you say uses the '130 Patent, is better than format 1, which you say does not use the '130 Patent.  Right?

A.    Yes.

Q.    So that the distance, if you will, between the -- in the yellow circle between the blue dot and the red dot, you say that represents kind of an advantage.  Right?

A.    It is.

Q.    Okay.  Did you make this slide, Doctor Kowalski?

A.    No.  I excerpted it from the ZTE document.

Q.    Okay.  And, in fact, you kind of took something off of the document when you made this slide.  Right?

A.    There was something removed, yes.

Q.    You kind of erased the information that would tell anybody reading this kind of what these lines mean.  Right?

A.    Yes.  The upper two lines mean the probability -- the rate of missed acknowledgements.

Q.    Okay.  But my point is, sir, you took some information off of the graph.  Right?

A.    To make it more legible.

Q.    Well, did you take it off or did somebody else?

A.    It might have been taken off in preparation for trial.

Q.    Okay.

MR. CORDELL:  Well, can I have PTX 26?  Can we go back to the source document and show that figure?  It's figure 4.  It's at page 308, I believe.  There we go.  The top half will do.  The top half, please.  Figure 4.  Can you give me figure 4?

It's late, Your Honor.  My apologies.

Can I -- yeah.  No.  The top half is figure 4, but I want the legend.  There we go.  Thank you.

Q.    (BY MR. CORDELL)  So now this is the figure that you made the slide from, but you took off all of this identifying information.  Right?

A.    Yes.

Q.    And when we look at the information closely, we see that you were comparing option 1 to option 2.  Right?

A.    Right.  Because those -- because option 1 is like --

THE COURT:  Just a minute, Doctor Kowalski.  He didn't ask you why you were comparing them; he just simply asked you to verify that was what you were comparing.  You answered that.

THE WITNESS:  Okay.  Sorry.

THE COURT:  You need to limit your answers to the

questions asked.  Ms. Glasser is going to get a chance to ask follow-up questions if she thinks it's appropriate.

Go ahead, Mr. Cordell.

Q.   (BY MR. CORDELL)  And 'option 1 ACK missing' has -- does not have frequency hopping.  Right?

A.   I'm not sure.  I'd have to go back and look.

Q.   Okay.  It's a fact, sir, that instead of comparing option 1 with the blue with option 2 green, you should have compared option 1 with the blue with option 2 in the black.  Right?

A.   Well --

Q.   You made a mistake.  People make mistakes.  Right?

A.   I would have to go back and review it.

Q.   Okay.  When you sit here, you can't tell me that you should have picked 'option 1 ACK missing' in the blue and 'option 2 without hopping' in the black?  And I'm talking about the blue circle and the black circle lines.  Does that help you?

A.   Well, like I said, I'd have to go back and read it and get back to you on that.

Q.   Okay.  You just don't know.

In fact, sir, you needed to compare the option that had hopping with the option without hopping.  Correct?

A.   For the same amount of resources.

Q.   And, in fact, if I'm right and you should have compared the blue line with the circle to the black line with the

circle, those two lines are exactly or pretty close to the same spot.  Correct?

A.    It seems to be the case.

Q.    The lines are right on top of each other.  Right?

THE COURT:  That's a question.  Can you answer that.

THE WITNESS:  Can you repeat it, please?

Q.    (BY MR. CORDELL)  That the lines are almost right on top of each other.  Right?

A.    It seems to be the case.

Q.    So that really shows no performance benefit at all.  Correct?

A.    I wouldn't say that.

Q.    Well, it's very small.  Correct?

A.    There would still be performance benefits in terms of saved power.

Q.    Well, the curves are right on top of each other, sir; neither power nor error.

A.    Right.  But as noted, option 1 -- the option 2 would be more efficient in terms of use of resources.

Q.    Okay.  But, by your analysis, we won't have a vertical oval and we won't have a horizontal oval to talk about.  Right?

A.    I'd have to go back and look.

Q.    Okay.  Let me take you to PTX 26 at page 307.  And let me just see if this helps you under observation one?

MR. CORDELL:  If we can blow up that paragraph.

Q.   (BY MR. CORDELL)  Do you see where it says, "In EPA channel mode, it can be seen that the performance of DMRS-based structure and sequence-based structures without frequency hopping is almost identical"?

You picked the wrong curve.  Right, Doctor Kowalski?

A.   I'd have to go back and look --

Q.   Okay.

A.   -- further.

Q.   You worked at Sharp Electronics for a long time.  Right?

A.   Yes.

Q.   And you developed technologies for 4G and 5G standards. Right?

A.   Yes.

Q.   And you were named as an inventor on a whole bunch of patents.  Isn't that right?

A.   Yes.

MR. CORDELL:  Can I have DDX 168?

Q.   (BY MR. CORDELL)  This is your patent.  Correct?

A.   Yes.

Q.   And it's "transmitting control data and user data on a physical uplink channel."  Right?

A.   Yes.

Q.   That's one of these PUCCH inventions.  Right?

A.   Yes.

Q.   And this is some of the same functionality we see in the '130 Patent.  Right?

A.   I would have to review the patent.  Given that I have 135 of them, to expect me to tie this to the '130 Patent would be asking a lot.

Q.   Okay.  And you know that Sharp declared this patent, your '796 Patent, as essential to the 5G standard.  Right?

A.   I don't know whether or not they declared that this patent is -- may be or may become standard essential.

Q.   Okay.  Well, let's look at it real quick.

        MR. CORDELL:  Can I have DDX 169?

Q.   (BY MR. CORDELL)  Do you recognize this, sir?

A.   I recognize that it's an IPR information statement and licensing declaration.

Q.   Okay.  It was one of those forms that they use to declare the patents to the standard.  Right?

A.   Yes.

        MR. CORDELL:  And then let's go to page 63 at column 123.  Would you believe 133?  Actually, my apologies.  I actually think it is 123.  Yes.

     May I get my glasses, Your Honor?

        THE COURT:  You may.

        MR. CORDELL:  Yes.  There we go.

Q.   (BY MR. CORDELL)  So do you recognize this is the '796 Patent?

A.    It says '796.

Q.    And it's declared as essential to TS 38.211.  Right?

A.    It is declared that it may be or may become standard essential to 38.211.

Q.    Well, and that was declared to the same section of the standard as the '130 Patent.  Right?

A.    The same standard.

Q.    Well, not just -- it's not just the 5G standard; it's a specific chapter in the 5G standard.  Right?

A.    They're just called specifications.

Q.    You're right.  I should have called it the TS 38.211 technical specification.  Correct?

A.    Correct.

Q.    And your patent and the '130 Patent were both put in that same specification.  Right?

A.    They were declared that they may be or may become standard essential.

Q.    Well, don't you think your patent was standard essential?

A.    I don't know.  Again, I have 135 of them.

Q.    That's fine.

A.    But as per earlier testimony, most of them are not.

Q.    That's okay.

      And the -- Let's look at another one.

            MR. CORDELL:  Can I have DDX 170?

Q.    (BY MR. CORDELL)  This is another one of your patents,

the '604 Patent.  Right, Doctor Kowalski?

A.    That's what it says.

Q.    And this one was declared as essential to the same technical specification as the '776 Patent.  Right?

A.    Again, I was not involved with the standard declaration that Sharp did.

MR. CORDELL:  I pass the witness, Your Honor.

THE COURT:  Is there redirect?

MS. GLASSER:  Briefly, Your Honor.

THE COURT:  All right.  Are you going to use this chart, Ms. Glasser, for redirect?

MS. GLASSER:  I don't think, Your Honor.

THE COURT:  Mr. Cordell, you need to put it back where it was.  And turn it to a blank page, please.

All right.  Let's proceed with redirect.

MS. GLASSER:  Thank you.

REDIRECT EXAMINATION

BY MS. GLASSER:

Q.    So first I would like to ask you about that patent application that was quickly flashed up on the screen, and he said it has -- this IS from Samsung.  Do you remember that?

A.    Yes.

Q.    First of all, was that an actual issued patent?

A.    No.

Q.    And did any of the Samsung witnesses or experts identify

that as having any sort of basis to be an alternative to

Samsung to their infringement?

A.    No.

Q.    Okay.  So then I want to put up slide 22.

MS. GLASSER:  Could we have that?  And if we could advance one more forward after that--23.

Q.    (BY MS. GLASSER)  So opposing counsel put up this slide.  And do you remember he started accusing you that you had taken something off of the slide?  Do you remember that?

A.    Right.

Q.    Now, if we flip back to 22 --

A.    It's on.

Q.    Did you present all of that material to the jury that he accused you of taking off the slide?

A.    Yes.

Q.    Okay.  So he also started to ask you -- after he showed you the other one and accused you of taking the stuff off the slide incorrectly, he then started asking you about frequency hopping.  Do you remember that?

A.    Yes, he did.

Q.    And you said you would want to do some more looking up the things he was throwing out there at you.

A.    Right.

MS. GLASSER:  I'd like to put up PTX 31, and we have this, actually, on PDX 3.69.

Q.   (BY MS. GLASSER)  What are we looking at here in PTX 31?

A.   Yes.  We are looking at an excerpt from the radio resource control specification.  This is the standard that tells the handset how to operate its radio.  And we're looking at what's called an information element, which is a signal that the network sends the handset to enable to use frequency hopping.

Q.   And so does this slide -- is this one of those documents you could look at to confirm that frequency hopping is applicable for all types of formats?

        MR. CORDELL:  Objection; leading, Your Honor.

        THE COURT:  Sustained.

Q.   (BY MS. GLASSER)  Okay.  What does this document tell you about that question of frequency hopping and when it's enabled?

A.   It literally says "enabling frequency hopping applicable for all types of formats."

Q.   Thank you.

        MS. GLASSER:  I pass the witness.

        THE COURT:  Is there further cross?

        MR. CORDELL:  No, Your Honor.  Thank you.

        THE COURT:  All right.  You may step down, Doctor Kowalski.

    Ladies and gentlemen of the jury, we're going to recess for the day at this time.  We've gone longer than I

anticipated, but sometimes it's not an exact science as to when a witness starts and stops, and I really do not like stopping or breaking for the day with a witness only part of the way through their testimony.  But I apologize for going longer than I anticipated.

We will start tomorrow morning at 8:30.  I'm going to ask you to make your plans to be here about 8:15 or 8:20 so that we can start at 8:30.  Check the weather, check the gas in your tank, check all the things you need to check so you can be here at 8:30 in the morning and ready to go.

A jury is a lot like a convoy of ships--it moves only as fast as its slowest ship, so if seven of you are here and one of you is not, I can't start, so it's important that you're all here ready to go by or before 8:30 in the morning.

I also wanted to share with you--and I didn't do it earlier and I'll do it now--in my 12 years on the bench, I have had juries repeatedly tell me after the trial is over that they would much rather be away from their homes and their work a shorter number of days but work a longer day to accomplish that than work a shorter day and have twice as many days away from work and home.  And so because of that, we will go till 5:00 or 5:30 or 6:00 each evening to try to get the case finished in a shorter number of days.  We could stop at 4:00 in the afternoon but it would take us twice as many days to finish the case.  So factor that into your planning and let

those that you live with and coordinate with know exactly what to expect.  I know that several of you have a distance to drive each evening, and I'll try to keep that in mind.

Please take your notebooks with you as you leave the courtroom and leave them on the table in the jury room.  Let me remind you of all the instructions I've given you today, including not to discuss the case with anyone in any way, and among yourselves.

Have a good evening, travel safely, ladies and gentlemen, and you're excused until tomorrow morning at 8:30.

(Whereupon, the jury left the courtroom.)

THE COURT:  Be seated, please.

Counsel, for your benefit and planning, we've used a total of 3 hours and 16 minutes of designated trial time today.  The Plaintiff has used an hour and 50 minutes and has remaining 2 hours and 10 minutes; the Defendants have used an hour and 26 minutes and have remaining 2 hours and 34 minutes.

We have had somewhat of a moving target today on the order of witnesses, and I would like to be updated before tomorrow morning with a firm idea of who is going to be called and who's not going to be called.  I know some of this is because of the moving target of you-all resolving demonstrative disputes.

I assume, Mr. Sheasby, you will start tomorrow with Doctor Reed-Arthurs.  Is that correct?

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  Followed by Doctor Dell -- or Mr. Dell.

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  What about the two depositions you have listed that haven't been played yet?

MR. SHEASBY:  So there -- that -- Doctor -- Mr. Rodermund would go between Rebekah Reed-Arthurs and Mr. Dell.  And if we do play Mr. Jeon, he will go as well between the two.

THE COURT:  Well, let me know before in the morning what to expect.  Okay?

MR. SHEASBY:  And Your Honor, given the substantial amount of time that was taken today I think beyond what we had expected, there is a potential that Doctor Reed-Arthurs will not be called, and I did want to flag that for the Court; not as an example of gamesmanship, but just as a prudential thing. We may not have time.

THE COURT:  Well, that's the kind of thing I want to know before we start tomorrow morning.

MR. SHEASBY:  I completely understand, Your Honor.

THE COURT:  All right.  I won't say this more often than is necessary, but the meet and confer process has failed to accomplish what it was intended to.  I am going to hope and expect that it will be much more productive going forward and that I am not going to be inundated with three inches thick of

disputed slides first thing in the morning.  If so, we'll take an alternative path.  But I expect the parties to meet and confer professionally and effectively and in a straight-forward manner, and I expect the majority of the disputes to be resolved.  That hasn't happened so far, but I will -- I have not given up hope that it can't happen going forward.

Also, given the length of time that this case is set for trial, and given the discreet issue of damages that is being retried, I have determined that rather than ask the parties to submit updated revised proposed final jury instructions and a verdict form, I'm going to craft what the Court believes to be the appropriate final jury instructions and verdict form and I'm going to send it to you for comments, and I'll do that before we -- before or after when we complete the evidence in this case.  Quite honestly, I don't have any confidence that what you would send me would be workable at this point.  So I'll be glad to hear your comments on what I send you, but I'm going to reverse the flow of preparation and disclosure here.

All right.  Are there other issues at 6:31 in the evening that I need to hear from the parties on before we recess?

MR. SHEASBY:  Your Honor, I did want to flag one thing, which is that this should not collapse into a childlike bickering, but I do believe that the number of objections that were made today were prolix and may have been based on a strategy to suck time.  Tomorrow I'm going to make a

commitment to you that when their witnesses are called we will not do the same thing, and I would ask the Court to consider whether there needs to be an adjustment in time after the Court sees the difference between our behavior and what I think occurred today.

THE COURT:  I'll be watching as we go forward, Mr. Sheasby.  That's all I can tell you.

MR. SHEASBY:  Thank you, Your Honor.

MR. CORDELL:  And obviously, Your Honor, we disagree with that.  And we will endeavor to make the meet and confer process more productive.

If I can make a suggestion.  If I could speak directly to Mr. Sheasby in the evening on the meet and confer, I think we would solve most of these problems.

THE COURT:  Is there some reason why that can't happen?

MR. SHEASBY:  Your Honor, based on what happened today, it is -- I have serious concerns about Mr. Cordell's ability to -- we're going to do our best, but the problem is that Mr. Cordell doesn't know the issues.  He agreed that those slides were all acceptable, and we lost 15 minutes fighting about a slide that he told me to my face was acceptable.  And so the problem that I have is there's a gap between what he says and what the people who make the decisions and know the facts are.  The people who need to

meet and confer are the people who are going to make the final decisions, and --

THE COURT:  You're telling me lead counsel for the Defendants' is not going to make the final decision?

MR. SHEASBY:  Your Honor, I'm telling you that his behavior with regard to that slide was 180 degrees opposite of what he told me in our meet and confer; 180 degrees opposite.

THE COURT:  Well, I don't want this to devolve into name-calling and I'm not going to countenance that.  I want both sides to meet and confer effectively and professionally, and if that means lead counsel wants to talk to opposing lead counsel, I expect opposing lead counsel to make themselves available.  I want whoever can help move the process forward in a constructive manner to be part of the discussions.  I want anyone on either side that has been an impediment to that so far out the way and out of the process.

Now you-all know who's who on your side of the case; I don't; but I'm telling you I want things to improve.

MR. SHEASBY:  I understand, Your Honor.

THE COURT:  All right.  With that, I will see you in chambers if needed in the morning.  I'll be there by 7:30.  I expect the reports overnight to my staff as I've directed you.

And with that, counsel, we stand in recess.

(The proceedings were concluded at 6:35 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                    04/15/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

.