IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

G+ COMMUNICATIONS, LLC.,        (   CAUSE NO. 2:22-CV-078-JRG
                                )
            Plaintiff,          (
                                )
vs.                             (
                                )
SAMSUNG ELECTRONICS CO., LTD.,  (
et al.,                         )   MARSHALL, TEXAS
                                (   APRIL 16, 2024
            Defendants.         )   8:30 A.M.
_____

VOLUME 2

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:      IRELL & MANELLA, LLP -
                        LOS ANGELES
                        1800 AVENUE OF THE STARS
                        SUITE 900
                        LOS ANGELES, CA 90067-4276
                        (310) 203-7096
                        BY: MR. JASON SHEASBY
                            MR. BENAJMIN MANZIN-MONNIN
                            MR. MICHAEL HARBOUR

                        IRELL & MANELLA -
                        NEWPORT BEACH
                        840 NEWPORT CENTER DRIVE
                        SUITE 400
                        NEWPORT BEACH, CA 92660
                        (949) 760-0991
                        BY:  MS. LISA GLASSER

                        McKOOL SMITH, P.C. - MARSHALL
                        104 EAST HOUSTON, SUITE 300
                        MARSHALL, TEXAS  75670
                        (903) 923-9000
                        BY:  MS. JENNIFER TRUELOVE
                             MR. SAM BAXTER

FOR THE DEFENDANTS:     FISH & RICHARDSON, PC -
                        WASHINGTON, DC
                        1000 MAINE AVE., SW
                        SUITE 1000
                        WASHINGTON, DC 20024
                        (202) 783-5070
                        BY:  MR. RUFFIN CORDELL
                             MR. MICHAEL McKEON
                             MS. LAUREN DEGNAN

                        FISH & RICHARDSON, PC - DALLAS
                        1717 MAIN STREET, SUITE 5000
                        DALLAS, TEXAS  75201
                        (214) 292-4084
                        BY:  MR. THOMAS REGER

                        GILLAM & SMITH, LLP
                        303 SOUTH WASHINGTON AVENUE
                        MARSHALL, TEXAS  75670
                        (903) 934-8450
                        BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                      100 E. HOUSTON STREET
                      MARSHALL, TEXAS  75670
                      (903) 923-8546

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| FRIEDHELM RODERMUND | |
|    BY VIDEO DEPOSITION .............................................. | 343 |
| STEPHEN DELL | |
|    Direct By MS. TRUELOVE ........................................... | 347 |
|    Cross By MR. CORDELL ............................................. | 400 |
|    Redirect By MS. TRUELOVE ......................................... | 444 |
|    Recross By MR. CORDELL ........................................... | 446 |
| GUY WAITLEY | |
|    Direct By MS. SMITH .............................................. | 450 |
|    Cross By MS. GLASSER ............................................. | 463 |
|    Redirect By MS. SMITH ............................................ | 466 |
|    Recross By MS.  GLASSER .......................................... | 467 |
|    Redirect By MS. SMITH ............................................ | 467 |
| PAUL MIN, PH.D. | |
|    Direct By MS. DEGNAN ............................................. | 470 |
|    Cross By MR. SHEASBY ............................................. | 485 |
|    Redirect By MS. DEGNAN ........................................... | 499 |
| PAUL MEYER | |
|    Direct By MR. McKEON ............................................. | 502 |
|    Cross By MR. SHEASBY ............................................. | 536 |
|    Redirect By MR. McKEON ........................................... | 552 |
| MANG ZHU | |
|    BY VIDEO DEPOSITION .............................................. | 558 |

THE COURT:  Be seated, please.

All right, counsel.  Before I ask you to read into the record the items from the list of pre-admitted exhibits used during yesterday's portion of the trial, I want to give you a ruling on the record with regard to the dispute over redactions required in the Court's order.

This is a motion by G+ to redact certain additional items beyond what had previously been ordered redacted in DTX 422.

I am denying the request to further redact DTX 422, particularly the three columns immediately to the left of the right two columns that are redacted, being the columns entitled Percentage of SEPs Determined Essential, 5G SEPs Determined Essential, and Effective Royalty Rate Per Patent.

Those three columns which G+ sought to have redacted and Samsung opposed, I am denying the motion to have those redacted and they can be used or the document can be used without those redactions.  The original redactions previously ordered by the Court stand.

The Court finds that that material is relevant and probative, and the Court finds that the risk that the jury would be able to take that very limited information and somehow extrapolate into the numbers that were actually redacted is a very minor and remote, if even existing, possibility.

So I'm going to find that the probative value outweighs

the risk here, and I'm going to deny G+'s motion in that regard.

Now, let me ask representatives of both sides to go to the podium and read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial.

And for the record, the motion I was discussing earlier is Document No. 627.  I don't think I said that just for clarity.

Go ahead, Ms. Truelove.

MS. TRUELOVE:  Thank you, Your Honor.

Exhibits that were used yesterday during trial on behalf of Plaintiff G+ are:  JTX 04, JTX 16, JTX 17, PTX 21, PTX 24, PTX 26, PTX 31, DTX 17, DTX 18, DTX 25, DTX 578, JTX 01, and JTX 28.

THE COURT:  Any objection from Defendants as to that rendition by Plaintiff?

MR. FREEMAN:  Will Freeman for Defendant Samsung. No objection, Your Honor.

THE COURT:  All right.  Do Defendants have a similar list to read into the record?

MR. FREEMAN:  We do have three exhibits, Your Honor. They were all previously read by Plaintiffs.  They were DTX 18, JTX 16, and JTX 17.

THE COURT:  All right.  And I gather Plaintiff has

no objection to that offering.

MS. TRUELOVE:  That's correct, Your Honor.

THE COURT:  All right, counsel.  Thank you.

All right, counsel.  Is there anything else that we need to take up before I bring in the jury and we continue with Plaintiff's case in chief?

MS. TRUELOVE:  Nothing from Plaintiff, Your Honor.

MR. CORDELL:  Nothing from Defendant, Your Honor. Thank you.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Welcome back.  Please have a seat.

Plaintiff, call your next witness.

MS. GLASSER:  Good morning.  May it please the Court.

Plaintiff G+ calls its next witness, Mr. Friedhelm Rodermund, by video designation.  Mr. Rodermund was retained as an expert by the Samsung Defendants in this case.

THE COURT:  All right.  Proceed with this witness by deposition.  Do you have the times on this, Ms. Glasser?

MS. GLASSER:  23 minutes, 55 seconds to the Plaintiff.

THE COURT:  All right.  Let's proceed with the

witness by deposition.

FRIEDHELM RODERMUND,

BY VIDEO DEPOSITION

Q.   Sir, can you state your full name for the record?

A.   Friedhelm Rodermund.

Q.   And, sir, you've been -- you've been retained as an expert by the law firm representing Samsung.  Is that correct?

A.   That's correct.

Q.   Now, have you been paid to represent Samsung in litigations before?

A.   Yes, I have cases for Samsung in the past, yes.

Q.   I believe it's been six cases, but you're welcome to look.

A.   It might have been six cases, yeah.

Q.   You agree that the royalties that should be due on patents that are standard essential needs to be based on the technical benefit of the patent in terms of the performance improvement separate from any standardization.  Correct?

A.   Yeah, it needs to be based on the value of the patent ideally prior to its adoption to standardization.

Q.   So one way you could do that is what is the performance benefit of the patent as compared to the next closest alternative that exists?

A.   The performance benefit could be one of the factors of evaluating the value of the patent.

344

Q.   Other than the performance benefit of the patent in comparison to the next closest alternative that was available, what other factors go into the value of patents that are standard essential?

A.   It can be different aspects which also play a role in terms of assessing the value, for example, the complexity of the solution.  If you have a solution which achieves performance increase by a very complex implementation, then this is -- this is less value than a comparable performance increase achieved by a less complex implementation.  So this also adds up to costs and power consumption of a device.

So the complexity plays a role, the impact on -- on power consumption, the footprint required to perform certain functions in terms of CPU power, memory.  And then also it's not on the -- patent not only about the performance increasements, but also about adding new functionality to a telecommunication system which allows additional functionality, additional features, additional services.  So there are different -- different aspects which play a role in assessing -- assessing the value of the patent.

Q.   Those can all -- and would it -- can we describe all those as technical benefit?

A.   No, they are also commercial benefits.

Q.   Technical and commercial benefit?

A.   Technical and commercial, yes.

Q.   And you agree that FRAND rates should be based on the technical and commercial benefit of the patented technology in comparison to the next closest alternative that was available at the time of standardization?

A.   Yes.  These are areas which are important for the evaluation of the value of the patent.

THE COURT:  Does that complete this witness by deposition, counsel?

MS. GLASSER:  It does, Your Honor.

THE COURT:  All right.  Thank you.

Plaintiff, call your next witness.

MS. TRUELOVE:  Your Honor, at this time we call Mr. Stephen Dell.

THE COURT:  All right.  Mr. Dell, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand, Mr. Dell.

MS. TRUELOVE:  Your Honor, could I hand you up --

THE COURT:  You may approach.

MS. TRUELOVE:  Thank you.

THE COURT:  All right, Ms. Truelove.  You may proceed with direct examination when you're ready.

MS. TRUELOVE:  Thank you very much, Your Honor.

Prior to getting started here this morning, I would

respectfully request that we seal the courtroom for the duration of Mr. Dell's testimony.

We'll be getting into a significant amount of confidential information throughout his testimony, and just to expedite the process and as discussed in chambers, we would respectfully request that the courtroom be sealed.

THE COURT:  All right.  Based on counsel's request and to protect confidential information, I'm going to order the courtroom sealed.

Anyone present who is not subject to the protective order in this case should excuse themselves and remain outside the courtroom until it's reopened and unsealed.

This will also seal this portion of the transcript.

MR. CORDELL:  May I ask Your Honor if this is all parties, third parties, Samsung confidential?  Which one are we talking about?

MS. TRUELOVE:  It is all parties, Samsung confidential third parties, all of the above, Your Honor.

THE COURT:  All right.  The courtroom is sealed. Let's proceed.  Well, let's let Samsung's representative get out the door.

(Courtroom sealed.)

███████████████████████████████████████████████

████████████████████.

██████████████████████████████████████████████.

347



Q. ███████████████████████████████████████ ██████████████████?

A. ██████████████████████████████████.

Q. █████████████████████████████████████?

A. ███████████████████████████████████████ ████████████████████████████████████████ █████████████████████████.

Q. █████████████████████████████████████ ███████?

A. ████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████.

Q. █████████████████████████████████████████ ████████████████████████████.

A. ████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████.

Q. ███████████████████████████████████ ███████████████████████████?

A. ████████████████████████████████████████



Q.

?

A.

.

Q.

?

A.

.

Q.

?

A.

.

Q.

?

A.













A. ███.

Q. ██████

████? 

A. ██.

Q. ██████?

Q. ██████

A. ████.



356



357



Q. ?
A.

Q. ?
A.

.

Q. ?

A. .
Q. ?
A.

.

Q. ?

A.

.

Q.

358



359



Q. ?

A.

.

Q.

?

A.

.

Q.

?

A.

Q.

?

A.



361



362













Q. ██████████████████████████████████████████████████████████████?

A. ████████████████████████████████████████████████████████████.

Q. ████████████████████████████████████████████████████████████?

A. ████████████████████████████████████████████████████████████.

Q. ██████████████████████████████████████████████████████?

A. ████████████████████████████████████████████████████████████.

Q. ██████████████████?

A. ████████████████████████████████████████████████.





Q. ██████████████████████████████████

██████████████████████████████████

████████████████████████████████?

A. ████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████.

Q. ████████████████████████████████

██████████████████████████████

███████?

A. ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████

██████████████.

Q. ██████████████████████████████████

████████████████████████████████?

A. ██████████████████████████████████

██████████████████████████████████



Q. ███████████████████████████

A. ████████████████████████████.

Q. ███████████████████████?

A. ████████████████████████
███████████████████████████████.

Q. ████████████████████████
███████████████████████████
███████████████████?

A. ████████████████.

Q. █████████████████████████████
██████████?

A. ████████████████████████
████████████████.

Q. ███████████████████████████?

A. █████████████████████████████
█████████████████████
█████████████████████
████████████████████
███████████████████



Q. ████████████████████████████████████████

██████?

A. ██████████████████████████████████████.

Q. ██████████████?

A. ███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████.

Q. ██████████████████████████████?

A. ███████████████████████████████████████

████████████████████████████████████████████

██████████.

Q. ████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████?

A. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████



Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

Q. [redacted]?

A. [redacted].

373





Q. ███████████████████████████████████

███████████████████████████████████?

A. ████████████.

Q. ██████████████████████████████████████

███████████████████████████?

A. █████████████████.

Q. ████?

A. ████████████████████████████████████████

██████████████.

Q. ████████████████████████████████

███████████████████████████████████

███████████████████████████████████████?

A. ███████████████████████████████

█████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████.

Q. █████████████████████████████████

███████████████████████████████████████

██████?

A. ████████████████████████████████

█████████████████████████████████

███████████████████████████████████





A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

378

A.

Q.

A.

Q.

A.

Q.

A.

Q.



380



Q. ████████████████████████████████████████?

A. ████████.

Q. ███████████████████████████?

A. ████████████████████████

████████████████████████

████████████████████████████████

██████████████████████████.

Q. ████████████████████████████████

████████████████████████?

A. ████████.

Q. ███████████████████████████?

A. ████████████████████████████████

████████████████████████

████████████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████.

Q. ██████████████████?



A.

Q.

A.

Q.

A.

Q.

A.

382



383



384



Q. ?

A. .

Q.

.

Q.

?

A.

.

Q.

Q.

?

A.



Q. ████████████████████████████████████████
████████████?

A. ████████████████████████.

Q. ████████████████████████████████
████████████?

A. █████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████.

Q. ████████████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████
████████████?

A. ████████████████████████████████
████████████████████████████████████
████████████████████████



387





A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮





391



392



Q. ████████████████████████████████?

A. ████████.

Q. ████████████████████████████████████
████████████████████?

A. ██████████████████████████
████████████████████████████
██████████████████.

Q. ████████████████████████████████████
████

A. ██████████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████████
██████████████████.

Q. ████████████████████████████████
██████████████████████████?

A. ████████████.

Q. ████████████████████?

A. ██████████████████████████.

Q. ████████████████████████████?



A. ▇▇▇▇▇▇▇▇.

Q. ▇▇▇▇▇▇▇▇▇▇▇?

A. ▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇.

Q. ▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇
▇?

A. ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇
▇▇▇▇▇.

Q. ▇▇▇▇▇▇▇▇?

A. ▇▇▇▇.

Q. ▇▇▇▇▇▇▇?

A. ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇.

Q. ▇▇▇▇▇▇▇▇
▇?

A. ▇▇▇▇▇▇▇

394



Q.

A.

Q.

A.

Q.

A.

Q.

A.



396

Q. ███████████████████████████████████████
███████████████████████████?
A. █████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████.
Q. ████████████████████████████████████████
███?
A. ████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
█████████████████████████.
Q. ████████████████████████████████████
████████████████████████████████?
A. ████████████████████████████████████
██████████████████████████████████████
███████████████████████.
Q. ███████████████████████████████████████████
A. ████████████████████████████████████
████████████████████████████████████████
███████████████████████████████
████████████████████████████████████
████████████████████████████████████



A. ████████████████████████████████

████████████████████████████████

████████████████████████████████.

Q. ████████████████████████████████

████████████████████████████?

A. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

█████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████.

Q. ████████████████████

████████████████████████████

███████.

████████████████████████████████

████████████████████████████████

████████████████████████

████████████████████████████████

████████████████████████████████

███████

(Courtroom unsealed.)

THE COURT:  Ladies and gentlemen, as you leave the

jury box for recess, you can simply close your notebooks and leave them in your chairs. We'll try to keep this relatively short.

Please remember to follow all of the instructions I've given you, including not to discuss the case among yourselves, and we'll be back shortly to continue with cross examination of this witness.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT: The Court stands in recess.

(Brief recess.)

THE COURT: Be seated, please.

Mr. Cordell, are you prepared to go forward with cross examination?

MR. CORDELL: I am, Your Honor. And I believe that we are going to go right into the confidential stuff right away.

THE COURT: So you'd like me to seal the courtroom.

MR. CORDELL: Please.

THE COURT: Let's get the jury in, and then I'll take that up.

Let's bring the jury in, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Please have a seat.

MR. CORDELL:  Actually, Your Honor, I think we can stay public for a little while.

THE COURT:  All right.  We're going to proceed at this time with cross examination of Mr. Dell by counsel for Samsung.

Mr. Cordell, you may proceed with cross examination.  If there's a need to seal the courtroom, let me know.

MR. CORDELL:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CORDELL:

Q.   Good morning, Mr. Dell.

A.   Good morning.

Q.   You were here to offer an opinion to this jury about what the right price should be for a FRAND license to the two patents-in-suit.  Correct?

A.   I would say I'm here to calculate the reasonable royalty damages that are attributed to the infringement which includes calculation of a royalty rate attributed to that, yes.

Q.   My question is really precise.  This jury's got to answer one question.  Right?

A.   I understand I'm here for damages.  I'm not sure what questions will be on the jury form.  I don't know.

Q.   This jury is going to be asked to set a price for this license to the two patents-in-suit.  Correct?

A.   Correct.  They're going to calculate the royalty damages

for Samsung's infringement.  That's correct.

Q.   And these patents are subject to a FRAND promise.  Right?

A.   The patents -- the royalty rate would be negotiated under the FRAND construct, yes.

Q.   And ZTE promised that they would only ask for money that was fair and reasonable.  Correct?

A.   Well, it's fair, reasonable, and non-discriminatory is how it's defined.

Q.   Thank you.

And GComm is bound by that same promise to ask only for fair, reasonable, and non-discriminatory money.  Correct?

A.   Generally that's correct.  They would -- because of the declaration of the patents being essential, they are to determine a FRAND rate.

Q.   And it is your opinion, Mr. Dell, that all other things being equal, the price for patents with a FRAND promise is generally lower than the price for patents that have no FRAND promise.  Correct?

A.   No, because I'm not sure I understand your question when you say all things being equal.  I think it's important to determine the value of each specific patent that's being analyzed.

Q.   If you had FRAND versus non-FRAND, FRAND rates would typically be lower.  Correct?

A.   No, I wouldn't agree with that in all circumstances.

Q.    Turn in your binder to DDX 166, your exhibit binder.

A.    There's two binders.  Which binder?

Q.    It's the one that says cross-examination of Stephen Dell.

A.    I'm sorry.  Which tab again, sir?

Q.    It's the tab marked DDX 166 and go to page 683.  And just to yourself, I want you to read from lines 21 to 684, line 1.

A.    And through which line again?

Q.    Through 684, line 1.

A.    Okay.

Q.    Now, I'm going to ask it again, Mr. Dell.  All other things being equal, the price for patents with a FRAND promise are generally lower than the price for patents without a FRAND promise.  Correct?

A.    No.  My answer would be the same as I mentioned before.

Q.    If you had FRAND versus non-FRAND, in your opinion, FRAND rates would typically be lower.

A.    No, not in all instances.  I would disagree.

        MR. CORDELL:  Your Honor, may I publish the testimony?

        THE COURT:  You may.

Q.    (BY MR. CORDELL)  So beginning at line 21, "And FRAND royalties would be less than royalties for patents where there is no FRAND commitment.  Correct?"

        Answer:  "I would say all else equal, because I think your question was a little broad.

"If you had FRAND versus non-FRAND, I think, as I mentioned in my slide, FRAND rates would be typically lower."

Did I read that correctly, sir?

A.    For the slide that was shown for this, yes.

Q.    And this was your sworn testimony.  Correct?

A.    In a separate case for different patents on that analysis, yes.

Q.    Okay.  Thank you.

Now, in this case you've said that the proper rate --

MR. CORDELL:  Your Honor, may I advance the easel.

THE COURT:  You may use the easel as is typical.

Q.    (BY MR. CORDELL)  You said in this case the proper rate is $1.35.  Is that right?

A.    For both patents, correct.

Q.    Okay.  And the lump sum that you come up with is 142.6. Right?

A.    At the low end based on those rates, that's correct.

Q.    And I think for the '776, you said it was $1.02, and for the '130 I think you said it was -- let me make sure I get this right.  I'm sorry.  It's a dollar for the '776 and 35 for is the '130.  Is that fair?

A.    35 cents, yes.

Q.    So the way it works is you had a dollar for the '776 and -- I'm sorry.  And that gives you a lump-sum number of 102.6.  Correct?  These are millions.  Is that right?

A.   The 102.6 is for the '776.  Yes.

Q.   So -- and then for the '130, you had 35 cents, and that gives you roughly 40 million.  Right?

A.   Generally that's correct.

Q.   Okay.  And so just to make this a little easier on all of us, you know, for every penny of royalty on the '776, you end up with about a little over a million dollars.  Right?

A.   I guess I'm not sure what you're asking.

Q.   So you have a dollar, that's a hundred pennies.  And you're telling the jury that that rolls up to $102 million.  Right?  So it's about a million dollars -- a little over a million dollars per penny of royalty.  Right?

A.   No, that's not how my analysis presented.  It's a dollar per unit for the '776 Patent.

Q.   But when you do all your calculations and you end up at the end of the day, you say that that dollar ends up with a lump sum of $102.6 million.  Right?

A.   Yes, when it's applied to the infringing units.  That's correct.

Q.   Okay.  And for the '130, that 35 cents, you get a little more than a million in lump sum for every penny of royalty for the '130.  Right?

A.   No, I don't look at it that way.  It's 35 cents times the number of infringing units.

Q.   And when you do that multiplication, you end up with a

little over a million dollars for every penny of the royalty. Right?

A.   It may work out mathematically like that, but that's not how I look at the analysis.

Q.   I'm just trying to make it a little simpler for us all, Mr. Dell.

So if we're looking at this and if you're wrong and the royalty is $1.30 and we're trying to figure out how much the lump sum should change by, you could just do the same multiplication and you would come out with, well, about $6 million less.  Right?

A.   No.  You would look at the specific rates for each patent and apply that rate to the infringing units.

Q.   Okay.  But I'm just trying to gauge how it is that we are as -- all of us, the jury and us, are to get -- are to associate your running royalty rates with the lump sum.  Are you with me?

A.   I understand what you're asking, yes.

Q.   Okay.  So if I divide 142 million by $1.35, I might be able to figure out what each penny of royalty results in the lump sum.  Are you with me?

A.   I understand what you're saying, but I'm not sure why you would do it that way.

Q.   So it ends up being a million 50.  Do you want me to do the math for you or do you trust me?

A.    I'll take your representation for it right now.  I wouldn't look at it that way, but I'll take your representation.

Q.    Okay.  So for every penny, if you're wrong and the royalty rate should be $1.40, then we would add four times this, that would be $4.2 million to your total amount.  Right?

A.    No, that's not how you would do it.  You would look at the specific rate for each patent and apply it to the infringing units.

Q.    Okay.  Well, but if you took the specific rate and it turns out to be five pennies higher, chances are it's going to be around $4.2 million more than this.  Right?

A.    If you apply it to the number of units for whichever patent that may be, then, yes, that's how the math would work out.

Q.    I'm just trying to find a way for the jury to associate your running royalty rates with a lump sum.  Is that fair?

A.    That's fair.  It's shown in the calculations that I provided, but yes.

Q.    It might be kind of rough, but that's a general approximation.  Fair?

A.    Well, again, there's no need for approximation because I provide the number of infringing units and the rate to apply to those units.

Q.    Now, you've testified a number of a times.  Correct?

A.    Yes.

Q.    And you're not here testifying for free.  Right?

A.    No.

Q.    And you've made, I don't know -- do you know how much money you've been paid in this case?

A.    My firm has billed for all of our work around $500,000, if I recall.

Q.    Okay.  You've said you have been paid 400,000 back in September of 2023.  Does that sound right to you?

A.    That sounds right.

Q.    And you've only done $100,000 worth of work since September of 2023?

A.    Again, based on my recollection, that's generally about correct for what we've billed, that's correct.

Q.    And you understand that the other experts in this case are also paid for their time.  Right?

A.    That's my understanding.

Q.    So you understand that Mr. Meyer, for example, our damages expert, he's being paid for his time.  Right?

A.    I assume so, yes.

Q.    And you understand Mr. Meyer has testified in Samsung cases on a number of occasions.  Right?

A.    I do.

Q.    And you have testified against Samsung on a number of occasions.  Right?

408

A.   Against them?  Yes.

Q.   In fact, you've testified against Samsung 10 separate times.  Right?

A.   I think that sounds correct, all for different companies asserting them of infringement.  But, yes, I would agree with that.

Q.   So you've testified against Samsung in 10 separate cases. Right?

A.   I think that sounds fair.

Q.   You don't hate Samsung or anything.  Right?

A.   No.

Q.   Now, let's talk about that hypothetical negotiation.  You set it up for the jury and you said a couple of times, maybe it was a misstatement, but I thought you said GComm was dealing with Samsung.  But that's not right.  Correct?

A.   I'm sorry.  Can you re-ask your question, please?

Q.   At the hypothetical negotiation, GComm's not in the room. Correct?

A.   That's correct.

Q.   It's ZTE and Samsung.  Right?

A.   Yes, sir, that's correct.

Q.   Okay.  And you did a calculation of the kinds of comparable agreements that GComm and ZTE -- I'm sorry.  Now I'm doing it.  Let me start again.

     You did a calculation, an analysis of the comparable

agreements that ZTE and Samsung would consider as part of that hypothetical negotiation.  Right.

A.    I looked at agreements that were produced by Samsung, yes.

Q.    And you did a calculation.  You took it down to the per-unit royalty rate for those comparable agreements.  Right?

A.    For some of them, yes.

Q.    And you did it very precisely.  Right?

A.    Yes, based on the analysis of the methodology that was used.

Q.    And we had a lot of discussion in your direct about how you didn't have confidential information and you had to guess about things.  Do you remember all of that?

A.    Well, I didn't have to guess.  I just used confidential information -- or non-confidential information for some of the analyses.

Q.    But when you did the analysis in your expert report, you had the confidential information.  Right?

A.    It depends.  There's two sets of analyses.  But for the Samsung confidential agreements, yes, I had that information.  That's correct.

Q.    And you decided that there were three agreements that were like apartments that you could look at to see what they rented for to know how much this apartment was worth.  Right?

A.    I didn't use an apartment analogy for that analysis, but

I did consider those agreements that were related to cellular standards.

Q.   Okay.  But in your direct you talked about renting an apartment and that you looked at other apartments to see if the rent was right.  Correct?

A.   No, that's not how I used that analogy.  I used it to explain what a royalty is.

Q.   You said there were three agreements that were important--Ericsson, InterDigital, and Qualcomm.  Right?

A.   Yes, those are three agreements that I analyzed.

Q.   And those were agreements with Samsung where Samsung was licensing other people's patents.  Right?

A.   Yes, as well as providing a cross license back in some of them.

Q.   And you believed for each of those agreements, the proper royalty rate after you did all your analysis, all your confidential calculations, were between one cent and six cents per patent.  Right?

A.   No, I disagree that I said it was the proper royalty rate.  I said it was the rate if you analyzed it from Samsung's perspective as to what they would look at.

Q.   You said the per-patent royalty rates discussed above would provide Samsung with reasonable royalty rate benchmarks ranging from 0.1, which is one cent, to 0.06, which is six cents, per patent from which to negotiate at the hypothetical

negotiation.  Right?

A.    That's correct, from Samsung's perspective and how they would look at them.

Q.    We would expect Samsung to then try to negotiate down from those rates, don't you think?

A.    I think it just depends.

Q.    You go into a car dealer with a price in mind and then negotiate up?

A.    Well, again, I think it depends on the facts and the circumstances of the agreement that you're analyzing from an economic perspective if they would negotiate up or down.

Q.    So to save time, I've actually tried to get ahead of us here a little bit.  And you did a comparable agreement analysis, again for Samsung/Ericsson, Samsung/InterDigital or IDC, and Samsung/Qualcomm.  Correct?

A.    I analyzed those agreements based on the information provided, yes.

Q.    And you concluded that for Samsung/Ericsson, the proper number, and I probably should have added this, the proper number was one cent per patent.  Right?

A.    No, sir, I did not say the proper number was one cent.

MS. TRUELOVE:  Your Honor, I don't think this is information that Mr. Pitcock should be seeing.

MR. CORDELL:  That's probably right, Your Honor.  Thank you.  We should seal the courtroom.

412

THE COURT: All right. Based on counsel's request to protect confidential information, I'll order the courtroom sealed.

I'll direct all persons present who are not subject to the protective order to excuse themselves and remain outside the courtroom until it's reopened and unsealed.

(Courtroom sealed.)





A.

Q.

?

A.

Q.

?

A.

Q.

?

A.

Q.

A.

Q.

414



A.    ███████████████████████████████████████.

Q.    ██████████████████████████████████████████
███████████████████████████████

A.    ████████████████████.

Q.    ██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████?

A.    ███████████████████████████████████████████.

Q.    ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████?

A.    ██████████████████████████████████████████
████████████████.

Q.    ██████████████████████████████████████████
███████████████████████████████████████
████████████████?

A.    ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████.

Q.    ██████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████?

A.    █████████████████████████████████████████.

Q.    █████████████████████████████████████████

416

















Q. ███████████████████████████████████████

████████████████████████████?

A. ████.

Q. ████████████████████████████████████████

████████████████████████████████████████

██████████████████?

A. ██████████████████████████████████████

██████████████████████████











429



430

A. ████████████████████████████████████████████ ████████████████████████.

Q. ████████████████████████████████████████████ ████████████████████████████? 

A. ████████████████████████████████████████████ ████████████

Q. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████?

A. ████████████████████████████████████.

████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████

████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████.

████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

████████████████████████████████████

████████████████████████████████

431





Q.



A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

434



███████████?

A.   █████████████████.

Q.   ████████████████████████

████?

A.   ███████████████████████.

Q.   █████████████████████████

███████████████████████████████.

████████████████████████████████████████████████

██████████████?

A.   ████████████████████████████

████████.

Q.   ██████████████████████████████?

A.   ████████.

Q.   ████████████████████████████

██████████████████████████████████?

A.   ████████████████████████████

█████████████████.

Q.   █████████████████████████████

████████████████████████████████

██████████████?

A.   ███████████████████████

Q.   █████████████████████████████

████████████████████████████████████?

A.   █████████████████████████████

██████████.

437

Q. ████████████████████████████████████████?

A. ████████████████████████████████████.

Q. ██████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████#

███████████████████████████████████████████

████████████████████████

A. ████████████████████████████████.

          ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████

      ██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

      █████████████████████

          █████████████████████████████.

          █████████████████████████████████████

████████████████████████████████████████████

      ████████████████████

          ██████████████████████████.

Q. █████████████████████████████████████████

438

██████████████████?

A.   ████████.

Q.   ████████████████████████████████████████

████████████████████████████████?

A.   ██████████████.

Q.   █████████████████████████████████████████████

████████████████████████████████████████████

████?

A.   ██████████████████████████████████.

Q.   ████████████████████████████████████████?

A.   █████████████████████.

Q.   ████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████?

A.   ███████████████████████████████.

Q.   ████████████████████████████████████████?

A.   ███████████████████████████████.

Q.   ████████████████████████████████████████████

██████████████████?

A.   █████████████████████████████.

Q.   ████████████████████████████████████████████

████████████████████████████████?

A.   █████████████████████████████████████████

████████████████████████.

Q.   ████████████████████████████████████████████

439



440

Q. ████████████████████████████████████?

A. ████████████████████.

Q. ███████████████████████████████████████
█████████████████████████████████████████?

A. ███████████████████.

Q. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████?

A. ████████████████████████████████████████.

Q. ████████████████████████████████████████
██████████████████████████████?

A. ████████████████████████████████.

Q. ████████████████████████████████████
████████████████████████████████████████████
██████████████████████?

A. ████████████████████████████████████████
█████.

Q. █████████████████████████████████
████████████████████████████
████?

A. ████████████.

Q. ████████████████████████████████████████
████████.

441







Q. ■■■■■■■■■■■■■■■■■■■■■?

A. ■■■■■■.

Q. ■■■■■■■■■■■■■■■?

A. ■■.

Q. ■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■?



445



Q. ███████████████████████████████████
████████?
A. █████████████████████.
Q. ███████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████?
A. ██████████████████████████████.
Q. ███████████████████?
A. ████████████████████████████████.
Q. ████████████████████████████████
█████████████████████████████████████████
███████████████████
         ████████████████████████████████.
Q. ███████████████████████████████████
████████████████████████?
A. ███████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████████████.
         ████████████████████████████████
███████████
         ███████████████████
Q. ████████████████████████████████████
███████████████████?

A.    ███████ .

Q.    ████████████████████████████

████████████████████████████████████

██████████████ ?

A.    ██████████████████████ .

Q.    ██████████████████████████████

████████████████████████████████████

████████████████████████████ ?

A.    ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████ .

         ████████████████████████████

████████

         ████████████████████████████

         ████████████████████

         ████████████████████████████

██████████████████████████████████

██████████████

              ████████████████

██████████

Q.    ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████



448



Q. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬ ?

A. ▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬ .

Q. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬ ?

A. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬ .

Q. ▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬ ?

A. ▬▬▬▬▬▬▬▬▬▬ .

Q. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬ ?

A. ▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬ .

Q. ▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬ .

A. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬ .
▬▬▬▬▬▬▬▬▬▬▬
▬▬ .



(Courtroom unsealed.)

THE COURT: All right, Plaintiff. Call your next witness.

MR. SHEASBY: Your Honor, may it please this Court, Plaintiff rests its case in chief.

THE COURT: All right. Plaintiff having rested its case in chief, is the Defendant prepared to go forward with its case in chief?

MR. CORDELL: Yes, we are, Your Honor.

THE COURT: Call your first witness, please.

MS. SMITH: Your Honor, Samsung calls Mr. Guy Waitley.

THE COURT: All right. Mr. Waitley, if you'll come forward and be sworn by the Courtroom Deputy.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, sir, have a seat on

the witness stand.

All right, Ms. Smith.  You may proceed with direct examination.

MS. SMITH:  Thank you, Your Honor.  May it please the Court.

GUY WAITLEY,

having been duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. SMITH:

Q.   Good morning, Mr. Waitley:

A.   Good morning.

Q.   If you would introduce yourself, Mr. Waitley, to the ladies and gentlemen of the jury.

A.   Sure.  I'm Guy Waitley.  I live with my wife in Fairview, Texas.  We have four children, all out of the house at this point.

Q.   And how long have you lived in Fairview, Texas?

A.   I moved down from Kansas to North Texas 20 years ago. I've been in Fairview for the last seven years.

Q.   Mr. Waitley, what's your educational background?

A.   I went to the University of Kansas.  I have a Bachelor's degree in business administration and a law degree.

Q.   And where do you currently work?

A.   I work for Samsung Electronics America, SEA, in Plano, Texas.

Q.   Now, how is Samsung Electronics America, or SEA as we've been calling them, related to Samsung Electronics Corporation, or SEC?

A.   SEA is a wholly-owned subsidiary of SEC.  SEA is based here in the U.S., and SEC is based in South Korea.

Q.   And what does SEA do in the U.S.?

A.   SEA is the sales and marketing arm, essentially, for great products that we want to bring to the U.S., and that's the function of people and facilities.

          THE COURT:  Let's take a minute.  Go ahead and pour yourself some water, and pull the microphone closer so we can hear you better, please.

          THE WITNESS:  Okay.  Thank you, Your Honor.

          THE COURT:  All right.  Let's continue.

          THE WITNESS:  Thank you.

          MS. SMITH:  Thank you, Your Honor.

Q.   (BY MS. SMITH)  How long have you worked at SEA?

A.   Twelve years.

Q.   And what is your job title?

A.   I'm director of handheld product launch operations.

Q.   So Mr. Waitley, how do you find yourself in the courtroom testifying today?  A little bit different than launch operations?

A.   Yes.

Q.   Why are you here today?

452

A.    Quite different.

In my role I have a deep understanding of what customers value and want when they're buying a new phone, and I was responsible for the launch of our first 5G phones and so there's a personal investment it, and I'm here to speak on behalf of Samsung.

Q.    Who developed that first 5G phone that you just mentioned launching?

A.    Samsung.  We did from beginning to end.

Q.    Okay.  And to be perfectly clear, when Samsung launched that phone, who was in charge of that launch?

A.    I was in charge of it.

Q.    Okay.  Mr. Waitley, I believe you've brought some slides with you today to aid the jury with your testimony?

A.    I have.

Q.    All right.  Let's take a look at slide 2.

MS. SMITH:  Thank you, sir.

Q.    (BY MS. SMITH)  Now, Mr. Waitley, if you can provide a little bit of background on SEC, or Samsung Electronics Corporation, the Korean company, looking here at the left side of the screen here.

A.    As I mentioned, SEA is a wholly-owned subsidiary, so SEC is the parent company based in South Korea.

Q.    Okay.  Directing your attention over to the right to our great state of Texas there, what operations does Samsung have

453

in Texas?

A.   We have quite a few.  My office is in Plano, Texas, as I mentioned.  We have facilities in Coppell, Texas; Round Rock, Texas; in Austin we have a semiconductor manufacturing facility; and we're building another semiconductor manufacturing facility in Taylor, Texas that should open this year.  The presence of Samsung in the Dallas area and the Austin area has been for over 25 years now.

Q.   Now, we've all heard that this case is about mobile products, mobile phones.  Does Samsung make phones in Texas?

A.   No, we don't.  We make those -- we produce those overseas and then bring them into the United States.

Q.   Okay.

        MS. SMITH:  If we could see slide 3, please.  There we go.

Q.   (BY MS. SMITH)  You said you work in Plano.  What does SEA do in Plano?

A.   So SEA in Plano, the portion of the SEA in Plano is the mobile headquarters for SEA.  So all the tablets, laptops, handheld devices, phones, watches, earbuds, things like that are all managed out of that facility.

Q.   And the facility we're looking at here, is that where you go to work every day?

A.   Every day that's the front door I walk through.

Q.   Okay.  So what all does that involve being the mobile

headquarters of SEA?

A.    So it's a couple of things that we do, and we provide feedback to our colleagues in Korea from a customer's perspective of preferences, as well as things that are going on here in the U.S. that may have influences on purchasing patterns and things like that.  And then we also have cross functional teams in areas such as marketing, retail, product management, where my group is, and these teams are what bring the products to market.

Q.    Across all those teams, how many folks work in Plano?

A.    Around 1900.

Q.    Okay.  How important are mobile phones to SEA's total business?

A.    It's -- mobile phones are extremely important to our business.

Q.    Okay.  Now, you were here, sir.  You've been here every point in trial.  Correct?

A.    I have; sitting at the front table there.

Q.    Sitting next to me?

A.    Yes, ma'am.

Q.    All right.  And so you were here during Mr. Sheasby's opening statement.  Correct?

A.    I was.

Q.    Okay.  Did you hear Mr. Sheasby say, and I actually wrote this down, that in 2019 Samsung was in crisis?  Did you hear

that?

A.    I did hear that.

Q.    Where did Samsung rank in worldwide sales in 2018?

A.    We were number one.

Q.    Were did Samsung rank in worldwide sales, worldwide sales in 2019?

A.    We were number one.

Q.    Same question:  where did Samsung rank in worldwide sales in 2020?

A.    We were number one.

          MS. SMITH:  Now, if we could take a look at slide 4, please.

Q.    (BY MS. SMITH)  Now, you mentioned part of your job, you're in charge of product launches.  If you could kind of step the jury through and describe for the jury what a product launch is all about.

A.    Sure.  A product launch is a huge deal for us, and it really sets the tone as our year plays out.  And what happens is we have 20 to 22 internal groups that contribute to the launch, so retail, marketing, product management, logistics, the accessory teams.  All of those teams have to be coordinated and have tasks along the way in working towards launch.  I coordinate those teams and make sure that they're all, you know, hitting dates that we need them to hit, or informed on the products and all the information that they

456

need so that they can accomplish their tasks and be in position for launch as well as possible. And that's what -- product launch, basically it goes through that cycle each time, because if you think about 24 weeks, I mean, it's basically year-round.

Q. And again, you've referenced teams and coordination, but to be perfectly clear, when Samsung launches a new phone, who's in charge of that launch?

A. I'm responsible for it; responsible for coordinating those teams and responsible for the effectiveness of that launch.

Q. And over your now almost 12 years?

A. Yes, ma'am.

Q. Did I get that right?

Over your almost 12 years at Samsung, how many products have you launched?

A. Over 50 products.

Q. Okay. Now, Mr. Waitley, I understand you brought some products to share with the jury today?

A. I did.

Q. Okay. I believe you brought three groups of products? Did I get that right?

A. I did, yes.

Q. All right. If you could share a little bit about the first group of products that you brought here to the courtroom

457

today with the jurors.

A.    Sure.    So the first group that I brought to talk about was two devices out of our A-series group, and these are more affordable budget or entry level devices, as you can see here, you might see these in Walmart for sale; great devices, but they run from $199 to $399.    And these are just two representatives of those.

Q.    And do those two representative devices at that budget price point or $199, for instance, do they connect to the 5G network?

A.    They do.

Q.    All right.    What's behind door number two?    What's in our next --

A.    Door number two has S23 FE.    So this is a step up, and these run from $599 to $799.    There's variation in size, displays are a little bit different, but those are two devices in that category.

Q.    The same question about those.    Do those two handsets run on the 5G network?

A.    They do.

Q.    So why, in your experience, are consumers paying, frankly, quite a bit more to buy a handset in that second group versus those A models in the first group?

A.    There's a step up in the components, there's a step up in the material.    It's a trade-off, you know--as you spend more

458

money, the cost of making the devices, whether it's a larger display, more cameras, becomes more expensive.

Q.   Got a third group, third and final group?

A.   Third and final group.

Q.   All right.

A.   The premium group.

Q.   Tell us about that.

A.   This is the -- where all the innovation really shines, and that's -- you know, this is a flip phone and you've got a full length screen that flips in half.  You've got a foldable phone that flips in half the other way.  Those are two of the devices; and then our S24Ultra device that we just launched, and it has artificial intelligence integrated into it; great devices.  These run up to $1800 is the highest expense on those.

Q.   Across those three devices, they all connect to the same 5G network as the mid-tier and as the $199 A version?

A.   They do.  They connect to the -- each of the carriers' 5G networks.

Q.   So why, in your opinion, do consumers spend that $1800 for that step-up handset?

A.   It's the displays, it's the technology, the innovation, the size of screen.  All those factors are influencing buyers to go to those higher ends.

Q.   Why does Samsung offer such a wide range from that $199

459

to $1800? Why does Samsung offer such a wide range of handset options?

A. We really try to find a pocket for every consumer. We know that one size does not fit all, and so we offer a variety of devices at different price points and mix and match different features and functionalities so that we can hit those price points and offer an effective device for everyone.

Q. Now, when you look at some of those specific features of the phones you talked about, whether it be the screen size or the camera or that really cool flip feature, does Samsung put a specific price on any of those specific features?

A. No, we don't.

Q. Why not?

A. It's just the whole package is what is included. And like I said, it's not just one feature that's changed; it's multiple features or components and the costs of those components that get factored into the device.

Q. Okay. Now, on that note, the cost of components and revisiting Mr. Sheasby's opening statement -- are you with me?

A. Yes, ma'am.

Q. All right. We saw Mr. Sheasby put up a photograph of a Samsung model S10. Do you recall that?

A. I do.

Q. Okay. And Mr. Sheasby pointed to a price difference between an S10 4G and an ST 5G. Do you remember that?

A.    I do.

Q.    Okay.  How do you -- can you explain why -- can you explain to the jurors why we see that price difference?

A.    Yeah.  That price difference is -- and it's shown on the slide with our S10 4G devices that launched about a month earlier than the device Mr. Sheasby was pointing out.  The 5G device has additional components in it to make it compatible with 5G, so there's a higher cost.

There was research and development that was put into that device that wasn't, you know -- hasn't come out yet.  So it's not exactly the same device, so the $200 is not just margin that we're putting into our pocket; it's -- there's different costs associated with that.

Q.    And does that price difference that you see at the initial launch, how far or how long does that price differential last?

A.    It varies, but it erodes very quickly.  I mean, we -- by the time -- and the -- by the time we had S20, they were all 5G, and you don't have that differentiation anymore, so it's very quickly over months.

Q.    And is that that $199 model A phone, you showed us an example of that?

A.    Yes, absolutely.  It's -- you know, $199 phone that has 5G incorporated into it with many, many more functions than just 5G.

Q.    Now, as part of your job, do you understand what Samsung's customers value in a handset?

A.    I do.  It's a big part of my role is to understand that.

Q.    Of the features that we've been visiting about and the phones we've looked at, what are the most important features that customers care about?

A.    Yeah.  I mean, it's really the camera, battery, and display that are the overriding factors.  There's also -- obviously these aren't features, but it's cost, brand is really important, but camera, battery, and display are consistently what we've seen launch over launch what are the most important features that are important to customers.

Q.    And what separates Samsung apart in the market?

A.    It's the whole package of what we put together.  Again, it's the brand, it's the innovation.  You know, we're one of the only ones out there that are making foldable displays. It's the push into the display technology.  There's no finer display than Samsung displays.  So that's what makes Samsung different is the whole package with those leading peers coming forward.

Q.    Now, we've heard a lot about 5G generally, but what I want you to focus on is the -- what we've heard about an alleged seven percent increase in 5G download speed.  You've heard some talk about that in this courtroom?

A.    Yes, ma'am.

462

Q.    All right.  If 5G download speed was seven percent faster, would that change how Samsung markets its phones?

A.    No, it wouldn't.

Q.    Would it change why customers buy Samsung phones?

A.    No, it wouldn't.

Q.    Well, what about if 5G download speed was seven percent slower?  Would that affect Samsung's sales?

A.    It wouldn't, no.

Q.    Why not?

A.    It wouldn't.  There are too many variables with that. The number is too low to begin with, but there's -- when we talk about speed, customers don't really understand what speed is.  And this is what one of the confusing things when 5G was coming out because the carriers marketed heavily about this speed that you're going to be able to obtain, but customers really had a hard time connecting with what that speed meant to them.  So it's just a hard claim for us to validate and then be able to offer to consumers.  It's too -- not big enough.

Q.    Okay.  Thank you so much, Mr. Waitley.

        MS. SMITH:  Your Honor, I'll pass the witness.

        THE COURT:  Cross examination by the Plaintiff.

        MS. GLASSER:  Can we have the slides, please?

        THE COURT:  Proceed when you're ready, Ms. Glasser.

        MS. GLASSER:  Thank you, Your Honor.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

CROSS EXAMINATION

BY MS. GLASSER:

Q.    It's nice to see you again, Mr. Waitley.

A.    Good to see you as well.

Q.    To be clear, your job does not include setting pricing. Correct?

A.    That's correct.

Q.    Pricing is determined at the Korea headquarters. Correct?

A.    It's a combination of -- or negotiation between Korea and SEA.

Q.    And the folks involved in that are not you.  Correct?

A.    That's correct.

Q.    And in terms of the consumer surveys to determine what consumers are looking for, there is a gentleman named Paul Kim.  Is that right?  Who heads that division.

A.    No longer in that role, but during this time frame, yes.

Q.    During the time frame that we're talking about back in this 5G launch, it was a gentleman named Paul Kim who was in charge of determining what features were important to consumers.  Correct?

A.    No.  I wouldn't phrase it that way exactly.  He was over the CSMI Group which produces studies.

Q.    Okay.  Let's take a look at some of the studies, then.

A.    Sure.

464

Q.   And I think your counsel mentioned this.  You acknowledge that there was a $200 price differential between the 5G and the non-5G at launch.  Correct?

A.   That's correct.

Q.   And we're looking at JTX 6.  This document states, "It's worth noting that 4G and D2 4G and D2 5G will be the same device from a spec standpoint except for the 5G hardware."
     Correct?

A.   That's correct, except for the 5G hardware and components.

Q.   And then I just wanted to touch on one other thing you said.  You said customers don't understand what speed is.  Is that correct?

A.   During the 5G marketing, that's correct.

Q.   And what we're looking at on the screen is one of those surveys performed by Mr. Kim's organization during that time frame.  Correct?

A.   That's correct.

Q.   This is JTX 7.  And what Samsung's own customers told Mr. Kim, Samsung organization, that hyper-fast connection was vital to their purchase.  Correct?

A.   That's what it says.

Q.   And another survey that Mr. Kim, Samsung organization, performed during this same time period is at JTX 8.  Correct? Do you see at the bottom "consumer shopper and market

insights"?

A.   And the question again?

Q.   This is another survey that was performed by Samsung in that other division during the launch time period.  Correct?

A.   I don't see a date.

Q.   Okay.  Will you accept my representation with the Bates number on the bottom from Samsung, this is an actual Samsung document at JTX 8?

MS. SMITH:  Your Honor, can we possibly show him the front of the document or --

MS. GLASSER:  Sure.  I can short circuit this. Okay?

THE COURT:  Let's do that.

Q.   (BY MS. GLASSER)  Do you agree or do you have any reason to dispute that Samsung's Consumer Shopper and Market Insights Group found that 5G drives higher sales and premium pricing, as stated on this document?

A.   In one survey I would agree with that.

Q.   Okay.  Thank you, sir.

MS. GLASSER:  I pass the witness.

THE COURT:  All right.  Is there redirect?

MS. SMITH:  Very briefly, Your Honor.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MS. SMITH:

Q.    Mr. Waitley, you just discussed that $200 difference in the launch of the 4G and 5G, and you noted that the $200 had something to do with the hardware and components.  How does having different hardware and different components affect cost?

A.    The -- when we have new generation devices, we're buying in bulk, basically, and, therefore, when you're -- you have the new generation and new components that you're buying, you're not getting the same discount that you are when you've purchased the same components device-over-device.

Q.    All right.  Now, you visited with Ms. Glasser about these CMSI studies, and she showed you a couple of surveys, I believe.  Correct?

A.    That's correct.

Q.    Okay.  Why does your opinion of what customers want or what sells phones differ from these surveys?

A.    Most of my opinion is coming from feedback from customers after the fact.  CSMI provides many, many surveys to us.  They are one point of input, but they are not driving strategy themselves.  They're an input device into your product management team who does set the strategy for those devices.

Q.    Fair to say your opinions are based on actual sales and real-world numbers, not surveys and forecasts?

A.    Yes, ma'am.

Q.    Thank you, sir.

MS. SMITH:  I'll pass the witness, Your Honor.

THE COURT:  All right.  Is there additional cross?

MS. GLASSER:  One more, Your Honor.

Could we have the slides again?

RECROSS EXAMINATION

BY MS. GLASSER:

Q.  Let's go back where your counsel left off on the feedback from the actual customers who purchased the product.

JTX 9, nearly half of customers said 5G was a motivating factor for getting a new smartphone.  Correct?

A.  Yes, that's --

Q.  And, in fact, of those folks, almost half of them, 49 percent, said the reason they purchased the phone was they wanted the fastest speed possible.  Correct?

A.  Why they purchased the 5G phone, yes.

Q.  Correct?

A.  Yes.

Q.  Thank you.

MS. GLASSER:  I pass the witness.

THE COURT:  Further direct?

MS. SMITH:  One more, Your Honor.

REDIRECT EXAMINATION

BY MS. SMITH:

Q.  Mr. Waitley, when Ms. Glasser shows you documents, she's addressing 5G globally.  Is that correct?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

468

A.    That is correct.

Q.    Anywhere do we see some claimed seven percent increase in download speed?

A.    No.

Q.    No feedback on that, sir.  Correct?

A.    That's correct.

Q.    Thank you, sir.

        MS. SMITH:  Your Honor, I pass the witness.

        THE COURT:  Additional cross?

        MS. GLASSER:  No, Your Honor.  Thank you.

        THE COURT:  All right.  You may step down, Mr. Waitley.

        THE WITNESS:  Thank you.

        THE COURT:  You're welcome.

    Ladies and gentlemen of the jury, we're going to break for lunch at this juncture and before the next witness is called.

    If you will take your notebooks with you to the jury room over the lunch break, remember all the instructions I've given you, including not to discuss the case with each other.  I have 10 minutes until 12:00.  We'll reconvene somewhere around 12:30, 12:40.

    With that, ladies and gentlemen, you're excused for lunch.

        (Whereupon, the jury left the courtroom.)

THE COURT:  The Court stands in recess.

(Lunch recess.)

THE COURT:  Be seated, please.

All right.  Mr. Cordell, is Samsung prepared to continue with its case in chief?

MR. CORDELL:  We are, Your Honor.  And I've wanted to inform the Court we're no longer going to call Mr. Jeon just for time purposes, and the remaining witnesses in our order will be Doctor Min followed by Mr. Meyer, and the deposition of Mang Zhu, and then, time permitting, Mr. Simonson.

THE COURT:  All right.  And Doctor Simonson will be live if you call him?

MR. CORDELL:  If we call him, yes.

THE COURT:  Okay.  So you're ready to go forward with Doctor Min at this time.

MR. CORDELL:  We are.

THE COURT:  All right.  Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back from lunch, ladies and gentlemen.  Please be seated.

I do know how to tell time.  I told you 12:30; it's almost 1:00.  The rest of my world just seems to go faster when I'm in trial and not slower, and I apologize for the delay.

470

All right.  We'll continue with the Defendants' case in chief.

Defendants, call your next witness.

MS. DEGNAN:  Good afternoon.  My name is Lauren Degnan, and Samsung calls Dr. Paul Min.

THE COURT:  All right.  Doctor Min, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand, sir.

All right.  Counsel, you may proceed with direct examination.

PAUL MIN, Ph.D.,

having been duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. DEGNAN:

Q.  Good afternoon, Doctor Min.

A.  Good afternoon.

Q.  Would you please introduce yourself to the members of the jury?

A.  Yes.  My name is Paul Min.  I'm 64 years old.  I was born in South Korea.  I lived in the United States for 47 years. I'm a U.S. citizen.  I am married for 37 years, three grown children, one grandchild.

Q.  Did you prepare some slides to assist with your testimony

471

today?

A.    Yes, I did.

Q.    At a high level, what are you here to testify about today?

A.    I'm here to testify technical issues related to '776 and '130 Patent.

Q.    Now, in this trial are you here to talk about whether the patents are invalid?

A.    No, I'm not.

Q.    Would you describe for the jury, please, your educational background?

MR. SHEASBY:  Your Honor, objection.  The patents are valid, not invalid.  The question was asked whether she's suggesting about the patents being invalid.

THE COURT:  Well, we've already passed that point. That's an untimely objection.  I'll overrule it.

Let's continue.

Q.    (BY MS. DEGNAN)  Would you describe for the jury, please, your educational background?

A.    Yes.  I went to the University of Michigan in Ann Arbor for my Bachelor's degree.  That's when I met my wife, freshman year.  And then I stayed on to get my graduate degree, Master's and Ph.D. in electrical engineering, all from the University of Michigan.

Q.    And what did you do after you left the University?

472

A.   I went to work for Bell Corp., which is part of Bell Laboratory, and I was there for three years.  And then I came to the Washington University in St. Louis where I am a senior professor in electrical engineering.

Q.   At Washington University, what have been the areas of your research?

A.   I've been doing research mainly focused on communication, highspeed communication and wireless cellular communication.

Q.   Does your work or education relate to the subject matter at issue in this case?

A.   Yes.  I been working on those research topic and innovation.  I did quite a bit of consulting work outside and built some commercial lateral nationwide networks in different places.

Q.   Have you done any work involving the telecommunications standards like the 4G and 5G we've been hearing about this week?

A.   Yes, I did.

Q.   Have you been awarded any patents for your work?

A.   I have 11 United States patents.

Q.   Over the course of your career, are there any awards or activities that you are particularly proud of?

A.   So I am a teacher at heart.  I trained a lot of people over the past 35, 40 years.  So many of them went out and making a good living and started a company, myself included;

made a difference to thousands of people, making a good living.  I'm actually quite proud of that.

Q.    All right.

MS. DEGNAN:  We would tender Doctor Min as an expert in the field of telecommunications and cellular communications.

MR. SHEASBY:  No objection.

Q.    (BY MS. DEGNAN)  In forming your opinions --

THE COURT:  Wait a minute.

MS. DEGNAN:  Oh, excuse me.

THE COURT:  You're offering him as an expert witness.

MS. DEGNAN:  Yes.  I'll do it again if you'd like.

THE COURT:  Please do.

MS. DEGNAN:  Your Honor, we would tender Doctor Min as an expert in the field of telecommunications and cellular communications.

THE COURT:  All right.  Is there objection from the Plaintiff?

MR. SHEASBY:  No objection.

THE COURT:  All right.  I'd like to ask the question before I get the answer.

I'll recognize this witness as an expert in the designated fields without any objection.

Let's continue.

474

MS. DEGNAN:  Thank you, Your Honor.

Q.    (BY MS. DEGNAN)  In forming your opinions in this case, what information did you consider?

A.    Of course, I have to study the patents and patent file history and related documents; and also the standard 4G and 5G technical standard; and then patent license agreements, specifically Ox Mobile agreement and 5G IP Holdings agreement; and technical expert report from GComm's experts; and deposition transcripts; and source code.

Q.    Are you being paid for your time in this case?

A.    Yes, I am.

Q.    What is your rate?

A.    I am being paid at $500 an hour.

Q.    Does any part of your compensation depend on the outcome of this case?

A.    No.

Q.    All right.  Would you summarize for the jury, please, what your opinions are that you'll discuss today?

A.    So, firstly, my opinion, Ox Mobile and 5G IP Holding licensed patents have a higher technical value than '776 and '130 Patent.

It is also my opinion that '776 and '130 Patent do not improve download speed or throughput and does not really impact user experience.

And '776 and '130 Patent has a lot lower technical value

than a typical declared standard essential patents.

Q.   All right.  Well, starting with your first opinion regarding patents and Samsung licenses, did you review all the U.S. patents licensed in the Ox Mobile agreement?

A.   Yes, I did.

Q.   How many were there?

A.   There were four.

Q.   Are they declared essential?

A.   Yes.  They're declared essential for 4G and 5G.

Q.   What was your conclusion about the value technically of the Ox Mobile patents as they compare to the '776 and '130 Patents?

A.   In my opinion, the patents in Ox Mobile portfolio has a higher technical value than '776 and '130 Patent.

Q.   Why are the Ox Mobile patents more technically valuable than the GComm patents?

A.   Because Ox Mobile patents are related to processes going on while the phone is active.  By that, I mean the mobile phone and then cell tower actively exchanging data and communicating, and that process is a called handoff or handover.

Q.   Would you explain for the jury, please, what is handoff or handover?

A.   So when phone is -- I'm talking on the phone and in a car that's driving and my phone may be connected to one cell tower

476

right now, but as the car moves on, it may have to switch the cell tower over to the next cell tower. And that process is called handoff. And if that handoff doesn't work well, then of course you just not going to be happy at all and the phone call will get dropped.

Q.   Now, does the '776 Patent relate to any process that occurs while the phone is active?

A.   No, it does not.

Q.   What does it relate to?

A.   So as the phone cover of '776 Patent described, '776 Patent is about cell reselection, and the cell reselection is a process that's taking place while the phone is idle; in other words, there's no data being exchanged between the cell tower and the mobile phone.

Q.   Is an example of when my phone is idle is when it's sitting on the table?

A.   Yeah.

Q.   Now, did you hear Doctor Akl yesterday admit that cell reselection only happens in idle mode?

A.   Yes.

Q.   Now, did you hear Doctor Kowalski disagree with him?

A.   Yes. Actually I was surprised that Doctor Kowalski disagreed with him.

Q.   So there's no confusion for the ladies and gentlemen of the jury, Doctor Min, does cell reselection occur in any state

other than idle?

A.   No, it does not.

Q.   Now, was cell reselection known before the '776 Patent?

A.   Yes, it was.

Q.   Does the '776 Patent itself actually admit that cell reselection predated its invention?

MR. SHEASBY:  Objection; leading.

THE COURT:  Sustained.

Q.   (BY MS. DEGNAN)  What does this patent tell us about the relative timing of cell reselection in its alleged invention?

A.   So the background section of the patent, this is the section where the patent tells what the state of the art at the time of invention was, and it says -- it talks about in third generation, 3G, not even 4G, the terminals will perform the cell reselection.

The phone has to be connected to the network even if it's not active, because phone call may be coming in and then network does not know where the phone is.  So the cell phone has to be connected.  So if somehow the cell phone has to change the cell tower, cell reselection has to be done.  And it's as old as a cellular technology cell.

Q.   Now, does the '776 Patent cover all ways of performing cell reselection?

A.   No, it does not.

Q.   So we're going to compare handoff, which is done while

the phone is active on the one hand, to cell reselection while the phone is sitting on the table idle.

What is a more fundamental aspect of cellular communication standard?

A.    Clearly something that happens while the phone is active has a more fundamental value to its impact than the process that's taking place while the phone is idle sitting on the desk.

Q.    Well, with that background, what is the relative value of the Ox Mobile patents which relate to handoff and the '776 Patent which relates to cell reselection?

A.    The Ox Mobile patent would have a higher technical value than '776 Patent.

Q.    Let's switch to the '130 Patent.  Does it relate to handoff?

A.    No, it does not.

Q.    What does it relate to?

A.    So the '130 Patent is called -- is about sending uplink control signal.

Q.    All right.  What is an uplink control signal?

A.    So starting with the term control signal, when I'm talking on the phone so my voice go back and forth, that's called user signal.  To make that voice communication possible, the phone and the tower has to communicate, exchange the information in the background.  That is what we call

479

control signal.

Q.   Why do they call it uplink control signal?

A.   So the uplink is a direction from the user phone up to the network.  So that's why it's called uplink.  It's control signal going up in direction.

Q.   Was sending uplink control signals something that was known before the '130 Patent?

A.   Yes, it was.

Q.   What does the '130 Patent say its invention does differently than previous ways of transmitting uplink control signals?

A.   So as I mentioned, control signal is necessary to make the actual communication possible.  So the uplink control signal was used from the beginning of the cellular communication.

What '130 Patent does is finding a specific signal format to use.  So as an analogy, if I want to say yes or no, I can say yes/no as a signal.  Yea/nay; yeah/no; aye/nay.  I mean, there are different format over signals that you can send. '130 Patent talks about a specific format of a signal to send for uplink control signal.

Q.   Now, does using this very specific format to transmit uplink control signals, does it impact the user's experience?

A.   No, it does not.

Q.   All right.  Thank you.

MS. DEGNAN:  Can we have slide DDX 13-10, please?

Q.   (BY MS. DEGNAN)  Well, let's switch to the 5G IP Holdings license agreement.  What do the patents in that agreement relate to?

A.   5G IP Holdings patent are related to real-time control of data communication, and this happens while the phone is active, again.

Q.   Now, what is your opinion about the technical value of the 5G IP patents compared to the GComm patents?

A.   The 5G IP Holdings patents have a higher technical value, again related to something that's happening to phone activity, and has a more fundamental impact on user experience.

Q.   Now let's turn to your second opinion.  Do either the '776 or '130 Patents say that their inventions improve the download speed or throughput for the user?

A.   They do not.

Q.   Are you aware of any reason why the inventions of the '776 or '130 Patents would improve the download speed or throughput for the user?

A.   I can't think of any.

Q.   Now, we heard a bit about ping-pong.  Do you know what that is?

A.   Yes.

Q.   Does the '776 Patent say that its disclosed invention reduces ping-pong?

A.    No, it does not.

Q.    Does it even mention ping-pong at all?

A.    No.

Q.    Now, yesterday did you hear Doctor Kowalski talk about how he thinks using the '776 Patent increases speed and throughput by five percent?

A.    Yeah, I was here.

Q.    Do you agree with him?

A.    I do not.

Q.    Why not?

A.    So '776 Patent, as I mentioned, it's about certain process called cell reselection while the phone is idle, is sitting here.  How -- so there's no data being exchanged between tower and the phone.  How does that process help improve the throughput by five percent?  There's nothing going on.

      So I think it's illogical and nonsensical to assume that there's a throughput improvement of five percent while the phone is idle.

Q.    Did you hear Doctor Kowalski talk about how using the '130 Patent supposedly increases speed and throughput by two percent?

A.    Yes.  I was here.

Q.    Did he -- he relied on an article, a ZTE article for that opinion?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

482

A.    Yes.

MS. DEGNAN:  Can we please have Doctor Kowalski's slide PDX 3.25?

Q.    (BY MS. DEGNAN)  Well, did you review the article PTX 26 that Doctor Kowalski used?

A.    Yeah.  That's the ZTE reference.

Q.    And does this ZTE article refer to any system that implements the invention of the '130 Patent?

A.    No, it does not.

Q.    Okay.

MS. DEGNAN:  And could we please get 3.25?

Q.    (BY MS. DEGNAN)  All right.  Would you remind the jury what line on this graph does Doctor Kowalski say corresponds to what he says is the '130 Patent's invention?

A.    So Doctor Kowalski pointed the green line, the sequence-based PUCCH format 0.  He pointed that to be the -- what invention -- '130 Patent invention is about.

Q.    So if the green line doesn't correspond to format 0, is the ZTE paper relevant to the technical benefits of the '130 Patent at all?

A.    The comparison that Doctor Kowalski made, in my opinion, is mistake, really does not have any relationship to establishing a benefit of '130 Patent.

Q.    I'm sorry.  You said Doctor Kowalski made a mistake?

A.    I think he did.

Q.   In your opinion, does the green line he pointed to relate to the invention of the '130 Patent?

A.   In my opinion, it does not.

Q.   Now, did you hear Doctor Kowalski admit yesterday that format 0 doesn't use frequency hopping when it sends only one symbol?

MR. SHEASBY:  Your Honor, objection; leading. Second, outside the scope of his report.  Mr. -- Doctor Min did not do any analysis regarding frequency hopping in his report and the section discussing this.

THE COURT:  I'll sustain as to leading.

If there's a dispute about whether it's inside or outside of his report, I can take that further, but at this point I'll sustain as to leading.

Q.   (BY MS. DEGNAN)  Okay.

MS. DEGNAN:  Well, let's just -- let's go ahead and get my slides back, please, at DDX 13.  13-11.

Q.   (BY MS. DEGNAN)  Let's go to your third opinion.

MS. DEGNAN:  13-11, please.

Q.   (BY MS. DEGNAN)  Let's go to your third opinion about the technical value of the GComm patents versus the average value of other declared SEPs.  What kind of patents did you consider in doing this analysis?

A.   So there are many companies around the world who submit and declare standard essential patent, dozens and dozens.  And

companies like Nokia, Ericsson, Qualcomm, Panasonic, ZTE, InterDigital, I mean, these are all just examples of companies who submit that.  And I looked at those patents.

Q.    All right.  What is your opinion as to the relative value of the '776 and '130 Patents as compared to other declared SEPs?

A.    I think the '776 and '130 Patent is lower than the typical declared standard essential patents.

Q.    And why is that?

A.    So when these companies submit and declare certain patent to be essential patent, then they typically aim to improve like performance, throughput, reliability, user experience. There's some incremental improvement in some of those factors. '776 Patent and '130 Patent do not provide that incremental improvement.

Q.    I know you said the GComm patents have a lower relative value.  But if you had to cap it, what would be the highest relative value the GComm patents would have compared to the average value of a declared SEP?

        MR. SHEASBY:  Objection, outside the scope of the report.

        THE COURT:  What's your response, counsel?

        MS. DEGNAN:  I disagree with that entirely, but in the interest of time, Your Honor, I don't think we can clear the courtroom to have a debate about that at chambers -- I

mean, up here, so I'll withdraw the question.

THE COURT:  All right.  The question's withdrawn. Let's move on.

Q.   (BY MS. DEGNAN)  Do the '776 and '130 Patents contribute to the advantages of 5G over 4G?

A.   No, they do not.

Q.   Thank you, Doctor Min.

MS. DEGNAN:  I'll pass the witness.

THE COURT:  Cross examination?

MR. SHEASBY:  Yes, Your Honor.

THE COURT:  Proceed with cross examination.

MR. SHEASBY:  May it please the Court.

Good afternoon, ladies and gentlemen of the jury.  It's nice to speak with you again.

CROSS EXAMINATION

BY MR. SHEASBY:

Q.   Good afternoon, Doctor Min.

A.   Good afternoon.

Q.   It's nice to speak with you again.

A.   Thank you.  Likewise.

Q.   Doctor Min, you've served as an expert witness for Samsung eight times.  Is that correct?

A.   I think you and I talked about this before.  I was retained on maybe five different occasions, and one of those occasion there were like three or four different jurisdiction.

Q.   And for this case alone, you've been paid over $300,000. Is that correct?

A.   Yes.

Q.   And if we can just level set as to the issues you're dealing with.

MR. SHEASBY:  Madam Courtroom Deputy?

Q.   (BY MR. SHEASBY)  This is the first issue that you talked about which is the Ox Mobile and 5G agreement.  Is that correct?

A.   Yes.

Q.   And just so we're crystal clear, you didn't speak to any Samsung engineer before your depositions and report about the Ox Mobile and 5G IP agreements.  Correct?

A.   Yes, that's correct.

Q.   And you were in the deposition -- you heard the testimony yesterday when we talked about this pyramid--declared, essential, and infringed valid.  Correct?

A.   I was sitting in the back so I didn't really get to see that, but I was in the -- in the courtroom.

Q.   You understand the concept.

A.   Yes, I do.

Q.   Okay.  And so -- just so we can be as crystal clear as possible, you did not determine whether any of the Ox Mobile or 5G patents are essential.  Correct?

A.   I did not do that analysis, no.

487

Q.   You didn't even get here as to those patents.  Correct?

A.   That's correct.

Q.   And in this case the jury is instructed by Judge Gilstrap to accept the patents-at-issue are not just essential; they're infringed and they're valid.  Correct?

A.   So I think for the most part it's correct, but I was told by the attorney that what the jury found is the patents are not invalid as opposed to patents are valid.  That's the instruction that I was given.

Q.   The patents-at-issue in this case are not just essential; they're infringed and not invalid.  Correct?

A.   That's right.

Q.   And you didn't disclose to the ladies and gentlemen of the jury in your testimony that these patents that you say have a higher technical value are -- you have no evidence that they're essential.  Correct?

A.   I did not provide that evidence.  That's correct.

Q.   In fact, we can also talk about the technical impact of a patent.  Correct?

A.   Could you repeat the question?

Q.   You can talk about the technical impact of a patent.  Correct?

A.   Yes.

Q.   And you said that these patents have a higher technical value than the patents-in-suit in this case that are

infringed, not invalid, and essential.  Correct?

A.    The last one, the essential part, I also do not have an opinion because I don't know if the jury found the patents to be essential.  What I understood was the patents found to be infringed and also not invalid, so I don't know jury actually found that the patents were essential.

Q.    Oh, okay.  And in your report, you admitted that if the patents are infringed in your expert reports, you identified them as essential.  Correct?

A.    Yes, that's right.

Q.    Okay.

A.    That's right.

Q.    So in your report, given that the patents are infringed, you concede they're essential.  Correct?

A.    I think I may have said that.  I have to see the context, but I think I may have said that.

Q.    Okay.  And so for the ladies and gentlemen of the jury, these Ox Mobile and 5G IP patents, you did not determine whether there was anyone anywhere in the world that used these in any commercial system.  Correct?

A.    I did not, no.

Q.    And you didn't identify whether Samsung ever used these patents or was even planning on using these patents.  Correct?

A.    Yes, that's correct.

Q.    And so when the ladies and gentlemen of the jury assess

489

the credibility of the counsel who just put you on and your own credibility, they can take into account that you showed them a license agreement that involved patents that you have no evidence are essential, have no evidence they were ever commercially used anywhere in the world, and have no evidence that Samsung ever used.  Correct?

A.    That is correct.

Q.    What's the value of something that is useless?

A.    If it's useless, truly useless, then it obviously has no value.

Q.    Okay.

A.    But that's not what I just say.  I just did not do that analysis.  I didn't say they are useless.

Q.    You were paid over $300,000 in this matter, and you did not do the analysis or speak to a Samsung engineer about whether these patents had any use.  Correct?

A.    That's correct.  That was not my assignment.

Q.    Okay.  Now, the second issue you dealt with is your focus on you didn't think the '776 patent and the '130 Patent improve any -- have any performance improvement.  That was your testimony.  Correct?

A.    To the effect more precisely improved download speed, throughput, or impact user experience.

Q.    Sir, I asked you, it's your testimony under oath that the '779 and '130 Patents have no performance impact on 5G.

Correct?

A.   I did not use the word 'performance impact'.  What I said here is exactly what it says.

Q.   Okay.  Cellular networks -- I want to speak first about the '130 Patent, if I may.  In cellular networks --

MR. SHEASBY:  And let's go to the slides actually now, Mr. Svenson.

Q.   (BY MR. SHEASBY)  Cellular networks are notoriously unreliable.  Correct?  You testified to that previously?

A.   I'm not sure if I said notoriously unreliable.  What I said was cellular channels are notoriously hostile.  It's very -- there is a lot of things go wrong.

Q.   There's a lot of transmissions that fail.  And when the base station sends something, there's actually a meaningful probability that it's not going to come through.  Correct?

A.   Yeah, yeah, that's right.

Q.   And the tool that you used to address that is ACK and NACK, sending confirmations.  Correct?

A.   It's one of the tools.

Q.   Okay.  And if we go to slide 20, the '130 Patent is about reducing the transmission time intervals.  Correct?

A.   No, I would not say that.

Q.   Okay.  Why don't we -- the inventor's aim is to reduce the transmission time intervals.  Correct?

A.   No.

491

Q.   Okay.   Why don't we go to your deposition.   Actually we'll go -- it has the front of it, it's -- the first transcript in front of you, it has a day on it.   And if you turn to page 1097, this is the Min trial transcript?

A.   1097?

Q.   Yes.   It should have a little clip on it, just a paperclip?   It's loose?

A.   Yes, this is one of the paperclips.   This only goes to page 240.

MR. SHEASBY:   Your Honor, may I approach to assist him to find the correct document?

THE COURT:   I really don't want you walking across the courtroom and pointing something over the witness' shoulder.

MR. SHEASBY:   I'm just going to show him the document.   I won't --

THE COURT:   If you have a copy of it, turn to the page you want, and then you can approach and hand it to the Court Security Officer who will hand it to the witness.

MS. DEGNAN:   Actually, this is my only copy.

Q.   (BY MR. SHEASBY)   On your table is something that says Trial Transcript, Day 4 on the front of it.

A.   I have two transcript.   I'm sorry.   There are three transcript.   This is a small one.   This one only goes to page 80.

Q.    There's one, and there's a second and a third?

A.    The second one is this one.

Q.    And what does the title of it say?

A.    Video Deposition of Dr. Paul Min.

Q.    And now go to the third one?

A.    Trial on Merit.

Q.    Yes, that's correct.

A.    That's the one?

Q.    Can you go to page 1097 of that?

A.    This one goes to -- oh, so sorry.  1097.  Yes, I'm there now.

Q.    And if you go to lines 23 to 1098, line 2?

A.    From 23 --

Q.    1097, 23 to 1098, line 2?

A.    Okay.

Q.    And I'll ask you again, The inventor's aim --

        THE COURT:  Just a minute.  Let him read that section, and then he can tell you when he's read it, and then you can ask your question.

        THE WITNESS:  Yes.  I see that.

Q.    (BY MR. SHEASBY)  "The inventor's aim for the '130 Patent is to reduce transmission time intervals."  Correct?  That's what you testified to?

A.    Yes, that's what I said.

Q.    Okay.  And you testified to that under oath.  Correct?

493

A.    Yes.

Q.    Okay.

        MR. SHEASBY:  Now let's go back to the slides.

Q.    (BY MR. SHEASBY)  And the patent actually talks about reducing the transmission time interval to as little as one to two OFDM symbols.  Correct?

A.    So, once again, please repeat the question.

Q.    Sure.  It talks about reducing the transmission time interval to as little as one to two OFDM symbols.  Correct?

A.    OFDM symbols.  Yes.

Q.    Is that correct, sir?

A.    Yes.

Q.    And the -- in the 5G, a single sub-frame is 1/16th of a millisecond.  Correct?

A.    A single -- did you say single frame?

Q.    A single sub-frame is as little as 1/16th of a millisecond.  Correct?  1/6th of a millisecond.  Correct?

A.    A frame is not really a term that the 5G uses.

Q.    The sub-frame in 5G is 1/16th of a millisecond.  Correct?

A.    Sub-frames?  It could be that.  That's not the typical length, but it could be that.

Q.    That's the maximum, the smallest possible length is 1/16th.

A.    It can actually go smaller, but yes.

Q.    At least 1/16th of a -- of a millisecond.  Correct?

A.    Yes.

Q.    And we spoke previously about how agree that the patent does talk about reducing the transmission time interval. Correct?

A.    So what patent talks about is transmission time will be smaller, it will be reduced, and then patent wants to find a ways to send uplink control signal.  That's what the patent wants to do.

Q.    And if we look at PTX 16, Samsung actually testified that it's the reduction of the transmission time interval that is able to achieve ultra low latency.  Correct?

A.    I'm trying to look for that ultra low latency.  Oh, yeah, there -- yeah, that's right.

Q.    And just for the ladies and gentlemen of the jury, you testified under oath previously that the stated goal of the '130 Patent is to reduce the transmission time interval. Correct?

A.    What I said was the inventor's aim was related to reducing the transmission -- transmission time interval.

Q.    Okay.  Now let's move on to the '776 Patent, if I may.

For the '776 Patent, the '776 Patent relates to retransmission.  Is that correct?

A.    Retransmission?

Q.    Reselection.  Is that correct?

A.    Cell reselection, yes.

Q.    Yes, sir.

MR. SHEASBY:  And if we go to slide 14, Mr. Svenson.

Q.    (BY MR. SHEASBY)  And we agree, I think, that reselection is important feature in 5G.  Correct?

A.    Yes, as well as all other generation, it is very important.

Q.    And, in fact, in particular, selection across multiple frequencies is an important part of the operation of 5G. Correct?

A.    Yeah, I would say that.

Q.    And you testified about how reselection has existed for a long period of time, but the reality is, is that the reselection that's used in 5G is different from the reselection that is used in 4G.  Correct?

A.    Every generation is different, that's correct.

Q.    Okay.  And if we go to this slide, you were here and under oath -- you were here when Samsung's corporate representative testified under oath that if you don't have reselection, you cannot launch.  Do you see that?

A.    I see what he says.

Q.    And you didn't talk to the ladies and gentlemen of the jury about this testimony.  Correct?

A.    I did not, no.

Q.    Okay.  And you in your expert report testified that you felt there were alternatives to the '776 Patent and the '130.

496

Correct?

A. Yes.

Q. But you didn't speak to any Samsung engineer to vet whether those alternatives that you identified would be acceptable to Samsung. Correct?

A. Yeah, that's correct.

Q. In fact, for the ladies and gentlemen of the jury, even though there are alternatives that Samsung could use, you did not identify one acceptable alternative to them in your testimony today. Correct?

A. Yeah, that's correct.

Q. Okay. And the third issue you talked about is the relative value of these patents. Is that correct? Versus other patents?

A. Yes, that's right.

Q. And just so the record is very clear, when we're doing our funnel, other than the patents-at-issue in this case, you were unable and you did not identify a single other essential patent anywhere in the world. Correct? By number.

A. Not by number, no.

Q. So $300,000 and not one other essential patent that you've identified on behalf of Samsung. Correct?

A. Not by number, that's correct, yes.

Q. Okay. And then, in addition, not only did you not identify any other patent that's essential by number, is you

can't give me the number of any patent anywhere in the world that is of equal importance to the '776 and '130 Patent. Correct?  You can't give me that number.  Correct?

A.    I cannot give you the number.

Q.    $300,000 or more and you can't give me the number. Correct, sir?

A.    I cannot remember the number.

Q.    And the last thing I want to talk about is, do you have children?

A.    I do.

Q.    And when your children are sick, do you bring them to a pediatrician or a specialist to deal with their illness?

A.    So my children is all grown up so I think they went past that pediatrician age, but they were probably drive themselves to go to doctor themselves.

Q.    You understand what it means to be a specialist. Correct?

A.    I do, yes.

Q.    And counsel represented that you made contributions to 5G in her direct examination of you.  Correct?

A.    Yeah.

Q.    The reality is you've never made any contribution documents that have been submitted to 5G.  Correct?

A.    Not to the standard meetings, no.

Q.    Okay.  And you've never designed any 5G equipment.

Correct?

A.    That's not correct.

Q.    You can't identify the specific 5G product that you helped design or use.  Correct?

A.    I don't have a manufacturing facility to actually make those, but I've done the drawings and I've provided my design work to different companies.

Q.    You can't identify any company that adopted your methods or solution in 5G.  Correct?

A.    No, I can't name them.

Q.    So for just the ladies and gentlemen of the jury, we have Doctor Kowalski who spent 35 years designing 5G systems. Correct?

A.    I don't know for a fact he was doing that.  I don't know his details of his career.

Q.    You didn't hear his direct examination?

A.    I heard him saying he worked for Hitachi, American InterDigital.  That's what I know, and people in a company do different things.

Q.    Okay.  But we know what you haven't done is have any role in submitting contributions to 5G.  Correct?

A.    Not to the standard meetings, no.

        MR. SHEASBY:  I pass the witness, Your Honor.

        THE COURT:  All right.  Is there redirect?

        MS. DEGNAN:  Yes, Your Honor.

THE COURT:  Let's proceed with redirect.

MS. DEGNAN:  Mr. Andryszak, can I please have DDX 13-11?

REDIRECT EXAMINATION

BY MS. DEGNAN:

Q.    Doctor Min, do you recall being asked about whether you were able to identify any patent by number that was of equal importance to the '776 and '130 Patents?

A.    Yes.

Q.    Can we remind the jury what your opinion is about the relative technical value of the '776 and '130 Patents compared to the average value of declared patents?

A.    I said they are lower.

Q.    So given that GComm patents have a lower technical value, is there any surprise that you didn't identify any patent equal in value compared to the average value of a declared SEP?

A.    No.  I would not focus on --

MR. SHEASBY:  Your Honor, objection.  This is -- this is very leading.

THE COURT:  When the witness is halfway through the answer, it's an untimely objection.  I'll allow the question to be answered.  If it's posed as a leading question, then you need to object before the witness is halfway through with the answer.

500

Go ahead and finish the answer, Doctor Min.

THE WITNESS:  Thank you.

My opinion is that the '776 and '130 Patent has a low value, and I would not focus my effort to remember the declared standard patents that have a lower value.  So it's not surprise at all.

Q.   (BY MS. DEGNAN)  Now, counsel asked you about and mentioned a few times how much money you made for Samsung in this case?

A.   Yes.

Q.   In the past five years, about what percentage of your income has come from working with Samsung?

A.   Previous to this case, it would be very small.  I worked -- it's been a while since I really work for Samsung.  So this is like a really first major case for the past five years.  It will be very small.

Q.   In the past five years, how many different companies have you worked with?

A.   Over 30 different companies.

Q.   Has any of that work been on behalf of the patent owner rather than a defendant?

A.   Yes.

Q.   Have you ever worked for a patent owner -- have you ever worked on behalf of a patent owner with Mr. Sheasby's law firm?

501

A.    Yeah, it turns out that I did.

Q.    Does it matter to you whether you're working for Samsung, the patent owner, or another defendant?

A.    No, it does not matter.  To me what matters is whether or not I can speak independently and without restriction and provide my opinion.

Q.    Thank you, Doctor Min.

        THE COURT:  You pass the witness, counsel?

        MS. DEGNAN:  Yes, Your Honor.

        THE COURT:  Is there additional cross examination?

        MR. SHEASBY:  No additional cross examination, Your Honor.

        THE COURT:  All right.  You may step down, Doctor Min.

        THE WITNESS:  Thank you.

        THE COURT:  You're welcome, sir.

    Defendants, call your next witness.

        MR. McKEON:  Your Honor, Samsung calls Mr. Paul Meyer.

        THE COURT:  All right.  If you'll come forward to be sworn, Mr. Meyer.

        (Whereupon, the oath was administered by the Clerk.)

        THE COURT:  Please come around, have a seat on the witness stand.

    All right, Mr. McKeon.  You may proceed with direct

examination.

MR. McKEON:  Thank you, Your Honor.

Good afternoon, members of the jury.

PAUL MEYER,

having been duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. McKEON:

Q.   And good afternoon, Mr. Meyer.  Could you please introduce yourself to the jury?

A.   Yes, I can.  My name is Paul Meyer, and I grew up in Virginia military family.  I've been married for 40 years, two adult sons now, one played baseball for a while professionally.  And I live in California now.

Q.   And the jury's heard about a FRAND throughout this trial.  What kind of FRAND analysis have you done in the past?

A.   I've done many FRAND analysis.  I have worked with implementors and -- and SEP holders to help them negotiate FRAND licenses, and I've done valuation of FRAND in situations like this.

Q.   Can you provide -- sorry, Mr. Meyer.  Get the right clicker here.

Can you provide some examples for the members of the jury of the companies that you worked in in your career?

A.   Yes.  They're on the screen here.  And so you'll see a lot of the leading high technology companies in the world,

many who either own these standard essential patents and license them out, and then companies that use those patents in their tablets and phones.

And so I've done probably over the last 15 years 30 separate FRAND determinations.  And if you look at the 69,000 patents that are declared to the 5G standard, I've probably been involved in seeing the licensing of over half those patent assets.  And so half of those licenses have been part of my consulting and testimony and valuation in courts like this, courts throughout the United States, the International Trade Commission, and I've testified in the high court of law of London and Wales on FRAND.  And I've submitted evidence like this in probably -- about the value of a FRAND royalty in probably the majority of developed countries around the world.

Q.    Thank you, Mr. Meyer.  What is your educational background?

A.    I grew up in Virginia.  I went to the University of Virginia.  I studied accounting and quantitative methods, and I graduated in 1979 from UVA.

Q.    And do you have any certifications?

A.    Yes.  I've been certified as a CPA, initially in Virginia in 1985, and I'm now certified in California.

I have a separate valuation with the CPA Society.  It's about a valuation.  It's called ABV.  It's really a mini-CPA exam.  You take a long test about how to value assets, both

504

property, tangible assets, intangible assets, patents.

And then I taught at Stanford for 30 years, taught over a thousand students.  They all were engineers, and I talked to them about valuation, finance, accounting, royalties, and how to run a business -- a start-up business financially and economically.

Q.   And is your intellectual property valuation experience used to help companies that are negotiating real life, real-world licensing deals?

A.   So what I don't do is I don't sign the agreements, I don't ultimately make the decision.  But the same analyses I'll describe to the jury today that I do for these court cases, the same analyses of licenses and financial data and profitability, I give that kind of insight to companies when they want to figure out what should we pay for these FRAND-encumbered assets, what should we charge out.

I've also worked for the SEP holders.  I've worked for some of the biggest SEP holders in the world but on licensing.

Q.   How many license agreements would you say in your career roughly have you analyzed?

A.   It sounds boring, but I probably have seen not 10,000 but it's been thousands going back 30 years, and some assignments like this, there will be 70 agreements and one assignment with 300 agreements.  So it's been thousands.

Q.   Does that include FRAND -- agreements that had

FRAND-encumbered patents-at-issue?

A.    So that's total, going back 30 years, that includes non-FRAND.  So probably FRAND licenses, over a thousand.

Q.    And has a Court ever qualified you as an expert in the field of FRAND valuation and patent damages?

A.    I've been qualified in Texas, California --

MR. SHEASBY:  Your Honor, I object.  The only thing that matters is whether he's been qualified here.  It's irrelevant.

THE COURT:  Overruled.  He can answer the question.

THE WITNESS:  I've been qualified in Texas, California, International Trade Commission, the High Court of England and Wales where I appeared live for testimony.  I have not appeared yet in other parts of Europe, but that includes the United States and -- and the UK.

Q.    (BY MR. McKEON)  And have you worked for -- with Samsung before in the past?

A.    Yes.  I worked with Samsung going back 10 years.  It's probably been six or seven assignments and, you know, they -- they're busy, they're not busy, so over the last 10 years, a half dozen assignments.

Q.    And does your company bill Samsung for the hours you spend working on -- on cases for Samsung?

A.    Yes, my time and then the time of my colleagues.  So if I have staff helping out, we bill our time and we bill Samsung

for the time we've incurred.

Q.   And over the past 10 years, what have your company's fees been in Samsung-related work?

A.   I don't have an exact amount, but probably to put an average on it would probably be about $500,000 a year over the last ten years.  Maybe one year's, it's a million five; one year, it's nothing.

            MR. McKEON:  Your Honor, at this time Samsung offers Mr. Meyer as an expert in the field of FRAND valuation and patent damages.

            THE COURT:  Is there objection?

            MR. SHEASBY:  No objection, Your Honor.

            THE COURT:  Without objection, the Court recognizes Mr. Meyer as an expert in those designated fields.

      Please continue, Mr. McKeon.

            MR. McKEON:  Thank you, Your Honor.

Q.   (BY MR. McKEON)  Before jumping into the details, Mr. Meyer, can you provide the members of the jury just a quick overview of what your opinions you are going to be discussing today?

A.   Yes.  First opinion is when it comes to setting the royalty rate which is fair, reasonable, and non-discriminatory, the FRAND, it's my opinion that we should use a market comparables approach.  That's my first opinion.

Q.   Okay.  Let's jump right into that opinion.

Now, as a FRAND valuation expert, what framework did you use to value the patents in this case?

A.    So the framework is called *Georgia-Pacific*, and ultimately it's this thing we've heard about this week, it's called this hypothetical negotiation.  And so that's factor 15 of that -- of that court case.  And so these are the major assumptions in that -- in that determination.

It occurs basically between ZTE and Samsung at the time ZTE owned these patents.  It covers the accused products in this case.  And we've heard a lot about the '130 and the '776 Patents.  And as Mr. Dell mentioned, we get to have complete information.  So we get to see all the data from both G+, from ZTE has produced, and from Samsung to make the best decision.

And we're assuming it's valid and infringed, so these patents.  And this negotiation will result in a paid-up lump sum royalty.

Q.    And you have April 2019 on the slide here.  What does that mean?

A.    That's the date of the negotiations.  That's when the first accused product was sold, and that's when the parties would meet and hammer out this license.

Q.    Just so we're clear here, back in 2019, April 2019, that was before this case even started, in this hypothetical negotiation would the parties assume that the patents are valid and infringed in that hypothetical negotiation?

508

A.    Yes.  To basically -- they're coming to an agreement with the assumption that the patents are valid and infringed. That's correct, sir.

Q.    Thank you, Mr. Meyer.

Now, why is ZTE the party in the hypothetical negotiation and not GComm, who is the Plaintiff here?

A.    Well, it goes to your point about it's April of 2019. That's the first accused Samsung product.  That's when you have the hypothetical.  So at that time ZTE owned these two patents.  So they would be in this room negotiating with Samsung for that license.

Q.    Now, does the ZTE/GComm agreement that we've heard about in this case, does that impact your opinion on FRAND royalties?

A.    At a high level, just from the perspective that we're sitting in this situation where the royalty amount is at $142 million, and yet the owner of those patents let those patents go to GComm for $600,000 paid.

And everything after that was what's called contingent, and ZTE as the owner had no ability to do anything at all after that point in time.  Anything with those patents was out of their control.

So it's just an economic observation to keep in mind as we look at overall reasonableness.

Q.    And was there any guarantee that ZTE would get any

509

remuneration after this transaction?

A.    No guarantee, no claw-back, no instruction.  Basically it was in the hands of G+ to do as they liked.

Q.    Now, could you give context about the two patents compared to the -- all the patents in the 5G stack that we've heard about?

A.    Yes.  And this is an important concept.  And so we're talking about two patents in this case that need a license, 16 patent families were transferred to G+ from ZTE, and, importantly, about 70,000 patent families, which is upwards of 300,000 patents, have been declared to the 5G standard.

And these are declarations that are made by Nokia, Ericsson, Qualcomm, InterDigital, Huawei, Samsung, and these companies participate in the standard.  They actually develop the standard, and then they put their science into it and say, Hey, we're doing this for the good of the overall global community, we'll put our patents in here because you-all need this now to go out and sell phones and have phones that work around the world.

So that's who puts in the assets, and we're talking about two patents out of 70,000 families today, sir.

Q.    Okay.  Out of the about 70,000 families in the 5G stack, how many were contributed by Samsung?

A.    So Samsung's share of that stack is -- it's seven percent, 7.2 percent-ish, and about 5,000 patents.  And then I

think, you know, Huawei has 15,000, and then Qualcomm, 10,000. It works down from there.

THE COURT:  Counsel, approach the bench for a moment, please.

(The following was had outside the hearing of the jury.)

THE COURT:  Just so both of you-all will know, Mr. McKeon, Defendant has a total of 45 minutes of trial time left.

And, Mr. Sheasby, the Plaintiff has 22 minutes of trial time left.  All right?

MR. McKEON:  Okay.  Thanks, Your Honor.  I appreciate that.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

MR. McKEON:  Thank you, Your Honor.

Q.   (BY MR. McKEON)  You've been in the courtroom and heard discussion about declared patents to the standard versus patents that are actually or authentically essential.  Were you here for that testimony?

A.   Yes, I was.

Q.   Could you describe what that's all about?

A.   Yes.  So I mentioned who declares to the standard, all those companies have a science, and then ultimately of that, a

subset is essential.  But those that declare, that count of patents is kept by ETSI, so everybody can go and examine the shares.

And then basically to determine an essential patent, you really have to take in front of a science committee and a court to figure out actual essentiality.

Q.   And have you examined some various studies about who analyzed that in terms of the ratio or the percentage?

A.   Yes.  No one agrees exactly on essentiality over the whole declared stack, and there are studies out there that say it can be between 20 and 35 percent.

But the thing that's important for I think the Court is that whether you're looking at declared or essential, it doesn't really change the shares of who owns the stack.  And so if you go and examine from the various groups that study essentiality, it's apples-to-apples at the top.  But if you come down to 30 percent, roughly who owns the market share of that doesn't change a whole lot.

And, importantly, you have to make what we've all done in the court is a technical assessment of the patents, and the parties look at declarations and they also look at technical assessments of the portfolios.  And that's what both the licensors and licensees do in these proceedings.

Q.   Can you describe to the members of the jury the hypothetical negotiation and the factors that you consider?

A.    Yes.  These are the 14 factors, plus 15 is the actual hypothetical.  I considered all these in my reports and in my opinions.  The most important factors I believe for setting the royalty in this case, the FRAND royalty, are factors 1 and 2, which go to the market comparable agreements that relate to the technology in this case.

Q.    And how does the market comparable analysis work?

A.    You've heard a lot about this in the court already this week.  Basically you want to rent or buy a house, you go do the market comps and you do your research as the buyer, the seller does the research, and then you can negotiate.  And so you find the right neighborhood, size of the house, pool, whatever it may be that's important to you or your family, and that's a market comparable analysis.

Q.    And how does that compare to the licensing situation?

A.    Well, the great thing about it, I mean analogies can, you know, we make them too simple at times.  But if you can examine all the property values and get within a range, then you making certain that you're paying the same as your neighbors or charging the same as those other owners.

And with a patent license, you are getting comparable agreements and saying, how do licenses for comparable technology inform us as to what the parties should pay here. So we get within that tight range and then make those determinations.  So it's very -- it's called -- really it's

objective data about market transactions.

Q.   Now, is market comparables, is that an unusual approach to patent valuation?

A.   No.  It's used by all the SEP owners.  It's used by all the phone companies taking the licenses.  Samsung uses this approach.  ZTE testified in this case they use this approach.  Mr. Pitcock and GComm use this approach, and we heard about that today a little bit through Mr. Dell.

     And Mr. Dell himself uses this approach because it's the best way to -- to value property if you can get to the proper transactions.

Q.   Now, you said market comparables is used widely in the industry around the world.  How do you know that?

A.   Well, I've seen all the licenses.  And I can't speak about the details, but every major owner of a standard essential patent in this world does analysis around market comparables.  All the major phone companies that take the licenses do the same analysis.

     There's a company called InterDigital that's a public company that owns about two percent of the 5G stack.  And because they're public, they publish data, so you can actually do analysis around InterDigital and see exactly what people do to value these assets on a market comparables basis.

Q.   In all your work in FRAND licensing, have you ever seen anyone use the IPA approach in licensing before?

514

A.   I've never seen it ever in my 15 years of looking at FRAND.

Q.   Thank you, Mr. Meyer.

Did your analysis include the letters that we've seen in this trial already between GComm and Samsung?

A.   Yes, I did examine these.

Q.   And does this provide further evidence of your conclusion regarding the use of market comparables?

A.   Yes.  It just indicates that when Mr. Pitcock was approaching Samsung to -- to license, he went out and examined data.  And there's a lot of information in the public record because the big licensing companies have websites.  And so he did analysis around what those companies charge, made some assumptions about the patent assets and essentiality, and came up with these per-unit market comparable rates.

Q.   Thank you, Mr. Meyer.

MR. McKEON:  Your Honor, may I move these forward and put on the demonstrative?

THE COURT:  You may.

MR. McKEON:  Thank you.

Q.   (BY MR. McKEON)  Mr. Meyer, can you see that okay?

A.   Yes, thank you, sir.

Q.   You were in the courtroom for Mr. Dell's testimony?

MR. SHEASBY:  Your Honor, I'm sorry for doing this again, but at least Mr. Pitcock's going to have to leave

515

because this is confidential information.

THE COURT:  All right.

MR. McKEON:  We should close the courtroom then, Your Honor.

THE COURT:  All right.  I'm going to order the courtroom sealed based on this exchange with counsel.

I'm going to direct that all persons present who are not subject to the protective order in this case exit the courtroom until it's reopened and unsealed.

MR. McKEON:  And, Your Honor, just on that, I think the Samsung folks can stay, and at some point later on I'm going to ask them to leave as well with the Court's indulgence.

THE COURT:  I'd just as soon us not be any more disruptive than we have to.

MR. McKEON:  Thank you, Your Honor.

THE COURT:  Let's get everybody out who shouldn't be here.

MR. McKEON:  Thank you, Your Honor.

THE COURT:  And then we'll reopen it when they all come back.

(Courtroom sealed.)



516



Q. ██████████████████████████
████████████████████████████
███████████████████████████████
███████████████████████████████████?

A. ██████████████████████████
████████████████████████████
████████████████████████████
███████████████████████████████
█████████████████████████████████
████████████████████████████
████████████████████████
    ███████████████████████████
█████████████████████████████
██████████████████████████████
████████████████████████████
███████████████████████████
█████████████████████████
██████████
    █████████████████████████
████████████████████████████
█████████████████████████████
██████████████████████████████
██████████████████████.

Q. ██████████████████████████
██████████████████████████

██████████████████████████████████████████

██████████████████████████████████████?

A.      ████████████████████████████████

████████████████████████████████████?

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████

        ███████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

████████████████████

Q.      ███████████████████████████████████

██████████████████████████████████

██████████████████████████████?

A.      ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████████

        ████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████

518

Q. █████████████████████████████████████

█████████████████████████████████████?

A. █████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

Q. ███████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████?

A. █████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████



Q. ██████████████████████

████████████████████████████████

██████████████████████████████████?

A. ███████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████████████████████

███████████████████████████████████

██████████████████████████████████

█████████████████

████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

██████████████████████████.

Q. █████████████

████████████████████████████████████

██████████████████████████████████?

520

A.

521



Q.

?

A.

522



Q. █████████████████████████████████████

███████████████?

A. █████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████.

Q. ███████████

████████████████████████████████████████

██████████████████████████?

A. █████████████████████████████████████

██████████████████.

Q. █████████████████████████████████████

████████████████████████████████████

█████████?

A. ████████████

███████████████████████████████████████

███████████████████████████████████████

523

Q.

Q.

A.

Q.

A.

Q.

524

A.

Q.

?

A.

525



Q.

A.

526

Q. ███████████████████████████████████?

A. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████.

Q. ███████████████████

███████████████████████████████████

████████████████████?

A. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████

█████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███

█████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██.

527

Q.    █████████████████████
█████████████████████████████
█████████████████████████████

A.    ████████████████████
█████████████████████████████
█████████████████████████████
█████████████████████████████
█████████████████████████████
█████████████████████████████
█████████████████████████████
█████████████████████████████
████████████████████████████.

Q.    ██████████████████
           █████████████████████
           █████████████████████
           ████
           ████████████████████
████████████████████████████████
           ████████████████████
           █████████████████████
           ████████████
           █████████████████

Q.    ████████████████████████
█████████████████████████████
███████?

A.    ████████████████████████

528

Q.

?

A.



Q. ████████████████████████████████████████

███████████████████████████████████

████████████████████████?

A. ████████████████████████████████████████

530

Q. ███████████████████████████████████
███████████████████████████████████████████?

A. ███████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
██████

531



Q. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮

Q. ▮▮▮▮

▮▮▮▮▮?

A. ▮▮▮▮▮





Q.

Q.

██████████████████████████████████████████████

████████████████████████████████?

A.    ██████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████.

Q.    ███████████████████████████████████

████████████████████████████████████████████

██████████████████████

A.    ███████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

535



Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

536



537



A. ████████████████████.

Q. ██████████████████████████████

███████████████████████████████████████?

A. ███.

Q. ███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████?

A. ███.

Q. ███████████████████████████████████████

████████████████████████████████?

A. ██████████████████████████.

Q. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████?

A. ███.

██████████████████████████████████

███████████████████████████

Q. ███████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████?

A. ██████████████████████████.

Q. ███████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

███████████████████?

A.   ██████████████████████████████████

██████████████████.

Q.   ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

A.   ██████████████████████████████████

██████████████████████████████████████.

Q.   ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████?

A.   ████████████████.

Q.   ██████████████████████████████████

████████████████████████████████████████

██████████████████?

A.   ██████████████████████████████████

████████████████████████████████.

Q.   ██████████████████████████████████████?

A.   ████████████████████.

Q.   ██████████████████████████████████

██████████████████████████.

A.   ████████████████████████.

Q.   ██████████████████████████████████

539



540



541

Q. ███████████████████████████████████ ████████

Q. ████████████████████████████████████

████████████████████████████████████

A. ██.

Q. ████████████████████

███████████████████████

████████████████████████████████

████████████████████████████████████████

██.

████████████████████████

███████████████████████.

████████████████████████████████████

████████████████████████████.

████████████████████████████.

Q. ████████████████████████████████████

████████████████████████████████████

████████████████████████?

A. ██████████████████████.

Q. ████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████?

A. ███████████████████████████████████

████████████████████████.

542



██████████████████████████████████████████████████████

████████?

A.    ████████████████████████████████████████████████

████████.

Q.    ███████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████?

A.    ██████████████████.

Q.    ███████████████████████████████████████████████

████████████████████████████

        ███████████████████████████████████████████

████████████████

Q.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████?

A.    ██████████████████.

Q.    ██████████████████████████████████?

A.    █████.

Q.    ██████████████████████████████████?

A.    ██████████████.

Q.    █████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████

A.    ████████████████████████████████████████████████████

Q.    ██████████

544



A. ▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

545



546

A. █████████.

Q. █████████████████?

A. ███████████

Q. ████

A. ███████████████████████████.

Q. █████████████████████?

A. █████████████████████████████████.

Q. ██████████████████████████████?

A. █████████.

Q. █████████████████████████?

A. ███.

Q. ██████████████████████████?

A. ███████████████████.

Q. █████████████████████



A. ████████████████████████████████████████
█████████████.

Q. ████████████████████████████████████████
███████?

A. ███████.

Q. ████████████████████████████████████████
██████████████?

A. ████████████████████████

Q. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███?

A. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████.

Q. ████████████████████████████████████████
████████████████████████████████████████
█████████████?

A. ████████████████████████████████████████
████████████████████████████████████████
██████████████.

Q. ████████████████████████████████████████
████████████████████████████████████████



550



A.

Q.

A.

Q.

A.

Q.

551

A. ███████████████.

Q. ████████████████████████████████████

█████████████████████████████████?

A. ██████████████.

Q. █████████████████████████████████

███████████████████?

A. ██████████████.

Q. ██████████████████████████████████████

████████████████████████████████████████?

A. ████████████████.

Q. ████████████████████████████████████████████

██████████████████████████████████████████

████████████████████?

A. ████████████.

Q. ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████?

A. ██████████████████.

Q. █████████████████████████████████████

███████████████████████████████████████████████

████████████████████?

A. ██████████████.

███████████████████████

███████████████████████

███████████████████████████████

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

552

Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇?

A. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

553

A.  ███.

Q.  ██████████████████████████████████████

██████████████████████████████████████

███████?

A.  ████████████████████████████.

Q.  ██████████████████████████████████████

██████████████████?

A.  ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████

███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████.

Q.  ████████████████████

████████████████████████████████████████

554

███████████████████████████████?

A.   ███ .

Q.   ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████?

A.   ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



Q.

556





(Courtroom unsealed.)

THE COURT:  All right.  Let's have a seat, ladies and gentlemen.

MR. SHEASBY:  Your Honor, just to give you an update, there's a slight confusion about what script to play, and that's the reason for the delay and I apologize for it.

THE COURT:  Counsel, tell me what you want to do with your remaining time.  There's not very much, but we're not going to stand around and discuss it all day.

MR. CORDELL:  We're going to call Dr. Mang Zhu by deposition, Your Honor.

THE COURT:  All right.  Then let's identify him for the record as well as the run time, and we'll proceed with that witness by deposition.

MR. McKEON:  And Your Honor, for the record, if I may approach the podium, just the time allocations on this, Samsung's time is 4 minutes and 38 seconds, and GComm is 53 seconds.

THE COURT:  Let's proceed with this witness by deposition.

MR. CORDELL:  Yes, Your Honor.  We are calling Dr. Mang Zhu, and she is the head IP officer at ZTE.

THE COURT:  All right.  Let's proceed.

MANG ZHU, PH.D.,

BY VIDEO DEPOSITION

Q.   Good morning.  Can you please state your full name for the record?

A.   Mang Zhu.  First maim is M-A-N-G, the last name is Z-H-U.

Q.   First, who is your employer?

A.   My employer is ZTE USA.

Q.   Is ZTE USA a subsidiary of another company?

A.   ZTE USA is a subsidiary of ZTE Corporation, and I am contracted to work for ZTE Corporation.

Q.   What is your current title?

A.   Oh, they give me a title of chief IP strategy officer.

Q.   ZTE licenses patents that have been declared essential to ETSI.  Correct?

A.   Yes.

Q.   What is ZTE's FRAND framework?

A.    What is our FRAND framework?  We determine a license rate by looking at the different angles.  Then we use our -- use the top-down method to verify if the offer or the rate we -- we determined is in the range of verified by that top-down method.

Q.    Are you familiar with the market comparable approach?

A.    I know there are all different kinds of FRAND or the rate determination method.  There are -- top-down is one of the one, and also they have it's called comparable license, not comparable market.  Okay.  So I'm not sure.  Maybe there is a comparable market.

And there are some other ways of comparable stuff to determine a FRAND rate, and also it all depends the court, what court is taking, right.  So ZTE can only decide what we are going to do because we can only do at our ability, you know.

Q.    That's fine.  All I'm really curious is to confirm that patents declared essential to ETSI must be licensed under FRAND terms.  Right?

A.    Yeah, this is --

Q.    It's okay.  How does ZTE determine whether to license a patent family itself as opposed to selling the patent family to someone else to do the licensing work?

A.    Oh, this is -- as I said, it's like a family-by-family difference -- I mean case-by-case, right.  So these particular

560

ones, as I said, like Dai, he has tons of patents.  So this might be a query or a fact to saying, Hey, I can sell Dai's patents more than the patents covering security patents.  Honestly, we don't have so many security patents.  I try to keep the security patents.

For these physical layer patents--right?--if we have already charted a hundred, then the 100 to 1, then the 1 can be sell.  Right?  So it's not really have to be a good one, better one whatsoever, you know.  It's more of if it will ever affect my licensing, you know, business, and also if it will really make any revenue.  Right?

Q.   ZTE has declared over 4,000 patent families as essential to 5G.  Right?

A.   Yeah.

Q.   So your basic understanding is that ZTE gets 20 percent of any licensing fees or litigation fees that G+ receives from these patents.  Correct?

A.   Yeah.  That's the second means.

Q.   So you know that the same patents that were sold to G+ are also licensed to Apple?

A.   Yeah.

Q.   When these negotiations began with Samsung, ZTE had not yet begun negotiating with G+.  Right?

A.   No.  No.  I'm not sure if anybody else started a negotiation with G+ or not.  But these patents were already

identified to be in a package for sale.

Q.   The patents that were later sold to G+?

A.   Yeah.

Q.   Okay.  And so were they purposely kept out of the Samsung negotiations?

A.   It's not purposely -- thank you.  It's not purposely kept out.  It's just identified it's the small amount patent that we can sell.

THE COURT:  That completes this witness by deposition?

MR. CORDELL:  It does, Your Honor.

And with that, the Defendant rests.

THE COURT:  All right.  The Defendant has rested its case in chief.

And I gather the Plaintiff does not have a rebuttal case to present.  Is that correct?

MR. SHEASBY:  Your Honor, Plaintiff rests as well.

THE COURT:  All right.

MR. CORDELL:  Your Honor, with this Court's custom, we will defer our Rule 50 applications until later today.

THE COURT:  We'll take them up shortly, counsel.

MR. CORDELL:  Thank you.

THE COURT:  Ladies and gentlemen of the jury, that now means you have heard all the evidence in this case.  There are certain matters I need to take up with counsel outside of

your presence that do not directly involve the jury.  It is 3:00 in the afternoon and I'm about to let you go for the day. The flip side of that coin is I need you back in the morning, 8:30, as regular.

As you leave the courtroom in just a few minutes, if you will take your notebooks into the jury room and place them closed on the table there so they'll be there in the morning.

Please remember, ladies and gentlemen, to follow all my instructions.  We are well-along in this case and getting close to an end.  It would be an absolute travesty if all the work and resources and time and money and effort that's been put into this trial were to be jeopardized because somebody failed to continue to follow my instructions.  So please do not communicate with anyone in any way about this case, and that includes the eight of you on the jury until I tell you to deliberate on your verdict, which I anticipate's going to happen tomorrow morning.

So have a good evening, plan your travel so you can be assembled and ready to go by 8:30 in the morning, and with that, ladies and gentlemen, you're excused for the evening.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated, please.

Just for the interest of the parties, we completed the trial--or the presentation of the evidence, rather--today with the Defendant having 34 unused seconds and the Plaintiff

563

having a minute and 29 unused amount of time, a minute and 29 seconds unused.

Counsel, I have emailed you at 3:00, just a few minutes ago, what the Court believes to be an appropriate final jury instruction and verdict form. I am going to recess for about 15 minutes, and in about 15 minutes I intend to return to the bench and take up motions from either party pursuant to Rule 50(a). I can't imagine that there will be more than one motion since this is a one-issue trial, but we'll see what we get.

As is the Court's typical practice, those of you that are going to be presenting closing arguments tomorrow are not required to be here for either practice under Rule 50(a) or an informal charge conference where we will discuss the current version of the charge and verdict form.

It's my intent that after the 50(a) motions are heard and ruled on, that we will shortly thereafter convene an informal charge conference where the parties will be informally meeting with the Court off the record to review the charge and verdict form and let me have the benefit of your input as to what I've suggested. And after we've thoroughly examined and discussed those matters, then I will take your input into account. It's my plan to do that over the evening and forward to you early tomorrow morning what the Court has determined to be the appropriate charge and verdict form.

564

At 8:00 in the morning, it's my intention to go on the record and conduct a formal charge conference where either party may lodge such objections to both the charge and the verdict form as they feel are necessary and appropriate.

And then it's my hope that at or near 8:30 in the morning we can bring in the jury, I can present my final instructions to them on the law, and counsel can proceed to offer its closing arguments.

At this point, can you advise the Court as to who will be presenting closing arguments for the respective parties?

MR. SHEASBY:  Your Honor, I will on behalf of the Plaintiff, Jason Sheasby.  I'm not the Plaintiff Jason Sheasby; I will be --

THE COURT:  You represent the Plaintiff.  I understand.

MR. SHEASBY:  But I wanted it on the record I was the one who was speaking.

THE COURT:  I understand, Mr. Sheasby.  I don't know what that says about both of us, but I understand what you just said.

MR. SHEASBY:  Given the suggestions of Mr. Cordell, there could have been a suggestion I was, in fact, the Plaintiff, so I wanted to make that clear.

MR. CORDELL:  I can believe that, Your Honor.

THE COURT:  How about Defendants, Mr. Cordell?

565

MR. CORDELL:  With your permission, I will present for the Defendant.

THE COURT:  All right.  Then you two gentlemen are not required to be here through the rest of this afternoon's undertakings, but we'd certainly be happy to have you if you choose to join us.  It's up to you.

I'll be back in about 15 minutes, counsel.  We'll take up motions under Rule 50(a) at that time.

Court stands in recess.

MR. SHEASBY:  Thank you, Your Honor.

(Brief recess.)

THE COURT:  Be seated, please.

All right, counsel.  At this time the Court intends to take up motions either party may care to offer pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

What I would like to do is have a spokesperson for each side, Plaintiff and Defendants, and I'd like to identify first subject matter-wise motions either party cares to offer, and then after I've fully identified the scope of the motions requested, I'll go back and hear specific targeted argument.

Does Plaintiff have motions to offer pursuant to Rule 50(a)?

MR. HARBOUR:  Yes, we do, Your Honor.

THE COURT:  Please go to the podium.

MR. HARBOUR:  Hi, Your Honor.  This is Michael

Harbour on behalf of the Plaintiff G+ Communication.

We have a motion under Rule 50(a) for judgment as a matter of law that G+ is entitled to damages.

THE COURT:  Do you care to be more specific than that?

MR. HARBOUR:  Sorry.  Damages for the infringement of the '130 Patent and the '776 Patent.

THE COURT:  All right.  And is that the sole relief that Plaintiff seeks under Rule 50(a)?

MR. HARBOUR:  That is the sole relief.  I should have added also for the amount of 102 -- well, it's $102,582,538 for the '776 and $39,996,226 for the '130.  And that is the only motion we intend to make, Your Honor.

THE COURT:  All right.  Thank you.

Do Defendants care to seek relief under Rule 50(a)?

MR. REGER:  Good afternoon, Your Honor.  Tom Reger.

THE COURT:  Good afternoon, Mr. Reger.

MR. REGER:  Thank you, Your Honor.

Your Honor, GComm has been fully heard on its damages contentions and evidence, and there's no legally sufficient evidentiary base for a reasonable jury to award damages to GComm, let alone the amount of damages GComm requests.  That's our overarching topic.  There are a number of sub-issues beneath that, Your Honor.

THE COURT:  So as I understand it, Samsung moves for

567

judgment as a matter of law that no damages should be awarded to GComm.

MR. REGER:  Yes, Your Honor.

THE COURT:  All right.  Well, these are obviously diametrically opposed motions, so I'm prepared to hear concurrent argument from both sides.

Since Plaintiff has lodged this in the affirmative, let me hear from Plaintiff first, and then I'll hear from Defendants.

Tell me why, Mr. Harbour, GComm's entitled to this relief as a matter of law.

MR. HARBOUR:  Thank you, Your Honor.

Plaintiff respectfully moves under Rule 50(a) for judgment as a matter of law on the issue of damages.  G+ is entitled to a judgment as a matter of law that is entitled to damages together with interest and costs as fixed by the Court under 35 U.S.C. § 284 based on Samsung's infringement of the '130 and '776 Patents.

G+'s damages expert Mr. Dell calculated a reasonable royalty based on the minimum technical benefits of the patents as compared to the next best alternative when the standard was adopted as established by the testimony of G+'s technical experts, Samsung employees, and the patents.

Doctor Akl testified that the '776 provides increased speed and power savings, among other benefits.  Doctor Akl

568

further testified that the '130 Patent provides additional benefit of including at least increased speed and power savings, among other benefits.

Doctor Kowalski further testified as to the benefits of the '776 and the '130 Patents.  With respect to the '776, Doctor Kowalski testified that it provides a minimum of five percent and as much as 33 percent speed benefit, along with power savings and no increased costs.  Doctor Kowalski further testified that the '130 Patent provided at least a two percent increase in speed, two times increase in power saving, increased channel resources, and no increase in cost.

In addition, Doctor Akl, Doctor Kowalski, and Samsung's designee Sungjin Park testified that Samsung did not believe that it had viable non-infringing alternatives to either patent.

Plaintiff's damages expert Mr. Dell testified to the hypothetical negotiation, including the monetary benefits that Samsung would receive and believe it would receive by infringing the patents-in-suit.  For example, Mr. Dell cited customer survey evidence demonstrating that Samsung's customers rate speed and better battery life are the, quote unquote, most vital to their decision to purchase the infringing products.

He also cited to a survey conducted by an economist, Doctor Reed-Arthurs, showing that increase in speed alone

provided by the '130 and '776 Patent would result in a per-unit profit of at least $8.15 per Samsung product. This was conservative as it does not include the additional benefits that Doctor Akl and Doctor Kowalski described.

Mr. Dell also applied the *Georgia-Pacific* factors to determine a reasonable royalty. He concluded that a reasonable royalty would be a discounted lump sum damages of $102,582,538 for the '776 Patent and $39,996,226 for the '130 Patent, for a total of $142,578,763.

Samsung did not introduce sufficient evidence to rebut G+'s damages. Indeed, Samsung's corporate representative on non-infringing alternatives, Sungjin Park, admitted that he was unaware of any non-infringing alternatives for any of the patents-in-suit.

Samsung's corporate representative at trial Guy Waitley further admitted that Samsung's own studies demonstrate that hyper-fast connection speed are one of the most vital factors with respect to their consumers' decision to purchase a phone.

And finally, Doctor -- Samsung's technical expert Doctor Min admitted that he had not identified any acceptable alternative to either the '130 or '776 Patent.

For these reasons, G+ has met its burden to establish damages, and the Court should enter judgment as a matter of law for the amount of $142,578,763 lump sum payment for G+.

Thank you, Your Honor.

THE COURT:  Thank you.

Let me hear from Samsung in response.

MS. GLASSER:  I'm sorry, Your Honor.  There was a part -- I really apologize, Mr. Reger.

MR. REGER:  Of course.

THE COURT:  What's the problem, Ms. Glasser?

MS. GLASSER:  We just omitted one piece of it.

Additionally, the JMOL in support of damages is established by the testimony of Mr. Meyer who acknowledged that damages should be awarded, and, in fact, gave his own opinion of a number lower than G+'s number but of over $3 million.

THE COURT:  All right.  Now I'll hear from Samsung in response.

Go ahead, Mr. Reger.

MR. REGER:  Thank you, Your Honor.

As I mentioned earlier, GComm has been fully heard on its contentions.

At the outset, Your Honor, the presentation from GComm violated a number of tenets of black letter law.  They claim the standard rather than the patented technology.  That flies in the face of the *CSIRO* case as well as the *Ericsson* case where we are told that reasonable royalties for SEPs generally must not include any value flowing to the patent from the standards adoption.  We heard over and over again from

Plaintiff about the benefits, the popularity, and the widespread adoption of 5G.  That is contrary to what the clear mandate is from the Federal Circuit about what the jury's supposed to consider.

You're not supposed to consider the value of the standard as a whole, yet they continuously tried to inject 16 times the speed of 5G over 4G, and they basically tried to hitch their wagon onto the overall standard, as to opposed to narrowly focusing this jury on the incremental benefit of the actual patents at issue in this case.

Beyond that, Your Honor, of course they -- several times they referred to Samsung's gross revenue numbers.  As the D-Link -- *Ericsson v. D-Link* case reminds us, that there is considerable risk of misleading a jury into overcompensating, stating that such a base cannot help but skew the damages horizon for the jury, and they did that despite several warnings from us before starting this case.

They also relied on non-infringing alternatives, Your Honor.  And GComm presented to -- continued to present testimony on non-infringing alternatives, even though Your Honor in his final instructions will be -- and it's modified *Georgia-Pacific* factors will not be talking about non-infringing alternatives.  Particularly what Your Honor will be mentioning, for example, in modified GP 5, you're talking about the value that's going to be incorporated into

572

the standard.  That's the option that could have been presented.

That is not what we heard from Plaintiff.  Their non-infringing alternatives were something else.  They talk about a -- you know, a paper and such.  They were not talking about non- -- the alternatives that Your Honor discusses in its modified GP factors.  Instead they were talking about non-infringing alternatives that fly in the face of SEP cases, such as *Ericsson v. D-Link*.

Your Honor, moving on to just the overall damages numbers, they are unreliable and speculative.  They rely on Doctor Kowalski's testimony that was flawed and based on various articles and papers that were not tied to the patents in this case.  In fact, we heard Doctor Kowalski admit that he made a major mistake that actually ended up showing that it was not tied to the '130 Patent.

We also heard very briefly, I believe in one slide from Mr. Dell, about Doctor Reed-Arthurs' survey.  Not only was that survey fundamentally flawed; we never heard anything about it.  The jury never heard details about that survey, didn't know what was surveyed and what was not surveyed, how many people were surveyed.  She was not presented as a witness.

So we have one of the fundamental blocks of     Mr. Dell's damages is missing in this case, and without that

573

survey, his entire damages number fails without it, because all Mr. Dell does beyond that is an improper apportionment; actually just simple multiplication of 22.5 percent, and then a black box downward adjustment.  Without Doctor Reed-Arthurs' testimony, without real support on what that survey is and what that survey does, Mr. Dell's opinions ultimately fail.  They are unsupported by the evidence -- any evidence in this case.

I apologize for the length, Your Honor.  I have a couple of more issues, including future damages.

With respect to future damages, we're entitled to judgment as a matter of law that GComm is prohibited from future damages because of the way Mr. Dell calculated his numbers.  Mr. Dell did not calculate a lump sum, as he called it, in the traditional fashion; and that here in a standard essential case where there are comparable agreements, you can look at a lump sum paid-up license by looking at comparable agreements.  That is not what Mr. Dell did.  What Mr. Dell did was he projected into the future, sometimes to 2037, depending upon the patent, and then he brought that all back.  So it's effectively a running royalty.  However, he discounts it to turn it into a lump sum.

The idea that he's using these future royalties, these future sales is improper, especially when you consider the technology will be changing over the course of the years, and

574

there's many things in the future that could happen, including Samsung's IPRs and *ex parte* reexaminations.

THE COURT:  Could you slow down just a little bit, please?

MR. REGER:  My apologies, Your Honor.  I've been excited to get up here all day.

THE COURT:  I'm excited to hear you, but I want to follow you carefully.

MR. REGER:  All right.  I will slow down, sir.

One of the last issues I wanted to mention was a failure to mark.  GComm bears the burden of proving damages.  GComm also bears the burden of proving compliance with the marking requirement.

Setting aside, you know, all the failures they have with proving damages, they fail to even address the marking issue in this case, despite Samsung sending an *Arctic Cat* letter specifically identifying unmarked licensed products.  So despite us sending that letter prior to this trial, GComm never responded to the letter, GComm did not mention the letter in this case, GComm didn't mention a reason in this case why the Apple products may not matter, they did not -- in fact, they -- when it came to notice, they admitted that the letter they sent in September 8th, 2021, was, quote unquote, a notice letter.  That is from their slide.  So they never addressed marking in their case.  They bear the burden, so

they did not meet their proof when it comes to § 287.

And at the -- my last issue, Your Honor, is we -- again, we heard throughout this case from GComm that they continuously harped on the supposed value of these two patents because they've been adjudicated infringed and not invalid. Your Honor, in the hypothetical negotiation you're supposed to assume that. You're supposed to assume that they are infringed and you're supposed to assume they are valid. So their suggestion is improper, especially in light of Your Honor's earlier instruction given to the jury before the trial started.

And with that, Your Honor, I believe I'm done unless, Your Honor has questions.

THE COURT: All right. I have no additional questions. Thank you.

MR. REGER: Thank you, Your Honor.

THE COURT: Anything further from Plaintiff?

MS. GLASSER: Not unless Your Honor has questions.

THE COURT: All right. Thank you.

Counsel, at this juncture in the proceedings I always benefit from reflecting on Rule 50(a) itself, which says in part, "If a party has been fully heard on any issue during a jury trial and the Court finds that a reasonable jury did not have a legally sufficient evidentiary basis to find for the party on that issue, the Court may."

I am going to deny both Plaintiff and Defendants' motions for judgment as a matter of law related to the issue of damages in this case.

That completes practice under Rule 50(a).

It's 20 minutes until 4:00.  Counsel, if you would like, I would be happy to conduct and undertake an informal charge conference with you at 4:00 in my chambers.  I will see you in approximately 20 minutes there.

The Court stands in recess.

(The proceedings were concluded at 3:40 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts                    04/16/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

.