IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

G+ COMMUNICATIONS, LLC.,          (   CAUSE NO. 2:22-CV-078-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,    (
et al.,                           )   MARSHALL, TEXAS
                                  (   APRIL 17, 2024
          Defendants.            )   8:00 A.M.
_____

VOLUME 3

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:          IRELL & MANELLA, LLP -
                            LOS ANGELES
                            1800 AVENUE OF THE STARS
                            SUITE 900
                            LOS ANGELES, CA 90067-4276
                            (310) 203-7096
                            BY: MR. JASON SHEASBY
                                MR. BENAJMIN MANZIN-MONNIN
                                MR. MICHAEL HARBOUR

                            IRELL & MANELLA -
                            NEWPORT BEACH
                            840 NEWPORT CENTER DRIVE
                            SUITE 400
                            NEWPORT BEACH, CA 92660
                            (949) 760-0991
                            BY:  MS. LISA GLASSER

                            McKOOL SMITH, P.C. - MARSHALL
                            104 EAST HOUSTON, SUITE 300
                            MARSHALL, TEXAS  75670
                            (903) 923-9000
                            BY:  MS. JENNIFER TRUELOVE
                                 MR. SAM BAXTER

FOR THE DEFENDANTS:         FISH & RICHARDSON, PC -
                            WASHINGTON, DC
                            1000 MAINE AVE., SW
                            SUITE 1000
                            WASHINGTON, DC 20024
                            (202) 783-5070
                            BY:  MR. RUFFIN CORDELL
                                 MR. MICHAEL McKEON
                                 MS. LAUREN DEGNAN

                            FISH & RICHARDSON, PC - DALLAS
                            1717 MAIN STREET, SUITE 5000
                            DALLAS, TEXAS  75201
                            (214) 292-4084
                            BY:  MR. THOMAS REGER

                            GILLAM & SMITH, LLP
                            303 SOUTH WASHINGTON AVENUE
                            MARSHALL, TEXAS  75670
                            (903) 934-8450
                            BY:  MS. MELISSA SMITH

OFFICIAL REPORTER:        SHAWN M. McROBERTS, RMR, CRR
                          100 E. HOUSTON STREET
                          MARSHALL, TEXAS  75670
                          (903) 923-8546

THE COURT:  Be seated, please.

Let me ask, are the parties prepared to read into the record any items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MS. TRUELOVE:  We are, Your Honor.

THE COURT:  All right.  Let's proceed to do that.

MS. TRUELOVE:  Exhibits that were used by Plaintiff G+ during yesterday's proceedings are:  JTX 01, JTX 06, JTX 07, JTX 08, JTX 09, PTX 08, PTX 11, DTX 17, PTX 16, DTX 18, DTX 41, and DTX 52.

THE COURT:  All right.  Any objection to that rendition from the Defendants?

MR. FREEMAN:  No objection from Samsung.

THE COURT:  Do Defendants have a similar offering to make?

MR. FREEMAN:  We do, Your Honor.  Exhibits used by Samsung during yesterday's presentation were:  JTX 1, JTX 4, PTX 26, DTX 18, DTX 25, DTX 41, DTX 52, DTX 409, DTX 410, DTX 422, and DTX 578.

THE COURT:  All right.  Any objection to that offering from Plaintiff?

MS. TRUELOVE:  No objection, Your Honor.

THE COURT:  All right.  Thank you, counsel.

Yesterday after the close of the evidence and the releasing of the jury until this morning, the Court heard

motions regarding Rule 50(a) from both sides, heard argument on those motions, and ruled on those on the record.

Thereafter, the Court met with counsel for the parties in chambers and informally discussed in an informal charge conference the presently existing form of the final jury instructions and verdict form.

The Court obtained fulsome input and discussion from both sides in a constructive and professional manner.  The Court has taken the input from the parties into account and overnight prepared what it believes to be the proper and appropriate final jury instruction and verdict form for submission to the jury in this case.

And the Court now intends to hold a formal charge conference on the record where either side may lodge such objections as they believe the interests of their clients requires.

With that and in the usual fashion in this Court, I'm going to ask a single spokesperson for Plaintiff and for Defendants to go to the podium.  I'll review the current version of the final jury instructions on a page-by-page basis.  And at any page where a party believes a matter has been included that should not have been or has been omitted that should have been included, they are free to lodge whatever objections they believe are appropriate and proper. I'll rule on those objections, and then we'll proceed to take

up the verdict form in the same manner.

So with that, I see Ms. Glasser and Ms. Degnan at the podium.  Let's begin with the final jury instructions.

Turning to the first page or the cover page of the final jury instructions, are there objections here from either Plaintiff or Defendants?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning then to page 2 of the final jury instructions, are there objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 3, are there objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 4, are there any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Next is page 5.  Are there any objections?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  Yes, Your Honor.

THE COURT:  State your objection.

MS. DEGNAN:  In the very bottom paragraph in the second sentence that reads "I will then provide you with detailed instructions on what each side must prove to win on each of its contentions," we would strike each side and say G+.

THE COURT:  All right, Ms. Degnan.  I'm not finding the language that you're talking about.  I'm on page 5.  Where are you?

MS. DEGNAN:  I'm at the bottom of the paragraph that says, "As I did at the start of this case."

THE COURT:  Okay.  What line down in that paragraph are you looking at?

MS. DEGNAN:  Second line.

THE COURT:  Okay.  I was at the bottom.  You're nearer the top.

MS. DEGNAN:  Yes.  Yes, Your Honor.  So it's six words in from the right.

THE COURT:  All right.  Given that this is a trial on damages only and Plaintiff G+ has the burden by a preponderance and there is no issue on which Samsung has an affirmative burden, I'm going to grant that objection.

I'll change this sentence:  "I will then provide you with detailed instructions on what Plaintiff must prove to win on each of its contentions."

All right.  Anything further on page 5?

MS. DEGNAN:  Yes, Your Honor.  So we're just going to preserve for the record on page 5, going to page 6, Your Honor, the instruction about how there's been an adjudication of infringement and validity and not invalid, and we are just preserving the objection we made as set forth in our motion on the preliminary instructions.

Instead of referring to adjudicated infringement, we would ask the Court to say assumed infringement, and I think if we read briefly into the record what we put in our preliminary motion if that would be helpful.

THE COURT:  My ruling is going to be consistent with my ruling on your preliminary motion.  That objection is overruled.

MS. DEGNAN:  Thank you.

THE COURT:  All right.  Then let's turn to page 6 of the final jury instructions.  Are there any objections here that haven't already been mentioned?

MS. GLASSER:  Yes, Your Honor.  Twice on the page the phrase 'if any' occurs, damages if any, and in view of not only the prior verdict but the damages statute and the undisputed evidence in this case, G+ preserves its objection that the phrase 'if any' should not be used.

THE COURT:  All right.  I'm going to overrule that objection.  The jury is entitled to totally disregard the Plaintiff's evidence on damages and find no damages.  While

that's not likely, it's within the jury's purview and I think the 'if any' instruction is appropriate.  So the objection's overruled.

Anything further on page 6 from either party?

MS. DEGNAN:  No, Your Honor.

MS. GLASSER:  No, Your Honor.

THE COURT:  All right.  Then let's turn to page 7 of the final jury instructions.  Are there any objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  Yes, Your Honor.  One, we would have one insert at the very bottom of the page before -- three lines from the bottom.  So at the end of that paragraph, we would insert the following sentence:  "G+ bears the burden to establish the amounts attributable to the patented invention."

THE COURT:  All right.  I think that's adequately covered.  I'm going to overrule that objection.

Anything further on page 7?

MS. DEGNAN:  No, Your Honor.

THE COURT:  All right.  Let's turn to page 8.  Any objections here?

MS. GLASSER:  Your Honor, G+ has several objections on page 8.  The first is at the top of the page.  We are concerned that the reference to infringing sales and past and future infringement could be vague, and in view of that would

request that the Court instead refer to the products that were found infringing.

THE COURT:  All right.  That objection is overruled. What's your next objection?

MS. GLASSER:  The next objection is that in the second paragraph, it states the patents have been declared to be standard essential and that G+ asserts that the 5G standard cannot be practiced without using.  Similarly in the third full paragraph, it states G+ contends that the asserted patents are essential.

We have two objections to that.  One is in this case there was no evidence by either side that the patents were anything other than essential.  In fact, it was conceded that, in view of the prior verdict, the assumption the jury needs to be working on this case is that they are essential.  That is the first objection.

Secondly, I'll preview this for the modified *Georgia-Pacific* factors.  While we don't have an objection to those in view of the concession by Samsung of essentiality, if there is an open issue in front of the jury as to whether the patents are essential, we would object to the modified factors being given in that respect.

THE COURT:  All right.  That objection is overruled. Is there anything else on page 8?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  We'll turn to page 9.  Anything objectionable here from either party?

MS. GLASSER:  Other than the previously stated objection on page 8, no, Your Honor.

THE COURT:  Anything from Defendants here?

MS. DEGNAN:  No, Your Honor.

THE COURT:  All right.  We'll turn to page 10 of the final jury instructions.  Any objections here from either party?

MS. GLASSER:  Yes, Your Honor.  The second full paragraph on the page.

THE COURT:  The one that begins, "In determining a reasonable royalty?"

MS. GLASSER:  Yes.

THE COURT:  Okay.

MS. GLASSER:  The second-to-last sentence begins, "The party asserting that there is a non-infringing alternative, here G+, has the burden to show by a preponderance of the evidence," and it goes on.  G+, Your Honor, given that this is a damages issue only, does not bear the burden to show availability to Samsung, and we request that that portion be stricken as well the last sentence referring to the burden to show availability.

THE COURT:  All right.  That objection's overruled.

Anything else on page 10 from either party?

MS. DEGNAN:  Yes, Your Honor.  After the end of that paragraph and before the paragraph that begins, "In calculating damages," we would insert an instruction on royalty stacking as follows:  "In determining what amount is a FRAND royalty, you must also consider any evidence of royalty stacking.  'Royalty stacking' can arise when a standard implicates multiple patents, perhaps hundreds or thousands, with recall as a company that is forced to pay royalties for all such standard patents to pay royalties that 'stack' on top of each other and may become excessive."

THE COURT:  All right.  That objection's overruled.  Anything else from either party on page 10?

MS. DEGNAN:  No, Your Honor.

MS. GLASSER:  No, Your Honor.

THE COURT:  We'll turn then to page 11.  Anything here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Next is page 12.  Any objections here?

MS. DEGNAN:  No, Your Honor.

MS. GLASSER:  No, Your Honor.

THE COURT:  And finally page 13, the last page, are there any objections here?

MS. GLASSER:  No, Your Honor.

586

MS. DEGNAN:  No, Your Honor.

THE COURT:  All right.  Let's turn to the verdict form.  We'll follow the same approach.  We'll begin with the cover page or page 1 of the verdict form.

Any objections here from either Plaintiff or Defendants?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 2 where certain definitions are listed, any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 3 where additional instructions are included, any objections here?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  Turning to page 4 where Questions 1 is and 2 are located, are there any objections here?

MS. GLASSER:  Only as to the phrase "if any," Your Honor.

THE COURT:  All right.  Consistent with my prior ruling, that's overruled.  Anything further from either party on page 4?

MS. DEGNAN:  No, Your Honor.

MS. GLASSER:  No, Your Honor.

THE COURT:  Turning to page 5, which is the final

page of verdict form, any objections here from either party?

MS. GLASSER:  No, Your Honor.

MS. DEGNAN:  No, Your Honor.

THE COURT:  All right.  That completes the formal charge conference.  Thank you, counsel.

I will take a minute to make these very few changes, and then it's my intention to prepare eight final printed copies of the final jury instructions so that each member of the jury will have their own copy to review while they retire to deliberate, and I'll be back hopefully at or near 8:30 when we can bring in the jury and begin with those final instructions given orally to the parties.

I see lawyers on their feet, so I gather there are things we need to talk about before I recess.

MR. SHEASBY:  Your Honor, nothing controversial.

THE COURT:  We'll see, Mr. Sheasby.

MR. SHEASBY:  Famous last words.

There is going to be some presentation of confidential information.  I have constructed my presentation so that I will not be saying it out loud; it will only be shown. Consistent with past practice, I would request that the gallery screens be deactivated for my opening -- my closing.

THE COURT:  All right.  Are you asking that they be turned off throughout the entirety of your closing or are you going to begin with them on and then notify the Court so we

can turn them off when you reach a point of confidentiality.

MR. SHEASBY:  Your Honor, given the interest of public access, I believe I can ask for them to be turned on and off during the middle of the presentation if that is the Court's preference.

THE COURT:  I would prefer that.

MR. SHEASBY:  Understood.

THE COURT:  And we'll do it that way.

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  All right.  Mr. McKeon, you are on your feet.

MR. McKEON:  Yes, Judge.  We have no objection to that.  And, you know, at this point we are having confidential information in our closing clearly, and just to avoid the in and out of the courtroom at this point, we're inclined to close the courtroom for our closing in light of the fact that, you know, big chunks of this are going to be confidential and given the 30-minute time limit and, you know, given the confidential nature of the material, we just think it's a more efficient way to do it because we'd like be able to verbalize some of the material that's confidential.

THE COURT:  So, in other words, you're going to ask me to formally close the courtroom to cover confidential information?

MR. McKEON:  Yes.

THE COURT: Now, do I understand that it's Defendants' request to close the courtroom, seal the courtroom for the entirety of your closing?

MR. McKEON: Yes. At this point, Your Honor, just to avoid the disruption during the 30-minute closing of having to do it. It's not -- we're certainly not going to have all of the --

THE COURT: Everything Mr. Cordell says is not going to be confidential.

MR. McKEON: Yes, that's right. But the problem, Your Honor, as you know, is sort of the disruption of the in and out during just a 30-minute presentation, but that's what we're struggling with.

We understand it's the nature of trying to keep the courtroom open to the public and that certainly should be a goal. But given -- you know, given the nature of the case and damages and the reliance on these confidential licenses, you know, we just think that's a problem.

THE COURT: All right. Here's what I'm going to do, Mr. McKeon. I will entertain affirmatively Mr. Cordell's request to close the courtroom once he gets to confidential information in his closing. I will afford you 30 seconds extra time to account for the time it takes for the public to leave the courtroom. And I'll leave the courtroom closed from that point until the end of the closing.

But we're not going to close the entirety -- we're not going to seal the courtroom for the entirety of the closing, but I think that should accommodate your concerns.  Is that acceptable?

MR. McKEON:  That is, Your Honor.  Makes perfect sense, and I appreciate the Court's accommodation.

THE COURT:  If you will let Mr. Cordell know that's what I wish to do.

MR. McKEON:  We will.

THE COURT:  All right.  Is there anything else before I recess and make these charges to the charge and verdict form?

MR. SHEASBY:  Your Honor, it's always easy to say thank you when things go well or go badly.  But on behalf of G+, we wanted to thank the Court and its staff for fitting us in on short notice and it was an incredibly impacted docket.  So thank you, Your Honor.

THE COURT:  You're quite welcome.

MR. McKEON:  Of course, Your Honor, we obviously echo the same sentiment.  Thank you for the Court and staff.

THE COURT:  All right.  Thank you as well.

The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

For those of you who just joined us recently, while I was

on the bench earlier this morning, counsel and I discussed and worked out how we would address confidential information that will be presented during closings.

With regard to the Defendants' closing, I anticipate that that will begin with an open courtroom.  But at some point when Defendants get into actual confidential information, they're going to request the Court seal the courtroom pursuant to the Court's standing order regarding protection of confidential information.

I'd like to ask everyone, when we do that, to exit the courtroom as promptly and as quietly as possible.  Those of you who are not subject to the protective order in this case will need to exit the courtroom at that time.  There may be others that you know of between the parties who would need to be outside the courtroom.

I want everybody to identify who needs to leave at that time and be ready to go and promptly leave as quietly and as expeditiously as possible when we get to that point.

Also, let me just say, as I typically do, reminding our friends in the gallery, at this juncture that the Court's final instructions to the jury and counsel's closing arguments are, in the Court's view, the most serious part of an inherently serious process.

I do not want people coming and going in and out of the courtroom, opening and closing the back door.  I do not want

people shuffling papers.  I do not want people whispering.  I do not want people moving from different locations in the gallery.

In short, ladies and gentlemen, I want everybody to be as still, as quiet, and as respectful as possible throughout this process.  The last thing the Court wants is any disruption that would detract from the jury's ability to carefully focus on my instructions and counsels' closing arguments.  So please take that into account with regard to your conduct.

All right.  I'm told by our staff that all eight members of the jury are present.  Is there anything I need to hear from either Plaintiff or Defendant on before I bring them in and begin with my final instructions?

MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

MR. CORDELL:  Nothing from Defendant, Your Honor.  Thank you.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, members of the jury.  Welcome back.  Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I'm now going do instruct you on the law that you must apply.

I want you to understand that when you retire to

593

deliberate in a few minutes, you are each going to have your own individual printed hard copy of these final jury instructions that I'm about to give you orally.  I send you back each a copy of these so that hopefully you will not feel compelled to have to take notes during this presentation but you will listen and focus carefully on me giving you these instructions orally.  But, again, you'll have your own hard copy to review during your deliberations, and I wanted you to be aware of that.

Now, it's your duty to follow the law as I give it to you.  On the other hand, and as I've said, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or that I make in these instructions as an indication that the Court has any opinion about the facts in this case.

You are about to hear closing arguments from the attorneys for the competing parties.  Statements and arguments of the attorneys in the case, ladies and gentlemen, are not evidence and they are not instructions on the law.  They are intended only to assist you, the jury, in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you will take this verdict form with you when you retire to the jury room after closing arguments have been presented.  And when you have reached a unanimous agreement as to how to answer the

questions in the verdict form, you will have your foreperson fill out the answers reflecting your unanimous agreements in that form, date the form, sign it, and then advise the Court Security Officer that the jury has reached a verdict.

Answer the questions in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  Again, ladies and gentlemen, your answers to the questions in the verdict form and your overall verdict in this case must be unanimous.

Now, in determining whether any fact has been proven, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them. You may consider the stipulations of the parties and the exhibits received and admitted into evidence, regardless of who may have presented those exhibits during the trial.

You, the jury, are the sole judges of the credibility of all the witnesses and you're the sole judges of the amount of weight and effect to give to all of the evidence.

Now, in deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone are to determine the questions of credibility, believability, and truthfulness of the witnesses.

In weighing the testimony of the witnesses, you may consider the witness' manner and demeanor on the witness

stand, you may consider any feelings or interests the witness may have in the case, any prejudice or bias about the case that the witness might have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances.

Has the witness been contradicted by other evidence?  Has he or she made statements at other times and in other places contrary to what they said on the witness stand during this trial?  You, ladies and gentlemen, must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind that a simple mistake does not mean that a witness is not telling the truth intentionally. You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory, and what significance should be attached to that testimony.

As I've told you previously, the attorneys in this case are advocates for the competing parties, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of this Court.

Now, when the Court sustained an objection to a question that was addressed to a witness, you must disregard that question entirely, you may draw no inference from its wording, and you may not speculate about what the witness would have said if he or she had been permitted to answer the question.

On the other hand, if the objection was overruled by the Court, then you must treat the question to that -- you must treat the answer to that question as any other testimony and as if no objection had been made.  Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court did not as a part of that indicate any opinion as to the weight or effect of that evidence.

Now, at times during the trial, ladies and gentlemen, it's been necessary for the Court to talk with the attorneys outside of your hearing either by talking to them here at the bench or by calling a recess and talking to them when you were outside of the courtroom.  This happens because during trials like this, there are things that arise that do not involve the jury.  You should not speculate or guess about what was said during these discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct evidence or circumstantial evidence, but simply

requires that you find the facts based on the evidence presented, both direct and circumstantial.

Now, over the course of the trial, certain testimony has been presented to you through depositions.  A deposition is the sworn recorded answers to questions asked to a witness in advance of the trial.  Generally speaking, if a witness cannot be present to testify in person, then the witness' testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing both sides questioned these deposition witnesses under oath.  At that time, a court reporter was present and recorded their sworn testimony.

Deposition testimony, ladies and gentlemen, is entitled to the same consideration as testimony given in person from the witness stand in open court.  And, accordingly, you should judge the credibility and the importance of deposition testimony to the best of your ability, just as if the witness had testified before you personally in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  Said another way, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case.

However, you should not base any decision on evidence not presented by the parties during the trial, including your own personal experience with any of the products that have been at issue in this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after you consider all the testimony you believe that single witness.

When knowledge of a technical subject matter may be helpful to you, the jury, a person who has special training and experience in that technical field--they're called an expert witness--is permitted to testify as to their opinions on those technical matters.  However, ladies and gentlemen, you are not required to accept the opinions of an expert witness or any other witness; it's up to you to determine who to believe, who not to believe, what to rely on, and what not to rely on.

Now, certain exhibits have been shown to you over the course of the trial that were simply illustrations.  We call these types of exhibits demonstrative exhibits, or sometimes simply demonstratives for short.  Demonstrative exhibits are a party's depiction, picture, model, or something to describe what's involved in the trial.

If your recollection of the evidence differs from these

demonstratives, then you must rely on your recollection of the evidence. Demonstrative exhibits are sometimes called jury aids, and these demonstrative exhibits, ladies and gentlemen, are not evidence, but the witness' testimony given during the use of a demonstrative is evidence. These demonstratives are not going to be available for you to review or consider while you're deliberating in the jury room.

Now, in any legal action, facts must be proven by a required amount of evidence known as the burden of proof.

In this case, G+, the Plaintiff, which you've referred to simply as the Plaintiff or G+, sometimes you've heard them called GComm, formally their name is G+ Communications, LLC, it has the burden of proving damages for the established patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you, the jury, that a claim is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, as I've previously told you, ladies and gentlemen, the burden of proof by a preponderance of the evidence is not to be confused with any other burden of proof you may have heard of, including a different burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and has no application whatsoever in a civil case like this. Beyond a reasonable doubt is a

higher standard or burden of proof than the preponderance of the evidence that will be applied here.

Now, as I did at the beginning of the case, I'll first give you a summary of each side's contentions, and then I'll provide you with detailed instructions of what the Plaintiff must prove to win on each of its contentions.  As I've previously advised you, this is an action to assess the fair and reasonable compensation for established patent infringement.

Specifically, it's been found by a different and a prior jury that the Defendants in this case, Samsung Electronics Company, Ltd., and Samsung Electronics America, Inc., which you've heard referred to throughout this trial as either the Defendants or as simply Samsung, infringe certain claims of two United States patents.  They are U.S. Patent No. 8,761,776, which you've heard referred to during the trial as the '776 Patent, and U.S. Patent No. 10,736,130, which you've heard referred to throughout the trial as the '130 Patent. Together, these two patents are referred to as the asserted patents or they may be called the patents-in-suit.

It has also been found by a prior jury that the asserted patents are not invalid.

Now, the Defendants, Samsung, disagrees with these findings and they have preserved their right to challenge and appeal these decisions in the future.  Again, ladies and

601

gentlemen, as I've already instructed you, you should not let the fact that these prior findings directly influence the award of monetary damages in this trial.

Now, the Plaintiff, G+, contends that it is entitled to money damages in the form of a reasonable royalty for Samsung's infringement. You must consider what amount of damages, if any, to award to G+.

I'll now instruct you about the measure of damages. The Plaintiff G+ has the burden of establishing the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that G+ establishes that it more likely than not suffered as a result of Samsung's infringement. While G+ is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. G+ is not entitled to any damages that are remote or that are only speculative.

The damages that you award in this case, if any, must be adequate to compensate G+ for the already established infringement of the asserted patents by Samsung. You must not award G+ more damages than are adequate to compensate it for that infringement. You also must not include in any damages award you would make an additional amount for the purpose of punishing Samsung or for the purpose of setting an example.

I'll now instruct you on how to calculate reasonable royalty damages.

A royalty, ladies and gentlemen, is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of the royalty payment that a patent owner and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began.

In this case, ZTE, the original owner of the asserted patents, was the patent holder, and Samsung was the alleged infringer at the time the hypothetical negotiation took place. In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed the patents were valid and infringed and that both parties were willing to enter into an agreement.  The reasonable royalty that you determine must be a royalty that would have resulted from this hypothetical negotiation and not simply a royalty that either party would have preferred.

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty, but only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Although evidence of the actual profits of an alleged infringer may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

Now, the law requires that any royalty awarded to G+ correspond to the value of the patented invention within the accused products, as distinct from other unpatented features or other market factors.  This is particularly true where the accused products have multiple features and multiple components that are not covered by the patent or where the accused products work in conjunction with other non-patented items.

If unpatented features contribute to the accused products, you must apportion that value to exclude any value attributable to unpatented features.  You must determine an appropriate royalty rate that reflects the value attributable to the patented invention alone.

Now, you may have heard throughout the trial that G+ should be entitled to a lump-sum royalty.  A lump-sum royalty is when the infringer pays a one-time single price for what is effectively a license covering both past and future infringing sales.  A lump-sum royalty payment should reflect the total amount necessary to compensate G+ for Samsung's past and future infringement during the remaining life of the infringed

patents.

Now, the parties agree that the asserted patents are subject to certain commitments to ETSI, the European Telecommunications Standards Institute.  You have heard that the asserted patents have been declared to be standard essential patents, or SEPs, and that G+ asserts that the 5G standard cannot be practiced without using the inventions claimed in the patents-in-suit.

The original owners of the asserted patents, ZTE, made a commitment to ETSI to license the asserted patents on fair, reasonable, and non-discriminatory terms and conditions.  We call this FRAND--fair, reasonable, and non-discriminatory.  G+ has also committed to license the asserted patents on FRAND terms.

The FRAND commitment, ladies and gentlemen, does not require any specific licensing model to determine a FRAND royalty.  You should determine a FRAND royalty in this case based on the totality of the circumstances.

G+ contends that the asserted patents are essential to the 5G standard.  In the area of standard essential patents, a patent owner's royalty must be premised on the value of the patented features and not any value added by the standard's adoption of the patented technology.  In other words, you may not consider the success of the standard itself in determining a reasonable royalty for the asserted patents.

When dealing with a standard essential patent, an SEP, there are two special apportionment issues that arise.  First, the patented features must be apportioned from all of the unpatented features reflected in the standard.  Second, the patentee's royalty must be premised on the value of the patented features, not any value added by the standard's adoption of the patented technology.

Now, in determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.

Some of the kinds of factors that you may consider in making your determination are as follows:

1.  The rates paid by a licensee for the use of other patents comparable to the patents-in-suit;

2.  The royalties received by the patentee for the licensing of the patents-in-suit proving or tending to prove an established royalty;

3.  The duration of the patent and the term of the license;

4.  The nature and scope of the license, including with respect to whom the manufactured products may be sold;

5.  The established profitability of the product made under the patent, its commercial success, its current popularity, taking into account only the value of the patented technology and not the value associated with incorporating the

patented technology into the standard;

6.   The utility and advantages of the patent over alternatives that could have been written into the standard instead of the patented technology in the period before the standard was adopted;

7.   The contribution of the patent to the technical capabilities of the standard and also the contribution of those relevant technical capabilities to the licensee and the licensee's products, taking into account only the value of the patented technology and not the value associated with incorporating the patented technology into the standard;

8.   The extent to which the infringer has made use of the invention and any evidence probative of the value of that use, taking into account only the use and value of the technology itself and not the use or value associated with incorporating the patented technology into the standard;

9.   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions that are also covered by FRAND-committed patents;

10.   The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, significant features or improvements added by the infringer,

or the value of the patent's incorporation into the standard;

11.    The opinion testimony of qualified experts;

12.    The amount that a licensor and a licensee would have agreed to upon at the time the infringement first began if both had been reasonably and voluntarily trying to reach an agreement, that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license taking into account the FRAND commitment and its purposes.

Now, you may have heard these factors referred to during the trial as the *Georgia-Pacific* factors.  No one of these factors is dispositive, ladies and gentlemen, and you can and should consider the evidence that's been presented to you in this case on each of these factors.

You may also consider any other factors which, in your mind, would have increased or decreased the royalty the infringer would have been willing to pay and the patent owner would have been willing to accept, acting as normally prudent business people.

In determining a reasonable royalty, you may also consider evidence concerning the availability, or lack

608

thereof, of acceptable non-infringing substitutes or alternatives to the patented invention that could have been written into the standard.

To be an acceptable non-infringing substitute, a product must have the advantages of the patented invention that were important to people who purchased an alleged infringer's product.  You may compare the patented invention to non-infringing alternatives to determine the value of the patented invention, including the utility and advantages of the patent over the old modes or devices, if any, that had been used to achieve similar results.

The party asserting that there is a non-infringing alternative, here G+, has the burden to show by a preponderance of the evidence that a proposed non-infringing alternative was available in the period before the standard was adopted.  You should not consider for damages purposes any alternatives that G+ has not shown were available during this time.

Now, in calculating damages, you may only award damages to G+ for infringement that occurred after the damages period begins.  The damages period for issues related to infringement of the '130 Patent begin on August the 4th, 2020, and end when the '130 Patent expires.  The damages period for issues related to infringement of the '776 Patent begins on April the 1st, 2019, and ends when the '776 Patent expires.

If you award damages for the '130 Patent and the '776 Patent, the amount you award must reflect damages for acts of infringement during these damages periods only.

Now, with these instructions, ladies and gentlemen, we'll proceed at this time to hear closing arguments for the attorneys in the case.  The Plaintiff may now present its first closing argument to the jury.

Would you like a warning on your time, Mr. Sheasby?

MR. SHEASBY:  Yes, Your Honor.  Could I have a warning on my time when 10 minutes have been used and when 15 minutes have been used?

THE COURT:  I will warn you at those times.  You may proceed with your closing statement.

MR. SHEASBY:  May it please this Honorable Court.

Good morning, ladies and gentlemen of the jury.  I want to begin again by thanking you for your service.  I'm acutely aware of the financial and personal sacrifice that you've taken on by serving this week, but I hope you can understand, after hearing the testimony of the last few days, how incredibly important this case is to the Plaintiff, G+.

The laws of the United States of America should be enforced strictly and they should be enforced consistently. The Constitution places the sole power to enforce the patent laws of the United States in the hands of the citizens of this country.  It is your right, it is your power, and that is what

has been exercised this week.

G+ complied with the law.  When these innovations were created overseas, G+ sought formal permission to present them to the United States.  They were carefully analyzed by the United States Patent and Trademark Office and the United States patents were granted.  This is a strict property right, it's an absolute property right.  It's a property right that has been violated by the Samsung entities.

The Court has instructed you that infringement has been established, and it's not just it's been established in some hypothetical sense.  Dr. Paul Min, their expert, under cross examination conceded that these patents are not just essential, these patents are infringed and not invalid.  The only folks who dispute that are the lawyers representing the Samsung executives.

The Court's instructions make clear that you should not give undue weight to the previous finding of a jury of your peers of infringement and not invalid, and I think that's very important.  G+ is not entitled to a penalty, we are not asking that you punish Samsung, but something special happens when a patent is found infringed and valid.  And the statute crafted by our Congress hundreds of years ago makes clear what we are entitled to--no less than a reasonable royalty.

These are the products that have been accused of infringement, have been found to infringe in this case.  They

are the most advanced products Samsung sold through the period of time in which we had access to their data--their premier phones, the phones that they sell at the highest possible prices, the phones that they sell with the highest profitable margins.

These patents are entitled to one form of special protection beyond the statute.  These patents are essential, and because they are essential, we are entitled to not just a reasonable royalty; we're entitled to be rewarded for the innovation.  And that makes sense because of the unique power that happens when a patent is essential.

The Court has also instructed you as to how damages are to be calculated.  They're to be calculated by looking at the use made of the invention by the infringer, by the Samsung entities, in their actual products, and that is the steps we brought to you the last few days.

Samsung was desperate for technology to compete against its, quote, lovely opponent.  In deliberations if someone asks you, but did they really need the technology, was it that important, you can go to JTX 8 and you can show them this document and show that they said we must offer a disproportionate amount of additional value to compete with their lovely opponent.  And that additional value is the 5G technology that is enabled in substantial part by the patents-at-issue in this case.

612

So they may ask you, well, does 5G really matter?  Do customers care?  When customers are paying $1800 for a phone, as Samsung's corporate representative stated yesterday, JTX 9 at 24.  How does Samsung charge these incredible premiums?  Because they build the fastest, because they build the best.  And the premiums that they charge are dramatic.  JTX 6 at 13, $200 difference for the identical phone.

The first set of factors that you can consider and you should consider are all focused and they must take into account the use and benefit of the patents from a technological perspective.  The record will show that the damages expert presented by Samsung ignored the factors that relate to the benefits of this invention.

This is a slide from his presentation.  I don't know if you caught it because he went through it quickly, but he crossed out all the factors that he ignored, factors that the Court has instructed you must be considered.  And Samsung, the Defendant, will not dispute that this is a copy of the slide that was used by their damages expert.

The use made by the infringer, what the statute requires to focus on immediately, up to 250,000 -- 250 million units through the life of these patents through 2037.  And the profits that are generated from this acts of infringement, over $19 billion through the period of infringement.  The infringing units, 166.14 million for the '776, the infringing

613

units for the '130 Patent, 250.45 million units.

The first patent-at-issue, the '776 Patent, reselection, to take into account the vast amount of bandwidth that is available in 5G, you need be able to be and select one of the vast number of cell towers that exist.  Mr. Pitcock noted that millions of cell towers are being built each year.  And the ability to make sure that at the moment you are on and ready to transfer data, you are on the correct cell is critical to the performance of these inventions.

There was some suggestion that because the transfer is made in idle mode, that they weren't valuable.  Look at the patent.  If someone tells you these patents are not critical and important, go to the patent.  Point them out to column 1, line 66 through column 2, lines 2, where they talk about and the United States government acknowledged when it granted these patents the dramatic energy consumption that occurs when reselection is not done properly.

And, in fact, Doctor Min, Samsung's own expert on cross examination, was forced to concede that the technique this patent of being able to select the best cell in multiple frequencies is important.

It's not just important in the abstract.

I'd like Doctor Akl and Professor Kowalski to stand now.

200 technical investigations, 35 years designing cellular systems.  The only expert in this case who in the real world

has designed 5G systems is Doctor Kowalski.

Please sit down.

And what they have indicated is that the benefits of these patents are vast.  33 percent speed, power savings. And, most importantly, no increase in costs.

For the '130 Patent, the '130 Patent dramatically decreased the transmission time interval that is used to send data.  And Doctor Min admitted it, that 5G transmission time interval is 1/16th of a millisecond.  And the patent on the left-hand side makes clear that it is able to achieve that dramatic decrease and transmission time interval.

If anyone asks you, does it really have a benefit, take them to column 1, lines 43 to 49, where the United States Patent and Trademark Office has acknowledged that these patents are what enable that dramatic increase in transmission time interval.

THE COURT:  Ten minutes have been used.

MR. SHEASBY:  I want to stop here and focus particularly on this slide.  I like Doctor Min quite a bit, the Defendants' expert.  I thought he was a very, very nice man.  But when I cross-examined him yesterday, I was stunned at the following:  They didn't give him access to a single Samsung engineer, they didn't let him interview a single Samsung designer who designed these phones to speak about the importance of this, they didn't let him speak to a single

615

person who had actually built and designed 5G networks.

And when I showed him this document, which is a Samsung document, PTX 16, which shows that the transmission time interval decrease results in ultra low latency, he was shocked. He hadn't even seen it as if they didn't even show it to him.

If someone asked you how important this technology is, take them to PTX 16 and the ultra low latency, and these are the benefits that are achieved. There is no alternative to this technology. Samsung's corporate representative admitted it. There is no acceptable alternative.

There is a stark distinction. Stephen Dell, Samsung's public statements, the Court's instructions, Samsung's own FRAND expert who testified by deposition, all admitted that the damages must be based on the value of the use of our technology.

And the outlier in all of that is Mr. Meyer. Mr. Meyer, who says you divide 70,000 patents because those are the number of patents that are filed in the universe and you get a number. That has no connection to any instruction you will find in the Court's instructions.

The technical and commercial benefit is what must be considered. Doctor Rodermund admitted it.

Samsung's own documents, PTX 24, the incremental value, the incremental value, this is on page 10 through 11, Mr.

Meyer, their damages expert, stood up and told you under oath, I never even heard of incremental value analysis; that's crazy.

Well, perhaps he should have looked at Samsung's own filings with the government in which they concede that the incremental value is the critical factor that must be considered.

The second set of factors relate to license agreements. Are they comparable? What's the duration? The nature and scope of the license?

Madam Courtroom Deputy, if you could now close off the screen, I'd appreciate it.

This is the slide that Samsung showed. These are the agreements that Samsung thinks are relevant. They're settlement offers. They're settlement offers in which Samsung did not provide us with the source code and confidential information. They're agreements in which there's no finding of infringement and validity. And because of that, they are agreements in which the United States damages statute does not apply, which it does in this case.

Samsung has spent immense amounts of money on 5G technology, and it's done it for very short terms, four years, seven years, eight years, billions of dollars on 5G technology. But in none of these situations do we have the special circumstance of here of a finding of infringement and

validity.  In all of these situations Samsung provided immense additional compensation, and in none of these situations does Samsung have to pay through the life of the patents as it does in this situation.

Samsung points to the Ox Mobile and 5G IP agreements, and this is another example in which I was shocked by the behavior.  Doctor Min was forced to get up on the stand and say these patents had value, that they had more value than our patents that were infringed and valid and essential.

And then when I asked him on cross examination, he quickly abandoned what his lawyers forced him to say--no evidence of use, no evidence of essentiality, no evidence of value.  And yet this is what Samsung believes the royalties should be based on.

Common sense is your most powerful tool.  A patent that is useless is worth very little.  Samsung is pointing you to a nuisance settlement that was done to avoid a litigation and trying to convince you that that's the same terms that apply when billions and billions of dollars in revenue are covered by our patents.

THE COURT:  15 minutes have been used.

MR. SHEASBY:  The amount of damages that are due in this case are a range, and the range is set out here.  It's between $142 million and $863 million, and that range exists for a very particular reason.  That range exists because Mr.

Dell did something very careful.  He assumed on the low end that Samsung would be able to present evidence that it contributed something of value to the infringing technology. It was a responsible thing, it was the right thing to do.

But what has the record shown in this case?  Samsung has not made any contribution to the infringing technology in this case.

Ladies and gentlemen of the jury, thank you.

THE COURT:  All right.  Defendant may proceed to present its closing arguments.

MR. CORDELL:  Approach just briefly, Your Honor?

THE COURT:  Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

MR. CORDELL:  I just want to lodge an objection to counsel's suggestion to the jury that the damages are really closer to $893 billion.  The damages model has been 142.6 all the way through this, and it's improper for him to try to change it now.

THE COURT:  This is closing argument.  He can argue pretty much what he thinks the evidence will support.  I'm not going to sit here and handhold either of you with what you can argue to the jury.  Your credibility's on the line.  Somebody comes up with a number that's eight times more than what they presented during the trial, they risk their credibility.  I'm

going to let the jury be the judge here.

MR. CORDELL:  Thank you.

THE COURT:  Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Counsel, if you'll pull the microphone back, and then you may begin with Defendants' closing statement.

MR. CORDELL:  May it please the Court.

Good morning, ladies and gentlemen.  I am Ruffin Cordell and proud to stand before you on behalf of Samsung.

And let me echo what my friend, Mr. Sheasby, just said, that we really all do appreciate the sacrifices you've made this week.  We know you have busy lives, families, friends, people that depend on you.  And on behalf of Samsung, we dearly, dearly appreciate your service because we need your help.  We need your help.

You know, this is -- this is a difficult process, it's been a long road.  But at the end of the day, you know, Samsung does what's right.  Samsung, you heard the evidence, has taken licenses to over -- from 70 different companies.  And they want to sign a license.

But, ladies and gentlemen, what the law tells us is that license has to be fair, it has to be reasonable, and it has to be non-discriminatory.  And so what we're here to do is not to

decide which party you like better or who's doing, you know, the right things or the wrong things as a matter of litigation. What we're here to decide is a price, a price for these two patents. We need to set a price for a license to -- on a fair, reasonable, and non-discriminatory basis to these two patents.

Now, you've heard a lot of evidence, and my job over the next half an hour is to try to take that evidence and help you sort through it with respect to the Court's instructions that he just gave us.

So we were just told exactly how it is you're supposed to make your decisions, the rules of the road, if you will, that tell you how to weigh evidence and who has the -- the burden of proof, who has to prove to you certain issues one way or the other. And so over the next half hour I'm going to try to take you through that and highlight the evidence we think is most important for your work.

So you know that there are almost 70,000 patents declared to this 5G standard, this wonderful technology that we've heard so much about this week. But we're only talking about two. We're only talking about two out of the 70,000.

And you know my friends over at GComm say, well, those 70,000, that's too many, that not all of them are really used or really essential. They use different phrases. I think their expert called them authentic essential, but they tell us

that 10 percent are.  So that means 7,000 5G patents are actually essential, are actually used.

And so what you have to do is you have to put yourself back into that negotiation and you realize that, you know, Mr. Samsung is facing 7,000 5G patents.  That's what they're going to have to pay for eventually.  Right?  All these people are going to want to get a royalty.  And so the impact of the damages is profound.  We can't simply say that fair and reasonable is any number we can make up or swing for the fences for the biggest number possible, because it's got to work with the system.  Why is that?

Well, we know that this was declared essential to the 5G standard.  There is absolutely no doubt about that.  Mr. Sheasby just said that GComm brought this patent to the United States.  That's not quite right.  Right?  I mean, this was done back in 2008, long before GComm was ever even conceived.  So this is -- and we'll talk a little more about that later.

But I'd like to go back to my road analogy for just a moment, if I could, because I didn't quite get it right.  I said that people who live along the road and want to -- you know, they want the road because everybody needs the road, you know, sell a piece of land to the county.

Well, that's not really what happens in this context.  GComm is still going to own its patents after this trial.  So after this trial and you set a price for the license, GComm

can move on to the next company. Remember that big list of companies that ZTE gave them. They can go down every single one of them, and they can collect money from every one of those companies.

So the right analogy for the road is that it's not that you're selling them a piece, it's that it's a toll road. And everybody that agrees to be part of the toll road gets to charge people that go back and forth down the road. And what makes it work is that everybody on the road has to be reasonable about it. People want to do this, and in the patent context they want to put their patents into the standard like this declaration that I just showed you.

ZTE isn't doing this or wasn't doing this because they were altruistic. They didn't do it because they wanted to help mankind. They wanted their patent to be part of the 5G portfolio so that it would be widely used, so lots and lots of companies would use their technology and then pay them a toll.

And so the toll road is really the right analogy. It's everybody who lives along the road, everybody who gives a patent to the 5G standard gets to go back and claim damages, not damages because it's not user damages but a royalty or money.

But the key, ladies and gentlemen, is that it's got to be fair, it's got to be reasonable, and it's got to be non-discriminatory. Why is that? Well, think about your toll

road.  What if Mr. Blair, the property owner that I've highlighted in red, what if he says, you know, all my neighbors, they're willing to charge just a, you know, penny a trip or something like that, but I want -- I want a thousand dollars every time somebody goes down the road.  Well, you can't do that.  You can't do that.  Nobody's going to use the road.

And the same is true in the patent context.  If they're not reasonable about the fair, reasonable, and non-discriminatory money they demand, you can't build the road.  You can't build the phone system.  And we all suffer because then we don't have phones.

You saw this from Mr. Dell, their expert.  This wasn't my expert, this is Mr. Dell.  He was on the stand, he didn't want to admit this, I had to show him some prior testimony.  He resisted this, but what did he say?  He said, look, if you're looking at a FRAND patent versus a non-FRAND patent, the FRAND patent is going to be lower.  And he's right.  He's right.  It has to be lower, because if it's not lower, then we can't all get together and create that system where the phone talks to the network and the network talks to the base stations and the base stations let you move around.  They all have to be able to speak that same language.  That toll road has to go all the way through in order to make it work.

And so fair and reasonable and non-discriminatory means

lower.  Mr. Dell is exactly right.  He's exactly right.

Now, let me talk about a couple of things before I get back into the evidence too heavily.  And let's talk about why we're here.  So we heard from Doctor Zhu, Doctor Mang Zhu from ZTE, you know -- and I apologize.  I know that her testimony came in as a deposition and it's kind of hard to understand sometimes.

But, you know, we asked her, why did you give these patents to GComm?  And she said, look, you know, we had charted a hundred of them in this area.  And when you get to the 101st -- we had a hundred patents in this area.  You get to the 101st, it's not so useful.

And she said, you know, it's not really have to be a good one, it doesn't really have to be a good one, better one whatsoever, you know.  So she gave her kind of left-over patents to GComm.  There's nothing wrong with that.  Right?  She didn't need it anymore.

But when they come before you and they say, this is the greatest thing since sliced bread, you've got to ask yourself, why?  Why did ZTE do this and why did they do it -- remember, there were 70 patents.  Why did they do it for $600,000?  That doesn't quite make sense.

We know a lot about GComm.  We know that they don't make products.  We don't have engineers.  Mr. Pitcock's their only employee.  But there are still -- there are still some

questions that we have.  We know why GComm was in this.  Right?  They were in it for the money.  Mr. Pitcock admitted that their only mission in life is to take those patents and go make money on them.  And we're happy for them to do that.

But, remember, it has to be fair, reasonable, and non-discriminatory to make the system work.  And I asked him, you know, if you get that full $142.6 million, that's a -- that's a 23,000 percent profit.  Does that sound fair?  Does that sound reasonable?

But we still have some unanswered questions, ladies and gentlemen.  We know who Mr. Pitcock is.  He's a lawyer from New Jersey.  He's a, you know, patent guy.  He seems to be a nice fellow.  But at the same time he's never done a deal on 4G or 5G telecom patents.  He'd never met anybody from ZTE.

We know ZTE chose the patents before he ever came along.  We know they gave him a list of target companies before he ever came along.  But we have no idea why they picked Mr. Pitcock out.  They didn't ask Doctor Zhu about this and, incredibly, even Mr. Pitcock didn't explain it when he was on the stand.

Now, we know that ZTE set up this deal so they would get 20 percent of the money back.  So whatever money you give, ZTE is going to take 20 percent of it.  But what we still don't know is what happens to the other 70.  Mr. Pitcock says he gets 10, he and his wife, and then ZTE gets 20.  And we don't

know what happens to the other 70.  Unanswered questions.

I'd like to caution you against a couple of distractions, if I can, because all through this trial, and we just heard it from my friend, Mr. Sheasby, he said, you know, valid and infringed.  He keeps beating that drum.  And, ladies and gentlemen, that's an important part of this case.  Don't get me wrong.  Right?  We wouldn't be here if we didn't have a finding of validity and infringement or accurately not a finding of invalidity and infringement.  It's kind of hard to say that.  That's an important part of this case.

But the law says you're not to take that into account when you're setting damages.  And His Honor just gave you this instruction and said you should not let the fact of these prior findings directly influence the amount of monetary damages in this trial.  And we've heard it over and over and over again.  You're here to set a price.  You're not here to figure out who shot John or who did what.  We're here to set a price.  And they need to stick to the evidence that relates to that.

There's also this business that they say 5G is great.  And we agree 5G is great.  There's no question about that.  Everybody thinks 5G is great.  But that's not what the law says.  The law says they don't get to put a patent into a standard, one of 70,000 patents in the standard, and then say, we own it all, this is all our technology, so everything great

about 5G is because of our two little patents.  That's not what the law says.

The law says, and you heard it from His Honor just a minute ago, that they've got to look at what they actually contributed, they have to look at alternatives that existed at the time the standard was adopted.  You heard a lot about non-infringing alternatives.  They can't claim the entirety of 5G.  It's just not theirs.

So what do we do?  We had a debate in this case about the right method to come up with a price.  We say that forever people have looked at comparable licenses.  It's like renting a house, you look at comparable houses.  And sometimes there's this top-down approach.  And we think that's the right approach in this case, we think that's what all the evidence supports, and we'll get to that in some detail.

We're not alone.  Everybody in the world uses this comparable license approach.  Importantly, Samsung and ZTE, the two parties who are at the hypothetical negotiation table, they use this comparable license approach.  GComm used it before they -- before this lawsuit was filed.  When they were negotiating with us, they looked at comparable licenses.  Mr. Dell, their expert, he did comparable licenses all day long and top-down as well.

The fact is, ladies and gentlemen, I'm showing you here an excerpt of DTX 422, and if you want to see it, you can ask

for that exhibit, and that was Mr. Dell and Mr. Pitcock's work, and they relied on comparable licenses.

Mr. Sheasby said, well, that was before they got the confidential information.

But, ladies and gentlemen, that's not what happened because these same numbers, if you recall --

May I, Your Honor?

THE COURT:  You may.

MR. CORDELL:  And I'll just set it here to avoid the gallery.

The numbers on my chart came from Mr. Dell's expert report after he had confidential information, after he had done the calculations he said he needed to do.  And the numbers here are quite consistent with what he put in that letter that they sent to Samsung.

And these numbers you're going to see over and over again--6.6 million, 2.1 million, 4.2 million.  These are their expert's numbers, ladies and gentlemen, not mine, of what a fair, reasonable, and non-discriminatory rate should be.

So we have Mr. Dell's analysis.  And at the low end, he said it was 2.1 million.  At the high end, he said it was 21. And we dispute that.  Right?  We think that's too high.  We think that 21 is too high.  But at least we know what range we're talking about.

But, Mr. Dell, you know -- we built this neighborhood

that showed all of the various entries that Mr. Dell analyzed.

These are the license agreements, the comparable license

agreements that Mr. Dell analyzed; not my expert, their

expert.  He said this is a fair and reasonable price.

Your Honor, this is when we need to close the courtroom.

THE COURT:  All right.  I'll order the courtroom

sealed at this time.

I'll direct that all persons not subject to the

protective order excuse themselves and remain outside the

courtroom until it's reopened and unsealed.

(Courtroom sealed.)











634



635











Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter



(Courtroom unsealed.)

THE COURT:  All right.  Plaintiff may now present its final closing argument to the jury.

MR. SHEASBY:  Madam Courtroom Deputy, can we close down the slides?

And, Your Honor, may I approach to get my device?

THE COURT:  You may.  Begin when you're ready.

MR. SHEASBY:  Could I have slide 83?

We want a license, is what Samsung's lawyer just told you.  In Texas we talk to each other.  Well, I grew up in California my whole life, and Samsung's counsel lives in South Beach, Florida.  But what I do know is that we repeatedly, again and again and again, gave these entities the opportunity to license these patents.

We made them a settlement offer in January of 2022.  We

made them a settlement offer in 11/2022. We flew to Korea to ask them to comply with the law, and what we've had is a series of excuses. First it was, we don't infringe and its patents are invalid, and now it's that these patents are valueless. The laws of the United States will be enforced here today.

The shock that Samsung wasn't aware of the consequences of its behavior, we expressly told them, DTX 578, if you do not take a settlement, you will face the consequences of this litigation. After the settlement, Mr. Cordell showed you this part of our settlement offer to them. What he didn't show you was where we expressly called it a settlement and said we didn't have access. Why did he cut off that part of the document?

Can we have slide 87?

70,000 patents. Only a small portion of them are essential and only a smaller portion are infringed. If there is other patents, if these are junk as Samsung asks you to believe, where are the good ones? They paid their lawyers more than they're saying we're due in this case, and they can't identify a single essential patent, a single patent that is the same value as our technology, a single patent that is used.

Mr. Meyer has been paid three-and-a-half million dollars from Samsung. He couldn't be bothered to identify these magic

other patents that are so valuable.  And the reason for that is because within the body of essential patents, not all those patents are equal value.  The studies have shown that a small portion of the essential patents have a significant portion of the value.

Let's go to slide 72.

We are not a toll road.  We are not blocking the construction of anything.  There are alternatives to our technology.  They're just not acceptable because Samsung demands the speed and performance that we're able to achieve.  Doctor Min admitted there are alternatives, but they chose not to use them.

Let's go to slide 33.

FRAND is typically, quote, lower.  You will read every single word of Judge Gilstrap's instructions.  You will never see that said.  Samsung pays immense amounts of revenue for patents.

Let's go to slide 104.

If you go to DTX 17, under the standards for FRAND, if there is a dispute and there is not agreement, a court of law applying the national laws of the country is what governs.

Let's go to slide 57.

Our patents are junk.  Our patents are on reselection which Samsung can't even launch their phones without the use of our technology.  That's what Mr. Han said.

644

Slide 37.

Samsung has 130,000 patents.  It can't identify a single patent that relates to our innovative technology.  It can't identify a single contribution it's made to our technology.

Let's go to slide 62.

Our patents reduce the transmission time interval, and the transmission time interval is critical to the performance.

PTX 16.

The discussion of who receives this verdict is an insult to this process.  The question is, who receives the billions of dollars that are received by Samsung for infringing these patents.  And we heard yesterday from Mr. Dell, Samsung's counsel tried to pretend they make a loss on these phones, they lose billions of dollars on these phones.  It's because their U.S. subsidiary ships all the revenue to Korea.  And the suggestion that we should be ashamed at asking Samsung and its Korean parent to comply with the law?

Let's go to slide 28.

Counsel for Samsung said, we've never heard of using incremental valuation analysis; it's made up.

THE COURT:  You have seven minutes remaining.

MR. SHEASBY:  Samsung's paid damages expert testified under oath that it's the method that you must use. Samsung's internal documents, PTX 24 at 10 through 11, emphasize that it's the damages you must use.  You just heard

645

counsel stand up and tell you, we've never heard of incremental profit analysis; it's made up.

It's in their legal filings.  If someone asked you, I'm not too sure about those legal filings, you go to PTX 24 at 10 through 11, and you will see the exact methodology that Mr. Dell applied endorsed by Samsung.

Let's go to slide 101.

The Ox Mobile and the 5G IP agreement.  In what universe are nuisance settlements for patents that are not infringed, not invalid -- not valid, and not essential a comparable agreement?  If you look at the context, if you look at the Judge's instructions, you must focus on comparability.  To focus on patents that have no value is inappropriate.

Three Samsung engineers testified by deposition in this case.  Three Samsung engineers.  Not one of them, not a single one, suggested these patents had any value whatsoever.

Let's go to slide 91.

The suggestion that the Apple and Samsung license agreements with ZTE are worth $165,000 for two patents is a fiction.  You can look through those agreements all day.  The numbers that Mr. Cordell and that Mr. Meyer put up are fictionalized.  They appear nowhere in the agreements.  The agreements are worth hundreds of millions of dollars.

The difference is, is that in those agreements, for example, the Apple and ZTE agreement, it was only a five-year

agreement.  Our agreement goes out through 2037.  Of course the amount they're going to have to pay is higher.  It's over two decades of additional damages.

And the suggestion that Samsung is being discriminated against when Apple paid an immense amount of money to ZTE for only a five-year term, in addition gave us rights to patents that are worth over a billion dollars.

The challenge is that Samsung did not choose to take the opportunity to license it.  And in this court proceeding under the laws of the United States, it cannot give us a billion dollars in patent rights.  It must face the law as it stands, a reasonable royalty.  And you can look at the instructions and you will see nowhere in the instructions a suggestion that Samsung gets a discount because it chooses not to comply with the law.

Let's go to slide 97.

The ZTE agreement with Samsung had no relationship to 5G. Samsung did not get any rights to 5G.  And G+ was retained. And if you go to DTX 041, which is the ZTE/Samsung agreement, you will see that there is no rights to 5G.

THE COURT:  Three minutes remaining.

MR. SHEASBY:  And if there was rights to 3G, ZTE and Samsung's agreement would be vastly more expensive.  And you can see how much more they would have to pay each year if they would have had access to 5G.

Samsung did not comply with the law.  There are consequences to that.  Those consequences exist today.

Let's go to slide 111.

We need to show by a preponderance of the evidence, one pebble on our side, that Mr. Meyer's Ox Mobile agreement is not an appropriate measure of damages under the instructions. That's all we need to show, by one pebble that it's improper to cap our damages at Ox Mobile.  And how could it be proper when Samsung makes over $1.5 billion?

I'd like Mr. Dell to stand because Mr. Dell stayed here and didn't go back to his family.  He stayed here and listened to this closing because he stands behind his analysis.  For you to accept Samsung's number, you must reject Mr. Dell's professionalism.  Samsung's counsel has effectively called Mr. Dell a liar, that he's making something up, that the incremental profit value which you will see referred to repeatedly in the instructions is a falsehood.  Mr. Dell stands behind his analysis.

You may sit.  Thank you, Mr. Dell.

Ladies and gentlemen of the jury, the laws of this country are to be enforced strictly and without fear or favor. We are in your hands.  I thank you for your attention today.

Thank you.

THE COURT:  Ladies and gentlemen of the jury, I'd like to now provide you with just a few final instructions

before you begin your deliberations.

You must perform your duty as jurors without bias or prejudice to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as I have given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions that the Court has given you on the law. Again, do not decide who you think should win this case and answer the questions to reach that result. And one more time, let me remind you that your answers to the questions in the verdict form must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, equal worth, and holding the same or similar stations in life. This is true in patent cases between corporations, partnerships, or individuals.

A patent owner is entitled to protect its rights under the laws of the United States. The law recognizes no distinction among types of parties. All corporations, partnerships, or other organizations stand equal before the law regardless of their size, regardless of who owns them, and

649

they are to be treated as equals.

Now, when you retire to the jury room to deliberate on your verdict, as I've told you, you will each have a copy of these final jury instructions that I'm giving you orally. You'll have a copy in writing to take with you.

If during your deliberations you desire to review any of the exhibits which the Court has admitted into evidence over the course of the trial, then you should advise me by written note delivered to the Court Security Officer, signed by your foreperson requesting one or more exhibits, and I will send those exhibits to you.

Once you retire, you should first select your foreperson and then conduct your deliberations. If during your deliberations you desire to recess, then you should follow all the instructions that I have given you about your conduct during the trial during any such recess.

Now, after you have reached a verdict, your foreperson is to fill in your unanimous answers to those questions in the verdict form, date it, sign it, and advise the Court Security Officer you've reached a verdict. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. And you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Now, any notes that you've taken over the course of the

trial are aids to your memory only.  If your memory should differ from your notes, then you should rely on your memory and not your notes.  The notes are not evidence, and a juror who has not taken notes must rely on his or her own independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.

Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony and evidence.

Now, if you want to communicate with me at any time during your deliberations, then you should give a message or a question in writing to the Court Security Officer and that should be signed and dated by your foreperson.  The Court Security Officer will then bring it to me, and I will respond to you as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.

And I will always first disclose to the attorneys in the case any question and my intended response before I respond to any question you might send me.

Now, after you have reached a verdict, ladies and gentlemen, and I have discharged you upon acceptance of that verdict and you are no longer jurors in this case, then I want you to understand at that time you are perfectly free to talk about your experience in this trial and as jurors with anyone

of your choosing.

By the same token, you have absolutely no obligation to talk with anyone about your experience as jurors.  Whether you discuss this experience or not is 100 percent up to you and no one else.

I'm now going to hand eight printed copies of these final jury instructions and one clean copy of the verdict form to the Court Security Officer who will deliver it to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room and conduct your deliberations.  We await your verdict.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, awaiting either a question or note from the jury or the return of their verdict, we stand in recess.

MR. SHEASBY:  Thank you, Your Honor.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, the Court's received a note from the jury.  I'm going to mark it with a '1' in the upper right-hand corner for identification.  I'll read the note and then I'll hand the original to the Courtroom Deputy.  It simply says, "May we have a calculator?"  Signed by Ms. Smith, Juror No. 7.  So I assume she is the foreperson.

I'll hand the original note to the Courtroom Deputy.

I'm also informed by the Court Security Officer that after the note came out, the jury knocked on the door and told him they found a calculator in a drawer in the jury room. So my intention is simply to instruct the Court Security Officer to tell the jury they may use the calculator that's already in the jury room. Anybody have an objection to that?

MR. SHEASBY: No objection for Plaintiff, Your Honor.

MR. CORDELL: No objection from Defendants, Your Honor.

THE COURT: Mr. Richardson, if you will make sure the jury knows they are permitted to use the calculator they found.

THE COURT SECURITY OFFICER: Yes, sir.

THE COURT: All right. Pending another note or a return of a verdict, counsel, we stand in recess.

(Deliberations continue.)

THE COURT: Be seated, please.

Counsel, I've received the following from the jury: "We have a verdict." Signed by Ms. Smith as foreperson. I'll mark it with a '2' for identification in the upper right-hand corner and I'll hand the original note to the Courtroom Deputy.

All right. Just out of an abundance of caution, let me

ask, is there anything I should hear from either party on before I bring in the jury and receive their verdict?

MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

MR. CORDELL:  Nothing from Defendants, Your Honor. Thank you.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen. Ms. Smith, I understand you're the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Would you hand the completed verdict form to the Court Security Officer, who will bring it to me?

All right, ladies and gentlemen of the jury, I'm going to announce the verdict into the record at this time.  I'm going to ask each one of you to listen very carefully as I do this because after I've announced the verdict into the record, I'm going to ask each of you if this is your verdict so that we can confirm on the record that it is, in fact, the unanimous verdict of all eight members of the jury.

Turning to the verdict form and beginning on page 4, Question No. 1:  "What sum of money, if paid now in cash, do you find by a preponderance of the evidence would fairly and

reasonably compensate G+ for Samsung's infringement of the '776 Patent?"

The jury's answer is: "$61 million."

Question No. 2: "What sum of money, if paid now in cash, do you find by a preponderance of the evidence would fairly and reasonably compensate G+ for Samsung's infringement of the '130 Patent?"

The jury's answer is: "$81 million."

Turning to page 5, which is the last page of the verdict form, I find it's dated with today's date, April the 17th, and it's signed by Ms. Smith as the foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you to make sure that this verdict reflects the unanimous agreement of all eight members of the jury.  If this is your verdict as I have read it, would you please stand up?  Thank you, ladies and gentlemen.  Please have a seat.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury.  This confirms that this is the unanimous verdict of all eight members of the jury.  The Court accepts your verdict and I'll hand the original verdict form to the Courtroom Deputy.

Ladies and gentlemen, this now completes the trial in this case.  From the very beginning I have instructed you time and time again about not discussing the case with anyone and

various other things that I've required of you regarding your conduct as jurors in this case. Having accepted your verdict, I am releasing you as jurors. You are released from all those instructions. You may, if you choose, talk with anyone you'd like to about your experience in this case. On the other hand, if you would prefer not to, you are under no obligation to talk with anyone about your experience in this case. It is completely up to you 100 percent.

Also, ladies and gentlemen, I want to take a minute to thank you personally and on the record for your hard work and your attention, your time and your sacrifice in this trial. It has been a sacrifice in every sense of the word. You've paid careful attention, you've focused on the evidence, and you've done everything I have asked you to do with regard to your conduct over the course of the trial, and I thank you on behalf of myself and the Court staff and the parties in this case, I thank you for that service.

I would like to ask a favor of you, though. Having released you as jurors, you are free to go, but I would like as a personal favor when you leave the jury box in just a few minutes if you would go back into the jury room and let me join you in the jury room. I would like to come in, I'd like to shake each hand of each member of the jury personally, look each one of you in the eye and tell you face-to-face thank you for your service. I would consider that a very real honor,

and I consider that that is fully warranted by the commitment and the public service you've rendered by serving on this jury. I promise I won't keep you very long, but if you'd let me thank you personally before you leave, I would consider it a great privilege.

Now, there's one other thing I need to let you know about, and that is that the practice and the custom in the Marshall Division of the Eastern District of Texas has been for decades that when you leave this building and go down the front steps, it is entirely likely that several of the lawyers in this case are going to be standing on the sidewalk down there. They are hoping that you will want to stop and talk with them about what you thought about the trial, what you thought about their presentations, your reactions, and thoughts about the entire process.

You don't have to talk to anybody, and they are not going to try to block you, they're not going to try to initiate a conversation with you; they're just going to make it convenient for you if you want to stop and visit with them.

And that's the way it's been in this division since I started practicing law here a long time ago. If you'd like to talk, I guarantee you, whether they're on the Plaintiff's side or the Defendants' side, they would be more than interested in what you have to say. If you don't want to talk with them they're not going to do anything to impede you in any way,

other than probably smile at you as you walk by.  But that's what you should expect when you leave the building.

When I'm with you in the jury room in just a minute, in addition to thanking you, I'm going to make available to you a slip of paper that has a contact phone number for both sides of this case.  If you think you might want to talk with somebody on either or both sides at a future time but you don't want to stop today, you will have the ability to take one of those slips of paper with you and make a phone call, either tomorrow, next week, next month, next year, whenever it's convenient for you if you want to do that.  If you don't want to talk to anybody on either side of this case, you don't have to in any shape, form, or fashion.  It is completely up to you.  But so you won't feel like, I either have to stop today on the sidewalk or never have a chance to talk with anybody, I'm going to make those phone numbers available to you to give you an extra option if you want it.  But again, it is 100 percent up to you.  You're not required to in any way.

But having tried my share of jury trials before I got this job, I know how interested these lawyers are.  Whether they're on the side that prevailed or the side that didn't prevail, they're interested in what your thoughts and observations and suggestions for them might be.

So it's up to you.  If you want to talk to them, stop and talk today.  If you want to talk in the future or think you

might, take a slip with phone numbers on it.  If you're sure you never want to talk to anybody, you don't have to, and there's nothing that will require you to.  But I want you to know what to expect.

So with that, ladies and gentlemen, I'm releasing you as jurors, and I would look forward to just a moment with you in the jury room to thank you personally for your service.

With that you're excused.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, it's 10 minutes after 1:00.  I need about 20 minutes with the jury, give or take.  If it's convenient, I'd like to see Mr. Sheasby and Ms. Truelove and Ms. Smith and Mr. Cordell in chambers about 1:30.  I won't keep you, but I'd like to spend a minute with you.

This completes the trial of this case.  You are excused, counsel.

The Court stands in recess.

(The proceedings were concluded at 1:10 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                04/17/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER